**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS; TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | § § § § § | |
| Plaintiffs, | § § | Case No. 2:__-cv-000__-Z |
| v. | § § | |
| ELIZABETH RICHTER, in her official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the Department of Health and Human Services; the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA, | § § § § § § § § § § § § § § | |
| Defendants. | § § § | |

**COMPLAINT**

**I. INTRODUCTION**

1.     The poor shall always be with us. Texas, like every State, seeks to ensure its most vulnerable citizens have an opportunity to obtain quality healthcare despite their limited means. And like every State, Texas has "developed intricate statutory and administrative regimes over the course of many decades" to deliver these vital healthcare services through the Medicaid system. *Nat'l Fed'n of Indep. Bus. v.*

1

*Sebelius*, 567 U.S. 519, 581 (2012) ("*NFIB*"). As of the filing of this Complaint, Texas offers Medicaid to approximately 4.3 million of its citizens. Tex. Health & Human Servs. Comm'n*, Texas Medicaid and CHIP Reference Guide*, at 2 (13th ed. 2020), https://tinyurl.com/y4bhjfyv.

2.     Texas and the federal government cooperate to make Medicaid available in Texas. Generally speaking, Texans fund Medicaid through billions of dollars of taxes, and the federal government returns a portion of those taxes in the form of grants to implement Medicaid. *See NFIB*, 567 U.S. at 581 (reporting a federal government estimate that it would spend at least $3.3 trillion between 2010 and 2019 on Medicaid expenditures). Participating States, including Texas, accept those grants in exchange for providing medical assistance to needy individuals subject to federal-law requirements.

3.     Texas is a (famously) large State with substantial regional differences in population, population density, demographics, health needs, and geography. By default, federal law imposes a variety of statewide requirements on state Medicaid plans. For example, fee-for-service Medicaid must provide a "free choice of providers" to all enrollees statewide, which generally prohibits a State from requiring participants to select a specific provider designated by the State. 42 U.S.C. §§ 1396a(a)(23), (e)(2), 1396n(a)-(b), 1396u-2; *see also, e.g.*, 42 C.F.R. § 431.51.

4.     Federal law contemplates that each State is different, and that different States will sometimes need to vary from uniform requirements under Medicaid. Federal law therefore empowers federal authorities to allow States to deviate from

2

federal Medicaid requirements in various ways—including through a demonstration project, by which a State may propose alternative means of serving some part of its Medicaid population, a waiver, by which a State may be excused from one or more Medicaid requirements, or both.[1]

5.      Texas depends on a number of waivers and demonstration projects to implement its Medicaid program. The one at issue here is the Texas Healthcare Transformation and Quality Improvement Program ("THTQIP" or the "Demonstration Project"). Texas has relied on THTQIP in some form since 2011. Since 2011, Texas's THTQIP has been extended 3 times: in 2016, 2017, and 2021. Texas is in routine contact with the federal government on numerous aspects of its Medicaid program, including the Demonstration Project, other related waivers or authorities, and the State's overall Medicaid plan.

6.      Archetypal examples of how States can serve as laboratories of democracy, demonstration projects allow States to experiment with innovative ways to manage complex healthcare systems. They are temporary by design, enabling both state and federal Medicaid regulators to examine and update these experiments periodically. Because they are temporary, a State employing a demonstration project may require extensions or additional demonstration projects in order to complete a significant healthcare-related goal. Like other States, Texas has used its demonstration projects to achieve (among other things) the goal of shifting from an

---

[1] *See generally Medicaid 101: Waivers*, MACPAC, https://www.macpac.gov/medicaid-101/waivers/ (last visited May 14, 2021) (summarizing the distinction between waivers and demonstration projects).

outdated fee-for-service delivery model for Medicaid to a modern, managed-care-provider delivery model.

7.      States who engage in demonstration projects are required to gather data along a variety of metrics in order to determine whether various components of the project are working as intended, advancing the goals of Medicaid, and better providing healthcare for citizens in need. This data allows state and federal governments to see what policies work before rolling them out to larger segments of the population.

8.      The temporary nature of demonstration projects also carries significant risks and drawbacks for the States. Implementation of modern healthcare programs requires considerable investments of time and treasure by both private and public actors, meaning that significant healthcare policies cannot be changed overnight. A State that engages in a demonstration project requires periodic approvals extending the current project or implementing a new project. Federal regulators scrutinize state proposals closely, including any waivers of general federal requirements a State may request as part of a proposed project. State and federal officials may negotiate for months regarding the particulars of these waivers. Failure to obtain approval of an extension to a demonstration project can leave a State with policies that are half-implemented and without an immediate option to reverse course.

9.      The nature and significance of many demonstration projects demand that all parts of a State act immediately once it receives approval. By their nature, demonstration projects involve the provision of vital care to a State's most needy

citizens. Federal approval of a demonstration project sometimes necessitates lawmaking, executive guidance, or regulatory action, requiring a State's legislature, governor, and relevant administrative agencies to act. And because these projects include components that will be performed under contract with private entities, they often involve complex bidding processes or contract amendments that can take a substantial amount of time to complete. In both situations—whether by way of actions by a State's public officials or by means of negotiations with private actors— a State must move swiftly once it has regulatory approval to implement programs providing care for those in need in order to make the most of the limited time available before the approval process must start anew.

10.     Such dispatch was particularly necessary in this instance. Following the onset of COVID-19 in early 2020, Texas's healthcare system faced a severe market contraction because of changes in healthcare consumption related to the virus. This, in turn, introduced an unexpected problem in Texas's THTQIP: The project was designed to expand managed care to additional populations and services with an aim at aligning incentives between providers and patients, increasing financial stability, and creating opportunities for reimbursement of uncompensated costs in the system. Yet the virus was an exogenous event that dramatically increased the demand for emergency care and decreased the willingness of Medicaid beneficiaries to obtain

healthcare that was not immediately necessary.[2] This event made it difficult to consistently measuring key metrics of plan success.

11.    To examine and ultimately address these closely intertwined issues, Texas commissioned a survey of all healthcare providers, including providers in its Medicaid network, in fall 2020. This survey led the State to conclude that it needed to allay providers' fears by securing additional time for its current Demonstration Project. Providers told the State that the increased costs and decreased revenue wrought by the pandemic had significantly depleted their remaining financial resources. As a result, providers were faced with multi-year decisions—whether to renew leases for their clinics, and whether to continue employment contracts, for example—all of which hinged on Texas's plans for the Demonstration Project.

12.    Seeking such an extension from federal authorities would allow Texas to ensure stability in its healthcare markets, to avoid a harmful contraction, and to gather more information about the efficacy of its current project. Texas filed a fast-track request for an extension from federal regulators of THTQIP in November 2020. Ex. A.[3]

13.    On January 15, 2021, after more than a month of negotiations—and significant concessions by Texas—CMS approved an extension of Texas's current Demonstration Project, with new agreed-upon terms and conditions and a new end-

---

[2] Mark E. Czeisler, et al., *Delay or Avoidance of Medical Care Because of COVID-19-Related Concerns*, Centers for Disease Control (Sept. 11, 2020), https://tinyurl.com/ydwbh997.

[3] Unless otherwise specified, all references to exhibits are to documents attached to the Declaration of Lanora C. Pettit.

date of September 30, 2030. Texas began operating under the new terms and conditions that same day. Ex. B (Approval); Ex. C (Acceptance). As both usual and expected, Texas immediately took action to shore up its provider network, continue modernizing its healthcare delivery system in view of that longer time horizon, and meet the deliverables of the agreement that were only months away.

14.    That reliance proved costly. On April 16, 2021, with mere weeks remaining in the Texas Legislature's regular session, and without prior notice or an opportunity for Texas to provide input, the acting Administrator for the Centers for Medicare & Medicaid Services sent Texas an eight-page letter purporting to "rescind[] [its] approval of the State's . . . demonstration extension approval." Ex. C at 7. This letter acknowledged the potential "adverse consequences that might result from the [S]tate or providers in the [S]tate making plans based on the January 15, 2021 approval." *Id.* Nonetheless, the letter purported to reinstate the previous version of the Demonstration Project with the previous 2022 expiration date. *Id.*

15.    Federal authorities may not topple a State's Medicaid system as a child might a sandcastle. Neither the Social Security Act, 42 U.S.C. ch. 7, nor Defendants' own regulations, 42 C.F.R. pt. 430, empower the federal government to rescind a demonstration project: In other words, "once the Secretary authorizes a demonstration project, no take-backs." *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 233 (5th Cir. 2019).

16.    Even if the Administrator had that authority, her eight-page letter would not suffice for a host of reasons. For example, the letter was issued in violation

of agency regulations, without even minimal prior notice to the State or the required notice-and-comment that such a regulatory action requires. Moreover, it gave no indication that Defendants considered options less disruptive than they chose, which threatened to rip a thirty-billion-plus-dollar hole in Texas's budget and deprive millions of Texans of improved care coordination. Agency action impacting this many lives requires at least some consideration of less destructive policies. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020). Even more troubling, reports since the letter suggest that there was an ulterior—and unconstitutional—motive behind the Administrator's utter disregard of administrative procedural safeguards: to force Texas into expanding Medicaid under the Patient Protection and Affordable Care Act. Ex. E. It suffices to say that the Administrator may not accomplish by letter what Congress could not by law. *See NFIB*, 567 U.S. at 581.

## II. PARTIES

17.    Plaintiff Texas is a sovereign State. Texas brings this suit both on its own behalf and on behalf of its citizens *parens patriae* in order to preserve much-needed stability in its healthcare system, ensure the federal government complies with statutory and administrative limitations when considering official actions that affect millions of Texans, and vindicate its sovereign prerogative not to be coerced by an Administration ostensibly unconcerned with structural limits on its power. *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam).

18.     Plaintiff Texas Health and Human Services Commission ("HHSC") is an administrative agency organized under the laws of Texas. It is the state agency designated under 42 C.F.R. § 431.10 to administer Texas's Medicaid program and demonstration projects related to that program. For simplicity, HHSC will be referred to collectively with the State as "Texas."

19.     The Centers for Medicare and Medicaid Services ("CMS") is a federal agency organized under the laws of the United States. It is responsible for federally administering Medicaid, and for approving State applications for demonstration projects and waivers under Medicaid. CMS maintains a regional office in the State of Texas for administering its operations in Arkansas, Louisiana, New Mexico, and Texas. CMS is a part of the United States Department of Health and Human Services ("HHS").

20.     Defendant Elizabeth Richter, named in her official capacity, is the Acting Administrator for CMS. She signed the April 16 letter, which purported to rescind the extension of THTQIP.

21.     Defendant United States Department of Health and Human Services is a federal agency organized under the laws of the United States. It is responsible for administering federal healthcare policy and is the cabinet-level Department of which CMS is a part.

22.     Defendant Xavier Becerra, named in his official capacity, is the Secretary of HHS. As Secretary of HHS, Becerra is charged by statute with approving

demonstration projects and waivers. Recent regulations also require that he personally approve significant guidance documents. 45 C.F.R. § 1.3(b)(1)-(2).

23.     Defendant United States of America is the federal sovereign.

### III. JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this suit concerns the constitutionality and legality of actions taken by federal agencies and federal officers in their official capacity.

25.     Court has subject-matter jurisdiction over the United States under 5 U.S.C. § 702, which waives federal sovereign immunity.

26.     This Court is authorized to issue the requested declaratory and injunctive relief under 28 U.S.C. §§ 1361, 2201-02, Federal Rules of Civil Procedure 57 and 65, and by the general legal and equitable powers of this Court.

27.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) because the United States, two of its agencies, and two of its officers in their official capacity are Defendants. Plaintiff the State of Texas resides in this judicial district, and a substantial part of the events or omissions giving rise to Texas's claims occurred in this district. Residents of Tyler and healthcare providers in Tyler would realize significant benefits from THTQIP. THTQIP provided the authority under which Medicaid beneficiaries who resided in Texas were transitioned from an outdated fee-for-service delivery model to a modern managed-care model. *See infra* at ¶ 37. As a result, Medicaid beneficiaries residing in Tyler have access to high-quality healthcare model only because of the Demonstration Project.

28.     Texas has standing to challenge the April 16 letter. CMS's attempt to withdraw approval of the extension of Texas's Demonstration Project destabilizes Texas's healthcare system, threatens to impose significant additional financial costs on the State, and will lead to significant reductions in the quality and availability of care for Texans—including residents of this District. If allowed to stand, these statewide costs could run into the tens of billions of dollars. Texas has also already taken administrative and regulatory actions in reliance on CMS's January approval of its new extension, the costs of which will be compounded if Texas is forced to re-negotiate a new demonstration project on a compressed timeline.

29.     Texas also has standing *parens patriae* to bring this action on behalf of the hundreds of thousands, if not millions, of Texans whose ability to access healthcare will be adversely affected if CMS's unlawful decision is permitted to stand.

## IV. FACTUAL BACKGROUND

### A. Overview of Medicaid

30.     Since 1965, Medicaid has been a prime example of "cooperative federalism," under which programs are "financed largely by the federal government" but "administered by the States." *King v. Smith*, 392 U.S. 309, 316 (1968). A State that elects to participate in Medicaid must propose a comprehensive plan that meets numerous federal-law requirements. *See* 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10-.25. Once that plan is approved, the State becomes entitled to federal reimbursement for certain covered services. 42 U.S.C. § 1396b; 42 C.F.R. § 430.30(a)(1).

31.     The precise compensation rates to which a State is entitled under Medicaid vary. It is largely based on a federal medical-assistance percentage, which,

for Texas, is currently 68%. *Federal Medical Assistance Percentage (FMAP) for Medicaid and Multiplier*, KFF, https://tinyurl.com/wwjs4nn4 (last visited May 14, 2021).

32.     States may provide Medicaid benefits to qualifying citizens under one of two basic models for healthcare delivery: a fee-for-service model or a managed-care model.

33.     In a fee-for-service model, a doctor who treats a Medicaid beneficiary submits a reimbursement request to the relevant state agency, and, after confirming the beneficiary's eligibility and the need for the treatment, the State pays the doctor.[4] The State then seeks partial reimbursement from the federal government for all qualifying expenditures, typically on a quarterly basis. 42 C.F.R. § 430.30(a)(2); *Bowen v. Massachusetts*, 487 U.S. 879, 883-84 (1988).

34.     The fee-for-service model has several substantial drawbacks. It can decouple the incentives of doctors and patients such that patients may receive expensive procedures either unnecessarily or prematurely. The fee-for-service model likewise leads to patients receiving insufficient preventative care, which tends to be less expensive, instead relying on more expensive emergency care. *See Better Care. Smarter Spending. Healthier People: Why it Matters*, Ctrs. for Medicare & Medicaid Servs. (Jan. 26, 2015), https://tinyurl.com/u2h43w25, *see also, e.g.*, Michael E. Porter

---

[4] *Fact Sheet: The Medicaid Fee-for-Service Provider Payment Process*, MACPAC (July 2018), https://tinyurl.com/z4vfk8km.

& Robert S. Kaplan, *How to Pay for Health Care*, Harvard Bus. Rev. (July-Aug. 2016), https://hbr.org/2016/07/how-to-pay-for-healthcare.

35.    In a managed-care model, the State contracts with insurance companies to provide Medicaid benefits. The State pays a managed-care organization a monthly premium, known as a "capitation payment," for each Medicaid beneficiary, regardless of that beneficiary's immediate health needs. The organization then assumes the risk of the beneficiary falling ill—and thus has an incentive to encourage patients to use primary-care physicians and preventative care, rather than specialists and emergency care. *Medicaid Managed Care: CMS's Oversight of States' Rate Setting Needs Improvement*, U.S. Gov't Accountability Off. GAO-10-810 (Aug. 4, 2010), https://www.gao.gov/products/gao-10-810.

36.    Congress, the States, and the health-insurance market have largely shifted from what is perceived as an out-of-date fee-for-service model to the managed-care model of healthcare. *See* Aaron Mendelson et al., *New Rules for Medicaid Managed Care—Do They Undermine Payment Reform?*, 4 Healthcare 274, 274 (2016).

37.    Texas has joined this general trend, beginning in 1993 with the State of Texas Access Reform ("STAR") program, implemented in Travis County and in the Tri-County Area of Chambers, Jefferson, and Galveston counties. This program itself began through a waiver under section 1915 of the Social Security Act. 42 U.S.C. § 1396n. The program proved successful, and the Texas Legislature's 2012-2013 biennium appropriation directed HHSC to transition Texas's Medicaid program to

the managed-care model statewide. Ex. D at Attachment M (describing history of THTQIP).

**B. Section 1115 Demonstration Projects**

38.　　Waivers like those that led to the STAR program are necessary because, by default, the Social Security Act imposes numerous requirements regarding a State's Medicaid plan that are not always administrable immediately or in large States. These requirements include obligations that apply statewide or to an entire class of beneficiaries in that State. 42 U.S.C. § 1396a(a)(1).

39.　　As a practical matter, it is more difficult for geographically and demographically diverse States to meet these broad requirements than it is for smaller and more homogeneous States to do so. For example, section 1902(a)(23) entitles beneficiaries to receive services from a participating Medicaid provider of their choice. 42 U.S.C. § 1396a(a)(23); 42 C.F.R. § 431.51. As a result, a State must allow a Medicaid member to be treated by any willing Medicaid provider in the State. This and similar Medicaid requirements constrain a State's—and particularly a large State's—ability to tailor a proposed Medicaid plan to the unique needs of its population.

40.　　But Federal law provides CMS several ways to grant States additional flexibility. Section 1115 of the Act is one such process. It empowers the Administrator[5] to authorize "any experimental, pilot, or demonstration project which,

---

[5] The Act authorizes the Secretary of HHS to approve these projects. 42 U.S.C. § 1315(a). HHS has largely delegated this authority to CMS's Administrator. 42 C.F.R. § 430.25(f)(2). Recent changes reserve to the Secretary a non-delegable

in the judgment of the Secretary, is likely to assist in promoting the objectives of" the Act "in a State or States" by "waiv[ing] compliance with any of the requirements" of various parts of the Act "to the extent and for the period he finds necessary to enable such State or States to carry out such project." 42 U.S.C. § 1315(a), (a)(1). This enables a State to propose an alternative plan that varies from the Social Security Act's default requirements, but that serves the goals of Medicaid and Medicaid beneficiaries within the State. *See Forrest Gen. Hosp.*, 926 F.3d at 224.

41.    Modernizing a State's Medicaid system is a challenging endeavor further complicated by the many requirements a Medicaid plan must satisfy. As part of its efforts to shift from a fee-for-service to managed-care Medicaid model, Texas adopted THTQIP, a demonstration project under section 1115.[6]

42.    Texas first requested approval for THTQIP in July 2011, and it was approved in December 2011. Under the demonstration as initially approved, Medicaid managed-care was expanded statewide and funding pools were established to reimburse providers for uncompensated-care costs, and to provide incentive payments to certain healthcare providers that implemented delivery-system reforms. To be effective, the project authorized the State to require Medicaid beneficiaries to enroll in a managed-care organization and expanded both the product lines that

---

authority to review certain guidance documents. 45 C.F.R. § 1.3(b)(1)-(2). Defendants did not invoke this new regulation to justify the Administrator's actions, nor did they claim in the April 16 letter that the Secretary reviewed the Administrator's letter.

[6] Unless otherwise specified, information regarding the history of the Demonstration Project is taken from Exhibit D, Attachment M.

Texas Medicaid would provide through managed-care organizations and the State's eligibility criteria.

43.     During THTQIP's original five-year period, the State engaged in a series of steps to gradually expand covered services and service areas. For example, when initially created in 2011, THTQIP focused on expanding quality care to children, disabled adults, and those needing behavioral-health services. Effective September 1, 2014, managed-care organizations began providing services to eligible adults over age 21 and residing in certain Medicaid rural service areas. A new beneficiary population was also added to acute-care managed care: individuals with intellectual disabilities or a related condition. In 2015, nursing-facility services were also added to benefits administered under managed care.

44.     In 2016, THTQIP again expanded to provide a separate program for services to children and young adults with complex developmental and physical conditions, including those needing home- and community-based services to avoid institutionalization. Eligible children who had been in fee-for-service were moved to this new managed-care program.

45.     Because transforming a State's entire healthcare model takes more than five years, the State sought an extension of THTQIP in September 2015. In May 2016, CMS granted a fifteen-month extension to allow the State to demonstrate the results it had obtained during the first five years of the project. During this period, the managed-care model was again expanded to cover beneficiaries in the Department of

Family Protective Services' adoption-assistance and permanency care programs, and women receiving care through the breast- and cervical-cancer program.

46.     Due to the gradual expansion of the managed-care model through THTQIP—conducted with the full knowledge and support of Defendants and their predecessors—Texas operated much of its Medicaid program under that five-year extension to the Demonstration Project (until it was superseded by the January 15, 2021 version of THTQIP). *See* Ex. F at 3 ("The waiver also represents the authority for most Texas Medicaid managed care, which is the service delivery model for about 93 percent of Texas Medicaid clients."). That extension took effect January 1, 2018, and was originally scheduled to end on September 30, 2022. Ex. D at 1.

**C. Delivery System Reform Incentive Program**

47.     Texas's Demonstration Project also continued the State's ongoing efforts to modernize its Medicaid delivery model in other ways. That is, Texas was able to use the savings made available by transitioning away from the expensive and inefficient fee-for-service model to finance an incentive program to expand coverage— particularly in rural and semi-urban areas. Through this process, Texas set region-specific goals addressing region-specific health needs and appointed local coordinators to address these goals. To encourage those regions and their coordinators to achieve quantifiable metrics regarding those goals, the Demonstration Project implemented the Delivery System Reform Incentive Program or "DSRIP." *See generally* Ex. D, Attachment Q; *All Texas Access*, Texas Health and Human Services, https://tinyurl.com/ydsjzzhx (last visited May 14, 2021) (collecting information regarding regional plans for DSRIP programs).

17

48. Throughout its existence, DSRIP has complemented this local coordination structure by establishing a pool of funds through which the statewide Medicaid program could pay performance bonuses to regions or providers for improvement along a variety of identifiable measures relating to specific health-related issues, such as primary care and prevention, pediatric primary care, and maternal care. Ex. D, Attachment R at 1-3.

49. DSRIP participants have received over $20 billion since its inception. These funds have gone to "offer[] flexibility to 1) innovate to deliver better care and improve health outcomes; and 2) deliver services not traditionally billable to insurance but that can improve health." Ex. G at 2. These include disease prevention, chronic-care management, and care coordination and care transitions—particularly for patients with complex conditions (*e.g.*, developmental disorders, cerebral palsy, etc.). *Id.* For example, a hospital in Port Lavaca used the $1.2 million it received per year to "start an outpatient behavioral health program geared toward older adults and expand its cardiac rehabilitation program." Aisha Ainsworth, *DSRIP: How Texas Hospitals Navigate the Make-or-Break Transition*, Texas Hospital Association, https://tinyurl.com/a6z4fjrw.

50. Nearly 300 entities participate in DSRIP, and under the current Demonstration Project, federal support for DSRIP is set to expire in September 2021. If DSRIP expires without a replacement, these entities will immediately lose a substantial amount of their funding. This would be devastating as Texas, which is more than 70% rural, "ha[s] the continued threat of rural hospitals and health care

18

facilities closing every year across our [S]tate." *Id.* (internal quotation marks omitted).

51.     Both prior to the COVID-19 pandemic and during the early stages of negotiating the Demonstration Project extension, Texas spent a significant amount of time and effort working with CMS on a transition and extension plan for DSRIP. As discussed in greater detail below, these transition plans would ultimately be merged into the larger extension of the Demonstration Project.

**D. The COVID-19 Pandemic**

52.     In late 2019, COVID-19 began spreading throughout the globe, causing untold disruption wherever it went. By spring 2020, it had swept through the United States, including Texas. Neither federal nor state authorities anticipated the scope of the COVID-19 pandemic, or the level of disruption it would inflict on healthcare delivery in Texas and elsewhere.

53.     This disruption interrupted normal planning and healthcare activities statewide, including Texas's plans to transition DSRIP, as all resources were tasked with responding to the once-in-a-century pandemic. Texas was also unable to engage stakeholders in transition planning effectively as providers were similarly focused on the immediate peril Texans faced from the virus. In acknowledgement of this disruption, CMS extended deliverable dates for key DSRIP transition activities. Because the success of the DSRIP transition was in jeopardy even with these concessions, Texas sent CMS a letter on October 16, 2020, requesting that DSRIP be extended for one-year.

54.     Meanwhile, COVID-19 imposed an immense strain on Texas's Medicaid program in two ways. *First*, the unpredictable—and unpredictably significant—effects of COVID-19 sweeping across the State introduced uncertainty into the various performance metrics the State gathered in evaluating the success of its regions and, ultimately, the Demonstration Project. *See, e.g.*, Ex. A at 20.

55.     *Second*, COVID-19 imposed severe financial pressures on healthcare providers, jeopardizing Medicaid beneficiaries' access to care in the future. Concerns over healthcare capacity given rapidly mounting cases led Texas, like many States, to restrict providers' ability to perform many procedures to preserve personal protective equipment and hospital capacity. *See* Office of the Texas Governor, Executive Order No. GA-9, https://tinyurl.com/3fazkpja. Some providers nevertheless exceeded their maximum capacity in order to treat COVID-19 patients.

56.     Paradoxically, there were many other providers that faced financial strain because patients were either unable or unwilling to seek treatment for non-emergency conditions. *See, e.g.*, Czeisler, *supra* n.2. Indeed, more than four patients out of ten have chosen to forgo treatment at some point during the pandemic. Tanya Albert Henry, *Why 41% of patients have skipped care during COVID-19 pandemic*, AMA (Feb. 15, 2021), https://tinyurl.com/w4k7276p. Empty waiting rooms combined with the increased costs of staffing and equipment shortages inevitably strained providers, particularly in poorer or more rural areas. *Patient Visits Cut in Half or More; Practice Revenues Slashed*, Texas Medical Association (May 20, 2020), https://tinyurl.com/w255xus4 ("[M]any physician practices work on a fairly tight

margin of profit, especially those who see a lot of Medicare, Medicaid, or HMO patients. . . .") (internal quotation marks omitted).

57.    A November 2020 survey suggested that these pressures threatened the long-term stability of Texas's Medicaid provider network unless Texas acted immediately. *See generally* Ex. H. The survey revealed that COVID-19 financially stressed many providers: 76% of respondents expressed that they were extremely or very concerned about COVID-19's financial impacts. *Id.* at 5. Of survey respondents, 42% reported reducing their operating hours; 23% reported closing locations or facilities; 20% reported reducing non-COVID-19-related services; and 27% reported that COVID-19-related demand exceeded provider capacity. *Id.* at 6.

58.    Concerns regarding COVID-19 and the forthcoming expiration of DSRIP were expressed to HHSC and state elected officials in the months leading to the fast-track application and were repeated in public hearings that were held in December 2020. Ex. I. "Provider representatives noted that the approval [of an extension to the Demonstration Project] would allow them to focus on their responses to the COVID-19 public health emergency without the added burden and financial uncertainty created by the DSRIP transition and the 1115 waiver." *Id.* at 3.

59.    As a result of these communications, HHSC recognized signs of a developing market contraction across the State. Bilse Decl. ¶ 4; Grady Decl. ¶¶ 3-4, 9. HHSC research and experience suggested that it would take years for a major economic sector like the healthcare market in Texas to recover from the type of

contraction that would result if immediate action were not taken to stabilize the system. *Cf.* Grady Decl. ¶¶ 8.

### E. Budget Neutrality and COVID-19

60.    A key facet of THTQIP is that Texas may not receive federal reimbursement for any expenditures above the amount that CMS estimated would be spent under the Medicaid program *without* a waiver. CMS issued guidance that it planned to change the method for calculating budget neutrality limits for States with mature waivers on August 22, 2018.

61.    Under this new method, CMS would calculate spending estimates for future waiver extensions using the second-to-last year of the then-existing waiver. Under Texas's waiver without the extension as relevant here, that year would have been the period from October 1, 2020 through September 30, 2021. Yet this year will have been either wholly or in large part encompassed by the COVID-19 public-health emergency, meaning that Texas's expenditures for that calculation period will vary significantly from normal levels.

62.    The uncertainty surrounding these abnormal budget-neutrality calculations posed a serious risk for Texas and its Medicaid providers. While Texas providers were aware of the imminent fiscal jeopardy created by the pandemic, they did not expect this second dimension of uncertainty associated with inaccurate data and the possibility of losing DSRIP. But, adding insult to injury, even if Texas were able to create solutions to mitigate the loss of DSRIP in the final year of the current waiver, there was no option to provide long-term stability under this new CMS policy.

## F. Texas's Application to Extend the Demonstration Project

63.    Given these prominent and rising concerns, on November 27, 2020, HHSC published notice in the Texas Register that it intended to ask for a five-year extension of Texas's ongoing Demonstration Project. Exs. I & J.[7] On November 30, HHSC followed this notice with the submission of an application to CMS to extend the Demonstration Project. Ex. A.

64.    Such an extension request ordinarily triggers a mandatory notice-and-comment period at both the state and federal level. 42 C.F.R. §§ 431.408, 431.416. Texas completed the state notice-and-comment requirements.[8] Ex. J. But Texas's survey of providers indicated that the financial pressures on its provider network from COVID-19 were so severe and urgent that the additional delay inherent in completion of the standard notice-and-comment process threatened a more severe contraction in healthcare service and provider capacity. Ex. A at 20. CMS confirmed Texas's view separately by offering many flexibilities to Texas to assist with pandemic response, including allowing the State to waive other typical notice requirements, indicating that Texas's application should be exempt from the federal notice-and-comment requirements given these pressures.

---

[7] As required by law, Texas had previously given notice to tribal authorities for Texas's three federally recognized Indian tribes.

[8] Ordinarily, Texas would have completed the state notice-and-comment period before its extension application would have been considered complete. *See* 42 C.F.R. § 431.408. Texas began the process before it submitted the application for a waiver of the federal notice-and-comment period. It completed the state notice-and-comment period notwithstanding the grant of the federal waiver. To the extent that this sequence could be construed as an irregularity (and it should not be), Administrator Richter did not cite it as a reason for rescission of the extension.

65.    At CMS's recommendation, Texas asked for an exemption from the normal public-notice process as permitted by 42 C.F.R. § 431.416(g). In its extension application and in subsequent communications with CMS, Texas outlined the potential effects a market contraction would have on over four million Medicaid beneficiaries. Bilse Decl. ¶ 4; Grady Decl. ¶¶ 10-11.

66.    CMS promptly contacted Texas to discuss its application, and the State provided additional information at CMS's request. Texas also updated its extension request at CMS's prompting.

67.    Days later, on December 15, 2020, CMS informed Texas by letter that its extension application was complete and confirmed that the application was exempt from notice-and-comment requirements. Exhibit K.

68.    As expected for extension requests regarding demonstration projects, federal and state Medicaid authorities negotiated over the contents of Texas's proposed Demonstration Project. Bilse Decl. ¶ 5; Grady Decl. ¶ 9. In response to the State's request for a one-year extension to DSRIP, CMS recommended that Texas incorporate any DSRIP extension into the THTQIP extension. Based on that recommendation, CMS and HHSC agreed to transition away from DSRIP to a Public Health Provider Charity Care Pool ("PHP-CCP"), which would partially replace the expiring DSRIP and reimburse providers for mental-health services, preventative care, and certain other healthcare services when the costs of that care were not offset by another source. Ex. B at 3-4.

69.     CMS and the State agreed to a longer extension term to provide the necessary stability for COVID-19 response and recovery, and the significant transition from DSRIP to PHP-CCP and expanded directed-payment programs. *Id.* at 1.

70.     CMS requested that Texas agree to increased reporting of certain home-and-community-based-services data and reporting related to the methods of finance a State may use under a waiver. CMS represented that these changes were a mandatory condition of the extension; Texas therefore agreed, despite the significantly greater administrative burden associated with this requirement.

71.     CMS further required Texas to agree to recalculate the limitations of its uncompensated-care program twice during the terms of the longer waiver. These changes may reduce future expenditure authority; nonetheless, Texas agreed.

72.     On January 15, 2021, CMS granted Texas's application, authorizing an extension of Texas's Demonstration Project as modified through the parties' negotiations, continuing THTQIP through 2030. *Id.* This approval reflected the need to work through details of how extended Demonstration Projects would interact with other aspects of Texas's Medicaid program. For example, Texas expected to receive $7 billion to support directed payments to entities that would provide (among other things) increased access to medical, nursing-facility, behavioral-health, and public-health services, as well as care to children with complex conditions. *Id.* at 5-6 (noting that the State "intends to submit requests for CMS approval for directed payment programs").

25

73.    Texas immediately began implementing the new components of its Demonstration Project. HHSC developed rules to implement the PHP-CCP and a tool for providers to use under that new program. *E.g.*, 46 Tex. Reg. 1715 (2021) (to be codified at 15 Tex. Admin. Code § 355.8215) (proposed Mar. 8, 2021) (Tex. Health & Human Servs. Comm'n, Public Health Provider Charity Care Program). Texas likewise submitted implementation documents to CMS. *See, e.g.*, Ex. M.; *Presentation to the Senate Committee on Health & Human Services*, at 41 (Mar. 10, 2021), https://tinyurl.com/7f53e2ht (describing steps necessary to implement the extension). The State's Legislature drafted and took under advisement bills proposing a variety of reporting requirements as well as appropriations regarding PHP-CCP in the current session, which is nearing its close. *See, e.g.*, Tex. S.B. 1, art. 2, § 16, 87th Leg., R.S. (2021).

### G. Acting Administrator Richter's April 16, 2021 Letter

74.    122 days after declaring Texas's application complete, and 91 days after approving Texas's request to forgo notice and comment, Acting Administrator Richter purported to "rescind[] . . . approval of the state's 42 C.F.R. § 431.416(g) exemption request" regarding Texas's extension application, ultimately "withdrawing the January 15, 2021 extension approval" itself and requiring Texas to return to the previous version of the Demonstration, which had been approved by CMS in December 2017. Ex. D at 7.

75.    Prior to April 16, 2021, none of Defendants notified Texas that they viewed CMS's prior approval as defective—much less that it was likely to be withdrawn. Indeed, neither Texas nor HHSC were informed of any concerns

regarding the already-approved extension, let alone given an opportunity to address those concerns or propose ways of remedying them short of withdrawing the extension. Bilse Decl. ¶ 7; Grady Decl. ¶ 12.

76.     In an eight-page letter, Richter asserted that CMS "materially erred in granting Texas's request for an exemption from the normal public notice process under 42 C.F.R. § 431.416(g)," because, according to Richter, "the [S]tate's exemption request did not articulate a sufficient basis for us to conclude . . . [it] was needed to address a public health emergency or other sudden emergency" as required by the regulation. Ex. D at 2. She claimed that the exemption was "contrary to the interests of beneficiaries as well as other interested stakeholders," but declined to suggest what beneficiaries or interests her purported rescission served. *Id.* at 5. She similarly faulted Texas's state-level notice, claiming it "did not reflect the substantial modifications" to the Demonstration Project "that were ultimately approved"— including modifications that were suggested or required by CMS. *Id.* at 1.

77.     Richter then "determined that leaving" the extension approval "in effect would not be an appropriate approach to remedy the underlying procedural errors and [we] are instead withdrawing that extension approval." *Id.* at 7. She did not articulate what Texas might have done to remedy her claimed "procedural errors," or what harms were caused to Texas, Medicaid beneficiaries, CMS, or other parties through those alleged errors. *Id.*

78.     At no point did Richter describe or estimate the cost to Texas to fix those errors, or how that cost compared to the costs on other parties of leaving the claimed

27

errors uncorrected. The letter similarly did not address how any of these costs compared to the costs Texas undertook in reliance on CMS's decision, let alone to the costs to the State, its Medicaid population, and healthcare providers resulting from uncertainty regarding Texas's Demonstration Project. *See generally* Ex. D.[9]

79.     Indeed, Richter's sole acknowledgment of any potential reliance interests is an offhand statement that she purportedly withdrew the January 15, 2021 extension "to avoid uncertainty . . . that could result from reliance on the January 15, 2021 approval." *Id.* at 2. Richter takes the position that there were no reliance interests "because payments from the new uncompensated care pool are not authorized until October 1, 2021." *Id.* at 7. This statement reflects a complete lack of understanding of the complicated task of implementing major healthcare changes that can take years, if not decades to fully implement. Indeed, it does not even seem to consider that the new PHP-CCP pool is designed as a part of the years-long transition away from DSRIP, which will expire on September 30.

80.     The statement also failed to consider Texas healthcare providers' reliance on the approval of the extension and new terms. Providers begin budgeting and planning their business operations months and years in advance as they seek to sign facility leases, execute employment contracts, and make investments in care for the clients they serve. Providers began immediately contacting Texas in January

---

[9] For example, during the state notice-and-comment period, an Indian tribe expressed the intent to use funding available under the extension of the Demonstration project to "establish[] a new clinic." Ex. J at 3. Richter's letter does not mention this interest or how Defendants intend to address this funding shortfall—if at all.

2021 to assist with implementation of the new programs and to ensure their data and billing systems would be compatible with those planned new programs.

81.     Failing to acknowledge the full scope of Texas's reliance interests altogether, Richter also failed to explain whether such reliance interests would have been better served by, among other possibilities, declining to withdraw the approved extension, or merely reducing the length of the extension. Richter claimed, without explaining how, that there remained "sufficient time today to accomplish an extension while respecting all federal legal requirements." *Id.* at 4. But commentators started warning about insufficient time to avoid the upcoming "cliff" more than two years before the Administrator sent her letter. *See, e.g.*, Edgar Walters, *A federal safety net funds health care for uninsured Texans. Time is running short to negotiate its renewal*, Texas Tribune (Mar. 14, 2019), https://tinyurl.com/4atnm9yb.

82.     What Richter *did* cite shows that Defendants had an ulterior motive in rescinding the extension: to force Texas to adopt the Medicaid expansion. The Administrator's letter cites only one set of third-party interests she purports to vindicate: three self-proclaimed interest groups who submitted a letter on December 28, 2020 opposing the extension. Ex. L. Tellingly, however, these groups did not complain about the structure of the Demonstration Project itself. Instead, they complained that "Texas has relied on its waiver funding to address gaps in care that result in large part from the state's failure to expand coverage"—namely, to adopt the Medicaid expansion established by the Affordable Care Act. *Id.* at 1. The letter acknowledges that DSRIP has provided "invaluable access to services for uninsured

29

adults," but complains that the Demonstration Project "never provided comprehensive health coverage" to those who would be covered by Medicaid had Texas accepted the expansion. *Id.* Put another way, these groups do not complain that Texas's extension request changed Texas's Medicaid program in some problematic way. To the contrary, their gripe was that the request "create[d] *no policy changes* . . . to extend the tested innovations and coverage to uninsured adults." *Id.*

83.   These groups have no legitimate interests in using the federal government to leverage a political result that they have failed time and again to obtain through Texas's state political processes. To the extent the Administrator's decision actually relied on these quondam interests, these groups were mere private proxies for the federal government's identical desire: to coerce Texas to accept the Affordable Care Act's Medicaid expansion, an unwanted political decision that Texas's elected leaders have repeatedly rejected.

84.   An April 16, 2021 Washington Post story confirmed this motive to rescind Texas's extension and public-notice exemption. On condition of anonymity, the story reported that two Biden officials confirmed that Richter's decision was "an effort to push [Texas] state officials toward accepting the Affordable Care Act's Medicaid expansion." Ex. E; *see also* Walters, *supra* ¶ 81 (describing "conflict with the Obama administration, which told Texas it would be more cost-effective to provide health coverage via Medicaid expansion" than to maintain the Demonstration Project). It further cited a Biden Administration call pressing Texas officials in March to adopt the expansion, describing those efforts as pressure on a dozen States who

30

have refused to accept the ACA's Medicaid expansion (Ex. E)—a refusal the United States Supreme Court has already vindicated once. *See NFIB*, 567 U.S. at 581.

85.    In the days following CMS's letter and the leak of the Administration's real reason for upending 94% of Texas's Medicaid, CMS employees contacted employees at HHSC. They invited Texas to immediately reapply by submitting the same or a materially identical application and insisted that CMS only sought to correct a "procedural error" or vindicate a process interest by rescinding Texas's extension. *See Hearing on The Fiscal Year 2020 HHS Budget*, 116th Cong. (May 12, 2021), *available at* https://tinyurl.com/9v9y66f4 (discussing Administrator Richter's rescission of Texas's extension beginning at approximately 1:16).[10]

### H. Aftermath of CMS's Withdrawal of Approval

86.    Richter's decision immediately sent a shock through Texas's healthcare system. *See* Grady Decl. ¶ 13. In addition to serving as the authorization for most of Texas's managed-care delivery model, the approved demonstration extension anticipated approximately $7 billion in directed-payment programs. Bilse Decl. ¶ 6; Grady Decl. ¶ 5. HHSC must now determine whether and to what extent to implement those programs given the uncertainty as to whether they will ultimately be sustained.

87.    Without the extension, PHP-CCP cannot be implemented, leaving only DSRIP. But DSRIP and its more than $3 billion in annual funding are set to expire in mere months. Ex. G at 2; *id.* App'x A. DSRIP's expiration, coupled with the lack of

---

[10] A copy of the relevant clip is on file with undersigned counsel and can be provided upon request.

PHP-CCP, would immediately threaten funding for mental-health, diabetes, and other services for vulnerable populations throughout Texas. *Id.* at 3; *see also, e.g.*, Ainsworth, *supra* ¶ 49.

88.     If THTQIP were permitted to expire, federal Medicaid funding for Texas would dramatically decline—depriving Texas and Texans of approximately $35 billion in federal funding. Such a loss would have an almost incalculable effect on Texas's most vulnerable citizens and would lead to widespread closures among medical providers and severe cuts to services provided to Texans currently receiving Medicaid benefits.

89.     Even were a handful of months (for DSRIP funding), or a year and a few months (for the Demonstration Project as a whole), sufficient to reapply for an extension effectively, Defendants' actions place Texas, HHSC, and Texas's Medicaid beneficiaries in an untenable position. Medical providers throughout Texas have now been subjected to severe uncertainty regarding the future of Medicaid and THTQIP—uncertainty only aggravated by the continuing COVID-19 pandemic. *See* Ex. J at 3-4; Ex. H at 6-7. This uncertainty harms Texas Medicaid beneficiaries, who face a loss of access to healthcare services as a consequence of the reduction in healthcare capacity that financial uncertainty inflicts across Texas. *See Losing Texas' Waiver Extension Destabilizes the Health Care Safety Net*, Texas Hospital Association (Apr. 22, 2021), https://tinyurl.com/hcfvcmae. Texas must act immediately in order to prevent a serious healthcare market contraction—yet it cannot know whether its

actions will be approved or congruent with a future demonstration project or extension.

90.     The timing of Richter's letter further amplifies its disruption across the State. Texas's Legislature meets only every other year, and only for 140 days. This brief period all but mandates that any critical legislation be prepared by the start of, or at least early in, a legislative session. *See generally* Frank Decl.; Kolkhorst Decl. Richter sent her letter with merely 45 days left in the legislative session—at a point designed to make a legislative solution to CMS's decision particularly difficult. *See* Ex. D. The reduced possibility of a legislative solution in turn amplifies the disruption to medical providers, and, in turn, Medicaid beneficiaries.

91.     Defendants may not place the State, HHSC, or the State's Medicaid beneficiaries in this untenable position. Having approved Texas's extension and the public-notice exemption needed to procure that extension in a timely fashion, Defendants lacked the power to rescind those actions—and certainly the power to do so without considering the effects on Texas. Indeed, the unexplained and inexplicable disruption to Texas's healthcare system, threatening tens of billions of dollars in funding without prior notice, can only be understood as the Administration's sources explained it: an unconstitutional attempt to coerce a sovereign State into adopting a preferred federal policy.

## V. CLAIMS FOR RELIEF

92.     Texas incorporates the allegations in each paragraph in this Complaint in each following count.

## COUNT I
## Violation of Statutory Limits on Agency Power

93.     CMS and its Administrator have only the powers conferred on them by statute—and may not expand those powers by regulation. *E.g.*, *Civil Aeronautics Bd. v. Delta Airlines, Inc.*, 367 U.S. 316, 334 (1961). That legal truism applies with particular force in instances where a federal agency seeks to disrupt the balance between state and congressional authority. *See La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368-70 (1986).

94.     Section 1115 of the Social Security Act, 42 U.S.C. § 1315, enables the Administrator to "waive compliance with" Medicaid requirements, *id*. § 1315(a)(1), to promulgate regulations relating to demonstration projects, *id*. § 1315(d)(1)-(2), and to approve or disapprove such projects, *id*. § 1315(f).

95.     The Administrator must approve or deny an application to extend a demonstration project—often referred to in section 1115 as a "waiver project"—within statutorily defined time periods. *Id*. § 1315(f). The Administrator's failure to act on an extension application by either approving or disapproving it within that time period generally results in the application being approved. *E.g.*, *id*. §§ 1315(f)(2), (3), (5)(B).

96.     But section 1115 does not mention a power to "rescind," "withdraw," or otherwise remove an extension of a demonstration project or reimpose conditions already validly waived by the Administrator. Quite the opposite: Section 1115 contemplates finality. It sets fixed deadlines, giving the Administrator a single, up-or-down choice regarding a State's extension application.

34

97.     Because section 1115 authorizes the approval (or disapproval) of a demonstration project or an extension of a project, but not the power to rescind that approval, the Administrator lacks such a power. Thus, "[o]nce the [Administrator] authorizes a demonstration project, no take-backs." *Forrest Gen. Hosp.*, 926 F.3d at 233.

98.     By attempting to rescind Texas's already-approved extension, Defendants attempted to exercise a power that Congress never provided—and thus acted both contrary to law and beyond their statutory limitations. 5 U.S.C. § 706(2)(A), (C). The purported rescission of the exemption from regular notice and comment—and, by extension, rescission of the extension of the Demonstration Project—must therefore be set aside. 5 U.S.C. § 706(2).

## COUNT II
## Violation of Statutory Limits on Agency Power

99.     Even if Defendants could cobble together a power to rescind out of the power to approve or disapprove an application, Congress has likewise constrained that power by limiting the time in which they are permitted to act.

100.     The Secretary—or by delegation the Administrator—has, at most, 120 days to approve or disapprove an application for an extension of a demonstration project after it has been presented to her. 42 U.S.C. § 1315(f)(5)(A). A failure to act within this period approves an application by operation of law. *Id*. § 1315(f)(5)(B).

101.     This time limitation inherently brings the Administrator's power to approve or disapprove an extension application to an end at the close of this 120-day window. Even if the Administrator could reconsider an application within the

window, once this time has run, her decision approving or disapproving an application becomes final, or if she has failed to decide, the application is approved by operation of law. *Id.*

102.   Texas's application was submitted to the Administrator on November 30, 2020. Ex. A. The Administrator acknowledged that it was complete no later than December 15, 2020. Ex. K.

103.   Administrator Richter's purported rescission of that decision occurred at earliest when she sent her letter on April 16, 122 days later.

104.   Because Richter acted after the 120-day period allowed under section 1115, Defendants lacked the power to reconsider the Administrator's previous approval, and the April 16 letter again must be set aside as contrary to law and in excess of Defendants' statutory limitations. 5 U.S.C. § 706(2)(A), (C).

## COUNT III
### Violation of Statutory Limits on Agency Power

105.   In any event, Defendants may only exercise the power to approve or disapprove an extension of a demonstration project to the extent that choice "is likely to assist in promoting the objectives" of the Medicaid program. 42 U.S.C. § 1315(a).

106.   If Medicaid has a single identifiable purpose, it is to "provide federal financial assistance for all legitimate state expenditures" for the provision of healthcare to citizens of limited means "under an approved Medicaid plan." *Harris v. McRae*, 448 U.S. 297, 308-09 (1980) (citing S. Rep. No. 89, at 83-85 (1965); H.R. Rep. No. 213, at 72-74 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 1943); *see also, e.g.*, 42 U.S.C. § 1396d(1) (defining "medical assistance"); *id.* at §§ 1396r-1 through 1396r-1c

(defining certain forms of presumptive eligibility); *id.* at § 1396u-3 (providing additional cost sharing for low-income Medicare beneficiaries).

107.   Whatever Defendants' authority, they can only exercise it consistent with promoting the objectives of the Medicaid program—and even then, only in a way consistent with Congress's delegation of authority to HHS and CMS in the first place.

108.   Congress has passed numerous laws during the COVID-19 pandemic expanding the availability of healthcare to Americans and mitigating the financial instability deriving from the pandemic. *E.g.,* American Rescue Plan Act of 2021, Pub. L. No. 117-2, §§ 9811-19, 135 Stat. 4, 208-19 ("ARPA"); Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, §§ 3801-32, 134 Stat. 281, 427-34 (2020); Families First Coronavirus Response Act, Pub. L. No. 116-127, §§ 6008-09, 134 Stat. 178, 208-10 (2020) ("FFCPA").[11] These laws likewise inform the scope of the Administrator's discretion: Where Congress legislates repeatedly on a subject, it prohibits administrative agencies from acting contrary that legislation, even if it does not amend an agency's organic statute. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 157-59 (2000).

109.   Rescinding Texas's section 1115 extension threatens healthcare for over four-million Texans during a pandemic. If Defendants ever have the power to take

---

[11] *Accord* Paycheck Protection Program and Health Care Enhancement Act, Pub L. 116-139, tit. I (Apr. 24, 2020) (providing financial assistance to "eligible health care providers" including "Medicaid enrolled suppliers and providers"); Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020, Pub. L. 116-123 (Mar. 6, 2020) (permitting Secretary to waive certain Medicare requirements in order to expand access to telemedicine).

such a drastic step to *contract* Medicaid coverage in light of the Act's goals of *expanding* coverage, they surely lack that power now, given Congress's repeated emphasis on mitigating the physical and economic harms of the pandemic. *E.g.*, FFCPA § 6008 (increasing FMAP during COVID emergency); ARPA § 9819 (requiring recalculation of disproportionate share allotments during "any fiscal year for which" the FMAP is increased due to COVID) (codified at 42 U.S.C. § 1396r-4(f)(3)(F)(i)).

110.   And the Administrator's only admitted motivation—in vindicating procedural rights held by third parties—cannot possibly be sufficiently weighty to justify placing millions of Texans' healthcare at risk given that unequivocal congressional emphasis on expanding healthcare coverage and nearly uniform support for the extension during the state-level notice-and-comment period. Ex. J (reflecting a single negative comment was received).

111.   The Administrator's decision to withdraw Texas's exemption from the federal notice-and-comment process, and thus to rescind the extension of the Demonstration Project, therefore cannot stand, as it is both arbitrary and capricious as well as contrary to law. 5 U.S.C. § 706(2)(A).[12]

---

[12] Again, the State completed state notice-and-comment procedures notwithstanding its exemption from federal notice and comment. Any complaint about the timing of those state-level procedures has been waived.

## COUNT IV
### Failure to Follow Agency Procedures

112.    CMS's regulations directing how the Administrator may suspend or terminate a demonstration project, or otherwise withdraw a waiver, imply that the Administrator lacks the power to ignore both options in favor of "rescind[ing]" an extension of a demonstration project. Ex. D at 7.

113.    The enumeration of several things, after all, implies the exclusion of matters not enumerated. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107-11 (2012); *accord Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 498 & n.13 (5th Cir. 2003) (discussing role of *expressio unius* canon in interpreting administrative regulations). CMS's regulation regarding "terminations and suspensions" provides the Administrator with the ability to end demonstration projects or waivers, but it does not authorize her to rescind or reverse extensions. 42 C.F.R. § 431.420(d). By implication, she possesses no such power.

114.    If the Administrator wishes to assert this new power, she must first at minimum promulgate a regulation authorizing her to do so through the ordinary course, subjecting that regulation to public notice and comment, in the same manner as other substantive CMS regulations. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (defining substantive rules requiring notice and comment as those that "affect[] individual rights and obligations") (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)); *see also, e.g.*, *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014) (Kavanaugh, J.) (describing impact on private parties as "most important factor" in determining substantive rule).

39

115.   She cannot simply create a third option to rescind a demonstration-project extension to circumvent the requirements of regulations governing how she may suspend those projects or end waivers within them. Her April 16th letter purporting to do so must be set aside. 5 U.S.C. § 706(2)(A).

## COUNT V
## Failure to Follow Agency Procedures

116.   Assuming the Administrator could issue the April 16 letter absent additional rulemaking, she was required to follow the rules HHS and CMS have promulgated; her failure to do so renders her resulting decision arbitrary and capricious. *INS v. Yang*, 519 U.S. 26, 32 (1996) ("[I]f [the agency] announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy. . . could constitute action that must be overturned."); *see also, e.g.*, *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954). "In addition, prior notice is required where a private party justifiably relies upon an agency's past practice and is substantially affected by a change in that practice." *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) (per curiam) (citing *Indep. Broker-Dealers' Trade Ass'n v. SEC*, 442 F.2d 132 (D.C. Cir. 1971)).

117.   CMS has a regulation that specifically governs "[t]erminations and suspensions" of demonstration projects or waivers. 42 C.F.R. § 431.420(d).

118.   This regulation purports to allow the Administrator to "suspend or terminate a demonstration in whole or part," but requires her to "determine[] that

the State has materially failed to comply with the terms of the demonstration project" in order to do so. *Id*. § 431.420(d)(1).

119.   Alternatively, the Administrator may "withdraw waivers," but may only do so "based on a finding that the demonstration project is not likely to achieve the statutory purposes." *Id*. § 431.420(d)(2).

120.   If the Administrator's termination of Texas's extension was based on the Administrator's ability to "suspend or terminate a demonstration in whole or part," she would have had to make a specific finding that Texas had "materially failed to comply" with the terms of its project. *Id*. § 431.420(d)(1). She would also have had to "afford the State an opportunity to request a hearing to challenge CMS's determination prior to the effective date" under the terms and conditions of the Demonstration Project. Ex. D, Special Terms and Conditions at 7.

121.   The April 16 letter does neither. It does *not* find that *Texas* violated any of the terms and conditions of its grant, nor does it allow Texas a hearing to challenge this non-finding or the Administrator's ultimate decision. Instead, the letter simply states that "CMS materially erred in granting Texas's request" without additional information regarding why "an exemption from the normal public notice process was needed to address a public health emergency." Ex. D at 2. And it cancels the extension of THTQIP for failure to go through notice and comment.

122.   The absence of the necessary finding and the failure to offer a hearing to challenge CMS's determination each represent a failure by the Agency to abide by the limits CMS and HHS regulations place on the Administrator's discretion. And

41

each is fatal to the April 16 letter. *E.g.*, *Big Horn Coal Co. v. Temple*, 793 F.2d 1165, 1169 (10th Cir. 1986) (per curiam) (finding agency decision unlawful where it failed to consider rebuttal evidence as required by agency procedures).

123.   The Administrator also withdrew the approved exemption from regular notice-and-comment procedures Texas had requested. Yet again, she failed to make a finding that the demonstration project was "not likely to achieve the statutory purposes" of the Act. *Id.* § 431.420(d)(2).

124.   Even if Administrator Richter had made this necessary finding, her comments about the effects of the waiver plainly indicate that her decision to withdraw the waiver was based on those effects—and not based on the requisite finding that she failed to make.

125.   The Administrator is confined to the reasons she actually provided in the April 16 letter, and she cannot supplement those here. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Nor can she rely on stated reasons that are pretextual. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574-75 (2019). Because the Administrator failed to make this essential finding—and because she attempted to rescind something CMS's regulations do not allow her to rescind—she failed to follow regulations regarding how she may use her authority, and her letter must be set aside. 5 U.S.C. § 706(2)(A).

## COUNT VI
### Failure to Provide Notice and Comment

126.   The Administrator may not simply re-issue her letter without providing notice and receiving comment regarding the cancellation of the extended

Demonstration Project. CMS must provide public notice and an opportunity to comment on pending applications for extensions to demonstration projects. 42 C.F.R. §§ 431.408(a), 431.416(a). Texas's application was exempt from this process due to the correct application of an agency regulation, *id.* § 431.416(g), but that exception does not change the general rule.

127.   Under general principles of administrative law, that which must be done with notice and comment must, absent a similar exception, be undone with notice and comment. *Motor Vehicle Mfr's Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S 29, 41, 46-47 (1983). Indeed, where significant reliance interests are implicated, notice and comment is required even where an initial action was *not* taken with notice-and-comment procedures. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913-14. Because of the reliance interests that adhere to healthcare policy decisions, HHS and CMS have recently formalized that principle by regulation. 45 C.F.R. § 1.3(b)(1)-(2).

128.   The Administrator's April 16 letter failed either to provide the public with a notice-and-comment period or to justify why it did not require one; instead, it merely declared a final agency action affecting millions of Texans and costing billions of dollars.

129.   Indeed, the rescission of an extension to a demonstration project implicates more significant reliance interests than the initial decision of whether to approve or disapprove that extension. While an application is underway, third parties are on notice that the federal government and the State are negotiating regarding

the demonstration project, its aims, and the permissible methods of achieving those aims. The approval of an extension, however, represents a commitment to numerous healthcare decisions—by both the state and federal governments—on which providers and beneficiaries rely.

130.    The Administrator's failure to follow the Administrative Procedure Act's requirements before reversing CMS's earlier decision prevents the Administrator's purported rescission from having any legal force. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1927-28 (Thomas, J., concurring in part and dissenting in part). The April 16 letter failed to provide the public with notice or an opportunity to comment before taking a drastic action affecting the healthcare system in Texas for millions and imperiling billions of dollars for mental-health and other services as soon as September of this year. That failure renders her letter arbitrary and capricious, and it must be set aside. 5 U.S.C. § 706(2)(A).

## COUNT VII
## Arbitrary and Capricious Agency Decisionmaking

131.    Even if Defendants could cancel a multi-billion-dollar program without notice and comment, they could not do so for the reasons spelled out in the Administrator's letter. "In exercising [CMS's] waiver authority," the Administrator "may not 'act out of unbridled discretion or whim . . . any more than in any other aspect of [CMS's] regulatory function." *Keller Commcn's, Inc. v. F.C.C.*, 130 F.3d 1073, 1076 (D.C. Cir. 1997) (quoting *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969)). Those affected by an administrative agency's change in its rules or policies are entitled, at the least, to consideration of any reliance interests that developed

around the since-rejected policy. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913-14. Moreover, Texas and its Medicaid beneficiaries were entitled not only to a consideration of their reliance interests, but to have the Administrator consider alternative ways of accomplishing CMS's goals that would have less deleterious effects on those interests. *Id.*

132.   Texas, its healthcare providers, and its Medicaid beneficiaries accrued substantial reliance interests based on the January 15 extension. For example, Texas abandoned its plans to extend DSRIP based on the PHP-CCP compromise that it reached with the federal government. It likewise expended significant resources coordinating with local Medicaid administrators, designing rules and guidance for PHP-CPP, and organizing a transition from the terms of the 2017 plan and DSRIP to the 2021 extension and PHP-CPP. Moreover, Texas had significant engagement with stakeholders and adopted rules for four directed-payment programs, relying on the funding that would have resulted from the extension and new terms. Like the PHP-CCP, these programs were intended to replace DSRIP funding

133.   Not only did the Administrator fail to consider these reliance interests, she dismissed them out of hand. In a single line, she declared that Texas "ha[d] not incurred a reliance interest based on the January 15, 2021 approval." Ex. D at 7. She failed even to consider the providers, the beneficiaries, and their reliance interests.

134.   The Administrator similarly failed to consider "alternatives" to her draconian decision to cancel the Demonstration Project extension "that are within the ambit of existing policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (cleaned up)

45

(quoting *State Farm*, 463 U.S. at 51). As the Administrator's letter acknowledged, THTQIP is extremely "complex." Ex. D at 2. She identified two problems with the State's extension request: the "longer extension through September 30, 2030 [and] the new uncompensated care pool that the state did not initially request but that we ultimately approved." *Id.* at 3.

135.   The April 16 letter demonstrates that Defendants did not give due consideration to the full record. For example, her letter relies entirely on the content of Texas's original application for an extension. *Compare* Ex. D *with* Ex. A. It makes no mention of the extensive communications that occurred between Texas and Defendants or their predecessors while the initial application was pending and prior to its approval on January 15.

136.   More importantly, though the letter mentioned Defendants' view of third parties' interests in notice-and-comment procedures, it failed to consider less-intrusive alternatives that might have struck a reasonable compromise with those interests. Nor did the letter mention how its measures were commensurate with how it has treated similar programs in other States.

137.   Less intrusive means are clearly available. For example, CMS could have sought public comment on the extension after the fact, or could have asked for state-level notice and comment about the changes in Texas's Demonstration Project about which the federal and state governments had negotiated.[13] *Cf.* 42 C.F.R. § 431.420(c). Either of these alternatives would have done substantially less harm to

---

[13] Texas completed state-level notice and comment related to its initial application.

Texas's reliance interests, let alone the interests of Medicaid beneficiaries in the State.

138.    Indeed, as a last resort, it would have been less intrusive simply to excise the two portions of the extension request that CMS found objectionable. As CMS noted, Texas only asked for a five-year extension. Moreover, while an important aspect of the transition away from DSRIP, the PHP-CCP is a fairly small percentage of the overall Medicaid program: It represents $500 million in annual funding. Ex. B at 4. Texas's overall Medicaid budget is nearly $40 billion—more than half of which comes from the federal government. *See Budget & Planning*, Tex. Health & Human Servs., https://hhs.texas.gov/about-hhs/budget-planning (last visited May 14, 2021). While Texas in no way concedes that CMS had grounds to either shorten the waiver extension or cancel the PHP-CCP, doing so was a less intrusive means to address the stated concerns. Well-established principles of administrative law require that it have been considered before taking the drastic measure of cancelling the legal authority for 94% of Texas's Medicaid program.

139.    Finally, the April 16 letter does not reflect that the Administrator considered how similar DSRIP programs and uncompensated-care pools have been handled in other States. Texas's DSRIP program is far from unique: "Originally, DSRIP initiatives were more narrowly focused on funding for safety net hospitals and often grew out of negotiations between [S]tates and HHS over the appropriate way to finance hospital care. Now, however, they increasingly are being used to promote a far more sweeping set of payment and delivery system reforms." *See* Alexandra Gates,

et al., *An Overview of Delivery System Reform Incentive Payment (DSRIP) Waivers*, at 1 (Oct. 2014), https://files.kff.org/attachment/an-overview-of-dsrip. Yet, on information and belief, Texas is the only State for whom CMS has abruptly cancelled either a DSRIP program or a transition pool designed to wind down such a program based on what was (at most) a procedural foot fault.

140.    Administrator Richter's letter demonstrates that Defendants arbitrarily and capriciously failed to consider these important aspects of the problem before them. They were required to consider reliance interests; whether they could have accomplished their stated goals through policies which would have better left Texas's reliance interests intact; and how other States have been treated. Failure to perform any of these tasks is a flaw that independently requires setting the April 16 letter aside. 5 U.S.C. § 706(2)(A).

## COUNT VIII
## Arbitrary and Capricious Agency Action

141.    The myriad statutory and procedural failings underlying the April 16 letter aside, it is arbitrary and capricious for a simpler reason: It rests on an erroneous premise. "An agency decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), if the agency applies an incorrect legal standard." *Gen. Land Office v. U.S. Dep't of Interior*, 947 F.3d 309, 320 (5th Cir. 2020) (citing *inter alia Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 977 (10th Cir. 2016) (Gorsuch, J.) ("[A]n agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand."); *Humane Soc'y of U.S. v. Pritzker*, 75

F. Supp. 3d 1, 11 (D.D.C. 2014) ("NMFS acted arbitrarily and capriciously in applying an inappropriately-stringent evidentiary requirement at the 90-day stage.")).

142.   The April 16 letter rests on at least one incorrect legal premise, and at least one unsupportable factual assumption. In particular, the letter rests on the legally incorrect assertion that Texas failed to show a sufficient basis for its request for an exemption from regular public notice-and-comment obligations. Richter's position appears to be that the Demonstration Project itself must have been created to address COVID-19. Ex. D at 3 (faulting the State because "[t]he demonstration was initially approved effective December 12, 2011, and had already been extended through September 30, 2022"). And she insists that COVID-19 is irrelevant because the Demonstration Project will not expire until September 2022, by which time COVID-19 will no longer present an issue to Texas's healthcare system. The first premise is legally incorrect; the second is contrary to the position that Defendants have themselves taken and should be disregarded.

143.   The letter's reading of the regulation is unsupported by its text. Section 431.416(g) allows a waiver of the notice-and-comment period where either (1) "a proposed demonstration or demonstration extension request . . . addresses a natural disaster, public health, or sudden emergency threats to human lives," or (2) "unforeseen circumstances resulting from a natural disaster, public health emergency or other sudden emergency . . . warrant an exception." 42 C.F.R. § 431.416(g)(1)-(2).

144.    Even though the Demonstration Project predates the present public-health emergency, many aspects of it "address" that emergency. To name just one example: As HHSC has explained in documents ignored by the April 16 letter, the Demonstration Project provides mechanisms to improve vaccine rates and accessible services, which will apply to COVID-19 vaccines. Ex. M. Moreover, it is well documented that COVID-19 has increased the needs for mental-health and certain medical services, like immunizations—the very same types of care covered by the Demonstration Project. *See supra* at 42-46, 49, 72.

145.    Similarly without basis is the letter's implied conclusion that an extension is unnecessary because the Demonstration Project extends to 2022, by which time COVID-19 will not be a threat. Leaving aside the immediate effect of the uncertainty discussed above, this conclusion is not only internally inconsistent with but also contrary to public positions taken by the agency about the ongoing effect of COVID-19. As discussed above, the PHP-CCP is a replacement for DSRIP, the funding for which is scheduled to expire this September 2021—not September 2022. And Secretary Becerra has publicly taken the position that COVID-19 will continue to represent a national public-health emergency until *at least* July 2021. Xavier Becerra, *Public Health Emergency: Renewal of Determination That a Public Health Emergency Exists*, U.S. Dep't of Health & Human Servs., https://tinyurl.com/aszk4ppp (last reviewed Apr. 15, 2021) (renewing public-health disaster declaration for additional 90 days). And the Administration has elsewhere suggested that the public-health emergency "will likely remain in place for the

entirety of 2021." Norris Cochran, *Message to Governors*, at 1, Sec'y Health & Human Servs. (Jan. 22, 2021), https://tinyurl.com/2wena4aa. In light of these statements, it was arbitrary for Defendants to conclude that Texas does not need to extend a program currently being used to respond to an emergency where the program would expire before the emergency itself is expected to abate.

146.   To the extent more was needed, Texas provided a sound basis that disruptions caused by COVID-19 necessitated an extension of the Demonstration Project. Texas commissioned an extensive survey regarding the impact of COVID-19 on its provider network. Ex. H. It discussed the concerns raised by that study during the state notice-and-comment period that accompanied the extension request. Ex. J. And it provided summaries of those discussions to CMS as part of its initial extension application, Ex. A at 20, and in subsequent communications, Ex. J; Bilse Decl. ¶ 4; Grady Decl. ¶¶ 10-11.

147.   The Administrator's April 16 letter did not mention the vast majority of Texas's communications with CMS regarding the impact of COVID-19 on its request for an extension of the Demonstration Project. It certainly did not explain why Texas's proffer was insufficient in light of these communications.

148.   Upon information and belief, CMS has approved extension requests and waivers based on far less. Indeed, as discussed above (at ¶ 99-104), CMS can approve waivers by *failing* to act within 120 days. 42 U.S.C. § 1315(f)(5)(A).

149.   Defendants acted arbitrarily when they failed to consider the full scope of the communications between Texas and CMS regarding the need for the waiver.

*See Motor Vehicle Mfrs. Ass'n of U.S., Inc*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation marks omitted)); *id.* ("[A]n agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency."). To the extent that they have treated Texas differently from other similarly situated States, that was arbitrary too. *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 285-86 (D.C. Cir. 2020). Defendants actions must be set aside. 5 U.S.C. § 706(2)(A).

## COUNT IX
### Estoppel

150.    Aside from Defendants' various violations of the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, Defendants are estopped from revoking the prior approval of Texas's request for an exemption from notice-and-comment requirements or its THTQIP. Ordinarily, a "private litigant who would estop the government bears a very heavy burden." *Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs*, 976 F.2d 934, 937 (5th Cir. 1992). Nevertheless, where a party gives up valuable rights based on the conduct of a government official, courts will estop the government from denying those actions "to prevent manifest injustice." *E.g.*, *Walsonavich v. United States*, 335 F.2d 96, 101 (3d Cir. 1964) (finding estoppel when a "taxpayer was lulled into a sense of security" by a written agreement with the Commissioner of Internal Revenue); *id.* ("[T]here are circumstances where the Government should be required by our law to stand behind written agreements of a

high public official like the Commissioner." (citing *Routzahn v. Brown*, 95 F.2d 766, 771 (6th Cir. 1938); *Schuster v. Commissioner* 413 F.2d 311, 317 (9th Cir. 1962))).

151.   Estoppel is particularly appropriate because this case involves the interaction between two public bodies. Ordinary concerns about estoppel arise from concerns over the need of the sovereign to protect the public interest. *Heckler v. Cmty. Health Servs. of Crawford Cty, Inc.*, 467 U.S. 51, 60 (1984). Those concerns do not arise in the same manner when the dispute is between two sovereigns, each of which is charged with protecting the public interest.

152.   The highly unique circumstances here justify estopping Defendants from denying the exemption to notice and comment or the extension to the Demonstration Project. To the extent Texas was not entitled to an exemption—and it was—it sought one based on assurances from CMS under Administrator Verma that it satisfied the regulatory requirements for an exemption.

153.   Defendants were aware of the relevant facts on which Texas based its claim to an exemption: Its application plainly explained the grounds on which it relied, and those documents were in Administrator Verma's and CMS's possession at all times. Ex. A.

154.   Defendants intended for Texas to act in reliance on its assurance that Texas met the exemption from the notice-and-comment procedures. They not only encouraged Texas to apply for a public-notice exemption, but also approved that exemption and the Demonstration Project extension. Exs. B & K.

155.   Texas had no knowledge that its request for an exemption was improper or legally defective—to the contrary, based on its own research and the reasonable assurances of Defendants (and their predecessors), it reasonably believed its request had been properly granted. *See* Bilse Decl. ¶¶ 6-7; Grady Decl. ¶¶ 12-13.

156.   Texas accordingly reasonably relied on the federal government's assurances, suffering substantial injury. Texas abandoned an opportunity to extend the multi-billion-dollar DSRIP program based on the exemption and extension it received. Bilse Decl. ¶ 6; Grady Decl. ¶ 10. Texas also expended significant resources working to implement new components of the Demonstration Project in reliance on its approved extension. If Defendants are permitted to withdraw the extension based on the exemption, Texas stands to lose billions of dollars in funding for vital healthcare services in mere months.

157.   Defendants should be enjoined from rescinding the January 15 extension and thereby working a manifest injustice against millions of vulnerable Texans and the State itself.

## COUNT X
## Violation of Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1

158.   Finally, Defendants' efforts to coerce the State to adopt the Medicaid Expansion exceed the federal government's powers as conclusively interpreted by the Supreme Court. The Constitution denies the federal government the power to "require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). While Congress may "grant federal funds to the States, and may condition such a grant upon the States' 'taking certain actions that

Congress could not require them to take,'" *NFIB*, 567 U.S. at 576, Congress cannot use its spending power to coerce Texas into adopting the federal government's preferred policy, *id*. at 577-78.

159.   Though nominally a rejection based on third-party notice-and-comment procedural rights, the Administrator has attempted to rescind the extension of Texas's Demonstration Project in order to pressure it into adopting the Medicaid expansion of the Patient Protection and Affordable Care Act. Ex. E.

160.   The Supreme Court has already held that the federal government may not coerce States into accepting the Medicaid expansion by withholding funds for Medicaid as it was originally established in 1965. *NFIB*, 567 U.S. at 582-85. Doing so was considered unconstitutionally coercive because in 2012 "Medicaid spending account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." *Id*. at 581.

161.   Those facts have not changed in the intervening decade. Federal Medicaid funding under Texas's Medicaid THTQIP forms an immense amount of Texas's budget. While the final 2021 biennial budget has not been finalized, it is expected to amount to approximately $125 billion per fiscal year. *See generally* Senate Bill 1. Of that, fully a quarter—over $30 billion—comes from federal Medicaid funding. *Id*. title 2.

162.   An end to Texas's THTQIP would functionally amount to the end of Medicaid in Texas—or, at minimum, would impose billions of dollars of higher costs

on Texas as the State will need to implement expensive alternatives to a demonstration project under section 1115.

163.    By threatening the loss of approximately a quarter of Texas's annual budget, the Administrator proposes "economic dragooning that leaves [Texas] with no real option but to acquiesce." *NFIB*, 567 U.S. at 582.

164.    The purpose of this dragooning is to compel Texas to accept the ACA's Medicaid expansion—in other words, to fundamentally rework what Texas is willing to do under Medicaid's "cooperative federalism" framework through the threat of an impossibly large fiscal loss. *King*, 392 U.S. at 316.

165.    Such a threat is unconstitutional, *NFIB*, 566 U.S. at 582-83, as is the purported rescission enabling it, *cf. Clinton v. City of New York,* 524 U.S. 417 (1998) (affirming district court's invalidation of Executive's action taken under unconstitutionally delegated authority).

## VI. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

    a.    Declare that Defendants' April 16 letter is invalid and set it aside because Defendants lacked statutory authority to rescind their previous extension of Texas's Demonstration Project;

    b.    Declare that Defendants' April 16 letter is invalid and set it aside because Defendants lacked regulatory authority to rescind Texas's Demonstration Project by letter, or otherwise that they exceeded that authority in a way that is arbitrary and capricious, contrary to law, or both;

    c.    Declare that Defendants' April 16 letter is invalid and set it aside because it attempts to unconstitutionally coerce Texas in violation of the Spending Clause;

d.  Declare that Defendants' April 16 letter is invalid and set it aside because it imposes unconstitutional conditions on federal funding for Texas's Medicaid program;

e.  Enjoin Defendants, and any other agency or employee of the United States, or any individual working in concert with them, from implementing or enforcing the April 16 letter in any way;

f.  Enjoin Defendants, and any other agency or employee of the United States, or any individual working in concert with them, from attempting to rescind, revoke, or amend the January 15, 2021 extension of Texas's Demonstration Project in any way;

g.  To the extent that Defendants withhold funds on the basis of the April 16 letter during the pendency of this case, order them to disgorge those funds;

h.  Award Plaintiffs costs and reasonable attorneys' fees; and

i.  Award such other and further relief as this Court deems equitable and just.

Respectfully,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant
Attorney General

LESLEY FRENCH
Chief of Staff

PATRICK SWEETEN
Chief, Special Litigation Unit


OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Judd E. Stone II
JUDD E. STONE II
Solicitor General
*Lead Counsel*
Texas Bar No. 24076720
Judd.Stone@oag.texas.gov

LANORA C. PETTIT
Deputy Solicitor General
Texas Bar No. 24115221

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Texas Bar No. 24088531

BENJAMIN D. WILSON
Assistant Solicitor General
Texas Bar No. 24084105

JEFFREY M. WHITE
Special Counsel for Special Litigation
Texas Bar No. 24064380

*Counsel for Plaintiffs*

57