# Exhibit L



May 2, 2016

Gary Jessee
Associate Commissioner for Medicaid/CHIP
State of Texas, Health and Human Services Commission
4900 Lamar Boulevard
Austin, TX 78751

Dear Mr. Jessee:

I am writing to inform you that the Centers for Medicare & Medicaid Services (CMS) is granting a 15-month temporary extension for Texas' section 1115(a) demonstration (11-W-00278/6), entitled "Texas Healthcare Transformation and Quality Improvement Program." Approval of this extension is under the authority of section 1115(a) of the Social Security Act, and is effective from the date of this letter through December 31, 2017.

This temporary extension allows Texas to continue its existing demonstration, which has aimed to expand Medicaid managed care to manage costs, develop improved care delivery throughout the state, and move towards quality-based payment systems. As part of this extension, the Delivery System Reform Incentive Payment (DSRIP) program and Uncompensated Care (UC) pool will be extended at their existing funding levels for an additional fifteen months.

During the fifteen month extension period, CMS will work with Texas towards agreement on an approach that supports adequate and appropriate levels of Medicaid payment under managed care. This fifteen month period will provide the time needed for the state to submit and CMS to review an independent report analyzing the Uncompensated Care pool and DSRIP and to develop reforms that will improve Medicaid payment systems and funding mechanisms and the quality of health care services for Texas' Medicaid beneficiaries. As we noted in our November 20 letter, CMS uses three principles to review states' uncompensated care pool requests: coverage is the best way to assure beneficiary access to health care for low income individuals and uncompensated care pool funding should not pay for costs that would otherwise be covered in a Medicaid expansion; Medicaid payments should support the provision of services to Medicaid and low income uninsured individuals; and provider payment rates must be sufficient to promote provider participation and access, and should support plans in managing and coordinating care. We appreciate your commitment to submit that report to CMS by August 31, 2016. This year, CMS will also work with Texas towards an approach to the future of the DSRIP that supports Texas's commitment to managed care in the STAR and STAR-Plus systems.

Although we are confident that CMS and Texas will reach agreement by the end of the 15 month extension period with respect to the Uncompensated Care pool and the DSRIP, the terms and conditions of the temporary extension provide that, should an alternative agreement not be

reached, CMS expects that the Uncompensated Care pool will not be renewed at the end of 2017 except at a reduced level consistent with CMS' principles for uncompensated care. The reduction will limit the size of the Uncompensated Care pool to the costs of uncompensated and charity care for low-income individuals who are uninsured and cannot be covered through Medicaid or other insurance programs, using Texas hospital Medicare cost reports and projections of the potential impact of Medicaid expansion in Texas. In addition, the terms and conditions provide that absent an agreement, the DSRIP will phase down beginning at 25 percent in 2018, then by an additional 25 percentage points each year after that.

CMS approval of this Texas demonstration extension is conditioned on continued compliance with the enclosed set of STCs defining the nature, character, and extent of anticipated federal involvement in the project. The award is subject to your written acknowledgement of the award and acceptance of the Special Terms and Conditions (STCs) within 30 days of the date of this letter.

A copy of the revised STCs and the expenditure authorities is enclosed. A copy of the waiver list is also enclosed.

Your project officer for this demonstration is Mr. Eli Greenfield. He is available to answer any questions concerning your section 1115 demonstration and this amendment. Mr. Greenfield's contact information is:

> Center for Medicare & Medicaid Services
> Center for Medicaid & CHIP Services
> Mail Stop: S2-03-06
> 7500 Security Boulevard
> Baltimore, MD 21244-1850
> Telephone: (410) 786-6157
> Facsimile: (410) 786-5882
> E-mail: Eli.Greenfield@cms.hhs.gov

Official communications regarding official matters should be sent simultaneously to Mr. Greenfield and Bill Brooks, Associate Regional Administrator for the Division of Medicaid and Children's Health in our Dallas office. Mr. Brook's contact information is as follows:

> Mr. Bill Brooks
> Associate Regional Administrator
> Division of Medicaid and Children's Health Operations
> 1301 Young Street, Room 714
> Dallas, TX 75202

If you have any questions regarding this approval, please contact Mr. Eliot Fishman, Director, State Demonstrations Group, Centers for Medicaid & CHIP Services at (410) 786-9686.

Sincerely,

/s/

Vikki Wachino
Director

Enclosure

cc: Bill Brooks, ARA Region VI

## CENTERS FOR MEDICARE & MEDICAID SERVICES
## EXPENDITURE AUTHORITIES

**NUMBER:**      **No. 11-W-00278/6**

**TITLE:**       **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE:**     **Texas Health and Human Services Commission**

Under the authority of section 1115(a)(2) of the Social Security Act (the Act), expenditures made by the State for the items identified below, which are not otherwise included as expenditures under section 1903 of the Act, shall, for the period of this demonstration, December 12, 2011, through December 31, 2017, be regarded as expenditures under the State's Medicaid title XIX State plan.

## EXPENDITURES RELATED TO POPULATIONS COVERED UNDER THE DEMONSTRATION

**1.      Expenditures for the STAR+PLUS 217-Like HCBS Group**

Expenditures for the provision of state plan benefits and HCBS like services to individuals age 65 and older, or age 21 and older with disabilities, who would otherwise be Medicaid-eligible under section 1902(a)(10)(A)(ii)(VI) of the Act and 42 CFR § 435.217 in conjunction with section 1902(a)(10)(A)(ii)(V) of the Act, if the services they receive under STAR+PLUS were provided under a HCBS waiver granted to the State under section 1915(c) of the Act. This expenditure authority is subject to an enrollment cap. All Medicaid laws, regulations and policies apply to this expenditure authority except as expressly waived or listed s not applicable.

**2.      Expenditures Related to Managed Care Organization (MCO) Enrollment and Disenrollment**

Expenditures made under contracts that do not meet the requirements in section 1903(m) of the Act specified below. Texas managed care plans will be required to meet all requirements of section 1903(m) of the Act except the following:

- Section 1903(m)(2)(H) of the Act, Federal regulations at 42 CFR 438.1, to the extent that the rules in section 1932(a)(4) are inconsistent with the enrollment and disenrollment rules contained in paragraph 31(c) of the Demonstration's Special Terms and Conditions (STCs), which permit the State to authorize automatic re-enrollment in the same managed care organization (MCO) if the beneficiary loses eligibility for less than six (6) months.

**3.** **Expenditures for Inpatient Hospital Services and Prescription Drugs for STAR and STAR+PLUS Enrollees that Exceed State Plan Limits**

Expenditures for STAR enrollees for inpatient hospital services that would not otherwise be covered under the State plan, and expenditures for prescription drugs for adults ages 21 and older enrolled in STAR or STAR+PLUS.

**4.** **HCBS for SSI-Related State Plan Eligibles**

Expenditures for the provision of HCBS waiver-like services as specified in Table 4 and Attachment C of the STCs that are not described in section 1905(a) of the Act, and not otherwise available under the approved State plan, but that could be provided under the authority of section 1915(c) waivers, that are furnished to STAR+PLUS enrollees who are ages 65 and older and ages 21 and older with disabilities, qualifying income and resources, and a nursing facility institutional level of care. All Medicaid laws, regulations and policies apply to the Demonstration Expenditure authority except as expressly waived or listed as not applicable.

**EXPENDITURES RELATED TO THE UNCOMPENSATED CARE POOL**

Subject to an overall cap on the Uncompensated Care (UC) Pool, the following expenditure authorities are granted for the period of the Demonstration:

**5.** Expenditures for care and services that meet the definition of "medical assistance" contained in section 1905(a) of the Act that are incurred by hospitals and other providers for uncompensated costs of medical services provided to Medicaid eligible or uninsured individuals, and to the extent that those costs exceed the amounts paid to the hospitals pursuant to section 1923 of the Act.

**6.** Expenditures for transition year payments to hospitals and other providers as outlined in paragraph 44(b) (*Transition Payments*) of the STCs.

**EXPENDITURES RELATED TO THE DELIVERY SYSTEM REFORM INCENTIVE PAYMENT (DSRIP) PROGRAM**

Subject to CMS' timely receipt and approval of all deliverables specified in STC paragraph 45 (*Delivery System Reform Incentive Payment (DSRIP) Pool*) relating to the creation, operation, and funding of the Regional Healthcare Partnerships (RHPs), the following expenditure authorities are granted for the period of the Demonstration:

**7.** Expenditures for incentive payments from pool funds for the Delivery System Reform Incentive Payment (DSRIP) Program.

# CENTERS FOR MEDICARE & MEDICAID SERVICES

## WAIVER LIST

**NUMBER:**      **No. 11-W-00278/6**

**TITLE:**      **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE:**      **Texas Health and Human Services Commission**

## Title XIX Waivers

All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived in this list, shall apply to the Demonstration project beginning December 12, 2011 through December 31, 2017.  In addition, these waivers may only be implemented consistent with the approved Special Terms and Conditions (STCs).

Under the authority of section 1115(a)(1) of the Social Security Act (the Act), the following waivers of State plan requirements contained in section 1902 of the Act are granted in order to enable Texas to carry out the Texas Healthcare Transformation and Quality Improvement Program section 1115 Demonstration.

**1.**      **Statewideness**                            **Section 1902(a)(1)**

To enable the State to conduct a phased transition of Medicaid beneficiaries from fee-for-service to a managed care delivery system based on geographic service areas.

To the extent necessary, to enable the State to operate the STAR+PLUS program on a less than statewide basis.

**2.**      **Amount, Duration, and Scope of Services**         **Section 1902(a)(10)(B)**

To the extent necessary to enable the State to vary the amount, duration, and scope of services offered to individuals, regardless of eligibility category, by providing additional, or cost-effective alternative benefit packages to enrollees in certain managed care arrangements. To the extent necessary to enable the state to provide a greater duration of hospital services for individuals with severe and persistent mental illness.

**3.**      **Freedom of Choice**                        **Section 1902(a)(23)(A)**

To the extent necessary, to enable the State to restrict freedom of choice of provider through the use of mandatory enrollment in managed care plans for the receipt of covered services.  No waiver of freedom of choice is authorized for family planning providers.

**4.    Self-Direction of Care for HCBS Members              Section 1902(a)(32)**

To permit section 1915(c)-like Home and Community Based Services (hereinafter HCBS) members to self-direct expenditures for HCBS long-term care and supports as specified in paragraph 41(h) of the STCs.

# CENTERS FOR MEDICARE AND MEDICAID SERVICES
## SPECIAL TERMS AND CONDITIONS (STCs)

**NUMBER:**          **11-W-00278/6**

**TITLE:**                **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE:**        **Texas Health and Human Services Commission**

**DEMONSTRATION PERIOD:**    **December 12, 2011 through December 31, 2017**

**NUMBER:**       **Title XIX No. 11-W-00278/6**

**TITLE:**        **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE:**      **Texas Health and Human Services Commission**

# I.      PREFACE

The following are the Special Terms and Conditions (STCs) for the Texas Healthcare Transformation and Quality Improvement Program section 1115(a) Medicaid demonstration (hereinafter "demonstration").  The parties to this agreement are the Texas Health and Human Services Commission (HHSC/state) and the Centers for Medicare & Medicaid Services (CMS).  The STCs set forth, in detail, the nature, character, and extent of Federal involvement in the Demonstrations, and the state's obligations to CMS during the life of the demonstration.  This Demonstration is effective the date of the approval letter through September 30, 2016, unless otherwise specified.

The STCs have been arranged into the following subject areas:

I.    Preface
II.   Program Description and Objectives
III.  General Program Requirements
IV.   Eligibility Derived from the Demonstration
V.    Demonstration Delivery Systems
     A.  Phased Expansion of Managed Care Delivery Systems
     B.  Assurances Related to the Ongoing Operation of Managed Care and Readiness Review Requirements for March 2012 Expansion Eligibility
     C.  STAR AND STAR+PLUS (non-HCBS) Enrollment, Benefits and Reporting Requirements
     D.  Children's Dental Program
     E.  STAR+PLUS HCBS Enrollment, Benefits and Reporting Requirements

VI.   Funding Pools Under the Demonstration
VII.  General Financial Requirements
VIII. Monitoring Budget Neutrality for the Demonstration
IX.   General Reporting Requirements
X.    Evaluation of the Demonstration

The following attachments have been included to provide supplemental information and guidance for specific STCs. The following attachments are incorporated as part of this agreement.

Attachment A: Schedule of Deliverables
Attachment B: Quarterly Report Template
Attachment C: HCBS Service Definitions
Attachment D: Quality Improvement Strategy for HCBS
Attachment E: HCBS Quality Review Worksheet
Attachment F: HCBS Fair Hearing Procedures
Attachment G: HCBS Participant Safeguards
Attachment H: UC Claiming Protocol and Application
Attachment I: Regional Healthcare Partnership (RHP) Planning Protocol
Attachment J: Program and Funding Mechanics Protocol
Attachment K: Administrative Cost Claiming Protocol
Attachment L: Consumer Support System Plan

## II.    PROGRAM DESCRIPTION AND OBJECTIVES

The Texas Legislature, through the 2012-2013 General Appropriations Act and Senate Bill 7, instructed the Texas Health and Human Services Commission (HHSC) to expand its use of pre-paid Medicaid managed care to achieve program savings, while also preserving locally funded supplemental payments to hospitals. The State of Texas submitted a section 1115 Demonstration proposal to CMS in July 2011 to expand risk-based managed care statewide consistent with the existing STAR section 1915(b) and STAR+PLUS section 1915(b)/(c) waiver programs, and thereby replace existing Primary Care Case Management (PCCM) or fee-for-service (FFS) delivery systems. The state sought a section 1115 Demonstration as the vehicle to both expand the managed care delivery system, and to operate a funding pool, supported by managed care savings and diverted supplemental payments, to reimburse providers for uncompensated care costs and to provide incentive payments to participating hospitals that implement and operate delivery system reforms.

The STAR and STAR+PLUS managed care programs will cover most beneficiaries statewide through three geographic expansions. The first expansion occurred on September 1, 2011, under existing section 1915(b) and section 1915(c) authorities, and the second expansion occurred in March 2012, under section 1115 authority. A third expansion of STAR+PLUS will occur September 1, 2014 under section 1115 authority as a result of an amendment to the demonstration.

STAR is the primary managed care program serving low-income families and children, and STAR+PLUS provides acute and long-term service and supports to the aged, disabled, and chronically ill. Medicaid eligible adults who are not enrolled in Medicare, meet the level of care for Home and Community Based Services (HCBS), and reside in the MRSA, must enroll in a

STAR managed care organization (MCO); children meeting these criteria can voluntarily enroll in STAR. STAR MCOs in the MRSA will provide acute care services, and will coordinate acute and long-term care services with section 1915(c) waivers, such as the Community Based Alternatives Program and the Community Living Assistance and Support Services Program, that exist outside of this section 1115 demonstration.

STAR+PLUS, which serves beneficiaries meeting an institutional level of care (LOC) in the home or community, did not operate in the MRSA during the March 2012 expansion, but effective September 1, 2014, Medicaid eligible adults over age 21 who meet STAR+PLUS eligibility criteria and reside in the MRSA must enroll in STAR+PLUS. Clients under 21 who meet the criteria will be able to voluntarily enroll in STAR+PLUS effective September 1, 2014, thus will not be required to enroll.

STAR and STAR+PLUS beneficiaries receive enhanced behavioral health services consistent with the requirements of the Mental Health Parity Act. As of March 2012, STAR+PLUS beneficiaries began receiving inpatient services through the contracted managed care organizations (MCOs). STAR+PLUS MCOs will also provide Medicaid wrap services for outpatient drugs and biological products to dual eligible beneficiaries for whom the State has financial payment obligations. Additionally, Medicaid beneficiaries under the age of 21 will receive the full array of primary and preventive dental services required under the State plan, through contracting pre-paid dental plans.

Effective March 6, 2014, cognitive rehabilitation therapy services (CRT) will be provided through the STAR+PLUS HCBS program.

Effective September 1, 2014, the following additional benefits will be provided:

- acute care services for beneficiaries receiving services through an intermediate care facility for individuals with intellectual disabilities or a related condition (ICF/IID), or an ICF/IID waiver will be provided through STAR+PLUS; employment assistance and supported employment will be provided through the STAR+PLUS home and community based services (HCBS) program;
- mental health rehabilitation services will be provided via managed care; and
- mental health targeted case management for members who have chronic mental illness will be provided via managed care.
- Effective March 1, 2015, nursing facility services will be a covered benefit under STAR+PLUS managed care for adults over the age of 21,

Note: The NorthSTAR waiver in the Dallas service delivery area is not changing as a result of the September 1, 2014 and the March 1, 2015 STAR+PLUS expansions.

Beginning January 1, 2014, children ages 6 - 18 with family incomes between 100 – 133 percent of the federal poverty level were transferred from the state's separate Children's Health Insurance Program (CHIP) to Medicaid in accordance with section 1902(a)(10)(A)(i)(VII) of the

Act.  Under the demonstration these targeted low-income children (M-CHIP) are required to enroll in managed care. For the purposes of eligibility and benefits, these children are considered a mandatory Medicaid group for poverty-level related children and title XIX eligibility and benefit requirements apply. The state may claim enhanced match from the state's title XXI allotment for these M-CHIP children in accordance with title XXI funding requirements and regulations.  All references to CHIP and title XXI in this document apply to these M-CHIP children only.  Other requirements of title XXI (for separate CHIP programs) are not applicable to this demonstration.

Savings generated by the expansion of managed care and diverted supplemental payments will enable the state to maintain budget neutrality, while establishing two funding pools supported by Federal matching funds, to provide payments for uncompensated care costs and delivery system reforms undertaken by participating hospitals and providers.  These payments are intended to help providers prepare for new coverage demands in 2014 scheduled to take place under current Federal law.  The state proposes that the percentage of funding for uncompensated care will decrease as the coverage reforms of the Patient Protection and Affordable Care Act are implemented, and the percentage of funding for delivery system improvement will correspondingly increase.

Texas plans to work with private and public hospitals to create Regional Healthcare Partnerships (RHPs) that are anchored financially by public hospitals and/or local government entities, that will collaborate with participating providers to identify performance areas for improvement that may align with the following four broad categories: (1) infrastructure development, (2) program innovation and redesign, (3) quality improvements, and (4) population focused improvements. The non-Federal share of funding pool expenditures will be largely financed by state and local intergovernmental transfers (IGTs).  Texas will continue to work with CMS in engaging provider stakeholders and developing a sustainable framework for the RHPs.  It is anticipated, if all deliverables identified in this demonstration's STCs are satisfied, incentive payments for planning will begin in the second half of the first Demonstration Year (DY).

Through this demonstration, the state aims to:
- Expand risk-based managed care statewide;
- Support the development and maintenance of a coordinated care delivery system;
- Improve outcomes while containing cost growth;
- Protect and leverage financing to improve and prepare the health care infrastructure to serve a newly insured population; and
- Transition to quality-based payment systems across managed care and hospitals.

In May of 2016, CMS granted the demonstration a 15 month temporary extension to allow additional time for DSRIP projects to demonstrate their results. The extension also allows Texas to study its Medicaid payment and financing policies and providers' uncompensated care burdens, and prepare for the next stage in delivery system reform.

# III. GENERAL PROGRAM REQUIREMENTS

1. **Compliance with Federal Non-Discrimination Statutes.** The state must comply with all applicable Federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990, title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

2. **Compliance with Medicaid and Children's Health Insurance Program (CHIP) Law, Regulation, and Policy.** All requirements of the Medicaid program and CHIP expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), must apply to the demonstration.

3. **Changes in Medicaid and CHIP Law, Regulation, and Policy.** The state must, within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in Federal law, regulation, or policy affecting the Medicaid or CHIP program that occur during this Demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable.

4. **Impact on Demonstration of Changes in Federal Law, Regulation, and Policy Statements.**

   a) To the extent that a change in Federal law, regulation, or policy requires either a reduction or an increase in Federal financial participation (FFP) for expenditures made under this Demonstration, the State must adopt, subject to CMS approval, modified budget neutrality and allotment neutrality agreements for the Demonstration as necessary to comply with such change. The modified agreements will be effective upon the implementation of the change. The trend rates for the budget neutrality agreement are not subject to change under the subparagraph.

   b) If mandated changes in the Federal law require state legislation, the changes must take effect on the day such state legislation becomes effective, or on the last day such legislation was required to be in effect under the law.

5. **State Plan Amendments.** The state will not be required to submit title XIX or XXI State Plan amendments for changes affecting any populations made eligible solely through the Demonstration. If a population eligible through the Medicaid or CHIP State Plan is affected by a change to the Demonstration, a conforming amendment to the appropriate State Plan may be required, except as otherwise noted in these STCs.

6. **Changes Subject to the Amendment Process.** Changes related to eligibility, enrollment, benefits, cost sharing, sources of non-Federal share of funding, budget neutrality, spending limits for funding pools, methodologies for determining amounts paid from pools (to the extent specified in the STCs), deadlines for deliverables, and other comparable program

elements must be submitted to CMS as amendments to the demonstration. All amendment requests are subject to approval at the discretion of the Secretary, in accordance with section 1115 of the Act. The state must not implement changes to these elements without prior approval by CMS. Amendments to the demonstration are not retroactive, and FFP will not be available for changes to the demonstration that have not been approved through the amendment process set forth in paragraph 7 below (*Amendment Process*).

7. **Amendment Process.** Requests to amend the demonstration must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation of the change, and may not be implemented until approved. CMS reserves the right to deny or delay approval of a demonstration amendment based on non-compliance with these STCs, including, but not limited to, failure by the state to submit required reports and other deliverables in a timely fashion, according to the deadlines specified therein. Amendment requests must include, but are not limited to, the following:

   a) An explanation of the public process used by the state, consistent with the requirements of paragraph 14, to reach a decision regarding the requested amendment;

   b) A data analysis which identifies the specific "with waiver" impact of the proposed amendment on the current budget neutrality agreement. Such analysis must include current total computable "with waiver" and "without waiver" status, on both a summary and detailed level, through the current extension approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as a result of the proposed amendment which isolates (by Eligibility Group (EG)) the impact of the amendment;

   c) A detailed description of the amendment, including impact on beneficiaries, with sufficient supporting documentation, including a conforming title XIX State Plan amendment, if necessary; and

   d) A description of how the evaluation design will be modified to incorporate the amendment provisions.

8. **Extension of the Demonstration.** States that intend to request demonstration extensions under sections 1115(e) or 1115(f) are advised to observe the timelines contained in those statutes. Otherwise, no later than 12 months prior to the expiration date of the Demonstration, the chief executive officer of the state must submit to CMS either a Demonstration extension request or a phase-out plan, consistent with the requirements of paragraph 9.

As part of the Demonstration extension request, the State must provide documentation of compliance with the transparency requirements in 42 CFR § 431.412 and the public notice and tribal consultation requirements outlined in paragraph 13, as well as include the following supporting documentation:

a) <u>Demonstration Summary and Objectives</u>: The state must provide a summary of the Demonstration project, reiterate the objectives set forth at the time the Demonstration was proposed, and provide evidence of how these objectives have been met. If changes are requested, a narrative of the changes being requested, along with the objective of the change, and desired outcomes must be included.

b) <u>Special Terms and Conditions (STCs)</u>: The state must provide documentation of its compliance with each of the STCs. Where appropriate, a brief explanation may be accompanied by an attachment containing more detailed information. Where the STCs address any of the following areas, they need not be documented a second time.

c) <u>Waiver and Expenditure Authorities</u>: The state must provide a list along with a programmatic description of the waivers and expenditures authorities that are being requested in the extension.

d) <u>Quality</u>: The state must provide summaries of External Quality Review Organization (EQRO) reports, MCO and State quality assurance monitoring, and any other documentation of the quality of care provided under the Demonstration.

e) <u>Compliance with the Budget Neutrality Cap</u>: The state must provide financial data (as set forth in the current STCs) demonstrating that the state has maintained, and will maintain, budget neutrality for the requested period of extension. CMS will work with the state to ensure that federal expenditures under the extension of this project do not exceed the federal expenditures that would otherwise have been made. In doing so, CMS will take into account the best estimate of current trend rates at the time of the extension. In addition, the state must provide five years of recent historical expenditure and enrollment data for Medicaid and demonstration populations that are to be included in the demonstration extension, and a proposed budget neutrality test for the extension period based on the recent data.

f) <u>Interim Evaluation Report</u>: The state must provide an evaluation report reflecting the hypotheses being tested and any results available.

g) <u>Demonstration of Public Notice 42 CFR §431.408</u>: The state must provide documentation of the State's compliance with public notice process as specified in 42 CFR §431.408 including the post-award public input process described in 42 CFR §431.420(c), with a report of the issues raised by the public during the comment period and how the State considered the comments when developing the Demonstration extension application.

**9. Demonstration Phase-Out.** The state may only suspend or terminate this Demonstration in whole, or in part, consistent with the following requirements.

a) <u>Notification of Suspension or Termination</u>:  The state must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date and a phase-out plan.  The state must submit its notification letter and a draft phase-out plan to CMS no less than 5 months before the effective date of the Demonstration's suspension or termination.  Prior to submitting the draft phase-out plan to CMS, the state must publish on its Web site, the draft phase-out plan for a 30-day public comment period.  In addition, the State must conduct tribal consultation, in accordance with its approved tribal consultation State Plan Amendment.  Once the 30-day public comment period has ended, the state must provide a summary of each public comment received, the state's response to the comment, and how the State incorporated the received comment into the revised phase-out plan.

The state must obtain CMS approval of the phase-out plan prior to the implementation of the phase-out activities.  Implementation of phase-out activities must be no sooner than 14 days after CMS approval of the phase-out plan.

b) <u>Phase-out Plan Requirements</u>:  The state must include, at a minimum, in its phase-out plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the state will conduct administrative reviews of Medicaid eligibility for the affected beneficiaries, and ensure ongoing coverage for eligible individuals, as well as any community outreach activities.

c) <u>Phase-out Procedures</u>:  The state must comply with all notice requirements found in 42 CFR §431.206, 431.210 and 431.213.  In addition, the State must assure all appeal and hearing rights afforded to Demonstration participants as outlined in 42 CFR §431.220 and 431.221.  If a Demonstration participant requests a hearing before the date of action, the State must maintain benefits, as required in 42 CFR §431.230.  In addition, the state must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category, as discussed in the October 1, 2010, State Health Official Letter #10-008.

d) <u>Federal Financial Participation (FFP)</u>:  If the project is terminated or any relevant waivers suspended by the State, FFP shall be limited to normal closeout costs associated with terminating the Demonstration including services and administrative costs of disenrolling participants.

**10. CMS Right to Terminate or Suspend.**

a) CMS may suspend or terminate the demonstration (in whole or in part) at any time before the date of expiration, whenever it determines, following a hearing, that the state has materially failed to comply with the terms of the project.  CMS will promptly notify the state in writing of the determination and the reasons for the suspension or termination, together with the effective date.

b) **Finding of Non-Compliance.** The state does not relinquish its rights to challenge the CMS finding that the state materially failed to comply.

11. **Withdrawal of Waiver Authority.** CMS reserves the right to withdraw waivers of expenditure authorities at any time it determines that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of title XIX and/or XXI. CMS will promptly notify the State in writing of the determination and the reasons for the withdrawal, together with the effective date, and afford the State an opportunity to request a hearing to challenge CMS' determination prior to the effective date. If a waiver or expenditure authority is withdrawn, FFP is limited to normal closeout costs associated with terminating the waiver or expenditure authority, including services and administrative costs or disenrolling participants.

12. **Adequacy of Infrastructure.** The State will ensure the availability of adequate resources for the implementation and monitoring of the Demonstration, including education, outreach, and enrollment; maintaining eligibility systems; compliance with cost sharing requirements; and reporting on financial and other Demonstration components.

13. **Public Notice, Tribal Consultation, and Consultation with Interested Parties.** The State must comply with the State Notice Procedures set forth in 59 Fed. Reg. 49249 (September 27, 1994). The State must also comply with the tribal consultation requirements pursuant to section 1902(a)(73) of the Act as amended by section 5006(e) of the American Recovery and Reinvestment Act of 2009 and the tribal consultation requirements contained in the State's approved Medicaid State plan, when any program changes to the Demonstration, including (but not limited to) those referenced in paragraph 6, are proposed by the State.

In states with Federally recognized Indian tribes, consultation must be conducted in accordance with the consultation process outlined in the July 17, 2001 letter or the consultation process in the State's approved Medicaid State plan if that process is specifically applicable to consulting with tribal governments on waivers (42 C.F.R. §431.408(b)(2)).

In states with Federally recognized Indian tribes, Indian health programs, and/or Urban Indian organizations, the State is required to submit evidence to CMS regarding the solicitation of advice from these entities prior to submission of any demonstration proposal and/or renewal of this Demonstration (42 C.F.R. §431.408(b)(3)).

The state must also comply with the Public Notice Procedures set forth in 42 C.F.R. §447.205 for changes in statewide methods and standards for setting payment rates.

14. **Post Award Forum:** At least once each year, the state will afford the public with an opportunity to provide meaningful comment on the progress of the demonstration. At least 30 days prior to the date of the planned public forum, the state must publish the date, time and location of the forum in a prominent location on its website. The state can use either its

Medicaid Advisory Committee, or another meeting that is open to the public and where an interested party can learn about the progress of the demonstration to meet the requirements of the STC. The state must include a summary in the quarterly report, as specified in STC 65, associated with the quarter in which the forum was held. The state must also include the summary in its annual report as required by STC 66.

15. **Federal Financial Participation (FFP).** No federal matching funds for expenditures authorized for this demonstration will be available prior to the effective date identified in the demonstration approval letter.

## IV. ELIGIBILITY DERIVED FROM THE DEMONSTRATION

This section governs the state's exercise of Expenditure Authority 3. Those groups made eligible by virtue of the expenditure authorities expressly granted in this demonstration are subject to Medicaid laws, regulations and policies, except as expressly identified as not applicable under expenditure authority granted in this demonstration.

16. **STAR+PLUS 217-Like HCBS Eligibility Group.** This section describes the eligibility requirements for the 217-Like group under the Demonstration.

   a) STAR+PLUS 217-Like HCBS Eligibility Group consists of persons age 21 and older , who satisfy the following:

   i. Meet the STAR+PLUS Nursing Facility (NF) level of care requirement;

   ii. Will receive home and community based-services; and

   iii. Would be eligible in the same manner as specified under 42 CFR 435.217, 435.236 and 435.726 of the Federal Regulations and eligibility rules specified in section 1924 of the Social Security Act, if the home and community based services of the kind listed in Table 5 were provided under a 1915(c) waiver. The state does not use spousal impoverishment post-eligibility rules.

   b) This demonstration eligibility group is active at the times and in the parts of the state as indicated below:

   i. As of the implementation date of this demonstration, in Column B counties (as defined in Table 1).

   ii. Starting March 1, 2012 (or the implementation date for the STAR+PLUS expansion, if a later date), in Column E counties (as defined in Table 1).

   iii. Starting September 1, 2014, (or the implementation date for the STAR+PLUS expansion, if a later date), in Column F counties (as defined in Table 1).

c) The state retains the discretion to apply an interest list for the STAR+PLUS 217-Like Group as described in paragraph 41(c)(i)(A).

## V.  DEMONSTRATION DELIVERY SYSTEMS

This section governs the state's exercise of the following: waivers of the requirements for Statewideness (section 1902(a)(1)), Amount, Duration, and Scope of Services (section 1902(a)(10)(B)), Freedom of Choice (section 1902(a)(23)(A)), and Self-Direction of Care for HCBS Participants (section 1902(a)(32)), and Expenditure Authorities 1 through 4.

### A.  PHASED EXPANSION OF MANAGED CARE DELIVERY SYSTEMS

**17. Transition of Existing section 1915(b) and 1915(c) Waiver Programs into the Demonstration.**  Prior to this demonstration, the state operated managed care programs under the authority of section 1915(b) and 1915(c) waivers and provided HCBS through additional section 1915(c) waivers where managed care organizations did not operate.  The following is a description of the 1915 (b) and (c) waivers that are affected by this Demonstration:

a) STAR section 1915(b) waiver, TX 16 (ends with initial implementation of the Demonstration);

b) STAR+PLUS section 1915(b) waiver, TX 12 (ends with initial implementation of the Demonstration);

c) STAR+PLUS 1915 section (c) waiver, TX 0862 (Medical Assistance Only (MAO) eligibles) (ends with initial implementation of the Demonstration);

d) STAR+PLUS 1915 section (c) waiver, TX 0325 (SSI eligibles) (ends with initial implementation of the Demonstration);

e) Community Based Alternatives (CBA) section 1915(c) waiver, TX 0266 (ends in Column E counties that are not Column B counties, as defined in Table 1, when the March 2012 managed care expansion is implemented).

f) Pending CMS approval, CBA section 1915(c) waiver, TX 0266, terminates effective August 31, 2014.  Individuals in that waiver will transition to the STAR+PLUS 1115 HCBS program, effective September 1, 2014.

**18. Description of Managed Care Expansion Plan.**  The state shall conduct geographic expansion of the STAR and STAR+PLUS programs according to the Service Areas defined below.  The Primary Care Case Management (PCCM) delivery system in place prior to the Demonstration will terminate and transition to a capitated managed care delivery system.  The state shall implement the STAR and STAR+PLUS Expansions on March 1, 2012, or a later date approved by CMS, and determined as part of the Readiness Review, whichever is later.  The state shall notify CMS of a need for a delay in implementation, or CMS may identify such a need.  Table 1 below defines the Service Areas and delivery systems according to the managed care expansion plan.  (Note: the MRSA is defined in paragraph 19 in Table 1, Column D).

**Table 1. Service Areas and Delivery Systems as Defined by the Expansion Plan**
**Note:** Counties added to existing Service Areas are noted in italics.

| Service Area | STAR Start of Demo Column (A) | STAR+PLUS Start of Demo Column (B) | STAR March 2012 Column (C) | STAR March 2012 Column (D) (MRSA) | STAR+PLUS March 2012 Column (E) | STAR+PLUS September 2014 Column (F) (MRSA) |
|---|---|---|---|---|---|---|
| Bexar | Atascosa, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, Wilson | Atascosa, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, Wilson | Atascosa, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, Wilson | N/A | Atascosa, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, Wilson | N/A |
| Dallas | Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, Rockwall | Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, Rockwall | Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, Rockwall | N/A | Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, Rockwall | N/A |
| El Paso | El Paso Hudspeth | N/A | El Paso, Hudspeth | N/A | *El Paso, Hudspeth* | N/A |
| Harris | Austin, Brazoria, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, Wharton | Austin, Brazoria, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, Wharton | Austin, Brazoria, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, Wharton | N/A | Austin, Brazoria, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, Wharton | N/A |

| Service Area | STAR Start of Demo Column (A) | STAR+PLUS Start of Demo Column (B) | STAR March 2012 Column (C) | STAR March 2012 Column (D) (MRSA) | STAR+PLUS March 2012 Column (E) | STAR+PLUS September 2014 Column (F) (MRSA) |
|---|---|---|---|---|---|---|
| Hidalgo | N/A | N/A | *Cameron, Duval, Hidalgo, Jim Hogg, Maverick, McMullen, Starr, Webb, Willacy, Zapata* | N/A | *Cameron, Duval, Hidalgo, Jim Hogg, Maverick, McMullen, Starr, Webb, Willacy, Zapata* | N/A |
| Jefferson | Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, San Jacinto, Tyler, Walker | Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, San Jacinto, Tyler, Walker | Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, San Jacinto, Tyler, Walker | N/A | Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, San Jacinto, Tyler, Walker | N/A |
| Lubbock | Carson, Crosby, Deaf Smith, Floyd, Garza, Hale, Hockley, Hutchinson, Lamb, Lubbock, Lynn, Potter, Randall, Swisher, Terry | N/A | Carson, Crosby, Deaf Smith, Floyd, Garza, Hale, Hockley, Hutchinson, Lamb, Lubbock, Lynn, Potter, Randall, Swisher, Terry | N/A | *Carson, Crosby, Deaf Smith, Floyd, Garza, Hale, Hockley, Hutchinson, Lamb, Lubbock, Lynn, Potter, Randall, Swisher, Terry* | N/A |

| Service Area | STAR Start of Demo Column (A) | STAR+PLUS Start of Demo Column (B) | STAR March 2012 Column (C) | STAR March 2012 Column (D) (MRSA) | STAR+PLUS March 2012 Column (E) | STAR+PLUS September 2014 Column (F) (MRSA) |
|---|---|---|---|---|---|---|
| Nueces | Aransas, Bee, Brooks, Calhoun, Goliad, Jim Wells, Karnes, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, Victoria | Aransas, Bee, Brooks, Calhoun, Goliad, Jim Wells, Karnes, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, Victoria | Aransas, Bee, Brooks, Calhoun, Goliad, Jim Wells, Karnes, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, Victoria | N/A | Aransas, Bee, Brooks, Calhoun, Goliad, Jim Wells, Karnes, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, Victoria | N/A |
| Tarrant | Denton, Hood, Johnson, Parker, Tarrant, Wise | Denton, Hood, Johnson, Parker, Tarrant, Wise | Denton, Hood, Johnson, Parker, Tarrant, Wise | N/A | Denton, Hood, Johnson, Parker, Tarrant, Wise | N/A |
| Travis | Bastrop, Burnet, Caldwell, Fayette, Hays, Lee, Travis, Williamson | Bastrop, Burnet, Caldwell, Fayette, Hays, Lee, Travis, Williamson | Bastrop, Burnet, Caldwell, Fayette, Hays, Lee, Travis, Williamson | N/A | Bastrop, Burnet, Caldwell, Fayette, Hays, Lee, Travis, Williamson | N/A |
| Rural (West Texas, Central Texas, and Northeast Texas service areas) | N/A | N/A | N/A | See STC 19 | N/A | See STC 19 |

**19. Medicaid Rural Service Area (MRSA).** The MRSA consists of 164 counties and, prior to this demonstration, Medicaid beneficiaries residing in this service area received services through the non-capitated PCCM program under the State plan. The following counties comprise the Medicaid Rural Service Area:

  a) <u>West Texas:</u> Andrews, Archer, Armstrong, Bailey, Baylor, Borden, Brewster, Briscoe, Brown, Callahan, Castro, Childress, Clay, Cochran, Coke, Coleman, Collingsworth, Concho, Cottle, Crane, Crockett, Culberson, Dallam, Dawson, Dickens, Dimmit, Donley, Eastland, Ector, Edwards, Fisher, Foard, Frio, Gaines, Glasscock, Gray, Hall, Hansford, Hardeman, Hartley, Haskell, Hemphill, Howard, Irion, Jack, Jeff Davis, Jones, Kent, Kerr, Kimble, King, Kinney, Knox, La Salle, Lipscomb, Loving, Martin, Mason, McCulloch, Menard, Midland, Mitchell, Moore, Motley, Nolan, Ochiltree, Oldham, Palo Pinto, Parmer, Pecos, Presidio, Reagan, Real, Reeves, Roberts, Runnels, Schleicher, Scurry, Shackelford, Sherman, Stephens, Sterling, Stonewall, Sutton, Taylor, Terrell, Throckmorton, Tom Green, Upton, Uvalde, Val Verde, Ward, Wheeler, Wichita, Wilbarger, Winkler, Yoakum, Young, and Zavala.
  b) <u>Central Texas:</u> Bell, Blanco, Bosque, Brazos, Burleson, Colorado, Comanche, Coryell, DeWitt, Erath, Falls, Freestone, Gillespie, Gonzales, Grimes, Hamilton, Hill, Jackson, Lampasas, Lavaca, Leon, Limestone, Llano, Madison, McLennan, Milam, Mills, Robertson, San Saba, Somervell, Washington
  c) <u>Northeast Texas:</u> Anderson, Angelina, Bowie, Camp, Cass, Cherokee, Cooke, Delta, Fannin, Franklin, Grayson, Gregg, Harrison, Henderson, Hopkins, Houston, Lamar, Marion, Montague, Morris, Nacogdoches, Panola, Rains, Red River, Rusk, Sabine, San Augustine, Shelby, Smith, Titus, Trinity, Upshur, Van Zandt, Wood

**B.  ASSURANCES RELATED TO THE ONGOING OPERATION OF MANAGED CARE AND READINESS REVIEW REQUIREMENTS FOR SEPTEMBER 2014 EXPANSION**

**20. Managed Care Requirements.**
- <u>General.</u> The state must comply with the managed care regulations published at 42 CFR 438, except as waived herein. Capitation rates shall be developed and certified as actuarially sound, in accordance with 42 CFR 438.6. The certification shall identify historical utilization of State Plan services used in the rate development process.

- <u>Data requirements.</u> All managed care organizations shall maintain an information system that collects, analyzes, integrates and reports data as set forth at 42 CFR 438.242. This system shall include encounter data that can be reported in a standardized format. Encounter data requirements shall include the following:

  i.  *Encounter Data (Health Plan Responsibilities).* The health plan must collect, maintain, validate and submit data for services furnished to enrollees as stipulated by the state in its contracts with the health plans.

ii. *Encounter Data (State Responsibilities).* The state shall, in addition, develop mechanisms for the collection, reporting, and analysis of these, as well as a process to validate that each plan's encounter data are timely, complete and accurate. The state will take appropriate actions to identify and correct deficiencies identified in the collection of encounter data. The state shall have contractual provisions in place to impose financial penalties if accurate data are not submitted in a timely fashion. Additionally, the state shall contract with its EQRO to validate encounter data through medical record review.

iii. *Encounter Data Validation for New Capitated Managed Care Plans.* If the state contracts with new managed care organizations, the state shall conduct a validation 18 months after the effective date of the contract to determine completeness and accuracy of encounter data. The initial review shall include validation through a sample of medical records of demonstration enrollees.

iv. *Submission of Encounter Data to CMS.* The state shall submit encounter data to the Medicaid Statistical Information System (MSIS) and when required T-MSIS (Transformed MSIS) as is consistent with Federal law. The state must assure that encounter data maintained at managed care organizations can be linked with eligibility files maintained at the state.

- State Advisory Committee. The state will maintain a state Medicaid Advisory Committee, which is comprised of Medicaid recipients, Managed Care Organizations, providers, community-based organizations and advocates serving or representing Medicaid recipients and other interested parties as set forth in Tex. Gov't Code sec. 533.041. The advisory committee will provide input and recommendations to the Health and Human Services Commission regarding the statewide implementation of Medicaid Managed Care, including input and recommendations regarding: 1) program design and benefits, 2) systematic concerns from consumers and providers, 3) the efficiency and quality of services delivered by Medicaid managed care organizations, 4) contract requirements for the Medicaid managed care organizations, 5) Medicaid managed care network adequacy, and 6) trends in claims processing. The advisory committee will also assist HHSC with issues relevant to Medicaid managed care to improve the polices established for and programs operating under Medicaid managed care, including early and periodic screening, diagnosis and treatment, provider and patient education issues, and patient eligibility issues. The state will maintain minutes from these meetings and use them in evaluating program operations and identifying necessary program changes. Copies of committee meeting minutes will be made available to CMS upon request and the outcomes of the meetings may be discussed on the demonstration monitoring calls.

- MCO Participant Advisory Committees. The state shall require each MCO, through its contracts, to create and maintain participant advisory committees through which the

MCO can share information and capture enrollee feedback. The MCOs will be required to support and facilitate participant involvement and submit meeting minutes to the State. Copies of meeting minutes will be made available to CMS upon request.

- <u>Independent Consumer Supports.</u> To support the beneficiary's experience receiving medical assistance and long term services and supports in a managed care environment, the State shall create and maintain a system of consumer supports independent from the managed care plans to assist enrollees in understanding the coverage model and in the resolution of problems regarding services, coverage, access and rights.

    i. <u>Core Elements of the Independent Consumer Support System.</u>
    
    A. *Organizational Structure*. The Independent Consumer Supports System shall operate independently from any STAR+PLUS MCO. The organizational structure of the support system shall facilitate transparent and collaborative operation with beneficiaries, MCOs, and state government.

    B. *Accessibility*. The services of the Independent Consumer Supports System will be available to all Medicaid beneficiaries enrolled in STAR+PLUS receiving Medicaid long-term services and supports (institutional, residential and community based). The Independent Consumer Supports system will be accessible through multiple entryways (e.g., phone, internet, office) and will have the capacity to reach out to beneficiaries and/or authorized representatives through various means (mail, phone, in person), as appropriate.

    C. *Functions*. The Independent Consumer Supports system will be available to assist beneficiaries in navigating and accessing covered health care services and supports. Where an individual is enrolling in a new delivery system, the services of this system help individuals understand their choices and resolve problems and concerns that may arise between the individual and a provider/payer. The following list encompasses the system's scope of activity.
        1. The system will offer beneficiaries support in the pre-enrollment stage, such as unbiased health plan choice counseling and general program-related information.
        2. The system will serve as an access point for complaints and concerns about health plan enrollment, access to services, and other related matters.
        3. The system will be available to help enrollees understand the hearing, grievance, and appeal rights and processes within the health plan as well as the fair hearing, grievance, and appeal rights and processes available at the state level and assist them through the process if needed/requested.

D. *Staffing and training*. The Independent Consumer Supports system will include individuals who are knowledgeable about the state's Medicaid programs; beneficiary protections and rights under Medicaid managed care arrangements; and the health and service needs of persons with complex needs, including those with a chronic condition, disability, and cognitive or behavioral needs. In addition, the Independent Consumer Supports System will ensure that its services are delivered in a culturally competent manner and are accessible to individuals with limited English proficiency. The system ultimately developed by the state may draw upon existing staff within the chosen organizational structure and provide substantive training to ensure core competencies and a consistent consumer experience.

E. *Data Collection and Reporting*. The Independent Consumer Supports System shall track the volume and nature of beneficiary complaints and the resolution of such complaints on a schedule and manner determined by the state, but no less frequently than quarterly. This information will inform the state of any provider or contractor issues and support the reporting requirements to CMS.

ii. Independent Consumer Supports System Plan. The state shall submit a plan to CMS describing the structure and operation of the Independent Consumer Supports system that aligns with the core elements provided in STC 20.e.i no later than May 1, 2014.

iii. <u>Reporting and Evaluation under the Demonstration.</u> The state will report on the activities of the Independent Consumer Support System in the quarterly and annual reports. An approved Independent Consumer Support System Plan required will become Attachment L. Changes to Attachment L must be submitted to CMS for review and approval subject to STC 7. The state will evaluate the impact of the Independent Consumer Support Program in the demonstration Evaluation per Section XVI of these STCs.

21. **Managed Care Delivery Systems.** The state has been granted the authority (subject to Readiness Review, as discussed below) to operate managed care programs in the areas described in paragraphs 18 and 19; therefore, a demonstration amendment is not required to implement expansions in these service areas. However, any proposed changes in Demonstration authorities; implementation of managed care after June 1, 2012, in the service areas provided in Columns C, D, and E in Table 1; or changes in the populations included or excluded in the authorized service areas will require an amendment to the demonstration as outlined in STC 7.

**22. Readiness Review Requirements for September 1, 2014 expansion.** The state will submit to CMS, documentation regarding network adequacy and capacity for the September 1, 2014, expansion and the March 1, 2015 nursing facility expansion, as described below:

a) The Readiness Review for the September 1, 2014, and March 1, 2015, expansions will consist of the following elements:

   i. Review and approval of managed care contract amendments; and

   ii. Review of the State's plans for monitoring, overseeing, and ensuring compliance with MCO contract requirements, including network adequacy.

b) Unless otherwise noted below, sixty (60) days prior to the State's planned implementation date for the September 1, 2014, and March 1, 2015, expansions, the state must submit the following to CMS review:

   i. A list of deliverables and submissions the state will request from health plans to establish their readiness, with a description of the State's approach to analysis and verification, due May 1, 2014, submitted by the state May 1, 2014, and under review by CMS);

   ii. Plans for ongoing monitoring and oversight of MCO contract compliance;

   iii. A contingency plan for addressing insufficient network issues;

   iv. A plan for the transition from the section 1915(c) waiver programs to the STAR+PLUS HCBS program, submitted by the state on January 10, 2014 and under review by CMS;

   v. Demonstrations of network adequacy according to the list of deliverables provided in paragraph 24(e); and

   vi. Proposed managed care contracts or contract amendments, as needed, to implement the STAR and STAR+PLUS Expansions, submitted by the state December 17, 2013 and under review by CMS;

   vii. Amendment to the Community Based Alternatives (CBA) section 1915(c) waiver (TX 0266) to allow beneficiaries to transition to STAR+PLUS, due 90 days prior to when it takes effect.

c) CMS reserves the right to request additional documentation and impose additional milestones on the September 1, 2014 and March 1, 2015, expansions in light of findings from the 2014 and 2015 readiness review activities.

d) The state must postpone the September 1, 2014 or March 1, 2015, implementation of STAR+PLUS changes (in whole or in part) if requested to do so by CMS. CMS will provide the state its reasons, in writing, for requesting the postponement, which may be based on findings from the readiness review, and will modify the approved demonstration as necessary to reflect the delay. CMS will endeavor to make any postponement request before June 1, 2014 for the September 1, 2014, expansion and before December 1, 2014, for the March 1, 2015, expansion, but reserves the right to make a request later should new material information become available that would give grounds for postponement.

e) <u>Attempts To Gain an Accurate Beneficiary Address.</u> The state will complete return mail tracking after first enrollment notification mailing and throughout the first 90 days of implementation. The state will use information gained from return mail to make additional outreach attempts through other methods (phone, email, etc.) or complete other beneficiary address analysis from previous claims to strengthen efforts to obtain a valid address.

f) <u>Verification of Beneficiary's MCO Enrollment.</u> The state shall implement a CMS approved process for an MCO, network and non-network providers, or the State to confirm enrollment of enrollees who do not have a card or go to the wrong provider.

g) <u>Sample Notification Letters.</u> The state must send sample beneficiary notification letters to the existing Medicaid providers, either through direct mailing, posted on the STAR+PLUS website, or other widely distributed method, so providers are informed of what is being told to the beneficiaries regarding their transition to STAR+PLUS.

h) <u>Educational Activities for Beneficiaries and Providers.</u> The state will conduct a series of educational events for beneficiaries and providers throughout the state during the five months prior to the implementation of the September 1, 2014, STAR+PLUS expansion.

  i. Beneficiary educational events will consist of state and MCO staff traveling to locations throughout the state to provide enrollees and potential enrollees with information about STAR+PLUS and the MCOs. Events will be focused on the various demonstration populations including the elderly and HCBS participants. The educational events will educate beneficiaries on their MCO enrollment options, rights and responsibilities, and other important program elements. This effort will include, at a minimum, participation of ombudsman and any other relevant group providing enrollment support for beneficiaries. All informational materials will include contact numbers for the State Call Center and other contracted entities (e.g., fiscal intermediary, ADRCs) that can provide beneficiaries with enrollment support.

  ii. Provider education events will be conducted primarily by the MCOs with the state in attendance. Events will occur throughout the state at times and places that will allow providers and their administrative staff, as appropriate, to attend. MCOs and the state will educate providers about the goals of STAR+PLUS and the MCOs

will train providers and their administrative staff on basic processes and procedures.

i) <u>State Operated Call Center.</u>  The state must operate a call center independent of the MCOs for the duration of the demonstration.  This can be achieved either by providing the call center directly or through other state contracted entities (e.g. ADRCs, Fiscal Intermediary).  This entity should be able to help enrollees in making independent decisions about MCO choice, provide access to other state resources and enable enrollees to voice complaints about each of the MCOs independent of the MCOs.

j) <u>Call Center Response Statistics</u>.  During the first 30 days of implementation the state must review all call center response statistics daily to ensure all contracted entities are meeting requirements in their contracts.  If deficiencies are found, the state and the entity must determine how they will remedy the deficiency as soon as possible.  After the first 30 days, if all entities are consistently meeting requirements, the state can lessen the review of call center statistics, but must still review all statistics at least weekly for the first 180 days of implementation.  Data and information regarding call center statistics, including beneficiary questions and concerns, must be made available to CMS upon request.

k) <u>Implementation Calls with the MCOs</u>.  During the initial implementation of the STAR+PLUS expansion, the state must hold regular calls with the MCOs to discuss any issues that arise. The calls should cover all MCO operations and determine plans for correcting any issues as quickly as possible.  The state must maintain weekly calls for the first 90 days and bi-weekly calls for the next 90 days.  After the first 180 days of the program, the state may move to the regular timeframe intended for meeting with each of the MCOs.

l) <u>State Review of Beneficiary Complaints, Grievances, and Appeals</u>**.**  During the first six months of the STAR+PLUS expansion, the state must review complaint, grievance, and appeal logs for each MCO and data from the state or MCO operated incident management system on a monthly basis, to understand what issues beneficiaries and providers are having with each of the MCOs.  This review should be particularly focused on issues raised by populations that were transitioned from a 1915(c) waiver.  The state will use this information to implement any immediate corrective actions necessary.  The state will continue to monitor these statistics throughout the demonstration period and report on them in the quarterly reports.  Data and information regarding the beneficiary complaints, grievances, and appeals process must be made available to CMS upon request.

**23. Contracts.** No FFP is available for activities covered under contracts and/or modifications to existing contracts that are subject to 42 CFR 438 requirements prior to CMS approval of such contracts and/or contract amendments. The state shall submit any supporting documentation deemed necessary by CMS.  The state will provide CMS with a minimum of 45 days to

review and approve changes. CMS reserves the right, as a corrective action, to withhold FFP (either partial or full) for the demonstration, until the contract compliance requirement is met.

24. **Network Requirements**. The state must, through contract with MCOs, ensure the delivery of all covered benefits, including high quality care. Services must be delivered in a culturally competent manner, and the MCO network must be sufficient to provide access to covered services to the low-income population. In addition, the MCO must coordinate health care services for demonstration populations. The following requirements must be met by the State through its MCOs for the duration of the demonstration.

a) **Special Health Care Needs.** Enrollees with special health care needs must have direct access to a specialist, as appropriate for the individual's health care condition, as specified in 42 C.F.R. 438.208(c)(4).

b) **Out of Network Requirements.** The state, through MCOs, must provide demonstration populations with all demonstration program benefits described within these STCs, and as specified in 42 CFR 438.206(b)(4), and must allow access to non-network providers, without extra charge, when services cannot be timely furnished through a geographically accessible preferred provider network.

c) **Timeliness.** The state, through its MCOs, must comply with timely access requirements, and ensure their providers comply with these requirements. Providers must meet state standards for timely access to care and services, considering the urgency of the service needed. Network providers must offer office hours at least equal to those offered to the MCO's commercial line of business enrollees or Medicaid fee-for-service participants, if the provider accepts only Medicaid patients. Contracted services must be made available 24 hours per day, seven days per week, when medically necessary. The State, through the MCO contracts, must establish mechanisms to ensure and monitor provider compliance, and must take corrective action when noncompliance occurs.

d) **Credentialing.** The state, through its MCOs, must demonstrate that the MCO providers are credentialed. The state must also require these MCOs to participate in efforts to promote culturally-competent service delivery.

e) **Demonstrating Network Adequacy.** Annually, the state must provide adequate assurances that it has sufficient capacity to serve the expected enrollment in its service area.

   i.   The state must provide supporting documentation that must show that the MCO offers an adequate range of preventive, primary, pharmacy, and specialty service care for the anticipated number of enrollees in the service area. The network must contain providers who are sufficient in number, mix, and geographic distribution to meet the anticipated needs of enrollees. The supporting documentation for network adequacy by MCO includes the following:

(A) The MCO's demonstration population enrollment;
(B) Service utilization based on the demonstration population's characteristics and health care needs;
(C) The number and types of primary care, pharmacy, and specialty providers available to provide covered services to the demonstration population;
(D) The number of network providers accepting the new demonstration population;
(E) The geographic location of providers and demonstration populations, as shown through GeoAccess or similar software and identified according to the requirements contained in the state's MCO contract.

ii. The state must submit the documentation required in subparagraphs (A), (C), (D), and (E) above to CMS in conjunction with the initial contract submission.

iii. The state must submit this documentation to CMS any time that a significant change occurs in the health plan's operations that would affect adequate capacity and services. Significant changes include changes in services, benefits, geographic service area, or payments or the entity's enrollment of a new population.

**25. Enrollment Broker Monitoring.** The state shall submit the enrollment broker's monthly reports to CMS upon receipt. The reports should include information on activities including, but not limited to, community outreach events, call center intake statistics, and other enrollment broker activities as needed.

**26. Notice of Change in Implementation Timeline.** The state must notify CMS of any potential changes in the implementation and deliverables timelines as specified in the STCs.

**27. Revision of the State Quality Strategy and Required Monitoring Activities by State.**

i. Quality strategy. In accordance with Federal regulations at Subpart D 438.200 regarding Quality Assessment and Performance Improvement to ensure the delivery of quality health care and establishment of standards, the State must update its Quality Strategy to reflect all managed care plans operating under the STAR and STAR+PLUS programs and all quality improvement activities (such as the Delivery System Reform Incentive Payments Pool) proposed through this Demonstration and submit to CMS for approval. The state must obtain the input of recipients and other stakeholders in the development of its revised comprehensive Quality Strategy and make the Strategy available for public comment. The comprehensive Quality Strategy must be submitted to CMS for final approval within nine (9) months from the approval date of demonstration amendment #7 (which expands STAR+PLUS to the MRSA effective September 1, 2014). As requested by CMS, the State will submit a revised Attachment D "Future of the 1115 Transformation Waiver" and the "Future Initiatives" sections, and related sections, to CMS for review no later than June 1, 2016. The state must

revise the strategy whenever other significant changes are made, including changes through this Demonstration. The state will also provide CMS with annual reports on the implementation and effectiveness of the updated comprehensive Quality Strategy as it impacts the Demonstration. Until the revised comprehensive Quality Strategy is approved by CMS and implemented by the state, the state must continue with its pre-Demonstration Quality Strategy, which for HCBS is shown as Attachments D and E of these STCs.

ii. <u>Required Monitoring Activities by State and/or External Quality Review Organization (EQRO).</u> The state's EQRO process shall meet all the requirements of 42 CFR §438 Subpart E. In addition to routine encounter data validation processes that take place at the MCO and state level, the state must maintain its contract with its external quality review organization (EQRO) to require the independent validation of encounter data for all MCOs at a minimum of once every three years. In addition, the state, or its EQRO having sufficient experience and expertise and oversight by the SMA, shall monitor and evaluate the MCOs' performance on specific HCBS requirements. These include but are not limited to the following:

    a. Level of care determinations – to ensure that approved instruments are being used and applied appropriately and as necessary, and to ensure that individuals receiving HCBS services have been assessed to meet the required level of care for those services.

    b. Service plans – to ensure that MCOs are appropriately creating and implementing service plans based on enrollee's identified needs.

    c. MCO credentialing and/or verification policies – to ensure that HCBS services are provided by qualified providers. Health and welfare of enrollees – to ensure that the MCO, on an ongoing basis, identifies, addresses, and seeks to prevent instances of abuse, neglect, and exploitation.

## BENEFICIARIES SERVED THROUGH THE DEMONSTRATION

**28. Eligibility Groups Affected by the Demonstration.** Mandatory and optional Medicaid State plan groups described below are subject to all applicable Medicaid laws and regulations except as expressly waived under authority granted by this Demonstration and as described in these STCs. Any Medicaid State Plan Amendments to the eligibility standards and methodologies for these eligibility groups, including the conversion to a modified adjusted gross income standard effective January 1, 2014, will apply to this demonstration. These State plan eligible beneficiaries are required under the demonstration to enroll in managed care to receive benefits and may have access to additional benefits not described in the State plan.

Table 2 below describes the state plan eligibility groups that are mandatory and voluntary enrollees into managed care. Delivery system participation in the various Service Areas is subject to the implementation schedule and Readiness Review requirements described earlier in this Section. Currently, STAR+PLUS member who enters a nursing facility remains in STAR+PLUS for four months, but the nursing facility services are paid through FFS. By September 1, 2014, the State will "turn off" the four month counter. To maintain continuity of care, members will remain in STAR+PLUS and the nursing facility services will continue to be paid through FFS. Effective March 1, 2015, nursing facility services will be paid through managed care.

### Table 2. State Plan Populations Affected by the Demonstration

**A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; F= STAR January 2014; **G** = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G")

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR Mandatory | STAR Voluntary | STAR+ Mandatory | STAR+ Voluntary |
|---|---|---|---|---|---|---|
| Low Income Families §1931 low income families | §1902(a)(10)(A)(i)(I) MEG: THTQIP-Adults (parents and caretaker relatives) OR Children (dependent children) | 14% FPL (uses AFDC limits); $2,000/$3,000 if an aged or disabled member meets relationship requirement | A C D | | | |
| Earnings Transitional Twelve months TMA from increase | Individuals who lose eligibility under §1931 due to increase in income or new employment or loss | 185% FPL; No resource test | A C D | | | |

| A=STAR Start of Demo; B = STAR+PLUS Start of Demo; C = STAR March 2012; D = STAR March 2012 (MRSA); E = STAR+PLUS March 2012; F= STAR January 2014; G = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G") | | | STAR | | STAR+ | |
|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | **Description and Medicaid Eligibility Group (MEG)** | **Income Limit and Resource Standards** | **Mandatory** | **Voluntary** | **Mandatory** | **Voluntary** |
| in earnings, combined increase in earnings and child support, or loss of 90% earned income disregard | of earned income disregards; §1902(a)(52) <u>MEG:</u> THTQIP-Adults (parents and caretaker relatives) OR THTQIP-Children (dependent children) | | | | | |
| <u>Child Support Transitional</u> Four months post Medicaid resulting from child support | Individuals who lose eligibility under §1931 due to child or spousal support; §1902(a)(10)(A)(i)(I) <u>MEG:</u> THTQIP-Adults (parents and caretaker relatives) OR THTQIP-Children (dependent children) | N/A; No resource test | A C D | | | |
| <u>Poverty Level Pregnant Women</u> | §1902(a)(10)(A)(i)(IV), §1902(l)(1)(A) <u>MEG:</u> THTQIP-Adults | 185% FPL; No resource test | A C D | | | |
| <u>Children Under 1</u> Poverty level infants | §1902(a)(10)(A)(i)(IV), §1902(l)(1)(B) <u>MEG:</u> THTQIP-Children | 185% FPL; $2,000/$3,000 if aged or disabled member meets relationship requirement | A C D | | | |
| <u>Newborn Children</u> Children to age one born to Medicaid eligible mother | Deemed Newborn – mother was eligible for and received Medicaid for the birth; §1902(e)(4), 42 CFR §435.117 <u>MEG:</u> THTQIP-Children | N/A; No resource test | A C D | | | |
| <u>Children Age 1-5</u> | Poverty level children under 6; §1902(a)(10)(A)(i)(VI), §1902(l)(1)(C) <u>MEG:</u> THTQIP-Children | 133% FPL; $2,000/$3,000 if aged or disabled member meets relationship requirement | A C D | | | |

| | | | STAR | | STAR+ | |
|---|---|---|---|---|---|---|

**A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014;  * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G")

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR Mandatory | STAR Voluntary | STAR+ Mandatory | STAR+ Voluntary |
|---|---|---|---|---|---|---|
| Children Age 6-18 | Poverty level children under 19; §1902(a)(10)(A)(i)(VII), §1902(l)(1)(D)<br><br>Note:<br> All children at or below 100 percent FPL in this eligibility group are funded through title XIX.  Title XXI funding for children between 100-133% FPL shall be claimed as outlined in 42 CFR § 433.11<br><br>MEG:<br>If title XIX: THTQIP-Children<br>If title XXI: THTQIP-MCHIP Children | 133%  FPL;[1]<br>$2,000/$3,000 if aged or disabled member meets relationship requirement | A<br>C<br>D<br>F | | | |
| Former Foster Care Children[1] | Former foster care children §1902(a)(10)(A)(i)(IX)<br><br>Mandatory managed care for 18-26. Ages 18 through 20: choice between STAR Health and STAR program. Ages 21 up to 26: Mandatory STAR.<br><br>MEG: THTQIP-Adults (parents and caretaker relatives) | N/A; No resource test | F | | | |
| SSI Recipient 21 and older with Medicare (Dual) | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(ll) §1902(a)(10)(A)(i)(ll)(cc) Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS<br>MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B<br>E<br>G | |

---

[1] Note: The inclusion of children age 6-18 between 100-133 percent FPL and former foster care children is effective January 1, 2014, consistent with the state plan.

| A=STAR Start of Demo; B = STAR+PLUS Start of Demo; C = STAR March 2012; D = STAR March 2012 (MRSA); E = STAR+PLUS March 2012; F= STAR January 2014; G = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G") | | | | | | |
|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | **Description and Medicaid Eligibility Group (MEG)** | **Income Limit and Resource Standards** | **STAR** | | **STAR+** | |
| | | | Mandatory | Voluntary | Mandatory | Voluntary |
| SSI Recipient under 21 with Medicare (Dual) | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(ll) §1902(a)(10)(A)(i)(ll)(cc). Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS <u>MEG:</u> THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B E G |
| SSI Recipient without Medicare 21 and older | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(II). §1902(a)(10)(A)(i)(II)(cc). Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS <u>MEG:</u> THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | |
| SSI Recipient without Medicare under 21 | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(II) §1902(a)(10)(A)(i)(II)(cc) Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS <u>MEG:</u> THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B E G |
| Pickle Group 21 and older, with Medicare Includes pre-Pickle eligibility group | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §§435.134, 435.135 <u>MEG:</u> THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | |
| Pickle Group 21 and older without Medicare Includes pre-Pickle eligibility group | Would be eligible for SSI if title II COLAs were deducted from income; 42 CFR §435.134, 42 CFR §435.135 <u>MEG:</u> THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | |
| Pickle Group under 21 with Medicare | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §435.135 <u>MEG:</u> THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B E G |

| A=STAR Start of Demo; B = STAR+PLUS Start of Demo; C = STAR March 2012; D = STAR March 2012 (MRSA); E = STAR+PLUS March 2012; F= STAR January 2014; G = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G") | | | | | | |
|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | **Description and Medicaid Eligibility Group (MEG)** | **Income Limit and Resource Standards** | **STAR** | | **STAR+** | |
| | | | Mandatory | Voluntary | Mandatory | Voluntary |
| Pickle Group under 21 without Medicare | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §435.135 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B E G |
| Disabled Adult Children (DAC) 21 or over with Medicare | §1635(c); §1935 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | |
| Disabled Adult Children (DAC) 21 or over without Medicare | §1635(c); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | |
| DAC under 21 with Medicare | §1635(c); §1935 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B E G |
| DAC under 21 without Medicare | 1635(c); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B E G |
| Disabled Widow(er) | Widows/Widowers, 1634(b); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | |
| Early Aged Widow(er) | Early Widows/Widowers, 1634(d); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | |
| SSI Denied Children with Medicare, under age 19 | Children no longer eligible for SSI because of change in definition of disability; §1902(a)(10)(A)(i)(II) MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B E G |
| SSI Denied Children without Medicare, under age 19 | Children no longer eligible for SSI because of change in definition of disability; §1902(a)(10)(A)(i)(II) MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B E |
| Medicaid Buy-In (MBI) with Medicare | BBA Work Incentives Group; §1902(a)(10)(ii)(XIII) MEG: THTQIP-AMR | 250% FPL; $2,000 | | | B E G | |
| Medicaid Buy-In (MBI) without Medicare | BBA Work Incentives Group; §1902(a)(10)(ii)(XIII) MEG: THTQIP-Disabled | 250% FPL; $2,000 | D* | A* | | B E G |

| **A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G") | | | | | | |
|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | **Description and Medicaid Eligibility Group (MEG)** | **Income Limit and Resource Standards** | **STAR** | | **STAR+** | |
| | | | Mandatory | Voluntary | Mandatory | Voluntary |
| <u>Medicaid Buy-In for Children (under age 19) with Medicare</u> | Family Opportunity Act (MBIC), §1902(a)(10)(A)(ii)(XIX) <u>MEG</u>: THTQIP-AMR | 300% FPL; No resource standard | | | | B E G |
| <u>Medicaid Buy-In for Children(under age 19) without Medicare</u> | Family Opportunity Act (MBIC), §1902(a)(10)(A)(ii)(XIX) <u>MEG</u>: THTQIP-Disabled | 300% FPL; No resource standard | | A* D* | | B E G |
| <u>Nursing Facility age 21 and older</u> | Special income level group, in a medical institution for at least 30 consecutive days with gross income that does not exceed 300% of the SSI income standard; §1902(a)(10)(A)(ii)(V) <u>MEG</u>: THTQIP-AMR (with Medicare) OR THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/ $3,000 couple | | | B† E† G | |
| <u>217 Group without Medicare under 21</u> | Institutional eligibility and post-eligibility rules for individuals who are eligible as specified under 42 CFR 435.217, 435.236, and 435.726 §1924 of the Act. <u>MEG</u>: THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility, but not for post-eligibility. | | | D* | G |
| <u>217 Group without Medicare 21and older</u> | Institutional eligibility and post-eligibility rules for individuals who are eligible as specified under 42 CFR 435.217, 435.236, and 435.726 and §1924 of the Act. <u>MEG</u>: THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility, but not for post-eligibility. | D* | | G | |

† Only beneficiaries who enrolled in STAR+PLUS prior to a nursing facility admission remain enrolled in STAR+PLUS while in a nursing facility. These beneficiaries left STAR+PLUS after four months in a nursing facility.

## 29. Demonstration Expansion Population – STAR+PLUS 217-Like Eligibility Group

Table 3 below describes the demonstration expansion populations that are mandatory and voluntary enrollees into managed care. Delivery system participation in the various Service Areas is subject to the implementation schedule and Readiness Review requirements described earlier in paragraph 22. A STAR+PLUS member who enters a nursing facility remains in STAR+PLUS for four months, but payment for the nursing facility services is made outside of the managed care capitation rate directly to the nursing facility, at the otherwise applicable state plan rate. Effective March 1, 2015, nursing facility benefits will be a capitated service for STAR+PLUS members age 21 and older. STAR+PLUS members who enter a nursing facility on September 1, 2014, or later will remain enrolled in STAR+PLUS through February 28, 2015, provided they continue to be eligible for STAR+PLUS.

As described in STC 16, those groups made eligible by virtue of the expenditure authorities expressly granted in this demonstration are subject to Medicaid laws, regulations and policies, except as expressly identified as not applicable under expenditure authority granted in this demonstration.

### Table 3. Demonstration Expansion Populations Made Eligible by the Demonstration

**A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F** = STAR January 2014; **G** = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G")

| Expansion Eligibility Group | Description and MEG | Income Limit and Resource Standards | STAR Mandatory | STAR Voluntary | STAR+ Mandatory | STAR+ Voluntary |
|---|---|---|---|---|---|---|
| 217-Like Group Categorically needy individuals under the State plan receiving HCBS services (of the kind listed in Table 5) in the STAR+PLUS service areas. | Institutional eligibility and post-eligibility rules for individuals who would only be eligible in the same manner as specified under 42 CFR 435.217, 435.236, and 435.726 and §1924 of the Act, if the State had not eliminated its 1915(c) STAR+PLUS waivers. MEG: THTQIP-AMR (with Medicare) OR THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. | | | B E G | |

**30. Populations Not Affected by the Demonstration.** The following populations receive Medicaid services without regard to the demonstration.

a) Medically Needy;

b) IV-E eligible adoption assistance individuals, STAR Health enrollees, transitioning foster care youth, non-IV-E Foster Care and State subsidized adoption children, independent foster care adolescents, and optional categorically needy children eligible under 42 CFR 435.222;

c) Women in the Medicaid Breast and Cervical Cancer Program;

d) Residents of State Supported Living Centers;

e) Undocumented or Ineligible (5-year bar) Aliens only eligible for emergency medical services;

f) Prior to September 1, 2014, individuals residing in a nursing facility, who entered the nursing facility while enrolled in STAR+PLUS, and who have been in the nursing facility for at least four months;

g) Individuals residing in a nursing facility who entered the nursing facility while enrolled in STAR, beginning with the month after the State receives notification that they entered the nursing facility;

h) Individuals enrolled in the Program for All Inclusive Care for the Elderly (PACE) program;

i) Individuals enrolled in the Medically Dependent Children Program (1915(c)); and

j) Individuals residing in a facility in the pediatric care facility class of nursing facilities, or any Veterans Land Board (VLB) Texas State Veterans Homes.

**C.     STAR AND STAR+PLUS (non-HCBS) ENROLLMENT, BENEFITS AND REPORTING REQUIREMENTS**

**31. Enrollment.**

**Time to Choose a Plan.**
For implementation of the September 1, 2014 and March 1, 2015, changes, as described in Section II, potential beneficiaries, excluding pregnant women, will have 30 days to choose a managed care organization. Pregnant women will have 16 days to choose a managed care

organization. Effective September 1, 2014, and March 1, 2015, all beneficiaries will have 15 days to choose a managed care organization.

a) **Auto-Assignment.** If a potential beneficiary does not choose a managed care organization within the time frames defined in (a), he or she may be auto-assigned to a managed care organization. When possible, the auto-assignment algorithm shall take into consideration the beneficiary's history with a primary care provider, and when applicable, the beneficiary's history with a nursing facility. If this is not possible the State will equitably distribute beneficiaries among qualified MCOs.

b) The State may automatically re-enroll a beneficiary in the same managed care organization if there is a loss of Medicaid eligibility for six months or less.

**32. Disenrollment or Transfer.** Individuals should be informed of opportunities no less than annually for disenrollment and ongoing plan choice opportunities, regularly and in a manner consistent with 42 CFR 438 and other requirements set forth in the Demonstration Special Terms and Conditions.

a) **MCO Transfer at Request of Beneficiary.** Beneficiaries may request transfer to another managed care organization in the service area through the enrollment broker at any time.

b) **Transfer to FFS at Request of Beneficiary** Recipients that are voluntarily enrolled in a managed care programs may request disenrollment and return to traditional Medicaid. Mandatory recipients must request disenrollment from managed care in writing to HHSC; however, HHSC considers disenrollment from managed care only in rare situations, when sufficient medical documentation establishes that the MCO cannot provided the needed services. An authorized HHSC representative reviews all disenrollment requests, and processes approved requests for disenrollment from an MCO. The Enrollment Broker provides disenrollment education and offers other options as appropriate.

c) **Transfer to FFS at Request of MCO.** A managed care organization has a limited right to request a beneficiary be disenrolled from the managed care organization without the beneficiary's consent. HHSC must approve any managed care organization request for disenrollment of a beneficiary for cause. HHSC may permit disenrollment of a beneficiary under the following circumstances:

i. The beneficiary misuses or loans his or her managed care organization membership card to another person to obtain services; or

ii. The beneficiary is disruptive, unruly, threatening or uncooperative to the extent that his or her membership seriously impairs the MCO's or provider's ability to provide services to the beneficiary, or to obtain new beneficiaries, and the beneficiary's behavior is not caused by a physical or behavioral health condition; or

    iii.    The beneficiary consistently refuses to comply with managed care restrictions (e.g., repeatedly using the emergency room in combination with refusing to allow the managed care organization to treat the underlying medical condition).

The managed care organization must take reasonable measures to correct the beneficiary's behavior prior to requesting disenrollment. Reasonable measures may include providing education and counseling regarding the offensive acts or behaviors. HHSC must notify the beneficiary of HHSC's decision to disenroll the beneficiary, if all reasonable measures have failed to remedy the problem. If the beneficiary disagrees with the decision to disenroll the beneficiary from the managed care organization, HHSC must notify the beneficiary of the availability of the complaint procedure and HHSC's fair hearing process. The managed care organization cannot request a disenrollment based on adverse change in the member's health status or utilization of services that are medically necessary for treatment of a member's condition.

    d)  **Impact of Nursing Facility Entry on Enrollment in STAR and STAR+PLUS.**

    i.    For STAR+PLUS: Effective through February 28, 2015, individuals in a nursing facility are excluded from STAR+PLUS. STAR+PLUS members who enter a nursing facility can continue to be enrolled for four months. After four months, if still in a nursing facility, the member is disenrolled. Persons in a nursing facility may enter STAR+PLUS when discharged from the nursing facility through the Money Follows the Person program. STAR+PLUS members who enter a nursing facility on September 1, 2014, or later will remain enrolled in STAR+PLUS through February 28, 2015, provided they continue to be eligible for STAR+PLUS. Effective March 1, 2015, nursing facility services are included in STAR+PLUS.

    ii.    For STAR: Individuals residing in a nursing facility who entered the nursing facility while enrolled in STAR are disenrolled from STAR, beginning with the month after the state receives notification they entered the nursing facility.


**33. Benefits.** The following Table 3 specifies the scope of services that may be made available to STAR and STAR+PLUS enrollees through the STAR and STAR+PLUS managed care plans. The schedule of services mirrors those provided in the Medicaid State plan, with the exception of 1915(b)(3)-like services as described in this waiver.

Should the state amend its State plan to provide additional optional services not listed below, coverage for those services may also be provided through the STAR and STAR+PLUS MCOs. The state will include non-behavioral inpatient hospital services in STAR+PLUS capitation as of the March 2012 expansion.

**Table 3. State Plan Services for STAR and STAR+PLUS Participants**

| Adult/Child | Service | Mandatory or Optional State Plan Services[2] |
|---|---|---|
| Adult/Child | Inpatient Hospital Services[1,2,3] | Mandatory §1905(a)(1) |
| Adult/Child | Outpatient Hospital Services | Mandatory §1905(a)(2) |
| Adult/Child | Rural Health Clinic Services | Mandatory §1905(a)(2) |
| Adult/Child | (Federally Qualified Health Center (FQHC) Services | Mandatory §1905(a)(2) |
| Adult/Child | Laboratory and x-ray services | Mandatory §1905(a)(3) |
| Adult/Child | Diagnostic Services | Optional §1905(a)(13) |
| Child | EPSDT | Mandatory §1905(a)(4) |
| Adult/Child | Family Planning | Mandatory §1905(a)(4) |
| Adult/Child | Physician's Services | Mandatory §1905(a)(5) |
| Adult/Child | Medical and Surgical Services Furnished by a Dentist | Mandatory §1905(a)(5) |
| Adult/Child | Podiatrists' Services | Optional §1905(a)(6) |
| Adult/Child | Optometrists' Services | Optional §1905(a)(6) |
| Adult/Child | Intermittent or part-time nursing services provided by a home health agency | Mandatory for individuals who, under the State plan, are entitled to nursing facility services, §1902(a)(10)(D) |
| Adult/Child | Home health aide services provided by a home health agency | Mandatory for individuals who, under the State plan, are entitled to nursing facility services, §1902(a)(10)(D) |
| Adult/Child | Medical supplies, equipment, and appliances | Mandatory for individuals who, under the State plan, are entitled to nursing facility services, §1902(a)(10)(D) |
| Adult/Child | Physical therapy, occupational therapy, speech pathology, and audiology provided by a home health agency | Optional §1902(a)(10)(D), 42 CFR 440.70 |
| Adult/Child | Clinic Services | Optional §1905(a)(9) |
| Adult/Child | Prescribed Drugs (beginning March 1, 2012)[4] | Optional §1927(d) |
| Adult/Child | Non-prescription drugs (beginning March 1, 2012 | Optional §1927(d) |
| Adult/Child | Prosthetic Devices | Optional §1905(a)(12) |
| Adult/Child | Eyeglasses | Optional §1905(a)(12) |
| Adult/Child | Preventive Services | Optional §1905(a)(13) |
| Adult | Services for individuals over age 65 in IMDs – Inpatient, Not Nursing Facility | Optional §1905(a)(14) |
| Adult | Effective through February 28, 2015: Nursing facility services for enrollees age 21 and older – 4 month service limitation. | Mandatory §1905(a)(4) |

---

[2] This column describes whether a services is a required state plan service or if a state can elect to cover the service under the Social Security Act. All services listed here are covered in the Texas State plan.

| Adult/ Child | Service | Mandatory or Optional State Plan Services[2] |
|---|---|---|
| | Effective March 1, 2015: Nursing facility services (STAR+PLUS only) | |
| Child | Inpatient psychiatric facility services for individuals under age 21 | Optional §1905(a)(16) |
| Adult (STAR+PLUS) | Rehabilitative Services – Day Activity & Health Services | Optional, Rehabilitation Service, 42 CFR 440.130(d) |
| Adult/Child | Effective September 1, 2014: Mental Health Rehabilitative Services | Optional, Rehabilitation Service, 1905(a)(13) and 42 CFR 440.130(d) |
| Adult/Child | Effective September 1, 2014: Targeted Case Management for Individuals with Chronic Mental | Optional 1915(a)(19), 1915(g) |
| Adult/Child | Nurse-Midwife Services | Mandatory §1905(a)(17) |
| Adult/Child | Certified pediatric or family nurse practitioners' services | Mandatory §1905(a)(21) |
| Adult/Child | Personal care services in the home | Optional §1905(a)(24), 42 CFR 440.170 |

[1]Substance use disorder treatment services are capitated services for STAR and STAR+PLUS, and MCOs may provide these services in a chemical dependency treatment facility in lieu of the acute care inpatient hospital setting. Similarly, the MCOs will be responsible for providing acute inpatient days for psychiatric conditions, and may provide these services in a free-standing psychiatric hospital in lieu of acute care inpatient hospital settings. The State does not include non-State plan services, such as room and board, in the STAR or STAR+PLUS capitation; however, the MCO is not restricted to only the delivery of State plan services when alternative services are a cost-effective and medically appropriate response to the needs of the member.

[2] The 30-day spell of illness limitation for hospital inpatient services described in the state plan does not apply to STAR enrollees, certain approved transplants, children age 20 and younger, or to individuals with severe and persistent mental illness.

[3] The annual benefit limitation on inpatient hospital services that is described in the state plan does not apply to STAR or STAR+PLUS enrollees.

+ The state plan prescription drug limitations for adults aged 21 and older do not apply to STAR or STAR+PLUS enrollees.
.

**34. Self-Referral.** Demonstration beneficiaries may self-refer for the following services:

a) In-network behavioral health services;

b) Obstetric and gynecological services, regardless of whether the provider is in the client's MCO network;

c) In-network eye health care services, other than surgery, including optometry and ophthalmology;

d) Family planning services, regardless of whether the provider is in the client's MCO network; and

e) Services from a provider with the Early Childhood Intervention program for children ages 0-3 years with a developmental delay.

**35. Federally Qualified Health Centers and Rural Health Centers.** An enrollee is guaranteed the choice of at least one MCO which has at least one FQHC as a participating provider. If the enrollee elects not to select an MCO that includes a FQHC in the provider network, no FQHC services will be required to be furnished to the enrollee while the enrollee is enrolled with that MCO. The same requirements apply to Rural Health Centers.

**36. Early and Periodic Screening, Diagnosis, and Treatment (EPSDT).** The MCOs will fulfill the state's responsibilities for coverage, outreach, and assistance with respect to EPSDT services that are described in the requirements of sections 1905(a)(4)(b) (services), 1902(a)(43) (administrative requirements), and 1905(r) (definitions).

**37. Marketing and Information.** The state may permit indirect marketing by MCOs, including: radio, TV, billboard, bus signs, bench displays, newspaper, decals, and banners. Direct mail marketing is prohibited, with the exception of direct marketing conducted during HHSC-approved enrollment events. HHSC's managed care contracts and Uniform Managed Care Manual must include restrictions on offering gifts and other incentives to potential enrollees, and reporting and investigating alleged marketing violations.

a) The State must require MCOs to translate marketing materials into languages of major population groups that comprise 10 percent or more of the population.

b) All information provided to enrollees, inclusive of, and in addition to, educational materials, enrollment and disenrollment materials, benefit changes, and explanations and other communication, must fully comport with 42 CFR 438.10, and be accessible and understandable to individuals enrolled or potentially enrolled in the Demonstration.

**38. Fair Hearing Procedures.** For standard appeals, members have a right to access the fair hearing process at any time. For expedited appeals, members must exhaust the MCO's expedited appeals process before making a request for an expedited HHSC fair hearing.

**39. STAR and STAR+PLUS (non-HCBS) Reporting Requirements.** The State will be required to report to CMS the following topics within each report. Each report topic should include a brief description of the findings (if reported by MCOs as required under contract), any problems found, and any corrective action plans put in place either at the plan level or the State level to address the issues.

a) <u>Quarterly Progress Report</u> – Provider termination rates (including primary care physicians and types of specialists) and reasons for termination; customer service reporting, including average speed of answer at the plans and call abandonment rates; Medicaid managed care helpline findings, MCO network adequacy reporting through Enrollment Broker reporting;

and MCO compliance with access time/distance standards, including Geo Access mapping through HHSC Strategic Division Support.

b) Bi-annual (Every Other Quarterly Progress Report) – Disenrollment requests by enrollees or the plans; summary of MCO appeals for the quarter; and outcomes of claims summary reporting including timeliness in processing claims, accuracy and any possible fraud and abuse detected, enrollment into managed care for people with special health care needs.

c) Annual Report – CAHPS survey (for STAR or STAR+PLUS depending on the availability of the survey data), including report on provider wait times or appointment scheduling times; annual summary of network adequacy by plan, as specified in paragraph 27(e)(1), MCO compliance with provider 24/7 availability; summary of outcomes of any reviews or studies, including focused studies, External Quality Reviews, financial reviews, or other types of reviews or studies conducted by the state or a contractor of the state, as feasible and appropriate.

## E.    CHILDREN'S DENTAL PROGRAM

**40. Implementation of the Children's Dental Program.** As of March 2012 (subject to the CMS readiness review, as discussed in STC 18), children's primary and preventive Medicaid dental services shall be delivered through a capitated statewide dental services program (the Children's Dental Program). Contracting dental maintenance organizations (DMOs) will develop networks of Main Dental Home providers, consisting of general dentists and pediatric dentists. The dental home framework under this statewide program shall be informed by the improved dental outcomes evidenced under the "First Dental Home Initiative" in the State. Services provided through the Children's Dental Program are separate from the medical services provided by the STAR and STAR+PLUS managed care organizations, and are available to persons listed in Table 2 who are under age 21, with the exception of the groups listed in (b) below. The Children's Dental Program must conform to all applicable regulations governing prepaid ambulatory health plans (PAHPs), as specified in 42 C.F.R. 438.

a) The following Medicaid recipients are excluded from the Children's Dental Program, and will continue to receive their Medicaid dental services outside of the Demonstration: Medicaid recipients age 21 and over; all Medicaid recipients, regardless of age, residing in Medicaid-paid facilities such as nursing homes, state supported living centers, or Intermediate Care Facilities for Individuals with an Intellectual Disability or Related Conditions (ICF/ID); and STAR Health Program recipients.

b) Implementation of the Children's Dental Program is subject to the State demonstrating sufficient network adequacy, in accordance with the requirements and deliverables provided in paragraph 22(b) of these STCs, except that subparagraph 22(b)(iv) does not apply, and (to the extent that it cross-references requirements relating to primary care providers and pharmacy services in STC 24(e)) subparagraph 22(b)(v) does not apply. In

addition, for purposes of this paragraph 40(b), references to the STAR and STAR+PLUS programs in paragraphs 22(b) and 24(e) are replaced with the Children's Dental Program. CMS acknowledges that the state already has submitted the readiness review deliverables due November 3, 2011.

c) The state will continue to hold quarterly meetings with dental stakeholders, including dental care providers, as required under the *Frew* consent decree. The state will collect relevant data from each DMO to comply with CMS-416 reporting requirements.

## F.  STAR+PLUS HOME AND COMMUNITY BASED SERVICES (HCBS) ENROLLMENT, BENEFITS AND REPORTING REQUIREMENTS

## 41. Operations of the STAR+PLUS HCBS Program

a) **Compliance with Specified HCBS Requirements.** All federal regulations that govern the provision of HCBS under section 1915(c) waivers shall apply to the HCBS program authorized under section 1115, and provided through STAR+PLUS. The state shall include a description of the steps taken to ensure compliance with these regulations as part of the Annual Report discussed in paragraph 67. HCBS, under the demonstration, shall operate in accordance with these STCs and associated attachments. As of the initial approval of this demonstration, these STCs define an HCBS program that operates in the same manner as under the approved section 1915(c) waiver authorities that were transferred to this demonstration.

b) **Regional Rollout and Transition of the Demonstration and Concurrent Ending of the section 1915(c) Waivers.**

i. The state must provide notice to STAR+PLUS HCBS participants residing in Column B counties (see Table 1) that the authority for such services is transferring from a section 1915(c) waiver authority to the demonstration, that no action is required on behalf of the beneficiary, and that there is no disruption or changes to services. Such notice must be provided to said beneficiaries prior to the transfer of waiver authorities from section 1915(c) to the section 1115 demonstration.

ii. The state may implement STAR+PLUS in Column E counties that are not Column B counties (see Table 1) no earlier than March 1, 2012.

iii. The state must provide notice and any outreach and educational materials to all individuals currently enrolled in the section 1915(c) waiver known as Community Based Alternatives (control number 0266) that reside in Column E counties that are not Column B counties (see Table 1) where the Community Based Alternatives will terminate, and be replaced with the STAR+PLUS HCBS program. Such notice must be provided no later than 30 days prior to the transfer of waiver authorities from

1915(c) to the 1115 demonstration.  The transition plan for this population must be submitted to CMS as part of the Readiness Review specified in paragraph 22.

iv.  The State may implement STAR+PLUS in the counties described in Column F of Table 1 no earlier than September 1, 2014.

v.  Per an amendment and phase-out schedule for the section 1915(c) waiver, the state must simultaneously cease operation of the section 1915(c) waiver for persons who are elderly and/or disabled in the region in which the STAR+PLUS program is being implemented, in accordance with requirements for 1915(c) waiver termination, including submission of waiver amendments, public notice/tribal consultation requirements.

vi.  The state must provide notice and any outreach and educational materials to all individuals currently enrolled in the section 1915(c) waiver known as Community Based Alternatives (control number 0266) that reside in STC 19 counties where the Community Based Alternatives will terminate and be replaced with the STAR+PLUS HCBS program.  Such notice must be provided no later than 30 days prior to the transfer of waiver authorities from 1915(c) to the 1115 demonstration.  The transition plan for this population must be submitted to CMS as part of the Readiness Review specified in paragraph 22.

c)  **Determination of Benefits by Designation into a STAR+PLUS HCBS Group.**  The STAR+PLUS HCBS Program provides long-term care services and supports as identified in Table 5 to two groups of people, as defined below:

i.  **STAR+PLUS 217-Like HCBS Group.**  This group consists of persons age 21 and older, who meet the NF level of care (LOC), who qualify as members of the 217-Like HCBS Group, and who need and are receiving HCBS as an alternative to NF care.  The Demonstration population includes persons who could have been eligible under 42 CFR 435.217 had the state continued its section 1915(c) HCBS waiver for persons who are elderly and/or physically disabled.  This group is subject to a numeric enrollment limitation, as described below.

(A)  **Interest List for STAR+PLUS 217-LIKE HCBS Group.**  The state will operate an interest list for the STAR+PLUS 217-Like HCBS population in the demonstration.  An interest list is a waiting list that an individual is placed on when they express interest in enrollment, to the state or local agency that determines eligibility for STAR +PLUS.  Individuals meeting all eligibility criteria are enrolled into this population on a "first-come, first-served" basis from the interest list, except that persons entering the demonstration through Money Follows the Person (MFP) are placed at the head of the interest list.  These lists must be managed on a statewide basis using a standardized assessment tool, and in accord with criteria established by the state.  Interest list policies must be based

on objective criteria and applied consistently in all geographic areas served. Persons living in the service areas provided in Column B, E, and F of Table 1 that are on an interest list for the CBA 1915(c) waiver program at the time of transition to STAR+PLUS must be included in the STAR+PLUS interest list, and be offered enrollment in the same priority order as would have occurred if STAR+PLUS had been in place at the time of their initial application.

(B) **Unduplicated Participant Slots for the 217-Like HCBS Group.** Table 4a below specifies the unduplicated number of participants for the 217-Like Group.

    1.    Column A reflects the following slots which were available beginning October 2011: (1) the number of unduplicated participant slots transferred from the STAR+PLUS 1915(c) waiver, TX 0862; (2) the 515 unduplicated participant slots transferred from the Community Based Alternatives (CBA) 1915(c) waiver, TX 0266; (3) individuals released from the interest list; and (4) individuals discharged from institutional care who are in the Money Follows the Person (MFP) Demonstration, in the areas of the state where the managed care expansion occurred on September 1, 2011.

    2.    Column B reflects the additional slots that were added in March 2012: (1) the 3,549 unduplicated participant slots transferred from the CBA 1915(c) waiver upon expansion of STAR+PLUS; (2) individuals released from the interest list; and (3) individuals discharged from institutional care who are in the MFP Demonstration.

    3.    Column C reflects the additional slots made available for the Nursing Facility Diversion Group, created June 1, 2013. The Nursing Facility Diversion Group was created as a subset of the STAR+PLUS 217-Like HCBS Group. This group consists of persons age 65 and older, and adults with physical disabilities age 21 and older, who meet the NF LOC as defined by the state, who qualify as members of the 217-Like HCBS Group, and who are at imminent risk of entering a nursing facility as a result of a catastrophic episode. Examples of a catastrophic episode include: (1) an individual is significantly dependent on a caregiver to remain in the community and the caregiver passes away or is suddenly no longer able to provide care; (2) an individual has a community support system but must suddenly move where there is no support system; (3) an individual has a sudden occurrence that would cause imminent placement in a nursing facility because he can no longer care for himself; or (4) an individual is identified by the Texas Department of Family and Protective Services as being at imminent risk of nursing facility placement. The number of nursing facility

diversion group slots for each DY is listed in the chart below. Nursing Facility Diversion Group slots may be encumbered only by individuals identified as belonging to the Nursing Facility Diversion Group.

4.  Column D reflects the additional slots that will be added September 1, 2014: (1) an additional 7,159 participant slots that will be transferred from the CBA 1915(c) waiver upon expansion of STAR+PLUS; (2) individuals that will be continued to be discharged from institutional care who are in the MFP Demonstration; and (3) the addition of 33 nursing facility diversion slots in demonstration year four.

5.  Column E reflects the additional slots that will be added September 1, 2015 and September 1, 2016 after the 84th Legislature (Regular Session) of Texas appropriated additional funds to increase the number of unduplicated participants for the STAR+PLUS 217-Like Group served by the STAR+PLUS HCBS Program.

| | | | | | | Table 4a. Unduplicated Number of Participants for the STAR+PLUS 217-Like HCBS Group |
|---|---|---|---|---|---|---|
| Demonstration Year | Column A | Column B | Column C | Column D | Column E | Total |
| DY 1 | 8,794 | 3,798 | n/a | n/a | n/a | 12,592 |
| DY 2 | 9,064 | 4,082 | 67 | n/a | n/a | 13,213 (67 of which are Nursing Facility Diversion Group slots) |
| DY 3 | 9,347 | 4,255 | 100 | n/a | n/a | 13,702 (100 of which are Nursing Facility Diversion Group slots) |
| DY 4 | 9,644 | 4,502 | 100 | 7,192 | n/a | 21,438 (133 of which are Nursing Facility Diversion Group slots) |
| DY 5 | 9,957 | 4,655 | 100 | 7,375 | 618 | 22,705 (133 of which are Nursing Facility Diversion Group slots) |
| DY 6[3] | 10,248 | 4,869 | 100 | 7,558 | 1,235 | 24,010 |

ii.  **SSI-Related Eligibles.** Persons age 65 and older, and adults age 21 and older, with physical disabilities that qualify as SSI eligibles and meet the NF LOC as defined by the state. Table 4b below specifies the unduplicated number of participants for the SSI-Related Eligible HCBS Group.

---

[3] DY6 is a 15 month period

1. Column A column reflects the following participants eligible as of October 2011: (1) the number of unduplicated participants transferred from the STAR+PLUS 1915(c) waiver, TX 0325; (2) the 1,093 unduplicated participants transferred from the CBA 1915(c) waiver; and (3) individuals discharged from institutional care who are in the Money Follows the Person (MFP) Demonstration, in the areas of the state where the managed care expansion occurred on September 1, 2011.

2. Column B reflects the 7,348 unduplicated participants transferred from the CBA 1915(c) waiver upon expansion of STAR+PLUS in March 2012, as well individuals discharged from institutional care in the MFP Demonstration.

3. Column C reflects changes that take effect September 1, 2014: (1) an estimated 4,344 number of CBA 1915(c) participants who are SSI-related who will transfer to HCBS in demonstration year four due to the expansion of STAR+PLUS, (2) an estimated 582 individuals who are SSI related and will move from the CBA interest list into HCBS, and (3) approximately 72 SSI-related individuals who will enroll in HCBS through the MFP Demonstration. The number of SSI-related participants is assumed to follow normal STAR+PLUS enrollment growth in demonstration year five.

| Table 4b. Unduplicated Number of Participants for the SSI-Related Eligible Group | | | |
|---|---|---|---|
| Demonstration Year | Column A | Column B | Column C | Total |
| DY 1 | 16,587 | 6,336 | n/a | 22,923 |
| DY 2 | 18,909 | 6,563 | n/a | 25,472 |
| DY 3 | 21,558 | 7,225 | n/a | 28,783 |
| DY 4 | 24,575 | 7,950 | 4,998 | 37,523 |
| DY 5 | 28,015 | 8,739 | 5,174 | 41,928 |
| DY6 | TBD | TBD | TBD | TBD |

d) **Eligibility for STAR+PLUS HCBS Benefits.** Individuals can be eligible for HCBS under STAR+PLUS depending upon their medical and / or functional needs, financial eligibility designation as a member of the 217-Like STAR+PLUS HCBS Group or an SSI-related recipient, and the ability of the State to provide them with safe, appropriate, and cost-effective LTC services.

a. Medical and / or functional needs are assessed according to LOC criteria published by the State in State rules. These LOC criteria will be used in assessing eligibility for STAR+PLUS HCBS benefits through the 217-Like or SSI-related eligibility pathways.

b.  For an individual to be eligible for HCBS services, the State must have determined that the individual's cost to provide services is equal to or less than 202 percent of the cost of the level of care in a nursing facility.

e) **Freedom of Choice.**  The service coordinators employed by the managed care organizations must be required to inform each applicant or member of any alternatives available, including the choice of institutional care versus home and community based services, during the assessment process.  The Freedom of Choice Form must be incorporated into the Service Plan.  The applicant or member must sign this form to indicate that he or she freely choices waiver services over institutional care.  The managed care organization's service coordinator also addresses living arrangements, choice of providers, and available third party resources during the assessment.

f) **Service Plan.**  In accordance with 42 CFR § 441.301(b)(1)(i), a participant-centered service plan of care must be developed for each participant.  All waiver services must be furnished pursuant to the service plan, according to the projected frequency and type of provider.  The service plan must also describe the other services, regardless of the funding source, and the informal supports that complement waiver services in meeting the needs of the participant.  The service plan is subject to the approval of the HHSC. Federal financial participation (FFP) may not be claimed for waiver services furnished prior to the development of the service plan or for services that are not included in the service plan. The State will use an electronic process for submission and approval of most individual service plans. Service plans for individuals turning 21, outside the cost ceiling, and the 217-Like Group will remain a manual process.

g) **Benefit Package under the STAR+PLUS HCBS Program.**  The following Table 5 describe the benefits available to HCBS participants, whether in the 217-Like HCBS Group or the SSI-related group, that are provider-directed and, if the participant elects the option, self-directed.  The services are further defined in Attachment C.

**Table 5 HCBS Services**

| Service | Provider Directed | Participant Directed |
|---|---|---|
| Personal Assistance Service | X | X |
| Respite | X | X |
| Financial Management Services | X | |
| Support Consultation | X | X |
| Adaptive Aids and Medical Supplies | X | |
| Adult Foster Care | X | |
| Assisted Living | X | |
| Dental Services | X | |
| Emergency Response Services | X | |
| Home Delivered Meals | X | |

| Service | Provider Directed | Participant Directed |
|---|---|---|
| Minor Home Modifications | X | |
| Nursing | X | X |
| Occupational Therapy | X | X |
| Physical Therapy | X | X |
| Speech, Hearing, and Language Therapy | X | X |
| Transition Assistance Services | X | |
| Cognitive Rehabilitation Therapy (Effective March 6, 2014) | X | X |
| Supported Employment Services (Effective September 1, 2014) | X | X |
| Employment Assistance Services (Effective September 1, 2014) | X | X |

h) **Self-Direction of Home and Community Based Services.** STAR+PLUS participants who elect the self-direction opportunity will have the option to self-direct all or some of the long term services, as identified in Table 5, under the Demonstration. The services, goods, and supports that a participant self-directs will still be included in the calculations of the participant's budget. Participant's budget plans will reflect the plan for purchasing these needed services, goods, and supports.

i. **Information and Assistance in Support of Participant Direction.** The state shall have a support system that provides participants with information, training, counseling, and assistance, as needed or desired by each participant, to assist the participant to effectively direct and manage their self-directed services and budgets. Participants shall be informed about self-directed care, including feasible alternatives, before electing the self-direction option. Participants shall also have access to the support system throughout the time that they are self-directing their care. Support activities must include, but are not limited to, financial management services and support consultation, defined as follows.

(A) **Financial Management Services.** Financial management services provide assistance to members with managing funds associated with the services elected for self-direction. Financial management services include initial orientation and ongoing training related to responsibilities of being an employer, and adhering to legal requirements for employers. The financial management services providers, referred to as the Financial Management Services Agency (CDSA), serves as the member's employer-agent, which is the Internal Revenue Service's (IRS) designation of the entity responsible for making payables and withholding, and filing and depositing taxes on behalf of the members. As the employer-agent, the CDSA files required forms and reports to the Texas Workforce Commission.

(B) **Support Consultation.**  Support Consultation offers practical skills training and assistance to enable an individual to successfully direct those services the individual elects for participant-direction.  This service is provided by a certified support advisor, and includes skills training related to recruiting, screening, and hiring workers, preparing job descriptions, verifying employment eligibility and qualifications, completion of documents required to employ an individual, management of workers, and development of effective back-up plans for services considered critical to the individual's health and welfare in the absence of the regular provider or an emergency situation.  Support consultation is provided only by a certified support advisor certified by the Department of Aging and Disability Services.

ii. **Participant Direction by Representative.**  The participant who self-directs one or more services may appoint a volunteer designated representative to assist with or perform employer responsibilities to the extent approved by the participant.  The participant documents the employer responsibilities, and that only a non-legal representative freely chosen by the participant or legally authorized representative may serve as the designated representative to assist in performance of employer responsibilities, to the extent desired by the individual or legally authorized representative.  The participant documents the employer responsibilities that the designated representative may and may not perform on the participant's behalf.

iii. **Participant Budget Authority.**  The participant's budget authority is operated and developed as follows:

(A) The participant has budget authority and decision-making authority over the budget to reallocate funds among services included in the budget; to determine the amount paid for services within the State's established limits; to substitute service providers and to schedule the provision of services; to specify additional service provider qualifications consistent with established criteria; to specify the provision of services consistent with service specifications in Attachment C for services that may be self-directed as specified in Table 5; to identify service providers and refer for provider enrollment; to authorize payment for waiver goods and services; and to review and approve provider invoices for services rendered.

(B) All participants, in conjunction with the CDSA, must develop a budget based on the service plan.  The amount of funds included in the service plan is calculated by the service planning team based on the planned waiver services and the adopted reimbursement rate.  The service plan is developed in the same manner for the participant who elects to have services delivered through the consumer directed services option as it is for the participant who elects to have services delivered through the traditional provider-managed option.

With approval of the CDSA, the participant may make revisions to a specific service budget that does not change the amount of funds available for the service in the approved service plan. Revisions to the service plan amount available for a particular service, or a request to shift funds from one self-directed waiver service component to another, must be justified by the participant's service planning team and authorized by the MCO.

(C) Modifications to the participant directed budget must be preceded by a change in the service plan.

iv. **Disenrollment from Self-Direction.** A participant may voluntarily disenroll from the self-directed option at any time and return to a traditional service delivery system. A participant may also be involuntarily disenrolled from the self-directed option for cause, if continued participation in the consumer directed services option would not permit the participant's health, safety, or welfare needs to be met, or the participant or the participant's representative, when provided with additional support from the CDSA, or through Support Consultation, has not carried out employer responsibilities in accordance with the requirements of this option. If a participant is terminated voluntarily or involuntarily from the self-directed service delivery option, the State will transition the participant to the traditional agency direction option and will have safeguards in place to ensure continuity of services.

i) **Fair Hearing.** For standard appeals, members have a right to access the fair hearing process at any time. For expedited appeals, members must exhaust the MCO's expedited appeals process before making a request for an expedited HHSC fair hearing. Procedures related to fair hearings are described in Attachment F.

j) **Participant Safeguards**. The state must follow all member safeguard procedures as described in Attachment G of these STCs.

**42. Quality Improvement Strategy for the STAR+PLUS HCBS Program.** The state will abide by the Quality Improvement Strategy that existed under the section 1915(c) waivers under the STAR+PLUS program prior to this Demonstration. The Quality Improvement Strategy is described in detail in Attachments D and E. As requested by CMS, the State will revise Attachment D "Future of the 1115 Transformation Waiver" and the "Future Initiatives" sections, and related sections, to CMS for review no later than June 1, 2016. This Quality Improvement Strategy will remain in full force until CMS approves the comprehensive quality strategy described in paragraph 27.

# VI.    FUNDING POOLS UNDER THE DEMONSTRATION

The terms and conditions in Section VI apply to the state's exercise of the following Expenditure Authorities: (5) Expenditures Related to the Uncompensated Care Pool, (6) Expenditures Related to Transition Payments, and (7) Expenditures Related to the Delivery System Incentive Reform Payment (DSRIP) Pool.

**43. Terms and Conditions Applying to Pools Generally.**

    a. The non-Federal share of pool payments to providers may be funded by state general revenue funds, transfers from units of local government, and certified public expenditures that are compliant with section 1903(w) of the Act. Any payments funded by intergovernmental transfers must remain with the provider, and may not be transferred back to any unit of government.

    b. The state must inform CMS of the funding of all payments from the pools to hospitals or other providers through a quarterly payment report to be submitted to CMS within 60 days after the end of each quarter, as required under paragraph 65 of the STCs. This report must identify the funding sources associated with each type of payment received by each provider.

    c. By December 31, 2011, the state must submit Medicaid State plan amendments to CMS to remove all supplemental payments for inpatient hospital, outpatient hospital, and physician services from its State plan, with an effective date of October 1, 2011.

    d. The state will ensure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope or quality of services available under the State plan or this Demonstration. The preceding sentence is not intended to preclude the state from modifying the Medicaid benefit through the State Plan amendment process.

**44. Uncompensated Care (UC) Pool.** Payments from this pool will help defray uncompensated costs of care provided to Medicaid or Demonstration eligibles or to individuals who have no source of third party coverage, for the services provided by hospitals or other providers, as discussed below. Two types of payments can be made from the UC Pool: (1) UC Payments (described in subparagraph (a) below), and (2) in DY 1 only, Transition Payments (described in (b) below). Annual UC payments are limited to the annual amounts identified in paragraph 46.

    a. **UC Payments.** Funds may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are provided to Medicaid eligible or uninsured individuals incurred by hospitals, clinics, or by other provider types, as agreed upon by CMS and the state and defined at subparagraph (iv) below. Expenditures must be claimed in accordance with CMS-approved claiming protocols for each provider type and application form in Attachment H. FFP is not available for any UC Payments other than Transition Payments in DY 1 prior to CMS approval of the claiming protocol and application for that particular provider type for which payments are sought. For any provider seeking to receive UC Payments in DY1, the total payment under the Medicaid state plan, Disproportionate Share Hospital (DSH) allotment, UC Payments, and Transition

Payments cannot exceed the actual cost of providing services to Medicaid beneficiaries and the uninsured as defined in the cost claiming protocol.

ii.  **UC Application.**  To qualify for a UC Payment, a provider must submit to the state an annual UC Application that will collect cost and payment data on services eligible for reimbursement under the UC Pool.  Data collected from the application will form the basis for UC Payments made to individual hospitals and non-hospital providers.  The state must require hospitals to report data in a manner that is consistent with the Medicare 2552-96 cost report, or for non-hospital providers, a CMS-approved cost report consistent with Medicare cost reporting principles.

(A) After CMS has approved the applicable protocol, the state may begin accepting applications from providers for UC Payments in DY 1.  Thereafter, providers are required to submit their UC Applications to the State by September 30 of each year, in order to qualify for a UC Pool payment for the DY that begins on October 1st.

(B) Cost and payment data included on the application must be based on the Medicare 2552-96 cost report, or for non-hospital providers, a CMS-approved cost report consistent with Medicare cost reporting principles for a federal fiscal year (FFY) that is two years prior to the DY in which UC Payments are to be made, in order to allow time for providers to finalize their cost reports from that data year and submit their application data to HHSC.  (For example, FFY 2010 would be the data year for UC Payments under the UC pool in DY 1.)  The state may trend the data to model costs incurred in the year in which payments are to be made.  Subsequent DY applications will be used to reconcile estimates for prior years.  For example, uncompensated care cost data from a DY 3 application will be used to determine the actual uncompensated care for DY 1 UC Payments for a qualifying provider.  Any overpayments identified in the reconciliation process that occurred in a prior year must be recouped from the provider, with the FFP returned to CMS.  During the reconciliation process, if a provider demonstrates that it has allowable uncompensated costs consistent with the protocol that were not reimbursed through the initial UC Payment (based on application figures), and the state has available UC Pool funding for the year in which the costs were accrued, the state may provide reimbursement for those actual documented unreimbursed UC costs through a prior period of adjustment.

(C) Any provider that meets the criteria below may submit a UC Application to be eligible to receive a UC Payment.

(I)  Private providers must have an executed indigent care affiliation agreement on file with HHSC.

(II) Only providers participating in a RHP are eligible to receive a UC Payment, although exceptions may be approved by CMS on a case by case basis.

(D) When submitting the UC Application, providers may request that cost and payment data from the data year be adjusted to reflect increases or decreases in costs, resulting from changes in operations or circumstances. A provider may request that:

(I) Costs not reflected on the filed cost report, but which would be incurred for the spending year, be included when calculating payment amounts; or

(II) Costs reflected on the filed cost report, but which would not be incurred for the spending year, be excluded when calculating payment amounts.

Adjustments described in subparagraphs (I) and (II) above cannot be considered as part of the application for reconciliation of a prior year payment. Such costs must be properly documented by the provider, and are subject to review by the State. Such costs are subject to reconciliation to future year applications to ensure that providers actually incurred such eligible uncompensated costs.

(E) All applicable inpatient and outpatient hospital UC payments, including Transition Payments, received by a hospital provider count as title XIX revenue, and must be included as offsetting revenue in the State's annual DSH audit reports. Providers receiving both DSH and UC Payments cannot receive total payments under the State plan and the UC Pool (related to inpatient and outpatient hospital services) that exceed the hospital's total eligible uncompensated costs. UC Payments for physicians, non-physician professionals, pharmacy, and clinic costs are not considered inpatient or outpatient Medicaid payments for the purpose of annual hospital specific DSH limits and the DSH audit rule. All reimbursements must be made in accordance with CMS approved cost-claiming protocols that are consistent with the Medicare 2552-96 cost report or, for non-hospital providers, a CMS approved cost report consistent with Medicare cost reporting principles.

iii. **UC Payment Protocol.** The state must submit for CMS approval a funding and reimbursement protocol that will establish rules and guidelines for the State to claim FFP for UC Payments. The state may not claim FFP for any UC Payments until a draft UC Protocol is submitted to CMS by March 1, 2012, and such protocol is approved by CMS. The approved UC Payment Protocol will become Attachment H to these STCs. The UC Payment Protocol must include precise definitions of eligible uncompensated provider costs and revenues that must be included in the calculation of uncompensated cost. The Protocol will also identify the allowable source documents to support costs; it will include detailed instructions regarding the calculation and documentation of eligible costs, the tool used by the State and

providers to apply for UC Payments, and a timetable and reconciliation of payments against actual cost documentation. This process will align the application process (based on prior cost periods) to the reconciliation process (using the application costs from subsequent years to reconcile earlier payments). Protocols will contain not only allowable costs and revenues, it will also indicate the twelve (12) month period for which the costs will apply.

The State must submit a UC Payment Protocol for each non-hospital provider type that may seek UC payments. FFP will not be available for UC Payments made to a non-hospital provider type until a cost-claiming protocol consistent with the Medicare cost reporting principles is approved by CMS. .

iv. **UC Payments to Hospitals and Physician Groups in DY 1.** The state will allow eligible hospitals and physician groups (see paragraph 44(b) *Transition Payments)* to submit a CMS-approved UC Application in DY 1 to be eligible for UC Payments in DY 1. Eligible hospitals and physician groups that do not submit a UC Application will only be eligible for Transition Payments in DY 1, as described in section (b) below. For eligible hospitals and physician groups that submit a UC Application, the State will reconcile the Transition Payments and UC Payments made to ensure the total UC Pool payments paid in DY 1 do not exceed the total amount of actual UC costs in that year. Hospitals and physician groups that are paid based on the UC Application will be subject to the reconciliation provisions described in subsection (a)(i)(B) above. All UC and Transition Payments made for DY 1 are subject to UC Pool annual limits for DY 1.

v. **UC Payments to Non-Hospital Providers.** UC Payments may be provided only to the following qualifying non-hospital providers: physician practice groups, government ambulance providers, government dental providers, and other providers in rural RHPs with no public hospitals. The state cannot claim FFP for UC Payments made to providers of the types listed here until CMS has approved an uncompensated care protocol specific to that provider type, which will be incorporated into Attachment H. UC Payments are considered to be Medicaid payments to providers and must be treated as Medicaid revenue when determining total title XIX funding received, in particular for any provider utilizing certified public expenditures as the non-Federal share of a Medicaid payment.

vi. **Annual Reporting Requirements for UC Payments**. The state will submit to CMS two reports related to the amount of UC Payments made from the UC Pool per Demonstration year. The reporting requirements are as follows:

a. By December 31st of each Demonstration year, starting with DY 2, the State shall provide the following information to CMS:

(I) The UC payment applications submitted by eligible providers; and

(II)   A chart of estimated UC Payments to each provider for a DY.

b. Within ninety (90) days after the end of each Demonstration year, beginning with the end of DY 2, the State shall provide the following information to CMS:

(I)   The UC Payment applications submitted by eligible providers;

(II)   A chart of actual UC payments to each provider for the previous DY;

(III)   For reconciliation payments to providers, the UC payments made to the provider in the prior Demonstration year and the reconciliation costs against the actual payments made to said provider.

**b. Transition Payments.** During DY 1 only, the state will make Transition Payments to hospitals and physician groups that received supplemental payments under the Medicaid State plan for claims adjudicated during FFY 2011. This transition period ensures that these providers are eligible to secure historical Medicaid funding as the state develops the pool payment methodologies. These Transition Payments are available only during DY 1 subject to UC pool annual limits for DY 1. No protocol must be approved by CMS for the state to make Transition Payments; instead, Transition Payments are subject to the following requirements:

i. A hospital or physician group is eligible to receive Transition Payments if it:

(A) Is enrolled as a Texas Medicaid provider;

(B) Received a supplemental payment under the Medicaid State plan for claims adjudicated in one or more months between October 1, 2010, and September 30, 2011;

(C) Has a source of intergovernmental transfer (IGT) or State general revenue appropriated as the non-federal share of the Transition Payment consistent with section 1903(w) of the Act; and

(D) Submitted any documentation that would have been required to receive a supplemental payment under the State Plan to HHSC before September 30, 2011, and submits any other documentation requested by HHSC.

ii. Transition Payments will be based on the following methodology:

(A) Participating hospitals and physician groups will be eligible to receive total Transition Payments equal to the amount the provider received in supplemental

payments for claims adjudicated during FFY 2011, annualized to cover the entire twelve (12) month period of DY 1.

(B) Participating providers are eligible to receive one-fourth of their total Transition Payment amount each quarter in DY 1, beginning October 1, 2011, through the quarter ending September 30, 2012.

(C) The state must provide CMS with a list of all hospitals and physician groups that will receive Transition Payments under this section, as well as the amounts of 2011 State plan supplemental payments and 2012 (DY 1) Transition Payments. The state must identify the source of funding for each DY 1 Transition Payment as a part of this list.

(I) The state will provide a list of estimated maximum Transition Payments within forty-five (45) days of approval of the Demonstration; and

(II) The state will provide a list of actual Transition Payments made within ninety (90) days of the end of DY 1.

iii. For hospitals qualifying for and receiving DSH payments for FFY 2012, Transition Payments are considered title XIX payments and must be treated as revenues when determining DSH eligible uncompensated costs as part of the annual DSH audits, except for transition payments related to hospital-based physician practice groups.

iv. The supplemental provider payments to hospitals and physicians made in November and December 2011 under the Medicaid State plan in the amount of $466,091,028 will be considered as if they were payments under this Demonstration, and will be included in the budget neutrality test, and the amount available as payment from the UC Pool. The state may count these payments under the UC Pool limit for any of the five years of the demonstration.

v. The state may not receive FFP for UC Payments, other than those described here in paragraph 44(b), until the UC Protocol is approved by CMS.

c. **Evaluation of Uncompensated Care Costs for the Uninsured.** The following sets forth the requirements for the evaluation of Texas' uncompensated care pool and DSRIP program through an independent report on the use of such pools, and the relationship of such payments to base Medicaid provider payment rates. Texas shall submit the report by the end August of 2016, and it will be used to rebase the size of the Uncompensated Care pool.

i. General Description. The state must commission a report from an independent entity on Medicaid provider payment in the state that reviews the role of uncompensated care and DSRIP payments in the overall Medicaid system for paying hospitals. The

report should consider adequacy of base Medicaid payment levels and their relation to Medicaid shortfalls (as reported in provider cost reports), and should indicate the degree to which uncompensated care pool and DSRIP payments compensate for insufficient base payment levels. The report should also identify the percentage of uncompensated care pool payments that are not specifically related to Medicaid shortfalls, and define uncompensated care costs as those associated with charity care as defined by the principles of the Healthcare Financial Management Association, and not include bad debt or Medicaid shortfall.

ii. <u>Funding for Uncompensated Care Pool Evaluation.</u> $500,000 (total computable) will be funded from the Texas demonstration's general administrative budget for commissioning this report, unless the state receives written authorization from CMS to expend a lower amount. The state may use more than $500,000 of its general administrative budget for this report. Expenditures for the creation of the report will be considered Medicaid administrative expenditures and be eligible for FFP at the usual matching rate for administrative expenditures

iii. <u>Specific Evaluation Requirements.</u>  The report must meet the following criteria:

(A) **Goal of the Report.** The goal is to ensure sustainable, transparent, equitable, appropriate, accountable and actuarially sound Medicaid payment systems and funding mechanisms for hospital providers that will ensure quality health care services to Texas' Medicaid beneficiaries throughout the state.

(B) **Framework of the Report.** The report must include a detailed description and analysis of the current Medicaid provider payment (for all Texas hospitals) and financing system, with a major focus on services currently supported with pool funds. The report must also include information regarding the non-federal share for the various payments and how payments to providers correspond to amounts reported on the CMS- 64. The report must note any shortfall or overages in provider payments across all payment types in the current funding structure.

I. The report should include information on external trends within Texas (e.g. the economy, possible reductions to DSH) that may affect the data being analyzed

II. The report must include an analysis of non-hospital providers and their participation within the UC pool.

III. The report must include detailed information on the historical methods of funding hospital payments, the way in which the source of non-federal share interacts with payment distribution methodology, and describe the composition of payments, including base and

supplemental payments, and the percentage of payment providers receive and retain.

IV. The report must analyze the adequacy of current payment levels for Medicaid hospital providers, and the adequacy, equity, accountability and sustainability of the state's funding mechanisms for making these payments. The report will include the impact of UC, DSH, and DSRIP funding on uninsured and Medicaid shortfall. The report will primarily focus on the types of providers supported by the pool.

V. The report will include an analysis of how Texas Medicaid compares with other states regarding what portion of Medicaid hospital costs are covered by Medicaid provider payment rates.

VI. The report must include the cost of uncompensated care provided to uninsured individuals by hospitals, and the extent that historical pool payments have addressed these costs.

VII. The report will also estimate what Texas' UC burden would be in FFY 2017 if Texas Medicaid rates fully funded Medicaid shortfall, and if Texas opted to expand Medicaid as allowed under the ACA.

VIII. All data presented in the report must be submitted to CMS in unlocked Excel worksheets to assist in review of the analysis, and the state will provide an appendix with individual hospital details.

IX. The report should provide the following information for the hospital providers covered in the report:

1. Total hospital system revenue from all payors
2. Total Medicaid revenue (including patient care revenue and all other Medicaid revenue such as demonstration revenue and incentive payments)
3. Total Medicaid patient care revenue
4. Total UC and DSRIP pool revenue

iv. Deadlines, Monitoring, and Funding

A. A draft report will be due for CMS preliminary review no later than July 15, 2016

B. The final report will be due no later than August 30, 2016.

C. Monthly monitoring calls with the state will include an update of progress on the report.

D. If the state does not timely submit either stage of the report, including all requested analyses and recommendations, the state's expenditure authority for uncompensated care pools will be reduced by up to $500,000. The state may seek, and CMS may grant, relief from this reduction, if needed.

45. **Delivery System Reform Incentive Payment (DSRIP) Pool.** The DSRIP Pool is available for the development of a program of activity that supports hospitals' efforts to enhance access to health care, the quality of care, and the health of the patients and families they serve. The program of activity funded by the DSRIP shall be based in Regional Healthcare Partnerships (RHPs) that are directly responsive to the needs and characteristics of the populations and communities comprising the RHP. Each RHP will have geographic boundaries, and will be directed and financially supported by a public hospital or a local governmental entity with the authority to make intergovernmental transfers (IGTs). In collaboration with participating providers, the public hospital or local governmental entity will develop a delivery reform and incentive plan that is rooted in the intensive learning and sharing that will accelerate meaningful improvement within the providers participating in the RHP. Individual hospitals' DSRIP proposals must flow from the RHP plans, and be consistent with the hospitals' shared mission and quality goals within the RHP, as well as CMS's overarching approach for improving health care through the simultaneous pursuit of three aims: better care for individuals (including access to care, quality of care, and health outcomes; better health for the population; and lower cost through improvement (without any harm whatsoever to individuals, families or communities).

   a) **Focus Areas.** There are 4 areas for which funding is available under the DSRIP, each of which has explicit connection to the achievement of the Three Part Aim. Projects will be identified within the following categories, and included in the full list of projects provided in the RHP Planning Protocol, and may include projects such as those identified below within each category.

   ii. **Category 1: Infrastructure Development** – This category lays the foundation for delivery system transformation through investments in technology, tools, and human resources that will strengthen the ability of providers to serve populations and continuously improve services:
      a. Expand primary care capacity,
      b. Expand behavioral healthcare capacity,
      c. Expand specialty care capacity,
      d. Expand clinical and administrative reporting systems that support quality improvement,
      e. Increase training of primary care workforce, and
      f. Expand reporting and HIT systems and capabilities.

iii. **Category 2: Program Innovation and Redesign** – This category includes the piloting, testing, and replicating of innovative care models:
   a. Primary care redesign,
   b. Behavioral healthcare redesign,
   c. Increase specialty care access/redesign referral process,
   d. Adoption of medical homes,
   e. Expansion of chronic care management models,
   f. Implement /expand care transition programs, and
   g. Implement real-time Hospital acquired Infections (HAI) system.

iv. **Category 3: Quality Improvements** – This category includes outcome reporting and improvements in care that can be achieved within four years.

v. **Category 4: Population Focused Improvements** – This category includes reporting measures across several domains selected by a RHP based on community assessments that demonstrate the impact of delivery system reform investments made in previous years under the Demonstration. The domains may include:
   a. Patient experience,
   b. Preventive health,
   c. Care coordination, and
   d. At-risk groups.

**b. Regional Healthcare Partnerships.** Regional Healthcare Partnerships will be developed throughout the state to more effectively and efficiently deliver care and provide increased access to care for low-income Texans. Each RHP will include a variety of healthcare providers to adequately respond to the needs of the community, and the process of forming each RHP will evidence meaningful participation by all interested providers. Each RHP will be anchored financially (i.e. single point of contact for the RHP) by a public hospital (or in areas with no public hospital, anchored financially by the governmental entity providing IGTs to support funding pool payments) that will be responsible for developing the RHP's DSRIP plan in coordination with other identified RHP providers. To the extent that the public hospital is a government entity eligible to participate in the funding of the Medicaid program, they may be the source of the non-Federal share. The RHP DSRIP plan will identify the community needs, the projects, and investments under the DSRIP to address those needs, community healthcare partners, the healthcare challenges, and quality objectives within the RHP and the metrics described in state protocol associated with each project and quality objective. These plans must be submitted to the state and CMS for approval, and must delineate total DSRIP funding associated with the plan.

**c. Hospital DSRIP Plans within the RHP.** RHP anchoring entities providing IGT for Uncompensated Care (UC) and DSRIP Payments within an RHP will develop RHP plans in good faith, to leverage public and non-public hospital and other community resources to best achieve delivery system transformation goals within RHP areas consistent with

the Demonstration's requirements. RHP plans shall include estimated funding available by year to support UC and DSRIP payments, and specific allocation of funding to UC and to DSRIP projects proposed within the RHP plan. RHP anchoring entities shall provide opportunities for public input to the development of RHP plans, and shall provide opportunities for discussion and review of proposed RHP plans prior to plan submission to the state. In accordance with the guidelines specified in the RHP Planning Protocol (see paragraph 45(d)(ii)(A) *RHP Planning Protocol*), a final RHP DSRIP Plan must include maximum payment amounts for UC and DSRIP Payments. These amounts may be proportionally adjusted based on available non-Federal share.

**d. DSRIP Plans and Protocols.** The state may not claim DSRIP funding until the following milestones have been met:

i. By March 31, 2012, the state must submit to CMS for approval a document that describes the State's plan for and status on forming the RHPs, identifying the public hospitals directing each RHP, and the general projects and quality measures to be addressed in each RHP DSRIP, and potential provider partners that will comprise the RHP.

ii. No later than August 31, 2012, CMS, the state and Texas hospitals will, through a collaborative process, finalize the following two protocols to implement the DSRIP program.

(A) **RHP Planning Protocol**: This protocol will include a master list of potential project/interventions for each Category 1-4 and related milestones, and metrics which RHPs may select from, in developing their 5-year plans. When developing the RHP Planning Protocol, the state should consider ways to structure the different projects that will facilitate the collection, dissemination, and comparison of valid quantitative data to support the Evaluation Design required in Section X. From these, the state must select a preferred research plan for the applicable research question, and provide a rationale for its selection. To the extent possible, RHPs should use similar metrics for similar projects across RHPs to enhance the evaluation and learning experience between RHPs. To facilitate evaluation, the RHP Planning Protocol must identify a core set of Category 3 and Category 4 metrics that all participating hospitals must be required to report. This RHP Planning Protocol will become Attachment I.

(B) **Program Funding and Mechanics Protocol:** This protocol will include information on State and CMS review and approval processes for RHP plans, RHP and State reporting requirements, incentive payment mechanisms and payment methodologies, and penalties for missed milestones. This protocol will become Attachment J. As requested by CMS, the state will submit a revised Attachment J specifying DSRIP activities for DY 6 to CMS for review no later than July 1, 2016.

vi. No later than October 31, 2012, urban and rural RHPs must submit their final RHP DSRIP Plans to the State and CMS for approval. Except for Category 3 for non-hospital RHPs, the final RHP DSRIP Plans must address all four focus areas described in paragraph 45(a). The final RHP DSRIP Plan must also identify the metrics that will be used by each provider selecting that project within the RHP, so that all providers selecting a particular project or quality measure will be held to the same standard reporting requirement. The final RHP DSRIP Plan will also include payment methodologies for each metric providing an annual maximum budget for each final RHP DSRIP Plan, and penalties for missed milestones.

vii. Payments from the DSRIP Pool may begin during DY 1, based on approved final RHP DSRIP Plans and successful completion of the metrics associated with DSRIP incentive payments. The State will not claim FFP for DSRIP Payments until the RHP Planning Protocol and Program Funding and Mechanics Protocol are approved by CMS.

d. **DSRIP Payments are Not Direct Reimbursement for Expenditures or Payments for Services.** Payments from the DSRIP pool are intended to support and reward hospital systems and other providers for improvements in their delivery systems that support the simultaneous pursuit of improving the experience of care, improving the health of populations, and reducing per capita costs of health care. Payments from the DSRIP Pool are not considered patient care revenue, and shall not be offset against disproportionate share hospital expenditures or other Medicaid expenditures that are related to the cost of patient care (including stepped down costs of administration of such care) as defined under these Special Terms and Conditions, and/or under the State Plan.

46. **Goals for an agreement regarding Uncompensated Care pool and DSRIP, and expected consequences of a failure to come to agreement.** CMS and Texas will work over the next fifteen months on an agreement to reform the state's Uncompensated Care pool and DSRIP. At the end of calendar year (CY) 2017, if the state and CMS have not come to agreement on a UC pool that is consistent with CMS' UC pool principles and a DSRIP that supports Texas's commitment to managed care in the STAR and STAR-Plus systems, CMS expects that: The DSRIP will not be renewed except as a phasedown starting at the end of CY 2017. The phase down would begin at 25 percent in 2018, and phase down by an additional 25 percentage points each year afterwards.

Furthermore, the Uncompensated Care pool will not be renewed at the end of CY 2017 except at a reduced level consistent with CMS' articulated principles for uncompensated care. The reduction will limit the size of the Uncompensated Care pool to the costs of uncompensated and charity care for low-income individuals who are uninsured and cannot be covered through Medicaid or other insurance programs, using

Texas hospital Medicare cost reports and projections of the potential impact of Medicaid expansion in Texas.

47. **Limits on Pool Payments.** Expenditures eligible for FFP for UC Pool and DSRIP Pool in each DY may not exceed the amounts shown in Table 6.

**Table 6. Pool Allocations According to Demonstration Year (total computable)**

| Type of Pool | DY 1 (2011-2012) | DY 2 (2012- 2013) | DY 3 (2013- 2014) | DY 4 (2014-2015) | DY 5 (2015-2016) | DY 6 [4] (2016-2017) | Totals |
|---|---|---|---|---|---|---|---|
| UC | 3,700,000,000 | 3,900,000,000 | 3,534,000,000 | 3,348,000,000 | 3,100,000,000 | 3,875,000,000 | 21,457,000,000 |
| DSRIP | 500,000,000 | 2,300,000,000 | 2,666,000,000 | 2,852,000,000 | 3,100,000,000 | 3,875,000,000 | 15,293,000,000 |
| Total/ DY | 4,200,000,000 | 6,200,000,000 | 6,200,000,000 | 6,200,000,000 | 6,200,000,000 | 7,750,000,000 | 36,750,000,000 |
| % UC | 88% | 63% | 57% | 54% | 50% | 50% | 58% |
| % DSRIP | 12% | 37% | 43% | 46% | 50% | 50% | 42% |

48. **Assurance of Budget Neutrality.**

a. By October 1 of each year, the State must submit an assessment of budget neutrality to CMS, including a summation of all expenditures and member months already reported to CMS, estimates of expenditures already incurred but not reported, and projections of future expenditures and member months to the end of the Demonstration, broken out by DY and Medicaid Eligibility Group (MEG) or other spending category.

b. Should the report in (a) indicate that the budget neutrality Annual Target for any DY has been exceeded, or is projected to be exceeded, the State must propose adjustments to the limits on UC Pool and DSRIP Pool limits, such that the Demonstration will again be budget neutral on an annual basis, and over the lifetime of the Demonstration. The new limits will be incorporated through an amendment to the Demonstration.

49. **Transition Plan for Funding Pools.** No later than March 31, 2015, the State shall submit a transition plan to CMS based on the experience with the DSRIP pool, actual uncompensated care trends in the State, and investment in value based purchasing or other payment reform options.

50. **1115A Duals Demonstration Savings.** When Texas' section 1115(a) demonstration is considered for an amendment, renewal, and at the end of the duals demonstration, CMS' Office of the Actuary (OACT) will estimate and certify actual title XIX savings to date under the duals demonstration attributable to populations and services provided under the 1115(a) demonstration. This amount will be subtracted from the 1115(a) budget neutrality savings approved for the renewal.

---

[4] DY6 is a 15 month period

Specifically, OACT will estimate and certify actual title XIX savings attributable to populations and services provided under the 1115(a) demonstration following the methodology below.

The actual title XIX savings attributable to populations and services provided under the 1115(a) demonstration are equal to the savings percentage specified in the 1115A duals demonstration MOU multiplied by the Medicaid portion of the 1115A demonstration capitation rate and the number of 1115A duals demonstration beneficiaries enrolled in the 1115(a) demonstration. The Medicaid portion of the 1115A Demonstration capitation rate is reviewed by CMS's Medicare and Medicaid Coordination Office (MMCO), MMCO's contracted actuaries and CMS' Office of the Actuary (OACT), and was certified by the state's actuaries. Per the 1115A duals demonstration MOU, the actual Medicaid rate paid for beneficiaries enrolled in the 1115A demonstration is equivalent to the state's 1115A Medicaid capitation rate minus an established savings percentage (as outlined in the chart below). The state must track the number of member months for every Medicare-Medicaid enrollee (MME) who participates in both the 1115(a) and 1115A demonstration.

The table below provides an illustrative example of how the savings attributable to populations and services provided under the 1115(a) demonstration is calculated

| A. 1115A Demonstration Year | B. Medicaid Capitation Rate (hypothetical) | C. Medicaid Savings Percentage Applied Per MOU (average) | D. Savings Per Month (B*C) | E. Member Months of MMEs who participated in 1115A and 1115(a) Demos (estimated) | F. Amount subtracted from 1115(a) BN savings/ margin (D*E) |
|---|---|---|---|---|---|
| DY 1.a | $1,000 PMPM | 1.25% | $12.50 PMPM | 1,000 | 1,000* $12.50 PMPM = $12,500 |
| DY 1.b | $1,000 PMPM | 2.75% | $27.50 PMPM | 1,000 | 1,000 * $27.50 PMPM = $27,500 |
| DY 2 | $1,000 PMPM | 3.75% | $37.50 PMPM | 1,000 | 1,000* $37.50 PMPM = $37,500 |
| DY 3 | $1,000 PMPM | 5.5% | $55.00 PMPM | 1,000 | 1,000 * $55.00 PMPM = $55,000 |

In each quarterly report, the state must provide the information in the above-named chart (replacing estimated figures with actual data). Should rates differ by geographic area and/or rating category within the 1115A demonstration, this table should be done for each geographic area and/or rating category. In addition, the state must show the "amount subtracted from the 1115(a) budget neutrality savings" in the updated budget neutrality Excel worksheets that are submitted in each quarterly report.

Finally, in each quarterly CMS-64 submission and in each quarterly report, the state must indicate in the notes section: "For purposes of 1115(a) demonstration budget neutrality reporting purposes, the state reports the following information:
- Number of Medicare-Medicaid enrollees served under the 1115 duals demonstration = *[Insert number]*
- Number of member months = *[Insert number]*
- PMPM savings per dual beneficiary enrolled from the 1115A duals demonstration = *[Insert number]*

The State must make the necessary retroactive adjustments to the budget neutrality worksheets to reflect modifications to the rates paid in the 1115A demonstration. This must include any Medicaid payment triggered by the risk corridor, IGTs, or other retroactive adjustments. The State must add additional columns to the chart above in subsequent quarterly reporting to reflect those adjustments.

## VII.    GENERAL FINANCIAL REQUIREMENTS

This project is approved for title XIX expenditures applicable to services rendered during the demonstration period. Effective January 1, 2014, this project is approved for title XXI expenditures applicable to services rendered during the demonstration period for certain children ages 6-18 between 100-133% FPL. This section describes the general financial requirements for these expenditures.

**51.    Quarterly Expenditure Reports.** The state must provide quarterly title XIX expenditure reports using Form CMS-64, to separately report total expenditures for services provided through this Demonstration under section 1115 authority that are subject to budget neutrality. This project is approved for expenditures applicable to services rendered during the Demonstration period. CMS shall provide FFP for allowable Demonstration expenditures, only as long as they do not exceed the pre-defined limits on the costs incurred, as specified in Section VIII.

The state shall provide quarterly title XXI expenditure reports using the Form CMS64.21U/CMS64.21UP to report total title XXI expenditures for services provided to M-CHIP children under the section 1115 authority until its XXI allotment is spent and then using the 64.9/64.9P Waiver form with waiver name of "THTQIP-M-CHIP." CMS will provide Federal financial participation (FFP) for allowable Texas title XXI demonstration expenditures that do not exceed the state's available title XXI funding and then Federal

participation at the enhanced rate under Title XIX once the state's Title XXI funding is fully exhausted.

**52. Expenditures Subject to the title XIX Budget Neutrality Expenditure Limit.**

a. All expenditures for Medicaid services for demonstration participants (as defined in paragraphs 28 [Table 2], 29, 33 [Table 3], and 41 [Table 5]) are demonstration expenditures subject to the budget neutrality expenditure limit, except expenditures for the services listed as follows:

    i. Nursing facility services (for dates of service before March 1, 2015);

    ii. Medical transportation;

    iii. Medicare premiums;

    iv. In Column D counties only, Community Based Alternatives 1915(c) waiver services, primary home care and day activity and health services (for dates of service before September 1, 2014), and

    v. Other 1915(c) waiver programs as follows: Medically Dependent Children Program (TX 0181), Consolidated Waiver Program (TX 0373 and TX 0374), Deaf Blind with Multiple Disabilities (TX 0281), Home and Community-Based Services (TX 0110), Community Living Assistance and Support Services (TX 0221), Texas Home Living (TX 0403), and Youth Empowerment Services (TX 0657).

b. All Funding Pool expenditures (as defined in Section VI) are Demonstration expenditures subject to the budget neutrality expenditure limit.

**53. Reporting Expenditures in the Demonstration.** The following describes the reporting of expenditures subject to the budget neutrality expenditure limit:

a. **Use of Waiver Forms.** In order to track expenditures under this Demonstration, the State must report Demonstration expenditures through the Medicaid and Children's Health Insurance Program Budget and Expenditure System (MBES/CBES), following routine CMS-64 reporting instructions outlined in section 2500 of the State Medicaid Manual (SMM). All Demonstration expenditures claimed under the authority of title XIX of the Act, and subject to the budget neutrality expenditure limit, must be reported each quarter on separate Forms CMS-64.9 Waiver and/or 64.9P Waiver, identified by the Demonstration Project Number (11-W-00278/6) assigned by CMS.

b. **Reporting By Date of Service.** In each quarter, Demonstration expenditures (including prior period adjustments) must be totaled and reported on separate Forms CMS-64.9 Waiver and/or 64.9P Waiver by Demonstration Year (DY). The DY for which

expenditures are reported is identified using the project number extension (a 2-digit number appended to the Demonstration Project Number). Expenditures must be assigned to DYs on the basis of date of service (except for pool payments, as discussed below). The date of service for premium payments is identified as the DY that includes the larger share of the month for which the payment is principally made. Pool payments must be reported by DY as follows: Transition payments must be reported for DY 1, UC payments must be reported in a manner consistent with the payment timeframes specified in the UC Pool Protocol, and DSRIP payments must be reported based on the payment methodologies and annual maximum budgets specified in the final master DSRIP plans. DY 1 will be the year beginning October 1, 2011, and ending September 30, 2012, and subsequent DYs will be defined accordingly.

c. **Use of Waiver Forms.** Each quarter, the State must identify separate forms CMS-64.9 Waiver and/or 64.9P Waiver by Waiver Name to report expenditures that belong in the following categories:

    i. "THTQIP-Adults" – Medicaid service expenditures for all participating individuals whose MEG is defined as Adults;

    ii. "THTQIP-Children" – Medicaid service expenditures for all participating individuals whose MEG is defined as Children;

    iii. "THTQIP-AMR" – Medicaid service expenditures for all participating individuals who are aged, or who are disabled and have Medicare, except for 1915(c) waiver services described in (v) below;

    iv. "THTQIP-Disabled" – Medicare service expenditures for all participating individuals who are disabled and do not have Medicare, except for 1915(c) waiver services described in (v) below;

    v. "THTQIP-CBA 1915(c)" – Expenditures for CBA 1915(c) waiver services for all individuals who reside in Column E counties that are not Column B counties (only used for expenditures with dates of service between October 1, 2011 and the implementation date of the March 2012 STAR+PLUS expansion);

    vi. "THTQIP-UC" – All expenditures that count against UC Pool limits, except those described in (vii);

    vii. "THTQIP-UC UPL" – Medicaid State plan supplemental provider payments to hospitals or physician groups made between October 1, 2011 and the approval date of the Demonstration; and

    viii. "THTQIP-DSRIP" – All DSRIP Pool expenditures.

ix. "THTQIP-QUALIFIED" – Medicaid service expenditures for all participating individuals whose MEG is defined as Qualified aliens. Title XXI expenditures for this group are excluded from budget neutrality but are counted against the Title XXI allotment as described in paragraph (d) below.

x. "THTQIP-M-CHIP" – All expenditures for children who are ages 6-18 and between 100-133% FPL, <u>or children served in CHIP on December 31, 2013 due to assets in excess of Medicaid eligibility limits. These are children who</u> meet the definition of "targeted low-income child" specified in section 2110 (b)(1) of the Social Security Act. Title XXI expenditures for this group are excluded from budget neutrality but are counted against the Title XXI allotment as described in paragraph (d) below.

**d. Title XXI Funded Groups in the Waiver.**

Expenditures for THTQIP-Qualified and THTQIP-M-CHIP under title XXI must be reported on separate Forms CMS-64.21U and/or 64.21UP in accordance with the instructions in section 2115 of the State Medicaid Manual, identified using Waiver Name "THTQIP-M-CHIP" or "THTQIP-QUALIFIED."

i. Title XIX funds for children who are ages 6-18 and between 100-133% FPL meeting the definition of "targeted low-income child" specified in section 2110(b)(1) of the Social Security Act (M-CHIP children) are available under this demonstration if the state exhausts its title XXI allotment once timely notification as described in subparagraph (iii) has been provided.

ii. If the state exhausts its title XXI allotment prior to the end of a Federal fiscal year, title XIX Federal matching funds are available for these M-CHIP children. During the period when title XIX funds are used, expenditures related to this demonstration population must be reported as waiver expenditures on the Forms CMS 64.9 Waiver and/or CMS 64.9P Waiver, identified using Waiver Name "THTQIP-M-CHIP.". To initiate this:

    1. The state shall provide CMS with 120 days prior notice before it begins to draw down title XIX matching funds for the M-CHIP children demonstration population;

    2. The State shall submit:

        c. An updated budget neutrality assessment that includes a data analysis which identifies the specific "with waiver" impact of the proposed change on the current budget neutrality expenditure cap. Such analysis shall include current total computable "with waiver" and "without waiver" status on both a summary and detailed level through the current extension approval period using the most recent actual

expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as result of the proposed change which isolates (by Eligibility Group) the impact of the change;

    d. An updated CHIP allotment neutrality worksheet.

iii. If the state exhausts its title XXI allotment prior to the end of a Federal fiscal year, the expenditures attributable to the M-CHIP children demonstration population will count toward the budget neutrality expenditure cap calculated under STC58, using the per member per month (PMPM) amounts for TANF Children described in STC 58(b)(ii), and will be considered expenditures subject to the budget neutrality cap as defined in STC 56(a).

e. **Pharmacy Rebates.** Because pharmacy rebates are not reflected in the data used to determine the budget neutrality expenditure limit, all pharmacy rebates must be reported on Forms CMS-64.9 Base or Forms CMS-64.9P Base, and not on any waiver form associated with this Demonstration.

f.  **Cost Settlements.** For monitoring purposes, cost settlements related to the Demonstration must be recorded on Line 7 or 10.B, in lieu of Line 9. For any other cost settlements (i.e., those not attributable to this Demonstration), the adjustments should be reported, as instructed in the State Medicaid Manual. The amount of non-claim specific cost settlements will be allocated to each DY based on the larger share of the coverage period for which the cost settlement is made.

g. **Premium and Cost Sharing Adjustments.** Premiums and other applicable cost-sharing contributions that are collected by the State from enrollees under the Demonstration must be reported to CMS each quarter on Form CMS-64 Summary Sheet Line 9D, columns A and B. In order to assure that these collections are properly credited to the Demonstration, premium and cost-sharing collections (both total computable and Federal share) should also be reported separately by Demonstration Year on the Form CMS-64 Narrative. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to Demonstration populations will be offset against expenditures. These section 1115 premium collections will be included as a manual adjustment (decrease) to the Demonstration's actual expenditures on a quarterly basis.

h. **Mandated Increase in Physician Payment Rates in 2013 and 2014.** Section 1202 of the Health Care and Education Reconciliation Act of 2010 (Pub. Law 110-152) requires state Medicaid programs to pay physicians for primary care services at rates that are no less than what Medicare pays, for services furnished in 2013 and 2014. The federal government provides a Federal medical assistance percentage of 100 percent for the claimed amount by which the minimum payment exceeds the rates paid for those services as of July 1, 2009. The state may exclude from the budget neutrality test for this

demonstration the portion of the increase for which the federal government pays 100 percent. These amounts should be reported on the base forms CMS-64.9, 64.21, or 64.21U (or their "P" counterparts), and not on any waiver form.

i. **Administrative Costs.** Administrative costs are not included in the budget neutrality expenditure limit, but the State must separately track and report additional administrative costs that are directly attributable to the demonstration. All attributable administrative costs must be identified on the Forms CMS-64.10 Waiver and/or 64.10P Waiver, using Waiver Name "TX Reform Admin."

j. **Administrative Cost Claiming Protocol.** The state must maintain a CMS-approved Administrative Cost Claiming Protocol, to be incorporated as Attachment K to these STCs, which explains the process the State will use to determine administrative costs incurred under the demonstration. CMS will provide Federal financial participation (FFP) to the State at the regular 50 percent match rate for administrative costs incurred according to limitations set forth in the approved Administrative Cost Claiming protocol. No FFP is allowed until a claiming protocol is approved by CMS.

k. **Claiming Period**. All claims for expenditures subject to the budget neutrality expenditure limit (including any cost settlements) must be made within 2 years after the calendar quarter in which the state made the expenditures. Furthermore, all claims for services during the demonstration period (including any cost settlements) must be made within 2 years after the conclusion or termination of the demonstration. During the latter 2-year period, the State must continue to identify separately on the CMS-64 waiver forms, the net expenditures related to dates of service during the operation of the section 1115 demonstration, in order to account for these expenditures properly to determine budget neutrality.

54. **Reporting Member Months.** The following describes the reporting of member months for Demonstration participants.

a. For the purpose of calculating the budget neutrality expenditure limit, the state must provide to CMS, as part of the quarterly report required under paragraph 65 of these STCs, the actual number of eligible member months for all demonstration participants, according to the MEGs defined in paragraphs 28 (Table 2) and 29.

b. To permit full recognition of "in-process" eligibility, reported member month totals may be revised subsequently, as needed. To document revisions to totals submitted in prior quarters, the State must report a new table with revised member month totals indicating the quarter for which the member month report is superseded.

c. The term "eligible member months" refers to the number of months in which persons are eligible to receive services. For example, a person who is eligible for 3 months

contributes 3 eligible member months to the total. Two individuals, who are eligible for 2 months each, contribute 2 eligible member months to the total, for a total of 4 eligible member months.

**55.     Standard Medicaid and CHIP Funding Process.**

a.  The standard Medicaid funding process must be used during the Demonstration. The State must estimate matchable demonstration expenditures (total computable and Federal share) subject to the budget neutrality expenditure limit, and separately report these expenditures by quarter for each Federal fiscal year on the Form CMS-37 for both the Medical Assistance Payments (MAP) and State and Local Administration Costs (ADM). CMS shall make Federal funds available based upon the State's estimate, as approved by CMS. Within 30 days after the end of each quarter, the State must submit the Form CMS-64 quarterly Medicaid expenditure report, showing Medicaid expenditures made in the quarter just ended. CMS shall reconcile expenditures reported on the Form CMS-64 with Federal funding previously made available to the state, and include the reconciling adjustment in the finalization of the grant award to the state.

b.  The standard title XXI funding process will be used during the demonstration for M-CHIP children. The state must estimate matchable M-CHIP expenditures on the quarterly Form CMS-37. As a footnote to the CMS-37, the state shall provide updated estimates of expenditures for the M-CHIP children demonstration populations. CMS will make Federal funds available based upon the state's estimate, as approved by CMS. Within 30 days after the end of each quarter, the state must submit the Form CMS-61.21 U-Waiver quarterly CHIP expenditure report. CMS will reconcile expenditures reported on the Form CMS-64.21U-waiver with Federal funding previously made available to the state, and include the reconciling adjustment in the finalization of the grant award to the state.

**56.     Extent of Federal Financial Participation for the Demonstration**. Subject to CMS approval of the source(s) of the non-Federal share of funding (see paragraph 55, *Sources of Non-Federal Share*), CMS shall provide FFP at the applicable Federal matching rates for the Demonstration as a whole as outlined below, subject to the budget neutrality limits described in section X of these STCs:

a.  Administrative costs, including those associated with the administration of the Demonstration;

b.  Net expenditures and prior period adjustments of the Medicaid program that are paid in accordance with the approved Medicaid State plan and waiver authorities;

c. Net expenditures and prior period adjustments, made under approved Expenditure Authorities granted through section 1115(a)(2) of the Act, with dates of service during the operation of the Demonstration;

d. Net expenditures for Funding Pool payments.

**57.** **Sources of Non-Federal Share.** The state certifies that the matching non-Federal share of funds for the demonstration is state/local monies. The state further certifies that such funds shall not be used as the match for any other federal grant or contract, except as permitted by law. All sources of non-Federal funding must be compliant with section 1903(w) of the Act and applicable regulations. In addition, all sources of the non-Federal share of funding are subject to CMS approval.

a. CMS may review, at any time, the sources of the non-federal share of funding for the demonstration. The State agrees that all funding sources deemed unacceptable by CMS shall be addressed within the time frames set by CMS.

b. Any amendments that impact the financial status of the program shall require the State to provide information to CMS regarding all sources of the non-Federal share of funding.

c. Under all circumstances, health care providers must retain 100 percent of the STAR and STAR+PLUS reimbursement amounts claimed by the state as a demonstration expenditure. Moreover, no pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the State and/or local government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (such as payments related to taxes (including health care provider-related taxes), fees, and business relationships with governments that are unrelated to Medicaid and in which there is no connection to Medicaid payments) are not considered returning and/or redirecting a Medicaid payment.

## VIII. MONITORING BUDGET NEUTRALITY FOR THE DEMONSTRATION

**58.** **Limit on Title XIX and XXI Funding.**
a) The state shall be subject to a limit on the amount of federal title XIX funding that the state may receive on selected Medicaid expenditures during the period of approval of the demonstration. The limit is determined by using a per capita cost method, with an aggregate adjustment for projected supplemental provider payments. The budget neutrality expenditure targets are set on a yearly basis with a cumulative budget neutrality expenditure limit for the length of the entire demonstration. Actual expenditures subject to the budget neutrality expenditure limit shall be reported by the state using the procedures described in Section VII.

b) The state will be subject to a limit on the amount of federal title XXI funding that the state may receive on demonstration expenditures for M-CHIP children during the demonstration period. Federal title XXI funding available for demonstration expenditures for M-CHIP children is limited to the state's available allotment, including currently available reallocated funds and contingency funds. Should the state expend its available title XXI Federal funds for the claiming period, no further enhanced title XXI Federal matching funds will be available for costs of the approved title XXI child health program or demonstration until the next allotment becomes available.

    i. <u>Exhaustion of title XXI Funds.</u> After the State has exhausted title XXI funds, expenditures for M-CHIP children, may be claimed as title XIX expenditures. The State shall report expenditures for these children as waiver expenditures on the Forms CMS 64.9 Waiver and/or CMS 64.9P Waiver in accordance with paragraph 51.d.

    ii. <u>Exhaustion of title XXI Funds Notification.</u> The State must notify CMS in writing of any anticipated title XXI shortfall at least 120 days prior to an expected change in claiming of expenditures for the M-CHIP children. The State must follow Medicaid State plan criteria for these beneficiaries unless specific waiver and expenditure authorities are granted through this demonstration.

**59. Risk.** Under this budget neutrality agreement, Texas shall be at risk for the per capita cost of participating Medicaid and demonstration eligibles, but not for the number of demonstration eligibles. In this way, Texas will not be at risk for changing economic conditions that impact enrollment levels; however, by placing Texas at risk for the per capita costs for Medicaid and demonstration eligibles, CMS assures that the Federal demonstration expenditures do not exceed the level of expenditures that would have occurred had there been no demonstration.

**60. Budget Neutrality Expenditure Limit**. The following describes the method for calculating the budget neutrality expenditure limit:

a. For each DY of the budget neutrality agreement, an Annual Target is calculated as the sum two components.

    i. The <u>Per Capita Component</u> is the sum of six sub-components, calculated as the projected per member per month (PMPM) cost, times the actual number of member months (reported by the State in accordance with paragraph 52) for the MEGs identified in (b) below.

    ii. The <u>Aggregate Component</u> is a projection of what certain supplemental payments to providers would have cost each year in the absence of the Demonstration, as shown in (c) below.

b. The following tables give the projected PMPM costs to be used in the Per Capita Component calculation in each DY. PMPM costs for four of the six sub-components are shown in Table 8a, and for the remaining two sub-components are shown in Table 8b.

  i. Table 8a gives the projected without-waiver costs of medical services for included populations. The Base Year PMPMs include fee-for-service claims and capitation payments for Medicaid State plan services and 1915(c) home and community based services, and an attributed share of inpatient hospital supplemental payments, divided by base year member-months. FY 2012 President's Budget Medicaid Baseline trends are used to project without-waiver PMPM costs.

  ii. The PMPM amounts shown in Table 8b represent additional without-waiver costs that would have occurred for Adults and Children had the State carried out its plan to carve inpatient hospital services out from the capitated benefit for current STAR participants. These amounts follow the same President's Budget trends as the corresponding rows in Table 8a; however, per mutual agreement, these amounts will phase down to $0, starting in DY 3. The Base Medical PMPMs for AMR include NF costs, starting March 1, 2015 (DY 4).

**Table 8a – Projected PMPM Costs, Base Medical and Included UPL**

| MEG | Base Year PMPM (SFY 2010) | Trend | DY 1 | DY 2 | DY 3 | DY 4 | DY 5 | DY 6[5] |
|---|---|---|---|---|---|---|---|---|
| AMR | $463.87 | 4.6% | $509.43 | $532.87 | $557.46 | $896.17 | $1,166.62 | $1,166.62 |
| Disabled | $1,212.96 | 5.2% | $1,348.07 | $1,418.17 | $1,493.00 | $1,621.99 | $1,748.57 | $1,748.57 |
| Adults | $784.30 | 5.8% | $882.05 | $933.21 | $987.33 | $1,044.60 | $1,105.18 | $1,105.18 |
| Children | $252.48 | 5.2% | $280.60 | $295.19 | $310.54 | $326.69 | $343.68 | $343.68 |

**Table 8b – Projected PMPM Costs, STAR FFSE and STAR UPL**

| MEG | Base Year PMPM (SFY 2010) | Trend | DY 1 | DY 2 | DY 3 | DY 4 | DY 5 | DY 6[6] |
|---|---|---|---|---|---|---|---|---|
| Adults | $152.76 | 5.8% | $171.80 | $181.76 | $96.15 | $50.87 | $0 | $0 |
| Children | $20.02 | 5.2% | $22.25 | $23.40 | $12.31 | $6.47 | $0 | $0 |

c. The following table shows the calculation of the Aggregate Component for each DY. These projections were developed by the state and accepted by CMS, and are based on

---

[5] DY6 is a 15 month period
[6] DY6 is a 15 month period

historical trends in supplemental payment amounts and UPLs. They represent what the state would have paid in supplemental provider payments in the absence of the demonstration.

**Table 9-- Aggregate Component**

| Payment Stream | DY 1 | DY 2 | DY 3 | DY 4 | DY 5 | DY 6[7] |
|---|---|---|---|---|---|---|
| Inpatient Hospital UPL for Excluded Population | $1,346,191,839 | $1,423,194,012 | $1,504,600,709 | $1,590,663,870 | $1,681,649,843 | $2,102,062,304 |
| Outpatient Hospital UPL | $58,024,149 | $61,343,130 | $64,851,957 | $68,561,489 | $72,483,206 | $90,604,008 |
| Physician UPL | $74,843,903 | $77,089,221 | $79,401,897 | $81,783,954 | $84,237,473 | $105,296,841 |
| TOTAL | $1,479,059,891 | $1,561,626,363 | $1,648,854,563 | $1,741,009,313 | $1,838,370,522 | $2,297,963,153 |

d. The budget neutrality expenditure limit is the Federal share of the combined total of the Annual Targets for all DYs, and is calculated as the sum of the Annual Targets times the Composite Federal Share (defined in (e) below). This limit represents the maximum amount of FFP that the State may receive for title XIX expenditures during the Demonstration period.

e. The Composite Federal Share is the ratio calculated by dividing the sum total of FFP received by the State on actual Demonstration expenditures during the approval period (as reported through the MBES/CBES and summarized on Schedule C) by total computable Demonstration expenditures for the same period as reported on the same forms.

f. CMS policy requires that budget neutral savings cannot be derived from hypothetical populations. In this Demonstration, the STAR+PLUS 217-Like HCBS Eligibility Group is the only hypothetical population. On request from CMS, the State must provide separate expenditure and member month totals by MEG for individuals in the STAR+PLUS 217-Like HCBS Eligibility Group to allow any saving attributable to that group to be netted out of the budget neutrality calculation.

61. **Future Adjustments to the Budget Neutrality Expenditure Limit.** CMS reserves the right to adjust the budget neutrality expenditure limit to be consistent with enforcement of impermissible provider payments, health care related taxes, new Federal statutes, or policy interpretations implemented through letters, memoranda, or regulations with respect to the provision of services covered under this demonstration. CMS reserves the right to make

---

[7] DY6 is a 15 month period

adjustments to the budget neutrality expenditure limit if any health care-related tax that was in effect during the base year with respect to the provision of services covered under this Demonstration, or provider-related donation that occurred during the base year, is determined by CMS to be in violation of the provider donation and health care-related tax provisions of section 1903(w) of the Social Security Act. Adjustments to annual budget targets will reflect the phase out of impermissible provider payments by law or regulation, where applicable.

62. **Enforcement of Budget Neutrality**. CMS shall enforce budget neutrality over the life of the demonstration rather than on an annual basis. However, if the State exceeds the calculated cumulative target limit by the percentage identified below for any of the DYs, the state shall submit a corrective action plan to CMS for approval.

| DY | Cumulative Target Definition | Percentage |
|---|---|---|
| DY 1 | Cumulative budget neutrality cap plus: | 3 percent |
| DY 2 | Cumulative budget neutrality cap plus: | 1 percent |
| DY 3 | Cumulative budget neutrality cap plus: | 0.5 percent |
| DY 4 | Cumulative budget neutrality cap plus: | 0 percent |
| DY 5 | Cumulative budget neutrality cap plus: | 0 percent |
| DY 6[8] | Cumulative budget neutrality cap plus: | 0 percent |

63. **Exceeding Budget Neutrality**. If the budget neutrality expenditure limit has been exceeded at the end of this demonstration period, the excess Federal funds shall be returned to CMS. If the demonstration is terminated prior to the end of the budget neutrality agreement, the budget neutrality test shall be based on the time elapsed through the termination date.

64. **Future Managed Care Rates**. The state will proceed with separate rate structures for institutional and home and community-based services (HCBS) populations in managed care. The state will identify the current (March 2015) baseline of persons receiving HCBS and those receiving institutional services. By December 31, 2015, the state will provide CMS an update based on early managed care experience on the mix of institutional and HCBS care, and if needed, will establish a goal in coordination with CMS to rebalance the mix of institutional and community-based services. In September of 2016, the state will provide evidence of progress towards that rebalancing goal, including identifying the number of community and institutional residents and evaluating the effectiveness of measures taken to promote access to community-based care. Depending on the progress of this rebalancing, CMS may require the state, within a reasonable time frame, to develop and implement a blended managed care rate structure for the institutional and community populations.

## IX.  GENERAL REPORTING REQUIREMENTS

---

[8] DY6 is a 15 month period

65. **General Financial Requirements.** The state will comply with all general financial requirements under title XIX set forth in these STCs.

66. **Reporting Requirements Relating to Budget Neutrality.** The state will comply with all reporting requirements for monitoring budget neutrality set forth in these STCs. The State must submit any corrected budget neutrality data upon request.

67. **Monthly Calls.** CMS shall schedule monthly conference calls with the state. The purpose of these calls is to discuss any significant actual or anticipated developments affecting the demonstration. Areas to be addressed include, but are not limited to:

   a. The health care delivery system;
   b. Enrollment, quality of care, and access to care;
   c. The benefit package;
   d. Performance of hospitals according receiving incentive payments as described in the STCs;
   e. Audits, lawsuits;
   f. Financial reporting and budget neutrality issues;
   g. Progress on evaluations;
   h. State legislative developments; and
   i. Any Demonstration amendments, concept papers or State plan amendments under consideration by the State.

CMS shall update the state on any amendments or concept papers under review as well as federal policies and issues that may affect any aspect of the demonstration. The state and CMS (both the Project Officer and Regional Office) shall jointly develop the agenda for the calls.

68. **Demonstration Quarterly Reports.** The state will submit progress reports 60 days following the end of each quarter (Attachment B). Information required for the first quarter of DY 1 (December 2011 – February 2011) will be included in the second quarter report for DY 2 (March 2012 – May 2012). The intent of these reports is to present the State's analysis and the status of the various operational areas. These quarterly reports will include, but are not limited to**:**

   a. A discussion of the events occurring during the quarter or  anticipated to occur in the near future that affect health care delivery, enrollment, quality of care, access, the benefit package, and other operational issues;

   b. Action plans for addressing any policy, operations, and administrative issues identified;

   c. Monthly enrollment data during the quarter and Demonstration Year to Date by eligibility group;

d.  Budget neutrality monitoring tables;

e.  Grievance and appeals filed during the quarter by beneficiaries in STAR and STAR+PLUS

69. **Demonstration Annual Report.**  The state will submit a draft annual report documenting accomplishments, project status, quantitative, and case study findings, utilization data, and policy and administrative difficulties in the operation of the demonstration.  The state will submit the draft annual report no later than 120 days after the end of each operational year.  Within 60 days of receipt of comments from CMS, a final annual report will be submitted for the Demonstration Year to CMS.

70. **Transition Plan for the Expansion of Medicaid Eligibility in 2014.**  On or before November 1, 2012, the state is required to submit a draft transition plan describing how the state plans to coordinate the transition of any individuals enrolled in the demonstration who may become eligible for a coverage option available under the Affordable Care Act without interruption in coverage to the extent possible.  The plan must also describe the steps the state will take to support adequate provider networks for Medicaid State plan populations in 2014.  The Plan will include a proposed schedule of activities that the State may use to implement the Transition Plan.  After submitting the initial Transition Plan for CMS approval, the state must include progress updates in each quarterly and annual report. The Transition Plan shall be revised as needed.

## X.  EVALUATION OF THE DEMONSTRATION

71. **Submission of a Draft Evaluation Plan.**  The state shall submit to CMS for approval a draft evaluation design for an overall evaluation of the demonstration no later than 120 days after CMS approval of the demonstration.  The draft evaluation design must discuss the outcome measures that shall be used in evaluating the impact of the demonstration during the period of approval.  It shall discuss the data sources, including the use of Medicaid encounter data, and sampling methodology for assessing these outcomes.  The draft evaluation design must include a detailed analysis plan that describes how the effects of the demonstration shall be isolated from other initiatives occurring in the state.  The draft design shall identify whether the state will conduct the evaluation, or select an outside contractor for the evaluation.

a.  <u>Domains of Focus.</u>  The Evaluation Design must, at a minimum, address the research questions listed below.  For questions that cover broad subject areas, the state may propose a more narrow focus for the evaluation.

   i.  What is the impact of the managed care expansion on access to care, the quality, efficiency, and coordination of care, and the cost of care?  This impact should be measured for health care services in general, as well as specifically evaluating the following:

   a.  What is the impact of including pharmacy benefits in the capitated managed

care benefit on access to prescription drugs? Does the effect vary by service area?

b. What is the impact of managed dental care on the likelihood that children receive recommended dental services? For example, have the dental managed care organizations been successful in meeting the target utilization measures set in the State's dental performance dashboard?

c. How does the State's Experience Rebate provision compare to Medical Loss Ratio regulation as a strategy for ensuring that managed care plans spend an appropriate amount of their premium revenue on medical expenses? Would the same plans return approximately the same amounts to the State under a Medical Loss Ratio requirement as under the Experience Rebate, or would the results differ? Are there changes that could be made to either model to improve upon the intended purpose of such mechanisms?

d. What is the impact of including the non-behavioral health inpatient services in the STAR+PLUS program in terms of access to and quality of care and program financing?

e. What is the impact of carving in behavioral health services to STAR and STAR+PLUS as compared to the carving out of behavioral health services in the service area of the NorthSTAR 1915(b) waiver on coordination and quality of care?

f. What is the impact of the STAR+PLUS nursing facility carve-in on quality of care?

ii. What percentage of providers' uncompensated care cost was made up by payments from the UC Pool? What was the distribution of percentage of UC Pool funds and DSRIP funds among types of providers (hospitals v. community providers, public hospitals vs. other hospitals)?

iii. Were the Regional Health Partnerships able to show quantifiable improvements on measures related to the goals of:

(A) Better Care for Individuals (including access to care, quality of care, health outcomes),

(B) Better Health for the Population, and

(C) Lower Cost Through Improvement, especially with respect to per capita costs for Medicaid, uninsured, and underinsured populations, and the cost-effectiveness of care?

(D) To what degree can improvements be attributed to the activities undertaken under DSRIP?

iv. How effective were the Regional Health Partnerships as a governing structure to coordinate, oversee, and finance payments for uncompensated care costs and incentives for delivery system reform? If issues were encountered, how were they addressed? What was the cost-effectiveness of DSRIP as a program to incentivize change? How did the amount paid in incentives compare with the amount of improvement achieved?

v. What do key stakeholders (covered individuals and families, advocacy groups, providers, health plans) perceive to be the strengths and weaknesses, successes and challenges of the expanded managed care program, and of the UC and DSRIP pools? What changes would these stakeholders recommend to improve program operations and outcomes?

b. <u>Evaluation Design Process:</u> Addressing the research questions listed above will require a mix of quantitative and qualitative research methodologies. When developing the RHP Planning Protocol, the State should consider ways to structure the different projects that will facilitate the collection, dissemination, and comparison of valid quantitative data to support the Evaluation Design required in Section X. From these, the State must select a preferred research plan for the applicable research question, and provide a rationale for its selection. To the extent applicable, the following items must be specified for each design option considered:

i. Quantitative or qualitative outcome measures;
ii. Proposed baseline and/or control comparisons;
iii. Proposed process and improvement outcome measures and specifications;
iv. Data sources and collection frequency;
v. Robust sampling designs (e.g., controlled before-and-after studies, interrupted time series design, and comparison group analyses);
vi. Cost estimates;
vii. Timelines for deliverables.

c. <u>Levels of Analysis:</u> The evaluation designs proposed for each question may include analysis at the beneficiary, provider, and aggregate program level, as appropriate, and include population stratifications to the extent feasible, for further depth.

72. **Final Evaluation Design and Implementation.** CMS shall provide comments on the draft evaluation plan described in paragraph 68 within 60 days of receipt, and the state shall submit a final design within 60 days after receipt of CMS comments. The state shall implement the evaluation plan and submit its progress in each of the quarterly and annual reports.

73. **Evaluation Reports.**

a) **Interim Evaluation Report.** The state must submit an Interim Evaluation Report by October 1, 2015, or in conjunction with the State's application for renewal of the Demonstration, whichever is earlier. The purpose of the Interim Evaluation Report is to present preliminary evaluation finds, plans for completing the evaluation design, and submitting a Final Evaluation Report according to the schedule outlined in

subparagraph (b).  The State shall submit the final Interim Evaluation Report within 60 days after receipt of CMS comments.

    **b)  Final Evaluation Report.**  The State shall submit to CMS a draft of the Final Evaluation Report by January 31, 2017.  The State shall submit the Final Evaluation Report within 60 days after receipt of CMS comments.

**c)** CMS may defer up to $10 million in FFP if evaluation reports are not submitted on time or do not meet the requirements specified in the CMS-approved evaluation plan if the deficiency is material. CMS will work with HHSC to rectify issues with these reports prior to deferring any FFP.

74. **Cooperation with Federal Evaluators.**  Should CMS undertake an independent evaluation of any component of the demonstration, the state shall cooperate fully with CMS or the independent evaluator selected by CMS.  The state shall submit the required data to CMS or the contractor.

| Monthly Deliverables | | |
|---|---|---|
| Monthly, by the 31st of each month | Monitoring Call | 67 |
| Monthly, upon receipt, by the 20th of each month with a one month lag (e.g. January report due by March 20). | Enrollment Broker Reports | 25 |
| **Quarterly Deliverables** | | |
| 60 days after end of each quarter DY 5 Quarter 1= February 29, 2016 DY 5 Quarter 2= May 30, 2016 DY 5 Quarter 3= August 29, 2016. DY 5 Quarter 4= November 29, 2016. DY 6 Quarter 1= March 1, 2017 DY6 Quarter 2=May 30, 2017 DY6 Quarter 3=August 29, 2017 DY6 Quarter 4= November 29, 2017 DY6 Quarter5= March 1, 2018 | Quarterly Progress Reports (The first quarterly report due in DY 1 will encompass Oct. 2011 – March 2012) | 39(a) and (b), 68 |
| | Quarterly expenditure, budget neutrality, member month reports | 50, Section VIII, and  53 |
| 60 days after end of each quarter DY5 Quarter 1= February 29, 2016 DY5 Quarter 2= May 30, 2016 | Quarterly Payment Reports | 43(b) |

| | | |
|---|---|---|
| DY5 Quarter 3= August 29, 2016. DY5 Quarter 4= November 29, 2016. DY 6Quarter 1= March 1, 2017 DY6 Quarter 2=May 30, 2017 DY6 Quarter 3=August 29, 2017 DY6 Quarter 4= November 29, 2017 DY6 Quarter5= March 1, 2018 | | |
| Dec. 31, 2011 | Medicaid State Plan Amendments to remove all supplemental payments for inpatient hospital, outpatient hospital, and physician services from the State plan | 43(c) |
| **Annual Deliverables** | | |
| Beginning DY 2, December 31st of each DY | Estimated UC Payments | 44(a)(v)(A) |
| Beginning DY 2, 90 days following end of DY (DY 5: December 29, 2016) DY6: March 31, 2018 | Actual UC Payments and any Reconciliation | 44(a)(v)(B) |
| 120 days after end of each Demonstration year (DY 5: January 28, 2017) DY6: April 30, 2018 | Draft Annual Report | 69, 39(c) |
| Within 60 days of receipt of | Final Annual Report | 69 |

| | | |
|---|---|---|
| comments from CMS, annually | | |
| | | |
| Oct. 1st of each year | Assessment of Budget Neutrality | 48(a) |
| Annually; anytime significant changes occur | Adequate assurances of sufficient capacity to serve the expected enrollment in service area | 24 |
| Annually | Annual Reports on Implementation and Effectiveness of Quality Strategy | 27 |
| **Other Deliverables** | | |
| 12 months before expiration of Demonstration | Request For Extension | 8 |
| 5 months prior to the effective date of Demonstration's suspension or termination | Notification letter and Draft Phase-Out Plan | 9 |
| Post 30-day public comment period | Revised Phase-Out Plan incorporating public comment | 9 |
| The earlier of the date of Application for Renewal or October 1, 2015 | Interim Evaluation Report | 8 and 73(a) |
| 120 days after expiration of Demonstration (January 31, 2017) | Draft Evaluation Report | 73(b) |
| Within 60 days of receipt of CMS comments on Draft Evaluation Report | Final Evaluation Report | 73(b) |

| No later than 120 days prior to planned implementation and may not be implemented until approved | Demonstration amendments, including requests for changes subject to the amendment process | 6 and 7 |
|---|---|---|
| Within 9 months from approval date of Demonstration | Comprehensive Quality Strategy, revision upon any significant changes | 27 |
| Submitted Nov. 3, 2011 | Plans for ongoing monitoring and oversight of MCO contract compliance | 22(b)(ii) |
| Submitted Nov. 3, 2011 | Contingency Plan for addressing insufficient network issues | 22(b)(iii) |
| Submitted Nov. 28, 2011 | Transition plan from the 1915(c) waiver | 22(b)(iv), |
| Dec. 23, 2011 | Demonstrations of Network Adequacy | 22(b)(v), 24(e) |
| Dec. 23, 2011 | Proposed managed care contracts or contract amendments | 22(b)(vi) |
| March 31, 2012 | State's plan for formation of RHPs | 45(d)(i) |
| August 31, 2012 | Program Funding and Mechanics Protocol | 45(d)(ii)(A) |
| August 31, 2012 | RHP Planning Protocol | 45(d)(ii)(B) |
| March 1, 2012 | Draft UC Protocol | 44(a)(ii) |
| October 31, 2012 | Initial DSRIP plans from RHPs | 45(d)(iii) |
| November 12, 2012 | Transition Plan for the Expansion of Medicaid Eligibility in 2014 | 70 |
| March 31, 2015 | Transition Plan for Funding Pools | 49 |

Under Section IX, paragraph 68 *(Demonstration Quarterly Report)* of these STCs, the state is required to submit quarterly progress reports to CMS. The purpose of the quarterly report is to inform CMS of significant demonstration activity from the time of approval through completion of the demonstration. The reports are due to CMS 60 days after the end of each quarter.

The following report guidelines are intended as a framework and can be modified when agreed upon by CMS and the State. A complete quarterly progress report must include an updated budget neutrality monitoring workbook. An electronic copy of the report narrative, as well as the Microsoft Excel workbook must be provided.

## NARRATIVE REPORT FORMAT:

**Title Line One** – Texas Healthcare Transformation and Quality Improvement Program

**Title Line Two -** Section 1115 Quarterly Report

**Demonstration/Quarter Reporting Period:**
*Example:*   *Demonstration Year:  1 (12/12/2011 – 9/30/2016)*
                *Federal Fiscal Quarter:  1/2012 (10/011 - 12/11)*

**Footer:** December 12, 2011 – December 31, 2017

## I. Introduction
Present information describing the goal of the Demonstration, what it does, and the status of key dates of approval/operation.

## II. Enrollment and Benefits Information
Discuss the following:
* Trends and any issues related to STAR and STAR+PLUS eligibility, enrollment, disenrollment, access, and delivery network.
* Any changes or anticipated changes in populations served and benefits. Progress on implementing any Demonstration amendments related to eligibility or benefits.

Please complete the following table that outlines all enrollment activity under the demonstration. The State should indicate "N/A" where appropriate. If there was no activity under a particular enrollment category, the State should indicate that by "0".

## Enrollment Counts for Quarter

Note: Enrollment counts should be person counts, not member months

| Demonstration Populations | Total No. |
|---|---|
| Adults | |
| Children | |
| AMR | |
| Disabled | |

## III. Outreach/Innovative Activities to Assure Access

Summarize marketing, outreach, or advocacy activities to potential eligibles and/or promising practices for the current quarter to assure access for STAR and STAR+PLUS enrollees or potential eligibles.

## IV. Collection and Verification of Encounter Data and Enrollment Data

Summarize any issues, activities, or findings related to the collection and verification of encounter data and enrollment data.

## V. Operational/Policy/Systems/Fiscal Developments/Issues

Identify all other significant program developments/issues/problems that have occurred in the current quarter or are anticipated to occur in the near future that affect health care delivery, including, but not limited to, program development, quality of care, approval and contracting with new plans, health plan contract compliance and financial performance relevant to the Demonstration, fiscal issues, systems issues, and pertinent legislative or litigation activity.

## VI. Action Plans for Addressing Any Issues Identified

Summarize the development, implementation, and administration of any action plans for addressing issues related to the Demonstration.

## VII. Financial/Budget Neutrality Development/Issues

Identify all significant developments/issues/problems with financial accounting, budget neutrality, and CMS 64 and budget neutrality reporting for the current quarter. Identify the State's actions to address these issues.

## VIII. Member Month Reporting

Enter the member months for each of the EGs for the quarter.

## A. For Use in Budget Neutrality Calculations

| Eligibility Group | Month 1 | Month 2 | Month 3 | Total for Quarter Ending XX/XX |
|---|---|---|---|---|
| Adults | | | | |
| Children | | | | |
| AMR | | | | |
| Disabled | | | | |

## B. Not Used in Budget Neutrality Calculations

| Eligibility Group | Month 1 | Month 2 | Month 3 | Total for Quarter Ending XX/XX |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## IX. Consumer Issues

A summary of the types of complaints or problems consumers identified about the program or grievances in the current quarter. Include any trends discovered, the resolution of complaints or grievances, and any actions taken or to be taken to prevent other occurrences.

## X. Quality Assurance/Monitoring Activity

Identify any quality assurance/monitoring activity or any other quality of care findings and issues in current quarter.

## XI. Demonstration Evaluation

Discuss progress of evaluation plan and planning, evaluation activities, and interim findings.

## XII. Regional Healthcare Partnership Participating Hospitals

## Enclosures/Attachments

Identify by title the budget neutrality monitoring tables and any other attachments along with a brief description of what information the document contains.

## State Contact(s)

Identify the individual(s) by name, title, phone, fax, and address that CMS may contact should any questions arise.

## Date Submitted to CMS

The following are the provider guidelines and service definitions for HCBS provided to individuals requiring a nursing facility level of care under STAR+PLUS.

| Service | Service Definition |
|---------|--------------------|
| **Adaptive Aids and Medical Supplies** | Adaptive aids and medical supplies are specialized medical equipment and supplies which include devices, controls, or appliances that enable members to increase their abilities to perform activities of daily living, or to perceive, control, or communicate with the environment in which they live.<br><br>This service also includes items necessary for life support, ancillary supplies, and equipment necessary to the proper functioning of such items, and durable and non-durable medical equipment not available under the Texas State Plan, such as: vehicle modifications, service animals and supplies, environmental adaptations, aids for daily living, reachers, adapted utensils, and certain types of lifts.<br><br>The annual cost limit of this service is $10,000 per waiver plan year. The $10,000 cost limit may be waived by the HHSC upon request of the managed care organization.<br><br>The State allows a member to select a relative or legal guardian, other than a legally responsible individual, to be his/her provider for this service if the relative or legal guardian meets the requirements for this type of service. |
| **Adult Foster Care** | Adult foster care services are personal care services, homemaker, chore, and companion services, and medication oversight (where applicable) provided in a licensed (where applicable) private home by an adult foster care provider who lives in the home. Adult foster care services are furnished to adults who receive these services in conjunction with residing in the home.<br><br>The total number of individuals (including persons served in the waiver) living in the home cannot exceed three, without appropriate licensure. Separate payment will not be made for personal assistance services furnished to a member receiving adult foster care services, since these services are integral to and inherent in the provision of adult foster care services.<br><br>Payments for adult foster care services are not made for room and board, items of comfort or convenience, or the costs of facility maintenance, upkeep, and improvement. The State allows a member to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Assisted Living** | Assisted living services are personal care, homemaker, and chore services; medication oversight; and therapeutic, social and recreational programming provided in a homelike environment in a licensed community facility in conjunction with residing in the facility. This service includes 24-hour on-site response staff to meet scheduled or unpredictable needs in a way that promotes maximum dignity and independence, and to provide supervision, safety, and security. Other individuals or agencies may also furnish care directly, or under arrangement with the community facility, but the services provided by these other entities supplement that provided by the community facility and do not supplant those of the community facility. |

| Service | Service Definition |
|---------|-------------------|
|  | The individual has a right to privacy. Living units may be locked at the discretion of the individuals, except when a physician or mental health professional has certified in writing that the individual is sufficiently cognitively impaired as to be a danger to self or others if given the opportunity to lock the door. The facility must have a central dining room, living room or parlor, and common activity center(s) (which may also serve as living rooms or dining rooms. The individual retains the right to assume risk, tempered only by the individual's ability to assume responsibility for that risk. The State allows an individual to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. Nursing and skilled therapy services (except periodic nursing evaluations if specified above) are incidental, rather than integral to the provision of assisted living services. Payment will not be made for 24-hour skilled care or supervision. Federal financial participation is not available in the cost of room and board furnished in conjunction with residing in an assisted living facility. |
| **Cognitive Rehabilitation Therapy (effective March 6, 2014)** | Cognitive rehabilitation therapy is a service that assists an individual in learning or relearning cognitive skills that have been lost or altered as a result of damage to brain cells/chemistry in order to enable the individual to compensate for the lost cognitive functions. Cognitive rehabilitation therapy is provided when determined to be medically necessary through an assessment conducted by an appropriate professional. Cognitive rehabilitation therapy is provided in accordance with the plan of care developed by the assessor, and includes reinforcing, strengthening, or reestablishing previously learned patterns of behavior, or establishing new patterns of cognitive activity or compensatory mechanisms for impaired neurological systems.<br><br>Qualified providers<br>• Psychologists licensed under Texas Occupations Code Chapter 501.<br>• Speech and language pathologists licensed under Title 3 of the Texas Occupations Code, Subtitle G, Chapter 401.<br>• Occupational therapists licensed under Title 3 of the Texas Occupations Code, Subtitle H, Chapter 454. |
| **Dental Services** | Dental services which exceed the dental benefit under the State plan are provided under this waiver when no other financial resource for such services is available or when other available resources have been used.<br>Dental services are those services provided by a dentist to preserve teeth and meet the medical need of the member. Allowable services include:<br>• Emergency dental treatment procedures that are necessary to control bleeding, relieve pain, and eliminate acute infection;<br>• Operative procedures that are required to prevent the imminent loss of teeth;<br>• Routine dental procedures necessary to maintain good oral health;<br>• Treatment of injuries to the teeth or supporting structures; and<br>• Dentures and cost of fitting and preparation for dentures, including extractions, molds, etc.<br><br>The State allows a member to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to |

| Service | Service Definition |
|---------|--------------------|
| | provide this service. Payments for dental services are not made for cosmetic dentistry. The annual cost cap of this service is $5,000 per waiver plan year. The $5,000 cap may be waived by the managed care organization upon request of the member only when the services of an oral surgeon are required. Exceptions to the $5,000 cap may be made up to an additional $5,000 per waiver plan year when the services of an oral surgeon are required. |
| **Emergency Response Services** | Emergency response services provide members with an electronic device that enables certain members at high risk of institutionalization to secure help in an emergency. The member may also wear a portable "help" button to allow for mobility. The system is connected to the person's phone and programmed to signal a response center once a "help" button is activated. Trained professionals staff the response center. Emergency response services are limited to those members who live alone, who are alone for significant parts of the day, or who have no regular caregiver for extended periods of time, and who would otherwise require extensive routine supervision. The State allows a member to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Employment Assistance** | Assistance provided to an individual to help the individual locate paid employment in the community. Employment assistance includes: <ul><li>identifying an individual's employment preferences, job skills, and requirements for a work setting and work conditions;</li><li>locating prospective employers offering employment compatible with an individual's identified preferences, skills, and requirements; and</li><li>contacting a prospective employer on behalf of an individual and negotiating the individual's employment.</li></ul> In the state of Texas, this service is not available to individuals receiving waiver services under a program funded under section 110 of the Rehabilitation Act of 1973. Documentation is maintained in the individual's record that the service is not available to the individual under a program funded under the Individuals with Disabilities Education Act (20 U.S.C. §1401 et seq.). An employment assistance service provider must satisfy one of these options: Option 1: <ul><li>a bachelor's degree in rehabilitation, business, marketing, or a related human services field; and</li><li>six months of documented experience providing services to people with disabilities in a professional or personal setting.</li></ul> Option 2: <ul><li>an associate's degree in rehabilitation, business, marketing, or a related human services field; and</li><li>one years of documented experience providing services to people with disabilities in a professional or personal setting.</li></ul> Option 3: <ul><li>a high school diploma or GED, and</li></ul> |

| Service | Service Definition |
|---------|-------------------|
| | • two years of documented experience providing services to people with disabilities in a professional or personal setting.<br>• |
| **Financial Management Services** | Financial management services provide assistance to members with managing funds associated with the services elected for self-direction. The service includes initial orientation and ongoing training related to responsibilities of being an employer and adhering to legal requirements for employers. The financial management services provider, referred to as the Consumer Directed Services Agency, also:<br>• Serves as the member's employer-agent;<br>• Provides assistance in the development, monitoring, and revision of the member's budget;<br>• Provides information about recruiting, hiring, and firing staff, including identifying the need for special skills and determining staff duties and schedule;<br>• Provides guidance on supervision and evaluation of staff performance;<br>• Provides assistance in determining staff wages and benefits;<br>• Provides assistance in hiring by verifying employee's citizenship status and qualifications, and conducting required criminal background checks in the Nurse Aide Registry and Employee Misconduct Registry;<br>• Verifies and maintains documentation of employee qualifications, including citizenship status, and documentation of services delivered;<br>• Collects timesheets, processes timesheets of employees, processes payroll and payables, and makes withholdings for, and payment of, applicable Federal, State, and local employment-related taxes;<br>• Tracks disbursement of funds and provides quarterly written reports to the member of all expenditures and the status of the member's Consumer Directed Services budget; and<br>• Maintains a separate account for each member's budget.<br>The State allows a relative or legal guardian, other than a legally responsible member, to be the member's provider for this service if the relative or legal guardian meets the requirements for this type of provider. |
| **Home Delivered Meals** | Home delivered meals services provide a nutritionally sound meal to members. The meal provides a minimum of one-third of the current recommended dietary allowance for the member as adopted by the United States Department of Agriculture. |
| **Minor Home Modifications** | Minor home modifications are those physical adaptations to a member's home, required by the service plan, that are necessary to ensure the member's health, welfare, and safety, or that enable the member to function with greater independence in the home. Such adaptations may include the installation of ramps and grab-bars, widening of doorways, modification of bathroom facilities, or installation of specialized electric and plumbing systems that are necessary to accommodate the medical equipment and supplies necessary for the member's welfare. Excluded are those adaptations or improvements to the home that are of general utility, and are not of direct medical or remedial benefit to the member, such as carpeting, roof repair, central air conditioning, etc. Adaptations that add to the total square footage of the home are excluded from this benefit. All services are provided in accordance with applicable State or local building codes. Modifications are not made to settings that are leased, owned, or controlled by waiver providers. The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's |

| Service | Service Definition |
|---------|-------------------|
| | provider for this service if the relative or legal guardian meets the requirements to provide this service.<br>There is a lifetime limit of $7,500 per member for this service and $300 yearly for repairs. To request approval to exceed the service cost cap for minor home modifications, the managed care organization must send a written request to HHSC along with appropriate documentation which must include the cost estimate and an assurance that the Plan of Care is within the member's overall cost ceiling and adequate to meet the needs of the member. Once the $7,500 cap or a higher amount approved by HHSC is reached, only $300 per year per member, excluding the fees, will be allowed for repairs, replacement, or additional modifications. The home and community support services provider is responsible for obtaining cost-effective modifications authorized on the member's ISP by the managed care organization. |
| Nursing | Nursing services are those services that are within the scope of the Texas Nurse Practice Act and are provided by a registered nurse (or licensed vocational nurse under the supervision of a registered nurse), licensed to practice in the State. In the Texas State Plan, nursing services are provided only for acute conditions or exacerbations of chronic conditions lasting less than 60 days. Nursing services provided in the waiver cover ongoing chronic conditions such as medication administration and supervising delegated tasks. This broadens the scope of these services beyond extended State plan services. |
| Occupational Therapy | Occupational therapy consists of interventions and procedures to promote or enhance safety and performance in activities of daily living, instrumental activities of daily living, education, work, play, leisure, and social participation.<br><br>Occupational therapy services consist of the full range of activities provided by a licensed occupational therapist, or a licensed occupational therapy assistant under the direction of a licensed occupational therapist, acting within the scope of his/her State licensure. Texas assures that occupational therapy is cost-effective and necessary to avoid institutionalization. The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| Personal Assistance Services | Personal assistance services provide assistance to members in performing the activities of daily living based on their service plan. Personal assistance services include assistance with the performance of the activities of daily living and household chores necessary to maintain the home in a clean, sanitary, and safe environment. Personal assistance services also include the following services: protective supervision provided solely to ensure the health and safety of a member with cognitive/memory impairment and/or physical weakness; tasks delegated by a registered nurse under the rules of the Texas Board of Nursing; escort services consist of accompanying, but not transporting, and assisting a member to access services or activities in the community; and extension of therapy services. The attendant may perform certain tasks if delegated and supervised by a registered nurse in accordance with Board of Nursing rules found in 22 Texas Administrative Code, Part 11, Chapter 224. The home and community support services agency registered nurse is responsible for delegating any task to the attendant, and the home and community support services agency must maintain a copy of the delegation requirements in the member's case record. |

| Service | Service Definition |
|---|---|
| | Health Maintenance Activities are limited to tasks that enable a member to remain in an independent living environment and go beyond activities of daily living because of the higher skill level required.  A registered nurse may determine that performance of a health maintenance activity for a particular member does not constitute the practice of professional nursing.  An unlicensed person may perform health maintenance activities without delegation. (See Board of Nursing rules at 22 Texas Administrative Code, Part 11, Chapter 225.)  Licensed therapists may choose to instruct the attendants in the proper way to assist the member in follow-up on therapy sessions.  This assistance and support provides reinforcement of instruction and aids in the rehabilitative process.  In addition, a registered nurse may instruct an attendant to perform basic interventions with members that would increase and optimize functional abilities for maximum independence in performing activities of daily living such as range of motion exercises.<br>The following contingencies apply to providers:  Texas does not allow service breaks of personal assistance services for health and safety reasons; therefore, providers are required to have back-up attendants if the regular attendant is not available.  The provider nurse may provide personal assistance services if the regular and back-up attendants are not available and nurse delegation is authorized.<br><br>The State allows, but does not require, a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. Personal assistance services will not be provided to members residing in adult foster care homes, assisted living facilities, or during the same designated hours or time period a member receives respite care. |
| **Physical Therapy** | Physical therapy is defined as specialized techniques for evaluation and treatment related to functions of the neuro-musculo-skeletal systems provided by a licensed physical therapist or a licensed physical therapy assistant, directly supervised by a licensed physical therapist.  Physical therapy is the evaluation, examination, and utilization of exercises, rehabilitative procedures, massage, manipulations, and physical agents (such as mechanical devices, heat, cold, air, light, water, electricity, and sound) in the aid of diagnosis or treatment.<br><br>Physical therapy services consist of the full range of activities provided by a licensed physical therapist, or a licensed physical therapy assistant under the direction of a licensed physical therapist, acting within the scope of state licensure. Physical therapy services are available through this waiver program only after benefits available through Medicare, Medicaid, or other third party resources have been exhausted.  The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Respite** | Respite care services are provided to individuals unable to care for themselves, and are furnished on a short-term basis because of the absence of or need for relief for those persons normally providing unpaid services.  Respite care may be provided in the following locations:  member's home or place of residence; adult foster care home; Medicaid certified NF; and an assisted living facility.  Respite care services are authorized by a member's PCP as part of the member's care plan.  Respite services may be self-directed. Limited to 30 days per year. |

| Service | Service Definition |
|---------|-------------------|
| | There is a process to grant exceptions to the annual limit. The managed care organization reviews all requests for exceptions, and consults with the service coordinator, providers, and other resources as appropriate, to make a professional judgment to approve or deny the request on a case-by-case basis. Members residing in adult foster care homes and assisted living facilities are not eligible to receive respite services. Other waiver services, such as Personal Assistance Services, may be provided on the same day as respite services, but the two services cannot be provided at the exact same time. |
| **Speech, Hearing, and Language Therapy** | Speech therapy is defined as evaluation and treatment of impairments, disorders, or deficiencies related to an individual's speech and language. The scope of Speech, Hearing, and Language therapy services offered to HCBS participants exceeds the State plan as the service in this context is available to adults. Speech, hearing, and language therapy services are available through the waiver program only after benefits available through Medicare, Medicaid, or other third party resources have been exhausted. The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Support Consultation** | Support consultation is an optional service component that offers practical skills training and assistance to enable a member or his legally authorized representative to successfully direct those services the member or the legally authorized representative chooses for consumer-direction. This service is provided by a certified support advisor, and includes skills training related to recruiting, screening, and hiring workers, preparing job descriptions, verifying employment eligibility and qualifications, completion of documents required to employ an individual, managing workers, and development of effective back-up plans for services considered critical to the member's health and welfare in the absence of the regular provider or an emergency situation.

Skills training involves such activities as training and coaching the employer regarding how to write an advertisement, how to interview potential job candidates, and role-play in preparation for interviewing potential employees. In addition, the support advisor assists the member or his or her legally authorized representative to determine staff duties, to orient and instruct staff in duties and to schedule staff. Support advisors also assist the member or his or her legally authorized representative with activities related to the supervision of staff, the evaluation of the job performance of staff, and the discharge of staff when necessary.

This service provides sufficient information and assistance to ensure that members and their representatives understand the responsibilities involved with consumer direction. Support consultation does not address budget, tax, or workforce policy issues. The State defines support consultation activities as the types of support provided beyond that provided by the financial management services provider. The scope and duration of support consultation will vary depending on a member's need for support consultation. Support consultation may be provided by a certified support advisor associated with a consumer directed services agency selected by the member or by an independent certified support advisor hired by the member. Support consultation has a specific reimbursement rate and is a component of the member's service budget. In conjunction with the service planning team, members or legally authorized representatives determine the level of support consultation necessary for inclusion in each member's service plan. |

| Service | Service Definition |
|---------|-------------------|
| | |
| **Supported Employment Services** | Assistance provided, in order to sustain competitive employment, to an individual who, because of a disability, requires intensive, ongoing support to be self-employed, work from home, or perform in a work setting at which individuals without disabilities are employed. Supported employment includes adaptations, supervision, training related to an individual's assessed needs, and earning at least minimum wage (if not self-employed). <br><br> In the state of Texas, this service is not available to individuals receiving waiver services under a program funded under section 110 of the Rehabilitation Act of 1973. Documentation is maintained in the individual's record that the service is not available to the individual under a program funded under the Individuals with Disabilities Education Act (20 U.S.C. §1401 et seq.). <br><br> A supported employment service provider must satisfy one of these options: <br><br> Option 1: <br> • a bachelor's degree in rehabilitation, business, marketing, or a related human services field; and <br> • six months of documented experience providing services to people with disabilities in a professional or personal setting. <br> Option 2: <br> • an associate's degree in rehabilitation, business, marketing, or a related human services field; and <br> • one year of documented experience providing services to people with disabilities in a professional or personal setting. <br> Option 3: <br> • a high school diploma or GED, and <br> • two years of documented experience providing services to people with disabilities in a professional or personal setting |
| **Transition Assistance Services** | Transition Assistance Services pay for non-recurring, set-up expenses for members transitioning from nursing homes to the STAR+PLUS HCBS program. <br><br> Allowable expenses are those necessary to enable members to establish basic households and may include: security deposits for leases on apartments or homes; essential household furnishings and moving expenses required to occupy and use a community domicile, including furniture, window coverings, food preparation items, and bed and bath linens; set-up fees or deposits for utility or service access, including telephone, electricity, gas, and water; services necessary for the member's health and safety, such as pest eradication and one-time cleaning prior to occupancy; and activities to assess need, arrange for, and procure needed resources (limited to up to 180 consecutive days prior to discharge from the nursing facility. Services do not include room and board, monthly rental or mortgage expenses, food, regular utility charges, or household appliances or items that are intended for purely recreational purposes. There is a $2,500 limit per member. |

**Quality Improvement Program and Quality Improvement Strategy**

Since 1991, the Texas Health and Human Services Commission (HHSC) has overseen and coordinated the planning and delivery of health and human service programs in Texas. HHSC was established in accordance with Texas Government Code Chapter 531 and is responsible for the oversight of all Texas health and human service agencies. It is the goal of HHSC to use its Quality Improvement Strategy to:

- Transition from volume-based purchasing models to a pay-for-performance model;
- Improve member satisfaction with care; and
- Reduce payments for low quality care.

It is the intention of HHSC to achieve these goals through the mechanisms described in this Strategy, including:

- Program integrity monitoring through both internal and external processes;
- Implementation of financial incentives for high performing MCOs (MCOs) and financial disincentives for poor performing MCOs; and
- Developing and implementing targeted initiatives that encourage the adoption by MCOs of evidence-based clinical and administrative practices.

HHSC's fundamental commitment is to contract for results. HHSC defines a successful result as the generation of defined, measurable, and beneficial outcomes that satisfy the contract requirements and support HHSC's missions and objectives.

## TEXAS HEALTH CARE TRANSFORMATION AND QUALITY IMPROVEMENT PROGRAM 1115 WAIVER

The Texas Healthcare Transformation and Quality Improvement Program 1115 Waiver, known as the 1115 Transformation Waiver, is a demonstration waiver that allows the state to expand Medicaid managed care, including pharmacy and dental services, while preserving federal hospital funding historically received as Upper Payment Limit payments.

There are multiple programs included in the 1115 Transformation Waiver:

STAR
Medicaid's State of Texas Access Reform (STAR) program is the managed care program in which HHSC contracts with MCOs to provide, arrange for, and coordinate preventative, primary, and acute care covered services, including pharmacy. STAR serves primarily pregnant women and children. There have been no significant changes to the program since 2014.

STAR+PLUS

STAR+PLUS is the agency's program for integrating the delivery of acute and long-term services and supports through a managed care system. STAR+PLUS enrollment is mandatory for adults receiving SSI and non-SSI adults who qualify for STAR+PLUS home and community-based services. Acute, pharmacy, and long-term services and supports are coordinated and

provided through a provider network contracted with MCOs. Children under age 21 who receive SSI may currently voluntarily enroll in STAR+PLUS.

Senate Bill 7, 83rd Legislature, Regular Session, 2013, required HHSC to carve nursing facility services into managed care, a transition that was implemented on March 1, 2015. Adults residing in nursing facilities who receive Medicaid, including those who also receive Medicare, transitioned from ee-for-service to STAR+PLUS.

*Texas Dual Eligible Integrated Care Project*
This project, also known as "the Demonstration," tests an innovative payment and service delivery model to improve coordination of services for individuals who are eligible for both Medicaid and Medicare, enhance quality of care, and reduce costs for both the state and the federal government. Individuals participating in the Demonstration receive their Medicaid and Medicare services through the same MCO, known as a Medicare-Medicaid Plan, or MMP. By having one health plan, Medicare and Medicaid benefits will be coordinated to better serve the individual. The Demonstration was implemented on March 1, 2015, and has been operating in six Demonstration counties (Bexar, Dallas, El Paso, Harris, Hidalgo, and Tarrant) since October 2015. The Demonstration will end in December 2018.

*Community First Choice*
Senate Bill 7, 83rd Legislature, Regular Session, 2013, required the HHSC to put in place a cost-effective option for attendant and habilitation services for people with disabilities, including individuals enrolled in STAR+PLUS. A federal option, called Community First Choice (CFC), allows states to provide home and community-based attendant services and supports to Medicaid recipients with disabilities. CFC includes habilitation, personal assistance services, emergency response services, and support management. HHSC implemented Community First Choice on June 1, 2015.

STAR+PLUS Home and Community-based Services
The STAR+PLUS home and community-based services program provides long-term care services and supports to members age 21 and older, who meet nursing facility level of care, and who need and are receiving home and community-based services as an alternative to nursing facility care. The 1115 Transformation Waiver population includes individuals who could have been eligible under 42 CFR 435.217 had the State continued its Section 1915(c) home and community-based services waiver for individuals who are elderly and individuals with physical disabilities.


Dental
The children's Medicaid dental services are provided through a managed care model to children under age 21 who are eligible for Medicaid Texas Health Steps Comprehensive Care services or SSI. Children residing in institutional settings receive dental through a fee-for-service model. Members who receive dental services through a Medicaid managed care dental plan are required to select a dental plan and a main dentist. A main dentist serves as the client's dental home and is responsible for providing routine care, maintaining the continuity of patient care, and initiating referrals for specialty care.

The 1115 Transformation Waiver does not include any provisions for the Children's Health Insurance Program (CHIP) or STAR Health programs, which are covered under separate agreements.

Delivery System Improvements

The primary goal of the 1115 Transformation Waiver is to expand Medicaid managed care statewide while also preserving Upper Payment Limit funding and increasing quality of care. Two pools of funds were created.

*Uncompensated Care Pool*
Uncompensated Care Pool payments are designed to help offset the costs of uncompensated care provided by the hospital or other providers.

*Delivery System Reform Incentive Payment Pool*
The Delivery System Reform Incentive Payment pool is intended to incentivize hospitals and other providers to transform their service delivery practices to improve quality, health status, patient experience, coordination, and cost-effectiveness.

Under the 1115 Transformation Waiver, eligibility to receive Uncompensated Care or Delivery System Reform Incentive Payments requires participation in a Regional Healthcare Partnership. Regional Healthcare Partnerships collaborate with participating providers to establish a plan designed to achieve quality outcomes and learn more about local needs through population-based reporting. Performing providers in a Regional Healthcare Partnership can access waiver Delivery System Reform Incentive Payment funding by performing improvement projects leading to quality outcomes. Performance improvement projects and outcome reporting in the Regional Healthcare Partnership plans align with the following four categories:
- Infrastructure development;
- Program innovation and redesign;
- Quality improvements; and
- Population-focused improvements.

Counties and other entities providing state share determine how their funds are used in the Regional Healthcare Partnership consistent with waiver requirements. Participants develop a regional plan identifying partners, community needs, proposed projects, and funding distribution. These plans provide the basis for:
- Voluntarily improving regional access, quality, cost-effectiveness and collaboration;
- Identifying transformation programs, performance metrics, and incentive payments for each participating performing provider consistent with the Delivery System Reform Incentive Payment menu of projects; and
- Eligibility to earn incentive payments.

Each partnership must have an anchoring entity, which acts as a primary point of contact for HHSC in the region and is responsible for seeking regional stakeholder engagement and coordinating development of the regional plan.

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

In order to achieve and sustain success at responding to community needs, providers and communities will need to apply best practices in continuous quality improvement. Most notably, learning collaboratives are essential to the success of high quality health systems that have achieved the highest level of performance. Participants are strongly encouraged to form learning collaboratives to promote sharing of challenges and testing of new ideas and solutions by providers implementing similar projects in each Regional Healthcare Partnership. These regionally-focused learning collaboratives also can inform the learning collaborative conducted annually during demonstration years three through five to share learning, experiences, and best practices acquired from the Delivery System Reform Incentive Payment program across the State.

Regional Healthcare Partnerships can be a natural hub for this type of shared learning by connecting providers who are working together on common challenges in the community, but providers and Regional Healthcare Partnerships are also encouraged to connect with others across Texas to form a "community of communities" that can connect on an ongoing basis to share best practices, breakthrough ideas, challenges and solutions. This will allow regions to learn from each other's challenges and develop shared solutions that can accelerate the spread of breakthrough ideas across Texas.

**BASIS FOR QUALITY IMPROVEMENT STRATEGY**
In accordance with Federal regulations, the State must develop a quality strategy to reflect all managed care programs and plans operating under the 1115 Transformation Waiver. The State must also provide the Centers for Medicare and Medicaid Services (CMS) with annual reports on the implementation and effectiveness of the updated comprehensive Quality Strategy as it affects the 1115 Transformation Waiver. The Code of Federal Regulations includes requirements outlining the components of a state quality strategy. The underlying requirement is that the contract between the State and the MCOs must include specified elements related to quality. The Uniform Managed Care Contract can be accessed at
http://www.hhsc.state.tx.us/medicaid/managed-care/UniformManagedCareContract.pdf and the Uniform Managed Care Manual can be accessed at
http://www.hhsc.state.tx.us/medicaid/managed-care/umcm/.

**STRUCTURE OF QUALITY IMPROVEMENT STRATEGY**
The 1115 Quality Improvement Strategy encompasses multiple programs and divisions within HHSC, including Quality Assurance, Health Plan Management, the Office of Health Policy and Clinical Services, as well as advisory committees, and the external quality review organization. This section describes each of these programs and their role in the Strategy.

External Quality Review Organization
The Balanced Budget Act of 1997 requires state Medicaid agencies to provide an annual external independent review of quality outcomes, timeliness of services, and access to services provided by a Medicaid MCO and prepaid inpatient health plans. To comply with this requirement, and to provide HHSC with data analysis and information to effectively manage its Medicaid managed care programs, HHSC contracts with an external quality review organization for Medicaid managed care and CHIP. In collaboration with the external quality review organization, HHSC

evaluates, assesses, monitors, guides, and directs the Medicaid managed care programs and organizations for the State. Since 2002, Texas has contracted with the University of Florida's Institute on Child Health Policy to conduct external quality review organization activities.

The Institute of Child Health Policy performs the following three CMS-required functions:

- Validation of performance improvement projects;
- Validation of performance measures; and
- A review to determine MCO compliance with certain federal Medicaid managed care regulations.

The Institute of Child Health Policy also conducts focused quality of care studies, performs encounter data validation and certification, assesses member satisfaction, provides assistance with rate setting activities, and completes other reports and data analysis as requested by HHSC. The external quality review organization develops studies, surveys, or other analytical approaches to assess enrollee's quality and outcomes of care and to identify opportunities for MCO improvement. To facilitate these activities, HHSC ensures that the Institute of Child Health Policy has access to enrollment, health care claims and encounter, and pharmacy data. HHSC also ensures access to immunization registry data. The MCOs collaborate with the Institute of Child Health Policy to ensure medical records are available for focused clinical reviews. In addition to these activities, the Institute of Child Health Policy collects and analyzes data on potentially preventable events for the Delivery System Reform Incentive Payment Pool projects.

HHSC Medicaid/CHIP Division
The Medicaid/CHIP Division develops and oversees the Texas Medicaid and CHIP policies that determine client services and provider reimbursements while complying with federal program mandates. The Medicaid/CHIP Division develops fee-for-service and managed care services through key program areas such as implementation and operations of the 1115 Transformation Waiver and Cost Containment, Office of Policy, Medicaid-related Health Information Technology, the Vendor Drug Program, Contract Compliance and Support, Health Plan Management, Project Advisory and Coordination Team, and Operations Coordination.

HHSC Medicaid/CHIP- Program Operations
The Office of Policy and Health Plan Management work together to: provide better access to healthcare services, improve quality of services and service delivery, promote service-appropriate utilization, and contain costs. The major activities related to oversight of MCOs and Texas' managed care programs include:
- Developing and operating managed care models to provide a medical and dental home;
- Developing and maintaining provider networks;
- Performing utilization reviews and utilization management;
- Managing Medicaid and CHIP contracts; and
- Quality assessment and performance improvement.

*Office of Policy- Policy and Program Development*

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

Policy and Program Development implements initiatives that directly affect Medicaid and CHIP service delivery. This area provides program expertise and coordinates with HHSC health plan managers, quality analysts, and HHSC contracts and finance units to refine existing or implement new healthcare delivery models. Staff manage program and policies of the various managed care programs, including STAR, STAR+PLUS, CHIP, and Dental in addition to the Medicaid fee-for-service policies . Staff also manage certain state or federally-directed projects for the Medicaid/CHIP Division

*Office of Policy- Quality Assurance*
The Quality Assurance unit in the Office of Policy is the primary liaison between HHSC and the external quality review organization, and between the MCOs and the external quality review organization. This includes providing oversight of the external quality review organization contract and the fee-for-service Texas Medicaid Wellness Program, and monitoring MCO compliance with the *Linda Frew, et al. vs. Charles Smith et al.* lawsuit. The unit is responsible for working with the external quality review organization to develop and implement quality programs, including pay for performance programs, and reviewing and analyzing data produced by the external quality review organization related to those quality programs. The Quality Assurance unit also provides technical assistance to other areas of HHSC and to the various providers, MCOs, and stakeholder groups.

Finance
The Finance section monitors MCO financial compliance with the Uniform Managed Care Contact and the Uniform Managed Care Manual. This group has primary responsibility for:
- Monitoring financial performance of MCOs, including the financial aspects of subcontracts and affiliate relationships, and recommending strategies to address issues and concerns;
- Reviewing and validating MCO financial deliverables;
- Administering the recovery of excess profits through the experience rebate process;
- Managing the MCO external audit process;
- Developing financial reporting principles;
- Supporting Health Plan Management and other stakeholders within the Medicaid/CHIP Division regarding financial reporting and related issues;
- Providing ad hoc analysis as requested;
- Providing financial expertise for request for proposal and contract amendments;
- Responding to and implementing recommendations of State and HHSC internal auditors; and
- Performing financial aspects of MCO readiness reviews.

The Finance section calculates the amounts of payments and recoupments based on results of MCO financial incentive programs.

Health Plan Management
Health Plan Management monitors MCO compliance with the Uniform Managed Care Contract, the Uniform Managed Care Manual, Texas Government Code §533 and §531, and Texas Administrative Code §353 and §354. Health Plan Management's major activities include

monitoring of service delivery, provider networks, claims processing, deliverables, and marketing and other administrative requirements. Monitoring of service delivery includes evaluating and trending provider and client complaints. It also includes monitoring service coordination, MCO call center services, claims processes, and encounters. Monitoring provider networks involves analyzing MCO provider data and geographic access reports, and includes review of provider turnover rates, network panel status reports, and provider directories. Health Plan Management also assists with the resolution of complex issues; facilitates internal and external stakeholder meetings; obtains and develops policy clarifications; resolves encounter data and premium payment issues; and clarifies contract requirements. Health Plan Management staff reviews MCO marketing materials for compliance with the Uniform Managed Care Marketing Policy and Procedures Manual.

MCOs report specific data to Health Plan Management each fiscal quarter. Health Plan Management staff compiles this information by MCO, program, and service area. Each MCO may have multiple quarterly reports, which are used for monitoring purposes. These reports capture data on the following elements:

- Enrollment;
- Provider network status;
- Member hotline, behavioral health crisis hotline, and provider hotline performance;
- MCO complaints and appeals (member and provider);
- Complaints received by state agencies (member and provider);
- Claims; and
- Encounter reconciliation.

While the MCO is the initial point of contact to address member or provider concerns, Health Plan Management will assist with issues that have been escalated to HHSC. Inquiries and complaints are referred to Health Plan Management from a variety of sources including elected officials, the Office of the Ombudsman, and other agencies and departments. Provider inquiries and complaints are received directly from providers through email. Health Plan Management also receives information on cases that have been overturned on appeal to track and address any issues in which it appears MCOs may have denied services inappropriately.

Based on findings from monthly and quarterly self-reported performance data, onsite visits, member or other complaints, financial status, and any other source, Health Plan Management may impose or pursue one or more of the following remedies for each item of material non-compliance in accordance with the Uniform Managed Care Contract:

- Assessment of liquidated damages;
- Accelerated monitoring of the MCO, which includes more frequent or extensive monitoring by HHSC;
- Requiring additional financial or programmatic reports to be submitted by the MCO;
- Requiring additional or more detailed financial or programmatic audits or other reviews of the MCO;
- Terminating or declining to renew or extend an MCO contract;

- Appointing temporary MCO management under the circumstances described in 42 CFR §438.706;
- Initiating or suspending member disenrollment;
- Withholding or recouping payment to the MCO; and
- Requiring forfeiture of all or part of the MCO's performance bond.

Health Plan Management determines the scope and severity of the remedy on a case-by-case basis.

HHSC Medicaid/CHIP- 1115 Healthcare Transformation and Quality Improvement Waiver Operations
The 1115 Transformation Waiver Operations area oversees the implementation and roll-out of the Delivery System Reform Incentive Payment portion of the waiver.  Major activities have included:

- Review and submission of more than 1,500 proposed Delivery System Reform Incentive Payment 4-year and 3-year projects from all 20 Regional Healthcare Partnerships to CMS;
- Review and submission of outcome measures associated with each project;
- Development of policies and protocols, reporting process, tools, and guidelines;
- Provision of ongoing and extensive technical assistance for Regional Healthcare Partnership anchoring entities and providers related to areas including project plan corrections, milestone and metrics reporting, and outcome measures;
- Ongoing and extensive submission of information to CMS to support waiver implementation;
- Review of metric reporting;
- Establishing formal waiver evaluation in coordination with HHSC Strategic Decision Support; and
- Development of the monitoring for Delivery System Reform Incentive Payment projects through contract with an external compliance monitor.

Operations Coordination
The Operations Coordination area develops, oversees, and performs functions related to information technology operational systems processing, data management, analysis, and reporting.  Operations Coordination works on eligibility and enrollment operations within the Medicaid/CHIP Division, information technology program development and oversight, and provider claims oversight.  This section of HHSC provides data that is used for multiple quality purposes, including tracking rates of potentially preventable events and sharing encounter data with the external quality review organization.  Operations Coordination also manages the vendor responsible for housing the data.

HHSC Financial Services- Actuarial Analysis
Actuarial Analysis calculates the capitated premium rates paid to the Medicaid and CHIP MCOs.  HHSC uses an external actuary to certify these rates as meeting the actuarial soundness guidelines established by CMS.  Actuarial Analysis is also involved with benefit and rate changes, program expansions, and legislative mandates that affect MCOs.  Finally, Actuarial Analysis provides actuarial support services for other HHSC activities, including initiatives

related to the 1115 Transformation Waiver. Key quality-related activities with which Actuarial Analysis is involved include financial incentive programs, data certification, and implementation of provider-level and MCO-level disincentives related to potentially preventable events.

HHSC Financial Services- Strategic Decision Support
Strategic Decision Support provides research and analytic support to the Health and Human Services Enterprise. Broadly, Strategic Decision Support staff:

- Conducts quantitative analysis of health and human services program data;
- Compiles, analyzes, and reports relevant third-party data (e.g., Census Bureau, Labor Statistics, CDC programs);
- Collects, analyzes, and reports survey data;
- Conducts program evaluation studies; and
- Conducts innovative research studies on various topics of interest to executive management staff.

HHSC Office of Health Policy and Clinical Services
The Office of Healthcare Quality Analytics, Research, and Coordination Support works within the health and human services system and with external stakeholders to improve enterprise collaboration and coordination on quality initiatives, and to reduce duplication of efforts. The program is charged with identifying initiatives that focus on increased quality and cost effectiveness, promote transparency and efficiency, and enhance internal and external understanding of quality and performance. The Office of Healthcare Quality Analytics, Research, and Coordination Support is responsible for several special projects related to quality and efficiency improvement. Several examples of high impact projects are listed below.

*Behavioral Health Organization and MCO Coordination*
The Office of Healthcare Quality Analytics, Research, and Coordination Support has spearheaded an effort to better coordinate behavioral healthcare and physical healthcare by improving the communication capabilities of the NorthSTAR behavioral health organization and the MCOs operating in the NorthSTAR service area. A successful outcome will be improved quality of care, largely demonstrated by a reduction in potentially preventable events, particularly potentially preventable emergency department visits.

*Alternative Provider Payment Structures*
Using initial funding from an Agency for Healthcare Research and Quality grant administered by Rutgers University, HHSC has focused on a series of quality measures related to antipsychotic medication prescribing and mental health treatment practices within the MCO/behavioral health organization model. HHSC has begun to share performance related information with the MCOs and behavioral health organizations and is engaging them in discussions regarding intervention strategies.

*Interagency Collaboration on Strategies to Promote Improved Birth Outcomes*
Prenatal care, delivery, newborn care, and postpartum care represent areas of ongoing quality improvement and cost savings. HHSC recognizes that often this requires close coordination among the HHS agencies, namely with the Department of State Health Services. The Department of State Health Services is Texas' public health agency. HHSC and the Department

of State Health Services have formed interagency workgroups focused on targeted projects of mutual concern in this area.

<u>Management Information System Requirements</u>
MCOs are required to maintain a Management Information System (MIS) that supports all functions of the MCO's processes and procedures for the flow and use of MCO data. They must have hardware, software, and a network and communications system with the capability and capacity to handle and operate all MIS subsystems for the following operational and administrative areas:

- Enrollment/Eligibility
- Provider Network
- Encounter/Claims Processing
- Financial System
- Utilization/Quality Improvement
- Reporting
- Interfaces
- Third Party Liability Reporting

<u>Intersection of Roles</u>
Each of these areas is responsible for complex unique activities and serves a specific purpose in the overall Texas Medicaid quality system. Their distinct roles interact with each other to fluctuating degrees, largely dictated by specific projects and needs of the agency and stakeholders. The diagram found in Attachment C of this document summarizes the roles and interactions of these units.

## EVIDENCE-BASED CARE AND QUALITY MEASUREMENT

HHSC's mission is to create a customer-centered, innovative, and adaptable managed care system that provides the highest quality of care to individuals served by the agency while at the same time ensuring access to services. To this end, the 1115 Transformation Waiver goals and objectives include improving outcomes and transitioning to quality-based payment systems across managed care and hospitals. The 1115 Quality Improvement Strategy is intended to outline the internal and external resources, mechanisms, and initiatives that together will achieve these goals.

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

Measurement

Texas relies on a combination of established sets of measures and state-developed measures that are validated by the external quality review organization. This approach allows the State to collect data comparable to nationally recognized benchmarks and ensure validity and reliability in collection and analysis of data that is of particular interest to Texas. Resources used by Texas include:

- National Committee for Quality Assurance Healthcare Effectiveness Data and Information Set (HEDIS®)
- Agency for Healthcare Research and Quality Pediatric Quality Indicators /Prevention Quality Indicators
- 3M Software for Potentially Preventable Events
- Consumer Assessment of Healthcare Providers & Systems (CAHPS®) Surveys

Tools for Obtaining and Disseminating Information Related to Quality

The analysis and dissemination of quality data is primarily conducted using MCO-generated data and reports and external quality review organization data analysis and summary reports.

Mechanism for Identifying Race, Ethnicity, and Primary Language of Members

The State obtains race, ethnicity, and primary language spoken by a member from the enrollment form completed by that member. Applications are processed through the Texas Integrated Eligibility Redesign System (TIERS) and routed to a third-party enrollment broker. The enrollment broker transmits a file containing the race/ethnicity and primary language of each enrollee to the MCOs monthly.

Encounter Data Requirements

MCOs are required to submit complete and accurate encounter data for all covered services, including value-added services, at least monthly to a data warehouse for reporting purposes. The data file must include all encounter data and encounter data adjustments processed by the MCO no later than the 30th calendar day after the last day of the month in which the claim was adjudicated. The Texas Medicaid claims administrator contractor developed and maintains the data warehouse and is responsible for collecting, editing, and storing MCO encounter data.

HHSC contracts with the external quality review organization to certify the accuracy and completeness of MCO encounter data. The data certification reports support rate-setting activities and provide information relating to the quality, completeness, and accuracy of the MCO encounter data. Certification reports include a quality assessment analysis to assure data quality within agreed standards for accuracy, a summary of amounts paid by service type and month of service, and a comparison of paid amounts reported in the encounter data to financial statistical reports provided by the MCOs.

Encounter data must follow the format and data elements as described in the Health Insurance Portability and Accounting Act-compliant 837 Companion Guides and Encounter Submission Guidelines. HHSC specifies the method of transmission, the submission schedule, and any other requirements in the Uniform Managed Care Manual. Original records must be made available for inspection by HHSC for validation purposes. Encounter data that does not meet quality standards must be corrected and returned within a time period specified by HHSC.

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

**Managed Care Organization-Generated Data and Reports**

*Quality Assessment and Performance Improvement*
Each MCO must develop, maintain, and operate a Quality Assessment and Performance Improvement Program that meets state and federal requirements.  The MCO must approach all clinical and nonclinical aspects of quality assessment and performance improvement based on principles of Continuous Quality Improvement/Total Quality Management and must:
- Evaluate performance using objective quality indicators;
- Foster data-driven decision-making;
- Recognize that opportunities for improvement are unlimited;
- Solicit member and provider input on performance and Quality Assessment and Performance Improvement activities;
- Support continuous ongoing measurement of clinical and non-clinical effectiveness and member satisfaction;
- Support programmatic improvements of clinical and non-clinical processes based on findings from ongoing measurements; and
- Support re-measurement of effectiveness and member satisfaction, and continued development and implementation of improvement interventions as appropriate.

The MCO must adopt at least two evidence-based clinical practice guidelines per program (e.g., STAR, STAR+PLUS).  Practice guidelines must be based on valid and reliable clinical evidence, consider the needs of the MCO's members, be adopted in consultation with network providers, and be reviewed and updated periodically, as appropriate.  The MCO must adopt practice guidelines based on members' health needs and opportunities for improvement identified as part of the Quality Assessment and Performance Improvement Program.

*Performance Improvement Projects*
The external quality review organization recommends topics for performance improvement projects based on MCO performance results, data from member surveys, administrative and encounter files, medical records, and the immunization registry.  HHSC selects two of these goals, which become projects that enable each MCO to target specific areas for improvement that will affect the greatest number of members.  These projects are specified and measurable, and reflect areas that present significant opportunities for performance improvement for each MCO.  When conducting performance improvement projects, MCOs are required to follow the ten-step CMS protocol published in the CMS External Quality Review Organization Protocols.

**External Quality Review Organization Processes and Reports**

*MCO Administrative Interviews*
To ensure Medicaid MCOs are meeting all state and federal requirements related to providing care to Medicaid members, the external quality review organization conducts MCO administrative interviews and on-site visits to assess the following domains:
- Organizational structure;
- Children's programs;
- Care coordination and disease management programs;

- Utilization and referral management;
- Provider network and contractual relationships;
- Provider reimbursement and incentives;
- Member enrollment and enrollee rights and grievance procedures; and
- Data acquisition and health information management.

The MCOs complete the administrative interview tool online and are required to provide supporting documentation. For example, when describing disease management programs, the MCO must also provide copies of all evidenced-based guidelines used in providing care to members. The external quality review organization analyzes all responses and documents and generates follow-up questions for each MCO as necessary. The follow-up questions are administered during in-person site visits and conference calls.

*Data Certification Reports*
The information contained in data certification reports is used for actuarial analysis and rate setting, and meets the requirements of Texas Government Code §533.0131, Use of Encounter Data in Determining Premium Payment Rates. Analyses include volume analysis based on service category, data validity and completeness, consistency analysis between encounter data and MCO financial summary reports, and validity and completeness of provider information (not performed for pharmacy data).

*Encounter Data Validation Report*
Encounter data validation ensures the data used for rate setting and calculating quality of care measures is valid. Encounter data validation is an optional external quality review organization activity per CMS but is highly recommended. Encounter data validation is the strongest approach to ensure that high quality data are available for analysis and reporting. The report summarizes the results of the external quality review organization's assessment of the accuracy of the information found in the MCOs' claims and encounter data compared to corresponding medical records.

*Quarterly Topic Reports*
Quarterly Topic reports provide additional information on issues of importance to HHSC. Historically, Texas HHSC has requested special topic reports to obtain in-depth analyses and information on legislative topics.

*Summary of Activities Report*
Texas provides the Summary of Activities report to CMS annually as evidence of external quality review organization activities. The report includes an annual summary of all quality of care activities, performance improvement project information, MCO structure and processes, and a description of all findings and quality improvement activities.

*Survey Reports*
The external quality review organization (EQRO) conducts member surveys using validated and nationally accepted instruments, including the Consumer Assessment of Healthcare Providers and Systems (CAHPS®) surveys. These surveys are typically conducted in alternating years, and include the following:

- STAR Adult Behavioral Health Survey
- STAR Adult CAHPS® Survey
- STAR+PLUS CAHPS® Survey

Survey results are provided in table format and are used to develop MCO report cards and for other data analysis purposes.

*Quality of Care Reports*
CMS requires the external quality review organization to validate performance measures. This is done through analysis of data used to develop quality of care tables. Additionally, the external quality review organization calculates the quality of care measures that rely on administrative data (i.e., enrollment, health care claims and encounter data). This provides the state with a comprehensive set of measures calculated using National Committee for Quality Assurance-certified software and audited by a National Committee for Quality Assurance-certified auditor. Data tables are available by program.

*FREW Report*
The Institute of Child Health Policy calculates rates by plan code for Texas Health Steps checkups given to new and existing members based on the Medicaid Managed Care Texas Health Steps Medical Checkups Utilization Report instructions. The results are compiled and compared with MCO-submitted reports to determine if the MCO-submitted reports are within an eight percent threshold of external quality review organization calculated rates.

## TEXAS QUALITY INITIATIVES

HHSC, together with the Institute of Child Health Policy, has developed multiple quality initiatives that are in various stages of implementation.

## Financial Incentive Programs

*Pay-for-Quality Program*
Senate Bill 7, 83rd Legislature, Regular Session, 2013, focuses on the use of outcome and process measures in quality-based payment systems that focus on measuring potentially preventable events; rewarding use of evidence-based practices; and promoting healthcare coordination, collaboration and efficacy. To comply with legislative direction and to best identify quality of care measures that reflect the needs of the population served and areas of needed improvement, the HHSC Medicaid/CHIP Division implemented the Pay-for-Quality Program beginning in 2014. The Pay-for-Quality Program uses an incremental improvement approach that provides financial incentives and disincentives to MCOs based on year-to-year incremental improvement on pre-specified quality goals. The quality of care measures used in this initiative are a combination of process and outcome measures which include select potentially preventable events as well as other measures specific to the program's enrolled populations. HHSC is currently revising the Pay-for-Quality Program for the 2017 measurement year and beyond.

*Dental Pay-for-Quality Program*
In the Dental Pay-for-Quality Program, rewards and penalties are based on rates of improvement or decline over the baseline.  Plans earn back their own at-risk premium based on performance of quality of care measures.  HHSC is considering revisions that may be implemented in 2017.


## Performance Comparisons

*Performance Indicator Dashboards*
The Performance Indicator Dashboard includes a series of measures that identify key aspects of performance to support transparency and MCO accountability.  The Performance Indicator Dashboard is not an all-inclusive set of performance measures; HHSC measures other aspects of the MCO's performance as well.  Rather, the Performance Indicator Dashboard assembles performance indicators that assess many of the most important dimensions of MCO performance and includes measures that incentivize excellence.  The Dashboard is shared on the HHSC website and includes minimum threshold standards as a means to gauge performance.  Additionally, HHSC plans to begin including MCO performance data on these measures and sharing this information on the HHSC website.

*MCO Report Cards*
Texas Government Code §536.051 requires HHSC to provide information to Medicaid and CHIP members regarding MCO performance on outcome and process measures during the enrollment process.  To comply with this requirement and other legislatively mandated transparency initiatives, HHSC develops annual MCO report cards for each program service area to allow members to easily compare the MCOs on specific quality measures.  MCO report cards are posted on the HHSC website and included in Medicaid enrollment packets sent by the enrollment broker to potential members.

## Data Sharing and Transparency

*Texas Healthcare Learning Collaborative*
The Texas Healthcare Learning Collaborative is a secure web portal designed and run by the Institute of Child Health Policy.  The Portal is an online learning collaborative that includes a graphical user interface that allows MCOs, HHSC, and the Institute of Child Health Policy to visualize healthcare metrics.  MCOs, HHSC staff, and Texas legislative staff are able to log in to the portal and generate graphical reports of plan and program specific performance.

Through the Texas Healthcare Learning Collaborative Portal, HHSC and the Institute of Child Health Policy share monthly and quarterly reports with the MCOs about potentially preventable events.  The reports are interactive and the managed care plans can query the data to create more customized summaries of the quality results.

**Figure 1: Screenshot of the Texas Healthcare Learning Collaborative Portal**

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**



*Medicaid Quality Assurance and Improvement Website*
HHSC has created a dedicated quality website. The intent of this website is to consolidate information related to different quality and efficiency related initiatives in one place, and to promote better information dissemination. The Medicaid Quality Assurance and Improvement Website will serve as a tool for communication and information-sharing about initiatives and other efforts to improve quality and efficiency of Texas Medicaid program with external stakeholders such as health care providers, health plans, and the public, as well as HHS Enterprise divisions. The website will also promote transparency and public reporting related to quality and efficiency of care and efficiency of services provided to Medicaid beneficiaries, and provides a centralized location for stakeholders to access information such as managed care organization data, presentations, specialized reports, and committee information.

*Delivery System Reform Incentive Payment Website*
The primary purpose of the Delivery System Reform Incentive Payment website is to provide targeted technical resources for Delivery System Reform Incentive Payment participants. The website is also used to communicate general information regarding the Delivery System Reform Incentive Payment program to stakeholders. Examples of communication disseminated through the website include:

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

- Background and historical information on the waiver;
- New and updated policies, procedures, tools, and guidelines for Delivery System Reform Incentive Payment anchors and providers;
- Provider and Regional Healthcare Partnership-specific Excel workbooks used for reporting purposes; and
- Key Delivery System Reform Incentive Payment program dates and deadlines.

Additionally, the Delivery System Reform Incentive Payment website serves as a repository of waiver information related to amendments, program funding, Regional Healthcare Partnership Planning Protocols and plans, and instructional and technical assistance webinars for Delivery System Reform Incentive Payment anchors and providers.

**Innovation**
Texas is engaging in multiple activities to develop new strategies to measure and encourage quality service delivery in Medicaid managed care. Several examples of these activities are outlined below.

*Regional Healthcare Partnership Projects*
Delivery System Reform Incentive Payment pool payments are made to hospitals and other providers that develop programs or strategies to enhance access to health care, and to increase the quality and cost-effectiveness of care provided and the health of the members served. In order to receive Delivery System Reform Incentive Payment pool payments, a provider must participate in a Regional Healthcare Partnership that includes governmental entities providing public funds, Medicaid providers, and other stakeholders. Participants must develop a regional plan that identifies community needs and proposed projects to meet those needs, and identifies partners and funding distribution. There are four categories of projects:

- Category I (Infrastructure Development) lays the foundation for the delivery system through investments in people, places, processes and technology;
- Category II (Program Innovation & Redesign) tests and replicates innovative care models;
- Category III (Quality Improvements) assesses the effectiveness of Category 1 and 2 interventions; and
- Category IV (Population-based Improvements) requires all regional health partnerships to report on the same measures.

*Long-Term Services and Supports Performance Measures*
HHSC stakeholders, both internal and external, had recognized a need for improved long-term services and supports (LTSS) measures for the STAR+PLUS HCBS program and the State Plan community-based LTSS. In the fall of 2013, HHSC convened a workgroup consisting of external stakeholders and representatives from the external quality review organization to develop a comprehensive set of performance measures that will provide data that allows the State to evaluate the quality of community-based LTSS provided through Medicaid managed care. These measures are included in the managed care quality dashboard, which is included in Attachment B of this document.

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

The legislative direction to carve nursing facility services into managed care included a requirement for managed care-specific performance measures for nursing facility care. Together with the Department of Aging and Disability Services, HHSC developed a set of performance measures that will be appropriate to gauge quality of care in the nursing facility environment, and that will incentivize MCOs to ensure a high level of quality of care. As directed by the legislation, it is HHSC's ultimate goal to use these measures to financially incentivize managed care organizations to ensure their contracted nursing facilities are providing high quality care. The extent to which this is possible will depend in part on the baseline data obtained on these measures, which will demonstrate the appropriateness of these measures being used for financial incentives. These measures are included in the managed care quality dashboard, which is included in Attachment B of this document.

*Senate Bill 7*
Senate Bill (SB) 7, 83rd Legislature, Regular Session, 2013, is a broadly scoped bill that redesigns multiple aspects of Texas Medicaid, focusing on improved service delivery quality and efficiency. Key components of SB 7 include:
- Establishment of a managed care clinical improvement program;
- The option for HHSC to create an incentive program that enrolls a higher proportion of members eligible for auto-enrollment into MCOs that meet pre-determined performance levels on selected metrics;
- Builds upon §536.003 in the Government Code requiring HHSC to include outcome and process measures based on potentially preventable events. Potentially preventable event outcome measures must allow for rate-based determination of health care provider performance compared to statewide norms and be risk-adjusted based on severity of illness. Requirements are also added for the process and outcome measures developed by HHSC, including effective coordination of acute and long-term care services and reduction of preventable health care utilization and costs;
- Requires HHSC to develop quality-based payment systems in conjunction with stakeholders and to require MCOs to develop quality-based payment systems;
- Adds a requirement for HHSC to develop a web-based system to provide data to MCOs and providers on their quality metrics and how they measure against comparable peers;
- Requires HHSC to base a percentage of premiums paid to MCOs on performance measures that address potentially preventable events and advance quality improvement and innovation;
- Directs HHSC to allow MCOs increased flexibility to implement quality initiatives, including allowing for reductions in the incidence of unnecessary institutionalization and using alternative payment systems such as shared savings models;
- Directs HHSC to adopt rules related to potentially preventable events and directs HHSC to report to hospitals on their performance related to these events. The bill also requires HHSC to release hospital reports after one year only after receiving stakeholder input on the content included;
- Allows HHSC to exclude payments made under the Disproportionate Share Hospital and Upper Payment Limit systems to be based on the hospitals performance related to potentially preventable readmissions and other potentially preventable events;
- Directs HHSC to develop payment initiatives for health care providers that will, among other things, encourage the integration of acute care services and long-term care services

and supports, including discharge planning from acute care services to community based long-term services and supports;

- Allows HHSC to implement quality-based payments for long-term services and supports if cost-effective and feasible; and

- Requires HHSC to adopt rules related to preventable costly service utilization by members receiving long-term care.

HHSC is working to develop and enhance programs, systems, and polices to meet these directives.

*Potentially Preventable Events*
Potentially preventable events include inpatient stays, hospital readmissions, potentially preventable complications, and emergency department visits that may have been avoidable had the patient received high quality primary and preventive care prior to or after the event in question. High potentially preventable event rates may reflect inadequacies in the health care provided to the patient in multiple settings, including inpatient and outpatient facilities and clinics. A better understanding of the factors that contribute to potentially preventable events in STAR and STAR+PLUS can assist HHSC and MCOs in developing intervention strategies to reduce their occurrence and to estimate the potential cost savings associated with implementing these interventions.

*Potentially Preventable Admissions:* These events are considered an indicator of poor availability, accessibility, and effectiveness of primary care, and the added burden to hospital resources can adversely influence the quality of care for all in need of inpatient services.

*Potentially Preventable Readmissions:* Potentially preventable readmissions to the hospital are costly, and present a particularly relevant challenge for the efficient delivery of health services in state Medicaid programs. Medicaid beneficiaries are 70 percent more likely than people with private insurance to have an inpatient readmission. While a number of individual factors are known to influence potentially preventable readmissions – including age, severity of illness, and co-morbidities – poor access to primary care is thought to be a major contributing factor.

*Potentially Preventable Emergency Department Visits:* These events are considered an indicator of poor availability, accessibility, and effectiveness of primary care, and their added burden to emergency department resources can adversely affect the quality of care for all in need of urgent medical attention. Potentially preventable emergency department visits present a particularly relevant challenge for the efficient delivery of health services in state Medicaid programs. Research has found that Medicaid beneficiaries make up a disproportionate share of emergency department visits for ambulatory care sensitive conditions, such as asthma, chronic obstructive pulmonary disease, congestive heart failure, diabetes, and hypertension. The occurrence of preventable emergency department visits can be influenced by chronic illness burden. However, compared to the general population, higher rates of potentially preventable emergency department visits for Medicaid beneficiaries are not explained by differences in disease prevalence or severity, but rather suggest a reduced likelihood of ongoing primary care.

*Potentially Preventable Complications:* HHSC defines a potentially preventable complication as a harmful event or negative outcome with respect to a person, including an infection or surgical complication, that occurs after the person's admission to a hospital or long-term care facility; and may have resulted from the care, lack of care, or treatment provided during the hospital or long-term care facility stay rather than from a natural progression of an underlying disease (Texas Administrative Code, Title 1, §354.1446 (relating to Potentially Preventable Complications)).

# FUTURE GOALS AND PROJECTS

## Administrative and State-Level Initiatives

HHSC has concrete and specific goals for current and future projects.  These include:
- Improving internal HHSC coordination related to quality issues;
- Creating provider incentive programs;
- Fine-tuning a vision that will inform HHSC's goals and guide HHSC in meeting those goals;
- Administrative simplification for MCOs and within HHSC;
- Program and policy changes as needed; and
- Improving access by expanding the provider network and enhancing the timeliness of care.

*Data Analytics Unit*
In response to a directive from Senate Bill 8, 83rd Legislature, Regular Session, 2013, a new data analytics unit was created.  This unit is responsible for establishing and overseeing a data analysis processes designed to:
- Improve contract management;
- Detect data trends; and
- Identify anomalies relating to:
  - service utilization
  - providers
  - payment methodologies
  - compliance with requirements in Medicaid
  - compliance with requirements in child health plan program managed care
  - compliance with requirements in fee-for-service contracts.

This unit is also responsible for providing quarterly legislative reports.

## Future of the 1115 Transformation Waiver

The 1115 Transformation Waiver was set to expire on September 30, 2016. In May 2016, CMS granted a 15-month temporary extension of Texas' 1115 Transformation Waiver through December 31, 2017 to allow additional time for the Delivery System Reform Incentive Payment projects to demonstrate their results and for the State to study its Medicaid payment and financing policies and providers' uncompensated care burdens.

**Future Initiatives**

<u>Alignment of healthcare-related goals and strategies across enterprise</u>
HHSC is striving to create a more unified and aligned quality improvement system across Texas Medicaid managed care. Areas of potential alignment include access to care, behavioral health, coordination of care, dental, and disease management. Another example involves potentially preventable events. HHSC has multiple initiatives targeting potentially preventable events, including hospital-level reporting and rate reductions, Regional Healthcare Partnership level reporting, and managed care organization-level reporting. The table in Attachment E outlines in more detail opportunities for the leveraging of existing initiatives and activities to improve alignment.

<u>Sunset Activities</u>
The Texas Sunset Act (Government Code, Chapter 325) requires each state agency to undergo a regular review to determine if the agency is still appropriate and needed. Recommendations for improved agency efficacy and efficiencies are generally part of the final assessment and report published by the Sunset Advisory Commission. In 2014, as part of the Sunset process, HHSC underwent an assessment of current agency functions. The following recommendations came out of the process.

- Develop a comprehensive, coordinated operational plan designed to ensure consistent approaches in its major initiatives for improving the quality of health care.

  HHSC and its partner agencies provide or oversee provision of healthcare through a number of publicly funded programs, including Medicaid managed care and fee-for-service, general revenue-funded services, and other state-funded programs. Program quality improvement strategies have evolved over the years, and continue to evolve as new services and programs are added to Texas Medicaid and as new guidance is received from CMS. HHSC staff have formed an internal workgroup that includes the different areas on HHSC most involved in quality-related activities. Development of this comprehensive operational plan is one responsibility of this workgroup.

- Require HHSC to develop a pilot project to promote increased use of incentive-based payments by managed care organizations

  The managed care contracts already require managed care organizations and dental maintenance organizations to submit to HHSC their plans for alternative payment structures with providers, including the type of structure they plan to use, the metrics used, the approximate dollar amount and number of members impacted, and the evaluation process. This Sunset directive builds upon the existing contract requirement, directing HHSC to create and implement a pilot program to further encourage value-based provider payments.

As each of these recommendations is implemented, HHSC will examine this Strategy to determine if it requires subsequent revision.

**Quality Improvement Program and Quality Improvement Strategy**

Network Adequacy
In response to stakeholder concerns over managed care provider networks and as directed by the Legislature via Senate Bill 760, 84th Legislature, Regular Session, 2015, HHSC's Medicaid/CHIP Division created an internal workgroup consisting of representatives from across HHSC, tasked with researching best practices for implementing network adequacy policies, developing new provider access standards, and recommending ways to increase access to health care services. This workgroup intends to report on its progress at routinely scheduled meetings of the State Medicaid Managed Care Advisory Committee, a legislatively-created advisory committee, and has held two stakeholder forums to receive public input on managed care provider networks.

**Future of Enterprise**

Through the Sunset process described above, recommendations were made to consolidate the five Enterprise agencies into a single agency. Recent legislation has amended that recommendation to move sections of the Department of Aging and Disability Services and the Department of Assistive and Rehabilitative Services functions to HHSC, as well as certain functions of the Department of Family and Protective Services and the Department of State Health Services. Those latter two agencies will remain in existence to operate certain remaining functions. The plan for consolidation is not yet final, and implementation will be a long process. As needed, this Strategy will be updated to incorporate changes.

**Review and Update of Quality Improvement Strategy**

The quality strategy will be reviewed and updated every two years at a minimum. The 1115 Waiver also requires the State to revise the strategy whenever significant changes are made. Significant changes include:
- Changes made through the 1115 Transformation Waiver;
- Adding new populations to the managed care programs;
- Expanding managed care programs to new parts of the state; and
- Carving new services into the managed care programs.

**Attachment A- CFR and External Quality Review Organization Activities Crosswalk**

A note regarding NorthSTAR:
Until fall 2013, the external quality review organization did not conduct Performance Improvement Projects (PIP) or Quality Assessment and Performance Improvement (QAPI) evaluations for NorthSTAR.

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| §438.364(a)(1) | A detailed technical report that describes the manner in which the data from all activities conducted in accordance with §438.358 were | Summary of Activities Report | N/A |

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| | aggregated and analyzed, and conclusions were drawn as to the quality, timeliness, and access to the care furnished by the MCO or PIHP. | | |
| §438.364(a)(2) | Assessment of each MCOs' and PIHPs' strengths and weaknesses with respect to quality, timeliness, and access to health care services furnished to Medicaid beneficiaries. | Administrative Interview Reports<br><br>Member Survey Reports<br><br>Quality of Care data tables<br><br>QAPI Evaluations PIP Evaluations | Yes |
| §438.364(a)(3) | Recommendations for improving quality of health care services furnished by each MCO or PIHP. | Administrative Interview Reports<br><br>Member Survey Reports<br><br>QAPI Evaluations<br><br>PIP Evaluations<br><br>Summary of Activities Report | Yes |
| §438.364(a)(4) | Methodologically appropriate, comparative information for all MCOs/PIHPs.<br><br>This information should align with what the state outlines in its quality strategy as methodologically appropriate. | Member Survey Reports<br><br>Quality of Care data tables<br><br>Administrative Interview Reports<br><br>QAPI Evaluations<br><br>PIP Evaluations | Yes |

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| | | | |
| §438.364(a) (5) | Assessment of the degree to which each MCO or PIHP has addressed effectively the recommendations for quality improvement made by the External Quality Review Organization (EQRO) during the previous year's EQR. | QAPI Program Evaluation Summaries | Yes[1] |
| **Validation of Performance Improvement Projects (PIPs)** | | | |
| §438.358(b)(1) | Information on the validation of PIPs required by the state to comply with requirements set forth in §438.240(b)(1) and that were underway during the preceding 12 months. | PIP Evaluation Summaries<br><br>PIP Template<br><br>Summary of Activities Report | Yes |
| §438.364(a)(1) | Description of the manner in which the data from the validation of PIPs were aggregated and analyzed, and conclusions were drawn as to the quality, timeliness, and access to the care furnished by the MCO or PIHP. | PIP Evaluation Summaries<br><br>PIP Template<br><br>Summary of Activities Report | Yes |
| §438.364(a)(1)(i-iv) | The following information related to the validation of PIPs:<br><br>• Objectives;<br>• Methods of data collection and analysis (Note: this should include a description of the validation process/methodology, e.g., was the CMS PIP validation protocol used, or a method consistent with the CMS protocol);<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | PIP Evaluation Summaries<br><br>PIP Template<br><br>Summary of Activities Report | Yes |

---

[1] This has not been previously included in the Summary of Activity report, but will be moving forward.

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| | Assessment of the overall validity and reliability of study results and includes any threats to accuracy/confidence in reporting. | PIP Evaluation Summaries<br><br>PIP Template<br><br>Summary of Activities Report | Yes[2] |
| §438.358(b)(1) | Validation results for all state-required PIP topics for the current EQR review cycle. | PIP Evaluation Summaries<br>PIP Template<br>Summary of Activities Report | Yes[3] |
| | Description of PIP interventions and outcomes information associated with each state-required PIP topic for the current EQR review cycle. | PIP Evaluation Summaries<br><br>PIP Template | No[4] |
| **Validation of Performance Measures (PMs)** | | | |
| §438.358(b)(2) | Information on the validation of MCO or PIHP PMs reported (as required by the state) or MCO or PIHP PMs calculated by the state during the preceding 12 months to comply with requirements set forth in §438.240(b)(2). | Quality of Care TablesSummary of Activities-MCO Profiles | Yes |
| §438.364(a)(1) | Description of the manner in which the data from the validation of PMs were aggregated and analyzed, and conclusions were drawn as to the quality, timeliness, and access to the care furnished by the MCO or PIHP. | Quality of Care Reports | Yes |

---

[2] This has not been previously included in the Summary of Activity report, but will be moving forward.
[3] This has not been previously included in the Summary of Activity report, but will be moving forward.
[4] The Summary of Activity report typically focuses on selected PIP interventions.

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| §438.364(a)(1)(i-iv) | The following information related to the validation of PMs:<br><br>• Objectives;<br>• Methods of data collection and analysis (Note: this should include a description of the validation process/methodology, e.g., was the CMS PM validation protocol used, or a method consistent with the CMS protocol);<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | Quality of Care Table Methodology | Yes |
| | Documentation of which PMs the state required the EQRO to validate for the current EQR review cycle (Note: this may be a subset of reported PMs or all reported PMs). | Quality of Care Tables | Yes |
| | EQR assessment of the MCO/PIHP information system as part of the validation process. | Administrative Interview Reports | Yes[5] |
| | Outcomes information associated with each PM for the current EQR review cycle. | Quality of Care data tables<br><br>Summary of Activities Report-MCO profiles | Yes |
| | | | |
| §438.358(b)(3) | Information on a review, conducted within the previous 3-year period, to determine the MCO's or PIHP's compliance with standards established | Administrative Interview Reports<br><br>Quality of Care Tables | Yes[6] |

---

[5] This has been present in some, but not all, prior Summary of Activity reports. It will be included consistently in these reports moving forward.

[6] The Summary of Activity report typically includes a summary of selected results from the Administrative Interview reports.

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| | by the state to comply with the requirements of §438.204(g). | Member Survey Reports<br><br>QAPI Evaluation Summaries | |
| §438.364(a)(1) | Description of the manner in which the data from the compliance review were aggregated and analyzed, and conclusions were drawn as to the quality, timeliness, and access to the care furnished by the MCO or PIHP. | Administrative Interview Reports<br><br>QAPI Evaluation Summaries | Yes[7] |
| §438.364(a)(1)(i-iv) | The following information related to the compliance review:<br><br>• Objectives;<br>• Methods of data collection and analysis (Note: this should include a description of the validation process/methodology, e.g., was the CMS PM validation protocol used, or a method consistent with the CMS protocol);<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | Administrative Interview Reports<br><br>QAPI Evaluation Summaries | Yes[8] |
| §438.358(b)(3) | Compliance assessment results for each MCO/PIHP from within the past three years. | Administrative Interview Reports<br><br>Quality of Care Tables<br><br>QAPI Evaluation Summaries | Yes[9] |

---

[7] A summary of methodologies has been present in some, but not all, prior Summary of Activity reports. It will be included consistently in reports moving forward.

[8] A summary of methodologies has been present in some, but not all prior Summary of Activity reports. It will be included consistently in reports moving forward.

[9] Three-year trends have been shown in prior Summary of Activity reports, but typically only at the program level, and not the managed care organization level.

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| | | | |
| §438.364(a)(1)(i-iv) | If appropriate, the following information related to encounter data validation:<br><br>• Objectives;<br>• Methods of data collection and analysis;<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | Encounter Data Validation Report | Yes |
| **§438.364(a)(1)(i-iv)** | If appropriate, the following information related to the administration or validation of consumer or provider surveys of quality of care:<br><br>• Objectives;<br>• Methods of data collection and analysis;<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | STAR Adult and Parent of Child Member CAHPS® Survey<br><br>STAR+PLUS Adult Member CAHPS® Survey<br><br>CHIP (Parent of) Child Member CAHPS® Survey<br><br>STAR Health (Parent of) Child Member CAHPS® Survey | Yes |
| §438.364(a)(1)(i-iv) | If state contracts with the EQRO to calculate PMs in addition to those reported by an MCO or PIHP and validated by an EQRO (as described in §438.358(c)(3)), the technical report must include the following related to that EQR activity:<br><br>• Objectives;<br>• Methods of data collection and analysis;<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | Summary of Activities Report | Yes |

**Quality Improvement Program and Quality Improvement Strategy**

| CMS Requirement | | HHSC Report | Included in Summary of Activities Report? |
|---|---|---|---|
| | | | |
| §438.364(a)(1)(i-iv) | The following information related to the conducting of PIPs:<br><br>• Objectives;<br>• Methods of data collection and analysis;<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | PIP Evaluation Summaries | Yes |
| §438.364(a)(1)(i-iv) | If appropriate, the following information related to studies on quality that focus on a particular aspect of clinical or nonclinical services at a point in time:<br><br>• Objectives;<br>• Methods of data collection and analysis;<br>• Description of data obtained; and<br>• Conclusions drawn from the data. | Ad Hoc Focus Studies<br><br>Ad Hoc Quarterly Topic Reports | Yes |

**Attachment B- Dashboards**

**STAR and STAR+PLUS (2016)**

| Performance Indicator | HHSC STAR | HHSC STAR+PLUS |
|---|---|---|
| **I. POTENTIALLY PREVENTABLE EVENTS** | | |
| Potentially Preventable Emergency Department Visits (PPV) | x | x |
| Potentially Preventable Readmissions (PPR) | x | x |
| Potentially Preventable Admissions (PPA) | x | x |
| Potentially Preventable Complications (PPC) | x | x |
| Potentially Preventable Ancillary Services (PPS) | x | x |
| **II. ACCESS TO CARE** | | |
| **Access/Availability of Care** | | |
| % of Children with Access to PCP (CAP) (12 - 24 months) | x | |
| % of Children with Access to PCP (CAP) (25 months - 6 yrs.) | x | |
| % of Children with Access to PCP (CAP) (7 - 11 yrs.) | x | |
| % of Children with Access to PCP (CAP) (12 - 19 yrs.) | x | |
| **III. QUALITY OF CARE** | | |
| **Member Satisfaction - Adult** | | |
| % of Members with Good Access to Urgent Care | x | x |
| % of Members with Good Access to Specialist Appointment | x | x |
| % of Members with Good Access to Routine Care | x | x |
| % of Members with Good Access to Special Therapies | x | x |
| % of STAR+PLUS Members with Good Access to Service Coordination | | x |
| % of Members with Good Access to Behavioral Health Treatment or Counseling | x | x |
| % of Members Rating Their Personal Doctor a "9" or "10" | x | x |
| % of Members Rating Their Health Plan a "9" or "10" | x | x |
| % of Members having Good Experience with Doctor's Communication | x | x |
| % Members Utilizing Consumer Directed Services (CDS) that includes: 1. Non-HCBS Program Primary Home Care 2. HCBS Personal Attendant Services | | x |

**Quality Improvement Program and Quality Improvement Strategy**

| Performance Indicator | HHSC STAR | HHSC STAR+PLUS |
|---|---|---|
| **Member Satisfaction - Child (Parent/Caregiver)** | | |
| % of Members with Good Access to Urgent Care | x | |
| % of Members Good Access to Specialist Appointment | x | |
| % of Members with Good Access to Routine Care | x | |
| % of Members with Good Access to Behavioral Health Treatment or Counseling | x | |
| % Rating Their Child's Personal Doctor a "9" or "10" | x | |
| % Rating Their Child's Health Plan a "9" or "10" | x | |
| % Good Experience with Doctor's Communication | x | |
| **Children's Preventive Health** | | |
| Well-Child Visits - First 15 Months: 6+ visits (W15) | x | |
| Well-Child Visits - 3rd, 4th, 5th, & 6th years (W34) | x | x |
| Well-Child Visits - Adolescents (AWC) | x | x |
| Childhood Immunization Status (CIS) - Combination 4 | x | |
| Childhood Immunization Status (CIS) - Combination 10 | x | |
| **Women's Preventive Health** | | |
| Cervical Cancer Screening (CCS) | x | x |
| Prenatal Care (PPC) | x | x |
| Postpartum Care (PPC) | x | x |
| Breast Cancer Screening (BCS) | | x |
| Chlamydia Screening in Women (CHL) | x | |
| **Prevention and Screening** | | |
| Adult BMI Assessment (ABA) | | x |
| Child/Adolescent BMI Percentile Documented (WCC) | x | |
| Counseling for Nutrition for Children/Adolescents (WCC) | x | |
| Counseling for Physical Activity for Children/Adolescents (WCC) | x | |
| **AHRQ Prevention Quality Indicators [PQI] (Adults ≥ 18 yrs.)** | | |
| Diabetes Short-Term Complications Admission Rate {PQI 01} | x | x |
| Diabetes Long-Term Complications Admission Rate {PQI 03} | x | x |
| Chronic Obstructive Pulmonary Disease Admission Rate {PQI 05} | x | x |
| Hypertension Admission Rate {PQI 07} | x | x |
| Congestive Heart Failure Admission Rate {PQI 08} | x | x |
| Low Birth Weight Admission Rate {PQI 09} | x | x |
| Dehydration Admission Rate {PQI 10} | x | x |
| Bacterial Pneumonia Admission Rate {PQI 11} | x | x |

| Performance Indicator | HHSC STAR | HHSC STAR+PLUS |
|---|---|---|
| Urinary Tract Infection Admission Rate {PQI 12} | x | x |
| Angina w/o Procedure Admission Rate {PQI 13} | x | x |
| Uncontrolled Diabetes Admission Rate {PQI 14} | **x** | **x** |
| Asthma in Younger Adults {PQI 15} | x | x |
| Lower Extremity Amputation due to Uncontrolled Diabetes Admission Rate {PQI 16} | x | x |
| **AHRQ Pediatric Quality Indicators [PDI] (Children < 18 yrs.)** | | |
| Asthma Admission Rate {PDI 14} | x | x |
| Diabetes Short-Term Complications Admission Rate {PDI 15} | x | x |
| Gastroenteritis Admission Rate {PDI 16} | x | x |
| Perforated Appendix Admission Rate {PDI 17} | x | x |
| Urinary Tract Infection Admission Rate {PDI 18} | x | x |
| **IV. CARE FOR CHRONIC ILLNESS** | | |
| **Asthma** | | |
| Medication Management for People with Asthma-Medication Compliance 75% (MMA) | x | x |
| Asthma Medication Ratio > 50% (all ages) (AMR) | | |
| Appropriate Treatment for Children with Upper Respiratory Infection (URI) | x | |
| Avoidance of Antibiotic Treatment in Adults with Acute Bronchitis (AAB) | | x |
| Appropriate Testing for Children with Pharyngitis (CWP) | x | |
| **Behavioral Health** | | |
| 7-day Follow-Up After Hospital Stay for Mental Health (FUH) | x | x |
| 30-day Follow-Up After Hospital Stay for Mental Health (FUH) | x | x |
| Antidepressant Medication Management: Acute Phase (AMM) | | x |
| Antidepressant Medication Management: Continuation Phase (AMM) | | x |
| Follow-Up Care for Children Prescribed ADHD Medication: Initiation (ADD) | x | |
| Follow-Up Care for Children Prescribed ADHD Medication: Maintenance (ADD) | x | |
| Initiation of Alcohol and Other Drug Dependence Treatment (IET) | x | x |
| Engagement of Alcohol and Other Drug Dependence Treatment (IET) | x | x |
| **Diabetes (Adults ≥ 18 yrs.)** | | |

| Performance Indicator | HHSC STAR | HHSC STAR+PLUS |
|---|---|---|
| HbA1c Tested (CDC) | x | x |
| HbA1c Control < 8% (CDC) | x | x |
| Diabetic Eye Exam (CDC) | x | x |
| Nephropathy Monitored (CDC) | x | x |
| **High Blood Pressure** | | |
| High Blood Pressure Controlled (CBP) | x | x |
| **Smoking Prevention** | | |
| Advising Smokers to Quit | x | x |
| **V. LONG TERM SERVICES AND SUPPORT** | | |
| Timeliness of face-to-face assessment for personal attendant services after member non-emergency request. | | x |
| Timeliness of authorization of non-emergency personal attendant services after assessment determining need. | | x |
| Timeliness of initiation of non-emergency personal attendant services after MCO authorization of services. | | x |
| Timeliness of service coordinator assignment after a request for a service coordinator is made by a member. | | x |
| Rate of face-to-face service coordination encounters completed as required. | | x |
| Quarterly turnover rate for field service coordinators. | | x |
| Service Coordination Hotline Performance: Total Calls Answered | | x |
| Service Coordination Hotline Performance: Calls Answered by 4th ring | | x |
| Service Coordination Hotline Performance: Calls Answered by Live Person | | x |
| Service Coordination Hotline Performance: Number of Calls Abandoned | | x |
| Service Coordination Hotline Performance: Average Hold Time | | x |
| Rate of admissions to nursing facility from community pre- vs post- carve-in | | x |
| Rate of admissions to nursing facility from hospital pre- vs post- carve-in | | x |
| Number of individuals who went from community to hospital to nursing facility and remained in nursing facility | | x |
| Potentially Preventable Admissions (PPA) - Ratio of Actual to Expected (Nursing Facility only) | | x |
| Potentially Preventable Readmissions (PPR) - Ratio of Actual to Expected (Nursing Facility only) | | x |

| Performance Indicator | HHSC STAR | HHSC STAR+PLUS |
|---|---|---|
| Consumer Assessment of Healthcare Providers & Systems Nursing Home Long Stay Questionnaire* | | x |
| Number of individuals who transitioned from the nursing facility to the community who were readmitted to the nursing facility | | x |

*This is a placeholder to inform plans that this survey will be conducted. Specific survey questions to be added to the dashboard will be determined upon calculation of survey results.

## Dashboard- Medicaid Dental (2016)

| |
|---|
| % of members (2 - 3 yrs) enrolled for at least 11 of the past 12 months who had at least one annual dental visit |
| % of members (4 - 6 yrs) enrolled for at least 11 of the past 12 months who had at least one annual dental visit |
| % of members (7 - 10 yrs) enrolled for at least 11 of the past 12 months who had at least one annual dental visit |
| % of members (11 - 14 yrs) enrolled for at least 11 of the past 12 months who had at least one annual dental visit |
| % of members (15 - 18 yrs) enrolled for at least 11 of the past 12 months who had at least one annual dental visit |
| % of members (19 - 21 yrs) enrolled for at least 11 of the past 12 months who had at least one annual dental visit |
| % of members (6 - 35 months) who had at least one First Dental Home Services visit |

### Preventive Dental Services

| |
|---|
| % of members (1 - 20 yrs) enrolled for at least 11 of the past 12 months who had at least one preventive dental service during the measurement year |
| % of members (1 - 20 yrs) enrolled for 12 consecutive months who had at least one preventive dental service during the measurement year |
| THSteps Care Measures<br>a. Percent of members (1 year - 20 years) receiving exactly one THSteps Dental Checkup per year<br>b. Percent of members (1 year - 20 years) receiving at least two THSteps Dental Checkup per year<br>Combined Rate=0.5*rate of one checkup + Rate of at least two checkups<br>*Based on recommended standards of THSteps dental checkup visits (2 visits per year), the sub-measure of one checkup will receive 50% of the weight of the sub-measure of at least two checkups.* |
| % of members (1 yr - 20 yrs) receiving more than two THSteps Dental Checkups per year |
| % of new members (1 yr - 20 yrs) receiving at least one THSteps Dental Checkup within 90 days of enrollment |
| % of members (6 - 9 yrs) enrolled for at least 6 continuous months who had at least one sealant service on one of the permanent first molars during the measurement year |

| |
|---|
| % of members (10 - 14 yrs) enrolled for at least 6 continuous months who had at least one sealant service on one of the permanent second molars during the measurement year |
| Dental Quality Alliance: Sealants in 6-9 Years - % of members (6-9 yrs) enrolled for at least six continuous months who are at elevated risk for dental caries and who had at least one sealant service on one of the permanent first molars within the reporting year |
| Dental Quality Alliance: Sealants in 10-14 Years - % of members (10-14 yrs) enrolled for at least six continuous months  who are at elevated risk for dental caries and who had at least one sealant service on one of the  permanent second molars within the reporting year |
| Dental Quality Alliance: Oral Evaluation - Percentage of enrolled children under age 21 who received a comprehensive or periodic oral evaluation within the reporting year |

### Treatment and Prevention of Caries

| |
|---|
| Dental Quality Alliance: Topical Fluoride - Percentage of enrolled children aged 1-20 years who are at "elevated" risk (i.e. "moderate" or "high") who received at least 2 topical fluoride applications within the reporting year |

### Continuity of Care

| |
|---|
| Dental Quality Alliance: Care Continuity- % of members (1-20 yrs) enrolled in two consecutive years for at least 6 months in each year who received a comprehensive or periodic oral evaluation in both years |

### Use of Dental Treatment Services

| |
|---|
| % of members (1 - 20 yrs) enrolled for at least 11 of the past 12 months who had at least one orthodontic service during the measurement year |
| Dental Quality Alliance: Utilization of Services - % of members (0 - 20 yrs) enrolled for at least 6 months who received at least one dental service within the reporting year |
| Dental Quality Alliance: Treatment Services -- % of members (0 - 20 yrs) enrolled for at least 6 months who received a treatment service within the reporting year |
| Dental Quality Alliance: Total Amount Paid Per-Member Per-Month for Dental Services |

### Patient Satisfaction

| |
|---|
| % of members satisfied with dental services and providers |

**Attachment C- Interaction of Roles**

Data Collection
- Operations Coordination
- Health Plan Management
- External Quality Review Organization
- Policy and Program Development
- Transformation Waiver Operations
- Office of Healthcare Quality Analytics, Research, and Coordination Support




Implementation
- External Quality Review Organization
- Quality Assurance
- Health Plan Management
- Transformation Waiver Operations
- Actuarial Analysis
- Office of Healthcare Quality Analytics, Research, and Coordination Support
- Policy and Program Development

Analysis
- Office of Healthcare Quality Analytics, Research, and Coordination Support
- External Quality Review Organization
- Quality Assurance
- Health Plan Management
- Finance
- Transformation Waiver Operations
- Policy and Program Development




Initiative Development
- External Quality Review Organization
- Quality Assurance
- Office of Healthcare Quality Analytics, Research, and Coordination Support

**Attachment D- CFR and Relevant MCO Contract Requirements**

| 42 CFR | Element | **Uniform Managed Care Contract** **Terms and Conditions** |
|---|---|---|
| § 438.200 | Scope | |
| § 438.202 | State responsibilities | |
| § 438.204 | Elements of State quality strategies | |
| **Access Standards** | | |
| § 438.206 | Availability of services | 8.1.2 Covered Services; 8.1.3 Access to Care; 8.1.4 Provider Network; 8.1.5.8 Cultural Competency Plan; 8.1.12 Services for People with Special Health Care Needs; 8.1.13 Service Management for Certain Populations; 8.1.15 Behavioral Health (BH) Network and Services; 8.1.21 Pharmacy Services; 8.1.24 Immunizations; 8.1.25 Dental Coverage; 8.1.26 Health Home Services; 8.2.1 Continuity of Care and Out-of-Network Services; 8.2.2 Provisions Related to Covered Services for Medicaid    Members |
| § 438.207 | Assurances of adequate capacity and services | 8.1.3 Access to Care |
| § 438.208 | Coordination and continuity of care | 8.2.1 Continuity of Care and Out-of-Network Providers; 8.2.7.2.3 Care Coordination; 8.3.2 Service Coordination |
| § 438.210 | Coverage and authorization of services | 8.1.2 Covered Services |
| **Structure & Operation Standards** | | |
| § 438.214 | Provider selection | 8.1.4 Provider Network; 8.1.22 Federally Qualified Health Centers (FQHCs) and Rural Health Clinics (RHCs); 8.2.3 Medicaid Significant Traditional Providers |
| § 438.218 | Enrollee information | 8.1.5 Member Services |
| § 438.224 | Confidentiality | 8.1.18.4 Health Insurance Portability and Accountability Act (HIPAA) Compliance |
| § 438.226 | Enrollment and disenrollment | 5.0 Member Eligibility & Enrollment |
| § 438.228 | Grievance systems | 8.1.5.9 Member Complaint and Appeal Process; |

| | | |
|---|---|---|
| | | 8.2.4 Provider Complaints and Appeals;<br>8.2.6 Medicaid Member Complaint and Appeal System |
| § 438.230 | Subcontractual relationships and delegation | 4.08 Subcontractors;<br>4.09 HHSC's Ability to Contract with Subcontractors;<br>8.1.20 General Reporting Requirements |
| **Measurement & Improvement Standards** | | |
| § 438.236 | Practice guidelines | 8.1.7.6 Clinical Practice Guidelines;<br>8.1.8 Utilization Management;<br>8.1.9 Early Childhood Intervention (ECI):<br>8.1.10 Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) – Specific Requirements;<br>8.1.12 Services for People with Special Health Care Needs;<br>8.1.14 Disease Management |
| § 438.240 | Quality assessment and performance improvement program | 8.1.1.1 Performance Evaluation;<br>8.1.7 Quality Assessment and Performance Improvement |
| § 438.242 | Health information systems | 8.1.18 Management Information System Requirements |

**Attachment E- Quality Initiatives Crosswalk**

| Topic | Delivery System Reform Incentive Payment Program | Quality Assurance | Healthcare Quality Analytics, Research, Coordination, and Support | Other (Policy, Health Plan Management, etc.) |
|---|---|---|---|---|
| **Access to Care** | Delivery System Reform Incentive Payment Projects | CAHPS Survey Process<br><br>Quality Assurance and Performance Improvement Projects | | Network Adequacy Workgroup<br><br>Contract Monitoring |
| **Behavioral Health** | Delivery System Reform Incentive Payment Projects | Performance Improvement Projects | NorthSTAR and area managed care organization coordination | Carve-in of mental health targeted case management and rehabilitative services |

**Attachment D**
**Quality Improvement Program and Quality Improvement Strategy**

| | | | | |
|---|---|---|---|---|
| **Coordination of Care** | Delivery System Reform Incentive Payment Projects | Long-term services and supports performance measures/quality program<br><br>Nursing facility performance measures/quality program | NorthSTAR and area managed care organization coordination | Dual Eligible Demonstration<br><br>Carve-in of mental health targeted case management and rehabilitative services<br><br>Nursing facility carve-in |
| **Dental** | Delivery System Reform Incentive Payment Projects | Dental Pay-for-Quality<br><br>Performance Improvement Projects | | |
| **Disease Management** | Delivery System Reform Incentive Payment Projects | Performance Improvement Projects<br><br>Quality Assurance and Performance Improvement Projects | | |
| **Potentially Preventable Events** | Hospital rate adjustments | Performance Improvement Projects | "Superutilizer" project | Hospital rate adjustments<br><br>MCO capitation rate adjustments |

**Attachment E HCBS Quality Review**
The following worksheet provides the sub-assurances and performance measures for level of care determinations, service plan development and maintenance, qualified providers, health and welfare, administrative authority, and financial accountability.

Where applicable, the State shall consider using the follow types of evidence to verify adherence to the sub-assurances for Level of Care Determinations, Service Plans, Qualified Providers, Health and Welfare, Administrative Authority, and Financial Accountability: Summary reports based on a significant sample of any single or combined method or source of evidence, such as on-site record reviews; off-site record reviews; training: record verification; analyzed collected data (including surveys, focus group, interviews, etc.); trends, remediation actions proposed/taken; provider performance monitoring, staff observation or opinion; participant/family observation or opinion; critical events and incident reports; financial records (including expenditures); financial audits; meeting minutes; presentation of policies; and reports to HHSC on delegated administrative functions.

## I. Level of Care (LOC) Determination

| *The State demonstrates that it implements the processes and instrument(s) specified in this Demonstration for evaluating/reevaluating an applicant's/Demonstration participant's level of care consistent with care provided in a nursing facility.* | |
|---|---|
| **Sub-Assurances** | **Performance Measures** |
| **An evaluation for level of care is provided to all applicants for whom there is a reasonable indication that services may be needed in the future.** | Number and percent of applicants who had a medical necessity level of care (MN/LOC) evaluation prior to the receipt of services |
| **The process and instruments described in the approved waiver are applied appropriately and according to the approved description to determine participant level of care.** | Number and percent of members' initial LOC determinations that were made using the instrument required by the State |
| **Methods for Remediation/Fixing Problems Related to Level of Care Determinations** | |
| If an MCO fails to meet a performance expectation, standard, schedule, or other contract requirement, the managed care contracts give HHSC the authority to use a variety of remedies, including:<br><br>• Accelerated monitoring<br>• Enrollment suspensions<br>• Forfeiture or all or part of the MCO's bond<br>• Contract termination | |

## II. Service Plans

| The State demonstrates it has designed and implemented an effective system for reviewing the adequacy of service plans for Demonstration participants receiving HCBS services. | |
|---|---|
| **Sub-Assurances** | **Performance Measures** |
| **Service plans address all participants' assessed needs (including health and safety risk factors) and personal goals, either by the provision of Demonstration HCBS services or through other means.** | Number and percent of members who had service plans that addressed members' needs (including health care needs) as indicated in the assessment(s) |
| | Number and percent of members' service plans that address members' goals as indicated in the assessment(s) |
| | Number and percent of members reporting that service coordinators asked about their preferences |
| **Service plans are updated/revised at least annually or when warranted by changes in the Demonstration participant's needs.** | Number and percent of members' service plans that are renewed annually prior to service plan expiration date |
| | Number and percent of members' service plans that addressed member needs including revisions when appropriate |
| **Services are delivered in accordance with the service plan, including in the type, scope, amount, and frequency specified in the service plan.** | Number and percent of members whose services were delivered according to the service plan |
| **Participants are afforded choice between/among Demonstration services and providers.** | Number and percent of members who signed that they understand their right to change MCOs and who to contact |
| **Methods for Remediation/Fixing Problems Related to Service Plans** | |
| If an MCO fails to meet a performance expectation, standard, schedule, or other contract requirement, the managed care contracts give HHSC the authority to use a variety of remedies, including:<br><br>• Accelerated monitoring<br>• Enrollment suspensions<br>• Forfeiture or all or part of the MCO's bond<br>• Contract termination | |

## III. Qualified Providers

| The State demonstrates that it has designed and implemented an adequate system for assuring that all waiver services are provided by qualified providers. |
|---|

| Sub-Assurances | Performance Measures |
|---|---|
| **The State verifies that providers initially and continually meet required licensure and/or certification standards and adhere to other standards prior to their furnishing services.** | Number and percent of new program providers that are licensed/certified as required, prior to the provision of services. <br><br> Number and percent of program providers credentialed by the MCOs which retain licensure/certification |
| **The State monitors non-licensed/non-certified providers to assure adherence to waiver requirements.** | Number and percent of new non-licensed providers of waiver services that meet background and training qualifications prior to the provision of services <br><br> Number and percent of non-licensed providers of waiver services that meet background and training qualifications prior to the provision of services |
| **The State implements its policies and procedures for verifying that provider training is conducted in accordance with State requirements and the approved Demonstration.** | Number and percent of providers who receive State required training |
| **Methods for Remediation/Fixing Problems Related to Qualified Providers** | |
| If an MCO fails to meet a performance expectation, standard, schedule, or other contract requirement, the managed care contracts give HHSC the authority to use a variety of remedies, including: <br><br> • Accelerated monitoring <br> • Enrollment suspensions <br> • Forfeiture or all or part of the MCO's bond <br> • Contract termination | |

## IV. Health and Welfare

| *The State demonstrates it has designed and implemented an effective system for assuring waiver participant health and welfare.* | |
|---|---|
| **Sub-Assurances** | **Performance Measures** |

| The State demonstrates on an ongoing basis that it identifies, addresses, and seeks to prevent instances of abuse, neglect, exploitation, and unexplained death. | Number and percent of member complaints that received follow-up within the required timeframe |
| --- | --- |
| The State demonstrates that an incident management system is in place that effectively resolves those incidents and prevents further similar incidents to the extent possible. | Number of MCOs with required training requirements<br>Number of MCOs with approved manuals that include training on abuse, neglect, and exploitation |
| The State policies and procedures for the use or prohibition of restrictive interventions (including restraints and seclusion) are followed. | Number and percent of complaints received relating to unauthorized use of restraint or seclusion |
| The State establishes overall health care standards and monitors those standards based on the responsibility of the service provider as stated in the approved waiver. | Number and percent of MCOs within ten percent of HHSC standards for 90 percent of the STAR+PLUS quality of care measures |

| Methods for Remediation/Fixing Problems Related to Member Health and Welfare |
| --- |
| If an MCO fails to meet a performance expectation, standard, schedule, or other contract requirement, the managed care contracts give HHSC the authority to use a variety of remedies, including:<br><br>• Accelerated monitoring<br>• Enrollment suspensions<br>• Forfeiture or all or part of the MCO's bond<br>• Contract termination |

## V. Administrative Authority

| *The State demonstrates that it retains ultimate administrative authority over the Demonstration HCBS program and that its administration of the program is consistent with the approved Demonstration Terms and Conditions.* |
| --- |
| **Sub-Assurances** | **Performance Measures** |

| The Medicaid agency retains ultimate administration authority and responsibility for the operation of the Demonstration's HCBS program by exercising oversight of the performance of Demonstration functions by other State and local/regional non-State agencies (if appropriates) and contracted entities. | Number and percent of members' service plans authorized by the managed care organization prior to service delivery. Number and percent of managed care organizations that follow an agreed upon utilization management process as outlined in their contracts. |
|---|---|

| **Methods for Remediation/Fixing Problems Related to Administrative Authority** |
|---|
| If an MCO fails to meet a performance expectation, standard, schedule, or other contract requirement, the managed care contracts give HHSC the authority to use a variety of remedies, including:<br><br>• Accelerated monitoring<br>• Enrollment suspensions<br>• Forfeiture or all or part of the MCO's bond<br>• Contract termination |

## VI. Financial Accountability

| *The State must demonstrate that it has designed and implemented an adequate system for insuring financial accountability of the waiver program.* | |
|---|---|
| **Sub-Assurances** | **Performance Measures** |
| **The State provides evidence that claims are coded and paid for in accordance with the reimbursement methodology specified in the approved waiver and only for services rendered.** | Number and percent of per member per month capitated payments paid to the managed care organization only for eligible Medicaid members. |
| **The State provides evidence that rates remain consistent with the approved rate methodology throughout the five year waiver cycle.** | Number of changes made to methodology during reporting period that were submitted for CMS approval prior to implementation. |
| **Methods for Remediation/Fixing Problems Related to Financial Accountability** | |

If an MCO fails to meet a performance expectation, standard, schedule, or other contract requirement, the managed care contracts give HHSC the authority to use a variety of remedies, including:

- Accelerated monitoring
- Enrollment suspensions
- Forfeiture or all or part of the MCO's bond
- Contract termination.

The material presented in Attachment F corresponds to the contents of Appendix F of the Application for a §1915(c) Home and Community-Based Services Waiver, Version 3.5.

## I.      Opportunity to Request a Fair Hearing

The State provides an opportunity to request a Fair Hearing under 42 CFR Part 431, Subpart E to individuals: (a) who are not given the choice of home and community-based services as an alternative to the institutional care; (b) are denied the service(s) of their choice or the provider(s) of their choice; or, (c) whose services are denied, suspended, reduced or terminated.  The State provides notice of action as required in 42 CFR §431.210.

**Procedures for Offering Opportunity to Request a Fair Hearing**

The managed care organization (MCO) must develop, implement and maintain an Appeal procedure that complies with state and federal laws and regulations.  When a Member or his or her authorized representative expresses orally or in writing any dissatisfaction or disagreement with an Action, the MCO must regard the expression of dissatisfaction as a request to Appeal an Action.

A Member must file a request for an Appeal with the MCO within 30 days from receipt of the notice of reduction, denial or termination of services.

The MCO's Appeal procedures must be provided to Members in writing and through oral interpretive services.

The MCO must send a letter to the Member within five (5) business days acknowledging receipt of the Appeal request.  Except for the resolution of an Expedited Appeal, the MCO must complete the entire standard Appeal process within 30 calendar days after receipt of the initial written or oral request for Appeal.  The timeframe for a standard Appeal may be extended up to 14 calendar days if the Member or his or her representative requests an extension; or the MCO shows that there is a need for additional information and how the delay is in the Member's interest.  If the timeframe is extended and the Member had not requested the delay, the MCO must give the Member written notice of the reason for delay.  The MCO must designate an officer who has primary responsibility for ensuring that Appeals are resolved within these timeframes and in accordance with the MCO's written policies.

In accordance with 42 C.F.R. § 438.420, the MCO must continue the Member's benefits currently being received by the Member, including the benefit that is the subject of the Appeal, if all of the following criteria are met:

1.  The Member or his or her representative files the Appeal timely as defined in this Contract;
2.  The Appeal involves the termination, suspension, or reduction of a previously authorized course of treatment;
3.  The services were ordered by an authorized provider;

4. The original period covered by the original authorization has not expired; and
5. The Member requests an extension of the benefits.

If, at the Member's request, the MCO continues or reinstates the Member's benefits while the Appeal is pending, the benefits must be continued until one of the following occurs:
1. The Member withdraws the Appeal;
2. Ten (10) days pass after the MCO mails the notice resolving the Appeal against the Member, unless the Member, within the 10-day timeframe, has requested a Fair Hearing with continuation of benefits until a Fair Hearing decision can be reached; or
3. A State Fair Hearing officer issues a hearing decision adverse to the Member or the time period or service limits of a previously authorized service has been met.

In accordance with 42 C.F.R.§ 438.420(d), if the final resolution of the Appeal is adverse to the Member and upholds the MCO's Action, then to the extent that the services were furnished to comply with the Contract, the MCO may recover such costs from the Member.

If the MCO or State Fair Hearing Officer reverses a decision to deny, limit, or delay services that were not furnished while the Appeal was pending, the MCO must authorize or provide the disputed services promptly and as expeditiously as the Member's health condition requires.

If the MCO or State Fair Hearing Officer reverses a decision to deny authorization of services and the Member received the disputed services while the Appeal was pending, the MCO is responsible for the payment of services.

The MCO is prohibited from discriminating or taking punitive action against a Member or his or her representative for making an Appeal.

In accordance with 42 C.F.R. §438.410, the MCO must establish and maintain an expedited review process for Appeals, when the MCO determines or the provider indicates that taking the time for a standard resolution could seriously jeopardize the Member's life or health. The MCO must follow all Appeal requirements for standard Member Appeals except where differences are specifically noted. The MCO must accept oral or written requests for Expedited Appeals.

Members must exhaust the MCO's Expedited Appeal process before making a request for an expedited Fair Hearing. After the MCO receives the request for an Expedited Appeal, it must hear an approved request for a Member to have an Expedited Appeal and notify the Member of the outcome of the Expedited Appeal within 3 business days, except that the MCO must complete investigation and resolution of an Appeal relating to an ongoing emergency or denial of continued hospitalization:
1. In accordance with the medical or dental immediacy of the case; and
2. not later than one business day after receiving the Member's request for Expedited Appeal is received.

The MCO is prohibited from discriminating or taking punitive action against a Member or his or her representative for requesting an Expedited Appeal. The MCO must ensure that punitive action is neither taken against a provider who requests an expedited resolution or supports a Member's request.

If the MCO denies a request for expedited resolution of an Appeal, it must:

1. Transfer the Appeal to the timeframe for standard resolution, and
2. Make a reasonable effort to give the Member prompt oral notice of the denial, and follow up within two (2) calendar days with a written notice.

The MCO must inform Members that they have the right to access the Fair Hearing process at any time during the Appeal system provided by the MCO. In the case of an expedited Fair Hearing process, the MCO must inform the Member that the Member must exhaust the MCO's internal Expedited Appeal process prior to filing an Expedited Fair Hearing. The MCO must notify Members that they may be represented by an authorized representative in the Fair Hearing process.

If a Member requests a Fair Hearing, the MCO will submit to the request to the appropriate Fair Hearings office, within five (5) calendar days.

Within five (5) calendar days of notification that the Fair Hearing is set, the MCO will prepare an evidence packet for submission to the HHSC Fair Hearings staff and send a copy of the packet to the Member. The evidence packet must comply with HHSC's Fair Hearings requirements.

The Fair Hearings Officer makes the final decision on appeals submitted to Fair Hearings. The Fair Hearings Officers are employees of HHSC that are separate from the State Medicaid Agency. This provides for an independent review and disposition for the member. The MCO sends a letter to the member informing the member that if an appeal is filed timely the member's benefits/services will continue. The member may also contact a member advocate or service coordinator for assistance or clarification. All documentation related to the adverse action and/or requests are maintained by the managed care operation in the member's case file.

## II.    State Grievance/Complaint System

The State operates a grievance/complaint system that affords participants the opportunity to register grievances or complaints concerning the provision of services.

### A.    Operational Responsibility

HHSC, the State Medicaid agency, and the MCO operate the grievance/complaint system.

The State Medicaid Agency operates and maintains an electronic complaint/grievance system that provides information to HHSC staff on any complaints/grievances related to members of the MCOs. The MCO is required by contract to develop, implement and maintain a member complaint and appeal system specific to their members.

The member is informed at enrollment that filing a grievance or making a complaint is not a pre-requisite or substitute for Fair Hearing. The member is also informed that they can contact a Member Advocate or their service coordinator if they need assistance for issues related to making complaints or filing a grievance.

## B. Description of System

The MCO must develop, implement, and maintain a Member Complaint and Appeal system that complies with the requirements in applicable federal and state laws and regulations.

The Complaint and Appeal system must include a Complaint process, an Appeal process, and access to HHSC's Fair Hearing System. The procedures must be the same for all Members and must be reviewed and approved in writing by HHSC or its designee. Modifications and amendments to the Member Complaint and Appeal system must be submitted for HHSC's approval at least 30 days prior to the implementation.

The MCO must have written policies and procedures for receiving, tracking, responding to, reviewing, reporting and resolving Complaints by Members or their authorized representatives. . The MCO must resolve Complaints within 30 days from the date the Complaint is received. The Complaint procedure must be the same for all Members under the Contract. The Member or Member's authorized representative may file a Complaint either orally or in writing. The MCO must also inform Members how to file a Complaint directly with HHSC, once the Member has exhausted the MCO's complaint process.

The MCO's Complaint procedures must be provided to Members in writing and through oral interpretive services. The MCO must include a written description of the Complaint process in the Member Handbook. The MCO must maintain and publish in the Member Handbook, at least one local and one toll-free telephone number with Teletypewriter/Telecommunications Device for the Deaf (TTY/TDD) and interpreter capabilities for making Complaints.

The MCO's process must require that every Complaint received in person, by telephone, or in writing must be acknowledged and recorded in a written record and logged with the following details:
1. Date;
2. Identification of the individual filing the Complaint;
3. Identification of the individual recording the Complaint;
4. Nature of the Complaint;
5. Disposition of the Complaint (i.e., how the managed care organization resolved the Complaint);
6. Corrective action required; and
7. Date resolved.

The MCO is prohibited from discriminating or taking punitive action against a Member or his or her representative for making a Complaint.

If the Member makes a request for disenrollment, the MCO must give the Member information on the disenrollment process and direct the Member to the HHSC Administrative Services Contractor.  If the request for disenrollment includes a Complaint by the Member, the Complaint will be processed separately from the disenrollment request, through the Complaint process.

The MCO will cooperate with the HHSC's Administrative Services Contractor and HHSC or its designee to resolve all Member Complaints.  Such cooperation may include, but is not limited to, providing information or assistance to internal Complaint committees.  The MCO must provide a designated Member Advocate to assist the Member in understanding and using the MCO's Complaint system until the issue is resolved.

**Attachment G
HCBS Participant Safeguards**

The material presented in Attachment G corresponds to the contents of Appendix G of the Application for a §1915(c) Home and Community-Based Services Waiver, Version 3.5.

### I.      Introduction

Managed long-term services and supports (MLTSS) refer to the delivery of long-term services and supports (LTSS) through managed care programs, including community-based and institutional LTSS under the State Plan and home and community based services (HCBS) under the STAR+PLUS Waiver. Under the authority of the Texas Healthcare Transformation and Quality Improvement Program Demonstration, managed care organizations (MCOs) deliver LTSS to members in Medicaid managed care programs in Texas.

Texas has well-established safeguards to ensure that participant health and welfare are assured within the delivery of MLTSS. This document details these protections, such as statements of participant rights and the critical incident management system, in order to protect members from abuse, neglect, and exploitation.

### II.      Participant Rights and Responsibilities

In accordance and consistent with federal law under the Code of Federal Regulations (CFR), the Texas Health and Human Services Commission (HHSC) established a statement of participant rights that may be found in the Texas Administrative Code (TAC). Participant rights are reflected in contracts with MCOs, under the managed care contracts and the Uniform Managed Care Manual (UMCM), to ensure that participants are advised of their rights. Members are informed through MCO member handbooks and are provided with additional support, as needed, to understand their rights as well as their responsibilities. In accordance with 42 CFR §438.420 and Title 1 of the TAC, Chapter 357 (1 TAC §357.13 (relating to Appellant Rights and Responsibilities)), members notified of an adverse MCO determination may request a continuation of LTSS benefits during an appeal.

#### A.   42 CFR §438.100 Enrollee rights

(a) *General rule.* The State must ensure that—

    (1) Each MCO and PIHP has written policies regarding the enrollee rights specified in this section; and

    (2) Each MCO, PIHP, PAHP, and PCCM complies with any applicable Federal and State laws that pertain to enrollee rights, and ensures that its staff and affiliated providers take those rights into account when furnishing services to enrollees.

(b) *Specific rights*—

    (1) *Basic requirement.* The State must ensure that each managed care enrollee is guaranteed the rights as specified in paragraphs (b)(2) and (b)(3) of this section.

    (2) An enrollee of an MCO, PIHP, PAHP, or PCCM has the following rights: The right to—

        (i) Receive information in accordance with §438.10.

        (ii) Be treated with respect and with due consideration for his or her dignity and privacy.

        (iii) Receive information on available treatment options and alternatives, presented in a manner appropriate to the enrollee's condition and ability to understand. (The information

requirements for services that are not covered under the contract because of moral or religious objections are set forth in §438.10(f)(6)(xii).)

(iv) Participate in decisions regarding his or her health care, including the right to refuse treatment.

(v) Be free from any form of restraint or seclusion used as a means of coercion, discipline, convenience or retaliation, as specified in other Federal regulations on the use of restraints and seclusion.

(vi) If the privacy rule, as set forth in 45 CFR parts 160 and 164 subparts A and E, applies, request and receive a copy of his or her medical records, and request that they be amended or corrected, as specified in 45 CFR §164.524 and 164.526.

(3) An enrollee of an MCO, PIHP, or PAHP (consistent with the scope of the PAHP's contracted services) has the right to be furnished health care services in accordance with §§438.206 through 438.210.

(c) *Free exercise of rights.* The State must ensure that each enrollee is free to exercise his or her rights, and that the exercise of those rights does not adversely affect the way the MCO, PIHP, PAHP, or PCCM and its providers or the State agency treat the enrollee.

(d) *Compliance with other Federal and State laws.* The State must ensure that each MCO, PIHP, PAHP, and PCCM complies with any other applicable Federal and State laws (such as: title VI of the Civil Rights Act of 1964 as implemented by regulations at 45 CFR part 80; the Age Discrimination Act of 1975 as implemented by regulations at 45 CFR part 91; the Rehabilitation Act of 1973; and titles II and III of the Americans with Disabilities Act; and other laws regarding privacy and confidentiality).

## B.  1 TAC §353.202 Member Bill of Rights

Each managed care organization (MCO) participating in the Texas Medicaid program must provide to each member an easy-to-read, written document describing the member's rights, which must include the following:

(1) Member rights for members of health care MCOs:

(A) You have the right to respect, dignity, privacy, confidentiality and nondiscrimination. That includes the right to:

(i) Be treated fairly and with respect.

(ii) Know that your medical records and discussions with your providers will be kept private and confidential.

(B) You have the right to a reasonable opportunity to choose a managed care organization (MCO) and primary care provider. This is the doctor or health care provider you will see most of the time and who will coordinate your care. You have the right to change to another MCO or provider in a reasonably easy manner. That includes the right to:

(i) Be told how to choose and change your MCO and your primary care provider.

(ii) Choose any MCO you want that is available in your area and choose your primary care provider from that plan.

(iii) Change your primary care provider.

(iv) Change your MCO without penalty.

(v) Be told how to change your MCO or your primary care provider.

(C) You have the right to ask questions and get answers about anything you do not understand. That includes the right to:

(i) Have your provider explain your health care needs to you and talk to you about the different ways your health care problems can be treated.

(ii) Be told why care or services were denied and not given.

(D) You have the right to agree to or refuse treatment and actively participate in treatment decisions. That includes the right to:

(i) Work as part of a team with your provider in deciding what health care is best for you.

(ii) Say yes or no to the care recommended by your provider.

(E) You have the right to use each complaint and appeal process available through the MCO and through Medicaid, and get a timely response to complaints, appeals and fair hearings. That includes the right to:

(i) Make a complaint to your MCO or to the Texas Medicaid program about your health care, your provider or your MCO.

(ii) Get a timely answer to your complaint.

(iii) Use the MCO's appeal process and be told how to use it.

(iv) Ask for a fair hearing from the Texas Medicaid program and get information about how that process works.

(F) You have the right to timely access to care that does not have any communication or physical access barriers. That includes the right to:

(i) Have telephone access to a medical professional 24 hours a day, 7 days a week to get any emergency or urgent care you need.

(ii) Get medical care in a timely manner.

(iii) Be able to get in and out of a health care provider's office. This includes barrier free access for people with disabilities or other conditions that limit mobility, in accordance with the Americans with Disabilities Act.

(iv) Have interpreters, if needed, during appointments with your providers and when talking to your MCO. Interpreters include people who can speak in your native language, help someone with a disability, or help you understand the information.

(v) Be given information you can understand about your MCO's rules, including the health care services you can get and how to get them.

(G) You have the right to not be restrained or secluded when it is for someone else's convenience, or is meant to force you to do something you do not want to do, or is to punish you.

(H) You have a right to know that doctors, hospitals, and others who care for you can advise you about your health status, medical care, and treatment. Your MCO cannot prevent them from giving you this information, even if the care or treatment is not a covered service.

(I) You have a right to know that you are not responsible for paying for covered services. Doctors, hospitals, and others cannot require you to pay copayments or any other amounts for covered services.

(2) Member rights for members of dental MCOs:

(A) You have the right to get accurate, easy-to-understand information to help you make good choices about you or your child's dentists and other providers.

(B) You have the right to know how your child's dentists are paid. You have a right to know about what those payments are and how they work.

(C) You have the right to know how your managed care organization (MCO) decides about whether a service is covered and/or medically necessary. You have the right to know about the people in the MCO's office who decide those things.

(D) You have the right to know the names of the dentists and other providers enrolled with your MCO and their addresses.

(E) You have the right to pick from a list of dentists that is large enough so that your child can get the right kind of care when your child needs it.

(F) You have the right to take part in all the choices about your child's dental care.

(G) You have the right to speak for your child in all treatment choices.

(H) You have the right to get a second opinion from another dentist enrolled in your MCO about what kind of treatment your child needs.

(I) You have the right to be treated fairly by your MCO, dentists and other providers.

(J) You have the right to talk to your child's dentists and other providers in private, and to have your child's dental records kept private. You have the right to look over and copy your child's dental records and to ask for changes to those records.

(K) You have a right to know that dentists, hospitals, and others who care for your child can advise you about your child's health status, medical care, and treatment. Your child's MCO cannot prevent them from giving you this information, even if the care or treatment is not a covered service.

(L) You have a right to know that you are not responsible for paying for covered services for your child. Dentists, hospitals, and others cannot require you to pay any other amounts for covered services.


## C.  Managed Care Contracts

In accordance with 42 CFR §438.100 (relating to Enrollee Rights), the managed care contracts require that MCOs maintain written policies and procedures for informing members of their rights and responsibilities, and must notify members of their right to request a copy of these rights and responsibilities (Member Rights and Responsibilities). An MCO's Member Handbook must include a notice regarding member rights and responsibilities, in compliance with the UMCM, Chapter 3.4 (relating to Medicaid Managed Care Member Handbook Required Critical Elements).

### III.    Abuse, Neglect, and Exploitation Defined

The following statutory definitions of abuse, neglect and exploitation (ANE) apply to investigations of alleged ANE:

- Chapter 48 of the Texas Human Resources Code (relating to Investigations and Protective Services for Elderly and Disabled Persons);
- Chapter 260A of the Texas Health and Safety Code (relating to Reports of Abuse, Neglect, and Exploitation of Residents of Certain Facilities); and

- Chapter 261 of the Texas Family Code, Subchapter E, Section 261.404 (relating to Investigation of Abuse, Neglect, or Exploitation in Certain Facilities).

HHSC defines critical events or incidents in the managed care contracts, Attachment 2, Article 2, as those that may bring harm, or create the potential for harm, to an individual. Critical events or incidents include but are not limited to:

- abuse, neglect, or exploitation;
- the unauthorized use of restraint, seclusion, or restrictive interventions;
- serious injuries that require medical intervention or result in hospitalization;
- criminal victimization;
- unexplained death;
- medication errors; and
- other incidents or events that involve harm or risk of harm to a member.

## IV.    Critical Incident System

The state has a system to prevent, identify, report, investigate, and remediate critical incidents that occur within the delivery of  MLTSS as well as to track and trend results in order to make system improvements. The obligation to report abuse, neglect, and exploitation is mandated by statute and HHSC clarifies roles, expectations, and responsibilities for providers and MCOs in the managed care contracts.

The critical incident systems consists of numerous levels of participant protection: prevention, identification, and reporting of ANE; investigations of ANE; monitoring findings; remediation of issues; and consumer support for members.

In accordance with 42 CFR §431.10(e), HHSC is the single state Medicaid agency and retains oversight and full administrative authority over the waiver program.

## A.  Prevention

### 1.  Licensure Requirements

The state, through the Department of Aging and Disability Services (DADS), licenses the following LTSS providers:

- Adult day care facilities (TAC Title 40, Chapter 98);
- Adult foster care, serving four or more individuals (licensing: TAC Title 40, Chapter 92);
- Assisted living facilities (TAC Title 40, Chapter 92);
- Home and community support services agencies (TAC Title 40, Chapter 97); and
- Nursing facilities (TAC Title 40, Chapter 19).

Additional LTSS providers licensed through other entities:

- Emergency response system providers (TAC Title 25, Part 1, Chapter 140, Subchapter B);
- Licensed durable medical equipment providers (TAC Title 25, Part 1, Chapter 229, Subchapter X);
- Providers of cognitive rehabilitation therapy services;
- Occupational therapists (TAC Title 40, Part 12);
- Physical therapists (TAC Title 22, Part 16); and
- Speech therapists (TAC Title 22, Part 32).

Prior to issuing licensure to the above healthcare providers, the state screens those facilities or persons for prior disciplinary or criminal history in Texas and in other states. In accordance with Section 1919(e)(2) of the Social Security Act , the state maintains a registry of all nurse aides who are certified to provide services in nursing facilities and skilled nursing facilities licensed by DADS. (See: 42 U.S.C. 1396r(e)(2)) The Nurse Aide Registry (NAR) lists nurse aides who are unemployable because of confirmed instances of abuse, neglect, exploitation, misappropriation, or misconduct against a nursing facility resident. For those individuals that do not require licensure, in accordance with state law, DADS maintains an Employee Misconduct Registry (EMR) that includes the names of unlicensed persons who are unemployable because of confirmed instances of abuse, neglect, exploitation, misappropriation, or misconduct in the DADS facilities listed above. (See: Texas Health and Safety Code, Title 4, Subtitle B, Chapter 253 (relating to Employee Misconduct Registry)

All DADS-regulated facilities and agencies are required to check both the NAR and EMR before hiring an individual and annually thereafter. In addition, all MCOs are required to check both the NAR and EMR prior to contracting with an unlicensed or uncertified LTSS provider, and annually thereafter.

## 2. Credentialing Unlicensed or Uncertified Providers by MCOs

Through their credentialing process, the MCOs ensure that the agencies they contract with have met all licensure requirements. According to the managed care contracts, before contracting with an unlicensed LTSS provider or LTSS provider not certified by a health and human services agency, such as minor home modification or home-delivered meals providers, the MCOs must take steps to verify that the provider:

- has not been convicted of a crime listed in Texas Health and Safety Code, §250.006;
- is not listed as "unemployable" in the EMR or the NAR maintained by DADS by searching or ensuring a search of such registries is conducted before hire and annually thereafter;
- is knowledgeable of acts that constitute abuse, neglect, or exploitation of a member;
- is instructed on and understands how to report suspected abuse, neglect, or exploitation;
- adheres to applicable state laws if providing transportation; and
- is not a spouse of, legally responsible person for, or employment supervisor of the member who receives the service, except as allowed in the Texas Healthcare Transformation and Quality Improvement Program 1115 Waiver.

## B. Identification and Reporting

### 1. Obligation to Report

Under state law, a person is required to report suspected abuse, neglect, or exploitation of an individual receiving waiver services to the appropriate state agency. More specifically:

Reports to the Department of Family and Protective Services (DFPS):

- A person having cause to believe that an individual who is elderly or who has a disability is in a state of abuse, neglect, or exploitation is required to report the information immediately to DFPS. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.051 (relating to Reports of Abuse Neglect, or Exploitation: Immunities))
- A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by a person must report the information immediately to DFPS. (See: Texas Family Code, Title 4, Subtitle E, Subchapter B, §261.101 (relating to Persons Required to Report; Time to Report))
- A professional who has cause to believe that a child has been abused or neglected or may be abused or neglected must make a report to DFPS within 48 hours after the professional first suspects abuse or neglect. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.101(b))

Reports to DADS:

- If a person has cause to believe that an individual who is elderly or who has a disability has been abused, neglected, or exploited in a facility or by a provider operated, licensed, certified, or registered by DADS, the person shall report the information to DADS. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.051 (relating to Reports of Abuse Neglect, or Exploitation: Immunities)) This requirement is also addressed in Chapter 260A of the Health and Safety Code. A person, including an owner or employee of a facility, who has cause to believe that the physical or mental health or welfare of a resident has been or may be adversely affected by abuse, neglect, or exploitation caused by another person shall report the abuse, neglect, or exploitation to DADS and law enforcement as appropriate under Chapter 260A of the Texas Health and Safety Code. (See: Texas Health and Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.002 (relating to Reporting of Abuse, Neglect, and Exploitation))

Reports regarding the suspected abuse, neglect, or exploitation of a resident of a facility regulated by DADS may also be made to a local or state law enforcement agency, which in turn will refer the report to DADS to ensure that DADS is made aware of the allegations of ANE. Additionally, reports alleging that a resident's health or safety is in imminent danger; that a resident has died because of the alleged conduct; that a resident has been hospitalized or treated in an emergency room because of the alleged conduct; that the alleged conduct involves a criminal act; or that a resident has suffered bodily injury due to the alleged conduct shall be

made to both DADS and the appropriate law enforcement agency. (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.005 (relating to Telephone Hotline; Processing of Reports))

State agencies receiving reports of suspected abuse, neglect, or exploitation keep the reporter's identity confidential. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.101 (relating to Confidentiality); Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.008 (relating to Confidentiality); and Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.101 (relating to Persons Required to Report; Time to Report))

The failure to report suspected abuse, neglect, or exploitation of a child or of an individual who is elderly or who has a disability is considered a criminal offense. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.052 (relating to Failure to Report; Penalty); Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.012 (relating to Failure to Report; Criminal Penalty); and Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.109 (relating to Failure to Report; Penalty))

## 2. Managed Care Contracts

According to the managed care contracts, MCOs must train and educate their staff, providers, and subcontractors to understand abuse, neglect, and exploitation and all prevention, detection, reporting, investigation and remediation procedures and requirements. In addition, MCOs must educate members about abuse, neglect, and exploitation and ensure that MCO staff such as member services staff and service coordinators are knowledgeable about how to identify and report a critical event or incident such as abuse, neglect, and exploitation. MCOs must administer training for service coordination staff that includes identification and reporting of critical events or incidents.

In addition to the information provided to all members, a financial management services agency (FMSA), provides members who elect the consumer directed services option with training and written information related to reporting allegations of abuse, neglect, and exploitation (See: TAC Title 40, Chapter 41).

## C. Investigation of Abuse, Neglect, or Exploitation (ANE)

### 1. DFPS

DFPS investigates reports of alleged ANE of individuals who are elderly or have a disability. This includes investigations of:

- an adult who is elderly or has a disability and is receiving services from a home and community support services agency (HCSSA) or in an unlicensed adult foster care home;
- an adult with a disability or a child residing in or receiving services from a local authority, local mental health authority (LMHA), or community center; or
- an adult with a disability receiving services through consumer directed services.

DFPS investigations are governed by Title 2 of the Texas Human Resources Code, Subtitle D, Chapter 48 (relating to Investigations and Protective Services for Elderly and Disabled Persons).

When DFPS receives ANE reports concerning an individual in a facility licensed by another state agency and explicitly responsible for investigating ANE in that facility, DFPS forwards the report to that agency for investigation.

### 2. DADS

DADS investigates reports of ANE of individuals who are elderly or have a disability that occur in a facility or are perpetrated by a provider, either of which are operated, licensed, or certified by DADS. These investigations are governed by Title 2 of the Texas Human Resources Code, Subtitle D, Chapter 48 (relating to Investigations and Protective Services for Elderly and Disabled Persons) and Title 4 of the Texas Health and Safety Code, Subtitle B, Chapter 260A (relating to Reports of Abuse, Neglect, and Exploitation of Residents of Certain Facilities). Reports of abuse, neglect, and exploitation of a child under the age of 18 receiving services from a HCSSA are investigated by DADS pursuant to Title 2 of the Texas Health and Safety Code, Subtitle G, Chapter 142, §142.009 (relating to Surveys; Consumer Complaints).

### 3. Law Enforcement

State law requires DFPS and DADS to notify the appropriate law enforcement agency of reports of abuse, neglect, or exploitation during certain investigations. Specifically:

- DFPS and DADS are required to immediately notify the appropriate law enforcement agency when a caseworker or supervisor has cause to believe that an individual who is elderly or who has a disability has been abused, neglected, or exploited by another person in a manner that constitutes a criminal offense under any law. This requirement does not apply when the law enforcement agency is the entity to report the alleged abuse, neglect, or exploitation to DADS or DFPS. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.1522 (relating to Reports of Criminal Conduct to Law Enforcement))

- Within 24 hours after the receipt of a report of abuse, neglect, or exploitation of a resident of a DADS facility, DADS must report the incident to the appropriate law enforcement agency when the complaint alleges: a resident's health or safety is in imminent danger; a resident has recently died because of conduct alleged in the report of abuse, neglect, exploitation, or other complaint; a resident has been hospitalized or been treated in an emergency room because of conduct alleged in the report of abuse, neglect, exploitation, or other complaint; a resident has been a victim of any act or attempted act described by Section 21.02, 21.11, 22.011, or 22.021 of the Texas Penal Code; or a resident has suffered bodily injury, as that term is defined by Section 1.07 of the Texas Penal Code, because of conduct alleged in the report of abuse, neglect, exploitation, or other complaint. (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.007 (relating to Investigation and Report by Department))

- DFPS and DADS must immediately notify the appropriate law enforcement agency of any report that concerns the suspected abuse, neglect, or exploitation of a child or the

death of a child from abuse or neglect. If DFPS or DADS finds evidence indicating that a child may have been abused, neglected, or exploited, DFPS or DADS must report the evidence to the appropriate law enforcement agency. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.402 (relating to Investigative Reports)) These requirements do not apply when the law enforcement agency is the entity to report the alleged abuse, neglect, or exploitation to DADS or DFPS.

Specifically, Section 22.04 of the Texas Penal Code makes it a criminal offense to intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, cause to a child, individual who is elderly or an individual with a disability serious bodily injury; serious mental deficiency, impairment, or injury; or bodily injury. Section 32.53 of the Texas Penal Code makes it a criminal offense to intentionally, knowingly, or recklessly cause the exploitation of a child, individual who is elderly, or an individual with a disability.

All reports that allege abuse or neglect by a person responsible for a child's care, custody, or welfare received by a local or state law enforcement agency are referred immediately to DFPS or the designated agency. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.105(a)) Furthermore, reports of abuse, neglect or exploitation of an individual residing in a facility regulated by DADS received by a law enforcement agency are referred to DADS. (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.005 (relating to Telephone Hotline; Processing of Reports))

If a child has been or may be the victim of conduct that constitutes a criminal offense that poses an immediate risk of physical or sexual abuse of a child that could result in death or serious harm to the child, DFPS conducts a joint investigation with the appropriate law enforcement agency. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.301(f)) Additionally, if DFPS initiates an investigation and determines that the abuse or neglect does not involve a person responsible for the child's care, custody, or welfare, DFPS refers the report to the appropriate law enforcement agency for further investigation. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.105(d)).

Upon receipt of a report of alleged abuse, neglect, or exploitation of a person residing in a facility licensed, operated, certified or registered by DADS, law enforcement must acknowledge the report and begin a joint investigation with DADS within 24 hours after receipt of the report. (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.017)

## D. Monitoring

HHSC monitors ANE investigation findings as well as MCO compliance efforts. The state of Texas maintains overall responsibility for the operation of the critical incident system and engages in continuous process improvements. Protections against ANE are not limited to HHSC's jurisdiction, as other state and local entities have related responsibilities, described in Section C (relating to Investigation of Abuse, Neglect, or Exploitation (ANE)) of this Attachment.

## E. Remediation

HHSC has the authority to terminate or replace an MCO or its subcontractor(s), according to managed care contracts, if either are convicted of a criminal offense related to the neglect or abuse of members in connection with the delivery of an item or service. If an MCO fails to meet contractual requirements related to protection against or reporting of ANE, such as contracting with LTSS providers that fail to meet standards outlined in Sections A and B, then HHSC has authority to use a variety of remedies, up to and including contract termination.

## F. Member Support

Texas maintains a consumer support system that is independent of the MCOs to assist members in understanding managed care and resolution of problems regarding services, benefits, access, and rights.

Texas' independent consumer supports system (ICSS) consists of HHSC's Medicaid/CHIP Division, Office of the Ombudsman (Ombudsman), the state's managed care Enrollment Broker (EB, "MAXIMUS"), and community support from the Aging and Disability Resource Centers (ADRCs). These entities operate independently of any Medicaid MCO and work with beneficiaries and MCOs to ensure beneficiaries seeking to enroll with a MCO understand the managed care program, MCO options, and the process for resolving issues. Data related to the ICSS is reported and monitored regularly, on at least a quarterly basis, by all entities discussed in this report.

HHSC's Medicaid/CHIP Division provides guidance to the MCOs on Medicaid policy and managed care program requirements, reviews MCO materials, monitors the MCOs' contractual obligations, answers managed care inquiries, and resolves managed care complaints. HHSC's Medicaid/CHIP Division also monitors implementation of MCO corrective action plans and assesses damages when necessary.

## V. Restraints, Seclusions, and Medication Management

DADS licenses adult foster care, assisted living providers, nursing facilities, HCSSAs, and adult day care providers. DADS oversight of medication management and use of restraint and seclusion is conducted primarily through licensure inspections and complaint investigations. DADS is responsible for ensuring compliance with licensing requirements and inspects licensed providers for compliance with licensing requirements, such as medication management and authorized use of restraint and seclusion. DADS licensing inspections include medication administration review that is based on a sample of client and resident records. The state imposes penalties, such as administrative penalties and license revocation, when harmful medication management practices are detected. DADS survey staff follow up to ensure plans of correction are properly implemented. DADS survey staff conduct follow-up surveys and inspections to ensure the provider has effectively implemented plans of correction required due to cited state violations. DADS tracks the number of validated instances of licensure violations.

## A. Restraint

Pursuant to federal and state rules, a waiver recipient has the right to be free from any form of restraint or seclusion used as a means of coercion, discipline, convenience, or retaliation. (See: 42 CFR §438.100 (relating to Enrollee Rights), and TAC Title 1 §353.202 (relating to Member

Bill of Rights)) The state does permit the use of restraints in limited and appropriate circumstances, as detailed in this section. All allegations of improper restraints by providers licensed by DADS are referred to DADS for investigation.

### 1. Adult foster care (AFC)

All AFC clients have the right to be free from physical or chemical restraints not required to treat the resident's medical symptoms or imposed for purposes of discipline or convenience. A provider may use physical or chemical restraints only if the use is authorized in writing by a physician or if the use is necessary in an emergency to protect the resident or others from injury. A physician's written authorization for the use of restraint must specify the circumstances under which the restraint may be used and the duration for which the restraint may be used. Except in a behavioral emergency, restraint may only be administered by qualified medical personnel. The AFC provider must inform the resident verbally and in writing, before or at the time of admission, of his rights and responsibilities, including those related to restraint and seclusion. HHSC applies and enforces these requirements for both licensed and unlicensed AFC facilities pursuant to the provisions in the STAR+PLUS Handbook. AFC providers who provide services to four or more unrelated individuals must be licensed as assisted living facilities (ALFs) and are also subject to the requirements discussed below.

In addition, AFCs licensed as Type A or B ALFs are also subject to ALF restraint rules that are specific to Type A or Type B facilities. These rules are found under TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, all restraints for purposes of behavior management, staff convenience, or resident discipline are prohibited. A facility may use physical or chemical restraints only (1) if the use is authorized in writing by a physician and specifies: (a) the circumstances under which a restraint may be used; and (b) the duration for which the restraint may be used; or (2) if the use is necessary in an emergency to protect the resident or others from injury.

A restraint must not be administered under any circumstance if it obstructs the resident's airway, including a procedure that places anything in, on, or over the resident's mouth or nose; impairs the resident's breathing by putting pressure on the resident's torso; interferes with the resident's ability to communicate; or places the resident in a prone or supine position. After the use of restraint, the facility must, with the resident's consent, make an appointment with the resident's physician no later than the end of the first working day after the use of restraint and document in the resident's record that the appointment was made. If the resident refuses to see the physician, staff must document the refusal in the resident's record. As soon as possible but no later than 24 hours after the use of restraint, the facility must notify the resident's legally authorized representative or an individual actively involved in the resident's care, if there is such a person, that the resident has been restrained, unless the release of this information would violate other law.

Staff at Type A or B ALFs must attend training which includes practices to decrease the frequency of the use of restraint and alternatives to restraints. Before or upon admission of a resident, a facility must notify the resident and, if applicable, the resident's legally authorized representative, of DADS' rules and the facility's policies related to restraint. In order to decrease the frequency of the use of restraint, facility staff must be aware of and adhere to the findings of

the required resident assessment. A facility may adopt policies that allow less use of restraint than allowed by these rules.

## 2. Assisted living facility

Assisted living facilities (ALFs) must comply with restraint rules found in TAC Title 40, Chapter 92, §92.125 (relating to Resident's Bill of Rights and Provider Bill of Rights). Pursuant to these rules, ALF residents have the right to be free from physical and chemical restraints that are administered for the purpose of discipline or convenience and not required to treat the resident's medical symptoms. A provider may use physical or chemical restraints only if the use is authorized in writing by a physician or if the use is necessary in an emergency to protect the resident or others from injury. A physician's written authorization for the use of restraint must specify the circumstances under which the restraint may be used and the duration for which the restraint may be used. Except in a behavioral emergency, restraint may only be administered by qualified medical personnel.

Furthermore, Type A and Type B ALFs must also comply with restraint rules in TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, all restraints for purposes of behavior management, staff convenience, or resident discipline are prohibited. A facility may use physical or chemical restraints only (1) if the use is authorized in writing by a physician and specifies: (a) the circumstances under which a restraint may be used; and (b) the duration for which the restraint may be used; or (2) if the use is necessary in an emergency to protect the resident or others from injury.

A restraint must not be administered under any circumstance if it obstructs the resident's airway, including a procedure that places anything in, on, or over the resident's mouth or nose; impairs the resident's breathing by putting pressure on the resident's torso; interferes with the resident's ability to communicate; or places the resident in a prone or supine position. After the use of restraint, the facility must, with the resident's consent, make an appointment with the resident's physician no later than the end of the first working day after the use of restraint and document in the resident's record that the appointment was made. If the resident refuses to see the physician, the facility must document the refusal in the resident's record. As soon as possible but no later than 24 hours after the use of restraint, the facility must notify the resident's legally authorized representative or an individual actively involved in the resident's care, if there is such a person, that the resident has been restrained, unless the release of this information would violate other law.

Staff at Type A or B ALFs must attend training which includes practices to decrease the frequency of the use of restraint and alternatives to restraints. Before or upon admission of a resident, a facility must notify the resident and, if applicable, the resident's legally authorized representative, of DADS' rules and the facility's policies related to restraint. In order to decrease the frequency of the use of restraint, facility staff must be aware of and adhere to the findings of the required resident assessment. A facility may adopt policies that allow less use of restraint than allowed by these rules.

## 3. Nursing facility

Nursing facilities must comply with restraint rules found in TAC Title 40, Chapter 19, §92.125 (relating to Nursing Facility Requirements for Licensure and Medicaid Certification). Nursing

facility providers may use restraints, of any kind, only with the orders of the attending physician. Residents must be informed in writing upon admission, and during their stay, of DADS' rules and the facility's policies related to the use of restraint and involuntary seclusion. As part of orientation, and annually, each employee must receive instruction regarding restraint reduction. If restraints are used to treat a resident's medical condition, the resident must be monitored hourly, and at a minimum, restraints must be released every two hours for a minimum of ten minutes, and the resident must be repositioned. Restraints that obstruct the resident's airway, impair the resident's breathing, interfere with the resident's ability to communicate, or place the resident in a prone or supine position are prohibited. The use of restraints and their release must be documented in the clinical record.

### 4. HCSSA

Members receiving services from home health agencies, licensed as HCSSAs, have the right to be free from restraint when it is used for someone else's convenience or is meant to force the member to do something, or punish the member (TAC Title 1, Chapter 353, Subchapter C (relating to Member Bill of Rights and Responsibilities)).

### 5. Adult Day Care Centers

Providers of day activity and health services (DAHS) require an adult day care (ADC) license issued by DADS in accordance with TAC Title 40, Chapter 98 (relating to Adult Day Care and Day Activity and Health Services Requirements).

ADC providers must comply with licensure and program rules found in TAC Title 40, Chapter 98, §98.61 (relating to General Requirements) and §98.62 (relating to Program Requirements). Pursuant to this section, ADC providers must provide a client with a written list of the client's rights, as outlined under the Texas Human Resource Code, Chapter 102, §102.004 (relating to List of Rights). §102.003 (relating to Rights of the Elderly) sets forth the specific rights addressed by §102.004. Under this section, ADC clients have the right to be free from physical or chemical restraints that are administered for the purpose of discipline or convenience and are not required to treat the individual's medical symptoms. A person providing services may use physical or chemical restraints only if the use is authorized in writing by a physician or the use is necessary in an emergency to protect the client or others from injury. A physician's written authorization for the use of restraint must specify the circumstances under which the restraint may be used and the duration for which the restraint may be used. Except in an emergency, restraint may only be administered by qualified medical personnel.

## B. Seclusion

The state does not permit the use of seclusion as it relates to services delivered through managed long term services and supports. All allegations of improper seclusion of individuals receiving managed long term services and supports by providers licensed by DADS are referred to DADS for investigation.

# Attachment G
## HCBS Participant Safeguards

### 1. Adult foster care

The use of seclusion in any licensed or unlicensed AFC is prohibited. The state applies and enforces these requirements for licensed and unlicensed adult foster care facilities under provisions in the STAR+PLUS Handbook.

### 2. Assisted living facility

The use of seclusion by Type A and Type B assisted living facility providers is prohibited. (See: TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities))

### 3. Nursing facility

Nursing facilities may not use involuntary seclusion on a resident. (See: TAC Title 40, Chapter 19, §19.601 (relating to Resident Behavior and Facility Practice)) "Involuntary seclusion" is defined as the "separation of a resident from others or from the resident's room or confinement to the resident's room, against the resident's will or the will of a person who is legally authorized to act on behalf of the resident. Monitored separation from other residents is not involuntary seclusion if the separation is a therapeutic intervention that uses the least restrictive approach for the minimum amount of time, not to exceed 24 hours, until professional staff can develop a plan of care to meet the resident's needs." (See: TAC Title 40, Chapter 19, §19.101 (relating to Definitions))

### 4. HCSSA

Members receiving services from home health agencies, licensed as HCSSAs, have the right to be free from seclusion when it is for someone else's convenience or is meant to force the member to do something, or punish the member (See: TAC Title 1, Chapter 353, Subchapter C (relating to Member Bill of Rights and Responsibilities)).

### 5. Adult Day Care Centers

Members receiving services from adult day care centers have the right to be free from seclusion when it is for someone else's convenience or is meant to force the member to do something, or punish the member (See: TAC Title 1, Chapter 353, Subchapter C (relating to Member Bill of Rights and Responsibilities)).

## C. Medication Management

Adult foster care providers, assisted living facilities, nursing facilities, HCSSAs, and adult day care providers must provide medication management in accordance with licensing standards. The State enforces the same requirements for unlicensed adult foster care facilities under provisions in the STAR+PLUS Handbook.

A registered nurse who supervises a medication aide or delegates medication administration must provide ongoing supervision and any necessary training to the unlicensed person. Registered nurses must follow procedures for delegation in accordance with relevant law and rule. (See: TAC Title 22, Chapter 225 (relating to RN Delegation to Unlicensed Personnel and Tasks Not Requiring Delegation in Independent Living Environments for Clients with Stable and Predictable Conditions) An RN that fails to properly supervise or delegate is subject to action by

the Texas Board of Nursing. (See: TAC Title 22, Chapter 217 (relating to Licensure, Peer Assistance, and Practice))

### 1. Adult foster care

All AFC providers must ensure that all medications are taken as prescribed and in a timely manner according to the instructions on the medication label or instructions from the resident's physician. The AFC provider may administer medications only as allowed by state law or regulation, and prescription medications must be kept in a locked container. Medications must be disposed of when the resident's medication regimen changes or when the medication is out of date. The AFC provider must ensure that a resident takes over-the-counter medications according to the package directions. Excessive use of these medications must be reported to the AFC caseworker. The AFC provider must inform the resident verbally and in writing, before or at the time of admission, of his rights and responsibilities. The State enforces the same requirements for unlicensed adult foster care facilities under provisions in the STAR+PLUS Handbook.

In addition, AFCs licensed as Type A or B ALFs, which are AFCs serving 5 or more residents and licensed prior to September 1, 2014, and AFCs with a current contract with DADS, serving 4 or more residents and licensed after September 1, 2014, are also subject to ALF medication management rules that are specific to Type A or Type B facilities. These rules are found in TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, medications must be administered according to physician's orders.

Residents who choose not to or cannot self-administer their medications must have their medications administered by a person who: (i) holds a current license under state law that authorizes the licensee to administer medication; (ii) holds a current medication aide permit and functions under the direct supervision of a licensed nurse on duty or on call by the facility and that nurse authorizes the licensee to administer medication; or (iii) is an employee of the facility to whom the administration of medication has been delegated by a registered nurse, and must have been trained by the nurse to administer medications or have had the nurse verify the training of the employee. The delegation of the administration of medication is governed by TAC Title 22, Chapter 225 (relating to RN Delegation to Unlicensed Personnel and Tasks Not Requiring Delegation in Independent Living Environments for Clients with Stable and Predictable Conditions).

A resident's prescribed medication must be dispensed through a pharmacy or by the resident's treating physician or dentist. Each resident's medications must be listed on an individual resident's medication profile record. Supervision of a resident's medication regimen by facility staff may be provided to residents who are incapable of self-administering without assistance. Residents who self-administer their own medications and keep them locked in their room must be counseled at least once a month by facility staff to ascertain if the residents continue to be capable of self-administering their medications and if security of medications can continue to be maintained. The facility must keep a written record of counseling. Residents who choose to keep their medications locked in a central medication storage area may be permitted entrance or access to the area for the purpose of self-administering their own medication. A facility staff member must remain in or at the storage area the entire time any resident is present.

Facility staff immediately report to the resident's physician and responsible party any unusual reactions to medications or treatments. When the facility supervises or administers the medications, a written record must be kept when the resident does not receive or take his/her medications or treatments as prescribed. The facility must provide a locked area for all medications. Medications no longer being used by the resident are to be kept separate from current medications and are to be disposed of according to state law.

### 2. Assisted living facility

Assisted living facility (ALF) providers must comply with medication management rules found in TAC Title 40, Chapter 92, Section 92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, medications must be administered according to a physician's orders.

Residents who choose not to or cannot self-administer their medications must have their medications administered by a person who: i) holds a current license under state law that authorizes the licensee to administer medication; (ii) holds a current medication aide permit and functions under the direct supervision of a licensed nurse on duty or on call by the facility and that nurse authorizes the licensee to administer medication; or (iii) is an employee of the facility to whom the administration of medication has been delegated by a registered nurse, and must have been trained by the nurse to administer medications or have had the nurse verify the training of the employee. The delegation of the administration of medication is governed by TAC Title 22, Chapter 225 (relating to RN Delegation to Unlicensed Personnel and Tasks Not Requiring Delegation in Independent Living Environments for Clients with Stable and Predictable Conditions).

A resident's prescribed medication must be dispensed through a pharmacy or by the resident's treating physician or dentist. Each resident's medications must be listed on an individual resident's medication profile record. Supervision of a resident's medication regimen by facility staff may be provided to a resident who is incapable of self-administering without assistance. Residents who self-administer their own medications and keep them locked in their room must be counseled at least once a month by facility staff to ascertain if the residents continue to be capable of self-administering their medications and if security of medications can continue to be maintained. The facility must keep a written record of counseling. Residents who choose to keep their medications locked in the central medication storage area may be permitted entrance or access to the area for the purpose of self-administering their own medication. A facility staff member must remain in or at the storage area the entire time any resident is present.

Facility staff immediately report to the resident's physician and responsible party any unusual reactions to medications or treatments. When the facility supervises or administers the medications, a written record must be kept when the resident does not receive or take his/her medications or treatments as prescribed. The facility must provide a locked area for all medications. Medications no longer being used by the resident are to be kept separate from current medications and are to be disposed of according to state law. Providers are required to record any type of medication error, regardless of severity, in the resident's clinical record.

### 3. Nursing facility

Nursing facility providers must comply with medication management rules found in TAC Title 40, Chapter 19 (relating to Nursing Facility Requirements for Licensure and Medicaid Certification). A nursing facility provider must ensure that medications are administered pursuant to the ordering physician's directions. Each resident must have an individual medication record. An individual may self-administer medications if the interdisciplinary team has determined that this practice is safe. The facility nursing staff must report medication errors and adverse reactions to the resident's physician in a timely manner, as warranted by an assessment of the resident's condition, and record them in the resident's record. Medication errors include, but are not limited to, administering the wrong medication, administering at the wrong time, administering the wrong dosage, administering by the wrong route, omitting a medication, or administering to the wrong resident.

When not in use, a medication cart must be secured in a designated area. Self-administered medications may be kept in a locked cabinet in the resident's room. When medications are self-administered, the facility remains responsible for medication security, accurate information, and medication compliance. Medications of deceased residents, medications that have passed the expiration date, and medications that have been discontinued must be securely stored and reconciled. These medications must be disposed of according to federal and state laws or rules on a quarterly basis.

### 4. HCSSA

Home health agencies licensed as HCSSAs must comply with medication management rules found in TAC Title 40, Chapter 97, §97.300 (relating to Medication Administration). A HCSSA must adopt and enforce a written policy for maintaining a current medication list and a current medication administration record. A client's healthcare provider must order administration of medication. Each client must have an individual medication record. An individual delivering care must report any adverse reaction to a supervisor and document this in the client's record on the day of occurrence. If the adverse reaction occurs after regular business hours, the individual delivering care must report the adverse reaction as soon as it is disclosed. Notification must also be made in the medication administration record or clinical notes of medications not given and the reason. Providers are required to record any type of medication error, regardless of severity, in the client's clinical record. (See: TAC Title 40, Chapter 97, §97.301 (relating to Client Records))

### 5. Adult day care

Day activity and health services require an adult day care license issued by DADS in accordance with TAC Title 40, Chapter 98 (relating to Adult Day Care and Day Activity and Health Services Requirements). (See also TAC Title 40, Chapter 49, §49.205(a)(15) (relating to License, Certification, Accreditation, and Other Requirements))

Adult day care providers must comply with medication management rules found in TAC Title 40, Chapter 98, §98.62 (relating to Program Requirements).

The facility nurse is responsible for obtaining physician's orders for medication and treatments to be administered, and administering medication and treatments. Clients who choose not to or cannot self-administer their medications must have their medications administered by a person

who holds a current license under state law which authorizes the licensee to administer medications. All medication prescribed to clients must be dispensed through a pharmacy or by the client's treating physician or dentist. Each client's medications must be listed on an individual client's medication profile record.

Assistance with self-administration of client's medication by licensed nursing staff may be provided to clients who are incapable of self-administering without assistance. Clients who self-administer their own medications must be counseled at least once a month by licensed nursing staff to ascertain if the clients continue to be capable of self-administering their medications and/or treatments. A written record of counseling must be kept by the facility.

The facility director, the activities director, or a facility nurse must immediately report to the client's physician and responsible party any unusual reactions to medications or treatments. When the facility supervises or administers the medications, a written record must be kept when the client does not receive or take his medications and/or treatments as prescribed. The documentation must include the date and time the dose should have been taken, and the name and strength of medication missed. The facility must provide a locked area for all medications. Medications no longer in use must be disposed of according to state law.

OVERVIEW

The intent of the Texas Medicaid Waiver Application ("UC Application") is to provide a simplified way to subsidize the costs incurred by hospitals, physicians and mid-level professionals for patient care services (as further defined below) provided to Medicaid and Uninsured patients that are not reimbursed through the claims adjudication process or by other supplemental payments. All UC payments to providers and all expenditures described as UC permissible expenditures must not exceed the cost of services provided to Medicaid and Uninsured patients as defined and discussed in this protocol. These unreimbursed Medicaid and Uninsured costs are determined based on one of two UC tools depending on the type of entity providing the service. These tools have been approved by the Centers for Medicare and Medicaid Services (CMS). To the extent that there are UC expenditures a hospital provider wants to make against the UC cost limit, and the methodology for capturing such expenditures is not stated in this protocol, the expenditures must be approved by CMS prior to the submission of the reconciliation for the applicable period for the expenditures.

The Medicaid coverage limitations under Section 1905(a) of the Act, which exclude coverage for patients in an institution for mental diseases (IMD) who are under age 65, except for coverage of inpatient psychiatric hospital services for individuals under age 21, are applicable.

The Texas Hospital Uncompensated Care tool ("TXHUC") will be utilized by hospitals to determine their unreimbursed costs for Medicaid and Uninsured patients for physicians' and mid-level professionals' direct patient care services where the hospital incurs these costs. In addition, if the hospital has unreimbursed hospital costs for services provided to Medicaid and Uninsured patients that were not paid via the claims adjudication process or thru the Medicaid Disproportionate Share (DSH) pool, these costs can be included in the TXHUC application. Also, for some hospitals meeting the criteria, unreimbursed pharmacy costs for take home drugs provided by the hospital to Medicaid and Uninsured patients will be included in the TXHUC application.

The Texas Physicians Uncompensated Care tool ("TXPUC") will be utilized by physician and/or mid-level professional entities that provide direct patient care physician and/or mid-level professional services to Medicaid and Uninsured patients in a hospital setting and the professional entity is not reimbursed under a contractual or employment relationship by the hospital for these services. The professional entity may also include in its TXPUC application the costs related to direct patient care services provided to Medicaid and Uninsured patients in a non-hospital setting. Only physician entities that had previously received payments under the Texas Medicaid Physician UPL (Upper Payment Limit) program and their successor organizations are eligible to submit a TXPUC application under the 1115 Waiver program.

The costs and other data included in the initial UC application should be representative of the fiscal period from October 1, 2009 through September 30, 2010. The UC application should be submitted to the Texas Health and Human Services Commission (HHSC) by the deadline specified by HHSC on its website at http://www.hhsc.state.tx.us/rad/hospital-svcs/1115-waiver.shtml. Applications for future fiscal periods which will cover the period from October 1 through September 30 of the applicable years will be due to HHSC by the deadline specified by HHSC. For hospitals, due to the five (5) month time period for the completion of the Medicare cost report which serves as the basis for the costs to be reported on the UC application, some entities will not have completed their cost report prior to the deadline for the submission of their UC application. In these situations, the hospital should submit a full 12 months of data

on the UC application based on the most recently completed Medicare cost reporting period that includes a minimum of twelve (12) months. It should be noted that when HHSC completes the reconciliation process, HHSC will utilize the hospital's actual data reported on their respective UC applications, weighted accordingly, to determine the hospital's final UC Pool distribution. This should not be an issue for physician and mid-level professional organizations since their financial data should be available immediately following the end of their respective fiscal years.

All costs and other data reported in the UC Application are subject to the Medicare regulations and Program instructions. The entity submitting the UC Application must maintain adequate supporting documentation for all information included in the UC Application in accordance with the Medicare program's data retention policies. The entity must submit the supporting documentation upon request from HHSC.

For purposes of the UC Application, a mid-level professional is defined as:

- ☐ Certified Registered Nurse Anesthetist (CRNA)
- ☐ Nurse Practitioner
- ☐ Physician Assistant
- ☐ Dentist
- ☐ Certified Nurse Midwife
- ☐ Clinical Social Worker
- ☐ Clinical Psychologist
- ☐ Optometrist

For purposes of the UC Application, a visit is defined as:

A face-to-face encounter between a patient and a physician and/or mid-level professional. Multiple encounters with the same physician and/or mid-level professional that take place on the same day and at a single location for the same diagnosis constitute a single visit. More than one visit may be counted on the same day (which may be at a different location) in either of the following situations:

a) When the patient, after the first visit, suffers illness or injury requiring another diagnosis or treatment, two visits may be counted.

b) When the patient is seen by a dentist and sees a physician and/or mid-level professional, two visits may be counted.

**Texas Hospital Uncompensated Care Tool (TXHUC)**

The TXHUC is comprised of a certification page, 4 primary schedules (a Summary Schedule and Schedules 1, 2 & 3) and various schedules.  Schedules 1, 2 and 3 determine the hospital's unreimbursed costs for services provided to Medicaid and Uninsured patients related to physician and/or mid-level professional direct patient care costs, pharmacy costs, and DSH hospital costs, respectively. The supporting schedules are the schedules hospitals are required to submit to HHSC when applying for the Medicaid DSH program. Each of these schedules along with instructions for the completion of the schedule is detailed below.

*Certification*

The certification page must be signed and dated by an officer or administrator of the provider. An officer is defined as a member of the provider's senior management such as the chief executive officer, chief financial officer, chief operating officer, etc. The certification must contain an original signature and not a copy or electronic signature. If the TXHUC is an initial submission, it should be so indicated in the appropriate box on the certification page.

Upon receipt of a final and/or amended final Medicare cost report, the provider is required to submit a "final" TXHUC based on the costs and other data contained in the final cost report. This final TXHUC will be utilized by HHSC to perform a final reconciliation of the actual costs for the period and the cost utilized to determine the provider's distribution from the UC Pool for that period. If the TXHUC submission is a final submission, it should be so indicated in the appropriate box on the certification page.

Upon the termination of the 1115 Waiver, providers will be required to submit actual cost data in the prescribed format of the TXHUC for a minimum of two years for purposes of reconciling the UC Pool payments for the last two years of the Waiver with the provider's actual costs incurred for those fiscal periods

*Summary Schedule*

*Column 1* - Summarizes the Medicaid and Uninsured costs determined on Schedules 1, 2 & 3. These amounts will flow automatically from the respective schedules and no input is required.

*Column 2* – The initial distribution of the Uncompensated Care Pool ("UC Pool") for the fiscal period 10/1/2011 – 9/30/2012 will be based on the costs for the period from 10/1/2009 – 9/30/2010 as computed on Schedules 1, 2 & 3. If the provider knows these costs are not representative of their actual costs for the period from 10/1/2011 – 9/30/2012, due to changes in their contractual arrangements or other operational or economic issues, the provider can make an adjustment to these costs. The provider is required to maintain supporting documentation to support their adjustment amount and make this information available upon request from HHSC and/or CMS.

*Column 3* – Represents the net Medicaid and Uninsured costs after any adjustments and is determined by summing the amounts in Columns 1 & 2. The net cost amount will be utilized to determine the provider's distribution from the UC Pool.

*Schedule 1*

The schedule computes the costs related to direct patient care services provided by physicians and mid-level professionals to Medicaid and Uninsured patients. To be included in the schedule, these costs must be recorded on the hospital's accounting records and reported on the hospital's Medicare cost report, Worksheet A, Columns 1 and/or 2.

The source for these costs and other data will be the hospital's Medicare cost report(s) that span the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. If the hospital's cost reporting period is other than October 1through

September 30, it will be necessary to pro-rate the costs and other data from the applicable cost reports that span this period.

*Column 1* - The direct patient care physician and/or mid-level professional costs are identified from the Medicare cost report.  These professional costs are:

1. Limited to allowable and auditable physician and/or mid-level professional compensations that has been incurred by the hospital;

2. Physician's services to individual patients identified as professional component costs on Worksheet A-8-2, Column 4 of the cost report(s);

3. Or, for contracted physicians and/or mid-level professionals only, Worksheet A-8, if the physician and/or mid-level professional compensation cost is not reported by the hospital on Worksheet A-8-2 because the physicians are contracted solely for direct patient care activities (i.e., no administrative, teaching, research, or any other provider component or non-patient care activities); and

4. Removed from hospital costs on Worksheet A-8 / A-8-2

If the professional physicians' costs on Worksheet A-8-2, Column 4 include Medicare Part A costs (e.g. departmental administration, hospital committee activities, etc.) that were reported as professional component due to lack of a physicians' time study(s) to allocate the costs between professional and provider component and/or application of the Reasonable Compensation Equivalents (RCE) , these costs must be excluded from the physicians' costs related to direct patient care professional services and cannot be included for UC reimbursement purposes unless the following conditions are met:

(1) The costs must be allocated between direct patient care (Medicare Part B) and reimbursable Medicare Part A activities. The costs associated with Medicare Part A activities must be subjected to the Medicare RCEs. If the hospital does not have adequate time studies for the application of the RCEs, then the hospital must obtain a proxy, signed and dated by the physician that estimates the amount of time spent on allowable Medicare Part A activities, teaching of interns & residents and medical students, research and direct patient care for the period the costs were incurred. The proxy should account for 100% of the physicians' time related to the costs incurred by the hospital. If the costs are for a group of physicians, each physician in the group must complete a proxy.

(2) For a physician the hospital can elect to apply the RCE limit on an individual physician basis or in the aggregate.

(3) The hospital must allocate the physicians' costs based on the physicians' proxy and apply the applicable RCE limits to the Medicare Part A non-teaching physicians'. The hospital must maintain auditable documentation of the determination of the allowable Part A non-teaching physician.

(4) For cost reporting periods beginning on or after 10-1-2012, the hospital is expected to obtain adequate and auditable time studies from each physician and/or mid-level professional providing Medicare Part A services to the hospital for the proper application of the RCEs via the Medicare 2552 cost report. The physician and/or

mid-level professional time study forms to be used are located on the Texas Health and Human Services Commission website. Time studies should be completed for a two (2) week period once per quarter during the fiscal year. Ideally, the time study period will not be the same two weeks in any 2 given quarters. Medicare Part A physician and/or mid-level professional costs will not be allowed to be included in the UC tool for cost reporting periods beginning on or after 10-1-2012.

Physician Part A costs in excess of the RCE limits cannot be included in Column 1. Physician costs related to direct patient care and physician Part A costs not in excess of the RCE limits should be reported on the respective line in Column 1 for cost reporting periods ending on or prior to 9-30-2012. For cost reporting periods beginning on or after 10-1-2012, Physician Part A costs cannot be included in Column 1.The physicians' costs should be reported in the cost center in which the expenses were reported on Worksheet A, Column 3 of the Medicare cost report.

Hospital costs for mid-level professional practitioner services that have been identified and removed from hospital costs on the Medicare cost report are to be included. Typically these costs are comprised of salaries and direct fringe benefits (payroll taxes, vacation and sick pay, health and life insurance, etc.), contract fees and professional liability insurance. The mid-level professional practitioner types to be included are:

(1)     Certified Registered Nurse Anesthetists
(2)     Nurse Practitioners
(3)     Physician Assistants
(4)     Dentists
(5)     Certified Nurse Midwives
(6)     Clinical Social Workers
(7)     Clinical Psychologists
(8)     Optometrists

To the extent these mid-level practitioners' professional compensation costs are not included in Worksheet A-8-2, Column 4, but are removed from hospital costs through an A-8 adjustment on the Medicare cost report, these costs may be recognized if the mid-level professional practitioners are Medicaid-qualified practitioners for whom the services are billable under Medicare separate from hospital services.

If the physician and/or mid-level practitioner costs are reported in a non-reimbursable cost center on the hospital's Medicare cost report, Worksheet A, these costs can be included in Column 1. The costs to be included would be the costs from Worksheet B Part I, the last column for the applicable line(s).

Hospitals may include physician and/or mid-level professional support staff compensation, data processing, and patient accounting costs as physician and/or mid-level professional-related costs to the extent that:

1. These costs are removed from hospital inpatient and outpatient costs because they have been specifically identified as costs related to physician and/or mid-level professional services;
2. They are directly identified on W/S A-8 as adjustments to hospital costs;
3. They are otherwise allowable and auditable provider costs; and
4. They are further adjusted for any non-patient-care activities such as research based on the physician and/or mid-level professional time studies.

If these costs are removed as A-8 adjustments to the hospital's general service cost centers, these costs should be reported on the General Services line (line 1) in Column 1.

If the hospital has costs for physicians and one or more types of mid-level professional for a given cost center, the costs can be combined and the total reported in Column 1 provided the same allocation statistic will be utilized to apportion the costs to Medicaid and Uninsured. If the hospital elects to utilize different allocation statistics to apportion the physician and/or any type of mid-level professional costs for a given cost center the cost center can be subscripted.

*Column 1a* – The recommended apportionment statistic for physician and/or mid-level professional costs is total billed professional charges by cost center. If a hospital does not maintain professional charges by payer type separately in its patient accounting system, then the professional costs can be apportioned based on total billed hospital departmental charges. Total billed hospital departmental charges by cost center are identified from the hospital's applicable Medicare cost report(s).

If professional charges related to the physician and/or mid-level professional services whose costs are reported in Column 1are utilized as the apportionment statistic, the professional charges must be from the same corresponding time period as the costs. The hospital must maintain adequate and auditable documentation to support the statistics reported in Column 1a.

If the hospital reports costs on the General Services line (Line 1) in Column 1, the recommended allocation statistic reported in Column 1a would be the aggregate total departmental charges (professional or hospital
department, based on the apportionment statistic for the specific cost centers) for all cost centers.

*Column 1b* – The allocation basis the hospital elects to utilize to apportion the costs from Column 1 should be identified for each cost center. The approved allocation bases are total departmental professional charges if available. Otherwise departmental hospital charges may be utilized.

*Column 2* - A cost to charge ratio (CCR) for each cost center is calculated by dividing the total costs for each cost center reported in Column 1 by the total allocation statistic for each cost center reported in Column 1a. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the CCR for the additional line(s).

*Columns 3a & 3b* – The applicable allocation statistics related to the physician and/or mid-level professional services provided to Medicaid Fee-For Service (FFS) patients are reported in Columns 3a and 3b based on the hospital's elected allocation basis reported in Column 1b. The allocation statistics applicable to Medicaid FFS inpatient services are reported in Column 3a and allocation statistics

applicable to Medicaid FFS outpatient services are reported in Column 3b. The Medicaid FFS inpatient and outpatient statistics should be from the hospital's internal records and for the same fiscal period as the costs reported in Column 1 and total allocation statistics reported in Column 1a. If the hospital provided services to out-of-state Medicaid FFS patients, the charges related to those services should be included in Columns 3a and 3b as applicable.

*Columns 3c & 3d* – The Medicaid FFS inpatient and outpatient physician and/or mid-level professional costs are computed based on the CCR reported in Column 2 multiplied by the Medicaid FFS inpatient and outpatient allocation statistics reported in Columns 3a and 3b, respectively. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the Medicaid FFS inpatient and outpatient costs for the additional line(s).

*Columns 4a & 4b* - The applicable allocation statistics related to the physician and/or mid-level professional services provided to Medicaid Managed Care (HMO) patients are reported in Columns 4a and 4b based on the hospital's elected allocation basis reported in Column 1b. The allocation statistics applicable to Medicaid HMO inpatient services are reported in Column 4a and allocation statistics applicable to Medicaid HMO outpatient services are reported in Column 4b. The Medicaid HMO inpatient and outpatient statistics should be from the hospital's internal records and for the same fiscal period as the costs reported in Column 1 and total allocation statistics reported in Column 1a. If the hospital provided services to out-of-state Medicaid HMO patients, the charges related to those services should be included in Columns 3a and 3b as applicable.

*Columns 4c & 4d* – The Medicaid HMO inpatient and outpatient physician and/or mid-level professional costs are computed based on the CCR reported in Column 2 multiplied by the Medicaid HMO inpatient and outpatient allocation statistics reported in Columns 4a and 4b, respectively. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the Medicaid HMO inpatient and outpatient costs for the additional line(s).

*Columns 5a & 5b* - The applicable allocation statistics related to the physician and/or mid-level professional services provided to Uninsured patients are reported in Columns 5a and 5b based on the hospital's elected allocation basis reported in Column 1b. The allocation statistics applicable to Uninsured inpatient services are reported in Column 5a and allocation statistics applicable to Uninsured outpatient services are reported in Column 5b. The Uninsured inpatient and outpatient statistics should be from the hospital's internal records and for the same fiscal period as the costs reported in Column 1 and total allocation statistics reported in Column 1a.

*Columns 5c & 5d* – The Uninsured inpatient and outpatient physician and/or mid-level professional costs are computed based on the CCR reported in Column 2 multiplied by the Uninsured inpatient and outpatient allocation statistics reported in Columns 5a and 5b, respectively. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the Uninsured inpatient and outpatient costs for the additional line(s).

All revenue received by the hospital related to physician and/or mid-level professional services provided inpatients and outpatients covered by Medicaid FFS, Medicaid HMO and Uninsured patients should be reported on Line 102 of the respective Columns 3c & 3d, 4c& 4d and 5c & 5d. The revenue will be

subtracted from the respective costs to determine the net costs to be included in the hospital's UC Application.

*Schedule 2*

The schedule computes the pharmacy costs related to prescription drugs provided by hospitals participating in the Texas Vendor Drug program. These pharmacy costs are not related to services provided by the hospital's retail pharmacy or billed to a third party payer under revenue code 253. If the pharmacy costs were included in the hospital's Texas Medicaid DSH Application, they should not be included in the TXHUC application.

*Column 1* - The total costs for the cost center that contains the drug costs related to the prescription drugs provided under the Texas Vendor Drug program are reported in Column 1, Line 1. These costs are from the hospital Medicare cost report(s) Worksheet B, Part I, last column for the applicable cost center. If the hospital cost reporting period spans September 30, the costs from the two Medicare cost reports that span the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined should be pro-rated and added together to determine the pharmacy costs to be reported in Column 1, Line 1.

*Column 1a* – The total hospital departmental charges for the cost center that contains the drug charges related to the prescription drugs provided under the Texas Vendor Drug program are reported in Column 1a, Line 1. These charges are from the hospital Medicare cost report(s) Worksheet C, Part I, Column 8 for the applicable cost center. If the hospital cost reporting period spans September 30, the charges from the two Medicare cost reports that span the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined should be pro-rated and added together to determine the pharmacy charges to be reported in Column 1a, Line 1.

*Column 1b* – The allocation basis is hospital departmental charges. If the hospital wants to utilize an alternative allocation basis, they must submit a written request to Texas HHSC that identifies the alternative allocation basis and an explanation as to why the alternative allocation basis results in a more equitable apportionment of the pharmacy costs. HHSC will provide a written response to the hospital's request within 60 days of receiving the request and their decision is final.

*Column 2* – The Cost-to-Charge ratio is computed by dividing the costs reported in Column 1 by the allocation statistic reported in Column 2. The CCR is carried out to six (6) decimal places.

*Column 3b* – The charges related to the prescription drugs provided to Medicaid FFS patients under the Texas Vendor Drug program are reported in Column 3b, Line 1. These charges are obtained from the hospital's internal records. These charges should be for services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The hospital must maintain the supporting documentation and submit it to HHSC upon request.

*Column 3d* – The costs related to the prescription drugs provided to Medicaid FFS patients under the Texas Vendor Drug program are computed by multiplying the charges reported in Column 3b by the CCR computed in Column 2.

*Column 4b* - The charges related to the prescription drugs provided to Medicaid HMO patients under the Texas Vendor Drug program are reported in Column 4b, Line 1. These charges are obtained from the hospital's internal records. These charges should be for services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The hospital must maintain the supporting documentation and submit it to HHSC upon request.

*Column 4d* – The costs related to the prescription drugs provided to Medicaid HMO patients under the Texas Vendor Drug program are computed by multiplying the charges reported in Column 4b by the CCR computed in Column 2.

*Column 5b* - The charges related to the prescription drugs provided to Uninsured patients under the Texas Vendor Drug program are reported in Column 5b, Line 1. These charges are obtained from the hospital's internal records. These charges should be for services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The hospital must maintain the supporting documentation and submit it to HHSC upon request.

*Column 5d* – The costs related to the prescription drugs provided to Uninsured patients under the Texas Vendor Drug program are computed by multiplying the charges reported in Column 5b by the CCR computed in Column 2.

*Line 2* - All revenue received by the hospital related to prescription drug services provided to Medicaid FFS, Medicaid HMO and Uninsured patients should be reported on Line 2 of the respective Columns 3d, 4d and 5d. This includes any rebates received from the Texas Vendor Drug program. The revenue will be subtracted from the respective costs to determine the net costs to be included in the hospital's UC Application.

*Schedule 3*

The schedule determines the hospital's Medicaid DSH costs (Medicaid shortfall and uninsured costs) in excess of the payments received by the hospital from the Texas Medicaid DSH Program. HHSC will complete the schedule based on the hospital's DSH hospital specific limit (HSL) and the DSH Program payments received by the hospital for the applicable fiscal year (10/1/20XX – 9/30/20YY) as described in the steps below.

*Line 1* - For hospitals that submitted a DSH Application to HHSC for the applicable year consisting of the applicable federal fiscal year (FFY) DSH and Cost Report Collection Form worksheets, HHSC will determine the DSH HSL to be reported on Line 1 based on the data per their DSH Application. The hospital may not submit revised data.

If the hospital submitted a complete DSH Application and did not receive a payment from the DSH Pool, HHSC will determine the HSL to be reported on Line 1based on the hospital's DSH Application submission utilizing the same methodology employed by HHSC in the determination of these costs for DSH Pool payment purposes. The hospital may not submit revised data.

If the hospital did not submit the Cost Report Collection Form worksheet as part of its DSH Application, the hospital must submit this worksheet with its TXHUC Tool. HHSC will utilize the data from the hospital's DSH worksheet along with the data per the Cost Report Collection Form to calculate the hospital's DSH HSL to be reported on Line 1. HHSC will employ the same methodology used to compute the hospital-specific DSH costs (cap) for the determination of the DSH Pool payments to compute the DSH costs (cap) for inclusion in Line 1.

If the hospital did not submit a DSH Application to HHSC, they must complete the DSH and Cost Report Collection Form worksheets in the TXHUC Tool to allow HHSC to compute their DSH HSL for inclusion in Line 1. HHSC will employ the same methodology used to determine a hospital's DSH HSL utilized in the distribution of DSH Pool payments to determine a hospital's DSH HSL to be included in Line 1.

*Line 2* – HHSC will determine the Texas Medicaid DSH Program payments received by the hospital for the applicable fiscal year and report the payments on Line 2.

*Line 3* – The excess hospital DSH costs are computed by subtracting the DSH payments received on Line 2 from the DSH HSL on Line 1. The excess costs will be included in the hospital's costs to determine their distribution from the UC Pool. If the hospital's DSH payments on Line 2 exceeds its DSH HSL on Line 1, the negative amount is not offset against the hospital's other UC Pool costs as computed in the TXHUC.


*DSH Application*

This schedule is one of the two schedules included in the Texas Medicaid DSH Application. If the hospital submitted this schedule to HHSC as part of its Medicaid DSH Application for the period from October 1, 2009 through September 30, 2010, the hospital should not complete this schedule in conjunction with the submission of the TXHUC Tool. HHSC will utilize the data per the hospital's Medicaid DSH Application to compute the amounts to be reported on Schedule 3, Line 1.

If the hospital did not submit a DSH Application to HHSC for the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined, the hospital should complete this schedule in accordance with the instructions contained in the Instructions-DSH Data Collection schedule. If the hospital elects to not have its excess hospital DSH costs included in its UC Pool application, the hospital is not required to complete the schedule.

*Cost Report Collection Form*

This schedule is the second of the two schedules included in the Texas Medicaid DSH Application. If the hospital submitted this schedule to HHSC as part of its Medicaid DSH Application for the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined, the hospital should not complete this schedule in conjunction with the submission of the TXHUC Tool. HHSC will utilize the data per the hospital's Medicaid DSH Application to compute the amounts to be reported on Schedule 3, Line 1.

**Attachment H**
**UC Claiming Protocol and Application**
**Part 1: UC Claiming Protocol for Hospitals and Physician Groups**

If the hospital did not submit a DSH Application to HHSC or did not submit the Cost Report Collection Form schedule as part of its DSH Application to HHSC for the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined, the hospital should complete this schedule in accordance with the instructions contained in the Instructions-DSH Data Collection schedule. If the hospital elects to not have its excess hospital DSH costs included in its UC Pool application, the hospital is not required to complete the schedule.

<u>Interim Reconciliation of Physician and Mid-Level Professional Services Payments to Hospitals</u>

For the physician and/or mid-level professional, self-pay pharmacy and unreimbursed Medicaid DSH costs, UC payments for FFY 2012 are determined utilizing the TXHUC, which is based on data for services furnished during the period 10/1/2009 – 9/30/2010. The FFY 2012 UC payments are reconciled to the costs per the as-filed Medicare cost reports for the fiscal period 10/1/2011 – 9/30/2012 once the cost report(s) have been filed with the State. If, at the end of the interim reconciliation process, it is determined that a provider received an overpayment, the federal share of the overpayment will be properly credited to the federal government through an adjustment shown on the CMS-64; if a provider was underpaid, the provider will receive an adjusted payment amount.  Similar interim reconciliations will be conducted for each year of the waiver.

# Attachment H
## UC Claiming Protocol and Application
## Part 1: UC Claiming Protocol for Hospitals and Physician Groups

<u>Final Reconciliation of Physician and Mid-Level Professional Services Payments to Hospitals</u>

Once the Medicare cost report(s) for the expenditure year has been finalized by the Medicare Fiscal Intermediary (FI) / Medicare Administrative Contractor (MAC), a reconciliation of the finalized costs to all UC payments made for FFY 2012 will be carried out, including adjustments for overpayments and underpayments if necessary. The same method as described for the interim reconciliation will be used except that the finalized Medicare UC physician and/or mid-level professional cost amounts and updated uninsured data will be substituted as appropriate. If, at the end of the final reconciliation process, it is determined that a hospital received an overpayment, the federal share of the overpayment will be properly credited to the federal government through an adjustment shown on the CMS-64. Similar final reconciliations will be conducted for each year of the Waiver.

The timelines for the submission of interim and final reconciliations are detailed in the "section 1115 Waiver UCC Program Interim and Final Reconciliation Schedule (attached). Scheduling of the Final Reconciliations will take place three years after the close of each Demonstration Year. The number of TXHUCs that will be subject to the final reconciliation will be dependent on the availability of finalized cost reports for each Demonstration Year.

## Texas Physician Uncompensated Care Tool (TXPUC)

The purpose of the TXPUC is to determine the physician professional costs related to services provided to Medicaid (FFS & HMO) and Uninsured patients by physician organizations in a non-hospital setting. Only professional organizations who previously participated in the Texas Medicaid Physician UPL ("Physician UPL") program are eligible to submit a TXPUC and receive a distribution from the UC Pool. Under the Physician UPL, supplemental payments were made only for physician services performed by doctors of medicine and osteopathy licensed in Texas. With effect from Demonstration Year (DY 2), all costs (direct and indirect) incurred by the physician organization related to services provided by mid-level professionals may be reported on the physician organization's UC application.

For purposes of the TXPUC Application, a mid-level professional is defined as:

☐ Certified Registered Nurse Anesthetist (CRNA)
☐ Nurse Practitioner
☐ Physician Assistant
☐ Dentist
☐ Certified Nurse Midwife
☐ Clinical Social Worker
☐ Clinical Psychologist
☐ Optometrist

The TXPUC is based on established physician and/or mid-level cost finding methodologies developed by the Medicare program over the past 40 years. The schedules that follow use the same or similar methodology and worksheet identification process used by the Medicare hospital cost report.

# Attachment H
## UC Claiming Protocol and Application
### Part 1: UC Claiming Protocol for Hospitals and Physician Groups

For all the worksheets in the TXPUC, the cells requiring input are highlighted in green. All line numbers and descriptions are linked to Worksheet A. If lines are inserted, they must be inserted on all worksheets and in the same location.

The costs to be reported in the TXPUC are limited to identifiable and auditable compensation costs that have been incurred by the physician organization for services furnished by physicians and/or mid-level professionals in all applicable sites of service, including services provided in a hospital setting and non-hospital physician office sites for which the professional organization bills for and collects payment for the direct patient care services.

The basis for the total physicians' and/or mid-level professionals' compensation costs incurred by the professional organization will be the organization's general ledger. The costs should be representative of the services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. If the organization's fiscal year straddles October 1 it will be necessary to pro-rate the costs for the two fiscal periods that comprise the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined.

Total costs, reported by cost centers/departments, are then allocated between clinical and non-clinical activities using a CMS-approved time-study. The physician and/or mid-level professional time study forms to be used are located on the Texas Health and Human Service Commission website. Time studies should be completed for a two (2) week period once per quarter during the fiscal year. Ideally, the time study period will not be the same two weeks in any 2 given quarters. Prior to October 1, 2012, the physician professional organization may use a CMS-approved benchmark RVU methodology in lieu of the CMS-approved time study to allocate physician compensation costs between clinical and non-clinical activities only. Effective October 1, 2012, the physician organization must utilize the CMS-approved time study to allocate physician and/or mid-level professional compensation costs between clinical and non-clinical activities. The allocation of physician and/or mid-level professional compensations costs based on the benchmark RVU methodology will not be accepted after September 30, 2012. The result of the CMS-approved time study (or the benchmark RVU methodology before October 1, 2012) is the physicians' and mid-level professionals' compensation costs pertaining only to clinical, patient care activities. The physicians' and mid-level professionals' compensation costs are reduced by National Institute of Health (NIH) grants to the extent the research activities component is not removed via physician time studies.

The physician clinical and/or mid-level professional costs are subject to further adjustments and offsets, including any necessary adjustment to bring the costs in line with Medicare cost principles. There will be an offset of revenues received for services furnished to non-patients and other applicable non-patient care revenues that were not previously offset or accounted for by the application of the CMS-approved time study.

The above physicians' and/or mid-level professionals' compensation costs must not be duplicative of any costs claimed on a hospital's TXHUC.

Additional costs that can be recognized as professional direct costs are, costs for non-capitalized medical supplies and equipment (as defined in the instructions for Worksheet A, Column 3 below) used in the furnishing of direct patient care.

Overhead costs will be recognized through the application of rate for indirect costs to be determined by the actual costs incurred by the physician organization for the applicable reporting period(s) included in the UC application. The determination of the facility-specific indirect rate is defined in the instructions for Worksheet A, Column 8 below. Other than the direct costs defined above and the application of an approved indirect rate, no other costs are allowed.

Total billed professional charges by cost center related to physician and/or mid-level professional services are identified from provider records.

The total professional charges for each cost center related to Medicaid fee-for-service (FFS), Medicaid managed care (HMO), and uninsured physician and/or mid-level professional services, billed directly by the professional organization, are identified using auditable financial records. Professional charges related to services provided to out-of-State Medicaid FFS and HMO patients should be included in the Medicaid charges reported on the TXPUC. The professional organization must map the claims to the respective cost centers using information from their billing systems. Each charge must be mapped to only one cost center to prevent duplicate mapping and claiming. These charges must be associated with services furnished during the period covered by the TXPUC (the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined). The professional organization must prepare a worksheet that identifies professional charges related to physician and/or mid-level professional services provided to patients covered by Medicaid FFS, Medicaid HMO, uninsured and all other payers for each cost center to be used to report the total charges on Worksheet B and the Program charges on Worksheet D. The worksheet total charges must be reconciled to the total charges per the professional organization's general ledger and/or financial statements for the applicable fiscal period(s).

**Certification**

The certification page must be signed and dated by an officer or administrator of the provider. An officer is defined as a member of the entity's senior management such as the chief executive officer, chief financial officer, chief operating officer, etc. The certification must contain an original signature and not a copy or electronic signature.

Upon the termination of the 1115 Waiver, entities will be required to submit actual cost data in the prescribed format of the TXPUC for a minimum of two years for purposes of reconciling the UC Pool payments for the last two years of the Waiver with the provider's actual costs incurred for those fiscal periods

**Summary Schedule**

*Column 1* - Summarizes the Medicaid and Uninsured costs determined on the applicable columns from Worksheet D. These amounts will flow automatically from the respective columns and no input is required.

*Column 2* – The distribution of the Uncompensated Care Pool ("UC Pool") for a specific demonstration year will be based on the costs for the period from October 1 through September 30 two years prior to the

demonstration year as computed on Worksheet D. If the entity knows these costs are not representative of their actual costs for the demonstration year, due to changes in their contractual arrangements or other operational or economic issues, the entity can make an adjustment to these costs. The entity is required to maintain supporting documentation to support their adjustment amount and make this information available upon request from HHSC and/or CMS.

*Column 3* – Represents the net Medicaid and Uninsured costs after any adjustments and is determined by summing the amounts in Columns 1 & 2. The net cost amount will be utilized to determine the entity's distribution from the UC Pool.

**Worksheet A**

This worksheet is a summary of the allowable direct patient care costs for physicians and mid-level professionals. The worksheet is segregated into 3 sections. Lines 1 – 29 contain the costs for physicians and mid-level professionals for patient care services provided in a hospital-based setting. Lines 31 – 55 contain the costs for physicians and mid-level professionals for patient care services provided in a non-hospital-based setting. Lines 56 – 79 contain costs for physicians and mid-level professionals for patient care services provided in settings other than those identified in Sections 1 and 2.

Cost center descriptions are input on this worksheet and will flow to the other worksheets. If lines are added to this worksheet to accommodate the professional organization's unique cost centers, similar lines will need to be added to the other worksheets.

The professional organization's name, provider number, reporting period and indirect cost rate should be input on this worksheet and will flow to the other worksheets.

*Column 1* – Physicians' and mid-level professionals' costs determined on Worksheet A-1 will flow to this column.

*Column 2* – This column will not be utilized at this time.

*Column 3* – Non-capital equipment and supplies costs related to direct patient care are input in this column. Non-capital equipment would be items such as the purchase of reusable surgical trays, scalpels or other medical equipment whose costs are expensed upon acquisition since they are below the organization's threshold for capitalization. Supplies would be items such as disposable supplies utilized during the treatment of patients (sutures, gauze pads, tape, bandages, needles and syringes, splints, etc.). The source for these costs is the professional organization's accounting records. The source for these costs must be maintained by the professional organization and submitted to HHSC or CMS upon request.

*Column 4* – This column is the sum of Columns 1, and 3. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

*Column 5* – Any reclassification of costs reported on Worksheet A-6 will flow to this column.

*Column 6* – This column is the sum of Columns 4 and 5. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

*Column 7* - Any adjustments of costs reported on Worksheet A-8 will flow to this column. For example, revenue received for National Institute of Health (NIH) grants, to the extent the research activities component is not removed via physician and/or mid-level professional time studies should be reported on this Worksheet.

*Column 8* – The indirect costs in this column are computed based on the costs reported in Column 6 multiplied by the indirect cost rate for the professional organization. The indirect cost rate will be determined based on the professional organization's actual indirect costs to its total direct costs (allowable and nonallowable) for the applicable reporting period(s) covered by the UC application. If the professional organization's fiscal period does not coincide with the reporting period covered by the UC application, the indirect cost ratio for the two periods should be weighted based on the number of months each period is within the UC application reporting period to determine the organization's actual indirect cost ratio. The professional organization's costs per its general ledger for the applicable fiscal period(s) should be used to identify the allowable direct and indirect costs to be used to compute the indirect cost rate. The indirect cost rate should be rounded to two (2) decimal places (e.g. 22.58%). The professional organization must submit its calculation of its indirect cost rate with its UC application.

Allowable indirect costs are defined as costs incurred by the professional organization in support of the physicians' and mid-level professionals' direct patient care services, regardless of the location where these services are performed. Medicare cost finding principles should be used to determine allowable indirect costs. Allowable indirect costs would include, but are not limited to, nurse staff and other support personnel salaries and fringe benefits involved in direct patient care, billing and administrative personnel salaries and fringe benefits related to direct patient care, space costs (building and equipment depreciation or lease, interest, utilities, maintenance, etc.) related to the space utilized to provide care to patients. Nonallowable indirect costs would include but are not limited to; advertising for the purpose of increasing patient utilization, bad debts related to accounts receivable, gain or loss on the sale of depreciable assets, fines or penalties imposed by local, state or federal government or their agencies. Any fringe benefits cost related to the physicians' and mid-level professionals' compensation costs should be included in Columns 1 and/or 2 of Worksheet A should not be included in the allowable indirect costs. The non-capital equipment and supply costs reported in Column 3 of Worksheet A above should also be excluded from allowable indirect costs.

Total costs would be determined based on the professional organization's total expenses per its general ledger. The following is an illustrative example of the calculation of an indirect cost rate for a professional organization.

| **UC application reporting period** | **10/1/2009 - 9/30/2010** | |
|---|---|---|
| Fiscal year end of professional organization | 12/21/2009 | 12/31/2010 |
| Total expenses per the general ledger | 25,000,000 | 28,600,800 |
| Bad Debts | (800,000) | (923,000) |
| Loss on sale of depreciable assets | (200,000) | (123,000) |
| N/A Advertising Expenses | (111,000) | (133,000) |

| | | |
|---|---|---|
| Physician and mid-level professional compensation (from Col. 1) | (11,500,700) | (13,600,200) |
| Non capital equipment and supplies (from Col. 3) | (765,000) | (842,000) |
| Allowable Direct Expenses | (12,265,700) | (14,442,200) |
| | | |
| Allowable indirect costs | 11,623,300 | 12,979,600 |
| Total direct costs | 13,376,700 | 15,621,200 |
| Indirect cost ratio | 86.89% | 83.09% |
| Weighted indirect cost ratio | 21.72% | 62.32% |
| Allowable indirect cost ratio | | 84.04% |

*Column 9* – This column is the total physicians' and mid-level professionals' costs that flow to Worksheet B, Column 1. It is the sum of Columns 6, 7 and 8. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

**Worksheet A-1**
This worksheet determines the physicians' and/or mid-level professionals' compensation costs for direct patient care services. These costs are determined separately for services provided in a hospital-based and non-hospital based setting. If there are services provided in a unique setting, these costs are determined in Section 3. If a physician provides services in more than one setting, it will be necessary to report his/her data for each applicable setting separately. Data on this worksheet should be reported based on the physicians' and/or mid-level professionals' specialty/cost center identified on the worksheet.

Physicians' and/or mid-level professionals' compensation costs are comprised of the direct payments made by the professional organization to the physician and/or mid-level professional for all services provided by the physician and/or mid-level professional on behalf of the professional organization. These costs would be salaries and related fringe benefits, payments under a contractual arrangement between the physician and/or mid-level professional and the professional organizations, funding of a retirement and/or deferred compensation plan by the professional organization on behalf of the physician, and costs related to a health and/or long-term disability program for the physician and his/her dependents.

If the professional organization has a physician and/or mid-level professional time study to allocate the physicians' and/or mid-level professionals' compensation costs to direct patient care services and the physicians' and/or mid-level professionals' other activities, it is not necessary to complete this worksheet. The professional organization can complete a supporting schedule in which the time study can be applied to the physicians' and/or mid-level professionals' compensation costs and the result should be input directly in Column 1 of Worksheet A. In the absence of a physician and/or mid-level professional time study to allocate the physicians' and/or mid-level professionals' compensation costs between direct patient care services and the physicians' and/or mid-level professionals' other activities prior to 10-1-2012, the costs for direct patient care services will be determined based on each physician's work Relative Value Units (RVUs) for direct patient care. Effective 10-1-2012, professional organizations are expected to obtain a time study from each physician and/or mid-level professional to be used in the allocation of the physicians' and/or mid-level professionals' compensation costs to direct patient care

services and other activities. The physician and/or mid-level professional time study forms to be used are located on the Texas Health and Human Services website. Time studies should be completed for a two (2) week period once per quarter during the fiscal year. Ideally, the time study period will not be the same two weeks in any two given quarters.

If a professional organization incurs costs for services provided by another entity under a contractual arrangement, those costs can be included. The professional organization would be required to offset the revenue received on its UC Application to eliminate any duplicate payment for the costs related to these services.

*Column 1* – The physicians' and/or mid-level professionals' work RVUs are reported in this column for periods prior to 10-1-2012. The source for the work RVUs are the professional organization's internal records. The source for the work RVUs should be maintained by the professional organization and made available upon request by HHSC and/or CMS. An individual physicians' and/or mid-level professionals' work RVUs cannot exceed the benchmark RVU for one FTE. For periods after 10-1-2012, the physician's and/or mid-level professionals' time related to direct patient care activities based on their time study is reported in this column.

*Column 2* – The benchmark RVU for an FTE for each physician and/or mid-level professional specialty is reported in this column for periods prior to 10-1-2012. The benchmark RVUs for each physician specialty FTE are contained in the Benchmark RVU worksheet of the TXPUC. If the professional organization has a physician specialty that is not listed on the Benchmark RVU worksheet, the benchmark RVU for the physician specialty most closely related to the actual physician specialty should be utilized. The benchmark RVU must be multiplied by the number of physicians and mid-level professionals included in each cost center to determine the benchmark RVU to be reported in this column. For periods after 10-1-2012, the physician's total time related to the physician's compensation reported in Column 4 based on their time study is reported in this column.

*Column 3* – The RVU percentage is computed based on the actual physicians' and mid-level professionals' RVUs reported in Column 1 divided by the benchmark RVUs reported in Column 2 for each line. The RVU percentage should not exceed 1.00000. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

*Column 4* – The physicians' and mid-level professionals' compensation costs for each physician and/or mid-level professional/specialty/cost center are reported in this column. The source for the compensation costs are the professional organization's internal records. The source for the physicians' and mid-level professionals' compensation costs should be maintained by the professional organization and made available upon request by HHSC and/or CMS.

*Column 5* – The physicians' and mid-level professionals' compensation costs for direct patient care services are computed based on the RVU percentage in Column 3 multiplied by the total physicians' and mid-level professionals' compensation costs reported in Column 4. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added. The costs in this column flow to Worksheet A, Column 1.

**Worksheet A-6**

This reclassification worksheet is similar to the Worksheet A-6 in the Hospital 2552 Medicare cost report. It allows for the reclassification of costs between cost centers reported on Worksheet A. Any reclassifications reported on this worksheet will need to be input on Worksheet A, Column 5 in the applicable line.

**Worksheet A-8**

This adjustments worksheet is similar to the Worksheet A-8 in the Hospital 2552 Medicare cost report. It allows for any required adjustment(s) to the costs reported on Worksheet A (e.g. NIH grant revenue if research costs are not identified via the time studies). All payments received for services provided to another entity's patients should be offset against the applicable costs. All payments received from another entity to subsidize the care provided to a patient who was referred by the entity should be offset against the applicable costs. Any adjustments reported on this worksheet will need to be input on Worksheet A, Column 7 in the applicable line.

**Worksheet B**

The worksheet calculates the cost-to-charge ratio (CCR) to be utilized in apportioning the physicians' and/or mid-level professionals' compensation costs for services provided to Medicaid and Uninsured patients that is the basis for the determination of the professional organization's distribution from the UC Physician Pool.

*Column 1* – The net physicians' and mid-level professionals' costs from Worksheet A, Column 8 will flow to this column.

*Column 2* – The physicians' and/or mid-level professionals' total billed charges are reported in this column. As an alternative, the professional organization can use the number of visits as the allocation basis to apportion the costs. If the professional organization does elect to utilize patient visits to apportion the costs, the allocation basis reported at the top of this column should be changed from Total Billed Charges to Patient Visits. For either allocation basis, the source for this data will be the professional organization's internal records. If the professional organization's fiscal period straddles October 1, it will be necessary to pro-rate the data from the two fiscal periods that encompass the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined.

*Column 3* – The CCR is computed by dividing the costs reported in Column 1 of this worksheet by the total allocation basis reported in Column 2 of this worksheet.

**Worksheet D**

This worksheet computes the physicians' and/or mid-level professionals' costs for services provided to Medicaid FFS, Medicaid HMO and Uninsured patients. It utilizes the CCR determined on Worksheet B, Column 3 and the charges for physician and/or mid-level professional services. The source for the Medicaid FFS, Medicaid HMO and Uninsured data are the professional organization's internal records. If the professional organization's fiscal period straddles October 1, it will be necessary to pro-rate the data

from the two fiscal periods that encompass the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The allocation basis reported on Worksheet B Column 2 must be the same as the apportionment basis reported on Worksheet D, Columns 2 – 7. If the professional organization elects to utilize patient visits to apportion the costs rather than billed charges, the apportionment basis at the top of Columns 2 – 7 should be changed from Billed Charges to Patient Visits.

*Column 1* – The CCR from Worksheet B, Column 3 flows to this column.

*Columns 2 through 7* – The apportionment statistics for inpatient and outpatient services provided to Medicaid FFS, Medicaid HMO and Uninsured patients are reported in the respective columns.

*Columns 8 – 13* – The physicians' and mid-level professionals' costs for inpatient and outpatient services provided to Medicaid FFS, Medicaid HMO and Uninsured patients are computed by multiplying the CCR reported in Column 1 multiplied by the apportionment statistics reported in Columns 2 – 7 for the respective columns.

The total costs for each column are determined at the bottom of the worksheet. All revenues received from any source related to the physician and/or mid-level professional services provided to Medicaid FFS, Medicaid HMO and Uninsured should be reported on the Less Payments line at the bottom of the worksheet in the respective column. This would include any payments received from third-party payers, patient copays, etc.

The Net Unreimbursed Cost for Columns 8 through 13 flows to the Cost Summary worksheet of the TXPUC tool. This cost will be utilized to determine the professional organization's distribution from the UC Physician Pool.

Interim/Final Reconciliation of Physician Payments to Professional Organizations

The physician UC payments for DY 1 (FFY 2012) are determined utilizing the TXPUC that utilizes data for the fiscal period 10/1/2009 – 9/30/2010. These DY 1 (FFY 2012) UC payments are reconciled to the data per the professional organization's DY 3 (FFY 2014) TXPUC, which contains contemporaneous data for the fiscal period 10/1/2011 – 9/30/2012 once the DY 3 TXPUC has been filed with the State. Once the TXPUC for the expenditure year has been finalized by the State, a sole reconciliation of the finalized costs per the TXPUC to all UC payments made for the same period will be carried out, including adjustments for overpayments and underpayments if necessary. If, at the end of the final reconciliation process, it is determined that a professional organization received an overpayment, the federal portion of the overpayment will be properly credited to the federal government through an adjustment shown on the CMS-64. Similar sole interim/final reconciliations will be conducted for each year of the Waiver.

The timelines for the submission of interim and final reconciliations are detailed in the "section 1115 Waiver UCC Program Interim and Final Reconciliation Schedule."

**Attachment H**
**UC Claiming Protocol and Application**
**Part 1: UC Claiming Protocol for Hospitals and Physician Groups**

Section 1115 Waiver UCC Program Interim and Final Reconciliation ScheduleThe final Uncompensated Care reconciliations for hospitals will be performed in conjunction with each DSH audit starting with Demonstration Year (DY) 1/federal fiscal year (FFY) 2012. Reconciliations will be completed by February 28 after completion of the DSH audit each year for hospitals that have finalized Medicare cost report(s) at the beginning of each audit. This process will continue each year until all reconciliations have been finalized for a demonstration year. Recoupment notices will be sent to hospitals by March 31 with collections made by February 28 of the following year.

Since there is no difference in the data used for the interim and the final reconciliation of Physician Payments to Professional Organizations, an interim/final reconciliation will be performed at the same time the TXHUC interim reconciliation is performed. Recoupment notices and collections for the  professional organizations will follow the same schedule as the hospitals in the interim reconciliation schedule.

## Section 1115 Waiver UCC Program Interim Reconciliation Schedule and Interim/Final Reconciliation for TXPUC

**DY 1; FFY 2012**

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | October | January | April | July | October | January | April | July | October | January | April | July |
| | 2014/DY 3 | | | | 2015/DY 4 | | | | 2016/DY 5 | | | |
| Demonstration Year 1 / FFY 2012 | | - | Interim Reconciliation Collect 2012 Data for DY1 Interim Reconciliation | | Interim Reconciliation Recoupments calculated by end of quarter | Interim Reconciliation Recoupment notice | | | Interim Reconciliation Recoupments collected | | |

**DY 2; FFY 2013**

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | October | January | April | July | October | January | April | July | October | January | April | July |
| | 2015/DY 4 | | | | 2016/DY 5 | | | | 2017 | | | |
| Demonstration Year 2 / FFY 2013 | | - | Interim Reconciliation Collect 2013 Data for DY2 Interim Reconciliation and Interim recoupments calculated by end of quarter | Interim Reconciliation Recoupment notice | | | Interim Reconciliation Recoupments collected | | | |

**DY 3; FFY 2014**

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | October | January | April | July | October | January | April | July | October | January | April | July |
| | 2016/DY 5 | | | | 2017 | | | | 2018 | | | |

| Demonst ration Year 3 / FFY 2014 | Interim Reconcil iation Collect 2014 Data for DY3 Interim Reconcil iation | Interim Reconcil iation Interim recoupm ents calculate d by end of quarter | Interim Reconcil iation Recoup ment notice | | Interim Reconcil iation Recoup ments collected | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

DY 4; FFY 2015

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Octo ber | January | April | July | October | January | April | July | Octo ber | January | Ap ril | Ju ly |
| | | 2017 | | | | 2018 | | | | 2019 | | |
| Demonst ration Year 4 / FFY 2015 | | Interim Reconcil iation Collect 2015 data for DY4 Interim Reconcil iation | Interim Reconcil iation Interim recoupm ents calculate d | Interim Reconcil iation Recoup ment notice | | Interim Reconcil iation Recoup ments collected | | | | | | |

DY 5; FFY 2016

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Octo ber | January | April | July | October | January | April | July | Octo ber | January | Ap ril | Ju ly |
| | | 2018 | | | | 2019 | | | | 2020 | | |
| Demonst ration Year 5 / FFY 2016 | | Interim Reconcil iation Collect 2016 data for DY5 Interim Reconcil iation | Interim Reconcil iation Interim recoupm ents calculate d | Interim Reconcil iation Recoup ment notice | | Interim Reconcil iation Recoup ments collected | | | | | | |

DY 6; FFY 2017

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Octob er | January | April | July | Octob er | January | Apr il | Jul y | Octob er | Janua ry | Apr il | Jul y |
| | | 2018 | | | | 2019 | | | | 2020 | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Demonstration Year 5 / FFY 2016 | <span style="color:red">Interim Reconciliation</span> Collect 2016 data for DY5 Interim Reconciliation | <span style="color:red">Interim Reconciliation</span> Interim recoupments calculated | <span style="color:red">Interim Reconciliation</span> Recoupment notice | | <span style="color:red">Interim Reconciliation</span> Recoupments collected | | | | | | |

**Attachment H**
**UC Claiming Protocol and Application**
**Part 2: UC Claiming Protocol for Dental Providers**

**General:**

Governmentally owned dental providers are eligible to participate in the supplemental payment program if they are directly funded by a local government, hospital authority, hospital district, city, county or state as specified in 42 CFR § 433.50 (i) which describes a unit of government. This would include providers such as public health clinics and departments, dental schools, mobile dental units or other dental facilities that are owned by the government. Providers wanting to participate in the program should contact the Texas Health and Human Services Commission (HHSC), Rate Analysis Department at 512-730-7401.

The cost report will include only allocable expenditures related to Medicaid, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program.

The Dental Services Supplemental Payment Cost Report (cost report) must be prepared and completed on an annual basis for federal fiscal years ending on September 30. Cost reports are due to HHSC 180 days after the close of the applicable reporting period. An eligible provider who has been approved to submit a cost report for supplemental payment will prepare the cost report, attest to and certify the total actual Medicaid costs/expenditures. The completed cost report will be sent to:

HHSC Rate Analysis/Acute Care Services
Brown Heatly Building
Mail Code H-400
4900 North Lamar
Austin, TX 78751-2399

When using the Excel spreadsheet, many fields in the pages will automatically populate with information from another worksheet to avoid additional data entry and reduce errors. Therefore, only the **SHADED AREAS** of the cost report are to be completed. Please review and verify the accuracy of all information on the pages before completing the report.

**For questions on completing the cost report, please contact the Health and Human Services Commission, Rate Analysis Department at 512-730-7401.**

**Definitions:**

**Cognizant agency**—the agency responsible for reviewing, negotiating, and approving cost allocation plans or indirect cost proposals developed in accordance with the Office of Management and Budget Circular A-87.

**Commercial Pay Insurance—**health insurance that covers medical expenses and disability income for the insured. Commercial health insurance can be categorized according to its

renewal provisions and type of medical benefits provided.  Commercial policies can be sold individually or as part of a group plan.

**Cost Allocation Plans**—are the means by which costs are identified in a logical and systematic manner for reimbursement under federal grants and agreements.

**Cost-to-charge-ratio (CCR)—** a provider's reported costs are allocated to the Medicaid program based on a cost-to-billed-charge ratio.  Cost-to- billed charge ratio is calculated as total allowable cost reported for the service period divided by total billed charges for the service period.  This ratio is then applied to total billed charges associated with Medicaid paid claims to calculate total allowable billed charges for the cost report.

**Direct Cost—means any cost which is identified specifically with a particular final cost objective.  Direct costs are not limited to items which are incorporated in the end product as material or labor.  Costs identified specifically with a contract are direct costs of that contract.  All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.**

**Federal Medical Assistance Percentage (FMAP)**—the share of state Medicaid benefit costs paid for by the federal government.

**Indirect Costs—cost incurred and identified with having two or more cost objectives but not specifically identified with any final cost objective.**

**Indirect Cost Rate—a device for determining in a reasonable manner the proportion of indirect costs each program should bear.  It is the ratio, expressed as a percentage, of the indirect costs to the direct costs.**

**Intergovernmental Transfers** (IGT)—State and local funds derived from taxes, assessments, levies, investments, and other public revenues within the sole and unrestricted control of a governmental entity and eligible for federal match under the 1115 Transformation Waiver.  This does not include gifts, grants, trusts, or donations, the use of which is conditioned on supplying a benefit solely to the donor or grantor of the funds.

**Medicaid Fee-For-Service (FFS)—**the traditional health care payment system, in which providers receive a payment for each unit of service they provide

**Medicaid Managed Care (MCO)—**an entity that provides or contracts for managed health care.  Medicaid payments are made by the MCOs to providers for services provided to Medicaid recipients.

**Medicare—**a federal system of health insurance for those who are 65 and older, disabled or have permanent kidney failure.

**Attachment H**
**UC Claiming Protocol and Application**
**Part 2: UC Claiming Protocol for Dental Providers**

**Self-Pay**—an individual who either does not have insurance or her/his insurance does not cover a particular procedure or provider and therefore, the individual is responsible for paying the provider.

**Texas Healthcare Transformation and Quality Improvement Program 1115 Waiver**—the vehicle approved by HHSC and CMS for implementation of the waiver program under section 1115 of the Social Security Act.

**Uncompensated Care (UC)—**costs of uncompensated care provided to Medicaid eligibles or to individuals who have no funds or third party coverage for services provided by medical, dental or other providers.

**Uninsured**—an individual who has no health insurance or other source of third-party coverage for medical/health services.

**Uninsured cost**--the cost to provide dental services to uninsured patients as defined by the Centers for Medicare and Medicaid Services. An individual whose third-party coverage does not include the service provided is considered by HHSC to be uninsured for that service.

**Unit of government**—a state, city, county, special purpose district or other governmental unit in the State that: has taxing authority, has direct access to tax revenues, is a State university teaching hospital with direct appropriations from the State treasury, or is an Indian tribe as defined in Section 4 of the Indian Self-Determination and Education Assistance Act, as amended (25 U.S.C. 450b).

**Page 1:  Cover Page**

Page 1 is the cost report cover page. This form includes a provider's national and state provider identification numbers.  Each governmental provider enters its legal name and the appropriate contact information for all parties listed on the form.  This information will be used by HHSC to contact the provider during the cost reconciliation and settlement process.
**DIRECTIONS TO COMPLETE PAGE 1**
Federal Fiscal Year:  Enter the federal fiscal year for which the cost report will be completed (e.g., 2012).  When this is entered on the cover page, this field will automatically transfer to subsequent pages.
Reporting Period:  Enter the actual reporting period for which the cost report will be completed (e.g., 10/01/11 to 09/30/12).  When this is entered on the cover page, this field will automatically transfer to subsequent pages.
 Texas Provider Identification Number (TPI):  Enter the 9-digit TPI number for the provider that is completing the cost report.  When this is entered on the cover page, this field will automatically transfer to subsequent pages.

National Provider Identification Number (NPI):  Enter the 10-digit NPI number for the provider that is completing the cost report.  When this is entered on the cover page, this field will automatically transfer to subsequent pages.

**Provider Information**

Provider Name:  Enter the provider's legal name (e.g., Laredo Health Department Dental Clinic)

Provider Contact Name:  Enter the provider's contact

Street Address:  Enter the street address and also include the city, state, and zip code in this field.

Mailing Address:  Enter the mailing address and also include the city, state, and zip code in this field.

Phone Number:  Enter the phone number of the provider's contact.

Fax Number:  Enter the fax number of the provider's contact.

Email:  Enter the email of the provider's contact.

**Chief Financial Officer / Business Manager**

Name:  Enter the name of the chief financial officer or business manager.

Title:  Enter the title of the chief financial officer or business manager.

Business Name:  Enter the business name (e.g. UT Health Science Center at San Antonio Dental School).

Mailing Address:  Enter the mailing address and also include the city, state, and zip code in this field.

Phone Number:  Enter the phone number of the chief financial officer or business manager.

Fax Number:  Enter the fax number of the chief financial officer or business manager.

Email:  Enter the email of the chief financial officer or business manager.

**Report Preparer Identification**

Name:  Enter the name of the person responsible for preparing the cost report (this is the person HHSC should contact if there are questions).

Title:   Enter the title of the report preparer.

Business Name:  Enter the business name (e.g. UT Health Science Center at San Antonio Dental School).

Mailing Address:  Enter the mailing address and also include the city, state, and zip code in this field.

Phone Number:  Enter the phone number of the report preparer.

Fax Number:  Enter the fax number of the report preparer.

Email:  Enter the email of the report preparer.

**Location of Accounting Records that Support this Report**

Physical Address:  Enter the Physical Address of the location where the provider maintains the accounting records that support the cost report and include the city, state, and zip code in this field.  When this is entered on the cover page, this field will automatically transfer to the subsequent pages.

**Page 2: General and Statistical Information**

**<ins>DIRECTIONS TO COMPLETE PAGE 2</ins>**

Page 2 is the General and Statistical Information page of the cost report. This page includes general provider and statistical information used in the cost report.

**General Provider Information**

1.00-1.03: These fields will automatically transfer from the Cover Page.

1.04: Enter either yes or no to indicate if the reporting period is less than a full federal fiscal year. If the cost report is being prepared for a partial fiscal quarter, enter a response that explains the reason why (e.g., no, Supplemental Payment Request Approval was effective beginning 3/1/20XX).

**Cost Allocation Information**

The purpose of this section is to obtain summary information regarding the cost allocation methodology the governmental entity utilized to allocate costs to various programs, grants, contracts and agreements. Additional information required to support an agency's methodology will be found on Page 7 Worksheet C.

1.05: Enter either yes or no to indicate whether your agency has an approved Cost Allocation Plan (CAP). Additional information must be provided on Page 7 Worksheet C.

1.06: If the answer to 1.05 is yes, enter the name of the Cognizant Agency.

1.07: Enter yes or no to indicate whether your agency has an approved Indirect Cost Rate (IDCR).

1.08: If the answer to 1.07 is yes, enter the name of the Cognizant Agency.

1.09: Enter either yes or no to indicate whether your agency will be using an IDCR on this report.

1.10: If the answer to 1.09 is yes, enter the IDCR Statistical Information.

1.11: Medicaid Fee-For-Service (FFS) Paid Claims Amount: Enter the total.

1.12: Total Medicaid FFS Billed Charges Associated with Medicaid Paid Claims: Enter the total.

1.13: Medicaid Managed Care Organization (MCO) Paid Claims Amount: Enter the total.

1.14: Total FFS Billed Charges Associated with Medicaid Paid Claims: Enter the total.

1.15: Uncompensated (Uninsured) Care Reimbursement: Enter the total.

1.16: Uncompensated (Uninsured) Care Billed Amount: Enter the total.

1.17: Total Allowable Costs for Reporting Period: This field will automatically transfer from Page 3 – Dental Cost Settlement, 2.40). This amount includes Medicaid FFS, Medicaid MCO and Uncompensated Care cost only.

1.18: Total Paid Claims and UC Reimbursement: This field will automatically add the total paid claims from Medicaid Fee-for-Service (line 1.11), MCOs (line 1.13) and UC reimbursement (line 1.15).

1.19: Total Billed Charges: This field will automatically add the total billed charges from Medicaid Fee-for-Service (line 1.12), Medicaid Managed Care Organizations (line 1.14) and UC Billed Amount (line 1.16).

## Additional Cost Data (For Informational Purposes Only)

In addition to the statistical information entered for Cost Reporting period, other cost data is being requested.

1.20: Medicare Costs: Enter the total.

1.21: Other (Self-Pay, Commercial Pay, etc.) Costs: Enter the total.

**Page 3: Dental Cost Settlement**

## DIRECTIONS TO COMPLETE PAGE 3

Page 3 identifies and summarizes all dental services costs. Much of the information contained within this page is automatically pulled from other pages; however, there are unique items of cost that must be entered in this page.

Only allocable expenditures related to Medicaid Fee-for-Service, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program will be included for supplemental payment.

Direct cost methods must be used whenever reasonably possible. Direct costing means that allowable costs, direct or indirect, incurred for the benefit of, or directly attributable to, a specific business component must be directly charged to that particular business component. Direct cost accounting may include:

1. Dedicated Cost Centers: Cost may be included for those cost centers that are solely dedicated to Medicaid and Uncompensated Care.

2. Multiple Cost Centers: Cost may be included for those cost centers that are not solely dedicated to Medicaid and Uncompensated Care. However, the provider must submit a detailed approved Cost Allocation Plan (CAP). If cost allocation is necessary for cost-reporting purposes, governmental providers must use reasonable methods of allocation and must be consistent in their use of allocation methods for cost-reporting purposes across all program areas and business entities. The allocation method should be a reasonable reflection of the actual business operations. Allocation methods that do not reasonably reflect the actual business operations and resources expended toward each unique business entity are not acceptable. Allocated costs are adjusted if HHSC considers the allocation method to be unreasonable. The provider must submit a detailed summary of their cost allocation methodology including a description of the components, the formula for calculating the percentage and any additional supporting documentation as required by HHSC. Supplemental schedules must also be attached to the cost report listing each employee, job title, total salary and benefits, the applicable allocation percentage and the allocation amount that will be included in the cost report. The amounts from the supplemental schedule allocated to the Medicaid and Uncompensated Care programs should match the amounts entered on Page 6 Worksheet B with additional detail entered on Page 7 Worksheet C.

If Indirect Cost (IDC) is included, that amount should be listed in line 2.30 (Other) with the detail described in either the Explanation Box or as a separate attachment. Indirect cost is

calculated by multiplying the **Total Allowable** costs by the provider's approved indirect cost rate. IDCR detail should include the methodology for determining the IDCR, the percentage and amount of the IDCR and if the dental provider is already using the IDCR to claim cost on another report. If IDCR costs are claimed in line 2.30, indirect or administrative costs cannot also be claimed as non-clinical cost in lines 2.26 a., 2.27 a. or in administrative salaries and compensation in Page 6 (Worksheet B). IDCR costs may be disallowed if it is determined that the provider has already claimed those same IDCR costs on this or another report. Additional detail regarding an agency's IDCR must be provided on Page 7 Worksheet C.

This page sums the payroll expenses and adds other costs to calculate the total cost of dental services. Identified reductions, either from Page 6 or entered manually with descriptions in the Explanation Box, are subtracted to calculate the adjusted amount of dental costs allowable as part of the cost report. The cost report identifies the portion of allowable costs that are related to Medicaid FFS, Medicaid MCOs, and Uncompensated Care and applies the cost-to-charge-ratio applicable for the cost report period. This ratio is applied to billed charges associated with Medicaid FFS and MCO paid claims and Uncompensated Care billed charges resulting in the total computable amount for dental services. This amount is then reduced by f Medicaid FFS, Medicaid MCO paid claims and any reimbursement received for Uncompensated Care. The resulting amount is then multiplied by the applicable federal medical assistance percentage (FMAP) to calculate the Federal and state amounts. The page is separated into the sections identifying:

**Personnel/Payroll Expenses**

2.00-2.21: If using hours as an allocation method enter the number of hours. Total paid hours include but are not limited to regular wage, sick and vacation hours. If personnel/payroll expenditure data is entered on Page 6 – Worksheet B – Payroll and Benefits, those costs will automatically transfer to this page.

2.22: State Unemployment Payroll Taxes: Enter the total (if applicable).

2.23: Federal Unemployment Payroll Taxes: Enter the total (if applicable).

2.24: Unemployment Compensation (Reimbursing Employer): Enter the total (if applicable).

2.25: Total Staff Costs: Will automatically calculate (sum of applicable items in 2.00-2.24).

**Other Costs**

2.26: Supplies and Materials: Supplies and materials include but are not limited to dental and medical supplies, office supplies, and maintenance supplies. Supplies and materials must be separated according to whether they are non-clinical or clinical. The total for non-clinical supplies and materials would be entered on 2.26 a. and the total for clinical supplies and materials would be entered on 2.26 b. Detail describing the supplies and materials along with the amount and allocation methodology should be entered in the Explanation Box or attached as a separate sheet. If a cognizant-agency- approved indirect cost rate is used, additional administrative (non-clinical) cost will not be permitted.

2.27: Equipment: Equipment costs include but are not limited to dental and medical equipment, computers and communication equipment. Equipment costs must be separated according to whether they are non-clinical or clinical. The total for non-clinical equipment would be entered on 2.27 a. and the total for clinical equipment would be entered on 2.27 b.

Detail describing the equipment costs along with the amount and allocation methodology should be entered in the Explanation Box or attached as a separate sheet. If a cognizant-agency-approved indirect cost rate is used, additional administrative (non-clinical) cost will not be permitted.2.28: Support Services: Enter the total and provide detail in the Explanation Box. Support services expenditures may include personnel and non-personnel expenditures such as information technology salaries and benefits and operating expenditures.

2.29: Depreciation: Depreciation information should first be entered on Page 5 – Schedule A – Depreciation and those costs will automatically transfer to this line.

2.30: Other: Enter the total and provide detail in the Explanation Box.

2.31: Total Direct and Indirect Dental Other Costs: Will automatically calculate (sum of 2.26 through 2.30).

2.32: Total Staff, Direct and Indirect Dental Other Costs: Will automatically calculate (sum of 2.25 and 2.31).

**Reductions**

2.33: Other Federal Funds and Grants: If expenditure data is entered on Page 6 – Worksheet B Payroll and Benefits, those costs will automatically transfer to this line.

2.34: Other: Enter the total and provide detail in the Explanation Box.

2.35: Total Reductions: Will automatically calculate (sum of 2.33 and 2.34).

**Cost Settlement Calculation**

2.40: Total Allowable Costs: Will automatically calculate ( 2.32 less 2.35).

2.41: Total Billed Charges: This field will automatically transfer from Page 2 – General & Statistical, 1.19.

2.42: Cost-to-Charge-Ratio (CCR) = Total Allowable Costs/Total Billed Charges: Will automatically calculate (2.40 divided by 2.41)

2.43: Total Billed Charges Associated with Medicaid Paid Claims and Uncompensated Care: This field will automatically transfer from Page 2 – General & Statistical, (sum of 1.06 and1.08).

2.44: Medicaid Allowable Costs = CCR * Total Billed Charges Associated with Medicaid Paid Claims and Uncompensated Care: Will automatically calculate (2.42 multiplied by 2.43).

2.45: Total Medicaid Allowable Billed Charges: This field will automatically calculate the lesser of 2.43 or 2.44; this amount cannot exceed 2.43, Total Billed Charges Associated with Medicaid Paid Claims and Uncompensated Care).

2.46: Medicaid Paid Claims Amount and Uncompensated Care reimbursement: This field will automatically transfer from Page 1 – General & Statistical (sum of 1.05 and 1.07).

2.47: Settlement Amount = Total Medicaid Allowable Billed Charges and Uncompensated Care Charges minus Medicaid Paid Claims Amount and Uncompensated Care Reimbursement: Will automatically calculate 2.45 minus 2.46

2.48: FMAP (Federal Medical Assistance Percentage): HHSC will enter the correct FMAP.

2.49: Federal Funds = Settlement Amount * FMAP: Will automatically calculate (2.47 multiplied by 2.48).

2.50: State Funds (IGT Amount): Will automatically calculate 2.47 less 2.49). Governmental entities are required to certify on Page 4 Cost Report Certification that they have completed the appropriate documentation required by HHSC and the Texas Comptroller's Office regarding the Intergovernmental Transfer (IGT) process. Once the cost report has been reviewed and accepted by HHSC, the provider will be notified of the amount required for the IGT.

## Page 4 – Cost Report Certification

### DIRECTIONS TO COMPLETE PAGE 4

Page 4 is the certification of costs included in the cost report. This form attests to and certifies the accuracy of the financial information contained within the cost report and that the report was prepared in accordance with State and Federal audit and cost principle standards. The signer is also certifying that the expenditures included in this cost report have not been claimed on any other cost report.

Most of the information in Page 4 will be updated automatically with information from previous pages. This page must be signed and included **UPON COMPLETION OF ALL OTHER PAGES**.

Upon completion of all other pages in the cost report, please have the appropriate person read and sign the form. **Scan and include the signed page** when sending the electronic version of the cost report to HHSC.

**Signature Authority/Certifying Signature**

Printed/Typed Name of Signer: Enter the name of the person that will be certifying the costs identified in the cost report.

Title of Signer: Enter the title of the signer.

Name of Provider: Enter the name of the Provider.

Address of Signer: Enter the address of the signer.

Phone Number: Enter the phone number of the signer.

Fax Number: Enter the fax number of the signer.

Email: Enter the email of the signer.

Signature of Signer and Date: The signer should sign and date the form.

## Page 5 – Schedule A - Depreciation

### DIRECTIONS TO COMPLETE PAGE 5

Page 5 identifies allowable depreciation expenses incurred by the provider for that portion which is related to Medicaid, Medicaid Managed Care and Uncompensated Care. This page will identify all depreciable assets for which there was a depreciation expense during the Cost Report period. Information on this page must come from a depreciation schedule maintained by the provider in accordance with straight line depreciation guidelines.

**Vehicles, Equipment, Building, Etc.**

For depreciation expenses, the straight line method should be used.

Asset Description: Enter the name and description of the asset. If there is the need to add additional lines, please do so.

Month/Year Placed in Service:  Enter the month/year placed in service as identified on the provider's depreciation schedule.

Years Useful Life:  Enter the number of years of useful life of the asset.

Cost:  Enter the amount of initial cost.

Prior Period Accumulated Depreciation:  Enter the amount of prior period accumulated **d**epreciation.

Depreciation for Reporting Period:  Enter the amount of current period depreciation expense.

Years Useful Life:  Enter the number of years of useful life of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost:  Enter the amount of initial cost of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation plus Depreciation for Reporting Period cannot exceed the total cost of an asset.  In addition, assets that have been fully expensed should not be reported.  For depreciation expense related to buildings where the provider's vehicles or staff is housed with other agencies or entities, **ONLY the portion related to the provider** may be reported. If this is the case, the provider must attach a supplemental page showing how the portion of the building related to the provider was calculated.

**Page 6 – Worksheet B – Payroll and Benefits**

**DIRECTIONS TO COMPLETE PAGE 6**

Page 6 includes the salary and benefits, and appropriate reductions for contract and employed staff related to the provision of dental services. Data entered on this page is only for that portion of an employee's salary and benefits that is applicable to Medicaid FFS, Medicaid MCOs and Uncompensated Care.  Salary and compensation must be reported on a direct charge basis.  This page includes several pre-populated staffing classifications for which information will need to be completed.  These pre-populated classifications include:

Director:  salary and benefit expenditures related to developing, administration, and overall operational effectiveness of the organization including strategic planning, leadership and oversight, including but not limited to:

- Director
- Director's Assistant

Dental Director:  salary and benefit expenditures related to planning, developing, scheduling, and the implementation of dental program services and activities, including but not limited to:

- Dental Director
- Dental Director's Assistant

Dentists and Dental Assistants:  salary and benefit expenditures related to dental care including but not limited to:

- Dentists
- Dental Assistants

Safety Officer:

- Safety Officer
- Safety Officer Assistants

Billing Account Representatives:  salary and benefit expenditures related to verification of patients' insurance coverage, including Medicaid, collection of third party insurance submissions and payments, and patient service related tasks, including but not limited to:

- Billing Representatives
- Account Representatives
- Patient Account Representative

Quality Assurance Technicians:  salary and benefit expenditures related to analyzing performance and quality improvement program including but not limited to:

- Quality Assurance Technicians

For each employee, the following information must be included:

**Employee Information**

Employee #:  Enter the employee #.

Last Name:  Enter the last name.

First Name:  Enter the first name.

Job Title/ Credentials:  Enter the job title/credentials.

Employee (E) /Contractor (C):  Enter the appropriate designation, either an E or a C, for the employee.

**Payroll and Benefits**

Gross Salary:  Enter the gross salary amount.

Contractor Payments:  Enter the amount of contractor payments for the employee.

Employee Benefits:  Enter the amount. This includes all benefits that are not discretely identified in Columns J-L of this page.

Employer Retirement:  Enter the amount.

FICA:  Enter the amount of FICA.

Medicare Payroll Taxes:  Enter the amount.

**Federal Funding Reductions**
This section of the page is designed to identify the federal funding, or other payroll and benefit expenditure reduction necessary for the specific job classifications identified above. This section of the page is also designed to discretely identify the payroll and benefit expenditures for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.  For each of the job classifications identified above, the following information must be included:

Allocated Funded Positions Entry:  Enter the appropriate designation, either yes or no, for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. A yes in this field designates an employee for which a portion or all of their salary and benefit expenditures are funded by federal funds or grants. An no in this field designates an employee whose entire salary or a portion of whose salary and benefit expenditures are not funded by federal funds or grants, but whose costs still need to be removed from allowable expenditures as reported on the Cost Report.

Federal Funding:  If the answer to the field previously is yes, then enter the amount of federal funding related to the employee's salary and benefits that must be reduced from the total allowable costs.

Other Funds:  Enter the other amount to be removed related to the employee's salary and benefits that must be reduced from the total allowable costs.

Total Reduction:  Will automatically calculate (sum of federal funding and other funds).

**Page 7 – Worksheet C – Cost Allocation Methodologies**

**DIRECTIONS TO COMPLETE PAGE 7**
Page 7 details the cost allocation methodologies employed by the governmental entity.

    A.   If you entered "yes" on Page 2, Line 1.05, please provide a copy of your agency's approved Cost Allocation Plan (CAP).

B.  If you entered "yes" on Page 2, Line 1.06 and 1.09, please provide a copy of your agency's approved Indirect Cost Rate (IDCR).

C.  If you do not have an approved CAP or IDCR but are using another cost allocation methodology, please provide a copy of your methodology and the supporting documentation.

D.  Please provide a list of personnel cost worksheets that support your CAP or IDCR.

Appendix A - List of Participating Providers

University of Texas at San Antonio Health Science Center (UTHSC-SA) Dental School: performs the patient billing activities for the dental school, the mobile dental unit, the Ricardo Salinas Dental Clinic and the Laredo Health Department Dental Clinic.

| General |
| --- |

Governmentally owned ambulance providers are eligible to participate in the supplemental payment program if they are directly funded by a local government, hospital authority, hospital district, city, county or state as specified in 42 CFR § 433.50 (i) which describes a unit of government.  This would include providers such as public health clinics and departments.  ,
**The cost report will include only allocable expenditures related to Medicaid, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program.**

The Ambulance Services Supplemental Payment Cost Report (cost report) must be prepared and completed a governmental entity on an annual basis for fiscal years ending on September 30Cost reports are due to HHSC 180 days after the close of the applicable reporting period.   A a provider who meets the definition of eligible governmental provider and who has been approved to submit a cost report for supplemental payment will prepare the cost report and will attest to, and certify through its cost report the total actual, incurred Medicaid and Uncompensated (uninsured) costs/expenditures, including the federal share and the non-federal share applicable to the cost report period. The completed cost report will be sent to the Texas HHSC at 11209 Metric Boulevard, Building H, Austin, TX 78758.

For the cost report to be accurate, only the **SHADED AREAS** of the cost report are to be completed.

Many worksheets (i.e. exhibits) will auto populate with information from another worksheet as to avoid additional extra data entry and to reduce errors.  Please review and verify the accuracy of all information on all exhibits before completing the report.
**For questions on completing the cost report, please contact the Health and Human Services Commission, Rate Analysis Department at 512-491-1802.**

| Definitions: |
| --- |

**Cognizant agency** - agency responsible for reviewing, negotiating, and approving cost allocation plans or indirect cost proposals developed in accordance with the Office of Management and Budget Circular A-87.

**Cost Allocation Plans** - are the means by which costs are identified in a logical and systematic manner for reimbursement under federal grants and agreements.

**Cost-to-charge ratio --** A provider's reported costs are allocated to the Medicaid program based on a cost-to-billed-charge ratio.  Cost-to- billed charge ratio is calculated as the Total Allowable Cost reported for the service period to represent the numerator of the ratio to the billed charges of the total Medicaid paid claims for the service period that represents the denominator of the ratio.  This ratio is applied to

calculate total billed charges associated with Medicaid paid claims or total computable amount for the cost report.

**Direct Cost** - means any cost which is identified specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.

**Federal Medical Assistance Participation (FMAP) Rate -–** is the share of state Medicaid benefit costs paid for by the federal government.

Indirect Costs **- costs incurred and identified with having two or more cost objectives but not specifically identified with any final cost objective.**

Indirect Cost Rate **- is a device for determining in a reasonable manner the proportion of indirect costs each program should bear. It is the ratio, expressed as a percentage, of the indirect costs to the direct costs.**

**Medicaid Fee-For-Service (FFS) Paid Claims** -- Medicaid payments made by the Health and Human Services Commission through the Texas Medicaid Healthcare Partnership to enrolled providers for services provided to Medicaid recipients.

**Medicaid Managed Care** --provides for the delivery of Medicaid health benefits and additional services through an arrangement between a state Medicaid agency and managed care organizations (MCOs) that accept a set payment for these services. Medicaid payments are made by the MCO's to providers for services provided to Medicaid recipients.

**Un-insured** -- an individual who has no health insurance or other source of third-party coverage for medical/health services.

**Uninsured cost** -- the cost to provide ambulance services to uninsured patients as defined by the Centers for Medicare and Medicaid Services. An individual whose third-party coverage does not include the service provided is considered by HHSC to be uninsured for that service.

**Medicare** -- A federal system of health insurance for people over 65 years of age and for certain younger people with disabilities.

**Other third-party coverage -**
Commercial Pay Insurance -- health insurance that covers medical expenses and disability income for the insured. Commercial health insurance can be categorized according to its renewal provisions and type of medical benefits provided. Commercial policies can be sold individually or as part of a group plan.

Self-Pay -- self pay patient pays in full at the time of visit for our services and we are not required to file claim or submit any documentation on his/her behalf to a third party.

Total Computable Amount – is the total Medicaid allowable amount payable for ambulance services prior to any reductions for interim payments.

**Uncompensated Care (UC)**—health care provided for which a charge was recorded but no payment was received; UC consists of two components, charity care in which the patient is unable to pay and bad debt in which a payment was expected but not received. Uncompensated care excludes other unfunded costs of care such as underpayment from Medicaid and Medicare.

**Unit of government**—a state, city, county, special purpose district or other governmental unit in the State that: has taxing authority, has direct access to tax revenues, is a State university teaching hospital with direct appropriations from the State treasury, or is an Indian tribe as defined in Section 4 of the Indian Self-Determination and Education Assistance Act, as amended (25 U.S.C. 450b).

## Exhibit A: Cost Report Cover Page

Exhibit A is the cost report cover page. This form includes a provider's National and State provider identification number that is used by HHSC as a means to obtain fee for service cost data included in the cost report. Each governmental provider must enter their entities legal name, name of person responsible for submitting the cost report, the cost preparers name and physical location, mailing address, phone number and Fax number of all contacts listed. The information will be used by HHSC to contact the provider as necessary through the cost reconciliation and cost settlement process.

## DIRECTIONS TO COMPLETE EXHIBIT A

Fiscal Year: Enter the Federal **Fiscal Year** for which the cost report will be completed (e.g., 2010).

Reporting Period: Enter the actual **Reporting Period** for which the cost report will be completed (e.g., 10/01/10 to 09/30/11).

Texas Provider Identification Number (TPI) Enter the **9-digit TPI** number for the provider that is completing the cost report (e.g., 1234567-89).

National Provider Identification Number (NPI): Enter the **10-digit NPI** number for the provider that is completing the cost report (e.g., 1234567890).

*Provider Information*

Provider Legal Name Enter the **Provider Legal Name** (e.g., (Health and Human Services Commission EMS). This is the name of the provider completing the cost report.

Street Address: Enter provider **Street Address** (e.g., 11209 Metric Blvd., Bldg. H., Austin, TX 78758). Include the city, state, and zip code in this field.

Mailing Address:       Enter provider **Mailing Address** (e.g., 11209 Metric Blvd., Bldg H., Austin, TX 78758 or P.O. Box 85700, Mail Code H-360, Austin, TX 78708-5200). Include the city, state, and zip code in this field.

Phone Number:       Enter the **Phone Number** of the provider's contact (e.g., (512) 123-4567).

Fax Number:  Enter the **Fax Number** of the provider's contact (e.g., (512) 987-6543).

Email Address:       Enter the **Email** address of the provider's contact (e.g., iampublic@xyzabc.com).

### *Business Manager / Financial Director*

Business Manager/Financial Directors Name:       Enter the **Name** of the business manager or financial director of the provider (e.g., Jane Doe).

Title:       Enter the **Title** of the business manager or financial director of the provider identified in the field above (e.g., Director).

Email Address:       Enter the **Email** address of the provider's contact (e.g., jqpublic@xyzabc.com).

### *Report Preparer Identification*

Report Preparer Name:       Enter the **Name** of the provider's contact or person responsible for preparing the cost report (e.g., Jane Doe). This is the name of the person that HHSC may contact if there are questions.

Title:       Enter the **Title** of the provider's contact identified in the field above (e.g., Director).

### *Location of Accounting Records that Support this Report*

Records Location:       Enter the **Physical Address** of the location where the provider maintains the accounting records in support of the cost report (e.g., 11209 Metric Blvd., Bldg. H., Austin, TX 787581). Include the city, state, and zip code in this field.

**Exhibit 1: General and Statistical Information**

Exhibit 1 is the General and Statistical Information page of the cost report. This exhibit includes general provider information and statistical information used in the cost report.

## DIRECTIONS TO COMPLETE EXHIBIT 1

### General Provider Information

Reporting Period – Begin Date:    Enter the **Reporting Period – Beginning** date or the beginning date of the cost report period (e.g., 10/1/2010).

Reporting Period – End Date:    Enter the **Reporting Period – Ending** date or the ending date of the cost report period (e.g., 9/30/2011).

Part Year Cost Report:    Enter an answer to the question "**Is Reporting Period less than a full year?"** This question identifies if the cost report is being prepared for a period that is not an entire fiscal year. If the cost report is for an entire fiscal year (October 1 – September 30), then enter **No** in the field. If the cost report is being prepared for a partial fiscal year, enter a response that explains the reason why (e.g., Supplemental Payment Request Approval was effective beginning on 7/1/20XX).

### Cost Allocation Information

The purpose of this section is to obtain summary information regarding the cost allocation methodology the governmental entity utilized to allocate costs to various programs, grants, contracts and agreements. Additional information supporting an agencies methodology will be found on Exhibit 7.

Cost Allocation Plan:    Enter either Yes or No indicating whether your agency has an approved **Cost Allocation Plan (CAP)**. If the answer is yes, enter the **name of the Cognizant Agency** that approved the agency CAP.

Approved Indirect Cost Rate:   Enter either Yes or No indicating whether your agency has an approved **Indirect Cost Rate**.

Indirect Cost Rate:    Enter either Yes or No indicating whether your agency will be **utilizing an Indirect Cost Rate**. If yes, enter the Agencies Approved Indirect Cost Rate.

### Statistical Information

This cost report uses a costs to billed charge ratio methodology that is applied to determine the portion of costs eligible for reimbursement under the Direct Medical settlement exhibit of the cost report (see Exhibit 2).

### Summary of Payments and Billed Charge Data (Applicable to Cost Report)

Medicaid Fee for Service Paid Claims Amount: Enter the **Total Ambulance Medicaid fee-for-service (FFS) Paid Claims Amount** for the applicable cost report period identified on the form. The ambulance Medicaid fee-for-service entered must only be for **dates of service** during the cost report period.

Total Billed Charges Associated with Medicaid FFS Paid Claims: Enter the **Total Billed Charges associated with Medicaid FFS Paid Claims** for the applicable cost report period identified on

the form. The total billed charges associated with Medicaid FFS paid claims entered must only be for **dates of service** during the cost report period.

Medicaid Managed Care Organization (MCO) Costs:  Enter the total **MCO** Costs for services provided for the applicable Cost Report period identified on the form.  The ambulance Medicaid MCO costs for services entered should be for dates of service during the cost report period.

Total Billed Charges Associated with **MCO** Costs:  Enter the **Total Billed Charges associated with Medicaid MCO Claims** for the applicable cost report period identified on the form. The total billed charges associated with MCO paid claims entered must only be for **dates of service** during the cost report period.

Uncompensated Care (UC) (Uninsured) Billed Amounts (UC): Enter the total **UC** Charity and Bad Debt amounts billed for services provided for the applicable Cost Report period identified on the form.  The ambulance UC costs for services entered should be for dates of service during the cost report period and must exclude all unfunded Medicaid and Medicare costs.

Total Uncompensated Care (UC) (Uninsured) Reimbursements Received Associated with **UC** Costs:  Enter the **reimbursements received associated with UC Claims** for the applicable cost report period identified on the form. The total reimbursements received associated with UC claims entered must only be for **dates of service** during the cost report period.

Total Allowable Costs For Reporting Period:  The **Total Allowable Costs** calculated are for the applicable cost report period identified on the direct service tab.  The total allowable costs are only for dates of service during the cost report period.

Total Billed Charges for Reporting Period:  The **Total Billed Charges** calculated are for the applicable cost report period identified on the form less the total allowable costs and less any reimbursements received.  The total billed charges entered are only for dates of service during the cost report period.

Additional Cost Data (For Informational Purposes Only)

In addition to the statistical information entered for Cost Reporting period, other cost data is being requested

Medicare Costs:  Enter the total **Medicare Costs** for services provided for the applicable cost report period identified on the form.  The ambulance Medicare costs for services entered should be for dates of service during the cost report period.

Other Third Party Coverage:  Enter the total **Other third-party coverage (Self-Pay, Commercial Pay)** Costs for services provided for the applicable cost report period identified on the form.  The ambulance "other" costs for services entered should be for dates of service during the cost report period.

## Exhibit 2: Direct Medical (Ambulance Services)

Exhibit 2 identifies and summarizes from other exhibits all ambulance services costs within the cost report. Much of the information contained within this exhibit is pulled from either Exhibit 5 or Exhibit 6; however, there are unique items of cost that are identified in this exhibit. **Only allocable expenditures related to Medicaid, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program will be included for supplemental payment.** This Exhibit sums the personnel expenses and adds additional costs to calculate the total cost of Medical and Uncompensated Care Services.

Direct cost methods must be used whenever reasonably possible. Direct costing means that allowable costs, direct or indirect, incurred for the benefit of, or directly attributable to, a specific business component must be directly charged to that particular business component.

For example, the payroll costs of a direct service employee who works across cost areas within one contracted program would be directly charged to each cost area of that program based upon that employee's continuous daily time sheets and the costs of a direct care employee who works across more than one service delivery area would also be directly charged to each service delivery area based upon that employee's continuous daily time sheets. Health insurance premiums, life insurance premiums, and other employee benefits are applied as direct costs.

Direct Cost Accounting may include:
a. Dedicated Cost Centers which are comprised of a distinctly identifiable department or unit whose costs are associated with a specific activity; or

b. Multiple Cost Centers which included cost for those cost centers that are not solely dedicated to one activity but may be allocated to multiple activities.

Governmental providers must use reasonable methods of allocation and must be consistent in their use of allocation methods for cost-reporting purposes across all program areas and business entities. The allocation method should be a reasonable reflection of the actual business operations. Allocation methods that do not reasonably reflect the actual business operations and resources expended toward each unique business entity are not acceptable. Allocated costs are adjusted if HHSC considers the allocation method to be unreasonable. The provider must submit a detailed summary of their cost allocation methodology including a description of the components, the formula for calculating the percentage and any additional supporting documentation as required by HHSC. Supplemental schedules must also be attached to the cost report listing each employee, job title, total salary and benefits, the applicable allocation percentage and the allocation amount that will be included in the cost report. The amounts from the supplemental schedule allocated to the Medicaid and Uncompensated Care programs should match the amounts entered on Exhibit 6 Schedule B with additional detail entered on Page 7

Worksheet C. Any change in cost-reporting allocation methods from one year to the next must be fully disclosed by the contracted provider on its cost report

*Indirect Costs Rate*
If an Indirect Cost Rate IDCR) is utilized, that rate must be applied to all appropriate cost objectives specifically identified in the cost report.   Indirect cost is calculated by multiplying the **Total Allowable** costs by the provider's approved indirect cost rate. These indirect rates are developed by the state cognizant agency and are updated annually. The methodology used by the respective cognizant agency to develop the **Indirect Cost Rate** (IDCR) has been approved by the cognizant federal agency, as required by the CMS guide. Indirect costs are included in the claim as reallocated costs.  The provider is responsible to ensure that costs included in the cost report not included in the indirect cost rate, and no costs will be accounted for more than once.

All indirect cost calculations developed to arrive at the total allowable costs must be included in Worksheet 7 of the cost report.  All scenarios utilized to calculate the indirect cost must be fully explained as well.  The provider must verify that no duplicative costs are included in line 2.33 "Other Cost".  IDCR costs will be disallowed if it is determined that the provider has already claimed those same IDCR costs.  All documents that support the indirect cost rate calculation must be maintained by the approved governmental entity and must be made immediately available upon request by HHSC.

Identified reductions, from Exhibit 6, are subtracted to calculate the adjusted amount of Direct Medical Costs allowable as part of the cost report. The cost report identifies the portion of allowable costs that are related to Medicaid FFS, Medicaid MCOs, and Uncompensated Care and applies the cost to charge ratio applicable for the cost report period.  The ratio is applied to billed charges associated with Medicaid FFS, Medicaid MCOs, and Uncompensated Care paid claims resulting in the total computable amount for ambulance services. This amount is then reduced by the amount of Medicaid FFS, Medicaid MCOs paid claims and any reimbursement received for Uncompensated Care. The resulting  amount is  then multiplied by the applicable  federal medical assistance percentage (FMAP) to calculate the amount of settlement due to, or owed by (if negative) the provider.

The exhibit is separated into the sections identifying:

- **Personnel / Payroll Expenses.**  This section of the Exhibit includes, in part, expenditures from Exhibit 6.

- **Other Operating Costs.**  This section of the Exhibit includes, in part, expenditures from Exhibit 5.

- **Reductions to Allowable Costs.**  This section of the Exhibit includes reductions to expenditures identified in Exhibit 6.

- **Cost Settlement Calculation.** This section applies the cost to charge ratio calculation methodology to arrive at the final settlement due to or from the provider.

## DIRECTIONS TO COMPLETE EXHIBIT 2

*Personnel / Payroll Expenses*

This section of the exhibit includes all personnel related expenditures and hours for the job classifications identified.

Hours:      Enter the number of **Hours** for each of the job classifications identified in this Exhibit and for which costs are identified in Exhibit 6. Hours for this exhibit represent total paid hours that are reported by the provider on their payroll report. Total paid hours include, but are not limited to:

- Regular wage hours
- Sick hours
- Vacation hours

Payroll Taxes/Unemployment Compensation:      If applicable, enter the amount of the following payroll expenses:

- State Unemployment Payroll Taxes
- Federal Unemployment Payroll Taxes
- Unemployment Compensation (Reimbursing Employer)

*Other Costs*

This section of the Exhibit identifies other operating costs not related to the job classifications identified above. Within this section, Support Services or Other may include personnel-related expenditures not identified in the job classifications in the section above.

All costs identified in the section of the Exhibit are supported by supplemental schedules to the cost report, and will be supplied at the time of cost report submittal.

Supplies and Materials Costs: Enter the amount of **Supplies and Materials** expenditures incurred by the provider during the cost report period. Supplies and materials include, but are not limited to, the following:

- Medical supplies
- Office supplies
- Maintenance supplies
- Medical materials

Equipment Costs:      Enter the amount of **Equipment** expenditures incurred by the provider during the cost report period. Equipment expenditures include, but are not limited to, the following non-depreciable items:

- Medical equipment
- Computers

- Radios
- Communications equipment

Support Services Costs:      Enter the amount of **Support Services** expenditures incurred by the provider during the cost report period. Support Services expenditures may include personnel and non-personnel expenditures depending if the personnel expenditures are represented in the job classification categories identified in this Exhibit and detailed in Exhibit 6.  Support Services expenditures include, but are not limited to, the following:

- Information technology salaries, benefits, and operating expenditures
- Telecommunications personnel and operating expenditures

Other Costs:      Enter the amount of **Other** expenditures incurred by the provider during the Cost Report period.  Other expenditures may include personnel and non-personnel expenditures depending if the personnel expenditures are represented in the job classification categories identified in this Exhibit and detailed in Exhibit 6. Other expenditures include, but are not limited to, the following:

- Depreciation expense (Exhibit 5)
- Parent organization allocated costs (discretely identified from prepared cost allocation plan (CAP))
- Other unit personnel and operating expenditures not otherwise identified (Indirect Cost)

*Cost Settlement Calculation*

Period of Service for Applicable Cost Report Period:  Enter the **Period of Service** for the applicable cost report period.  Example 10/01/20XX to 12/31/20XX.  For part year cost reports, enter the period of service applicable only to the time frame a cost report is being submitted for.

Total Allowable Costs for Period of Services is the total allowable costs entered into the cost report less any "other federal funding" received ( No entry is required).

Total Billed Charges for Period of Service: The **Total Billed Charges** for the applicable period of service (No entry is required).

Cost to Charge Ratio (CCR) is the result of dividing a provider's Total Allowable Costs for the reporting period by the providers Total Billed Charges for the same period.

Total Charges Associated with , Medicaid, Paid Claims, Medicaid Managed Care Claims and Uncompensated Care Paid Fees: Enter the **Total Billed Charges Associated with Medicaid FFS and Medicaid MCO Paid Claims** for the period of service applicable to the cost report.

Total Computable is the total Medicaid Allowable Costs for the period of service applicable to the cost report. The **Total Computable** amount is reduced by the amount of Medicaid Claims paid (Interim Payments) to a provider (TMHP) for the period of service applicable to the cost report. This calculation is equal to the **Settlement Amount** for the reporting period.

Federal Medical Assistance Participation Rate (FMAP): Enter the **FMAP rate** for the appropriate federal fiscal year of the cost report.

Amount due to the Provider is the net amount of the settlement due to or from a provider after the FMAP rate is applied.

## Exhibit 3 – Cost Report Certification

Exhibit 3 is the Certification of costs included in the cost report. This form attests to, and certifies the accuracy of the financial information contained within the cost report.

**<u>DIRECTIONS TO COMPLETE EXHIBIT 3</u>**

Most of the information in Exhibit 3 will be updated automatically with information from previous exhibits. This Exhibit must be signed and included **UPON COMPLETION OF ALL OTHER EXHIBITS**.

Upon completion of all other exhibits in the cost report, please **print this exhibit, sign the exhibit, have the form notarized, scan the exhibit, and include the signed exhibit** when sending the electronic version of the cost report to HHSC. Please have the appropriate person within the provider read and sign the form.

*Signature Authority/Certifying Signature*

Certifier Name:     Enter the **Name of** the person that will be certifying the costs identified in the cost report (e.g., Jane Doe).

Title:     Enter the **Title of Signer**, or the title of the person that will be certifying the costs identified in the cost report (e.g., Director).

Print:     Please print this Exhibit and have the appropriate person identified above sign the certification form.

Date:     Enter the **Date** that the appropriate person identified above signs the certification form (e.g., 1/1/2011).

Signature Authority Check Box:  **Check the appropriate box** that corresponds to the tile of the person signing this Exhibit.

Notary:     Upon printing and signing this Exhibit, please have this form **Notarized** by a Notary Public.

**Exhibit 4 – Certification of Funds**

Exhibit 4 is the Certification of Public Expenditure that allows the state to use the computable Medicaid expenditures as the non-federal match of expenditures to draw the federal portion of Medicaid funding as identified in the settlement.  This form attests to, and certifies the accuracy of the provided financial information and that t the report was prepared in accordance with State and Federal audit and cost principle standards and that the costs   have not been claimed on any other cost report forfederal reimbursement purposes.  This Exhibit also identifies the amount of local provider expenditure that is allowable for use as the state match

**<u>DIRECTIONS TO COMPLETE EXHIBIT 4</u>**

Most of the information in Exhibit 4 will be updated automatically with information from previous exhibits.  This Exhibit must be signed and included **UPON COMPLETION OF ALL OTHER EXHIBITS**.

Upon completion of all other exhibits in the cost report, please **print this exhibit, sign the exhibit, have the form notarized, scan the exhibit, and include the signed exhibit** when sending the electronic version of the cost report to HHSC.  Please have the appropriate person within the provider read and sign the form.

***Signature Authority/Certifying Signature***

| | |
|---|---|
| Print | Please print this Exhibit and have the appropriate person sign the certification form. |
| Date: | Enter the **Date** that the appropriate person identified above signs the certification form (e.g., 1/1/2011). |
| Certifier Name: | Enter the **Name of Signer**, or the person that will be certifying the public expenditures identified in the cost report (e.g., Jane Doe). |
| Title: | Enter the **Title of Signer**, or the title of the person that will be certifying the public expenditures identified in the cost report (e.g., Director). |
| Certifier Check Box | **Check the appropriate box** that corresponds to the tile of the person signing this Exhibit. If **Other Agent/Representative** is selected, please include the appropriate title in **Column N, Line 40**. |

Notary Upon printing and signing this Exhibit, please have this form **Notarized** by a Notary Public.

## Exhibit 5 – Schedule A (Depreciation Schedule)

Exhibit 5 identifies allowable depreciation expenses incurred by the provider related to Medicaid, Medicaid Managed Care and Uncompensated Care. This Exhibit will identify depreciable assets for which there was a depreciation expense during the Cost Report period. Information on this Exhibit must come from a depreciation schedule maintained by the provider in accordance with appropriate accounting guidelines established by the provider and/or the parent organization of the provider. For depreciation expenses, the straight line method should be used. Prior Period Accumulated Depreciation plus Depreciation for Reporting Period cannot exceed the total cost of an asset. In addition, assets that have been fully expensed should not be reported.

## DIRECTIONS TO COMPLETE EXHIBIT 5

### *Vehicles*

For depreciation expense related to vehicles, the provider must follow depreciable asset thresholds already in place at the provider and/or parent organization. The vehicle depreciation expense as reported on the Cost Report must come from the provider's depreciation schedule.

Asset Description: Enter the **Description of the Asset** that will be included in this depreciation schedule. The name or account code, or both will suffice. If there is the need to add additional lines, please do so.

Month/Year Placed in Service: Enter the **Month/Year Placed in Service** as identified on the provider's depreciation schedule (e.g., January 2000, or 1/2000). This is the month and the year that the depreciable asset was first put into service.

Years Useful Life: Enter the number of **Years of Useful Life** of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost: Enter the amount of initial **Cost** of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation: Enter the amount of **Prior Period Accumulated Depreciation** related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expenses to date related to the depreciable asset.

Depreciation for Reporting Period: Enter the amount of current period depreciation expense in the **Depreciation for Reporting Period** field related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expense incurred during the Cost Report period.

### *Equipment*

For depreciation expense related to equipment, the provider must follow depreciable asset thresholds already in place at the provider and/or parent organization. The equipment

depreciation expense as reported on the Cost Report must come from the provider's depreciation schedule.

Asset Description: Enter the **Description of the Asset** that will be included in this depreciation schedule. The name or account code, or both will suffice. If there is the need to add additional lines, please do so.

Month/Year Placed in Service: Enter the **Month/Year Placed in Service** as identified on the provider's depreciation schedule (e.g., January 2000, or 1/2000). This is the month and the year that the depreciable asset was first put into service.

Years Useful Life: Enter the number of **Years of Useful Life** of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost: Enter the amount of initial **Cost** of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation: Enter the amount of **Prior Period Accumulated Depreciation** related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expenses to date related to the depreciable asset.

Depreciation for Reporting Period: Enter the amount of current period depreciation expense in the **Depreciation for Reporting Period** field related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expense incurred during the Cost Report period.

### *Building*

For depreciation expense related to buildings where the provider's vehicles or staff are housed with other agencies or entities, **ONLY the portion related to the provider** may be reported. If this is the case, the provider must attach a supplemental exhibit showing how the portion of the building related to the provider was calculated.

Asset Description: Enter the **Description of the Asset** that will be included in this depreciation schedule. The name or account code, or both will suffice. If there is the need to add additional lines, please do so.

Month/Year Placed in Service: Enter the **Month/Year Placed in Service** as identified on the provider's depreciation schedule (e.g., January 2000, or 1/2000). This is the month and the year that the depreciable asset was first put into service.

Years of Useful Life: Enter the number of **Years of Useful Life** of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost: Enter the amount of initial **Cost** of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation :     Enter the amount of **Prior Period Accumulated Depreciation** related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expenses to date related to the depreciable asset.

Depreciation for Reporting Period:    Enter the amount of current period depreciation expense in the **Depreciation for Reporting Period** field related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expense incurred during the Cost Report period.

**Exhibit 6 – Worksheet B (Payroll and Benefits)**

This exhibit includes the salary and benefits, and appropriate reductions related to contracted and employed staff of the provider applicable to Medicaid, Medicaid Managed Care and Uncompensated Care.. For this Exhibit, all employed and contracted staff related to the provision of Ambulance EMS services should be identified here.

This Exhibit includes several pre-populated staffing classifications for which information will need to be completed. The pre-populated staffing classifications include:

- **9-1-1 Call Technicians** This cost classification includes all personnel salary and benefit expenditures related to operation of emergency communications equipment used in receiving, sending, and relaying medical self-help in response to emergency calls, including, but not limited to:
  - 9-1-1 Call Technicians
  - 9-1-1 Call Technician Assistants
  - …

- **Paramedics** This cost classification includes all personnel salary and benefit expenditures related to performing basic and advanced medical rescue procedures to access, stabilize, evacuate, and transport a patient to an appropriate medical facility's emergency department, including, but not limited to:
  - Paramedics
  - EMTs
  - …

- **Training Coordinators** This cost classification includes all personnel salary and benefit expenditures related to providing training, quality, operational, and support of specific ambulance service training and organizational programs, including local pre-paramedic institutions, internal paramedic/communications medic instruction, training activities within Field Operations and Communications, and analysis of performance and quality improvement programs, including, but not limited to:
  - Training Coordinators
  - …

- **Quality Assurance Technicians** Quality Assurance Technicians have the same job description as training coordinators above. This cost classification includes all personnel salary and benefit expenditures related to providing training, quality, operational, and support of specific ambulance service training and organizational programs, including local pre-paramedic institutions, internal paramedic/communications medic instruction, training activities within Field

Operations and Communications, and analysis of performance and quality improvement programs, including, but not limited to:
- o Quality Assurance Techs
- o …

- **Safety Officer** This cost classification includes all personnel salary and benefit expenditures related to developing, administering, implementing, and evaluating departmental occupational safety program and activities, including, but not limited to:
  - o Safety Officer
  - o Safety office assistant
  - o …

- **Billing / Account Reps** This cost classification includes all personnel salary and benefit expenditures related to verification of patients' insurance coverage, including Medicaid, collection of third party insurance submissions and payments, and patient customer service related tasks, including, but not limited to:
  - o Billing representative
  - o Account representative
  - o Patient account representative
  - o …

- **CPR Technicians** This cost classification includes all personnel salary and benefit expenditures related to the coordination of all EMS activities related to community education of CPR and First Aid skills and techniques, including, but not limited to:
  - o CPR Techs
  - o …

- **Medical Director**) This cost classification includes all personnel salary and benefit expenditures related to the clinical oversight of pre-hospital treatment rendered by EMS personnel. The Medical Director costs shall only include those costs as identified to be related to including, but not limited to:
  - o Medical Director
  - o Medical Director Assistant
  - o …

- **Director** This cost classification includes all personnel salary and benefit expenditures related to developing, administration, and overall operational effectiveness of the organization including strategic planning, leadership, and oversight of all operational aspects of the EMS Department, including, but not limited to:
  - o Director
  - o Director's Assistant

o …

- **Public Information Officer**) This cost classification includes all personnel salary and benefit expenditures related to planning and directing public information, public relations, media relations, or public involvement programs and developing, maintaining, and improving public awareness initiatives, including, but not limited to:
  o Public Information Officer
  o PIO Assistant
  o …

- **Contracted EMT/Paramedics** This cost classification includes all contracted expenditures related to performing basic and advanced medical rescue procedures to access, stabilize, evacuate, and transport a patient to an appropriate medical facility's emergency department, including, but not limited to:
  o Contracted Paramedics
  o Contracted EMTs
  o …

## DIRECTIONS TO COMPLETE EXHIBIT 6
### *Employee Information*
This section of the Exhibit is designed to identify employee information for the specific job classifications identified above. This section of the Exhibit is also designed to discretely identify the employee information for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.

For each of the job classifications identified above, the following information must be included:

Employee #:  Enter the **Employee #** for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Last Name:  Enter the **Last Name** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

First Name:  Enter the **First Name** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Job Title/ Credentials: Enter the **Job Title / Credentials** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Employee (E) /Contractor (C):       Enter the appropriate designation, **either an E or a C,** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. E designates an employee of EMS. C designates a contractor for EMS.

### *Payroll and Benefits*

This section of the Exhibit is designed to identify payroll and benefit expenditures for the specific job classifications identified above. This section of the Exhibit is also designed to discretely identify the payroll and benefit expenditures for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.

For each of the job classifications identified above, the following information must be included:

Gross Salary:       Enter the **Gross Salary** amount for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Contractor Payments: Enter the amount of **Contractor Payments** for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Employee Benefits:    Enter the amount of **Employee Benefits** for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. This includes all benefits that are not discretely identified in Columns J-L of this Exhibit.

Employer Retirement: Enter the amount of **Employer Retirement** expenditure for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

FICA:             Enter the amount of **FICA** expenditure for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Payroll Taxes:  Enter the amount of **Payroll Taxes** expenditure for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

### *Federal Funding Reductions*

This section of the Exhibit is designed to identify the federal funding, or other payroll and benefit expenditure reduction necessary for the specific job classifications identified above. This section of the Exhibit is designed to discretely identify the payroll and benefit expenditures for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.

For each of the job classifications identified above, the following information must be included:

Allocated Funded Positions Entry:  Enter the appropriate designation, **either a Y or a N**, for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. A "Y" in this field designates an employee for which a portion, or all of their salary and benefit expenditures are funded by federal funds or grants. A "N" in this field designates an employee for which a portion, or all of their salary and benefit expenditures are not funded by federal funds or grants, but still need to be removed from allowable expenditures as reported on the Cost Report.

Federal Funding  If the answer to the field previously is "Y", then enter the amount of **Federal Funding** related to the employee's salary and benefits that must be reduced from the total allowable costs as reported on the Cost Report.

Other Funds:  Enter the amount of **Other Amount to be Removed** related to the employee's salary and benefits that must be reduced from the total allowable costs as reported on the Cost Report.

**Payroll and Benefits Entry:** Enter the amount of Salary and appropriate Benefits for all other personnel and staff related to the job classifications identified above, for which no salary or benefit expenditures must be reduced from the total allowable costs.

Exhibit 7-Schedule C – Cost Allocation Methodologies

This exhibit details the cost allocation methodologies employed by the governmental entity.

   E.  If you entered "yes" on Page 2, Line 1.05, please provide a copy of your agency's approved Cost Allocation Plan (CAP).
   F.  If you entered "yes" on Page 2, Line 1.06 and 1.09, please provide a copy of your agency's approved Indirect Cost Rate (IDCR).
   **G.** Please provide a list of personnel cost worksheets that support your CAP or IDCR

## I. PREFACE

### A. Delivery System Reform Incentive Payment Program

Special Terms and Conditions (STC) 45 of the Demonstration authorizes Texas to establish a Delivery System Reform Incentive Payment (DSRIP) program. Initiatives under the DSRIP program are designed to provide incentive payments to hospitals and other providers for investments in delivery system reforms that increase access to health care, improve the quality of care, and enhance the health of patients and families they serve.

The program of activity funded by the DSRIP shall be based on Regional Healthcare Partnerships (RHPs). Each RHP shall have geographic boundaries and will be coordinated by a public hospital or local governmental entity with the authority to make intergovernmental transfers. The public hospital or local governmental entity shall collaborate with hospitals and other potential providers to develop an RHP Plan that will accelerate meaningful delivery system reforms that improve patient care for low-income populations. The RHP Plans must be consistent with regional shared mission and quality goals of the RHP and CMS's triple aims to improve care for individuals (including access to care, quality of care, and health outcomes); improve health for the population; and lower costs through improvements (without any harm whatsoever to individuals, families, or communities).

### B. RHP Planning Protocol and Program Funding and Mechanics Protocol
In accordance with STC 45(a) and 45(d)(ii)(A) & (B), the RHP Planning Protocol (Attachment I) defines the specific initiatives that will align with the following four categories: (1) Infrastructure Development; (2) Program Innovation and Redesign; (3) Quality Improvements; and (4) Population-focused Improvements. The Program Funding and Mechanics Protocol (Attachment J) describes the State and CMS review process for RHP Plans, incentive payment methodologies, RHP and State reporting requirements, and penalties for missed milestones.

Each RHP must submit an RHP Plan that identifies the projects, outcomes, population-focused objectives, and specific milestones and metrics in accordance with these attachments and STCs.

### C. Organization of "Attachment I: RHP Planning Protocol"
Attachment I has been organized into the following sections:
|     |     |
| --- | --- |
| I. | Preface |
| II. | Key Principles |
| III. | Required RHP Plan Elements |
| IV. | Format of this Document |
| V. | Category 1 Infrastructure Development |
| VI. | Category 2 Program Innovation and Redesign |
| VII. | Category 3 Quality Improvements |
| VIII. | Category 4 Population Focused Improvements |
| Appendix: | CMS-Provided Key Elements for Learning Collaboratives and Continuous Quality Improvement |

This document is supplemented by a ***metric specification guide*** developed by the state in consultation with CMS that provides more detail on the Category 1, 2, 3, and 4 metrics, including the data source for each measure, the measure steward, and the high performance level or other target setting methodology that will be used to determine targets for Category 3 metrics. The metric specification guide will be made available on the state's website.

II. **Key Principles**

**A. Responding to the Needs and Challenges of the Texas Health Care Delivery System**

Texas faces many unique health challenges. For example, rates of obesity and chronic diseases are some of the highest in the nation, and many Texans do not have a regular source of care to help manage and prevent these diseases. Many Texans do not receive regular treatment for mental health issues, and as a result, mental health problems account for a large percentage of admissions to hospitals that could have been avoided. These challenges and many more disproportionately affect safety net providers who serve Medicaid beneficiaries and the uninsured.

DSRIP provides an unprecedented opportunity to improve patient care for low-income populations by incentivizing delivery system reforms that increase access to health care, improve the quality of care, and enhance the health of patients and families they serve. These investments not only contribute to the triple aim, but they can also help position safety net providers for the emerging healthcare market, in which data-based quality performance and cost-efficiency drive competition.

This protocol presents a "menu" of evidence-based projects that can be incentivized through DSRIP. These projects were selected by HHSC and CMS to have the maximum impact on the health system challenges facing Texas.

Since health system reform requires regional collaboration, providers must select projects that relate to the community needs identified by the RHP, and RHPs must engage stakeholders in the development of RHP plans. The requirements for the community needs assessment and stakeholder engagement are described in section 10 of the Program Funding and Mechanics Protocol (Attachment J).

**B. Interconnection and Shared Orientation of Projects**

DSRIP activities are divided into four categories, which are interrelated and complementary:

- <u>Category 1 Infrastructure Development</u> lays the foundation for delivery system transformation through investments in technology, tools, and human resources that will

strengthen the ability of providers to serve populations and continuously improve services.

- <u>Category 2 Program Innovation and Redesign</u> includes the piloting, testing, and replicating of innovative care models.
- <u>Category 3 Quality Improvements</u> includes outcome reporting and improvements in care that can be achieved within four years.
- <u>Category 4 Population-focused Improvements</u> is the reporting of measures that demonstrate the impact of delivery system reform investments under the waiver.

Multiple, complementary initiatives will be occurring in the same RHP simultaneously, reinforcing each other in the transformation of care delivery. The selected projects for the RHP plan should possess the following qualities:

- While they are highly related projects, each improvement project is distinct;
- All of the proposed projects are oriented to creating more effective and coordinated care provision; and
- There is a coordinated approach to supporting improved patient experience, population health, quality improvement, and cost control.

In order to achieve meaningful change by the end of the demonstration, every performing provider must link each of its Category 1 and 2 projects to a related Category 3 outcome. The outcomes shall assess the results of care experienced by patients, including patients' clinical events, patients' recovery and health status, patients' experiences in the health system, and efficiency/cost. Additional information about category 3 outcomes and the setting of outcome targets is provided in section 11.d of the Program Funding and Mechanics Protocol (Attachment J).

## C. Fostering Continuous Quality Improvement

In order to achieve and sustain success at responding to community needs, providers and communities will need to apply best practices in continuous quality improvement. Most notably, learning collaboratives are essential to the success of high quality health systems that have achieved the highest level of performance. Performing providers are strongly encouraged to form learning collaboratives to promote sharing of challenges and testing of new ideas and solutions by providers implementing similar projects in each RHP. These regionally-focused learning collaboratives also can inform the learning collaborative conducted annually during DYs 3-5 to share learning, experiences, and best practices acquired from the DSRIP program across the State. For the Key Elements for Learning Collaboratives provided by CMS, please see Attachment 1.

RHPs can be a natural hub for this type of shared learning by connecting providers who are working together on common challenges in the community, but providers and RHPs are also encouraged to connect with others across Texas to form a "community of communities" that can

connect on an ongoing basis to share best practices, breakthrough ideas, challenges and solutions. This will allow regions to learn from each other's challenges and develop shared solutions that can accelerate the spread of breakthrough ideas across Texas.

**III. Required Plan Elements**

Based on the projects and measures listed in this Protocol and the requirements for plan development defined in the *Program Funding and Mechanics Protocol* (Attachment J) , RHPs will submit five-year RHP plans that describe: (1) the reasons for the selection of the projects, based on local data, gaps, community needs, and key challenges; (2) how the projects included in the plan are related to each other and how, taken together, the projects support broad delivery system reform relevant to the patient population; and (3) the progression of each project year-over-year, including the specifics and exact data source needed per project per milestone per metric per year.

Each RHP must submit an RHP Plan using a State-approved template that identifies the projects, objectives, and specific milestones, metrics, measures, and associated DSRIP values. The plan must meet all requirements pursuant to Standard Terms and Conditions (STCs) 45 and 46 and follow the format outlined in the *Program Funding and Mechanics Protocol* (Section III, Key Elements of Proposed RHP Plans).

**Organization of Projects and Measures**
The RHP five-year plan will include sections on each of the four categories included in this Protocol.

**Categories 1-2 Requirements:** For each project selected from Category 1 and 2, RHP Plans must include a narrative that has the following subsections:

- Identifying Information: Identification of the DSRIP Category, name of the project, project element, and RHP Performing Provider name and Texas Provider Identifier (TPI) involved with the project. Each project shall be implemented by one Performing Provider only.

- Project Goal: The goal(s) for the project, which describes the challenges or issues of the Performing Provider and brief description of the major delivery system solution identified to address those challenges by implementing the particular project; the starting point of the Performing Provider related to the project and based on that, the 5-year expected outcome for the Performing Provider and the patients.

- Rationale: As part of this subsection, each Performing Provider will provide the reasons for selecting the project, milestones, and metrics based on relevancy to the RHP's population and circumstances, community need, and RHP priority and starting point with available baseline data, as well as a description of how the project represents a new initiative for the Performing Provider or significantly enhances an existing initiative, including any initiatives that may have related activities that are funded by the U.S. Department of Health and Human Services. These projects should be data-driven and based on community needs and local data that demonstrate the project is addressing an area of poor performance and/or disparity that is important to the population (i.e. a provider selecting a project to implement a chronic care model for diabetes should discuss local data such as prevalence of diabetes in the community and rates of preventable admissions for diabetes and describe why diabetes is an important health challenge for the community).

- Related Category 3 Outcome Measure(s): The Performing Provider will indicate the Category 3 Outcome Measure(s) and reasons/rationale for selecting the outcome measure(s). The rationale should be data-driven, including:
  - Data supporting why these outcomes are a priority for the RHP;
  - Validated, evidence-based rationale describing how the related Category 1 or 2 project will help achieve the Category 3 outcome measure selected; and/or
  - Explanation of how focusing on the outcomes will help improve the health of low-income populations.

- Relationship to Other Projects and Measures: A description of how this project supports, reinforces, enables, and is related to other Category 1 and 2 projects and Category 4 population-focused improvement measures within the RHP Plan

- Milestones and Metrics Table: For each project, RHP Plans shall include milestones and metrics adopted in accordance with this Protocol. In a table format, the RHP Plan will indicate by demonstration year when project milestones will be achieved and indicate the data source that will be used to document and verify achievement.

- o For each project from Category 1 and 2, the Performing Provider must include at least one milestone based on a Process Milestone and at least one milestone based on an Improvement Milestone over the 4-year period.
- o Since Quality Improvement (QI) activities are essential to the provider's success implementing Category 1 and 2 projects and achieving Category 3 outcome measures, Quality Improvement (QI) is a core project component for all project options for most Category 1 and 2 projects (except 1.1 Expand Primary Care Capacity, 1.2 Increase Training of Primary Care Workforce, 1.9 Expand Specialty Care Capacity, 1.12 Enhance Service Availability, and 1.14 Develop Workforce Enhancement). Category 1 and 2 project areas contain recommended process milestones designed to support providers that are engaging in meaningful quality improvement work to improve performance and achieve outcomes. Performing Providers are strongly encouraged to include process milestones reflecting their Quality Improvement activities for all 4 years of the DSRIP.
- o For each milestone, the estimated DSRIP funding must be identified as the maximum amount that can be received for achieving the milestone. For each year, the estimated available non-federal share must be included and the source (Intergovernmental Transfer (IGT) Entity) of non-federal share identified.

- Relationship to Other Providers' Projects in the RHP: If applicable, a list of other providers in the RHP that are proposing similar projects and will be members of a learning collaborative to support this project and share best practices, new ideas, and solutions across the RHP.
- Plan for Learning Collaborative: If applicable, describe plans for participating in a RHP-wide learning collaborative with other providers with similar projects. Describe how the learning collaborative will promote sharing of challenges and testing of new ideas and solutions between providers implementing similar projects.

**Category 3 Requirements:** Category 3 involves outcomes associated with Category 1 and 2 projects. All Performing Providers (both hospital and non-hospital providers) shall select outcomes and establish improvement targets that tie to their projects in Categories 1 and 2. RHP Plans must include:

- Identifying Information: Identification of the Category 3 outcomes and RHP Performing Provider name and Texas Provider Identifier that is reporting the measure.
- Narrative Description: Each Performing Provider shall provide a narrative describing the Category 3 outcomes.
- Outcomes Table: In a table format, the RHP Plan shall include the outcomes selected by each Performing Provider.
  - o For each outcome, the RHP Plan may include process milestones described in 11.d.ii of the *Program Funding and Mechanics Protocol* in DY 2-3 only that support the development of the outcomes.
  - o For each outcome, the RHP Plan shall include improvement targets beginning no later than DY 4. In DY 4 and 5, incentive payments will only be received for achieving improvement targets (pay-for-performance) in Category 3.

      o  For each milestone or outcome improvement target, the estimated DSRIP funding must be identified as the maximum amount for achieving the milestone or outcome target. For each year, the estimated non-federal share must be included and the source (IGT Entity) of non-federal share identified.

**Category 4 Requirements:** Category 4 involves population-focused improvements associated with Category 1 and 2 projects and Category 3 outcomes. Each hospital-based Performing Provider shall report on all Category 4 measures, unless the hospital-based performing provider either is exempt from all measures or from certain measures in accordance with *Program Funding and Mechanics Protocol*, Sections 11.e. and 11.f. For Category 4, RHP Plans must include:

- <u>Identifying information:</u> Identification of the DSRIP Category 4 measures and the name and Texas Provider Identifier of the RHP Performing Provider that is reporting the measure.
- <u>Narrative description</u>: A narrative description of the Category 4 measures.
- <u>Table Presentation:</u> In a table format, the RHP Plan will include, starting in DY 3:
  - o  List of Category 4 measures the Performing Provider will report on by domain;
  - o  For each measure, the estimated DSRIP funding must be identified as the maximum amount that can be received for reporting on the measure. For each year, the estimated available non-federal share must be included and the source of non-federal share identified.

## IV. Explanation of the Format of this Document

Each RHP will follow the guidelines in this document and provide specificity in its plan. The Categories 1 and 2 projects that follow include the following components, which guide the RHPs in what to include in the plan:

- **Project Area:** The overarching subject matter the project addresses.
- **Project Goal:** This component describes the purpose of performing a project in the project area.
- **Project Option:** This component describes a comprehensive intervention a Performing Provider may undertake to accomplish the project goal.
- **"Other" Project Options:** Each Category 1 and 2 project area includes an "other" project option. Providers that wish to implement an innovative, evidence-based project that is not included on the list of project options for a project area may choose the "other" project option. Providers implementing an innovative, evidence-based project using the "Other" project option may design their project using the process and improvement milestones specified in the project area or may include one or more customizable process milstones P-X and/or improvement milestones I-X, as appropriate for their project. "Other" project options will be subject to additional scrutiny during the plan review and approval process.
- **Project Component:** Activities that may occur in conjunction with one another to carry out a project option. Project components may be required core components or optional components. Required core components are listed with the project options with which

they must be completed. Providers either must incorporate all required core components in their plan narrative or they must provide justification for why they are not including a core component (e.g., the provider was at a more advanced stage with the project and had already completed one or more core components).

The metric specification guide, which is a compendium to this protocol, provides the following additional information:

- **Milestone:** An objective for DSRIP performance comprised of one or more metrics.
  - o **Process Milestones:** Objectives for completing a process that is intended to assist in achieving an outcome. These include objectives for continuous quality improvement, rapid-cycle testing, and collaborative learning that are intended to help providers share best practices, spread breakthrough ideas, and test new solutions with the goal of performing at a higher level and achieving outcomes within the 5 years.
  - o **Improvement Milestones:** Objectives, such as outputs, to assist in achieving an outcome.
- **Metric:** Quantitative or qualitative indicator of progress toward achieving a milestone from a baseline. There are one or more metrics associated with each milestone. The RHP participants may tailor the targets in the metric, as appropriate.
- **Data Source:** The data source often lists multiple options that could be used for the data being measured by the metric. Please note that these options identify appropriate sources of information, but as allowed, Performing Providers may identify alternative sources that are more appropriate to their individual systems and that provide comparable or better information. The RHP plans will specify the exact data source being used for the metric each year.
- **Rationale:** This component describes why the metric is appropriate, including academic citations, descriptions of how widely used the metric is in the industry, and other reasons why the metric is seen as the appropriate data to meaningfully measure progress toward achieving the milestone.

## Additional Process Milestones

In an effort to avoid repetition, it is permissable for each project to include any one of the following as process milestones, in addition to or in lieu of the other process milestones listed. Each is in the spirit of continuous improvement and applying and sharing learning. If a Performing Provider elects to use one or more of these process milestones, the RHP plan describe the related specifics for the milestone, such as the metric and data source, using customizable process milestone P-X, which is included in each project area:

- Participate in a learning collaborative (e.g., in DY 2, join the Hospital Engagement Network, as documented by the appropriate participation document)Conduct a needs/gap analysis, in order to inform the establishment or expansion of services/programs (e.g., in DY2, conduct a gap analysis of high-impact specialty services to identify those in most demand by the local community in order to expand specialty care capacity targeted to those specialties most needed by patients)

- Pilot a new process and/or program
- Assess efficacy of processes in place and recommend process improvements to implement, if any (e.g., in DY 4, evaluate whether the primary care redesign methodology was as effective as it could be, by: (1) performing at least two team-based Plan-Do-Study-Act workshops in the primary care clinics; (2) documenting whether the anticipated metric improvements were met; (3) identifying opportunities, if any, to improve on the redesign methodology, as documented by the assessment document capturing each of these items)
- Redesign the process in order to be more effective, incorporating learnings (e.g., in DY 4, incorporate at least one new element into the process based on the assessment, using the process modification process to include the specificity needed as new learnings are discovered in DY 3)
- Implement a new, improved practice piloted in one or more Performing Providers within an RHP (e.g., in DY 5, implement improved practices across the Performing Provider's ambulatory care setting)
- Establish a baseline, in order to measure improvement over self
- Complete a planning process/submit a plan, in order to do appropriate planning for the implementation of major infrastructure development or program/process redesign (e.g., in DY 2, complete a planning process for a care navigation program to provide support to patient populations who are most at risk of receiving disconnected and fragmented care)
- Designate/hire personnel or teams to support and/or manage the project/intervention
- Implement, adopt, upgrade, or improve technology to support the project
- Develop a new methodology, or refine an existing one, based on learnings
- Incorporate patient experience surveying

**Category 1 Infrastructure Development**

## Category 1 Table of Contents

1.1     Expand Primary Care Capacity ......................................................................................... 249
1.2     Increase Training of Primary Care Workforce ............................................................. 250
1.3     Implement a Chronic Disease Management Registry ................................................... 252
1.4     Enhance Interpretation Services and Culturally Competent Care ................................ 254
1.5     Collect Valid and Reliable Race, Ethnicity, and Language (REAL) Data to Reduce
Disparities ................................................................................................................................. 257
1.6     Enhance Urgent Medical Advice ................................................................................... 260
1.7     Introduce, Expand, or Enhance Telemedicine/Telehealth .............................................. 262
1.8     Increase, Expand, and Enhance Dental Services .......................................................... 268
1.9     Expand Specialty Care Capacity .................................................................................... 271
1.10    Enhance Performance Improvement and Reporting Capacity ...................................... 273
1.11    Implement technology-assisted services (telehealth, telemonitoring, telementoring, or
telemedicine) to support, coordinate, or deliver behavioral health services ............................ 277
1.12    Enhance service availability (i.e., hours, locations, transportation, mobile clinics) to
appropriate levels of behavioral health care ............................................................................ 281
1.13    Development of behavioral health crisis stabilization services as alternatives to
hospitalization. ......................................................................................................................... 283
1.14    Develop Workforce enhancement initiatives to support access to behavioral health
providers in underserved markets and areas (e.g., psychiatrists, psychologists, LMSWs, LPCs
and LMFTs.) ............................................................................................................................. 286

## 1.1   Expand Primary Care Capacity

**Project Goal:**
Expand the capacity of primary care to better accommodate the needs of the regional patient population and community, as identified by the RHP needs assessment, so that patients have enhanced access to services, allowing them to receive the right care at the right time in the right setting. Projects plans related to access to primary care services should address current challenges to the primary care system and patients seeking primary care services, including: expanded and/or enhanced system access points, barriers to transportation, and expanded or enhanced primary care services to include urgent care.

**Project Options:**
   a)    Establish more primary care clinics
   b)    Expand existing primary care capacity
          Required core project components:
          a)    Expand primary care clinic space
          b)    Expand primary care clinic hours
          c)    Expand primary care clinic staffing
   c)    Expand mobile clinics
   d)    "Other" project option:  Implement other evidence-based project to expand primary care capacity in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-15 includes suggestions for improvement metrics to use with this innovative project option.

**Rationale:**
In our current system, more often than not, patients receive services in urgent and emergent care settings for conditions that could be managed in a more coordinated manner if provided in the primary care setting. This often results in more costly, less coordinated care and a lack of appropriate follow-up care. Patients may experience barriers in accessing primary care services secondary to transportation, cost, lack of assigned provider, physical disability, inability to receive appointments in a timely manner and a lack of knowledge about what types of services can be provided in the primary care setting. By enhancing access points, available appointment times, patient awareness of available services and overall primary care capacity, patients and their families will align themselves with the primary care system resulting in better health outcomes, patient satisfaction, appropriate utilization and reduced cost of services.

**1.2    Increase Training of Primary Care Workforce**

**Project Goal:**
Texas has a growing shortage of primary care doctors and nurses due to the needs of an aging population, a decline in the number of medical students choosing primary care, and thousands of aging baby boomers who are doctors and nurses looking towards retirement.  The shortage of primary care workforce personnel in Texas is a critical problem that we have the opportunity to begin addressing under this waiver.  It is difficult to recruit and hire primary care physicians. The shortage of primary care providers has contributed to increased wait times in hospitals, community clinics, and other care settings.  Expanding the primary care workforce will increase access and capacity and help create an organized structure of primary care providers, clinicians, and staff.  Moreover, this expansion will strengthen an integrated health care system and play a key role in implementing disease management programs.  The extended primary care workforce will also be trained to operate in patient-centered medical homes.  A greater focus on primary care will be crucial to the success of an integrated health care system.   Furthermore, in order to effectively operate in a medical home model, there is a need for residency and training programs to expand the capabilities of primary care providers and other staff to effectively provide team-based care and manage population health.  Therefore, the need to expand the responsibilities of primary care workforce members will be even more important.  In summary, the goal for this project is to train more workforce members to serve as primary care providers, clinicians, and staff to help address the substantial primary care workforce shortage and to update training programs to include more organized care delivery models.  This project may apply to primary care physicians (including residents in training), nurse practitioners, physician assistants, and other clinicians/staff (e.g., health coaches, community health workers/promotoras) in the following service areas: family medicine, internal medicine, obstetrics and gynecology, geriatrics, and pediatrics.

In 2010, Texas had 176 patient care physicians per 100,000 population and 70 primary care physicians per 100,000 population with a state ranking of 46 and 47, respectively.  (Comparable ratios for US Total are 219.5 and 90.5, respectively.)  From 2001 to 2011, the Texas physician workforce grew 32.3%, exceeding the population growth of 25.1%.  Primary care physician workforce grew only 25% in the same period.  From 2002 to 2011, Texas increased medical school enrollment 31% from 1,342 to 1,762 in line with the national call by the Association of American Medical Colleges to increase medical school enrollments by 30%.  In 2011, there were 1,445 medical school graduates.  Coincidentally, there were 1,445 allopathic entry-level GME positions offered in the annual National Resident Matching program.  (There were 31 osteopathic slots.)  The Texas Higher Education Coordinating Board recommends a ratio of 1.1 entry-level GME positions for each Texas medical school graduate.  The number of Texas medical school graduates is expected to peak at over 1,700 in 2015.  This implies a need for 400 additional GME positions by 2015.  The shortage of GME positions or residency slots may be

the single most problematic bottleneck in Texas' efforts to alleviate the state's physician shortage.[22]

The rate of Primary Care Physicians per 100,000 Population varies by region from 43 (South Texas) to 78 (Central Texas). Resident physicians provide low-cost care to needy populations and tend to remain in the state in which they complete their residency training.

**Project Options:**

| | |
|---|---|
| a) | Update primary care training programs to include training on the medical home and chronic care models, disease registry use for population health management, patient panel management, oral health, and other identified training needs and/or quality/performance improvement |
| b) | Increase the number of primary care providers (i.e., physicians, residents, nurse practitioners, physician assistants) and other clinicians/staff (such as health coaches and community health workers/promotoras). |
| c) | Increase the number of residency/training program for faculty/staff to support an expanded, more updated program |
| d) | Establish/expand primary care training programs, with emphasis in communities designated as health care provider shortage areas (HPSAs) |
| e) | "Other" project option: Implement other evidence-based project to increase training of the primary care workforce in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. |

---

[22] **2010 physician supply extracted from "Physician Characteristics and Distribution in the U.S., " 20122012 Edition, published by American Medical Association. U.S. and Texas population estimates, 2010, extracted from U.S. Census Bureau American Fact Finder Website. Prepared by: Medical Education Dept., Texas Medical Association, 2/2012.**

**1.3    Implement a Chronic Disease Management Registry**

**Project Goal:**
Implement a disease management registry for one or more patient populations diagnosed with a selected chronic disease(s) or with Multiple Chronic Conditions (MCCs).  By tracking key patient information, a disease registry can help physicians and other members of a patient's care team identify and reach out to patients who may have gaps in their care in order to prevent complications, which often lead to more costly care interventions.  A disease registry can assist physicians in one or more key processes for managing patients with a chronic disease, including:

- Prompt physicians  and their teams to conduct appropriate assessments and deliver condition-specific recommended care;
- Identify patients who have missed appointments, are overdue for care, or are not meeting care management goals;
- Provide reports about how well individual care teams and overall provider organizations are doing in delivering recommended care to specific patient populations;
- Stratify patients into risk categories in order to target interventions toward patients with highest needs.

**Project Options:**
   a)    Implement/enhance and use chronic disease management registry functionalities
          Required core project components:
          a)    Enter patient data into unique chronic disease registry
          b)    Use registry data to proactively contact, educate, and track patients by disease status, risk status, self-management status, community and family need.
          c)    Use registry reports to develop and implement targeted QI plan
          d)    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.
   b)    "Other" project option:  Implement other evidence-based project to implement a chronic disease management registry in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as

appropriate for their project.  Milestone I-23 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.3 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Utilization of registry functionalities helps care teams to actively manage patients with targeted chronic conditions because the disease management registry will include clinician prompts and reminders, which should improve rates of preventive care.

## 1.4 Enhance Interpretation Services and Culturally Competent Care

**Project Goal:**
Patients have access to timely, qualified health care interpreter services in their primary language, thereby increasing the likelihood of safe and effective care, open communication, adherence to treatment protocols, and better health outcomes. This Project Area applies to both written and oral interpretation services.

Cultural competence in health care describes the ability of systems to provide care to patients' with diverse values, beliefs and behaviors, including tailoring care delivery to meet patients' social, cultural, and linguistic needs. Cultural competence can be described both as a vehicle to increase access to quality care for all patient populations and as a business strategy to attract new patients and market share.

To achieve **organizational cultural competence** within the health care leadership and workforce, it is important to maximize diversity.

To achieve **systemic cultural competence** (e.g., in the structures of the health care system) it is essential to address such initiatives as conducting community assessments, developing mechanisms for community and patient feedback, implementing systems for patient racial/ethnic and language preference data collection, developing quality measures for diverse patient populations, and ensuring culturally and linguistically appropriate health education materials and health promotion and disease prevention interventions.

To attain **clinical cultural competence**, health care providers must: (1) be made aware of the impact of social and cultural factors on health beliefs and behaviors; (2) be equipped with the tools and skills to manage these factors appropriately through training and education; and (3) empower their patients to be more of an active partner in the medical management.

**Project Options:**
    a)    Expand access to written and oral interpretation services
        Required core project components:
        a)    Identify and address language access needs and/or gaps in language access
        b)    Implement language access policies and procedures (in coordination with statewide and federal policies to ensure consistency across the state)
        c)    Increase training to patients and providers at all levels of the organization (and organization-wide) related to language access and/or cultural competency/sensitivity
        d)    Increase interpretation staff
    b)    Enhance Organizational Cultural Competence
        Required core project components:

    a)     Hire, promote, and retain minorities at all levels of the organization to increase diversity in the health care workforce.

    b)     Develop a program that actively involves community representatives in the health care organization's planning and quality improvement meetings, whether as part of the board or as part of focus groups.

c)     Enhance Systemic Cultural Competence
Required core project components:

    a)     Develop policies and procedures to measure systemic culture competence, or use existing evidence-based culturally competency assessment tool (e.g., CAHPS Cultural Competency Supplement).

    b)     Adopt and implement all 14 CLAS standards, including those that are not federal mandates.[23]Conduct CLAS Standards trainings at facilities

    c)     Identify federal and state reimbursement strategies for interpreter services and identify community resources and partnerships to develop the needed workforce.

    d)     Provide staff training around Title VI requirements mandating the provision of interpreter services in health care settings.

    e)     Identify and use tools to detect medical errors that result from lack of systemic cultural competence, including those stemming from language barriers (e.g., taking a prescribed medication incorrectly); misunderstanding health education materials, instructions, or signage (e.g., inappropriately preparing for a diagnostic or therapeutic procedure, resulting in postponement or delay); and misunderstanding the benefits and risks of procedures requiring informed consent.

    f)     Implement projects to address medical errors resulting from systemic cultural competency.

d)     Clinical Cultural Competence:  Develop cross-cultural training program that is a required, integrated component of the training and professional development of health care providers at all levels. The curricula should:

- increase awareness of racial and ethnic disparities in health and the importance of socio-cultural factors on health beliefs and behaviors;
- address the impact of race, ethnicity, culture, and class on clinical decision making;
- develop tools to assess the community members' health beliefs and behaviors
- Develop human resource skills for cross-cultural assessment, communication, and negotiation.

---

[23] http://minorityhealth.hhs.gov/assets/pdf/checked/finalreport.pdf

e)      Implement Quality improvement efforts that include culturally and linguistically appropriate patient survey methods as well as process and outcome measures that reflect the needs of multicultural and minority populations.

f)      Clinical Cultural Competence:  Develop programs to help patients navigate the health care system and become a more active partner in the clinical encounter.

g)      "Other" project option:  Implement other evidence-based project to enhance interpretation services and culturally competent care in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-18 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.4 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**

The 2010 United States Census confirmed that our nation's population has become more diverse than ever before, and this trend is expected to continue over this century. As we become a more ethnically and racially diverse nation, health care systems and providers need to reflect on and respond to patients' varied perspectives, values, beliefs, and behaviors about health and well-being. Failure to understand and manage socio-cultural differences may have significant health consequences for minority groups in particular.

Various systemic issues have been identified in the literature and by the health care experts. While this was more obvious in poorly constructed and complicated systems that are not responsive to the needs of diverse patient populations, the issue of language discordance between provider and patient was of foremost importance.  Systems lacking interpreter services or culturally and linguistically appropriate health education materials lead to patient dissatisfaction, poor comprehension and adherence, and lower-quality care. According to various studies, care experts in government, managed care, academia, and community health care make a clear connection between cultural competence, quality improvement, and the elimination of racial/ethnic disparities.

## 1.5 Collect Valid and Reliable Race, Ethnicity, and Language (REAL) Data to Reduce Disparities

In 2002, the Institute of Medicine report *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care[24], signified a new era of national attention to racial and ethnic disparities in the American health care system. Corroborating that report, many research studies have established that Americans* do not all have equal access to health care, or experience similar health care quality and outcomes. Low-income, racial and ethnic minority, limited-English proficient, and other underserved populations often have higher rates of disease, fewer treatment options, reduced access to care, and lower satisfaction with care. A key prerequisite for measuring equity of care and addressing disparities is to collect valid and reliable patient demographic data on race, ethnicity, and preferred language (REAL data). These data elements must be effectively linked to data systems used in health care service delivery (to tailor care to patient needs), as well as data systems used in quality improvement (to identify disparities). Creating organizational systems for capturing REAL data is a long and resource-intensive process. Currently, the processes for analyzing equity of care are mostly piecemeal and limited in scope, taxing organizational resources. However, in the state of Texas there are significant barriers to effective collection and utilization of these patient demographic data for public hospitals. To address these barriers, key next steps for public hospitals systems include developing tools, HIT protocols and training curricula to improve the collection and utilization of REAL data elements, which is the foundation for achieving significantly greater efficiency and cost-effectiveness in measuring equity of care, thus enabling the designs of more successful efforts to eliminate health care disparities.

**Project Goal:**
To improve the collection of valid and reliable self-reported data on the demographics of patients receiving care, the quality of care delivered, and implementing stratification capabilities to stratify clinical/quality data, and analyzing data by relevant demographic categories: race, ethnicity, sex, primary language and disability status.[25] Recently finalized data collection standards for surveys of demographic categories were released by HHS and will be used in the process of developing standards for administrative data collection for the same 5 categories. RHPs will work to implement initiatives, promote training, and accelerate capacity building, community engagement and empowerment. The project focuses on efforts to reduce health and mental health disparities, disparities among racial/ethnic groups, women, seniors, children, rural populations, and those with disabilities and their families.

**Project Options:**

    a)             Train patients and staff on the importance of collecting REAL data (For project option 1.5.1, the provider must do both subpart (i) and subpart (ii), If

---

24 http://www.iom.edu/Reports/2002/Unequal-Treatment-Confronting-Racial-and-Ethnic-Disparities-in-Health-Care.aspx
25 http://minorityhealth.hhs.gov/templates/browse.aspx?lvl=2&lvlid=208

the provider is not using existing curriculum. If the provider is using existing curriculum, only subpart (ii) is required.):

    i.   Develop curriculum that includes effective strategies to explain relevance of collecting REAL data to patients and staff. Education about the value of the information for patient care, with clear examples of the benefits of data collection is central to an effective training.

    ii.   Train patients and staff on the importance of collecting REAL data using developed or existing curricula.

b)    Implement intervention that involves collaborating/partnering/ instituting data sharing agreements with Medicaid agencies, public health departments, academic research centers, other agencies, etc. to better assess patient populations and aid in the evaluation of health disparities

c)    Implement project to enhance collection, interpretation, and / or use of REAL data.

    Required core project components:

a)    Redesign care pathways to collect valid and reliable data on race, ethnicity, and language at the point of care

b)    Implement system to stratify patient outcomes and quality measures by patient REAL demographic information in order to identify, analyze, and report on potential health disparities and develop strategies to address goals for equitable health outcomes. NOTE: Providers are encouraged to stratify outcomes and measures using both two-way and three-way interactions (race and quality; gender, race, and quality)

c)    Develop improvement plans, which include a continuous quality improvement plan, to address key root causes of disparities within the selected population.

d)    Use data to undertake interventions aimed at reducing health and health care disparities (tackling "the gap") for target patient populations through improvements in areas such as f preventive care, patient experience, and/or health outcomes.

d)    "Other" project option: Implement other evidence-based project to implement and use REAL data in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-12 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 1.5 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Several RHPs within Texas focus on health disparities in communities through research, education, and community relations. To build upon the existing infrastructure to address health disparities in Texas, RHPs will select projects appropriate to specific populations based on relevancy to the RHP needs assessment. Some populations experience disparities in health, quality of care, health outcomes, and incidence as related to conditions such as: tuberculosis, congestive heart failure, stroke, COPD, Chlamydia, cervical cancer, liver cancer, stomach cancer, gallbladder cancer, child and adolescent leukemia, neural tube defects, other birth defects, obesity, diabetes, and pesticide poisoning. Disparities can been seen among groups based on race and ethnicity, language, economic factors, education, insurance status, geographic location (rural vs. urban, zip code) , gender, sexual orientation and many other social determinants of health.  The collection of REAL data helps providers to delineate potential categories of differences in observed health status.

**1.6    Enhance Urgent Medical Advice**

**Project Goal:**
Provide urgent medical advice so that patients who need it can access it telephonically, and an appropriate appointment can be scheduled so that access to urgent medical care is increased and avoidable utilization of urgent care and the ED can be reduced. The advice line provides callers with direct access to a registered nurse who can address their specific health needs with an on-demand service.

**Project Options:**
a)       Expand urgent care services
b)       Establish/expand access to medical advice and direction to the appropriate level of care to reduce Emergency Department use for non-emergent conditions and increase patient access to health care.
Required core project components:
a) Develop a process (including a call center) that in a timely manner triages patients seeking primary care services in an ED to an alternate primary care site. Survey patients who use the nurse advice line to ensure patient satisfaction with the services received.
b) Enhance linkages between primary care, urgent care, and Emergency Departments in order to increase communication and improve care transitions for patients.
c) Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.
c)       "Other" project option:  Implement other evidence-based project to implement and use urgent medical advice in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-17 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.6 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient

population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Several RHPs within Texas implemented an urgent medical advice line to serve patients within selected populations. To facilitate the diffusion of practices among RHPs, RHPs will have the opportunity to implement an urgent medical advice line to underserved and under privileged areas.
Implementation across Texas for an urgent medical advice line is not consistent between RHPs. As such, Texas will promote the implementation of an **urgent medical advice line** for underserved and underprivileged populations (i.e. rural areas with limited access to healthcare, or areas where cultural differences may disincentivize the use of automated telephone services).

### 1.7    Introduce, Expand, or Enhance Telemedicine/Telehealth

**Project Goal:**

Provide electronic health care services to increase patient access to health care. Telemedicine is the use of medical information exchanged from one site to another via electronic communications to improve patients' health status. Closely associated with telemedicine is the term "telehealth," which is often used to encompass a broader definition of remote healthcare that does not always involve clinical services. Videoconferencing, transmission of still images, remote monitoring of vital signs with a focus on the specialty care access challenges in rural communities, and continuing medical education are all considered part of telemedicine and telehealth.[26]

Telehealth is the use of electronic information and telecommunications technologies to support long-distance clinical health care, patient and professional health-related education, public health and health administration. Technologies include videoconferencing, the internet, store-and-forward imaging, streaming media, and terrestrial and wireless communications.[27]

Telemedicine is viewed as a cost-effective alternative to the more traditional face-to-face way of providing medical care (e.g., face-to-face consultations or examinations between provider and patient) that states can choose to cover under Medicaid. This definition is modeled on Medicare's definition of telehealth services (42 CFR 410.78). Note that the federal Medicaid statute does not recognize telemedicine as a distinct service.[28]

Telemedicine is not a separate medical specialty. Products and services related to telemedicine are often part of a larger investment by health care institutions in either information technology or the delivery of clinical care. Even in the reimbursement fee structure, there is usually no distinction made between services provided on site and those provided through telemedicine and often no separate coding required for billing of remote services. Telemedicine encompasses different types of programs and services provided for the patient. Each component involves different providers and consumers.[29]

**Telemedicine Services:**

*Specialist referral services* typically involves of a specialist assisting a general practitioner in rendering a diagnosis. This may involve a patient "seeing" a specialist over a live, remote consult or the transmission of diagnostic images and/or video along with patient data to a specialist for viewing later. Recent surveys have shown a rapid increase in the number of specialty and subspecialty areas that have successfully used telemedicine. Radiology continues to make the

---

[26] http://www.americantelemed.org/i4a/pages/index.cfm?pageid=3333
[27] http://www.hrsa.gov/ruralhealth/about/telehealth/
[28] http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Telemedicine.html
[29] http://www.americantelemed.org/i4a/pages/index.cfm?pageid=3333

greatest use of telemedicine with thousands of images "read" by remote providers each year. Other major specialty areas include: dermatology, ophthalmology, mental health, cardiology and pathology. According to reports and studies, almost 50 different medical subspecialties have successfully used telemedicine.

*Patient consultations* using telecommunications to provide medical data, which may include audio, still or live images, between a patient and a health professional for use in rendering a diagnosis and treatment plan. This might originate from a remote clinic to a physician's office using a direct transmission link or may include communicating over the Web.

*Remote patient monitoring* uses devices to remotely collect and send data to a monitoring station for interpretation. Such "home telehealth" applications might include a specific vital sign, such as blood glucose or heart ECG or a variety of indicators for homebound patients. Such services can be used to supplement the use of visiting nurses.

*Medical education* provides continuing medical education credits for health professionals and special medical education seminars for targeted groups in remote locations.

*Consumer medical and health information* includes the use of the Internet for consumers to obtain specialized health information and on-line discussion groups to provide peer-to-peer support.

**Delivery Mechanisms:**

*Networked programs* link tertiary care hospitals and clinics with outlying clinics and community health centers in rural or suburban areas. The links may use dedicated high-speed lines or the Internet for telecommunication links between sites. Studies by the several agencies within the U.S. Department of Health and Human Services, private vendors and assessments by ATA of its membership place the number of existing telemedicine networks in the United States at roughly 200. These programs involve close to 2,000 medical institutions throughout the country. Of these programs, it is estimated that about half (100) are actively providing patient care services on a daily basis. The others are only occasionally used for patient care and are primarily for administrative or educational use.

*Point-to-point connections using private networks* are used by hospitals and clinics that deliver services directly or contract out specialty services to independent medical service providers at ambulatory care sites. Radiology, mental health and even intensive care services are being provided under contract using telemedicine to deliver the services.

*Primary or specialty care to the home connections* involves connecting primary care providers, specialists and home health nurses with patients over single line phone-video systems for interactive clinical consultations.

*Home to monitoring center links* are used for cardiac, pulmonary or fetal monitoring, home care and related services that provide care to patients in the home. Often normal phone lines are used to communicate directly between the patient and the center although some systems use the Internet.

*Web-based e-health patient service sites* provide direct consumer outreach and services over the Internet. Under telemedicine, these include those sites that provide direct patient care.

**Project Options:**

a) Implement telemedicine program to provide or expand specialist referral services in an area identified as needed to the region.
Required core project components:
   a) Provide patient consultations by medical and surgical specialists as well as other types of health professional using telecommunications
   b) Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b) Implement remote patient monitoring programs for diagnosis and/or management of care. Providers should demonstrate that they are exceeding the requirements of the EHR incentive program.

c) Use telehealth to deliver specialty, psychosocial, and community-based nursing services

d) Develop a teledentistry infrastructure and use telehealth to provide dental and oral health services.

e) Use telehealth services to provide medical education and specialized training for targeted professionals in remote locations.

f) Implement an electronic consult or electronic referral processing system to increase efficiency of specialty referral process by enabling specialists to provide advice and guidance to primary care physicians that will address their questions without the need for face-to-face visits when medically appropriate.

g) "Other" project option: Implement other evidence-based project to expand/establish telemedicine/telehealth program to help fill significant gaps in services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their

project.  Milestone I-18 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.7 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale[30]:**

One of the greatest challenges facing the U.S. healthcare system is to provide quality care to the large segment of the population, which does not have access to specialty physicians because of factors such as geographic limitations or socioeconomic conditions. The use of technology to deliver health care from a distance, or telemedicine, has been demonstrated as an effective way of overcoming certain barriers to care, particularly for communities located in rural and remote areas. In addition, telemedicine can ease the gaps in providing crucial care for those who are underserved, principally because of a shortage of sub-specialty providers.

The use of telecommunications technologies and connectivity has impacted real-world patients, particularly for those in remote communities. This work has translated into observable outcomes such as:

- improved access to specialists
- increased patient satisfaction with care
- improved clinical outcomes
- reduction in emergency room utilization
- cost savings

Nowhere are these benefits more evident than in Texas. With a land mass area of 268,820 square miles and a growing population of 25.1 million, Texas is the second largest US state by area and population.1 Its population growth rose more than 18.8 percent between 2000 to 2009, reflecting an increase that is more than double the national growth in this period.2 This rapid growth is attributed to a diversity of sources such as natural increases from the total of all births minus all deaths and to a high rate of net in-migration from other states and countries. Along with the increase in population, an ever-growing aging population (the state's older population, 65+, is expected to double that of the previous 8 years) has significantly affected the demand on the healthcare workforce as demands for quality care increased.

---

[30] http://telehealth.utmb.edu/presentations/Benefits_Of_Telemedicine.pdf

In its Statewide Health Plan 2011-2016 report[31], the Texas Statewide Health Council concluded: "Texas faces particular challenges with respect to physician and other healthcare workforces not primarily because of an overall shortage, but because of sharp disparities in the allocation of healthcare resources to different parts of the state. In the metropolitan areas outside the border, there is one physician in direct patient care for each 573 county residents. In the 32-county border region and in non-metropolitan Texas, the ratios are 2 to 3 times as high."

Although the overall supply of physicians has increased in Texas since 2000 from in-migration, the vast majority of these healthcare professionals resides and practices within four primary areas of Texas: Dallas, Houston, Austin, and San Antonio. Moreover, Texas has consistently lagged behind the US average in the ratio of physician supply per 100,000 of population, and the gap between the two appears to be increasing. In 2009, there were 25 counties with no physicians, and the counties with lowest ratios of providers to populations were by and large in West Texas, South Texas and the Panhandle.

Theoretically, resources such as healthcare would be distributed across the state in accordance with population density and needs. Realistically, however, geographical and economic barriers create significant disparities across the state, with rural and underserved communities enduring significantly greater barriers to accessing the care continuum. The supply ratios for a number of health professionals, including primary care physicians and mental health professionals, are lowest in rural, border and other health professional shortage areas. Data for 2009 indicated that out of the 254 counties in Texas, 118 counties are designated as whole county primary care Health Professional Shortage Areas (HPSAs) due to primary care doctor to patient ratios of 1:3500 or less, and 173 counties (68 percent of the state) are designated as whole county mental health HPSAs²

In Texas, communities are struggling to care for an increasing number of underserved, disadvantaged, and at-risk populations. In most communities, especially in rural areas, care is not organized to promote prevention and early intervention, coordinate services, or monitor access to and quality of care. Moreover, public and private funding to subsidize care remains inadequate, despite growing community needs associated with increases in the uninsured and aging populations. Consequently, many people are left to seek care in emergency rooms, often as a last resort, in an unmanaged and episodic manner. The costs of such care are borne by care-giving institutions, local governments, and, ultimately, taxpayers, many of whom are already burdened with the costs of meeting health-related costs of their own.

Given the various benefits observed through the provision of health care via telemedicine, there is a tremendous amount of momentum toward increasing access to care through the use of health

---

[31] Texas Statewide Health Coordinating Council. 2011-2016 Texas State Health Plan Update. Texas Department of State Health Services. http://www.dshs.state.tx.us/chs/shcc/. Retrieved February 28, 2011

information technologies, thereby creating an exciting and central role for innovation and implementation of new and advanced platforms for service delivery. Two such platforms include the use of wireless and telemonitoring technologies. It is our belief that healthcare delivery is about to make a significant leap forward. The development and installation of high-speed wireless telecommunications networks coupled with large-scale search engines and mobile devices will change healthcare delivery as well as the scope of healthcare services. It will allow for real-time monitoring and interactions with patients without bringing them into a hospital or a specialty care center. This real/near-time monitoring and interacting could enable a healthcare team to address patient problems before they require major interventions, creating a potentially patient-centered approach that could undoubtedly change our expectations of our healthcare system.

In conclusion, the overall goal of the proposed telehealth projects is to reduce disparities in access, outcome, cost and satisfaction that are created by geographic barriers. Specifically, we hope to achieve the following goals for the state's Medicaid population:

1.) increase the knowledge and capacity of rural primary care physicians to manage complex chronic conditions
2.) increase patients' timely access to specialty care and reduce geographic barriers;
3.) create the ability for specialists to provide direct patient consults to patients based at rural clinics
4.) improve efficiency in the referral process by letting specialists divert unnecessary referrals and decreasing the wait time for urgent referrals
5.) provide services in HPSAs
6.) enhance access to other health care services (case management, education, etc.)

## 1.8    Increase, Expand, and Enhance Oral Health Services

**Project Goal:**
Dental health is a key component of overall health. Oral disease can lead to poor nutrition; serious systemic illnesses and conditions such as poor birth outcomes, diabetes, and cardiovascular disease; and a diminished quality of life and life expectancy.[32] Inadequate access to oral health services compounds other health issues. It can result in untreated dental disease that not only affects the mouth, but can also have physical, mental, economic, and social consequences.[33] Fortunately, many of the adverse effects associated with poor oral health can be prevented with quality regular dental care, both at home and professionally. Increasing, expanding, and enhancing oral health services will improve health outcomes.

**Barriers to Oral Health Care:**
- Distribution of dental providers/lack of dental providers in underserved areas
- Inconvenient hours and location of dental clinic/services
- Transportation issues
- Low oral health literacy within the community
- Cultural and language competency of dental providers
- Cost of services/health insurance coverage
- Providers' limited experience treating special groups (medically compromised, elderly, special needs, pregnant women, young children)

**Specific Project Goals:**
- Close gaps/disparities in access to dental care services
- Enhance the quality of dental care
- Increase and enhance the dental workforce
- Redistribute and retain the dental workforce to/in underserved areas

**Project Options:**
**Increase dental provider training, education, recruitment and/or retention, as well as expand workforce capacity through one of the following project options:**

  a)    The development of academic linkages with the three Texas dental schools, to establish  a multi-week externship program for fourth year dental students to provide exposure and experience in providing dental services within a rural setting during their professional academic preparation.

  b)    The establishment of a clinical rotation, continuing education within various community settings for dental residents to increase their exposure and

---

[32] http://www.perio.org/consumer/media/releases.htm#pregnancy
[33] Building Better Oral Health: A Dental Home for All Texans. A Report Commissioned by the Texas Dental Association. Fall 2008

  experience providing dental services to special populations such as the elderly, pregnant women, young children, medically compromised, and/or special needs patients.

c)  The establishment of a loan repayment program or scholarships for advanced training/education in a dental specialty with written commitments to practice in underserved markets after graduation for fourth year dental students, new dental and dental hygiene graduates, and dental residents.

**Increase interdisciplinary training and education opportunities for dentists and other health care providers to promote an interdisciplinary team approach to addressing oral health through one of the following project options:**

d)  Grand rounds, in-service trainings, and other continuing education events that integrate information on oral health issues and implications as related to chronic diseases, such as diabetes and cardiovascular disease, and the importance of good oral health during pregnancy and perinatal period.

e)  Establishing a referral system/network that provides medically complex patients with coordinated care between dental and medical providers such as cardiologists, pediatricians, OB/GYNs, endocrinologists, oncologists, etc.

**Increase and expand services by increasing clinics, clinic hours, using satellite mobile clinics with an affiliated fixed-site dental clinic location, school-based/school-linked health centers or other approaches to increase oral health services to underserved populations through one of the following project options:**

f)  The expansion of existing dental clinics, the establishment of additional dental clinics, or the expansion of dental clinic hours.

g)  The expansion or establishment of satellite mobile dental clinics with an affiliated fixed-site dental clinic location.

h)  The development of a tele-dentistry infrastructure including Medicaid reimbursement to expand access to dental specialty consultation services in rural and other limited access areas.

i)  The implementation or expansion of school-based sealant and/or fluoride varnish programs that provide sealant placement and/or fluoride varnish applications to otherwise unserved school-aged children by enhancing dental workforce capacity through collaborations and partnerships with dental and dental hygiene schools, local health departments (LHDs), federally qualified health centers (FQHCs), and/or local dental providers.

j)  The addition or establishment of school-based health centers that provide dental services for otherwise unserved children by enhancing dental workforce capacity through collaborations and partnerships with dental and dental hygiene schools, LHDs, FQHCs, and/or local dental providers.

k)  The implementation of dental services for individuals in long-term care facilities, intermediate care facilities, and nursing homes, and for the elderly,

        and/or those with special needs by enhancing dental workforce capacity through collaborations and partnerships with dental and dental hygiene schools, LHDs, FQHCs, and/or local dental providers.

l)     "Other" project option:  Implement other evidence-based project to enhance oral health services in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note 1:  All of the project options in project area 1.8 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note 2:  The following project components to implement or enhance efforts to improve quality of care and quality assurance in the delivery of dental care may be included as a part of the above project options:

- Integrating oral health information with electronic medical record.
- Establishing dental care coordination collaboratives where dental case studies are reviewed by dental and medical healthcare providers in an effort to identify best practices and to evaluate health outcomes as a result of the dental interventions and services provided.

## 1.9    Expand Specialty Care Capacity

**Project Goal:**
To increase the capacity to provide specialty care services and the availability of targeted specialty providers to better accommodate the high demand for specialty care services so that patients have increased access to specialty services. With regard to specialty areas of greatest need, the recent report of the Committee on Physician Distribution and Health Care Access cites psychiatry, general/preventive medicine, and child/adolescent psychiatry where the ratios per 100,000 population are 56.7%, 60.2%, and 67% of the US ratios, respectively. Federal funding (Medicare Direct Graduate Medical Education or DGME) for residency training is capped at 1996 levels for the direct support of graduate medical education. The cap only supports a third of the costs of 4,056 of the 4,598 actual positions in Texas, leaving the residency programs to cover the cost of two-thirds of the 4,056 positions and the full cost of 542 positions. Texas is currently over its Medicare cap by 13%.

Residency programs require 3 to 8 years of training, depending on the specialty. Medicare funding only covers years 1 through 3. In 2011, Texas had more than 550 residency programs, offering a total of 6,788 positions. Only 22% (1,494) of theses were first-year residency positions. According to the Coordinating Board, conservative estimates indicate that the cost to educate a resident physician for one year is $150,000.

Hence, a great need for extended residency programs in Texas and increase in the number of specialists.

**Project Options:**
- a) Expand high impact specialty care capacity in most impacted medical specialties
  Required core project components:
- a) Identify high impact/most impacted specialty services and gaps in care and coordination
- b) Increase the number of residents/trainees choosing targeted shortage specialties
- c) Design workforce enhancement initiatives to support access to specialty providers in underserved markets and areas (recruitment and retention)
- d) Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.
- b) Improve access to specialty care
  Required core project components:
  - a) Increase service availability with extended hours

      b)      Increase number of specialty clinic locations

      c)      Implement transparent, standardized referrals across the system.

      d)      Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

c)      "Other" project option:  Implement other evidence-based project to expand specialty care capacity in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-33 includes suggestions for improvement metrics to use with this innovative project option.

**Rationale:**
Inadequate access to specialty care has contributed to the limited scope and size of safety net health systems. To achieve success as an integrated network, gaps must be thoroughly assessed and addressed.

## 1.10 Enhance Performance Improvement and Reporting Capacity

**Project Goal: To expand quality improvement capacity through people, processes and technology so that the resources are in place to conduct, report, drive and measure quality improvement.**

The goal of this project is to implement process improvement methodologies to improve safety, quality, and efficiency. Providers may design customized initiatives based on various process improvement methodologies such as Lean, Six Sigma, Care Logistics, and Nurses Improving Care for Health system Elders (NICHE) among others.

The Lean methodology as applied to medicine evaluates the use of resources, measures the value to the patient, considers the use of resources in terms of their value to the patient, and eliminates those that are wasteful. Focus on Lean is especially valuable to safety net providers because of its emphasis on waste reduction. Denver Health a safety net hospital in Denver, Colorado has identified more than $124 million in cost savings that the health system has achieved due to Lean Rapid Improvement Events since implementing Lean in 2005[34]. Using methodologies such as Lean that are proven to eliminate waste and redundancies and optimize patient flow, providers may customize a project that will develop and implement a program of continuous improvement that will increase communication, integrate system workflows, provide actionable data to providers and patients, and identify and improve models of patient-centered care that address issues of safety, quality, and efficiency. Implementation frequently requires a new "operational mindset" using tools such as Lean to identify and progressively eliminate inefficiencies while at the same time linking human performance, process performance and system performance into transformational performance in the delivery system.[35] The process improvement, as a further example, may include elements such as identifying the value to the patient, managing the patient's journey, facilitating the smooth flow of patients and information, introducing "pull" in the patient's journey (e.g. advanced access), and/or continuously reducing waste by developing and amending processes awhile at the same time smoothing flow and enhancing quality and driving down cost.[36]

**Rationale:**
Performance improvement and reporting is a very large component of success of all of the project areas across the categories. The necessity for quality and safety improvement initiatives permeates health care.[2,3] Quality health care is defined as "the degree to which health services for individuals and populations increase the likelihood of desired health outcomes and are consistent with current professional knowledge"[3] (p. 1161). According to the Institute of Medicine (IOM)

---

[34] http://denverhealth.org/LEANAcademy.aspx

[35] Oujiri J, Ferrara C. "The Phoenix Project – Integrating Effective Disease Management Into Primary Care Using Lean Six-Sigma Tools." *Duluth Clinic Presentation.* 2010.

[36] Bibby J. "Lean in Primary Care: The Basics – Sustaining Transformation." *Asian Hospital and Healthcare Management* (2011) 18.

report, To Err Is Human,[37] the majority of medical errors result from faulty systems and processes, not individuals.

Processes that are inefficient and variable, changing case mix of patients, health insurance, differences in provider education and experience, and numerous other factors contribute to the complexity of health care. With this in mind, the IOM also asserted that today's health care industry functions at a lower level than it can and should, and it put forth the following six aims of health care: effective, safe, patient-centered, timely, efficient, and equitable.[3] The aims of effectiveness and safety are targeted through process-of-care measures, assessing whether providers of health care perform processes that have been demonstrated to achieve the desired aims and avoid those processes that are predisposed toward harm. The goals of measuring health care quality are to determine the effects of health care on desired outcomes and to assess the degree to which health care adheres to processes based on scientific evidence or agreed to by professional consensus and is consistent with patient preferences.

Because errors are caused by system or process failures, it is important to adopt various process-improvement techniques to identify inefficiencies, ineffective care, and preventable errors to then influence changes associated with systems. Each of these techniques involves assessing performance and using findings to inform change. This chapter will discuss strategies and tools for quality improvement—including failure modes and effects analysis, Plan-Do-Study-Act, Six Sigma, Lean, and root-cause analysis—that have been used to improve the quality and safety of health care.[38]

Whatever the acronym of the method (e.g., TQM, CQI) or tool used (e.g., FMEA or Six Sigma), the important component of quality improvement is a dynamic process that often employs more than one quality improvement tool. Quality improvement requires five essential elements for success: fostering and sustaining a culture of change and safety, developing and clarifying an understanding of the problem, involving key stakeholders, testing change strategies, and continuous monitoring of performance and reporting of findings to sustain the change.

**Project Options:**
    a)      Enhance improvement capacity within people
           Required core project components
           a)     Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.

---

[37] Hughes RG. Tools and Strategies for Quality Improvement and Patient Safety. In: Hughes RG, editor. Patient Safety and Quality: An Evidence-Based Handbook for Nurses. Rockville (MD): Agency for Healthcare Research and Quality (US); 2008 Apr. Chapter 44. Available from: http://www.ncbi.nlm.nih.gov/books/NBK2682/

[38] Hughes RG. Tools and Strategies for Quality Improvement and Patient Safety. In: Hughes RG, editor. Patient Safety and Quality: An Evidence-Based Handbook for Nurses. Rockville (MD): Agency for Healthcare Research and Quality (US); 2008 Apr. Chapter 44. Available from: http://www.ncbi.nlm.nih.gov/books/NBK2682/

    b)    Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.

b)    Enhance improvement capacity through technology
    Required core project components
        a)    Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.
        b)    Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.
        c)    Design data collection systems to collect real-time data that is used to drive continuous quality improvement (possible examples include weekly run charts or monthly dashboards)

c)    Enhance improvement capacity within systems
    Required core project components
        d)    Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.
        e)    Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.

f)    "Other" project option:  Implement other evidence-based project to enhance performance improvement and reporting capacity in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area1.10 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

# CATEGORY 1: BEHAVIORAL HEALTH INFRASTRUCTURE PROJECTS

## GOAL: Improve the infrastructure for delivery of mental health and substance use disorder (AKA behavioral health) services.

The goals of infrastructure-related mental health and substance use disorder (behavioral health) projects are to improve the access to appropriate behavioral health interventions and specialists throughout Texas. This is an especially critical need in Texas for several reasons:

- State funding for behavioral health indigent care is limited. Texas ranks 50th in per capita funding for state mental health authority (DSHS) services and supports for people with serious and persistent mental illness and substance use disorders. Medically indigent individuals who are not eligible for Medicaid have no guarantee of access to needed services and may face extended waiting periods.
- Texas ranks highest among states in the number of uninsured individuals per capita. One in four Texans lack health insurance. People with behavioral health disorders are disproportionately affected. For example, 60 percent of seriously mentally ill adults served in the public mental health system are uninsured.[39]
  - The supply of behavioral health care providers is inadequate in most of the State. In April of 2011, 195 (77%) of Texas' 254 counties held federal designations as whole county Health Provider Shortage Areas (HPSAs). This is an increase from the 183 counties designated in 2002.[40]



Texas Population (age 18+) 18,789,238

Estimated Number with Serious and Persistent Mental Illness 488,520

Number Served in DSHS-Funded Community Mental Health Services (including NorthSTAR) 157,131 (32.2% Need Met)

Projects / project elements under this heading are designed to increase the supply of behavioral health professionals practicing in the State, extend the capacity of behavioral health providers to offer expertise to other health care providers, such as primary care physicians and enhance the capacity of behavioral health and other providers to effectively serve patients with behavioral health conditions. Examples of such projects could include training and residency programs for behavioral health providers, programs which expand access to certified peer support services, telehealth consultation programs in which behavioral health providers offer timely expertise to primary care providers and extended clinic hours / mobile clinics.

---

[39] DSHS Decision Support, 2012
[40] **"Highlights: The Supply of Mental Health Professionals in Texas -2010", Texas Department of State Health Services Center for Health Statistics, E-Publication No. E25-12347. Accessed at:**
**http://www.dshs.state.tx.us/chs/hprc/publicat.shtm**

**1.11 Implement technology-assisted services (telehealth, telemonitoring, telementoring, or telemedicine) to support, coordinate, or deliver behavioral health services**

**Project Goal:**

Texas faces several access barriers that make the deployment of workable integrated health care models a challenge. Specifically, Texas is composed of 254 counties, the majority of which can be classified as either "rural" or "frontier". The availability of health care providers is severely limited in many of these sparsely populated areas. While these shortages make access to physical healthcare difficult for those who reside in these rural areas, the impact on individuals with behavioral health needs is even more severe. For example, in 2009, 171 Texas counties did not have a psychiatrist, 102 counties did not have a psychologist, 40 counties did not have a social worker and 48 counties did not have a licensed professional counselor.

There are 195 Texas counties (77% of all Texas counties) that have been designated by the Health Resources and Services Administration (HRSA) as Health Professional Shortage Areas (HPSAs) in relation to behavioral health. Furthermore, certain specialties (such as Child Psychiatrists) are virtually non-existent in the vast majority of the rural and frontier areas of the state.

Additionally, the size of the state makes travel from these underserved areas to larger urban settings difficult. For individuals who lack reliable transportation or have disabilities that restrict driving, the challenge of accessing health care may be virtually insurmountable.

Furthermore, there are many non-rural areas of the state where the availability of health care professionals is greatly limited. For example, in Bexar country, which has one of the largest urban populations in Texas, there are 123 areas within the county that have been designated as HPSAs by HRSA. Similar shortages can be found in most Texas urban counties.

Modern communications technology holds the greatest promise of bridging the gap between medical need in underserved areas and the provision of needed services. The developments in internet-based communications that began with voice messaging have been extended to video in the form of widely available video compression technologies that allow for high quality, real time, face-to-face communications and consultations over relatively inexpensive telecommunications equipment. With this new technology, in any area of the state where high speed broadband internet access is available, access to many forms of health care can become a reality. To leverage the promise of this new technology, Texas would like to expand the use of telemedicine, telehealth, and telemonitoring to thereby increase access to, and coordination of, physical and behavioral healthcare.

Televideo technology can be used to provide a variety of what have been referred to as "Telemental Health" services. These services may include mental health assessments, treatment, education, monitoring, mentoring and collaboration. These services may be used in a variety of

locations (schools, nursing facilities, and even in homes) in any geographical location where traditional service providers are in short supply. Providers can include psychiatrists, nurse practitioners, physician assistants, social workers, pharmacists, psychologists, counselors, PCPs, and nurses. For example, telemental health could be used to provide follow-up outpatient consults with a psychiatrist or other mental health professional within 7 or 30 days of discharge from the inpatient hospital. These virtual follow-up visits could focus on monitoring for remission of symptoms, adjusting psychotropic medications, and developing a treatment plan to prevent readmissions in partnership with the primary care provider. Telemental services could also be used to provide medication management services to community mental health patients with severe mental illness to ensure appropriate medication treatment and compliance, preventing psychiatric crises which would require psychiatric hospitalization.

The use of telemedicine could provide direct video access to a psychiatrist while the use of telementoring would provide a General Practitioner with access to consultation with psychiatrists with expertise in managing complex medication regimens. Additionally, telehealth could provide direct access to Cognitive Behavioral Therapy and other evidence-based counseling protocols that have proven to be effective in addressing major depression, trauma, and even schizophrenia in some populations.

Telecommunications technology can also be used to foster peer support and mentoring efforts among providers and among consumers (e.g., support groups, peer mentors).

For example, The University of New Mexico has successfully utilized a telementoring program (Project ECHO) to successfully train and provide ongoing support to Primary Care Physicians (PCPs) who provide care to persons with addiction. This initiative provides weekly didactic sessions as well as case presentations to address challenging clinical cases and get feedback from specialists based at the University and from colleagues around the state.[41]

**Project Options:**

a)     Procure and build the infrastructure needed to pilot or bring to scale a successful pilot of the selected forms of service in underserved areas of the state (this must be combined with one of the two interventions below). Required core project components:

a)     Identify existing infrastructure for high speed broadband communications technology (such as T-3 lines, T-1 lines) in rural, frontier, and other underserved areas of the state;

---

[41]   **Project ECHO: a model for expanding access to addiction treatment in a rural state**
Miriam Komaromy, MD, 2010.

b) Assess the local availability of and need for video communications equipment in areas of the state that already have (or will have) access to high speed broadband technology.

c) Assess applicable models for deployment of telemedicine, telehealth, and telemonitoring equipment.

b) Implement technology-assisted behavioral health services from psychologists, psychiatrists, substance abuse counselors, peers and other qualified providers). Required core project components:

a) Develop or adapt administrative and clinical protocols that will serve as a manual of technology-assisted operations.

b) Determine if a pilot of the telehealth, telemonitoring, telementoring, or telemedicine operations is needed. Engage in rapid cycle improvement to evaluate the processes and procedures and make any necessary modifications.

c) Identify and train qualified behavioral health providers and peers that will connect to provide telemedicine, telehealth, telementoring or telemonitoring to primary care providers, specialty health providers (e.g., cardiologists, endocrinologists, etc.), peers or behavioral health providers. Connections could be provider to provider, provider to patient, or peer to peer.

d) Identify modifiers needed to track encounters performed via telehealth technology

e) Develop and implement data collection and reporting standards for electronically delivered services

f) Review the intervention(s) impact on access to specialty care and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

g) Scale up the program, if needed, to serve a larger patient population, consolidating the lessons learned from the pilot into a fully-functional telehealth, telemonitoring, telementoring, or telemedicine program. Continue to engage in rapid cycle improvement to guide continuous quality improvement of the administrative and clinical processes and procedures as well as actual operations.

h) Assess impact on patient experience outcomes (e.g. preventable inpatient readmissions)

c) "Other" project option: Implement other evidence-based project to implement technology-assisted services to support, coordinate, or deliver behavioral health services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using

the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 1.11 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**1.12  Enhance service availability (i.e., hours, locations, transportation, mobile clinics) of appropriate levels of behavioral health care**

**Project Goal**

Positive healthcare outcomes are contingent on the ability of the patient to obtain both routine examinations and healthcare services as soon as possible after a specific need for care has been identified. However, many Texans are unable to access either routine services or needed care in a timely manner either because they lack transportation or because they are unable to schedule an appointment due to work scheduling conflicts (or school scheduling conflicts in the case of children) or because they have obligations to provide care for children or elderly relatives during normal work hours. While such barriers to access can compromise anyone's ability to make or keep scheduled appointments, individuals with behavioral health needs may be especially negatively affected. Many individual with behavioral health needs are reticent to seek treatment in the first place and such barriers may be sufficient to prevent access entirely. Others may be easily discouraged by such barriers and may drop out of treatment. Any such delay in accessing services or any break or disruption in services may result in functional loss and the worsening of symptoms.  These negative health outcomes come at great personal cost to the individual and also result in increased costs to payers when care is finally obtained.

In order to mitigate the effects of these barriers to accessing care, Texas proposes to take specific steps to broaden access to care that will include an expansion of operating hours in a select number of clinics, an expansion of community-based service options (including the development of mobile clinics), and an expanded transportation program that will support appointments that are scheduled outside of normal business hours.

**Project Options:**

a)      Establish extended operating hours at a select number of Local Mental Health Center clinics or other community-based settings in areas of the State where access to care is likely to be limited.
Required core project component:

      a)      Evaluate existing transportation programs and ensure that transportation to and from medical appointments is made available outside of normal operating hours.  If transportation is a significant issue in care access, develop and implement improvements as part of larger project.

      b)      Review the intervention(s) impact on access to behavioral health services and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

b)      Expand the number of community based settings where behavioral health services may be delivered in underserved areas

c)      Develop and staff a number of mobile clinics that can provide access to care in very remote, inaccessible, or impoverished areas of Texas.

d)      "Other" project option:  Implement other evidence-based project to enhance service availability of appropriate levels of behavioral health care in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

**1.13 Development of behavioral health crisis stabilization services as alternatives to hospitalization.**

**Project Goal**

When a consumer lacks appropriate behavioral health crisis resolution mechanisms, first responders are often limited in their options to resolve the situation. Sometimes the choice comes down to the ER, jail or an inpatient hospital bed. Crisis stabilization services can be developed that create alternatives to these less desirable settings. Building on existing systems, communities can develop crisis alternatives such as sobering units, crisis residential settings and crisis respite programs with varying degrees of clinical services based on the needs of clients. While hospitalization provides a high degree of safety for the person in crisis, it is very expensive and is often more than what is needed to address the crisis. Community-base crisis alternatives can effectively reduce expensive and undesirable outcomes, such as preventable inpatient stays. For example, state psychiatric hospital recidivism trended downward coincident with implementation of crisis outpatient services in some Texas communities. The percent of persons readmitted to a Texas state psychiatric hospital within 30 days decreased from 8.0% in SFY2008 (before implementation of alternatives) to 6.9% in SFY2011.[42]



*Figure 2.* Number of persons accessing crisis outpatient services and transitional services at DSHS-funded community mental health centers compared to percent of persons readmitted to a state psychiatric hospital within 30 days, SFY2008-2011.

**Project Options**

    a)    Develop and implement crisis stabilization services to address the identified gaps in the current community crisis system
                Required core project components:

---

[42] **Behavioral Health NEWS BRIEF Vol. 7 Issue 3 -** May 25, 2012 , http://www.dshs.state.tx.us/sa/_BHNB/

a) Convene community stakeholders who can support the development of crisis stabilization services to conduct a gap analysis of the current community crisis system and develop a specific action plan that identifies specific crisis stabilization services to address identified gaps (e.g. for example, one community with high rates of incarceration and/or ED visits for intoxicated patients may need a sobering unit while another community with high rates of hospitalizations for mild exacerbations mental illness that could be treated in community setting may need crisis residential programs).

b) Analyze the current system of crisis stabilization services available in the community including capacity of each service, current utilization patterns, eligibility criteria and discharge criteria for each service.

c) Assess the behavioral health needs of patients currently receiving crisis services in the jails, EDs, or psychiatric hospitals. Determine the types and volume of services needed to resolve crises in community-based settings. Then conduct a gap analysis that will result in a data-driven plan to develop specific community-based crisis stabilization alternatives that will meet the behavioral health needs of the patients (e.g. a minor emergency stabilization site for first responders to utilize as an alternative to costly and time consuming Emergency Department settings)

d) Explore potential crisis alternative service models and determine acceptable and feasible models for implementation.

e) Review the intervention(s) impact on access to and quality of behavioral health crisis stabilization services and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations

b) "Other" project option: Implement other evidence-based project to develop behavioral health crisis stabilization services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 1.13 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient

population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**1.14  Develop Workforce enhancement initiatives to support access to behavioral health providers in underserved markets and areas (e.g., psychiatrists, psychologists, LMSWs, LPCs and LMFTs.)**

**Project Goal:**
The goal of this project is to enhance access and reduce shortages in specialty behavioral health care to improve local integration of behavioral health care into the overall health delivery system; improve consumer choice and increase availability of effective, lower-cost alternatives to inpatient care, prevent inpatient admissions when possible and promote recovery from behavioral health disorders. The supply of behavioral health care providers is inadequate in most of the State. In 2011, 195 (77%) of Texas' 254 counties held federal designations as whole county Health Provider Shortage Areas (HPSAs) in relation to behavioral health.[43]  Indeed, Texas ranks far below the national average in the number of mental health professionals per 100,000 residents. These shortages are even greater in rural, poor and Texas – Mexico border communities.

**Project Options:**
  a)   Implement strategies defined in the plan to encourage behavioral health practitioners to serve medically indigent public health consumers in HPSA areas or in localities within non-HPSA counties which do not have access equal to the rest of the county. Examples of strategies could include marketing campaigns to attract providers, enhanced residency programs or structured financial and non-financial incentive programs to attract and retain providers, identifying and engaging individual health care workers early in their studies/careers and providing training in identification and management of behavioral health conditions to other non-behavioral health disciplines (e.g., ANPs, PAs).
  Required core project components:
      a)   Conduct a qualitative and quantitative gap analysis to identify needed behavioral health specialty vocations lacking in the health care region and the issues contributing to the gaps.
      b)   Develop plan to remediate gaps identified and data reporting mechanism to assess progress toward goal. This plan will specifically identify:
          •   The severity of shortages of behavioral health specialists in a region by type (psychiatrists, licensed psychologists, nurse practitioners, physicians assistants, nurses, social workers, licensed professional counselors, licensed marriage and family therapists,

---

[43] "Highlights: The Supply of Mental Health Professionals in Texas -2010", Texas Department of State Health Services Center for Health Statistics, E-Publication No. E25-12347. Accessed at:
http://www.dshs.state.tx.us/chs/hprc/publicat.shtm

licensed chemical dependency counselors, peer support specialists, community health workers etc.)
- Recruitment targets by specialty over a specified time period.
- Strategies for recruiting healthcare specialists
- Strategies for developing training for primary care providers to enhance their understanding of and competency in the delivery of behavioral health services and thereby expand their scope of practice.

c)  Assess and refine strategies implemented using quantitative and qualitative data. Review the intervention(s) impact on behavioral health workforce in HPSA areas and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations

b)  "Other" project option:  Implement other evidence-based project to develop workforce enhancement initiatives to support access to behavioral health providers in underserved markets in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

**Category 2 Innovation and Redesign**

## Category 2 Table of Contents

2.1    Enhance/Expand Medical Homes ................................................................................ 290
2.2    Expand Chronic Care Management Models ................................................................ 294
2.3    Redesign Primary Care ............................................................................................... 297
2.4    Redesign to Improve Patient Experience .................................................................... 299
2.5    Redesign for Cost Containment .................................................................................. 302
2.6    Implement Evidence-based Health Promotion Programs ............................................ 304
2.7    Implement Evidence-based Disease Prevention Programs ......................................... 306
2.8    Apply Process Improvement Methodology to Improve Quality/Efficiency .................. 308
2.9    Establish/Expand a Patient Care Navigation Program ................................................ 314
2.10   Use of Palliative Care Programs ................................................................................. 316
2.11   Conduct Medication Management .............................................................................. 319
2.12   Implement/Expand Care Transitions Programs .......................................................... 322
2.13   Provide an intervention for a targeted behavioral health population to prevent unnecessary use of services in a specified setting (i.e., the criminal justice system, ER, urgent care etc.). ... 330
2.14   Implement person-centered wellness self-management strategies and self directed financing models that empower consumers to take charge of their own health care. ................ 334
2.15   Integrate Primary and Behavioral Health Care Services ............................................. 337
2.16   Provide virtual psychiatric and clinical guidance to all participating primary care providers delivering services to behavioral patients regionally. ................................................ 342
2.17   Establish improvements in care transition from the inpatient setting for individuals with mental health and / or substance abuse disorders. .................................................................... 345
2.18   Recruit, train and support consumers of mental health services to provide peer support services ........................................................................................................................................ 348
2.19   Develop Care Management Function that integrates primary and behavioral health needs of individuals ............................................................................................................................. 350

## 2.1    Enhance/Expand Medical Homes

**Project Goal:**
The goal of projects under this heading is to expand or enhance the delivery of care provided through the Patient-Centered Medical Home (PCMH) model[44]. The PCMH provides a primary care "home base" for patients. Under this model, patients are assigned a health care team who tailors services to a patient's unique health care needs, effectively coordinates the patient's care across inpatient and outpatient settings, and proactively provides preventive, primary, routine and chronic care.

**Project Options:**

a)    Develop, implement, and evaluate action plans to enhance/eliminate gaps in the development of various aspects of PCMH standards.
Required core project components:

    **a)**    Utilize a gap analysis to assess and/or measure hospital-affiliated and/or PCPs' NCQA PCMH readiness.

    **b)**    Conduct feasibility studies to determine necessary steps to achieve NCQA PCMH status

    **c)**    Conduct educational sessions for primary care physician practice offices, hospital boards of directors, medical staff and senior leadership on the elements of PCMH, its rationale and vision.

    **d)**    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)    Collaborate with an affiliated Patient-Centered Medical Home to integrate care management and coordination for shared, high-risk patients.
Required core project components:

    **a)**    Improve data exchange between hospitals and affiliated medical home sites.

    **b)**    Develop best practices plan to eliminate gaps in the readiness assessment.

    **c)**    Hire and train team members to create multidisciplinary teams including social workers, health coaches, care managers, and nurses with a diverse skill set that can meet the needs of the shared, high-risk patients

---

44 http://www.aafp.org/online/etc/medialib/aafp_org/documents/about/pcmh.Par.0001.File.dat/PCMH.pdf

    **d)**    Implement a comprehensive, multidisciplinary intervention to address the needs of the shared, high-risk patients

    **e)**    Evaluate the success of the intervention at decreasing ED and inpatient hospitalization by shared, high-risk patients and use this data in rapid-cycle improvement to improve the intervention.

    **f)**    Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

c)    Implement medical homes in HPSA and other rural and impoverished areas using evidence-approached change concepts for practice transformation developed by the Commonwealth Fund's Safety Net Medical Home Initiative: Required core project components:

    **a)**    Empanelment: Assign all patients to a primary care provider within the medical home. Understand practice supply and demand, and balance patient load accordingly.

    **b)**    Restructure staffing into multidisciplinary care teams that manage a panel of patients where providers and staff operate at the top of their license. Define roles and distribute tasks among care team members to reflect the skills, abilities, and credentials of team members.

    **c)**    Link patients to a provider and care team so both patients and provider/care team recognizes each other as partners in care.

    **d)**    Assure that patients are able to see their provider or care team whenever possible.

    **e)**    Promote and expand access to the medical home by ensuring that established patients have 24/7 continuous access to their care teams via phone, e-mail, or in-person visits.

    **f)**    Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

d)    "Other" project option: Implement other evidence-based project to enhance/expand medical home in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more

customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-19 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.1 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note: PCMH models include investments in projects that are the foundation of delivery system change and a complete package of change. Therefore, it is preferable to pursue a full continuum of projects (PCMH readiness preparations, the establishment or expansion of medical homes which may include gap analyses and eventual application for PCMH recognition[45] to a nationally recognized organization such as NCQA, as well as educating various constituent groups within hospitals and primary care practices about the essential elements of the NCQA medical home standards). [46,47,48,49,50,51,52]

**Rationale:**
Federal, state, and health care providers share goals to promote more patient-centered care focused on wellness and coordinated care. In addition, the PCMH model is viewed as a foundation for the ability to accept alternative payment models under payment reform. PCMH development is a multi-year transformational effort and is viewed as a foundational way to deliver care aligned with payment reform models and the Triple Aim goals of better health, better patient experience of care, and ultimately better cost-effectiveness. By providing the right care at the right time and in the right setting, over time, patients may see their health improve, rely less on costly ED visits, incur fewer avoidable hospital stays, and report greater patient satisfaction. These projects all are focused on the concepts of the PCMH model; yet, they take different shapes for different providers.[53]

This initiative aims to eliminate fragmented and uncoordinated care, which can lead to emergency department and hospital over-utilization. The projects associated with Medical

---

45 http://www.medicalhomeinfo.org/national/recognition_programs.aspx
46 http://www.commonwealthfund.org/Topics/Patient-Centered-Care.aspx
47 http://www.qhmedicalhome.org/pcmh-qualis-health/change-concepts
48 http://www.pcmh.ahrq.gov/portal/server.pt/community/pcmh__home/1483
49 http://www.medicalhomeforall.com/
50 http://www.acponline.org/running_practice/pcmh/
51 http://www.pediatricmedhome.org/
52 Transformed: http://www.transformed.com/index.cfm
53 http://www.pcpcc.net/content/pcmh-vision-reality

Homes establish a foundation for transforming the primary care landscape in Texas by emphasizing enhanced chronic disease management through team-based care.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: December 12, 2011 through December 31, 2017
Temporary Extension Awarded May 2, 2016

Page 293 of 460

## 2.2    Expand Chronic Care Management Models[54]

**Project Goal:**
The goal of this project is to develop and implement chronic disease management interventions that are geared toward improving effective management of chronic conditions and ultimately improving patient clinical indicators, health outcomes and quality, and reducing unnecessary acute and emergency care utilization. Chronic disease management initiatives use population-based approaches to create practical, supportive, evidence-based interactions between patients and providers to improve the management of chronic conditions and identify symptoms earlier, with the goal of preventing complications and managing utilization of acute and emergency care. Program elements may include the ability to identify one or more chronic health conditions or co-occurring chronic health conditions that merit intervention across a patient population, based on a an assessment of patients' risk of developing complications, co-morbidities or utilizing acute or emergency services.  These chronic health conditions may include diabetes, congestive heart failure, chronic obstructive pulmonary disease, among others, all of which are prone to co-occurring health conditions and risks.

**Project Options:**
   a)       Redesign the outpatient delivery system to coordinate care for patients with chronic diseases
            Required core project components:
            a)       Design and implement care teams that are tailored to the patient's health care needs, including non-physician health professionals, such as pharmacists doing medication management; case managers providing care outside of the clinic setting via phone, email, and home visits; nutritionists offering culturally and linguistically appropriate education; and health coaches helping patients to navigate the health care system
            b)       Ensure that patients can access their care teams in person or by phone or email
            c)       Increase patient engagement, such as through patient education, group visits, self-management support, improved patient-provider communication techniques, and coordination with community resources
            d)       Implement projects to empower patients to make lifestyle changes to stay healthy and self-manage their chronic conditions
            e)       Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned,"

---

54  Some chronic diseases addressed by chronic care management models in RHP plans may include diabetes, hypertension, heart failure, asthma, post-secondary stroke, community-acquired pneumonia (CAP), HIV/AIDS, and chronic pain.

        opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)       Apply evidence-based care management model to patients identified as having high-risk health care needs

c)       Redesign rehabilitation delivery models for persons with disabilities

d)       Develop a continuum of care in the community for persons with serious and persistent mental illness and co-occurring disorders

e)       Develop care management functions that integrate the primary and behavioral health needs of individuals

f)       "Other" project option: Implement other evidence-based project to expand chronic care management models in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-21 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.2 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Promoting effective change in provider groups to support evidence-based clinical and quality improvement across a wide variety of health care settings. There are many definitions of "chronic condition", some more expansive than others. We characterize it as any condition that requires ongoing adjustments by the affected person and interactions with the health care system. The most recent data show that more than 145 million people, or almost half of all Americans, live with a chronic condition. That number is projected to increase by more than one percent per year by 2030, resulting in an estimated chronically ill population of 171 million. Almost half of all people with chronic illness have multiple conditions. As a result, many managed care and integrated delivery systems have taken a great interest in correcting the many deficiencies in current management of diseases such as diabetes, heart disease, depression, asthma and others. Those deficiencies include:

- Rushed practitioners not following established practice guidelines
- Lack of care coordination
- Lack of active follow-up to ensure the best outcomes

- Patients inadequately trained to manage their illnesses

Overcoming these deficiencies will require nothing less than a transformation of health care, from a system that is essentially reactive - responding mainly when a person is sick - to one that is proactive and focused on keeping a person as healthy as possible. To speed the transition, Improving Chronic Illness Care created the Chronic Care Model, which summarizes the basic elements for improving care in health systems at the community, organization, practice and patient levels. Evidence on the effectiveness of the Chronic Care Model has recently been summarized. [55]

---

55 http://content.healthaffairs.org/content/28/1/75.full

## 2.3    Redesign Primary Care

**Project Goal:**
Increase efficiency and redesign primary care clinics programs to be oriented around the patient so that primary care access and the patient experience can be improved.

**Project Options:**

    a)        Redesign primary care in order to achieve improvements in efficiency, access, continuity of care, and patient experience

                Required core project components:

                **a)**    Implement the patient-centered scheduling model in primary care clinics

                **b)**    Implement patient visit redesign

                **c)**    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

    b)        "Other" project option:  Implement other evidence-based project to redesign primary care in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-18 includes suggestions for improvement metrics to use with this innovative project option.

        Note:  All of the project options in project area 2.3 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Primary care in the United States faces serious challenges. Many physician practices struggle to ensure that their patients have prompt access to care, consistently high-quality chronic and preventative services, and adequate coordination of care.  This struggle impacts patients who may experience barriers in accessing primary care services secondary to transportation, the lack of an assigned provider, inability to receive appointments in a timely manner and a lack of

knowledge about what types of services can be provided in the primary care setting. By enhancing access points, available appointment times, patient awareness of available services and overall primary care capacity, patients and their families will align themselves with the primary care system resulting in improved health access, improved health outcome and reduced costs of services.

## 2.4    Redesign to Improve Patient Experience

**Project Goal:**

Improve how the patient experiences the care and the patient's satisfaction with the care provided.  The state healthcare transformation is counting on a robust primary care sector to improve quality, reduce costs, and improve patient experience. This will require a redesign of primary care to meet the needs of patients for timely, patient-centered, continuous, and coordinated care to enhance access to care regardless of type of insurance. The overall approach to redesigning patient experience will be centered on cultural change at the organizational level. This will involve the practitioners in a clinic as well as the patients and their families or caregivers. An organizational strategy will be developed so that entities will manage patient experience and create avenues to implement the strategic plan/vision. Providers' performance will be measured, among other factors, by the extent to which patient experience improves systematically.

Patient experience with care will be assessed through focused surveys. The architecture for patient focused surveys should be modeled after the Consumer Assessment of Healthcare Providers and Systems (CAHPS) tool, which includes the following domains: patients are getting timely care, appointments, and information; how well providers communicate with patients; patients' rating of provider; and assessment office staff. [56] The Clinician and Group Consumer Assessment of Health Care Providers and Systems (CG CAHPS) survey[57] can be used to assess patient and caregiver experience of care in outpatient settings while HCAHPS can be employed to measure patient experience in the hospital setting. Certain supplemental modules for the adult survey CG-CAHPS may be used to establish additional outcomes: Health Literacy, Cultural Competence, Health Information Technology, and Patient Centered Medical Home.

These surveys will be mandatory, and will be administered at the end of the medical episode, six weeks after the visit (to avoid recall bias) and six months if no other episode of care intervened.

**Project Options:**

a)    Implement processes to measure and improve patient experience
       Required core project components:

   **a)**    Organizational integration and prioritization of patient experience
   **b)**    Data and performance measurement will be collected by utilizing patient experience of care measures from the Hospital Consumer Assessment of Healthcare Providers and Systems (HCAHPS) in addition to CAHPS and/or other systems and methodologies to measure patient experience;

---

56 https://cahps.ahrq.gov/clinician_group/cgsurvey/patientexperiencemeasurescgsurveys.pdf
57 https://cahps.ahrq.gov/clinician_group/

  **c)**  Implementing processes to improve patient's experience in getting through to the clinical practice;

  **d)**  Develop a process to certify independent survey vendors that will be capable of administering the patient experience of care survey in accordance with the standardized sampling and survey administration procedures.

b)  Implement other evidence based project to improve patient experience in an innovative manner not described above.  Note, providers opting to implement an innovative project under this option must propose relevant process metrics and report on the improvement metrics listed under milestone I-X.

c)  Project Option: Increased patient satisfaction
Implement an innovative and evidence based intervention that will lead to improvements in patient satisfaction for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category ,3  Outcome Domain – 6 Patient Satisfaction**. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

d)  "Other" project option:  Implement other evidence-based project to redesign to improve patient experience in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-20 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.4 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Over time, implemented projects have the potential to yield improvements in the level of care integration and coordination for patients and ultimately lead to better health and better patient experience of care.

## 2.5    Redesign for Cost Containment

**Project Goal:**
Improve cost-effectiveness of care through improved care delivery for individuals, families, employers, and the government.  Measures that provide insights both into improved opportunities for health care delivery and health care cost-effectiveness are an area of particular focus in the TX-DSRIP. Many of the projects include a specific focus on improving population health inside and outside of the walls of the hospital therefore, it will be important to examine measures that develop the capability to test methodologies for measuring cost containment. These methodologies may be subsequently applied to other projects or efforts so that the ability to measure the efficacy of these initiatives is in place, so integrated care models that use data-based cost and quality measures can be developed.

**Project Options:**
- a)        Develop an integrated care model with outcome-based payments
          Required core project components:
    - **a)**      Implement cost-accounting systems to measure intervention impacts
    - **b)**      Establish a method to measure cost containment
    - **c)**      Establish a baseline for cost
    - **d)**      Measure cost containment
- b)        Implement other evidence based project to redesign for cost containment in an innovative manner not described above.  Note, providers opting to implement an innovative project under this option must propose relevant process metrics and report on the improvement metrics listed under milestone I-11.
- c)        Project Option: Cost Savings
          Implement an innovative and evidence based intervention that will lead to **cost savings** for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain – 5 Cost of Care** [58]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

- d)        "Other" project option:  Implement other evidence-based project to will impact cost efficiency in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process

---

[58] Category 3 Outcome Measures document

milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-11 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.5 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Health care spending for a given population might be roughly defined as a function of five basic factors[59]:
- Population needs or morbidity,
- Access to services,
- Propensity to seek services,
- Volume, nature, or intensity of services supplied or ordered, and
- Unit cost or price of services.

For the purpose of this project area, "cost containment" will be defined as any set of policies or measures intended to affect any one or more of these factors.

---

59 http://www.policyarchive.org/handle/10207/bitstreams/21904.pdf

**2.6    Implement Evidence-based Health Promotion Programs**

**Project Goal:**
Implement innovative evidence based health promotion strategies such as use of community health workers, innovations in social media and messaging for targeted populations.

**Project Options:**

a)      Engage in population-based campaigns or programs to promote healthy lifestyles using evidence-based methodologies including social media and text messaging in an identified population.

b)      Establish self-management programs and wellness using evidence-based designs.

c)      Engage community health workers in an evidence-based program to increase health literacy of a targeted population.

d)      "Other" project option:  Implement other evidence-based project to implement evidence-based health promotion programs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-8 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.6 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note:  All of the project options in 2.6 should include a component to conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
The current prevention and treatment system is an unconnected, silo-based approach, which reduces the effectiveness and increases the cost of health care. [1] As the US health care system strives to deliver better health, improved care and lower costs, the potential exists for innovative evidenced based health promotion strategies to further these goals.

Delivery Mechanisms: Community health workers can increase access to care and facilitate appropriate use of health resources by providing outreach and cultural linkages between communities and delivery systems; reduce costs by providing health education, screening, detection, and basic emergency care; and improve quality by contributing to patient-provider communication, continuity of care, and consumer protection. Information sharing, program support, program evaluation, and continuing education are needed to expand the use of community health workers and better integrate them into the health care delivery system.

Self-Management education complements traditional patient education in supporting patients to live the best possible quality of life with their chronic condition. Whereas traditional patient education offers information and technical skills, self-management education teaches problem-solving skills. A central concept in self-management is self-efficacy—confidence to carry out a behavior necessary to reach a desired goal. Self-efficacy is enhanced when patients succeed in solving patient-identified problems. Evidence from controlled clinical trials suggests that[60] (1) programs teaching self-management skills are more effective than information-only patient education in improving clinical outcomes; (2) in some circumstances, self-management education improves outcomes and can reduce costs for arthritis and probably for adult asthma patients[61]; and (3) in initial studies, a self-management education program bringing together patients with a variety of chronic conditions may improve outcomes and reduce costs.[62]

---

60 1Thorpe, K, The Affordable Care Act lays the groundwork for a national diabetes prevention and treatment strategy.  Health Aff January 2012 vol. 31 no. 1 61-66
61 2A Witmer, S D Seifer, L Finocchio, J Leslie, and E H O'Neil. Community health workers: integral members of the health care work force. American Journal of Public Health August 1995: Vol. 85, No. 8_Pt_1, pp. 1055-1058. doi: 10.2105/AJPH.85.8_Pt_1.1055
62 Bodenheimer T, Lorig K, Holman H, Grumbach K. Patient Self-management of Chronic Disease in Primary Care. JAMA. 2002; 288(19):2469-2475.

## 2.7   Implement Evidence-based Disease Prevention Programs

**Project Goal:**
Implement innovative evidence-based strategies in disease prevention areas including the following: diabetes, obesity, tobacco use, prenatal care, birth spacing, and health screenings.

**Project Options:**

a)      Implement innovative evidence-based strategies to increase appropriate use of technology and testing for targeted populations (e.g., mammography screens, colonoscopies, prenatal alcohol use, etc.)

b)      Implement innovative evidence-based strategies to reduce tobacco use.

c)      Implement innovative evidence-based strategies to increase early enrollment in prenatal care.

d)      Implement innovative evidence-based strategies to reduce low birth weight and preterm birth.

e)      Implement innovative evidence-based strategies to reduce and prevent obesity in children and adolescents.

f)      "Other" project option:  Implement other evidence-based project to implement evidence-based disease prevention programs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-7 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.7 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Disease management emphasizes prevention of disease-related exacerbations and complications using evidence-based guidelines and patient empowerment tools. It can help manage and improve the health status of a defined patient population over the entire course of a disease.[1]

By concentrating on the causes of chronic disease, the community moves from a focus on sickness and disease to one based on wellness and prevention. The  National Prevention Council strategy for Disease Prevention  focuses on four areas: building healthy and safe community

environments, expanding quality preventive services in clinical and community settings, helping people make healthy choices, and eliminating health disparities. To achieve these aims, the strategy identifies seven evidence-based recommendations that are likely to reduce the leading causes of preventable death and major illness, including tobacco-free living, drug- and excessive alcohol-use prevention, healthy eating, active living, injury and violence-free living, reproductive and sexual health, and mental and emotional well-being.[2]

Delivery Mechanisms: (note this list is not inclusive of all delivery mechanisms)

- Establish and use patient registry systems to enhance the provision of patient follow-up, screenings for related risk factors and to track patient improvement.
- Establish and implement clinical practice guidelines.
- Adopt the Chronic Care Model
- Develop a mapping process linking patients treated in the emergency rooms with RFPs to improve the continuum of care and standardized procedures and outcome measures.
- Promote RHP health system supports such as reminders of care, development of clinical performance measures, and the use of case management services to increase patient's adherence to health care guidelines.
- Establish evidence-based disease and disability prevention programs for targeted populations to reduce their risk of disease, injury, and disability.

2.8    Apply Process Improvement Methodology to Improve Quality/Efficiency

**Project Goal:**
The goal of this project is to implement process improvement methodologies to improve safety, quality, patient experience and efficiency.  Providers may design customized initiatives based on various process improvement methodologies such as Lean, Six Sigma, Continuous Improvement, Rapid Cycle, Care Logistics, Nurses Improving Care for Healthsystem Elders (NICHE) among others.

For example, the Lean methodology as applied to medicine evaluates the use of resources, measures the value to the patient, considers the use of resources in terms of their value to the patient, and eliminates those that are wasteful.  Using methodologies such as Lean that are proven to eliminate waste and redundancies and optimize patient flow, hospitals may customize a project that will develop and implement a program of continuous improvement that will increase communication, integrate system workflows, provide actionable data to providers and patients, and identify and improve models of patient-centered care that address issues of safety, quality, and efficiency.

Implementation frequently requires a new "operational mindset" using tools such as Lean to identify and progressively eliminate inefficiencies while at the same time linking human performance, process performance and system performance into transformational performance in the delivery system.[63]

The process improvement, as a further example, may include elements such as identifying the value to the patient, managing the patient's journey, facilitating the smooth flow of patients and information, introducing "pull" in the patient's journey (e.g. advanced access), and/or continuously reducing waste by developing and amending processes awhile at the same time smoothing flow and enhancing quality and driving down cost.[64]

Furthermore, projects designed and implemented using the Care Logistics™ patient-centered, care coordination model involves managing the simultaneous logistics of a patient moving through the hospital.  It may be used to help hospitals transform their operations to improve patient flow into cross departmental hubs and provide actionable data in real-time on key performance indicators, such as, but not limited to, length of stay, patient flow times, discharge process times, re-admission rates, and patient, provider and staff satisfaction.[65]

---

63 Oujiri J, Ferrara C. "The Phoenix Project – Integrating Effective Disease Management Into Primary Care Using Lean Six-Sigma Tools." Duluth Clinic Presentation. 2010.
64 Bibby J. "Lean in Primary Care:  The Basics – Sustaining Transformation." Asian Hospital and Healthcare Management (2011) 18.
65 http://www.carelogistics.com/

In addition, hospitals may design a process improvement initiative utilizing the NICHE program framework, which aims to facilitate the infusion of evidence-based geriatric best practices throughout institutions to improve nursing care for older adult patients. NICHE is based on the use of principles and tools to support a systemic change in nursing practice and in the culture of healthcare facilities to achieve patient-centered care.[66]

**Project Options:**

a) Design, develop, and implement a program of continuous, rapid process improvement that will address issues of safety, quality, and efficiency. Required core project components:

    **a)** Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.

    **b)** Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.

    **c)** Define key safety, quality, and efficiency performance measures and develop a system for continuous data collection, analysis, and dissemination of performance on these measures ((i.e. weekly or monthly dashboard).

    **d)** Develop standard workflow process maps, staffing and care coordination models, protocols, and documentation to support continuous process improvement.

    **e)** Implement software to integrate workflows and provide real-time performance feedback.

    **f)** Evaluate the impact of the process improvement program and assess opportunities to expand, refine, or change processes based on the results of key performance indicators.

b) "Other" project option: Implement other evidence-based project to apply process improvement methodology to improve quality/efficiency in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-16 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.8 should include a component to conduct quality improvement for the project using methods such as rapid cycle

---

66 http://www.nicheprogram.org/

improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Project Options tied to a customized outcome in a specified Category 3 domain**

c)      Project Option: Reduction in Potentially Preventable Admission Rates (PPAs)
Implement an innovative and evidence based intervention that will lead to **reductions** in Potentially Preventable Admissions (PPAs) for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -2, Potentially Preventable Admissions**[67].  Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y, and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

d)      Project Option: Reduction in 30-Day Hospital Readmission Rates (Potentially Preventable Readmissions)[68]
Implement an innovative and evidence based intervention that will lead to reductions in 30 Day Readmissions for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain- 3, Potentially Preventable Readmissions**[1]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y, and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

e)      Project Option: Reduction in Potentially Preventable Complications (PPC)
Implement an innovative and evidence based intervention that will lead to **reductions** in Potentially Preventable Complications (PPCs) for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain-4, Potentially Preventable Complications**[1].  Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

---

67 Category 3 Outcome Measures document
68 http://www.hhsc.state.tx.us/reports/2012/potentially-preventable-readmissions.pdf

f)       Project Option: Reduce Inappropriate ED Use
Implement an innovative and evidence based intervention that will lead to **reductions** in inappropriate Emergency Department use for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -9, Right Care, Right Setting**[1].  Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

g)       Project Option: Improved Clinical Outcome for Identified Disparity Group
Implement an innovative and evidence based intervention that will lead to **improvements** in clinical outcomes for an identified disparity group for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -11, Addressing Health Disparities in Minority Population**[69].  Providers selecting this project option should use process milestones X, improvement milestones Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

h)       Project Option: Improved Access to Care
Implement an innovative and evidence based intervention that will lead to **increase** in access to care for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -1, Primary Care and Chronic Disease Management**[3].  Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

i)       Project Option: Improvement in Perinatal Health Indicator(s)
Implement an innovative and evidence based intervention that will lead to **improvements** in perinatal health outcomes for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain - 8, Perinatal Care Outcomes**[3].  Providers selecting this project option should use process milestones X, improvement milestones Y and the milestone development

---

[69] Category 3 Outcome Measures document

template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

j)   Project Option: Improve Clinical Indicator/Functional Status for Target Population

Implement an innovative and evidence based intervention that will lead to **improvements** in a selected clinical indicator for a targeted population for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain - 10, Quality of Life/Functional Status**[3].  Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

k)   Project Option: Sepsis

Implement an innovative and evidence based intervention that will lead to **reductions** in Sepsis Complications (mortality, prevalence and incidence) for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -3, Potentially Preventable Complications**[70]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

l)   Project Option: Other

Implement an innovative and evidence based intervention that will lead to improvements in a health outcome not include elsewhere for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) titled Other Outcome Improvement Target listed in each **Outcome Domain** in **Category 3**. Providers selecting this project option should use process milestones X, improvement milestones Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

**Rationale:**

Every day, millions of Americans receive high-quality health care that helps to maintain or restore their health and ability to function. However, far too many do not. Quality problems are reflected in a wide variation in the use of health care services, underuse of some services, overuse of other services, and misuse of services, including an unacceptable level of errors.

---

[70] Category 3 Outcome Measures document

A central goal of health care quality improvement is to maintain what is good about the existing health care system while focusing on the areas that need improvement.
Several types of quality problems in health care have been documented through peer-reviewed research. [71]

**Variation in services**. There continues to be a pattern of wide variation in health care practice, including regional variations and small-area variations. This is a clear indicator that health care practice has not kept pace with the evolving science of health care to ensure evidence-based practice in the United States.

**Underuse of services**. Millions of people do not receive necessary care and suffer needless complications that add to costs and reduce productivity. Each year, an estimated 18,000 people die because they do not receive effective interventions.

**Overuse of services**. Each year, millions of Americans receive health care services that are unnecessary, increase costs, and may even endanger their health. Research has shown that this occurs across all populations.

**Misuse of services**. Too many Americans are injured during the course of their treatment, and some die prematurely as a result.

**Disparities in quality**. Although quality problems affect all populations, there may be specific groups identified that have marked differences in quality of care and health outcome. These group may be defined by racial/ethnic differences, income states, geographic area or other social determinants of health.

---

[71] http://www.ahrq.gov/news/qualfact.htm

**2.9    Establish/Expand a Patient Care Navigation Program**

**Project Goal:**
The goal of this project is to utilize community health workers, case managers, or other types of health care professionals as patient navigators to provide enhanced social support and culturally competent care to vulnerable and/or high-risk patients. Patient navigators will help and support these patients to navigate through the continuum of health care services. Patient Navigators will ensure that patients receive coordinated, timely, and site-appropriate health care services. Navigators may assist in connecting patients to primary care physicians and/or medical home sites, as well as diverting non-urgent care from the Emergency Department to site-appropriate locations. RHPs implementing this project will identify health care workers, case managers/workers or other types of health professionals needed to engage with patients in a culturally and linguistically appropriate manner that will be essential to guiding the patients through integrated health care delivery systems.
A study on Patient Navigation funded by the National Cancer Institute was done in TX and a manual for patient navigation programs directed towards Latino audiences was released following its completion.[72]

**Project Options:**

a)      Provide navigation services to targeted patients who are at high risk of disconnect from institutionalized health care (for example, patients with multiple chronic conditions,  cognitive impairments and disabilities,  Limited English Proficient patients, recent immigrants, the uninsured, those with low health literacy, frequent visitors to the ED, and others)
Required core project components:

   a)      Identify frequent ED users and use navigators as part of a preventable ED reduction program. Train health care navigators in cultural competency.

   b)      Deploy innovative health care personnel, such as case managers/workers, community health workers and other types of health professionals as patient navigators.

   c)      Connect patients to primary and preventive care.

   d)      Increase access to care management and/or chronic care management, including education in chronic disease self-management.

   e)      Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion

---

72 http://www.redesenaccion.org/sites/www.redesenaccion.org/files/PNmanualfinal.pdf

of the project, including special considerations for safety-net populations.

b) "Other" project option: Implement other evidence-based project to establish/expand a patient care navigation program in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-10 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.9 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**

Patient navigators help patients and their families navigate the fragmented maze of doctors' offices, clinics, hospitals, out-patient centers, payment systems, support organizations and other components of the healthcare system. Services provided by patient navigators vary by program and the needs of the patient, but often include:[73]

- Facilitating communication among patients, family members, survivors and healthcare providers.
- Coordinating care among providers.
- Arranging financial support and assisting with paperwork.
- Arranging transportation and child care.
- Ensuring that appropriate medical records are available at medical appointments.
- Facilitating follow-up appointments.
- Community outreach and building partnership with local agencies and groups.
- Ensuring access to clinical trials.

There is no one common definition of patient navigators and the profile of a patient navigator vary widely by program. Many use trained community health workers who may be full-time employees or volunteers. Community health workers have close ties to the local community and serve as important links between underserved communities and the healthcare system. They also posses the linguistic and cultural skills needed to connect with patients from underserved communities. Community health workers are also known as community health advisors, lay

---

73 http://www.altfutures.com/draproject/pdfs/Report_07_02_Patient_Navigator_Program_Overview.pdf

health advocates and promotoras de salud. Healthcare navigators include trained social workers, nurses and nurse practitioners as well as trained lay persons/volunteers. Some navigation programs also use a team based approach that combines community health workers with one or more professionals with experience in healthcare or social work. While there is no set education required for a patient navigator to be successful, a successful navigator should be:

- Compassionate, sensitive, culturally attuned to the people and community being served and able to communicate effectively.
- Knowledgeable about the environment and healthcare system.
- Connected with critical decision makers inside the system, especially financial decision makers.

## 2.10  Use of Palliative Care Programs

**Project Goal:**[74]
Provide palliative care services to improve patient outcomes and quality of life. Palliative medicine represents a different model of care, focusing not on cure at any cost but on relief and prevention of suffering. Here the priority is supporting the best possible quality of life for the patient and family, regardless of prognosis. Ideally, the principles of palliative care can be applied as far upstream as diagnosis, in tandem with cure-directed treatment, although it's still associated in most people's minds with end-of-life care. There is an economic incentive for hospitals to support palliative care -- research shows significant reductions in pharmacy, laboratory, and intensive care costs -- though there's understandable reluctance to tout such benefits. After all, accusations of "death panels" effectively shut out government funding for palliative care as national debates about health care reform took shape.

Palliative care has emerged in the past decade. It takes an interdisciplinary approach – doctors, nurses, social workers and often chaplains – and blends it with curative care for seriously ill people. While palliative care is for people who are very sick, they don't have to have a six-month life expectancy. Some palliative care programs operate in hospitals; others treat people living at home. Growing numbers of community-based hospices also have palliative care services now. Pediatric palliative care is not available everywhere, although it's becoming more common at the major children's hospitals, In addition, hospices nationwide, which traditionally were often unwilling to treat dying children, have also become more open to pediatric care. The new health reform law allows dying children on Medicaid or the state Children's Health Insurance Program to get hospice or palliative care without halting other treatment[75].

---

74 The Center to Advance Palliative Care (CAPC)www.capc.org/reportcard
75 http://www.kaiserhealthnews.org/

Health care reform has the potential to improve palliative care by implementing care coordination (in hospitals and community) evidence-based programs that are already proven to be working. Within palliative care, patients receive dignified and culturally appropriate end-of-life care, which is provided for patients with terminal illnesses in a manner that prioritizes pain control, social and spiritual care, and patient/family preferences

**Project Options:**

a)     Implement a Palliative Care Program to address patients with end-of-life decisions and care needs

Required core project components:

**a)**     Develop a business case for palliative care and conduct planning activities necessary as a precursor to implementing a palliative care program

**b)**     Transition palliative care patients from acute hospital care into home care, hospice or a skilled nursing facility

**c)**     Implement a patient/family experience survey regarding the quality of care, pain and symptom management, and degree of patient/family centeredness in care and improve scores over time

**d)**     Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)     "Other" project option: Implement other evidence-based project to implement use of palliative care programs in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-14 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.10 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient

---

76 Cost savings associated with US hospital palliative care consultation programs.
Morrison RS, Penrod JD, Cassel JB, Caust-Ellenbogen M, Litke A, Spragens L, Meier DE; Palliative Care Leadership Centers' Outcomes Group. Arch Intern Med. 2008 Sep 8; 168(16):1783-90.

population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
While end-of-life care was once associated almost exclusively with terminal cancer, today people receive end-of-life care for a number of other conditions, such as congestive heart failure, other circulatory conditions, COPD, and dementia[77]. Further, some experts have suggested that palliative and hospice care could be more widely embraced for many dying patients. However, these experts say that overly rigid quality standards and poorly aligned reimbursement incentives discourage appropriate end-of-life care and foster incentives to provide inappropriate restorative care and technologically intensive treatments. These experts note that hospitals, nursing homes, and home health agencies need stronger incentives to provide better access to palliative care and care coordination either directly, themselves, or by contract with outside suppliers of hospice services[78]. It seems clear that improving care coordination near the end of life can improve care for patients with chronic conditions, however, in addition to the elderly with multiple chronic conditions and terminal illnesses, palliative care should also allow children who are enrolled in either Medicaid or CHIP to receive hospice services without foregoing curative treatment related to a terminal illness.

---

77 MedPAC, 2008
78 Zerzan, Stearns, & Hanson, 2000; Hanley, 2004

## 2.11 Conduct Medication Management

**Project Goal:**

The goal of conducting Medication Management is to provide information that facilitates the appropriate use of medications in order to control illness and promote health[79]. Medication management is the monitoring of medications a patient takes to confirm that the patient is complying with a medication regimen, while also ensuring the patient is avoiding potentially dangerous drug interactions and other complications. This is especially important for patients taking large numbers of medications to address chronic illnesses and multiple diseases. Taking numerous medications is known as polypharmacy and it is particularly common among older adults, as they are more likely to need medications to manage an array of chronic conditions.

There are a number of aspects to medication management, all of which are focused on making sure that medications are used appropriately. Keeping track of all of the medications currently in use by a patient is an important part of medication management. This can include creating printed lists describing medications, their dosages, and how they are being used. These lists can be kept in patient charts and provided to patients to help them track the drugs they use and understand why various medications are being prescribed.

Monitoring medication administration is also key. Medications usually need to be taken in specific doses at set intervals. Missing doses or timing doses incorrectly can cause complications. Medication management can include everything from using devices that issue reminders to patients to take their medications to filling pill cases for patients and marking the lid of each compartment to indicate when the contents need to be taken[80].

The specific purpose of this project area is to provide the platform to conduct Medication Management so that patients receive the right medications at the right time across the Performing Provider in order to reduce medication errors and adverse effects from medication use.

**Project Options:**

a) Implement interventions that put in place the teams, technology, and processes to avoid medication errors
Required core project components:
**a)** Develop criteria and identify targeted patient populations; e.g. chronic disease patient populations that are at high risk for developing complications, co-morbidities, and/or utilizing acute and emergency care services.

---

79 The Patient-Centered Medical Home: Integrating Comprehensive Medication Management to Optimize Patient Outcomes. 2nd ed, 2012.
80 http://www.wisegeek.com/

      **b)**     Develop tools to provide education and support to those patients at highest risk of an adverse drug event or medication error.

      **c)**     Conduct root cause analysis of potential medication errors or adverse drug events and develop/implement processes to address those causes

      **d)**     Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)     Evidence-based interventions that put in place the teams, technology and processes to avoid medication errors. This project option could include one or more of the following components:

      **a)**     Implement a medication management program that serves the patient across the continuum of care targeting one or more chronic disease patient populations

      **b)**     Implement Computerized Physician Order Entry (CPOE)

      **c)**     Implement pharmacist-led chronic disease medication management services in collaboration with primary care and other health care providers.

c)     "Other" project option: Implement other evidence-based project to conduct medication management in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-20 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.11 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**

More than 3.5 billion prescriptions are written annually in the United States[81], and four out of five patients who visit a physician leave with at least one prescription[82]. Medications are involved in 80 percent of all treatments and impact every aspect of a patient's life. The two most commonly identified drug therapy problems in patients receiving comprehensive medication management services are: (1) the patient requires additional drug therapy for prevention, synergistic, or palliative care; and (2)the drug dosages need to be titrated to achieve therapeutic levels that reach the intended therapy goals[83].According to the World Health Organization, adherence to therapy for chronic diseases in developed countries averages 50 percent, and the major consequences of poor adherence to therapies are poor health outcomes and increased health care costs[84].Drug therapy problems occur every day and add substantial costs to the health care system. Drug-related morbidity and mortality costs exceed $200 billion annually in the U.S., exceeding the amount spent on the medications themselves[85]. The Institute of Medicine noted that while only 10 percent of total health care costs are spent on medications, their ability to control disease and impact overall cost, morbidity, and productivity—when appropriately used—is enormous[86].

---

81 Sommers JP. Prescription drug expenditures in the10 largest states for persons under age 65, 2005.2008. Agency for Healthcare Research and Quality. Available at: http://meps.ahrq.gov/mepsweb/data_files/publications/st196/stat196.pdf.

82 The chain pharmacy industry profile. National Association of Chain Drug Stores. 2001.

83 Cipolle R, Strand L, Morley P. Pharmaceutical care practice: The clinician's guide. McGraw-Hill; 2004.

84 World Health Organization. Adherence to long-term therapies: Evidence for action. 2003. Available at: http://whqlibdoc.who.int/publications/2003/9241545992.pdf.

85 Johnson J, Bootman JL. Drug-related morbidity and mortality. Arch Intern Med. 1995; 155(18):1949-1956; Johnson JA, Bootman JL. Drug-related morbidity and mortality. Am J Health Syst Pharm. 1997; 54(5):554-558; Ernst, FR, Grizzle AJ. Drug-related morbidity and mortality: Updating the cost-of-illness model. J Am Pharm Assoc. 2001; 41(2):192-199.

86 Centers for Medicare & Medicaid Services. National Health Expenditures. January 2008.

## 2.12 Implement/Expand Care Transitions Programs

**Project Goal:**
The goal of this project is to implement improvements in care transitions and coordination of care from inpatient to outpatient, post-acute care, and home care settings in order to prevent increased health care costs and hospital readmissions. Care transitions refer to the movement of patients from one health care provider or setting to another. For people with serious and complex illnesses, transitions in setting of care—for example from hospital to home or nursing home, or from facility to home- and community-based services—have been shown to be prone to errors.[87] Safe, effective, and efficient care transitions and reduced risk of potentially preventable readmissions require cooperation among providers of medical services, social services, and support services in the community and in long-term care facilities. High-risk patients often have multiple chronic diseases. The implementation of effective care transitions requires practitioners to learn and develop effective ways to successfully manage one disease in order to effectively manage the complexity of multiple diseases.[88]The discontinuity of care during transitions typically results in patients with serious conditions, such as heart failure, chronic obstructive pulmonary disease, and pneumonia, falling through the cracks, which may lead to otherwise preventable hospital readmission.[89]The goal is to ensure that the hospital discharges are accomplished appropriately and that care transitions occur effectively and safely.

**Project Options:**
a)      Develop, implement, and evaluate standardized clinical protocols and evidence-based care delivery model to improve care transitions
Required core project components:
    **a)**    Review best practices from a range of models (e.g. RED, BOOST, STAAR, INTERACT, Coleman, Naylor, GRACE, BRIDGE, etc.).
    **b)**    Conduct an analysis of the key drivers of 30-day hospital readmissions using a chart review tool (e.g. the Institute for Healthcare Improvement's (IHI) State Action on Avoidable Re-hospitalizations (STAAR) tool) and patient interviews.
    **c)**    Integrate information systems so that continuity of care for patients is enabled
    **d)**    Develop a system to identify patients being discharged potentially at risk of needing acute care services within 30-60 days
    **e)**    Implement discharge planning program and post discharge support program

---

87Coleman EA. "Falling Through the Cracks: Challenges and Opportunities for Improving Transitional Care for Persons with Continuous Complex Care Needs." Journal of the American Geriatrics Society (2003) 51:549-555

88 Rittenhouse D, Shortell S, et al. "Improving Chronic Illness Care: Findings from a National Study of Care Management Processes in Large Physician Practices." Medical Care Research and Review Journal (2010) 67(3): 301-320

89 Coleman, E., Parry, C., et. al.  "The Care Transitions Intervention: a patient centered approach to ensuring effective transfers between sites of geriatric care." Home Health Care Serv Q  (2003) 22 (3): 1-17

    **f)**    Develop a cross-continuum team comprised of clinical and administrative representatives from acute care, skilled nursing, ambulatory care, health centers, and home care providers.

    **g)**    Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)    Implement one or more pilot intervention(s) in care transitions targeting one or more patient care units or a defined patient population. Examples of interventions include, but are not limited to, implementation of:

- Discharge checklists
- "Hand off" communication plans with receiving providers
- Wellness initiatives targeting high-risk patients
- Patient and family education initiatives including patient self-management skills and "teach-back"
- Post-discharge medication planning
- Early follow-up such as homecare visits, primary care outreach, and/or patient call-backs.

c)    "Other" project option: Implement other evidence-based project to implement/expand care transitions program in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-15 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.12 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Note:** Providers selecting one of these project options should ensure that overlaps do not exist with the EHR Incentive Program or other available demonstration funding.

**Rationale[90]:**

When a patient's transition is less than optimal, the repercussions can be far-reaching — hospital readmission, an adverse medical event, and even mortality. Without sufficient information and an understanding of their diagnoses, medication, and self-care needs, patients cannot fully participate in their care during and after hospital stays. Additionally, poorly designed discharge processes create unnecessary stress for medical staff causing failed communications, rework, and frustrations. A comprehensive and reliable discharge plan, along with post-discharge support, can reduce readmission rates, improve health outcomes, and ensure quality transitions. Patient transition is a multidimensional concept and may include transfer from the hospital to home, or nursing home, or from facility to home- and community-based services, etc.

---

90 http://www.ihi.org/offerings/Training/ReduceReadmissions/July2011ReducingReadmissions/Pages/default.aspx

## CATEGORY 2 BEHAVIORAL HEALTH INFRASTRUCTURE PROJECTS

**GOAL:  Integrate behavioral health with physical health and other evidence-based services and supports.**

The goals of the projects under this heading are to create service delivery models, which engage / integrate behavioral, physical and other community-based services and supports to provide services to individuals with a broad range of behavioral health conditions in the most appropriate community-based settings and to empower the individual to better manage their health / wellness.

According to a recent study released by the Robert Wood Johnson Foundation, only 33% of patients with BH conditions (24% of the adult population) receive adequate treatment.[91] Patients with BH issues experience higher risk of mortality and poor health outcomes, largely due to a lack of preventive health services and poorly controlled co-morbid medical disease. Risk increases with the severity of the behavioral health diagnoses. In Texas for example, persons with severe mental illness live over 29 years less, on average, than the general population.[92] Behavioral health conditions, also account for increased health care expenditures such as higher rates of potentially preventable inpatient admissions. Texas Medicaid data on potentially preventable inpatient readmissions demonstrates that behavioral health conditions are a significant driver of inpatient costs. Mental health and substance abuse conditions comprise 8 percent of initial inpatient readmissions to general acute and specialty inpatient hospitals but represent 24 percent of potentially preventable admissions.[93]

Complex medical and social issues including multiple chronic health conditions, low income, housing insecurity, social isolation, and lack of natural supports systems severely impact health and social functioning for persons with more severe behavioral health diagnoses such as schizophrenia, bipolar disorder and major depressive disorder.  Substance use disorders, alone or in combination with mental health conditions, have significant physical consequences, leading to disability and increased acute and long term service expenditures.

Gaps in the service delivery system have far reaching costs and consequences. For example, the Texas state psychiatric hospital system is in crisis -- nearing or already over capacity, in large part due to gaps in the continuum of services and supports for individuals with more complex

---

91 Druss BG, Reisinger Walker E., "Mental Disorders and Medical Co-Morbidity."  Robert Wood Johnson Foundation, The Synthesis Project: Issue 21 (2011).

**92 Parks, J, Svendsen, D, et. al. "Morbidity and Mortality in People with Serious Mental Illness", National Association of State Mental Health Program Directors, 2006.**

93 Potentially Preventable Readmissions in the Texas Medicaid Population, Fiscal Year 2010, Texas Health and Human Services Commission (2012)

chronic mental health conditions. These individuals require a stable, supportive housing, integrated with community-based clinical and psychosocial services to prevent continual cycling through the street, to emergency room, jail and inpatient hospital.[94]

Providing adequate health care to people with behavioral health conditions requires a comprehensive, person-centered approach within an integrated, "no wrong door" access, and delivery system. The system should include early and accurate assessment. It should facilitate access to acute and long term services as well as short term, community-based alternatives for stabilizing individuals in a behavioral health crisis; discharge planning to transition the individual back to the community from the inpatient setting; and post-discharge support services.

Evidence-based and evidence-informed strategies exist which can facilitate person-centered care for people with behavioral health conditions.

These approaches include:

- organizational realignment and process improvements to better integrate behavioral and physical health care and ensure that there is "no wrong door" to accessing needed treatment;
- self-management and wellness programs which empower individuals to better manage their chronic physical and behavioral health conditions; and
- specialized services and supports directed at high need / high cost populations which integrate clinical and other interventions to address the complex needs of persons with more severe illnesses and social challenges.

### *Integration: Organizational Realignment and Process Improvement*
Health care systems which successfully integrate behavioral health and primary care services demonstrate improved care, cost savings, increased provider and consumer satisfaction.[95] This is especially important for medically indigent populations, which have co-occurring chronic health and mental health conditions. Treatments for individuals who present with mental health and/or substance abuse concerns are integrated with physical health via person-centered approaches.

The Four Quadrant Clinical Integration Model provides a promising, person-centered conceptual framework for organizational realignment.
Each quadrant considers the behavioral health and physical health risk and complexity of the population and suggests the major system elements that would be utilized to meet the needs of the individuals within that subset of the population. The Four Quadrant model is not intended to

---

94 Continuity of Care Task Force Final Report, DSHS, (2010)

95 Integrating Publicly Funded Physical and Behavioral Health Services: A Description of Selected Initiatives, Health Management Associates (2007).

be prescriptive about what happens in each quadrant, but to serve as a conceptual framework for collaborative planning in each local system. Ideally it would be used as a part of collaborative planning for each new HRSA BH site, with the CHC and the local provider(s) of public BH services using the framework to decide who will do what and how coordination for each person served will be assured.

The use of the Four Quadrant Model to consider subsets of the population, the major system elements and clinical roles would result in the following broad approaches:

- Quadrant I: Low BH-low physical health complexity/risk, served in primary care with BH staff on site; very low/low individuals served by the PCP, with the BH staff serving those with slightly elevated health or BH risk.
- Quadrant II: High BH-low physical health complexity/risk, served in a specialty BH system that coordinates with the PCP.
- Quadrant III: Low BH-high physical health complexity/risk, served in the primary care/medical specialty system with BH staff on site in primary or medical specialty care, coordinating with all medical care providers including disease managers.
- Quadrant IV: High BH-high physical health complexity/risk, served in both the specialty BH and primary care/medical specialty systems; in addition to the BH case manager, there may be a disease manager, in which case the two managers work at a high level of coordination with one another and other members of the team.

Other integration models include the IMPACT Model[96] and Wagner's Chronic Care Model.

Process improvements, such as adoption of evidence-based clinical practice guidelines for detection and treatment of depression and other conditions and for assessment of suicide risk can improve outcomes in both primary and specialty behavioral clinical settings. For example, one effective evidence-based strategy that has been shown to improve outcomes for depression, the most prevalent BH disorder, is the DIAMOND/IMPACT model of care. Key elements of such care models are screening for high prevalence mental health conditions, co-location of BH clinicians into primary care settings, collaborative meetings held by primary care and BH team members to discuss cases, training of primary care and BH staff on effective screening and collaborative care, the presence of tracking systems and registries to support effective monitoring of patients, the "Stepped Care" approach for appropriate level of treatment, care management for the highest risk patients with mental health and substance abuse disorders, and relapse prevention, among others.[97]     Other examples of evidence-base practices include Screening, Brief Intervention and Referral to Treatment (SBIRT) for substance use disorders. SBIRT

---

96 Excerpted from the IMPACT website at the University of Washington at http://impact-uw.org/about/key.html.
97 Katon W., MD. "The Diamond Model." (based on Katon's Collaborative Care Model for depression) and Unutzer J.,MD. "IMPACT Study." (as well as numerous other controlled trials). Institute for Clinical Systems Improvement and Minnesota Family Health Services. Presentation to the Institute for HealthCare Improvement Annual Forum, Dec. 2010.

employs a brief assessment, performed by physical health providers in settings such as hospital emergency rooms and clinics to determine the presence of substance use issues, intervene and refer the individual to appropriate treatment. Independent evaluation of Texas SBIRT study determined that it resulted in significant inpatient / emergency department savings and increased appropriate use of services in the state's largest public hospital district.[98]

Self-Management and Wellness Programs
Successfully engaging the individual consumer in disease self-management and wellness activities related to chronic physical and behavioral health conditions empowers person-centered recovery and improved health outcomes. The Chronic Disease Self-Management Program developed at Stanford University to help people manage physical conditions such as diabetes and chronic pain, and Wellness Recovery Action Planning (WRAP) which is directed toward managing severe mental illness[99], are two prominent examples of evidenced-based, self-management models. Giving the individual consumer control over health resources is another complementary promising practice.

Health navigation and individual health planning are related practices. The Texas and Minnesota Demonstrations to Maintain Independence and Employment (DMIE) studies which focused on medically indigent adults with behavioral health disorders, used health care navigation to achieve positive results in health care utilization and wellness measures.[100] In Texas DMIE, health navigation and support from case managers trained in Motivational Interviewing resulted in increased access to and use of appropriate health services, including: more use of preventative care; more outpatient, more mental health and dental visits; greater adherence and persistence in taking prescribed medications for chronic conditions such as hypertension, respiratory conditions, diabetes, high cholesterol; more medical stability for chronic conditions and greater satisfaction with healthcare.[101]

Self-directed resource use models empower the individual to purchase goods and services to promote wellness and recovery. There is an evidence base for these models. For example, adults with severe mental illness and co-occurring physical disabilities in the Arkansas Cash and Counseling program were less likely to fall, have respiratory infections, develop bed sores, or spend a night in hospital or a nursing home if they had access to individual budgets than if they

---

98 Insight Project Research Group (2009). SBIRT outcomes in Houston: Final report on InSight, a hospital district-based program for patients at risk for alcohol or drug use problems. Alcoholism: Clinical and Experimental Research, 33(8): 1-8.
99 Copeland, M.E. "Wellness recovery action plan: a system for monitoring, reducing and eliminating uncomfortable or dangerous physical symptoms and emotional feelings." Occupational Therapy in Mental Health. 17, 127–150 (2002).
100 Ozaki, R., Schneider, J., Hall, J., Moore, J., Linkins, K., Brya, J., Oelschlaeger, A., Bohman, T., Christensen, K., Wallisch, L., Stoner, D., Reed, B.,Ostermeyer, B. (2011). Personal navigation, life coaching, and case management: Approaches for enhancing health and employment support services. Journal of Vocational Rehabilitation, (34)2, 83-95.
101 Bohman, T., Wallisch, L., Christensen, K., Stoner, D., Pittman, A., Reed, B.,Ostermeyer, B. (2011). Working Well – The Texas Demonstration to Maintain Independence and Employment: 18-month outcomes. Journal of Vocational Rehabilitation, (34)2, 97-106.

did not [102]. Similarly, an evaluation of the New Jersey Cash and Counseling program found that it was equally successful for participants with SMI as those with other types of disabilities[103].

In the Texas Self-Directed Care study (SDC), individuals with severe mental illness are empowered to manage a flexible fund to purchase goods and services with assistance from an advisor. Consumers have broad latitude for making substitutions of traditional services and supports within a typical maximum budget of $4,000 / year. Experience during the first year of the SDC indicates that individuals in the intervention group are making significant gains in recovery, wellness and employment relative to the control group.

Specialized Services and Supports for High Need Sub-Populations
The Texas Continuity of Care Task Force[104] analyzed needs and recommendations for improving services to severely mentally ill individuals who move repeatedly through multiple systems, such as criminal justice, general acute inpatient and mental health. Among the recommendations was the development of:

- supported housing,
- assisted living,
- smaller, community-based living options, and
- services, such as cognitive rehabilitative modalities, to address the individual's limitations in organizing, planning and completing activities.

Services could be provided in a variety of settings, including individual homes, apartments, adult foster homes, assisted living facilities, and small group (three- to four-bed) community-supported residential settings. Examples of services could include cognitive and psychosocial rehabilitation; supported employment; transition assistance to establish a residence; peer support; specialized therapies; medical services, transportation medications and personal assistance.

---

102 Shen, C., Smyer, M.A., Mahoney, K.J., Loughlin, D.M. et al., (2008). Does Mental Illness Affect Consumer Direction of Community-Based Care? Lessons From the Arkansas Cash and Counseling Program. The Gerontologist, 48(1), 93-104.
103 Shen, C., Smyer, M., Mahoney, K.J., Simon-Rusinowitz, L. et al., (2008). Consumer-Directed Care for Beneficiaries With Mental Illness: Lessons From New Jersey's Cash and Counseling Program. Psychiatric Services, 59, 1299-1306.
104See Continuity of Care Task Force Report at: http://www.dshs.state.tx.us/mhsa/continuityofcare/)

**2.13 Provide an intervention for a targeted behavioral health population to prevent unnecessary use of services in a specified setting (i.e., the criminal justice system, ER, urgent care etc.).**

**Project Goal:**

Provide specialized services to complex behavioral health populations such as people with severe mental illnesses and/or a combination of behavioral health and physical health issues. These populations often have multiple concomitant issues such as substance use, traumatic injuries, homelessness, cognitive challenges, and lack of daily living skills and lack of natural supports. The State's mental health system provides rehabilitative services and pharmacotherapy to people with certain severe psychiatric diagnoses and functional limitations, but can serve only a fraction of the medically indigent population. It does not serve other high risk behavioral health populations and does not provide the range of services needed to deal with complex psychiatric and physical needs. These complex populations become frequent users of local public health systems.

The goal of this project is to avert outcomes such as potentially avoidable inpatient admission and readmissions in settings including general acute and specialty (psychiatric) hospitals; to avert disruptive and deleterious events such as criminal justice system involvement; to promote wellness and adherence to medication and other treatments; and to promote recovery in the community. This can be done by providing community based interventions for individuals to prevent them from cycling through multiple systems, such as the criminal justice system; the general acute and specialty psychiatric inpatient system; and the mental health system. Examples of interventions could include integrated medical and non-medical supports such as transition services to help individuals establish a stable living environment, peer support, specialized therapies, medical services, personal assistance, and short or long term residential options.

Residential options linked to a range of support services can effectively improve health outcomes for vulnerable individuals, such as the long-term homeless with severe mental illness. One such model in Colorado demonstrated a drastic 80 percent decrease in overnight hospital stays and a 76 percent decrease in nights in jail (Wortzel, 2007). Research indicates that among residents of permanent supportive housing:

- Rates of arrest and days incarcerated are reduced by 50%;
- Emergency room visits decrease by 57%;
- Emergency detoxification services decrease by 85%; and
- Nursing home utilization decreased by 50%.[105]

---

105 Lewis, D., Corporation for Supportive Housing, Permanent Supportive Housing Program & Financial Model for Austin/Travis County, TX, 2010. Retrieved from http://www.caction.org/homeless/documents/AustinModelPresentation.pdf

**Project Options:**

a) Design, implement, and evaluate research-supported and evidence-based interventions tailored towards individuals in the target population. Required core components:

  **a)** Assess size, characteristics and needs of target population(s) (e.g., people with severe mental illness and other factors leading to extended or repeated psychiatric inpatient stays. Factors could include chronic physical health conditions; chronic or intermittent homelessness, cognitive issues resulting from severe mental illness and/or forensic involvement.

  **b)** Review literature / experience with populations similar to target population to determine community-based interventions that are effective in averting negative outcomes such as repeated or extended inpatient psychiatric hospitalization, decreased mental and physical functional status, nursing facility admission, forensic encounters and in promoting correspondingly positive health and social outcomes / quality of life.

  **c)** Develop project evaluation plan using qualitative and quantitative metrics to determine outcomes.

  **d)** Design models which include an appropriate range of community-based services and residential supports.

  e) Assess the impact of interventions based on standardized quantitative measures and qualitative analysis relevant to the target population. Examples of data sources include: standardized assessments of functional, mental and health status (such as the ANSA and SF 36); medical, prescription drug and claims/encounter records; participant surveys; provider surveys. Identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient populations, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

b) "Other" project option: Implement other evidence-based project to provide an intervention for a targeted behavioral health population to prevent unnecessary use of services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 2.13 should include a component to conduct quality improvement for the project using methods such as rapid cycle

improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note: Community-based interventions should be comprehensive and multispecialty. They should incorporate two or more components, such as those listed below depending on the needs of the target populations being served. These interventions should have significant flexibility to add more components if they are appropriate to meet the needs of the target population. Community-based components may include (but are not limited to):

- Residential Assistance (Foster/Companion Care, Supervised Living, Residential Support Services)
- Assisted living;
- Cognitive Adaptation Training (CAT) – an evidence-based service that uses tools and motivational techniques to establish and refine daily living skills;
- Psychosocial Rehabilitation;
- Supported employment;
- Minor home modifications;
- Home delivered meals;
- Transition assistance – assistance to establish a basic household, including security deposits, essential furnishings, moving expenses, bed and bath linens;
- Adaptive aids (e.g., medication-adherence equipment, communication equipment, etc.);
- Transportation to appointments and community-based activities;
- Specialized behavioral therapies:
  - Cognitive Behavioral Therapy – An empirically supported treatment that focuses on maladaptive patterns of thinking and the beliefs that underlie such thinking; and
  - Dialectical Behavior Therapy – A manualized treatment program (derived from cognitive behavioral therapy) that provides support in managing chronic crisis and stress to keep individuals in outpatient treatment settings;
- Prescription medications;
- Peer support – A service that models successful health and mental health behaviors. It is provided by certified peer specialists who are in recovery from mental illness and/or substance use disorders and are supervised by mental health professionals;
- Respite care (short term);

- Substance abuse services (specialized for individuals who have experienced prolonged  or repeated institutionalization);
- Visiting Nursing and / or community health worker services;
- Employment supports
- Nutritional counseling
- Occupational therapy; Speech and language therapy; and Physical therapy.

Components must be articulated into a system which uses a CQI design such as the CMS Quality Framework for HCBS services. (Anita Yuskauskas, 2010) and/or be informed by guidance such as the SAMHSA evidence-based toolkit for permanent supported housing (http://store.samhsa.gov/product/Permanent-Supportive-Housing-Evidence-Based-Practices-EBP-KIT/SMA10-4510) or other evidence-based system

**2.14  Implement person-centered wellness self-management strategies and self directed financing models that empower consumers to take charge of their own health care.**

**Project Goal:**
Create wellness, self-management programs that employ research supported interventions singly or in combination to help individuals manage their chronic physical and behavioral health conditions.  Examples of research-supported individual wellness self management strategies include Wellness Recovery Action Planning (WRAP), the Chronic Disease Self Management Program; Motivational Interviewing; client-managed wellness accounts; and health navigation / individual health planning models to empower the individual to achieve their health goals. These interventions should be closely coordinated with the patient's medical home.

Successfully engaging the individual consumer in disease self management and wellness activities related to chronic physical and behavioral health conditions empowers person-centered recovery and improved health outcomes. The Chronic Disease Self Management Program, developed at Stanford University to help people manage physical conditions such as diabetes and chronic pain, and Wellness Recovery Action Planning (WRAP) which is directed toward managing severe mental illness[106], are two prominent examples of evidenced-based, self-management models. Giving the individual consumer control over health resources is another complementary promising practice.

Health navigation and individual health planning are related practices. The Texas and Minnesota Demonstrations to Maintain Independence and Employment (DMIE), which focused on medically indigent adults with behavioral health disorders, used health care navigation to achieve positive results in health care utilization and wellness measures.[107]  In Texas DMIE, health navigation and support from case managers trained in Motivational Interviewing resulted in increased access to and use of appropriate health services, including: more use of preventative care; more outpatient, more mental health and dental visits; greater adherence and persistence in taking prescribed medications for chronic conditions such as hypertension, respiratory conditions, diabetes, high cholesterol; more medical stability for chronic conditions and greater satisfaction with healthcare.[108]

Self directed resource use models empower the individual to purchase goods and services to promote wellness and recovery.  There is an evidence base for these models. For example, adults

---

106 Copeland, M.E. "Wellness recovery action plan: a system for monitoring, reducing and eliminating uncomfortable or dangerous physical symptoms and emotional feelings." Occupational Therapy in Mental Health. 17, 127–150 (2002).
107 Ozaki, R., Schneider, J., Hall, J., Moore, J., Linkins, K., Brya, J., Oelschlaeger, A., Bohman, T., Christensen, K., Wallisch, L., Stoner, D., Reed, B.,Ostermeyer, B. (2011). Personal navigation, life coaching, and case management: Approaches for enhancing health and employment support services.  Journal of Vocational Rehabilitation, (34)2, 83-95.
108 Bohman, T., Wallisch, L., Christensen, K., Stoner, D., Pittman, A., Reed, B.,Ostermeyer, B. (2011). Working Well – The Texas Demonstration to Maintain Independence and Employment: 18-month outcomes.  Journal of Vocational Rehabilitation, (34)2, 97-106.

with severe mental illness and co-occurring physical disabilities in the Arkansas Cash and Counseling program were less likely to fall, have respiratory infections, develop bed sores, or spend a night in hospital or a nursing home if they had access to individual budgets than if they did not[109]. Similarly, an evaluation of the New Jersey Cash and Counseling program found that it was equally successful for participants with SMI as those with other types of disabilities[110].

In the Texas Self-Directed Care study (SDC), individuals with severe mental illness are empowered to manage a flexible fund to purchase goods and services with assistance from an advisor. Consumers have broad latitude for making substitutions of traditional services and supports within a typical maximum budget of $4,000 / year. Experience during the first year of the SDC indicates that individuals in the intervention group are making significant gains in recovery, wellness and employment relative to the control group.

**Project Options:**

    a)    Establish interventions to promote person-centered wellness self-management strategies and train staff / contractors to empower consumers to take charge of their own health care.
Required core project components:

    **a)**    Develop screening process for project inclusion

    **b)**    Identify population for intervention using claims and encounter data, clinical records, or referrals from providers.

    **c)**    Recruit eligible individuals based on administrative and diagnostic data

    **d)**    Establish interventions and train staff / contractors

    **e)**    Hire staff (including the following minimum qualifications):

- Wellness and Health Navigation: Bachelors level professional with experience in mental health and/or wellness initiatives or a peer specialist who has successfully completed the DSHS certification program for peer specialists
- WRAP Facilitator: an individual trained and credentialed as a WRAP facilitator using the WARP model developed by Mary Ellen Copeland (See: http://www.mentalhealthrecovery.com/wrap/).

    **f)**    Train staff in motivational interviewing and person-centered planning

    **g)**    Assess project outcomes.  Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may

---

109 Shen, C., Smyer, M.A., Mahoney, K.J., Loughlin, D.M. et al., (2008). Does Mental Illness Affect Consumer Direction of Community-Based Care? Lessons From the Arkansas Cash and Counseling Program. The Gerontologist, 48(1), 93-104.

110 Shen, C., Smyer, M., Mahoney, K.J., Simon-Rusinowitz, L. et al., (2008). Consumer-Directed Care for Beneficiaries With Mental Illness: Lessons From New Jersey's Cash and Counseling Program. Psychiatric Services, 59, 1299-1306.

include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b) Implement self-directing financing models including wellness accounts. Note: If selected, this must be implemented as part of a person-centered wellness project as described in 2.14.1.

Required core project components:
  **a)** Establish wellness account funding mechanisms.
  **b)** Establish policies and procedures for program operations.
  **c)** Establish accountability systems to track outcomes and expenditures.
  **d)** Implement interventions.
  **e)** Assess project outcomes.

c) "Other" project option:  Implement other evidence-based project to implement person-centered wellness self-management strategies and self-directed financing models that empower consumers to take charge of their own health care in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.14 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

## 2.15  Integrate Primary and Behavioral Health Care Services

**Project Goal**
Integrate primary care and behavioral health care services in order to improve care and access to needed services.

The concept of a medical home that can address the needs of the whole person is increasingly recognized as a key in improving both access to care, continuity of care, improved outcomes. The importance of simultaneously addressing the physical health needs and the behavioral health needs of individuals has become recognized over the past three decades.

A recent study of adults discharged from psychiatric hospitals found 20% with chronic and serious conditions such as HIV infection, brain trauma, cerebral palsy and heart disease. As many as 75% of individuals with schizophrenia have been found to have high rates of serious physical illnesses, such as diabetes, respiratory, heart and/or bowel problems and high blood pressure. High rates were also seen for vision (93%), hearing (78%), and dental (60%) problems … the effects of atypical antipsychotic medications, which exacerbate this predisposition, individuals with schizophrenia have especially high rates of diabetes. Cardiovascular diseases are also very prevalent among people with mental illnesses. Again, psychiatric medications exacerbate the problem because they are associated with obesity and high triglyceride levels, known risk factors for cardiovascular disease. Adults with serious mental illnesses are known to have poor nutrition, high rates of smoking and a sedentary lifestyle—all factors that place them at greater risk for serious physical disorders, including diabetes, cardiovascular disease, stroke, arthritis and certain types of cancers. Despite such extensive medical needs, adults with serious mental illnesses often do not receive treatment… Among people with schizophrenia, fewer than 70% of those with co-occurring physical problems were currently receiving treatment for 10 of 12 physical health conditions studied.[111]

Medical Homes and similar collaborative care approaches have been determined to be beneficial in the treatment of mental illness in a variety of controlled studies.[112]

Behavioral health problems are often cyclical in nature meaning that over a course of months or years a person may experience periods of time when symptoms are well controlled (or in remission) while at other times symptoms can range from moderate to severe.  The concept of  a Medical home where physical and behavioral health care is integrated and provides supports for individuals who are in any quadrant of the National Council for Community Behavioral Health (NCCBH) Four Quadrant Clinical Integration Model at a given time.

---

111 Bazelon Center for Mental Health Law (2004),  GET IT TOGETHER How to Integrate Physical and Mental Health Care for People with Serious Mental Disorders
112 Thielke, S., Vannoy, S. & Unützer, J. (2007). Integrating mental health and primary care. Primary Care: Clinics in Office Practice, 34

The use of the Four Quadrant Model to consider subsets of the population, the major system elements and clinical roles would result in the following broad approaches:

- Quadrant I: Low BH-low physical health complexity/risk, served in primary care with BH staff on site; very low/low individuals served by the PCP, with the BH staff serving those with slightly elevated health or BH risk.
- Quadrant II: High BH-low physical health complexity/risk, served in a specialty BH system that coordinates with the PCP.
- Quadrant III: Low BH-high physical health complexity/risk, served in the primary care/medical specialty system with BH staff on site in primary or medical specialty care, coordinating with all medical care providers including disease managers.
- Quadrant IV: High BH-high physical health complexity/risk, served in both the specialty BH and primary care/medical specialty systems; in addition to the BH case manager, there may be a disease manager, in which case the two managers work at a high level of coordination with one another and other members of the team.

Other integration models include the IMPACT Model[113] and Wagner's Chronic Care Model.

Through the integration of behavioral health and physical health care services, opportunities to address both conditions during a single visit are vastly increased. Co-location, when coupled with protocols, training, technology and team building has the potential to improve communications between providers and enhance coordination of care. Additionally, access to care is enhanced because individuals do not have to incur the cost or inconvenience of arranging transportation or making multiple trips to different locations to address physical and behavioral health needs.

Finally, given the ever-increasing cost of transportation, a "one stop shopping" approach for health care improves the chances that individuals with multiple health needs will be able to access the needed care in a single visit and thereby overcome the negative synergy that exists between physical and behavioral health conditions.

Co-location alone is not synonymous with integration. Levels of interaction between physical and behavioral health providers may range from traditional minimally collaborative models to fully integrated collaborative models.

---

113 Excerpted from the IMPACT website at the University of Washington at http://impact-uw.org/about/key.html.

1. **Minimal Collaboration:** mental health providers and primary care providers work in separate facilities, have separate systems, and communicate sporadically.
2. **Basic Collaboration at a Distance:** separate systems at separate sites; periodic communication about shared patients, typically by telephone or letter.
3. **Basic Collaboration On-site:** separate systems, but shared facility; more communication, but each provider remains in his/her own professional culture.
4. **Close Collaboration in a Partly Integrated System:** providers share the same facility and have some systems in common (scheduling appointments, medical records); regular face-to-face communication; sense of being part of a team.
5. **Close Collaboration in a Fully Integrated System:** providers are part of the same team and system; the patient experiences mental health treatment as part of their regular primary care or vice versa.

Delivery system reform projects proposed under this category should be structured to achieve level 4 or, preferably level 5 levels of interaction.

**Project Options:**

a)  Design, implement, and evaluate projects that provide integrated primary and behavioral health care services.
    Required core components:

   a)  Identify sites for integrated care projects, which would have the potential to benefit a significant number of patients in the community. Examples of selection criteria could include proximity/accessibility to target population, physical plant conducive to provider interaction; ability / willingness to integrate and share data electronically; receptivity to integrated team approach.

   b)  Develop provider agreements whereby co-scheduling and information sharing between physical health and behavioral health providers could be facilitated.

   c)  Establish protocols and processes for communication, data-sharing, and referral between behavioral and physical health providers

   d)  Recruit a number of specialty providers (physical health, mental health, substance abuse, etc. to provide services in the specified locations.

   e)  Train physical and behavioral health providers in protocols, effective communication and team approach. Build a shared culture of treatment to include specific protocols and methods of information sharing that include:

       • Regular consultative meetings between physical health and behavioral health practitioners;

- Case conferences on an individualized as-needed basis to discuss individuals served by both types of practitioners; and/or
- Shared treatment plans co-developed by both physical health and behavioral health practitioners.

**f)** Acquire data reporting, communication and collection tools (equipment) to be used in the integrated setting, which may include an integrated Electronic health record system or participation in a health information exchange – depending on the size and scope of the local project.

**g)** Explore the need for and develop any necessary legal agreements that may be needed in a collaborative practice.

**h)** Arrange for utilities and building services for these settings

**i)** Develop and implement data collection and reporting mechanisms and standards to track the utilization of integrated services as well as the health care outcomes of individual treated in these integrated service settings.

**j)** Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b) "Other" project option: Implement other evidence-based project to integrate primary and behavioral health care services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 2.15 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**2.16  Provide virtual psychiatric and clinical guidance to all participating primary care providers delivering services to behavioral patients regionally.**

**Project Goal**
Provide ready access to psychiatric consultation in primary care to enhance and improve treatment for individuals with behavioral health conditions.  Virtual psychiatric consultation may include (but is not limited to) the following modalities of communication: telephone, instant message, video conference, facsimile, and e-mail.  Primary Care Providers (PCPs) tend to be the first (and often last) stop for services for individuals with mental illness and substance use disorders.  Indeed, more than 1/3 of all patients rely solely on PCPs to treat psychiatric disorders.  These individuals may have medical conditions that are created or exacerbated by untreated or under-treated mental illness and substance abuse.  This trend means PCPs should have adequate resources and expertise to treat behavioral health conditions.  Treating behavioral health conditions during a PCP visit reduces the chances of losing the patient during the referral process.

The goal of this project is to provide PCPs delivering services regionally with the necessary resources and guidance to adequately treat patients who present with behavioral health conditions.  Clinical guidance will be provided remotely via the following communication methods: telephone, instant message, video conference, facsimile, and e-mail.  Access to these services will allow the medical treatment team to utilize behavioral health expertise in areas including, but not limited to: diagnostic impressions, psychiatric medication administration, trajectory and outcomes of mental health diagnoses, cultural considerations relevant to behavioral health treatment, and referral recommendations for ongoing treatment, and behavioral health self-management resources.  PCPs will increase their knowledge base about behavioral health conditions while also having quick access to cutting edge and research based behavioral health interventions over several communication methods.  This effort will bridge the often disparate disciplines of behavioral and physical health, providing better outcomes for patients who increasingly rely on primary care settings for treatment of their behavioral health conditions.

**Project Options:**
a)      Design, implement, and evaluate a program to provide remote psychiatric consultative services to all participating primary care providers delivering services to patients with mental illness or substance abuse disorders
Required core project components:
**a)**     Establish the infrastructure and clinical expertise to provide remote psychiatric consultative services.
**b)**     Determine the location of primary care settings with a high number of individuals with behavioral health disorders (mental health and substance abuse) presenting for services, and where ready access to behavioral health expertise is lacking.  Identify what expertise primary care providers lack and what they identify as their greatest needs for

psychiatric and/or substance abuse treatment consultation via survey or other means.

   **c)** Assess applicable models for deployment of virtual psychiatric consultative and clinical guidance models

   **d)** Build the infrastructure needed to connect providers to virtual behavioral health consultation. This may include:

- Procuring behavioral health professional expertise (e.g., Psychiatrists, Psychologists, Psychiatric Nurses, Licensed Professional Counselors, Masters level Social Workers, Licensed Chemical Dependency Counselors, Licensed Marriage and Family Therapists, Certified Peer specialists, and Psychiatric Pharmacists,). This will include expertise in children and adolescents (e.g. Child and Adolescent Psychiatrists, Psychologists, Nurses, and Pharmacists); expertise in psychotropic medication management in severe mental illness.

   **e)** Ensuring staff administering virtual psychiatric consultative services are available to field communication from medical staff on a 24-hour basis.

   **f)** Identify which medical disciplines within primary care settings (nursing, nursing assistants, pharmacists, primary care physicians, etc.) could benefit from remote psychiatric consultation.

   **g)** Provide outreach to medical disciplines in primary care settings that are in need of telephonic behavioral health expertise and communicate a clear protocol on how to access these services.

   **h)** Identify clinical code modifiers and/or modify electronic health record data systems to allow for documenting the use of telephonic behavioral health consultation.

   **i)** Develop and implement data collection and reporting standards for remotely delivered behavioral health consultative services.

   **j)** Review the intervention(s) impact on access to telephonic psychiatric consults and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations

Optional Project Components:

   **k)** Develop a database or information resource center for behavioral health professionals to ensure appropriate research based interventions are being communicated to providers.

   **l)** Develop or adapt best practice resources and research based literature to medical professions on a range of behavioral health topics that frequently occur in primary care settings (including guidelines for best

        practices for administration of psychotropic medications for specific mental health conditions and monitoring of these medications).

b)     "Other" project option:  Implement other evidence-based project to provide virtual psychiatric and clinical guidance to all participating primary care providers delivering services to behavioral health patients regionally in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.16 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**2.17  Establish improvements in care transition from the inpatient setting for individuals with mental health and / or substance abuse disorders.**

**Project Goals:**

The goal of this project is to implement improvements in care transitions and coordination of care from inpatient to outpatient, post-acute care, and home care settings in order to prevent increased health care costs and hospital readmissions of individuals with mental health and substance use (behavioral health) disorders. For people with mental health and substance use disorders, these transitions are especially critical in reducing the risk of readmission. Texas Medicaid data on potentially preventable inpatient readmissions demonstrates that behavioral health conditions are a significant driver of inpatient costs. Mental health and substance abuse conditions comprise 8 percent of initial inpatient readmissions to general acute and specialty inpatient hospitals but represent 24 percent of potentially preventable admissions.[114] The implementation of effective care transitions requires that providers learn and develop effective ways to successfully manage one disease in order to effectively manage the complexity of multiple diseases.[115]  Preventable admissions in Texas are commonly indicative of  "the absence of excellent care, especially during the transition from inpatient care to care at home or in a post-acute facility."[116]

Relatively simple steps can make a real difference. These include scheduling the follow-up appointment before discharge, voice-to-voice transfer of care between the attending physician and the primary care physician / provider community-based services, reconciling medication instructions, and follow-up phone calls or visits after discharge. More complex populations with severe behavioral health disorders and other issues, such as homelessness may require more intensive follow-through post discharge. Strategies, such as Critical Time Intervention (CTI), are designed to prevent recurrent adverse outcomes, such as readmissions among persons with severe mental illness. Such interventions may include pre-transition planning, intensive transition support, assessment and adjustment of support and transfer to community sources of care. Peer support can be an important strategy for individuals transitioning from inpatient to community settings. In Texas, the Department of State Health Services, has developed a peer certification program which could be leveraged by partnerships to develop peer support capacity.

**Project Options:**

a)      Design, implement, and evaluate interventions to improve care transitions from the inpatient setting for individuals with mental health and/or substance abuse disorders.
Required core project components:

---

114 Potentially Preventable Readmissions in the Texas Medicaid Population, Fiscal Year 2010, Texas Health and Human Services Commission (2012)
115 Rittenhouse D, Shortell S, et al. "Improving Chronic Illness Care: Findings from a National Study of Care Management Processes in Large Physician Practices." Medical Care Research and Review Journal  (2010) 67(3): 301-320
116 Ibid.

    **a)**    Develop a cross-continuum team comprised of clinical and administrative representatives from acute care, ambulatory care, behavioral health and community-based non-medical supports

    **b)**    Conduct an analysis of the key drivers of 30-day hospital readmissions for behavioral health conditions using a chart review tool (e.g. the Institute for Healthcare Improvement's (IHI) State Action on Avoidable Re-hospitalizations (STAAR) tool) and patient and provider interviews.

    **c)**    Identify baseline mental health and substance abuse conditions at high risk for readmissions, (example include schizophrenia, bipolar disorder, major depressive disorder, chemical dependency).

    **d)**    Review best practices for improving care transitions from a range of evidence-based or evidence-informed models

    **e)**    Identify and prioritize evidence-based strategies and clinical protocols that support seamless care transitions and reduce preventable 30-day readmissions.

    **f)**    Implement two or more pilot intervention(s) in care transitions targeting one or more patient care units or a defined patient population. Examples of interventions include, but are not limited to, implementation of:

    **g)**    Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)    "Other" project option: Implement other evidence-based project to establish improvement in care transition from the inpatient setting for individuals with mental health and / or substance abuse disorders in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 2.17 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Examples of interventions include, but are not limited to, implementation of:

- Discharge checklists
- "Hand off" communication plans with receiving medical and behavioral health providers
- Wellness initiatives targeting high-risk behavioral health patients, such as WRAP, health planning and motivation strategies, Screening, Brief Intervention and Referral to Treatment (SBIRT) for substance use disorders,
- Individual and family education initiatives including self-management skills.
- Post-discharge medication planning
- Early follow-up such as homecare visits, primary care outreach, and/or patient call-backs.
- Transition and wellness support from certified peer specialists for mental health and /or substance use disorders.
- More intensive follow-through programs, such as CTI or other evidence-informed practices, for individuals with more severe behavioral health disorders and other challenges, such as homelessness.
- Electronic data exchange for critical clinical information to support excellent continuity of care.

**2.18   Recruit, train, and support consumers of mental health services to provide peer support services**

**Project Goal:**
The goal of this project is to use consumers of mental health services who have made substantial progress in managing their own illness and recovering a successful life in the community to provide peer support services.  These services are supportive and not necessarily clinical in nature.  Building on a project originally established under the State's Mental Health Transformation grant, consumers are being trained to serve as peer support specialists.  In addition to the basic peer specialist training and certification, an additional training is provided to certified peers specialists in "whole health".  With the whole health training peer specialists learn to work with other consumers to set achievable goals to prevent or self-manage chronic diseases such as diabetes and COPD. While such training currently exists, very limited numbers of peers are trained due to resource limitations. Evidence exists that such an approach can work with particularly vulnerable populations with serious mental illness[117].  The need for strategies to improve the health outcomes for people with behavioral health disorders is evidenced by their disparate life expectancy (dying 29 years younger than the general population[118] ), increased risk of mortality and poor health outcomes as severity of behavioral health disorders increase[119]

**Project Options**

a)      Design, implement, and evaluate whole health peer support for individuals with mental health and /or substance use disorders.
Required core project components:
  **a)**   Train administrators and key clinical staff in the use of peer specialists as an essential component of a comprehensive health system.
  **b)**   Conduct readiness assessments of organization that will integrate peer specialists into their network.
  **c)**   Identify peer specialists interested in this type of work.
  **d)**   Train identified peer specialists in whole health interventions, including conducting health risk assessments, setting SMART goals, providing educational and supportive services to targeted individuals with specific disorders (e.g. hypertension, diabetes, or health risks (e.g. obesity, tobacco use, physical inactivity.

---

117 Benjamin G. Druss, MD, MPH, Liping Zhao, MSPH, Silke A. von Esenwein, PhD, Joseph R. Bona, MD, MBA, Larry Fricks, Sherry Jenkins-Tucker, Evelina Sterling, MPH, CHES, Ralph DiClemente, PhD, and Kate Lorig, RN, DrPH,  The Health and Recovery Peer (HARP) Program: A peer-led intervention to improve medical self-management for persons with serious mental illness, Schizophrenia Research, Volume 118, Issue 1 , Pages 264-270, May 2010

118  Parks, J, Svendsen, D, et. al. "Morbidity and Mortality in People with Serious Mental Illness", National Association of  State Mental Health Program Directors, 2006.

119 Druss BG, Reisinger Walker E., "Mental Disorders and Medical Co-Morbidity."  Robert Wood Johnson Foundation, The Synthesis Project: Issue 21 (2011).

    **e)**       Implement health risk assessments to identify existing and potential health risks for behavioral health consumers.

    **f)**       Identify patients with serious mental illness who have health risk factors that can be modified.

    **g)**       Implement whole health peer support.

    **h)**       Connect patients to primary care and preventive services.

    **i)**       Track patient outcomes.  Review the intervention(s) impact on participants and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

**b)**     "Other" project option:  Implement other evidence-based project to recruit, train, and support consumers of mental health services to provide peer support services in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.18 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

## 2.19 Develop Care Management Function that integrates primary and behavioral health needs of individuals

**Project Goal:**
Provide a targeted care management intervention program for the population of people with co-occurring mental health, substance use and chronic physical disorders to increase use of primary and specialty care and reducing the use of ER, crisis and jail diversion services. The prevalence of co-occurring mental health, substance use and chronic physical disorders is high in the indigent population. This is due to the lack of access to and the complexity of navigating primary care and specialty care services. These individuals end up consuming a great deal of community resources due to ER visits, involvement of crisis response systems and often unnecessary incarcerations when routine treatment would be a better alternative. Early engagement in appropriate services to address the multiple conditions for these individuals, as well as their needs for housing and social support, requires both behavioral health case managers and chronic disease care managers working closely to make service settings accessible and to track progress.

**Project Options:**
    a)      Design, implement, and evaluate care management programs and that integrate primary and behavioral health needs of individual patients
              Required core project components:

    **a)**      Conduct data matching to identify individuals with co-occurring disorders who are:
- not receiving routine primary care,
- not receiving specialty care according to professionally accepted practice guidelines,
- over-utilizing ER services based on analysis of comparative data on other populations,
- over-utilizing crisis response services.
- Becoming involved with the criminal justice system due to uncontrolled/unmanaged symptoms.

    **b)**      Review chronic care management best practices such as Wagner's Chronic Care Model and select practices compatible with organizational readiness for adoption and implementation.

    **c)**      Identification of BH case managers and disease care managers to receive assignment of these individuals.

    **d)**      Develop protocols for coordinating care; identify community resources and services available for supporting people with co-occurring disorders.

    **e)**    Identify and implement specific disease management guidelines for high prevalence disorders, e.g. cardiovascular disease, diabetes, depression, asthma.

    **f)**    Train staff in protocols and guidelines.

    **g)**    Develop registries to track client outcomes.

    **h)**    Review the intervention(s) impact on quality of care and integration of care and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

**b)**    "Other" project option:  Implement other evidence-based project to develop care management function that integrates primary and behavioral health needs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.19 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

# Category 3 Quality Improvements

**75.    Category 3 Overview**

**a.    Introduction**

The overall objective of Category 3 is to assess the effectiveness of Category 1 and 2 interventions in improving outcomes in the Texas healthcare delivery system. As described in the Program Funding and Mechanics (PFM) Protocol, each project selected in Categories 1 and 2 will have one or more associated outcome measures from Category 3.

For the purposes of the RHP Planning and PFM Protocols, outcome measures are defined as "*measures that assess the results of care experienced by patients, including patients' clinical events, patients' recovery and health status, patients' experiences in the health system, and efficiency/cost.*"

All Category 3 outcome measures must be reported to specifications, except that a Performing Provider may customize the population measured by an outcome as allowed by CMS and HHSC to more closely reflect the patient population targeted in the related Category 1 or 2 project.

**b.**

**c.    Pay for Performance Measures**

The Category 3 menu of measures contains a large proportion of Pay for Performance (P4P) measures that providers may select from to receive incentive payments for demonstrating incremental improvements in the selected outcome. These measures are considered the stronger, more validated measures.   If there is a P4P measure appropriate to the Category 1 or 2 project that the provider can report to the specifications in the attached Compendium (Appendix C), then the provider must select a P4P measure.

There will be standard achievement levels for P4P measures to earn Category 3 funds in demonstration year (DY) 4 and DY 5.  In October 2014, providers may request to deviate from the standard achievement levels based on extenuating circumstances to be determined by the Texas Health and Human Services Commission (HHSC) and Centers for Medicare and Medicaid Services (CMS), such as if the intervention population is much smaller, significantly different than the denominator required in the measure specifications or if the benchmarks provided are not an appropriate fit for the denominator population (e.g., with the use of denominator subsets for age). Providers may request a deviation from the standard achievement levels established during the October 2014 baseline reporting period within parameters as agreed to by HHSC and CMS.

**d.    Pay for Reporting Measures**

The Category 3 menu also contains some measures that are designated as Pay for Reporting (P4R).  To accommodate the wide variety of Texas DSRIP providers and projects, these P4R measures were approved for inclusion in the menu as "exploratory" measures even though they do not have the strongest rigor of validation or evidence.

All P4R measures require prior authorization by HHSC and CMS. The prior authorization process will determine a) if the measure was a previously selected by the provider and was approved for use for a Category 1 or 2 project (if so, this serves as the authorization) and b) if not previously approved, whether there is a P4P measure that would be an appropriate fit for the project that the provider can report to specifications.

Providers that need to use a P4R measure will not receive payment for improving its rate, but instead will receive payment for reporting the measure to the associated specifications. Providers may still demonstrate improvement in these measures; however, that improvement will not be the basis for incentive payment. For these reporting only or "exploratory" measures providers must engage in an alternate improvement activity - either a Population-Focused Priority Measure or a Stretch Activity. These alternate improvement activities are detailed in Appendix (A).

For Hospital, Community Mental Health Center, and Physician Group provider types, providers with a P4R measure should select an outcome from the Population-Focused Priority Measure list. These outcomes do not have to be tied to the associated Category 1 or 2 project and instead represent a larger health priority for the health system.

For Local Health Department providers and for those providers above who cannot identify a measure to report from the Population-Focused Priority Measure list, providers may select a Stretch Activity. These activities are intended to improve data infrastructure and capacity.

### e. Minimum Category 3 Requirements for Each Category 1 or 2 Project

Each outcome measure (IT-X.X) is labeled as a standalone measure or non-standalone measure. Providers can select among the following methods to meet Category 3 requirements for each Category 1 or 2 project:

- **At least one standalone measure:** Providers can select a standalone measure from any outcome domain listed in the table below for Category 1 and 2 projects. Cost-related outcomes may be used as the standalone outcome only for project area 2.5 (Cost Containment). Cost outcomes can be selected as non-standalone measures for other project areas.
- **At least one standalone measure and additional non-standalone measure(s):** One or more non-standalone measures from any outcome domain can be combined with at least one standalone measure.
- **A combination of at least 3 non-standalone measures:** A provider can select a combination of 3 non-standalone measures for a Category 1 or 2 project and these measures may be from different outcome domains if needed.

The measures selected for each Category 1 or 2 project may be a combination of P4P and P4R measures. Each measure is treated separately for reporting and payment purposes.

**f.     Types of Category 3 Milestones**

The terms "process milestone" and "achievement milestone" are used to classify Category 3 milestones in each demonstration year.  Process milestones will be those milestones in which a provider is not earning DSRIP funds based on reaching a goal achievement level over baseline, i.e., it will be used for DY2 and DY3 planning activities to prepare for Category 3 reporting, in DY4 and DY5 for reporting to specifications (for P4R measures), and in DY5 for stretch activities.  Achievement milestones will be used for milestones in which the provider will earn funds based on progress towards a goal achievement level for the measure, i.e., for P4P measures in DY4 and DY5 and Population-Focused Priority Measures in DY5.

The table below describes the milestones each year for both P4P and P4R outcomes.

|  | **Pay for Performance (P4P) outcome measures** | **Pay for Reporting (P4R) outcome measures** |
|---|---|---|
| DY2 | Each provider selected process milestones from the original menu (P-1 through P-7) and designated the valuation per milestone; a status update was allowed in lieu of specific milestone documentation for DY2 | |
| DY3 | 2 process milestones (P-8 & P-9) - DY3 Category 3 status update (50% of DY3 allocation) and establishing baseline (50% of DY3 allocation) | |
| DY4 | Process Milestone 10 - 50% of DY4 allocation for reporting P4P measure to specifications<br><br>Achievement  Milestone 1 - 50% of DY4 allocation for demonstrating improvement in P4P measure over baseline | Process Milestone 10  - 100% of DY4 allocation for reporting P4R measure to specifications |
| DY5 | Achievement Milestone 1 - 100% of DY5 allocation for demonstrating improvement in P4P measure over baseline | Process Milestone 10  - 50% of DY5 allocation for reporting P4R measure to specifications<br><br>Alternate Improvement Activity<br>EITHER<br>Achievement Milestone 2 – 50% of DY5 allocation for demonstrating improvement in a Population Focused Priority Measure<br>OR<br>Process Milestone 11 –<br>50% of DY5 allocation for reporting as required on a stretch activity |

*Per the PFM Protocol, all Category 3 milestones are eligible for carry forward into the subsequent year and achievement milestones only are eligible for payment for partial achievement.

## 76. Category 3 Outcome Measures

All of the measures included in the Category 3 menu have been approved by CMS. Often the source of these measures is an authoritative agency around outcome measurement (e.g., AHRQ, NCQA, CDC, NQF). Most of these measures have been validated and tested to ensure that the outcomes are measuring what they purport to measure. In some instances, these evidence based measures are modified in order to be used by DSRIP providers to change the specifications to describe a provider focus as opposed to a health plan focus. These modifications are described in detail within the compendium document (Appendix C). In some cases, where validated measures did not previously exist, measures were created based on evidence based guidelines and practices. These measures were included in the menu to reflect outcomes pertinent to approved Category 1 and 2 projects. The outcomes are salient to aspects of patient care that reflect better health and satisfaction with services, improved efficiencies in health care delivery and cost savings.

## 77. Outcome Domains

All of the Category 3 outcome measures are organized into 15 Outcome Domains (ODs) to facilitate measure selection.

- OD-1: Primary Care and Chronic Disease Management
- OD-2: Potentially Preventable Admissions
- OD-3: Potentially Preventable Readmissions (PPRs) – 30-day Readmission Rates
- OD-4: Potentially Preventable Complications, Healthcare Acquired Conditions, and Patient Safety
- OD-5: Cost of Care
- OD-6: Patient Satisfaction
- OD-7: Oral Health
- OD-8: Perinatal Outcomes and Maternal Child Health
- OD-9: Right Care, Right Setting
- OD-10: Quality of Life/Functional Status
- OD-11: Behavioral Health/Substance Abuse Care
- OD-12: Primary Prevention
- OD-13: Palliative Care
- OD-14: Healthcare Workforce
- OD-15: Infectious Disease Management

**78.     List of Category 3 Outcome Measures**

The table below lists the outcome measures from which providers may choose.  The
Compendium (Appendix C) contains further details on how each measure is to be reported and
the Category 3 Companion (Appendix D) contains guidance for providers selection of their
Category 3 outcome measures in March 2014 based on the revised Category 3 framework agreed
to by CMS and HHSC in February 2014 and reflected in this protocol and the PFM Protocol.

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 1 | IT-1.1 | Non-Standalone (NSA) | P4P | No | Third next available appointment |
| 1 | IT-1.2 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications - Angiotensin Converting Enzyme (ACE) inhibitors or Angiotensin Receptor Blockers (ARBs) |
| 1 | IT-1.3 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications - Digoxin |
| 1 | IT-1.4 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications- Diuretic |
| 1 | IT-1.5 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications - Anticonvulsant |
| 1 | IT-1.6 | Standalone (SA) | P4P | No | Cholesterol management for patients with cardiovascular conditions |
| 1 | IT-1.7 | Standalone (SA) | P4P | No | Controlling high blood pressure |
| 1 | IT-1.8 | Non-Standalone (NSA) | P4P | No | Depression management: Screening and Treatment Plan for Clinical Depression |
| 1 | IT-1.9 | Standalone (SA) | P4P | No | Depression management: Depression Remission at Twelve Months |
| 1 | IT-1.10 | Standalone (SA) | P4P | No | Diabetes care: HbA1c poor control (>9.0%) |
| 1 | IT-1.11 | Standalone (SA) | P4P | No | Diabetes care:  BP control (<140/90mm Hg) |
| 1 | IT-1.12 | Non-Standalone (NSA) | P4P | No | Diabetes care: Retinal eye exam |
| 1 | IT-1.13 | Non-Standalone (NSA) | P4P | No | Diabetes care:  Foot exam |
| 1 | IT-1.14 | Non-Standalone (NSA) | P4P | No | Diabetes care: Nephropathy |
| 1 | IT-1.15 | Standalone (SA) | P4P | No | Peritoneal Dialysis Adequacy Clinical Performance Measure III |
| 1 | IT-1.16 | Standalone (SA) | P4P | No | Hemodialysis Adequacy Clinical Performance Measure III |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 1 | IT-1.17 | Standalone (SA) | P4P | No | Hemodialysis Adequacy for Pediatric Hemodialysis Patients |
| 1 | IT-1.18 | Standalone (SA) | P4P | No | Follow-Up After Hospitalization for Mental Illness |
| 1 | IT-1.19 | Standalone (SA) | P4P | No | Antidepressant Medication Management |
| 1 | IT-1.20 | Non-Standalone (NSA) | P4P | No | Comprehensive Diabetes Care LDL Screening |
| 1 | IT-1.21 | Non-Standalone (NSA) | P4P | No | Adult Body Mass Index (BMI) Assessment |
| 1 | IT-1.22 | Standalone (SA) | P4P | No | Asthma Percent of Opportunity Achieved |
| 1 | IT-1.23 | Non-Standalone (NSA) | P4P | No | Tobacco Use: Screening & Cessation |
| 1 | IT-1.24 | Standalone (SA) | P4R | Yes | Adolescent tobacco use |
| 1 | IT-1.25 | Standalone (SA) | P4R | Yes | Adult tobacco use |
| 1 | IT-1.26 | Non-Standalone (NSA) | P4P | No | Seizure type(s) and current seizure frequency(ies) |
| 1 | IT-1.27 | Non-Standalone (NSA) | P4P | No | Pain Assessment and Follow-up |
| 1 | IT-1.28 | Non-Standalone (NSA) | P4P | No | Preventive Care and Screening: Screening for High Blood Pressure and Follow-Up Documented |
| 1 | IT-1.29 | Non-Standalone (NSA) | P4P | No | Weight Assessment and Counseling for Nutrition and Physical Activity for Children/Adolescents |
| 1 | IT-1.30 | Non-Standalone (NSA) | P4P | No | Hemoglobin A1c (HbA1c) Testing for Pediatric Patients |
| 1 | IT-1.31 | Standalone (SA) | P4P | No | Medication Management for People with Asthma (MMA) |
| 1 | IT-1.32 | Standalone (SA) | P4P | No | Asthma Medication Ratio (AMR) |
| 1 | IT-1.33 | Non-Standalone (NSA) | P4P | No | Medical Assistance With Smoking and Tobacco Use Cessation |
| 1 | IT-1.34 | Standalone (SA) | P4P | No | Appropriate Testing for Children With Pharyngitis |
| 2 | IT-2.1 | Standalone (SA) | P4R | Yes | Congestive Heart Failure (CHF) Admission rate |
| 2 | IT-2.2 | Standalone (SA) | P4P | No | Risk Adjusted Congestive Heart Failure (CHF) Admission rate |
| 2 | IT-2.3 | Standalone (SA) | P4R | Yes | End-Stage Renal Disease (ESRD) Admission Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 2 | IT-2.4 | Standalone (SA) | P4P | No | Risk Adjusted End-Stage Renal Disease (ESRD) Admission Rate |
| 2 | IT-2.5 | Standalone (SA) | P4R | Yes | Hypertension (HTN) Admission Rate |
| 2 | IT-2.6 | Standalone (SA) | P4P | No | Risk Adjusted Hypertension (HTN) Admission Rate |
| 2 | IT-2.7 | Standalone (SA) | P4R | Yes | Behavioral Health/Substance Abuse (BH/SA) Admission Rate |
| 2 | IT-2.8 | Standalone (SA) | P4P | No | Risk Adjusted Behavioral Health/Substance Abuse (BH/SA) |
| 2 | IT-2.9 | Standalone (SA) | P4R | Yes | Chronic Obstructive Pulmonary Disease (COPD) Admission Rate |
| 2 | IT-2.10 | Standalone (SA) | P4P | No | Risk Adjusted Chronic Obstructive Pulmonary Disease (COPD) Admission Rate |
| 2 | IT-2.11 | Standalone (SA) | P4R | Yes | Adult Asthma Admission Rate |
| 2 | IT-2.12 | Standalone (SA) | P4P | No | Risk Adjusted Adult Asthma Admission Rate |
| 2 | IT-2.13 | Standalone (SA) | P4R | Yes | Diabetes Short Term Complication Admission Rate |
| 2 | IT-2.14 | Standalone (SA) | P4P | No | Risk Adjusted Diabetes Short Term Complication Admission Rate |
| 2 | IT-2.15 | Standalone (SA) | P4R | Yes | Diabetes Long Term Complications Admission Rate |
| 2 | IT-2.16 | Standalone (SA) | P4P | No | Risk Adjusted Diabetes Long Term Complications Admission Rate |
| 2 | IT-2.17 | Standalone (SA) | P4R | Yes | Uncontrolled Diabetes Admissions Rate |
| 2 | IT-2.18 | Standalone (SA) | P4P | No | Risk Adjusted Uncontrolled Diabetes Admissions Rate |
| 2 | IT-2.19 | Standalone (SA) | P4R | Yes | Flu and pneumonia Admission Rate |
| 2 | IT-2.20 | Standalone (SA) | P4P | No | Risk Adjusted Flu and pneumonia Admission Rate |
| 2 | IT-2.21 | Standalone (SA) | P4P | No | Ambulatory Care Sensitive Conditions Admissions Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 2 | IT-2.22 | Standalone (SA) | P4P | No | Prevention Quality Indicators (PQI) Composite Measure Potentially Preventable Hospitalizations for Ambulatory Care Sensitive Conditions |
| 2 | IT-2.23 | Standalone (SA) | P4R | Yes | Pediatric Asthma Admission Rate |
| 2 | IT-2.24 | Standalone (SA) | P4P | No | Risk Adjusted Pediatric Asthma Admission Rate |
| 2 | IT-2.25 | Standalone (SA) | P4R | Yes | Pain Admission Rate |
| 2 | IT-2.26 | Standalone (SA) | P4P | No | Risk Adjusted Pain Admission Rate |
| 2 | IT-2.27 | Standalone (SA) | P4R | Yes | Cancer Admission Rate |
| 2 | IT-2.28 | Standalone (SA) | P4P | No | Risk Adjusted Cancer Admission Rate |
| 2 | IT-2.29 | Standalone (SA) | P4R | Yes | Cellulitis Admission Rate |
| 2 | IT-2.30 | Standalone (SA) | P4P | No | Risk Adjusted Cellulitis Admission Rate |
| 3 | IT-3.1 | Standalone (SA) | P4P | No | Hospital-Wide All-Cause Unplanned Readmission Rate |
| 3 | IT-3.2 | Standalone (SA) | P4R | Yes | Congestive Heart Failure (CHF) 30-day Readmission Rate |
| 3 | IT-3.3 | Standalone (SA) | P4P | No | Risk Adjusted Congestive Heart Failure (CHF) 30-day Readmission Rate |
| 3 | IT-3.4 | Standalone (SA) | P4R | Yes | Diabetes 30-day Readmission Rate |
| 3 | IT-3.5 | Standalone (SA) | P4P | No | Risk Adjusted Diabetes 30-day Readmission Rate |
| 3 | IT-3.6 | Standalone (SA) | P4R | Yes | Renal Disease 30-day Readmission Rate |
| 3 | IT-3.7 | Standalone (SA) | P4P | No | Risk Adjusted Renal Disease 30-day Readmission Rate |
| 3 | IT-3.8 | Standalone (SA) | P4R | Yes | Acute Myocardial Infarction (AMI) 30-day Readmission Rate |
| 3 | IT-3.9 | Standalone (SA) | P4P | No | Risk Adjusted Acute Myocardial Infarction (AMI) 30-day Readmission Rate |
| 3 | IT-3.10 | Standalone (SA) | P4R | Yes | Coronary Artery Disease (CAD) 30-day Readmission Rate |
| 3 | IT-3.11 | Standalone (SA) | P4P | No | Risk Adjusted Coronary Artery Disease (CAD) 30-day Readmission Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 3 | IT-3.12 | Standalone (SA) | P4R | Yes | Stroke (CVA) 30-day Readmission Rate |
| 3 | IT-3.13 | Standalone (SA) | P4P | No | Risk Adjusted Stroke (CVA) 30-day Readmission Rate |
| 3 | IT-3.14 | Standalone (SA) | P4R | Yes | Behavioral Health /Substance Abuse 30-day Readmission Rate |
| 3 | IT-3.15 | Standalone (SA) | P4P | No | Risk Adjusted Behavioral Health /Substance Abuse 30-day Readmission Rate |
| 3 | IT-3.16 | Standalone (SA) | P4R | Yes | Chronic Obstructive Pulmonary Disease (COPD) 30-day Readmission Rate |
| 3 | IT-3.17 | Standalone (SA) | P4P | No | Risk Adjusted Chronic Obstructive Pulmonary Disease (COPD) 30-day Readmission Rate |
| 3 | IT-3.18 | Standalone (SA) | P4R | Yes | Adult Asthma 30-day Readmission Rate |
| 3 | IT-3.19 | Standalone (SA) | P4P | No | Risk Adjusted Adult Asthma 30-day Readmission Rate |
| 3 | IT-3.20 | Standalone (SA) | P4R | Yes | Pediatric Asthma 30-day Readmission Rate |
| 3 | IT-3.21 | Standalone (SA) | P4P | No | Risk Adjusted Pediatric Asthma 30-day Readmission Rate |
| 3 | IT-3.22 | Standalone (SA) | P4P | No | Risk Adjusted All-Cause Readmission |
| 3 | IT-3.23 | Standalone (SA) | P4R | Yes | Ventricular Assist Device 30-day Readmission Rate |
| 3 | IT-3.24 | Standalone (SA) | P4P | No | Risk Adjusted Ventricular Assist Device 30-day Readmission Rate |
| 3 | IT-3.25 | Standalone (SA) | P4R | Yes | Post-Surgical 30-day Readmission Rate |
| 3 | IT-3.26 | Standalone (SA) | P4P | No | Risk Adjusted Post-Surgical 30-day Readmission Rate |
| 3 | IT-3.27 | Standalone (SA) | P4R | Yes | Cancer Related 30-day Readmission Rate |
| 3 | IT-3.28 | Standalone (SA) | P4R | Yes | Medication Complication 30-day Readmission Rate |
| 3 | IT-3.29 | Standalone (SA) | P4P | No | Risk Adjusted Medication Complication 30-day Readmission Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 4 | IT-4.1 | Standalone (SA) | P4P | No | Improvement in risk adjusted Potentially Preventable Complications rate(s) |
| 4 | IT-4.2 | Standalone (SA) | P4P | No | Central line-associated bloodstream infections (CLABSI) rates |
| 4 | IT-4.3 | Standalone (SA) | P4P | No | Catheter-associated Urinary Tract Infections (CAUTI) rates |
| 4 | IT-4.4 | Standalone (SA) | P4P | No | Surgical site infections (SSI) rates |
| 4 | IT-4.5 | Standalone (SA) | P4P | No | Patient Fall Rate |
| 4 | IT-4.6 | Standalone (SA) | P4P | No | Incidence of Hospital-acquired Venous Thromboembolism (VTE) |
| 4 | IT-4.7 | Standalone (SA) | P4P | No | Pressure Ulcer Rate |
| 4 | IT-4.8 | Standalone (SA) | P4R | Yes | Sepsis mortality |
| 4 | IT-4.9 | Non-Standalone (NSA) | P4R | Yes | Average length of stay: Sepsis |
| 4 | IT-4.10 | Standalone (SA) | P4P | No | Sepsis bundle  (NQF 0500) |
| 4 | IT-4.11 | Non-Standalone (NSA) | P4P | No | Risk-Adjusted Average Length of Inpatient Hospital Stay |
| 4 | IT-4.12.1 | Non-Standalone (NSA) | P4P | No | Average Length of Stay for patients of Medication Errors |
| 4 | IT-4.13 | Non-Standalone (NSA) | P4R | Yes | Patients receiving language services supported by qualified language services providers |
| 4 | IT-4.14 | Standalone (SA) | P4P | No | Intensive Care: In-hospital mortality rate |
| 4 | IT-4.15 | Standalone (SA) | P4P | No | Venous Thromboembolism Prophylaxis Bundle |
| 4 | IT-4.16 | Standalone (SA) | P4R | Yes | Reduce Unplanned Re-operations |
| 4 | IT-4.12.2 | Non-Standalone (NSA) | P4P | No | Adverse drug events |
| 4 | IT-4.17 | Non-Standalone (NSA) | P4P | No | Stroke - Thrombolytic Therapy |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 4 | IT-4.18 | Non-Standalone (NSA) | P4P | No | Warfarin management: percentage of patients on warfarin with an international normalized ratio (INR) result of 4 or above whose dosage has been adjusted or reviewed prior to the next warfarin dose, during the 6 month time period |
| 4 | IT-4.19 | Non-Standalone (NSA) | P4P | Yes | Falls: Screening, Risk-Assessment, and Plan of Care to Prevent Future Falls |
| 5 | IT-5.1 a | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost of Illness Analysis |
| 5 | IT-5.1 b | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Minimization Analysis |
| 5 | IT-5.1 c | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Effectiveness Analysis |
| 5 | IT-5.1 d | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Utility Analysis |
| 5 | IT-5.1 e | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Benefit Analysis |
| 5 | IT-5.2 | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Per Episode Cost of Care |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 5 | IT-5.3 | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Total Cost of Care |
| 6 | IT-6.1.a.i | Standalone (SA) | P4P | No | HCAHPS Communication with Doctors |
| 6 | IT-6.1.a.ii | Standalone (SA) | P4P | No | HCAHPS Communication with Nurses |
| 6 | IT-6.1.a.iii | Standalone (SA) | P4P | No | HCAHPS Responsiveness of Hospital Staff |
| 6 | IT-6.1.a.iv | Standalone (SA) | P4P | No | HCAHPS Pain Control |
| 6 | IT-6.1.a.v | Standalone (SA) | P4P | No | HCAHPS Communication about Medicine |
| 6 | IT-6.1.a.vi | Standalone (SA) | P4P | No | HCAHPS Cleanliness of Hospital Environment |
| 6 | IT-6.1.a.vii | Standalone (SA) | P4P | No | HCAHPS Quietness of Hospital Environment |
| 6 | IT-6.1.a.viii | Standalone (SA) | P4P | No | HCAHPS Discharging Information |
| 6 | IT-6.1.a.ix | Standalone (SA) | P4P | No | HCAHPS Overall Hospital Rating |
| 6 | IT-6.1.a.x | Standalone (SA) | P4P | No | HCAHPS Likelihood to Recommend |
| 6 | IT-6.1.b.i | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Timeliness of Appointments, Care, & Information |
| 6 | IT-6.1.b.ii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Provider Communication |
| 6 | IT-6.1.b.iii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Office Staff |
| 6 | IT-6.1.b.iv | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Overall Provider Rating |
| 6 | IT-6.1.b.v | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Provider's Attention to Child's Growth and Development(Pediatric) |
| 6 | IT-6.1.b.vi | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Provider's Advice on Keeping Child Safe and Healthy(Pediatric) |
| 6 | IT-6.1.c.i | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Cultural Competence Survey Supplement |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 6 | IT-6.1.c.ii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Health Information Technology Supplement |
| 6 | IT-6.1.c.iii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Health Literacy Supplement |
| 6 | IT-6.1.c.iv | Standalone (SA) | P4P | No | CG-CAHPS 12-month: PCMH Supplement (includes Shared Decision Making) |
| 6 | IT-6.1.d.i | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Timeliness of Appointments, Care, & Information |
| 6 | IT-6.1.d.ii | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Provider Communication |
| 6 | IT-6.1.d.iii | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Office Staff |
| 6 | IT-6.1.d.iv | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Overall Provider Rating |
| 6 | IT-6.1.d.v | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Provider's Attention to Child's Growth and Development (Pediatric) |
| 6 | IT-6.1.d.vi | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Providers Advice on Keeping Child Safe and healthy (Pediatric) |
| 6 | IT-6.2.a | Standalone (SA) | P4P | No | Client Satisfaction Questionnaire 8 (CSQ-8) |
| 6 | IT-6.2.b | Standalone (SA) | P4P | No | Visit-Specific Satisfaction Instrument (VSQ-9) |
| 6 | IT-6.2.c | Standalone (SA) | P4R | Yes | Health Center Patient Satisfaction Survey |
| 6 | IT-6.2.d.i | Standalone (SA) | P4P | No | PSQ-III General Satisfaction |
| 6 | IT-6.2.d.ii | Standalone (SA) | P4P | No | PSQ-III Technical Quality |
| 6 | IT-6.2.d.iii | Standalone (SA) | P4P | No | PSQ-III Interpersonal Aspects |
| 6 | IT-6.2.d.iv | Standalone (SA) | P4P | No | PSQ-III Communication |
| 6 | IT-6.2.d.v | Standalone (SA) | P4P | No | PSQ-III Financial Aspects |
| 6 | IT-6.2.d.vi | Standalone (SA) | P4P | No | PSQ-III Time Spent w/ Doctors |
| 6 | IT-6.2.d.vii | Standalone (SA) | P4P | No | PSQ-III Access, Availability, & Convenience |
| 6 | IT-6.2.d.viii | Standalone (SA) | P4P | No | PSQ-18 General Satisfaction |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 6 | IT-6.2.d.ix | Standalone (SA) | P4P | No | PSQ-18 Technical Quality |
| 6 | IT-6.2.d.x | Standalone (SA) | P4P | No | PSQ-18 Interpersonal Aspects |
| 6 | IT-6.2.d.xi | Standalone (SA) | P4P | No | PSQ-18 Communication |
| 6 | IT-6.2.d.xii | Standalone (SA) | P4P | No | PSQ-18 Financial Aspects |
| 6 | IT-6.2.d.xiii | Standalone (SA) | P4P | No | PSQ-18 Time Spent w/ Doctors |
| 6 | IT-6.2.d.xiv | Standalone (SA) | P4P | No | PSQ-18 Access, Availability, & Convenience |
| 6 | IT-6.2.e | Standalone (SA) | P4R | Yes | Experience of Care and Health Outcomes (ECHO) 3.0 |
| 7 | IT-7.1 | Non-Standalone (NSA) | P4P | Yes | Dental Sealant:  Children |
| 7 | IT-7.2 | Standalone (SA) | P4P | Yes | Cavities: Children |
| 7 | IT-7.3 | Non-Standalone (NSA) | P4P | Yes | Early Childhood Caries – Fluoride Applications |
| 7 | IT-7.4 | Non-Standalone (NSA) | P4P | Yes | Topical Fluoride application |
| 7 | IT-7.5 | Standalone (SA) | P4P | Yes | Proportion of older adults aged 65 to 74 years who have lost all their natural teeth |
| 7 | IT-7.6 | Standalone (SA) | P4P | Yes | Urgent Dental Care Needs in Children: Percentage of children with urgent dental care needs |
| 7 | IT-7.7 | Standalone (SA) | P4P | Yes | Urgent Dental Care Need in Older Adults |
| 7 | IT-7.8 | Standalone (SA) | P4P | Yes | Chronic Disease Patients Accessing Dental Services |
| 7 | IT-7.9 | Standalone (SA) | P4P | Yes | Dental Treatment Needs Among Chronic Disease Patients |
| 7 | IT-7.10 | Standalone (SA) | P4P | No | Cavities: Adults |
| 7 | IT-7.11 | Non-Standalone (NSA) | P4P | No | Utilization of Services: Children |
| 7 | IT-7.12 | Non-Standalone (NSA) | P4P | No | Oral Evaluation: Children |
| 7 | IT-7.13 | Non-Standalone (NSA) | P4P | No | Prevention: Sealants for 6 – 9 year-old Children at Elevated Risk |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 7 | IT-7.14 | Non-Standalone (NSA) | P4P | No | Prevention: Sealants for 10 – 14 year-old Children at Elevated Risk |
| 7 | IT-7.15 | Non-Standalone (NSA) | P4P | No | Prevention: Topical Fluoride Intensity for Children at Elevated Caries Risk |
| 7 | IT-7.16 | Non-Standalone (NSA) | P4P | No | Preventive Services for Children at Elevated Caries Risk |
| 7 | IT-7.17 | Non-Standalone (NSA) | P4P | No | Treatment Services: Children |
| 7 | IT-7.18 | Non-Standalone (NSA) | P4P | No | Usual Source of Services |
| 7 | IT-7.19 | Non-Standalone (NSA) | P4P | No | Care Continuity: Children |
| 7 | IT-7.20 | Non-Standalone (NSA) | P4P | No | Per Member Per Month Cost of Clinical Services (PMPM Cost): Children |
| 7 | IT-7.21 | Non-Standalone (NSA) | P4P | No | Annual Dental Visit |
| 7 | IT-7.22 | Non-Standalone (NSA) | P4R | Yes | Diabetes mellitus: percent of patients who obtained a dental exam in the last 12 months (NQMC:1600) |
| 8 | IT-8.1 | Non-Standalone (NSA) | P4P | No | Timeliness of Prenatal/Postnatal Care |
| 8 | IT-8.2 | Standalone (SA) | P4P | No | Percentage of Low Birth- weight births |
| 8 | IT-8.3 | Standalone (SA) | P4P | No | Early Elective Delivery |
| 8 | IT-8.4 | Non-Standalone (NSA) | P4P | No | Antenatal Steroids |
| 8 | IT-8.5 | Non-Standalone (NSA) | P4P | No | Frequency of ongoing prenatal care |
| 8 | IT-8.6 | Non-Standalone (NSA) | P4P | No | Cesarean Rate for Nulliparous Singleton Vertex |
| 8 | IT-8.7 | Non-Standalone (NSA) | P4P | No | Birth Trauma Rates |
| 8 | IT-8.8 | Standalone (SA) | P4P | Yes | Neonatal Mortality |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 8 | IT-8.9 | Standalone (SA) | P4R | Yes | Youth Pregnancy Rate |
| 8 | IT-8.10 | Standalone (SA) | P4R | Yes | Pregnancy Rate |
| 8 | IT-8.11 | Standalone (SA) | P4R | Yes | Healthy term newborn |
| 8 | IT-8.12 | Standalone (SA) | P4P | No | Pre-term birth rate |
| 8 | IT-8.13 | Standalone (SA) | P4R | Yes | NICU days/delivery |
| 8 | IT-8.14 | Non-Standalone (NSA) | P4R | Yes | Exclusive Breastfeeding at 3 Months |
| 8 | IT-8.15 | Non-Standalone (NSA) | P4R | Yes | Exclusive Breastfeeding at 6 Months |
| 8 | IT-8.16 | Non-Standalone (NSA) | P4R | Yes | Any Breastfeeding at 6 Months |
| 8 | IT-8.17 | Non-Standalone (NSA) | P4R | Yes | Any Breastfeeding at 12 Months |
| 8 | IT-8.18 | Non-Standalone (NSA) | P4P | No | Rate of Exclusive Breastfeeding |
| 8 | IT-8.19 | Standalone (SA) | P4P | No | Post-Partum Follow-Up and Care Coordination |
| 8 | IT-8.20 | Non-Standalone (NSA) | P4P | No | Developmental Screening in the First Three Years of Life |
| 8 | IT-8.21 | Non-Standalone (NSA) | P4P | No | Well-Child Visits in the First 15 Months of Life (6 or more visits) |
| 8 | IT-8.22 | Non-Standalone (NSA) | P4P | No | Well-Child Visits in the Third, Fourth, Fifth and Sixth Years of Life |
| 8 | IT-8.23 | Non-Standalone (NSA) | P4P | No | Children and Adolescents' Access to Primary Care Practitioners (CAP) |
| 8 | IT-8.24 | Non-Standalone (NSA) | P4P | No | Adolescent Well-Care Visits (AWC) |
| 8 | IT-8.25 | Non-Standalone (NSA) | P4R | Yes | Sudden Infant Death Syndrome Counseling |
| 8 | IT-8.26 | Non-Standalone (NSA) | P4R | Yes | Routine prenatal care: percentage of pregnant patients who receive counseling about aneuploidy screening in the first trimester (NQMC:8031) |
| 8 | IT-8.27 | Non-Standalone (NSA) | P4R | Yes | Behavioral health risk assessment (for pregnant women) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 9 | IT-9.1 | Standalone (SA) | P4P | Yes | Decrease in mental health admissions and readmissions to criminal justice settings such as jails or prisons |
| 9 | IT-9.2 | Standalone (SA) | P4P | No | Reduce Emergency Department (ED) visits for Ambulatory Care Sensitive Conditions (ACSC) per 100,000 |
| 9 | IT-9.3 | Standalone (SA) | P4P | No | Reduce Pediatric Emergency Department (ED) visits for Ambulatory Care Sensitive Conditions (ACSC) per 100,000 |
| 9 | IT-9.2.a | Standalone (SA) | P4P | No | Emergency Department (ED) visits per 100,000 |
| 9 | IT-9.3.a | Standalone (SA) | P4P | No | Pediatric Emergency Department (ED) visits per 100,000 |
| 9 | IT-9.4.a | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Congestive Heart Failure |
| 9 | IT-9.4.b | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Diabetes |
| 9 | IT-9.4.c | Standalone (SA) | P4P | No | Reduce Emergency Department visits for End Stage Renal Disease |
| 9 | IT-9.4.d | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Angina and Hypertension |
| 9 | IT-9.4.e | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Behavioral Health/Substance Abuse |
| 9 | IT-9.4.f | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Chronic Obstructive Pulmonary Disease |
| 9 | IT-9.4.g | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Asthma |
| 9 | IT-9.4.i | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Dental Conditions |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 9 | IT-9.4.h | Standalone (SA) | P4P | No | Pediatric/Young Adult Asthma Emergency Department Visits |
| 9 | IT-9.5 | Non-Standalone (NSA) | P4R | Yes | Reduce low acuity ED visits |
| 9 | IT-9.6 | Non-Standalone (NSA) | P4P | No | Emergency department (ED) visits where patients left without being seen |
| 9 | IT-9.7 | Non-Standalone (NSA) | P4P | No | Emergency department (ED) visits where patients with a mental health complaint without being seen |
| 9 | IT-9.8 | Non-Standalone (NSA) | P4P | No | Care Transition: Transition Record with Specified Elements Received by Discharged Patients (Emergency Department Discharges to Ambulatory Care [Home/Self Care] or Home Health Care) |
| 9 | IT-9.9 | Non-Standalone (NSA) | P4P | No | Transition Record with Specified Elements Received by Discharged Patients (Inpatient Discharges to Home/Self Care or Any Other Site of Care) |
| 9 | IT-9.10 | Standalone (SA) | P4P | No | ED throughput Measure bundle |
| 9 | IT-9.10.a | Non-Standalone (NSA) | P4P | No | Median Time from ED Arrival to ED Departure for Discharged ED Patients |
| 9 | IT-9.10.b | Non-Standalone (NSA) | P4P | No | Median time from admit decision time to time of departure from the ED for ED patients admitted to inpatient status |
| 9 | IT-9.10.c | Non-Standalone (NSA) | P4P | No | Median time from ED arrival to time of departure from the emergency room for patients admitted to the facility from the ED |
| 10 | IT-10.1.a.i | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-4D) |
| 10 | IT-10.1.a.ii | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-6D) |
| 10 | IT-10.1.a.iii | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-7D) |
| 10 | IT-10.1.a.iv | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-8D) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 10 | IT-10.1.a.v | Standalone (SA) | P4P | No | Pediatric Quality of Life Inventory (PedsQL) |
| 10 | IT-10.1.b.i | Standalone (SA) | P4P | No | RAND Medical Outcomes Study: Measures of Quality of Life Survey Core Survey (MOS) |
| 10 | IT-10.1.b.ii | Standalone (SA) | P4P | No | RAND Short Form 12 (SF-12v2)  Health Survey |
| 10 | IT-10.1.b.iii | Standalone (SA) | P4P | No | RAND Short Form 36[1] (SF-36) Health Survey |
| 10 | IT-10.1.c | Standalone (SA) | P4R | Yes | Quality of Life Enjoyment and Satisfaction Questionnaire (Q-LES-Q) |
| 10 | IT-10.1.d | Standalone (SA) | P4P | No | McGill Quality of Life (MQOL) Index |
| 10 | IT-10.1.e.i | Standalone (SA) | P4P | No | Palliative Care Outcome Scale (POSv1) |
| 10 | IT-10.1.e.ii | Standalone (SA) | P4P | No | Palliative Care Outcome Scale (POSv2) |
| 10 | IT-10.1.f | Standalone (SA) | P4P | No | Functional Assessment of Cancer Therapy (FACT-G) |
| 10 | IT-10.1.g | Standalone (SA) | P4P | No | Missoula-VITAS Quality of Life Index (MVQOLI) |
| 10 | IT-10.1.h | Standalone (SA) | P4P | No | CDC Health-Related Quality of Life (HRQoL) Measures |
| 10 | IT-10.1.i.i | Standalone (SA) | P4R | Yes | Child Health Questionnaire Parent  CHQ-PF50 |
| 10 | IT-10.1.i.ii | Standalone (SA) | P4R | Yes | Child Health Questionnaire Parent  CHQ-PF28 |
| 10 | IT-10.1.i.iii | Standalone (SA) | P4R | Yes | Child Health Questionnaire Child Form (CHQ-CF87) |
| 10 | IT-10.1.j | Standalone (SA) | P4R | Yes | Family Experiences Interview Schedule (FEIS) |
| 10 | IT-10.2.a | Standalone (SA) | P4R | Yes | Supports Intensity Scale (SIS) |
| 10 | IT-10.2.b | Standalone (SA) | P4P | No | Lawton Instrumental Activities of Daily Living (IADLs) Scale |
| 10 | IT-10.3.a | Standalone (SA) | P4P | No | Activity Measure for Post-Acute Care (AMPAC) |
| 10 | IT-10.3.b | Standalone (SA) | P4R | Yes | The Duke Health Profile (Duke) |
| 10 | IT-10.3.d | Standalone (SA) | P4P | No | Battelle Development Inventory-2 (BDI-2) |
| 10 | IT-10.3.e | Standalone (SA) | P4P | No | Problem Areas in Diabetes (PAID) Scale |
| 10 | IT-10.4.a | Standalone (SA) | P4R | Yes | Developmental Profile 3 (DP-3) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 10 | IT-10.4.b | Standalone (SA) | P4R | Yes | Vineland Adaptive Behavior Scales, 2nd Edition (VABS II) |
| 10 | IT-10.5 | Standalone (SA) | P4R | Yes | Bayley Scales of Infant and Toddler Development-Third Edition (Bayley-III) |
| 11 | IT-11.1 | Non-Standalone (NSA) | P4R | Yes | Adult Mental Health Facility Admission Rate |
| 11 | IT-11.2 | Non-Standalone (NSA) | P4R | Yes | Youth Mental Health Facility Admission Rate |
| 11 | IT-11.3 | Non-Standalone (NSA) | P4R | Yes | IDD/ICF Admissions to a Care Facility |
| 11 | IT-11.4 | Non-Standalone (NSA) | P4R | Yes | IDD/SPMI Admissions and Readmissions to State Institutions |
| 11 | IT-11.5 | Standalone (SA) | P4P | No | Adherence to Antipsychotic Medications for Individuals with Schizophrenia |
| 11 | IT-11.6 | Standalone (SA) | P4P | No | Follow-up Care for Children Prescribed ADHD Medication (ADD) |
| 11 | IT-11.7 | Non-Standalone (NSA) | P4P | No | Initiation of Depression Treatment |
| 11 | IT-11.8 | Standalone (SA) | P4P | No | Initiation and Engagement of Alcohol and Other Drug Dependence Treatment |
| 11 | IT-11.9 | Non-Standalone (NSA) | P4P | No | Care Planning for Dual Diagnosis |
| 11 | IT-11.10 | Non-Standalone (NSA) | P4R | Yes | Diabetes Screening for People with Schizophrenia or Bipolar Disorder Prescribed Antipsychotic Medications (SSD) |
| 11 | IT-11.11 | Non-Standalone (NSA) | P4R | Yes | Diabetes Monitoring for People With Diabetes and Schizophrenia |
| 11 | IT-11.12 | Non-Standalone (NSA) | P4P | No | Cardiovascular monitoring for people with cardiovascular disease and schizophrenia (SMC) |
| 11 | IT-11.13 | Non-Standalone (NSA) | P4R | Yes | Assignment of Primary Care Physician to Individuals with Schizophrenia |
| 11 | IT-11.14 | Non-Standalone (NSA) | P4R | Yes | Annual Physical Exam for Persons with Mental Illness |
| 11 | IT-11.15 | Non-Standalone (NSA) | P4R | Yes | Depression Screening by 18 years of age |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 11 | IT-11.16 | Non-Standalone (NSA) | P4P | Yes | Assessment for Substance Abuse Problems of Psychiatric Patients |
| 11 | IT-11.17 | Non-Standalone (NSA) | P4P | Yes | Assessment of Risk to Self/Others |
| 11 | IT-11.18 | Non-Standalone (NSA) | P4R | Yes | Bipolar Disorder (BD) and Major Depression (MD): Appraisal for alcohol or substance use |
| 11 | IT-11.19 | Non-Standalone (NSA) | P4P | Yes | Assessment for Psychosocial Issues of Psychiatric Patients |
| 11 | IT-11.20 | Non-Standalone (NSA) | P4R | Yes | Bipolar Disorder and Major Depression: Assessment for Manic or hypomanic behaviors |
| 11 | IT-11.21 | Non-Standalone (NSA) | P4R | Yes | Assessment of Major Depressive Symptoms |
| 11 | IT-11.22 | Non-Standalone (NSA) | P4R | Yes | Child and Adolescent Major Depressive Disorder: Suicide Risk Assessment |
| 11 | IT-11.27 | Non-Standalone (NSA) | P4P | No | Vocational Rehabilitation for Schizophrenia |
| 11 | IT-11.28 | Non-Standalone (NSA) | P4R | Yes | Housing Assessment for Individuals with Schizophrenia |
| 11 | IT-11.29 | Non-Standalone (NSA) | P4R | Yes | Independent Living Skills Assessment for Individuals with Schizophrenia |
| 11 | IT-11.23.a | Standalone (SA) | P4R | Yes | Texas Adult Mental Health (AMH) Consumer Survey |
| 11 | IT-11.23.b | Standalone (SA) | P4R | Yes | Quick Inventory of Depressive Symptomatology (QIDS) |
| 11 | IT-11.24 | Standalone (SA) | P4R | Yes | Generalized Anxiety Disorder (GAD-7) |
| 11 | IT-11.25 | Standalone (SA) | P4R | Yes | Daily Living Activities (DLA-20) |
| 11 | IT-11.26.a | Standalone (SA) | P4R | Yes | Positive Symptom Rating Scale (PSRS) |
| 11 | IT-11.26.b | Standalone (SA) | P4R | Yes | Aberrant Behavior Checklist (ABC) |
| 11 | IT-11.26.c | Standalone (SA) | P4R | Yes | Adult Needs and Strength Assessment (ANSA) |
| 11 | IT-11.26.d | Standalone (SA) | P4R | Yes | Children and Adolescent Needs and Strengths Assessment (CANS-MH) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 11 | IT-11.26.e.i | Standalone (SA) | P4P | No | Patient Health Questionnaire 9 (PHQ-9) |
| 11 | IT-11.26.e.ii | Standalone (SA) | P4P | No | Patient Health Questionnaire 15 (PHQ-15) |
| 11 | IT-11.26.e.iii | Standalone (SA) | P4P | No | Patient Health Questionnaire: Somatic, Anxiety, and Depressive Symptoms (PHQ-SADS) |
| 11 | IT-11.26.e.iv | Standalone (SA) | P4P | No | Patient Health Questionnaire 4 (PHQ-4) |
| 11 | IT-11.26.e.v | Standalone (SA) | P4R | Yes | Edinburg Postpartum Depression Scale |
| 12 | IT-12.1 | Non-Standalone (NSA) | P4P | No | Breast Cancer Screening |
| 12 | IT-12.2 | Non-Standalone (NSA) | P4P | No | Cervical Cancer Screening |
| 12 | IT-12.3 | Non-Standalone (NSA) | P4P | No | Colorectal Cancer Screening |
| 12 | IT-12.4 | Non-Standalone (NSA) | P4P | No | Pneumonia vaccination status for older adults |
| 12 | IT-12.5 | Non-Standalone (NSA) | P4P | No | Pneumococcal Immunization- Inpatient |
| 12 | IT-12.6 | Non-Standalone (NSA) | P4P | No | Influenza Immunization -- Ambulatory |
| 12 | IT-12.7 | Non-Standalone (NSA) | P4P | No | Influenza Immunization- Inpatient |
| 12 | IT-12.8 | Non-Standalone (NSA) | P4P | No | Immunization for Adolescents- Tdap/TD and MCV |
| 12 | IT-12.9 | Non-Standalone (NSA) | P4P | No | Childhood immunization status |
| 12 | IT-12.10 | Non-Standalone (NSA) | P4P | No | Adults (18+ years) Immunization status |
| 12 | IT-12.11 | Non-Standalone (NSA) | P4P | No | HPV vaccine for adolescents |
| 12 | IT-12.12 | Non-Standalone (NSA) | P4R | Yes | Immunization and Recommended Immunization Schedule Education |
| 12 | IT-12.13 | Standalone (SA) | P4P | No | Mammography follow-up rate |
| 12 | IT-12.14 | Non-Standalone (NSA) | P4R | Yes | Prostate Cancer: Avoidance of Overuse Measure – Bone Scan for Staging Low-Risk Patients |
| 12 | IT-12.15 | Standalone (SA) | P4P | No | Abnormal Pap test follow-up rate |
| 12 | IT-12.16 | Standalone (SA) | P4P | No | High-risk Colorectal Cancer Follow-up rate within one year |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|-----------------------------|------------------|
| 12 | IT-12.17 | Non-Standalone (NSA) | P4R | Yes | Intensive behavioral dietary counseling for adult patients with hyperlipidemia and other known risk factors for cardiovascular and diet-related chronic disease |
| 12 | IT-12.18 | Non-Standalone (NSA) | P4R | Yes | ABI Screening for Peripheral Arterial Disease |
| 12 | IT-12.19 | Non-Standalone (NSA) | P4P | No | Osteoporosis: Screening or Therapy for Women Aged 65 Years and Older |
| 13 | IT-13.1 | Non-Standalone (NSA) | P4P | Yes | Hospice and Palliative Care – Pain assessment |
| 13 | IT-13.2 | Non-Standalone (NSA) | P4P | No | Hospice and Palliative Care – Treatment Preferences |
| 13 | IT-13.3 | Standalone (SA) | P4P | Yes | Hospice and Palliative Care – Proportion with more than one emergency room visit in the last days of life |
| 13 | IT-13.4 | Standalone (SA) | P4P | Yes | Hospice and Palliative Care – Proportion admitted to the ICU in the last 30 days of life |
| 13 | IT-13.5 | Non-Standalone (NSA) | P4P | No | Hospice and Palliative Care – Percentage of patients receiving hospice or palliative care services with documentation in the clinical record of a discussion of spiritual/religions concerns or documentation that the patient/caregiver did not want to discuss |
| 13 | IT-13.6 | Non-Standalone (NSA) | P4P | No | Palliative Care:  Percent of patients who have documentation in the medical record that an interdisciplinary family meeting was conducted on or before day five of ICU admission |
| 13 | IT-13.7 | Standalone (SA) | P4R | Yes | Oncology: Pain Intensity Quantified – Medical Oncology and Radiation Oncology |
| 13 | IT-13.8 | Non-Standalone (NSA) | P4R | Yes | Oncology: Plan of Care for Pain – Medical Oncology and Radiation Oncology |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 14 | IT-14.1 | Standalone (SA) | P4R | Yes | Number of practicing primary care practitioners per 1000 individual in HPSAs or MUAs |
| 14 | IT-14.2 | Standalone (SA) | P4R | Yes | Number of practicing nurse practitioners and physician assistants per 1000 individuals in HPSAs or MUAs |
| 14 | IT-14.3 | Standalone (SA) | P4R | Yes | Number of practicing psychiatrists per 1000 individuals in HPSAs or MUAs |
| 14 | IT-14.4 | Non-Standalone (NSA) | P4R | Yes | Percent of graduates who practice in a HPSA or MUA |
| 14 | IT-14.5 | Non-Standalone (NSA) | P4R | Yes | Percent of graduates who work in a practice that has a high Medicaid share that reflects the distribution of Medicaid in the population |
| 14 | IT-14.6 | Non-Standalone (NSA) | P4R | Yes | Percent of trainees who have spent at least 5 years living in a health- professional shortage area (HPSA) or medically underserved area |
| 14 | IT-14.7 | Non-Standalone (NSA) | P4R | Yes | Percent of trainees who report that they plan to practice in HPSAs or MUAs based on a systematic survey |
| 14 | IT-14.8 | Non-Standalone (NSA) | P4R | Yes | Percent of trainees who report that they plan to serve Medicaid populations based on a systematic survey |
| 14 | IT-14.9 | Standalone (SA) | P4R | Yes | Number of practicing specialty care practitioners per 1000 individuals in HPSA or MUA |
| 15 | IT-15.1 | Non-Standalone (NSA) | P4P | No | HIV medical visit frequency |
| 15 | IT-15.2 | Standalone (SA) | P4P | No | Prescription of Antiretroviral Medications |
| 15 | IT-15.3 | Non-Standalone (NSA) | P4P | No | HIV Screening: Patients at High Risk of HIV |
| 15 | IT-15.4 | Non-Standalone (NSA) | P4P | No | HIV/AIDS: Tuberculosis (TB) Screening |
| 15 | IT-15.5 | Non-Standalone (NSA) | P4P | No | HIV/AIDS: Sexually Transmitted Diseases - Screening for Chlamydia, Gonorrhea, and Syphilis |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 15 | IT-15.6 | Non-Standalone (NSA) | P4P | No | Chlamydia screening in women |
| 15 | IT-15.7 | Non-Standalone (NSA) | P4P | No | Chlamydia Screening and Follow up in adolescents |
| 15 | IT-15.8 | Standalone (SA) | P4R | Yes | Follow-up testing for C. trachomatis among recently infected men and women |
| 15 | IT-15.9 | Non-Standalone (NSA) | P4R | Yes | Syphilis screening |
| 15 | IT-15.10 | Non-Standalone (NSA) | P4P | No | Syphilis positive screening rates |
| 15 | IT-15.11 | Standalone (SA) | P4P | No | Follow-up after Treatment for Primary or Secondary Syphilis |
| 15 | IT-15.12 | Non-Standalone (NSA) | P4R | Yes | Gonorrhea screening rates |
| 15 | IT-15.13 | Non-Standalone (NSA) | P4P | No | Gonorrhea Positive Screening Rates |
| 15 | IT-15.14 | Standalone (SA) | P4P | No | Follow-up testing for N. gonorrhoeae among recently infected men and women |
| 15 | IT-15.15 | Non-Standalone (NSA) | P4R | Yes | High Intensity Behavioral Counseling to prevent STIs for all sexually active adolescents and for adults at increased risk for STIs |
| 15 | IT-15.16 | Standalone (SA) | P4P | No | Curative Tuberculosis (TB) treatment rate |
| 15 | IT-15.17 | Standalone (SA) | P4P | No | Latent Tuberculosis Infection (LTBI) treatment rate |
| 15 | IT-15.18 | Standalone (SA) | P4P | No | Hepatitis C Cure Rate |

**Grouping Patients for Outcomes**
For the purpose of Category 3 outcomes, there are three main groups of patients to consider.

**Intervention population** - This is the group of individuals that receives the intervention outlined in the Category 1 or 2 project. In almost all cases (and based on measure specifications), a provider will not report on the intervention-level population for the purposes of Category 3 reporting.

**Target population** - This is the group of individuals that is eligible to receive the intervention (the broader group of individuals the intervention is designed to serve). While Category 3 must be reported to measure specifications, providers may narrow the measure denominator based on certain criteria to more closely represent the Category 1 or 2 project's target population.

**Outcome population** - This is the group of patients that meet the criteria for outcome measurement based on the specifications for each measure. This often is a broader population than the project target population.

## 79.    Allowable Denominator Subsets

All Category 3 outcome measures are required to be reported to the specifications required for the measure as outlined in the menu and the compendium. However, as appropriate to the Category 1 or 2 project, the provider can propose a more narrow denominator (a subset of the outcome population) based on one or more of the following criteria:

- Payer source (Medicaid or Indigent or both),
- Target condition (including co-morbid condition/diagnosis)
- Demographic factors - age, race/ethnicity, and/or gender, or
- Clinic or other location where the Category 1 or 2 project is taking place.

Using allowable denominator subsets is a way to more closely reflect the target population for each project (which will still be broader than the intervention population in almost all cases).

## 80.    Establishing a Baseline for Each Category 3 Measure

Each DSRIP provider will need to establish a baseline for all Category 3 outcome measures, both P4P and P4R. Baselines also must be established for any selected Population-Focused Priority measures used as an alternative performance activity. The baseline will be specific to the patients served by that provider. Baselines will be formally reported in October 2014 or later if needed.

The provider's baseline for each measure will determine both the achievement goals for the measure in DY4 and DY5. The baseline period should be as recent as possible, DY3 is preferred, and will generally be a 12-month or 6-month period. The DY4 measurement period will be set as the 12 months immediately following the end of baseline period and the DY5

measurement period will be the 12 months immediately following the end of DY4 measurement period. Providers should review the measure specifications to help determine the appropriate baseline period.

If providers need to request an earlier baseline measurement period than DY2, provider will need to submit justification as to why DY2 or DY3 baseline is not appropriate or available. HHSC will review these on a case by case basis and make a determination on appropriate DY4 and DY5 measurement periods.

## 81.    Standard Achievement Target Methodology for Achievement Milestones

For achievement milestones for P4P measures in DY4-5 and Population-Focused Priority Measures in DY5, providers will receive incentive payments for demonstrating improvements in rate performance towards an achievement target. Achievement targets are determined based on a provider's baseline performance in the measure and are calculated by one of the two methodologies described below. Achievement milestones are eligible for partial achievement in increments of 25% as outlined in the PFM Protocol.

***Quality Improvement System for Managed Care (QISMC)***: For those P4P measures where the improvement methodology is designated as QISMC, providers will receive incentive payments for closing the gap between their baseline performance and the benchmark rates listed. For DSRIP, Texas is using a hybrid of this system used for managed care, and the benchmarks are a proxy for performance based on national or state data and may not be an exact match to the population or delivery system for a DSRIP project. If a provider, at baseline, is performing above the high performance benchmark it is required to select another measure unless the provider can make a compelling justification for how improvement can be demonstrated beyond the high performance benchmark.

The achievement level goal for DY4 will be determined as follows:

- IF a provider's reported baseline rate falls below the low performance benchmark (also called minimum performance level or MPL) the DY4 Achievement Target is equal to the rate listed for the MPL.
- IF a provider's reported baseline rate falls above the MPL but below the high performance level (HPL) benchmark, the provider must close the gap between baseline performance and the HPL rate by 10%.

The achievement level goal for DY5 will be determined as follows.

- IF a provider's reported baseline rate falls below the low performance benchmark (also called minimum performance level or MPL) the DY5 Achievement Target is equal to a 10% gap reduction between the MPL and HPL.
- IF a provider's reported baseline rate falls above the MPL but below the high performance level (HPL) benchmark providers must close the gap between baseline performance and the HPL rate by 20%.

**Example:**

| IT-1.10 A1C poor control (>9%) | MPL = 50.7% | HPL = 28.95% |
|---|---|---|

| Baseline performance | DY4 Achievement Target (**goal**) | DY5 Achievement target (**goal**) | DY4 performance/ payment | DY5 performance/ payment |
|---|---|---|---|---|
| Scenario 1: **63.4%** | 50.7% (= MPL) | 48.53% = MPL – ([HPL-MPL] * 10%) | 53.4%: 78% achievement towards goal- earns 75% of allocation | 47.50%: 100% achievement towards goal- earns 100% of allocation |
| Scenario 2: **36.7%** | 35.93% ( = (baseline - HPL)* 10% improvement over baseline) | 35.15% ( = (baseline - HPL)* 20% improvement over baseline | 35.50%: 100% achievement towards goal- earns 100% of allocation | 35.40%: 84% achievement towards goal- earns 75% of allocation |

***Improvement over Self (IOS)****:* There are some P4P measures where QSMIC appropriate benchmarks (HPL and MPL) are not available. For these P4P measures, the improvement methodology is designated as "IOS", or Improvement over self, providers earn incentive payments for demonstrating improvement over baseline performance.

The achievement level goals will be determined as follows:

- DY4 achievement level goal is equal to a 5% improvement over the provider's baseline and is calculated as a 5% gap reduction between baseline performance and highest possible performance in the measure (e.g., 0% or 100% depending on the directionality of a rate based measure).
- DY5 achievement level goal is equal to 10% improvement over the provider's baseline and is calculated as a 10% gap reduction between baseline performance and highest possible performance in the measure.

The IOS methodology is further described and specified in Appendix B for measures that are categorized as rates, frequencies or counts and survey scores

Example of IOS achievement methodology for a rate based measure:

| IT-1.9 | Depression Management: Depression Remission at 12 months | | | No high and low performing benchmark information available, therefore assume highest possible performance (100%) as performance gap upper limit. |
|---|---|---|---|---|
| Baseline | DY4 Achievement target (goal) | DY4 performance/payment | DY5 Achievement target (goal) | DY5 performance/payment |

| 40.25% | 5%* (100-40.25) + baseline= **43.24%** | **42.5%**: ((performance – baseline)/(goal – baseline)) = 2.25/2.99 * 100 = 75.25% achievement towards goal - earns 75% of allocation | 10%* (100-40.25) + baseline = **46.23%** | **47.5%**: ((performance – baseline)/(goal – baseline)) = 7.25/5.98 * 100 = 121% achievement towards goal - earns 100% of allocation. |
|---|---|---|---|---|

82.

**83.    Category 3 Reporting**

i.      <u>DY2 Reporting</u>

For DY2, providers were able to select their Category 3 process milestones from the below options and also designate the valuation for each milestone as long as their total Category 3 valuation met the minimum percentage level required in the PFM Protocol.  Metrics, data sources, goals and rationale were specified by the performing provider for each of the selected process milestones listed below.

- P- 1 Project planning - engage stakeholders, identify current capacity and needed resources,
- determine timelines and document implementation plans
- P- 2 Establish baseline rates
- P- 3 Develop and test data systems
- P- 4 Conduct Plan Do Study Act (PDSA) cycles to improve data collection and intervention activities
- P- 5 Disseminate findings, including lessons learned and best practices, to stakeholders
- P- 7 Other activities not described above

HHSC and CMS also allowed performing providers in DY2 to provider a Category 3 status update in lieu of documentation specific to the milestones above since the revised Category 3 menu and framework was not final by the end of DY2.

ii.     <u>DY3 Reporting</u>

For all Category 3 measures, there will be two process milestones in DY3 - providers will be eligible to earn 50% of the funding for each Category 3 measure based on a status report and the other 50% during the based on establishing or validating the baseline for each measure.

iii.    <u>DY4 Reporting</u>

Reporting in DY4 will vary depending on the type of outcome selected (P4P or P4R).

| Measure and performance type | Milestone type and % fund allocation | Successful Achievement |
|---|---|---|
| P4P – QISMC | Process Milestone (PM) - 50% allocation Achievement Milestone (AM) - 50% allocation | PM - accurate reporting of DY4 rate per approved measure specifications. AM - achievement of DY4 goal (MPL achieved or 10% gap reduction between baseline rate and HPL benchmark) |
| P4P- IOS | Process Milestone (PM) - 50% allocation Achievement Milestone (AM) - 50% allocation | PM - accurate reporting of DY4 rate per approved measure specifications. AM - achievement of DY4 |

| | | goal (5% improvement over baseline rate) |
|---|---|---|
| P4R | Process Milestone (PM) - 100% allocation | PM - accurate reporting of DY4 rate per approved measure specifications. |

iv.  <u>DY5 Reporting</u>

DY5 reporting will vary depending on the type of outcome selected (P4P or P4R) as well as the type of Alternate Improvement Activity selected.

| Measure and performance type | Milestone type and % fund allocation | Successful Achievement |
|---|---|---|
| P4P - QISMC | Achievement Milestone - 100% allocation | AM- achievement of DY5 goal (improvement over MPL goal by a 10% gap reduction between MPL and HPL or 20% gap reduction between baseline rate and HPL benchmark) |
| P4P – IOS | Achievement Milestone - 100% allocation | AM- achievement of DY5 goal (10% improvement over baseline rate) |
| P4R | Process Milestone - 50% allocation<br><br><u>Alternate Improvement Activity</u> – 50% allocation for Achievement Milestone for Population-Focused Priority Measure improvement OR Process Milestone for Stretch Activity | PM - accurate reporting of DY5 rate per approved measure specifications.<br><br>AM - for Population-Focused Priority measures- achievement of DY5 goal<br>OR<br>PM- successful reporting of Stretch Activity |

**Category 4 Population-focused Improvements**

**The Category 4 measures are:**
- Aligned with the low-income, Medicaid, and uninsured population;
- Identified as high priority given the health care needs and issues of the patient population served; and
- Viewed as valid health care indicators to inform and identify areas for improvement in population health within the health care system.

## Category 4 Structure:
- <u>Required Reporting Domains:</u>  Category 4 contains five domains on which hospital performing providers must report, as specified in the *Program Funding and Mechanics Protocol*. The required reporting domains include:
  - Potentially Preventable Admissions (PPAs)
  - Potentially Preventable  Readmissions (PPRs) - 30-day
  - Potentially preventable Complications (PPCs)
  - Patient-centered healthcare, including patient satisfaction and medication management
  - Emergency department
- <u>Optional Reporting Domain:</u>  At their option, hospital performing providers may report on Reporting Domain (RD) 6, which is the CMS Initial Core Set of Measures for Adults and Children in Medicaid/CHIP. While reporting on this domain is optional, participation in Domain 6 reporting is required to value Category 4 at the 15 percent maximum (see *Category 4 Valuation* below.)
- Hospital performing providers, with the exception of those that are exempt from Category 4 reporting in accordance with paragraph 11.f of the *Program Funding and Mechanics Protocol*, must report on Category 4 measures in the required reporting domains. Each hospital performing provider subject to required Category 4 reporting must report on all measures in the required reporting domains, unless for certain measures the provider does not have statistically valid data, as defined in paragraph 11.e of the *Program Funding and Mechanics Protocol*. Hospitals designated as Institutes of Mental Disease (IMDs) report on an alternate set of measures listed at the end of this section.
- HHSC will collect all Category 4 data for each hospital, but based on Texas statutory requirements pertaining to the confidentiality of individual hospital data for some of the Category 4 measures, HHSC will summarize certain data related to Category 4 for CMS at the RHP level rather than at the individual provider level.
- Each performing provider subject to Category 4 required reporting will include Category 4 measures for PPCs (RD-3) during DY 4-5 and for all other required reporting domains during DY 3-5.
- The Category 4 emphasis is on the reporting of population health measures to gain information on and understanding of the health status of key populations and to build the capacity for reporting on a comprehensive set of population health metrics; therefore, hospital performing providers will not be required to achieve improvement in Category 4.

## Category 4 Valuation:

- <u>Maximum valuation:</u> In order to value Category 4 up to the 15 percent maximum for DY 3-5, hospital performing providers must report on the optional reporting domain (RD-6) in addition to the five required reporting domains.
- <u>10 percent valuation:</u> Hospital performing providers that do not report on the optional reporting domain (RD-6) only may value Category 4 at the minimum 10 percent for DY 3-5. Performing providers that only report on the required reporting domains may designate to Categories 1, 2, or 3 the 5 percent valuation they are unable to obtain in Category 4 by foregoing reporting on the optional domain.

## Category 4 Reporting Measures by Domain:

### RD-1: Potentially Preventable Admissions

Texas Medicaid's External Quality Review Organization (EQRO) supplies Potentially Preventable Admissions (PPA) reports for DSRIP participating hospital providers for the duration of the Waiver. These PPA reports are produced with the 3M methodology and describe admissions for the providers Medicaid and CHIP populations. For reporting in this domain, providers submit the PPA data on the following categories:

| Category |
| --- |
| Congestive Heart Failure |
| Diabetes |
| Behavioral Health or Substance Abuse |
| Chronic Obstructive Pulmonary Disease |
| Adult Asthma  (Age>18yrs) |
| Pediatric Asthma  (Age<=18yrs) |
| Angina and Coronary Artery Disease |
| Hypertension |
| Cellulitis |
| Bacterial PNA (Respiratory Infection) |
| Pulmonary Edema and Respiratory Failure |
| Others |

Additional technical specifications are available in the DSRIP Provider Reporting Potentially Preventable Events Technical Notes (Appendix E), including APR-DRGs associated with these categories.

### RD-2: Potentially Preventable Readmission - 30-day

Texas Medicaid's External Quality Review Organization (EQRO) supplies Potentially Preventable 30-day Readmissions (PPR) reports for the duration of the waiver. These PPR reports are produced with the 3M methodology and describe readmissions for the providers Medicaid and CHIP populations. For reporting in this domain, providers submit PPR data on the following categories:

| Category |
|---|
| Congestive Heart Failure |
| Diabetes |
| Behavioral Health or Substance Abuse |
| Chronic Obstructive Pulmonary Disease |
| Cerebrovascular Accident |
| Adult Asthma  (Age>18yrs) |
| Pediatric Asthma  (Age<=18yrs) |
| Acute Myocardial Infarction |
| Angina and Coronary Artery Disease |
| Hypertension |
| Cellulitis |
| Renal Failure |
| Cesarean delivery |
| Sepsis |
| Others |

Additional technical specifications are available in the DSRIP Provider Reporting Potentially Preventable Events Technical Notes (Appendix E), including APR-DRGs associated with these categories.

### RD-3: Potentially Preventable Complications (PPCs)

Hospital performing providers subject to required Category 4 reporting must report on the 64 PPC measures listed below in DY 4-5. Texas Medicaid's External Quality Review Organization (EQRO) supplies PPC reports for the duration of the waiver.
- o **Metric:** Risk-adjusted PPC rates for the 64 PPCs below.  (As calculated by the 3M software.[120])

---

[120]For measure specifications see 3M's Users Manual.

| PPC | PPC Description |
|---|---|
| 1 | Stroke & Intracranial Hemorrhage |
| 2 | Extreme CNS Complications |
| 3 | Acute Pulmonary Edema and Respiratory Failure without Ventilation |
| 4 | Acute Pulmonary Edema and Respiratory Failure with Ventilation |
| 5 | Pneumonia & Other Lung Infections |
| 6 | Aspiration Pneumonia |
| 7 | Pulmonary Embolism |
| 8 | Other Pulmonary Complications |
| 9 | Shock |
| 10 | Congestive Heart Failure |
| 11 | Acute Myocardial Infarction |
| 12 | Cardiac Arrhythmias & Conduction Disturbances |
| 13 | Other Cardiac Complications |
| 14 | Ventricular Fibrillation/Cardiac Arrest |
| 15 | Peripheral Vascular Complications except Venous Thrombosis |
| 16 | Venous Thrombosis |
| 17 | Major Gastrointestinal Complications without Transfusion or Significant Bleeding |
| 18 | Major Gastrointestinal Complications with Transfusion or Significant Bleeding |
| 19 | Major Liver Complications |
| 20 | Other Gastrointestinal Complications without Transfusion or Significant Bleeding |
| 21 | Clostridium Difficile Colitis |
| 23 | GU Complications except UTI |
| 24 | Renal Failure without Dialysis |
| 25 | Renal Failure with Dialysis |
| 26 | Diabetic Ketoacidosis & Coma |
| 27 | Post-Hemorrhagic & Other Acute Anemia with Transfusion |
| 28 | In-Hospital Trauma and Fractures |
| 29 | Poisonings except from Anesthesia |
| 30 | Poisonings due to Anesthesia |
| 31 | Decubitus Ulcer |
| 32 | Transfusion Incompatibility Reaction |
| 33 | Cellulitis |
| 34 | Moderate Infections |
| 35 | Septicemia & Severe Infections |
| 36 | Acute Mental Health Changes |
| 37 | Post-Operative Infection & Deep Wound Disruption without Procedure |

| 38 | Post-Operative Wound Infection & Deep Wound Disruption with Procedure |
|----|----------------------------------------------------------------------|
| 39 | Reopening Surgical Site |
| 40 | Post-Operative Hemorrhage & Hematoma without Hemorrhage Control Procedure or I&D Procedure |
| 41 | Post-Operative Hemorrhage & Hematoma with Hemorrhage Control Procedure or I&D Procedure |
| 42 | Accidental Puncture/Laceration during Invasive Procedure |
| 43 | Accidental Cut or Hemorrhage during Other Medical Care |
| 44 | Other Surgical Complication - Moderate |
| 45 | Post-procedure Foreign Bodies |
| 46 | Post-Operative Substance Reaction & Non-O.R. Procedure for Foreign Body |
| 47 | Encephalopathy |
| 48 | Other Complications of Medical Care |
| 49 | Iatrogenic Pneumothorax |
| 50 | Mechanical Complication of Device, Implant & Graft |
| 51 | Gastrointestinal Ostomy Complications |
| 52 | Inflammation & Other Complications of Devices, Implants or Grafts except Vascular Infection |
| 53 | Infection, Inflammation and Clotting Complications of Peripheral Vascular Catheters and Infusions |
| 54 | Infections due to Central Venous Catheters |
| 55 | Obstetrical Hemorrhage without Transfusion |
| 56 | Obstetrical Hemorrhage with Transfusion |
| 57 | Obstetric Lacerations & Other Trauma Without Instrumentation |
| 58 | Obstetric Lacerations & Other Trauma With Instrumentation |
| 59 | Medical & Anesthesia Obstetric Complications |
| 60 | Major Puerperal Infection and Other Major Obstetric Complications |
| 61 | Other Complications of Obstetrical Surgical & Perineal Wounds |
| 62 | Delivery with Placental Complications |
| 63 | Post-Operative Respiratory Failure with Tracheostomy |
| 64 | Other In-Hospital Adverse Events |
| 65 | Urinary Tract Infection |
| 66 | Catheter-Related Urinary Tract Infection |

    o   Additional technical specifications will be available in the DSRIP Provider Reporting Potentially Preventable Events Technical Notes (Appendix E).


**RD-4: Patient-centered Healthcare**

1. **Patient Satisfaction**

The reporting of the measures is limited to the inpatient setting only utilizing Hospital Consumer Assessment of Healthcare Providers and Systems (HCAHPS) survey. IMDs and children's facilities not eligible to use HCAHPs report any other relevant survey results in the qualitative reporting section.

Additional guidance is available in the Category 4 compendium. (Appendix F)

2. **Medication management**

*1.*

*Reconciled Medication List Received by Discharged Patients (Discharges from an Inpatient Facility to Home/Self Care or Any Other Site of Care) (NQF 0646)*

STEWARD: American Medical Association - Physician Consortium for Performance Improvement (AMA-PCPI), http://www.qualitymeasures.ahrq.gov/content.aspx?id=28139

Detailed measure specifications are described in Category 4 compendium (Appendix F).

*i.*
**RD-5: Emergency Department**

*Emergency department throughput time—admitted patients: admit decision time to ED departure time for admitted patients (NQF 0497)*

Measure Steward Information: Center for Medicare and Medicaid Services; http://www.qualitymeasures.ahrq.gov/hhs/content.aspx?id=44602#.U1-9VvldWCU

Additional guidance is available in the Category 4 compendium (Appendix F).

**RD-6.   (Optional  Domain)  Initial Core Set of Measures for Adults and Children in Medicaid/CHIP**

**Initial Core Set for Children in Medicaid/CHIP**: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/ChildCoreMeasures.pdf

**Child Core Set Technical Specifications**: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/Medicaid-and-CHIP-Child-Core-Set-Manual.pdf

**Initial Core Set for Adults in Medicaid:** http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/AdultCoreMeasures.pdf

> **Adult Core Set Technical Specifications:** http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/Medicaid-Adult-Core-Set-Manual.pdf

Measures designed for health plans and will require minor modifications of specifications for reporting by hospital providers.

Hospital providers will report measures appropriate to settings of care. Hospitals that provide inpatient services only are not required to report measures that are specific to ambulatory settings. Hospitals that have outpatient clinics are required to report measures appropriate to ambulatory care settings. HHSC and CMS will jointly agree on a minimum data set for inpatient and outpatient providers (Appendix G)

**Alternate Measures for Institutes of Mental Disease (IMDs) :**

Public and private Institutes for Mental Disease (IMDs) report an alternative set of Category 4 measures:

## RD-1
1. – Potentially Preventable Admissions for behavioral health/ substance abuse conditions (with a preference for distinguishing behavioral health and substance abuse)
2. All-cause Potentially Preventable Admissions

## RD-2
1. Behavioral health/ substance abuse readmission rates (with a preference for distinguishing behavioral health and substance abuse)
2. All-cause Potentially Preventable Readmissions

## RD-4
1. - Patient satisfaction
   o Psychiatric facilities for which using HCAHPS is not appropriate should report "0" in the HCAHPS reporting section. Facilities should include all relevant data from their satisfaction surveys in the qualitative reporting section.
2. - Medication reconciliation (NQF 0646 specifications)

**Additional Measures:**
**Bacterial pneumonia immunization**
   o Pneumococcal Immunization (PPV23) – Overall Rate (CMS IQR/Joint Commission measure IMM-1a)
   Specifications Found Here:
   http://www.jointcommission.org/specifications_manual_for_national_hospital_inpatient_quality_measures.aspx
**Influenza Immunization**
   o Influenza Immunization (CMS IQR/Joint Commission measure IMM-2)
   Specifications Found Here:
   http://www.jointcommission.org/specifications_manual_for_national_hospital_inpatient_quality_measures.aspx

The Texas state IMDs will be able to report on the Category 4 measures suggested by CMS above with the following caveats:
- State mental health hospitals will have admission rates for BH and not substance abuse as a separate reportable item.
- The "all cause PPAs" will only report on mental health PPA since that is the only diagnosis the state admits a patient to a state mental health facility.

- State mental health hospitals can report on mental health readmission rates but not substance abuse, since patients would have not been admitted for only substance abuse disorders.
- The "all cause PPRs" will only report on mental health PPR since that is the only diagnosis DSHS admits a patients into a state mental health facility.

# Appendix

**CMS-Provided Key Elements for Learning Collaboratives and Continuous Quality Improvement**

**Learning Collaboratives** – The key elements in the design of any learning collaborative include:

1. *It should review data and respond to it - with tests of new solutions and ideas - every week.*

2. *It should bring all participating sites together by phone or webinar on a weekly or bi-weekly basis to learn from one another.* All sites should share results of their testing, a breakthrough idea, and a challenge each week at the start of each call and they should leave with a public commitment to test a new idea the following week.

3. *It should set one or two quantifiable, project-level goals, with a deadline, preferably defined in terms of outcomes, related to the project's area of work.* Participants should actively manage toward this goal over the course of the work.

4. *It should invest more in learning than in teaching.* Huge proportional investments in web sites and conferences do not typically result in performance improvement or transformation of care delivery. It is more effective to get out into the field and support learning and exchange at the front lines where care is delivered.

5. *It should support a small, lightweight web site to help site share ideas and simple data over time.* The website should not be developed from scratch for the program. Rather, it should be possible to "rent" space on a portal already designed to support this kind of improvement work.

6. *It should set up simple, interim measurement systems, based on self-reported data and sampling, that can be shared at the local level and are sufficient for the purposes of improvement.*

7. *It should employ individuals (regional "innovator agents") to travel from site to site in the network to (a) rapidly answer practical questions about implementation and (b) harvest good ideas and practices that they systematically spread to others. The regional "innovator agents" should all attend the same initial training in improvement tools and skills organized by the State or RHP and should receive periodic continuing education on improvement.*

8. *It should set up face-to-face learning (meetings or seminars) at least a couple of times a year.*

9. *It should celebrate success every week.*

10. *It should mandate some improvements (simple things that everyone can do to "raise the floor" on performance) and it should unleash vanguard sites to pursue previously unseen levels ("raise the bar" on performance).*

11. *It should use metrics to measure its success such as:*
    - Rate of testing
    - Rate of spread
    - Time from idea to full implementation
    - Commitment rate (rate at which 50% of organizations take action for any specific request)
    - Number of questions asked per day
    - Network affinity/reported affection for the network

**Continuous Quality Improvement:**

In order to incentivize engagement in meaningful quality improvement (QI) activities that can lead to successful projects, this protocol includes optional process milestones and metrics for quality improvement activities. The process milestones and metrics for quality improvement activities listed below (which are also included as process milestone in the relevant project areas) further reflect CMS thinking on the type of QI activities that should be part of the QI core component for projects and provide direct insight into how CMS will review projects for this core element.

# I. PREFACE

On December 12, 2011, the Centers for Medicare and Medicaid Services (CMS) approved the Texas request for a new Medicaid demonstration waiver entitled "Texas Healthcare Transformation and Quality Improvement Program" (Project # 11-W-00278/6) in accordance with section 1115 of the Social Security Act. The new waiver was approved through September 30, 2016.

## 1. Delivery System Reform Incentive Payment Program

Special Terms and Conditions (STC) 45 of the Demonstration authorizes Texas to establish a Delivery System Reform Incentive Payment (DSRIP) program. Initiatives under the DSRIP program are designed to provide incentive payments to hospitals and other providers for investments in delivery system reforms that increase access to health care, improve the quality of care, and enhance the health of patients and families they serve.

The program of activity funded by the DSRIP shall be based on Regional Healthcare Partnerships (RHPs). Each RHP shall have geographic boundaries and will be coordinated by a public hospital or local governmental entity with the authority to make intergovernmental transfers. The public hospital or local governmental entity shall collaborate with hospitals and other potential providers to develop an RHP Plan that will accelerate meaningful delivery system reforms that improve patient care for low-income populations. The RHP Plans must be consistent with regional shared mission and quality goals of the RHP and CMS's triple aims to improve care for individuals (including access to care, quality of care, and health outcomes); improve health for the population; and lower costs through improvements (without any harm whatsoever to individuals, families, or communities).

## 2. RHP Planning Protocol and Program Funding and Mechanics Protocol

In accordance with STC 45(a) and 45(d)(ii)(A) & (B), the RHP Planning Protocol (Attachment I) defines the specific initiatives that will align with the following four categories: (1) Infrastructure Development; (2) Program Innovation and Redesign; (3) Quality Improvements; and (4) Population-focused Improvements. The Program Funding and Mechanics Protocol (Attachment J) describes the State and CMS review process for RHP Plans, incentive payment methodologies, RHP and State reporting requirements, and penalties for missed milestones.

Following CMS approval of Attachment I and Attachment J, each RHP must submit an RHP Plan that identifies the projects, outcomes, population-focused objectives, and specific milestones and metrics in accordance with these attachments and STCs.

This version of the Program Funding and Mechanics Protocol is approved as of May 22, 2014.

## 3. Organization of "Attachment J: Program Funding and Mechanics Protocol"

**4.**

Attachment J has been organized into the following sections:

     I.     Preface
    II.    DSRIP Eligibility Criteria
   III.   Key Elements of Proposed RHP Plans
  IV.   State and Federal Review Process of RHP Plans
    V.    RHP and State Reporting Requirements
  VI.   Disbursement of DSRIP Funds
 VII.   Plan Modifications
VIII.  Carry-forward and Penalties for Missed Milestones

# II. DSRIP ELIGIBILITY CRITERIA

## 5. RHP Regions

Texas has approved 20 Regional Healthcare Partnerships whose members may participate in the DSRIP program. The approved RHPs share the following characteristics:

- The RHPs are based on distinct geographic boundaries that generally reflect patient flow patterns for the region;
- The RHPs have identified local funding sources to help finance the non-federal share of DSRIP payments for Performing Providers; and
- The RHPs have identified an Anchoring Entity to help coordinate RHP activities.

The approved RHPs include the following counties:

1.  RHP 1: Anderson, Bowie, Camp, Cass, Cherokee, Delta, Fannin, Franklin, Freestone, Gregg, Harrison, Henderson, Hopkins, Houston, Hunt, Lamar, Marion, Morris, Panola, Rains, Red River, Rusk, Smith, Titus, Trinity, Upshur, Van Zandt, Wood

2.  RHP 2: Angelina, Brazoria, Galveston, Hardin, Jasper, Jefferson, Liberty, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Tyler

3.  RHP 3: Austin, Calhoun, Chambers, Colorado, Fort Bend, Harris, Matagorda, Waller, Wharton

4.  RHP 4: Aransas, Bee, Brooks, DeWitt, Duval, Goliad, Gonzales, Jackson, Jim Wells, Karnes, Kenedy, Kleberg, Lavaca, Live Oak, Nueces, Refugio, San Patricio, Victoria

5.  RHP 5: Cameron, Hidalgo, Starr, Willacy

6. RHP 6: Atascosa, Bandera, Bexar, Comal, Dimmit, Edwards, Frio, Gillespie, Guadalupe, Kendall, Kerr, Kinney, La Salle, McMullen, Medina, Real, Uvalde, Val Verde, Wilson, Zavala

7. RHP 7: Bastrop, Caldwell, Fayette, Hays, Lee, Travis

8. RHP 8: Bell, Blanco, Burnet, Lampasas, Llano, Milam, Mills, San Saba, Williamson

9. RHP 9: Dallas, Denton, Kaufman

10. RHP 10: Ellis, Erath, Hood, Johnson, Navarro, Parker, Somervell, Tarrant, Wise

11. RHP 11: Brown, Callahan, Comanche, Eastland, Fisher, Haskell, Jones, Knox, Mitchell, Nolan, Palo Pinto, Shackelford, Stephens, Stonewall, Taylor

12. RHP 12: Armstrong, Bailey, Borden, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Dawson, Deaf Smith, Dickens, Donley, Floyd, Gaines, Garza, Gray, Hale, Hall, Hansford, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley 0, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Scurry, Sherman, Swisher, Terry, Wheeler, Yoakum

13. RHP 13: Coke, Coleman, Concho, Crockett, Irion, Kimble, Mason, McCulloch, Menard, Pecos, Reagan, Runnels, Schleicher, Sterling, Sutton, Terrell, Tom Green

14. RHP 14: Andrews, Brewster, Crane, Culberson, Ector, Glasscock, Howard, Jeff Davis, Loving, Martin, Midland, Presidio, Reeves, Upton, Ward, Winkler

15. RHP 15: El Paso, Hudspeth

16. RHP 16: Bosque, Coryell, Falls, Hamilton, Hill, Limestone, McLennan

17. RHP 17: Brazos, Burleson, Grimes, Leon, Madison, Montgomery, Robertson, Walker, Washington

18. RHP 18: Collin, Grayson, Rockwall

19. RHP 19: Archer, Baylor, Clay, Cooke, Foard, Hardeman, Jack, Montague, Throckmorton, Wichita, Wilbarger, Young

20. RHP 20: Jim Hogg, Maverick, Webb, Zapata

## 6. RHP Anchoring Entity

The Texas Health and Human Services Commission (HHSC) delegates to the Anchoring Entity the responsibility of coordination with the RHP participants in development of the RHP Plan for that region. Each RHP shall have one Anchoring Entity that coordinates the development of the RHP Plan for that region. In RHPs that have a public hospital, a public hospital shall serve as the Anchoring Entity. In regions without a public hospital, the following entities may serve as anchors: (1) a hospital district; (2) a hospital authority; (3) a county; or (4) a State university with a health science center or medical school. RHP Anchoring Entities shall be responsible for coordinating RHP activities and assisting HHSC perform key oversight and reporting responsibilities.

Anchoring Entities activities shall include:
- Coordinating the development of a community needs assessment for the region;
- Engaging stakeholders in the region, including the public;
- Coordinating the development the 5-year RHP Plan that best meets community needs in collaboration with RHP participants;
- Ensuring that the RHP Plan is consistent with Attachment I, Attachment J, and all other State/waiver requirements;
- Facilitating RHP Plan compliance with the RHP Plan Checklist;
- Transmitting the RHP Plan and any associated plan amendments to HHSC on behalf of the RHP;
- Ongoing monitoring and annual reporting (as required in paragraphs 16 and 24) on status of projects and performance of Performing Providers in the region; and
- Ongoing communication with HHSC on behalf of the RHP.

## 7. IGT Entities

Intergovernmental transfer (IGT) Entities are entities that fund the non-federal share of DSRIP payments for an RHP. They include Anchoring Entities, government-owned Performing Providers, community mental health centers (CMHCs), local health departments, academic health science centers, and other government entities such as counties.

An IGT Entity may fund DSRIP, Uncompensated Care (UC), or both DSRIP and UC as long as regional requirements are met, as described in Section VI "Disbursement of DSRIP Funds" and the IGT funding source comports with federal requirements outlined in paragraph 55 of the waiver's special terms and conditions.

IGT Entities may fund DSRIP projects outside of their RHP Region. Such a DSRIP project must be documented in the RHP Plan where the Performing Provider implementing the DSRIP project is physically located, with a few exceptions described in 7 below.

## 8. Performing Providers

Providers that are responsible for performing a project in an RHP Plan are called "Performing Providers." All Performing Providers must have a current Medicaid provider identification number. Performing Providers that complete RHP project milestones and measures as specified in Attachment I, "RHP Planning Protocol" are the only entities that are eligible to receive DSRIP incentive payments in DYs 2-5. Performing Providers will primarily be hospitals, but CMHCs, local health departments, physician practice plans affiliated with an academic health science center, and other types of providers approved by the State and CMS may also receive DSRIP payments. Physician practices plans not affiliated with an academic health science center may also be eligible as Performing Providers under the "Pass 2" methodology as described in paragraph 29.d.

A Performing Provider may only participate in the RHP Plan where it is physically located except that physician practice plans affiliated with an academic health science center, major cancer hospitals, or children's hospitals may perform projects outside of the region where the Performing Provider's institution is physically located if it receives an allocation from that region in accordance with the process described in paragraph 29. In these cases, the project must be included in the RHP Plan where the DSRIP project is implemented. All related DSRIP payments for the project(s) are counted against the allocation of that RHP Plan as specified in Section VI "Disbursement of DSRIP Funds".

## 9. DSRIP and Uncompensated Care Pool

a. UC Pool Description
   STC 44 establishes an Uncompensated Care Pool to help defray uncompensated care costs provided to Medicaid eligibles or to individuals who have no source of third party coverage, for services provided by hospitals or other selected providers.

b. DSRIP Requirements for UC Pool Program Participants
   Hospitals that receive payments from the Uncompensated Care Pool shall participate in the RHP and be required to report on a subset of Category 4 measures from Attachment I, "RHP Planning Protocol". The subset of Category 4 measures fall into 3 domains: (1) Potentially Preventable Admissions (PPAs); (2) Potentially Preventable Readmissions (PPRs) and (3) Potentially Preventable Complications (PPCs). Category 4 reporting shall begin in DY 3 for the PPA and PPR domains, and in DY 4 for the PPC domain and continue through DY 5. Hospitals that only participate in UC shall not be eligible to receive DSRIP funding for required Category 4 reporting. If a hospital fails to report on all required Category 4 measures by the last quarter of the applicable Demonstration Year, the hospital shall forfeit one fourth of its total UC payments for that DY. A hospital may request from HHSC a 6-month extension from the end of the DY to report any outstanding Category 4 measures. The fourth-quarter UC payment will be made upon completion of the outstanding required Category 4 measure reports within the 6-month period. A hospital may receive only one 6-month extension to complete Category 4 reporting for each demonstration year. This requirement shall apply to all UC participating hospitals, including hospital Performing Providers that are fully participating in DSRIP. Hospitals that meet the criteria described in paragraph 11.f below are exempt from this requirement.

UC hospital participants shall also participate in learning collaboratives conducted annually during DYs 3-5 to share learning, experiences, and best practices acquired from the DSRIP program across the State.

# III. KEY ELEMENTS OF PROPOSED RHP PLANS

### 10. RHP Plans

Each RHP must submit an RHP Plan using a State-approved template that identifies the projects, objectives, and specific milestones, metrics, measures, and associated DSRIP values adopted from Attachment I, "RHP Planning Protocol" and meet all requirements pursuant to STCs 45 and 46. The project and DSRIP payments are documented in the RHP Plan where the Performing Provider of the DSRIP project is physically located. An exception applies to projects performed by physician practice plans affiliated with an academic health science center, major cancer hospitals, or children's hospitals in locations outside of the RHP region where these Performing Providers are physically located (as discussed in paragraph 7 above). In these cases, the project must be documented in the RHP Plan where the DSRIP project is implemented.

## 11. Organization of RHP Plan

a. Executive Summary
The Executive Summary shall provide a summary of the RHP Plan, a summary of the RHP's vision of delivery system transformation, a description of the RHP's patient population, a description of the health system, and a table of the projects being funded including project titles, brief descriptions of the projects, and the five-year goals. The Executive Summary shall also include a description of key challenges facing the RHP and how the five-year RHP Plan realizes the RHP's vision.

b. Description of RHP Organization
The RHP Plan shall describe how the RHP is organized and include information on RHP participants including the Anchoring Entity, IGT Entities, Performing Providers, and other stakeholders.

c. Community Needs Assessment
The RHP Plan shall include a community needs assessment for the five-year period that has the following elements for the region:

   i.   Demographic information (e.g., race/ethnicity, income, education, employment, etc.)
   ii.  Insurance coverage (e.g., commercial, Medicaid, Medicare, uncompensated care);
   iii. Description of the region's current health care infrastructure and environment (e.g., number/types of providers, services, systems, and costs; Health Professional Shortage Area [HPSA]);
   iv.  Description of any initiatives in which providers in the RHP are participating that are funded by the U.S. Department of Health and Human Services and any other relevant delivery system reform initiatives underway in the RHP region.
   v.   Description of changes in the above areas, i. – iv., expected to occur during the waiver period of federal fiscal years 2012-16.
   vi.  Key health challenges specific to the region supported by data (e.g., high diabetes rates, access issues, high emergency department [ED] utilization, etc.)

The RHP's community needs assessment should guide, and be reflected in, the RHP Plan and selection of projects. The community needs assessment may be compiled from existing data sources.

d. Stakeholder Engagement
The RHP Plan shall include a description of the processes used to engage and reach out to the following stakeholders regarding the DSRIP program:

   i.   Hospitals and other providers in the region.
   ii.  Public stakeholders and consumers, including processes used to solicit public input into RHP Plan development and opportunities for public discussion and review prior to plan submission.
   iii. A plan for ongoing engagement with public stakeholders.

iv. At a minimum, a description of public meetings that were held in different areas of the RHP Region, the public posting of the RHP Plan, and the process for submitting public comment on the RHP Plan.

e. <u>RHP Plan Development</u>
The RHP Plan shall describe the regional approach for addressing the community needs and goals, process for evaluating and selecting projects, and identification of Pass 1 and Pass 2 projects. The RHP Plan shall also include as an appendix a list of projects that were considered but not selected.

## 12. Number of Projects and Measures

a. <u>General Requirements for Categories 1-4</u>
Pursuant to Attachment I, RHP Planning Protocol, an RHP Plan must meet the following requirements:

i. RHPs must select a minimum number of projects from Categories 1 and 2. The number of minimum projects will differ for RHPs depending on their Tier classification (defined below). An RHP's Tier classification is displayed in Table 1 of Section VI "Disbursement of DSRIP Funds";

ii. Both hospital-based and non-hospital Performing Providers must establish outcomes in Category 3 that tie back to their Category 1 and 2 projects; and

iii. Hospital-based Performing Providers must report on the population-focused improvement measures across five domains identified in Category 4.

Certain hospital Performing Providers defined in 11.f below shall be exempt from selected requirements.

b. <u>RHP Tier Definition</u>

i. <u>Tier 1 RHP</u>
An RHP that contains more than 15 percent share of the statewide population under 200 percent of the federal poverty level (FPL) as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS).

ii. <u>Tier 2 RHP</u>
An RHP that contains at least 7 percent and less than 15 percent share of the statewide population under 200 percent FPL as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS).

iii. <u>Tier 3 RHP</u>
An RHP that contains at least 3 percent and less than 7 percent share of the statewide population under 200 percent FPL as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS).

iv. <u>Tier 4 RHP</u>
An RHP is classified in Tier 4 if one of the following three criteria are met: (1) the RHP contains less than 3 percent share of the statewide population under 200 percent FPL as defined by the U.S. Census Bureau: 2006-2010 American Community Survey

for Texas (ACS); (2) the RHP does not have a public hospital; or (3) the RHP has
public hospitals that provide less than 1 percent of the region's uncompensated care.

c.   Categories 1 and 2 Projects

    i.   Tier 1 RHP
        A Tier 1 RHP must select a minimum of 20 projects from Categories 1 and 2
        combined, with at least 10 of the 20 projects selected from Category 2, in accordance
        with Attachment I, "RHP Planning Protocol", which lists the acceptable projects,
        milestones, metrics, and data sources.

    ii.   Tier 2 RHP
        A Tier 2 RHP must select a minimum of 12 projects from Categories 1 and 2
        combined, with at least 6 of the 12 projects selected from Category 2, in accordance
        with Attachment I, "RHP Planning Protocol", which lists the acceptable projects,
        milestones, metrics, and data sources.

   iii.   Tier 3 RHP
        A Tier 3 RHP must select a minimum of 8 projects from Categories 1 and 2
        combined, with at least 4 of the 8 projects selected from Category 2, in accordance
        with Attachment I, "RHP Planning Protocol, which lists the acceptable projects,
        milestones, metrics, and data sources.

   iv.   Tier 4 RHP
        A Tier 4 RHP must select a minimum of 4 projects from Categories 1 and 2
        combined, with at least 2 of the 4 projects selected from Category 2, in accordance
        with Attachment I, "RHP Planning Protocol", which lists the acceptable projects,
        milestones, metrics, and data sources.

    v.   Performing Provider Participation in Categories 1 and 2

       1.  A Performing Provider in an RHP Plan must, at a minimum, participate in a
          project(s) from either Category 1 or Category 2, and if it chooses to, may
          participate in projects from both Categories;
       2.  The RHP Plan must explain how incentive payments to Performing Providers that
          perform a similar DSRIP project are not duplicative. For example, if two
          Performing Providers offer diabetes disease management, they must describe how
          the projects are serving different patients; and
       3.  The RHP Plan must explain how incentive payments do not duplicate funding for
          activities of federal initiatives funded by the U.S. Department of Health and
          Human Services.

d.   Category 3:  Outcome Reporting and Improvements
    i.   For each of its Category 1 and 2 projects, every Performing Provider must have one
        or more related Category 3 outcomes. The outcomes shall assess the results of care
        experienced by patients, including patients' clinical events, patients' recovery and
        health status, patients' experiences in the health system, and efficiency/cost. A single
        Category 3 outcome may tie back to more than one project in Categories 1 or 2
        implemented by the Performing Provider. All Category 3 outcomes must be reported

to specifications as outlined in the RHP Planning Protocol (and the compendium, which contains specifications for each outcome).

ii. Performing Providers shall report on outcome improvement over baseline in DY 4 and DY 5.  In DYs 2 and 3, Performing Providers may undertake actions/steps to establish baselines and prepare for outcome reporting in DYs 4 and 5. These preparatory activities will be reflected as process milestones in the RHP Plan.

   a. A hospital Performing Provider shall identify the outcome(s) it has selected for its Category 1 and 2 projects in the RHP Plan. Such baselines must be established for no later than DY 3.

   b. A non-hospital Performing Provider may defer identifying outcomes for its Category 1 and 2 projects until a date defined by HHSC, at which point new, approved outcomes shall be added to the RHP Planning Protocol and incorporated into the RHP Plan.  A non-hospital Performing Provider must complete establishment of baselines for its selected outcomes for no later than DY 3.

   c. Each Performing Provider shall have the opportunity during DY 3, based on the revised RHP Planning Protocol and Category 3 framework, to modify the outcome(s) previously selected for its Category 1 and 2 projects, in a manner specified by HHSC.

   d. If the provider's baseline (DY 3) performance on a Category 3 measure exceeds their DY 5 target, the provider must either increase the DY 5 target to exceed their baseline performance or add an alternate improvement activity, as described in the RHP Planning Protocol.

e. Category 4 "Pay for Reporting" Measures
   Pursuant to STC 45(d)(ii)(A), all hospital-based Performing Providers in all RHPs must report on all common Category 4 measures.  A Performing Provider may also choose to report on additional optional measures.  In accordance with this requirement, beginning in DY 3 (FFY 14) and DY 4 (FFY 15) hospital-based Performing Providers in all RHPs must include reporting of all common domains, pursuant to Attachment I, "RHP Planning Protocol".  Hospitals defined under paragraph 11.f are exempt from reporting Category 4 measures. If an exempted hospital elects to report Category 4, then it shall report on all common Category 4 measures and be held to the same requirements as all other Performing Providers participating in Category 4.  If a hospital-based Performing Provider's population for a given measure is not sufficiently large to produce statistically valid data, the hospital shall not be required to report the data for that particular Category 4 measure.  HHSC will collect all Category 4 data for each hospital. Where limited by Texas statutory requirements pertaining to the confidentiality of individual hospital data for some of the Category 4 measures, HHSC will summarize certain data related to Category 4 for CMS at the RHP level rather than at the individual provider level.

f. Hospital Exemption

DSRIP hospitals that meet the criteria below and as approved by the State are exempt from implementing Category 4 reporting in paragraph 11.e of this section.

Definition:
A hospital is not a state-owned hospital or a hospital that is managed or directly or indirectly owned by an individual, association, partnership, corporation, or other legal entity that owns or manages one or more other hospitals and:

(1) is located in a county that has a population estimated by the United States Bureau of the Census to be not more than 35,000 as of July 1 of the most recent year for which county population estimates have been published; or

(2) is located in a county that has a population of more than 35,000, but that does not have more than 100 licensed hospital beds and is not located in an area that is delineated as an urbanized area by the United States Bureau of the Census.

## 13. Organization of DSRIP Projects

a. Categories 1-4 Descriptions
The RHP five-year plan will include sections on each of the 4 categories as specified in the RHP Planning Protocol. They include:

  i. Category 1 Infrastructure Development lays the foundation for delivery system transformation through investments in technology, tools, and human resources that will strengthen the ability of providers to serve populations and continuously improve services.
  ii. Category 2 Program Innovation and Redesign includes the piloting, testing, and replicating of innovative care models.
  iii. Category 3 Quality Improvements includes outcome reporting and improvements in care that can be achieved within four years.
  iv. Category 4 Population Focused Improvements is the reporting of measures that demonstrate the impact of delivery system reform investments under the waiver.

b. Categories 1-2 Requirements
For each project selected from Category 1 and 2, RHP Plans must include a narrative that includes the following subsections:

  i. Identifying Information
     Identification of the DSRIP Category, name of the project, project element, and RHP Performing Provider name and Texas Provider Identifier (TPI) involved with the project. Each project shall be implemented by one Performing Provider only.
  ii. Project Goal
     The goal(s) for the project, which describes the challenges or issues of the Performing Provider and brief description of the major delivery system solution identified to address those challenges by implementing the particular project; the starting point of

the Performing Provider related to the project and based on that, the 5-year expected outcome for the Performing Provider and the patients.

iii.  Rationale

As part of this subsection, each Performing Provider will provide the reasons for selecting the project, milestones, and metrics based on relevancy to the RHP's population and circumstances, community need, and RHP priority and starting point with available baseline data, as well as a description of how the project represents a new initiative for the Performing Provider or significantly enhances an existing initiative, including any initiatives that may have related activities that are funded by the U.S. Department of Health and Human Services.

iii.  Relationship to Other Projects and Measures

A description of how this project supports, reinforces, enables, and is related to other Category 1 and 2 projects, Category 3 outcomes, and Category 4 population-focused improvement measures within the RHP Plan

iv.  Milestones and Metrics Table

For each project, RHP Plans shall include milestones and metrics adopted in accordance with Attachment I, "RHP Planning Protocol." In a table format, the RHP Plan will indicate by demonstration year when project milestones will be achieved and indicate the data source that will be used to document and verify achievement.

1. For each project from Category 1 and 2, the Performing Provider must include at least 1 milestone based on a Process Milestone and at least 1 milestone based on an Improvement Milestone over the 4-year period in accordance with Attachment I, "RHP Planning Protocol."

2. For each project from Category 1 and 2, the Performing Provider must include at least 1 milestone that reflects the quantifiable patient impact (number of additional individuals served or encounters provided) of the project in DY 5. The 3-year projects, which are referenced in paragraph 18, also must contain a quantifiable patient impact milestone in DY 4. For certain projects, as specified by CMS and HHSC, these milestones also must include the quantifiable patient impact specific to the Medicaid and low-income uninsured populations.

3. For each milestone, the estimated DSRIP funding must be identified as the maximum amount that can be received for achieving the milestone. For each year, the estimated available non-federal share must be included and the source (IGT Entity) of non-federal share identified.

c.  Category 3 Requirements

This focus area involves outcomes associated with Categories 1 and 2 projects. All Performing Providers (both hospital and non-hospital providers) shall select outcomes that tie back to their projects in Categories 1 and 2. RHP Plans must include:

i. <u>Identifying Information</u>
Identification of the Category 3 outcome and RHP Performing Provider name and Texas Provider Identifier that is reporting the outcome.

ii. <u>Narrative Description</u>
In the associated Category 1 or 2 project, a brief narrative description of each Category 3 outcome selected for the project.

iii. <u>Category 3 Selection Information</u>
A summary of Category 3 outcome selection information for all DSRIP providers in an RHP shall be included as an attachment to the plan.

1. For each outcome, in DY 2 the RHP Plan may include process milestones described in 11.d.ii above that support the development of the outcome. For October 2013 DY 2 reporting, HHSC and CMS allowed a status update to meet the requirements for DY 2 Category 3 process milestones given that CMS and HHSC had not finalized the revised Category 3 framework and outcomes options as of the end of DY 2.

2. For each outcome, the RHP Plan will include two process milestones for each outcome in DY 3 – one for providing a status update on a template specified by HHSC once Category 3 outcomes are re-selected in DY 3, and one for establishing or verifying the provider's baseline for the outcome upon which improvement will be measured.

3. In DY 4 and DY 5 each outcome will have one or two milestones depending on whether the outcome is designated as a pay for performance (P4P) outcome or pay for reporting (P4R) outcome in the RHP Planning Protocol. These milestones may be process or achievement milestones depending on the specific outcome measure. See paragraph 32 and the RHP Planning Protocol for further details.

4. For each milestone, the estimated DSRIP funding must be identified as the maximum amount for achieving the milestone. For each year, the estimated non-federal share must be included and the source (IGT Entity) of non-federal share identified.

d. <u>Category 4 Requirements</u>
This focus area involves population-focused improvements associated with Categories 1 and 2 projects and Category 3 outcomes. Each hospital-based Performing Provider shall report on all common measures pursuant to Attachment I, "RHP Planning Protocol". RHP Plans must include:

i. <u>Identifying information</u>
Identification of the DSRIP Category 4 measures and RHP Performing Provider name and Texas Provider Identifier (TPI) that is reporting the measure.

ii. <u>Narrative description</u>
A narrative description of the Category 4 measures.

iii. <u>Table Presentation</u>
In a table format, the RHP Plan will include, starting in demonstration year 3:

1. List of Category 4 measures the Performing Provider will report on by domain;

2. For each measure, the estimated DSRIP funding must be identified as the maximum amount that can be received for reporting on the measure. For each year, the estimated available non-federal share must be included and the source of non-federal share identified.

e. Project Valuation

The RHP Plan shall contain a narrative that describes the overall regional and individual project approach for valuing each project and rationale, including an explanation why a similar project selected by two Performing Providers might have different valuations (e.g., due to project size, provider size, project scope, populations served, community benefit, cost avoidance, and addressing priority community needs). Project valuations must comply with requirements prescribed in Section VI "Disbursement of DSRIP Funds".

In addition, the value of a four-year Category 1 or Category 2 project may not exceed the greater of 10 percent of the Performing Provider's Pass 1 allocation (described in paragraph 29.c) or $20 million in total over DYs 2-5. For projects that represent collaboration across more than one Performing Provider as described in paragraph 29.c.iii and iv., the total maximum value may not exceed the greater of the sum of 10 percent of each Performing Provider's Pass 1 allocation for each Performing Provider that is collaborating in the project or $20 million in total over DYs 2-5. The value of a three-year project may not exceed $20 million in total for Categories 1-3 for DYs 3-5.

# IV. STATE AND FEDERAL REVIEW PROCESS OF RHP PLANS

## 14. Review Process

HHSC will review all 5-year RHP Plan proposals prior to submission to CMS for final approval according to the schedule below.

The HHSC and CMS review process for 5-year RHP Plan proposals shall include the following schedule:

## 15. HHSC Review and Approval Process

a. Pre-Submission Review of RHP Plans

To support HHSC's review process, the RHP Anchoring Entity shall perform an initial review of the RHP Plan to ensure compliance with elements described in b. below and with the RHP Plan Checklist, prior to submitting the plan to HHSC.

b. HHSC Review of Plans

    i.    Between September 1, 2012 and December 31, 2012, each RHP identified in paragraph 4 will submit a 5-year RHP Plan to HHSC for review. HHSC shall review and assess each plan according to the following criteria using the RHP Plan Checklist:

- The plan is in the format and contains all required elements described herein and is consistent with special terms and conditions, including STCs 45(a), 45(b), 45(c), and 45(d)(iii).
- The plan conforms to the requirements for Categories 1, 2, 3, and 4, as described in Section III "Key Elements of Proposed RHP Plans", Attachment I, "RHP Planning Protocol", and "RHP Plan Checklist."
- Category 1 and 2 projects clearly identify goals, milestones, metrics, and expected results, including quantifiable patient impact appropriate to the project option. Category 3 clearly identifies the outcomes to be reported. Category 4 clearly identifies the population-focused health improvement measures to be reported.
- The amount and distribution of funding is in accordance with the stipulations of STC 46 and Section VI "Disbursement of DSRIP Funds" of this protocol.
- The plan and all of the projects within are consistent with the overall goals of the DSRIP program and the objectives of the Medicaid program.

ii. Within 30 days of initial, complete RHP Plan submission, HHSC will complete its initial review of each timely submitted RHP Plan proposal using the RHP Plan Checklist and based on the Program Funding and Mechanics Protocol and RHP Planning Protocol and will notify the RHP Anchoring Entity in writing of any questions or concerns identified.

iii. The Anchoring Entity shall respond in writing to any notification by HHSC of questions or concerns. The RHP's responses must be received by the date specified in the aforementioned notification. The RHP Anchoring Entity's initial response may consist of a request for additional time to address HHSC's comments provided that the RHP's revised plan addresses HHSC's comments and is submitted to HHSC within 15 days of the notification.

c. <u>HHSC Approval of Plans</u>
HHSC will take action on each timely submitted RHP Plan, will approve each plan that it deems meets the criteria outlined in Attachment I, "RHP Planning Protocol", Attachment J, "Program and Funding Protocol", and "RHP Plan Checklist" and submit approved plans to CMS for final consideration. HHSC may approve a plan for submission to CMS that requires technical corrections when there is substantial compliance with the above criteria and HHSC notifies CMS of the priority technical corrections that need to be made.

**16. CMS Review Process for initial RHP plan submissions**

CMS will review an RHP's 5-year RHP Plan upon receipt of the plan as approved by HHSC. Plans reviewed and approved by HHSC will result in a decision by CMS within 45 days of receipt of an HHSC-approved plan. Plan(s) must meet all criteria outlined in paragraph 14.b.i above.

CMS will review RHP plans in a phased process that will allow providers to begin working on their DSRIP projects in DY 2 and 3 ("Initial Approval") while the issues in subparagraph c. of this paragraph are resolved in order to allow providers to continue working on their DSRIP projects in DY 4 and 5 ("Full Approval").

a. CMS Initial Approval

Within 45 days of receipt of the State-approved RHP Plan and RHP Plan Checklist from HHSC, CMS will complete its overall review of the RHP Plan and will either:

- Approve the plan; or
- Notify HHSC and the Anchoring Entity if initial approval will not be granted for all of, or a component of, the RHP Plan. For example, CMS may approve a project in the plan but not approve the project valuation if it does not comport with Section VI "Disbursement of DSRIP Funds". Notice to the State will be in writing and will include any questions, concerns, or issues identified in the application.

Receipt of initial approval constitutes recognition that the requirements of paragraph 29.a-d were met at the time of the full RHP Plan submission as of December 31, 2012.

An RHP may revise a plan for any components of the plan identified by CMS as not approvable. After the revisions are determined to be acceptable by HHSC, HHSC shall submit the revisions to CMS and CMS shall initially approve or deny the revisions (in whole or in part) in writing to HHSC by May 1, 2013 or within 15 days of receipt of the revisions, whichever is later.

If a provider submits an alternative project for review during the plan revision process, HHSC and CMS shall review the project in accordance with the timeline for new RHP Plan submissions (e.g. CMS has 45 days for initial review and 15 days for review of revisions).

With initial approval, if a project does not require priority technical corrections, the project is eligible to earn DY 2 and DY 3 payments. If a project requires priority technical corrections, the project is eligible to earn DY 2 payments with initial approval but the necessary priority technical corrections must be approved in order to be eligible to earn DY 3 payments. Initially approved projects must also meet the requirements of paragraphs 30 and 31 in order to receive DSRIP payments.

b. Priority Technical Corrections

HHSC or CMS may require an RHP to submit priority technical corrections to an RHP Plan that receives initial approval. Possible priority technical corrections include:

- Hospital provider Category 3 outcome does not meet criteria for one standalone or three non-standalone measures.
- Provider did not include at least one process milestone and one improvement milestone.
- Category 3 outcome duplicates an improvement milestone.
- All project components, if required, were not included in the narrative or milestones.

- Project lacks clearly defined milestones and metrics, including the lack of a quantifiable patient impact milestone for DYs 4 and 5, as required by paragraph 14.b.i.
- Any other priority technical correction CMS specifies for a project in the RHP Plan initial approval letter.
- Any other priority technical correction identified by HHSC, including any identified by HHSC subsequent to the RHP Plan initial approval letter, that is needed to clarify a Category 1 or 2 project or Category 3 outcome in order to make payment, such as clearly defined milestones and metrics.

These changes must be submitted to HHSC for review by no later than October 1, 2013 or such later date as specified by HHSC or CMS. HHSC, in collaboration with CMS, will work with the provider to refine the submitted priority technical corrections as needed for approval no later than March 31, 2014. DSRIP payment for a project for DY 3 may be withheld until the necessary priority technical corrections are approved (and all other requirements for DSRIP payment described in paragraphs 30 and 31 are met).

c. <u>CMS Full Approval</u>

c. <u>CMS Full Approval</u>
CMS may require an RHP to submit additional revisions to the plan to receive full approval, as specified in the RHP Plan initial approval letter. Full approval is necessary for a project to be eligible for DY 4 and 5 DSRIP funding, except that ii. of this subparagraph only applies to DY 4 and 5 DSRIP funding for Category 3. HHSC will review all revisions submitted prior to CMS review and final consideration, consistent with the process for review of plan modifications, described in paragraph 32.d. Fully approved projects must also meet the requirements of paragraph 30 and 31 in order to receive DSRIP payments.

In addition to any project-specific revisions requested in the RHP Plan initial approval letter, all RHPs will be required to submit the following revisions, as applicable, in order to receive full approval for the plan.

  i.   Valuation that is consistent with project impact

Using an objective methodology developed with HHSC, CMS will determine whether the information submitted on each project's impact sufficiently justifies each project's value for DYs 4 and 5. Any outlier project values identified by HHSC or CMS will be reviewed by the state's independent assessor as part of the mid-point assessment. The assessor will make recommendations to HHSC, and if HHSC's decision differs from the recommendations, HHSC will consult CMS to establish the DY4-5 project value. Projects that receive valuation approval for DYs 4 and 5 through this process may still be subject to a DY 4 and 5 modification during the mid-point assessment, including adjustments to metrics or valuation, if the performance of the project substantially deviates from what was approved.

  ii.   Category 3 framework for DY 4 and 5

Recognizing the complexity of setting Category 3 outcome targets, CMS and HHSC will jointly develop a standard target setting methodology for Category 3 outcomes no later than February 28, 2014 that will apply prospectively to Category 3 achievement milestones for DYs 4 and 5 for all projects.  This methodology will recognize the demonstration's focus on the Medicaid/uninsured populations and the differing baselines for different providers and will use appropriate benchmarks (where applicable) to set targets for meaningful improvement.  The methodology also will recognize the innovative nature of certain projects, as well as data limitations and data sharing issues for certain types of performing providers, including non-hospital providers.

Providers will be required to use this standard methodology to set their Category 3 achievement targets in DYs 4 and 5 unless they provide a compelling justification to use a different target that is approved by HHSC based on statistically justifiable inconsistencies with the target setting benchmark used, including differences in the relative size of the Category 1 or 2 project and reporting specifications of the measure.  If providers have already submitted Category 3 improvement targets for DYs 4 and 5 to CMS in the initial approval process, they should replace their previous targets with new targets based on the standard target setting methodology. Providers will have the opportunity by October 2014 to request to use an achievement target other than the standard methodology.  The independent assessor will provide recommendations to HHSC in cases where providers request to use a different target.  HHSC will need to approve the use of a different target that is not based on the standard target setting methodology.

Category 3 process or achievement milestone information for DYs 4 and 5 must be submitted to be eligible for payment of Category 3 outcome measures for DYs 4 and 5 (in addition to all requirements for DSRIP payment described in paragraphs 30 and 31).   HHSC will work with RHPs to submit Category 3 outcomes once the standard target setting methodology is developed and to refine outcomes as needed in October 2014.

## 17.     Post-approval Public Engagement and Ongoing Monitoring

After receiving initial CMS approval of an RHP Plan, the RHP shall conduct a post-award implementation forum with stakeholders, including those described in paragraph 10.d, in order to promote shared learning and continued alignment with community goals.  The feedback from these post-award forums shall be summarized in HHSC's annual demonstration report and should help inform the development of more robust quality improvement infrastructure for the region that can support the learning collaborative plan for each region, as described below and in the appendix to the RHP Planning Protocol.

On each RHP's website, the RHP Anchoring Entity will publicly post a copy of the most recently approved RHP plan as well as any pending plan modifications that have been submitted to HHSC for review.  The RHP websites will also provide for an opportunity for public comment.

In order to monitor the implementation of DSRIP activities and support shared learning, RHPs shall submit semi-annual progress reports to HHSC and CMS in a standardized format jointly

agreed upon by HHSC and CMS. If semi-annual reports are not submitted on time or do not meet the requirements of the reporting, future DSRIP payments may be withheld until the complete report is submitted (and all other requirements for DSRIP payment described in paragraphs 30 and 31 are met). HHSC shall provide overall programmatic reporting in the demonstration's quarterly and annual reports for all RHPs combined.

## 18. Learning Collaborative Plans

Recognizing the importance of learning collaboratives in supporting continuous quality improvement, RHPs will submit learning collaborative plans by October 1, 2013, to reflect opportunities and requirements for shared learning among the approved DSRIP projects in the region. Specifically, there should be a coherent discussion of providers' participation in a learning collaborative that is strongly associated with their projects and demonstrates a commitment to collaborative learning that is designed to accelerate progress and mid-course correction to achieve the goals of the projects and to make significant improvement in the Category 3 outcome measures and the Category 4 population health reporting measures.

Tier 4 RHPs may submit, for HHSC and CMS review, a request not to conduct their own regional learning collaborative if they have a compelling justification, such as if they do not have the administrative capacity to do so. They also must submit their plan to actively participate in the statewide learning collaborative referenced in paragraph 8.b and any plans to participate in other RHPs' learning collaboratives, which is strongly encouraged.

## 19. Review and Approval Process for Three-Year DSRIP Projects

By December 2013, using DY 3-5 DSRIP funds not yet allocated to DSRIP projects, each RHP may submit additional proposed three-year DSRIP projects for HHSC and CMS review and approval. Based on the criteria established in paragraph 14, HHSC will work with the RHPs and the Performing Provider of each proposed three-year project to get the projects ready for CMS submission. HHSC will take action on each project that it deems meets the criteria outlined in the "RHP Plan Checklist" and submit approved plans to CMS for initial consideration during a 45-day CMS review process.

If a three-year project submitted by HHSC is not initially approved by CMS prior to May 31, 2014 during CMS's 45-day review, then HHSC rather than CMS will notify RHPs of subsequent approvals as appropriate. Provider will have a one-time opportunity to revise projects that were not initially approved by CMS by a date specified by HHSC. HHSC, and the independent assessor will review these projects to ensure compliance with the "RHP Plan Checklist." HHSC will notify CMS of the HHSC approved projects, and provide CMS an opportunity for secondary review within 30 days, if requested by CMS.

## 20. Mid-Point Assessment

By the end of 2014, an independent assessor (also known as the compliance monitor) will work with HHSC to conduct a transparent mid-point assessment of all RHPs using CMS-approved criteria. This review will provide an opportunity to modify projects and/or metrics in consideration of learning and new evidence. The independent assessor will review certain projects identified by HHSC, CMS or the entity based on information provided for all projects in semi-annual reports for the following elements:

- Compliance with the approved RHP plan, including the elements described in the project narrative.

- Compliance with the required core components described in the RHP Planning Protocol, including continuous quality improvement activities.

- Non-duplication of Federal funds.

- The clarity of the improvement milestones for DYs 4 and 5 and their connection with actual project activities and meaningful, quantifiable patient impact. A clear improvement milestone should be supported by a coherent and comprehensive project description that clearly describes the relationship between the goals, the interventions and the measures of progress and outcome.

- The benefit of the project to the Medicaid and uninsured population and to the health outcomes of all patients served by the project (examples include number of readmissions, potentially preventable admissions, or adverse events that will be prevented by the project in DY 4 and DY 5).

- The opportunity to continue to improve the project by applying any lessons learned or best practices that can increase the likelihood of the project advancing the triple aim.

Based on the recommendations by the independent assessor, HHSC or CMS may require prospective plan modifications that would be effective for DYs 4 and 5, including adjustments to project metrics or valuation, if the performance of the project has substantially deviated from what was approved   Based on additional DSRIP compliance monitoring conducted by the independent assessor after the mid-point assessment is completed, HHSC or CMS also may require prospective plan modifications to be effective for DY 5.

 HHSC will submit to CMS, on or before September 1, 2013, draft review criteria, a description of its approach to review, and a draft DSRIP Plan Checklist that will reflect the approved criteria and will be used in the assessment.  CMS will provide comments within 60 days of HHSC's submission.  CMS and HHSC will work collaboratively to refine the criteria, approach, and DSRIP Plan Checklist.  HHSC will apply these criteria to ensure that DSRIP projects are thoroughly and consistently reviewed.  Where possible, HHSC will notify providers in advance of the mid-point assessment if providers need to make changes in order to comply with the approved review criteria.

HHSC will review all modifications resulting from the mid-point, consistent with the process for review of plan modifications, described in paragraph 32.d. Future DSRIP payment for a provider may be withheld until the necessary changes as identified by the mid-point assessment are submitted (and all other requirements for DSRIP payment described in paragraphs 30 and 31 are met).

## 21. Revisions to the RHP Planning Protocol

If the CMS review process of RHP Plans results in the modification of any component of an RHP's plan, including but not limited to projects, milestones, measures, metrics, or data sources, that was not originally include in the RHP Planning Protocol, Texas may revise the RHP Planning Protocol accordingly.  CMS will review and approve these proposed revisions within 30 days of submission by HHSC, provided that the RHP Planning Protocol revisions are in accordance with the final approved RHP Plan(s) prompting the revision(s) and all applicable STC requirements. Such revisions to the RHP Planning Protocol do not require a waiver amendment.

# V.  RHP AND STATE REPORTING REQUIREMENTS

## 22. RHP Reporting for Payment in DY 1

a.  <u>RHP Plan Submission</u>
Submission of a State-approved RHP Plan to CMS shall serve as the basis for the full DY 1 presumptive payment to that RHP's Performing Providers and Anchoring Entity as prescribed by Section VI "Disbursement of DSRIP Funds".

b.  <u>RHP Plans Not Approved by CMS on or after May 1, 2013</u>

All Performing Providers and Anchoring Entities in an RHP whose RHP Plan is not approved in full by CMS shall be at risk for recoupment of their entire DY 1 incentive payment related to plan submission. Within 10 business days of CMS written denial of an RHP Plan, the State shall recoup the DY 1 payment from all eligible entities in the affected RHP and promptly return the associated FFP to CMS. If an RHP deletes a project without a replacement to obtain CMS approval of the RHP Plan, the State shall recoup the DY 1 payment from the entities that received funding for that project and promptly return the associated FFP to CMS.

## 23. RHP Reporting for Payment in DYs 2-5

Two times per year, Performing Providers seeking payment under the DSRIP program shall submit reports to HHSC demonstrating progress on each of their projects as measured by category-specific milestones and metrics achieved during the reporting period. The reports shall be submitted using the standardized reporting form approved by HHSC. IGT Entities will review the submission of the reported performance. Based on the reports, HHSC will calculate the incentive payments for the progress achieved in accordance with Section VI "Disbursement of DSRIP Funds". The Performing Provider shall have available for review by Texas or CMS, upon request, all supporting data and back-up documentation. These reports will be due as indicated below after the end of each reporting period:

- Reporting period of October 1 through March 31: the reporting and request for payment is due April 30.
- Reporting period of April 1 through September 30: the reporting and request for payment is due October 31.

These reports will serve as the basis for authorizing incentive payments to Performing Providers in an RHP for achievement of DSRIP milestones. HHSC and CMS concurrently shall have 30 days to review and approve or request additional information regarding the data reported for each milestone/metric and measure. If additional information is requested, the Performing Provider shall respond to the request within 15 days and both HHSC and CMS shall have an additional 15 days to review, approve, or deny the request for payment, based on the data provided. HHSC shall schedule the payment transaction for each RHP Performing Provider within 30 days following CMS and HHSC approval of the Performing Provider's RHP report.

HHSC and CMS may determine that a subset of not less than half of the projects and metrics will be reviewed during the 30 days after the reporting period. In such instances, HHSC and CMS will designate those projects and metrics that are not reviewed within 30 days as "provisionally approved." Such "provisionally approved" projects and metrics will be reviewed in full by HHSC prior to the next reporting due date. HHSC will report back to CMS which projects were reviewed by the end of the initial 30 day review period and which projects will be reviewed prior to the next reporting cycle due date. When all reports have been reviewed, HHSC will submit to CMS a report with the results of completed reviews and assurance that all reviews have been completed. CMS will review projects and metrics judiciously as it deems necessary.

For metrics that are "provisionally approved" the Performing Provider will receive full DSRIP payment. After review of any "provisionally approved" item, additional information regarding

the data reported for each milestone/metric will be requested if necessary. If the initial supporting documentation, and any additional information, does not form a sufficient basis for actual metric achievement, HHSC will recoup the associated overpayments from the Performing Provider. If the Performing Provider does not comply with the recoupment, the overpayment amount will be deducted from future Medicaid payments. HHSC will notify CMS of any cases where the initial supporting documentation and additional information does not form a sufficient basis for metric achievement and the outcome of recouping the payments or withholding future payments.

## 24. Intergovernmental Transfer Process

HHSC will calculate the nonfederal share amount to be transferred by an IGT Entity in order to draw the federal funding for the incentive payments related to the milestone achievement that is reported by the Performing Provider in accordance with paragraph 22 and approved by the IGT Entity and the State. Within 14 days after notification by HHSC of the identified nonfederal share amount, the IGT Entity will make an intergovernmental transfer of funds. The State will draw the federal funding and pay both the nonfederal and federal shares of the incentive payment to the Performing Provider. If the IGT is made within the appropriate 14-day timeframe, the incentive payment will be disbursed within 30 days. The total computable incentive payment must remain with the Performing Provider.

At the time that HHSC requests IGT funding for DSRIP incentive payments, the state may also require the IGT Entity to transfer additional funds to provide a portion of the non-federal share of the state's administrative costs related to waiver monitoring activities, as permitted under the state plan.

## 25. RHP Annual Year End Report

Each RHP Anchoring Entity shall submit an annual report by December 15 following the end of Demonstration Years 2-5. The annual report shall be prepared and submitted using the standardized reporting form approved by HHSC. The report will include information provided in the interim reports previously submitted for the Demonstration Year, including data on the progress made for all metrics. Additionally, the RHP will provide a narrative description of the progress made, lessons learned, challenges faced, and other pertinent findings.

## 26. Texas Reporting to CMS

a. Quarterly and Annual Reporting
    DSRIP will be a component of the State's quarterly operational reports and annual reports related to the Demonstration. These reports will include:

    i.    All DSRIP payments made to Performing Providers that occurred in the quarter as required in the quarterly payment report pursuant to STC 43(b);

    ii.    Expenditure projections reflecting the expected pace of future disbursements for each RHP and Performing Providers;

    iii.    A summary assessment of each RHP's DSRIP activities during the given period including progress on milestones; and

    iv.    Evaluation activities and interim findings for the evaluation design pursuant to STC 68.

b.   <u>Claiming Federal Financial Participation</u>

Texas will claim federal financial participation (FFP) for DSRIP incentive payments on the CMS 64.9 waiver form. FFP will be available only for DSRIP payments made in accordance with all pertinent STCs and Attachment I, "RHP Planning Protocol" and Attachment J, "Program Funding and Mechanics Protocol". All RHP Plans are subject to potential audits, including review by the independent assessor during the mid-point assessment and ongoing compliance monitoring. The Performing Providers shall have available for review by HHSC and CMS, upon request, all supporting data and back-up documentation evidencing performance as described under an RHP Plan for DSRIP incentive payments. Failure of the Performing Provider to maintain adequate documentation or inaccurate reporting of data may result in recoupment of DSRIP payments, including based on findings of the independent assessor.

# VI.   DISBURSEMENT OF DSRIP FUNDS

## 27. DSRIP Allocation Methodology to RHPs in DYs 1-5

a.   <u>Initial DSRIP Allocation</u>

For Demonstration Years 1-5, DSRIP funding amounts identified in Table 6 of Waiver STC 46 shall be allocated to RHPs according to a formula that takes into account the RHP's role in the safety net system. RHPs that shoulder a larger burden of Medicaid care and serve a larger share of low-income populations shall be allocated a higher share of DSRIP funds. The goal of this approach is to ensure that delivery system reforms under DSRIP have the greatest impact on Medicaid and low-income populations. The following variables were selected as proxies for measuring an RHP's participation in Medicaid and serving low-income populations:

    i.    Percent of State population with income below 200% FPL residing in the RHP Region (Source: U.S. Census Bureau: 2006-2010 American Community Survey for Texas). An RHP's percentage was calculated by dividing the number of low-income individuals with income below 200% FPL in the RHP Region by the total number of low-income individuals in the State with income below 200% FPL.

    ii.    Percent of Texas Medicaid acute care payments in SFY 2011 made in the RHP Region (including fee for service, MCO, vendor drug, and PCCM payments). An RHP's percentage was calculated by dividing SFY 2011 Medicaid acute care payments in the RHP Region by total SFY 2011 State Medicaid acute care payments.

    iii.    Percent of total SFY 2011 Medicaid supplemental payments (former Upper Payment Limit [UPL] program) made to providers in the RHP. An RHP's percentage was

calculated by dividing SFY 2011 Medicaid supplemental payments by total SFY 2011 State Medicaid supplemental payments.

The RHP's percentages for the three variables are weighted equally, and then the individual RHP's percentages are averaged to come up with the RHP's DSRIP Funding Allocation Percentage for each demonstration years 1-5.

An RHP's DSRIP Funding Allocation Percentage shall be multiplied by the statewide DSRIP funding amounts in DYs 1-5 identified in Table 6 of STC 46. The product result of this calculation yields the DSRIP funding allocation amount for an RHP, which is reflected in Table 1 below. This table also displays the Tier Level of an RHP as defined in paragraph 11, Section III "Key Elements of Proposed RHP Plans".

### Table 1: DSRIP Allocation (All Funds)

| RHP | Tier | Funding Allocation % | DY 1 | DY 2 | DY 3 | DY 4 | DY 5 | Total |
|---|---|---|---|---|---|---|---|---|
| 1 | 3 | 4.00% | 19,978,502 | 91,901,110 | 106,525,374 | 113,957,376 | 123,866,713 | 456,229,075 |
| 2 | 3 | 3.78% | 18,880,393 | 86,849,806 | 100,670,253 | 107,693,759 | 117,058,434 | 431,152,643 |
| 3 | 1 | 20.22% | 101,101,113 | 465,065,121 | 539,071,136 | 576,680,750 | 626,826,902 | 2,308,745,022 |
| 4 | 3 | 4.23% | 21,162,653 | 97,348,206 | 112,839,268 | 120,711,775 | 131,208,451 | 483,270,354 |
| 5 | 4 | 7.02% | 35,114,687 | 161,527,561 | 187,231,512 | 200,294,176 | 217,711,061 | 801,878,997 |
| 6 | 2 | 10.15% | 50,733,669 | 233,374,879 | 270,511,925 | 289,384,850 | 314,548,750 | 1,158,554,074 |
| 7 | 3 | 6.04% | 30,176,126 | 138,810,179 | 160,899,104 | 172,124,622 | 187,091,981 | 689,102,012 |
| 8 | 4 | 1.66% | 8,275,517 | 38,067,378 | 44,125,056 | 47,203,548 | 51,308,205 | 188,979,704 |
| 9 | 2 | 14.29% | 71,434,099 | 328,596,853 | 380,886,614 | 407,460,098 | 442,891,411 | 1,631,269,075 |
| 10 | 2 | 9.74% | 48,707,230 | 224,053,259 | 259,706,952 | 277,826,042 | 301,984,828 | 1,112,278,311 |
| 11 | 4 | 1.16% | 5,822,871 | 26,785,208 | 31,047,550 | 33,213,658 | 36,101,803 | 132,971,091 |
| 12 | 3 | 3.56% | 17,777,700 | 81,777,422 | 94,790,698 | 101,404,003 | 110,221,742 | 405,971,566 |
| 13 | 4 | 0.67% | 3,353,261 | 15,425,003 | 17,879,590 | 19,127,003 | 20,790,221 | 76,575,078 |
| 14 | 4 | 2.29% | 11,426,916 | 52,563,813 | 60,928,316 | 65,179,128 | 70,846,879 | 260,945,051 |
| 15 | 3 | 4.41% | 22,037,042 | 101,370,394 | 117,501,509 | 125,699,288 | 136,629,661 | 503,237,895 |
| 16 | 4 | 1.30% | 6,511,903 | 29,954,753 | 34,721,466 | 37,143,894 | 40,373,798 | 148,705,813 |
| 17 | 4 | 1.89% | 9,474,480 | 43,582,608 | 50,517,928 | 54,042,434 | 58,741,777 | 216,359,227 |
| 18 | 4 | 1.22% | 6,095,208 | 28,037,958 | 32,499,651 | 34,767,068 | 37,790,292 | 139,190,178 |
| 19 | 4 | 0.95% | 4,727,871 | 21,748,205 | 25,209,007 | 26,967,774 | 29,312,798 | 107,965,655 |
| 20 | 4 | 1.44% | 7,208,757 | 33,160,283 | 38,437,093 | 41,118,751 | 44,694,294 | 164,619,177 |
|  |  | 100% | 500,000,000 | 2,300,000,000 | 2,666,000,000 | 2,852,000,000 | 3,100,000,000 | 11,418,000,000 |

b. <u>One-time Re-Assessment of DSRIP Allocation to RHPs in DY 3</u>
During DY 3, HHSC shall re-assess DSRIP allocation amounts to RHPs.  In the event that the total amount of DSRIP funds included in an RHP Plan for DYs 3-5 is less than the total amount available to the RHP in Table 1, HHSC shall redistribute uncommitted amounts that an RHP does not propose to use for new three year projects for DYs 3-5.  The uncommitted amounts shall be redistributed to RHPs according to a DSRIP funding allocation methodology agreed to by HHSC and CMS.  The redistributed funds may be used by RHPs to fund new three year projects beginning in DY 3 that are approved according to the process described in paragraph18.

## 28. Benchmark Payment Variation between UC and DSRIP

UC payments will be based on each provider's reported UC costs on the UC application and reduced proportionally if the total statewide UC cap is exceeded for a given demonstration year.  However, to ensure a robust and meaningful DSRIP program, RHPs are strongly encouraged to submit RHP Plans that in total fund DSRIP projects at no less than the percentages listed in Table 2 below.  Table 2 shows the statewide waiver funding allocation schedule for DSRIP and UC described in Table 6 of STC 46.

**Table 2:  Waiver Funding Allocation between UC Program and DSRIP Programs**

|         | DY 2 | DY 3 | DY 4 | DY 5 | Total |
|---------|------|------|------|------|-------|
| % UC    | 63%  | 57%  | 54%  | 50%  | 60%   |
| % DSRIP | 37%  | 43%  | 46%  | 50%  | 40%   |

## 29. DY 1 RHP DSRIP Allocation Formula

a. <u>Eligible Entities</u>
Anchoring Entities and Performing Providers that begin participation in DSRIP in DY 2 and that have a current Medicaid provider identification number are eligible to receive a DY 1 DSRIP payment according to the requirements in this section.  An entity that serves both roles in an RHP is eligible to receive a DY 1 payment under each of the categories described below.

b. <u>Anchoring Entities</u>
The Anchoring Entity of an RHP shall be allocated 20 percent of the total DY 1 RHP DSRIP funding amount.

c. <u>Performing Providers</u>
Remaining DY 1 RHP DSRIP funding (less the Anchoring Entity DY 1 DSRIP) shall be allocated to Performing Providers based on an allocation formula. The allocation formula divides an RHP Plan's estimated dollar value of a Performing Provider's DSRIP projects in Categories 1-4 over the DYs 2-5 period by the total value of the RHP's DSRIP projects over the DYs 2-5 period. The resulting percentage is then multiplied by the RHP's remaining DY 1 DSRIP amount to determine the DY 1 DSRIP payment for the Performing Provider.

*Example:*

- An RHP's DY1 DSRIP Allocation is $25 million.
- 20 percent or $5 million is allocated to the Anchoring Entity.
- The remaining amount, $20 million, shall be distributed to Performing Providers according to the following formula:
    1. An RHP Plan reports a total DSRIP valuation of projects in DYs 2-5 equal to $500 million across 10 Performing Providers.
    2. Performing Provider "A's" DSRIP valuation for projects over the 4-year period in the RHP is $100 million, or 20 percent of the total DSRIP valuation.
    3. Based on the formula, Performing Provider "A" would be eligible to receive $4 million or 20 percent of the remaining $20 million DY 1 DSRIP payment amount.

## 30. DYs 2-5 RHP DSRIP Allocation Formula

a. <u>Eligibility for DSRIP</u>
Performing Providers described in Section II "DSRIP Eligibility Criteria" are eligible to receive RHP DSRIP payments in Demonstration Years 2-5. Each Performing Provider will be individually responsible for progress towards and achievement of its milestone bundles in all categories as defined in the RHP's approved RHP Plan. As outlined in Section V "RHP and State Reporting Requirements", Performing Providers will be eligible to receive DSRIP incentive payments related to achievement of their milestone bundles upon submission and approval of the required reports for payment.

b. <u>"Two-Pass" Process for Allocating DSRIP Funds</u>
DSRIP funding shall be allocated to Performing Providers using a two-stage process. The first stage or "Pass 1" sets an initial allocation to each potential provider who would be eligible to participate in DSRIP as described in paragraph 26.c.i.-ii. The purpose of this step is to encourage broad participation in DSRIP within an RHP. Under Pass 1, the RHP must identify and fund its minimum required number of projects. In addition, in order to access Pass 2 funds, RHPs in each Tier must meet DSRIP participation requirements for major safety net hospitals (described below in paragraph 29.c.v.2) and meet a threshold for DSRIP participation by non-profit and other private hospitals (described below in paragraph 29.c.v.3).

Recognizing that not all potentially eligible Performing Providers will participate in DSRIP, Pass 2 of the DSRIP allocation process permits RHPs to reallocate unused DSRIP funds for new projects in Categories 1, 2, and 3. DSRIP projects funded in the plan must support the RHP's overall goals and be consistent with its community needs assessment. HHSC shall ensure in the RHP Plan submission requirements that the "two-pass" process has been followed.

c. <u>Initial DSRIP Allocation ("Pass 1" Allocation)</u>

   i. <u>Hospital Providers</u>

Potentially eligible hospital Performing Providers in an RHP that participated in either the Disproportionate Share Hospital (DSH) program during FFY 2012 or the former Upper Payment Limit (UPL) program during FFY 2011 shall be allocated 75 percent of the RHP's annual DSRIP funds. Of this amount, each hospital shall be assigned a potential DSRIP allocation based on a provider's size and role in serving Medicaid and uninsured patients, as measured by three variables:

1. The hospital's percent share of Medicaid acute care payments in SFY 201l made to all potentially eligible hospitals in the RHP (including fee for service, MCO, and PCCM payments);
2. The hospital's percent share of total SFY 2011 Medicaid supplemental payments made to all potentially eligible hospital providers in the RHP (former UPL program); and
3. The hospital's percent share of uncompensated care in the RHP. A hospital's uncompensated care is measured by its FFY 2012 Hospital Specific Limit (HSL). For hospitals that do not have a FFY 2012 Hospital Specific Limit, uncompensated care shall be measured by that hospital's charity care costs reported in the 2010 Annual Hospital Survey trended to 2012 by an annual trend rate of approximately 2 percent (4 percent total trend over the two-year period).

> The individual hospital's percent share of Medicaid acute care payments shall be weighted 25 percent, percent share of Medicaid supplemental payments shall be weighted 25 percent, and percent share of uncompensated care shall be weighted 50 percent to determine the Hospital DSRIP Funding Allocation Percentage. The Hospital DSRIP Funding Allocation shall be multiplied by the annual RHP DSRIP amount allocated to hospitals in the RHP to come up with the Pass 1 allocation amount for each hospital.

ii. <u>Non-Hospital Providers</u>
Potentially eligible non-hospital Performing Providers in an RHP are allocated a total of 25 percent of the RHP's annual DSRIP funds, to be distributed as follows:

1. Community Mental Health Centers (CMHCs) initially shall be allocated a total of 10 percent of the RHP's annual DSRIP funds;
2. Physician Practices affiliated with an Academic Health Science Center initially shall be allocated a total of 10 percent of the RHP's annual DSRIP funds. Such physician practices outside an RHP as referenced in paragraph 7 may access the 10 percent upon request of the RHP; and
3. Local Health Departments initially shall be allocated a total of 5 percent of the RHP's annual DSRIP funds.

If an RHP does not include one or more of the non-hospital providers listed above, the Pass 1 allocations will be redistributed in "Pass 2" as described in paragraph 29.d.

iii. <u>Option for Smaller Hospitals in Tiers 1 and 2 to Collaborate in Pass 1</u>

1. Hospitals in RHPs categorized in Tiers 1 or 2 whose DSRIP allocation in Pass 1 in DY 2 is less than $2 million are encouraged to work within their RHP to combine their individual DSRIP allocations to implement a robust DSRIP project(s) that will be valuable to the RHP as determined by the RHP Plan and community needs assessment. A single Performing Provider must implement each DSRIP project.

2. Such hospitals can combine their individual DSRIP allocations if there is a signed agreement between the affected parties submitted with the RHP Plan stating that the transaction is entered into freely and that it benefits regional transformation. No hospital is required to combine its individual DSRIP allocation.

iv. Option for Performing Providers in Tiers 3 and 4 to Collaborate in Pass 1

1. Performing Providers in RHPs categorized in Tiers 3 or 4 may combine their individual DSRIP allocations within their RHP to implement a robust DSRIP project(s) considered valuable to the RHP as determined by the RHP Plan and community needs assessment. A single Performing Provider must implement each DSRIP project.

2. Such Performing Providers can combine their individual DSRIP allocations if there is a signed agreement between the affected parties submitted with the RHP Plan stating that the transaction is entered into freely and that it benefits regional transformation. No Performing Provider is required to combine its individual DSRIP allocation.

v. Requirements in Pass 1

1. Minimum Projects
   RHP Plans must identify the minimum number of Category 1 and 2 projects the RHP is required to implement according to its Tier Level as outlined in Section III "Key Elements of Proposed RHP Plans" and must show that Performing Providers will meet the funding allocation requirements in each Category as described in paragraph 29.e. If an RHP Plan does not meet these criteria in Pass 1, the RHP Plan will not be approved.

2. DSRIP Participation Target for Major Safety Net Hospitals
   An RHP Plan must meet DSRIP participation requirements for major safety net hospitals in order to be eligible to participate in "Pass 2" and to receive any redistributed DSRIP funds in DY 3 (as described in paragraph 26.b). In order to ensure broad participation of safety net hospitals in DSRIP, each RHP will have a minimum number of safety net hospitals participate in DSRIP as Performing Providers. The participation target varies by RHP Tier Level and is presented in Table 3 below.

   For the purposes of this requirement, a hospital is defined as a major safety net hospital if it meets either of these two criteria:

**Attachment J
Program Funding and Mechanics Protocol**

   a. Criteria 1

   The hospital participated in the Disproportionate Share Hospital (DSH) program in FFY2012 <u>and</u>

      i. The hospital received at least 15 percent of the region's total Medicaid revenue (fee-for-service, managed care, primary care case management [PCCM]) in FFY2011 for Pass 1 hospitals <u>or;</u>

      ii. has a trended 2012 hospital specific limit (HSL) that represents at least 15 percent of the region's total HSL, <u>or</u>

   b. Criteria 2

   The hospital has a Pass 1 DSRIP allocation for DY 2-5 of greater than $60 million as defined in paragraph 29.c.i above.

**Table 3: Major Safety Net Hospital DSRIP Participation Target by RHP Tier Level**

| RHP Tier | Number of Major Safety Net Hospitals in each RHP that must Participate in DSRIP* | Estimated Number of Safety Net Hospitals Participating in DSRIP |
|---|---|---|
| Tier 1 | At least 5 | 5 |
| Tier 2 | At least 4 | 11 |
| Tier 3 | At least 2 | 12 |
| Tier 4 | At least 1 | 10 |
| Total | | 38 |

*If there are fewer major safety net hospitals in an RHP than specified for its Tier level, then the RHP Plan must include all the major safety net hospitals as defined above in that RHP as Performing Providers for DSRIP.

3. <u>Broad Hospital Participation Target</u>

An RHP Plan must meet the broad hospital participation target in order to be eligible to participate in "Pass 2" and to receive any redistributed DSRIP funds in DY 3 (as described in paragraph 26.b). RHPs shall have minimum representation of non-profit and other private hospitals in their RHP plans. An RHP Plan must include projects with values equal to at least a minimum percentage of DSRIP Annual Allocation Amounts assigned to non-profit and other private hospitals as defined in paragraph 29.c.i above. The minimum percentage varies by RHP Tier Level and is presented in Table 4 below.

**Table 4: Non-Profit and Other Private Hospital DSRIP Target by RHP Tier Level**

| RHP Tier | Percent of Total Pass 1 Assigned DSRIP Annual Amounts Aggregated Across all Non-Profit and Other Private Hospitals included in RHP Plan |
|---|---|
| Tier 1 | At least 30% |
| Tier 2 | At least 30% |

| Tier 3 | At least 15% |
|--------|--------------|
| Tier 4 | At least 5% |

d. <u>Re-allocation of Unused DSRIP Amounts for New Projects ("Pass 2")</u>
After requirements of Pass 1 are met, as specified in paragraph 29.c.iv, if there are DSRIP allocation amounts that remain unused by potential Performing Providers, the RHP may redirect the unused amounts to fund additional projects by hospital providers and non-hospital providers that support the overall goals and community needs assessment of the RHP. HHSC also strongly encourages broad geographic representation across the region. In "Pass 2", the RHP shall identify the new projects and outcomes from Categories 1-3, the Performing Providers who shall implement the project, and the DSRIP funding amount assigned to the projects and measures.

In addition to the eligible providers identified in paragraph 29, physician practices that are not affiliated with academic science health centers may participate in Categories 1, 2, and 3 DSRIP projects in Pass 2. Hospitals that did not participate in the DSH program in FFY 2012 or the UPL program in FFY 2011 may also participate in DSRIP in Pass 2.

    i. <u>Pass 2 - Performing Providers that did not participate in Pass 1:</u>
Potentially eligible Performing Providers in an RHP that did not participate in Pass 1 shall be allocated a total of 25 percent of the RHP's unused Pass 1 DSRIP funds. The Anchor will calculate the following for Pass 2 using the total unused DSRIP from Pass 1 allocations:

        1. Hospital Performing Providers that did not participate in the DSH program in FFY 2012 or the UPL program in FFY 2011 shall be allocated a total of 15 percent of the RHP's unused Pass 1 DSRIP funds. Each hospital shall be allocated a proportion of the 15 percent divided by the number of new hospital Performing Providers.
        2. Physician practices not affiliated with academic health science centers shall be allocated 10 percent of the RHP's unused Pass 1 DSRIP funds. Each physician practice shall be allocated a proportion of the 10 percent divided by the number of interested physician practices.

    ii. <u>Pass 2 - Performing Providers that participated in Pass 1:</u>
Performing Providers in an RHP that participated in Pass 1 shall be allocated a total of 75 percent of the RHP's unused Pass 1 DSRIP funds. The Anchor will calculate the following for Pass 2 using Pass 1 DSRIP project information:

    1. Each individual Performing Provider's percent of the total Pass 1 funding for DSRIP projects in Pass 1 in DYs 2-5.

2. The Performing Provider's percent as calculated in 1. above is multiplied by the 75 percent of the RHP's unused Pass 1 DSRIP funds to determine the allocation of DSRIP to each Performing Provider in the RHP for Pass 2.

3. Performing Providers may implement new DSRIP projects that complement the projects from Pass 1 and address outstanding community needs.

4. One Performing Provider must implement each DSRIP project.

iii. <u>Collaboration among Performing Providers in Pass 2</u>
Within each RHP, Performing Providers may combine their individual Pass 2 DSRIP allocations to fund a DSRIP project that is a priority for the RHP if there is a signed agreement between the affected parties submitted with the RHP Plan stating that the transaction is entered into freely and that it benefits regional transformation. No Performing Provider is required to combine its individual DSRIP allocation.

iv. If there are unused funds after Pass 2, the Anchoring Entity may collaborate with RHP Performing Providers to determine which additional DSRIP projects to include in the RHP Plan.

e. <u>Project Valuation</u>
RHP Plans shall include a narrative that describes the approach used for valuing projects and rationale to support the approach. At a minimum, Performing Providers shall ensure that upon initial submission of the RHP Plan and individual three-year projects, project values comport with the following funding distribution across Categories 1-4 in DYs 2-5. Projects valued at the maximum levels described in paragraph 12.e are expected to support meaningful, large-scale delivery system transformation and must provide sufficient justification of the project value in the RHP Plan.

In addition, if an IGT entity does not elect to transfer additional IGT funds to provide a portion of the nonfederal share of the administrative costs related to waiver monitoring activities, as described in paragraph 23, the state may lower a provider's valuation. The state may lower the valuation by an amount necessary to equal the associated IGT entity's share of the expected funds for waiver monitoring activities described in paragraph 23.

**Hospital Performing Providers:  DSRIP Category Funding Distribution**

|  | DY 2 | DY 3 | DY 4 | DY 5 |
|---|---|---|---|---|
| **Category 1 & 2** | No more than 85% | No more than 80% | No more than 75% | No more than 57% |
| **Category 3** | At least 10% | At least 10% | At least 15% | At least 33% |
| **Category 4\*** | 5% | 10 - 15% | 10 - 15% | 10 - 15% |

*Hospital providers defined in paragraph 11.f, Section III "Key Elements of Proposed RHP Plans" that elect not to report Category 4 measures shall allocate Category 4 funding to Categories 1 & 2 or 3.

**Non-Hospital Performing Providers:  DSRIP Category Funding Distribution**

|  | **DY 2** | **DY 3** | **DY 4** | **DY 5** |
|---|---|---|---|---|
| **Category 1 & 2** | 95% to 100% | No more than 90% | No more than 90% | No more than 80% |
| **Category 3*** | 0% to 5% | At least 10% | At least 10% | At least 20% |

*Non-hospital Performing Providers are expected to allocate funds for Category 3 in the RHP Plan submission and may submit plan modifications in DY 2 with specific Category 3 outcomes to be eligible for the funding in DYs 3-5.

f. Milestone Valuation
   With respect to Categories 1, 2, and 4, milestones for a project within a demonstration year shall be valued equally. For Category 3, milestones for a project within a demonstration year from DY 3-5 shall be valued equally (within the limits for pay for reporting and pay for performance and other parameters described in paragraph 32 below).

**31. Payment Based on Achievement of Milestone Bundles in Categories 1, 2, and 4**

a. Definition
   With respect to Categories 1-2, a milestone bundle is the compilation of milestones and related metrics associated with a project in a given year. A milestone may have more than one annual metric associated with it. Two or more metrics associated with a milestone shall be assigned equal weighted value for the purpose of calculating incentive payments. With respect to Category 4, a milestone bundle is the compilation of reporting measures within a Category 4 domain. A Category 4 reporting measure within a domain shall be considered a milestone for the purpose of this section and all measures within a domain shall be weighted equally for the purpose of calculating incentive payments.

b. Basis for Calculating Incentive Payment for Categories 1-2
   Incentive payments are calculated separately for each project in Categories 1 and 2.The amount of the incentive funding paid to a Performing Provider will be based on the amount of progress made within each specific milestone bundle. For each milestone within the bundle, the Performing Provider will include in the RHP semi-annual report the progress made in completing each metric associated with the milestone. A Performing Provider must fully achieve a Category 1 or 2 metric to include it in the incentive payment calculation.

   Based on the progress reported, each milestone will be categorized as follows to determine the total achievement value for the milestone bundle:
   - Full achievement (achievement value = 1)
   - At least 75 percent achievement (achievement value = .75)
   - At least 50 percent achievement (achievement value = .5)
   - At least 25 percent achievement (achievement value = .25)
   - Less than 25 percent achievement (achievement value = 0)

   The achievement values for each milestone in the bundle will be summed together to determine the total achievement value for the milestone bundle. The Performing Provider is then eligible to receive an amount of incentive funding for that milestone bundle determined

by multiplying the total amount of funding related to that bundle by the result of dividing the reported achievement value by the total possible achievement value. If a Performing Provider has previously reported progress in a bundle and received partial funding, only the additional amount it is eligible for will be disbursed. HHSC may determine milestones that qualify for partial achievement. (See example below of disbursement calculation).

*Example of disbursement calculation:*

A Category 1 Project in DY 2 is valued at $30 million and has 5 milestones, which make up the Milestone Bundle. Under the payment formula, the 5 milestones represent a maximum achievement value of 5.

The hospital Performing Provider reports the following progress at 6 months:
Milestone 1: 100 percent achievement (achievement value = 1)
- Metric 1: Fully achieved
- Metric 2: Fully achieved

Milestone 2: 66.7% percent achievement (Achievement value = .5)
- Metric 1: Fully achieved
- Metric 2: Fully achieved
- Metric 3: Not Achieved

Milestone 3: 0 percent achievement (Achievement value = 0)
Metric 1: Not Achieved

Milestone 4: 50 percent achievement (Achievement value = .5)
- Metric 1: Fully Achieved
- Metric 2: Not Achieved

Milestone 5: 40 percent achievement (Achievement value = .25)
- Metric 1: Fully achieved
- Metric 2: Fully Achieved
- Metric 3: Not Achieved
- Metric 4: Not Achieved
- Metric 5: Not Achieved

Total achievement value at 6 months = 2.25
Disbursement at 6 months = $30M x (2.25/5) = $13.5 million

By the end of the Demonstration Year, the hospital Performing Provider successfully completes all of the remaining metrics for the project. The hospital is eligible to receive the balance of incentive payments related to the project:

Disbursement at 12 months is $30 million - $13.5 million = $16.5 million.

c. <u>Basis for Calculating Incentive Payment for Category 4</u>

    i. <u>DY 2 Incentive Payments</u>

In DY 2, a hospital Performing Provider participating in Category 4 reporting shall be eligible to receive an incentive payment equal to 5 percent of its total allocation amount in DY 2 upon submission to HHSC of a status report that describes the system changes the hospital is putting in place to prepare to successfully report Category 4 measures in DYs 3-5.

ii. DYs 3-5 Incentive Payments
The amount of the incentive funding paid to a hospital Performing Provider will be based on the amount of progress made in successfully reporting all measures included in a domain. A hospital must complete reporting on **all** Category 4 measures included in a domain prior to requesting incentive payments. Hospitals shall report progress on completing measure reporting in the semi-annual reports.

*Example of disbursement calculation:*

A Category 4 Domain includes 5 reporting measures. The hospital Performing Provider completes reports on two measures by March 31 (or by the 6th month of the DY). The hospital reports this achievement in the first semi-annual report; however, an incentive payment is not made because 3 other measures in the domain remaining outstanding. By the 12th month of the DY, the hospital has successfully reported on the remaining 3 measures. At that point, the hospital may request and receive a full incentive payment for the entire domain of measures. If a hospital fails to report on a single measure in a domain, it will forfeit the entire payment for the domain in question.

## 32. Basis for Payment in Category 3

d. Valuation of Category 3 Outcomes
In February 2014, CMS and HHSC agreed to a revised Category 3 framework, including a revised list of Category 3 outcome options and a standard target setting methodology to be used to measure outcome improvement in DY 4 and DY 5.

The revised RHP Planning Protocol classifies Category 3 outcomes either as pay for performance (P4P) or pay for reporting (P4R). The number and type of milestones for each outcome in DY4 and DY 5 depends on whether the outcome is P4P or P4R, and in DY 5 Performing Providers with P4R measures also are required to report on a population-focused priority measure or stretch activity. See the RHP Planning Protocol for further details on the revisions to Category 3.

In the initial RHP Plan submission, a Performing Provider had flexibility to assign different values to its Category 3 outcomes and related milestones, as long as total payments met the annual category allocation amounts defined in 29.e above and the valuations were sufficiently justified.

**Attachment J**
**Program Funding and Mechanics Protocol**

Based on the updated Category 3 outcomes and framework in the RHP Planning Protocol, in March 2014 providers will re-select or verify their Category 3 outcome(s) for each Category 1 or 2 project. Category 3 valuation for DY 3-5 will be determined as follows:

    i.    HHSC will total all the funds the provider allocated to Category 3 each DY for DY 3, 4, and 5.

    ii.    HHSC will total the provider's Category 1 and 2 DSRIP projects, including both approved four-year projects and proposed three-year projects.

    iii.    Each provider will decide what percentage of its Category 3 funds will go toward a given Category 1 or 2 project. This percentage must be the same for DY 3-5. When determining the percentage of Category 3 funds related to each Category 1 or 2 project, a Performing Provider must allocate a minimum percentage to each Category 1 or 2 project. The minimum percentage is calculated as follows:

        1. Divide the total number of Category 1 and 2 DSRIP projects into 100. This is the average percentage of total Category 3 funding that would relate to each Category 1 or 2 project.

        2. Multiply the average percentage from 1 above by 25%.

        3. The product in 2 above is the minimum percentage of Category 3 funds that can be allocated to a Category 3 outcome related to a Category 1 or 2 project.

        4. HHSC may grant exceptions to a provider's minimum required percentage allocation per Category 1 or 2 project if needed for a provider to retain Category 3 valuation proportional to its Category 1 and 2 valuation. This would occur in cases where the valuation of a provider's Category 1 and 2 projects varies widely (e.g. one $7 million project and one $200,000 project).

Example of Category 3 Valuation Allocation Methodology with 5 Category 1 and 2 Projects

| | DY 3 | DY4 | DY5 |
|---|---|---|---|
| Project 1.1 | 30% | 30% | 30% |
| Project 1.2 | 25% | 25% | 25% |
| Project 1.3 | 35% | 35% | 35% |
| Project 2.1 | 5% | 5% | 5% |
| Project 2.2 | 5% | 5% | 5% |

    iv.    Once a provider decides the percentage of its funds to allocate to a given Category 1 or 2 project for DY 3-5, based on the number of outcome measures the provider selects for that Category 1 or 2 project, HHSC will allocate an equal amount of Category 3 funds to each outcome, and also to each milestone for that outcome in a given demonstration year.

    v.    If one or more of a Performing Provider's proposed three-year DSRIP projects do not get approved, HHSC will adjust the Category 3 valuations of its projects based on the above methodology.

    vi.    The Category 3 funding breakdown in DY 3-5 is as follows:

| P4P Category 3 Outcomes | P4R Category 3 Outcomes |
|---|---|

| | | (need prior authorization) |
|---|---|---|
| **DY3** | 50 percent status report / 50 percent establish baseline (both process milestones) | 50 percent status report / 50 percent establish baseline (both process milestones) |
| **DY 4** | 50 percent P4R (process milestone) / 50 percent P4P (achievement milestone) | 100 percent P4R on outcome (process milestone) |
| **DY 5** | 100 percent P4P (achievement milestone) | 50 percent P4R on outcome (process milestone) 50 percent P4P on population-focused priority measure (achievement milestone) or stretch activity (process milestone) |

Example 1 - P4P Outcomes

A provider allocates to its 1.1 project 30% of its total Category 3 valuation, which equals $1 million in DY 3, $2 million in DY 4, and $4 million in DY5. The provider selects two pay for performance outcomes associated with its 1.1 project. Funding distribution:

| | DY 3 | DY 4 | DY 5 |
|---|---|---|---|
| P4P Outcome 1 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (50% for reporting to specifications and 50% for improving on the outcome) | $2 million (100% for improving on the outcome) |
| P4P Outcome 2 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (50% for reporting to specifications and 50% for improving on the outcome) | $2 million (100% for improving on the outcome) |

Example 2 - P4R Outcomes

A provider allocates to its 1.1 project 30% of its total Category 3 valuation, which equals $1 million in DY 3, $2 million in DY 4, and $4 million in DY5. The provider selects two pay for reporting outcomes associated with its 1.1 project. Funding distribution:

| | DY 3 | DY 4 | DY 5 |
|---|---|---|---|
| P4R Outcome 1 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (100% for reporting to specifications) | $2 million (50% for reporting to specifications and 50% for |

| | | | improvement on population health measure or stretch activity) |
|---|---|---|---|
| P4R Outcome 2 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (100% for reporting to specifications) | $2 million (50% for reporting to specifications and 50% for improvement on population health measure or stretch activity) |

e. Process Milestones/Metrics
A Performing Provider must fully achieve metrics associated with the process milestones to qualify for a DSRIP payment related to these milestones.

f. Achievement Milestones
Performing Providers may receive partial payment for making progress towards, but not fully achieving, an achievement milestone. The partial payment would equal 25 percent, 50 percent, or 75 percent of the achievement value of that milestone. Based on the progress reported, each achievement milestone will be categorized as follows to determine the total achievement value percentage:
- Full achievement (achievement value = 1)
- At least 75 percent achievement (achievement value = .75)
- At least 50 percent achievement (achievement value = .5)
- At least 25 percent achievement (achievement value = .25)
- Less than 25 percent achievement (achievement value = 0)

*Example of disbursement calculation*:

A hospital Performing Provider has set an achievement target that would decrease potentially preventable readmissions for a target population with a chronic condition by 5 percent in DY 4 and by 10 percent in DY 5.

In DY 4, the Performing Provider achieved a 2.5 percent reduction in PPR, short of its goal. Under the partial payment policy, the provider would be reimbursed 50 percent of the incentive payment associated with this achievement milestone because it achieved 50 percent of the target. The Performing provider may earn the remaining DY 4 incentive payment for the achievement milestone in the following year (DY 5) under the carry-forward policy outlined in Section VIII: "Carry-forward and Penalties for Missed Milestones."

# VII. PLAN MODIFICATIONS

Consistent with the recognized need to provide RHPs with flexibility to modify their plans over time and take into account evidence and learning from their own experience over time, as well as for unforeseen circumstances or other good cause, an RHP may request prospective changes to its RHP Plan through a plan modification process.

## 33. Plan Modification Process

An RHP may request modifications to an RHP Plan under the following circumstances:

a. Adding New Projects for Demonstration Year 3
   An RHP may amend its plan to include new projects financed by either new or existing IGT Entities that are implemented by either existing and/or new Performing Providers. These projects shall be 3 years in duration, beginning in Demonstration Year 3. Projects added for DY 3 may be selected from Categories 1, 2, or 3 of Attachment I, "RHP Planning Protocol" and are subject to all requirements described herein and in the STCs. Newly added hospital Performing Providers shall be required to report Category 4 measures according to Section III "Key Elements of Proposed RHP Plans". HHSC and CMS will review three year projects according to the process described in paragraph 18.

b. Deleting or Terminating an Existing Project
   An RHP may request to delete or terminate a project from its RHP plan and forgo replacing it if the RHP continues to meet the minimum project number requirements outlined in Section III "Key Elements of Proposed RHP Plans" and the loss of the project does not jeopardize or dilute the remaining delivery system reforms pursued in the plan. An RHP may not redistribute incentive funding from the deleted project to other existing projects; unless the project is replaced in accordance with subparagraph a. above, the affected Performing Provider and RHP shall forfeit DSRIP allocation associated with the deleted project. The forfeited DSRIP allocation may be available for redistribution to RHPs in accordance with Section VI "Disbursement of DSRIP Funds".

   If a project is terminated prior to the mid-point assessment, HHSC will recoup prior DSRIP payments for that project and return the associated federal share of the payments to CMS.

   A Performing Provider will receive some period of time after the mid-point assessment to determine if a DSRIP project will continue for the remainder of the demonstration. Specifically, if the Performing Provider withdraws after the mid-point assessment but before DY 4 payments are made, no prior DSRIP payments will be recouped.

   If a DSRIP project is terminated after the post mid-point assessment consideration period, then HHSC will recoup all DSRIP payments made after the mid-point assessment and return the associated federal share of the payments to CMS.

c. Modifying Existing Projects

RHPs may submit requests to HHSC to modify elements of an existing project prospectively, including changes to milestones and metrics with good cause. Such requests must be submitted to HHSC 90 days prior to when the changes go into effect according to the standardized timeline agreed to by the state and CMS. Performing providers have opportunities to submit plan modification requests in December 2013 (for DY 3-5) and July 2014 (for DY 4-5). The final opportunity to submit plan modification requests for DY 4 will align with the timing of the mid-point assessment. There will be a final opportunity during DY 4 to submit plan modification requests for DY 5 only for Category 3 changes and for three-year projects.

d. Plan Modification Review and Approval Process

Plan modifications must be submitted in writing to HHSC; HHSC shall take action on the plan modification request using a CMS-approved approach, criteria, and checklist. HHSC will notify providers in writing of any questions or concerns identified. Once the projects are determined by HHSC to meet the CMS-approved criteria, the plan modifications will be approved and HHSC will notify CMS. Substantial reductions in project scope (such as reductions to quantifiable patient impact, as well as significant changes in the hiring of staff and completion of core components) will be subject to a secondary review and ongoing compliance monitoring by the independent assessor. If the independent assessor disagrees with HHSC's assessment to approve a plan modification, CMS will have an opportunity to review the plan modification and request a re-review by HHSC.

# VIII.   CARRY-FORWARD AND PENALTIES FOR MISSED MILESTONES

## 34. Carry-forward Policy

If a Performing Provider does not fully achieve a milestone bundle in Categories 1 or 2, or a Category 3 process milestone or achievement milestone that was specified in its RHP Plan for completion in a particular demonstration year, it will be able to carry forward the available incentive funding associated with the milestone until the end of the following demonstration year during which the Performing Provider may complete the milestone and receive full payment. Incentive funding that is carried forward still remains associated with the original demonstration year for all accounting purposes (including calculation of the annual DSRIP payment limits). Carried forward DSRIP funding is subject to all Medicaid claiming requirements and may be paid no later than two years after the end of a demonstration year in which it was to have been completed (e.g., for DY 2, which ends September 30, 2013, payments may be made no later than September 30, 2015). Although authority for DSRIP funding expires September 30, 2016, DSRIP payment may be claimed after this point, subject to the carry-forward provisions in this section. To effectuate carry-forward policy, a Performing Provider shall provide narrative description on the status of the missed milestones and outline the provider's plan to achieve the missed milestones by the end of the of the following demonstration year.

## 35. Penalties for Missed Milestones

If a Performing Provider does not complete the missed milestone bundle or measure during the 12-month carry-forward period or the reporting year with respect to Category 4, funding for the incentive payment shall be forfeited and no longer available for use in the DSRIP program.

# IX. DATA QUALITY ASSURANCE

### 36. Data validation and alignment with managed care

Data and metrics that form the basis of incentive payments in DSRIP should have a high degree of accuracy and validity. The state must require that each Performing Provider certify that data received to demonstrate DSRIP achievement is accurate and complete. Data accuracy and validity also will be subject to review by the independent assessor.

Consistent with the requirements of STC 27, the state will update its comprehensive quality strategy and include in its annual report to CMS opportunities to better standardize quality measurement between DSRIP and the state's Medicaid managed care programs in order to reduce administrative burden and ensure greater validity and reliability for performance measures.

# X. TRANSITION YEAR (DY6)

### 37. Definitions

a. Demonstration Year (DY) 6 - The initial 15-month period of time, as approved by the Centers for Medicare & Medicaid Services (CMS), for which the waiver is extended beyond the initial demonstration period, or October 1, 2016 - December 31, 2017.

    i. Demonstration Year (DY) 6A - Federal fiscal year (FFY) 2017, or the first 12 months of DY6 (October 1, 2016 - September 30, 2017).

    ii. Demonstration Year (DY) 6B - The last three months of DY6 (October 1, 2017 - December 31, 2017).

b. Extension period - The entire period of time, as approved by the Centers for Medicare & Medicaid Services (CMS), for which the waiver is extended beyond the initial demonstration period.

c. Initial demonstration period - The first five demonstration years (DYs) of the waiver, or December 12, 2011 through September 30, 2016.

d. Medicaid and Low-income or Uninsured (MLIU) – MLIU is changed from Medicaid/ Low-income uninsured in the initial demonstration period to Medicaid and low-income or uninsured in the applicable DY.

    i. To qualify as a Medicaid individual for purposes of MLIU Quantifiable Patient Impact (QPI), the individual must be enrolled in Medicaid at the time of at least one DSRIP project encounter during the applicable DY.

    ii. To qualify as a low-income or uninsured individual for purposes of MLIU QPI, the individual must either be below 200 percent of the federal poverty level (FPL) or must not have health insurance at the time of at least one DSRIP project encounter during the applicable DY.

    iii. If an individual was enrolled in Medicaid at the time of one DSRIP project encounter during the applicable DY, and was low-income or uninsured at the time of a separate DSRIP project encounter during the applicable DY, that individual is classified as a Medicaid individual for purposes of MLIU QPI.

e. Medicaid and Low-income or Uninsured (MLIU) Quantifiable Patient Impact (QPI) – The number of MLIU individuals served, or encounters provided to MLIU individuals, in accordance with paragraph 41(a)(iii), during an applicable DY that are attributable to the DSRIP project.

f. Medicaid and Low-income or Uninsured (MLIU) Quantifiable Patient Impact (QPI) Goal – The number of MLIU individuals that a Performing Provider intends to serve, or the number of MLIU encounters that a Performing Provider intends to provide, in accordance with paragraph 41(a)(iii), during an applicable DY that are attributable to the DSRIP project.

g. Quantifiable Patient Impact (QPI) Grouping – The category of the QPI measurement. The category may be either individuals served or encounters provided.

h. Pre-DSRIP Baseline - The service volume prior to the implementation of a DSRIP project, as measured by the number of individuals served or encounters provided during the 12-month period preceding the implementation of the DSRIP project. There is a pre-DSRIP baseline for total QPI and a pre-DSRIP baseline for MLIU QPI. For a DSRIP project that is a new intervention, both the pre-DSRIP baseline for total QPI and the pre-DSRIP baseline for MLIU QPI are zero.

i. Total Quantifiable Patient Impact (QPI) – The total number of individuals served or encounters provided, in accordance with paragraph 41(a)(ii), during an applicable DY that are attributable to the DSRIP project.

j. Total Quantifiable Patient Impact (QPI) Goal – The total number of individuals that a Performing Provider intends to serve, or the total number of encounters that a Performing Provider intends to provide, in accordance with paragraph 41(a)(ii), during an applicable DY that are attributable to the DSRIP project.

k.  Uncompensated Care (UC) Only Hospital – A hospital eligible to be a Performing Provider that is not a Performing Provider but receives UC payments.

## 38. DY6 DSRIP Pool Allocation

a.  The DSRIP pool allocation for DY6 is $3.875 billion.

  i.  $3.1 billion of the DSRIP pool allocation for DY6 is allocated to DY6A.
  ii.  $775 million of the DSRIP pool allocation for DY6 is allocated to DY6B.

b.  The $775 million allocated to DY6B will be combined with any DSRIP pool funds agreed to for DY7.

c.  Performing Providers' values must comport with the following funding distributions across Categories 1-4 in DY6A.

### Hospital Performing Providers:  DSRIP Category Funding Distribution*

|  | DY 2 | DY 3 | DY 4 | DY 5 | DY 6A |
|---|---|---|---|---|---|
| **Category 1 & 2** | No more than 85% | No more than 80% | No more than 75% | No more than 57% | No more than 57% |
| **Category 3** | At least 10% | At least 10% | At least 15% | At least 33% | At least 33% |
| **Category 4** | 5% | 10 - 15% | 10 - 15% | 10 - 15% | No more than 10% |

*Hospital Performing Providers defined in paragraph 11.f, Section III "Key Elements of Proposed RHP Plans" that elected not to report Category 4 measures during the initial demonstration period allocated Category 4 funding to Categories 1 & 2 or 3.  Consequently, the percentage of these Performing Providers' funding that is allocated to Categories 1 & 2 may exceed the maximum threshold of 57 percent up to 67 percent.  Also, if the Performing Provider met the 57 percent threshold at the time of initial RHP plan submission, but later exceeded it due to HHSC and CMS approval of a three-year project or withdrawal of Category 4 Reporting Domain 6, Categories 1 & 2 may be allocated no more than 62 percent of the DSRIP funds allocated to the Performing Provider.

### Non-Hospital Performing Providers:  DSRIP Category Funding Distribution

|  | DY 2 | DY 3 | DY 4 | DY 5 | DY 6A |
|---|---|---|---|---|---|
| **Category 1 & 2** | 95% to 100% | No more than 90% | No more than 90% | No more than 80% | No more than 80% |
| **Category 3** | 0% to 5% | At least 10% | At least 10% | At least 20% | At least 20% |

**39. Current DSRIP Projects Eligible to Continue**

a. A Performing Provider's total value for DY6A is equal to its total value for DY5 with the following exceptions:

    i. HHSC notified a Performing Provider in January 2016 that a DSRIP project's value may be reduced if the DSRIP project fails to complete DSRIP project or metric goals by the end of DY5; or

    ii. Performing Providers with a total value less than $250,000 for DY5 may increase their total value to up to $250,000 per each subsequent DY beginning in DY6. The increase in value is contingent on funds availability as described in paragraph 44. Categories 1-4 will each be increased proportionately. However, any funds in excess of the 10 percent maximum for Category 4 will be allocated to Category 3. A Performing Provider may need to increase a DSRIP project's MLIU QPI goal for DY6A and beyond in order to obtain the increased value. Performing Providers eligible for this option must make this choice by a date to be determined by HHSC.

b. For each DSRIP project that HHSC determines is eligible to continue, the Performing Provider must indicate to HHSC, by a date to be determined by HHSC, whether it chooses to: 1) discontinue the DSRIP project in DY6; or 2) continue the DSRIP project in DY6.

    i. If a Performing Provider indicates to HHSC, by a date to be determined by HHSC, that it chooses to discontinue the DSRIP project in DY6, the Performing Provider may not propose any new DSRIP projects for the entirety of the extension period with funds associated with the discontinued DSRIP project.

    ii. If a Performing Provider indicates to HHSC, by a date to be determined by HHSC, that it chooses to continue the DSRIP project in DY6, the Performing Provider must indicate to HHSC, by a date to be determined by HHSC, whether it chooses to: 1) continue the DSRIP project for the remainder of the extension period; or 2) replace the DSRIP project with a new DSRIP project to commence no sooner than the beginning of DY6B.

c. If a DSRIP project is withdrawn prior to the second payment period for DY7, HHSC will recoup all prior extension period DSRIP payments associated with the DSRIP project.

d. If a DSRIP project is withdrawn after the second payment period for DY7, but before the first reporting period for DY8, no prior extension period DSRIP payments associated with the DSRIP project will be recouped due to withdrawal.

e. If a DSRIP project is withdrawn after the first reporting period for DY8, any DSRIP payments made after that period will be recouped.

f. The DY5 intergovernmental transfer (IGT) process, payment calculations, and monitoring IGT are maintained in the extension period. IGT entities from DY5 will continue to provide

funding for the extension period unless a Performing Provider submits changes during a reporting period. No new certifications (RHP Plan Section VI) are required for continuing RHP participants.

g. If a Performing Provider participated in Category 4 in DY5, the Performing Provider will continue to participate in Category 4 in DY6A. The Performing Provider's Category 4 value for DY6A will be equal to the Performing Provider's Category 4 value for DY5, unless the Performing Provider's DY5 Category 4 value is greater than 10 percent of the Performing Provider's total DY5 value. In this case, the Performing Provider's DY6A Category 4 value will be reduced to 10 percent of the Performing Provider's total DY5 value, and the funds above the 10 percent threshold will be allocated to Category 3 in DY6A.

## 40. Current DSRIP Projects Ineligible to Continue

a. If HHSC determines that a DSRIP project is ineligible to continue in its current form, that DSRIP project may not participate in the extension period. A Performing Provider affected by such a determination will have the opportunity to use the funds associated with the DSRIP project beginning in DY6B, subject to DY6B-DY10 requirements.

## 41. Requirements for Continuing DSRIP Projects

a. <u>Category 1 and 2 Requirements for DY6A</u>

    i. Each DSRIP project must have the following four milestones in DY6A:
        A. A total QPI milestone valued at 25% of each DSRIP project's Category 1 or 2 value;
        B. A MLIU QPI milestone valued at 25% of each DSRIP project's Category 1 or 2 value;
        C. A core component reporting milestone valued at 25% of each DSRIP project's Category 1 or 2 value; and
        D. A sustainability planning milestone valued at 25% of each DSRIP project's Category 1 or 2 value.

    ii. *Total QPI Milestone*
        A. HHSC will convert each total QPI metric to a total QPI milestone with standardized language in DY6A. However, if a DSRIP project has multiple QPI metrics in DY5, that project may be exempted from this conversion, based on criteria determined by HHSC and CMS.
        B. The DY6A total QPI goal is equal to the DY5 total QPI goal. However, certain DSRIP projects are eligible for an adjustment to the DSRIP project's DY6A total QPI goal as identified by HHSC.
        C. DSRIP projects must retain the same QPI grouping from the initial demonstration period in DY6A for total QPI.

    D. DSRIP projects must retain the same pre-DSRIP baseline from the initial demonstration period in DY6A for total QPI. If multiple metrics are combined to form one total QPI milestone, the pre-DSRIP baselines will also be combined.

    E. DSRIP projects may carry forward total QPI milestones from DY6A to DY6B and DY7.

iii. *MLIU QPI Milestone*

    A. Beginning in DY6A, there is a standardized MLIU QPI milestone.

    B. For DSRIP projects that have an MLIU QPI requirement in DY5:

        1. The DY6A MLIU QPI goal is equal to the DY5 MLIU QPI goal. If, based on HHSC's determination pursuant to paragraph 41(a)(ii)(B), the DY6A total QPI goal is changed, the DY6A MLIU QPI goal will also be changed in proportion to the DY6A total QPI goal.

        2. If the DSRIP project has an MLIU QPI metric in DY5, it retains the same pre-DSRIP baseline for MLIU QPI in DY6A used in the initial demonstration period.

        3. If the DSRIP project does not have an MLIU QPI metric in DY5, the pre-DSRIP baseline for MLIU QPI in DY6A is equal to the pre-DSRIP baseline for total QPI multiplied by the earliest MLIU percentage goal on record with HHSC. For example, if a project's pre-DSRIP baseline for total QPI is 100 individuals, and the DY3 MLIU percentage target was 20%, the pre-DSRIP baseline for total QPI in DY6A would be 100, and the pre-DSRIP baseline for MLIU QPI in DY6A would be 20.

        4. The MLIU QPI milestone must be pay-for-performance (P4P).

**Example:**

| | Goal | Pre-DSRIP baseline | QPI Numeric Goal | MLIU Numeric Goal |
|---|---|---|---|---|
| **DY3 QPI milestone and MLIU % goal** (first year of QPI) | Serve 40 additional patients in the expanded clinic (individuals) in DY3. **80%** Medicaid/Low Income Uninsured | 220 | 40 | While there was no MLIU goal for payment purposes, 40*.80 = 32 |
| **DY5 QPI milestone and MLIU % goal** | Serve 50 additional patients in the expanded clinic (individuals) in DY5. 90% Medicaid/Low Income Uninsured | 220 | 50 | While there was no MLIU goal for payment purposes, 50*.90 = **45** |
| **DY6A Total QPI milestone** | Serve 50 additional patients in the expanded clinic (individuals). | 220 | 50 | NA |
| **DY6A MLIU QPI milestone** | Serve 45 MLIU patients (individuals). | 220*.**80**=176 | NA | **45** |

C. For DSRIP projects that do not have an MLIU QPI requirement in DY5:

1. The DY6A MLIU QPI goal is equal to the DY5 MLIU percentage goal multiplied by the DY5 total QPI goal, or as indicated in the DY5 goal language.  If, based on HHSC's determination pursuant to paragraph 41(a)(ii)(B), the DY6A total QPI goal is changed, the DY6A MLIU QPI goal will also be changed in proportion to the DY6A total QPI goal.

2. The pre-DSRIP baseline for MLIU QPI in DY6A is equal to the pre-DSRIP baseline for total QPI in DY6A multiplied by the earliest MLIU percentage goal on record with HHSC.  For example, if a project's pre-DSRIP baseline for total QPI in DY6A is 100 individuals, and the DY3 MLIU percentage target was 20%, the pre-DSRIP baseline for total QPI in DY6A would be 100, and the pre-DSRIP baseline for MLIU QPI in DY6A would be 20.

3. Although all DSRIP projects must have a DY6A MLIU QPI goal, DSRIP projects under paragraph 41(a)(iii)(C), with the exception of projects subject to paragraph 41(a)(iii)(C)(4), has a DY6A MLIU QPI milestone that is pay-for-reporting (P4R).  This means that the Performing Provider is eligible to receive payment for the project's

DY6A MLIU QPI milestone by reporting their actual DY6A MLIU QPI achievement, regardless of whether they achieved the DY6A MLIU QPI goal.

4. HHSC may determine that some of these DSRIP projects must have an DY6A MLIU QPI milestone that is P4P, meaning that the Performing Provider must demonstrate achievement of the project's DY6A MLIU QPI goal in order to receive payment for the DY6A MLIU QPI milestone. These DSRIP projects include the following:

    a) All Project Area 1.9 DSRIP projects, as described by the RHP Planning Protocol;

    b) DSRIP projects that did not achieve the estimated MLIU percentage in DY3, DY4, or DY5, and that caused them to have a higher than expected value per MLIU individual/ encounter;

    c) DSRIP projects for which HHSC notified the Performing Provider that the project was eligible to continue with changes, but the project's MLIU QPI milestone must be P4P; and

    d) DSRIP projects that included an MLIU goal in their QPI metric Baseline/Goal statement of their own choosing or that were required to address MLIU to receive CMS initial DSRIP project approval.

D. Certain DSRIP projects are eligible for an adjustment to the DSRIP project's DY6 MLIU QPI goal. These DSRIP projects include:

1. A DSRIP project that HHSC identifies as underperforming on MLIU estimates in the initial demonstration period;

2. A DSRIP project that is reporting on individuals or encounters that meet the MLIU definition for the initial demonstration period, but will not meet the MLIU definition for the extension period; and

3. Any other DSRIP project that HHSC determines has a strong justification for an adjustment.

E. Performing Providers of a DSRIP project described in paragraph 41(a)(iii)(D) may, by a date to be determined by HHSC, request an adjustment to the DSRIP project's DY6A MLIU QPI goal.

F. In DY6A, DSRIP projects must retain the same total QPI grouping from the initial demonstration period for MLIU QPI.

G. DSRIP projects may carry forward MLIU QPI milestones from DY6A to DY6B and DY7.

H. To be eligible for the MLIU QPI milestone payment, beginning in DY6A, Performing Providers must report for each DSRIP project the MLIU individuals served or MLIU encounters provided at the individual or encounter level as opposed to the percentage of total QPI.

1. There are limited exceptions to this requirement. Performing Providers may request an exception to this requirement by a date to be determined by HHSC. DSRIP projects eligible for an exception include:

       a) A DSRIP project for which the Performing Provider did not assess the DSRIP project participants' health insurance coverage or financial status prior to September 30, 2015, and instead used a proxy to estimate the MLIU population served in their October DY4 QPI Reporting Template, and:

          1) Utilizes an intervention site that is a school, non-medical social service office (i.e., shelter), or community health fair;

          2) Is in Project Area 1.6 (Enhance Urgent Medical Advice), 2.6 (Implement Evidence-based Health Promotion), or 2.7 (Implement Evidence-based Disease Prevention Programs) as described by the RHP Planning Protocol; or

          3) The Performing Provider is a Local Health Department that does not bill Medicaid for the types of services provided through the DSRIP project; or

       b) Any other DSRIP project that HHSC determines has a strong justification for an exception.

    iv. *Non-QPI Milestones*

      A. DSRIP projects must include the following non-QPI milestones in DY6A:

        1. Core component reporting, which may include continuous quality improvement (CQI); and

        2. Sustainability planning, which may include:

          a) Activities toward furthering the exchange of health information, integration into managed care, or collaboration with other community partners; and/ or

          b) A project-level evaluation.

        Performing Providers must report on their activities for these milestones in order to be eligible for milestone payment.

      B. DSRIP projects may report on DY6A non-QPI milestones only during the second reporting period of DY6A, and may not carry forward non-QPI milestones from DY6A to DY6B or DY7.

b. <u>Category 3 Requirements for DY6A</u>

    i. The Category 3 outcome values for DY6A are equal to the Category 3 outcome values for DY5.

      A. However, if a Performing Provider's Category 4 value is greater than 10 percent of the Performing Provider's total value, the funds in excess of the 10 percent will be redistributed to Category 3 outcomes proportionately.

    ii. If a Category 3 outcome is designated as pay-for-performance (P4P) in DY5, 100 percent of the Category 3 outcome's value in DY6A is P4P.

    iii. If a Category 3 outcome is designated as pay-for-reporting (P4R) or maintenance (outcomes designated as maintenance were high performing at baseline with no reasonable room for improvement and have been approved to use a milestone

structure that includes an alternate improvement activity) with a population focused priority measure (PFPM) in DY5, 100 percent of the Category 3 outcome's value in DY6A is P4P of the PFPM.

   iv.   If a Category 3 outcome is designated as P4R with an associated stretch activity in DY5, the Performing Provider must choose one of the following options by a date determined by HHSC in a form determined by HHSC:

      A.  The Performing Provider may maintain the Category 3 outcome designated as P4R from DY5 and select a new stretch activity that does not duplicate the DY5 stretch activity.

         1.  If the Performing Provider chooses this option, the Performing Provider must select a stretch activity from the following:

            a)  Program evaluation (Alternate approaches to program and outcome linkages).

            b)  New participation in Health Information Exchange (HIE), or improvement of existing HIE structure.

            c)  Cost analysis and value-based purchasing planning.

         2.  If the Performing Provider chooses this option, 50 percent of the Category 3 outcome's value is P4R of the Category 3 outcome, and 50 percent is for completion of the stretch activity.

      B.  The Performing Provider may select a PFPM to replace the Category 3 outcome designated as P4R. If a Performing Provider chooses this option, 100 percent of the Category 3 outcome's value is P4P of the newly selected PFPM.

   v.   If a Category 3 outcome is designated as maintenance with an associated stretch activity in DY5, 100 percent of the Category 3 outcome's value in DY6A is for statistically significant maintenance of the approved baseline rate.

   vi.   For Category 3 P4P outcomes, DY6A goals will be set as an improvement over the baseline approved in DYs 3-5 to be achieved in performance year (PY) 3, or PY4 if not fully achieved in PY3. PY3 is the 12-month period immediately following the PY2 approved for use in DYs 3-5, or Performing Providers may request, by a date to be determined by HHSC, to use DY6A as PY3. PY4 is the 12-month period immediately following the selected PY3.

      A.  For Category 3 outcomes designated as Quality Improvement System for Managed Care (QISMC) with a baseline between the High Performance Level (HPL) and Minimum Performance Level (MPL), PY3 goals will be set as a 25 percent gap closure towards the HPL used for goal setting in DYs 3-5, or with a minimum improvement floor for outcomes with a baseline close to the HPL. For outcomes with a baseline below the MPL, PY3 goals will be a 15% gap closure between the MPL and the HPL.

      B.  For outcomes designated as improvement over self (IOS) in DY5, DY6A goals will be set as a 12.5 percent gap closure towards perfect over baseline.

      C.  HHSC will develop an alternate DY6A goal-setting methodology for outcomes designated as IOS - Survey.

   vii.   Partial payment for DY6A will be measured over the PY1 goal. For outcomes approved to use a baseline established in DY4, partial payment will be measured over the PY1 equivalent goal, which is a 5 percent IOS or 10 percent QISMC gap closure.

| Percent of Goal Achieved for Category 3 P4P Outcomes | | | |
|---|---|---|---|
| PY | Milestone | Positive Direction (higher rates indicate improvement) | Negative Direction (lower rates indicate improvement) |
| PY3 | DY6A AM-3.x | (PY3 achieved - PY1 goal or equivalent)/(PY3 goal - PY1 goal or equivalent) | (PY1 goal or equivalent - PY3 achieved)/(PY1 goal or equivalent - PY3 goal) |
| PY4 | Carryforward of DY6A AM-3.x | (PY4 achieved - PY1 goal or equivalent)/(PY3 goal - PY1 goal or equivalent) | (PY1 goal or equivalent - PY4)/(PY1 goal or equivalent - PY3 goal) |

    viii.    Performing Providers may carry forward Category 3 milestones from DY6A to DY6B and DY7.

c.  Category 4 Requirements for DY6

    i.    Requirements for Category 4 in DY6A are the same as the requirements for Category 4 Reporting Domains (RDs) 1-5 in DY5.
    ii.    If a Performing Provider's Category 4 value is greater than 10 percent of the Performing Provider's total value, the funds in excess of the 10 percent will be redistributed to Category 3.
    iii.    The optional RD6 will be removed in DY6A as it was required to value Category 4 at the 15 percent maximum in DYs 3-5.


**42. Requirements for Combining Certain DSRIP Projects**

a.  Certain DSRIP projects may be eligible to combine in DY6A based on Performing Provider requests to combine. These DSRIP projects must:

    i.    Be eligible to continue into the extension period;
    ii.    Not exceed a DY6A value of $5 million when combined; and
    iii.    Be one of the following:
        A.  Cross-regional community mental health center DSRIP projects;
        B.  Similar DSRIP projects by the same Performing Provider; or
        C.  Similar DSRIP projects by different Performing Providers within the same health system.

b.  HHSC will combine these DSRIP projects' total QPI metrics, MLIU QPI metrics, and MLIU QPI goals, as well as their pre-DSRIP baselines, into:

    i.    One total QPI milestone and goal;
    ii.    One MLIU QPI milestone and goal; and
    iii.    One pre-DSRIP baseline for each.

### 43. DSRIP Requirements for Uncompensated Care (UC) Only Hospitals

a. A UC only hospital must participate in an annual learning collaborative and report on mandatory Category 4 domains.


### 44. Remaining DSRIP Funds

a. The funds in the DSRIP pool not allocated to DSRIP projects for DY6A will be reallocated.

    i. Funds are reallocated to increase Performing Providers' total value to up to $250,000 per each subsequent DY beginning in DY6A, as described in paragraph 39(a)(ii).

    ii. The Anchoring Entity of an RHP is allocated the greater of the regional DSRIP Funding Allocation Percentage as defined in paragraph 27(a) multiplied by $20 million or the following minimum allocations:

        A. A Tier 1 RHP Anchoring Entity has no minimum DY6A allocation.

        B. A Tier 2 RHP Anchoring Entity has no minimum DY6A allocation.

        C. A Tier 3 RHP Anchoring Entity has a minimum DY6A allocation of $1,250,000.

        D. A Tier 4 RHP Anchoring Entity has a minimum DY6A allocation of $625,000. A Tier 4 RHP's minimum DY6A allocation may be increased to $800,000 if the Anchoring Entity meets the requirements described in paragraph 45(a)(i).

**DY6A Anchoring Entity Allocation (All Funds)**

| RHP | Tier | Funding Allocation % | DY6A Anchoring Entity Allocation | DY6A Anchoring Entity Allocation with Regional Learning Collaboratives |
|---|---|---|---|---|
| 1 | 3 | 4.00% | $1,250,000 | $1,250,000 |
| 2 | 3 | 3.78% | $1,250,000 | $1,250,000 |
| 3 | 1 | 20.22% | $4,044,045 | $4,044,045 |
| 4 | 3 | 4.23% | $1,250,000 | $1,250,000 |
| 5 | 4 | 7.02% | $1,404,587 | $1,404,587 |
| 6 | 2 | 10.15% | $2,029,347 | $2,029,347 |
| 7 | 3 | 6.04% | $1,250,000 | $1,250,000 |
| 8 | 4 | 1.66% | $625,000 | $800,000 |
| 9 | 2 | 14.29% | $2,857,364 | $2,857,364 |
| 10 | 2 | 9.74% | $1,948,289 | $1,948,289 |
| 11 | 4 | 1.16% | $625,000 | $800,000 |
| 12 | 3 | 3.56% | $1,250,000 | $1,250,000 |
| 13 | 4 | 0.67% | $625,000 | $800,000 |
| 14 | 4 | 2.29% | $625,000 | $800,000 |
| 15 | 3 | 4.41% | $1,250,000 | $1,250,000 |
| 16 | 4 | 1.30% | $625,000 | $800,000 |
| 17 | 4 | 1.89% | $625,000 | $800,000 |
| 18 | 4 | 1.22% | $625,000 | $800,000 |
| 19 | 4 | 0.95% | $625,000 | $800,000 |
| 20 | 4 | 1.44% | $625,000 | $800,000 |
| | | 100.00% | $25,408,632 | $26,983,632 |

iii.  The DY6A Anchoring Entity allocation is in lieu of the anchor administrative payment.

## 45. Anchoring Entity Requirements

a.  To receive its DY6A Anchoring Entity allocation, an Anchoring Entity must:

i.  Submit a DY6A learning collaborative plan at the beginning of DY6 if it is the Anchoring Entity of a Tier 1, 2, or 3 region or it is the Anchoring Entity of a Tier 4 region that wishes to receive the enhanced allocation.

   A.  The DY6A learning collaborative plan, at a minimum, must include an annual regional learning collaborative. The learning collaborative must include a focus on DSRIP integration into Medicaid managed care, value-based purchasing, alternative payment models, or sustainability strategies for low-

income uninsured. The Anchoring Entity could meet also meet this
requirement through a work groups that would be in addition to the annual
learning collaborative.
    B. Two or more regions may work together to submit a cross-regional DY6A
    learning collaborative plan.
    C. HHSC will develop a template that includes the required activities specified in
    paragraph 45(a)(i)(A). Anchoring Entities will complete each element in the
    template and HHSC will follow up if the template questions are incomplete.
 ii. Extension Stakeholder Engagement Forum: Once CMS and HHSC agree on the
    longer term extension, the Anchoring Entity will conduct an extension stakeholder
    engagement forum to promote collaboration in the next phase of the waiver and
    community goals. The feedback from this forum should be used to inform the
    learning collaborative plan for DY6B and beyond. The Anchoring Entity will post a
    copy of the updated RHP Plan on the RHP's website prior to the forum.
 iii. Submit the following information in June 2017, or by another date specified by
    HHSC:
    A. The region's community needs assessment that was submitted with the
    original RHP plan in 2012 that has been updated as appropriate to reflect
    major changes, including changes to the priority needs;
    B. A description of the process used to update the region's community needs
    assessment, including the process used to obtain stakeholder feedback; and
    C. The RHP plan that was submitted in 2012 that has been updated for DY6B
    onward. This updated RHP plan will include next steps for DSRIP projects as
    agreed upon by HHSC and CMS that would occur beginning in DY6B.
 iv. Submit documentation during October 2017 that demonstrates that the Anchoring
    Entity implemented the DY6A learning collaborative plan and conducted an
    extension stakeholder engagement forum.

## 46. Compliance Monitoring of DSRIP Projects

a. All RHP plans are subject to potential audits, including review by the independent assessor.
   Upon request, Performing Providers must have available for review by the independent
   assessor, HHSC, and CMS, all supporting data and back-up documentation demonstrating
   performance as described under an RHP plan for DSRIP payments.

   Failure of a Performing Provider to provide supporting documentation of metric or milestone
   achievement may result in recoupment of DSRIP payments.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

**Preface**

The following guidance and protocols have been developed to inform and assist the TX Health and Human Services Commission (HHSC) and their partner Anchor and/or contractors in their efforts to comply with Federal statute, regulations, protocols, and guidance regarding claiming for Federal Financial Participation (FFP) for Medicaid administrative expenditures necessary to implement and operate this waiver.

**I.   General Requirements/Assurances**

**A.   The HHSC/Anchor hospital under this waiver must fully describe the administrative expenditures to be claimed to Medicaid, including the methodology used to identify allowable expenditures, and submit a detailed narrative description and a budget summary for all costs for claiming administrative expenditures in writing to CMS.**

   **State Response:**

   Texas has 20 Regional Healthcare Partnerships (RHPs), whose members may participate in the Delivery System Reform Incentive Payment (DSRIP) program.  A map of the Texas RHPs is provided (reference *Attachment C – RHP Map*).

   The RHPs share the following characteristics:

   - The RHPs are based on distinct geographic boundaries that generally reflect patient flow patterns for the region;
   - The RHPs have identified local funding sources to help finance the non-federal share of DSRIP payment for Performing Providers;
   - The RHPs have identified an Anchoring Entity to help coordinate RHP activities.

   RHPs vary in geographic and population size. RHP 3 represents the largest region which includes Houston and surrounding areas.  This RHP contains more than 15% share of the statewide population under 200 percent of the federal poverty level (FPL) as defined by the U.S. Census Bureau: 2006 – 2010 American Community Survey for Texas (ACS). Approximately one half of the RHPs contain less than 3 percent share of the statewide population under 200 percent of the population. Narrative descriptions from Anchors and the methodologies proposed will vary based on the size of the RHP they are serving, and the type of organization.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

Each RHP has one of its members designated as an "Anchor" entity. Anchors provide certain administrative services with respect to the Texas Transformation and Quality Improvement Program 1115 Waiver. The Anchor is a member of an RHP, and is one of the following types of public organizations:

- public hospital,
- hospital district,
- other hospital authority,
- county government, or
- State university with a health science center or medical school.

Description of Administrative Expenditures

Costs for Anchor activities allowable under this protocol for administrative claiming include the following:

1. The provision of appropriate accounting, human resources, and data management resources for the RHP;

2. The coordination of RHP annual reporting, as specified in the Program Protocol, on the status of projects and the performance of Performing Providers (as defined in the Program Protocol) in the region;

3. The provision of RHP data management for purposes of evaluation;

4. The development and facilitation of one or more regional learning collaboratives;

5. Communication with stakeholders in the region, including the public; and

6. Communication on behalf of the RHP with HHSC.

Methodology used to identify allowable expenditures

Parameters of allowable costs for the six activities listed above are addressed in the "Cost Principles for Expenses" specific to the 1115 Waiver document (reference *Attachment A – Cost Principles*). (Note that this document is also included as an attachment to the contract with each Anchor.) The Cost Principles describe in detail that not all types of costs that might be incurred by the Anchor in connection with the performance of its administrative functions under the Contract are allowable. It is the function of these Cost Principles for Expenses to clarify this issue. While this Attachment was derived from similar cost principles used by HHSC with respect to

managed care and other contracts, there are substantive differences. The specific terms of this Attachment are the definitive cost principles with respect to the Anchor function.

The Cost Reporting Template (reference *Attachment B – Cost Template*) provides additional framework and controls for reporting of costs for each Anchor. The protected Excel spreadsheet has rows set up for each of the six activities listed above. Cost limits placed in the spreadsheet by HHSC that are specific to each Anchor prevent the Anchor from submitting costs per FFY to HHSC in excess of the limits established by CMS (i.e., the lesser of: $2,000,000 or 2.5% of the RHP DSRIP allocation per FFY). (Note that Anchors may submit a request for additional funding above the maximum to support additional transformation activities for the RHP for approval by HHSC and CMS.)

Narrative description and a budget summary

Each Anchor has submitted a narrative description (reference *Attachment D - RHP Narratives*) and a corresponding budget summary (reference *Attachment E - RHP Budget (Projected Costs)*). Within each of the twenty RHP Narratives, there are three sections, as follows:

- The first section, "Information about the Anchor Organization" includes a general description of the type of organization, any 1115 Waiver activities other than the role as an Anchor (including DSRIP activities), and, any other Administrative Costs or Claiming in which the organization participates.

- The next section, "Administrative Activities," outlines a detailed narrative description and budget (projected costs) summary for each of the six allowable activities for this Protocol. Each Anchor has also submitted an Excel budget (projected costs) spreadsheet (reference Attachment E, which contains RHP 1 through RHP 20 Budget (Projected Costs). The documents also include the indirect rate proposed. If the rate proposed is higher than 10 %, the Anchor provides a justification proposed for the higher amount that is specific to the Anchor functions for the 1115 Waiver.

- The last section, "Cost Allocation Methodology," describes the specific method that the particular Anchor uses to account for its relevant staff and/or contract time, and to allocate the staff/contractor time according to multiple activities or cost objectives. The methodology described is required to provide sufficient detail to demonstrate that costs are not duplicated in other programs. Anchors are using a similar methodology for cost allocation that results in a Percent Effort Spreadsheet (Attachment D.1) The approach is

consistent with the "2003 CMS Medicaid School-Based Administrative Claiming Guide" incorporating the following requirements:

    a. Reflect an after the fact distribution of the actual activity of each employee;

    b. Are prepared monthly and coincide with one or more pay period;

    c. Are signed by the employee as being a true statement of activities and the employee/office will retain the documentation to support the report;

    d. Account for the total activity for which each employee is compensated.

The Anchors will utilize a "Time and Effort" reporting process similar to the process utilized by the Texas A&M University System for federally sponsored projects. This process is required for all federally sponsored projects in order to validate that direct salaries and wages charged are reasonable and accurately reflect the work performed. The Anchors will use a spreadsheet and designate a percent effort for each activity by individual employee based on time spent on each activity on a monthly basis.

A narrative overview description of each Anchor is provided below; see the attachments for further details for each Anchor. Also see the *Attachment E -* which includes a *Consolidated Budget Summary* that adds all twenty Anchors into a single total cost projection.

Anchors are using the Percent Effort Spreadsheet as a consistent methodology beginning DY 3 (October 2013) and will also use DY 4 and 5. Anchors have also described a methodology used for DY 2 (October 2012 through August 2013) in their narratives attached.

RHP 1: University of Texas Health Science Center at Tyler (UTHSCT) participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP, and also in the Uncompensated Care (UC) Program. Expenses for Anchor activities are maintained separately from any other administrative functions of the institution. UTHSCT participates in Medicaid, Medicare, and federal funding for graduate medical education programs; none of these programs provide administrative match.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

RHP 2: University of Texas Medical Branch (UTMB) participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP, and in UC. For the Anchor function, UTMB created the Office of Waiver Operations.

RHP 3: Harris Health System participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP, and in UC. The organization's DSRIP projects are all related to patient care, with no costs that could also be considered Anchor administration. There are no Anchor administrative costs that could be claimed under other state or federal programs. RHP 3 is Texas' largest region and has included significant detail in attached narrative for the staff involved in Anchor administrative activities.

RHP 4: Nueces County Hospital District (NCHD) participates in the 1115 Waiver as an Anchor. NCHD is not a provider for Medicaid, Medicare, or any other federal program, nor does it operate any healthcare facilities. The organization does not participate in any programs that have administrative cost claiming. It is an IGT entity for DSRIP and Uncompensated Care.

RHP 5: Hidalgo County is a local governmental entity and participates in the 1115 Waiver as an Anchor. It is also an IGT entity for funding for Uncompensated Care. Hidalgo County currently participates in the Medicaid Administrative Claiming (MAC) program. Hidalgo County is not planning to submit administrative costs at this time. Narrative information is not included.

RHP 6: The Bexar County Hospital District, doing business as University Health System (UHS), participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP projects, and in UC. University Health System prepares an annual Medicare/Medicaid cost report and submits administrative reports as required through grants and research programs. UHS has proposed an indirect cost rate of 34.8 %, which is the current federal negotiated cost rate with the Department of Health and Human Services (DHHS) used for grants and research.

RHP 7: The Travis County Healthcare District, doing business as Central Health, participates in the 1115 Waiver as an Anchor and IGT entity for DSRIP and UC. Central Health does not provide direct services but rather contracts with providers such as the Seton Healthcare Family. Central Health is the 51% owner of the Community Care Collaborative (Seton Healthcare Family is 49% owner). The Community Care Collaborative is a performing provider for DSRIP projects. Central Health is also the sole owner of Sendero Health Plan Medicaid Health Maintenance Organization (HMO). Sendero has a

separate board, staff and facilities. Central Health does not participate in any other administrative costs or claiming.

RHP 8: Texas A&M Health Science Center (TAMHSC) is the anchoring entity for both RHP 8 and RHP 17. There is separate Anchor staff for the two regions. RHP 8's Anchor staff is at TAMHSC's Round Rock campus; RHP 17 is at the Bryan campus. TAMHSC is a health related institution operating as a component under Texas A&M University and, in addition to the anchor role, participates in the 1115 Waiver as an IGT entity, and as a performing provider for DSRIP projects in RHP 17. TAMHSC's School of Rural Public Health is currently under contract with HHSC to conduct the Statewide Evaluation of the 1115 Waiver.

RHP 9: Dallas County Hospital District, DBA Parkland Health and Hospital System, "Parkland" is the anchoring entity for RHP 9. Parkland is the largest public safety net hospital in the Dallas area and participates in the 1115 Waiver as an Anchor, IGT entity for DSRIP and UC, a performing provider for DSRIP projects, and participates in UC. Parkland does not receive any other administrative match for Medicaid or any other federal program in which they participate. No costs related to Parkland as a participating provider are included in the costs.

RHP 10: Tarrant County Hospital District, DBA JPS Health Network, is the anchoring entity for RHP 10 and also participates in the 1115 Waiver as an IGT entity for DSRIP and UC, DSRIP performing provider, and in UC.

RHP 11: Palo Pinto General Hospital, in Mineral Wells, TX (about 50 miles west of Ft. Worth), is the anchoring entity in RHP 11. It is a small rural hospital and reports that it does not have resources to document administrative activities, and thus is not planning to participate in administrative match claiming at this time.

RHP 12: Lubbock County Hospital District, *dba* University Medical Center (UMC), is the anchoring entity in RHP 12, and participates in the 1115 Waiver as Anchor, DSRIP performing provider, UC, and as an IGT entity. UMC does not participate in any other administrative costs or claiming.

RHP 13: McCulloch County Hospital District, in Brady, TX (about 75 miles east of San Angelo), the anchoring entity in RHP 13, and is not planning to submit administrative costs at this time. Narrative and cost information is not included.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

RHP 14: Ector County Hospital District, DBA Medical Center Health System (MCHS), is the anchoring entity in RHP 14 and also participates as a performing provider in DSRIP, in UC and as an IGT entity. MCHS does not participate in other administrative match or claiming activities. For the purposes of Anchor functions, MCHS relies solely on one lead staff person.

RHP 15: El Paso County Hospital District, DBA University Medical Center of El Paso (UMC) is the anchoring entity in RHP 15 and also participates in the 1115 Waiver as a performing provider for DSRIP, UC, and an IGT entity for both DSRIP and UC. UMC also claims administrative types of costs on the Medicare and Medicaid cost reports. The anchor administrative costs will be excluded from these filings.

RHP 16: Coryell County Memorial Hospital Authority, the anchoring entity in RHP 16, is not planning to submit administrative costs at this time. Narrative and cost information is not included.

RHP 17: Texas A&M Health Science Center (TAMHSC) is the anchoring entity for RHP 8 and RHP 17. The RHP 17 Anchor team, as well as RHP 8 Anchor team, operates under the Rural and Community Health Institute which is a component of the College of Medicine. TAMHSC is a health related institution operating as a component under Texas A&M University and, in addition to the anchor role, participates in the 1115 Waiver as an IGT entity, and as a performing provider for DSRIP projects in RHP 17. RHP 17 Anchor team is housed at the Bryan TX campus.

RHP 18: Collin County is the anchoring entity for RHP 18. Collin County is not a Medicaid provider and does not participate as a Performing Provider in DSRIP or in UC.

RHP 19: Electra Hospital District (*dba* Electra Memorial Hospital) is the anchoring entity in RHP 19, and is not planning to submit administrative costs at this time. Narrative and cost information is not included.

RHP 20: Webb County is the anchoring entity in RHP 20. The Anchor did not submit a narrative, so cannot claim any costs unless this is rectified. Note that although narrative information was not submitted, preliminary costs information was submitted in an earlier request: $371,000 for DY2, and $395,000 for DY3.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

**B. The state is at risk for loss of FFP should an audit of this waiver find non-compliance with Federal statute, regulations, protocols, and guidance.**

**State Response:**
> Understood. Language is incorporated in Cost Principles that hold the Anchors to this same standard and risks.

**C. The state may be required to develop an administrative claiming plan (protocol) that is described in a later section of this agreement and to amend its cost allocation plan.**

**In order for the costs of administrative activities to be claimed as Medicaid administrative expenditures at the 50% FFP rate, the state assures that the following requirements are understood and met:**

- ✓ The state complies with all Federal statute, regulations and guidance for all claims for FFP.
- ✓ Costs are "necessary for the proper and efficient administration of the Medicaid State Plan" (Section 1903(a)(7) of the Social Security Act).
- ✓ If applicable, costs are allocated in accordance with the relative benefits received by all programs, not just Medicaid.
- ✓ Claims for costs are not duplicate costs that have been, or should have been, paid for through another federal funding source or paid as part of a rate for direct medical services.
- ✓ State or local governmental agency costs are supported by an allocation methodology under the applicable approved public assistance Cost Allocation Plan (42 Code of Federal Regulations (CFR) 433.34) submitted to the Division of Cost Allocation.
- ✓ Costs do not include funding for a portion of general public health initiatives that are made available to all persons, such as public health education campaigns.
- ✓ Costs do not include the overhead costs of operating a provider facility or otherwise include costs of a direct medical services to beneficiaries (these should be claimed as medical service costs, and not plan administration).
- ✓ Costs do not duplicate activities that are already being offered or should be provided by other entities, or through other programs.
- ✓ Costs are supported by adequate source documentation.
- ✓ Costs are not federally-funded or used for any other federal matching purposes.

**State Response:**

Understood. As a result of the specific guidance, the state has now added language to the Cost Principles that holds the Anchors to the above requirements. See new section I.E. entitled "Core CMS requirements for cost allowability" in the revised version of 1115 Waiver Cost Principles (reference Attachment A).

**D. Under the waiver, the state must:**

1. **Provide a detailed summary budget and a narrative description of all administrative expenditures for review and approval.**

   **State Response:**
   The total net impact to the Federal government of the administrative claiming hereunder, after incorporating offsetting IGT, shows the 50% Federal match at $4.0 Million for DY2, and $5.1M for DY3.

   In terms of what they will be claiming (in total dollars, before the impact/offset of IGTs), the twenty RHPs report that they have spent $8.0M during DY2, and plan to spend $10.1M in DY3. Actual expenditures are higher, in that five RHPs plan to not claim administrative expenses hereunder.

   Most RHPs are far under their individual maximum allowed amounts, and the aggregate amount of administrative claiming is about one-third of the maximum state-wide amount allowed.

   A summary of each Anchor's narrative is provided in Section A above. The full Anchor narratives are provided in Attachment D. Further, an aggregate budget narrative is included within Attachment E. Attachment E also includes substantial budget details, including an aggregate overview by Administrative Activity, a summary overview by RHP, and a detailed numerical page for each individual RHP.

2. **Submit a narrative budget of administrative expenditures for review purposes to be referenced in the administrative claiming section of the standard terms and conditions for the waiver.**

   **State Response:**

A summary of each Anchor's narrative is provided in Section A above. The full Anchor narratives are provided in Attachment D. An aggregate budget narrative is included within Attachment E, along with additional budget details.

3. **Obtain prior approval from CMS for any changes to the methodology used to capture or claim FFP for administrative costs associated with the Waiver/Demonstration**

    **State Response:**
    Understood.

4. **Describe how the State and its partners will offset other revenue sources for administrative expenditures associated with the Waiver/Demonstration, if applicable.**

    **State Response:**
    N/A

5. **Detail the oversight and monitoring protocol to oversee all aspects of the Waiver/Demonstration including administrative claiming for the Waiver/Demonstration.**

    **State Response:**
    A monitoring function is planned for the Waiver that is under development with CMS that may include staff and/or contracted activities.

6. **Obtain prior approval for any new categories of administrative expenditures to be claimed under the Demonstration.**

    **State Response:**
    Understood.

7. **Agree to permit CMS to review any time study forms and/or allocation methodology related documents that are subsequently developed for use by this program, prior to modification or execution.**

    **State Response:**
    Understood.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

8.  **Submit a Medicaid administrative claiming plan to CMS for review and approval prior to implementation and/or claiming costs.**

    **State Response:**
      Initial Medicaid administrative claiming plan was submitted February 2012.

9.  **Submit copies of all of the interagency agreements/MOUs/ and signed contracts for vendors that include administrative costs under this Waiver/Demonstration.**

    **State Response:**
      Understood.


**II.  Interagency Agreements/Memorandum of Understanding (MOU)/Contracts**

**A.  Only the state Medicaid agency may submit a claim to CMS to receive FFP for allowable Medicaid costs.  Therefore, every participating entity that is performing administrative activities on behalf of the Medicaid agency must be covered, either directly or indirectly, through an interagency agreement, memorandum of understanding (MOU) or contractual arrangement.**

These agreements must describe and define the relationships between the state Medicaid agency and the sister agency or sub-grantee claiming entity and document the scope of the activities to be performed by all parties. The interagency agreements must be in effect before the Medicaid agency may submit claims for federal matching funds for any administrative activities conducted by the entity as detailed in the agreement with the Medicaid agency.  Although CMS does not have approval authority for interagency agreements, nor are we party to them, the agency reserves the right to review interagency agreements executed for purposes of administering the waiver.

**State Response:**
    See anchor list in box below. Contracts will be executed with each Anchor utilizing the Anchor Contract Template (Attachment F). Anchor Administrative Costs reimbursement is contingent on signed MOU or Contract.

| Agency Name/Sub-grantee | Date of Signed MOU or Contract |
|---|---|
| University of Texas Health Science Center at Tyler | |

| | |
|---|---|
| University of Texas Medical Branch | |
| Harris Health System | |
| Nueces County Hospital District | |
| Hidalgo County | |
| University Health System | |
| Travis County Healthcare District (Central Health) | |
| Texas A&M Health Science Center | |
| Dallas Cty Hosp District (Parkland Health & Hosp) | |
| Tarrant Cty Hosp District (JPS Health Network) | |
| Palo Pinto General Hospital District | |
| Lubbock County Hospital District - University Medical Center | |
| McCulloch County Hospital District | |
| Ector County Hospital District (Medical Center Health System) | |
| University Med Ctr of El Paso (El Paso Hosp Dist) | |
| Coryell County Memorial Hospital Authority | |
| Texas A&M Health Science Center | |
| Collin County | |
| Electra Hosp District (Electra Memorial Hospital) | |
| Webb County | |

**B. The agreements above describe and define the relationships between the state Medicaid agency and the sister agency or sub-grantee claiming entity and document the scope of the activities being performed by all parties.**

**State Response:**

    Understood.

**C.** **The interagency agreement or sub-grant contract must describe the Medicaid administrative claiming process, including an allocation methodology, (i.e., time study) to identify the services the state Medicaid agency will provide as well as those to be performed by the local entity, including any related reimbursement and funding mechanisms, and define oversight and monitoring activities and the responsibilities of all parties.**

**State Response:**

    See cost reporting template (Attachment B).

**D.** **All requirements of participation the state Medicaid agency determines to be mandatory for ensuring a valid process should be detailed in the agreement. Maintenance of records, participation in audits, designation of local project coordinators, training timetables and criteria, and submission of fiscal information are all important elements of the interagency agreement.**

The interagency agreement includes:

- ✓ Mutual objectives of the agreement;
- ✓ Responsibilities of all the parties to the agreement;
- ✓ A description of the activities or services each party to the agreement offers and under what circumstances;
- ✓ Cooperative and collaborative relationships at the state and local levels;
- ✓ Specific administrative claiming time study activity codes which have been approved by CMS, by reference or inclusion;
- ✓ Specific methodology which has been approved by CMS for computation of the claim, by reference or inclusion;
- ✓ Methods for reimbursement, exchange of reports and documentation, and liaison between the parties, including designation of state and local liaison staff.

**State Response:**

    See updated contract form (Attachment G), Cost Principles (Attachment A), and cost reporting template (Attachment B).

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

**E. Many interagency agreements require the governmental agency that performs the administrative activities to provide the required state match for Medicaid administrative claiming.**

**State Response:**
> Anchors will be required to provide the required state match.

## III. Non-federal Share Funding Source

**For each activity and/or agreement to provide an activity please specify the source of the non-federal share of funding below. The non-federal share of the Medicaid payments must be derived from permissible sources (e.g., appropriations, Intergovernmental transfers, certified public expenditures, provider taxes) and must comply with federal regulations and policy.**

| Activity/Agreement | Funding Source |
|---|---|
| RHP01 Anchor Administrative Costs | UT Health Science Center Tyler |
| RHP02 Anchor Administrative Costs | The University of Texas Medical Branch at Galveston (UTMB) |
| RHP03 Anchor Administrative Costs | Harris Health System |
| RHP04 Anchor Administrative Costs | Anchor Entity (Nueces County Hospital District) |
| RHP05 Anchor Administrative Costs Not planning to submit at this time | Anchor – Hidalgo County |
| RHP06 Anchor Administrative Costs | University Hospital |
| RHP07 Anchor Administrative Costs | Public funds as defined in Rule 355.8202 of the Texas Administrative Code |
| RHP08 Anchor Administrative Costs | Texas A&M Health Science Center |
| RHP 09 Anchor Administrative Costs | Parkland Health & Hospital System |
| RHP10 Anchor Administrative Costs | Anchor – JPS Health Network |
| RHP11 Not planning to submit costs as this time | |
| RHP12 Anchor Administrative Costs | Lubbock County Hospital District dba University Medical Center |
| RHP13 Not planning to submit costs as this time | |
| RHP 14 Anchor Administrative Costs | Ector County Hospital District |

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

| | |
|---|---|
| RHP 15 Anchor Administrative Costs | El Paso County Hospital District d/b/a UMC of El Paso |
| RHP16<br>Not planning to submit costs as this time | |
| RHP 17 Anchor Administrative Costs | Texas A&M Health Science Center |
| RHP18 Anchor Administrative Costs | Collin County Healthcare Foundation |
| RHP19<br>Not planning to submit costs as this time | |
| RHP20<br>Did not submit narrative | |

**State Response:**
　　　See anchor list above.

## IV. Administrative Activities

**The state and its partners must describe the proposed administrative activities to be performed in the section below.**

| Activity | Provider |
|---|---|
| The provision of appropriate accounting, human resources, and data management resources for the RHP; | Anchors |
| The coordination of RHP annual reporting, as specified in the Program Protocol, on the status of projects and the performance of Performing Providers (as defined in the Program Protocol) in the region; | Anchors |
| The provision of RHP data management for purposes of evaluation; | Anchors |
| The development and facilitation of one or more regional learning collaboratives; | Anchors |

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

| Communication with stakeholders in the region | Anchors |
|---|---|
| Communication on behalf of the RHP with HHSC. | Anchors |

**State Response:**
See the list of proposed administrative activities in the box immediately above.  For additional details, further see the cost reporting template (Attachment B), the contract form (Attachment F), and updated Cost Principles (Attachment A).

## V.  Identification, Documentation and Allocation of Costs

**A. Public Assistance Cost Allocation Plan**
1. **The Public Assistance Cost Allocation Plan (CAP) is a narrative description of the procedures that the state agency will use to identify, measure, and allocate costs incurred under this Waiver/Demonstration. All administrative costs (direct and indirect) are normally charged to federal grant awards such as Medicaid through the state's public assistance Cost Allocation Plan (CAP).**

    **State Response:**
    Submitted February 2012.

2. The single state agency has an approved public assistance cost allocation plan (CAP) on file with the Division of Cost Allocation in the U.S. Department of Health and Human Services that meets certain regulatory requirements, which are specified at Subpart E of 45 CFR part 95 and referenced in OMB Circular A-87, Attachment D.

    **State Response:**
    Submitted February 2012.

3. Upon approval of this Waiver/Demonstration, it is the responsibility of the state Medicaid agency to amend their CAP plan and submit to the DCA for review and approval.

    **State Response:**
    Understood.

**4.** In accordance with the statute, the regulations, and the Medicaid state plan, the state will maintain/retain adequate source documentation to support Medicaid payments.

**State Response:**
    Understood.

**5.** Upon approval, the CAP must reference the claiming mechanism, the interagency agreement, and the time study methodology and other relevant issues pertinent to the allocation of costs to submit claims. The time study requirements are described in the next section.

**State Response:**
    Understood. Note: the State is not proposing time studies.

## B.  Cost Allocation Methodology and/or Time Study Description

The state will describe the methodology used to account for 100% of staff time (i.e., time study and/or sampling system) to allocate the staff time accordingly to multiple activities or cost objectives. The time study allocates the share of costs to administrative activities (both Medicaid and non-Medicaid) and direct medical services as well as all other funding sources that are not reimbursable under this administrative claiming protocol. The time study must be described in sufficient detail to include a description of each Medicaid and non-Medicaid codes (to allocate to other federal and non-federal programs) to account for 100% of staff time.

The state and its partners are responsible to develop a time study methodology and instructions to capture costs and reflect all of the time and activities performed by staff. The time study must include careful documentation of all of the work performed by staff over a set period of time and is used to identify, measure and allocate staff time devoted to Medicaid reimbursable administrative activities.

A Medicaid allocation statistic is applied to the resulting recognized administrative cost pool to determine Medicaid's reimbursable administrative cost. Note: Overhead costs incurred that are an integral part of, or an extension of, the provision of services by medical providers, are to be included in the rate paid by the state or its fiscal agent for the medical service. These costs are not claimable as administrative expenditures and there is no additional FFP available under this section.

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

In accordance with the statute, regulations and the Medicaid state plan, the state is required to maintain and retain source documentation to support Medicaid payments for administrative activities. The basis of this requirement can be found in statute and regulations.

See section 1902 (a)(4) of the Act and 42 CFR 431.17. Documentation maintained in support of administrative claims must be sufficiently detailed to permit CMS to determine whether activities are necessary for the proper and efficient administration of the state plan.

---

Provide the cost identification and time study methodology descriptions here, if applicable.
**State Response:**
Anchors are using a similar methodology for cost allocation that results in a Percent Effort Spreadsheet (Attachment D.1)
a.   Reflect an after the fact distribution of the actual activity of each employee;
b.   Are prepared monthly and coincide with one or more pay period;
c.   Are signed by the employee as being a true statement of activities and the employee/office will retain the documentation to support the report;
d.   Account for the total activity for which each employee is compensated.

---

## VI.  Authorized Collaborations/Partnerships

**A.**  As part of the total amount payable under this Waiver/Demonstration authority granted under section 1115(a)(2) of the Social Security Act (the Act) by the Centers for Medicare & Medicaid Services (CMS) Federal Financial Participation (FFP) as authorized by 42 Code of Federal Regulations (CFR) 433.15 is available at the 50 percent matching rate for administrative costs required for "proper and efficient" administration of the Waiver/Demonstration and subject to the limitations outlined below.

**State Response:**
    Understood.

## VII.  Administrative Claiming Budget and Budget Narrative

---

Provide a detailed budget and budget narrative.  The budget must crosswalk all of the administrative activities and staff positions associated with administrative services.
**State Response:**
Each anchor has provided based on draft cost reporting template, and contract and updated cost principles.

Te:
De
Ter                                                                                                             460

**Attachment K**
**Administrative Cost Claiming Protocol**
**Part 1: RHP Anchor Administrative Costs**

## VIII.  Attachments

See separate documents attached, corresponding to each of the following:

Attachment A – Cost Principles  –  The cost principles for expenses specific to the 1115 Waiver describe in detail that not all expenses incurred by an Anchor are allowable for inclusion for cost claiming under this program.  This document is also included as part of the contract between HHSC and the Anchor with regard to the program hereunder.

Attachment B – Cost Template  –  This is the cost reporting template, in the form of a locked Excel spreadsheet, which provides additional framework and controls for reporting of administrative costs by each Anchor.  Among other data, the spreadsheet shows costs by activity by Demonstration Year for each Anchor.

Attachment C – RHP Map  –  This map of the state of Texas shows the locations of the twenty Regional Healthcare Partnerships, whose members may participate in the Delivery System Reform Incentive Payment (DSRIP) program.

Attachment D – RHP Narratives  –  Each Anchor has submitted a narrative description, per the CMS requirements herein, which has been reviewed by HHSC.  This attachment shows this narrative detail for each of the twenty Anchors.

Attachment D.1 -- Percent Effort Spreadsheet -- Each Anchor will utilize this spreadsheet for cost allocation methodology.

Attachment E – RHP Budget (Projected Costs) and Consolidated Budget Summary  –  Each Anchor has submitted a cost projection / budget by Demonstration Year, which is subject to the maximums as established by CMS. There is a separate spreadsheet for each of the twenty Anchors. HHSC has consolidated the individual submittals from the twenty Anchors into a combined state total by activity by Demonstration Year.

Attachment F – Anchor Contract template -- This is the proposed form for the contracts between HHSC and each of the separate Anchors.  Among other things, the contract outlines tasks and responsibilities, payment terms, and various requirements, such as adherence to the Cost Principles for submission of allowable costs for reimbursement hereunder.

# Exhibit M



DEPARTMENT OF HEALTH & HUMAN SERVICES          Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC  20201

**DEC 2 1 2017**

Mr. Charles Smith
Executive Commissioner
Texas Health and Human Services Commissioner
4900 North Lamar Boulevard, MC-H425
Austin, Texas  78751

Dear Mr. Smith:

This letter is to inform you that the Centers for Medicare & Medicaid Services (CMS) has
approved your request to extend Texas' section 1115(a) demonstration project, entitled "Texas
Healthcare Transformation and Quality Improvement Program" (Project Number 11-W-00278/6).
This approval is effective from January 1, 2018 through September 30, 2022, unless otherwise
specified.

This extension reflects changes to the demonstration for both Texas's Delivery System Reform
Incentive Payment (DSRIP) program and its Uncompensated Care (UC) funding over the five-
year demonstration period.

*Texas DSRIP Program*

Under the terms of this demonstration agreement, CMS will provide Texas with four years of
additional federal matching funding for its DSRIP program. This will include two years of level
funding, followed by two years of funding which will decrease each year. The fifth year of the
extension, from October 1, 2021 through September 30, 2022, will not include any funding for
DSRIP, to reflect the time-limited nature of DSRIP payments to support demonstrable delivery
system transformation. Texas will be required to submit a transition plan outlining how it will
further develop its delivery system reforms without DSRIP funding and/or phase out DSRIP-
funded activities and meet mutually agreeable milestones to demonstrate its ongoing progress.

During this extension period, Texas' DSRIP program will transition to a more strategic systemic
effort focusing on health system performance measurement and improvement that achieves
sustainable and effective delivery system reform. While CMS and Texas are still actively
discussing operational details of the program, CMS is committed to working with Texas in a
timely manner to approve the two outstanding operational protocols necessary for Texas to
implement its amended DSRIP program and claim federal matching funds.

In order to ensure that the DSRIP program results in sustainable and measurable changes in care
delivery and quality, Texas's DSRIP implementation protocols (Attachments J and R) must
address specifically how the state will:

     i.    Strengthen the measurement set to include more outcome measures, assure uniform reporting on measures within bundles, and eliminate measures and bundles that are not specified.

    ii.    Define and incorporate an attribution model for beneficiaries to providers that reflects generally accepted standards for attribution, and assure that all of the beneficiaries attributed to a provider related to a particular measure be included in the denominators.

    iii.    Assure that the distribution of incentive funds to providers, based on their performance on a bundle of measures, is in proportion to the predetermined value of the bundle, and distribute funding within a bundle proportionately across all required measures.

    iv.    Include a suitable and accountable performance measurement and payment methodology for incentive payments for providers that have high and/or maximized performance baselines.

    v.    Require participating providers to specify and link needed core activities to their selected bundles and measures, advance these activities, and report on their progress.

No federal financial participation for DSRIP funds related to Demonstration Years (DY) 7-10 (October 2017 through September 2021) will be available until the DSRIP protocols are approved. As provided in the special terms and conditions for the extension period(STCs), CMS has 30 days from the date of this letter to approve or disapprove the DSRIP protocols. If the state submits DSRIP protocols for CMS approval that do not meet the criteria specified in the STCs, CMS will disapprove the state's submissions and Texas may resubmit them.

*Uncompensated Care Pool*

CMS will provide Texas five additional years of UC funding, with the level of funding subject to the STCs attached. CMS recognizes the critical role that safety net hospitals play in providing charity care to the uninsured and the associated fiscal burden that hospitals bear for that care. CMS has been working with states with UC pools to provide financial support, while applying consistent federal policy priorities to these pools. UC pool funds may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are incurred by hospitals, clinics, or other provider types, as agreed upon by CMS and the state in providing services to individuals as described in the STCs. These charity care costs may not include bad debt, Medicaid shortfall, or other costs.

Texas's UC pool funding disbursement methodology will be revised as part of this extension, in alignment with nationally applied federal policies. Over the course of calendar year 2018, Texas will lay the groundwork to direct UC pool funding towards charity care. The state will not receive federal financial participation for any UC pool payments for DY 9 (October 1, 2019 through September 30, 2020) or later until a UC Protocol Addendum has been submitted to and approved by CMS. The UC Protocol Addendum must include precise definitions of eligible uncompensated provider charity care costs (consistent with the Medicare cost reporting principles) and revenues that must be included in the calculation of uncompensated charity care

cost for purpose of reconciling UC payments to unreimbursed charity care cost. Once approved, Texas will begin distributing UC pool funds following this framework effective October 1, 2019.

CMS recognizes the need for Texas to conduct state-level rulemaking and other associated administrative work to reflect this change in methodology, and has included a provision that allows time for Texas to complete it. CMS anticipates Texas working in good faith to lay the necessary groundwork in order to comply with the UC pool distribution policy reflected in the approved STCs by October 1, 2019. However, CMS has included several separate benchmarks to ensure Texas implements its agreement by October 1, 2019.

For each of the first two years of the extension, Texas will receive approximately $3.1 billion for the UC pool; for subsequent years, the UC pool amount will be determined as specified in STC 35. CMS has granted Texas an additional year of a transitional UC pool funding level, in light of the significant impact of Hurricane Harvey on Texas health care providers' operations and financial stability. During the first year of the extension, CMS expects Texas will work with its providers seeking to participate in the UC pool so that they accurately report the extent of their charity care in alignment with Medicare cost reporting principles, and have reported S-10 data documenting charity care provided in federal fiscal year 2017 by no later than September 2019. CMS will resize Texas' UC pool for the remaining years of this demonstration extension, beginning October 1, 2019, to reflect final UC amount based on the most recent available S-10 data reflecting provider charity care for 2017. In the event that Texas does not supply the necessary data, CMS will temporarily resize the state's UC pool to approximately $2.3 billion based on CMS's current estimate, without further adjustment, of uncompensated care in the state.

Once 2017 S-10 data is used to determine the DY 9-11 UC pool amounts, CMS will assess whether total UC pool payments made during DY 9 through DY 11 exceed the final DY 9 through DY 11 pool sizes, and CMS will reclaim overpayments for these years. If the UC pool payments have not been sufficient to cover the final DY 9 through DY 11 UC pool sizes based on 2017 S-10 data, CMS will make additional payments consistent with the final pool sizes.

The demonstration renewal will also include an extension of the state's Medicaid managed care and MLTSS programs – STAR, STAR+PLUS, STAR Kids, and Children's Medicaid Dental Services – for an additional five years. CMS and Texas are not making any substantive changes to the requirements for these programs.

CMS's approval of this demonstration extension is subject to the limitations specified in the approved waiver and expenditure authorities and compliance with the enclosed STCs defining the nature, character, and extent of federal involvement in this project. The state may deviate from the Medicaid State Plan requirements only to the extent those requirements have been waived or specifically listed as not applicable to the expenditure authorities. The approval is subject to CMS receiving your written acknowledgement of the award and acceptance of these STCs within 30 days of the date of this letter. A copy of the revised STCs, waivers, and expenditure authorities are enclosed.

Your point of contact for this demonstration is Angela Garner. She is available to answer any questions concerning your demonstration. Ms. Garner's contact information is:

> Centers for Medicare & Medicaid Services
> Center for Medicaid & CHIP Services
> Mail Stop: S2-03-27
> 7500 Security Boulevard
> Baltimore, MD 21244-1850
> Telephone: (410) 786-9686
> E-mail: angela.garner@cms.hhs.gov

Official communications regarding this demonstration should be sent simultaneously to Ms. Garner and Mr. Bill Brooks, Associate Regional Administrator (ARA) for the Division of Medicaid and Children's Health, in our Dallas Regional Office. Mr. Brooks' contact information is as follows:

> Centers for Medicare & Medicaid Services
> 1301 Young St. Suite 714
> Dallas, TX 75202
> Telephone: (214) 767-4461
> E-mail: Bill.Brooks@cms.hhs.gov

If you have any questions regarding this approval, please contact Ms. Judith Cash, Acting Director, State Demonstrations Group, Center for Medicaid & CHIP Services at (410) 786-9686.

Sincerely,



Seema Verma

Enclosures

NUMBER:          **No. 11-W-00278/6**

TITLE:          **Texas Healthcare Transformation and Quality Improvement Program**

AWARDEE:     **Texas Health and Human Services Commission**

## Title XIX Waivers

All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived in this list, shall apply to the Demonstration project beginning January 1, 2018 through September 30, 2022.  In addition, these waivers may only be implemented consistent with the approved Special Terms and Conditions (STCs).

Under the authority of section 1115(a)(1) of the Social Security Act (the Act), the following waivers of State plan requirements contained in section 1902 of the Act are granted in order to enable Texas to carry out the Texas Healthcare Transformation and Quality Improvement Program section 1115 Demonstration.

**1.     Statewideness**                       **Section 1902(a)(1)**

To enable the State to conduct a phased transition of Medicaid beneficiaries from fee-for-service to a managed care delivery system based on geographic service areas.

To the extent necessary, to enable the State to operate the STAR+PLUS program on a less than statewide basis.

**2.     Amount, Duration, and Scope of Services**       **Section 1902(a)(10)(B)**

To the extent necessary to enable the State to vary the amount, duration, and scope of services offered to individuals, regardless of eligibility category, by providing additional, or cost-effective alternative benefit packages to enrollees in certain managed care arrangements. To the extent necessary to enable the state to provide a greater duration of hospital services for individuals with severe and persistent mental illness.

**3.     Freedom of Choice**                  **Section 1902(a)(23)(A)**

To the extent necessary, to enable the State to restrict freedom of choice of provider through the use of mandatory enrollment in managed care plans for the receipt of covered services.  No waiver of freedom of choice is authorized for family planning providers.

**4.     Self-Direction of Care for HCBS Members          Section 1902(a)(32)**

To permit section 1915(c)-like Home and Community Based Services (hereinafter HCBS) members to self-direct expenditures for HCBS long-term care and supports as specified in paragraph 43(h) of the STCs.

**NUMBER:**      **No. 11-W-00278/6**

**TITLE:**      **Texas Healthcare Transformation and Quality Improvement
Program**

**AWARDEE:**      **Texas Health and Human Services Commission**

Under the authority of section 1115(a)(2) of the Social Security Act (the Act), expenditures made
by the State for the items identified below, which are not otherwise included as expenditures
under section 1903 of the Act, shall, for the period of this demonstration extension, January 1,
2018, through September 30, 2022, be regarded as expenditures under the State's Medicaid title
XIX State plan.

The expenditure authorities listed below promote the objectives of title XIX in the following
ways:

- Expenditure authorities 1, 2, 3 4, 6, and 7 promote the objectives of title XIX by
  increasing efficiency and quality of care through initiatives to transform service delivery
  networks.
- Expenditure authorities 1, 2, 3, and 4 promote the objectives of title
- XIX by increasing overall coverage of low-income individuals in the state.
- Expenditure authorities 1, 2, 3, 4, 6, and 7 promote the objectives of title XIX by
  improving health outcomes for Medicaid and other low-income populations in the state.
- Expenditure authorities 1, 2, 3, 4, 5, 6, and 7 promote the objectives of title XIX by
  increasing access to, stabilizing, and strengthening providers and provider networks
  available to serve Medicaid and low-income populations in the state

**EXPENDITURES RELATED TO POPULATIONS COVERED UNDER THE
DEMONSTRATION**

**1.**      **Expenditures for the STAR+PLUS 217-Like HCBS Group**

Expenditures for the provision of state plan benefits and HCBS like services to individuals age
65 and older, or age 21 and older with disabilities, not eligible for these benefits under the state
plan, who would otherwise be Medicaid-eligible under section 1902(a)(10)(A)(ii)(VI) of the Act
and 42 CFR § 435.217 in conjunction with section 1902(a)(10)(A)(ii)(V) of the Act, if the
services they receive under STAR+PLUS were provided under a HCBS waiver granted to the
State under section 1915(c) of the Act. This expenditure authority is subject to an enrollment
cap. All Medicaid laws, regulations and policies apply to this expenditure authority except as
expressly waived or listed as not applicable.

**2.**      **Expenditures Related to Managed Care Organization (MCO) Enrollment and
Disenrollment**

Expenditures made under contracts that do not meet the requirements in section 1903(m) of the Act specified below. Texas managed care plans will be required to meet all requirements of section 1903(m) of the Act except the following:

- Section 1903(m)(2)(H) of the Act, Federal regulations at 42 CFR 438.1, to the extent that the rules in section 1932(a)(4) are inconsistent with the enrollment and disenrollment rules contained in STC 23(c) of the Demonstration's Special Terms and Conditions (STCs), which permit the State to authorize automatic re-enrollment in the same managed care organization (MCO) if the beneficiary loses eligibility for less than six (6) months.

**3. Expenditures for Inpatient Hospital Services and Prescription Drugs for STAR, STAR Kids, and STAR+PLUS Enrollees that Exceed State Plan Limits**

Expenditures for all enrollees for inpatient hospital services that would not otherwise be covered under the State plan, and expenditures for prescription drugs for adults ages 21 and older enrolled in STAR or STAR+PLUS.

**4. HCBS for SSI-Related State Plan Eligibles**

Expenditures for the provision of HCBS waiver-like services as specified in Table 5 and Attachment C of the STCs that are not described in section 1905(a) of the Act, and not otherwise available under the approved State plan, but that could be provided under the authority of section 1915(c) waivers, that are furnished to STAR+PLUS enrollees who are ages 65 and older and ages 21 and older with disabilities, qualifying income and resources, and a nursing facility institutional level of care. All Medicaid laws, regulations and policies apply to the Demonstration Expenditure authority except as expressly waived or listed as not applicable.

**EXPENDITURES RELATED TO THE UNCOMPENSATED CARE POOL**

Subject to an overall cap on the Uncompensated Care (UC) Pool, the following expenditure authorities are granted for the period of the Demonstration:

**5.** Through September 30, 2019, expenditures for care and services that meet the definition of "medical assistance" contained in section 1905(a) of the Act that are incurred by hospitals and other providers for uncompensated costs of medical services provided to Medicaid eligible or uninsured individuals, and to the extent that those costs exceed the amounts paid to the hospitals pursuant to section 1923 of the Act. Effective October 1, 2019, expenditures for care and services that meet the definition of "medical assistance" contained in section 1905(a) of the Act that are incurred by hospitals and other providers for uncompensated costs of medical services provided to uninsured individuals as charity care, and to the extent that those costs exceed the amounts paid to the hospitals pursuant to section 1923 of the Act.

**EXPENDITURES RELATED TO THE DELIVERY SYSTEM REFORM INCENTIVE PAYMENT (DSRIP) PROGRAM**

The following expenditure authorities are granted for the 7th and 8th years of the Demonstration (FFY 2018):

**6.** Expenditures for incentive payments from DSRIP pool funds for the Delivery System Reform Incentive Payment (DSRIP) Program.

Subject to CMS' timely receipt and approval of all deliverables specified in STC 37 (Transition Plan for DSRIP Pool) relating to the creation and implementation of the sustainability plan and associated milestones for DSRIP transition, the following expenditure authorities are granted for the 9th and 10th years of the Demonstration (FFY 2019, FFY 2020, and FFY 2021):

**7.** Expenditures for incentive payments from DSRIP pool funds for the Delivery System Reform Incentive Payment  Program.

## CENTERS FOR MEDICARE AND MEDICAID SERVICES
## SPECIAL TERMS AND CONDITIONS (STCs)

**NUMBER:**          **11-W-00278/6**

**TITLE:**          **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE:**          **Texas Health and Human Services Commission**

**DEMONSTRATION EXTENSION PERIOD:**     **December 13, 2017 through September 30, 2022**

**NUMBER:**   **Title XIX No. 11-W-00278/6**

**TITLE:**    **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE:**   **Texas Health and Human Services Commission**


## I. PREFACE

The following are the Special Terms and Conditions (STCs) for the Texas Healthcare Transformation and Quality Improvement Program section 1115(a) Medicaid demonstration (hereinafter "demonstration"). The parties to this agreement are the Texas Health and Human Services Commission (HHSC/state) and the Centers for Medicare & Medicaid Services (CMS). The STCs set forth, in detail, the nature, character, and extent of Federal involvement in the Demonstrations, and the state's obligations to CMS during the life of the demonstration. This Demonstration is effective the date of the approval letter through September 30, 2022, unless otherwise specified.

The STCs have been arranged into the following subject areas:

 I.  Preface
 II. Program Description and Objectives
 III. General Program Requirements
 IV. Demonstration Delivery Systems
     A. Managed Care Delivery Systems
     B. Assurances Related to the Ongoing Operation of Managed Care
     C. Beneficiaries Served Through the Demonstration
     D. STAR AND STAR+PLUS (non-HCBS) and STAR Kids Enrollment, Benefits and Reporting Requirements
     E. Children's Dental Program
     F. STAR+PLUS HCBS Enrollment, Benefits and Reporting Requirements

 V.  Funding Pools Under the Demonstration
 VI. Health IT
 VII. General Financial Requirements
 VIII. Monitoring Budget Neutrality for the Demonstration
 IX. General Reporting Requirements
 X.  Monitoring Calls and Discussion
 XI. Evaluation of the Demonstration

The following attachments have been included to provide supplemental information and guidance for specific STCs. The following attachments are incorporated as part of this agreement.

Attachment A: Schedule of Deliverables
Attachment B: Semi-annual and Annual Report Template
Attachment C: HCBS Service Definitions
Attachment D: Reserved
Attachment E: Reserved
Attachment F: HCBS Fair Hearing Procedures
Attachment G: HCBS Participant Safeguards
Attachment H: UC Claiming Protocol and Application
Attachment I: Regional Healthcare Partnership (RHP) Planning Protocol
Attachment J: Program and Funding Mechanics Protocol
Attachment K: Administrative Cost Claiming Protocol
Attachment L: Consumer Support System Plan
Attachment M: Historical Demonstration Information
Attachment N: Reserved
Attachment O: Preparing the Evaluation Plan
Attachment P: Preparing the Evaluation Report
Attachment Q: DSRIP Sustainability Plan
Attachment R: Measure Bundle Protocol
Attachment S: Evaluation Design

## II. OBJECTIVES

Through this demonstration, the state aims to:
- Expand risk-based managed care to new populations and services;
- Support the development and maintenance of a coordinated care delivery system;
- Improve outcomes while containing cost growth; and
- Transition to quality-based payment systems across managed care and providers.

## III. GENERAL PROGRAM REQUIREMENTS

1. **Compliance with Federal Non-Discrimination Statutes.** The state must comply with all applicable Federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990, title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

2. **Compliance with Medicaid and Children's Health Insurance Program (CHIP) Law, Regulation, and Policy.** All requirements of the Medicaid program and CHIP expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), must apply to the demonstration.

3. **Changes in Medicaid and CHIP Law, Regulation, and Policy.** The state must, within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in federal law, regulation, or policy affecting the Medicaid program that occur during this demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable. In addition, CMS reserves the right to amend the STCs as needed to reflect such changes and/or changes of an operational nature without requiring the state to submit an amendment to the demonstration under STCs 6 and 7. CMS will notify the state at least 30 days prior to the expected approval date of the amended STCs to allow the state to provide comment. Changes will be considered in force upon issuance of the approval letter by CMS. The state must accept the changes in writing

4. **Impact on Demonstration of Changes in Federal Law, Regulation, and Policy Statements.**

   a. To the extent that a change in Federal law, regulation, or policy requires either a reduction or an increase in Federal financial participation (FFP) for expenditures made under this Demonstration, the State must adopt, subject to CMS approval, modified budget neutrality and allotment neutrality agreements for the Demonstration as necessary to comply with such change. The modified agreements will be effective upon the implementation of the change. The trend rates for the budget neutrality agreement are not subject to change under the subparagraph.

   b. If mandated changes in the Federal law require state legislation, the changes must take effect on the day such state legislation becomes effective, or on the last day such legislation was required to be in effect under the law.

5. **State Plan Amendments.** The state will not be required to submit a title XIX state plan amendment for changes affecting any populations made eligible solely through the demonstration. If a population eligible through the Medicaid state plan is affected by a change to the demonstration, a conforming amendment to the state plan may be required, except as otherwise noted in these STCs.

6. **Changes Subject to the Amendment Process.** Changes related to eligibility, enrollment, benefits, cost sharing, sources of non-Federal share of funding, budget neutrality, spending limits for funding pools, methodologies for determining amounts paid from pools (to the extent specified in the STCs), deadlines for deliverables, and other comparable program elements must be submitted to CMS as amendments to the demonstration. All amendment requests are subject to approval at the discretion of the Secretary, in accordance with section 1115 of the Act. The state must not implement changes to these elements without prior approval by CMS. Amendments to the demonstration are not retroactive, and FFP will not be available for changes to the demonstration that have not been approved through the amendment process set forth in STC 7 below (*Amendment Process*).

7. **Amendment Process.** Requests to amend the demonstration must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation of the change and may not be implemented until approved. CMS reserves the right to deny or delay

approval of a demonstration amendment based on non-compliance with the STCs, including but not limited to failure by the state to submit required elements of a viable amendment request as found in these STCs, reports or other deliverables required in the approved STCs in a timely fashion according to the deadlines specified herein. Amendment requests must, at a minimum, include the following information:

a. Public Notice: The state must provide documentation of the state's compliance with the public notice process and tribal consultation requirements outlined in STC 14 for demonstration amendments. Such documentation shall include a summary of any public feedback received and identification of how this feedback was addressed by the state in the final amendment request submitted to CMS.

c. Demonstration Amendment Summary and Objectives: The state must provide a detailed description of the amendment, including what the state intends to demonstrate via the amendment as well as impact on beneficiaries with sufficient supporting documentation, the objective of the change and desired outcomes including a conforming Title XIX and/or Title XXI state plan amendment, if necessary.

d. Waiver and Expenditure Authorities: The state must provide a list, along with a programmatic description, of the waivers and expenditure authorities that are being requested for the amendment.

e. The state must provide a data analysis worksheet which identifies the specific "with waiver" impact of the proposed amendment on the current BN agreement. Such analysis shall include current total computable (TC) "With Waiver" and "Without Waiver" status on both a summary and detailed level through the current approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as a result of the proposed amendment, which isolates (by Eligibility Group) the impact of the amendment.

f. The state must provide an up-to-date CHIP allotment neutrality worksheet, if necessary.

g. The state must provide updates to existing demonstration reporting and evaluation plans: A description of how the evaluation design, and reports will be modified to incorporate the amendment provisions, as well as the oversight, monitoring and measurement of the provisions.

**8. Extension of the Demonstration.** States that intend to request demonstration extensions under sections 1115(e) or 1115(f) of the Act must submit extension applications in accordance with the timelines contained in statute. Otherwise, no later than 12 months prior to the expiration date of the demonstration, the Governor of Texas must submit to CMS either a demonstration extension request that meets federal requirements at 42 CFR section 431.412(c) or a transition and phase-out plan consistent with the requirements of STC 9.

**9. Demonstration Transition and Phase-Out.** The state may only suspend or terminate this demonstration in whole, or in part, consistent with the following requirements;

a. Notification of Suspension or Termination: The state must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date and a transition and phase-out plan.  The state must submit its notification letter and a draft phase-out plan to CMS no less than 6 months before the effective date of the demonstration's suspension or termination.  Prior to submitting the draft transition and phase-out plan to CMS, the state must publish on its website the draft transition and phase-out plan for a 30-day public comment period.  In addition, the state must conduct tribal consultation in accordance with its approved tribal consultation state plan amendment.  Once the 30-day public comment period has ended, the state must provide a summary of each public comment received, the state's response to the comment and how the state incorporated the received comment into a revised phase-out plan.

b. The state must obtain CMS approval of the phase-out plan prior to the implementation of the phase-out activities.  Implementation of phase-out activities must be no sooner than 14 days after CMS approval of the phase-out plan.

c. Transition and Phase-out Plan Requirements: The state must include, at a minimum, in its phase-out plan, the process by which it will notify affected beneficiaries(including those on any applicable interest lists), the content of said notices (including information on the beneficiary's appeal rights), the process by which the state will conduct administrative reviews of Medicaid eligibility for the affected beneficiaries, and ensure ongoing coverage for those  beneficiaries currently enrolled who are eligible.

d. Phase-out Procedures: The state must comply with all notice requirements found in 42 CFR §431.206, 431.210 and 431.213.  In addition, the state must assure all appeal and hearing rights afforded to demonstration participants as outlined in 42 CFR §431.220 and 431.221.  If a demonstration participant requests a hearing before the date of action, the state must maintain benefits as required in 42 CFR §431.230.  In addition, the state must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category as discussed in October 1, 2010, State Health Official Letter #10-008.

e. Exemption from Public Notice Procedures 42 CFR 431.416(g):  CMS may expedite or waive the federal and state public notice requirements under circumstances described in 42 CFR §431.416(g).

f. Federal Financial Participation (FFP): If the project is terminated or any relevant waivers suspended by the state, FFP shall be limited to normal closeout costs associated with terminating the demonstration including services and administrative costs of disenrolling enrollees.

10. **Expiring Demonstration Authority.**  For demonstration authority that expires prior to the demonstration's expiration date, the state must submit a demonstration expiration plan to CMS no later than 6 months prior to the applicable demonstration authority's expiration date, consistent with the following requirements:

a) Expiration Requirements: The state must include, at a minimum, in its demonstration expiration plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by

which the state will conduct administrative reviews of Medicaid eligibility for the affected beneficiaries, and ensure ongoing coverage for eligible individuals, as well as any community outreach activities.

b) Expiration Procedures: The state must comply with all notice requirements found in 42 CFR § 431.206, 431.210 and 431.213. In addition, the state must assure all appeal and hearing rights afforded to demonstration participants as outlined in 42 CFR § 431.220 and 431.221. If a demonstration participant requests a hearing before the date of action, the state must maintain benefits as required in 42 CFR §431.230. In addition, the state must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category as discussed in October 1, 2010, State Health Official Letter #10-008.

c) Federal Public Notice: CMS will conduct a 30-day federal public comment period consistent with the process outlined in 42 CFR § 431.416 in order to solicit public input on the state's demonstration expiration plan. CMS will consider comments received during the 30-day period during its review and approval of the state's demonstration expiration plan. The state must obtain CMS approval of the demonstration expiration plan prior to the implementation of the expiration activities. Implementation of expiration activities must be no sooner than 14 days after CMS approval of the plan.

d) Federal Financial Participation: FFP shall be limited to normal closeout costs associated with the expiration of the demonstration including services and administrative costs of disenrolling enrollees.

**11. CMS Right to Terminate or Suspend.**

a. CMS may suspend or terminate the demonstration (in whole or in part) at any time before the date of expiration, whenever it determines, following a hearing, that the state has materially failed to comply with the terms of the project. CMS will promptly notify the state in writing of the determination and the reasons for the suspension or termination, together with the effective date.

b. **Finding of Non-Compliance.** The state does not relinquish its rights to challenge the CMS finding that the state materially failed to comply.

**12. Withdrawal of Waiver Authority.** CMS reserves the right to withdraw waivers of expenditure authorities at any time it determines that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of title XIX and/or XXI. CMS will promptly notify the State in writing of the determination and the reasons for the withdrawal, together with the effective date, and afford the State an opportunity to request a hearing to challenge CMS' determination prior to the effective date. If a waiver or expenditure authority is withdrawn, FFP is limited to normal closeout costs associated with terminating the waiver or expenditure authority, including services and administrative costs or disenrolling participants.

13. **Adequacy of Infrastructure.** The State will ensure the availability of adequate resources for the implementation and monitoring of the Demonstration, including education, outreach, and enrollment; maintaining eligibility systems; compliance with cost sharing requirements; and reporting on financial and other Demonstration components.

14. **Public Notice, Tribal Consultation, and Consultation with Interested Parties.** The state must comply with the state notice procedures as required in 42 Code of Federal Regulations (CFR) section 431.408 prior to submitting an application to extend the demonstration. For applications to amend the demonstration, the state must comply with the state notice procedures set forth in 59 Fed. Reg. 49249 (September 27, 1994) prior to submitting such request. The state must also comply with the public notice procedures set forth in 42 CFR section 447.205 for changes in statewide methods and standards for setting payment rates.

    The state must also comply with tribal and Indian Health Program/Urban Indian Health Organization consultation requirements at section 1902(a)(73) of the Act, 42 CFR section 431.408(b), State Medicaid Director Letter #01-024, and contained in the state's approved Medicaid State plan, when any program changes to the demonstration, either through amendment as set out in STC 6 or extension, are proposed by the state

15. **Federal Financial Participation (FFP).** No federal matching funds for expenditures authorized for this demonstration will be available prior to the effective date identified in the demonstration approval letter.

16. **Common Rule Exemption.** The state shall ensure that the only involvement of human subjects in research activities which may be authorized and/or required by this demonstration is for projects which are conducted by or subject to the approval of CMS, and which are designed to study, evaluate, or otherwise examine the Medicaid program – including public benefit or service programs; procedures for obtaining Medicaid benefits or services; possible changes in or alternatives to those programs or procedures; or possible changes in methods or level of payment for benefits or services under those programs. CMS has determined that this demonstration as represented in these approved STCs meets the requirements for exemption from the human subject research provisions of the Common Rule set forth in 45 CFR 46.101(b)(5).

## IV.    DEMONSTRATION DELIVERY SYSTEMS

This section governs the state's exercise of the following: waivers of the requirements for Statewideness (section 1902(a)(1)), Amount, Duration, and Scope of Services (section 1902(a)(10)(B)), Freedom of Choice (section 1902(a)(23)(A)), and Self-Direction of Care for HCBS Participants (section 1902(a)(32)), and Expenditure Authorities 1 through 4, as well as waivers of the requirements of the federal regulations implementing these statutory provisions.

## A.  MANAGED CARE DELIVERY SYSTEMS

17. **Description of Managed Care Program.** Under terms of this demonstration, the state provides managed medical assistance through the following programs.

a. **STAR.** STAR is the primary managed care program providing acute care services to low-income families, children, and pregnant women.

b. **STAR+PLUS.** STAR+PLUS provides acute and long-term service and supports to older adults and adults with disabilities.

c. **STAR Kids.** The STAR Kids Program provides acute and long-term service and supports to children with disabilities.

   i. **Delivery of Medically Dependent Children Program (MDCP) Services.** The State will deliver services authorized under the MDCP section 1915(c) waiver through the STAR Kids managed care model for those individuals not in state conservatorship. Those children in state conservatorship who are eligible for the MDCP section 1915(c) waiver will receive those services through the STAR Health managed care program under the 1915(a) authority, rather than under the 1115 authority, and through contract with the STAR Health managed care organization.

18. The state contracts with managed care organizations on a geographical basis, and for this purpose, the state is divided in to service areas. Table 1 provides the definitions of the service areas.

**Table 1. Service Areas and Delivery Systems**

| Service Area | STAR, STAR+PLUS, and STAR Kids |
|---|---|
| Bexar | Atascosa, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, Wilson |
| Dallas | Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, Rockwall |
| El Paso | El Paso, Hudspeth |
| Harris | Austin, Brazoria, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, Wharton |
| Hidalgo | Cameron, Duval, Hidalgo, Jim Hogg, Maverick, McMullen, Starr, Webb, Willacy, Zapata |
| Jefferson | Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, San Jacinto, Tyler, Walker |
| Lubbock | Carson, Crosby, Deaf Smith, Floyd, Garza, Hale, Hockley, Hutchinson, Lamb, Lubbock, Lynn, Potter, Randall, Swisher, Terry |

| Service Area | STAR, STAR+PLUS, and STAR Kids |
|---|---|
| Nueces | Aransas, Bee, Brooks, Calhoun, Goliad, Jim Wells, Karnes, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, Victoria |
| Tarrant | Denton, Hood, Johnson, Parker, Tarrant, Wise |
| Travis | Bastrop, Burnet, Caldwell, Fayette, Hays, Lee, Travis, Williamson |
| Medicaid Rural Service Area: West Texas | Andrews, Archer, Armstrong, Bailey, Baylor, Borden, Brewster, Briscoe, Brown, Callahan, Castro, Childress, Clay, Cochran, Coke, Coleman, Collingsworth, Concho, Cottle, Crane, Crockett, Culberson, Dallam, Dawson, Dickens, Dimmit, Donley, Eastland, Ector, Edwards, Fisher, Foard, Frio, Gaines, Glasscock, Gray, Hall, Hansford, Hardeman, Hartley, Haskell, Hemphill, Howard, Irion, Jack, Jeff Davis, Jones, Kent, Kerr, Kimble, King, Kinney, Knox, La Salle, Lipscomb, Loving, Martin, Mason, McCulloch, Menard, Midland, Mitchell, Moore, Motley, Nolan, Ochiltree, Oldham, Palo Pinto, Parmer, Pecos, Presidio, Reagan, Real, Reeves, Roberts, Runnels, Schleicher, Scurry, Shackelford, Sherman, Stephens, Sterling, Stonewall, Sutton, Taylor, Terrell, Throckmorton, Tom Green, Upton, Uvalde, Val Verde, Ward, Wheeler, Wichita, Wilbarger, Winkler, Yoakum, Young, and Zavala |
| Medicaid Rural Service Area: Central Texas | Bell, Blanco, Bosque, Brazos, Burleson, Colorado, Comanche, Coryell, DeWitt, Erath, Falls, Freestone, Gillespie, Gonzales, Grimes, Hamilton, Hill, Jackson, Lampasas, Lavaca, Leon, Limestone, Llano, Madison, McLennan, Milam, Mills, Robertson, San Saba, Somervell, Washington |
| Medicaid Rural Service Area: Northeast Texas | Anderson, Angelina, Bowie, Camp, Cass, Cherokee, Cooke, Delta, Fannin, Franklin, Grayson, Gregg, Harrison, Henderson, Hopkins, Houston, Lamar, Marion, Montague, Morris, Nacogdoches, Panola, Rains, Red River, Rusk, Sabine, San Augustine, Shelby, Smith, Titus, Trinity, Upshur, Van Zandt, Wood |

## B. ASSURANCES RELATED TO THE ONGOING OPERATION OF MANAGED CARE

**19. Managed Care Requirements.**

a. <u>General.</u> The state must comply with the managed care regulations published at 42 CFR 438.

b. <u>Medical Care Advisory Committee.</u> The state will maintain a state Medical Care Advisory Committee, per CFR §431.12, which is comprised of Medicaid recipients, Managed Care Organizations, providers, community-based organizations and advocates serving or representing Medicaid recipients and other interested parties as set forth in Tex. Gov't Code sec. 533.041. The advisory committee will provide input and recommendations to the Health and Human Services Commission regarding the statewide implementation of Medicaid Managed Care, including input and recommendations regarding: 1) program design and benefits, 2) systematic concerns from consumers and providers, 3) the efficiency and quality of services delivered by Medicaid managed care organizations, 4) contract requirements for the Medicaid managed care organizations, 5) Medicaid managed care network adequacy, and 6) trends in claims processing. The advisory committee will also assist HHSC with issues relevant to Medicaid managed care to improve the polices established for and programs operating under Medicaid managed care, including early and periodic screening, diagnosis and treatment, provider and patient education issues, and patient eligibility issues. The state will maintain minutes from these meetings and use them in monitoring program operations and identifying necessary program changes. Copies of committee meeting minutes will be made available to CMS upon request and the outcomes of the meetings may be discussed on the demonstration monitoring calls.

c. <u>MCO Participant Advisory Committees.</u> The state shall require each MCO, through its contracts, to create and maintain participant advisory committees through which the MCO can share information and capture enrollee feedback. The MCOs will be required to support and facilitate participant involvement and submit meeting minutes to the State. Copies of meeting minutes will be made available to CMS upon request.

d. <u>Independent Consumer Supports.</u> To support the beneficiary's experience receiving medical assistance and long term services and supports in a managed care environment, the State shall create and maintain a system of consumer supports independent from the managed care plans to assist enrollees in understanding the coverage model and in the resolution of problems regarding services, coverage, access and rights.

e. <u>Core Elements of the Independent Consumer Support System.</u>

   i. *Organizational Structure*. The Independent Consumer Supports System shall operate independently from any STAR+PLUS or STAR Kids MCO. The organizational structure of the support system shall facilitate transparent and collaborative operation with beneficiaries, MCOs, and state government.

ii. *Accessibility*. The services of the Independent Consumer Supports System will be available to all Medicaid beneficiaries enrolled in STAR+PLUS or STAR Kids receiving Medicaid long-term services and supports (institutional, residential and community based). The Independent Consumer Supports system will be accessible through multiple entryways (e.g., phone, internet, office) and will have the capacity to reach out to beneficiaries and/or authorized representatives through various means (mail, phone, in person), as appropriate.

iii. *Functions*. The Independent Consumer Supports system will be available to assist beneficiaries in navigating and accessing covered health care services and supports. Where an individual is enrolling in a new delivery system, the services of this system help individuals understand their choices and resolve problems and concerns that may arise between the individual and a provider/payer. The following list encompasses the system's scope of activity.

    A. The system will offer beneficiaries support in the pre-enrollment stage, such as unbiased health plan choice counseling and general program-related information.

    B. The system will serve as an access point for complaints and concerns about health plan enrollment, access to services, and other related matters.

    C. The system will be available to help enrollees understand the hearing, grievance, and appeal rights and processes within the health plan as well as the fair hearing, grievance, and appeal rights and processes available at the state level and assist them through the process if needed/requested.

iv. *Staffing and training*. The Independent Consumer Supports system will include individuals who are knowledgeable about the state's Medicaid programs; beneficiary protections and rights under Medicaid managed care arrangements; and the health and service needs of persons with complex needs, including those with a chronic condition, disability, and cognitive or behavioral needs. In addition, the Independent Consumer Supports System will ensure that its services are delivered in a culturally competent manner and are accessible to individuals with limited English proficiency. The system ultimately developed by the state may draw upon existing staff within the chosen organizational structure and provide substantive training to ensure core competencies and a consistent consumer experience.

v. *Data Collection and Reporting*. The Independent Consumer Supports System shall track the volume and nature of beneficiary complaints and the resolution of such complaints on a schedule and manner determined by the state, but no less frequently than quarterly. This information will inform the state of any provider or contractor issues and support the reporting requirements to CMS.

f. <u>Reporting under the Demonstration.</u>  The state will report on the activities of the Independent Consumer Support System in the annual reports. The approved Independent Consumer Support System Plan is shown in Attachment L.  Changes to Attachment L must be submitted to CMS for review and approval subject to STC 7. The state will monitor the impact of the Independent Consumer Support Program in the demonstration.

## C.  BENEFICIARIES SERVED THROUGH THE DEMONSTRATION

**20. Eligibility Groups Affected by the Demonstration.**  Mandatory and optional Medicaid state plan groups described below are subject to all applicable Medicaid laws and regulations except as expressly waived under authority granted by this Demonstration and as described in these STCs.  Any Medicaid state plan amendments to the eligibility standards and methodologies for these eligibility groups will apply to this demonstration.  These state plan eligible beneficiaries are required under the demonstration to enroll in managed care to receive benefits and may have access to additional benefits not described in the state plan.

Table 2 below describes the state plan eligibility groups that are mandatory and voluntary enrollees into managed care.  A STAR+PLUS member who enters a nursing facility remains in STAR+PLUS and the nursing facility services are paid through managed care.

**Table 2. State Plan Populations Affected by the Demonstration**

| **A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012;  **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014;  * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); **H** = STAR Kids November 1, 2016, includes only individuals from birth through age 20; **I** = STAR+PLUS September 2017; **J**=STAR Kids September 2017; **K**= STAR September 2017. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | **Description and Medicaid Eligibility Group (MEG)** | **Income Limit and Resource Standards** | **STAR** | | **STAR+ (T)** | | **STAR Kids (S)** | |
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| <u>Low Income Families</u> §1931 low income families | Parents and other caretaker relatives; §1902(a)(10)(A)(i)(I); 42 CFR §435.110 <u>MEG</u>: THTQIP-Adults (parents and caretaker relatives) | 14% FPL (uses MAGI converted AFDC limits); No resource test; member meets relationship requirement | A C D | | | | | |
| <u>Earnings Transitional</u> Twelve months TMA from increase in earnings, combined increase in earnings and Alimony/Spousal support | Individuals who lose eligibility under §1931 due to increased earnings or hours of work §1902(a)(52); §1902(e)(1); §1925; §1931(c)(2) <u>MEG</u>: THTQIP-Adults (parents and caretaker relatives) OR THTQIP-Children (dependent children) | 185% FPL in second extension period; No resource test | A C D | | | | | |

| A=STAR Start of Demo; B = STAR+PLUS Start of Demo; C = STAR March 2012; D = STAR March 2012 (MRSA); E = STAR+PLUS March 2012; F= STAR January 2014; G = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); H = STAR Kids November 1, 2016, includes only individuals from birth through age 20; I = STAR+PLUS September 2017; J=STAR Kids September 2017; K= STAR September 2017. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T) | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| Alimony/Spousal Support Transitional Four months post Medicaid resulting from Alimony/Spousal support | Individuals who lose eligibility under §1931 due to Alimony/Spousal support; §1902(a)(10)(A)(i)(I); ); 42 CFR §435.115<br><br>MEG: THTQIP-Adults (parents and caretaker relatives) OR THTQIP-Children (dependent children) | N/A; No resource test | A C D | | | | | |
| Pregnant Women | §1902(a)(10)(A)(i)(IV), §1902(l)(1)(A); 42 CFR §435.116<br><br>MEG: THTQIP-Adults | 198% FPL; No resource test | A C D | | | | | |
| Children Under 1 | Poverty level infants; §1902(a)(10)(A)(i)(IV), §1902(l)(1)(B); ); 42 CFR §435.118<br><br>MEG: THTQIP-Children | 198% FPL | A C D | | | | | |
| Newborn Children Children to age one born to Medicaid eligible mother | Deemed Newborn – mother was eligible for and received Medicaid for the birth; §1902(e)(4), 42 CFR §435.117<br>MEG: THTQIP-Children | N/A; No resource test | A C D | | | | | |
| Children Age 1-5 | Poverty level children under 6; §1902(a)(10)(A)(i)(VI), §1902(l)(1)(C); 42 CFR §435.118<br>MEG: THTQIP-Children | 144% FPL | A C D | | | | | |

**A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014;  * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); **H** = STAR Kids November 1, 2016, includes only individuals from birth through age 20; **I** = STAR+PLUS September 2017; **J**=STAR Kids September 2017; **K**= STAR September 2017.

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T) | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| Children Age 6-18 | Poverty level children under 19; §1902(a)(10)(A)(i)(VII), §1902(l)(1)(D); 42 CFR §435.118<br><br>Note:<br> All children at or below 100 percent FPL in this eligibility group are funded through title XIX.  Title XXI funding for children between 100-133% FPL shall be claimed as outlined in 42 CFR § 433.11<br><br>MEG:<br>If title XIX: THTQIP-Children<br>If title XXI: THTQIP-MCHIP Children | 133%  FPL;[1] | A C D F | | | | | |
| Former Foster Care Children | Former foster care children §1902(a)(10)(A)(i)(IX); 42 CFR §435.150<br><br>Mandatory managed care for 18-26.<br>Ages 18 through 20:<br>- Choice between STAR Health or STAR.<br>- If receiving 1915(c) services: choice between STAR Health or STAR Kids.<br><br>Ages 21 through 26:<br>- STAR<br>-If receiving 1915(c) IDD waiver services (unless the individual is dually eligible): STAR+PLUS<br><br>MEG: THTQIP-Children<br>THTQIP-Adults (parents and caretaker relatives) | N/A; No resource test | F | | I | | J | |

A=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); **H** = STAR Kids November 1, 2016, includes only individuals from birth through age 20; **I** = STAR+PLUS September 2017; **J**=STAR Kids September 2017; **K**= STAR September 2017.

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR Mandatory | STAR Voluntary | STAR+ (T) Mandatory | STAR+ (T) Voluntary | STAR Kids (S) Mandatory | STAR Kids (S) Voluntary |
|---|---|---|---|---|---|---|---|---|
| SSI Recipient 21 and older with Medicare (Dual) | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(ll) §1902(a)(10)(A)(i)(ll)(cc) Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | | | |
| SSI Recipient under 21 with Medicare (Dual) | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(ll) §1902(a)(10)(A)(i)(ll)(cc). Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | | H | |
| SSI Recipient without Medicare 21 and older | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(II). §1902(a)(10)(A)(i)(II)(cc) Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | | | |
| SSI Recipient without Medicare under 21 | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(II) §1902(a)(10)(A)(i)(II)(cc) Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | A* D* | H | |
| Pickle Group 21 and older, with Medicare Includes pre-Pickle eligibility group | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §§435.134, 435.135 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | | | |
| Pickle Group 21 and older without Medicare | Would be eligible for SSI if title II COLAs were deducted from income; 42 CFR §435.134, 42 CFR §435.135 | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | | | |

**A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E**= STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014;  * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); **H** = STAR Kids November 1, 2016, includes only individuals from birth through age 20; **I** = STAR+PLUS September 2017; **J**=STAR Kids September 2017; **K**= STAR September 2017.

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR Mandatory | STAR Voluntary | STAR+ (T) Mandatory | STAR+ (T) Voluntary | STAR Kids (S) Mandatory | STAR Kids (S) Voluntary |
|---|---|---|---|---|---|---|---|---|
| Includes pre-Pickle eligibility group | MEG: THTQIP-Disabled | | | | | | | |
| Pickle Group under 21 with Medicare | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §435.135 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B E G | H | |
| Pickle Group under 21 without Medicare | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §435.135 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B E G | H | |
| Disabled Adult Children (DAC) 21 or over with Medicare | §1635(c); §1935 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B E G | | | |
| Disabled Adult Children (DAC) 21 or over without Medicare | §1635(c); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | | | |
| DAC under 21 with Medicare | §1635(c); §1935 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B E G | H | |
| DAC under 21 without Medicare | 1635(c); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B E G | H | |
| Disabled Widow(er) | Widows/Widowers, 1634(b); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | | | |
| Early Aged Widow(er) | Early Widows/Widowers, 1634(d); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B E G | | | |
| Medicaid Buy-In (MBI) with Medicare | BBA Work Incentives Group; §1902(a)(10)(ii)(XIII) MEG: THTQIP-AMR | 250% FPL; $2,000 | | | | B E G | H | |
| Medicaid Buy-In (MBI) without Medicare | BBA Work Incentives Group; §1902(a)(10)(ii)(XIII) MEG: THTQIP-Disabled | 250% FPL; $2,000 | D* | A* | | B E G | H | |
| Medicaid Buy-In for Children (under age 19) with Medicare | Family Opportunity Act (MBIC), §1902(a)(10)(A)(ii)(XIX) MEG: THTQIP-AMR | 300% FPL; No resource standard | | | | B E G | H | |

| A=STAR Start of Demo; B = STAR+PLUS Start of Demo; C = STAR March 2012; D = STAR March 2012 (MRSA); E = STAR+PLUS March 2012; F= STAR January 2014; G = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); H = STAR Kids November 1, 2016, includes only individuals from birth through age 20; I = STAR+PLUS September 2017; J=STAR Kids September 2017; K= STAR September 2017. | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | **Description and Medicaid Eligibility Group (MEG)** | **Income Limit and Resource Standards** | **STAR** | | **STAR+ (T)** | | **STAR Kids (S)** | |
| | | | **Mandatory** | **Voluntary** | **Mandatory** | **Voluntary** | **Mandatory** | **Voluntary** |
| Medicaid Buy-In for Children(under age 19) without Medicare | Family Opportunity Act (MBIC), §1902(a)(10)(A)(ii)(XIX)<br><br>MEG: THTQIP-Disabled | 300% FPL; No resource standard | | A* D* | | B E G | H | |
| Nursing Facility age 21 and older | Special income level group, in a medical institution for at least 30 consecutive days with gross income that does not exceed 300% of the SSI income standard; §1902(a)(10)(A)(ii)(V)<br>MEG: THTQIP-AMR (with Medicare) OR THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/ $3,000 couple | | | B† E† G | | | |
| 217 Group without Medicare under 21 | Institutional eligibility and post-eligibility rules for individuals who are eligible as specified under 42 CFR 435.217, 435.236, and 435.726 and §1924 of the Act.<br><br>MEG: THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility, and for post-eligibility. | | D* | | G | H | |
| 217 Group without Medicare 21and older | Institutional eligibility and post-eligibility rules for individuals who are eligible as specified under 42 CFR 435.217, 435.236, and 435.726 and §1924 of the Act.<br><br>MEG: THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility, and for post-eligibility. | D* | | G | | | |
| Medicaid for Breast and Cervical Cancer (MBCC) | Individuals screened for breast and cervical cancer by the Centers for Disease Control and Prevention breast and cervical cancer early detection program and found to need treatment for breast or | N/A; No resource test. | | | I | | | |

| **A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); **H** = STAR Kids November 1, 2016, includes only individuals from birth through age 20; **I** = STAR+PLUS September 2017; **J**=STAR Kids September 2017; **K**= STAR September 2017. | | | | | | | |

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T) | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| | cervical cancer as specified in §1902 (aa) and 42 CFR 435.213. | | | | | | | |
| Adoption Assistance and Permanency Care Assistance (AAPCA) | Children who are the subject of a IV-E adoption assistance agreement, as specified in SSA §1902(a)(10)(A)(i)(I), SSA §473(b)(3), and 42 CFR §435.145.<br><br>Children who are the subject of a non-IV-E adoption assistance agreement, as specified in SSA §1902(a)(10)(A)(ii)(VII) and 42 CFR §435.227.<br><br>Children for whom IV-E guardianship assistance payments are made, as specified in SSA §1902(a)(10)(A)(i)(I), SSA §473(b)(3), and 42 CFR §435.145.<br><br>Note: AAPCA clients who reside out-of-state will remain FFS. | N/A; No resource test. | K | | | | J | |

**(S):** Note children and young adults who are members of federally-recognized tribes, and have SSI or disability-related (including SSI-related) Medicaid or who are served through one of the 1915(c) waivers, will be able to voluntarily enroll in STAR Kids or opt to remain in traditional fee-for-service Medicaid.
**(T):** Note individuals who are members of federally-recognized tribes, and have Medicaid through the Medicaid for Breast and Cervical Cancer Program, Adoption Assistance Program, Permanency Care Assistance Program or Former Foster Care Group will be able to voluntarily enroll in managed care or opt to remain in traditional fee-for-service Medicaid.

**21. Demonstration Expansion Population – STAR+PLUS 217-Like Eligibility Group.** Table 3 below describes the demonstration expansion populations that are mandatory and voluntary enrollees into managed care. Groups made eligible by virtue of the expenditure authorities expressly granted in this demonstration are subject to Medicaid laws, regulations and policies, except as expressly identified as not applicable under expenditure authority granted in this demonstration.

**Table 3. Demonstration Expansion Populations Made Eligible by the Demonstration**

| **A**=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F** = STAR January 2014; **G** = STAR+PLUS September 2014; * = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G") | | | | | | |
|---|---|---|---|---|---|---|
| **Expansion Eligibility Group** | **Description and MEG** | **Income Limit and Resource Standards** | **STAR** | | **STAR+** | |
| | | | **Mandatory** | **Voluntary** | **Mandatory** | **Voluntary** |
| 217-Like Group Categorically needy individuals under the State plan receiving HCBS services (of the kind listed in Table 5) in the STAR+PLUS service areas. | Institutional eligibility and post-eligibility rules for individuals who would only be eligible in the same manner as specified under 42 CFR 435.217, 435.236, 435.726, and §1924 of the Act, if the State had not eliminated its 1915(c) STAR+PLUS and CBA waivers. MEG: THTQIP-AMR (with Medicare) OR THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility and for post-eligibility | | | B | |

**22. Populations Not Affected by the Demonstration.**  The following populations receive Medicaid services without regard to the demonstration.

a.  Medically Needy;

b.  STAR Health enrollees, transitioning foster care youth, independent foster care adolescents, and optional categorically needy children eligible under 42 CFR 435.222;

c.  Adults 21 or older who have Medicare Part A or B and who are receiving 1915(c) IDD waiver services (HCS, TxHmL, CLASS and DBMD);

d.  Residents of State Supported Living Centers;

e.  Undocumented or Ineligible (5-year bar) Aliens only eligible for emergency medical services;

f.  Individuals residing in a nursing facility who entered the nursing facility while enrolled in STAR, beginning with the month after the State receives notification that they entered the nursing facility;

g. Individuals enrolled in the Program for All Inclusive Care for the Elderly (PACE) program; and

h. Individuals residing in a facility in the pediatric care facility class of nursing facilities (currently, the Truman W. Smith Children Care Center), or any Veterans Land Board (VLB) Texas State Veterans Homes.

## D. STAR, STAR+PLUS (non-HCBS), and STAR Kids ENROLLMENT, BENEFITS AND REPORTING REQUIREMENTS

**23. Enrollment.**

a. **Time to Choose a Plan.** All beneficiaries who obtain Medicaid eligibility will have at least 15 days to choose a managed care organization.

b. **Auto-Assignment.** If a potential beneficiary does not choose a managed care organization within the time frames defined in (a), he or she may be auto-assigned to a managed care organization. When possible, the auto-assignment algorithm shall take into consideration the beneficiary's history with a primary care provider, and when applicable, the beneficiary's history with a managed care organization. If this is not possible the state will equitably distribute beneficiaries among qualified MCOs.

c. **Re-Enrollment.** The State may automatically re-enroll a beneficiary in the same managed care organization if there is a loss of Medicaid eligibility for six months or less.

**24. Disenrollment or Transfer.** Individuals should be informed of opportunities no less than annually for disenrollment and ongoing plan choice opportunities, regularly and in a manner consistent with 42 CFR 438 and other requirements set forth in the Demonstration Special Terms and Conditions.

a. **MCO Transfer at Request of Beneficiary.** Beneficiaries may request transfer to another managed care organization in the service area through the enrollment broker at any time.

b. **Disenrollment at Request of Beneficiary.** Recipients that are voluntarily enrolled in a managed care programs may request disenrollment and return to traditional Medicaid. Mandatory recipients must request disenrollment from managed care in writing to HHSC; however, HHSC considers disenrollment from managed care only in rare situations, when sufficient medical documentation establishes that the MCO cannot provide the needed services, or in any of the circumstances described in 42 CFR 438.56(c). An authorized HHSC representative reviews all disenrollment requests, and processes approved requests for disenrollment from an MCO. The Enrollment Broker provides disenrollment education and offers other options as appropriate.

c. **Disenrollment at Request of MCO.** A managed care organization has a limited right to request a beneficiary be disenrolled from the managed care organization without the beneficiary's consent pursuant to 42 CFR 438.56(b).

25. **Benefits.** The following Table 3a specifies the scope of services that may be made available to STAR, STAR+PLUS, and STAR Kids enrollees through the STAR, STAR+PLUS and STAR Kids managed care plans. The schedule of services mirrors those provided in the Medicaid State plan, with the exception of 1915(b)(3)-like services as described in this waiver. The individuals in these programs would still be able to receive all Texas state plan services based on medical necessity that are not listed in this chart and delivered outside of managed care; e.g. dental, ICF/IID.

Should the state amend its State plan to provide additional optional services not listed below, coverage for those services may also be provided through the STAR, STAR+PLUS, and STAR Kids MCOs.

**Table 3a. State Plan Services[1] for STAR, STAR+PLUS, and STAR Kids Participants**

| Adult/Child | Service | Mandatory or Optional State Plan Services (*) |
|---|---|---|
| Adult/Child | Inpatient Hospital Services[1,2,3] | Mandatory §1905(a)(1) |
| Adult/Child | Outpatient Hospital Services | Mandatory §1905(a)(2) |
| Adult/Child | Rural Health Clinic Services | Mandatory §1905(a)(2) |
| Adult/Child | (Federally Qualified Health Center (FQHC) Services | Mandatory §1905(a)(2) |
| Adult/Child | Laboratory and x-ray services | Mandatory §1905(a)(3) |
| Adult/Child | Diagnostic Services | Optional §1905(a)(13) |
| Child | EPSDT | Mandatory §1905(a)(4) |
| Adult/Child | Family Planning | Mandatory §1905(a)(4) |
| Adult/Child | Tobacco cessation counseling services for pregnant women. | Mandatory §1905(a)(4) |
| Adult/Child | Physician's Services | Mandatory §1905(a)(5) |
| Adult/Child | Medical and Surgical Services Furnished by a Dentist | Mandatory §1905(a)(5) |
| Adult/Child | Podiatrists' Services | Optional §1905(a)(6) |
| Adult/Child | Optometrists' Services | Optional §1905(a)(6) |
| Adult/Child | Chiropractor services | Optional §1905(a)(6) |
| Adult/Child | Other practitioner services: certified registered nurse anesthetists' Services, other categories of advanced nurse practitioner services, licensed clinical social worker (LCSW) services, licensed professional counselor (LPC) services, licensed marriage and family therapist (LMFT) services, psychologists services, services provided by physician assistants, and licensed midwife services | Optional §1905(a)(6) |

---

[1] Services are provided as detailed in Texas' state plan.

| Adult/Child | Intermittent or part-time nursing services provided by a home health agency | Mandatory for individuals who, under the State plan, are entitled to nursing facility services, §1902(a)(10)(D) |
|---|---|---|
| Adult/Child | Home health aide services provided by a home health agency | Mandatory for individuals who, under the State plan, are entitled to nursing facility services, §1902(a)(10)(D) |
| Adult/Child | Medical supplies, equipment, and appliances | Mandatory for individuals who, under the State plan, are entitled to nursing facility services, §1902(a)(10)(D) |
| Adult/Child | Physical therapy, occupational therapy, speech pathology, and audiology provided by a home health agency | Optional §1902(a)(10)(D), 42 CFR 440.70 |
| Adult/Child | Clinic Services | Optional §1905(a)(9) |
| Child | Private Duty Nursing Services | Optional §1905(a)(8) |
| Adult/Child | Prescribed Drugs | Optional §1927(d) |
| Adult/Child | Physical Therapy and related services | Optional §1905(a)(11) |
| Adult/Child | Speech Therapy services | Optional §1905(a)(11) |
| Adult/Child | Non-prescription drugs | Optional §1927(d), §1905(a)(12) |
| Adult/Child | Prosthetic Devices | Optional §1905(a)(12) |
| Adult/Child | Eyeglasses | Optional §1905(a)(12) |
| Adult/Child | Preventive Services | Optional §1905(a)(13) |
| Adult | Services for individuals over age 65 in IMDs – Inpatient, Not Nursing Facility | Optional §1905(a)(14) |
| Adult | Nursing facility services (STAR+PLUS only) | Mandatory §1905(a)(4) |
| Child | Inpatient psychiatric facility services for individuals under age 21 | Optional §1905(a)(16) |
| Adult (STAR+PLUS/STAR Kids) | Rehabilitative Services – Day Activity & Health Services | Optional, Rehabilitation Service, 42 CFR 440.130(d), 1905(a)(13) |
| Adult/Child | Mental Health Rehabilitative Services | Optional, Rehabilitation Service, 1905(a)(13) and 42 CFR 440.130(d) |
| Adult/Child | Targeted Case Management for Individuals with Chronic Mental Illness | Optional 1915(a)(19), 1915(g) |
| Adult/Child | Nurse-Midwife Services | Mandatory §1905(a)(17) |
| Adult/Child | Extended services for pregnant women–Pregnancy-related and postpartum services for a 60-day period after the pregnancy ends and any remaining days in the month in which the 60th day falls | Mandatory §1902(e)(5) |
| Adult/Child | Extended services for pregnant women–Services for any other medical conditions that may complicate pregnancy. | Mandatory §1905(a)(1-5), (17), (21), (28) |
| Adult/Child | Certified pediatric or family nurse practitioners' services | Mandatory §1905(a)(21) |
| Adult/Child | Personal care services in the home | Optional §1905(a)(24), 42 CFR 440.160 |

| Adult/Child | Community First Choice | Optional §1915(k) |
|---|---|---|
| Adult/Child | Ambulatory prenatal care for pregnant women furnished during a presumptive eligibility period by a eligible provider (in accordance with section 1920 of the Act). | Optional §1920 |
| Adult/Child | Respiratory care services (in accordance with section 1902(e)(9)(A) through (C) of the Act). | Optional §1905(a)(20) |
| Adult/Child | Services provided in Religious Nonmedical Health Care Institutions. | Optional §1905(a)(29) |
| Adult/Child | Emergency hospital services. | Optional §1905(a)(29) |
| Adult/Child | Ambulatory Surgical Center Services | Optional §1905(a)(29) |
| Adult/Child | Birthing Center Facility Services | Optional §1905(a)(28), (29) |

[1]Substance use disorder treatment services are capitated services for STAR, STAR+PLUS, and STAR Kids, and MCOs may provide these services in a chemical dependency treatment facility in lieu of the acute care inpatient hospital setting.  Similarly, the MCOs will be responsible for providing acute inpatient days for psychiatric conditions, and may provide these services in a free-standing psychiatric hospital in lieu of acute care inpatient hospital settings.  The State does not include non-State plan services, such as room and board, in the STAR, STAR+PLUS, and STAR Kids capitation; however, the MCO is not restricted to only the delivery of State plan services when alternative services are a cost-effective and medically appropriate response to the needs of the member.

[2] The 30-day spell of illness limitation for hospital inpatient services described in the state plan does not apply to STAR enrollees, certain approved transplants, children age 20 and younger, or to individuals with severe and persistent mental illness.

[3] The annual monetary benefit limitation on inpatient hospital services that is described in the state plan does not apply to STAR, STAR+PLUS, and STAR Kids enrollees.

(*) This column describes whether a services is a required state plan service or if a state can elect to cover the service under the Social Security Act. All services listed here are covered in the Texas State plan.

+ The state plan prescription drug limitations for adults aged 21 and older do not apply to STAR or STAR+PLUS enrollees.

## 26. Self-Referral.  Demonstration beneficiaries may self-refer for the following services:

a.  In-network behavioral health services;

b.  Obstetric and gynecological services, regardless of whether the provider is in the client's MCO network;

c.  In-network eye health care services, other than surgery, including optometry and ophthalmology;

d.  Family planning services, regardless of whether the provider is in the client's MCO network; and

e.  Services from a provider with the Early Childhood Intervention program for children ages 0-3 years with a developmental delay.

27. **Federally Qualified Health Centers and Rural Health Centers.**  An enrollee is guaranteed the choice of at least one MCO which has at least one FQHC as a participating provider.  If the enrollee elects not to select an MCO that includes a FQHC in the provider network, no FQHC services will be required to be furnished to the enrollee while the enrollee is enrolled with that MCO.  The same requirements apply to Rural Health Centers.

28. **Early and Periodic Screening, Diagnosis, and Treatment (EPSDT).**  The MCOs will fulfill the state's responsibilities for coverage, outreach, and assistance with respect to EPSDT services that are described in the requirements of sections 1905(a)(4)(b) (services), 1902(a)(43) (administrative requirements), and 1905(r) (definitions).

## E.  CHILDREN'S DENTAL PROGRAM

29. **Implementation of the Children's Dental Program.**  Children's primary and preventive Medicaid dental services are delivered through a capitated statewide dental services program (the Children's Dental Program).  Contracting dental maintenance organizations (DMOs) maintain networks of Main Dental Home providers, consisting of general dentists and pediatric dentists.  The dental home framework under this statewide program is informed by the improved dental outcomes evidenced under the "First Dental Home Initiative" in the State.  Services provided through the Children's Dental Program are separate from the medical services provided by the STAR, STAR+PLUS, and STAR Kids managed care organizations, and are available to persons listed in Table 2 who are under age 21, with the exception of the groups listed in (a) below.  The Children's Dental Program must conform to all applicable regulations governing prepaid ambulatory health plans (PAHPs), as specified in 42 C.F.R. 438.

a.  The following Medicaid recipients are excluded from the Children's Dental Program, and will continue to receive their Medicaid dental services outside of the Demonstration: Medicaid recipients age 21 and over; all Medicaid recipients, regardless of age, residing in Medicaid-paid facilities such as nursing homes, state supported living centers, or Intermediate Care Facilities for Individuals with an Intellectual Disability or Related Conditions (ICF/ID); and STAR Health Program recipients.

b.  The state will collect relevant data from each DMO to comply with CMS-416 reporting requirements.

## F.  STAR+PLUS HOME AND COMMUNITY BASED SERVICES (HCBS) ENROLLMENT, BENEFITS AND REPORTING REQUIREMENTS

30. **Operations of the STAR+PLUS HCBS Program**

a.  **Compliance with Specified HCBS Requirements.**  All federal regulations that govern the provision of HCBS under section 1915(c) waivers apply, to the HCBS program

authorized under section 1115, and provided through STAR+PLUS. The state includes a description of the steps taken to ensure compliance with these regulations as part of the Annual Report discussed in STC 60. HCBS, under the demonstration, operates in accordance with these STCs and associated attachments.

b. **Determination of Benefits by Designation into a STAR+PLUS HCBS Group.** The STAR+PLUS HCBS Program provides long-term services and supports as identified in Table 5 to two groups of people, as defined below:

i. **STAR+PLUS 217-Like HCBS Group.** This group consists of persons age 21 and older, who meet the NF level of care (LOC), who qualify as members of the 217-Like HCBS Group, and who need and are receiving HCBS as an alternative to NF care. The Demonstration population includes persons who could have been eligible under 42 CFR 435.217 had the state continued its section 1915(c) HCBS waiver for persons who are elderly and/or physically disabled. This group is subject to a numeric enrollment limitation, as described below.

A. **Interest List for STAR+PLUS 217-LIKE HCBS Group.** The state operates an interest list for the STAR+PLUS 217-Like HCBS population in the demonstration who are not in the STAR+PLUS mandatory eligibility categories. An interest list is a list that an individual is placed on when they express interest in enrollment, to the state or local agency that determines eligibility for STAR +PLUS. Individuals meeting all eligibility criteria are enrolled into this population on a "first-come, first-served" basis from the interest list, except that persons entering the demonstration through Money Follows the Person (MFP) are placed at the head of the interest list. These lists are managed on a statewide basis using a standardized assessment tool, and in accord with criteria established by the state. Interest list policies are based on objective criteria and applied consistently in all geographic areas served.

B. **Unduplicated Participant Slots for the 217-Like HCBS Group.** Table 4a below specifies the unduplicated number of participants for the 217-Like Group.

I. Column A reflects the following slots: (1) the number of unduplicated participant slots transferred from the STAR+PLUS 1915(c) waiver, TX 0862; (2) unduplicated participant slots transferred from the Community Based Alternatives (CBA) 1915(c) waiver, TX 0266; (3) individuals released from the interest list; and (4) individuals discharged from institutional care who are in the Money Follows the Person (MFP) Demonstration, in the areas of the state where the managed care expansion occurred.

II. Column B reflects the additional slots made available for the Nursing Facility Diversion Group, created June 1, 2013. The Nursing Facility Diversion Group was created as a subset of the STAR+PLUS 217-Like HCBS Group. This group consists of persons age 65 and older,

and adults with physical disabilities age 21 and older, who meet the NF LOC as defined by the state, who qualify as members of the 217-Like HCBS Group, and who are at imminent risk of entering a nursing facility as a result of a catastrophic episode. Examples of a catastrophic episode include: (1) an individual is significantly dependent on a caregiver to remain in the community and the caregiver passes away or is suddenly no longer able to provide care; (2) an individual has a community support system but must suddenly move where there is no support system; (3) an individual has a sudden occurrence that would cause imminent placement in a nursing facility because he can no longer care for himself; or (4) an individual is identified by the Texas Department of Family and Protective Services as being at imminent risk of nursing facility placement. The number of nursing facility diversion group slots for each DY is listed in the chart below. Nursing Facility Diversion Group slots may be encumbered only by individuals identified as belonging to the Nursing Facility Diversion Group.

III.  Column C reflects the additional slots added September 1, 2015 and September 1, 2016 after the 84th Legislature (Regular Session) of Texas appropriated additional funds to increase the number of unduplicated participants for the STAR+PLUS 217-Like Group served by the STAR+PLUS HCBS Program.

| Table 4a. Unduplicated Number of Participants for the STAR+PLUS 217-Like HCBS group | | | | |
|---|---|---|---|---|
| Demonstration Year | Column A | Column B | Column C | Total |
| DY 7 | 23,001 | 100 | 1,235 | 24,336 |
| DY 8 | 23,090 | 100 | 1,235 | 24,425 |
| DY 9 | 23,407 | 100 | 1,235 | 24,742 |
| DY 10 | 23,793 | 100 | 1,235 | 25,128 |
| DY 11 | 24,239 | 100 | 1,235 | 25,574 |

ii.  **SSI-Related Eligibles.** Persons age 65 and older, and adults age 21 and older, with physical disabilities that qualify as SSI eligibles and meet the NF LOC as defined by the state. Table 4b below specifies the unduplicated number of participants for the SSI-Related Eligible HCBS Group.

I.  Column A column reflects the following slots: (1) the number of unduplicated participants transferred from the STAR+PLUS 1915(c) waiver, TX 0325; (2) the number of unduplicated participants transferred from the CBA 1915(c) waiver; and (3) individuals released from the interest list; and (4) individuals discharged from institutional care who are in the Money Follows the Person (MFP) Demonstration, in the areas of the state where the managed care expansion occurred.

| Table 4b. Unduplicated Number of Participants for the SSI-Related Eligible Group | |
|---|---|
| Demonstration Year | Column A |
| DY 7 | 44,249 |
| DY 8 | 44,710 |
| DY 9 | 45,562 |
| DY 10 | 46,514 |
| DY 11 | 47,563 |

c. **Eligibility for STAR+PLUS HCBS Benefits.** Individuals can be eligible for HCBS under STAR+PLUS depending upon their medical and / or functional needs, financial eligibility designation as a member of the 217-Like STAR+PLUS HCBS Group or an SSI-related recipient, and the ability of the State to provide them with safe, appropriate, and cost-effective LTC services.

   i. Medical and / or functional needs are assessed according to LOC criteria published by the State in State rules. These LOC criteria will be used in assessing eligibility for STAR+PLUS HCBS benefits through the 217-Like or SSI-related eligibility pathways.

   ii. For an individual to be eligible for HCBS services, the State must have determined that the individual's cost to provide services is equal to or less than 202 percent of the cost of the level of care in a nursing facility.

d. **Freedom of Choice.** The service coordinators employed by the managed care organizations must be required to inform each applicant or member of any alternatives available, including the choice of institutional care versus home and community based services, during the assessment process. The Freedom of Choice Form must be incorporated into the Service Plan. The applicant or member must sign this form to indicate that he or she freely choices waiver services over institutional care. The managed care organization's service coordinator also addresses living arrangements, choice of providers, and available third party resources during the assessment.

e. **Service Plan.** In accordance with 42 CFR § 441.301(b)(1)(i), a participant-centered service plan of care must be developed for each participant. All waiver services must be furnished pursuant to the service plan, according to the projected frequency and type of provider. The service plan must also describe the other services, regardless of the funding source, and the informal supports that complement HCBS services in meeting the needs of the participant. The service plan is subject to the approval of the HHSC. Federal financial participation (FFP) may not be claimed for waiver services furnished prior to the development of the service plan or for services that are not included in the service plan. The State will use an electronic process for submission and approval of most individual service plans. Service plans for individuals turning 21, outside the cost ceiling, and the 217-Like Group will remain a manual process.

f.  **Benefit Package under the STAR+PLUS HCBS Program.**  The following Table 5 describe the benefits available to HCBS participants, whether in the 217-Like HCBS Group or the SSI-related group, that are provider-directed and, if the participant elects the option, self-directed.  The services are further defined in Attachment C.

**Table 5. HCBS Services**

| Service | Provider Directed | Participant Directed |
|---|---|---|
| Personal Assistance Service | X | X |
| Respite | X | X |
| Financial Management Services | X | |
| Support Consultation | X | X |
| Adaptive Aids and Medical Supplies | X | |
| Adult Foster Care | X | |
| Assisted Living | X | |
| Dental Services | X | |
| Emergency Response Services | X | |
| Home Delivered Meals | X | |
| Minor Home Modifications | X | |
| Nursing | X | X |
| Occupational Therapy | X | X |
| Physical Therapy | X | X |
| Speech, Hearing, and Language Therapy | X | X |
| Transition Assistance Services | X | |
| Cognitive Rehabilitation Therapy (Effective March 6, 2014) | X | X |
| Supported Employment Services (Effective September 1, 2014) | X | X |
| Employment Assistance Services (Effective September 1, 2014) | X | X |

g.  **Self-Direction of Home and Community Based Services.**  STAR+PLUS participants who elect the self-direction opportunity will have the option to self-direct all or some of the long term services, as identified in Table 5, under the Demonstration.  The services, goods, and supports that a participant self-directs will still be included in the calculations of the participant's budget.  Participant's budget plans will reflect the plan for purchasing these needed services, goods, and supports.

i.  **Information and Assistance in Support of Participant Direction.**  The state shall have a support system that provides participants with information, training, counseling, and assistance, as needed or desired by each participant, to assist the participant to effectively direct and manage their self-directed services and budgets. Participants shall be informed about self-directed care, including feasible alternatives, before electing the self-direction option.  Participants shall also have access to the support system throughout the time that they are self-directing their care.  Support

activities must include, but are not limited to, financial management services and support consultation, defined as follows.

A   **Financial Management Services.**  Financial management services provide assistance to members with managing funds associated with the services elected for self-direction.  Financial management services include initial orientation and ongoing training related to responsibilities of being an employer, and adhering to legal requirements for employers.  The financial management services providers, referred to as the Financial Management Services Agency (FMSA), serves as the member's employer-agent, which is the Internal Revenue Service's (IRS) designation of the entity responsible for making payables and withholding, and filing and depositing taxes on behalf of the members.  As the employer-agent, the FMSA files required forms and reports to the Texas Workforce Commission.

B   **Support Consultation.**  Support Consultation offers practical skills training and assistance to enable an individual to successfully direct those services the individual elects for participant-direction.  This service is provided by a certified support advisor, and includes skills training related to recruiting, screening, and hiring workers, preparing job descriptions, verifying employment eligibility and qualifications, completion of documents required to employ an individual, management of workers, and development of effective back-up plans for services considered critical to the individual's health and welfare in the absence of the regular provider or an emergency situation.  Support consultation is provided only by a certified support advisor certified by HHSC.

ii.   **Participant Direction by Representative.**  The participant who self-directs one or more services may appoint a volunteer designated representative to assist with or perform employer responsibilities to the extent approved by the participant.  The participant documents the employer responsibilities, and that only a non-legal representative freely chosen by the participant or legally authorized representative may serve as the designated representative to assist in performance of employer responsibilities, to the extent desired by the individual or legally authorized representative.  The participant documents the employer responsibilities that the designated representative may and may not perform on the participant's behalf.

iii.  **Participant Budget Authority.**  The participant's budget authority is operated and developed as follows:

A.   The participant has budget authority and decision-making authority over the budget to reallocate funds among services included in the budget; to determine the amount paid for services within the State's established limits; to substitute service providers and to schedule the provision of services; to specify additional service provider qualifications consistent with established criteria; to specify the provision of services consistent with service specifications in Attachment C for services that may be self-directed as specified in Table 5; to identify service providers and refer for provider enrollment; to authorize payment for waiver

goods and services; and to review and approve provider invoices for services rendered.

B. All participants, in conjunction with the FMSA, must develop a budget based on the service plan. The amount of funds included in the service plan is calculated by the service planning team based on the planned waiver services and the adopted reimbursement rate. The service plan is developed in the same manner for the participant who elects to have services delivered through the consumer directed services option as it is for the participant who elects to have services delivered through the traditional provider-managed option.

With approval of the FMSA, the participant may make revisions to a specific service budget that does not change the amount of funds available for the service in the approved service plan. Revisions to the service plan amount available for a particular service, or a request to shift funds from one self-directed waiver service component to another, must be justified by the participant's service planning team and authorized by the MCO.

C. Modifications to the participant directed budget must be preceded by a change in the service plan.

iv. **Disenrollment from Self-Direction.** A participant may voluntarily disenroll from the self-directed option at any time and return to a traditional service delivery system. A participant may also be involuntarily disenrolled from the self-directed option for cause, if continued participation in the consumer directed services option would not permit the participant's health, safety, or welfare needs to be met, or the participant or the participant's representative, when provided with additional support from the CDSA, or through Support Consultation, has not carried out employer responsibilities in accordance with the requirements of this option. If a participant is terminated voluntarily or involuntarily from the self-directed service delivery option, the State will transition the participant to the traditional agency direction option and will have safeguards in place to ensure continuity of services.

h. **Fair Hearing.** For standard and expedited appeals, members must exhaust the MCO's internal standard or expedited appeals process before making a request for a standard or expedited state fair hearing. Procedures related to state fair hearings are described in Attachment F.

i. **Participant Safeguards**. The state must follow all member safeguard procedures as described in Attachment G of these STCs.

## V. FUNDING POOLS UNDER THE DEMONSTRATION

The terms and conditions in Section V apply to the state's exercise of the following Expenditure Authorities: Expenditures Related to the Uncompensated Care Pool, and Expenditures Related to the Delivery System Incentive Reform Payment (DSRIP) Pool.

**32. Terms and Conditions Applying to Pools Generally.**

a. The non-Federal share of pool payments to providers may be funded by state general revenue funds, transfers from units of local government, and certified public expenditures that are compliant with section 1903(w) of the Act. Any payments funded by intergovernmental transfers must remain with the provider, and may not be transferred back to any unit of government.

b. The state must inform CMS of the funding of all payments from the pools to hospitals or other providers through a quarterly payment report to be submitted to CMS within 60 days after the end of each quarter, as required under STC 60 of the STCs. This report must identify the funding sources associated with each type of payment received by each provider.

c. The state will ensure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope or quality of services available under the State plan or this Demonstration. The preceding sentence is not intended to preclude the state from modifying the Medicaid benefit through the State Plan amendment process.

**33. Uncompensated Care (UC) Pool.** Through September 30, 2019, payments from the pool may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are provided to Medicaid eligible or uninsured individuals incurred by hospitals, clinics, or by other provider types, as agreed upon by CMS and the state and defined at subparagraph (c) below. Starting October 1, 2019, payments from this pool may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are provided to uninsured individuals as charity care by hospitals, clinics, or by other provider types, as specified at subparagraph (c) below, including uninsured full or partial discounts, that provide all or a portion of services free of charge to patients who meet the provider's charity care policy and that adhere to the charity care principles of the Healthcare Financial Management Association.[2] Annual UC Pool payments are limited to the annual amounts identified in STC 35. Expenditures for UC payments must be claimed in accordance with CMS-approved claiming protocols for each provider type and application form in Attachment H. The methodology used by the state to determine UC payments will ensure that payments to hospitals, clinics, and other providers are distributed based on uncompensated cost, without any relationship to source of non-federal share, as specified in Attachment H.

a) **UC Application.** To qualify for a UC Payment, a provider must submit to the state an annual UC Application that will collect cost and payment data on services eligible for reimbursement under the UC Pool. Data collected from the application will form the basis for UC Payments made to individual hospitals and non-hospital providers. The state must require hospitals to report data in a manner that is consistent with the

---

[2] Available at http://www.hfma.org/WorkArea/DownloadAsset.aspx?id=14589.

Medicare Form 2552-10 cost report, or for non-hospital providers, a CMS-approved cost report consistent with Medicare cost reporting principles.

i. Cost and payment data included on the application must be based on the Medicare 2552-10 cost report, or for non-hospital providers, a CMS-approved cost report consistent with Medicare cost reporting principles. For hospitals and physician groups, data on the application is for the federal fiscal year (FFY) that is two years prior to the DY in which UC Payments are to be made, in order to allow time for providers to finalize their cost reports from that data year and submit their application data to HHSC. (For example, FFY 2010 was the data year for UC Payments under the UC pool in DY 1.) The state may trend the data to model costs incurred in the year in which payments are to be made. HHSC or its designee will reconcile estimates for prior years. If trending is used, the base year can be no older than 2 years old and must be tied to a generally recognized and widely published trending factor used for trending health care costs. For hospitals not required to report charity care uncompensated costs on their cost reports, the hospital must report the required data in the tool approved by CMS and included in Attachment H. Any overpayments identified in the reconciliation process that occurred in a prior year must be recouped from the provider, with the FFP returned to CMS, except that during the reconciliation process, if a provider demonstrates that it has allowable uncompensated costs consistent with the protocol that were not reimbursed through the initial UC Payment (based on application figures), and the state has available UC Pool funding for the year in which the costs accrued, the state may provide reimbursement for those actual documented unreimbursed UC costs through a prior period of adjustment. For ambulance and dental providers, data on the application is based on actual eligible costs incurred during the demonstration year for which the payments are made.

ii. Any provider that meets the criteria below may submit a UC Application to be eligible to receive a UC Payment.

A. Private providers must have an executed indigent care affiliation agreement on file with HHSC.

B. Only providers participating in a (Regional Health Partnership) RHP are eligible to receive a UC Payment, although exceptions may be approved by CMS on a case by case basis.

iii. When submitting the UC Application, providers may request that cost and payment data from the data year be adjusted to reflect increases or decreases in costs, resulting from changes in operations or circumstances. A provider may request that:

A. Costs and revenue not reflected on the filed cost report, but which would be incurred for the program year, be included when calculating payment amounts; or

B. Costs and revenue reflected on the filed cost report, but which would not be incurred for the program year, be excluded when calculating payment amounts.

Adjustments described in subparagraphs (I) and (II) above cannot be considered as part of the reconciliation of a prior year payment. Such costs must be properly documented by the provider, and are subject to review by the State. Such costs are subject to reconciliation to ensure that providers actually incurred such eligible uncompensated costs.

iv. All applicable inpatient and outpatient hospital UC payments received by a hospital provider count as title XIX revenue, and must be included as offsetting revenue in the State's annual DSH audit reports. Providers receiving both DSH and UC Payments cannot receive total payments under the State plan and the UC Pool (related to inpatient and outpatient hospital services) that exceed the hospital's total eligible uncompensated costs. UC Payments for physicians, non-physician professionals, pharmacy, and clinic costs are not considered inpatient or outpatient Medicaid payments for the purpose of annual hospital specific DSH limits and the DSH audit rule. All reimbursements must be made in accordance with CMS approved cost-claiming protocols that are consistent with the Medicare Form 2552-10 cost report or, for non-hospital providers, a CMS approved cost report consistent with Medicare cost reporting principles.

b) **UC Payment Protocol.** The UC Payment Protocol, also known as the funding and reimbursement protocol, establishes rules and guidelines for the State to claim FFP for UC Payments. The approved UC Payment Protocol is appended into these STCs as Attachment H. By July 31, 2019, the state must submit for CMS approval an addendum to the funding and reimbursement protocol that will establish rules and guidelines for the State to claim FFP for UC Payments beginning in DY 9 (October 1, 2019 through September 30, 2020). CMS and Texas will work collaboratively with the expectation of CMS approval of the protocol within 90 calendar days after it receives the addendum. The state cannot claim FFP for any UC Payments for DY 9 or later until a UC Protocol addendum has been submitted to and approved by CMS. The UC Payment Protocol addendum must include precise definitions of eligible uncompensated provider charity care costs (consistent with the Medicare cost reporting principles and revenues that must be included in the calculation of uncompensated charity care cost for purpose of reconciling UC payments to unreimbursed charity care cost). The Protocol will also identify the allowable source documents to support costs; it will include detailed instructions regarding the calculation and documentation of eligible costs, the tool used by the State and providers to apply for UC Payments, and a timetable and reconciliation of payments

against actual charity care cost documentation. This process will align the application process (based on prior cost periods) to the reconciliation process (using the application costs from subsequent years to reconcile earlier payments). The Protocol will contain not only allowable costs and revenues, it will also indicate the twelve (12) month period for which the costs will apply.

The State must submit a UC Payment Protocol addendum for each non-hospital provider type that may seek UC payments. FFP will not be available for UC Payments made to a non-hospital provider type for DY 9 or later until a cost-claiming protocol addendum consistent with the Medicare cost reporting principles is approved by CMS for the relevant non-hospital provider type.

c) **UC Payments to Non-Hospital Providers.** UC Payments may be provided only to the following qualifying non-hospital providers: physician practice groups, government ambulance providers, and government dental providers. UC Payments are considered to be Medicaid payments to providers and must be treated as Medicaid revenue when determining total title XIX funding received, in particular for any provider utilizing certified public expenditures as the non-Federal share of a Medicaid payment.

d) **Reporting Requirements for UC Payments**. The state will submit to CMS two reports related to the amount of UC Payments made from the UC Pool per Demonstration Year. The reporting requirements are as follows:

    i. By December 31st of each Demonstration Year, the State shall provide the following information to CMS:

        A. The UC payment applications submitted by eligible providers; and

        B. A chart of estimated UC Payments to each provider for a DY.

    ii. Within ninety (90) days after the end of each Demonstration year, the State shall provide the following information to CMS:

        A. The UC Payment applications submitted by eligible providers; and

        B. A chart of actual UC payments to each provider for the previous DY.

e) **Required Milestones for UC Pool Transition.** CMS expects Texas will work in good faith to implement all requirements specified in these STCs, and in particular this STC 33, within the necessary timeline. To help ensure the state is making adequate progress toward meeting these requirements on the required timetable, the state must satisfy the milestones specified in this sub-STC 33(e). If Texas fails to meet any one or more of them, the permanent reduction of expenditure authority will immediately and irrevocably apply, as specified below. CMS will only modify these

milestones and associated penalties in extraordinary circumstances, and only through an amendment request pursuant to STC 7.

i. <u>Submit and implement the revised Attachment H by DY9:</u> Texas is required to submit Attachment H (the UC Payment Protocol) for CMS review by March 30, 2018. The revised Attachment H must be implemented as part of the revised UC distribution methodology starting October 1, 2019.

   A. CMS will permanently reduce Texas' UC expenditure authority by 20 percent for DY 7 and disallow funding that exceeds the reduced expenditure authority amount if Texas has not submitted a draft Attachment H to CMS by March 30, 2018.

   B. Texas may not claim FFP for UC payments after October 1, 2019 until CMS has approved Attachment H.

   C. Texas may claim FFP for DY 9 after it has received CMS approval and implemented the revised Attachment H, up to the annual limit (which is subject to reduction pursuant to sub-STC 33(e)(i)(D), below).

   D. If Texas has not demonstrated to CMS it has implemented the revised Attachment H by October 1, 2019, CMS will permanently reduce Texas' UC pool expenditure authority by 20 percent for DY 9 and disallow funding that exceeds the reduced expenditure authority amount.

ii. <u>Revise UC applications for all provider types</u>: After HHSC receives CMS approval of Attachment H (UC Payment Protocol), and concurrent with the state administrative rule amendment timeframe (see sub-STC 33(e)(iii), below), HHSC must revise, test, and obtain CMS approval of the application tools used to collect the information needed to determine the eligibility of providers to participate in the UC pool and their eligible uncompensated costs, as described in the protocol.

   A. CMS will permanently reduce Texas' UC expenditure authority by 20 percent for DY 8 and disallow funding that exceeds the reduced expenditure authority amount if Texas has not submitted draft revised UC application tools for all provider types to CMS by May 1, 2019, or if CMS has not approved revised UC tools for all provider types by August 31, 2019.

iii. <u>Amend the administrative rules that govern the program</u>: Once HHSC has received CMS approval of Attachment H (UC Payment Protocol), and concurrent with its revision of the UC applications for all provider types, HHSC must conduct the state administrative rulemaking process to amend the state's administrative rules governing the UC pool with respect to each

provider type to comport with the requirements of these STCs. The state has indicated that the rule development timeline is normally six-to-nine months, including the notice and comment periods required by state law.

   A. CMS will permanently reduce Texas' UC expenditure authority by 20 percent for DY7 and disallow funding that exceeds the reduced expenditure authority amount unless Texas begins the necessary administrative rule amendment process required to implement the UC pool distribution changes required by these STCs by no later than July 31, 2018. Texas must demonstrate to CMS that it is undertaking rulemaking to amend the Texas Administrative Code (TAC) to implement the required UC pool distribution methodology changes; this will be demonstrated by publishing a notice of the proposed rulemaking in the Texas Register and notice of a public hearing related to that rulemaking.

   B. CMS will permanently reduce Texas' UC expenditure authority by an additional 20 percent for DY8 and disallow funding that exceeds the reduced expenditure authority amount unless Texas has published the necessary final administrative rules to implement the required UC pool distribution methodology by January 30, 2019. The amended rules must be effective no later than September 30, 2019. Texas must demonstrate this by sending CMS a copy of the final rule as published in the Texas Register.

iv. If Texas's UC expenditure authority is reduced more than once for a DY, the reductions are applied cumulatively.[3]

v. The deliverables mentioned in this subparagraph (e) are not subject to STC 56.

**34. Delivery System Reform Incentive Payment (DSRIP) Pool.** The DSRIP Pool is available for the development of a program of activity that supports providers' efforts to enhance access to health care, the quality of care, and the health of the patients and families they serve. The program of activity funded by the DSRIP shall be based in Regional Healthcare Partnerships (RHPs) that are directly responsive to the needs and characteristics of the populations and communities comprising the RHP. Each RHP will have geographic boundaries, and will be directed by a public hospital or a local governmental entity. In collaboration with participating providers, the public hospital or local governmental entity will develop a delivery reform and incentive plan that is rooted in the intensive learning and sharing that will accelerate meaningful improvement within the providers participating in the RHP. Individual providers' DSRIP proposals must flow from the RHP plans, and be consistent with the providers' shared mission and quality goals within the RHP, as well as

---

[3] For one reduction in a DY, multiply the original UC pool limit by (1 - 0.20). For two reductions in a DY, multiply the reduced UC pool limit again by (1 – 0.20), or equivalently, multiply the original UC pool limit by (1 - 0.20)×(1 - 0.20).

CMS's overarching approach for improving health care through the simultaneous pursuit of three aims: better care for individuals (including access to care, quality of care, and health outcomes; better health for the population; and lower cost through improvement (without any harm whatsoever to individuals, families or communities) (the Three Part Aim).

Starting with DY 7, DSRIP will be temporarily extended with the goal of identifying non-DSRIP funding to continue financing these activities, and an updated methodology, reflecting an evolution from project-level reporting to provider core activities supporting performing provider-level outcomes that measure continued transformation of the Texas healthcare system. Performing providers are named in RHP plans to be eligible to receive DSRIP payments. DSRIP in this extension will support performing providers to move further towards sustainability of their transformed systems outside of the DSRIP funding structure, which could include development of Alternative Payment Models (APMs) to continue services for Medicaid beneficiaries within managed care or FFS funding structures, and to low-income or uninsured individuals outside of the Medicaid program after the demonstration ends. Further operational details (such as the definitions of categories, terms and processes below) will be delineated in the protocols.

a. **Focus Areas.** There are 4 areas for which funding is available under the DSRIP, each of which has explicit connection to the achievement of the Three Part Aim. Activities will be identified within the following categories, and included in the full list of projects provided in the Measure Bundle Protocol (Attachment R)

　　i. **Category A: Required reporting in order to be eligible for any amount of DSRIP payment** – Providers will describe transition from DY 2-6 to DY 7-8 activities, and specifically address the following.
　　　　1. Core activities – Report on performance improvement projects designed to enhance achievement on Category C measure goals.
　　　　2. Alternative Payment Methodology (APM) – Report on provider's progress toward, or implementation of, APM arrangements.
　　　　3. Costs and savings – Performing providers with greater than $1M total valuation will submit costs and forecasted/generated savings for at least one core activity. Valuations are described in Attachment J.
　　　　4. Collaborative activities - Performing providers will attend at least one learning collaborative, stakeholder forum, or other stakeholder meeting annually.

　　ii. **Category B: Report on Medicaid and Low-income or Uninsured (MLIU) Patient Population by Provider (PPP)** – Performing providers must maintain or increase number of MLIU individuals served each DY, within allowable variation specified in the protocols.

　　iii. **Category C: Measure Bundles and Measures** – Providers will select and report on health care quality and system performance measures, selected from a menu of pre-determined Measure Bundles or measures, and be rewarded based on meeting targeted improvement goals.

iv.   **Category D: Statewide Reporting Measure Bundle** – Providers will report on a statewide reporting Measure Bundle of population health measures for their provider type, to gain information on and understanding of the health status of key populations and to build the capacity for reporting on a comprehensive set of population health metrics.

b.   **Regional Healthcare Partnerships.**  Regional Healthcare Partnerships will be maintained throughout the state to coordinate regional planning, information sharing, and ongoing collaborative activities among DSRIP providers.  Each RHP will include a variety of healthcare providers to adequately respond to the needs of the community, and the process of maintaining each RHP and developing RHP plans will evidence meaningful participation by all interested providers.  Each RHP will be anchored (i.e. single point of contact for the RHP) by a public hospital (or in areas with no public hospital, anchored by a local governmental entity) that will be responsible for developing the RHP's DSRIP plan in coordination with other identified RHP providers.

c.   **DSRIP Plans within the RHP.**  RHP anchoring entities will develop RHP plans in good faith, to leverage public and non-public hospital and other community resources to best achieve delivery system transformation goals within RHP areas consistent with the Demonstration's requirements. RHP anchoring entities shall provide opportunities for public input to the development of RHP plans, and shall provide opportunities for discussion and review of proposed RHP plans prior to plan submission to the state.  In accordance with the guidelines specified in the DSRIP protocols (see STC 34(d)), a final RHP DSRIP Plan must include maximum payment amounts for DSRIP Payments.  These amounts may be proportionally adjusted based on available non-Federal share.

d.   **DSRIP Plans and Protocols.** The state may not claim DSRIP funding after January 1, 2018, for DSRIP DY 7-10, until the milestones discussed in this paragraph have been met.

i.   Within one month of the approval of this second extension, CMS, the state and Texas providers will, through a collaborative process, finalize updates to the RHP Planning Protocol (Attachment I), Program Funding and Mechanics Protocol (Attachment J), or other protocol documents as the state may propose to implement the DSRIP program as described above.

ii.   The updated protocols must include information on state and CMS review and approval processes for RHP Plan Updates, RHP and State reporting requirements, how potential DSRIP incentive payment amounts will be distributed to Performing Providers and to RHPs, mechanisms and payment methodologies.

iii. Texas may not claim FFP for DSRIP payments after Januaury1, 2018 for DSRIP DY 7-10, or later until after updated protocols for those DYs have been approved by CMS.

e. **DSRIP Payments are Not Direct Reimbursement for Expenditures or Payments for Services.** Payments from the DSRIP pool are intended to support and reward hospital systems and other providers for improvements in their delivery systems that support the simultaneous pursuit of improving the experience of care, improving the health of populations, and reducing per capita costs of health care. Payments from the DSRIP Pool are not considered patient care revenue, and shall not be offset against disproportionate share hospital expenditures or other Medicaid expenditures that are related to the cost of patient care (including stepped down costs of administration of such care) as defined under these Special Terms and Conditions, and/or under the State Plan.

f. **DSRIP Expenditure Reporting**. Texas will submit total DSRIP expenditures, including payments to providers reflecting the basis for incentive payments, 6 months after the end of each demonstration year.

35. **Limits on Pool Payments.** Expenditures eligible for FFP for UC Pool and DSRIP Pool in each DY may not exceed the amounts shown in Table 6.

a. **Reassessment of Hospitals' Uncompensated Charity Care.** CMS and Texas agree that UC Pool limits for DY 9-11 will be revised based on a reassessment of the amount of uncompensated charity care cost provided by Texas hospitals, to take place by September 1, 2019. The state and CMS will collaborate on the reassessment, which will be based on information reported by hospitals for 2017 on schedule S-10 of the CMS 2552-10 hospital cost report, with adjustment to ensure that demonstration pool payments do not enter the calculation, following a methodology approved by CMS. For non-S-10 hospitals, costs will be based on the CMS-approved cost reports described in Attachment H for the most recent available year. The results of the reassessment will be used to revise the UC Pool limits for DY 9-11.

b. If the reassessment discussed in (a) is not completed to produce an updated UC Pool limit by September 1, 2019, the place-holder amounts shown in Table 6 will be used to supply the preliminary UC Pool limits for DY 9-11.

c. When 2017 S-10 data as specified in 35(a) becomes available, the state and CMS will collaborate to recalculate the UC pool limits for DY 9-11 based on this updated information. The recalculated UC pool limits will become the final UC pool limits for DY 9-11. In addition to prospectively modifying the UC pool limits based on this recalculation, CMS and the state will perform a reconciliation of UC pool payments made on or after October 1, 2019. If UC pool payments for the reconciliation period have exceeded the final UC pool limit for that period, CMS will reclaim overpayments for these years. If the UC pool payments for the reconciliation period were less than the final

UC pool limit, CMS will provide FFP for additional payments consistent with the final UC pool limits so that Texas may make additional payments to providers for UC costs.

**Table 6. Pool Allocations According to Demonstration Year (total computable)**

| Type of Pool | DY 6** (2016-2017) | DY 7** (2017-2018) | DY 8 (2018- 2019) | DY 9 (2019- 2020) | DY 10 (2020-2021) | DY 11 (2021-2022) |
|---|---|---|---|---|---|---|
| UC | 3,100,000,000 | 3,101,776,278 | 3,101,776,278 | 2,334,323,270* | 2,334,323,270* | 2,334,323,270* |
| DSRIP | 3,100,000,000 | 3,100,000,000 | 3,100,000,000 | 2,910,000,000 | 2,490,000,000 | 0 |

*UC Pool limit amounts for DY 9-11 are placeholder amounts, pending reassessment of hospital uncompensated charity care discussed in the paragraphs above.
**Amounts shown for DY 6 are reduced by 20 percent from the amounts shown in the terms and conditions for the 15-month extension, to reflect redefinition of DY 6 to be 12 months instead of 15 months. Amounts for DY 7 include the 20 percent of adjustment formerly shown as part of DY 6.

## 36. Assurance of Budget Neutrality.

a. By October 1 of each year, the State must submit an assessment of budget neutrality to CMS, including a summation of all expenditures and member months already reported to CMS, estimates of expenditures already incurred but not reported, and projections of future expenditures and member months to the end of the Demonstration, broken out by DY and Medicaid Eligibility Group (MEG) or other spending category.

b. Should the report in (a) indicate that the budget neutrality Annual Target for any DY has been exceeded, or is projected to be exceeded, the State must propose adjustments to the limits on UC Pool and DSRIP Pool limits, such that the Demonstration will again be budget neutral on an annual basis, and over the lifetime of the Demonstration. The new limits will be incorporated through an amendment to the Demonstration.

## 37. Transition Plan for DSRIP Pool.

a. Texas will submit a draft transition plan to CMS by October 1, 2019 for CMS review and approval, describing how the state will further develop its delivery system reform efforts without DSRIP funding and/or phase out DSRIP funded activities. The final transition plan will become Attachment Q of the STCs for this demonstration. It must be finalized within 6 months of submission to CMS. As Texas' DSRIP is a time-limited federal investment that will conclude by October 2021, Texas will propose milestones by which it will be accountable for measuring sustainability of its delivery system reform efforts absent DSRIP funding. Milestones may relate to the use of alternative payment models, the state's adoption of managed care payment models, payment mechanisms that support providers' delivery system reform efforts, and other opportunities.

b. Portions of overall FFP for DSRIP will be at-risk for the state's achievement on achievement milestones, as specified below. If Texas fails to submit a complete sustainability plan by October 1, 2019, CMS will defer 10 percent of FFP for DSRIP funding starting in the next quarter, and an amount in all subsequent quarters indefinitely

until the state comes into compliance. Accountability for performance on these milestones will be as follows:, an additional 15 percent for FFP for DSRIP will be at risk in demonstration year 9, and additional 20 percent off FFP for DSRIP will be at risk in demonstration year 10.

c. This deliverable will not be subject to the deferral as described to STC 56; all accountability for the Transition Plan will be applied as per this STC.

38. **1115A Duals Demonstration Savings.** When Texas' section 1115(a) demonstration is considered for an amendment, renewal, and at the end of the duals demonstration, CMS' Office of the Actuary (OACT) will estimate and certify actual title XIX savings to date under the duals demonstration attributable to populations and services provided under the 1115(a) demonstration. This amount will be subtracted from the 1115(a) budget neutrality savings approved for the renewal.

Specifically, OACT will estimate and certify actual title XIX savings attributable to populations and services provided under the 1115(a) demonstration following the methodology below.

The actual title XIX savings attributable to populations and services provided under the 1115(a) demonstration are equal to the savings percentage specified in the 1115A duals demonstration MOU multiplied by the Medicaid portion of the 1115A demonstration capitation rate and the number of 1115A duals demonstration beneficiaries enrolled in the 1115(a) demonstration. The Medicaid portion of the 1115A Demonstration capitation rate is reviewed by CMS's Medicare and Medicaid Coordination Office (MMCO), MMCO's contracted actuaries and CMS' Office of the Actuary (OACT), and was certified by the state's actuaries. Per the 1115A duals demonstration MOU, the actual Medicaid rate paid for beneficiaries enrolled in the 1115A demonstration is equivalent to the state's 1115A Medicaid capitation rate minus an established savings percentage (as outlined in the chart below). The state must track the number of member months for every Medicare-Medicaid enrollee (MME) who participates in both the 1115(a) and 1115A demonstration.

The table below provides an illustrative example of how the savings attributable to populations and services provided under the 1115(a) demonstration is calculated

| A. 1115A Demonstration Year | B. Medicaid Capitation Rate (hypothetical) | C. Medicaid Savings Percentage Applied Per MOU (average) | D. Savings Per Month (B*C) | E. Member Months of MMEs who participated in 1115A and 1115(a) Demos (estimated) | F. Amount subtracted from 1115(a) BN savings/ margin (D*E) |
|---|---|---|---|---|---|
| DY 1.a | $1,000 PMPM | 1.25% | $12.50 PMPM | 1,000 | 1,000* $12.50 PMPM = $12,500 |

| DY 1.b | $1,000 PMPM | 2.75% | $27.50 PMPM | 1,000 | 1,000 * $27.50 PMPM = $27,500 |
| DY 2 | $1,000 PMPM | 3.75% | $37.50 PMPM | 1,000 | 1,000* $37.50 PMPM = $37,500 |
| DY 3 | $1,000 PMPM | 5.5% | $55.00 PMPM | 1,000 | 1,000 * $55.00 PMPM = $55,000 |

In each quarterly budget neutrality report, the state must provide the information in the above-named chart (replacing estimated figures with actual data). Should rates differ by geographic area and/or rating category within the 1115A demonstration, this table should be done for each geographic area and/or rating category. In addition, the state must show the "amount subtracted from the 1115(a) budget neutrality savings" in the updated budget neutrality Excel worksheets that are submitted each quarter.

Finally, in each quarterly CMS-64 submission and in each quarterly budget neutrality report, the state must indicate in the notes section: "For purposes of 1115(a) demonstration budget neutrality reporting purposes, the state reports the following information:

- Number of Medicare-Medicaid enrollees served under the 1115 duals demonstration = *[Insert number]*
- Number of member months = *[Insert number]*
- PMPM savings per dual beneficiary enrolled from the 1115A duals demonstration = *[Insert number]*

The State must make the necessary retroactive adjustments to the budget neutrality worksheets to reflect modifications to the rates paid in the 1115A demonstration. This must include any Medicaid payment triggered by the risk corridor, IGTs, or other retroactive adjustments. The State must add additional columns to the chart above in subsequent quarterly reporting to reflect those adjustments.

## VI.    HEALTH IT

**39.**    This STC is specifically related to the purposes of this demonstration. The plans envisioned in this section however should be aligned with the state's broader State Medicaid Health IT Plan (SMHP). The state will use Health Information Technology ("Health IT") to link services and core providers across the continuum of care to the greatest extent possible. The state is expected to achieve minimum standards in foundational areas of Health IT and to develop its own goals for the transformational areas of Health IT use. The state will discuss how it plans to meet the Health IT goals/milestones outlined below . Through semi-annual reporting, the state will further enumerate how it has, or intends to, meet the stated goals. This STC is not subject to STC 56.

a. The state must have plan(s) with achievable milestones for Health IT adoption for Medicaid service providers both eligible and ineligible for the Medicaid Electronic Health Records (EHR) Incentive Programs and execute upon the plan(s).

b. The state shall create a pathway, or a plan, for the exchange of clinical health information related to Medicaid beneficiaries statewide to support the demonstration's program objectives.

c. The state shall advance the standards identified in the "Interoperability Standards Advisory—Best Available Standards and Implementation Specifications" (ISA) in developing and implementing state policies—and in all applicable state procurements (e.g. including managed care contracts).

    i. Wherever it is appropriate, the state must require that contractors providing services paid for by funds authorized under this demonstration shall adopt the standards referenced in 45 CFR Part 170.

    ii. Wherever services paid for by funds authorized by this demonstration are not addressed by 45 CFR Part 170, but are addressed by the ISA, the state should require that contractors providing such services adopt the appropriate ISA standard.

    iii. States should use the CMS 1115 Health IT resources available on "Medicaid Program Alignment with State Systems to Advance HIT, HIE, and Interoperability" at https://www.medicaid.gov/medicaid/data-and-systems/hie/index.html. Specifically, the state should utilize the "1115 Health IT Toolkit" for health IT considerations in conducting an assessment and developing their Health IT Strategic Plans.

d. Based on the assessment described above, the state will provide a Health IT Strategic Plan that details existing HIT capabilities. Texas will aim to submit the Plan to CMS by October 1, 2019. The Strategic Plan should also support the goals below -- and develop a mutually-agreed upon timeframe between CMS and the state for submitting the plan and any necessary enhancements.

    i. When multiple Medicaid providers provide coordinated care to a beneficiary, the state shall require the legally appropriate electronic exchange of clinical health information, using the Consolidated Clinical Document Architecture (C-CDA), among appropriate members of the individual patient's interdisciplinary care team.

    ii. The state shall ensure legally appropriate access to a comprehensive Medicaid enterprise master patient index that supports the programmatic objectives of the demonstration.

    iii. The state shall ensure a comprehensive Medicaid service provider directory strategy that supports the programmatic objectives of the demonstration.

    iv. The state will pursue legally appropriate means of improved coordination and improved integration between Medicaid Behavioral Health, Physical Health, Home and Community Based Providers and community-level collaborators for Improved Care Coordination (as applicable) through the adoption of provider-level Health IT infrastructure and software—to facilitate and improve integration and coordination to support the programmatic objectives of the demonstration.

v.  The State shall ensure a comprehensive Health IT-enabled quality measurement strategy that supports the legally appropriate collection of data necessary for the State to monitor and evaluate programmatic objectives of the demonstration, and the legally appropriate means of providing such data for demonstration monitoring and evaluation activities.

## VII.  GENERAL FINANCIAL REQUIREMENTS

This project is approved for title XIX expenditures applicable to services rendered during the demonstration period.  This project is approved for title XXI expenditures applicable to services rendered during the demonstration period for certain children ages 6-18 between 100-133% FPL. This section describes the general financial requirements for these expenditures.

40. **Quarterly Expenditure Reports.** The state must provide quarterly title XIX expenditure reports using Form CMS-64, to separately report total expenditures for services provided through this demonstration under section 1115 authority that are subject to budget neutrality. This project is approved for expenditures applicable to services rendered during the demonstration period.  CMS shall provide FFP for allowable demonstration expenditures, only as long as they do not exceed the pre-defined limits on the costs incurred, as specified in Section VIII.

The state shall provide quarterly title XXI expenditure reports using the Form CMS64.21U/CMS64.21UP to report total title XXI expenditures for services provided to M-CHIP children under the section 1115 authority until its XXI allotment is spent and then using the 64.9/64.9P Waiver form with waiver name of "THTQIP-M-CHIP," and "THTQIP-Qualified". CMS will provide Federal financial participation (FFP) for allowable Texas title XXI demonstration expenditures that do not exceed the state's available title XXI funding and then Federal participation at the enhanced rate under Title XIX once the state's Title XXI funding is fully exhausted.

41. **Expenditures Subject to the title XIX Budget Neutrality Expenditure Limit.**

a.  All expenditures for Medicaid services for demonstration participants (as defined in STC 20 [Table 2], 21 [Table 3], and 30 [Table 5]) are demonstration expenditures subject to the budget neutrality expenditure limit, except expenditures for the services listed as follows:

i.  Medical transportation;

ii.  Medicare premiums;

iii.  Other 1915(c) waiver programs as follows: Medically Dependent Children Program (TX 0181), Deaf Blind with Multiple Disabilities (TX 0281), Home and Community-Based Services (TX 0110), Community Living Assistance and Support Services (TX

0221), Texas Home Living (TX 0403), and Youth Empowerment Services (TX 0657).

b.  All Funding Pool expenditures (as defined in Section V) are demonstration expenditures subject to the budget neutrality expenditure limit.

42.  **Reporting Expenditures Under the Demonstration.**  The following describes the reporting of expenditures subject to the budget neutrality agreement:

a.  **Use of Waiver Forms.**  In order to track expenditures under this demonstration, the state must report demonstration expenditures through the Medicaid and Children's Health Insurance Program Budget and Expenditure System (MBES/CBES), following routine CMS-64 reporting instructions outlined in Section 2500 of the State Medicaid Manual (SMM).  All Demonstration expenditures claimed under the authority of title XIX of the Act, and subject to the budget neutrality expenditure limit, must be reported each quarter on separate Forms CMS-64.9 Waiver and/or 64.9P Waiver, identified by the Demonstration Project Number (11-W-00278/6) assigned by CMS.

b.  **Reporting By Date of Service.**  In each quarter, Demonstration expenditures (including prior period adjustments) must be totaled and reported on separate Forms CMS-64.9 Waiver and/or 64.9P Waiver by Demonstration Year (DY).  The DY for which expenditures are reported is identified using the project number extension (a 2-digit number appended to the Demonstration Project Number).  Expenditures must be assigned to DYs on the basis of date of service (except for pool payments, as discussed below).  The date of service for premium payments is identified as the DY that includes the larger share of the month for which the payment is principally made.  Pool payments must be reported by DY as follows:  UC payments must be reported in a manner consistent with the payment timeframes specified in the UC Pool Protocol, and DSRIP payments must be reported based on the payment methodologies and annual maximum budgets specified in the final master DSRIP plans.  DY 1 will be the year beginning October 1, 2011, and ending September 30, 2012, and subsequent DYs will be defined accordingly.

c.  **Use of Waiver Forms.**  Each quarter, the State must identify separate forms CMS-64.9 Waiver and/or 64.9P Waiver by Waiver Name to report expenditures that belong in the following categories:

i.  "THTQIP-Adults" – Medicaid service expenditures for all participating individuals whose MEG is defined as Adults;

ii.  "THTQIP-Children" – Medicaid service expenditures for all participating individuals whose MEG is defined as Children;

iii.  "THTQIP-AMR" – Medicaid service expenditures for all participating individuals who are aged, or who are disabled and have Medicare;

iv.  "THTQIP-Disabled" – Medicare service expenditures for all participating individuals

who are disabled and do not have Medicare;

v.   "THTQIP-UC" – All expenditures that count against UC Pool limits;

vi. "THTQIP-DSRIP" – All DSRIP Pool expenditures.

vii. "THTQIP-QUALIFIED" – Medicaid service expenditures for all participating individuals whose MEG is defined as Qualified aliens.  Title XXI expenditures for this group are excluded from budget neutrality but are counted against the Title XXI allotment as described in paragraph (d) below.

viii.   "THTQIP-M-CHIP" – All expenditures for children who are ages 6-18 and between 100-133% FPL, or children served in CHIP on December 31, 2013 due to assets in excess of Medicaid eligibility limits.  These are children who meet the definition of "targeted low-income child" specified in section 2110 (b)(1) of the Social Security Act. Title XXI expenditures for this group are excluded from budget neutrality but are counted against the Title XXI allotment as described in paragraph (d) below.

**d.  Title XXI Funded Groups in the Waiver.**
Expenditures for THTQIP-Qualified and THTQIP-M-CHIP under title XXI must be reported on separate Forms CMS-64.21U and/or 64.21UP in accordance with the instructions in section 2115 of the State Medicaid Manual, identified using Waiver Name "THTQIP-M-CHIP" or "THTQIP-QUALIFIED."

i. Title XIX funds for children who are ages 6-18 and between 100-133% FPL meeting the definition of "targeted low-income child" specified in section 2110(b)(1) of the Social Security Act (M-CHIP children) are available under this demonstration if the state exhausts its title XXI allotment once timely notification as described in subparagraph (iii) has been provided.

ii. If the state exhausts its title XXI allotment prior to the end of a federal fiscal year, title XIX federal matching funds are available for these M-CHIP children.  During the period when title XIX funds are used, expenditures related to this demonstration population must be reported as waiver expenditures on the Forms CMS 64.9 Waiver and/or CMS 64.9P Waiver, identified using Waiver Name "THTQIP-M-CHIP.". To initiate this:

A. The state shall provide CMS with 120 days prior notice before it begins to draw down title XIX matching funds for the M-CHIP children demonstration population;

B. The State shall submit:

<blockquote>
<p style="margin-left: 2em;">I. An updated budget neutrality assessment that includes a data analysis which identifies the specific "with waiver" impact of the proposed change on the current budget neutrality expenditure cap. Such analysis shall include current total computable "with waiver" and "without waiver" status on both a summary and detailed level through the current extension approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as result of the proposed change which isolates (by Eligibility Group) the impact of the change;</p>

<p style="margin-left: 2em;">II. An updated CHIP allotment neutrality worksheet.</p>

<p>iii. If the state exhausts its title XXI allotment prior to the end of a Federal fiscal year, the expenditures attributable to the M-CHIP children demonstration population for which title XIX funds are available will count toward the budget neutrality expenditure cap calculated under STC 50, using member month of title XIX funded M-CHIP children times the per member per month (PMPM) amounts for TANF Children described in STC 50(b)(ii), and will be considered expenditures subject to the budget neutrality cap as defined in STC 48(a).</p>
</blockquote>

e. **Pharmacy Rebates.** Because pharmacy rebates are not reflected in the data used to determine the budget neutrality expenditure limit, all pharmacy rebates must be reported on Forms CMS-64.9 Base or Forms CMS-64.9P Base, and not on any waiver form associated with this Demonstration.

f. **Cost Settlements.** For monitoring purposes, cost settlements related to the Demonstration must be recorded on the appropriate prior period adjustment schedules (Form CMS 64.9P Waiver) for the Summary Sheet Line 7 or 10.B, in lieu of Line 9. For any other cost settlements (i.e., those not attributable to this Demonstration), the adjustments should be reported, as instructed in the State Medicaid Manual. The amount of non-claim specific cost settlements will be allocated to each DY based on the larger share of the coverage period for which the cost settlement is made.

g. **Premium and Cost Sharing Adjustments.** Premiums and other applicable cost-sharing contributions that are collected by the State from enrollees under the Demonstration must be reported to CMS each quarter on Form CMS-64 Summary Sheet Line 9D, columns A and B. In order to assure that these collections are properly credited to the Demonstration, premium and cost-sharing collections (both total computable and Federal share) should also be reported separately by Demonstration Year on the Form CMS-64 Narrative. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to Demonstration populations will be offset against expenditures. These section 1115 premium collections will be included as a manual adjustment (decrease) to the Demonstration's actual expenditures on a quarterly basis.

h. **Administrative Costs.** Administrative costs are not included in the budget neutrality expenditure limit, but the State must separately track and report additional administrative

costs that are directly attributable to the demonstration. All attributable administrative costs must be identified on the Forms CMS-64.10 Waiver and/or 64.10P Waiver, using Waiver Name "TX Reform Admin."

i. **Administrative Cost Claiming Protocol.** The state must maintain a CMS-approved Administrative Cost Claiming Protocol, to be incorporated as Attachment K to these STCs, which explains the process the State will use to determine administrative costs incurred under the demonstration. CMS will provide Federal financial participation (FFP) to the State at the regular 50 percent match rate for administrative costs incurred according to limitations set forth in the approved Administrative Cost Claiming protocol. No FFP is allowed until a claiming protocol is approved by CMS.

j. **Claiming Period**. All claims for expenditures subject to the budget neutrality expenditure limit (including any cost settlements) must be made within 2 years after the calendar quarter in which the state made the expenditures. Furthermore, all claims for services during the demonstration period (including any cost settlements) must be made within 2 years after the conclusion or termination of the demonstration. During the latter 2-year period, the State must continue to identify separately on the CMS-64 waiver forms, the net expenditures related to dates of service during the operation of the section 1115 demonstration, in order to account for these expenditures properly to determine budget neutrality.

43. **Reporting Member Months.** The following describes the reporting of member months for Demonstration participants.

a. For the purpose of calculating the budget neutrality expenditure limit, the state must provide to CMS, as part of the Budget Neutrality Monitoring Tool required under STC 54, the actual number of eligible member months for all demonstration participants, according to the MEGs defined in STCs 20 (Table 2) and 21 (Table 3). The state must submit a statement accompanying the Budget Neutrality Monitoring Tool, which certifies the accuracy of this information.

b. To permit full recognition of "in-process" eligibility, reported member month totals may be revised subsequently, as needed. To document revisions to totals submitted in prior quarters, the State must report a new table with revised member month totals indicating the quarter for which the member month report is superseded.

c. The term "eligible member months" refers to the number of months in which persons are eligible to receive services. For example, a person who is eligible for 3 months contributes 3 eligible member months to the total. Two individuals, who are eligible for 2 months each, contribute 2 eligible member months to the total, for a total of 4 eligible member months.

44. **Standard Medicaid and CHIP Funding Process.**

a. The standard Medicaid funding process must be used during the Demonstration. The State must estimate matchable demonstration expenditures (total computable and Federal

share) subject to the budget neutrality expenditure limit, and separately report these expenditures by quarter for each Federal fiscal year on the Form CMS-37 for both the Medical Assistance Payments (MAP) and State and Local Administration Costs (ADM). CMS shall make Federal funds available based upon the State's estimate, as approved by CMS. Within 30 days after the end of each quarter, the State must submit the Form CMS-64 quarterly Medicaid expenditure report, showing Medicaid expenditures made in the quarter just ended. CMS shall reconcile expenditures reported on the Form CMS-64 with Federal funding previously made available to the state, and include the reconciling adjustment in the finalization of the grant award to the state.

b. The standard title XXI funding process will be used during the demonstration for M-CHIP children. The state must estimate matchable M-CHIP expenditures on the quarterly Form CMS-37. As a footnote to the CMS-37, the state shall provide updated estimates of expenditures for the M-CHIP children demonstration populations. CMS will make Federal funds available based upon the state's estimate, as approved by CMS. Within 30 days after the end of each quarter, the state must submit the Form CMS-64.21 U-Waiver quarterly CHIP expenditure report. CMS will reconcile expenditures reported on the Form CMS-64.21U-waiver with Federal funding previously made available to the state, and include the reconciling adjustment in the finalization of the grant award to the state.

**45. Extent of Federal Financial Participation for the Demonstration**. Subject to CMS approval of the source(s) of the non-federal share of funding (see STC 46, *Sources of Non-Federal Share*), CMS shall provide FFP at the applicable federal matching rates for the demonstration as a whole as outlined below, subject to the budget neutrality limits described in Section IX of these STCs:

a. Administrative costs, including those associated with the administration of the demonstration;

b. Net expenditures and prior period adjustments of the Medicaid program that are paid in accordance with the approved Medicaid state plan and waiver authorities;

c. Net expenditures and prior period adjustments, made under approved Expenditure Authorities granted through section 1115(a)(2) of the Act, with dates of service during the operation of the demonstration;

d. Net expenditures for Funding Pool payments.

**46. Sources of Non-Federal Share.** The state certifies that the matching non-Federal share of funds for the demonstration is state/local monies. The state further certifies that such funds shall not be used as the match for any other federal grant or contract, except as permitted by law. All sources of non-Federal funding must be compliant with section 1903(w) of the Act and applicable regulations. In addition, all sources of the non-Federal share of funding are subject to CMS approval. CMS approval of this demonstration does not constitute approval of any specific Medicaid financing mechanism used to support provider payment

arrangements. All federal statutes and regulations not expressly waived or identified as inapplicable, including with respect to state share financing, continue to apply.

a. CMS may review, at any time, the sources of the non-federal share of funding for the demonstration. The State agrees that all funding sources deemed unacceptable by CMS shall be addressed within the time frames set by CMS.

b. Any amendments that impact the financial status of the program shall require the State to provide information to CMS regarding all sources of the non-Federal share of funding.

c. Under all circumstances, health care providers must retain 100 percent of the STAR, STAR+PLUS, and STAR Kids reimbursement amounts claimed by the state as a demonstration expenditure. Moreover, no pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the State and/or local government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (such as payments related to taxes (including health care provider-related taxes), fees, and business relationships with governments that are unrelated to Medicaid and in which there is no connection to Medicaid payments) are not considered returning and/or redirecting a Medicaid payment.

47. **Demonstration Year Definitions.** Demonstration Years are defined in the following table.

**Table 7: Demonstration Year Definitions**

| Demonstration Year | Start Date | End Date |
|---|---|---|
| DY 1 | December 12, 2011* | September 30, 2012 |
| DY 2 | October 1, 2012 | September 30, 2013 |
| DY 3 | October 1, 2013 | September 30, 2014 |
| DY 4 | October 1, 2014 | September 30, 2015 |
| DY 5 | October 1, 2015 | September 30, 2016 |
| DY 6 | October 1, 2016 | September 30, 2017 |
| DY 7 | October 1, 2017 | September 30, 2018 |
| DY 8 | October 1, 2018 | September 30, 2019 |
| DY 9 | October 1, 2019 | September 30, 2020 |
| DY 10 | October 1, 2020 | September 30, 2021 |
| DY 11 | October 1, 2021 | September 30, 2022 |

* For purpose of expenditure reporting and budget neutrality, DY 1 begins October 1, 2011.

## VIII. MONITORING BUDGET NEUTRALITY FOR THE DEMONSTRATION

48. **Limit on Title XIX and XXI Funding.**

a. The state shall be subject to a limit on the amount of federal title XIX funding that the state may receive on selected Medicaid expenditures during the period of approval of the

demonstration. The limit is determined by using a per capita cost method, with an aggregate adjustment for projected supplemental provider payments. The budget neutrality expenditure targets are set on a yearly basis with a cumulative budget neutrality expenditure limit for the length of the entire demonstration. Actual expenditures subject to the budget neutrality expenditure limit shall be reported by the state using the procedures described in Section VII.

b. The state will be subject to a limit on the amount of federal title XXI funding that the state may receive on demonstration expenditures for M-CHIP children during the demonstration period. Federal title XXI funding available for demonstration expenditures for M-CHIP children is limited to the state's available allotment, including currently available reallocated funds and contingency funds. Should the state expend its available title XXI Federal funds for the claiming period, no further enhanced title XXI Federal matching funds will be available for costs of the approved title XXI child health program or demonstration until the next allotment becomes available.

   i. <u>Exhaustion of title XXI Funds.</u> After the State has exhausted title XXI funds, expenditures for M-CHIP children, may be claimed as title XIX expenditures. The State shall report expenditures for these children as waiver expenditures on the Forms CMS 64.9 Waiver and/or CMS 64.9P Waiver in accordance with STC 42.

   ii. <u>Exhaustion of title XXI Funds Notification.</u> The State must notify CMS in writing of any anticipated title XXI shortfall at least 120 days prior to an expected change in claiming of expenditures for the M-CHIP children. The State must follow Medicaid State plan criteria for these beneficiaries unless specific waiver and expenditure authorities are granted through this demonstration.

**49. Risk.** Under this budget neutrality agreement, Texas shall be at risk for the per capita cost of participating Medicaid and demonstration eligibles, but not for the number of demonstration eligibles. In this way, Texas will not be at risk for changing economic conditions that impact enrollment levels; however, by placing Texas at risk for the per capita costs for Medicaid and demonstration eligibles, CMS assures that the Federal demonstration expenditures do not exceed the level of expenditures that would have occurred had there been no demonstration.

**50. Budget Neutrality Expenditure Limit**. The following describes the method for calculating the budget neutrality expenditure limit:

a. For each DY of the budget neutrality agreement, an Annual Target is calculated as the sum two components.

   i. The <u>Per Capita Component</u> is the sum of four sub-components, calculated as the projected per member per month (PMPM) cost, times the actual number of member months (reported by the State in accordance with STC 43) for the MEGs identified in (b) below.

ii. The <u>Aggregate Component</u> is a projection of what certain supplemental payments to providers would have cost each year in the absence of the Demonstration, as shown in (c) below.

b. Table 8 gives the projected PMPM costs to be used in the Per Capita Component calculation in each DY.

**Table 8 – Projected PMPM Costs, Base Medical and Included UPL**

| MEG | DY 6 Base | Trend | DY 7 | DY 8 | DY 9 | DY 10 | DY 11 |
|---|---|---|---|---|---|---|---|
| **AMR** | $1,167.10 | 3.8% | $1,253.57 | $1,301.21 | $1,350.66 | $1,401.98 | $1,455.26 |
| **Disabled** | $1,755.80 | 4.1% | $1,723.19 | $1,793.84 | $1,867.39 | $1,943.96 | $2,023.66 |
| **Adults** | $1,110.87 | 5.3% | $1,023.19 | $1,077.42 | $1,134.52 | $1,194.65 | $1,257.96 |
| **Children** | $344.52 | 4.5% | $347.08 | $362.70 | $379.02 | $396.07 | $413.90 |

c. The following table shows the calculation of the Aggregate Component for each DY. These projections were developed by the state and accepted by CMS, and are based on historical trends in supplemental payment amounts and UPLs. They represent what the state would have paid in supplemental provider payments in the absence of the demonstration.

**Table 9-- Aggregate Component**

| Payment Stream | DY 6 Base* | DY 7 | DY 8 | DY 9 | DY 10 | DY 11 |
|---|---|---|---|---|---|---|
| **Inpatient Hospital UPL for Included Population** | N/A | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 |
| **Inpatient Hospital UPL for Excluded Population** | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 |
| **Outpatient Hospital UPL** | $72,483,206 | $72,483,206 | $72,483,206 | $72,483,206 | $72,483,206 | $72,483,206 |
| **Physician UPL** | $84,237,473 | $84,237,473 | $84,237,473 | $84,237,473 | $84,237,473 | $84,237,473 |
| **TOTAL** | $1,838,370,522 | $4,185,251,227 | $4,185,251,227 | $4,185,251,227 | $4,185,251,227 | $4,185,251,227 |

* DY 6 amounts are reduced by 20 percent from the May 2016 temporary extension amount due to redefinition of DY 6 from a 15-month to a 12-month period.

d. The budget neutrality expenditure limit is the Federal share of the combined total of the Annual Targets for all DYs, and is calculated as the sum of the Annual Targets times the Composite Federal Share (defined in (e) below). This limit represents the maximum

amount of FFP that the State may receive for title XIX expenditures during the Demonstration period.

e. **Savings Phase-out.** Each DY, the net variance between the without-waiver cost and actual with-waiver cost will be reduced for selected Medicaid population-based MEGs. The reduced variance will be calculated as a percentage of the total variance, which will then be substituted for the total variance to determine overall budget neutrality for the demonstration. (Equivalently, the difference between the total variance and reduced variance could be subtracted from the without-waiver cost estimate.) The formula for calculating the reduced variance is: reduced variance equals total variance times applicable percentage. The percentages for each MEG and DY are determined based on the amount of time the associated population has been enrolled in managed care subject to this demonstration; lower percentages are for longer established managed care populations will have lower percentages applied to them. The MEGs affected by this provision and the applicable percentages are shown in Table 10 below, except that if the total variance for an MEG in a DY is negative, the applicable percentage is 100 percent.

**Table 10 – Savings Phase-Out**

| MEG | DY 7 | DY 8 | DY 9 | DY 10 | DY 11 |
|---|---|---|---|---|---|
| AMR | 86% | 83% | 76% | 68% | 60% |
| Disabled | 82% | 78% | 74% | 69% | 61% |
| Adults | 52% | 48% | 44% | 41% | 37% |
| Children | 60% | 55% | 49% | 43% | 38% |

f. The Composite Federal Share is the ratio calculated by dividing the sum total of FFP received by the State on actual Demonstration expenditures during the approval period (as reported through the MBES/CBES and summarized on Schedule C) by total computable Demonstration expenditures for the same period as reported on the same forms.

g. CMS policy requires that budget neutral savings cannot be derived from hypothetical populations. In this Demonstration, the STAR+PLUS 217-Like HCBS Eligibility Group is the only hypothetical population. On request from CMS, the State must provide separate expenditure and member month totals by MEG for individuals in the STAR+PLUS 217-Like HCBS Eligibility Group to allow any saving attributable to that group to be netted out of the budget neutrality calculation.

51. **Future Adjustments to the Budget Neutrality Expenditure Limit.** CMS reserves the right to adjust the budget neutrality expenditure limit to be consistent with enforcement of impermissible provider payments, health care related taxes, new Federal statutes, or policy interpretations implemented through letters, memoranda, or regulations with respect to the provision of services covered under this demonstration. CMS reserves the right to make adjustments to the budget neutrality expenditure limit if any health care-related tax that was in effect during the base year with respect to the provision of services covered under this Demonstration, or provider-related donation that occurred during the base year, is determined by CMS to be in violation of the provider donation and health care-related tax

provisions of section 1903(w) of the Social Security Act. Adjustments to annual budget targets will reflect the phase out of impermissible provider payments by law or regulation, where applicable.

52. **Enforcement of Budget Neutrality**. CMS shall enforce budget neutrality over the life of the demonstration extension, which for this purpose will be from October 1, 2017 through September 30, 2022 (i.e., DY 7 through DY 11). The budget neutrality test for the demonstration extension may incorporate net savings from the immediately prior demonstration period consisting of DY 2 through DY 6, but not from any earlier approval period. If the State exceeds the calculated cumulative target limit for this approval period by the percentage identified below for any of the DYs, the state shall submit a corrective action plan to CMS for approval.

| DY | Cumulative Target Definition | Percentage |
|---|---|---|
| DY 7 | Cumulative budget neutrality cap plus: | 3 percent |
| DY 8 | Cumulative budget neutrality cap plus: | 1 percent |
| DY 9 | Cumulative budget neutrality cap plus: | 0.5 percent |
| DY 10 | Cumulative budget neutrality cap plus: | 0 percent |
| DY 11 | Cumulative budget neutrality cap plus: | 0 percent |

53. **Exceeding Budget Neutrality**. If the budget neutrality expenditure limit has been exceeded at the end of this demonstration period, the excess Federal funds shall be returned to CMS. If the demonstration is terminated prior to the end of the budget neutrality agreement, the budget neutrality test shall be based on the time elapsed through the termination date.

54. **Budget Neutrality Monitoring Tool.** The state and CMS will jointly develop a budget neutrality monitoring tool (using a mutually agreeable spreadsheet program) for the state to use for quarterly budget neutrality status updates and other in situations when an analysis of budget neutrality is required. The state will revise this tool quarterly, and submit it to CMS within 60 days after the end of each quarter. The tool will incorporate the C Report for monitoring actual expenditures subject to budget neutrality. A working version of the monitoring tool will be available in early calendar year 2018. Should CMS issue a standardized budget neutrality monitoring tool, the state will begin providing its quarterly budget neutrality status updates using the standardized tool as directed by CMS.

55. **Withholding of Payment of Claims Under the Uncompensated Care Expenditure Authority Based on Failure to Submit Uncompensated Care Pool Reconciliations.** Texas must submit to CMS final reconciliations of all uncompensated care pools payments (e.g., identify all overpayments) for the period of DY1 to DY5 by January 30, 2020. If the final reconciliation is not submitted by January 30, 2020, CMS will make a retroactive deferral adjustment to the State's DY5 expenditure authority for the UC Pool by one percent for non-compliance with the final reconciliation requirement for failure to adequately document uncompensated care pool claims through reconciliation of claimed payments with allowable payments. If the final reconciliation has not been submitted within six months of initiation of the withhold, CMS will reduce the UC expenditure

authority by one percent for DY5 and will offset any amount claimed for DY5 in excess of the resulting expenditure authority from the grant award for the second quarter of calendar year 2020.

Texas must submit to CMS reconciliations of all uncompensated care pools payments for DY 6 (October 1, 2016 - September 30, 2017) by January 31, 2021. If the final reconciliation is not submitted by the dates set out above, CMS will withhold FFP (in the manner of a deferral) payable under the grant award for the fourth quarter of 2020, in an amount equal to the federal share of one percent of the state's DY6 expenditure authority for the UC Pool for failure to adequately document uncompensated care pool claims through reconciliation of claimed payments with allowable payments. If the final reconciliation has not been submitted within six months of initiation of the withhold, CMS will reduce the UC expenditure authority by one percent for DY6 and will offset any amount claimed for DY6 in excess of the resulting expenditure authority from the grant award for the third quarter of calendar year 2021. The above provisions will apply in the same manner to reconciliations of uncompensated care pools payments for DYs subsequent to DY 6, with key dates adjusted accordingly.

Texas must also credit the federal government with a share of any provider overpayments that are found in the course of reconciliations in accordance with the requirements of 42 CFR Part 433, Subpart F, or redistribute them as authorized elsewhere in these STCs.  Under those regulations, a refund of the Federal share of an overpayment must be made to CMS within one year after the date on which an overpayment is discovered or, if earlier, the date the provider refunded the overpayment. The date of discovery will be the earlier of the date that: the reconciliation is finalized; the provider was notified in writing of the overpayment or acknowledged the overpayment; or the state initiated a formal recoupment action.

Deliverables under this section will not be subject to the deferral indicated in STC 56, but solely the deferrals denoted in this STC.

## IX. GENERAL REPORTING REQUIREMENTS

56. **Deferral for Failure to Submit Timely Demonstration Deliverables.** CMS may issue deferrals in the amount of $5,000,000 per deliverable (federal share) when items required by these STCs, such as listed in Attachment A, (e.g., required data elements, analyses, reports, design documents, presentations, and other items specified in these STCs (hereafter singly or collectively referred to as "deliverable(s)") are not submitted timely to CMS or found to not be consistent with the requirements approved by CMS. Specifically:

   a. Thirty (30) days after the deliverable was due, CMS will issue a written notification to the state providing advance notification of a pending deferral for late or non-compliant submissions of required deliverables.

b. For each deliverable, the state may submit a written request for an extension to submit the required deliverable. Extension requests that extend beyond the current fiscal quarter must include a Corrective Action Plan (CAP).

    i. CMS may decline the extension request.

    ii. Should CMS agree in writing to the state's request, a corresponding extension of the deferral process described below can be provided.

    iii. If the state's request for an extension includes a CAP, CMS may agree to or further negotiate the CAP as an interim step before applying the deferral.

c. The deferral would be issued against the next quarterly expenditure report following the written deferral notification.

d. When the state submits the overdue deliverable(s) that are accepted by CMS, the deferral(s) will be released.

e. As the purpose of a section 1115 demonstration is to test new methods of operation or services, a state's failure to submit all required deliverables may preclude a state from renewing a demonstration or obtaining a new demonstration.

f. CMS will consider with the state an alternative set of operational steps for implementing the intended deferral to align the process with the state's existing deferral process, for example what quarter the deferral applies to, and how the deferral is released.

57. **Submission of Post-approval Deliverables.** The state must submit all deliverables as stipulated by CMS and within the timeframes outlined within these STCs.

58. **Compliance with Federal Systems Updates.** As federal systems continue to evolve and incorporate additional 1115 waiver reporting and analytics functions, the state will work with CMS to:

a. Revise the reporting templates and submission processes to accommodate timely compliance with the requirements of the new systems;

b. Ensure all 1115, T-MSIS, and other data elements that have been agreed to for reporting and analytics are provided by the state; and

c. Submit deliverables to the appropriate system as directed by CMS.

59. **Cooperation with Federal Evaluators.** As required under 42 CFR 431.420(f), the state shall cooperate fully and timely with CMS and its contractors' in any federal evaluation of the demonstration or any component of the demonstration. This includes, but is not limited to, commenting on design and other federal evaluation documents and providing

data and analytic files to CMS, including entering into a data use agreement that explains how the data and data files will be exchanged, and providing a technical point of contact to support specification of the data and files to be disclosed, as well as relevant data dictionaries and record layouts. The state shall include in its contracts with entities who collect, produce or maintain data and files for the demonstration, that they shall make such data available for the federal evaluation as is required under 42 CFR 431.420(f) to support federal evaluation. The state may claim administrative match for these activities. Failure to comply with this STC may result in a deferral being issued as outlined in STC 56.

60. **Monitoring Reports.** The state must submit one (1) compiled Annual Report each DY. The compiled Annual Report is due no later than 120 days following the end of the DY. The state shall submit one semi-annual report each year. In addition, CMS reserves the right to increase the frequency of reporting as deemed necessary by CMS Officials (e.g., to require quarterly reports). The Annual Report will include all required elements as per 42 CFR 431.428 subpart G, and should not direct readers to links outside the report. Additional links not referenced in the document may be listed in a Reference/Bibliography section. The Monitoring Reports must follow the framework provided by CMS, which is subject to change as monitoring systems are developed/evolve, and be provided in a structured manner that supports federal tracking and analysis.

a. Operational Updates - Per 42 CFR 431.428, the Monitoring Reports must document any policy or administrative difficulties in operating the demonstration. The reports shall provide sufficient information to document key challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed. The discussion should also include any issues or complaints identified by beneficiaries; lawsuits or legal actions; unusual or unanticipated trends; legislative updates; and descriptions of any public forums held. The Monitoring Report should also include a summary of all public comments received through post-award public forums regarding the progress of the demonstration.

b. Performance Metrics – Per 42 CFR 431.428, the Monitoring Reports must document the impact of the demonstration in providing insurance coverage to beneficiaries and the uninsured population, as well as outcomes of care, quality and cost of care, and access to care. This may also include the results of beneficiary satisfaction surveys, if conducted, grievances and appeals. The required monitoring and performance metrics must be included in writing in the Monitoring Reports, and will follow the framework provided by CMS to support federal tracking and analysis.

c. Budget Neutrality and Financial Reporting Requirements – Per 42 CFR 431.428, the Monitoring Reports must document the financial performance of the demonstration. The state must provide an updated budget neutrality workbook with every Monitoring Report that meets all the reporting requirements for monitoring budget neutrality set forth in the General Financial Requirements section of these STCs, including the

submission of corrected budget neutrality data upon request. In addition, the state must report quarterly and annual expenditures associated with the populations affected by this demonstration on the Form CMS-64. Administrative costs should be reported separately.

Evaluation Activities and Interim Findings. Per 42 CFR 431.428, the Monitoring Reports must document any results of the demonstration to date per the evaluation hypotheses. Additionally, the state shall include a summary of the progress of evaluation activities, including key milestones accomplished, as well as challenges encountered and how they were addressed.

61. **Close Out Report.** Within 120 days prior to the expiration of the demonstration, the state must submit a draft Close Out Report to CMS for comments.

    d. The draft final report must comply with the most current guidance from CMS.

    e. The state will present to and participate in a discussion with CMS on the Close-Out report.

    f. The state must take into consideration CMS' comments for incorporation into the final Close Out Report.

    g. The final Close Out Report is due to CMS no later than thirty (30) days after receipt of CMS' comments.

    h. A delay in submitting the draft or final version of the Close Out Report may subject the state to penalties described in STC 56.


X. **MONITORING CALLS AND DISCUSSIONS**

62. **Monitoring Calls.** CMS will convene periodic conference calls with the state.

    i. The purpose of these calls is to discuss ongoing demonstration operation, to include (but not limited to), any significant actual or anticipated developments affecting the demonstration. Examples include implementation activities, enrollment and access, managed care issues, budget neutrality, and progress on evaluation activities.

    j. CMS will provide updates on any pending actions, as well as federal policies and issues that may affect any aspect of the demonstration.

    k. The state and CMS will jointly develop the agenda for the calls.

63. **Post Award Forum.** Pursuant to 42 CFR 431.420(c), within six (6) months of the demonstration's implementation, and annually thereafter, the state shall afford the public with an opportunity to provide meaningful comment on the progress of the

demonstration.  At least thirty (30) days prior to the date of the planned public forum, the state must publish the date, time and location of the forum in a prominent location on its website.  The state must also post the most recent annual report on its website with the public forum announcement. Pursuant to 42 CFR 431.420(c), the state must include a summary of the comments in the Monitoring Report associated with the quarter in which the forum was held, as well as in its compiled Annual Report.

## XI. EVALUATION OF THE DEMONSTRATION

64. **Independent Evaluator.**  Upon approval of the demonstration, the state must begin arrangements with an independent party to conduct an evaluation of the demonstration to ensure that the necessary data is collected at the level of detail needed to research the approved hypotheses. The independent party must sign an agreement to conduct the demonstration evaluation in an independent manner in accord with the CMS-approved, draft Evaluation Design.  When conducting analyses and developing the evaluation reports, every effort should be made to follow the approved methodology.  However, the state may request, and CMS may agree to, changes in the methodology in appropriate circumstances.

65. **Evaluation Budget.**  A budget for the evaluation shall be provided with the draft Evaluation Design.  It will include the total estimated cost, as well as a breakdown of estimated staff, administrative and other costs for all aspects of the evaluation such as any survey and measurement development, quantitative and qualitative data collection and cleaning, analyses and report generation.  A justification of the costs may be required by CMS if the estimates provided do not appear to sufficiently cover the costs of the design or if CMS finds that the design is not sufficiently developed, or if the estimates appear to be excessive.

66. **Draft Evaluation Design.**  The draft Evaluation Design must be developed in accordance with Attachments O (Developing the Evaluation Plan) of these STCs.  The state must submit, for CMS comment and approval, a draft Evaluation Design with implementation timeline, no later than one hundred twenty (120) days after the approval date of these STCs.  Any modifications to an existing approved Evaluation Design will not affect previously established requirements and timelines for report submission for the demonstration, if applicable.  The state may choose to use the expertise of the independent party in the development of the draft Evaluation Design.

67. **Evaluation Design Approval and Updates.**  The state must submit a revised draft Evaluation Design within sixty (60) days after receipt of CMS' comments.  Upon CMS approval of the draft Evaluation Design, the document will be included as an attachment to these STCs.  Per 42 CFR 431.424(c), the state will publish the approved Evaluation Design within thirty (30) days of CMS approval.  The state must implement the evaluation design and submit a description of its evaluation implementation progress in each of the Monitoring Reports, including any required Rapid Cycle Assessments specified in these SCTs.  Once CMS approves the evaluation design, if the state wishes to make changes, the state must submit a revised evaluation design to CMS for approval.

68.     **Evaluation Questions and Hypotheses.**  Consistent with Attachments O and P (Developing the Evaluation Plan and Preparing the Evaluation Report) of these STCs, the evaluation documents must include a discussion of the evaluation questions and hypotheses that the state intends to test. There are three main demonstration components: the carve-in of additional populations and services into Medicaid managed care, the UC pool, and DSRIP.  Each demonstration component should have at least one evaluation question and hypothesis.  The hypothesis testing should include, where possible, assessment of both process and outcome measures. Proposed measures should be selected from nationally-recognized sources and national measures sets, where possible. Measures sets could include CMS's Core Set of Health Care Quality Measures for Children in Medicaid and CHIP (Child Core Set), CMS's Core Set of Health Care Quality Measures for Medicaid-eligible Adults (Adult Core Set), Consumer Assessment of Health Care Providers and Systems (CAHPS), and/or measures endorsed by National Quality Forum (NQF).

69.     **Interim Evaluation Report.**  The state must submit an Interim Evaluation Report for the completed years of the demonstration, and for each subsequent renewal or extension of the demonstration, as outlined in 42 CFR 431.412(c)(2)(vi).  When submitting an application for renewal, the Evaluation Report should be posted to the state's website with the application for public comment.

   l.   The interim evaluation report will discuss evaluation progress and present findings to date as per the approved evaluation design.

   m.   For demonstration authority that expires prior to the overall demonstration's expiration date, the Interim Evaluation Report must include an evaluation of the authority as approved by CMS.

   n.   If the state is seeking to renew or extend the demonstration, the draft Interim Evaluation Report is due when the application for renewal is submitted.  If the state made changes to the demonstration in its application for renewal, the research questions and hypotheses, and how the design was adapted should be included.  If the state is not requesting a renewal for a demonstration, an Interim Evaluation report is due one (1) year prior to the end of the demonstration, September 30, 2021.  For demonstration phase outs prior to the expiration of the approval period, the draft Interim Evaluation Report is due to CMS on the date that will be specified in the notice of termination or suspension.

   o.   The state must submit the final Interim Evaluation Report 60 days after receiving CMS comments on the draft Interim Evaluation Report and post the document to the state's website.

   p.   The Interim Evaluation Report must comply with attachment P (Preparing the Evaluation Report) of these STCs.

70. **Summative Evaluation Report.** The draft Summative Evaluation Report must be developed in accordance with Attachment P (Preparing the Evaluation Report) of these STCs. The state must submit a draft Summative Evaluation Report for the demonstration's current approval period within 18 months of the end of the approval period represented by these STCs (March 31, 2023). The Summative Evaluation Report must include the information in the approved Evaluation Design.

    q. Unless otherwise agreed upon in writing by CMS, the state shall submit the final Summative Evaluation Report within 60 days of receiving comments from CMS on the draft.

    r. The final Summative Evaluation Report must be posted to the state's Medicaid website within 30 days of approval by CMS.

71. **State Presentations for CMS.** CMS reserves the right to request that the state present and participate in a discussion with CMS on the Evaluation Design, the interim evaluation, and/or the summative evaluation.

72. **Public Access.** The state shall post the final documents (e.g., Monitoring Reports, Close Out Report, approved Evaluation Design, Interim Evaluation Report, and Summative Evaluation Report) on the state's Medicaid website within 30 days of approval by CMS.

73. **Additional Publications and Presentations.** For a period of twelve (12) months following CMS approval of the final reports, CMS will be notified prior to presentation of these reports or their findings, including in related publications (including, for example, journal articles), by the state, contractor, or any other third party directly connected to the demonstration. Prior to release of these reports, articles or other publications, CMS will be provided a copy including any associated press materials. CMS will be given ten (10) business days to review and comment on publications before they are released. CMS may choose to decline to comment or review some or all of these notifications and reviews. This requirement does not apply to the release or presentation of these materials to state or local government officials.

## Attachment A

## Demonstration Deliverables

| Quarterly Deliverables | | |
|---|---|---|
| | Quarterly expenditure, budget neutrality, member month reports | 33, Section VI, and  42 |
| **Annual Deliverables** | | |
| December 31st of each DY | Estimated UC Payments | 33 |
| 90 days following end of DY | Actual UC Payments | 33 |
| 90 days following end of DY | DSRIP Payments | 34 |
| 120 days after end of each Demonstration year | Draft Annual Report | 60 |
| Within 60 days of receipt of comments from CMS, annually | Final Annual Report | 60 |
| Oct. 1st of each year | Assurance of Budget Neutrality | 36(a) |
| **Other Deliverables** | | |
| No later than April 1, 2019 | Revised UC Payment Protocol | 33(a) |
| No later than October 1, 2018 | Draft DSRIP Transition Plan | 37 |
| Within 6 months of submission to CMS | Final DSRIP Transition Plan | 37 |
| No later than January 30, 2020 | Final reconciliations of all uncompensated care pools payments (e.g., identify all overpayments) for the period of DY1 to DY5 by January 30, 2020 | 55 |
| No later than January 31, 2021 | Reconciliations of all uncompensated care pools payments for DY 6 (October 1, 2016 - September 30, 2017) by January 31, 2021. The provisions within STC will apply in the same manner to reconciliations of uncompensated care | 55 |

| | | |
|---|---|---|
| | pools payments for DYs subsequent to DY 6, with key dates adjusted accordingly. | |
| No later than 120 days after approval of demonstration extension | Draft Evaluation Design | 66 |
| Within 90 days after receipt of CMS' comments | Final Evaluation Design | 67 |
| 12 months before expiration of Demonstration | Request For Extension | 8 |
| 6 months prior to the effective date of Demonstration's suspension or termination | Notification letter and Draft Phase-Out Plan | 9 |
| Within 120 days prior to the expiration of the demonstration | Within 120 days prior to the expiration of the demonstration, the state must submit a draft Close Out Report to CMS for comments | 61 |
| Post 30-day public comment period | Revised Phase-Out Plan incorporating public comment | 9 |
| The date of Application for Renewal | Interim Evaluation Report | 8 and 69 |
| Within 18 months of the end of the demonstration approval period | Draft Summative Evaluation Report | 70 |
| Within 90 days of receipt of CMS comments on Draft Summative Evaluation Report | Final Summative Evaluation Report | 70 |
| Within 60 days of the end of each quarter | Quarterly Budget Neutrality Template | 53 |

# Attachment B: Semi-annual and annual report template

## Reserved

**Attachment C**
**HCBS Service Definitions**

The following are the provider guidelines and service definitions for HCBS provided to individuals requiring a nursing facility level of care under STAR+PLUS.

| Service | Service Definition |
|---------|-------------------|
| **Adaptive Aids and Medical Supplies** | Adaptive aids and medical supplies are specialized medical equipment and supplies which include devices, controls, or appliances that enable members to increase their abilities to perform activities of daily living, or to perceive, control, or communicate with the environment in which they live.<br><br>This service also includes items necessary for life support, ancillary supplies, and equipment necessary to the proper functioning of such items, and durable and non-durable medical equipment not available under the Texas State Plan, such as: vehicle modifications, service animals and supplies, environmental adaptations, aids for daily living, reachers, adapted utensils, and certain types of lifts.<br><br>The annual cost limit of this service is $10,000 per waiver plan year.<br><br>The State allows a member to select a relative or legal guardian, other than a legally responsible individual, to be his/her provider for this service if the relative or legal guardian meets the requirements for this type of service. |
| **Adult Foster Care** | Adult foster care services are personal care services, homemaker, chore, and companion services, and medication oversight provided in a licensed (where applicable) private home by an adult foster care provider who lives in the home. Adult foster care services are furnished to adults who receive these services in conjunction with residing in the home.<br><br>The total number of individuals (including persons served in the waiver) living in the home cannot exceed three, without appropriate licensure. Separate payment will not be made for personal assistance services furnished to a member receiving adult foster care services, since these services are integral to and inherent in the provision of adult foster care services.<br><br>Payments for adult foster care services are not made for room and board, items of comfort or convenience, or the costs of facility maintenance, upkeep, and improvement. The State allows a member to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Assisted Living** | Assisted living services are personal care, homemaker, and chore services; medication oversight; and therapeutic, social and recreational programming provided in a homelike environment in a licensed community facility in conjunction with residing in the facility. This service includes 24-hour on-site response staff to meet scheduled or unpredictable needs in a way that promotes maximum dignity and independence, and to provide supervision, safety, and security. Other individuals or agencies may also furnish care directly, or under arrangement with the community facility, but the services provided by these other entities supplement that provided by the community facility and do not supplant those of the community facility.<br>The individual has a right to privacy. Living units may be locked at the discretion of the individuals, except when a physician or mental health professional has certified in writing that the individual is sufficiently cognitively impaired as to be a danger to self or others if given the opportunity to lock the door. The facility must have a central dining room, living room or parlor, and common activity center(s) (which may also serve as living |

| Service | Service Definition |
|---|---|
| | rooms or dining rooms. The individual retains the right to assume risk, tempered only by the individual's ability to assume responsibility for that risk. The State allows an individual to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. Nursing and skilled therapy services (except periodic nursing evaluations if specified above) are incidental, rather than integral to the provision of assisted living services. Payment will not be made for 24-hour skilled care or supervision. Federal financial participation is not available in the cost of room and board furnished in conjunction with residing in an assisted living facility. |
| **Cognitive Rehabilitation Therapy (effective March 6, 2014)** | Cognitive rehabilitation therapy is a service that assists an individual in learning or relearning cognitive skills that have been lost or altered as a result of damage to brain cells/chemistry in order to enable the individual to compensate for the lost cognitive functions. Cognitive rehabilitation therapy is provided when determined to be medically necessary through an assessment conducted by an appropriate professional. Cognitive rehabilitation therapy is provided in accordance with the plan of care developed by the assessor, and includes reinforcing, strengthening, or reestablishing previously learned patterns of behavior, or establishing new patterns of cognitive activity or compensatory mechanisms for impaired neurological systems.<br><br>Qualified providers<br><br>• Psychologists licensed under Texas Occupations Code Chapter 501.<br>• Speech and language pathologists licensed under Title 3 of the Texas Occupations Code, Subtitle G, Chapter 401.<br>• Occupational therapists licensed under Title 3 of the Texas Occupations Code, Subtitle H, Chapter 454. |
| **Dental Services** | Dental services which exceed the dental benefit under the State plan are provided under this waiver when no other financial resource for such services is available or when other available resources have been used.<br>Dental services are those services provided by a dentist to preserve teeth and meet the medical need of the member. Allowable services include:<br>• Emergency dental treatment procedures that are necessary to control bleeding, relieve pain, and eliminate acute infection;<br>• Operative procedures that are required to prevent the imminent loss of teeth;<br>• Routine dental procedures necessary to maintain good oral health;<br>• Treatment of injuries to the teeth or supporting structures; and<br>• Dentures and cost of fitting and preparation for dentures, including extractions, molds, etc.<br><br>The State allows a member to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. Payments for dental services are not made for cosmetic dentistry. The annual cost cap of this service is $5,000 per waiver plan year. The $5,000 cap may be waived by the managed care organization upon request of the member only when the services of an oral surgeon are required. Exceptions to the $5,000 cap may be made up to an additional $5,000 per waiver plan year when the services of an oral surgeon are required. |

| Service | Service Definition |
|---------|--------------------|
| **Emergency Response Services** | Emergency response services provide members with an electronic device that enables certain members at high risk of institutionalization to secure help in an emergency. The member may also wear a portable "help" button to allow for mobility. The system is connected to the person's phone and programmed to signal a response center once a "help" button is activated. Trained professionals staff the response center. Emergency response services are limited to those members who live alone, who are alone for significant parts of the day, or who have no regular caregiver for extended periods of time, and who would otherwise require extensive routine supervision. The State allows a member to select a relative or legal guardian, other than a spouse, to be his/her provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Employment Assistance** | Assistance provided to an individual to help the individual locate paid employment in the community. Employment assistance includes:<br>• identifying an individual's employment preferences, job skills, and requirements for a work setting and work conditions;<br>• locating prospective employers offering employment compatible with an individual's identified preferences, skills, and requirements; and<br>• contacting a prospective employer on behalf of an individual and negotiating the individual's employment.<br><br>In the state of Texas, this service is not available to individuals receiving waiver services under a program funded under section 110 of the Rehabilitation Act of 1973. Documentation is maintained in the individual's record that the service is not available to the individual under a program funded under the Individuals with Disabilities Education Act (20 U.S.C. §1401 et seq.).<br><br>An employment assistance service provider must satisfy one of these options:<br><br>Option 1:<br>• a bachelor's degree in rehabilitation, business, marketing, or a related human services field; and<br>• six months of documented experience providing services to people with disabilities in a professional or personal setting.<br>Option 2:<br>• an associate's degree in rehabilitation, business, marketing, or a related human services field; and<br>• one years of documented experience providing services to people with disabilities in a professional or personal setting.<br>Option 3:<br>• a high school diploma or GED, and<br>• two years of documented experience providing services to people with disabilities in a professional or personal setting.<br>• |
| **Financial Management Services** | Financial management services provide assistance to members with managing funds associated with the services elected for self-direction. The service includes initial orientation and ongoing training related to responsibilities of being an employer and adhering to legal requirements for employers. The financial management services provider, referred to as the Consumer Directed Services Agency, also:<br>• Serves as the member's employer-agent; |

| Service | Service Definition |
|---------|-------------------|
| | • Provides assistance in the development, monitoring, and revision of the member's budget;<br>• Provides information about recruiting, hiring, and firing staff, including identifying the need for special skills and determining staff duties and schedule;<br>• Provides guidance on supervision and evaluation of staff performance;<br>• Provides assistance in determining staff wages and benefits;<br>• Provides assistance in hiring by verifying employee's citizenship status and qualifications, and conducting required criminal background checks in the Nurse Aide Registry and Employee Misconduct Registry;<br>• Verifies and maintains documentation of employee qualifications, including citizenship status, and documentation of services delivered;<br>• Collects timesheets, processes timesheets of employees, processes payroll and payables, and makes withholdings for, and payment of, applicable Federal, State, and local employment-related taxes;<br>• Tracks disbursement of funds and provides quarterly written reports to the member of all expenditures and the status of the member's Consumer Directed Services budget; and<br>• Maintains a separate account for each member's budget.<br>The State allows a relative or legal guardian, other than a legally responsible member, to be the member's provider for this service if the relative or legal guardian meets the requirements for this type of provider. |
| **Home Delivered Meals** | Home delivered meals services provide a nutritionally sound meal to members. The meal provides a minimum of one-third of the current recommended dietary allowance for the member as adopted by the United States Department of Agriculture. |
| **Minor Home Modifications** | Minor home modifications are those physical adaptations to a member's home, required by the service plan, that are necessary to ensure the member's health, welfare, and safety, or that enable the member to function with greater independence in the home. Such adaptations may include the installation of ramps and grab-bars, widening of doorways, modification of bathroom facilities, or installation of specialized electric and plumbing systems that are necessary to accommodate the medical equipment and supplies necessary for the member's welfare. Excluded are those adaptations or improvements to the home that are of general utility, and are not of direct medical or remedial benefit to the member, such as carpeting, roof repair, central air conditioning, etc. Adaptations that add to the total square footage of the home are excluded from this benefit. All services are provided in accordance with applicable State or local building codes. Modifications are not made to settings that are leased, owned, or controlled by waiver providers. The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service.<br>There is a lifetime limit of $7,500 per member for this service and $300 yearly for repairs. Once the $7,500 cap is reached, only $300 per year per member, excluding the fees, will be allowed for repairs, replacement, or additional modifications. The home and community support services provider is responsible for obtaining cost-effective modifications authorized on the member's ISP by the managed care organization. |
| **Nursing** | Nursing services are those services that are within the scope of the Texas Nurse Practice Act and are provided by a registered nurse (or licensed vocational nurse under the supervision of a registered nurse), licensed to practice in the State. In the Texas State Plan, nursing services are provided only for acute conditions or exacerbations of chronic conditions lasting less than 60 days. Nursing services provided in the waiver cover |

| Service | Service Definition |
|---------|-------------------|
| | ongoing chronic conditions such as medication administration and supervising delegated tasks. This broadens the scope of these services beyond extended State plan services. |
| **Occupational Therapy** | Occupational therapy consists of interventions and procedures to promote or enhance safety and performance in activities of daily living, instrumental activities of daily living, education, work, play, leisure, and social participation.<br><br>Occupational therapy services consist of the full range of activities provided by a licensed occupational therapist, or a licensed occupational therapy assistant under the direction of a licensed occupational therapist, acting within the scope of his/her State licensure. Texas assures that occupational therapy is cost-effective and necessary to avoid institutionalization. The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Personal Assistance Services** | Personal assistance services provide assistance to members in performing the activities of daily living based on their service plan. Personal assistance services include assistance with the performance of the activities of daily living and household chores necessary to maintain the home in a clean, sanitary, and safe environment. Personal assistance services also include the following services: protective supervision provided solely to ensure the health and safety of a member with cognitive/memory impairment and/or physical weakness; tasks delegated by a registered nurse under the rules of the Texas Board of Nursing; escort services consist of accompanying, but not transporting, and assisting a member to access services or activities in the community; and extension of therapy services. The attendant may perform certain tasks if delegated and supervised by a registered nurse in accordance with Board of Nursing rules found in 22 Texas Administrative Code, Part 11, Chapter 224. The home and community support services agency registered nurse is responsible for delegating any task to the attendant, and the home and community support services agency must maintain a copy of the delegation requirements in the member's case record.<br><br>Health Maintenance Activities are limited to tasks that enable a member to remain in an independent living environment and go beyond activities of daily living because of the higher skill level required. A registered nurse may determine that performance of a health maintenance activity for a particular member does not constitute the practice of professional nursing. An unlicensed person may perform health maintenance activities without delegation. (See Board of Nursing rules at 22 Texas Administrative Code, Part 11, Chapter 225.) Licensed therapists may choose to instruct the attendants in the proper way to assist the member in follow-up on therapy sessions. This assistance and support provides reinforcement of instruction and aids in the rehabilitative process. In addition, a registered nurse may instruct an attendant to perform basic interventions with members that would increase and optimize functional abilities for maximum independence in performing activities of daily living such as range of motion exercises.<br>The following contingencies apply to providers: Texas does not allow service breaks of personal assistance services for health and safety reasons; therefore, providers are required to have back-up attendants if the regular attendant is not available. The provider nurse may provide personal assistance services if the regular and back-up attendants are not available and nurse delegation is authorized.<br><br>The State allows, but does not require, a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. Personal assistance services will |

| Service | Service Definition |
|---------|-------------------|
| | not be provided to members residing in adult foster care homes, assisted living facilities, or during the same designated hours or time period a member receives respite care. |
| **Physical Therapy** | Physical therapy is defined as specialized techniques for evaluation and treatment related to functions of the neuro-musculo-skeletal systems provided by a licensed physical therapist or a licensed physical therapy assistant, directly supervised by a licensed physical therapist.  Physical therapy is the evaluation, examination, and utilization of exercises, rehabilitative procedures, massage, manipulations, and physical agents (such as mechanical devices, heat, cold, air, light, water, electricity, and sound) in the aid of diagnosis or treatment.<br><br>Physical therapy services consist of the full range of activities provided by a licensed physical therapist, or a licensed physical therapy assistant under the direction of a licensed physical therapist, acting within the scope of state licensure. Physical therapy services are available through this waiver program only after benefits available through Medicare, Medicaid, or other third party resources have been exhausted.  The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Respite** | Respite care services are provided to individuals unable to care for themselves, and are furnished on a short-term basis because of the absence of or need for relief for those persons normally providing unpaid services.  Respite care may be provided in the following locations:  member's home or place of residence; adult foster care home; Medicaid certified NF; and an assisted living facility.  Respite care services are authorized by a member's PCP as part of the member's care plan.  Respite services may be self-directed. Limited to 30 days per year.<br><br>There is a process to grant exceptions to the annual limit. The managed care organization reviews all requests for exceptions, and consults with the service coordinator, providers, and other resources as appropriate, to make a professional judgment to approve or deny the request on a case-by-case basis.  Members residing in adult foster care homes and assisted living facilities are not eligible to receive respite services. Other waiver services, such as Personal Assistance Services, may be provided on the same day as respite services, but the two services cannot be provided at the exact same time. |
| **Speech, Hearing, and Language Therapy** | Speech therapy is defined as evaluation and treatment of impairments, disorders, or deficiencies related to an individual's speech and language. The scope of Speech, Hearing, and Language therapy services offered to HCBS participants exceeds the State plan as the service in this context is available to adults.  Speech, hearing, and language therapy services are available through the waiver program only after benefits available through Medicare, Medicaid, or other third party resources have been exhausted.  The State allows a member to select a relative or legal guardian, other than a spouse, to be the member's provider for this service if the relative or legal guardian meets the requirements to provide this service. |
| **Support Consultation** | Support consultation is an optional service component that offers practical skills training and assistance to enable a member or his legally authorized representative to successfully direct those services the member or the legally authorized representative chooses for consumer-direction.  This service is provided by a certified support advisor, and includes skills training related to recruiting, screening, and hiring workers, preparing job descriptions, verifying employment eligibility and qualifications, completion of documents required to employ an individual, managing workers, and development of effective back-up plans for services considered critical to the member's health and welfare in the absence of the regular provider or an emergency situation. |

| Service | Service Definition |
|---|---|
|  | Skills training involves such activities as training and coaching the employer regarding how to write an advertisement, how to interview potential job candidates, and role-play in preparation for interviewing potential employees.  In addition, the support advisor assists the member or his or her legally authorized representative to determine staff duties, to orient and instruct staff in duties and to schedule staff.  Support advisors also assist the member or his or her legally authorized representative with activities related to the supervision of staff, the evaluation of the job performance of staff, and the discharge of staff when necessary.<br><br>This service provides sufficient information and assistance to ensure that members and their representatives understand the responsibilities involved with consumer direction.  Support consultation does not address budget, tax, or workforce policy issues.  The State defines support consultation activities as the types of support provided beyond that provided by the financial management services provider.  The scope and duration of support consultation will vary depending on a member's need for support consultation.  Support consultation may be provided by a certified support advisor associated with a consumer directed services agency selected by the member or by an independent certified support advisor hired by the member.  Support consultation has a specific reimbursement rate and is a component of the member's service budget.  In conjunction with the service planning team, members or legally authorized representatives determine the level of support consultation necessary for inclusion in each member's service plan. |
| **Supported Employment Services** | Assistance provided, in order to sustain competitive employment, to an individual who, because of a disability, requires intensive, ongoing support to be self-employed, work from home, or perform in a work setting at which individuals without disabilities are employed.  Supported employment includes adaptations, supervision, training related to an individual's assessed needs, and earning at least minimum wage (if not self-employed).<br><br>In the state of Texas, this service is not available to individuals receiving waiver services under a program funded under section 110 of the Rehabilitation Act of 1973.  Documentation is maintained in the individual's record that the service is not available to the individual under a program funded under the Individuals with Disabilities Education Act (20 U.S.C. §1401 et seq.).<br><br>A supported employment service provider must satisfy one of these options:<br><br>Option 1:<br>• a bachelor's degree in rehabilitation, business, marketing, or a related human services field; and<br>• six months of documented experience providing services to people with disabilities in a professional or personal setting.<br>Option 2:<br>• an associate's degree in rehabilitation, business, marketing, or a related human services field; and<br>• one year of documented experience providing services to people with disabilities in a professional or personal setting.<br>Option 3:<br>• a high school diploma or GED, and |

| Service | Service Definition |
|---------|-------------------|
| | • two years of documented experience providing services to people with disabilities in a professional or personal setting |
| **Transition Assistance Services** | Transition Assistance Services pay for non-recurring, set-up expenses for members transitioning from nursing homes to the STAR+PLUS HCBS program. |
| | Allowable expenses are those necessary to enable members to establish basic households and may include:  security deposits for leases on apartments or homes; essential household furnishings and moving expenses required to occupy and use a community domicile, including furniture, window coverings, food preparation items, and bed and bath linens; set-up fees or deposits for utility or service access, including telephone, electricity, gas, and water; services necessary for the member's health and safety, such as pest eradication and one-time cleaning prior to occupancy; and activities to assess need, arrange for, and procure needed resources (limited to up to 180 consecutive days prior to discharge from the nursing facility).  Services do not include room and board, monthly rental or mortgage expenses, food, regular utility charges, or household appliances or items that are intended for purely recreational purposes.  There is a $2,500 limit per member. |

# Attachment C
# HCBS Service Definitions

## Attachment D

## Reserved

# Attachment E

## Reserved

The material presented in Attachment F corresponds to the contents of Appendix F of the Application for a §1915(c) Home and Community-Based Services Waiver, Version 3.5.

## I.  Opportunity to Request a Fair Hearing

The State provides an opportunity to request a Fair Hearing under 42 CFR Part 431, Subpart E to individuals: (a) who are not given the choice of home and community-based services as an alternative to the institutional care; (b) are denied the service(s) of their choice or the provider(s) of their choice; or, (c) whose services are denied, suspended, reduced or terminated.  The State provides notice of action as required in 42 CFR §431.210.

**Procedures for Offering Opportunity to Request a Fair Hearing**

The managed care organization (MCO) must develop, implement and maintain an Appeal procedure that complies with state and federal laws and regulations.  When a Member or his or her authorized representative expresses orally or in writing any dissatisfaction or disagreement with an Action, the MCO must regard the expression of dissatisfaction as a request to Appeal an Action.

A Member must file a request for an Appeal with the MCO within 30 days from receipt of the notice of reduction, denial or termination of services.

The MCO's Appeal procedures must be provided to Members in writing and through oral interpretive services.

The MCO must send a letter to the Member within five (5) business days acknowledging receipt of the Appeal request.  Except for the resolution of an Expedited Appeal, the MCO must complete the entire standard Appeal process within 30 calendar days after receipt of the initial written or oral request for Appeal.  The timeframe for a standard Appeal may be extended up to 14 calendar days if the Member or his or her representative requests an extension; or the MCO shows that there is a need for additional information and how the delay is in the Member's interest.  If the timeframe is extended and the Member had not requested the delay, the MCO must give the Member written notice of the reason for delay.  The MCO must designate an officer who has primary responsibility for ensuring that Appeals are resolved within these timeframes and in accordance with the MCO's written policies.

In accordance with 42 C.F.R. § 438.420, the MCO must continue the Member's benefits currently being received by the Member, including the benefit that is the subject of the Appeal, if all of the following criteria are met:

1.  The Member or his or her representative files the Appeal timely as defined in this Contract;
2.  The Appeal involves the termination, suspension, or reduction of a previously authorized course of treatment;
3.  The services were ordered by an authorized provider;
4.  The original period covered by the original authorization has not expired; and
5.  The Member requests an extension of the benefits.

If, at the Member's request, the MCO continues or reinstates the Member's benefits while the Appeal is pending, the benefits must be continued until one of the following occurs:

1. The Member withdraws the Appeal;
2. Ten (10) days pass after the MCO mails the notice resolving the Appeal against the Member, unless the Member, within the 10-day timeframe, has requested a Fair Hearing with continuation of benefits until a Fair Hearing decision can be reached; or
3. A State Fair Hearing officer issues a hearing decision adverse to the Member or the time period or service limits of a previously authorized service has been met.

In accordance with 42 C.F.R.§ 438.420(d), if the final resolution of the Appeal is adverse to the Member and upholds the MCO's Action, then to the extent that the services were furnished to comply with the Contract, the MCO may recover such costs from the Member.

If the MCO or State Fair Hearing Officer reverses a decision to deny, limit, or delay services that were not furnished while the Appeal was pending, the MCO must authorize or provide the disputed services promptly and as expeditiously as the Member's health condition requires.

If the MCO or State Fair Hearing Officer reverses a decision to deny authorization of services and the Member received the disputed services while the Appeal was pending, the MCO is responsible for the payment of services.

The MCO is prohibited from discriminating or taking punitive action against a Member or his or her representative for making an Appeal.

In accordance with 42 C.F.R. §438.410, the MCO must establish and maintain an expedited review process for Appeals, when the MCO determines or the provider indicates that taking the time for a standard resolution could seriously jeopardize the Member's life or health. The MCO must follow all Appeal requirements for standard Member Appeals except where differences are specifically noted. The MCO must accept oral or written requests for Expedited Appeals.

Members must exhaust the MCO's Expedited Appeal process before making a request for an expedited Fair Hearing. After the MCO receives the request for an Expedited Appeal, it must hear an approved request for a Member to have an Expedited Appeal and notify the Member of the outcome of the Expedited Appeal within 3 business days, except that the MCO must complete investigation and resolution of an Appeal relating to an ongoing emergency or denial of continued hospitalization:

1. In accordance with the medical or dental immediacy of the case; and
2. not later than one business day after receiving the Member's request for Expedited Appeal is received.

The MCO is prohibited from discriminating or taking punitive action against a Member or his or her representative for requesting an Expedited Appeal. The MCO must ensure that punitive action is neither taken against a provider who requests an expedited resolution or supports a Member's request.

If the MCO denies a request for expedited resolution of an Appeal, it must:

1. Transfer the Appeal to the timeframe for standard resolution, and

2.  Make a reasonable effort to give the Member prompt oral notice of the denial, and follow up within two (2) calendar days with a written notice.

The MCO must inform Members that they have the right to access the Fair Hearing process at any time during the Appeal system provided by the MCO.  In the case of an expedited Fair Hearing process, the MCO must inform the Member that the Member must exhaust the MCO's internal Expedited Appeal process prior to filing an Expedited Fair Hearing.  The MCO must notify Members that they may be represented by an authorized representative in the Fair Hearing process.

If a Member requests a Fair Hearing, the MCO will submit to the request to the appropriate Fair Hearings office, within five (5) calendar days.

Within five (5) calendar days of notification that the Fair Hearing is set, the MCO will prepare an evidence packet for submission to the HHSC Fair Hearings staff and send a copy of the packet to the Member.  The evidence packet must comply with HHSC's Fair Hearings requirements.

The Fair Hearings Officer makes the final decision on appeals submitted to Fair Hearings.  The Fair Hearings Officers are employees of HHSC that are separate from the State Medicaid Agency.  This provides for an independent review and disposition for the member.  The MCO sends a letter to the member informing the member that if an appeal is filed timely the member's benefits/services will continue.  The member may also contact a member advocate or service coordinator for assistance or clarification.  All documentation related to the adverse action and/or requests are maintained by the managed care operation in the member's case file.

## II.     State Grievance/Complaint System

The State operates a grievance/complaint system that affords participants the opportunity to register grievances or complaints concerning the provision of services.

### A.     Operational Responsibility

HHSC, the State Medicaid agency, and the MCO operate the grievance/complaint system.

The State Medicaid Agency operates and maintains an electronic complaint/grievance system that provides information to HHSC staff on any complaints/grievances related to members of the MCOs.  The MCO is required by contract to develop, implement and maintain a member complaint and appeal system specific to their members.

The member is informed at enrollment that filing a grievance or making a complaint is not a pre-requisite or substitute for Fair Hearing.  The member is also informed that they can contact a Member Advocate or their service coordinator if they need assistance for issues related to making complaints or filing a grievance.

### B.     Description of System

The MCO must develop, implement, and maintain a Member Complaint and Appeal system that complies with the requirements in applicable federal and state laws and regulations.

The Complaint and Appeal system must include a Complaint process, an Appeal process, and access to HHSC's Fair Hearing System. The procedures must be the same for all Members and must be reviewed and approved in writing by HHSC or its designee. Modifications and amendments to the Member Complaint and Appeal system must be submitted for HHSC's approval at least 30 days prior to the implementation.

The MCO must have written policies and procedures for receiving, tracking, responding to, reviewing, reporting and resolving Complaints by Members or their authorized representatives. . The MCO must resolve Complaints within 30 days from the date the Complaint is received. The Complaint procedure must be the same for all Members under the Contract. The Member or Member's authorized representative may file a Complaint either orally or in writing. The MCO must also inform Members how to file a Complaint directly with HHSC, once the Member has exhausted the MCO's complaint process.

The MCO's Complaint procedures must be provided to Members in writing and through oral interpretive services. The MCO must include a written description of the Complaint process in the Member Handbook. The MCO must maintain and publish in the Member Handbook, at least one local and one toll-free telephone number with Teletypewriter/Telecommunications Device for the Deaf (TTY/TDD) and interpreter capabilities for making Complaints.

The MCO's process must require that every Complaint received in person, by telephone, or in writing must be acknowledged and recorded in a written record and logged with the following details:
1. Date;
2. Identification of the individual filing the Complaint;
3. Identification of the individual recording the Complaint;
4. Nature of the Complaint;
5. Disposition of the Complaint (i.e., how the managed care organization resolved the Complaint);
6. Corrective action required; and
7. Date resolved.
The MCO is prohibited from discriminating or taking punitive action against a Member or his or her representative for making a Complaint.

If the Member makes a request for disenrollment, the MCO must give the Member information on the disenrollment process and direct the Member to the HHSC Administrative Services Contractor. If the request for disenrollment includes a Complaint by the Member, the Complaint will be processed separately from the disenrollment request, through the Complaint process.

The MCO will cooperate with the HHSC's Administrative Services Contractor and HHSC or its designee to resolve all Member Complaints. Such cooperation may include, but is not limited to, providing information or assistance to internal Complaint committees. The MCO must provide a designated Member Advocate to assist the Member in understanding and using the MCO's Complaint system until the issue is resolved.

**Attachment F**
**HCBS Fair Hearing Procedures**

**Attachment G**
**HCBS Participant Safeguards**

The material presented in Attachment G corresponds to the contents of Appendix G of the Application for a §1915(c) Home and Community-Based Services Waiver, Version 3.5.

## I.       Introduction

Managed long-term services and supports (MLTSS) refer to the delivery of long-term services and supports (LTSS) through managed care programs, including community-based and institutional LTSS under the State Plan and home and community based services (HCBS) under the STAR+PLUS Waiver. Under the authority of the Texas Healthcare Transformation and Quality Improvement Program Demonstration, managed care organizations (MCOs) deliver LTSS to members in Medicaid managed care programs in Texas.

Texas has well-established safeguards to ensure that participant health and welfare are assured within the delivery of MLTSS. This document details these protections, such as statements of participant rights and the critical incident management system, in order to protect members from abuse, neglect, and exploitation.

## II.       Participant Rights and Responsibilities

In accordance and consistent with federal law under the Code of Federal Regulations (CFR), the Texas Health and Human Services Commission (HHSC) established a statement of participant rights that may be found in the Texas Administrative Code (TAC). Participant rights are reflected in contracts with MCOs, under the managed care contracts and the Uniform Managed Care Manual (UMCM), to ensure that participants are advised of their rights. Members are informed through MCO member handbooks and are provided with additional support, as needed, to understand their rights as well as their responsibilities. In accordance with 42 CFR §438.420 and Title 1 of the TAC, Chapter 357 (1 TAC §357.13 (relating to Appellant Rights and Responsibilities)), members notified of an adverse MCO determination may request a continuation of LTSS benefits during an appeal.

### A.   42 CFR §438.100 Enrollee rights

(a) *General rule.* The State must ensure that—

    (1) Each MCO and PIHP has written policies regarding the enrollee rights specified in this section; and

    (2) Each MCO, PIHP, PAHP, and PCCM complies with any applicable Federal and State laws that pertain to enrollee rights, and ensures that its staff and affiliated providers take those rights into account when furnishing services to enrollees.

(b) *Specific rights*—

    (1) *Basic requirement.* The State must ensure that each managed care enrollee is guaranteed the rights as specified in paragraphs (b)(2) and (b)(3) of this section.

    (2) An enrollee of an MCO, PIHP, PAHP, or PCCM has the following rights: The right to—

        (i) Receive information in accordance with §438.10.

        (ii) Be treated with respect and with due consideration for his or her dignity and privacy.

        (iii) Receive information on available treatment options and alternatives, presented in a manner appropriate to the enrollee's condition and ability to understand. (The information requirements for services that are not covered under the contract because of moral or religious objections are set forth in §438.10(f)(6)(xii).)

(iv) Participate in decisions regarding his or her health care, including the right to refuse treatment.

(v) Be free from any form of restraint or seclusion used as a means of coercion, discipline, convenience or retaliation, as specified in other Federal regulations on the use of restraints and seclusion.

(vi) If the privacy rule, as set forth in 45 CFR parts 160 and 164 subparts A and E, applies, request and receive a copy of his or her medical records, and request that they be amended or corrected, as specified in 45 CFR §164.524 and 164.526.

(3) An enrollee of an MCO, PIHP, or PAHP (consistent with the scope of the PAHP's contracted services) has the right to be furnished health care services in accordance with §§438.206 through 438.210.

(c) *Free exercise of rights.* The State must ensure that each enrollee is free to exercise his or her rights, and that the exercise of those rights does not adversely affect the way the MCO, PIHP, PAHP, or PCCM and its providers or the State agency treat the enrollee.

(d) *Compliance with other Federal and State laws.* The State must ensure that each MCO, PIHP, PAHP, and PCCM complies with any other applicable Federal and State laws (such as: title VI of the Civil Rights Act of 1964 as implemented by regulations at 45 CFR part 80; the Age Discrimination Act of 1975 as implemented by regulations at 45 CFR part 91; the Rehabilitation Act of 1973; and titles II and III of the Americans with Disabilities Act; and other laws regarding privacy and confidentiality).

## B. 1 TAC §353.202 Member Bill of Rights

Each managed care organization (MCO) participating in the Texas Medicaid program must provide to each member an easy-to-read, written document describing the member's rights, which must include the following:

(1) Member rights for members of health care MCOs:

(A) You have the right to respect, dignity, privacy, confidentiality and nondiscrimination. That includes the right to:

(i) Be treated fairly and with respect.

(ii) Know that your medical records and discussions with your providers will be kept private and confidential.

(B) You have the right to a reasonable opportunity to choose a managed care organization (MCO) and primary care provider. This is the doctor or health care provider you will see most of the time and who will coordinate your care. You have the right to change to another MCO or provider in a reasonably easy manner. That includes the right to:

(i) Be told how to choose and change your MCO and your primary care provider.

(ii) Choose any MCO you want that is available in your area and choose your primary care provider from that plan.

(iii) Change your primary care provider.

(iv) Change your MCO without penalty.

(v) Be told how to change your MCO or your primary care provider.

(C) You have the right to ask questions and get answers about anything you do not understand. That includes the right to:

(i) Have your provider explain your health care needs to you and talk to you about the different ways your health care problems can be treated.

(ii) Be told why care or services were denied and not given.

(D) You have the right to agree to or refuse treatment and actively participate in treatment decisions. That includes the right to:

(i) Work as part of a team with your provider in deciding what health care is best for you.

(ii) Say yes or no to the care recommended by your provider.

(E) You have the right to use each complaint and appeal process available through the MCO and through Medicaid, and get a timely response to complaints, appeals and fair hearings. That includes the right to:

(i) Make a complaint to your MCO or to the Texas Medicaid program about your health care, your provider or your MCO.

(ii) Get a timely answer to your complaint.

(iii) Use the MCO's appeal process and be told how to use it.

(iv) Ask for a fair hearing from the Texas Medicaid program and get information about how that process works.

(F) You have the right to timely access to care that does not have any communication or physical access barriers. That includes the right to:

(i) Have telephone access to a medical professional 24 hours a day, 7 days a week to get any emergency or urgent care you need.

(ii) Get medical care in a timely manner.

(iii) Be able to get in and out of a health care provider's office. This includes barrier free access for people with disabilities or other conditions that limit mobility, in accordance with the Americans with Disabilities Act.

(iv) Have interpreters, if needed, during appointments with your providers and when talking to your MCO. Interpreters include people who can speak in your native language, help someone with a disability, or help you understand the information.

(v) Be given information you can understand about your MCO's rules, including the health care services you can get and how to get them.

(G) You have the right to not be restrained or secluded when it is for someone else's convenience, or is meant to force you to do something you do not want to do, or is to punish you.

(H) You have a right to know that doctors, hospitals, and others who care for you can advise you about your health status, medical care, and treatment. Your MCO cannot prevent them from giving you this information, even if the care or treatment is not a covered service.

(I) You have a right to know that you are not responsible for paying for covered services. Doctors, hospitals, and others cannot require you to pay copayments or any other amounts for covered services.

(2) Member rights for members of dental MCOs:

(A) You have the right to get accurate, easy-to-understand information to help you make good choices about you or your child's dentists and other providers.

(B) You have the right to know how your child's dentists are paid. You have a right to know about what those payments are and how they work.

(C) You have the right to know how your managed care organization (MCO) decides about whether a service is covered and/or medically necessary. You have the right to know about the people in the MCO's office who decide those things.

(D) You have the right to know the names of the dentists and other providers enrolled with your MCO and their addresses.

(E) You have the right to pick from a list of dentists that is large enough so that your child can get the right kind of care when your child needs it.

(F) You have the right to take part in all the choices about your child's dental care.

(G) You have the right to speak for your child in all treatment choices.

(H) You have the right to get a second opinion from another dentist enrolled in your MCO about what kind of treatment your child needs.

(I) You have the right to be treated fairly by your MCO, dentists and other providers.

(J) You have the right to talk to your child's dentists and other providers in private, and to have your child's dental records kept private. You have the right to look over and copy your child's dental records and to ask for changes to those records.

(K) You have a right to know that dentists, hospitals, and others who care for your child can advise you about your child's health status, medical care, and treatment. Your child's MCO cannot prevent them from giving you this information, even if the care or treatment is not a covered service.

(L) You have a right to know that you are not responsible for paying for covered services for your child. Dentists, hospitals, and others cannot require you to pay any other amounts for covered services.

## C. Managed Care Contracts

In accordance with 42 CFR §438.100 (relating to Enrollee Rights), the managed care contracts require that MCOs maintain written policies and procedures for informing members of their rights and responsibilities, and must notify members of their right to request a copy of these rights and responsibilities (Member Rights and Responsibilities). An MCO's Member Handbook must include a notice regarding member rights and responsibilities, in compliance with the UMCM, Chapter 3.4 (relating to Medicaid Managed Care Member Handbook Required Critical Elements).

### III.    Abuse, Neglect, and Exploitation Defined

The following statutory definitions of abuse, neglect and exploitation (ANE) apply to investigations of alleged ANE:

- Chapter 48 of the Texas Human Resources Code (relating to Investigations and Protective Services for Elderly and Disabled Persons);
- Chapter 260A of the Texas Health and Safety Code (relating to Reports of Abuse, Neglect, and Exploitation of Residents of Certain Facilities); and
- Chapter 261 of the Texas Family Code, Subchapter E, Section 261.404 (relating to Investigation of Abuse, Neglect, or Exploitation in Certain Facilities).

HHSC defines critical events or incidents in the managed care contracts, Attachment 2, Article 2, as those that may bring harm, or create the potential for harm, to an individual. Critical events or incidents include but are not limited to:

- abuse, neglect, or exploitation;
- the unauthorized use of restraint, seclusion, or restrictive interventions;
- serious injuries that require medical intervention or result in hospitalization;

- criminal victimization;
- unexplained death;
- medication errors; and
- other incidents or events that involve harm or risk of harm to a member.


**IV.    Critical Incident System**

The state has a system to prevent, identify, report, investigate, and remediate critical incidents that occur within the delivery of  MLTSS as well as to track and trend results in order to make system improvements. The obligation to report abuse, neglect, and exploitation is mandated by statute and HHSC clarifies roles, expectations, and responsibilities for providers and MCOs in the managed care contracts.

The critical incident systems consists of numerous levels of participant protection: prevention, identification, and reporting of ANE; investigations of ANE; monitoring findings; remediation of issues; and consumer support for members.

In accordance with 42 CFR §431.10(e), HHSC is the single state Medicaid agency and retains oversight and full administrative authority over the waiver program.

## A.  Prevention

### 1.  Licensure Requirements

The state, through the Department of Aging and Disability Services (DADS), licenses the following LTSS providers:

- Adult day care facilities (TAC Title 40, Chapter 98);
- Adult foster care, serving four or more individuals (licensing: TAC Title 40, Chapter 92);
- Assisted living facilities (TAC Title 40, Chapter 92);
- Home and community support services agencies (TAC Title 40, Chapter 97); and
- Nursing facilities (TAC Title 40, Chapter 19).

Additional LTSS providers licensed through other entities:

- Emergency response system providers (TAC Title 25, Part 1, Chapter 140, Subchapter B);
- Licensed durable medical equipment providers (TAC Title 25, Part 1, Chapter 229, Subchapter X);
- Providers of cognitive rehabilitation therapy services;
- Occupational therapists (TAC Title 40, Part 12);
- Physical therapists (TAC Title 22, Part 16); and
- Speech therapists (TAC Title 22, Part 32).

Prior to issuing licensure to the above healthcare providers, the state screens those facilities or persons for prior disciplinary or criminal history in Texas and in other states. In accordance with Section 1919(e)(2) of the Social Security Act , the state maintains a registry of all nurse aides who are certified to provide services in nursing facilities and skilled nursing facilities licensed by DADS. (See: 42 U.S.C. 1396r(e)(2)) The Nurse Aide Registry (NAR) lists nurse aides who are unemployable because of confirmed instances of abuse, neglect, exploitation, misappropriation, or misconduct against a nursing facility resident. For those individuals that do not require licensure, in accordance with state law, DADS maintains an Employee Misconduct Registry (EMR) that includes the names of unlicensed persons who are unemployable because of confirmed instances of abuse, neglect, exploitation, misappropriation, or misconduct in the DADS facilities listed above. (See: Texas Health and Safety Code, Title 4, Subtitle B, Chapter 253 (relating to Employee Misconduct Registry)

All DADS-regulated facilities and agencies are required to check both the NAR and EMR before hiring an individual and annually thereafter. In addition, all MCOs are required to check both the NAR and EMR prior to contracting with an unlicensed or uncertified LTSS provider, and annually thereafter.

## 2. Credentialing Unlicensed or Uncertified Providers by MCOs

Through their credentialing process, the MCOs ensure that the agencies they contract with have met all licensure requirements. According to the managed care contracts, before contracting with an unlicensed LTSS provider or LTSS provider not certified by a health and human services agency, such as minor home modification or home-delivered meals providers, the MCOs must take steps to verify that the provider:

- has not been convicted of a crime listed in Texas Health and Safety Code, §250.006;
- is not listed as "unemployable" in the EMR or the NAR maintained by DADS by searching or ensuring a search of such registries is conducted before hire and annually thereafter;
- is knowledgeable of acts that constitute abuse, neglect, or exploitation of a member;
- is instructed on and understands how to report suspected abuse, neglect, or exploitation;
- adheres to applicable state laws if providing transportation; and
- is not a spouse of, legally responsible person for, or employment supervisor of the member who receives the service, except as allowed in the Texas Healthcare Transformation and Quality Improvement Program 1115 Waiver.

## B.  Identification and Reporting

### 1.  Obligation to Report

Under state law, a person is required to report suspected abuse, neglect, or exploitation of an individual receiving waiver services to the appropriate state agency. More specifically:

Reports to the Department of Family and Protective Services (DFPS):

- A person having cause to believe that an individual who is elderly or who has a disability is in a state of abuse, neglect, or exploitation is required to report the information immediately to DFPS. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.051 (relating to Reports of Abuse Neglect, or Exploitation: Immunities))

- A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by a person must report the information immediately to DFPS. (See: Texas Family Code, Title 4, Subtitle E, Subchapter B, §261.101 (relating to Persons Required to Report; Time to Report))

- A professional who has cause to believe that a child has been abused or neglected or may be abused or neglected must make a report to DFPS within 48 hours after the professional first suspects abuse or neglect. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.101(b))

Reports to DADS:

- If a person has cause to believe that an individual who is elderly or who has a disability has been abused, neglected, or exploited in a facility or by a provider operated, licensed, certified, or registered by DADS, the person shall report the information to DADS. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.051 (relating to Reports of Abuse Neglect, or Exploitation: Immunities)) This requirement is also addressed in Chapter 260A of the Health and Safety Code. A person, including an owner or employee of a facility, who has cause to believe that the physical or mental health or welfare of a resident has been or may be adversely affected by abuse, neglect, or exploitation caused by another person shall report the abuse, neglect, or exploitation to DADS and law enforcement as appropriate under Chapter 260A of the Texas Health and Safety Code. (See: Texas Health and Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.002 (relating to Reporting of Abuse, Neglect, and Exploitation))

Reports regarding the suspected abuse, neglect, or exploitation of a resident of a facility regulated by DADS may also be made to a local or state law enforcement agency, which in turn will refer the report to DADS to ensure that DADS is made aware of the allegations of ANE. Additionally, reports alleging that a resident's health or safety is in imminent danger; that a resident has died because of the alleged conduct; that a resident has been hospitalized or treated in an emergency room because of the alleged conduct; that the alleged conduct involves a criminal act; or that a resident has suffered bodily injury due to the alleged conduct shall be made to both DADS and the appropriate law enforcement agency.  (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.005 (relating to Telephone Hotline; Processing of Reports))

State agencies receiving reports of suspected abuse, neglect, or exploitation keep the reporter's identity confidential.  (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.101 (relating to Confidentiality); Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.008 (relating to Confidentiality); and Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.101 (relating to Persons Required to Report; Time to Report))

The failure to report suspected abuse, neglect, or exploitation of a child or of an individual who is elderly or who has a disability is considered a criminal offense. (See: Texas Human Resources Code, Title 2, Subtitle  D, Chapter 48, §48.052 (relating to Failure to Report; Penalty); Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.012 (relating to Failure to Report; Criminal Penalty); and Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.109 (relating to Failure to Report; Penalty))

## 2.  Managed Care Contracts

According to the managed care contracts, MCOs must train and educate their staff, providers, and subcontractors to understand abuse, neglect, and exploitation and all prevention, detection, reporting, investigation and remediation procedures and requirements. In addition, MCOs must educate members about abuse, neglect, and exploitation and ensure that MCO staff such as member services staff and service coordinators are knowledgeable about how to identify and report a critical event or incident such as abuse, neglect, and exploitation. MCOs must administer training for service coordination staff that includes identification and reporting of critical events or incidents.

In addition to the information provided to all members, a financial management services agency (FMSA), provides members who elect the consumer directed services option with training and written information related to reporting allegations of abuse, neglect, and exploitation (See: TAC Title 40, Chapter 41).

## C.  Investigation of Abuse, Neglect, or Exploitation (ANE)

### 1.  DFPS

DFPS investigates reports of alleged ANE of individuals who are elderly or have a disability. This includes investigations of:

- an adult who is elderly or has a disability and is receiving services from a home and community support services agency (HCSSA) or in an unlicensed adult foster care home;

- an adult with a disability or a child residing in or receiving services from a local authority, local mental health authority (LMHA), or community center; or

- an adult with a disability receiving services through consumer directed services.

DFPS investigations are governed by Title 2 of the Texas Human Resources Code, Subtitle D, Chapter 48 (relating to Investigations and Protective Services for Elderly and Disabled Persons). When DFPS receives ANE reports concerning an individual in a facility licensed by another state agency and explicitly responsible for investigating ANE in that facility, DFPS forwards the report to that agency for investigation.

### 2.  DADS

DADS investigates reports of ANE of individuals who are elderly or have a disability that occur in a facility or are perpetrated by a provider, either of which are operated, licensed, or  certified by DADS. These investigations are governed by Title 2 of the Texas Human Resources Code,

Subtitle D, Chapter 48 (relating to Investigations and Protective Services for Elderly and Disabled Persons) and Title 4 of the Texas Health and Safety Code, Subtitle B, Chapter 260A (relating to Reports of Abuse, Neglect, and Exploitation of Residents of Certain Facilities). Reports of abuse, neglect, and exploitation of a child under the age of 18 receiving services from a HCSSA are investigated by DADS pursuant to Title 2 of the Texas Health and Safety Code, Subtitle G, Chapter 142, §142.009 (relating to Surveys; Consumer Complaints).

### 3. Law Enforcement

State law requires DFPS and DADS to notify the appropriate law enforcement agency of reports of abuse, neglect, or exploitation during certain investigations. Specifically:

- DFPS and DADS are required to immediately notify the appropriate law enforcement agency when a caseworker or supervisor has cause to believe that an individual who is elderly or who has a disability has been abused, neglected, or exploited by another person in a manner that constitutes a criminal offense under any law. This requirement does not apply when the law enforcement agency is the entity to report the alleged abuse, neglect, or exploitation to DADS or DFPS. (See: Texas Human Resources Code, Title 2, Subtitle D, Chapter 48, §48.1522 (relating to Reports of Criminal Conduct to Law Enforcement))

- Within 24 hours after the receipt of a report of abuse, neglect, or exploitation of a resident of a DADS facility, DADS must report the incident to the appropriate law enforcement agency when the complaint alleges: a resident's health or safety is in imminent danger; a resident has recently died because of conduct alleged in the report of abuse, neglect, exploitation, or other complaint; a resident has been hospitalized or been treated in an emergency room because of conduct alleged in the report of abuse, neglect, exploitation, or other complaint; a resident has been a victim of any act or attempted act described by Section 21.02, 21.11, 22.011, or 22.021 of the Texas Penal Code; or a resident has suffered bodily injury, as that term is defined by Section 1.07 of the Texas Penal Code, because of conduct alleged in the report of abuse, neglect, exploitation, or other complaint. (See:  Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.007 (relating to Investigation and Report by Department))

- DFPS and DADS must immediately notify the appropriate law enforcement agency of any report that concerns the suspected abuse, neglect, or exploitation of a child or the death of a child from abuse or neglect. If DFPS or DADS finds evidence indicating that a child may have been abused, neglected, or exploited, DFPS or DADS must report the evidence to the appropriate law enforcement agency. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.402 (relating to Investigative Reports)) These requirements do not apply when the law enforcement agency is the entity to report the alleged abuse, neglect, or exploitation to DADS or DFPS.

Specifically, Section 22.04 of the Texas Penal Code makes it a criminal offense to intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, cause to a child, individual who is elderly or an individual with a

disability serious bodily injury; serious mental deficiency, impairment, or injury; or bodily injury. Section 32.53 of the Texas Penal Code makes it a criminal offense to intentionally, knowingly, or recklessly cause the exploitation of a child, individual who is elderly, or an individual with a disability.

All reports that allege abuse or neglect by a person responsible for a child's care, custody, or welfare received by a local or state law enforcement agency are referred immediately to DFPS or the designated agency. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.105(a)) Furthermore, reports of abuse, neglect or exploitation of an individual residing in a facility regulated by DADS received by a law enforcement agency are referred to DADS. (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.005 (relating to Telephone Hotline; Processing of Reports))

If a child has been or may be the victim of conduct that constitutes a criminal offense that poses an immediate risk of physical or sexual abuse of a child that could result in death or serious harm to the child, DFPS conducts a joint investigation with the appropriate law enforcement agency. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.301(f)) Additionally, if DFPS initiates an investigation and determines that the abuse or neglect does not involve a person responsible for the child's care, custody, or welfare, DFPS refers the report to the appropriate law enforcement agency for further investigation. (See: Texas Family Code, Title 5, Subtitle E, Chapter 261, §261.105(d)).

Upon receipt of a report of alleged abuse, neglect, or exploitation of a person residing in a facility licensed, operated, certified or registered by DADS, law enforcement must acknowledge the report and begin a joint investigation with DADS within 24 hours after receipt of the report. (See: Texas Health & Safety Code, Title 4, Subtitle B, Chapter 260A, §260A.017)

## D.  Monitoring

HHSC monitors ANE investigation findings as well as MCO compliance efforts.  The state of Texas maintains overall responsibility for the operation of the critical incident system and engages in continuous process improvements. Protections against ANE are not limited to HHSC's jurisdiction, as other state and local entities have related responsibilities, described in Section C (relating to Investigation of Abuse, Neglect, or Exploitation (ANE)) of this Attachment.

## E.  Remediation

HHSC has the authority to terminate or replace an MCO or its subcontractor(s), according to managed care contracts, if either are convicted of a criminal offense related to the neglect or abuse of members in connection with the delivery of an item or service. If an MCO fails to meet contractual requirements related to protection against or reporting of ANE, such as contracting with LTSS providers that fail to meet standards outlined in Sections A and B, then HHSC has authority to use a variety of remedies, up to and including contract termination.

## F.  Member Support

Texas maintains a consumer support system that is independent of the MCOs to assist members in understanding managed care and resolution of problems regarding services, benefits, access, and rights.

Texas' independent consumer supports system (ICSS) consists of HHSC's Medicaid/CHIP Division, Office of the Ombudsman (Ombudsman), the state's managed care Enrollment Broker (EB, "MAXIMUS"), and community support from the Aging and Disability Resource Centers

(ADRCs). These entities operate independently of any Medicaid MCO and work with beneficiaries and MCOs to ensure beneficiaries seeking to enroll with a MCO understand the managed care program, MCO options, and the process for resolving issues. Data related to the ICSS is reported and monitored regularly, on at least a quarterly basis, by all entities discussed in this report.

HHSC's Medicaid/CHIP Division provides guidance to the MCOs on Medicaid policy and managed care program requirements, reviews MCO materials, monitors the MCOs' contractual obligations, answers managed care inquiries, and resolves managed care complaints. HHSC's Medicaid/CHIP Division also monitors implementation of MCO corrective action plans and assesses damages when necessary.

## V. Restraints, Seclusions, and Medication Management

DADS licenses adult foster care, assisted living providers, nursing facilities, HCSSAs, and adult day care providers. DADS oversight of medication management and use of restraint and seclusion is conducted primarily through licensure inspections and complaint investigations. DADS is responsible for ensuring compliance with licensing requirements and inspects licensed providers for compliance with licensing requirements, such as medication management and authorized use of restraint and seclusion. DADS licensing inspections include medication administration review that is based on a sample of client and resident records. The state imposes penalties, such as administrative penalties and license revocation, when harmful medication management practices are detected. DADS survey staff follow up to ensure plans of correction are properly implemented. DADS survey staff conduct follow-up surveys and inspections to ensure the provider has effectively implemented plans of correction required due to cited state violations. DADS tracks the number of validated instances of licensure violations.

## A. Restraint

Pursuant to federal and state rules, a waiver recipient has the right to be free from any form of restraint or seclusion used as a means of coercion, discipline, convenience, or retaliation. (See: 42 CFR §438.100 (relating to Enrollee Rights), and TAC Title 1 §353.202 (relating to Member Bill of Rights)) The state does permit the use of restraints in limited and appropriate circumstances, as detailed in this section. All allegations of improper restraints by providers licensed by DADS are referred to DADS for investigation.

### 1. Adult foster care (AFC)

All AFC clients have the right to be free from physical or chemical restraints not required to treat the resident's medical symptoms or imposed for purposes of discipline or convenience. A provider may use physical or chemical restraints only if the use is authorized in writing by a physician or if the use is necessary in an emergency to protect the resident or others from injury. A physician's written authorization for the use of restraint must specify the circumstances under which the restraint may be used and the duration for which the restraint may be used. Except in a behavioral emergency, restraint may only be administered by qualified medical personnel. The AFC provider must inform the resident verbally and in writing, before or at the time of admission, of his rights and responsibilities, including those related to restraint and seclusion. HHSC applies and enforces these requirements for both licensed and unlicensed AFC facilities pursuant to the provisions in the STAR+PLUS Handbook. AFC providers who provide services

to four or more unrelated individuals must be licensed as assisted living facilities (ALFs) and are also subject to the requirements discussed below.

In addition, AFCs licensed as Type A or B ALFs are also subject to ALF restraint rules that are specific to Type A or Type B facilities. These rules are found under TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, all restraints for purposes of behavior management, staff convenience, or resident discipline are prohibited. A facility may use physical or chemical restraints only (1) if the use is authorized in writing by a physician and specifies: (a) the circumstances under which a restraint may be used; and (b) the duration for which the restraint may be used; or (2) if the use is necessary in an emergency to protect the resident or others from injury.

A restraint must not be administered under any circumstance if it obstructs the resident's airway, including a procedure that places anything in, on, or over the resident's mouth or nose; impairs the resident's breathing by putting pressure on the resident's torso; interferes with the resident's ability to communicate; or places the resident in a prone or supine position. After the use of restraint, the facility must, with the resident's consent, make an appointment with the resident's physician no later than the end of the first working day after the use of restraint and document in the resident's record that the appointment was made. If the resident refuses to see the physician, staff must document the refusal in the resident's record. As soon as possible but no later than 24 hours after the use of restraint, the facility must notify the resident's legally authorized representative or an individual actively involved in the resident's care, if there is such a person, that the resident has been restrained, unless the release of this information would violate other law.

Staff at Type A or B ALFs must attend training which includes practices to decrease the frequency of the use of restraint and alternatives to restraints. Before or upon admission of a resident, a facility must notify the resident and, if applicable, the resident's legally authorized representative, of DADS' rules and the facility's policies related to restraint. In order to decrease the frequency of the use of restraint, facility staff must be aware of and adhere to the findings of the required resident assessment. A facility may adopt policies that allow less use of restraint than allowed by these rules.

## 2. Assisted living facility

Assisted living facilities (ALFs) must comply with restraint rules found in TAC Title 40, Chapter 92, §92.125 (relating to Resident's Bill of Rights and Provider Bill of Rights). Pursuant to these rules, ALF residents have the right to be free from physical and chemical restraints that are administered for the purpose of discipline or convenience and not required to treat the resident's medical symptoms. A provider may use physical or chemical restraints only if the use is authorized in writing by a physician or if the use is necessary in an emergency to protect the resident or others from injury. A physician's written authorization for the use of restraint must specify the circumstances under which the restraint may be used and the duration for which the restraint may be used. Except in a behavioral emergency, restraint may only be administered by qualified medical personnel.

Furthermore, Type A and Type B ALFs must also comply with restraint rules in TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, all restraints for purposes of behavior management, staff convenience, or resident discipline are prohibited. A facility may use physical or chemical restraints only (1) if the use is authorized in writing by a physician and specifies: (a) the circumstances under which a

restraint may be used; and (b) the duration for which the restraint may be used; or (2) if the use is necessary in an emergency to protect the resident or others from injury.

A restraint must not be administered under any circumstance if it obstructs the resident's airway, including a procedure that places anything in, on, or over the resident's mouth or nose; impairs the resident's breathing by putting pressure on the resident's torso; interferes with the resident's ability to communicate; or places the resident in a prone or supine position. After the use of restraint, the facility must, with the resident's consent, make an appointment with the resident's physician no later than the end of the first working day after the use of restraint and document in the resident's record that the appointment was made. If the resident refuses to see the physician, the facility must document the refusal in the resident's record. As soon as possible but no later than 24 hours after the use of restraint, the facility must notify the resident's legally authorized representative or an individual actively involved in the resident's care, if there is such a person, that the resident has been restrained, unless the release of this information would violate other law.

Staff at Type A or B ALFs must attend training which includes practices to decrease the frequency of the use of restraint and alternatives to restraints. Before or upon admission of a resident, a facility must notify the resident and, if applicable, the resident's legally authorized representative, of DADS' rules and the facility's policies related to restraint. In order to decrease the frequency of the use of restraint, facility staff must be aware of and adhere to the findings of the required resident assessment. A facility may adopt policies that allow less use of restraint than allowed by these rules.

### 3. Nursing facility

Nursing facilities must comply with restraint rules found in TAC Title 40, Chapter 19, §92.125 (relating to Nursing Facility Requirements for Licensure and Medicaid Certification). Nursing facility providers may use restraints, of any kind, only with the orders of the attending physician. Residents must be informed in writing upon admission, and during their stay, of DADS' rules and the facility's policies related to the use of restraint and involuntary seclusion. As part of orientation, and annually, each employee must receive instruction regarding restraint reduction. If restraints are used to treat a resident's medical condition, the resident must be monitored hourly, and at a minimum, restraints must be released every two hours for a minimum of ten minutes, and the resident must be repositioned. Restraints that obstruct the resident's airway, impair the resident's breathing, interfere with the resident's ability to communicate, or place the resident in a prone or supine position are prohibited. The use of restraints and their release must be documented in the clinical record.

### 4. HCSSA

Members receiving services from home health agencies, licensed as HCSSAs, have the right to be free from restraint when it is used for someone else's convenience or is meant to force the member to do something, or punish the member (TAC Title 1, Chapter 353, Subchapter C (relating to Member Bill of Rights and Responsibilities)).

### 5. Adult Day Care Centers

Providers of day activity and health services (DAHS) require an adult day care (ADC) license issued by DADS in accordance with TAC Title 40, Chapter 98 (relating to Adult Day Care and Day Activity and Health Services Requirements).

**Attachment G**
**HCBS Participant Safeguards**

ADC providers must comply with licensure and program rules found in TAC Title 40, Chapter 98, §98.61 (relating to General Requirements) and §98.62 (relating to Program Requirements). Pursuant to this section, ADC providers must provide a client with a written list of the client's rights, as outlined under the Texas Human Resource Code, Chapter 102, §102.004 (relating to List of Rights). §102.003 (relating to Rights of the Elderly) sets forth the specific rights addressed by §102.004. Under this section, ADC clients have the right to be free from physical or chemical restraints that are administered for the purpose of discipline or convenience and are not required to treat the individual's medical symptoms. A person providing services may use physical or chemical restraints only if the use is authorized in writing by a physician or the use is necessary in an emergency to protect the client or others from injury. A physician's written authorization for the use of restraint must specify the circumstances under which the restraint may be used and the duration for which the restraint may be used. Except in an emergency, restraint may only be administered by qualified medical personnel.

## B. Seclusion

The state does not permit the use of seclusion as it relates to services delivered through managed long term services and supports. All allegations of improper seclusion of individuals receiving managed long term services and supports by providers licensed by DADS are referred to DADS for investigation.

### 1. Adult foster care

The use of seclusion in any licensed or unlicensed AFC is prohibited. The state applies and enforces these requirements for licensed and unlicensed adult foster care facilities under provisions in the STAR+PLUS Handbook.

### 2. Assisted living facility

The use of seclusion by Type A and Type B assisted living facility providers is prohibited. (See: TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities))

### 3. Nursing facility

Nursing facilities may not use involuntary seclusion on a resident. (See: TAC Title 40, Chapter 19, §19.601 (relating to Resident Behavior and Facility Practice)) "Involuntary seclusion" is defined as the "separation of a resident from others or from the resident's room or confinement to the resident's room, against the resident's will or the will of a person who is legally authorized to act on behalf of the resident. Monitored separation from other residents is not involuntary seclusion if the separation is a therapeutic intervention that uses the least restrictive approach for the minimum amount of time, not to exceed 24 hours, until professional staff can develop a plan of care to meet the resident's needs." (See: TAC Title 40, Chapter 19, §19.101 (relating to Definitions))

### 4. HCSSA

Members receiving services from home health agencies, licensed as HCSSAs, have the right to be free from seclusion when it is for someone else's convenience or is meant to force the member to do something, or punish the member (See: TAC Title 1, Chapter 353, Subchapter C (relating to Member Bill of Rights and Responsibilities)).

### 5. Adult Day Care Centers

Members receiving services from adult day care centers have the right to be free from seclusion when it is for someone else's convenience or is meant to force the member to do something, or punish the member (See: TAC Title 1, Chapter 353, Subchapter C (relating to Member Bill of Rights and Responsibilities)).

## C. Medication Management

Adult foster care providers, assisted living facilities, nursing facilities, HCSSAs, and adult day care providers must provide medication management in accordance with licensing standards. The State enforces the same requirements for unlicensed adult foster care facilities under provisions in the STAR+PLUS Handbook.

A registered nurse who supervises a medication aide or delegates medication administration must provide ongoing supervision and any necessary training to the unlicensed person. Registered nurses must follow procedures for delegation in accordance with relevant law and rule. (See: TAC Title 22, Chapter 225 (relating to RN Delegation to Unlicensed Personnel and Tasks Not Requiring Delegation in Independent Living Environments for Clients with Stable and Predictable Conditions) An RN that fails to properly supervise or delegate is subject to action by the Texas Board of Nursing. (See: TAC Title 22, Chapter 217 (relating to Licensure, Peer Assistance, and Practice))

### 1. Adult foster care

All AFC providers must ensure that all medications are taken as prescribed and in a timely manner according to the instructions on the medication label or instructions from the resident's physician. The AFC provider may administer medications only as allowed by state law or regulation, and prescription medications must be kept in a locked container. Medications must be disposed of when the resident's medication regimen changes or when the medication is out of date. The AFC provider must ensure that a resident takes over-the-counter medications according to the package directions. Excessive use of these medications must be reported to the AFC caseworker. The AFC provider must inform the resident verbally and in writing, before or at the time of admission, of his rights and responsibilities. The State enforces the same requirements for unlicensed adult foster care facilities under provisions in the STAR+PLUS Handbook.

In addition, AFCs licensed as Type A or B ALFs, which are AFCs serving 5 or more residents and licensed prior to September 1, 2014, and AFCs with a current contract with DADS, serving 4 or more residents and licensed after September 1, 2014, are also subject to ALF medication management rules that are specific to Type A or Type B facilities. These rules are found in TAC Title 40, Chapter 92, §92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, medications must be administered according to physician's orders.

Residents who choose not to or cannot self-administer their medications must have their medications administered by a person who: (i) holds a current license under state law that authorizes the licensee to administer medication; (ii) holds a current medication aide permit and functions under the direct supervision of a licensed nurse on duty or on call by the facility and that nurse authorizes the licensee to administer medication; or (iii) is an employee of the facility to whom the administration of medication has been delegated by a registered nurse, and must have been trained by the nurse to administer medications or have had the nurse verify the training of the employee. The delegation of the administration of medication is governed by TAC Title 22,

Chapter 225 (relating to RN Delegation to Unlicensed Personnel and Tasks Not Requiring Delegation in Independent Living Environments for Clients with Stable and Predictable Conditions).

A resident's prescribed medication must be dispensed through a pharmacy or by the resident's treating physician or dentist. Each resident's medications must be listed on an individual resident's medication profile record. Supervision of a resident's medication regimen by facility staff may be provided to residents who are incapable of self-administering without assistance. Residents who self-administer their own medications and keep them locked in their room must be counseled at least once a month by facility staff to ascertain if the residents continue to be capable of self-administering their medications and if security of medications can continue to be maintained. The facility must keep a written record of counseling. Residents who choose to keep their medications locked in a central medication storage area may be permitted entrance or access to the area for the purpose of self-administering their own medication. A facility staff member must remain in or at the storage area the entire time any resident is present.

Facility staff immediately report to the resident's physician and responsible party any unusual reactions to medications or treatments. When the facility supervises or administers the medications, a written record must be kept when the resident does not receive or take his/her medications or treatments as prescribed. The facility must provide a locked area for all medications. Medications no longer being used by the resident are to be kept separate from current medications and are to be disposed of according to state law.

## 2. Assisted living facility

Assisted living facility (ALF) providers must comply with medication management rules found in TAC Title 40, Chapter 92, Section 92.41 (relating to Standards for Type A and Type B Assisted Living Facilities). Pursuant to these rules, medications must be administered according to a physician's orders.

Residents who choose not to or cannot self-administer their medications must have their medications administered by a person who: i) holds a current license under state law that authorizes the licensee to administer medication; (ii) holds a current medication aide permit and functions under the direct supervision of a licensed nurse on duty or on call by the facility and that nurse authorizes the licensee to administer medication; or (iii) is an employee of the facility to whom the administration of medication has been delegated by a registered nurse, and must have been trained by the nurse to administer medications or have had the nurse verify the training of the employee. The delegation of the administration of medication is governed by TAC Title 22, Chapter 225 (relating to RN Delegation to Unlicensed Personnel and Tasks Not Requiring Delegation in Independent Living Environments for Clients with Stable and Predictable Conditions).

A resident's prescribed medication must be dispensed through a pharmacy or by the resident's treating physician or dentist. Each resident's medications must be listed on an individual resident's medication profile record. Supervision of a resident's medication regimen by facility staff may be provided to a resident who is incapable of self-administering without assistance. Residents who self-administer their own medications and keep them locked in their room must be counseled at least once a month by facility staff to ascertain if the residents continue to be capable of self-administering their medications and if security of medications can continue to be maintained. The facility must keep a written record of counseling. Residents who choose to keep their medications locked in the central medication storage area may be permitted entrance or

access to the area for the purpose of self-administering their own medication. A facility staff member must remain in or at the storage area the entire time any resident is present. Facility staff immediately report to the resident's physician and responsible party any unusual reactions to medications or treatments. When the facility supervises or administers the medications, a written record must be kept when the resident does not receive or take his/her medications or treatments as prescribed. The facility must provide a locked area for all medications. Medications no longer being used by the resident are to be kept separate from current medications and are to be disposed of according to state law. Providers are required to record any type of medication error, regardless of severity, in the resident's clinical record.

### 3. Nursing facility

Nursing facility providers must comply with medication management rules found in TAC Title 40, Chapter 19 (relating to Nursing Facility Requirements for Licensure and Medicaid Certification). A nursing facility provider must ensure that medications are administered pursuant to the ordering physician's directions. Each resident must have an individual medication record. An individual may self-administer medications if the interdisciplinary team has determined that this practice is safe. The facility nursing staff must report medication errors and adverse reactions to the resident's physician in a timely manner, as warranted by an assessment of the resident's condition, and record them in the resident's record. Medication errors include, but are not limited to, administering the wrong medication, administering at the wrong time, administering the wrong dosage, administering by the wrong route, omitting a medication, or administering to the wrong resident.

When not in use, a medication cart must be secured in a designated area. Self-administered medications may be kept in a locked cabinet in the resident's room. When medications are self-administered, the facility remains responsible for medication security, accurate information, and medication compliance. Medications of deceased residents, medications that have passed the expiration date, and medications that have been discontinued must be securely stored and reconciled. These medications must be disposed of according to federal and state laws or rules on a quarterly basis.

### 4. HCSSA

Home health agencies licensed as HCSSAs must comply with medication management rules found in TAC Title 40, Chapter 97, §97.300 (relating to Medication Administration). A HCSSA must adopt and enforce a written policy for maintaining a current medication list and a current medication administration record. A client's healthcare provider must order administration of medication. Each client must have an individual medication record. An individual delivering care must report any adverse reaction to a supervisor and document this in the client's record on the day of occurrence. If the adverse reaction occurs after regular business hours, the individual delivering care must report the adverse reaction as soon as it is disclosed. Notification must also be made in the medication administration record or clinical notes of medications not given and the reason. Providers are required to record any type of medication error, regardless of severity, in the client's clinical record. (See: TAC Title 40, Chapter 97, §97.301 (relating to Client Records))

### 5. Adult day care

Day activity and health services require an adult day care license issued by DADS in accordance with TAC Title 40, Chapter 98 (relating to Adult Day Care and Day Activity and Health Services Requirements). (See also TAC Title 40, Chapter 49, §49.205(a)(15) (relating to License, Certification, Accreditation, and Other Requirements))

Adult day care providers must comply with medication management rules found in TAC Title 40, Chapter 98, §98.62 (relating to Program Requirements).

The facility nurse is responsible for obtaining physician's orders for medication and treatments to be administered, and administering medication and treatments. Clients who choose not to or cannot self-administer their medications must have their medications administered by a person who holds a current license under state law which authorizes the licensee to administer medications. All medication prescribed to clients must be dispensed through a pharmacy or by the client's treating physician or dentist. Each client's medications must be listed on an individual client's medication profile record.

Assistance with self-administration of client's medication by licensed nursing staff may be provided to clients who are incapable of self-administering without assistance. Clients who self-administer their own medications must be counseled at least once a month by licensed nursing staff to ascertain if the clients continue to be capable of self-administering their medications and/or treatments. A written record of counseling must be kept by the facility.

The facility director, the activities director, or a facility nurse must immediately report to the client's physician and responsible party any unusual reactions to medications or treatments. When the facility supervises or administers the medications, a written record must be kept when the client does not receive or take his medications and/or treatments as prescribed. The documentation must include the date and time the dose should have been taken, and the name and strength of medication missed. The facility must provide a locked area for all medications. Medications no longer in use must be disposed of according to state law.

**Attachment G**
**HCBS Participant Safeguards**

# Attachment H
## UC Claiming Protocol and Application
## Part 1: UC Claiming Protocol for Hospitals and Physician Groups

### OVERVIEW

The intent of the Texas Medicaid Waiver Application ("UC Application") is to provide a simplified way to subsidize the costs incurred by hospitals, physicians and mid-level professionals for patient care services (as further defined below) provided to Medicaid and Uninsured patients that are not reimbursed through the claims adjudication process or by other supplemental payments. All UC payments to providers and all expenditures described as UC permissible expenditures must not exceed the cost of services provided to Medicaid and Uninsured patients as defined and discussed in this protocol. These unreimbursed Medicaid and Uninsured costs are determined based on one of two UC tools depending on the type of entity providing the service. These tools have been approved by the Centers for Medicare and Medicaid Services (CMS). To the extent that there are UC expenditures a hospital provider wants to make against the UC cost limit, and the methodology for capturing such expenditures is not stated in this protocol, the expenditures must be approved by CMS prior to the submission of the reconciliation for the applicable period for the expenditures.

The Medicaid coverage limitations under Section 1905(a) of the Act, which exclude coverage for patients in an institution for mental diseases (IMD) who are under age 65, except for coverage of inpatient psychiatric hospital services for individuals under age 21, are applicable.

The Texas Hospital Uncompensated Care tool ("TXHUC") will be utilized by hospitals to determine their unreimbursed costs for Medicaid and Uninsured patients for physicians' and mid-level professionals' direct patient care services where the hospital incurs these costs. In addition, if the hospital has unreimbursed hospital costs for services provided to Medicaid and Uninsured patients that were not paid via the claims adjudication process or thru the Medicaid Disproportionate Share (DSH) pool, these costs can be included in the TXHUC application. Also, for some hospitals meeting the criteria, unreimbursed pharmacy costs for take home drugs provided by the hospital to Medicaid and Uninsured patients will be included in the TXHUC application.

The Texas Physicians Uncompensated Care tool ("TXPUC") will be utilized by physician and/or mid-level professional entities that provide direct patient care physician and/or mid-level professional services to Medicaid and Uninsured patients in a hospital setting and the professional entity is not reimbursed under a contractual or employment relationship by the hospital for these services. The professional entity may also include in its TXPUC application the costs related to direct patient care services provided to Medicaid and Uninsured patients in a non-hospital setting. Only physician entities that had previously received payments under the Texas Medicaid Physician UPL (Upper Payment Limit) program and their successor organizations are eligible to submit a TXPUC application under the 1115 Waiver program.

The costs and other data included in the initial UC application (for the fiscal period ending September 30, 2012) should be representative of the fiscal period from October 1, 2009 through September 30, 2010. The UC application should be submitted to the Texas Health and Human Services Commission (HHSC) by the deadline specified by HHSC on its website at http://www.hhsc.state.tx.us/rad/hospital-svcs/1115-waiver.shtml. Applications for future fiscal periods which will cover the period from October 1 through September 30 of the applicable years will be due to HHSC by the deadline specified by HHSC. For hospitals, the source for these costs and other data will be the hospital's Medicare cost report that ends in the calendar year two years prior to the demonstration year for which UC payments are being determined.
It should be noted that when HHSC completes the reconciliation process described in this protocol, HHSC will utilize the hospital's actual data reported on the reconciliation surveys and best available cost reports to ensure that the hospital's payments did not exceed its eligible costs. Physician and mid-level

professional organizations do not complete Medicare cost reports, meaning that their financial data should be available immediately following the end of their respective fiscal years.

All costs and other data reported in the UC Application are subject to the Medicare regulations and Program instructions. The entity submitting the UC Application must maintain adequate supporting documentation for all information included in the UC Application in accordance with the Medicare program's data retention policies. The entity must submit the supporting documentation upon request from HHSC.

For purposes of the UC Application, a mid-level professional is defined as:

☐ Certified Registered Nurse Anesthetist (CRNA)
☐ Nurse Practitioner
☐ Physician Assistant
☐ Dentist
☐ Certified Nurse Midwife
☐ Clinical Social Worker
☐ Clinical Psychologist
☐ Optometrist

For purposes of the UC Application, a visit is defined as a face-to-face encounter between a patient and a physician and/or mid-level professional. Multiple encounters with the same physician and/or mid-level professional that take place on the same day and at a single location for the same diagnosis constitute a single visit. More than one visit may be counted on the same day (which may be at a different location) in either of the following situations:

a) When the patient, after the first visit, suffers illness or injury requiring another diagnosis or treatment, two visits may be counted.
b) When the patient is seen by a dentist and sees a physician and/or mid-level professional, two visits may be counted.

# Attachment H
## UC Claiming Protocol and Application
## Part 1: UC Claiming Protocol for Hospitals and Physician Groups

### Texas Hospital Uncompensated Care Tool (TXHUC)

The TXHUC comprises a certification page, four primary schedules (a Summary Schedule and Schedules 1, 2 & 3) and various other supporting schedules. Schedules 1, 2 and 3 determine the hospital's unreimbursed costs for services provided to Medicaid and Uninsured patients related to physician and/or mid-level professional direct patient care costs, pharmacy costs, and DSH hospital costs, respectively. The supporting schedules are the schedules hospitals are required to submit to HHSC when applying for the Medicaid DSH program. Each of these schedules along with instructions for the completion of the schedule is detailed below.

### Certification

The certification page must be signed and dated by an officer or administrator of the provider. An officer is defined as a member of the provider's senior management such as the chief executive officer, chief financial officer, chief operating officer, etc. The certification must contain an original signature and not a copy or electronic signature. If the TXHUC is an initial submission, it should be so indicated in the appropriate box on the certification page.

Upon the termination of the 1115 Waiver, providers will be required to submit actual cost data in the prescribed format of the TXHUC for a minimum of two years for purposes of reconciling the UC Pool payments for the last two years of the Waiver with the provider's actual costs incurred for those fiscal periods

### Summary Schedule

*Column 1* - Summarizes the Medicaid and Uninsured costs determined on Schedules 1, 2 & 3. These amounts will flow automatically from the respective schedules and no input is required.

*Column 2* – The initial distribution of the Uncompensated Care Pool ("UC Pool") for the fiscal period 10/1/2011 – 9/30/2012 will be based on the costs for the period from 10/1/2009 – 9/30/2010 as computed on Schedules 1, 2 & 3. If the provider knows these costs are not representative of their actual costs for the period from 10/1/2011 – 9/30/2012, due to changes in their contractual arrangements or other operational or economic issues, the provider can enter adjustments to these costs in this column. The provider is required to maintain supporting documentation to support their adjustment amount and make this information available upon request from HHSC and/or CMS.

*Column 3* – Represents the net Medicaid and Uninsured costs after any adjustments and is determined by summing the amounts in Columns 1 & 2. The net cost amount will be utilized to determine the provider's distribution from the UC Pool.

### Schedule 1

The schedule computes the costs related to direct patient care services provided by physicians and mid-level professionals to Medicaid and Uninsured patients. To be included in the schedule, these costs must be recorded on the hospital's accounting records and reported on the hospital's Medicare cost report, Worksheet A, Columns 1 and/or 2.

# Attachment H
## UC Claiming Protocol and Application
## Part 1: UC Claiming Protocol for Hospitals and Physician Groups

Unless otherwise instructed, the source for these costs and other data will be the hospital's Medicare cost report for the period that ends in the calendar year two years prior to the demonstration year for which UC payments are being determined.

*Column 1* - The direct patient care physician and/or mid-level professional costs are identified from the Medicare cost report. These professional costs are:

(1) Limited to allowable and auditable physician and/or mid-level professional compensations that has been incurred by the hospital;

(2) Physician's services to individual patients identified as professional component costs on Worksheet A-8-2, Column 4 of the cost report(s);

(3) Or, for contracted physicians and/or mid-level professionals only, Worksheet A-8, if the physician and/or mid-level professional compensation cost is not reported by the hospital on Worksheet A-8-2 because the physicians are contracted solely for direct patient care activities (i.e., no administrative, teaching, research, or any other provider component or non-patient care activities); and

(4) Removed from hospital costs on Worksheet A-8 / A-8-2

If the professional physicians' costs on Worksheet A-8-2, Column 4 include Medicare Part A costs (e.g. departmental administration, hospital committee activities, etc.) that were reported as professional component due to lack of a physicians' time study(s) to allocate the costs between professional and provider component and/or application of the Reasonable Compensation Equivalents (RCE) , these costs must be excluded from the physicians' costs related to direct patient care professional services and cannot be included for UC reimbursement purposes unless the following conditions are met:

(1) The costs must be allocated between direct patient care (Medicare Part B) and reimbursable Medicare Part A activities. The costs associated with Medicare Part A activities must be subjected to the Medicare RCEs. If the hospital does not have adequate time studies for the application of the RCEs, then the hospital must obtain a proxy, signed and dated by the physician that estimates the amount of time spent on allowable Medicare Part A activities, teaching of interns & residents and medical students, research and direct patient care for the period the costs were incurred. The proxy should account for 100% of the physicians' time related to the costs incurred by the hospital. If the costs are for a group of physicians, each physician in the group must complete a proxy.

(2) For a physician the hospital can elect to apply the RCE limit on an individual physician basis or in the aggregate.

(3) The hospital must allocate the physicians' costs based on the physicians' proxy and apply the applicable RCE limits to the Medicare Part A non-teaching physicians' costs. The hospital must maintain auditable documentation of the determination of the allowable Part A non-teaching physician costs.

(4) For cost reporting periods beginning on or after 10-1-2012, the hospital is expected to obtain adequate and auditable time studies from each physician and/or mid-level professional providing Medicare Part A services to the hospital for the proper application of the RCEs via the Medicare 2552 cost report. The physician and/or mid-level professional time study forms to be used are located on the Texas Health and Human Services Commission website. Time studies should be completed for a two (2) week period once per quarter during the fiscal year. Ideally, the time study period will not be the same two weeks in any two given quarters. Medicare Part A

physician and/or mid-level professional costs will not be allowed to be included in the UC tool for cost reporting periods beginning on or after 10-1-2012. In instances where a physician or mid-level professional is able to provide a contract that scopes out the specific direct patient care being provided and that contains the same information provided by a time study, that contract may be used for payment and reconciliation purposes.

Physician Part A costs in excess of the RCE limits cannot be included in Column 1. Physician costs related to direct patient care and physician Part A costs not in excess of the RCE limits should be reported on the respective line in Column 1 for cost reporting periods ending on or prior to 9-30-2012. For cost reporting periods beginning on or after 10-1-2012, Physician Part A costs cannot be included in Column 1. The physicians' costs should be reported in the cost center in which the expenses were reported on Worksheet A, Column 3 of the Medicare cost report.

Hospital costs for mid-level professional practitioner services that have been identified and removed from hospital costs on the Medicare cost report are to be included. Typically these costs comprise salaries and direct fringe benefits (payroll taxes, vacation and sick pay, health and life insurance, etc.), contract fees and professional liability insurance. The mid-level professional practitioner types to be included are:

(1) Certified Registered Nurse Anesthetists
(2) Nurse Practitioners
(3) Physician Assistants
(4) Dentists
(5) Certified Nurse Midwives
(6) Clinical Social Workers
(7) Clinical Psychologists
(8) Optometrists

To the extent these mid-level practitioners' professional compensation costs are not included in Worksheet A-8-2, Column 4, but are instead removed from hospital costs through an A-8 adjustment on the Medicare cost report, these costs may be recognized if the mid-level professional practitioners are Medicaid-qualified practitioners for whom the services are billable under Medicare separate from hospital services.

If the physician and/or mid-level practitioner costs are reported in a non-reimbursable cost center on the hospital's Medicare cost report, Worksheet A, these costs can be included in Column 1. The costs to be included would be the costs from Worksheet B Part I, the last column for the applicable line(s).

Hospitals may include physician and/or mid-level professional support staff compensation, data processing, and patient accounting costs as physician and/or mid-level professional-related costs to the extent that:

(1) These costs are removed from hospital inpatient and outpatient costs because they have been specifically identified as costs related to physician and/or mid-level professional services;
(2) They are directly identified on W/S A-8 as adjustments to hospital costs;
(3) They are otherwise allowable and auditable provider costs; and
(4) They are further adjusted for any non-patient-care activities such as research based on the physician and/or mid-level professional time studies.

If these costs are removed as A-8 adjustments to the hospital's general service cost centers, these costs should be reported on the General Services line (line 1) in Column 1.

If the hospital has costs for physicians and one or more types of mid-level professionals for a given cost center, the costs can be combined and the total reported in Column 1 provided the same allocation statistic will be utilized to apportion the costs to Medicaid and Uninsured. If the hospital elects to utilize different allocation statistics to apportion the physician and/or any type of mid-level professional costs for a given cost center the cost center can be subscripted.

*Column 1a* – The recommended apportionment statistic for physician and/or mid-level professional costs is total billed professional charges by cost center. If a hospital does not maintain professional charges by payer type separately in its patient accounting system, then the professional costs can be apportioned based on total billed hospital departmental charges. Total billed hospital departmental charges by cost center are identified from the hospital's applicable Medicare cost report(s).

If professional charges related to the physician and/or mid-level professional services whose costs are reported in Column 1are utilized as the apportionment statistic, the professional charges must be from the same corresponding time period as the costs. The hospital must maintain adequate and auditable documentation to support the statistics reported in Column 1a.

If the hospital reports costs on the General Services line (Line 1) in Column 1, the recommended allocation statistic reported in Column 1a would be the aggregate total departmental charges (professional or hospital department, based on the apportionment statistic for the specific cost centers) for all cost centers.

*Column 1b* – The allocation basis the hospital elects to utilize to apportion the costs from Column 1 should be identified for each cost center. The approved allocation bases are total departmental professional charges if available. Otherwise departmental hospital charges may be utilized.

*Column 2* - A cost to charge ratio (CCR) for each cost center is calculated by dividing the total costs for each cost center reported in Column 1 by the total allocation statistic for each cost center reported in Column 1a. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the CCR for the additional line(s).

*Columns 3a & 3b* – The applicable allocation statistics related to the physician and/or mid-level professional services provided to Medicaid Fee-For Service (FFS) patients are reported in Columns 3a and 3b based on the hospital's elected allocation basis reported in Column 1b. The allocation statistics applicable to Medicaid FFS inpatient services are reported in Column 3a and allocation statistics applicable to Medicaid FFS outpatient services are reported in Column 3b. The Medicaid FFS inpatient and outpatient statistics should be from the hospital's internal records and for the same fiscal period as the costs reported in Column 1 and total allocation statistics reported in Column 1a. If the hospital provided services to out-of-state Medicaid FFS patients, the charges related to those services should be included in Columns 3a and 3b as applicable.

*Columns 3c & 3d* – The Medicaid FFS inpatient and outpatient physician and/or mid-level professional costs are computed based on the CCR reported in Column 2 multiplied by the Medicaid FFS inpatient and outpatient allocation statistics reported in Columns 3a and 3b, respectively. If additional lines are added to

Schedule 1, it will be necessary to copy the formula used to compute the Medicaid FFS inpatient and outpatient costs for the additional line(s).

*Columns 4a & 4b* - The applicable allocation statistics related to the physician and/or mid-level professional services provided to Medicaid Managed Care (HMO) patients are reported in Columns 4a and 4b based on the hospital's elected allocation basis reported in Column 1b. The allocation statistics applicable to Medicaid HMO inpatient services are reported in Column 4a and allocation statistics applicable to Medicaid HMO outpatient services are reported in Column 4b. The Medicaid HMO inpatient and outpatient statistics should be from the hospital's internal records and for the same fiscal period as the costs reported in Column 1 and total allocation statistics reported in Column 1a. If the hospital provided services to out-of-state Medicaid HMO patients, the charges related to those services should be included in Columns 3a and 3b as applicable.

*Columns 4c & 4d* – The Medicaid HMO inpatient and outpatient physician and/or mid-level professional costs are computed based on the CCR reported in Column 2 multiplied by the Medicaid HMO inpatient and outpatient allocation statistics reported in Columns 4a and 4b, respectively. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the Medicaid HMO inpatient and outpatient costs for the additional line(s).

*Columns 5a & 5b* - The applicable allocation statistics related to the physician and/or mid-level professional services provided to Uninsured patients are reported in Columns 5a and 5b based on the hospital's elected allocation basis reported in Column 1b. The allocation statistics applicable to Uninsured inpatient services are reported in Column 5a and allocation statistics applicable to Uninsured outpatient services are reported in Column 5b. The Uninsured inpatient and outpatient statistics should be from the hospital's internal records and for the same fiscal period as the costs reported in Column 1 and total allocation statistics reported in Column 1a.

*Columns 5c & 5d* – The Uninsured inpatient and outpatient physician and/or mid-level professional costs are computed based on the CCR reported in Column 2 multiplied by the Uninsured inpatient and outpatient allocation statistics reported in Columns 5a and 5b, respectively. If additional lines are added to Schedule 1, it will be necessary to copy the formula used to compute the Uninsured inpatient and outpatient costs for the additional line(s).

All revenue received by the hospital related to physician and/or mid-level professional services provided inpatients and outpatients covered by Medicaid FFS, Medicaid HMO and Uninsured patients should be reported on Line 102 of the respective Columns 3c & 3d, 4c& 4d and 5c & 5d. The revenue will be subtracted from the respective costs to determine the net costs to be included in the hospital's UC Application.

*Schedule 2*

The schedule computes the pharmacy costs related to prescription drugs provided by hospitals participating in the Texas Vendor Drug program. These pharmacy costs are not related to services provided by the hospital's retail pharmacy or billed to a third party payer under revenue code 253. If the pharmacy costs were included in the hospital's Texas Medicaid DSH Application, they should not be included in the TXHUC application.

# Attachment H
## UC Claiming Protocol and Application
## Part 1: UC Claiming Protocol for Hospitals and Physician Groups

*Column 1* - The total costs for the cost center that contains the drug costs related to the prescription drugs provided under the Texas Vendor Drug program are reported in Column 1, Line 1. These costs are from the hospital Medicare cost report(s) Worksheet B, Part I, last column for the applicable cost center.

*Column 1a* – The total hospital departmental charges for the cost center that contains the drug charges related to the prescription drugs provided under the Texas Vendor Drug program are reported in Column 1a, Line 1. These charges are from the hospital Medicare cost report(s) Worksheet C, Part I, Column 8 for the applicable cost center.

*Column 1b* – The allocation basis is hospital departmental charges. If the hospital wants to utilize an alternative allocation basis, they must submit a written request to Texas HHSC that identifies the alternative allocation basis and an explanation as to why the alternative allocation basis results in a more equitable apportionment of the pharmacy costs. HHSC will provide a written response to the hospital's request within 60 days of receiving the request and their decision is final.

*Column 2* – The Cost-to-Charge ratio is computed by dividing the costs reported in Column 1 by the allocation statistic reported in Column 2. The CCR is carried out to six (6) decimal places.

*Column 3b* – The charges related to the prescription drugs provided to Medicaid FFS patients under the Texas Vendor Drug program are reported in Column 3b, Line 1. These charges are obtained from the hospital's internal records. These charges should be for services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The hospital must maintain the supporting documentation and submit it to HHSC upon request.

*Column 3d* – The costs related to the prescription drugs provided to Medicaid FFS patients under the Texas Vendor Drug program are computed by multiplying the charges reported in Column 3b by the CCR computed in Column 2.

*Column 4b* - The charges related to the prescription drugs provided to Medicaid HMO patients under the Texas Vendor Drug program are reported in Column 4b, Line 1. These charges are obtained from the hospital's internal records. These charges should be for services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The hospital must maintain the supporting documentation and submit it to HHSC upon request.

*Column 4d* – The costs related to the prescription drugs provided to Medicaid HMO patients under the Texas Vendor Drug program are computed by multiplying the charges reported in Column 4b by the CCR computed in Column 2.

*Column5b* - The charges related to the prescription drugs provided to Uninsured patients under the Texas Vendor Drug program are reported in Column 5b, Line 1. These charges are obtained from the hospital's internal records. These charges should be for services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined. The hospital must maintain the supporting documentation and submit it to HHSC upon request.

*Column 5d* – The costs related to the prescription drugs provided to Uninsured patients under the Texas Vendor Drug program are computed by multiplying the charges reported in Column 5b by the CCR computed in Column 2.

**Attachment H**
**UC Claiming Protocol and Application**
**Part 1: UC Claiming Protocol for Hospitals and Physician Groups**

*Line 2* - All revenue received by the hospital related to prescription drug services provided to Medicaid FFS, Medicaid HMO and Uninsured patients should be reported on Line 2 of the respective Columns 3d, 4d and 5d. This includes any rebates received from the Texas Vendor Drug program. The revenue will be subtracted from the respective costs to determine the net costs to be included in the hospital's UC Application.

*Schedule 3*

The schedule determines the hospital's Medicaid DSH costs (Medicaid shortfall and uninsured costs) and Hospital-Specific Limit (HSL) for the applicable fiscal year (10/1/20XX – 9/30/20YY). HHSC will employ the same methodology used to compute the hospital-specific limit for the determination of the DSH Pool payments except that the Medicaid coverage limitations under Section 1905(a) of the Act, which exclude coverage for patients in an IMD who are under age 65, except for coverage of inpatient psychiatric hospital services for individuals under age 21, are applicable.

Hospitals must complete the Cost Report Collection Form worksheets in the TXHUC Tool to allow HHSC to compute their HSL. HHSC will employ the same methodology to calculate an HSL for each hospital participating in the DSH program, the UC program, or both.

<u>Reconciliation of UC Payments to Hospitals</u>

As explained elsewhere in this protocol, UC payments to hospitals are determined utilizing the TXHUC, which is based on data for services furnished during the period two years before the demonstration year. Beginning in demonstration year four, HHSC began reconciling the UC payments made in prior demonstration years to ensure that a hospital's payments did not exceed its actual costs incurred during that demonstration year.

Reconciliations are performed three or more years after the demonstration year, except that HHSC will complete all reconciliations for demonstration years 1 - 5 no later than December 31, 2019. (The reconciliation schedule is more fully described in the section titled "<u>Section 1115 Waiver UC Program Reconciliation Schedule</u>" below.) The reconciliation process utilizes a reconciliation survey that employs the same cost finding methodology as the TXHUC to calculate uncompensated care costs (but which may have a format that is configured to interface with contractors' IT systems), and the best available cost report or reports covering the demonstration year.. If the hospital's cost report period does not coincide with the demonstration year being reconciled, it will be necessary to pro rate the data from the two cost report periods that cover the demonstration year. HHSC will perform reconciliations for payments made during each year of the waiver.

At the beginning of the reconciliation of payments for each demonstration year, HHSC or its designee will notify each hospital that is subject to the reconciliation and will provide the hospital with a survey of costs and payments that is similar to the TXHUC described elsewhere in this protocol. The hospital is required to complete the reconciliation survey and cooperate with HHSC or its designee to complete the reconciliation. If a hospital fails to provide required information, HHSC will recoup any UC payment that is unsupported by the available data, up to the full amount of the UC payment made to the hospital during the demonstration year for which payments are being reconciled. Upon completion of the reconciliation, HHSC will issue a report detailing proposed adjustments for overpayments and underpayments, if necessary.

If, at the end of the reconciliation process, it is determined that a provider received an overpayment, the amount of the overpayment will be recouped from the provider and may be redistributed to hospitals that have UC room (in proportion to the amount of each hospital's UC room) or, alternatively, the federal share of the overpayment will be properly credited to the federal government through an adjustment shown on the CMS-64.

Any amount recouped from an overpaid provider that is not distributed to underpaid providers in the same demonstration year will apply to offset the supplemental provider payments described in STC # 44, until that amount is fully offset. Since STC #44 authorizes the state to count these payments under the UC Pool limit for any of the five years of the demonstration, HHSC is authorized to complete reconciliations for all UC hospitals and physician groups for the first five demonstration years before compliance with STC #44 will be determined, provided that HHSC will account for the full amount of the supplemental payments described in STC #44 no later than the first quarter of FFY 2020.

### Texas Physician Uncompensated Care Tool (TXPUC)

The purpose of the TXPUC is to determine the physician professional costs related to services provided to Medicaid (FFS & HMO) and Uninsured patients by physician organizations. Only professional organizations who previously participated in the Texas Medicaid Physician UPL ("Physician UPL") program are eligible to submit a TXPUC and receive a distribution from the UC Pool. Under the Physician UPL, supplemental payments were made only for physician services performed by doctors of medicine and osteopathy licensed in Texas. With effect from Demonstration Year (DY 2), all costs (direct and indirect) incurred by the physician organization related to services provided by mid-level professionals may also be reported on the physician organization's UC application.

For purposes of the TXPUC Application, a mid-level professional is defined as:

☐ Certified Registered Nurse Anesthetist (CRNA)
☐ Nurse Practitioner
☐ Physician Assistant
☐ Dentist
☐ Certified Nurse Midwife
☐ Clinical Social Worker
☐ Clinical Psychologist
☐ Optometrist

The TXPUC is based on established physician and/or mid-level cost finding methodologies developed by the Medicare program over the past 40 years. The schedules that follow use the same or similar methodology and worksheet identification process used by the Medicare hospital cost report.

For all the worksheets in the TXPUC, the cells requiring input are highlighted in green. All line numbers and descriptions are linked to Worksheet A. If lines are inserted, they must be inserted on all worksheets and in the same location.

The costs to be reported in the TXPUC are limited to identifiable and auditable compensation costs that have been incurred by the physician organization for services furnished by physicians and/or mid-level professionals in all applicable sites of service, including services provided in a hospital setting and non-

hospital physician office sites for which the professional organization bills for and collects payment for the direct patient care services.

The basis for the total physicians' and/or mid-level professionals' compensation costs incurred by the professional organization will be the organization's general ledger. The costs should be representative of the services provided during the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined.

Total costs, reported by cost centers/departments, are then allocated between clinical and non-clinical activities using a CMS-approved time-study. The physician and/or mid-level professional time study forms to be used are located on the Texas Health and Human Service Commission website. Time studies should be completed for a two (2) week period once per quarter during the fiscal year. Ideally, the time study period will not be the same two weeks in any 2 given quarters. Prior to October 1, 2012, the physician professional organization may use a CMS-approved benchmark RVU methodology in lieu of the CMS-approved time study to allocate physician compensation costs between clinical and non-clinical activities only. Effective October 1, 2012, the physician organization must utilize the CMS-approved time study to allocate physician and/or mid-level professional compensation costs between clinical and non-clinical activities. The allocation of physician and/or mid-level professional compensations costs based on the benchmark RVU methodology will not be accepted after September 30, 2012. The result of the CMS-approved time study (or the benchmark RVU methodology before October 1, 2012) is the physicians' and mid-level professionals' compensation costs pertaining only to clinical, patient care activities. The physicians' and mid-level professionals' compensation costs are reduced by National Institute of Health (NIH) grants to the extent the research activities component is not removed via physician time studies.

The physician clinical and/or mid-level professional costs are subject to further adjustments and offsets, including any necessary adjustment to bring the costs in line with Medicare cost principles. There will be an offset of revenues received for services furnished to non-patients and other applicable non-patient care revenues that were not previously offset or accounted for by the application of the CMS-approved time study.

The above physicians' and/or mid-level professionals' compensation costs must not be duplicative of any costs claimed on a hospital's TXHUC.

Additional costs that can be recognized as professional direct costs are costs for non-capitalized medical supplies and equipment (as defined in the instructions for Worksheet A, Column 3 below) used in the furnishing of direct patient care.

Overhead costs will be recognized through the application of a rate for indirect costs to be determined by the actual costs incurred by the physician organization for the applicable reporting period(s) included in the UC application. The determination of the facility-specific indirect rate is defined in the instructions for Worksheet A, Column 8 below. Other than the direct costs defined above and the application of an approved indirect rate, no other costs are allowed.

Total billed professional charges by cost center related to physician and/or mid-level professional services are identified from provider records.

The total professional charges for each cost center related to Medicaid fee-for-service (FFS), Medicaid managed care (HMO), and uninsured physician and/or mid-level professional services, billed directly by the professional organization, are identified using auditable financial records. Professional charges related

to services provided to out-of-State Medicaid FFS and HMO patients should be included in the Medicaid charges reported on the TXPUC. The professional organization must map the claims to the respective cost centers using information from their billing systems. Each charge must be mapped to only one cost center to prevent duplicate mapping and claiming. These charges must be associated with services furnished during the period covered by the TXPUC (the period from October 1 through September 30 two years prior to the demonstration year for which UC payments are being determined). The professional organization must prepare a worksheet that identifies professional charges related to physician and/or mid-level professional services provided to patients covered by Medicaid FFS, Medicaid HMO, uninsured and all other payers for each cost center to be used to report the total charges on Worksheet B and the Program charges on Worksheet D. The worksheet total charges must be reconciled to the total charges per the professional organization's general ledger and/or financial statements for the applicable fiscal period(s).

## Certification

The certification page must be signed and dated by an officer or administrator of the provider. An officer is defined as a member of the entity's senior management such as the chief executive officer, chief financial officer, chief operating officer, etc. The certification must contain an original signature and not a copy or electronic signature.

Upon the termination of the 1115 Waiver, entities will be required to submit actual cost data in the prescribed format of the TXPUC for a minimum of two years for purposes of reconciling the UC Pool payments for the last two years of the Waiver with the provider's actual costs incurred for those fiscal periods

## Summary Schedule

*Column 1* - Summarizes the Medicaid and Uninsured costs determined on the applicable columns from Worksheet D. These amounts will flow automatically from the respective columns and no input is required.

*Column 2* – The distribution of the Uncompensated Care Pool ("UC Pool") for a specific demonstration year will be based on the costs for the period from October 1 through September 30 two years prior to the demonstration year as computed on Worksheet D. If the entity knows these costs are not representative of their actual costs for the demonstration year, due to changes in their contractual arrangements or other operational or economic issues, the entity can make an adjustment to these costs. The entity is required to maintain supporting documentation to support their adjustment amount and make this information available upon request from HHSC and/or CMS.

*Column 3* – Represents the net Medicaid and Uninsured costs after any adjustments and is determined by summing the amounts in Columns 1 & 2. The net cost amount will be utilized to determine the entity's distribution from the UC Pool.

## Worksheet A

This worksheet is a summary of the allowable direct patient care costs for physicians and mid-level professionals. The worksheet is segregated into 3 sections. Lines 1 – 29 contain the costs for physicians and mid-level professionals for patient care services provided in a hospital-based setting. Lines 31 – 55 contain the costs for physicians and mid-level professionals for patient care services provided in a non-

hospital-based setting. Lines 56 – 79 contain costs for physicians and mid-level professionals for patient care services provided in settings other than those identified in Sections 1 and 2.

Cost center descriptions are input on this worksheet and will flow to the other worksheets. If lines are added to this worksheet to accommodate the professional organization's unique cost centers, similar lines will need to be added to the other worksheets.

The professional organization's name, provider number, reporting period and indirect cost rate should be input on this worksheet and will flow to the other worksheets.

*Column 1* – Physicians' and mid-level professionals' costs determined on Worksheet A-1 will flow to this column.

*Column 2* – This column will not be utilized at this time.

*Column 3* – Non-capital equipment and supplies costs related to direct patient care are input in this column. Non-capital equipment would be items such as the purchase of reusable surgical trays, scalpels or other medical equipment whose costs are expensed upon acquisition since they are below the organization's threshold for capitalization. Supplies would be items such as disposable supplies utilized during the treatment of patients (sutures, gauze pads, tape, bandages, needles and syringes, splints, etc.). The source for these costs is the professional organization's accounting records. The source for these costs must be maintained by the professional organization and submitted to HHSC or CMS upon request.

*Column 4* – This column is the sum of Columns 1, and 3. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

*Column 5* – Any reclassification of costs reported on Worksheet A-6 will flow to this column.

*Column 6* – This column is the sum of Columns 4 and 5. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

*Column 7* - Any adjustments of costs reported on Worksheet A-8 will flow to this column. For example, revenue received for National Institute of Health (NIH) grants, to the extent the research activities component is not removed via physician and/or mid-level professional time studies should be reported on this Worksheet.

*Column 8* – The indirect costs in this column are computed based on the costs reported in Column 6 multiplied by the indirect cost rate for the professional organization. The indirect cost rate will be determined based on the professional organization's actual indirect costs to its total direct costs (allowable and nonallowable) for the applicable reporting period(s) covered by the UC application. The professional organization's costs per its general ledger for the applicable fiscal period(s) should be used to identify the allowable direct and indirect costs to be used to compute the indirect cost rate. The indirect cost rate should be rounded to two (2) decimal places (e.g. 22.58%). The professional organization must submit its calculation of its indirect cost rate with its UC application.

Allowable indirect costs are defined as costs incurred by the professional organization in support of the physicians' and mid-level professionals' direct patient care services, regardless of the location where these services are performed. Medicare cost finding principles should be used to determine allowable indirect costs. Allowable indirect costs would include, but are not limited to, nurse staff and other support

personnel salaries and fringe benefits involved in direct patient care, billing and administrative personnel salaries and fringe benefits related to direct patient care, space costs (building and equipment depreciation or lease, interest, utilities, maintenance, etc.) related to the space utilized to provide care to patients. Nonallowable indirect costs would include but are not limited to; advertising for the purpose of increasing patient utilization, bad debts related to accounts receivable, gain or loss on the sale of depreciable assets, fines or penalties imposed by local, state or federal government or their agencies. Any fringe benefits cost related to the physicians' and mid-level professionals' compensation costs should be included in Columns 1 and/or 2 of Worksheet A should not be included in the allowable indirect costs. The non-capital equipment and supply costs reported in Column 3 of Worksheet A above should also be excluded from allowable indirect costs.

Total costs would be determined based on the professional organization's total expenses per its general ledger. The following is an illustrative example of the calculation of an indirect cost rate for a professional organization.

| **UC application reporting period** | **10/1/2009 - 9/30/2010** | |
|---|---|---|
| Fiscal year end of professional organization | 12/21/2009 | 12/31/2010 |
| Total expenses per the general ledger | 25,000,000 | 28,600,800 |
| Bad Debts | (800,000) | (923,000) |
| Loss on sale of depreciable assets | (200,000) | (123,000) |
| N/A Advertising Expenses | (111,000) | (133,000) |
| Physician and mid-level professional compensation (from Col. 1) | (11,500,700) | (13,600,200) |
| Non capital equipment and supplies (from Col. 3) | (765,000) | (842,000) |
| Allowable Direct Expenses | (12,265,700) | (14,442,200) |
| Allowable indirect costs | 11,623,300 | 12,979,600 |
| Total direct costs | 13,376,700 | 15,621,200 |
| Indirect cost ratio | 86.89% | 83.09% |
| Weighted indirect cost ratio | 21.72% | 62.32% |
| Allowable indirect cost ratio | | 84.04% |

*Column 9* – This column is the total physicians' and mid-level professionals' costs that flow to Worksheet B, Column 1. It is the sum of Columns 6, 7 and 8. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

**Worksheet A-1**

This worksheet determines the physicians' and/or mid-level professionals' compensation costs for direct patient care services. These costs are determined separately for services provided in a hospital-based and non-hospital based setting. If there are services provided in a unique setting, these costs are determined in Section 3. If a physician provides services in more than one setting, it will be necessary to report his/her

data for each applicable setting separately. Data on this worksheet should be reported based on the physicians' and/or mid-level professionals' specialty/cost center identified on the worksheet.

Physicians' and/or mid-level professionals' compensation costs are comprised of the direct payments made by the professional organization to the physician and/or mid-level professional for all services provided by the physician and/or mid-level professional on behalf of the professional organization. These costs would be salaries and related fringe benefits, payments under a contractual arrangement between the physician and/or mid-level professional and the professional organizations, funding of a retirement and/or deferred compensation plan by the professional organization on behalf of the physician, and costs related to a health and/or long-term disability program for the physician and his/her dependents.

If the professional organization has a physician and/or mid-level professional time study to allocate the physicians' and/or mid-level professionals' compensation costs to direct patient care services and the physicians' and/or mid-level professionals' other activities, it is not necessary to complete this worksheet. The professional organization can complete a supporting schedule in which the time study can be applied to the physicians' and/or mid-level professionals' compensation costs and the result should be input directly in Column 1 of Worksheet A. In the absence of a physician and/or mid-level professional time study to allocate the physicians' and/or mid-level professionals' compensation costs between direct patient care services and the physicians' and/or mid-level professionals' other activities prior to 10-1-2012, the costs for direct patient care services will be determined based on each physician's work Relative Value Units (RVUs) for direct patient care. Effective 10-1-2012, professional organizations are expected to obtain a time study from each physician and/or mid-level professional to be used in the allocation of the physicians' and/or mid-level professionals' compensation costs to direct patient care services and other activities. The physician and/or mid-level professional time study forms to be used are located on the Texas Health and Human Services website. Time studies should be completed for a two (2) week period once per quarter during the fiscal year. Ideally, the time study period will not be the same two weeks in any two given quarters.

If a professional organization incurs costs for services provided by another entity under a contractual arrangement, those costs can be included. The professional organization would be required to offset the revenue received on its UC Application to eliminate any duplicate payment for the costs related to these services.

*Column 1* – The physicians' and/or mid-level professionals' work RVUs are reported in this column for periods prior to 10-1-2012. The source for the work RVUs are the professional organization's internal records. The source for the work RVUs should be maintained by the professional organization and made available upon request by HHSC and/or CMS. An individual physicians' and/or mid-level professionals' work RVUs cannot exceed the benchmark RVU for one FTE. For periods after 10-1-2012, the physician's and/or mid-level professionals' time related to direct patient care activities based on their time study is reported in this column.

*Column 2* – The benchmark RVU for an FTE for each physician and/or mid-level professional specialty is reported in this column for periods prior to 10-1-2012. The benchmark RVUs for each physician specialty FTE are contained in the Benchmark RVU worksheet of the TXPUC. If the professional organization has a physician specialty that is not listed on the Benchmark RVU worksheet, the benchmark RVU for the physician specialty most closely related to the actual physician specialty should be utilized. The benchmark RVU must be multiplied by the number of physicians and mid-level professionals included in each cost center to determine the benchmark RVU to be reported in this column. For periods after 10-1-

2012, the physician's total time related to the physician's compensation reported in Column 4 based on their time study is reported in this column.

*Column 3* – The RVU percentage is computed based on the actual physicians' and mid-level professionals' RVUs reported in Column 1divided by the benchmark RVUs reported in Column 2 for each line. The RVU percentage should not exceed 1.00000. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added.

*Column 4* – The physicians' and mid-level professionals' compensation costs for each physician and/or mid-level professional/specialty/cost center are reported in this column. The source for the compensation costs are the professional organization's internal records. The source for the physicians' and mid-level professionals' compensation costs should be maintained by the professional organization and made available upon request by HHSC and/or CMS.

*Column 5* – The physicians' and mid-level professionals' compensation costs for direct patient care services are computed based on the RVU percentage in Column 3 multiplied by the total physicians' and mid-level professionals' compensation costs reported in Column 4. If line(s) have been added to the worksheet, it will be necessary to copy the formula in this column from an existing line to the line(s) that were added. The costs in this column flow to Worksheet A, Column 1.

## Worksheet A-6

This reclassification worksheet is similar to the Worksheet A-6 in the Hospital 2552 Medicare cost report. It allows for the reclassification of costs between cost centers reported on Worksheet A. Any reclassifications reported on this worksheet will need to be input on Worksheet A, Column 5 in the applicable line.

## Worksheet A-8

This adjustments worksheet is similar to the Worksheet A-8 in the Hospital 2552 Medicare cost report. It allows for any required adjustment(s) to the costs reported on Worksheet A (e.g. NIH grant revenue if research costs are not identified via the time studies). All payments received for services provided to another entity's patients should be offset against the applicable costs. All payments received from another entity to subsidize the care provided to a patient who was referred by the entity should be offset against the applicable costs. Any adjustments reported on this worksheet will need to be input on Worksheet A, Column 7 in the applicable line.

## Worksheet B

The worksheet calculates the cost-to-charge ratio (CCR) to be utilized in apportioning the physicians' and/or mid-level professionals' compensation costs for services provided to Medicaid and Uninsured patients that is the basis for the determination of the professional organization's distribution from the UC Physician Pool.

*Column 1* – The net physicians' and mid-level professionals' costs from Worksheet A, Column 8 will flow to this column.

*Column 2* – The physicians' and/or mid-level professionals' total billed charges are reported in this column. As an alternative, the professional organization can use the number of visits as the allocation

basis to apportion the costs. If the professional organization does elect to utilize patient visits to apportion the costs, the allocation basis reported at the top of this column should be changed from Total Billed Charges to Patient Visits. For either allocation basis, the source for this data will be the professional organization's internal records and will be representative of costs incurred in the period October 1 to September 30 two years prior to the demonstration year for which UC payments are being determined.

*Column 3* – The CCR is computed by dividing the costs reported in Column 1 of this worksheet by the total allocation basis reported in Column 2 of this worksheet.

## Worksheet D

This worksheet computes the physicians' and/or mid-level professionals' costs for services provided to Medicaid FFS, Medicaid HMO and Uninsured patients. It utilizes the CCR determined on Worksheet B, Column 3 and the charges for physician and/or mid-level professional services. The source for the Medicaid FFS, Medicaid HMO and Uninsured data are the professional organization's internal records and will be representative of costs incurred in the period October 1 to September 30 two years prior to the demonstration year for which UC payments are being determined. The allocation basis reported on Worksheet B Column 2 must be the same as the apportionment basis reported on Worksheet D, Columns 2 – 7. If the professional organization elects to utilize patient visits to apportion the costs rather than billed charges, the apportionment basis at the top of Columns 2 – 7 should be changed from Billed Charges to Patient Visits.

*Column 1* – The CCR from Worksheet B, Column 3 flows to this column.

*Columns 2 through 7* – The apportionment statistics for inpatient and outpatient services provided to Medicaid FFS, Medicaid HMO and Uninsured patients are reported in the respective columns.

*Columns 8 – 13* – The physicians' and mid-level professionals' costs for inpatient and outpatient services provided to Medicaid FFS, Medicaid HMO and Uninsured patients are computed by multiplying the CCR reported in Column 1 multiplied by the apportionment statistics reported in Columns 2 – 7 for the respective columns.

The total costs for each column are determined at the bottom of the worksheet. All revenues received from any source related to the physician and/or mid-level professional services provided to Medicaid FFS, Medicaid HMO and Uninsured should be reported on the Less Payments line at the bottom of the worksheet in the respective column. This would include any payments received from third-party payers, patient copays, etc.

The Net Unreimbursed Cost for Columns 8 through 13 flows to the Cost Summary worksheet of the TXPUC tool. This cost will be utilized to determine the professional organization's distribution from the UC Physician Pool.

<u>Reconciliation of UC Payments to Professional Organizations</u>

The physician UC payments for DY 1 (FFY 2012) are determined utilizing the TXPUC that utilizes data for the fiscal period 10/1/2009 – 9/30/2010. These DY 1 (FFY 2012) UC payments are reconciled to the data per the professional organization's DY 3 (FFY 2014) TXPUC, which contains contemporaneous data for the fiscal period 10/1/2011 – 9/30/2012, once the DY 3 TXPUC has been filed with the State. Once the TXPUC for the expenditure year has been finalized by the State, a reconciliation of the finalized costs

per the TXPUC to all UC payments made for the same period will be carried out, including adjustments for overpayments and underpayments if necessary.

If, at the end of the reconciliation process, it is determined that a professional organization received an overpayment, the amount of the overpayment will be recouped from the provider and may be redistributed to professional organizations that were determined to be underpaid (in proportion to the amount of each professional organization's underpayment) or the federal portion of the overpayment will be properly credited to the federal government through an adjustment shown on the CMS-64. Similar reconciliations will be conducted for each year of the Waiver.

Any amount recouped from an overpaid provider that is not distributed to underpaid providers in the same demonstration year will apply to offset the supplemental provider payments described in STC # 44, until that amount is fully offset. Since STC #44 authorizes the state to count these payments under the UC Pool limit for any of the five years of the demonstration, HHSC is authorized to complete reconciliations for all UC hospitals and physician groups for those demonstration years before compliance with STC #44 will be determined, provided that HHSC will account for the full amount of the supplemental payments described in STC #44 no later than the first quarter of FFY 2020.

The timelines for the submission of reconciliations are detailed in the "section 1115 Waiver UCC Program Reconciliation Schedule."

<u>Section 1115 Waiver UC Program Reconciliation Schedule</u>

The Uncompensated Care reconciliations for hospitals will be performed three or more years after the demonstration year, except that HHSC will complete all reconciliations for demonstration years 1 - 5 no later than 2019, based on the schedule set out in the tables below.

The reconciliation of Physician Payments to Professional Organizations will be performed using the TXPUC that is submitted by the physician group two or more years after the demonstration year in which the organization received the payments. Recoupment notices and collections for the professional organizations will follow the same schedule as that for hospitals.

Section 1115 Waiver UC Program Reconciliation Schedule

## DY 1; FFY 2012

| | 2015/DY 4 | | 2016/DY 5 | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| | April | July | October | January | April | July | October | January | April | July |
| Subset of Demonstration Year 1 / FFY 2012 (with finalized cost reports) | | Collect 2012 Data for DY1 Reconciliation for subset of providers with finalized cost reports[1] | | | Recoupments calculated for subset of providers by end of quarter | Recoupment notice sent to subset of providers by September 30 | | | | Recoupments collected by September 30 |

## DY 2; FFY 2013

| | 2017 | | | | 2018 | | |
|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| | October | January | April | July | October | January | April |
| Subset of Demonstration Year 1 / FFY 2012 providers  Subset of Demonstration Year 2 / FFY 2013[2] | Collect 2012 Data for DY1 Reconciliation for subset of providers not subject to reconciliation in 2015/ 2016  Collect 2013 Data for DY2 Reconciliation for subset of providers | Recoupments calculated by end of quarter | Recoupment notice set to overpaid providers by June 30 | | | | Recoupments collected by June 30 |

## DY 3; FFY 2014

| | 2017 | | | | 2018 | | | | 2019 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| | Oct. | January | April | July | October | January | April | July | Oct. | January |
| Subset of Demonstration Year 2 / FFY 2013 providers  Subset of Demonstration Year 3 / FFY 2014 | | Collect 2013 Data for DY2 Reconciliation for subset of providers not subject to reconciliation in 2017/ 2018  Collect 2014 Data for DY3 Reconciliation for subset of providers | | | Recoupments calculated by end of quarter | Recoupment notice set to overpaid providers by March 31 | | | | Recoupments collected by March 31 |

## DY 4; FFY 2015

| | 2018 | | | | 2019 | | | | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |

---

[1] When the reconciliation began in DY 4, the UC protocol in effect at that time required the use of finalized cost reports. Not all providers had finalized cost reports so a subset of providers had their DY 1 payments reconciled to cost in DY 4/DY 5.

[2] In order to allow the contractors to adjust to the change of using best available cost reports for reconciliation purposes, the DY 2 - DY 4 reconciliations will need to be done in two phases with each phase comprising a subset of providers from the previous and the current DY undergoing reconciliation.

**Attachment H**
**UC Claiming Protocol and Application**
**Part 1: UC Claiming Protocol for Hospitals and Physician Groups**

| | October | January | April | July | October | January | April | July | Oct. | January |
|---|---|---|---|---|---|---|---|---|---|---|
| Subset of Demonstration Year 3 / FFY 2014 providers

Demonstration Year 4 / FFY 2015 | | Collect 2014 Data for DY3 Reconciliation for subset of providers not subject to reconciliation in 2017/ 2018

Collect 2015 Data for DY4 Reconciliation | | | Recoupments calculated by end of quarter | Recoupment notice set to overpaid providers by March 31 | | | | Recoupments collected by March 31 |

### DY 5; FFY 2016

| | 2019 | | | | 2020 | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| | Oct. | January | April | July | October | January | April | July | Oct. | January |
| Demonstration Year 5 / FFY 2016 | | Collect 2016 Data for DY5 Reconciliation | | | Recoupments calculated by end of quarter | Recoupment notice set to overpaid providers by March 31 | | | | Recoupments collected by March 31 |

### DY 6A; FFY 2017

| | 2020 | | | | 2021 | | | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| | Oct. | January | April | July | October | January | April | July | Oct. | January |
| Demonstration Year 6A / FFY 2016 | | Collect 2016 Data for DY6A Reconciliation | | | Recoupments calculated by end of quarter | Recoupment notice set to overpaid providers by March 31 | | | | Recoupments collected by March 31 |

## General:

Governmentally owned dental providers are eligible to participate in the supplemental payment program if they are directly funded by a local government, hospital authority, hospital district, city, county or state as specified in 42 CFR § 433.50 (i) which describes a unit of government. This would include providers such as public health clinics and departments, dental schools, mobile dental units or other dental facilities that are owned by the government. Providers wanting to participate in the program should contact the Texas Health and Human Services Commission (HHSC), Rate Analysis Department at 512-730-7401.

The cost report will include only allocable expenditures related to Medicaid, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program.

The Dental Services Supplemental Payment Cost Report (cost report) must be prepared and completed on an annual basis for federal fiscal years ending on September 30. Cost reports are due to HHSC 180 days after the close of the applicable reporting period. An eligible provider who has been approved to submit a cost report for supplemental payment will prepare the cost report, attest to and certify the total actual Medicaid costs/expenditures. The completed cost report will be sent to:

HHSC Rate Analysis/Acute Care Services
Brown Heatly Building
Mail Code H-400
4900 North Lamar
Austin, TX 78751-2399

When using the Excel spreadsheet, many fields in the pages will automatically populate with information from another worksheet to avoid additional data entry and reduce errors. Therefore, only the **SHADED AREAS** of the cost report are to be completed. Please review and verify the accuracy of all information on the pages before completing the report.

**For questions on completing the cost report, please contact the Health and Human Services Commission, Rate Analysis Department at 512-730-7401.**

## Definitions:

**Cognizant agency**—the agency responsible for reviewing, negotiating, and approving cost allocation plans or indirect cost proposals developed in accordance with the Office of Management and Budget Circular A-87.

**Commercial Pay Insurance**—health insurance that covers medical expenses and disability income for the insured. Commercial health insurance can be categorized according to its renewal provisions and type of medical benefits provided. Commercial policies can be sold individually or as part of a group plan.

**Cost Allocation Plans**—are the means by which costs are identified in a logical and systematic manner for reimbursement under federal grants and agreements.

**Cost-to-charge-ratio (CCR)—** a provider's reported costs are allocated to the Medicaid program based on a cost-to-billed-charge ratio. Cost-to- billed charge ratio is calculated as total allowable cost reported for the service period divided by total billed charges for the service period. This ratio is then applied to total billed charges associated with Medicaid paid claims to calculate total allowable billed charges for the cost report.

**Direct Cost—means any cost which is identified specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.**

**Federal Medical Assistance Percentage (FMAP)**—the share of state Medicaid benefit costs paid for by the federal government.

**Indirect Costs—cost incurred and identified with having two or more cost objectives but not specifically identified with any final cost objective.**

**Indirect Cost Rate—a device for determining in a reasonable manner the proportion of indirect costs each program should bear. It is the ratio, expressed as a percentage, of the indirect costs to the direct costs.**

**Intergovernmental Transfers** (IGT)—State and local funds derived from taxes, assessments, levies, investments, and other public revenues within the sole and unrestricted control of a governmental entity and eligible for federal match under the 1115 Transformation Waiver. This does not include gifts, grants, trusts, or donations, the use of which is conditioned on supplying a benefit solely to the donor or grantor of the funds.

**Medicaid Fee-For-Service (FFS)—**the traditional health care payment system, in which providers receive a payment for each unit of service they provide

**Medicaid Managed Care (MCO)—**an entity that provides or contracts for managed health care. Medicaid payments are made by the MCOs to providers for services provided to Medicaid recipients.

**Medicare—**a federal system of health insurance for those who are 65 and older, disabled or have permanent kidney failure.

**Self-Pay—**an individual who either does not have insurance or her/his insurance does not cover a particular procedure or provider and therefore, the individual is responsible for paying the provider.

**Attachment H**
**UC Claiming Protocol and Application**
**Part 2: UC Claiming Protocol for Dental Providers**

**Texas Healthcare Transformation and Quality Improvement Program 1115 Waiver**—the vehicle approved by HHSC and CMS for implementation of the waiver program under section 1115 of the Social Security Act.

**Uncompensated Care (UC)—c**osts of uncompensated care provided to Medicaid eligibles or to individuals who have no funds or third party coverage for services provided by medical, dental or other providers.

**Uninsured**—an individual who has no health insurance or other source of third-party coverage for medical/health services.

**Uninsured cost--**the cost to provide dental services to uninsured patients as defined by the Centers for Medicare and Medicaid Services. An individual whose third-party coverage does not include the service provided is considered by HHSC to be uninsured for that service.

**Unit of government**—a state, city, county, special purpose district or other governmental unit in the State that: has taxing authority, has direct access to tax revenues, is a State university teaching hospital with direct appropriations from the State treasury, or is an Indian tribe as defined in Section 4 of the Indian Self-Determination and Education Assistance Act, as amended (25 U.S.C. 450b).

---

## Page 1: Cover Page

Page 1 is the cost report cover page. This form includes a provider's national and state provider identification numbers. Each governmental provider enters its legal name and the appropriate contact information for all parties listed on the form. This information will be used by HHSC to contact the provider during the cost reconciliation and settlement process.

<u>DIRECTIONS TO COMPLETE PAGE 1</u>
Federal Fiscal Year: Enter the federal fiscal year for which the cost report will be completed (e.g., 2012). When this is entered on the cover page, this field will automatically transfer to subsequent pages.
Reporting Period: Enter the actual reporting period for which the cost report will be completed (e.g., 10/01/11 to 09/30/12). When this is entered on the cover page, this field will automatically transfer to subsequent pages.
 Texas Provider Identification Number (TPI): Enter the 9-digit TPI number for the provider that is completing the cost report. When this is entered on the cover page, this field will automatically transfer to subsequent pages.
National Provider Identification Number (NPI): Enter the 10-digit NPI number for the provider that is completing the cost report. When this is entered on the cover page, this field will automatically transfer to subsequent pages.
**Provider Information**
Provider Name: Enter the provider's legal name (e.g., Laredo Health Department Dental Clinic)
Provider Contact Name: Enter the provider's contact
Street Address: Enter the street address and also include the city, state, and zip code in this field.

Mailing Address: Enter the mailing address and also include the city, state, and zip code in this field.

Phone Number: Enter the phone number of the provider's contact.

Fax Number: Enter the fax number of the provider's contact.

Email: Enter the email of the provider's contact.

**Chief Financial Officer / Business Manager**

Name: Enter the name of the chief financial officer or business manager.

Title: Enter the title of the chief financial officer or business manager.

Business Name: Enter the business name (e.g. UT Health Science Center at San Antonio Dental School).

Mailing Address: Enter the mailing address and also include the city, state, and zip code in this field.

Phone Number: Enter the phone number of the chief financial officer or business manager.

Fax Number: Enter the fax number of the chief financial officer or business manager.

Email: Enter the email of the chief financial officer or business manager.

**Report Preparer Identification**

Name: Enter the name of the person responsible for preparing the cost report (this is the person HHSC should contact if there are questions).

Title: Enter the title of the report preparer.

Business Name: Enter the business name (e.g. UT Health Science Center at San Antonio Dental School).

Mailing Address: Enter the mailing address and also include the city, state, and zip code in this field.

Phone Number: Enter the phone number of the report preparer.

Fax Number: Enter the fax number of the report preparer.

Email: Enter the email of the report preparer.

**Location of Accounting Records that Support this Report**

Physical Address: Enter the Physical Address of the location where the provider maintains the accounting records that support the cost report and include the city, state, and zip code in this field. When this is entered on the cover page, this field will automatically transfer to the subsequent pages.

**Page 2: General and Statistical Information**

## DIRECTIONS TO COMPLETE PAGE 2

Page 2 is the General and Statistical Information page of the cost report. This page includes general provider and statistical information used in the cost report.

**General Provider Information**

1.00-1.03: These fields will automatically transfer from the Cover Page.

1.04: Enter either yes or no to indicate if the reporting period is less than a full federal fiscal year. If the cost report is being prepared for a partial fiscal quarter, enter a response that explains the reason why (e.g., no, Supplemental Payment Request Approval was effective beginning 3/1/20XX).

**Cost Allocation Information**

The purpose of this section is to obtain summary information regarding the cost allocation methodology the governmental entity utilized to allocate costs to various programs, grants,

contracts and agreements.  Additional information required to support an agency's methodology will be found on Page 7 Worksheet C.

1.05:  Enter either yes or no to indicate whether your agency has an approved Cost Allocation Plan (CAP).  Additional information must be provided on Page 7 Worksheet C.

1.06:  If the answer to 1.05 is yes, enter the name of the Cognizant Agency.

1.07:  Enter yes or no to indicate whether your agency has an approved Indirect Cost Rate (IDCR).

1.08:  If the answer to 1.07 is yes, enter the name of the Cognizant Agency.

1.09:  Enter either yes or no to indicate whether your agency will be using an IDCR on this report.

1.10:  If the answer to 1.09 is yes, enter the IDCR Statistical Information.

1.11:  Medicaid Fee-For-Service (FFS) Paid Claims Amount:  Enter the total.

1.12:  Total Medicaid FFS Billed Charges Associated with Medicaid Paid Claims:  Enter the total.

1.13:  Medicaid Managed Care Organization (MCO) Paid Claims Amount:  Enter the total.

1.14:  Total FFS Billed Charges Associated with Medicaid Paid Claims:  Enter the total.

1.15:  Uncompensated (Uninsured) Care Reimbursement:  Enter the total.

1.16:  Uncompensated (Uninsured) Care Billed Amount:  Enter the total.

1.17:  Total Allowable Costs for Reporting Period:  This field will automatically transfer from Page 3 – Dental Cost Settlement, 2.40).  This amount includes Medicaid FFS, Medicaid MCO and Uncompensated Care cost only.

1.18:  Total Paid Claims and UC Reimbursement:  This field will automatically add the total paid claims from Medicaid Fee-for-Service (line 1.11), MCOs (line 1.13) and UC reimbursement (line 1.15).

1.19:  Total Billed Charges:  This field will automatically add the total billed charges from Medicaid Fee-for-Service (line 1.12), Medicaid Managed Care Organizations (line 1.14) and UC Billed Amount (line 1.16).

**Additional Cost Data (For Informational Purposes Only)**

In addition to the statistical information entered for Cost Reporting period, other cost data is being requested.

1.20:  Medicare Costs: Enter the total.

1.21:  Other (Self-Pay, Commercial Pay, etc.) Costs: Enter the total.

**Page 3: Dental Cost Settlement**

## DIRECTIONS TO COMPLETE PAGE 3

Page 3 identifies and summarizes all dental services costs. Much of the information contained within this page is automatically pulled from other pages; however, there are unique items of cost that must be entered in this page.

Only allocable expenditures related to Medicaid Fee-for-Service, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program will be included for supplemental payment. Direct cost methods must be used whenever reasonably possible. Direct costing means that allowable costs, direct or indirect, incurred for the benefit of, or directly attributable to, a specific business component must be directly charged to that particular business component. Direct cost accounting may include:

1. Dedicated Cost Centers: Cost may be included for those cost centers that are solely dedicated to Medicaid and Uncompensated Care.

2. Multiple Cost Centers: Cost may be included for those cost centers that are not solely dedicated to Medicaid and Uncompensated Care. However, the provider must submit a detailed approved Cost Allocation Plan (CAP). If cost allocation is necessary for cost-reporting purposes, governmental providers must use reasonable methods of allocation and must be consistent in their use of allocation methods for cost-reporting purposes across all program areas and business entities. The allocation method should be a reasonable reflection of the actual business operations. Allocation methods that do not reasonably reflect the actual business operations and resources expended toward each unique business entity are not acceptable. Allocated costs are adjusted if HHSC considers the allocation method to be unreasonable. The provider must submit a detailed summary of their cost allocation methodology including a description of the components, the formula for calculating the percentage and any additional supporting documentation as required by HHSC. Supplemental schedules must also be attached to the cost report listing each employee, job title, total salary and benefits, the applicable allocation percentage and the allocation amount that will be included in the cost report. The amounts from the supplemental schedule allocated to the Medicaid and Uncompensated Care programs should match the amounts entered on Page 6 Worksheet B with additional detail entered on Page 7 Worksheet C.

If Indirect Cost (IDC) is included, that amount should be listed in line 2.30 (Other) with the detail described in either the Explanation Box or as a separate attachment. Indirect cost is calculated by multiplying the **Total Allowable** costs by the provider's approved indirect cost rate. IDCR detail should include the methodology for determining the IDCR, the percentage and amount of the IDCR and if the dental provider is already using the IDCR to claim cost on another report. If IDCR costs are claimed in line 2.30, indirect or administrative costs cannot also be claimed as non-clinical cost in lines 2.26 a., 2.27 a. or in administrative salaries and compensation in Page 6 (Worksheet B). IDCR costs may be disallowed if it is determined that the provider has already claimed those same IDCR costs on this or another report. Additional detail regarding an agency's IDCR must be provided on Page 7 Worksheet C.

This page sums the payroll expenses and adds other costs to calculate the total cost of dental services. Identified reductions, either from Page 6 or entered manually with descriptions in the Explanation Box, are subtracted to calculate the adjusted amount of dental costs allowable as part of the cost report. The cost report identifies the portion of allowable costs that are related to Medicaid FFS, Medicaid MCOs, and Uncompensated Care and applies the cost-to-charge-ratio applicable for the cost report period. This ratio is applied to billed charges associated with Medicaid FFS and MCO paid claims and Uncompensated Care billed charges resulting in the

total computable amount for dental services. This amount is then reduced by f Medicaid FFS, Medicaid MCO paid claims and any reimbursement received for Uncompensated Care. The resulting amount is then multiplied by the applicable federal medical assistance percentage (FMAP) to calculate the Federal and state amounts. The page is separated into the sections identifying:

**Personnel/Payroll Expenses**

2.00-2.21:  If using hours as an allocation method enter the number of hours.  Total paid hours include but are not limited to regular wage, sick and vacation hours.  If personnel/payroll expenditure data is entered on Page 6 – Worksheet B – Payroll and Benefits, those costs will automatically transfer to this page.

2.22:  State Unemployment Payroll Taxes:  Enter the total (if applicable).

2.23:  Federal Unemployment Payroll Taxes:  Enter the total (if applicable).

2.24:  Unemployment Compensation (Reimbursing Employer):  Enter the total (if applicable).

2.25:  Total Staff Costs:  Will automatically calculate (sum of applicable items in 2.00-2.24).

**Other Costs**

2.26:  Supplies and Materials:  Supplies and materials include but are not limited to dental and medical supplies, office supplies, and maintenance supplies.  Supplies and materials must be separated according to whether they are non-clinical or clinical.  The total for non-clinical supplies and materials would be entered on 2.26 a. and the total for clinical supplies and materials would be entered on 2.26 b.  Detail describing the supplies and materials along with the amount and allocation methodology should be entered in the Explanation Box or attached as a separate sheet.  If a cognizant-agency- approved indirect cost rate is used, additional administrative (non-clinical) cost will not be permitted.

2.27:  Equipment:   Equipment costs include but are not limited to dental and medical equipment, computers and communication equipment.  Equipment costs must be separated according to whether they are non-clinical or clinical.  The total for non-clinical equipment would be entered on 2.27 a. and the total for clinical equipment would be entered on 2.27 b.  Detail describing the equipment costs along with the amount and allocation methodology should be entered in the Explanation Box or attached as a separate sheet.  If a cognizant-agency-approved indirect cost rate is used, additional administrative (non-clinical) cost will not be permitted.2.28:  Support Services:  Enter the total and provide detail in the Explanation Box.  Support services expenditures may include personnel and non-personnel expenditures such as information technology salaries and benefits and operating expenditures.

2.29:  Depreciation:  Depreciation information should first be entered on Page 5 – Schedule A – Depreciation and those costs will automatically transfer to this line.

2.30:  Other:  Enter the total and provide detail in the Explanation Box.

2.31:  Total Direct and Indirect Dental Other Costs:  Will automatically calculate (sum of 2.26 through 2.30).

2.32:  Total Staff, Direct and Indirect Dental Other Costs:  Will automatically calculate (sum of 2.25 and 2.31).

**Reductions**

2.33:  Other Federal Funds and Grants:  If expenditure data is entered on Page 6 – Worksheet B Payroll and Benefits, those costs will automatically transfer to this line.

2.34:  Other:  Enter the total and provide detail in the Explanation Box.

2.35:  Total Reductions:  Will automatically calculate (sum of 2.33 and 2.34).

**Cost Settlement Calculation**

2.40:  Total Allowable Costs:  Will automatically calculate ( 2.32 less 2.35).

2.41:  Total Billed Charges:  This field will automatically transfer from Page 2 – General & Statistical, 1.19.

2.42:  Cost-to-Charge-Ratio (CCR) = Total Allowable Costs/Total Billed Charges:  Will automatically calculate (2.40 divided by 2.41)

2.43:  Total Billed Charges Associated with Medicaid Paid Claims and Uncompensated Care:  This field will automatically transfer from Page 2 – General & Statistical, (sum of 1.06 and1.08).

2.44:  Medicaid Allowable Costs = CCR * Total Billed Charges Associated with Medicaid Paid Claims and Uncompensated Care:  Will automatically calculate (2.42 multiplied by 2.43).

2.45:  Total Medicaid Allowable Billed Charges:  This field will automatically calculate the lesser of 2.43 or 2.44; this amount cannot exceed 2.43, Total Billed Charges Associated with Medicaid Paid Claims and Uncompensated Care).

2.46:  Medicaid Paid Claims Amount and Uncompensated Care reimbursement:  This field will automatically transfer from Page 1 – General & Statistical (sum of 1.05 and 1.07).

2.47:  Settlement Amount = Total Medicaid Allowable Billed Charges and Uncompensated Care Charges minus Medicaid Paid Claims Amount and Uncompensated Care Reimbursement:  Will automatically calculate 2.45 minus 2.46

2.48:  FMAP (Federal Medical Assistance Percentage):  HHSC will enter the correct FMAP.

2.49:  Federal Funds = Settlement Amount * FMAP:  Will automatically calculate (2.47 multiplied by 2.48).

2.50:  State Funds (IGT Amount):  Will automatically calculate 2.47 less 2.49).  Governmental entities are required to certify on Page 4 Cost Report Certification that they have completed the appropriate documentation required by HHSC and the Texas Comptroller's Office regarding the Intergovernmental Transfer (IGT) process.  Once the cost report has been reviewed and accepted by HHSC, the provider will be notified of the amount required for the IGT.

**Page 4 – Cost Report Certification**

## DIRECTIONS TO COMPLETE PAGE 4

Page 4 is the certification of costs included in the cost report.  This form attests to and certifies the accuracy of the financial information contained within the cost report and that the report was prepared in accordance with State and Federal audit and cost principle standards.  The signer is also certifying that the expenditures included in this cost report have not been claimed on any other cost report.

Most of the information in Page 4 will be updated automatically with information from previous pages. This page must be signed and included **UPON COMPLETION OF ALL OTHER PAGES**.

Upon completion of all other pages in the cost report, please have the appropriate person read and sign the form.  **Scan and include the signed page** when sending the electronic version of the cost report to HHSC.

**Signature Authority/Certifying Signature**
Printed/Typed Name of Signer:  Enter the name of the person that will be certifying the costs identified in the cost report.
Title of Signer:  Enter the title of the signer.
Name of Provider:  Enter the name of the Provider.
Address of Signer:  Enter the address of signer.
Phone Number:  Enter the phone number of the signer.
Fax Number:  Enter the fax number of the signer.
Email:  Enter the email of the signer.
Signature of Signer and Date:  The signer should sign and date the form.

**Page 5 – Schedule A - Depreciation**

**DIRECTIONS TO COMPLETE PAGE 5**

Page 5 identifies allowable depreciation expenses incurred by the provider for that portion which is related to Medicaid, Medicaid Managed Care and Uncompensated Care.  This page will identify all depreciable assets for which there was a depreciation expense during the Cost Report period. Information on this page must come from a depreciation schedule maintained by the provider in accordance with straight line depreciation guidelines.

**Vehicles, Equipment, Building, Etc.**
For depreciation expenses, the straight line method should be used.
Asset Description:  Enter the name and description of the asset. If there is the need to add additional lines, please do so.
Month/Year Placed in Service:  Enter the month/year placed in service as identified on the provider's depreciation schedule.
Years Useful Life:  Enter the number of years of useful life of the asset.
Cost:  Enter the amount of initial cost.
Prior Period Accumulated Depreciation:  Enter the amount of prior period accumulated **d**epreciation.
Depreciation for Reporting Period:  Enter the amount of current period depreciation expense.
Years Useful Life:  Enter the number of years of useful life of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).
Cost:  Enter the amount of initial cost of the asset as identified on the provider's depreciation schedule.
Prior Period Accumulated Depreciation plus Depreciation for Reporting Period cannot exceed the total cost of an asset.  In addition, assets that have been fully expensed should not be reported.  For depreciation expense related to buildings where the provider's vehicles or staff is housed with other agencies or entities, **ONLY the portion related to the provider** may be reported. If this is the case, the provider must attach a supplemental page showing how the portion of the building related to the provider was calculated.

**Page 6 – Worksheet B – Payroll and Benefits**

**DIRECTIONS TO COMPLETE PAGE 6**

Page 6 includes the salary and benefits, and appropriate reductions for contract and employed staff related to the provision of dental services. Data entered on this page is only for that portion of an employee's salary and benefits that is applicable to Medicaid FFS, Medicaid MCOs and

Uncompensated Care.  Salary and compensation must be reported on a direct charge basis.  This page includes several pre-populated staffing classifications for which information will need to be completed.  These pre-populated classifications include:

Director:  salary and benefit expenditures related to developing, administration, and overall operational effectiveness of the organization including strategic planning, leadership and oversight, including but not limited to:

- Director
- Director's Assistant

Dental Director:  salary and benefit expenditures related to planning, developing, scheduling, and the implementation of dental program services and activities, including but not limited to:

- Dental Director
- Dental Director's Assistant

Dentists and Dental Assistants:  salary and benefit expenditures related to dental care including but not limited to:

- Dentists
- Dental Assistants

Safety Officer:

- Safety Officer
- Safety Officer Assistants

Billing Account Representatives:  salary and benefit expenditures related to verification of patients' insurance coverage, including Medicaid, collection of third party insurance submissions and payments, and patient service related tasks, including but not limited to:

- Billing Representatives
- Account Representatives
- Patient Account Representative

Quality Assurance Technicians:  salary and benefit expenditures related to analyzing performance and quality improvement program including but not limited to:

- Quality Assurance Technicians

For each employee, the following information must be included:

**Employee Information**

Employee #:  Enter the employee #.

Last Name:  Enter the last name.

First Name:  Enter the first name.

Job Title/ Credentials:  Enter the job title/credentials.

Employee (E) /Contractor (C):  Enter the appropriate designation, either an E or a C, for the employee.

## Payroll and Benefits

Gross Salary:  Enter the gross salary amount.

Contractor Payments:  Enter the amount of contractor payments for the employee.

Employee Benefits:  Enter the amount. This includes all benefits that are not discretely identified in Columns J-L of this page.

Employer Retirement:  Enter the amount.

FICA:  Enter the amount of FICA.

Medicare Payroll Taxes:  Enter the amount.

## Federal Funding Reductions

This section of the page is designed to identify the federal funding, or other payroll and benefit expenditure reduction necessary for the specific job classifications identified above. This section of the page is also designed to discretely identify the payroll and benefit expenditures for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.  For each of the job classifications identified above, the following information must be included:

Allocated Funded Positions Entry:  Enter the appropriate designation, either yes or no, for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. A yes in this field designates an employee for which a portion or all of their salary and benefit expenditures are funded by federal funds or grants. An no in this field designates an employee whose entire salary or a portion of whose salary and benefit expenditures are not funded by federal funds or grants, but whose costs still need to be removed from allowable expenditures as reported on the Cost Report.

Federal Funding:  If the answer to the field previously is yes, then enter the amount of federal funding related to the employee's salary and benefits that must be reduced from the total allowable costs.

Other Funds:  Enter the other amount to be removed related to the employee's salary and benefits that must be reduced from the total allowable costs.

Total Reduction:  Will automatically calculate (sum of federal funding and other funds).

**Page 7 – Worksheet C – Cost Allocation Methodologies**

**<u>DIRECTIONS TO COMPLETE PAGE 7</u>**

Page 7 details the cost allocation methodologies employed by the governmental entity.

    A.  If you entered "yes" on Page 2, Line 1.05, please provide a copy of your agency's approved Cost Allocation Plan (CAP).

    B.  If you entered "yes" on Page 2, Line 1.06 and 1.09, please provide a copy of your agency's approved Indirect Cost Rate (IDCR).

    C.  If you do not have an approved CAP or IDCR but are using another cost allocation methodology, please provide a copy of your methodology and the supporting documentation.

    D.  Please provide a list of personnel cost worksheets that support your CAP or IDCR.

Appendix A - List of Participating Providers

University of Texas at San Antonio Health Science Center (UTHSC-SA) Dental School: performs the patient billing activities for the dental school, the mobile dental unit, the Ricardo Salinas Dental Clinic and the Laredo Health Department Dental Clinic.

| General |
| --- |

Governmentally owned ambulance providers are eligible to participate in the supplemental payment program if they are directly funded by a local government, hospital authority, hospital district, city, county or state as specified in 42 CFR § 433.50 (i) which describes a unit of government.  This would include providers such as public health clinics and departments.  ,
**The cost report will include only allocable expenditures related to Medicaid, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program.**

The Ambulance Services Supplemental Payment Cost Report (cost report) must be prepared and completed a governmental entity on an annual basis for fiscal years ending on September 30Cost reports are due to HHSC 180 days after the close of the applicable reporting period.   A a provider who meets the definition of eligible governmental provider and who has been approved to submit a cost report for supplemental payment will prepare the cost report and will attest to, and certify through its cost report the total actual, incurred Medicaid and Uncompensated (uninsured) costs/expenditures, including the federal share and the non-federal share applicable to the cost report period. The completed cost report will be sent to the Texas HHSC at 11209 Metric Boulevard, Building H, Austin, TX 78758.

For the cost report to be accurate, only the **SHADED AREAS** of the cost report are to be completed.

Many worksheets (i.e. exhibits) will auto populate with information from another worksheet as to avoid additional extra data entry and to reduce errors.  Please review and verify the accuracy of all information on all exhibits before completing the report.
**For questions on completing the cost report, please contact the Health and Human Services Commission, Rate Analysis Department at 512-491-1802.**

| Definitions: |
| --- |

**Cognizant agency** - agency responsible for reviewing, negotiating, and approving cost allocation plans or indirect cost proposals developed in accordance with the Office of Management and Budget Circular A-87.

**Cost Allocation Plans** - are the means by which costs are identified in a logical and systematic manner for reimbursement under federal grants and agreements.

Cost-to-charge ratio **--** A provider's reported costs are allocated to the Medicaid program based on a cost-to-billed-charge ratio.  Cost-to- billed charge ratio is calculated as the Total Allowable Cost reported for the service period to represent the numerator of the ratio to the billed charges of the total Medicaid paid claims for the service period that represents the denominator of the ratio.  This ratio is applied to calculate total billed charges associated with Medicaid paid claims or total computable amount for the cost report.

**Direct Cost** - means any cost which is identified specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.

**Federal Medical Assistance Participation (FMAP) Rate -**– is the share of state Medicaid benefit costs paid for by the federal government.

Indirect Costs **- costs incurred and identified with having two or more cost objectives but not specifically identified with any final cost objective.**

Indirect Cost Rate **- is a device for determining in a reasonable manner the proportion of indirect costs each program should bear. It is the ratio, expressed as a percentage, of the indirect costs to the direct costs.**

**Medicaid Fee-For-Service (FFS) Paid Claims** -- Medicaid payments made by the Health and Human Services Commission through the Texas Medicaid Healthcare Partnership to enrolled providers for services provided to Medicaid recipients.

**Medicaid Managed Care** --provides for the delivery of Medicaid health benefits and additional services through a arrangement between a state Medicaid agency and managed care organizations (MCOs) that accept a set payment for these services. Medicaid payments are made by the MCO's to providers for services provided to Medicaid recipients.

**Un-insured** -- an individual who has no health insurance or other source of third-party coverage for medical/health services.

**Uninsured cost** -- the cost to provide ambulance services to uninsured patients as defined by the Centers for Medicare and Medicaid Services. An individual whose third-party coverage does not include the service provided is considered by HHSC to be uninsured for that service.

**Medicare** -- A federal system of health insurance for people over 65 years of age and for certain younger people with disabilities.

**Other third-party coverage -**
Commercial Pay Insurance -- health insurance that covers medical expenses and disability income for the insured. Commercial health insurance can be categorized according to its renewal provisions and type of medical benefits provided. Commercial policies can be sold individually or as part of a group plan.

Self-Pay -- self pay patient pays in full at the time of visit for our services and we are not required to file claim or submit any documentation on his/her behalf to a third party.

Total Computable Amount – is the total Medicaid allowable amount payable for ambulance services prior to any reductions for interim payments.

**Uncompensated Care (UC)**—health care provided for which a charge was recorded but no payment was received; UC consists of two components, charity care in which the patient is unable to pay and bad debt in which a payment was expected but not received.   Uncompensated care excludes other unfunded costs of care such as underpayment from Medicaid and Medicare.

**Unit of government**—a state, city, county, special purpose district or other governmental unit in the State that: has taxing authority, has direct access to tax revenues, is a State university teaching hospital with direct appropriations from the State treasury, or is an Indian tribe as defined in Section 4 of the Indian Self-Determination and Education Assistance Act, as amended (25 U.S.C. 450b).

## Exhibit A: Cost Report Cover Page

Exhibit A is the cost report cover page. This form includes a provider's National and State provider identification number that is used by HHSC as a means to obtain fee for service cost data included in the cost report.  Each governmental provider must enter their entities legal name, name of person responsible for submitting the cost report, the cost preparers name and physical location, mailing address, phone number and Fax number of all contacts listed.  The information will be used by HHSC to contact the provider as necessary through the cost reconciliation and cost settlement process.

## DIRECTIONS TO COMPLETE EXHIBIT A

Fiscal Year:            Enter the Federal **Fiscal Year** for which the cost report will be completed (e.g., 2010).

Reporting Period:       Enter the actual **Reporting Period** for which the cost report will be completed (e.g., 10/01/10 to 09/30/11).

Texas Provider Identification Number (TPI) Enter the **9-digit TPI** number for the provider that is completing the cost report (e.g., 1234567-89).

National Provider Identification Number (NPI):       Enter the **10-digit NPI** number for the provider that is completing the cost report (e.g., 1234567890).

### *Provider Information*

Provider Legal Name Enter the **Provider Legal Name** (e.g., (Health and Human Services Commission EMS).  This is the name of the provider completing the cost report.

Street Address:         Enter provider **Street Address** (e.g., 11209 Metric Blvd., Bldg. H., Austin, TX 78758.  Include the city, state, and zip code in this field.

Mailing Address:        Enter provider **Mailing Address** (e.g., 11209 Metric Blvd., Bldg H., Austin, TX 78758 or P.O. Box 85700, Mail Code H-360, Austin, TX 78708-5200). Include the city, state, and zip code in this field.

Phone Number:          Enter the **Phone Number** of the provider's contact (e.g., (512) 123-4567).

Fax Number:  Enter the **Fax Number** of the provider's contact (e.g., (512) 987-6543).

Email Address:          Enter the **Email** address of the provider's contact (e.g., iampublic@xyzabc.com).

### *Business Manager / Financial Director*

Business Manager/Financial Directors Name:       Enter the **Name** of the business manager or financial director of the provider (e.g., Jane Doe).

Title:                  Enter the **Title** of the business manager or financial director of the provider identified in the field above (e.g., Director).

Email Address:          Enter the **Email** address of the provider's contact (e.g., jqpublic@xyzabc.com).

***Report Preparer Identification***

Report Preparer Name:   Enter the **Name** of the provider's contact or person responsible for preparing the cost report (e.g., Jane Doe).  This is the name of the person that HHSC may contact if there are questions.

Title:                  Enter the **Title** of the provider's contact identified in the field above (e.g., Director).

***Location of Accounting Records that Support this Report***

Records Location:       Enter the **Physical Address** of the location where the provider maintains the accounting records in support of the cost report (e.g., 11209 Metric Blvd., Bldg. H., Austin, TX 787581).  Include the city, state, and zip code in this field.

**Exhibit 1: General and Statistical Information**

Exhibit 1 is the General and Statistical Information page of the cost report. This exhibit includes general provider information and statistical information used in the cost report.

## <u>DIRECTIONS TO COMPLETE EXHIBIT 1</u>

*General Provider Information*

Reporting Period – Begin Date:    Enter the **Reporting Period – Beginning** date or the beginning date of the cost report period (e.g., 10/1/2010).

Reporting Period – End Date:    Enter the **Reporting Period – Ending** date or the ending date of the cost report period (e.g., 9/30/2011).

Part Year Cost Report:    Enter an answer to the question "**Is Reporting Period less than a full year?**" This question identifies if the cost report is being prepared for a period that is not an entire fiscal year. If the cost report is for an entire fiscal year (October 1 – September 30), then enter **No** in the field. If the cost report is being prepared for a partial fiscal year, enter a response that explains the reason why (e.g., Supplemental Payment Request Approval was effective beginning on 7/1/20XX).

*Cost Allocation Information*

The purpose of this section is to obtain summary information regarding the cost allocation methodology the governmental entity utilized to allocate costs to various programs, grants, contracts and agreements. Additional information supporting an agencies methodology will be found on Exhibit 7.

Cost Allocation Plan:    Enter either Yes or No indicating whether your agency has an approved **Cost Allocation Plan (CAP)**. If the answer is yes, enter the **name of the Cognizant Agency** that approved the agency CAP.

Approved Indirect Cost Rate:    Enter either Yes or No indicating whether your agency has an approved **Indirect Cost Rate**.

Indirect Cost Rate:    Enter either Yes or No indicating whether your agency will be **utilizing an Indirect Cost Rate**. If yes, enter the Agencies Approved Indirect Cost Rate.

*Statistical Information*

This cost report uses a costs to billed charge ratio methodology that is applied to determine the portion of costs eligible for reimbursement under the Direct Medical settlement exhibit of the cost report (see Exhibit 2).

### *Summary of Payments and Billed Charge Data (Applicable to Cost Report)*

Medicaid Fee for Service Paid Claims Amount: Enter the **Total Ambulance Medicaid fee-for-service (FFS) Paid Claims Amount** for the applicable cost report period identified on the form. The ambulance Medicaid fee-for-service entered must only be for **dates of service** during the cost report period.

Total Billed Charges Associated with Medicaid FFS Paid Claims: Enter the **Total Billed Charges associated with Medicaid FFS Paid Claims** for the applicable cost report period identified on the form. The total billed charges associated with Medicaid FFS paid claims entered must only be for **dates of service** during the cost report period.

Medicaid Managed Care Organization (MCO) Costs:  Enter the total **MCO** Costs for services provided for the applicable Cost Report period identified on the form.  The ambulance Medicaid MCO costs for services entered should be for dates of service during the cost report period.

Total Billed Charges Associated with **MCO** Costs:  Enter the **Total Billed Charges associated with Medicaid MCO Claims** for the applicable cost report period identified on the form. The total billed charges associated with MCO paid claims entered must only be for **dates of service** during the cost report period.

Uncompensated Care (UC) (Uninsured) Billed Amounts (UC): Enter the total **UC** Charity and Bad Debt amounts billed for services provided for the applicable Cost Report period identified on the form.  The ambulance UC costs for services entered should be for dates of service during the cost report period and must exclude all unfunded Medicaid and Medicare costs.

Total Uncompensated Care (UC) (Uninsured) Reimbursements Received Associated with **UC** Costs:  Enter the **reimbursements received associated with UC Claims** for the applicable cost report period identified on the form. The total reimbursements received associated with UC claims entered must only be for **dates of service** during the cost report period.

Total Allowable Costs For Reporting Period:  The **Total Allowable Costs** calculated are for the applicable cost report period identified on the direct service tab.  The total allowable costs are only for dates of service during the cost report period.

Total Billed Charges for Reporting Period:  The **Total Billed Charges** calculated are for the applicable cost report period identified on the form less the total allowable costs and less any reimbursements received.  The total billed charges entered are only for dates of service during the cost report period.

Additional Cost Data (For Informational Purposes Only)

In addition to the statistical information entered for Cost Reporting period, other cost data is being requested

Medicare Costs:  Enter the total **Medicare Costs** for services provided for the applicable cost report period identified on the form.  The ambulance Medicare costs for services entered should be for dates of service during the cost report period.

Other Third Party Coverage:  Enter the total **Other third-party coverage (Self-Pay, Commercial Pay)** Costs for services provided for the applicable cost report period identified on the form.  The ambulance "other" costs for services entered should be for dates of service during the cost report period.

## Exhibit 2: Direct Medical (Ambulance Services)

Exhibit 2 identifies and summarizes from other exhibits all ambulance services costs within the cost report. Much of the information contained within this exhibit is pulled from either Exhibit 5 or Exhibit 6; however, there are unique items of cost that are identified in this exhibit. **Only allocable expenditures related to Medicaid, Medicaid Managed Care and Uncompensated Care as defined and approved in the Texas Healthcare Transformation and Quality Improvement 1115 Waiver Program will be included for supplemental payment.** This Exhibit sums the personnel expenses and adds additional costs to calculate the total cost of Medical and Uncompensated Care Services.

Direct cost methods must be used whenever reasonably possible. Direct costing means that allowable costs, direct or indirect, incurred for the benefit of, or directly attributable to, a specific business component must be directly charged to that particular business component.

For example, the payroll costs of a direct service employee who works across cost areas within one contracted program would be directly charged to each cost area of that program based upon that employee's continuous daily time sheets and the costs of a direct care employee who works across more than one service delivery area would also be directly charged to each service delivery area based upon that employee's continuous daily time sheets. Health insurance premiums, life insurance premiums, and other employee benefits are applied as direct costs.

Direct Cost Accounting may include:
  a. Dedicated Cost Centers which are comprised of a distinctly identifiable department or unit whose costs are associated with a specific activity; or

  b. Multiple Cost Centers which included cost for those cost centers that are not solely dedicated to one activity but may be allocated to multiple activities.

Governmental providers must use reasonable methods of allocation and must be consistent in their use of allocation methods for cost-reporting purposes across all program areas and business entities. The allocation method should be a reasonable reflection of the actual business operations. Allocation methods that do not reasonably reflect the actual business operations and resources expended toward each unique business entity are not acceptable. Allocated costs are adjusted if HHSC considers the allocation method to be unreasonable. The provider must submit a detailed summary of their cost allocation methodology including a description of the components, the formula for calculating the percentage and any additional supporting documentation as required by HHSC. Supplemental schedules must also be attached to the cost report listing each employee, job title, total salary and benefits, the applicable allocation percentage and the allocation amount that will be included in the cost report. The amounts from the supplemental schedule allocated to the Medicaid and Uncompensated Care programs should match the amounts entered on Exhibit 6 Schedule B with additional detail entered on Page 7 Worksheet C. Any change in cost-reporting allocation methods from one year to the next must be fully disclosed by the contracted provider on its cost report

*Indirect Costs Rate*

If an Indirect Cost Rate IDCR) is utilized, that rate must be applied to all appropriate cost objectives specifically identified in the cost report.   Indirect cost is calculated by multiplying the **Total Allowable** costs by the provider's approved indirect cost rate. These indirect rates are developed by the state cognizant agency and are updated annually. The methodology used by the respective cognizant agency to develop the **Indirect Cost Rate** (IDCR) has been approved by the cognizant federal agency, as required by the CMS guide. Indirect costs are included in the claim as reallocated costs.  The provider is responsible to ensure that costs included in the cost report not included in the indirect cost rate, and no costs will be accounted for more than once.

All indirect cost calculations developed to arrive at the total allowable costs must be included in Worksheet 7 of the cost report.  All scenarios utilized to calculate the indirect cost must be fully explained as well.  The provider must verify that no duplicative costs are included in line 2.33 "Other Cost".  IDCR costs will be disallowed if it is determined that the provider has already claimed those same IDCR costs.  All documents that support the indirect cost rate calculation must be maintained by the approved governmental entity and must be made immediately available upon request by HHSC.

Identified reductions, from Exhibit 6, are subtracted to calculate the adjusted amount of Direct Medical Costs allowable as part of the cost report. The cost report identifies the portion of allowable costs that are related to Medicaid FFS, Medicaid MCOs, and Uncompensated Care and applies the cost to charge ratio applicable for the cost report period.  The ratio is applied to billed charges associated with Medicaid FFS, Medicaid MCOs, and Uncompensated Care paid claims resulting in the total computable amount for ambulance services. This amount is then reduced by the amount of Medicaid FFS, Medicaid MCOs paid claims and any reimbursement received for Uncompensated Care. The resulting  amount is  then multiplied by the applicable  federal medical assistance percentage (FMAP) to calculate the amount of settlement due to, or owed by (if negative) the provider.

The exhibit is separated into the sections identifying:

- **Personnel / Payroll Expenses.**  This section of the Exhibit includes, in part, expenditures from Exhibit 6.

- **Other Operating Costs.**  This section of the Exhibit includes, in part, expenditures from Exhibit 5.

- **Reductions to Allowable Costs.**  This section of the Exhibit includes reductions to expenditures identified in Exhibit 6.

- **Cost Settlement Calculation.**   This section applies the cost to charge ratio calculation methodology to arrive at the final settlement due to or from the provider.


**DIRECTIONS TO COMPLETE EXHIBIT 2**

*Personnel / Payroll Expenses*
This section of the exhibit includes all personnel related expenditures and hours for the job classifications identified.

Hours:          Enter the number of **Hours** for each of the job classifications identified in this Exhibit and for which costs are identified in Exhibit 6. Hours for this exhibit represent total paid hours that are reported by the provider on their payroll report. Total paid hours include, but are not limited to:

- Regular wage hours
- Sick hours
- Vacation hours

Payroll Taxes/Unemployment Compensation:     If applicable, enter the amount of the following payroll expenses:

- State Unemployment Payroll Taxes
- Federal Unemployment Payroll Taxes
- Unemployment Compensation (Reimbursing Employer)

*Other Costs*
This section of the Exhibit identifies other operating costs not related to the job classifications identified above. Within this section, Support Services or Other may include personnel-related expenditures not identified in the job classifications in the section above.

All costs identified in the section of the Exhibit are supported by supplemental schedules to the cost report, and will be supplied at the time of cost report submittal.

Supplies and Materials Costs: Enter the amount of **Supplies and Materials** expenditures incurred by the provider during the cost report period. Supplies and materials include, but are not limited to, the following:

- Medical supplies
- Office supplies
- Maintenance supplies
- Medical materials

Equipment Costs:      Enter the amount of **Equipment** expenditures incurred by the provider during the cost report period. Equipment expenditures include, but are not limited to, the following non-depreciable items:

- Medical equipment
- Computers
- Radios
- Communications equipment

Support Services Costs:     Enter the amount of **Support Services** expenditures incurred by the provider during the cost report period. Support Services expenditures may include personnel and non-personnel expenditures depending if the personnel expenditures are represented in the job classification categories identified in this Exhibit and detailed in Exhibit 6. Support Services expenditures include, but are not limited to, the following:

- Information technology salaries, benefits, and operating expenditures
- Telecommunications personnel and operating expenditures

Other Costs:    Enter the amount of **Other** expenditures incurred by the provider during the Cost Report period.  Other expenditures may include personnel and non-personnel expenditures depending if the personnel expenditures are represented in the job classification categories identified in this Exhibit and detailed in Exhibit 6. Other expenditures include, but are not limited to, the following:

- Depreciation expense (Exhibit 5)
- Parent organization allocated costs (discretely identified from prepared cost allocation plan (CAP))
- Other unit personnel and operating expenditures not otherwise identified (Indirect Cost)

*Cost Settlement Calculation*

Period of Service for Applicable Cost Report Period:  Enter the **Period of Service** for the applicable cost report period.  Example 10/01/20XX to 12/31/20XX.  For part year cost reports, enter the period of service applicable only to the time frame a cost report is being submitted for.

Total Allowable Costs for Period of Services is the total allowable costs entered into the cost report less any "other federal funding" received ( No entry is required).

Total Billed Charges for Period of Service: The **Total Billed Charges** for the applicable period of service (No entry is required).

Cost to Charge Ratio (CCR) is the result of dividing a provider's Total Allowable Costs for the reporting period by the providers Total Billed Charges for the same period.

Total Charges Associated with  , Medicaid, Paid Claims,  Medicaid Managed Care Claims and Uncompensated Care  Paid Fees:  Enter the **Total Billed Charges Associated with Medicaid FFS and Medicaid MCO Paid Claims** for the period of service applicable to the cost report.

Total Computable is the total Medicaid Allowable Costs for the period of service applicable to the cost report.  The **Total Computable** amount is reduced by the amount of Medicaid Claims paid (Interim Payments) to a provider (TMHP) for the period of service applicable to the cost report.   This calculation is equal to the **Settlement Amount** for the reporting period.

Federal Medical Assistance Participation Rate (FMAP):  Enter the **FMAP rate** for the appropriate federal fiscal year of the cost report.

Amount due to the Provider is the net amount of the settlement due to or from a provider after the FMAP rate is applied.

**Exhibit 3 – Cost Report Certification**

Exhibit 3 is the Certification of costs included in the cost report. This form attests to, and certifies the accuracy of the financial information contained within the cost report.

**DIRECTIONS TO COMPLETE EXHIBIT 3**

Most of the information in Exhibit 3 will be updated automatically with information from previous exhibits. This Exhibit must be signed and included **UPON COMPLETION OF ALL OTHER EXHIBITS**.

Upon completion of all other exhibits in the cost report, please **print this exhibit, sign the exhibit, have the form notarized, scan the exhibit, and include the signed exhibit** when sending the electronic version of the cost report to HHSC. Please have the appropriate person within the provider read and sign the form.

*Signature Authority/Certifying Signature*

Certifier Name:        Enter the **Name of** the person that will be certifying the costs identified in the cost report (e.g., Jane Doe).

Title:        Enter the **Title of Signer**, or the title of the person that will be certifying the costs identified in the cost report (e.g., Director).

Print:        Please print this Exhibit and have the appropriate person identified above sign the certification form.

Date:        Enter the **Date** that the appropriate person identified above signs the certification form (e.g., 1/1/2011).

Signature Authority Check Box:   **Check the appropriate box** that corresponds to the tile of the person signing this Exhibit.

Notary:        Upon printing and signing this Exhibit, please have this form **Notarized** by a Notary Public.

## Exhibit 4 – Certification of Funds

Exhibit 4 is the Certification of Public Expenditure that allows the state to use the computable Medicaid expenditures as the non-federal match of expenditures to draw the federal portion of Medicaid funding as identified in the settlement. This form attests to, and certifies the accuracy of the provided financial information and that t the report was prepared in accordance with State and Federal audit and cost principle standards and that the costs have not been claimed on any other cost report forfederal reimbursement purposes. This Exhibit also identifies the amount of local provider expenditure that is allowable for use as the state match

**<u>DIRECTIONS TO COMPLETE EXHIBIT 4</u>**

Most of the information in Exhibit 4 will be updated automatically with information from previous exhibits. This Exhibit must be signed and included **UPON COMPLETION OF ALL OTHER EXHIBITS**.

Upon completion of all other exhibits in the cost report, please **print this exhibit, sign the exhibit, have the form notarized, scan the exhibit, and include the signed exhibit** when sending the electronic version of the cost report to HHSC. Please have the appropriate person within the provider read and sign the form.

*Signature Authority/Certifying Signature*

| | |
|---|---|
| Print | Please print this Exhibit and have the appropriate person sign the certification form. |
| Date: | Enter the **Date** that the appropriate person identified above signs the certification form (e.g., 1/1/2011). |
| Certifier Name: | Enter the **Name of Signer**, or the person that will be certifying the public expenditures identified in the cost report (e.g., Jane Doe). |
| Title: | Enter the **Title of Signer**, or the title of the person that will be certifying the public expenditures identified in the cost report (e.g., Director). |
| Certifier Check Box | **Check the appropriate box** that corresponds to the tile of the person signing this Exhibit. If **Other Agent/Representative** is selected, please include the appropriate title in **Column N, Line 40**. |

Notary Upon printing and signing this Exhibit, please have this form **Notarized** by a Notary Public.

**Exhibit 5 – Schedule A (Depreciation Schedule)**

Exhibit 5 identifies allowable depreciation expenses incurred by the provider related to Medicaid, Medicaid Managed Care and Uncompensated Care. This Exhibit will identify depreciable assets for which there was a depreciation expense during the Cost Report period. Information on this Exhibit must come from a depreciation schedule maintained by the provider in accordance with appropriate accounting guidelines established by the provider and/or the parent organization of the provider. For depreciation expenses, the straight line method should be used. Prior Period Accumulated Depreciation plus Depreciation for Reporting Period cannot exceed the total cost of an asset. In addition, assets that have been fully expensed should not be reported.

## DIRECTIONS TO COMPLETE EXHIBIT 5
### *Vehicles*
For depreciation expense related to vehicles, the provider must follow depreciable asset thresholds already in place at the provider and/or parent organization. The vehicle depreciation expense as reported on the Cost Report must come from the provider's depreciation schedule.

Asset Description: Enter the **Description of the Asset** that will be included in this depreciation schedule. The name or account code, or both will suffice. If there is the need to add additional lines, please do so.

Month/Year Placed in Service: Enter the **Month/Year Placed in Service** as identified on the provider's depreciation schedule (e.g., January 2000, or 1/2000). This is the month and the year that the depreciable asset was first put into service.

Years Useful Life: Enter the number of **Years of Useful Life** of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost: Enter the amount of initial **Cost** of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation: Enter the amount of **Prior Period Accumulated Depreciation** related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expenses to date related to the depreciable asset.

Depreciation for Reporting Period: Enter the amount of current period depreciation expense in the **Depreciation for Reporting Period** field related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expense incurred during the Cost Report period.

### *Equipment*
For depreciation expense related to equipment, the provider must follow depreciable asset thresholds already in place at the provider and/or parent organization. The equipment depreciation expense as reported on the Cost Report must come from the provider's depreciation schedule.

Asset Description: Enter the **Description of the Asset** that will be included in this depreciation schedule. The name or account code, or both will suffice. If there is the need to add additional lines, please do so.

Month/Year Placed in Service: Enter the **Month/Year Placed in Service** as identified on the provider's depreciation schedule (e.g., January 2000, or 1/2000). This is the month and the year that the depreciable asset was first put into service.

Years Useful Life: Enter the number of **Years of Useful Life** of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost: Enter the amount of initial **Cost** of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation: Enter the amount of **Prior Period Accumulated Depreciation** related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expenses to date related to the depreciable asset.

Depreciation for Reporting Period: Enter the amount of current period depreciation expense in the **Depreciation for Reporting Period** field related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expense incurred during the Cost Report period.

### *Building*

For depreciation expense related to buildings where the provider's vehicles or staff are housed with other agencies or entities, **ONLY the portion related to the provider** may be reported. If this is the case, the provider must attach a supplemental exhibit showing how the portion of the building related to the provider was calculated.

Asset Description: Enter the **Description of the Asset** that will be included in this depreciation schedule. The name or account code, or both will suffice. If there is the need to add additional lines, please do so.

Month/Year Placed in Service: Enter the **Month/Year Placed in Service** as identified on the provider's depreciation schedule (e.g., January 2000, or 1/2000). This is the month and the year that the depreciable asset was first put into service.

Years of Useful Life: Enter the number of **Years of Useful Life** of the asset as identified on the provider's depreciation schedule (e.g., 20 for twenty years of useful life).

Cost: Enter the amount of initial **Cost** of the asset as identified on the provider's depreciation schedule.

Prior Period Accumulated Depreciation : Enter the amount of **Prior Period Accumulated Depreciation** related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expenses to date related to the depreciable asset.

Depreciation for Reporting Period:    Enter the amount of current period depreciation expense in the **Depreciation for Reporting Period** field related to the asset as identified on the provider's depreciation schedule. This is the total amount of depreciable expense incurred during the Cost Report period.

## Exhibit 6 – Worksheet B (Payroll and Benefits)

This exhibit includes the salary and benefits, and appropriate reductions related to contracted and employed staff of the provider applicable to Medicaid, Medicaid Managed Care and Uncompensated Care.. For this Exhibit, all employed and contracted staff related to the provision of Ambulance EMS services should be identified here.

This Exhibit includes several pre-populated staffing classifications for which information will need to be completed. The pre-populated staffing classifications include:

- **9-1-1 Call Technicians** This cost classification includes all personnel salary and benefit expenditures related to operation of emergency communications equipment used in receiving, sending, and relaying medical self-help in response to emergency calls, including, but not limited to:
    - o 9-1-1 Call Technicians
    - o 9-1-1 Call Technician Assistants
    - o …

- **Paramedics** This cost classification includes all personnel salary and benefit expenditures related to performing basic and advanced medical rescue procedures to access, stabilize, evacuate, and transport a patient to an appropriate medical facility's emergency department, including, but not limited to:
    - o Paramedics
    - o EMTs
    - o …

- **Training Coordinators** This cost classification includes all personnel salary and benefit expenditures related to providing training, quality, operational, and support of specific ambulance service training and organizational programs, including local pre-paramedic institutions, internal paramedic/communications medic instruction, training activities within Field Operations and Communications, and analysis of performance and quality improvement programs, including, but not limited to:
    - o Training Coordinators
    - o …

- **Quality Assurance Technicians** Quality Assurance Technicians have the same job description as training coordinators above. This cost classification includes all personnel salary and benefit expenditures related to providing training, quality, operational, and support of specific ambulance service training and organizational programs, including local pre-paramedic institutions, internal paramedic/communications medic instruction, training activities within Field Operations and Communications, and analysis of performance and quality improvement programs, including, but not limited to:
    - o Quality Assurance Techs
    - o …

- **Safety Officer** This cost classification includes all personnel salary and benefit expenditures related to developing, administering, implementing, and evaluating departmental occupational safety program and activities, including, but not limited to:
  - o Safety Officer
  - o Safety office assistant
  - o …

- **Billing / Account Reps** This cost classification includes all personnel salary and benefit expenditures related to verification of patients' insurance coverage, including Medicaid, collection of third party insurance submissions and payments, and patient customer service related tasks, including, but not limited to:
  - o Billing representative
  - o Account representative
  - o Patient account representative
  - o …

- **CPR Technicians** This cost classification includes all personnel salary and benefit expenditures related to the coordination of all EMS activities related to community education of CPR and First Aid skills and techniques, including, but not limited to:
  - o CPR Techs
  - o …

- **Medical Director**) This cost classification includes all personnel salary and benefit expenditures related to the clinical oversight of pre-hospital treatment rendered by EMS personnel. The Medical Director costs shall only include those costs as identified to be related to including, but not limited to:
  - o Medical Director
  - o Medical Director Assistant
  - o …

- **Director** This cost classification includes all personnel salary and benefit expenditures related to developing, administration, and overall operational effectiveness of the organization including strategic planning, leadership, and oversight of all operational aspects of the EMS Department, including, but not limited to:
  - o Director
  - o Director's Assistant
  - o …

- **Public Information Officer**) This cost classification includes all personnel salary and benefit expenditures related to planning and directing public information, public relations, media relations, or public involvement programs and developing, maintaining, and improving public awareness initiatives, including, but not limited to:

        o   Public Information Officer
        o   PIO Assistant
        o   …

- **Contracted EMT/Paramedics** This cost classification includes all contracted expenditures related to performing basic and advanced medical rescue procedures to access, stabilize, evacuate, and transport a patient to an appropriate medical facility's emergency department, including, but not limited to:
  - Contracted Paramedics
  - Contracted EMTs
  - …

## DIRECTIONS TO COMPLETE EXHIBIT 6
### *Employee Information*
This section of the Exhibit is designed to identify employee information for the specific job classifications identified above. This section of the Exhibit is also designed to discretely identify the employee information for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.

For each of the job classifications identified above, the following information must be included:

Employee #:     Enter the **Employee #** for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Last Name:     Enter the **Last Name** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

First Name:     Enter the **First Name** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Job Title/ Credentials:   Enter the **Job Title / Credentials** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Employee (E) /Contractor (C):   Enter the appropriate designation, **either an E or a C,** of the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. E designates an employee of EMS. C designates a contractor for EMS.

### *Payroll and Benefits*
This section of the Exhibit is designed to identify payroll and benefit expenditures for the specific job classifications identified above. This section of the Exhibit is also designed to discretely identify the payroll and benefit expenditures for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.

For each of the job classifications identified above, the following information must be included:

Gross Salary:    Enter the **Gross Salary** amount for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Contractor Payments: Enter the amount of **Contractor Payments** for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Employee Benefits:    Enter the amount of **Employee Benefits** for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. This includes all benefits that are not discretely identified in Columns J-L of this Exhibit.

Employer Retirement: Enter the amount of **Employer Retirement** expenditure for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

FICA:    Enter the amount of **FICA** expenditure for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

Payroll Taxes: Enter the amount of **Payroll Taxes** expenditure for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs.

***Federal Funding Reductions***
This section of the Exhibit is designed to identify the federal funding, or other payroll and benefit expenditure reduction necessary for the specific job classifications identified above. This section of the Exhibit is designed to discretely identify the payroll and benefit expenditures for any individual employee/contractor that must have a portion of their salary and/or benefits reduced from allowable expenditures on the Cost Report.

For each of the job classifications identified above, the following information must be included:

Allocated Funded Positions Entry:    Enter the appropriate designation, **either a Y or a N**, for the employee for which a portion of their salary and/or benefits must be reduced from the total allowable costs. A "Y" in this field designates an employee for which a portion, or all of their salary and benefit expenditures are funded by federal funds or grants. A "N" in this field designates an employee for which a portion, or all of their salary and benefit expenditures are not funded by federal funds or grants, but still need to be removed from allowable expenditures as reported on the Cost Report.

Federal Funding    If the answer to the field previously is "Y", then enter the amount of **Federal Funding** related to the employee's salary and benefits that must be reduced from the total allowable costs as reported on the Cost Report.

Other Funds:    Enter the amount of **Other Amount to be Removed** related to the employee's salary and benefits that must be reduced from the total allowable costs as reported on the Cost Report.

**Payroll and Benefits Entry:** Enter the amount of Salary and appropriate Benefits for all other personnel and staff related to the job classifications identified above, for which no salary or benefit expenditures must be reduced from the total allowable costs.

Exhibit 7-Schedule C – Cost Allocation Methodologies

This exhibit details the cost allocation methodologies employed by the governmental entity.

E.   If you entered "yes" on Page 2, Line 1.05, please provide a copy of your agency's approved Cost Allocation Plan (CAP).

F.   If you entered "yes" on Page 2, Line 1.06 and 1.09, please provide a copy of your agency's approved Indirect Cost Rate (IDCR).

**G.** Please provide a list of personnel cost worksheets that support your CAP or IDCR

**Attachment H**
**UC Claiming Protocol and Application**
**Part 3: UC Claiming Protocol for Ambulance Providers**

**Attachment I**
**Regional Healthcare Partnership (RHP) Planning Protocol**

## I. PREFACE

### A. Delivery System Reform Incentive Payment Program

Special Terms and Conditions (STC) 45 of the Demonstration authorizes Texas to establish a Delivery System Reform Incentive Payment (DSRIP) program. Initiatives under the DSRIP program are designed to provide incentive payments to hospitals and other providers for investments in delivery system reforms that increase access to health care, improve the quality of care, and enhance the health of patients and families they serve.

The program of activity funded by the DSRIP shall be based on Regional Healthcare Partnerships (RHPs). Each RHP shall have geographic boundaries and will be coordinated by a public hospital or local governmental entity with the authority to make intergovernmental transfers. The public hospital or local governmental entity shall collaborate with hospitals and other potential providers to develop an RHP Plan that will accelerate meaningful delivery system reforms that improve patient care for low-income populations. The RHP Plans must be consistent with regional shared mission and quality goals of the RHP and CMS's triple aims to improve care for individuals (including access to care, quality of care, and health outcomes); improve health for the population; and lower costs through improvements (without any harm whatsoever to individuals, families, or communities).

### B. RHP Planning Protocol and Program Funding and Mechanics Protocol

In accordance with STC 45(a) and 45(d)(ii)(A) & (B), the RHP Planning Protocol (Attachment I) defines the specific initiatives that will align with the following four categories: (1) Infrastructure Development; (2) Program Innovation and Redesign; (3) Quality Improvements; and (4) Population-focused Improvements. The Program Funding and Mechanics Protocol (Attachment J) describes the State and CMS review process for RHP Plans, incentive payment methodologies, RHP and State reporting requirements, and penalties for missed milestones.

Each RHP must submit an RHP Plan that identifies the projects, outcomes, population-focused objectives, and specific milestones and metrics in accordance with these attachments and STCs.

### C. Organization of "Attachment I: RHP Planning Protocol"

Attachment I has been organized into the following sections:

| | |
|---|---|
| I. | Preface |
| II. | Key Principles |
| III. | Required RHP Plan Elements |
| IV. | Format of this Document |
| V. | Category 1 Infrastructure Development |
| VI. | Category 2 Program Innovation and Redesign |
| VII. | Category 3 Quality Improvements |
| VIII. | Category 4 Population Focused Improvements |
| Appendix: | CMS-Provided Key Elements for Learning Collaboratives and Continuous Quality Improvement |

This document is supplemented by a ***metric specification guide*** developed by the state in consultation with CMS that provides more detail on the Category 1, 2, 3, and 4 metrics, including the data source for each measure, the measure steward, and the high performance level or other target setting methodology that will be used to determine targets for Category 3 metrics. The metric specification guide will be made available on the state's website.

## II. Key Principles

### A. Responding to the Needs and Challenges of the Texas Health Care Delivery System

Texas faces many unique health challenges. For example, rates of obesity and chronic diseases are some of the highest in the nation, and many Texans do not have a regular source of care to help manage and prevent these diseases. Many Texans do not receive regular treatment for mental health issues, and as a result, mental health problems account for a large percentage of admissions to hospitals that could have been avoided. These challenges and many more disproportionately affect safety net providers who serve Medicaid beneficiaries and the uninsured.

DSRIP provides an unprecedented opportunity to improve patient care for low-income populations by incentivizing delivery system reforms that increase access to health care, improve the quality of care, and enhance the health of patients and families they serve. These investments not only contribute to the triple aim, but they can also help position safety net providers for the emerging healthcare market, in which data-based quality performance and cost-efficiency drive competition.

This protocol presents a "menu" of evidence-based projects that can be incentivized through DSRIP. These projects were selected by HHSC and CMS to have the maximum impact on the health system challenges facing Texas.

Since health system reform requires regional collaboration, providers must select projects that relate to the community needs identified by the RHP, and RHPs must engage stakeholders in the development of RHP plans. The requirements for the community needs assessment and stakeholder engagement are described in section 10 of the Program Funding and Mechanics Protocol (Attachment J).

### B. Interconnection and Shared Orientation of Projects

DSRIP activities are divided into four categories, which are interrelated and complementary:

- Category 1 Infrastructure Development lays the foundation for delivery system transformation through investments in technology, tools, and human resources that will strengthen the ability of providers to serve populations and continuously improve services.
- Category 2 Program Innovation and Redesign includes the piloting, testing, and replicating of innovative care models.

- Category 3 Quality Improvements includes outcome reporting and improvements in care that can be achieved within four years.
- Category 4 Population-focused Improvements is the reporting of measures that demonstrate the impact of delivery system reform investments under the waiver.

Multiple, complementary initiatives will be occurring in the same RHP simultaneously, reinforcing each other in the transformation of care delivery. The selected projects for the RHP plan should possess the following qualities:

- While they are highly related projects, each improvement project is distinct;
- All of the proposed projects are oriented to creating more effective and coordinated care provision; and
- There is a coordinated approach to supporting improved patient experience, population health, quality improvement, and cost control.

In order to achieve meaningful change by the end of the demonstration, every performing provider must link each of its Category 1 and 2 projects to a related Category 3 outcome. The outcomes shall assess the results of care experienced by patients, including patients' clinical events, patients' recovery and health status, patients' experiences in the health system, and efficiency/cost. Additional information about category 3 outcomes and the setting of outcome targets is provided in section 11.d of the Program Funding and Mechanics Protocol (Attachment J).

## C.  Fostering Continuous Quality Improvement

In order to achieve and sustain success at responding to community needs, providers and communities will need to apply best practices in continuous quality improvement.  Most notably, learning collaboratives are essential to the success of high quality health systems that have achieved the highest level of performance.  Performing providers are strongly encouraged to form learning collaboratives to promote sharing of challenges and testing of new ideas and solutions by providers implementing similar projects in each RHP.  These regionally-focused learning collaboratives also can inform the learning collaborative conducted annually during DYs 3-5 to share learning, experiences, and best practices acquired from the DSRIP program across the State.  For the Key Elements for Learning Collaboratives provided by CMS, please see Attachment 1.

RHPs can be a natural hub for this type of shared learning by connecting providers who are working together on common challenges in the community, but providers and RHPs are also encouraged to connect with others across Texas to form a "community of communities" that can connect on an ongoing basis to share best practices, breakthrough ideas, challenges and solutions.  This will allow regions to learn from each other's challenges and develop shared solutions that can accelerate the spread of breakthrough ideas across Texas.

## III.  Required Plan Elements
Based on the projects and measures listed in this Protocol and the requirements for plan development defined in the *Program Funding and Mechanics Protocol* (Attachment J) , RHPs

will submit five-year RHP plans that describe: (1) the reasons for the selection of the projects, based on local data, gaps, community needs, and key challenges; (2) how the projects included in the plan are related to each other and how, taken together, the projects support broad delivery system reform relevant to the patient population; and (3) the progression of each project year-over-year, including the specifics and exact data source needed per project per milestone per metric per year.

Each RHP must submit an RHP Plan using a State-approved template that identifies the projects, objectives, and specific milestones, metrics, measures, and associated DSRIP values. The plan must meet all requirements pursuant to Standard Terms and Conditions (STCs) 45 and 46 and follow the format outlined in the *Program Funding and Mechanics Protocol* (Section III, Key Elements of Proposed RHP Plans).

**Organization of Projects and Measures**
The RHP five-year plan will include sections on each of the four categories included in this Protocol.

**Categories 1-2 Requirements:** For each project selected from Category 1 and 2, RHP Plans must include a narrative that has the following subsections:

- Identifying Information: Identification of the DSRIP Category, name of the project, project element, and RHP Performing Provider name and Texas Provider Identifier (TPI) involved with the project. Each project shall be implemented by one Performing Provider only.
- Project Goal: The goal(s) for the project, which describes the challenges or issues of the Performing Provider and brief description of the major delivery system solution identified to address those challenges by implementing the particular project; the starting point of the Performing Provider related to the project and based on that, the 5-year expected outcome for the Performing Provider and the patients.
- Rationale: As part of this subsection, each Performing Provider will provide the reasons for selecting the project, milestones, and metrics based on relevancy to the RHP's population and circumstances, community need, and RHP priority and starting point with available baseline data, as well as a description of how the project represents a new initiative for the Performing Provider or significantly enhances an existing initiative, including any initiatives that may have related activities that are funded by the U.S. Department of Health and Human Services. These projects should be data-driven and based on community needs and local data that demonstrate the project is addressing an area of poor performance and/or disparity that is important to the population (i.e. a provider selecting a project to implement a chronic care model for diabetes should discuss local data such as prevalence of diabetes in the community and rates of preventable admissions for diabetes and describe why diabetes is an important health challenge for the community).
- Related Category 3 Outcome Measure(s): The Performing Provider will indicate the Category 3 Outcome Measure(s) and reasons/rationale for selecting the outcome measure(s). The rationale should be data-driven, including:
  - Data supporting why these outcomes are a priority for the RHP;
  - Validated, evidence-based rationale describing how the related Category 1 or 2 project will help achieve the Category 3 outcome measure selected; and/or
  - Explanation of how focusing on the outcomes will help improve the health of low-income populations.
- Relationship to Other Projects and Measures: A description of how this project supports, reinforces, enables, and is related to other Category 1 and 2 projects and Category 4 population-focused improvement measures within the RHP Plan
- Milestones and Metrics Table: For each project, RHP Plans shall include milestones and metrics adopted in accordance with this Protocol. In a table format, the RHP Plan will indicate by demonstration year when project milestones will be achieved and indicate the data source that will be used to document and verify achievement.
  - For each project from Category 1 and 2, the Performing Provider must include at least one milestone based on a Process Milestone and at least one milestone based on an Improvement Milestone over the 4-year period.

- o Since Quality Improvement (QI) activities are essential to the provider's success implementing Category 1 and 2 projects and achieving Category 3 outcome measures, Quality Improvement (QI) is a core project component for all project options for most Category 1 and 2 projects (except 1.1 Expand Primary Care Capacity, 1.2 Increase Training of Primary Care Workforce, 1.9 Expand Specialty Care Capacity, 1.12 Enhance Service Availability, and 1.14 Develop Workforce Enhancement). Category 1 and 2 project areas contain recommended process milestones designed to support providers that are engaging in meaningful quality improvement work to improve performance and achieve outcomes. Performing Providers are strongly encouraged to include process milestones reflecting their Quality Improvement activities for all 4 years of the DSRIP.
- o For each milestone, the estimated DSRIP funding must be identified as the maximum amount that can be received for achieving the milestone. For each year, the estimated available non-federal share must be included and the source (Intergovernmental Transfer (IGT) Entity) of non-federal share identified.
- Relationship to Other Providers' Projects in the RHP: If applicable, a list of other providers in the RHP that are proposing similar projects and will be members of a learning collaborative to support this project and share best practices, new ideas, and solutions across the RHP.
- Plan for Learning Collaborative: If applicable, describe plans for participating in a RHP-wide learning collaborative with other providers with similar projects. Describe how the learning collaborative will promote sharing of challenges and testing of new ideas and solutions between providers implementing similar projects.

**Category 3 Requirements:** Category 3 involves outcomes associated with Category 1 and 2 projects. All Performing Providers (both hospital and non-hospital providers) shall select outcomes and establish improvement targets that tie to their projects in Categories 1 and 2. RHP Plans must include:

- Identifying Information: Identification of the Category 3 outcomes and RHP Performing Provider name and Texas Provider Identifier that is reporting the measure.
- Narrative Description: Each Performing Provider shall provide a narrative describing the Category 3 outcomes.
- Outcomes Table: In a table format, the RHP Plan shall include the outcomes selected by each Performing Provider.
  - o For each outcome, the RHP Plan may include process milestones described in 11.d.ii of the *Program Funding and Mechanics Protocol* in DY 2-3 only that support the development of the outcomes.
  - o For each outcome, the RHP Plan shall include improvement targets beginning no later than DY 4. In DY 4 and 5, incentive payments will only be received for achieving improvement targets (pay-for-performance) in Category 3.
  - o For each milestone or outcome improvement target, the estimated DSRIP funding must be identified as the maximum amount for achieving the milestone or outcome target. For each year, the estimated non-federal share must be included and the source (IGT Entity) of non-federal share identified.

**Category 4 Requirements:** Category 4 involves population-focused improvements associated with Category 1 and 2 projects and Category 3 outcomes. Each hospital-based Performing Provider shall report on all Category 4 measures, unless the hospital-based performing provider either is exempt from all measures or from certain measures in accordance with *Program Funding and Mechanics Protocol*, Sections 11.e. and 11.f. For Category 4, RHP Plans must include:

- Identifying information: Identification of the DSRIP Category 4 measures and the name and Texas Provider Identifier of the RHP Performing Provider that is reporting the measure.
- Narrative description: A narrative description of the Category 4 measures.
- Table Presentation: In a table format, the RHP Plan will include, starting in DY 3:
  - List of Category 4 measures the Performing Provider will report on by domain;
  - For each measure, the estimated DSRIP funding must be identified as the maximum amount that can be received for reporting on the measure. For each year, the estimated available non-federal share must be included and the source of non-federal share identified.

## IV. Explanation of the Format of this Document

Each RHP will follow the guidelines in this document and provide specificity in its plan. The Categories 1 and 2 projects that follow include the following components, which guide the RHPs in what to include in the plan:

- **Project Area:** The overarching subject matter the project addresses.
- **Project Goal:** This component describes the purpose of performing a project in the project area.
- **Project Option:** This component describes a comprehensive intervention a Performing Provider may undertake to accomplish the project goal.
- **"Other" Project Options:** Each Category 1 and 2 project area includes an "other" project option. Providers that wish to implement an innovative, evidence-based project that is not included on the list of project options for a project area may choose the "other" project option. Providers implementing an innovative, evidence-based project using the "Other" project option may design their project using the process and improvement milestones specified in the project area or may include one or more customizable process milstones P-X and/or improvement milestones I-X, as appropriate for their project. "Other" project options will be subject to additional scrutiny during the plan review and approval process.
- **Project Component:** Activities that may occur in conjunction with one another to carry out a project option. Project components may be required core components or optional components. Required core components are listed with the project options with which they must be completed. Providers either must incorporate all required core components in their plan narrative or they must provide justification for why they are not including a core component (e.g., the provider was at a more advanced stage with the project and had already completed one or more core components).

The metric specification guide, which is a compendium to this protocol, provides the following additional information:

- **Milestone:** An objective for DSRIP performance comprised of one or more metrics.

- o **Process Milestones:** Objectives for completing a process that is intended to assist in achieving an outcome. These include objectives for continuous quality improvement, rapid-cycle testing, and collaborative learning that are intended to help providers share best practices, spread breakthrough ideas, and test new solutions with the goal of performing at a higher level and achieving outcomes within the 5 years.
  - o **Improvement Milestones:** Objectives, such as outputs, to assist in achieving an outcome.
- **Metric:** Quantitative or qualitative indicator of progress toward achieving a milestone from a baseline. There are one or more metrics associated with each milestone. The RHP participants may tailor the targets in the metric, as appropriate.
- **Data Source:** The data source often lists multiple options that could be used for the data being measured by the metric. Please note that these options identify appropriate sources of information, but as allowed, Performing Providers may identify alternative sources that are more appropriate to their individual systems and that provide comparable or better information. The RHP plans will specify the exact data source being used for the metric each year.
- **Rationale:** This component describes why the metric is appropriate, including academic citations, descriptions of how widely used the metric is in the industry, and other reasons why the metric is seen as the appropriate data to meaningfully measure progress toward achieving the milestone.

**Additional Process Milestones**

In an effort to avoid repetition, it is permissible for each project to include any one of the following as process milestones, in addition to or in lieu of the other process milestones listed. Each is in the spirit of continuous improvement and applying and sharing learning. If a Performing Provider elects to use one or more of these process milestones, the RHP plan would describe the related specifics for the milestone, such as the metric and data source, using customizable process milestone P-X, which is included in each project area:

- Participate in a learning collaborative (e.g., in DY 2, join the Hospital Engagement Network, as documented by the appropriate participation document)Conduct a needs/gap analysis, in order to inform the establishment or expansion of services/programs (e.g., in DY2, conduct a gap analysis of high-impact specialty services to identify those in most demand by the local community in order to expand specialty care capacity targeted to those specialties most needed by patients)
- Pilot a new process and/or program
- Assess efficacy of processes in place and recommend process improvements to implement, if any (e.g., in DY 4, evaluate whether the primary care redesign methodology was as effective as it could be, by: (1) performing at least two team-based Plan-Do-Study-Act workshops in the primary care clinics; (2) documenting whether the anticipated metric improvements were met; (3) identifying opportunities, if any, to improve on the redesign methodology, as documented by the assessment document capturing each of these items)
- Redesign the process in order to be more effective, incorporating learnings (e.g., in DY 4, incorporate at least one new element into the process based on the assessment, using the

process modification process to include the specificity needed as new learnings are discovered in DY 3)
- Implement a new, improved practice piloted in one or more Performing Providers within an RHP  (e.g., in DY 5, implement improved practices across the Performing Provider's ambulatory care setting)
- Establish a baseline, in order to measure improvement over self
- Complete a planning process/submit a plan, in order to do appropriate planning for the implementation of major infrastructure development or program/process redesign (e.g., in DY 2, complete a planning process for a care navigation program to provide support to patient populations who are most at risk of receiving disconnected and fragmented care)
- Designate/hire personnel or teams to support and/or manage the project/intervention
- Implement, adopt, upgrade, or improve technology to support the project
- Develop a new methodology, or refine an existing one, based on learnings
- Incorporate patient experience surveying

**Attachment I**
**Regional Healthcare Partnership (RHP) Planning Protocol**

# Category 1 Infrastructure Development

## Category 1 Table of Contents

1.1   Expand Primary Care Capacity......................................................................... 12
1.2   Increase Training of Primary Care Workforce ................................................. 13
1.3   Implement a Chronic Disease Management Registry ....................................... 15
1.4   Enhance Interpretation Services and Culturally Competent Care .................... 17
1.5   Collect Valid and Reliable Race, Ethnicity, and Language (REAL) Data to Reduce Disparities ......................................................................................................... 20
1.6   Enhance Urgent Medical Advice ...................................................................... 23
1.7   Introduce, Expand, or Enhance Telemedicine/Telehealth ................................ 25
1.8   Increase, Expand, and Enhance Dental Services .............................................. 31
1.9   Expand Specialty Care Capacity....................................................................... 34
1.10  Enhance Performance Improvement and Reporting Capacity.......................... 36
1.11  Implement technology-assisted services (telehealth, telemonitoring, telementoring, or telemedicine) to support, coordinate, or deliver behavioral health services ............................... 40
1.12  Enhance service availability (i.e., hours, locations, transportation, mobile clinics) to appropriate levels of behavioral health care ................................................................. 44
1.13  Development of behavioral health crisis stabilization services as alternatives to hospitalization. ................................................................................................... 46
1.14  Develop Workforce enhancement initiatives to support access to behavioral health providers in underserved markets and areas (e.g., psychiatrists, psychologists, LMSWs, LPCs and LMFTs.) ........................................................................................................ 48

## 1.1   Expand Primary Care Capacity

**Project Goal:**
Expand the capacity of primary care to better accommodate the needs of the regional patient population and community, as identified by the RHP needs assessment, so that patients have enhanced access to services, allowing them to receive the right care at the right time in the right setting. Projects plans related to access to primary care services should address current challenges to the primary care system and patients seeking primary care services, including: expanded and/or enhanced system access points, barriers to transportation, and expanded or enhanced primary care services to include urgent care.

**Project Options:**
      a)        Establish more primary care clinics
      b)        Expand existing primary care capacity
              Required core project components:
              a)      Expand primary care clinic space
              b)      Expand primary care clinic hours
              c)      Expand primary care clinic staffing
      c)        Expand mobile clinics
      d)        "Other" project option:  Implement other evidence-based project to expand primary care capacity in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-15 includes suggestions for improvement metrics to use with this innovative project option.

**Rationale:**
In our current system, more often than not, patients receive services in urgent and emergent care settings for conditions that could be managed in a more coordinated manner if provided in the primary care setting. This often results in more costly, less coordinated care and a lack of appropriate follow-up care. Patients may experience barriers in accessing primary care services secondary to transportation, cost, lack of assigned provider, physical disability, inability to receive appointments in a timely manner and a lack of knowledge about what types of services can be provided in the primary care setting. By enhancing access points, available appointment times, patient awareness of available services and overall primary care capacity, patients and their families will align themselves with the primary care system resulting in better health outcomes, patient satisfaction, appropriate utilization and reduced cost of services.

**1.2    Increase Training of Primary Care Workforce**

**Project Goal:**
Texas has a growing shortage of primary care doctors and nurses due to the needs of an aging population, a decline in the number of medical students choosing primary care, and thousands of aging baby boomers who are doctors and nurses looking towards retirement.  The shortage of primary care workforce personnel in Texas is a critical problem that we have the opportunity to begin addressing under this waiver.  It is difficult to recruit and hire primary care physicians.  The shortage of primary care providers has contributed to increased wait times in hospitals, community clinics, and other care settings.  Expanding the primary care workforce will increase access and capacity and help create an organized structure of primary care providers, clinicians, and staff.  Moreover, this expansion will strengthen an integrated health care system and play a key role in implementing disease management programs.  The extended primary care workforce will also be trained to operate in patient-centered medical homes.  A greater focus on primary care will be crucial to the success of an integrated health care system.   Furthermore, in order to effectively operate in a medical home model, there is a need for residency and training programs to expand the capabilities of primary care providers and other staff to effectively provide team-based care and manage population health.  Therefore, the need to expand the responsibilities of primary care workforce members will be even more important.  In summary, the goal for this project is to train more workforce members to serve as primary care providers, clinicians, and staff to help address the substantial primary care workforce shortage and to update training programs to include more organized care delivery models.  This project may apply to primary care physicians (including residents in training), nurse practitioners, physician assistants, and other clinicians/staff (e.g., health coaches, community health workers/promotoras) in the following service areas: family medicine, internal medicine, obstetrics and gynecology, geriatrics, and pediatrics.

In 2010, Texas had 176 patient care physicians per 100,000 population and 70 primary care physicians per 100,000 population with a state ranking of 46 and 47, respectively.  (Comparable ratios for US Total are 219.5 and 90.5, respectively.)  From 2001 to 2011, the Texas physician workforce grew 32.3%, exceeding the population growth of 25.1%.  Primary care physician workforce grew only 25% in the same period.  From 2002 to 2011, Texas increased medical school enrollment 31% from 1,342 to 1,762 in line with the national call by the Association of American Medical Colleges to increase medical school enrollments by 30%.  In 2011, there were 1,445 medical school graduates.  Coincidentally, there were 1,445 allopathic entry-level GME positions offered in the annual National Resident Matching program.  (There were 31 osteopathic slots.)  The Texas Higher Education Coordinating Board recommends a ratio of 1.1 entry-level GME positions for each Texas medical school graduate.  The number of Texas medical school graduates is expected to peak at over 1,700 in 2015.  This implies a need for 400 additional GME positions by 2015.  The shortage of GME positions or residency slots may be

the single most problematic bottleneck in Texas' efforts to alleviate the state's physician shortage.[1]

The rate of Primary Care Physicians per 100,000 Population varies by region from 43 (South Texas) to 78 (Central Texas). Resident physicians provide low-cost care to needy populations and tend to remain in the state in which they complete their residency training.

**Project Options:**

a)      Update primary care training programs to include training on the medical home and chronic care models, disease registry use for population health management, patient panel management, oral health, and other identified training needs and/or quality/performance improvement

b)      Increase the number of primary care providers (i.e., physicians, residents, nurse practitioners, physician assistants) and other clinicians/staff (such as health coaches and community health workers/promotoras).

c)      Increase the number of residency/training program for faculty/staff to support an expanded, more updated program

d)      Establish/expand primary care training programs, with emphasis in communities designated as health care provider shortage areas (HPSAs)

e)      "Other" project option:  Implement other evidence-based project to increase training of the primary care workforce in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

---

[1] **2010 physician supply extracted from "Physician Characteristics and Distribution in the U.S., " 20122012 Edition, published by American Medical Association. U.S. and Texas population estimates, 2010, extracted from U.S. Census Bureau American Fact Finder Website. Prepared by: Medical Education Dept., Texas Medical Association, 2/2012.**

**1.3    Implement a Chronic Disease Management Registry**

**Project Goal:**
Implement a disease management registry for one or more patient populations diagnosed with a selected chronic disease(s) or with Multiple Chronic Conditions (MCCs).  By tracking key patient information, a disease registry can help physicians and other members of a patient's care team identify and reach out to patients who may have gaps in their care in order to prevent complications, which often lead to more costly care interventions.  A disease registry can assist physicians in one or more key processes for managing patients with a chronic disease, including:

- Prompt physicians  and their teams to conduct appropriate assessments and deliver condition-specific recommended care;
- Identify patients who have missed appointments, are overdue for care, or are not meeting care management goals;
- Provide reports about how well individual care teams and overall provider organizations are doing in delivering recommended care to specific patient populations;
- Stratify patients into risk categories in order to target interventions toward patients with highest needs.

**Project Options:**

a)    Implement/enhance and use chronic disease management registry functionalities
Required core project components:

    a)    Enter patient data into unique chronic disease registry

    b)    Use registry data to proactively contact, educate, and track patients by disease status, risk status, self-management status, community and family need.

    c)    Use registry reports to develop and implement targeted QI plan

    d)    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)    "Other" project option:  Implement other evidence-based project to implement a chronic disease management registry in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-23 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.3 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Utilization of registry functionalities helps care teams to actively manage patients with targeted chronic conditions because the disease management registry will include clinician prompts and reminders, which should improve rates of preventive care.

**1.4    Enhance Interpretation Services and Culturally Competent Care**

**Project Goal:**
Patients have access to timely, qualified health care interpreter services in their primary language, thereby increasing the likelihood of safe and effective care, open communication, adherence to treatment protocols, and better health outcomes. This Project Area applies to both written and oral interpretation services.

Cultural competence in health care describes the ability of systems to provide care to patients' with diverse values, beliefs and behaviors, including tailoring care delivery to meet patients' social, cultural, and linguistic needs. Cultural competence can be described both as a vehicle to increase access to quality care for all patient populations and as a business strategy to attract new patients and market share.

To achieve **organizational cultural competence** within the health care leadership and workforce, it is important to maximize diversity.

To achieve **systemic cultural competence** (e.g., in the structures of the health care system) it is essential to address such initiatives as conducting community assessments, developing mechanisms for community and patient feedback, implementing systems for patient racial/ethnic and language preference data collection, developing quality measures for diverse patient populations, and ensuring culturally and linguistically appropriate health education materials and health promotion and disease prevention interventions.

To attain **clinical cultural competence**, health care providers must: (1) be made aware of the impact of social and cultural factors on health beliefs and behaviors; (2) be equipped with the tools and skills to manage these factors appropriately through training and education; and (3) empower their patients to be more of an active partner in the medical management.

**Project Options:**
   a)    Expand access to written and oral interpretation services
         Required core project components:
         a)    Identify and address language access needs and/or gaps in language access
         b)    Implement language access policies and procedures (in coordination with statewide and federal policies to ensure consistency across the state)
         c)    Increase training to patients and providers at all levels of the organization (and organization-wide) related to language access and/or cultural competency/sensitivity
         d)    Increase interpretation staff
   b)    Enhance Organizational Cultural Competence
         Required core project components:
         a)    Hire, promote, and retain minorities at all levels of the organization to increase diversity in the health care workforce.

> b) Develop a program that actively involves community representatives in the health care organization's planning and quality improvement meetings, whether as part of the board or as part of focus groups.

c) Enhance Systemic Cultural Competence
Required core project components:

> a) Develop policies and procedures to measure systemic culture competence, or use existing evidence-based culturally competency assessment tool (e.g., CAHPS Cultural Competency Supplement).
>
> b) Adopt and implement all 14 CLAS standards, including those that are not federal mandates.[2]Conduct CLAS Standards trainings at facilities
>
> c) Identify federal and state reimbursement strategies for interpreter services and identify community resources and partnerships to develop the needed workforce.
>
> d) Provide staff training around Title VI requirements mandating the provision of interpreter services in health care settings.
>
> e) Identify and use tools to detect medical errors that result from lack of systemic cultural competence, including those stemming from language barriers (e.g., taking a prescribed medication incorrectly); misunderstanding health education materials, instructions, or signage (e.g., inappropriately preparing for a diagnostic or therapeutic procedure, resulting in postponement or delay); and misunderstanding the benefits and risks of procedures requiring informed consent.
>
> f) Implement projects to address medical errors resulting from systemic cultural competency.

d) Clinical Cultural Competence: Develop cross-cultural training program that is a required, integrated component of the training and professional development of health care providers at all levels. The curricula should:

> • increase awareness of racial and ethnic disparities in health and the importance of socio-cultural factors on health beliefs and behaviors;
>
> • address the impact of race, ethnicity, culture, and class on clinical decision making;
>
> • develop tools to assess the community members' health beliefs and behaviors
>
> • Develop human resource skills for cross-cultural assessment, communication, and negotiation.

e) Implement Quality improvement efforts that include culturally and linguistically appropriate patient survey methods as well as process and outcome measures that reflect the needs of multicultural and minority populations.

f) Clinical Cultural Competence: Develop programs to help patients navigate the health care system and become a more active partner in the clinical encounter.

g) "Other" project option: Implement other evidence-based project to enhance interpretation services and culturally competent care in an innovative manner not

---

[2] http://minorityhealth.hhs.gov/assets/pdf/checked/finalreport.pdf

described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-18 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.4 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
The 2010 United States Census confirmed that our nation's population has become more diverse than ever before, and this trend is expected to continue over this century. As we become a more ethnically and racially diverse nation, health care systems and providers need to reflect on and respond to patients' varied perspectives, values, beliefs, and behaviors about health and well-being. Failure to understand and manage socio-cultural differences may have significant health consequences for minority groups in particular.

Various systemic issues have been identified in the literature and by the health care experts. While this was more obvious in poorly constructed and complicated systems that are not responsive to the needs of diverse patient populations, the issue of language discordance between provider and patient was of foremost importance.  Systems lacking interpreter services or culturally and linguistically appropriate health education materials lead to patient dissatisfaction, poor comprehension and adherence, and lower-quality care. According to various studies, care experts in government, managed care, academia, and community health care make a clear connection between cultural competence, quality improvement, and the elimination of racial/ethnic disparities.

**1.5    Collect Valid and Reliable Race, Ethnicity, and Language (REAL) Data to Reduce Disparities**

In 2002, the Institute of Medicine report *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care[3], signified a new era of national attention to racial and ethnic disparities in the American health care system. Corroborating that report, many research studies have established that Americans* do not all have equal access to health care, or experience similar health care quality and outcomes. Low-income, racial and ethnic minority, limited-English proficient, and other underserved populations often have higher rates of disease, fewer treatment options, reduced access to care, and lower satisfaction with care. A key prerequisite for measuring equity of care and addressing disparities is to collect valid and reliable patient demographic data on race, ethnicity, and preferred language (REAL data). These data elements must be effectively linked to data systems used in health care service delivery (to tailor care to patient needs), as well as data systems used in quality improvement (to identify disparities). Creating organizational systems for capturing REAL data is a long and resource-intensive process. Currently, the processes for analyzing equity of care are mostly piecemeal and limited in scope, taxing organizational resources. However, in the state of Texas there are significant barriers to effective collection and utilization of these patient demographic data for public hospitals. To address these barriers, key next steps for public hospitals systems include developing tools, HIT protocols and training curricula to improve the collection and utilization of REAL data elements, which is the foundation for achieving significantly greater efficiency and cost-effectiveness in measuring equity of care, thus enabling the designs of more successful efforts to eliminate health care disparities.

**Project Goal:**
To improve the collection of valid and reliable self-reported data on the demographics of patients receiving care, the quality of care delivered, and implementing stratification capabilities to stratify clinical/quality data, and analyzing data by relevant demographic categories: race, ethnicity, sex, primary language and disability status.[4] Recently finalized data collection standards for surveys of demographic categories were released by HHS and will be used in the process of developing standards for administrative data collection for the same 5 categories. RHPs will work to implement initiatives, promote training, and accelerate capacity building, community engagement and empowerment. The project focuses on efforts to reduce health and mental health disparities, disparities among racial/ethnic groups, women, seniors, children, rural populations, and those with disabilities and their families.

**Project Options:**
     a)      Train patients and staff on the importance of collecting REAL data (For project option 1.5.1, the provider must do both subpart (i) and subpart (ii), If the provider is not using existing curriculum.  If the provider is using existing curriculum, only subpart (ii) is required.):

---

3 http://www.iom.edu/Reports/2002/Unequal-Treatment-Confronting-Racial-and-Ethnic-Disparities-in-Health-Care.aspx
4 http://minorityhealth.hhs.gov/templates/browse.aspx?lvl=2&lvlid=208

        i.   Develop curriculum that includes effective strategies to explain relevance of collecting REAL data to patients and staff. Education about the value of the information for patient care, with clear examples of the benefits of data collection is central to an effective training.

        ii.  Train patients and staff on the importance of collecting REAL data using developed or existing curricula.

b)      Implement intervention that involves collaborating/partnering/ instituting data sharing agreements with Medicaid agencies, public health departments, academic research centers, other agencies, etc. to better assess patient populations and aid in the evaluation of health disparities

c)      Implement project to enhance collection, interpretation, and / or use of REAL data.

Required core project components:

a)      Redesign care pathways to collect valid and reliable data on race, ethnicity, and language at the point of care

b)      Implement system to stratify patient outcomes and quality measures by patient REAL demographic information in order to identify, analyze, and report on potential health disparities and develop strategies to address goals for equitable health outcomes. NOTE: Providers are encouraged to stratify outcomes and measures using both two-way and three-way interactions (race and quality; gender, race, and quality)

c)      Develop improvement plans, which include a continuous quality improvement plan, to address key root causes of disparities within the selected population.

d)      Use data to undertake interventions aimed at reducing health and health care disparities (tackling "the gap") for target patient populations through improvements in areas such as f preventive care, patient experience, and/or health outcomes.

        d)   "Other" project option:  Implement other evidence-based project to implement and use REAL data in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-12 includes suggestions for improvement metrics to use with this innovative project option.

        Note:  All of the project options in project area 1.5 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Several RHPs within Texas focus on health disparities in communities through research, education, and community relations. To build upon the existing infrastructure to address health

disparities in Texas, RHPs will select projects appropriate to specific populations based on relevancy to the RHP needs assessment. Some populations experience disparities in health, quality of care, health outcomes, and incidence as related to conditions such as: tuberculosis, congestive heart failure, stroke, COPD, Chlamydia, cervical cancer, liver cancer, stomach cancer, gallbladder cancer, child and adolescent leukemia, neural tube defects, other birth defects, obesity, diabetes, and pesticide poisoning. Disparities can been seen among groups based on race and ethnicity, language, economic factors, education, insurance status, geographic location (rural vs. urban, zip code) , gender, sexual orientation and many other social determinants of health.  The collection of REAL data helps providers to delineate potential categories of differences in observed health status.

## 1.6    Enhance Urgent Medical Advice

**Project Goal:**
Provide urgent medical advice so that patients who need it can access it telephonically, and an appropriate appointment can be scheduled so that access to urgent medical care is increased and avoidable utilization of urgent care and the ED can be reduced. The advice line provides callers with direct access to a registered nurse who can address their specific health needs with an on-demand service.

**Project Options:**
a) Expand urgent care services
b) Establish/expand access to medical advice and direction to the appropriate level of care to reduce Emergency Department use for non-emergent conditions and increase patient access to health care.
Required core project components:
  a) Develop a process (including a call center) that in a timely manner triages patients seeking primary care services in an ED to an alternate primary care site. Survey patients who use the nurse advice line to ensure patient satisfaction with the services received.
  b) Enhance linkages between primary care, urgent care, and Emergency Departments in order to increase communication and improve care transitions for patients.
  c) Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.
c) "Other" project option: Implement other evidence-based project to implement and use urgent medical advice in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-17 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 1.6 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Several RHPs within Texas implemented an urgent medical advice line to serve patients within selected populations. To facilitate the diffusion of practices among RHPs, RHPs will have the opportunity to implement an urgent medical advice line to underserved and under privileged areas.

Implementation across Texas for an urgent medical advice line is not consistent between RHPs. As such, Texas will promote the implementation of an **urgent medical advice line** for underserved and underprivileged populations (i.e. rural areas with limited access to healthcare, or areas where cultural differences may disincentivize the use of automated telephone services).

## 1.7    Introduce, Expand, or Enhance Telemedicine/Telehealth

**Project Goal:**
Provide electronic health care services to increase patient access to health care. Telemedicine is the use of medical information exchanged from one site to another via electronic communications to improve patients' health status. Closely associated with telemedicine is the term "telehealth," which is often used to encompass a broader definition of remote healthcare that does not always involve clinical services. Videoconferencing, transmission of still images, remote monitoring of vital signs with a focus on the specialty care access challenges in rural communities, and continuing medical education are all considered part of telemedicine and telehealth.[5]

Telehealth is the use of electronic information and telecommunications technologies to support long-distance clinical health care, patient and professional health-related education, public health and health administration. Technologies include videoconferencing, the internet, store-and-forward imaging, streaming media, and terrestrial and wireless communications.[6]

Telemedicine is viewed as a cost-effective alternative to the more traditional face-to-face way of providing medical care (e.g., face-to-face consultations or examinations between provider and patient) that states can choose to cover under Medicaid. This definition is modeled on Medicare's definition of telehealth services (42 CFR 410.78). Note that the federal Medicaid statute does not recognize telemedicine as a distinct service.[7]

Telemedicine is not a separate medical specialty. Products and services related to telemedicine are often part of a larger investment by health care institutions in either information technology or the delivery of clinical care. Even in the reimbursement fee structure, there is usually no distinction made between services provided on site and those provided through telemedicine and often no separate coding required for billing of remote services. Telemedicine encompasses different types of programs and services provided for the patient. Each component involves different providers and consumers.[8]

**Telemedicine Services:**

***Specialist referral services*** typically involves of a specialist assisting a general practitioner in rendering a diagnosis. This may involve a patient "seeing" a specialist over a live, remote consult or the transmission of diagnostic images and/or video along with patient data to a specialist for viewing later. Recent surveys have shown a rapid increase in the number of specialty and subspecialty areas that have successfully used telemedicine. Radiology continues to make the greatest use of telemedicine with thousands of images "read" by remote providers each year. Other major specialty areas include: dermatology, ophthalmology, mental health, cardiology and

---

[5] http://www.americantelemed.org/i4a/pages/index.cfm?pageid=3333
[6] http://www.hrsa.gov/ruralhealth/about/telehealth/
[7] http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Telemedicine.html
[8] http://www.americantelemed.org/i4a/pages/index.cfm?pageid=3333

pathology. According to reports and studies, almost 50 different medical subspecialties have successfully used telemedicine.

***Patient consultations*** using telecommunications to provide medical data, which may include audio, still or live images, between a patient and a health professional for use in rendering a diagnosis and treatment plan. This might originate from a remote clinic to a physician's office using a direct transmission link or may include communicating over the Web.

***Remote patient monitoring*** uses devices to remotely collect and send data to a monitoring station for interpretation. Such "home telehealth" applications might include a specific vital sign, such as blood glucose or heart ECG or a variety of indicators for homebound patients. Such services can be used to supplement the use of visiting nurses.

***Medical education*** provides continuing medical education credits for health professionals and special medical education seminars for targeted groups in remote locations.

***Consumer medical and health information*** includes the use of the Internet for consumers to obtain specialized health information and on-line discussion groups to provide peer-to-peer support.

**Delivery Mechanisms:**

***Networked programs*** link tertiary care hospitals and clinics with outlying clinics and community health centers in rural or suburban areas. The links may use dedicated high-speed lines or the Internet for telecommunication links between sites. Studies by the several agencies within the U.S. Department of Health and Human Services, private vendors and assessments by ATA of its membership place the number of existing telemedicine networks in the United States at roughly 200. These programs involve close to 2,000 medical institutions throughout the country. Of these programs, it is estimated that about half (100) are actively providing patient care services on a daily basis. The others are only occasionally used for patient care and are primarily for administrative or educational use.

***Point-to-point connections using private networks*** are used by hospitals and clinics that deliver services directly or contract out specialty services to independent medical service providers at ambulatory care sites. Radiology, mental health and even intensive care services are being provided under contract using telemedicine to deliver the services.

***Primary or specialty care to the home connections*** involves connecting primary care providers, specialists and home health nurses with patients over single line phone-video systems for interactive clinical consultations.

***Home to monitoring center links*** are used for cardiac, pulmonary or fetal monitoring, home care and related services that provide care to patients in the home. Often normal phone lines are used

to communicate directly between the patient and the center although some systems use the Internet.

***Web-based e-health patient service sites*** provide direct consumer outreach and services over the Internet. Under telemedicine, these include those sites that provide direct patient care.

**Project Options:**

a)  Implement telemedicine program to provide or expand specialist referral services in an area identified as needed to the region.
Required core project components:
  a) Provide patient consultations  by medical and surgical specialists as well as other types of health professional using telecommunications
  b) Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)  Implement remote patient monitoring programs for diagnosis and/or management of care. Providers should demonstrate that they are exceeding the requirements of the EHR incentive program.

c)  Use telehealth to deliver specialty, psychosocial, and community-based nursing services

d)  Develop a teledentistry infrastructure and use telehealth to provide dental and oral health services.

e)  Use telehealth services to provide medical education and specialized training for targeted professionals in remote locations.

f)  Implement an electronic consult or electronic referral processing system to increase efficiency of specialty referral process by enabling specialists to provide advice and guidance to primary care physicians that will address their questions without the need for face-to-face visits when medically appropriate.

g)   "Other" project option:  Implement other evidence-based project to expand/establish telemedicine/telehealth program to help fill significant gaps in services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-18 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 1.7 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts,

"lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale[9]:**

One of the greatest challenges facing the U.S. healthcare system is to provide quality care to the large segment of the population, which does not have access to specialty physicians because of factors such as geographic limitations or socioeconomic conditions. The use of technology to deliver health care from a distance, or telemedicine, has been demonstrated as an effective way of overcoming certain barriers to care, particularly for communities located in rural and remote areas. In addition, telemedicine can ease the gaps in providing crucial care for those who are underserved, principally because of a shortage of sub-specialty providers.

The use of telecommunications technologies and connectivity has impacted real-world patients, particularly for those in remote communities. This work has translated into observable outcomes such as:

- improved access to specialists
- increased patient satisfaction with care
- improved clinical outcomes
- reduction in emergency room utilization
- cost savings

Nowhere are these benefits more evident than in Texas. With a land mass area of 268,820 square miles and a growing population of 25.1 million, Texas is the second largest US state by area and population.1 Its population growth rose more than 18.8 percent between 2000 to 2009, reflecting an increase that is more than double the national growth in this period.2 This rapid growth is attributed to a diversity of sources such as natural increases from the total of all births minus all deaths and to a high rate of net in-migration from other states and countries. Along with the increase in population, an ever-growing aging population (the state's older population, 65+, is expected to double that of the previous 8 years) has significantly affected the demand on the healthcare workforce as demands for quality care increased.

In its Statewide Health Plan 2011-2016 report[10], the Texas Statewide Health Council concluded: "Texas faces particular challenges with respect to physician and other healthcare workforces not primarily because of an overall shortage, but because of sharp disparities in the allocation of healthcare resources to different parts of the state. In the metropolitan areas outside the border, there is one physician in direct patient care for each 573 county residents. In the 32-county border region and in non-metropolitan Texas, the ratios are 2 to 3 times as high."

---

[9] http://telehealth.utmb.edu/presentations/Benefits_Of_Telemedicine.pdf
[10] **Texas Statewide Health Coordinating Council. 2011-2016 Texas State Health Plan Update. Texas Department of State Health Services.** http://www.dshs.state.tx.us/chs/shcc/. **Retrieved February 28, 2011**

Although the overall supply of physicians has increased in Texas since 2000 from in-migration, the vast majority of these healthcare professionals resides and practices within four primary areas of Texas: Dallas, Houston, Austin, and San Antonio. Moreover, Texas has consistently lagged behind the US average in the ratio of physician supply per 100,000 of population, and the gap between the two appears to be increasing. In 2009, there were 25 counties with no physicians, and the counties with lowest ratios of providers to populations were by and large in West Texas, South Texas and the Panhandle.

Theoretically, resources such as healthcare would be distributed across the state in accordance with population density and needs. Realistically, however, geographical and economic barriers create significant disparities across the state, with rural and underserved communities enduring significantly greater barriers to accessing the care continuum. The supply ratios for a number of health professionals, including primary care physicians and mental health professionals, are lowest in rural, border and other health professional shortage areas. Data for 2009 indicated that out of the 254 counties in Texas, 118 counties are designated as whole county primary care Health Professional Shortage Areas (HPSAs) due to primary care doctor to patient ratios of 1:3500 or less, and 173 counties (68 percent of the state) are designated as whole county mental health HPSAs[2]

In Texas, communities are struggling to care for an increasing number of underserved, disadvantaged, and at-risk populations. In most communities, especially in rural areas, care is not organized to promote prevention and early intervention, coordinate services, or monitor access to and quality of care. Moreover, public and private funding to subsidize care remains inadequate, despite growing community needs associated with increases in the uninsured and aging populations. Consequently, many people are left to seek care in emergency rooms, often as a last resort, in an unmanaged and episodic manner. The costs of such care are borne by care-giving institutions, local governments, and, ultimately, taxpayers, many of whom are already burdened with the costs of meeting health-related costs of their own.

Given the various benefits observed through the provision of health care via telemedicine, there is a tremendous amount of momentum toward increasing access to care through the use of health information technologies, thereby creating an exciting and central role for innovation and implementation of new and advanced platforms for service delivery. Two such platforms include the use of wireless and telemonitoring technologies. It is our belief that healthcare delivery is about to make a significant leap forward. The development and installation of high-speed wireless telecommunications networks coupled with large-scale search engines and mobile devices will change healthcare delivery as well as the scope of healthcare services. It will allow for real-time monitoring and interactions with patients without bringing them into a hospital or a specialty care center. This real/near-time monitoring and interacting could enable a healthcare team to address patient problems before they require major interventions, creating a potentially patient-centered approach that could undoubtedly change our expectations of our healthcare system.

<div align="right">**Category 1**</div>

In conclusion, the overall goal of the proposed telehealth projects is to reduce disparities in access, outcome, cost and satisfaction that are created by geographic barriers. Specifically, we hope to achieve the following goals for the state's Medicaid population:

1.) increase the knowledge and capacity of rural primary care physicians to manage complex chronic conditions
2.) increase patients' timely access to specialty care and reduce geographic barriers;
3.) create the ability for specialists to provide direct patient consults to patients based at rural clinics
4.) improve efficiency in the referral process by letting specialists divert unnecessary referrals and decreasing the wait time for urgent referrals
5.) provide services in HPSAs
6.) enhance access to other health care services (case management, education, etc.)

**1.8    Increase, Expand, and Enhance Oral Health Services**

**Project Goal:**
Dental health is a key component of overall health. Oral disease can lead to poor nutrition; serious systemic illnesses and conditions such as poor birth outcomes, diabetes, and cardiovascular disease; and a diminished quality of life and life expectancy.[11] Inadequate access to oral health services compounds other health issues. It can result in untreated dental disease that not only affects the mouth, but can also have physical, mental, economic, and social consequences.[12] Fortunately, many of the adverse effects associated with poor oral health can be prevented with quality regular dental care, both at home and professionally. Increasing, expanding, and enhancing oral health services will improve health outcomes.

**Barriers to Oral Health Care:**
- Distribution of dental providers/lack of dental providers in underserved areas
- Inconvenient hours and location of dental clinic/services
- Transportation issues
- Low oral health literacy within the community
- Cultural and language competency of dental providers
- Cost of services/health insurance coverage
- Providers' limited experience treating special groups (medically compromised, elderly, special needs, pregnant women, young children)

**Specific Project Goals:**
- Close gaps/disparities in access to dental care services
- Enhance the quality of dental care
- Increase and enhance the dental workforce
- Redistribute and retain the dental workforce to/in underserved areas

**Project Options:**
**Increase dental provider training, education, recruitment and/or retention, as well as expand workforce capacity through one of the following project options:**
a)    The development of academic linkages with the three Texas dental schools, to establish  a multi-week externship program for fourth year dental students to provide exposure and experience in providing dental services within a rural setting during their professional academic preparation.
b)    The establishment of a clinical rotation, continuing education within various community settings for dental residents to increase their exposure and experience providing dental services to special populations such as the elderly, pregnant women, young children, medically compromised, and/or special needs patients.

---

[11] http://www.perio.org/consumer/media/releases.htm#pregnancy
[12] Building Better Oral Health: A Dental Home for All Texans. A Report Commissioned by the Texas Dental Association. Fall 2008

      c)      The establishment of a loan repayment program or scholarships for advanced training/education in a dental specialty with written commitments to practice in underserved markets after graduation for fourth year dental students, new dental and dental hygiene graduates, and dental residents.

**Increase interdisciplinary training and education opportunities for dentists and other health care providers to promote an interdisciplinary team approach to addressing oral health through one of the following project options:**

      d)      Grand rounds, in-service trainings, and other continuing education events that integrate information on oral health issues and implications as related to chronic diseases, such as diabetes and cardiovascular disease, and the importance of good oral health during pregnancy and perinatal period.

      e)      Establishing a referral system/network that provides medically complex patients with coordinated care between dental and medical providers such as cardiologists, pediatricians, OB/GYNs, endocrinologists, oncologists, etc.

**Increase and expand services by increasing clinics, clinic hours, using satellite mobile clinics with an affiliated fixed-site dental clinic location, school-based/school-linked health centers or other approaches to increase oral health services to underserved populations through one of the following project options:**

      f)      The expansion of existing dental clinics, the establishment of additional dental clinics, or the expansion of dental clinic hours.

      g)      The expansion or establishment of satellite mobile dental clinics with an affiliated fixed-site dental clinic location.

      h)      The development of a tele-dentistry infrastructure including Medicaid reimbursement to expand access to dental specialty consultation services in rural and other limited access areas.

      i)      The implementation or expansion of school-based sealant and/or fluoride varnish programs that provide sealant placement and/or fluoride varnish applications to otherwise unserved school-aged children by enhancing dental workforce capacity through collaborations and partnerships with dental and dental hygiene schools, local health departments (LHDs), federally qualified health centers (FQHCs), and/or local dental providers.

      j)      The addition or establishment of school-based health centers that provide dental services for otherwise unserved children by enhancing dental workforce capacity through collaborations and partnerships with dental and dental hygiene schools, LDHs, FQHCs, and/or local dental providers.

      k)      The implementation of dental services for individuals in long-term care facilities, intermediate care facilities, and nursing homes, and for the elderly, and/or those with special needs by enhancing dental workforce capacity through collaborations and partnerships with dental and dental hygiene schools, LHDs, FQHCs, and/or local dental providers.

      l)      "Other" project option: Implement other evidence-based project to enhance oral health services in an innovative manner not described in the project options

above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note 1: All of the project options in project area 1.8 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note 2: The following project components to implement or enhance efforts to improve quality of care and quality assurance in the delivery of dental care may be included as a part of the above project options:

- Integrating oral health information with electronic medical record.
- Establishing dental care coordination collaboratives where dental case studies are reviewed by dental and medical healthcare providers in an effort to identify best practices and to evaluate health outcomes as a result of the dental interventions and services provided.

**1.9    Expand Specialty Care Capacity**

**Project Goal:**
To increase the capacity to provide specialty care services and the availability of targeted specialty providers to better accommodate the high demand for specialty care services so that patients have increased access to specialty services. With regard to specialty areas of greatest need, the recent report of the Committee on Physician Distribution and Health Care Access cites psychiatry, general/preventive medicine, and child/adolescent psychiatry where the ratios per 100,000 population are 56.7%, 60.2%, and 67% of the US ratios, respectively. Federal funding (Medicare Direct Graduate Medical Education or DGME) for residency training is capped at 1996 levels for the direct support of graduate medical education. The cap only supports a third of the costs of 4,056 of the 4,598 actual positions in Texas, leaving the residency programs to cover the cost of two-thirds of the 4,056 positions and the full cost of 542 positions. Texas is currently over its Medicare cap by 13%.

Residency programs require 3 to 8 years of training, depending on the specialty. Medicare funding only covers years 1 through 3. In 2011, Texas had more than 550 residency programs, offering a total of 6,788 positions. Only 22% (1,494) of theses were first-year residency positions. According to the Coordinating Board, conservative estimates indicate that the cost to educate a resident physician for one year is $150,000.

Hence, a great need for extended residency programs in Texas and increase in the number of specialists.

**Project Options:**
   a)     Expand high impact specialty care capacity in most impacted medical specialties
          Required core project components:
   a)     Identify high impact/most impacted specialty services and gaps in care and coordination
   b)     Increase the number of residents/trainees choosing targeted shortage specialties
   c)     Design workforce enhancement initiatives to support access to specialty providers in underserved markets and areas (recruitment and retention)
   d)     Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.
   b)     Improve access to specialty care
          Required core project components:
          a)     Increase service availability with extended hours
          b)     Increase number of specialty clinic locations
          c)     Implement transparent, standardized referrals across the system.

      d)      Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

   c)     "Other" project option: Implement other evidence-based project to expand specialty care capacity in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-33 includes suggestions for improvement metrics to use with this innovative project option.

**Rationale:**

Inadequate access to specialty care has contributed to the limited scope and size of safety net health systems. To achieve success as an integrated network, gaps must be thoroughly assessed and addressed.

## 1.10  Enhance Performance Improvement and Reporting Capacity

**Project Goal: To expand quality improvement capacity through people, processes and technology so that the resources are in place to conduct, report, drive and measure quality improvement.**

The goal of this project is to implement process improvement methodologies to improve safety, quality, and efficiency.  Providers may design customized initiatives based on various process improvement methodologies such as Lean, Six Sigma, Care Logistics, and Nurses Improving Care for Health system Elders (NICHE) among others.

The Lean methodology as applied to medicine evaluates the use of resources, measures the value to the patient, considers the use of resources in terms of their value to the patient, and eliminates those that are wasteful.  Focus on Lean is especially valuable to safety net providers because of its emphasis on waste reduction.  Denver Health a safety net hospital in Denver, Colorado has identified more than $124 million in cost savings that the health system has achieved due to Lean Rapid Improvement Events since implementing Lean in 2005[13].  Using methodologies such as Lean that are proven to eliminate waste and redundancies and optimize patient flow, providers may customize a project that will develop and implement a program of continuous improvement that will increase communication, integrate system workflows, provide actionable data to providers and patients, and identify and improve models of patient-centered care that address issues of safety, quality, and efficiency. Implementation frequently requires a new "operational mindset" using tools such as Lean to identify and progressively eliminate inefficiencies while at the same time linking human performance, process performance and system performance into transformational performance in the delivery system.[14]  The process improvement, as a further example, may include elements such as identifying the value to the patient, managing the patient's journey, facilitating the smooth flow of patients and information, introducing "pull" in the patient's journey (e.g. advanced access), and/or continuously reducing waste by developing and amending processes awhile at the same time smoothing flow and enhancing quality and driving down cost.[15]

**Rationale:**
Performance improvement and reporting is a very large component of success of all of the project areas across the categories. The necessity for quality and safety improvement initiatives permeates health care.[2,3] Quality health care is defined as "the degree to which health services for individuals and populations increase the likelihood of desired health outcomes and are consistent with current professional knowledge"[3] (p. 1161). According to the Institute of Medicine (IOM)

[13] http://denverhealth.org/LEANAcademy.aspx
[14] Oujiri J, Ferrara C. "The Phoenix Project – Integrating Effective Disease Management Into Primary Care Using Lean Six-Sigma Tools." *Duluth Clinic Presentation.* 2010.
[15] Bibby J. "Lean in Primary Care:  The Basics – Sustaining Transformation." *Asian Hospital and Healthcare Management* (2011) 18.

report, To Err Is Human,[16] the majority of medical errors result from faulty systems and processes, not individuals.

Processes that are inefficient and variable, changing case mix of patients, health insurance, differences in provider education and experience, and numerous other factors contribute to the complexity of health care. With this in mind, the IOM also asserted that today's health care industry functions at a lower level than it can and should, and it put forth the following six aims of health care: effective, safe, patient-centered, timely, efficient, and equitable.[3] The aims of effectiveness and safety are targeted through process-of-care measures, assessing whether providers of health care perform processes that have been demonstrated to achieve the desired aims and avoid those processes that are predisposed toward harm. The goals of measuring health care quality are to determine the effects of health care on desired outcomes and to assess the degree to which health care adheres to processes based on scientific evidence or agreed to by professional consensus and is consistent with patient preferences.

Because errors are caused by system or process failures, it is important to adopt various process-improvement techniques to identify inefficiencies, ineffective care, and preventable errors to then influence changes associated with systems. Each of these techniques involves assessing performance and using findings to inform change. This chapter will discuss strategies and tools for quality improvement—including failure modes and effects analysis, Plan-Do-Study-Act, Six Sigma, Lean, and root-cause analysis—that have been used to improve the quality and safety of health care.[17]

Whatever the acronym of the method (e.g., TQM, CQI) or tool used (e.g., FMEA or Six Sigma), the important component of quality improvement is a dynamic process that often employs more than one quality improvement tool. Quality improvement requires five essential elements for success: fostering and sustaining a culture of change and safety, developing and clarifying an understanding of the problem, involving key stakeholders, testing change strategies, and continuous monitoring of performance and reporting of findings to sustain the change.

**Project Options:**
a)   Enhance improvement capacity within people
     Required core project components
     a)   Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.
     b)   Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care

---

[16] Hughes RG. Tools and Strategies for Quality Improvement and Patient Safety. In: Hughes RG, editor. Patient Safety and Quality: An Evidence-Based Handbook for Nurses. Rockville (MD): Agency for Healthcare Research and Quality (US); 2008 Apr. Chapter 44. Available from: http://www.ncbi.nlm.nih.gov/books/NBK2682/

[17] Hughes RG. Tools and Strategies for Quality Improvement and Patient Safety. In: Hughes RG, editor. Patient Safety and Quality: An Evidence-Based Handbook for Nurses. Rockville (MD): Agency for Healthcare Research and Quality (US); 2008 Apr. Chapter 44. Available from: http://www.ncbi.nlm.nih.gov/books/NBK2682/

and satisfaction, efficiency and other issues aligned with continuous process improvement.

b)   Enhance improvement capacity through technology
     Required core project components
     a)   Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.
     b)   Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.
     c)   Design data collection systems to collect real-time data that is used to drive continuous quality improvement (possible examples include weekly run charts or monthly dashboards)

c)   Enhance improvement capacity within systems
     Required core project components
     d)   Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.
     e)   Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.

f)   "Other" project option:  Implement other evidence-based project to enhance performance improvement and reporting capacity in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area1.10 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

## CATEGORY 1: BEHAVIORAL HEALTH INFRASTRUCTURE PROJECTS

**GOAL: Improve the infrastructure for delivery of mental health and substance use disorder (AKA behavioral health) services.**

The goals of infrastructure-related mental health and substance use disorder (behavioral health) projects are to improve the access to appropriate behavioral health interventions and specialists throughout Texas. This is an especially critical need in Texas for several reasons:

- State funding for behavioral health indigent care is limited. Texas ranks 50th in per capita funding for state mental health authority (DSHS) services and supports for people with serious and persistent mental illness and substance use disorders. Medically indigent individuals who are not eligible for Medicaid have no guarantee of access to needed services and may face extended waiting periods.
- Texas ranks highest among states in the number of uninsured individuals per capita. One in four Texans lack health insurance. People with behavioral health disorders are disproportionately affected. For example, 60 percent of seriously mentally ill adults served in the public mental health system are uninsured.[18]
- The supply of behavioral health care providers is inadequate in most of the State. In April of 2011, 195 (77%) of Texas' 254 counties held federal designations as whole county Health Provider Shortage Areas (HPSAs). This is an increase from the 183 counties designated in 2002.[19]



Texas Population
(age 18+)
18,789,238

Estimated Number
with Serious and
Persistent
Mental Illness
488,520

Number Served in
DSHS-Funded
Community Mental
Health Services
(including NorthSTAR)
157,131
(32.2% Need Met)

Projects / project elements under this heading are designed to increase the supply of behavioral health professionals practicing in the State, extend the capacity of behavioral health providers to offer expertise to other health care providers, such as primary care physicians and enhance the capacity of behavioral health and other providers to effectively serve patients with behavioral health conditions. Examples of such projects could include training and residency programs for behavioral health providers, programs which expand access to certified peer support services, telehealth consultation programs in which behavioral health providers offer timely expertise to primary care providers and extended clinic hours / mobile clinics.

---

18 DSHS Decision Support, 2012
19 **"Highlights: The Supply of Mental Health Professionals in Texas -2010", Texas Department of State Health Services Center for Health Statistics, E-Publication No. E25-12347. Accessed at:**
http://www.dshs.state.tx.us/chs/hprc/publicat.shtm

**1.11  Implement technology-assisted services (telehealth, telemonitoring, telementoring, or telemedicine) to support, coordinate, or deliver behavioral health services**

**Project Goal:**
Texas faces several access barriers that make the deployment of workable integrated health care models a challenge. Specifically, Texas is composed of 254 counties, the majority of which can be classified as either "rural" or "frontier". The availability of health care providers is severely limited in many of these sparsely populated areas. While these shortages make access to physical healthcare difficult for those who reside in these rural areas, the impact on individuals with behavioral health needs is even more severe. For example, in 2009, 171 Texas counties did not have a psychiatrist, 102 counties did not have a psychologist, 40 counties did not have a social worker and 48 counties did not have a licensed professional counselor.

There are 195 Texas counties (77% of all Texas counties) that have been designated by the Health Resources and Services Administration (HRSA) as Health Professional Shortage Areas (HPSAs) in relation to behavioral health. Furthermore, certain specialties (such as Child Psychiatrists) are virtually non-existent in the vast majority of the rural and frontier areas of the state.

Additionally, the size of the state makes travel from these underserved areas to larger urban settings difficult. For individuals who lack reliable transportation or have disabilities that restrict driving, the challenge of accessing health care may be virtually insurmountable.

Furthermore, there are many non-rural areas of the state where the availability of health care professionals is greatly limited. For example, in Bexar country, which has one of the largest urban populations in Texas, there are 123 areas within the county that have been designated as HPSAs by HRSA. Similar shortages can be found in most Texas urban counties.

Modern communications technology holds the greatest promise of bridging the gap between medical need in underserved areas and the provision of needed services. The developments in internet-based communications that began with voice messaging have been extended to video in the form of widely available video compression technologies that allow for high quality, real time, face-to-face communications and consultations over relatively inexpensive telecommunications equipment. With this new technology, in any area of the state where high speed broadband internet access is available, access to many forms of health care can become a reality. To leverage the promise of this new technology, Texas would like to expand the use of telemedicine, telehealth, and telemonitoring to thereby increase access to, and coordination of, physical and behavioral healthcare.

Televideo technology can be used to provide a variety of what have been referred to as "Telemental Health" services. These services may include mental health assessments, treatment, education, monitoring, mentoring and collaboration. These services may be used in a variety of locations (schools, nursing facilities, and even in homes) in any geographical location where traditional service providers are in short supply. Providers can include psychiatrists, nurse

practitioners, physician assistants, social workers, pharmacists, psychologists, counselors, PCPs, and nurses. For example, telemental health could be used to provide follow-up outpatient consults with a psychiatrist or other mental health professional within 7 or 30 days of discharge from the inpatient hospital. These virtual follow-up visits could focus on monitoring for remission of symptoms, adjusting psychotropic medications, and developing a treatment plan to prevent readmissions in partnership with the primary care provider. Telemental services could also be used to provide medication management services to community mental health patients with severe mental illness to ensure appropriate medication treatment and compliance, preventing psychiatric crises which would require psychiatric hospitalization.

The use of telemedicine could provide direct video access to a psychiatrist while the use of telementoring would provide a General Practitioner with access to consultation with psychiatrists with expertise in managing complex medication regimens. Additionally, telehealth could provide direct access to Cognitive Behavioral Therapy and other evidence-based counseling protocols that have proven to be effective in addressing major depression, trauma, and even schizophrenia in some populations.

Telecommunications technology can also be used to foster peer support and mentoring efforts among providers and among consumers (e.g., support groups, peer mentors).

For example, The University of New Mexico has successfully utilized a telementoring program (Project ECHO) to successfully train and provide ongoing support to Primary Care Physicians (PCPs) who provide care to persons with addiction. This initiative provides weekly didactic sessions as well as case presentations to address challenging clinical cases and get feedback from specialists based at the University and from colleagues around the state.[20]

**Project Options:**

  a)   Procure and build the infrastructure needed to pilot or bring to scale a successful pilot of the selected forms of service in underserved areas of the state (this must be combined with one of the two interventions below). Required core project components:

   a)   Identify existing infrastructure for high speed broadband communications technology (such as T-3 lines, T-1 lines) in rural, frontier, and other underserved areas of the state;

   b)   Assess the local availability of and need for video communications equipment in areas of the state that already have (or will have) access to high speed broadband technology.

   c)   Assess applicable models for deployment of telemedicine, telehealth, and telemonitoring equipment.

---

[20]  **Project ECHO: a model for expanding access to addiction treatment in a rural state**
Miriam Komaromy, MD, 2010.

b)      Implement technology-assisted behavioral health services from psychologists, psychiatrists, substance abuse counselors, peers and other qualified providers). Required core project components:

      a)      Develop or adapt administrative and clinical protocols that will serve as a manual of technology-assisted operations.

      b)      Determine if a pilot of the telehealth, telemonitoring, telementoring, or telemedicine operations is needed. Engage in rapid cycle improvement to evaluate the processes and procedures and make any necessary modifications.

      c)      Identify and train qualified behavioral health providers and peers that will connect to provide telemedicine, telehealth, telementoring or telemonitoring to primary care providers, specialty health providers (e.g., cardiologists, endocrinologists, etc.), peers or behavioral health providers. Connections could be provider to provider, provider to patient, or peer to peer.

      d)      Identify modifiers needed to track encounters performed via telehealth technology

      e)      Develop and implement data collection and reporting standards for electronically delivered services

      f)      Review the intervention(s) impact on access to specialty care and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

      g)      Scale up the program, if needed, to serve a larger patient population, consolidating the lessons learned from the pilot into a fully-functional telehealth, telemonitoring, telementoring, or telemedicine program. Continue to engage in rapid cycle improvement to guide continuous quality improvement of the administrative and clinical processes and procedures as well as actual operations.

      h)      Assess impact on patient experience outcomes (e.g. preventable inpatient readmissions)

c)      "Other" project option: Implement other evidence-based project to implement technology-assisted services to support, coordinate, or deliver behavioral health services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 1.11 should include a component to conduct quality improvement for the project using methods such as rapid cycle

improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**1.12 Enhance service availability (i.e., hours, locations, transportation, mobile clinics) of appropriate levels of behavioral health care**

**Project Goal**

Positive healthcare outcomes are contingent on the ability of the patient to obtain both routine examinations and healthcare services as soon as possible after a specific need for care has been identified. However, many Texans are unable to access either routine services or needed care in a timely manner either because they lack transportation or because they are unable to schedule an appointment due to work scheduling conflicts (or school scheduling conflicts in the case of children) or because they have obligations to provide care for children or elderly relatives during normal work hours. While such barriers to access can compromise anyone's ability to make or keep scheduled appointments, individuals with behavioral health needs may be especially negatively affected. Many individual with behavioral health needs are reticent to seek treatment in the first place and such barriers may be sufficient to prevent access entirely. Others may be easily discouraged by such barriers and may drop out of treatment. Any such delay in accessing services or any break or disruption in services may result in functional loss and the worsening of symptoms. These negative health outcomes come at great personal cost to the individual and also result in increased costs to payers when care is finally obtained.

In order to mitigate the effects of these barriers to accessing care, Texas proposes to take specific steps to broaden access to care that will include an expansion of operating hours in a select number of clinics, an expansion of community-based service options (including the development of mobile clinics), and an expanded transportation program that will support appointments that are scheduled outside of normal business hours.

**Project Options:**

a) Establish extended operating hours at a select number of Local Mental Health Center clinics or other community-based settings in areas of the State where access to care is likely to be limited.

Required core project component:

    a) Evaluate existing transportation programs and ensure that transportation to and from medical appointments is made available outside of normal operating hours. If transportation is a significant issue in care access, develop and implement improvements as part of larger project.

    b) Review the intervention(s) impact on access to behavioral health services and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

b) Expand the number of community based settings where behavioral health services may be delivered in underserved areas

c) Develop and staff a number of mobile clinics that can provide access to care in very remote, inaccessible, or impoverished areas of Texas.

d)      "Other" project option:  Implement other evidence-based project to enhance service availability of appropriate levels of behavioral health care in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

## 1.13  Development of behavioral health crisis stabilization services as alternatives to hospitalization.

**Project Goal**

When a consumer lacks appropriate behavioral health crisis resolution mechanisms, first responders are often limited in their options to resolve the situation.  Sometimes the choice comes down to the ER, jail or an inpatient hospital bed. Crisis stabilization services can be developed that create alternatives to these less desirable settings.  Building on existing systems, communities can develop crisis alternatives such as sobering units, crisis residential settings and crisis respite programs with varying degrees of clinical services based on the needs of clients. While hospitalization provides a high degree of safety for the person in crisis, it is very expensive and is often more than what is needed to address the crisis. Community-base crisis alternatives can effectively reduce expensive and undesirable outcomes, such as preventable inpatient stays. For example, state psychiatric hospital recidivism trended downward coincident with implementation of crisis outpatient services in some Texas communities. The percent of persons readmitted to a Texas state psychiatric hospital within 30 days decreased from 8.0% in SFY2008 (before implementation of alternatives) to 6.9% in SFY2011.[21]



*Figure 2.* Number of persons accessing crisis outpatient services and transitional services at DSHS-funded community mental health centers compared to percent of persons readmitted to a state psychiatric hospital within 30 days, SFY2008-2011.

**Project Options**

a)   Develop and implement crisis stabilization services to address the identified gaps in the current community crisis system
Required core project components:
a)   Convene community stakeholders who can support the development of crisis stabilization services to conduct a gap analysis of the current community crisis system and develop a specific action plan that identifies specific crisis stabilization services to  address identified

gaps (e.g. for example, one community with high rates of incarceration and/or ED visits for intoxicated patients may need a sobering unit while another community with high rates of hospitalizations for mild exacerbations mental illness that could be treated in community setting may need crisis residential programs).

b)   Analyze the current system of crisis stabilization services available in the community including capacity of each service, current utilization patterns, eligibility criteria and discharge criteria for each service.

c)   Assess the behavioral health needs of patients currently receiving crisis services in the jails, EDs, or psychiatric hospitals. Determine the types and volume of services needed to resolve crises in community-based settings. Then conduct a gap analysis that will result in a data-driven plan to develop specific community-based crisis stabilization alternatives that will meet the behavioral health needs of the patients (e.g. a minor emergency stabilization site for first responders to utilize as an alternative to costly and time consuming Emergency Department settings)

d)   Explore potential crisis alternative service models and determine acceptable and feasible models for implementation.

e)   Review the intervention(s) impact on access to and quality of behavioral health crisis stabilization services and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations

b)   "Other" project option: Implement other evidence-based project to develop behavioral health crisis stabilization services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 1.13 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**1.14 Develop Workforce enhancement initiatives to support access to behavioral health providers in underserved markets and areas (e.g., psychiatrists, psychologists, LMSWs, LPCs and LMFTs.)**

**Project Goal:**
The goal of this project is to enhance access and reduce shortages in specialty behavioral health care to improve local integration of behavioral health care into the overall health delivery system; improve consumer choice and increase availability of effective, lower-cost alternatives to inpatient care, prevent inpatient admissions when possible and promote recovery from behavioral health disorders. The supply of behavioral health care providers is inadequate in most of the State. In 2011, 195 (77%) of Texas' 254 counties held federal designations as whole county Health Provider Shortage Areas (HPSAs) in relation to behavioral health.[22] Indeed, Texas ranks far below the national average in the number of mental health professionals per 100,000 residents. These shortages are even greater in rural, poor and Texas – Mexico border communities.

**Project Options:**

a) Implement strategies defined in the plan to encourage behavioral health practitioners to serve medically indigent public health consumers in HPSA areas or in localities within non-HPSA counties which do not have access equal to the rest of the county. Examples of strategies could include marketing campaigns to attract providers, enhanced residency programs or structured financial and non-financial incentive programs to attract and retain providers, identifying and engaging individual health care workers early in their studies/careers and providing training in identification and management of behavioral health conditions to other non-behavioral health disciplines (e.g., ANPs, PAs).

Required core project components:

a) Conduct a qualitative and quantitative gap analysis to identify needed behavioral health specialty vocations lacking in the health care region and the issues contributing to the gaps.

b) Develop plan to remediate gaps identified and data reporting mechanism to assess progress toward goal. This plan will specifically identify:

• The severity of shortages of behavioral health specialists in a region by type (psychiatrists, licensed psychologists, nurse practitioners, physicians assistants, nurses, social workers, licensed professional counselors, licensed marriage and family therapists, licensed chemical dependency counselors, peer support specialists, community health workers etc.)

• Recruitment targets by specialty over a specified time period.

---

[22] "Highlights: The Supply of Mental Health Professionals in Texas -2010", Texas Department of State Health Services Center for Health Statistics, E-Publication No. E25-12347. Accessed at:
http://www.dshs.state.tx.us/chs/hprc/publicat.shtm

- Strategies for recruiting healthcare specialists
- Strategies for developing training for primary care providers to enhance their understanding of and competency in the delivery of behavioral health services and thereby expand their scope of practice.

c) Assess and refine strategies implemented using quantitative and qualitative data. Review the intervention(s) impact on behavioral health workforce in HPSA areas and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations

b) "Other" project option: Implement other evidence-based project to develop workforce enhancement initiatives to support access to behavioral health providers in underserved markets in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

**Category 2 Innovation and Redesign**

## Category 2 Table of Contents

2.1    Enhance/Expand Medical Homes .................................................................................. 52

2.2    Expand Chronic Care Management Models ................................................................ 56

2.3    Redesign Primary Care ............................................................................................... 59

2.4    Redesign to Improve Patient Experience .................................................................... 61

2.5    Redesign for Cost Containment ................................................................................... 63

2.6    Implement Evidence-based Health Promotion Programs ............................................ 65

2.7    Implement Evidence-based Disease Prevention Programs ......................................... 67

2.8    Apply Process Improvement Methodology to Improve Quality/Efficiency.................... 69

2.9    Establish/Expand a Patient Care Navigation Program................................................. 75

2.10   Use of Palliative Care Programs .................................................................................. 77

2.11   Conduct Medication Management ............................................................................... 80

2.12   Implement/Expand Care Transitions Programs ........................................................... 83

2.13   Provide an intervention for a targeted behavioral health population to prevent unnecessary use of services in a specified setting (i.e., the criminal justice system, ER, urgent care etc.). ..... 91

2.14   Implement person-centered wellness self-management strategies and self directed financing models that empower consumers to take charge of their own health care. .................. 95

2.15   Integrate Primary and Behavioral Health Care Services ................................................. 98

2.16   Provide virtual psychiatric and clinical guidance to all participating primary care providers delivering services to behavioral patients regionally................................................. 102

2.17   Establish improvements in care transition from the inpatient setting for individuals with mental health and / or substance abuse disorders. .................................................................... 105

2.18   Recruit, train and support consumers of mental health services to provide peer support services........................................................................................................................................ 108

2.19   Develop Care Management Function that integrates primary and behavioral health needs of individuals .......................................................................................................................... 110

## 2.1    Enhance/Expand Medical Homes

**Project Goal:**
The goal of projects under this heading is to expand or enhance the delivery of care provided through the Patient-Centered Medical Home (PCMH) model[23]. The PCMH provides a primary care "home base" for patients. Under this model, patients are assigned a health care team who tailors services to a patient's unique health care needs, effectively coordinates the patient's care across inpatient and outpatient settings, and proactively provides preventive, primary, routine and chronic care.

**Project Options:**

a)    Develop, implement, and evaluate action plans to enhance/eliminate gaps in the development of various aspects of PCMH standards.
Required core project components:
   **a)**    Utilize a gap analysis to assess and/or measure hospital-affiliated and/or PCPs' NCQA PCMH readiness.
   **b)**    Conduct feasibility studies to determine necessary steps to achieve NCQA PCMH status
   **c)**    Conduct educational sessions for primary care physician practice offices, hospital boards of directors, medical staff and senior leadership on the elements of PCMH, its rationale and vision.
   **d)**    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)    Collaborate with an affiliated Patient-Centered Medical Home to integrate care management and coordination for shared, high-risk patients.
Required core project components:
   **a)**    Improve data exchange between hospitals and affiliated medical home sites.
   **b)**    Develop best practices plan to eliminate gaps in the readiness assessment.
   **c)**    Hire and train team members to create multidisciplinary teams including social workers, health coaches, care managers, and nurses with a diverse skill set that can meet the needs of the shared, high-risk patients
   **d)**    Implement a comprehensive, multidisciplinary intervention to address the needs of the shared, high-risk patients

---

23 http://www.aafp.org/online/etc/medialib/aafp_org/documents/about/pcmh.Par.0001.File.dat/PCMH.pdf

       **e)**      Evaluate the success of the intervention at decreasing ED and inpatient hospitalization by shared, high-risk patients and use this data in rapid-cycle improvement to improve the intervention.

       **f)**      Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

c)      Implement medical homes in HPSA and other rural and impoverished areas using evidence-approached change concepts for practice transformation developed by the Commonwealth Fund's Safety Net Medical Home Initiative: Required core project components:

       **a)**      Empanelment: Assign all patients to a primary care provider within the medical home. Understand practice supply and demand, and balance patient load accordingly.

       **b)**      Restructure staffing into multidisciplinary care teams that manage a panel of patients where providers and staff operate at the top of their license. Define roles and distribute tasks among care team members to reflect the skills, abilities, and credentials of team members.

       **c)**      Link patients to a provider and care team so both patients and provider/care team recognizes each other as partners in care.

       **d)**      Assure that patients are able to see their provider or care team whenever possible.

       **e)**      Promote and expand access to the medical home by ensuring that established patients have 24/7 continuous access to their care teams via phone, e-mail, or in-person visits.

       **f)**      Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

d)      "Other" project option: Implement other evidence-based project to enhance/expand medical home in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-19 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.1 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note: PCMH models include investments in projects that are the foundation of delivery system change and a complete package of change. Therefore, it is preferable to pursue a full continuum of projects (PCMH readiness preparations, the establishment or expansion of medical homes which may include gap analyses and eventual application for PCMH recognition[24] to a nationally recognized organization such as NCQA, as well as educating various constituent groups within hospitals and primary care practices about the essential elements of the NCQA medical home standards). [25,26,27,28,29,30,31]

**Rationale:**
Federal, state, and health care providers share goals to promote more patient-centered care focused on wellness and coordinated care.   In addition, the PCMH model is viewed as a foundation for the ability to accept alternative payment models under payment reform.  PCMH development is a multi-year transformational effort and is viewed as a foundational way to deliver care aligned with payment reform models and the Triple Aim goals of better health, better patient experience of care, and ultimately better cost-effectiveness. By providing the right care at the right time and in the right setting, over time, patients may see their health improve, rely less on costly ED visits, incur fewer avoidable hospital stays, and report greater patient satisfaction. These projects all are focused on the concepts of the PCMH model; yet, they take different shapes for different providers.[32]

This initiative aims to eliminate fragmented and uncoordinated care, which can lead to emergency department and hospital over-utilization. The projects associated with Medical Homes establish a foundation for transforming the primary care landscape in Texas by emphasizing enhanced chronic disease management through team-based care.

---

24 http://www.medicalhomeinfo.org/national/recognition_programs.aspx
25 http://www.commonwealthfund.org/Topics/Patient-Centered-Care.aspx
26 http://www.qhmedicalhome.org/pcmh-qualis-health/change-concepts
27 http://www.pcmh.ahrq.gov/portal/server.pt/community/pcmh__home/1483
28 http://www.medicalhomeforall.com/
29 http://www.acponline.org/running_practice/pcmh/
30 http://www.pediatricmedhome.org/
31 Transformed: http://www.transformed.com/index.cfm
32 http://www.pcpcc.net/content/pcmh-vision-reality

**Category 2**

## 2.2    Expand Chronic Care Management Models[33]

**Project Goal:**
The goal of this project is to develop and implement chronic disease management interventions that are geared toward improving effective management of chronic conditions and ultimately improving patient clinical indicators, health outcomes and quality, and reducing unnecessary acute and emergency care utilization. Chronic disease management initiatives use population-based approaches to create practical, supportive, evidence-based interactions between patients and providers to improve the management of chronic conditions and identify symptoms earlier, with the goal of preventing complications and managing utilization of acute and emergency care. Program elements may include the ability to identify one or more chronic health conditions or co-occurring chronic health conditions that merit intervention across a patient population, based on a an assessment of patients' risk of developing complications, co-morbidities or utilizing acute or emergency services. These chronic health conditions may include diabetes, congestive heart failure, chronic obstructive pulmonary disease, among others, all of which are prone to co-occurring health conditions and risks.

**Project Options:**

a)      Redesign the outpatient delivery system to coordinate care for patients with chronic diseases
Required core project components:

a)      Design and implement care teams that are tailored to the patient's health care needs, including non-physician health professionals, such as pharmacists doing medication management; case managers providing care outside of the clinic setting via phone, email, and home visits; nutritionists offering culturally and linguistically appropriate education; and health coaches helping patients to navigate the health care system

b)      Ensure that patients can access their care teams in person or by phone or email

c)      Increase patient engagement, such as through patient education, group visits, self-management support, improved patient-provider communication techniques, and coordination with community resources

d)      Implement projects to empower patients to make lifestyle changes to stay healthy and self-manage their chronic conditions

e)      Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion

---

33  Some chronic diseases addressed by chronic care management models in RHP plans may include diabetes, hypertension, heart failure, asthma, post-secondary stroke, community-acquired pneumonia (CAP), HIV/AIDS, and chronic pain.

of the project, including special considerations for safety-net populations.

b)      Apply evidence-based care management model to patients identified as having high-risk health care needs

c)      Redesign rehabilitation delivery models for persons with disabilities

d)      Develop a continuum of care in the community for persons with serious and persistent mental illness and co-occurring disorders

e)      Develop care management functions that integrate the primary and behavioral health needs of individuals

f)      "Other" project option:  Implement other evidence-based project to expand chronic care management models in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-21 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.2 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

## Rationale:

Promoting effective change in provider groups to support evidence-based clinical and quality improvement across a wide variety of health care settings. There are many definitions of "chronic condition", some more expansive than others. We characterize it as any condition that requires ongoing adjustments by the affected person and interactions with the health care system. The most recent data show that more than 145 million people, or almost half of all Americans, live with a chronic condition. That number is projected to increase by more than one percent per year by 2030, resulting in an estimated chronically ill population of 171 million. Almost half of all people with chronic illness have multiple conditions. As a result, many managed care and integrated delivery systems have taken a great interest in correcting the many deficiencies in current management of diseases such as diabetes, heart disease, depression, asthma and others. Those deficiencies include:

- Rushed practitioners not following established practice guidelines
- Lack of care coordination
- Lack of active follow-up to ensure the best outcomes
- Patients inadequately trained to manage their illnesses

Overcoming these deficiencies will require nothing less than a transformation of health care, from a system that is essentially reactive - responding mainly when a person is sick - to one that is proactive and focused on keeping a person as healthy as possible. To speed the transition,

Improving Chronic Illness Care created the Chronic Care Model, which summarizes the basic elements for improving care in health systems at the community, organization, practice and patient levels. Evidence on the effectiveness of the Chronic Care Model has recently been summarized. [34]

34 http://content.healthaffairs.org/content/28/1/75.full

## 2.3    Redesign Primary Care

**Project Goal:**
Increase efficiency and redesign primary care clinics programs to be oriented around the patient so that primary care access and the patient experience can be improved.

**Project Options:**

    a)    Redesign primary care in order to achieve improvements in efficiency, access, continuity of care, and patient experience
Required core project components:

        **a)**    Implement the patient-centered scheduling model in primary care clinics
        **b)**    Implement patient visit redesign
        **c)**    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

    b)    "Other" project option:  Implement other evidence-based project to redesign primary care in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-18 includes suggestions for improvement metrics to use with this innovative project option.

    Note:  All of the project options in project area 2.3 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Primary care in the United States faces serious challenges. Many physician practices struggle to ensure that their patients have prompt access to care, consistently high-quality chronic and preventative services, and adequate coordination of care.  This struggle impacts patients who may experience barriers in accessing primary care services secondary to transportation, the lack of an assigned provider, inability to receive appointments in a timely manner and a lack of knowledge about what types of services can be provided in the primary care setting. By enhancing access points, available appointment times, patient awareness of available services

and overall primary care capacity, patients and their families will align themselves with the primary care system resulting in improved health access, improved health outcome and reduced costs of services.

**2.4    Redesign to Improve Patient Experience**

**Project Goal:**
Improve how the patient experiences the care and the patient's satisfaction with the care provided.  The state healthcare transformation is counting on a robust primary care sector to improve quality, reduce costs, and improve patient experience. This will require a redesign of primary care to meet the needs of patients for timely, patient-centered, continuous, and coordinated care to enhance access to care regardless of type of insurance. The overall approach to redesigning patient experience will be centered on cultural change at the organizational level. This will involve the practitioners in a clinic as well as the patients and their families or caregivers. An organizational strategy will be developed so that entities will manage patient experience and create avenues to implement the strategic plan/vision. Providers' performance will be measured, among other factors, by the extent to which patient experience improves systematically.

Patient experience with care will be assessed through focused surveys. The architecture for patient focused surveys should be modeled after the Consumer Assessment of Healthcare Providers and Systems (CAHPS) tool, which includes the following domains: patients are getting timely care, appointments, and information; how well providers communicate with patients; patients' rating of provider; and assessment office staff. [35] The Clinician and Group Consumer Assessment of Health Care Providers and Systems (CG CAHPS) survey[36] can be used to assess patient and caregiver experience of care in outpatient settings while HCAHPS can be employed to measure patient experience in the hospital setting. Certain supplemental modules for the adult survey CG-CAHPS may be used to establish additional outcomes: Health Literacy, Cultural Competence, Health Information Technology, and Patient Centered Medical Home.

These surveys will be mandatory, and will be administered at the end of the medical episode, six weeks after the visit (to avoid recall bias) and six months if no other episode of care intervened.

**Project Options:**
> a)     Implement processes to measure and improve patient experience
>        Required core project components:
>> **a)**    Organizational integration and prioritization of patient experience
>> **b)**    Data and performance measurement will be collected by utilizing patient experience of care measures from the Hospital Consumer Assessment of Healthcare Providers and Systems (HCAHPS) in addition to CAHPS and/or other systems and methodologies to measure patient experience;
>> **c)**    Implementing processes to improve patient's experience in getting through to the clinical practice;
>> **d)**    Develop a process to certify independent survey vendors that will be capable of administering the patient experience of care survey in

---

[35] https://cahps.ahrq.gov/clinician_group/cgsurvey/patientexperiencemeasurescgsurveys.pdf
[36] https://cahps.ahrq.gov/clinician_group/

               accordance with the standardized sampling and survey administration procedures.

b)       Implement other evidence based project to improve patient experience in an innovative manner not described above.  Note, providers opting to implement an innovative project under this option must propose relevant process metrics and report on the improvement metrics listed under milestone I-X.

c)       Project Option: Increased patient satisfaction
Implement an innovative and evidence based intervention that will lead to improvements in patient satisfaction for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category ,3  Outcome Domain – 6 Patient Satisfaction**. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

d)       "Other" project option:  Implement other evidence-based project to redesign to improve patient experience in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-20 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.4 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Over time, implemented projects have the potential to yield improvements in the level of care integration and coordination for patients and ultimately lead to better health and better patient experience of care.

## 2.5    Redesign for Cost Containment

**Project Goal:**
Improve cost-effectiveness of care through improved care delivery for individuals, families, employers, and the government.  Measures that provide insights both into improved opportunities for health care delivery and health care cost-effectiveness are an area of particular focus in the TX-DSRIP. Many of the projects include a specific focus on improving population health inside and outside of the walls of the hospital therefore, it will be important to examine measures that develop the capability to test methodologies for measuring cost containment. These methodologies may be subsequently applied to other projects or efforts so that the ability to measure the efficacy of these initiatives is in place, so integrated care models that use data-based cost and quality measures can be developed.

**Project Options:**
  a)        Develop an integrated care model with outcome-based payments
            Required core project components:
            **a)**     Implement cost-accounting systems to measure intervention impacts
            **b)**     Establish a method to measure cost containment
            **c)**     Establish a baseline for cost
            **d)**     Measure cost containment
  b)        Implement other evidence based project to redesign for cost containment in an innovative manner not described above.  Note, providers opting to implement an innovative project under this option must propose relevant process metrics and report on the improvement metrics listed under milestone I-11.
  c)        Project Option: Cost Savings
            Implement an innovative and evidence based intervention that will lead to **cost savings** for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain – 5 Cost of Care** [37]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

  d)         "Other" project option:  Implement other evidence-based project to will impact cost efficiency in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their

---

[37] Category 3 Outcome Measures document

project.  Milestone I-11 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.5 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.


**Rationale:**
Health care spending for a given population might be roughly defined as a function of five basic factors[38]:

- Population needs or morbidity,
- Access to services,
- Propensity to seek services,
- Volume, nature, or intensity of services supplied or ordered, and
- Unit cost or price of services.

For the purpose of this project area, "cost containment" will be defined as any set of policies or measures intended to affect any one or more of these factors.

---

38 http://www.policyarchive.org/handle/10207/bitstreams/21904.pdf

## 2.6    Implement Evidence-based Health Promotion Programs

**Project Goal:**
Implement innovative evidence based health promotion strategies such as use of community health workers, innovations in social media and messaging for targeted populations.

**Project Options:**

a)      Engage in population-based campaigns or programs to promote healthy lifestyles using evidence-based methodologies including social media and text messaging in an identified population.

b)      Establish self-management programs and wellness using evidence-based designs.

c)      Engage community health workers in an evidence-based program to increase health literacy of a targeted population.

d)      "Other" project option:  Implement other evidence-based project to implement evidence-based health promotion programs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-8 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.6 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note:  All of the project options in 2.6 should include a component to conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
The current prevention and treatment system is an unconnected, silo-based approach, which reduces the effectiveness and increases the cost of health care. [1] As the US health care system strives to deliver better health, improved care and lower costs, the potential exists for innovative evidenced based health promotion strategies to further these goals.

Delivery Mechanisms: Community health workers can increase access to care and facilitate appropriate use of health resources by providing outreach and cultural linkages between communities and delivery systems; reduce costs by providing health education, screening, detection, and basic emergency care; and improve quality by contributing to patient-provider communication, continuity of care, and consumer protection. Information sharing, program support, program evaluation, and continuing education are needed to expand the use of community health workers and better integrate them into the health care delivery system.

Self-Management education complements traditional patient education in supporting patients to live the best possible quality of life with their chronic condition. Whereas traditional patient education offers information and technical skills, self-management education teaches problem-solving skills. A central concept in self-management is self-efficacy—confidence to carry out a behavior necessary to reach a desired goal. Self-efficacy is enhanced when patients succeed in solving patient-identified problems. Evidence from controlled clinical trials suggests that[39] (1) programs teaching self-management skills are more effective than information-only patient education in improving clinical outcomes; (2) in some circumstances, self-management education improves outcomes and can reduce costs for arthritis and probably for adult asthma patients[40]; and (3) in initial studies, a self-management education program bringing together patients with a variety of chronic conditions may improve outcomes and reduce costs.[41]

---

39 1Thorpe, K, The Affordable Care Act lays the groundwork for a national diabetes prevention and treatment strategy. Health Aff January 2012 vol. 31 no. 1 61-66

40 2A Witmer, S D Seifer, L Finocchio, J Leslie, and E H O'Neil. Community health workers: integral members of the health care work force. American Journal of Public Health August 1995: Vol. 85, No. 8_Pt_1, pp. 1055-1058. doi: 10.2105/AJPH.85.8_Pt_1.1055

41 Bodenheimer T, Lorig K, Holman H, Grumbach K. Patient Self-management of Chronic Disease in Primary Care. JAMA. 2002; 288(19):2469-2475.

**2.7    Implement Evidence-based Disease Prevention Programs**

**Project Goal:**
Implement innovative evidence-based strategies in disease prevention areas including the following: diabetes, obesity, tobacco use, prenatal care, birth spacing, and health screenings.

**Project Options:**

a)      Implement innovative evidence-based strategies to increase appropriate use of technology and testing for targeted populations (e.g., mammography screens, colonoscopies, prenatal alcohol use, etc.)

b)      Implement innovative evidence-based strategies to reduce tobacco use.

c)      Implement innovative evidence-based strategies to increase early enrollment in prenatal care.

d)      Implement innovative evidence-based strategies to reduce low birth weight and preterm birth.

e)      Implement innovative evidence-based strategies to reduce and prevent obesity in children and adolescents.

f)      "Other" project option:  Implement other evidence-based project to implement evidence-based disease prevention programs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-7 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.7 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Disease management emphasizes prevention of disease-related exacerbations and complications using evidence-based guidelines and patient empowerment tools. It can help manage and improve the health status of a defined patient population over the entire course of a disease.[1]

By concentrating on the causes of chronic disease, the community moves from a focus on sickness and disease to one based on wellness and prevention. The  National Prevention Council strategy for Disease Prevention  focuses on four areas: building healthy and safe community environments, expanding quality preventive services in clinical and community settings, helping people make healthy choices, and eliminating health disparities. To achieve these aims, the

strategy identifies seven evidence-based recommendations that are likely to reduce the leading causes of preventable death and major illness, including tobacco-free living, drug- and excessive alcohol-use prevention, healthy eating, active living, injury and violence-free living, reproductive and sexual health, and mental and emotional well-being.[2]

Delivery Mechanisms: (note this list is not inclusive of all delivery mechanisms)

- Establish and use patient registry systems to enhance the provision of patient follow-up, screenings for related risk factors and to track patient improvement.
- Establish and implement clinical practice guidelines.
- Adopt the Chronic Care Model
- Develop a mapping process linking patients treated in the emergency rooms with RFPs to improve the continuum of care and standardized procedures and outcome measures.
- Promote RHP health system supports such as reminders of care, development of clinical performance measures, and the use of case management services to increase patient's adherence to health care guidelines.
- Establish evidence-based disease and disability prevention programs for targeted populations to reduce their risk of disease, injury, and disability.

2.8    Apply Process Improvement Methodology to Improve Quality/Efficiency

**Project Goal:**
The goal of this project is to implement process improvement methodologies to improve safety, quality, patient experience and efficiency.  Providers may design customized initiatives based on various process improvement methodologies such as Lean, Six Sigma, Continuous Improvement, Rapid Cycle, Care Logistics, Nurses Improving Care for Healthsystem Elders (NICHE) among others.

For example, the Lean methodology as applied to medicine evaluates the use of resources, measures the value to the patient, considers the use of resources in terms of their value to the patient, and eliminates those that are wasteful.  Using methodologies such as Lean that are proven to eliminate waste and redundancies and optimize patient flow, hospitals may customize a project that will develop and implement a program of continuous improvement that will increase communication, integrate system workflows, provide actionable data to providers and patients, and identify and improve models of patient-centered care that address issues of safety, quality, and efficiency.

Implementation frequently requires a new "operational mindset" using tools such as Lean to identify and progressively eliminate inefficiencies while at the same time linking human performance, process performance and system performance into transformational performance in the delivery system.[42]

The process improvement, as a further example, may include elements such as identifying the value to the patient, managing the patient's journey, facilitating the smooth flow of patients and information, introducing "pull" in the patient's journey (e.g. advanced access), and/or continuously reducing waste by developing and amending processes awhile at the same time smoothing flow and enhancing quality and driving down cost.[43]

Furthermore, projects designed and implemented using the Care Logistics™ patient-centered, care coordination model involves managing the simultaneous logistics of a patient moving through the hospital.  It may be used to help hospitals transform their operations to improve patient flow into cross departmental hubs and provide actionable data in real-time on key performance indicators, such as, but not limited to, length of stay, patient flow times, discharge process times, re-admission rates, and patient, provider and staff satisfaction.[44]

In addition, hospitals may design a process improvement initiative utilizing the NICHE program framework, which aims to facilitate the infusion of evidence-based geriatric best practices throughout institutions to improve nursing care for older adult patients.  NICHE is based on the

---

[42] Oujiri J, Ferrara C. "The Phoenix Project – Integrating Effective Disease Management Into Primary Care Using Lean Six-Sigma Tools." Duluth Clinic Presentation. 2010.
[43] Bibby J. "Lean in Primary Care:  The Basics – Sustaining Transformation." Asian Hospital and Healthcare Management (2011) 18.
[44] http://www.carelogistics.com/

use of principles and tools to support a systemic change in nursing practice and in the culture of healthcare facilities to achieve patient-centered care.[45]

**Project Options:**

a) Design, develop, and implement a program of continuous, rapid process improvement that will address issues of safety, quality, and efficiency. Required core project components:

   **a)** Provide training and education to clinical and administrative staff on process improvement strategies, methodologies, and culture.

   **b)** Develop an employee suggestion system that allows for the identification of issues that impact the work environment, patient care and satisfaction, efficiency and other issues aligned with continuous process improvement.

   **c)** Define key safety, quality, and efficiency performance measures and develop a system for continuous data collection, analysis, and dissemination of performance on these measures ((i.e. weekly or monthly dashboard).

   **d)** Develop standard workflow process maps, staffing and care coordination models, protocols, and documentation to support continuous process improvement.

   **e)** Implement software to integrate workflows and provide real-time performance feedback.

   **f)** Evaluate the impact of the process improvement program and assess opportunities to expand, refine, or change processes based on the results of key performance indicators.

b) "Other" project option:  Implement other evidence-based project to apply process improvement methodology to improve quality/efficiency in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-16 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.8 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

---

45 http://www.nicheprogram.org/

**Project Options tied to a customized outcome in a specified Category 3 domain**

c)        Project Option: Reduction in Potentially Preventable Admission Rates (PPAs)
Implement an innovative and evidence based intervention that will lead to **reductions** in Potentially Preventable Admissions (PPAs) for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain - 2, <u>Potentially Preventable Admissions</u>**[46]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y, and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

d)        Project Option: Reduction in 30-Day Hospital Readmission Rates (Potentially Preventable Readmissions)[47]
Implement an innovative and evidence based intervention that will lead to reductions in 30 Day Readmissions for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain- 3, <u>Potentially Preventable Readmissions</u>**[1]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y, and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

e)        Project Option: Reduction in Potentially Preventable Complications (PPC)
Implement an innovative and evidence based intervention that will lead to **reductions** in Potentially Preventable Complications (PPCs) for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain- 4, <u>Potentially Preventable Complications</u>**[1]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

f)        Project Option: Reduce Inappropriate ED Use
Implement an innovative and evidence based intervention that will lead to **reductions** in inappropriate Emergency Department use for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -9, Right Care, Right Setting**[1]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone

---

46 Category 3 Outcome Measures document
47 http://www.hhsc.state.tx.us/reports/2012/potentially-preventable-readmissions.pdf

development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

g)      Project Option: Improved Clinical Outcome for Identified Disparity Group
Implement an innovative and evidence based intervention that will lead to **improvements** in clinical outcomes for an identified disparity group for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -11, Addressing Health Disparities in Minority Population**[48]. Providers selecting this project option should use process milestones X, improvement milestones Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

h)      Project Option: Improved Access to Care
Implement an innovative and evidence based intervention that will lead to **increase** in access to care for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -1, Primary Care and Chronic Disease Management**[3]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

i)      Project Option: Improvement in Perinatal Health Indicator(s)
Implement an innovative and evidence based intervention that will lead to **improvements** in perinatal health outcomes for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain - 8, Perinatal Care Outcomes**[3]. Providers selecting this project option should use process milestones X, improvement milestones Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

j)      Project Option: Improve Clinical Indicator/Functional Status for Target Population
Implement an innovative and evidence based intervention that will lead to **improvements** in a selected clinical indicator for a targeted population for providers that have demonstrated need or unsatisfactory performance in this area. This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain - 10, Quality of Life/Functional Status**[3]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the

---

48 Category 3 Outcome Measures document

milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

k)     Project Option: Sepsis
Implement an innovative and evidence based intervention that will lead to **reductions** in Sepsis Complications (mortality, prevalence and incidence) for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) listed in **Category 3, Outcome Domain -3, Potentially Preventable Complications**[49]. Providers selecting this project option should use process milestone(s) X, improvement milestone(s) Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

l)     Project Option: Other
Implement an innovative and evidence based intervention that will lead to improvements in a health outcome not include elsewhere for providers that have demonstrated need or unsatisfactory performance in this area.  This project requires reporting of specific metric(s) as associated with corresponding outcome(s) titled Other Outcome Improvement Target listed in each **Outcome Domain** in **Category 3**. Providers selecting this project option should use process milestones X, improvement milestones Y and the milestone development template listed at the conclusion of this project area to describe how the proposed milestones relate to the specific intervention goals.

**Rationale:**
Every day, millions of Americans receive high-quality health care that helps to maintain or restore their health and ability to function. However, far too many do not. Quality problems are reflected in a wide variation in the use of health care services, underuse of some services, overuse of other services, and misuse of services, including an unacceptable level of errors. A central goal of health care quality improvement is to maintain what is good about the existing health care system while focusing on the areas that need improvement.
Several types of quality problems in health care have been documented through peer-reviewed research. [50]

**Variation in services**. There continues to be a pattern of wide variation in health care practice, including regional variations and small-area variations. This is a clear indicator that health care practice has not kept pace with the evolving science of health care to ensure evidence-based practice in the United States.

**Underuse of services**. Millions of people do not receive necessary care and suffer needless complications that add to costs and reduce productivity. Each year, an estimated 18,000 people die because they do not receive effective interventions.

---

49 Category 3 Outcome Measures document
50 http://www.ahrq.gov/news/qualfact.htm

**Overuse of services**. Each year, millions of Americans receive health care services that are unnecessary, increase costs, and may even endanger their health. Research has shown that this occurs across all populations.

**Misuse of services**. Too many Americans are injured during the course of their treatment, and some die prematurely as a result.

**Disparities in quality**. Although quality problems affect all populations, there may be specific groups identified that have marked differences in quality of care and health outcome.  These group may be defined by racial/ethnic differences, income states, geographic area or other social determinants of health.

**2.9    Establish/Expand a Patient Care Navigation Program**

**Project Goal:**
The goal of this project is to utilize community health workers, case managers, or other types of health care professionals as patient navigators to provide enhanced social support and culturally competent care to vulnerable and/or high-risk patients. Patient navigators will help and support these patients to navigate through the continuum of health care services. Patient Navigators will ensure that patients receive coordinated, timely, and site-appropriate health care services. Navigators may assist in connecting patients to primary care physicians and/or medical home sites, as well as diverting non-urgent care from the Emergency Department to site-appropriate locations. RHPs implementing this project will identify health care workers, case managers/workers or other types of health professionals needed to engage with patients in a culturally and linguistically appropriate manner that will be essential to guiding the patients through integrated health care delivery systems.
A study on Patient Navigation funded by the National Cancer Institute was done in TX and a manual for patient navigation programs directed towards Latino audiences was released following its completion.[51]

**Project Options:**
>   a)    Provide navigation services to targeted patients who are at high risk of disconnect from institutionalized health care (for example, patients with multiple chronic conditions,  cognitive impairments and disabilities,  Limited English Proficient patients, recent immigrants, the uninsured, those with low health literacy, frequent visitors to the ED, and others)
>   Required core project components:
>>   a)    Identify frequent ED users and use navigators as part of a preventable ED reduction program. Train health care navigators in cultural competency.
>>   b)    Deploy innovative health care personnel, such as case managers/workers, community health workers and other types of health professionals as patient navigators.
>>   c)    Connect patients to primary and preventive care.
>>   d)    Increase access to care management and/or chronic care management, including education in chronic disease self-management.
>>   e)    Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

---

51 http://www.redesenaccion.org/sites/www.redesenaccion.org/files/PNmanualfinal.pdf

b)       "Other" project option:  Implement other evidence-based project to establish/expand a  patient care navigation program in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-10 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.9 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
Patient navigators help patients and their families navigate the fragmented maze of doctors' offices, clinics, hospitals, out-patient centers, payment systems, support organizations and other components of the healthcare system. Services provided by patient navigators vary by program and the needs of the patient, but often include:[52]

- Facilitating communication among patients, family members, survivors and healthcare providers.
- Coordinating care among providers.
- Arranging financial support and assisting with paperwork.
- Arranging transportation and child care.
- Ensuring that appropriate medical records are available at medical appointments.
- Facilitating follow-up appointments.
- Community outreach and building partnership with local agencies and groups.
- Ensuring access to clinical trials.

There is no one common definition of patient navigators and the profile of a patient navigator vary widely by program. Many use trained community health workers who may be full-time employees or volunteers. Community health workers have close ties to the local community and serve as important links between underserved communities and the healthcare system. They also posses the linguistic and cultural skills needed to connect with patients from underserved communities. Community health workers are also known as community health advisors, lay health advocates and promotoras de salud. Healthcare navigators include trained social workers, nurses and nurse practitioners as well as trained lay persons/volunteers. Some navigation programs also use a team based approach that combines community health workers with one or more professionals with experience in healthcare or social work. While there is no set education required for a patient navigator to be successful, a successful navigator should be:

---

52 http://www.altfutures.com/draproject/pdfs/Report_07_02_Patient_Navigator_Program_Overview.pdf

- Compassionate, sensitive, culturally attuned to the people and community being served and able to communicate effectively.
- Knowledgeable about the environment and healthcare system.
- Connected with critical decision makers inside the system, especially financial decision makers.

## 2.10  Use of Palliative Care Programs

**Project Goal:**[53]

Provide palliative care services to improve patient outcomes and quality of life. Palliative medicine represents a different model of care, focusing not on cure at any cost but on relief and prevention of suffering. Here the priority is supporting the best possible quality of life for the patient and family, regardless of prognosis. Ideally, the principles of palliative care can be applied as far upstream as diagnosis, in tandem with cure-directed treatment, although it's still associated in most people's minds with end-of-life care. There is an economic incentive for hospitals to support palliative care -- research shows significant reductions in pharmacy, laboratory, and intensive care costs -- though there's understandable reluctance to tout such benefits. After all, accusations of "death panels" effectively shut out government funding for palliative care as national debates about health care reform took shape.

Palliative care has emerged in the past decade. It takes an interdisciplinary approach – doctors, nurses, social workers and often chaplains – and blends it with curative care for seriously ill people. While palliative care is for people who are very sick, they don't have to have a six-month life expectancy. Some palliative care programs operate in hospitals; others treat people living at home. Growing numbers of community-based hospices also have palliative care services now. Pediatric palliative care is not available everywhere, although it's becoming more common at the major children's hospitals, In addition, hospices nationwide, which traditionally were often unwilling to treat dying children, have also become more open to pediatric care. The new health reform law allows dying children on Medicaid or the state Children's Health Insurance Program to get hospice or palliative care without halting other treatment[54].

Health care reform has the potential to improve palliative care by implementing care coordination (in hospitals and community) evidence-based programs that are already proven to be working. Within palliative care, patients receive dignified and culturally appropriate end-of-life care, which is provided for patients with terminal illnesses in a manner that prioritizes pain control, social and spiritual care, and patient/family preferences

---

53 The Center to Advance Palliative Care (CAPC)www.capc.org/reportcard
54 http://www.kaiserhealthnews.org/
55 Cost savings associated with US hospital palliative care consultation programs.
Morrison RS, Penrod JD, Cassel JB, Caust-Ellenbogen M, Litke A, Spragens L, Meier DE; Palliative Care Leadership Centers' Outcomes Group. Arch Intern Med. 2008 Sep 8; 168(16):1783-90.

**Project Options:**

    a)        Implement a Palliative Care Program to address patients with end-of-life decisions and care needs
Required core project components:

            **a)**        Develop a business case for palliative care and conduct planning activities necessary as a precursor to implementing a palliative care program

            **b)**        Transition palliative care patients from acute hospital care into home care, hospice or a skilled nursing facility

            **c)**        Implement a patient/family experience survey regarding the quality of care, pain and symptom management, and degree of patient/family centeredness in care and improve scores over time

            **d)**        Conduct quality improvement for project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

    b)        "Other" project option:  Implement other evidence-based project to implement use of palliative care programs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.  Milestone I-14 includes suggestions for improvement metrics to use with this innovative project option.

Note:  All of the project options in project area 2.10 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**

While end-of-life care was once associated almost exclusively with terminal cancer, today people receive end-of-life care for a number of other conditions, such as congestive heart failure, other circulatory conditions, COPD, and dementia[56]. Further, some experts have suggested that palliative and hospice care could be more widely embraced for many dying patients. However, these experts say that overly rigid quality standards and poorly aligned reimbursement incentives discourage appropriate end-of-life care and foster incentives to provide inappropriate restorative

---

56 MedPAC, 2008

care and technologically intensive treatments. These experts note that hospitals, nursing homes, and home health agencies need stronger incentives to provide better access to palliative care and care coordination either directly, themselves, or by contract with outside suppliers of hospice services[57]. It seems clear that improving care coordination near the end of life can improve care for patients with chronic conditions, however, in addition to the elderly with multiple chronic conditions and terminal illnesses, palliative care should also allow children who are enrolled in either Medicaid or CHIP to receive hospice services without foregoing curative treatment related to a terminal illness.

---

57 Zerzan, Stearns, & Hanson, 2000; Hanley, 2004

## 2.11 Conduct Medication Management

**Project Goal:**

The goal of **c**onducting Medication Management is to provide information that facilitates the appropriate use of medications in order to control illness and promote health[58]. Medication management is the monitoring of medications a patient takes to confirm that the patient is complying with a medication regimen, while also ensuring the patient is avoiding potentially dangerous drug interactions and other complications. This is especially important for patients taking large numbers of medications to address chronic illnesses and multiple diseases. Taking numerous medications is known as polypharmacy and it is particularly common among older adults, as they are more likely to need medications to manage an array of chronic conditions.

There are a number of aspects to medication management, all of which are focused on making sure that medications are used appropriately. Keeping track of all of the medications currently in use by a patient is an important part of medication management. This can include creating printed lists describing medications, their dosages, and how they are being used. These lists can be kept in patient charts and provided to patients to help them track the drugs they use and understand why various medications are being prescribed.

Monitoring medication administration is also key. Medications usually need to be taken in specific doses at set intervals. Missing doses or timing doses incorrectly can cause complications. Medication management can include everything from using devices that issue reminders to patients to take their medications to filling pill cases for patients and marking the lid of each compartment to indicate when the contents need to be taken[59].

The specific purpose of this project area is to provide the platform to conduct Medication Management so that patients receive the right medications at the right time across the Performing Provider in order to reduce medication errors and adverse effects from medication use.

**Project Options:**

a)   Implement interventions that put in place the teams, technology, and processes to avoid medication errors
   Required core project components:
   **a)**   Develop criteria and identify targeted patient populations; e.g. chronic disease patient populations that are at high risk for developing complications, co-morbidities, and/or utilizing acute and emergency care services.
   **b)**   Develop tools to provide education and support to those patients at highest risk of an adverse drug event or medication error.
   **c)**   Conduct root cause analysis of potential medication errors or adverse drug events and develop/implement processes to address those causes

---

58 The Patient-Centered Medical Home: Integrating Comprehensive Medication Management to Optimize Patient Outcomes. 2nd ed, 2012.
59 http://www.wisegeek.com/

      **d)**      Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

   **b)**    Evidence-based interventions that put in place the teams, technology and processes to avoid medication errors. This project option could include one or more of the following components:

      **a)**      Implement a medication management program that serves the patient across the continuum of care targeting one or more chronic disease patient populations

      **b)**      Implement Computerized Physician Order Entry (CPOE)

      **c)**      Implement pharmacist-led chronic disease medication management services in collaboration with primary care and other health care providers.

   c)    "Other" project option: Implement other evidence-based project to conduct medication management in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-20 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.11 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Rationale:**
More than 3.5 billion prescriptions are written annually in the United States[60], and four out of five patients who visit a physician leave with at least one prescription[61]. Medications are involved in 80 percent of all treatments and impact every aspect of a patient's life. The two most commonly identified drug therapy problems in patients receiving comprehensive medication management services are: (1) the patient requires additional drug therapy for prevention, synergistic, or palliative care; and (2)the drug dosages need to be titrated to achieve therapeutic

---

60 Sommers JP. Prescription drug expenditures in the10 largest states for persons under age 65, 2005.2008. Agency for Healthcare Research and Quality. Available at: http://meps.ahrq.gov/mepsweb/data_files/publications/st196/stat196.pdf.
61 The chain pharmacy industry profile. National Association of Chain Drug Stores. 2001.

levels that reach the intended therapy goals[62].According to the World Health Organization, adherence to therapy for chronic diseases in developed countries averages 50 percent, and the major consequences of poor adherence to therapies are poor health outcomes and increased health care costs[63].Drug therapy problems occur every day and add substantial costs to the health care system. Drug-related morbidity and mortality costs exceed $200 billion annually in the U.S., exceeding the amount spent on the medications themselves[64]. The Institute of Medicine noted that while only 10 percent of total health care costs are spent on medications, their ability to control disease and impact overall cost, morbidity, and productivity—when appropriately used— is enormous[65].

---

62 Cipolle R, Strand L, Morley P. Pharmaceutical care practice: The clinician's guide. McGraw-Hill; 2004.
63 World Health Organization. Adherence to long-term therapies: Evidence for action. 2003. Available at:
http://whqlibdoc.who.int/publications/2003/9241545992.pdf.
64 Johnson J, Bootman JL. Drug-related morbidity and mortality. Arch Intern Med. 1995; 155(18):1949-1956; Johnson JA,
Bootman JL. Drug-related morbidity and mortality. Am J Health Syst Pharm. 1997; 54(5):554-558; Ernst, FR, Grizzle AJ. Drug-related morbidity and mortality: Updating the cost-of-illness model. J Am Pharm Assoc. 2001; 41(2):192-199.
65 Centers for Medicare & Medicaid Services. National Health Expenditures. January 2008.

## 2.12  Implement/Expand Care Transitions Programs

**Project Goal:**
The goal of this project is to implement improvements in care transitions and coordination of care from inpatient to outpatient, post-acute care, and home care settings in order to prevent increased health care costs and hospital readmissions. Care transitions refer to the movement of patients from one health care provider or setting to another. For people with serious and complex illnesses, transitions in setting of care—for example from hospital to home or nursing home, or from facility to home- and community-based services—have been shown to be prone to errors.[66] Safe, effective, and efficient care transitions and reduced risk of potentially preventable readmissions require cooperation among providers of medical services, social services, and support services in the community and in long-term care facilities. High-risk patients often have multiple chronic diseases.  The implementation of effective care transitions requires practitioners to learn and develop effective ways to successfully manage one disease in order to effectively manage the complexity of multiple diseases.[67]The discontinuity of care during transitions typically results in patients with serious conditions, such as heart failure, chronic obstructive pulmonary disease, and pneumonia, falling through the cracks, which may lead to otherwise preventable hospital readmission. [68]The goal is to ensure that the hospital discharges are accomplished appropriately and that care transitions occur effectively and safely.

**Project Options:**
  a)       Develop, implement, and evaluate standardized clinical protocols and evidence-based care delivery model to improve care transitions
         Required core project components:
    **a)**       Review best practices from a range of models (e.g. RED, BOOST, STAAR, INTERACT, Coleman, Naylor, GRACE, BRIDGE, etc.).
    **b)**       Conduct an analysis of the key drivers of 30-day hospital readmissions using a chart review tool (e.g. the Institute for Healthcare Improvement's (IHI) State Action on Avoidable Re-hospitalizations (STAAR) tool) and patient interviews.
    **c)**       Integrate information systems so that continuity of care for patients is enabled
    **d)**       Develop a system to identify patients being discharged potentially at risk of needing acute care services within 30-60 days
    **e)**       Implement discharge planning program and post discharge support program

---

66Coleman EA. "Falling Through the Cracks: Challenges and Opportunities for Improving Transitional Care for Persons with Continuous Complex Care Needs." Journal of the American Geriatrics Society (2003) 51:549-555
67 Rittenhouse D, Shortell S, et al. "Improving Chronic Illness Care: Findings from a National Study of Care Management Processes in Large Physician Practices." Medical Care Research and Review Journal  (2010) 67(3): 301-320
68 Coleman, E., Parry, C., et. al.  "The Care Transitions Intervention: a patient centered approach to ensuring effective transfers between sites of geriatric care." Home Health Care Serv Q  (2003) 22 (3): 1-17

    **f)** Develop a cross-continuum team comprised of clinical and administrative representatives from acute care, skilled nursing, ambulatory care, health centers, and home care providers.

    **g)** Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b) Implement one or more pilot intervention(s) in care transitions targeting one or more patient care units or a defined patient population. Examples of interventions include, but are not limited to, implementation of:

- Discharge checklists
- "Hand off" communication plans with receiving providers
- Wellness initiatives targeting high-risk patients
- Patient and family education initiatives including patient self-management skills and "teach-back"
- Post-discharge medication planning
- Early follow-up such as homecare visits, primary care outreach, and/or patient call-backs.

c) "Other" project option: Implement other evidence-based project to implement/expand care transitions program in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project. Milestone I-15 includes suggestions for improvement metrics to use with this innovative project option.

Note: All of the project options in project area 2.12 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**Note:** Providers selecting one of these project options should ensure that overlaps do not exist with the EHR Incentive Program or other available demonstration funding.

**Rationale**[69]:

---

[69] http://www.ihi.org/offerings/Training/ReduceReadmissions/July2011ReducingReadmissions/Pages/default.aspx

When a patient's transition is less than optimal, the repercussions can be far-reaching — hospital readmission, an adverse medical event, and even mortality. Without sufficient information and an understanding of their diagnoses, medication, and self-care needs, patients cannot fully participate in their care during and after hospital stays. Additionally, poorly designed discharge processes create unnecessary stress for medical staff causing failed communications, rework, and frustrations. A comprehensive and reliable discharge plan, along with post-discharge support, can reduce readmission rates, improve health outcomes, and ensure quality transitions. Patient transition is a multidimensional concept and may include transfer from the hospital to home, or nursing home, or from facility to home- and community-based services, etc.

## CATEGORY 2 BEHAVIORAL HEALTH INFRASTRUCTURE PROJECTS

**GOAL:  Integrate behavioral health with physical health and other evidence-based services and supports.**

The goals of the projects under this heading are to create service delivery models, which engage / integrate behavioral, physical and other community-based services and supports to provide services to individuals with a broad range of behavioral health conditions in the most appropriate community-based settings and to empower the individual to better manage their health / wellness.

According to a recent study released by the Robert Wood Johnson Foundation, only 33% of patients with BH conditions (24% of the adult population) receive adequate treatment.[70] Patients with BH issues experience higher risk of mortality and poor health outcomes, largely due to a lack of preventive health services and poorly controlled co-morbid medical disease. Risk increases with the severity of the behavioral health diagnoses. In Texas for example, persons with severe mental illness live over 29 years less, on average, than the general population.[71] Behavioral health conditions, also account for increased health care expenditures such as higher rates of potentially preventable inpatient admissions. Texas Medicaid data on potentially preventable inpatient readmissions demonstrates that behavioral health conditions are a significant driver of inpatient costs. Mental health and substance abuse conditions comprise 8 percent of initial inpatient readmissions to general acute and specialty inpatient hospitals but represent 24 percent of potentially preventable admissions.[72]

Complex medical and social issues including multiple chronic health conditions, low income, housing insecurity, social isolation, and lack of natural supports systems severely impact health and social functioning for persons with more severe behavioral health diagnoses such as schizophrenia, bipolar disorder and major depressive disorder.  Substance use disorders, alone or in combination with mental health conditions, have significant physical consequences, leading to disability and increased acute and long term service expenditures.

Gaps in the service delivery system have far reaching costs and consequences. For example, the Texas state psychiatric hospital system is in crisis -- nearing or already over capacity, in large part due to gaps in the continuum of services and supports for individuals with more complex chronic mental health conditions.  These individuals require a stable, supportive housing,

---

70 Druss BG, Reisinger Walker E., "Mental Disorders and Medical Co-Morbidity."  Robert Wood Johnson Foundation, The Synthesis Project: Issue 21 (2011).

**71 Parks, J, Svendsen, D, et. al. "Morbidity and Mortality in People with Serious Mental Illness", National Association of State Mental Health Program Directors, 2006.**

72 Potentially Preventable Readmissions in the Texas Medicaid Population, Fiscal Year 2010, Texas Health and Human Services Commission (2012)

integrated with community-based clinical and psychosocial services to prevent continual cycling through the street, to emergency room, jail and inpatient hospital.[73]

Providing adequate health care to people with behavioral health conditions requires a comprehensive, person-centered approach within an integrated, "no wrong door" access, and delivery system. The system should include early and accurate assessment.  It should facilitate access to acute and long term services as well as short term, community-based alternatives for stabilizing individuals in a behavioral health crisis; discharge planning to transition the individual back to the community from the inpatient setting; and post-discharge support services.

Evidence-based and evidence-informed strategies exist which can facilitate person-centered care for people with behavioral health conditions.

These approaches include:

- organizational realignment and process improvements to better integrate behavioral and physical health care and ensure that there is "no wrong door" to accessing needed treatment;
- self-management and wellness programs which empower individuals to better manage their chronic physical and behavioral health conditions; and
- specialized services and supports directed at high need / high cost populations which integrate clinical and other interventions to address the complex needs of persons with more severe illnesses and social challenges.

### *Integration: Organizational Realignment and Process Improvement*
Health care systems which successfully integrate behavioral health and primary care services demonstrate improved care, cost savings, increased provider and consumer satisfaction.[74] This is especially important for medically indigent populations, which have co-occurring chronic health and mental health conditions. Treatments for individuals who present with mental health and/or substance abuse concerns are integrated with physical health via person-centered approaches.

The Four Quadrant Clinical Integration Model provides a promising, person-centered conceptual framework for organizational realignment.
Each quadrant considers the behavioral health and physical health risk and complexity of the population and suggests the major system elements that would be utilized to meet the needs of the individuals within that subset of the population. The Four Quadrant model is not intended to be prescriptive about what happens in each quadrant, but to serve as a conceptual framework for collaborative planning in each local system. Ideally it would be used as a part of collaborative planning for each new HRSA BH site, with the CHC and the local provider(s) of public BH

---

73 Continuity of Care Task Force Final Report, DSHS,  (2010)

74 Integrating Publicly Funded Physical and Behavioral Health Services: A Description of Selected Initiatives, Health Management Associates (2007).

services using the framework to decide who will do what and how coordination for each person served will be assured.

The use of the Four Quadrant Model to consider subsets of the population, the major system elements and clinical roles would result in the following broad approaches:

- Quadrant I: Low BH-low physical health complexity/risk, served in primary care with BH staff on site; very low/low individuals served by the PCP, with the BH staff serving those with slightly elevated health or BH risk.
- Quadrant II: High BH-low physical health complexity/risk, served in a specialty BH system that coordinates with the PCP.
- Quadrant III: Low BH-high physical health complexity/risk, served in the primary care/medical specialty system with BH staff on site in primary or medical specialty care, coordinating with all medical care providers including disease managers.
- Quadrant IV: High BH-high physical health complexity/risk, served in both the specialty BH and primary care/medical specialty systems; in addition to the BH case manager, there may be a disease manager, in which case the two managers work at a high level of coordination with one another and other members of the team.

Other integration models include the IMPACT Model[75] and Wagner's Chronic Care Model.

Process improvements, such as adoption of evidence-based clinical practice guidelines for detection and treatment of depression and other conditions and for assessment of suicide risk can improve outcomes in both primary and specialty behavioral clinical settings. For example, one effective evidence-based strategy that has been shown to improve outcomes for depression, the most prevalent BH disorder, is the DIAMOND/IMPACT model of care. Key elements of such care models are screening for high prevalence mental health conditions, co-location of BH clinicians into primary care settings, collaborative meetings held by primary care and BH team members to discuss cases, training of primary care and BH staff on effective screening and collaborative care, the presence of tracking systems and registries to support effective monitoring of patients, the "Stepped Care" approach for appropriate level of treatment, care management for the highest risk patients with mental health and substance abuse disorders, and relapse prevention, among others.[76]   Other examples of evidence-base practices include Screening, Brief Intervention and Referral to Treatment (SBIRT) for substance use disorders. SBIRT employs a brief assessment, performed by physical health providers in settings such as hospital emergency rooms and clinics to determine the presence of substance use issues, intervene and refer the individual to appropriate treatment. Independent evaluation of Texas SBIRT study

---

75 Excerpted from the IMPACT website at the University of Washington at http://impact-uw.org/about/key.html.
76 Katon W., MD. "The Diamond Model." (based on Katon's Collaborative Care Model for depression) and Unutzer J.,MD. "IMPACT Study." (as well as numerous other controlled trials). Institute for Clinical Systems Improvement and Minnesota Family Health Services. Presentation to the Institute for HealthCare Improvement Annual Forum, Dec. 2010.

determined that it resulted in significant inpatient / emergency department savings and increased appropriate use of services in the state's largest public hospital district.[77]

Self-Management and Wellness Programs
Successfully engaging the individual consumer in disease self-management and wellness activities related to chronic physical and behavioral health conditions empowers person-centered recovery and improved health outcomes. The Chronic Disease Self-Management Program developed at Stanford University to help people manage physical conditions such as diabetes and chronic pain, and Wellness Recovery Action Planning (WRAP) which is directed toward managing severe mental illness[78], are two prominent examples of evidenced-based, self-management models. Giving the individual consumer control over health resources is another complementary promising practice.

Health navigation and individual health planning are related practices. The Texas and Minnesota Demonstrations to Maintain Independence and Employment (DMIE) studies which focused on medically indigent adults with behavioral health disorders, used health care navigation to achieve positive results in health care utilization and wellness measures.[79]  In Texas DMIE, health navigation and support from case managers trained in Motivational Interviewing resulted in increased access to and use of appropriate health services, including: more use of preventative care; more outpatient, more mental health and dental visits; greater adherence and persistence in taking prescribed medications for chronic conditions such as hypertension, respiratory conditions, diabetes, high cholesterol; more medical stability for chronic conditions and greater satisfaction with healthcare.[80]

Self-directed resource use models empower the individual to purchase goods and services to promote wellness and recovery.  There is an evidence base for these models. For example, adults with severe mental illness and co-occurring physical disabilities in the Arkansas Cash and Counseling program were less likely to fall, have respiratory infections, develop bed sores, or spend a night in hospital or a nursing home if they had access to individual budgets than if they did not [81]. Similarly, an evaluation of the New Jersey Cash and Counseling program found that it was equally successful for participants with SMI as those with other types of disabilities[82].

---

77 Insight Project Research Group (2009). SBIRT outcomes in Houston: Final report on InSight, a hospital district-based program for patients at risk for alcohol or drug use problems. Alcoholism: Clinical and Experimental Research, 33(8): 1-8.

78 Copeland, M.E. "Wellness recovery action plan: a system for monitoring, reducing and eliminating uncomfortable or dangerous physical symptoms and emotional feelings." Occupational Therapy in Mental Health. 17, 127–150 (2002).

79 Ozaki, R., Schneider, J., Hall, J., Moore, J., Linkins, K., Brya, J., Oelschlaeger, A., Bohman, T., Christensen, K., Wallisch, L., Stoner, D., Reed, B.,Ostermeyer, B. (2011). Personal navigation, life coaching, and case management: Approaches for enhancing health and employment support services.  Journal of Vocational Rehabilitation, (34)2, 83-95.

80 Bohman, T., Wallisch, L., Christensen, K., Stoner, D., Pittman, A., Reed, B.,Ostermeyer, B. (2011). Working Well – The Texas Demonstration to Maintain Independence and Employment: 18-month outcomes.  Journal of Vocational Rehabilitation, (34)2, 97-106.

81 Shen, C., Smyer, M.A., Mahoney, K.J., Loughlin, D.M. et al., (2008). Does Mental Illness Affect Consumer Direction of Community-Based Care? Lessons From the Arkansas Cash and Counseling Program. The Gerontologist, 48(1), 93-104.

82 Shen, C., Smyer, M., Mahoney, K.J., Simon-Rusinowitz, L. et al., (2008). Consumer-Directed Care for Beneficiaries With Mental Illness: Lessons from New Jersey's Cash and Counseling Program. Psychiatric Services, 59, 1299-1306.

In the Texas Self-Directed Care study (SDC), individuals with severe mental illness are empowered to manage a flexible fund to purchase goods and services with assistance from an advisor. Consumers have broad latitude for making substitutions of traditional services and supports within a typical maximum budget of $4,000 / year. Experience during the first year of the SDC indicates that individuals in the intervention group are making significant gains in recovery, wellness and employment relative to the control group.

Specialized Services and Supports for High Need Sub-Populations
The Texas Continuity of Care Task Force[83] analyzed needs and recommendations for improving services to severely mentally ill individuals who move repeatedly through multiple systems, such as criminal justice, general acute inpatient and mental health. Among the recommendations was the development of:

- supported housing,
- assisted living,
- smaller, community-based living options, and
- services, such as cognitive rehabilitative modalities, to address the individual's limitations in organizing, planning and completing activities.

Services could be provided in a variety of settings, including individual homes, apartments, adult foster homes, assisted living facilities, and small group (three- to four-bed) community-supported residential settings. Examples of services could include cognitive and psychosocial rehabilitation; supported employment; transition assistance to establish a residence; peer support; specialized therapies; medical services, transportation medications and personal assistance.

---

83See Continuity of Care Task Force Report at: http://www.dshs.state.tx.us/mhsa/continuityofcare/)

**2.13 Provide an intervention for a targeted behavioral health population to prevent unnecessary use of services in a specified setting (i.e., the criminal justice system, ER, urgent care etc.).**

**Project Goal:**
Provide specialized services to complex behavioral health populations such as people with severe mental illnesses and/or a combination of behavioral health and physical health issues. These populations often have multiple concomitant issues such as substance use, traumatic injuries, homelessness, cognitive challenges, and lack of daily living skills and lack of natural supports. The State's mental health system provides rehabilitative services and pharmacotherapy to people with certain severe psychiatric diagnoses and functional limitations, but can serve only a fraction of the medically indigent population. It does not serve other high risk behavioral health populations and does not provide the range of services needed to deal with complex psychiatric and physical needs. These complex populations become frequent users of local public health systems.

The goal of this project is to avert outcomes such as potentially avoidable inpatient admission and readmissions in settings including general acute and specialty (psychiatric) hospitals; to avert disruptive and deleterious events such as criminal justice system involvement; to promote wellness and adherence to medication and other treatments; and to promote recovery in the community. This can be done by providing community based interventions for individuals to prevent them from cycling through multiple systems, such as the criminal justice system; the general acute and specialty psychiatric inpatient system; and the mental health system. Examples of interventions could include integrated medical and non-medical supports such as transition services to help individuals establish a stable living environment, peer support, specialized therapies, medical services, personal assistance, and short or long term residential options.

Residential options linked to a range of support services can effectively improve health outcomes for vulnerable individuals, such as the long-term homeless with severe mental illness. One such model in Colorado demonstrated a drastic 80 percent decrease in overnight hospital stays and a 76 percent decrease in nights in jail (Wortzel, 2007). Research indicates that among residents of permanent supportive housing:

- Rates of arrest and days incarcerated are reduced by 50%;
- Emergency room visits decrease by 57%;
- Emergency detoxification services decrease by 85%; and
- Nursing home utilization decreased by 50%.[84]

**Project Options:**

---

[84] Lewis, D., Corporation for Supportive Housing, Permanent Supportive Housing Program & Financial Model for Austin/Travis County, TX, 2010. Retrieved from http://www.caction.org/homeless/documents/AustinModelPresentation.pdf

a)   Design, implement, and evaluate research-supported and evidence-based interventions tailored towards individuals in the target population. Required core components:

   **a)**   Assess size, characteristics and needs of target population(s) (e.g., people with severe mental illness and other factors leading to extended or repeated psychiatric inpatient stays. Factors could include chronic physical health conditions; chronic or intermittent homelessness, cognitive issues resulting from severe mental illness and/or forensic involvement.

   **b)**   Review literature / experience with populations similar to target population to determine community-based interventions that are effective in averting negative outcomes such as repeated or extended inpatient psychiatric hospitalization, decreased mental and physical functional status, nursing facility admission, forensic encounters and in promoting correspondingly positive health and social outcomes / quality of life.

   **c)**   Develop project evaluation plan using qualitative and quantitative metrics to determine outcomes.

   **d)**   Design models which include an appropriate range of community-based services and residential supports.

   e)   Assess the impact of interventions based on standardized quantitative measures and qualitative analysis relevant to the target population. Examples of data sources include: standardized assessments of functional, mental and health status (such as the ANSA and SF 36); medical, prescription drug and claims/encounter records; participant surveys; provider surveys. Identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient populations, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

b)   "Other" project option:  Implement other evidence-based project to provide an intervention for a targeted behavioral health population to prevent unnecessary use of services in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.13 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient

population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

Note: Community-based interventions should be comprehensive and multispecialty. They should incorporate two or more components, such as those listed below depending on the needs of the target populations being served. These interventions should have significant flexibility to add more components if they are appropriate to meet the needs of the target population. Community-based components may include (but are not limited to):

- Residential Assistance (Foster/Companion Care, Supervised Living, Residential Support Services)
- Assisted living;
- Cognitive Adaptation Training (CAT) – an evidence-based service that uses tools and motivational techniques to establish and refine daily living skills;
- Psychosocial Rehabilitation;
- Supported employment;
- Minor home modifications;
- Home delivered meals;
- Transition assistance – assistance to establish a basic household, including security deposits, essential furnishings, moving expenses, bed and bath linens;
- Adaptive aids (e.g., medication-adherence equipment, communication equipment, etc.);
- Transportation to appointments and community-based activities;
- Specialized behavioral therapies:
  - Cognitive Behavioral Therapy – An empirically supported treatment that focuses on maladaptive patterns of thinking and the beliefs that underlie such thinking; and
  - Dialectical Behavior Therapy – A manualized treatment program (derived from cognitive behavioral therapy) that provides support in managing chronic crisis and stress to keep individuals in outpatient treatment settings;
- Prescription medications;
- Peer support – A service that models successful health and mental health behaviors. It is provided by certified peer specialists who are in recovery from mental illness and/or substance use disorders and are supervised by mental health professionals;
- Respite care (short term);
- Substance abuse services (specialized for individuals who have experienced prolonged or repeated institutionalization);
- Visiting Nursing and / or community health worker services;
- Employment supports

- Nutritional counseling
- Occupational therapy; Speech and language therapy; and Physical therapy.

Components must be articulated into a system which uses a CQI design such as the CMS Quality Framework for HCBS services. (Anita Yuskauskas, 2010) and/or be informed by guidance such as the SAMHSA evidence-based toolkit for permanent supported housing (http://store.samhsa.gov/product/Permanent-Supportive-Housing-Evidence-Based-Practices-EBP-KIT/SMA10-4510) or other evidence-based system

**2.14  Implement person-centered wellness self-management strategies and self directed financing models that empower consumers to take charge of their own health care.**

**Project Goal:**
Create wellness, self-management programs that employ research supported interventions singly or in combination to help individuals manage their chronic physical and behavioral health conditions.  Examples of research-supported individual wellness self management strategies include Wellness Recovery Action Planning (WRAP), the Chronic Disease Self Management Program; Motivational Interviewing; client-managed wellness accounts; and health navigation / individual health planning models to empower the individual to achieve their health goals. These interventions should be closely coordinated with the patient's medical home.

Successfully engaging the individual consumer in disease self management and wellness activities related to chronic physical and behavioral health conditions empowers person-centered recovery and improved health outcomes. The Chronic Disease Self Management Program, developed at Stanford University to help people manage physical conditions such as diabetes and chronic pain, and Wellness Recovery Action Planning (WRAP) which is directed toward managing severe mental illness[85], are two prominent examples of evidenced-based, self-management models. Giving the individual consumer control over health resources is another complementary promising practice.

Health navigation and individual health planning are related practices. The Texas and Minnesota Demonstrations to Maintain Independence and Employment (DMIE), which focused on medically indigent adults with behavioral health disorders, used health care navigation to achieve positive results in health care utilization and wellness measures.[86]  In Texas DMIE, health navigation and support from case managers trained in Motivational Interviewing resulted in increased access to and use of appropriate health services, including: more use of preventative care; more outpatient, more mental health and dental visits; greater adherence and persistence in taking prescribed medications for chronic conditions such as hypertension, respiratory conditions, diabetes, high cholesterol; more medical stability for chronic conditions and greater satisfaction with healthcare.[87]

Self directed resource use models empower the individual to purchase goods and services to promote wellness and recovery.  There is an evidence base for these models. For example, adults with severe mental illness and co-occurring physical disabilities in the Arkansas Cash and Counseling program were less likely to fall, have respiratory infections, develop bed sores, or spend a night in hospital or a nursing home if they had access to individual budgets than if they

85 Copeland, M.E. "Wellness recovery action plan: a system for monitoring, reducing and eliminating uncomfortable or dangerous physical symptoms and emotional feelings." Occupational Therapy in Mental Health. 17, 127–150 (2002).
86 Ozaki, R., Schneider, J., Hall, J., Moore, J., Linkins, K., Brya, J., Oelschlaeger, A., Bohman, T., Christensen, K., Wallisch, L., Stoner, D., Reed, B.,Ostermeyer, B. (2011). Personal navigation, life coaching, and case management: Approaches for enhancing health and employment support services.  Journal of Vocational Rehabilitation, (34)2, 83-95.
87 Bohman, T., Wallisch, L., Christensen, K., Stoner, D., Pittman, A., Reed, B.,Ostermeyer, B. (2011). Working Well – The Texas Demonstration to Maintain Independence and Employment: 18-month outcomes.  Journal of Vocational Rehabilitation, (34)2, 97-106.

did not[88]. Similarly, an evaluation of the New Jersey Cash and Counseling program found that it was equally successful for participants with SMI as those with other types of disabilities[89].

In the Texas Self-Directed Care study (SDC), individuals with severe mental illness are empowered to manage a flexible fund to purchase goods and services with assistance from an advisor. Consumers have broad latitude for making substitutions of traditional services and supports within a typical maximum budget of $4,000 / year. Experience during the first year of the SDC indicates that individuals in the intervention group are making significant gains in recovery, wellness and employment relative to the control group.

**Project Options:**

a) Establish interventions to promote person-centered wellness self-management strategies and train staff / contractors to empower consumers to take charge of their own health care.

Required core project components:

**a)** Develop screening process for project inclusion

**b)** Identify population for intervention using claims and encounter data, clinical records, or referrals from providers.

**c)** Recruit eligible individuals based on administrative and diagnostic data

**d)** Establish interventions and train staff / contractors

**e)** Hire staff (including the following minimum qualifications):

- Wellness and Health Navigation: Bachelors level professional with experience in mental health and/or wellness initiatives or a peer specialist who has successfully completed the DSHS certification program for peer specialists
- WRAP Facilitator: an individual trained and credentialed as a WRAP facilitator using the WARP model developed by Mary Ellen Copeland (See: http://www.mentalhealthrecovery.com/wrap/).

**f)** Train staff in motivational interviewing and person-centered planning

**g)** Assess project outcomes. Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

---

88 Shen, C., Smyer, M.A., Mahoney, K.J., Loughlin, D.M. et al., (2008). Does Mental Illness Affect Consumer Direction of Community-Based Care? Lessons From the Arkansas Cash and Counseling Program. The Gerontologist, 48(1), 93-104.

89 Shen, C., Smyer, M., Mahoney, K.J., Simon-Rusinowitz, L. et al., (2008). Consumer-Directed Care for Beneficiaries With Mental Illness: Lessons From New Jersey's Cash and Counseling Program. Psychiatric Services, 59, 1299-1306.

b)      Implement self-directing financing models including wellness accounts. Note: If selected, this must be implemented as part of a person-centered wellness project as described in 2.14.1.
Required core project components:
   **a)**   Establish wellness account funding mechanisms.
   **b)**   Establish policies and procedures for program operations.
   **c)**   Establish accountability systems to track outcomes and expenditures.
   **d)**   Implement interventions.
   **e)**   Assess project outcomes.
c)      "Other" project option:  Implement other evidence-based project to implement person-centered wellness self-management strategies and self-directed financing models that empower consumers to take charge of their own health care in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.14 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

## 2.15 Integrate Primary and Behavioral Health Care Services

**Project Goal**

Integrate primary care and behavioral health care services in order to improve care and access to needed services.

The concept of a medical home that can address the needs of the whole person is increasingly recognized as a key in improving both access to care, continuity of care, improved outcomes. The importance of simultaneously addressing the physical health needs and the behavioral health needs of individuals has become recognized over the past three decades.

A recent study of adults discharged from psychiatric hospitals found 20% with chronic and serious conditions such as HIV infection, brain trauma, cerebral palsy and heart disease. As many as 75% of individuals with schizophrenia have been found to have high rates of serious physical illnesses, such as diabetes, respiratory, heart and/or bowel problems and high blood pressure. High rates were also seen for vision (93%), hearing (78%), and dental (60%) problems … the effects of atypical antipsychotic medications, which exacerbate this predisposition, individuals with schizophrenia have especially high rates of diabetes. Cardiovascular diseases are also very prevalent among people with mental illnesses. Again, psychiatric medications exacerbate the problem because they are associated with obesity and high triglyceride levels, known risk factors for cardiovascular disease. Adults with serious mental illnesses are known to have poor nutrition, high rates of smoking and a sedentary lifestyle—all factors that place them at greater risk for serious physical disorders, including diabetes, cardiovascular disease, stroke, arthritis and certain types of cancers. Despite such extensive medical needs, adults with serious mental illnesses often do not receive treatment… Among people with schizophrenia, fewer than 70% of those with co-occurring physical problems were currently receiving treatment for 10 of 12 physical health conditions studied.[90]

Medical Homes and similar collaborative care approaches have been determined to be beneficial in the treatment of mental illness in a variety of controlled studies.[91]

Behavioral health problems are often cyclical in nature meaning that over a course of months or years a person may experience periods of time when symptoms are well controlled (or in remission) while at other times symptoms can range from moderate to severe.  The concept of  a Medical home where physical and behavioral health care is integrated and provides supports for individuals who are in any quadrant of the National Council for Community Behavioral Health (NCCBH) Four Quadrant Clinical Integration Model at a given time.

The use of the Four Quadrant Model to consider subsets of the population, the major system elements and clinical roles would result in the following broad approaches:

---

90 Bazelon Center for Mental Health Law (2004),  GET IT TOGETHER How to Integrate Physical and Mental Health Care for People with Serious Mental Disorders
91 Thielke, S., Vannoy, S. & Unützer, J. (2007). Integrating mental health and primary care. Primary Care: Clinics in Office Practice, 34

- Quadrant I: Low BH-low physical health complexity/risk, served in primary care with BH staff on site; very low/low individuals served by the PCP, with the BH staff serving those with slightly elevated health or BH risk.
- Quadrant II: High BH-low physical health complexity/risk, served in a specialty BH system that coordinates with the PCP.
- Quadrant III: Low BH-high physical health complexity/risk, served in the primary care/medical specialty system with BH staff on site in primary or medical specialty care, coordinating with all medical care providers including disease managers.
- Quadrant IV: High BH-high physical health complexity/risk, served in both the specialty BH and primary care/medical specialty systems; in addition to the BH case manager, there may be a disease manager, in which case the two managers work at a high level of coordination with one another and other members of the team.

Other integration models include the IMPACT Model[92] and Wagner's Chronic Care Model.

Through the integration of behavioral health and physical health care services, opportunities to address both conditions during a single visit are vastly increased. Co-location, when coupled with protocols, training, technology and team building has the potential to improve communications between providers and enhance coordination of care. Additionally, access to care is enhanced because individuals do not have to incur the cost or inconvenience of arranging transportation or making multiple trips to different locations to address physical and behavioral health needs.

Finally, given the ever-increasing cost of transportation, a "one stop shopping" approach for health care improves the chances that individuals with multiple health needs will be able to access the needed care in a single visit and thereby overcome the negative synergy that exists between physical and behavioral health conditions.

Co-location alone is not synonymous with integration. Levels of interaction between physical and behavioral health providers may range from traditional minimally collaborative models to fully integrated collaborative models.

1. **Minimal Collaboration:** mental health providers and primary care providers work in separate facilities, have separate systems, and communicate sporadically.
2. **Basic Collaboration at a Distance:** separate systems at separate sites; periodic communication about shared patients, typically by telephone or letter.
3. **Basic Collaboration On-site:** separate systems, but shared facility; more communication, but each provider remains in his/her own professional culture.

---

92 Excerpted from the IMPACT website at the University of Washington at http://impact-uw.org/about/key.html.

4. **Close Collaboration in a Partly Integrated System:** providers share the same facility and have some systems in common (scheduling appointments, medical records); regular face-to-face communication; sense of being part of a team.
5. **Close Collaboration in a Fully Integrated System:** providers are part of the same team and system; the patient experiences mental health treatment as part of their regular primary care or vice versa.

Delivery system reform projects proposed under this category should be structured to achieve level 4 or, preferably level 5 levels of interaction.

**Project Options:**

a) Design, implement, and evaluate projects that provide integrated primary and behavioral health care services.
Required core components:

**a)** Identify sites for integrated care projects, which would have the potential to benefit a significant number of patients in the community. Examples of selection criteria could include proximity/accessibility to target population, physical plant conducive to provider interaction; ability / willingness to integrate and share data electronically; receptivity to integrated team approach.

**b)** Develop provider agreements whereby co-scheduling and information sharing between physical health and behavioral health providers could be facilitated.

**c)** Establish protocols and processes for communication, data-sharing, and referral between behavioral and physical health providers

**d)** Recruit a number of specialty providers (physical health, mental health, substance abuse, etc. to provide services in the specified locations.

**e)** Train physical and behavioral health providers in protocols, effective communication and team approach. Build a shared culture of treatment to include specific protocols and methods of information sharing that include:
- Regular consultative meetings between physical health and behavioral health practitioners;
- Case conferences on an individualized as-needed basis to discuss individuals served by both types of practitioners; and/or
- Shared treatment plans co-developed by both physical health and behavioral health practitioners.

**f)** Acquire data reporting, communication and collection tools (equipment) to be used in the integrated setting, which may include an integrated Electronic health record system or participation in a health information exchange – depending on the size and scope of the local project.

     **g)**     Explore the need for and develop any necessary legal agreements that may be needed in a collaborative practice.

     **h)**     Arrange for utilities and building services for these settings

     **i)**     Develop and implement data collection and reporting mechanisms and standards to track the utilization of integrated services as well as the health care outcomes of individual treated in these integrated service settings.

     **j)**     Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)     "Other" project option: Implement other evidence-based project to integrate primary and behavioral health care services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 2.15 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**2.16  Provide virtual psychiatric and clinical guidance to all participating primary care providers delivering services to behavioral patients regionally.**

**Project Goal**
Provide ready access to psychiatric consultation in primary care to enhance and improve treatment for individuals with behavioral health conditions.  Virtual psychiatric consultation may include (but is not limited to) the following modalities of communication: telephone, instant message, video conference, facsimile, and e-mail.  Primary Care Providers (PCPs) tend to be the first (and often last) stop for services for individuals with mental illness and substance use disorders.  Indeed, more than 1/3 of all patients rely solely on PCPs to treat psychiatric disorders.  These individuals may have medical conditions that are created or exacerbated by untreated or under-treated mental illness and substance abuse.  This trend means PCPs should have adequate resources and expertise to treat behavioral health conditions.  Treating behavioral health conditions during a PCP visit reduces the chances of losing the patient during the referral process.

The goal of this project is to provide PCPs delivering services regionally with the necessary resources and guidance to adequately treat patients who present with behavioral health conditions.  Clinical guidance will be provided remotely via the following communication methods: telephone, instant message, video conference, facsimile, and e-mail.  Access to these services will allow the medical treatment team to utilize behavioral health expertise in areas including, but not limited to: diagnostic impressions, psychiatric medication administration, trajectory and outcomes of mental health diagnoses, cultural considerations relevant to behavioral health treatment, and referral recommendations for ongoing treatment, and behavioral health self-management resources.  PCPs will increase their knowledge base about behavioral health conditions while also having quick access to cutting edge and research based behavioral health interventions over several communication methods.  This effort will bridge the often disparate disciplines of behavioral and physical health, providing better outcomes for patients who increasingly rely on primary care settings for treatment of their behavioral health conditions.

**Project Options:**

    a)    Design, implement, and evaluate a program to provide remote psychiatric consultative services to all participating primary care providers delivering services to patients with mental illness or substance abuse disorders
Required core project components:

    **a)**    Establish the infrastructure and clinical expertise to provide remote psychiatric consultative services.

    **b)**    Determine the location of primary care settings with a high number of individuals with behavioral health disorders (mental health and substance abuse) presenting for services, and where ready access to behavioral health expertise is lacking.  Identify what expertise primary care providers lack and what they identify as their greatest needs for psychiatric and/or substance abuse treatment consultation via survey or other means.

    **c)**     Assess applicable models for deployment of virtual psychiatric consultative and clinical guidance models

    **d)**     Build the infrastructure needed to connect providers to virtual behavioral health consultation. This may include:

- Procuring behavioral health professional expertise (e.g., Psychiatrists, Psychologists, Psychiatric Nurses, Licensed Professional Counselors, Masters level Social Workers, Licensed Chemical Dependency Counselors, Licensed Marriage and Family Therapists, Certified Peer specialists, and Psychiatric Pharmacists,). This will include expertise in children and adolescents (e.g. Child and Adolescent Psychiatrists, Psychologists, Nurses, and Pharmacists); expertise in psychotropic medication management in severe mental illness.

    **e)**     Ensuring staff administering virtual psychiatric consultative services are available to field communication from medical staff on a 24-hour basis.

    **f)**     Identify which medical disciplines within primary care settings (nursing, nursing assistants, pharmacists, primary care physicians, etc.) could benefit from remote psychiatric consultation.

    **g)**     Provide outreach to medical disciplines in primary care settings that are in need of telephonic behavioral health expertise and communicate a clear protocol on how to access these services.

    **h)**     Identify clinical code modifiers and/or modify electronic health record data systems to allow for documenting the use of telephonic behavioral health consultation.

    **i)**     Develop and implement data collection and reporting standards for remotely delivered behavioral health consultative services.

    **j)**     Review the intervention(s) impact on access to telephonic psychiatric consults and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations

Optional Project Components:

    **k)**     Develop a database or information resource center for behavioral health professionals to ensure appropriate research based interventions are being communicated to providers.

    **l)**     Develop or adapt best practice resources and research based literature to medical professions on a range of behavioral health topics that frequently occur in primary care settings (including guidelines for best practices for administration of psychotropic medications for specific mental health conditions and monitoring of these medications).

  **b)**     "Other" project option: Implement other evidence-based project to provide virtual psychiatric and clinical guidance to all participating primary care providers delivering services to behavioral health patients regionally in an innovative

manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.16 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**2.17 Establish improvements in care transition from the inpatient setting for individuals with mental health and / or substance abuse disorders.**

**Project Goals:**

The goal of this project is to implement improvements in care transitions and coordination of care from inpatient to outpatient, post-acute care, and home care settings in order to prevent increased health care costs and hospital readmissions of individuals with mental health and substance use (behavioral health) disorders. For people with mental health and substance use disorders, these transitions are especially critical in reducing the risk of readmission. Texas Medicaid data on potentially preventable inpatient readmissions demonstrates that behavioral health conditions are a significant driver of inpatient costs. Mental health and substance abuse conditions comprise 8 percent of initial inpatient readmissions to general acute and specialty inpatient hospitals but represent 24 percent of potentially preventable admissions.[93] The implementation of effective care transitions requires that providers learn and develop effective ways to successfully manage one disease in order to effectively manage the complexity of multiple diseases.[94] Preventable admissions in Texas are commonly indicative of "the absence of excellent care, especially during the transition from inpatient care to care at home or in a post-acute facility."[95]

Relatively simple steps can make a real difference. These include scheduling the follow-up appointment before discharge, voice-to-voice transfer of care between the attending physician and the primary care physician / provider community-based services, reconciling medication instructions, and follow-up phone calls or visits after discharge. More complex populations with severe behavioral health disorders and other issues, such as homelessness may require more intensive follow-through post discharge. Strategies, such as Critical Time Intervention (CTI), are designed to prevent recurrent adverse outcomes, such as readmissions among persons with severe mental illness. Such interventions may include pre-transition planning, intensive transition support, assessment and adjustment of support and transfer to community sources of care. Peer support can be an important strategy for individuals transitioning from inpatient to community settings. In Texas, the Department of State Health Services, has developed a peer certification program which could be leveraged by partnerships to develop peer support capacity.

**Project Options:**

　　　a)　　　Design, implement, and evaluate interventions to improve care transitions from the inpatient setting for individuals with mental health and/or substance abuse disorders.

　　　　　　Required core project components:

---

93 Potentially Preventable Readmissions in the Texas Medicaid Population, Fiscal Year 2010, Texas Health and Human Services Commission (2012)

94 Rittenhouse D, Shortell S, et al. "Improving Chronic Illness Care: Findings from a National Study of Care Management Processes in Large Physician Practices." Medical Care Research and Review Journal (2010) 67(3): 301-320

95 Ibid.

    **a)**    Develop a cross-continuum team comprised of clinical and administrative representatives from acute care, ambulatory care, behavioral health and community-based non-medical supports

    **b)**    Conduct an analysis of the key drivers of 30-day hospital readmissions for behavioral health conditions using a chart review tool (e.g. the Institute for Healthcare Improvement's (IHI) State Action on Avoidable Re-hospitalizations (STAAR) tool) and patient and provider interviews.

    **c)**    Identify baseline mental health and substance abuse conditions at high risk for readmissions, (example include schizophrenia, bipolar disorder, major depressive disorder, chemical dependency).

    **d)**    Review best practices for improving care transitions from a range of evidence-based or evidence-informed models

    **e)**    Identify and prioritize evidence-based strategies and clinical protocols that support seamless care transitions and reduce preventable 30-day readmissions.

    **f)**    Implement two or more pilot intervention(s) in care transitions targeting one or more patient care units or a defined patient population. Examples of interventions include, but are not limited to, implementation of:

    **g)**    Conduct quality improvement for project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, identifying "lessons learned," opportunities to scale all or part of the project to a broader patient population, and identifying key challenges associated with expansion of the project, including special considerations for safety-net populations.

b)    "Other" project option: Implement other evidence-based project to establish improvement in care transition from the inpatient setting for individuals with mental health and / or substance abuse disorders in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 2.17 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

    Examples of interventions include, but are not limited to, implementation of:

**Attachment I**
**Regional Healthcare Partnership (RHP) Planning Protocol**

- Discharge checklists
- "Hand off" communication plans with receiving medical and behavioral health providers
- Wellness initiatives targeting high-risk behavioral health patients, such as WRAP, health planning and motivation strategies, Screening, Brief Intervention and Referral to Treatment (SBIRT) for substance use disorders,
- Individual and family education initiatives including self-management skills.
- Post-discharge medication planning
- Early follow-up such as homecare visits, primary care outreach, and/or patient call-backs.
- Transition and wellness support from certified peer specialists for mental health and /or substance use disorders.
- More intensive follow-through programs, such as CTI or other evidence-informed practices, for individuals with more severe behavioral health disorders and other challenges, such as homelessness.
- Electronic data exchange for critical clinical information to support excellent continuity of care.

## 2.18  Recruit, train, and support consumers of mental health services to provide peer support services

**Project Goal:**
The goal of this project is to use consumers of mental health services who have made substantial progress in managing their own illness and recovering a successful life in the community to provide peer support services.  These services are supportive and not necessarily clinical in nature.  Building on a project originally established under the State's Mental Health Transformation grant, consumers are being trained to serve as peer support specialists.  In addition to the basic peer specialist training and certification, an additional training is provided to certified peers specialists in "whole health".  With the whole health training peer specialists learn to work with other consumers to set achievable goals to prevent or self-manage chronic diseases such as diabetes and COPD. While such training currently exists, very limited numbers of peers are trained due to resource limitations. Evidence exists that such an approach can work with particularly vulnerable populations with serious mental illness[96].  The need for strategies to improve the health outcomes for people with behavioral health disorders is evidenced by their disparate life expectancy (dying 29 years younger than the general population[97] ), increased risk of mortality and poor health outcomes as severity of behavioral health disorders increase[98]

**Project Options**
  a)     Design, implement, and evaluate whole health peer support for individuals with mental health and /or substance use disorders.
         Required core project components:
  **a)**    Train administrators and key clinical staff in the use of peer specialists as an essential component of a comprehensive health system.
  **b)**    Conduct readiness assessments of organization that will integrate peer specialists into their network.
  **c)**    Identify peer specialists interested in this type of work.
  **d)**    Train identified peer specialists in whole health interventions, including conducting health risk assessments, setting SMART goals, providing educational and supportive services to targeted individuals with specific disorders (e.g. hypertension, diabetes, or health risks (e.g. obesity, tobacco use, physical inactivity.
  **e)**    Implement health risk assessments to identify existing and potential health risks for behavioral health consumers.

---

96 Benjamin G. Druss, MD, MPH, Liping Zhao, MSPH, Silke A. von Esenwein, PhD, Joseph R. Bona, MD, MBA, Larry Fricks, Sherry Jenkins-Tucker, Evelina Sterling, MPH, CHES, Ralph DiClemente, PhD, and Kate Lorig, RN, DrPH,  The Health and Recovery Peer (HARP) Program: A peer-led intervention to improve medical self-management for persons with serious mental illness, Schizophrenia Research, Volume 118, Issue 1 , Pages 264-270, May 2010
97  Parks, J, Svendsen, D, et. al. "Morbidity and Mortality in People with Serious Mental Illness", National Association of  State Mental Health Program Directors, 2006.
98 Druss BG, Reisinger Walker E., "Mental Disorders and Medical Co-Morbidity."  Robert Wood Johnson Foundation, The Synthesis Project: Issue 21 (2011).

      **f)**      Identify patients with serious mental illness who have health risk factors that can be modified.

      **g)**      Implement whole health peer support.

      **h)**      Connect patients to primary care and preventive services.

      **i)**      Track patient outcomes. Review the intervention(s) impact on participants and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

b)      "Other" project option: Implement other evidence-based project to recruit, train, and support consumers of mental health services to provide peer support services in an innovative manner not described in the project options above. Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note: All of the project options in project area 2.18 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement. Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

**2.19  Develop Care Management Function that integrates primary and behavioral health needs of individuals**

**Project Goal:**
Provide a targeted care management intervention program for the population of people with co-occurring mental health, substance use and chronic physical disorders to increase use of primary and specialty care and reducing the use of ER, crisis and jail diversion services. The prevalence of co-occurring mental health, substance use and chronic physical disorders is high in the indigent population. This is due to the lack of access to and the complexity of navigating primary care and specialty care services.  These individuals end up consuming a great deal of community resources due to ER visits, involvement of crisis response systems and often unnecessary incarcerations when routine treatment would be a better alternative.  Early engagement in appropriate services to address the multiple conditions for these individuals, as well as their needs for housing and social support, requires both behavioral health case managers and chronic disease care managers working closely to make service settings accessible and to track progress.

**Project Options:**
   a)       Design, implement, and evaluate care management programs and that integrate primary and behavioral health needs of individual patients
            Required core project components:
      **a)**   Conduct data matching to identify individuals with co-occurring disorders who are:
         - not receiving routine primary care,
         - not receiving specialty care according to professionally accepted practice guidelines,
         - over-utilizing ER services based on analysis of comparative data on other populations,
         - over-utilizing crisis response services.
         - Becoming involved with the criminal justice system due to uncontrolled/unmanaged symptoms.
      **b)**   Review chronic care management best practices such as Wagner's Chronic Care Model and select practices compatible with organizational readiness for adoption and implementation.
      **c)**   Identification of BH case managers and disease care managers to receive assignment of these individuals.
      **d)**   Develop protocols for coordinating care; identify community resources and services available for supporting people with co-occurring disorders.
      **e)**   Identify and implement specific disease management guidelines for high prevalence disorders, e.g. cardiovascular disease, diabetes, depression, asthma.
      **f)**   Train staff in protocols and guidelines.
      **g)**   Develop registries to track client outcomes.

    **h)**       Review the intervention(s) impact on quality of care and integration of care and identify "lessons learned," opportunities to scale all or part of the intervention(s) to a broader patient population, and identify key challenges associated with expansion of the intervention(s), including special considerations for safety-net populations.

b)      "Other" project option:  Implement other evidence-based project to develop care management function that integrates primary and behavioral health needs in an innovative manner not described in the project options above.  Providers implementing an innovative, evidence-based project using the "Other" project option may select among the process and improvement milestones specified in this project area or may include one or more customizable process milestone(s) P-X and/or improvement milestone(s) I-X, as appropriate for their project.

Note:  All of the project options in project area 2.19 should include a component to conduct quality improvement for the project using methods such as rapid cycle improvement.  Activities may include, but are not limited to, identifying project impacts, "lessons learned," opportunities to scale all or part of the project to a broader patient population, and key challenges associated with expansion of the project, including special considerations for safety-net populations.

# Category 3 Quality Improvements

**Category 3 Overview**

#### a. **Introduction**

The overall objective of Category 3 is to assess the effectiveness of Category 1 and 2 interventions in improving outcomes in the Texas healthcare delivery system. As described in the Program Funding and Mechanics (PFM) Protocol, each project selected in Categories 1 and 2 will have one or more associated outcome measures from Category 3.

For the purposes of the RHP Planning and PFM Protocols, outcome measures are defined as *"measures that assess the results of care experienced by patients, including patients' clinical events, patients' recovery and health status, patients' experiences in the health system, and efficiency/cost."*

All Category 3 outcome measures must be reported to specifications, except that a Performing Provider may customize the population measured by an outcome as allowed by CMS and HHSC to more closely reflect the patient population targeted in the related Category 1 or 2 project.

#### b. **Pay for Performance Measures**

The Category 3 menu of measures contains a large proportion of Pay for Performance (P4P) measures that providers may select from to receive incentive payments for demonstrating incremental improvements in the selected outcome. These measures are considered the stronger, more validated measures. If there is a P4P measure appropriate to the Category 1 or 2 project that the provider can report to the specifications in the attached Compendium (Appendix C), then the provider must select a P4P measure.

There will be standard achievement levels for P4P measures to earn Category 3 funds in demonstration year (DY) 4 and DY 5. In October 2014, providers may request to deviate from the standard achievement levels based on extenuating circumstances to be determined by the Texas Health and Human Services Commission (HHSC) and Centers for Medicare and Medicaid Services (CMS), such as if the intervention population is much smaller, significantly different than the denominator required in the measure specifications or if the benchmarks provided are not an appropriate fit for the denominator population (e.g., with the use of denominator subsets for age). Providers may request a deviation from the standard achievement levels established during the October 2014 baseline reporting period within parameters as agreed to by HHSC and CMS.

#### c. **Pay for Reporting Measures**

The Category 3 menu also contains some measures that are designated as Pay for Reporting (P4R). To accommodate the wide variety of Texas DSRIP providers and projects, these P4R measures were approved for inclusion in the menu as "exploratory" measures even though they do not have the strongest rigor of validation or evidence.

All P4R measures require prior authorization by HHSC and CMS. The prior authorization process will determine a) if the measure was a previously selected by the provider and was approved for use for a Category 1 or 2 project (if so, this serves as the authorization) and b) if not

previously approved, whether there is a P4P measure that would be an appropriate fit for the project that the provider can report to specifications.

Providers that need to use a P4R measure will not receive payment for improving its rate, but instead will receive payment for reporting the measure to the associated specifications. Providers may still demonstrate improvement in these measures; however, that improvement will not be the basis for incentive payment. For these reporting only or "exploratory" measures providers must engage in an alternate improvement activity - either a Population-Focused Priority Measure or a Stretch Activity. These alternate improvement activities are detailed in Appendix (A).

For Hospital, Community Mental Health Center, and Physician Group provider types, providers with a P4R measure should select an outcome from the Population-Focused Priority Measure list. These outcomes do not have to be tied to the associated Category 1 or 2 project and instead represent a larger health priority for the health system.

For Local Health Department providers and for those providers above who cannot identify a measure to report from the Population-Focused Priority Measure list, providers may select a Stretch Activity. These activities are intended to improve data infrastructure and capacity.

### d. Minimum Category 3 Requirements for Each Category 1 or 2 Project

Each outcome measure (IT-X.X) is labeled as a standalone measure or non-standalone measure. Providers can select among the following methods to meet Category 3 requirements for each Category 1 or 2 project:

- **At least one standalone measure:** Providers can select a standalone measure from any outcome domain listed in the table below for Category 1 and 2 projects. Cost-related outcomes may be used as the standalone outcome only for project area 2.5 (Cost Containment). Cost outcomes can be selected as non-standalone measures for other project areas.
- **At least one standalone measure and additional non-standalone measure(s):** One or more non-standalone measures from any outcome domain can be combined with at least one standalone measure.
- **A combination of at least 3 non-standalone measures:** A provider can select a combination of 3 non-standalone measures for a Category 1 or 2 project and these measures may be from different outcome domains if needed.

The measures selected for each Category 1 or 2 project may be a combination of P4P and P4R measures. Each measure is treated separately for reporting and payment purposes.

### e. Types of Category 3 Milestones

The terms "process milestone" and "achievement milestone" are used to classify Category 3 milestones in each demonstration year. Process milestones will be those milestones in which a provider is not earning DSRIP funds based on reaching a goal achievement level over baseline, i.e., it will be used for DY2 and DY3 planning activities to prepare for Category 3 reporting, in DY4 and DY5 for reporting to specifications (for P4R measures), and in DY5 for stretch activities. Achievement milestones will be used for milestones in which the provider will earn

funds based on progress towards a goal achievement level for the measure, i.e., for P4P measures in DY4 and DY5 and Population-Focused Priority Measures in DY5.

The table below describes the milestones each year for both P4P and P4R outcomes.

| | **Pay for Performance (P4P) outcome measures** | **Pay for Reporting (P4R) outcome measures** |
|---|---|---|
| DY2 | Each provider selected process milestones from the original menu (P-1 through P-7) and designated the valuation per milestone; a status update was allowed in lieu of specific milestone documentation for DY2 | |
| DY3 | 2 process milestones (P-8 & P-9) - DY3 Category 3 status update (50% of DY3 allocation) and establishing baseline (50% of DY3 allocation) | |
| DY4 | Process Milestone 10 - 50% of DY4 allocation for reporting P4P measure to specifications<br><br>Achievement Milestone 1 - 50% of DY4 allocation for demonstrating improvement in P4P measure over baseline | Process Milestone 10 - 100% of DY4 allocation for reporting P4R measure to specifications |
| DY5 | Achievement Milestone 1 - 100% of DY5 allocation for demonstrating improvement in P4P measure over baseline | Process Milestone 10 - 50% of DY5 allocation for reporting P4R measure to specifications<br><br>Alternate Improvement Activity<br>EITHER<br>Achievement Milestone 2 – 50% of DY5 allocation for demonstrating improvement in a Population Focused Priority Measure<br>OR<br>Process Milestone 11 –<br>50% of DY5 allocation for reporting as required on a stretch activity |

*Per the PFM Protocol, all Category 3 milestones are eligible for carry forward into the subsequent year and achievement milestones only are eligible for payment for partial achievement.

**Category 3 Outcome Measures**

All of the measures included in the Category 3 menu have been approved by CMS. Often the source of these measures is an authoritative agency around outcome measurement (e.g., AHRQ, NCQA, CDC, NQF). Most of these measures have been validated and tested to ensure that the outcomes are measuring what they purport to measure. In some instances, these evidence based measures are modified in order to be used by DSRIP providers to change the specifications to describe a provider focus as opposed to a health plan focus. These modifications are described

in detail within the compendium document (Appendix C). In some cases, where validated measures did not previously exist, measures were created based on evidence based guidelines and practices. These measures were included in the menu to reflect outcomes pertinent to approved Category 1 and 2 projects. The outcomes are salient to aspects of patient care that reflect better health and satisfaction with services, improved efficiencies in health care delivery and cost savings.

**Outcome Domains**

All of the Category 3 outcome measures are organized into 15 Outcome Domains (ODs) to facilitate measure selection.

- OD-1: Primary Care and Chronic Disease Management
- OD-2: Potentially Preventable Admissions
- OD-3: Potentially Preventable Readmissions (PPRs) – 30-day Readmission Rates
- OD-4: Potentially Preventable Complications, Healthcare Acquired Conditions, and Patient Safety
- OD-5: Cost of Care
- OD-6: Patient Satisfaction
- OD-7: Oral Health
- OD-8: Perinatal Outcomes and Maternal Child Health
- OD-9: Right Care, Right Setting
- OD-10: Quality of Life/Functional Status
- OD-11: Behavioral Health/Substance Abuse Care
- OD-12: Primary Prevention
- OD-13: Palliative Care
- OD-14: Healthcare Workforce
- OD-15: Infectious Disease Management

**List of Category 3 Outcome Measures**

The table below lists the outcome measures from which providers may choose. The Compendium (Appendix C) contains further details on how each measure is to be reported and the Category 3 Companion (Appendix D) contains guidance for providers selection of their Category 3 outcome measures in March 2014 based on the revised Category 3 framework agreed to by CMS and HHSC in February 2014 and reflected in this protocol and the PFM Protocol.

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|----|----|----|----|----|
| 1 | IT-1.1 | Non-Standalone (NSA) | P4P | No | Third next available appointment |
| 1 | IT-1.2 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications - Angiotensin Converting Enzyme (ACE) inhibitors or Angiotensin Receptor Blockers (ARBs) |
| 1 | IT-1.3 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications - Digoxin |
| 1 | IT-1.4 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications- Diuretic |
| 1 | IT-1.5 | Non-Standalone (NSA) | P4P | No | Annual monitoring for patients on persistent medications - Anticonvulsant |
| 1 | IT-1.6 | Standalone (SA) | P4P | No | Cholesterol management for patients with cardiovascular conditions |
| 1 | IT-1.7 | Standalone (SA) | P4P | No | Controlling high blood pressure |
| 1 | IT-1.8 | Non-Standalone (NSA) | P4P | No | Depression management: Screening and Treatment Plan for Clinical Depression |
| 1 | IT-1.9 | Standalone (SA) | P4P | No | Depression management: Depression Remission at Twelve Months |
| 1 | IT-1.10 | Standalone (SA) | P4P | No | Diabetes care: HbA1c poor control (>9.0%) |
| 1 | IT-1.11 | Standalone (SA) | P4P | No | Diabetes care:  BP control (<140/90mm Hg) |
| 1 | IT-1.12 | Non-Standalone (NSA) | P4P | No | Diabetes care: Retinal eye exam |
| 1 | IT-1.13 | Non-Standalone (NSA) | P4P | No | Diabetes care:  Foot exam |
| 1 | IT-1.14 | Non-Standalone (NSA) | P4P | No | Diabetes care: Nephropathy |
| 1 | IT-1.15 | Standalone (SA) | P4P | No | Peritoneal Dialysis Adequacy Clinical Performance Measure III |
| 1 | IT-1.16 | Standalone (SA) | P4P | No | Hemodialysis Adequacy Clinical Performance Measure III |
| 1 | IT-1.17 | Standalone (SA) | P4P | No | Hemodialysis Adequacy for Pediatric Hemodialysis Patients |
| 1 | IT-1.18 | Standalone (SA) | P4P | No | Follow-Up After Hospitalization for Mental Illness |
| 1 | IT-1.19 | Standalone (SA) | P4P | No | Antidepressant Medication Management |
| 1 | IT-1.20 | Non-Standalone (NSA) | P4P | No | Comprehensive Diabetes Care LDL Screening |
| 1 | IT-1.21 | Non-Standalone (NSA) | P4P | No | Adult Body Mass Index (BMI) Assessment |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|------------------------------|------------------|
| 1 | IT-1.22 | Standalone (SA) | P4P | No | Asthma Percent of Opportunity Achieved |
| 1 | IT-1.23 | Non-Standalone (NSA) | P4P | No | Tobacco Use: Screening & Cessation |
| 1 | IT-1.24 | Standalone (SA) | P4R | Yes | Adolescent tobacco use |
| 1 | IT-1.25 | Standalone (SA) | P4R | Yes | Adult tobacco use |
| 1 | IT-1.26 | Non-Standalone (NSA) | P4P | No | Seizure type(s) and current seizure frequency(ies) |
| 1 | IT-1.27 | Non-Standalone (NSA) | P4P | No | Pain Assessment and Follow-up |
| 1 | IT-1.28 | Non-Standalone (NSA) | P4P | No | Preventive Care and Screening: Screening for High Blood Pressure and Follow-Up Documented |
| 1 | IT-1.29 | Non-Standalone (NSA) | P4P | No | Weight Assessment and Counseling for Nutrition and Physical Activity for Children/Adolescents |
| 1 | IT-1.30 | Non-Standalone (NSA) | P4P | No | Hemoglobin A1c (HbA1c) Testing for Pediatric Patients |
| 1 | IT-1.31 | Standalone (SA) | P4P | No | Medication Management for People with Asthma (MMA) |
| 1 | IT-1.32 | Standalone (SA) | P4P | No | Asthma Medication Ratio (AMR) |
| 1 | IT-1.33 | Non-Standalone (NSA) | P4P | No | Medical Assistance With Smoking and Tobacco Use Cessation |
| 1 | IT-1.34 | Standalone (SA) | P4P | No | Appropriate Testing for Children With Pharyngitis |
| 2 | IT-2.1 | Standalone (SA) | P4R | Yes | Congestive Heart Failure (CHF) Admission rate |
| 2 | IT-2.2 | Standalone (SA) | P4P | No | Risk Adjusted Congestive Heart Failure (CHF) Admission rate |
| 2 | IT-2.3 | Standalone (SA) | P4R | Yes | End-Stage Renal Disease (ESRD) Admission Rate |
| 2 | IT-2.4 | Standalone (SA) | P4P | No | Risk Adjusted End-Stage Renal Disease (ESRD) Admission Rate |
| 2 | IT-2.5 | Standalone (SA) | P4R | Yes | Hypertension (HTN) Admission Rate |
| 2 | IT-2.6 | Standalone (SA) | P4P | No | Risk Adjusted Hypertension (HTN) Admission Rate |
| 2 | IT-2.7 | Standalone (SA) | P4R | Yes | Behavioral Health/Substance Abuse (BH/SA) Admission Rate |
| 2 | IT-2.8 | Standalone (SA) | P4P | No | Risk Adjusted Behavioral Health/Substance Abuse (BH/SA) Admission Rate |
| 2 | IT-2.9 | Standalone (SA) | P4R | Yes | Chronic Obstructive Pulmonary Disease (COPD) Admission Rate |
| 2 | IT-2.10 | Standalone (SA) | P4P | No | Risk Adjusted Chronic Obstructive Pulmonary Disease (COPD) Admission Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 2 | IT-2.11 | Standalone (SA) | P4R | Yes | Adult Asthma Admission Rate |
| 2 | IT-2.12 | Standalone (SA) | P4P | No | Risk Adjusted Adult Asthma Admission Rate |
| 2 | IT-2.13 | Standalone (SA) | P4R | Yes | Diabetes Short Term Complication Admission Rate |
| 2 | IT-2.14 | Standalone (SA) | P4P | No | Risk Adjusted Diabetes Short Term Complication Admission Rate |
| 2 | IT-2.15 | Standalone (SA) | P4R | Yes | Diabetes Long Term Complications Admission Rate |
| 2 | IT-2.16 | Standalone (SA) | P4P | No | Risk Adjusted Diabetes Long Term Complications Admission Rate |
| 2 | IT-2.17 | Standalone (SA) | P4R | Yes | Uncontrolled Diabetes Admissions Rate |
| 2 | IT-2.18 | Standalone (SA) | P4P | No | Risk Adjusted Uncontrolled Diabetes Admissions Rate |
| 2 | IT-2.19 | Standalone (SA) | P4R | Yes | Flu and pneumonia Admission Rate |
| 2 | IT-2.20 | Standalone (SA) | P4P | No | Risk Adjusted Flu and pneumonia Admission Rate |
| 2 | IT-2.21 | Standalone (SA) | P4P | No | Ambulatory Care Sensitive Conditions Admissions Rate |
| 2 | IT-2.22 | Standalone (SA) | P4P | No | Prevention Quality Indicators (PQI) Composite Measure Potentially Preventable Hospitalizations for Ambulatory Care Sensitive Conditions |
| 2 | IT-2.23 | Standalone (SA) | P4R | Yes | Pediatric Asthma Admission Rate |
| 2 | IT-2.24 | Standalone (SA) | P4P | No | Risk Adjusted Pediatric Asthma Admission Rate |
| 2 | IT-2.25 | Standalone (SA) | P4R | Yes | Pain Admission Rate |
| 2 | IT-2.26 | Standalone (SA) | P4P | No | Risk Adjusted Pain Admission Rate |
| 2 | IT-2.27 | Standalone (SA) | P4R | Yes | Cancer Admission Rate |
| 2 | IT-2.28 | Standalone (SA) | P4P | No | Risk Adjusted Cancer Admission Rate |
| 2 | IT-2.29 | Standalone (SA) | P4R | Yes | Cellulitis Admission Rate |
| 2 | IT-2.30 | Standalone (SA) | P4P | No | Risk Adjusted Cellulitis Admission Rate |
| 3 | IT-3.1 | Standalone (SA) | P4P | No | Hospital-Wide All-Cause Unplanned Readmission Rate |
| 3 | IT-3.2 | Standalone (SA) | P4R | Yes | Congestive Heart Failure (CHF) 30-day Readmission Rate |
| 3 | IT-3.3 | Standalone (SA) | P4P | No | Risk Adjusted Congestive Heart Failure (CHF) 30-day Readmission Rate |
| 3 | IT-3.4 | Standalone (SA) | P4R | Yes | Diabetes 30-day Readmission Rate |
| 3 | IT-3.5 | Standalone (SA) | P4P | No | Risk Adjusted Diabetes 30-day Readmission Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|---------------------|--------------|------------------|-----------------------------|------------------|
| 3 | IT-3.6 | Standalone (SA) | P4R | Yes | Renal Disease 30-day Readmission Rate |
| 3 | IT-3.7 | Standalone (SA) | P4P | No | Risk Adjusted Renal Disease 30-day Readmission Rate |
| 3 | IT-3.8 | Standalone (SA) | P4R | Yes | Acute Myocardial Infarction (AMI) 30-day Readmission Rate |
| 3 | IT-3.9 | Standalone (SA) | P4P | No | Risk Adjusted Acute Myocardial Infarction (AMI) 30-day Readmission Rate |
| 3 | IT-3.10 | Standalone (SA) | P4R | Yes | Coronary Artery Disease (CAD) 30-day Readmission Rate |
| 3 | IT-3.11 | Standalone (SA) | P4P | No | Risk Adjusted Coronary Artery Disease (CAD) 30-day Readmission Rate |
| 3 | IT-3.12 | Standalone (SA) | P4R | Yes | Stroke (CVA) 30-day Readmission Rate |
| 3 | IT-3.13 | Standalone (SA) | P4P | No | Risk Adjusted Stroke (CVA) 30-day Readmission Rate |
| 3 | IT-3.14 | Standalone (SA) | P4R | Yes | Behavioral Health /Substance Abuse 30-day Readmission Rate |
| 3 | IT-3.15 | Standalone (SA) | P4P | No | Risk Adjusted Behavioral Health /Substance Abuse 30-day Readmission Rate |
| 3 | IT-3.16 | Standalone (SA) | P4R | Yes | Chronic Obstructive Pulmonary Disease (COPD) 30-day Readmission Rate |
| 3 | IT-3.17 | Standalone (SA) | P4P | No | Risk Adjusted Chronic Obstructive Pulmonary Disease (COPD) 30-day Readmission Rate |
| 3 | IT-3.18 | Standalone (SA) | P4R | Yes | Adult Asthma 30-day Readmission Rate |
| 3 | IT-3.19 | Standalone (SA) | P4P | No | Risk Adjusted Adult Asthma 30-day Readmission Rate |
| 3 | IT-3.20 | Standalone (SA) | P4R | Yes | Pediatric Asthma 30-day Readmission Rate |
| 3 | IT-3.21 | Standalone (SA) | P4P | No | Risk Adjusted Pediatric Asthma 30-day Readmission Rate |
| 3 | IT-3.22 | Standalone (SA) | P4P | No | Risk Adjusted All-Cause Readmission |
| 3 | IT-3.23 | Standalone (SA) | P4R | Yes | Ventricular Assist Device 30-day Readmission Rate |
| 3 | IT-3.24 | Standalone (SA) | P4P | No | Risk Adjusted Ventricular Assist Device 30-day Readmission Rate |
| 3 | IT-3.25 | Standalone (SA) | P4R | Yes | Post-Surgical 30-day Readmission Rate |
| 3 | IT-3.26 | Standalone (SA) | P4P | No | Risk Adjusted Post-Surgical 30-day Readmission Rate |
| 3 | IT-3.27 | Standalone (SA) | P4R | Yes | Cancer Related 30-day Readmission Rate |
| 3 | IT-3.28 | Standalone (SA) | P4R | Yes | Medication Complication 30-day Readmission Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 3 | IT-3.29 | Standalone (SA) | P4P | No | Risk Adjusted Medication Complication 30-day Readmission Rate |
| 4 | IT-4.1 | Standalone (SA) | P4P | No | Improvement in risk adjusted Potentially Preventable Complications rate(s) |
| 4 | IT-4.2 | Standalone (SA) | P4P | No | Central line-associated bloodstream infections (CLABSI) rates |
| 4 | IT-4.3 | Standalone (SA) | P4P | No | Catheter-associated Urinary Tract Infections (CAUTI) rates |
| 4 | IT-4.4 | Standalone (SA) | P4P | No | Surgical site infections (SSI) rates |
| 4 | IT-4.5 | Standalone (SA) | P4P | No | Patient Fall Rate |
| 4 | IT-4.6 | Standalone (SA) | P4P | No | Incidence of Hospital-acquired Venous Thromboembolism (VTE) |
| 4 | IT-4.7 | Standalone (SA) | P4P | No | Pressure Ulcer Rate |
| 4 | IT-4.8 | Standalone (SA) | P4R | Yes | Sepsis mortality |
| 4 | IT-4.9 | Non-Standalone (NSA) | P4R | Yes | Average length of stay: Sepsis |
| 4 | IT-4.10 | Standalone (SA) | P4P | No | Sepsis bundle  (NQF 0500) |
| 4 | IT-4.11 | Non-Standalone (NSA) | P4P | No | Risk-Adjusted Average Length of Inpatient Hospital Stay |
| 4 | IT-4.12.1 | Non-Standalone (NSA) | P4P | No | Average Length of Stay for patients of Medication Errors |
| 4 | IT-4.13 | Non-Standalone (NSA) | P4R | Yes | Patients receiving language services supported by qualified language services providers |
| 4 | IT-4.14 | Standalone (SA) | P4P | No | Intensive Care: In-hospital mortality rate |
| 4 | IT-4.15 | Standalone (SA) | P4P | No | Venous Thromboembolism Prophylaxis Bundle |
| 4 | IT-4.16 | Standalone (SA) | P4R | Yes | Reduce Unplanned Re-operations |
| 4 | IT-4.12.2 | Non-Standalone (NSA) | P4P | No | Adverse drug events |
| 4 | IT-4.17 | Non-Standalone (NSA) | P4P | No | Stroke - Thrombolytic Therapy |
| 4 | IT-4.18 | Non-Standalone (NSA) | P4P | No | Warfarin management: percentage of patients on warfarin with an international normalized ratio (INR) result of 4 or above whose dosage has been adjusted or reviewed prior to the next warfarin dose, during the 6 month time period |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|--------------------|--------------|-----------------|----------------------------|------------------|
| 4 | IT-4.19 | Non-Standalone (NSA) | P4P | Yes | Falls: Screening, Risk-Assessment, and Plan of Care to Prevent Future Falls |
| 5 | IT-5.1 a | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost of Illness Analysis |
| 5 | IT-5.1 b | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Minimization Analysis |
| 5 | IT-5.1 c | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Effectiveness Analysis |
| 5 | IT-5.1 d | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Utility Analysis |
| 5 | IT-5.1 e | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Improved Cost Savings: Demonstrate cost savings in care delivery - Cost Benefit Analysis |
| 5 | IT-5.2 | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Per Episode Cost of Care |
| 5 | IT-5.3 | SA for project area 2.5, NSA for all other project areas | P4P | Yes | Total Cost of Care |
| 6 | IT-6.1.a.i | Standalone (SA) | P4P | No | HCAHPS Communication with Doctors |
| 6 | IT-6.1.a.ii | Standalone (SA) | P4P | No | HCAHPS Communication with Nurses |
| 6 | IT-6.1.a.iii | Standalone (SA) | P4P | No | HCAHPS Responsiveness of Hospital Staff |
| 6 | IT-6.1.a.iv | Standalone (SA) | P4P | No | HCAHPS Pain Control |
| 6 | IT-6.1.a.v | Standalone (SA) | P4P | No | HCAHPS Communication about Medicine |
| 6 | IT-6.1.a.vi | Standalone (SA) | P4P | No | HCAHPS Cleanliness of Hospital Environment |
| 6 | IT-6.1.a.vii | Standalone (SA) | P4P | No | HCAHPS Quietness of Hospital Environment |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 6 | IT-6.1.a.viii | Standalone (SA) | P4P | No | HCAHPS Discharging Information |
| 6 | IT-6.1.a.ix | Standalone (SA) | P4P | No | HCAHPS Overall Hospital Rating |
| 6 | IT-6.1.a.x | Standalone (SA) | P4P | No | HCAHPS Likelihood to Recommend |
| 6 | IT-6.1.b.i | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Timeliness of Appointments, Care, & Information |
| 6 | IT-6.1.b.ii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Provider Communication |
| 6 | IT-6.1.b.iii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Office Staff |
| 6 | IT-6.1.b.iv | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Overall Provider Rating |
| 6 | IT-6.1.b.v | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Provider's Attention to Child's Growth and Development(Pediatric) |
| 6 | IT-6.1.b.vi | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Provider's Advice on Keeping Child Safe and Healthy(Pediatric) |
| 6 | IT-6.1.c.i | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Cultural Competence Survey Supplement |
| 6 | IT-6.1.c.ii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Health Information Technology Supplement |
| 6 | IT-6.1.c.iii | Standalone (SA) | P4P | No | CG-CAHPS 12-month: Health Literacy Supplement |
| 6 | IT-6.1.c.iv | Standalone (SA) | P4P | No | CG-CAHPS 12-month: PCMH Supplement (includes Shared Decision Making) |
| 6 | IT-6.1.d.i | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Timeliness of Appointments, Care, & Information |
| 6 | IT-6.1.d.ii | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Provider Communication |
| 6 | IT-6.1.d.iii | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Office Staff |
| 6 | IT-6.1.d.iv | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Overall Provider Rating |
| 6 | IT-6.1.d.v | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Provider's Attention to Child's Growth and Development (Pediatric) |
| 6 | IT-6.1.d.vi | Standalone (SA) | P4P | No | CG-CAHPS Visit Survey 2.0: Providers Advice on Keeping Child Safe and healthy (Pediatric) |
| 6 | IT-6.2.a | Standalone (SA) | P4P | No | Client Satisfaction Questionnaire 8 (CSQ-8) |
| 6 | IT-6.2.b | Standalone (SA) | P4P | No | Visit-Specific Satisfaction Instrument (VSQ-9) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 6 | IT-6.2.c | Standalone (SA) | P4R | Yes | Health Center Patient Satisfaction Survey |
| 6 | IT-6.2.d.i | Standalone (SA) | P4P | No | PSQ-III General Satisfaction |
| 6 | IT-6.2.d.ii | Standalone (SA) | P4P | No | PSQ-III Technical Quality |
| 6 | IT-6.2.d.iii | Standalone (SA) | P4P | No | PSQ-III Interpersonal Aspects |
| 6 | IT-6.2.d.iv | Standalone (SA) | P4P | No | PSQ-III Communication |
| 6 | IT-6.2.d.v | Standalone (SA) | P4P | No | PSQ-III Financial Aspects |
| 6 | IT-6.2.d.vi | Standalone (SA) | P4P | No | PSQ-III Time Spent w/ Doctors |
| 6 | IT-6.2.d.vii | Standalone (SA) | P4P | No | PSQ-III Access, Availability, & Convenience |
| 6 | IT-6.2.d.viii | Standalone (SA) | P4P | No | PSQ-18 General Satisfaction |
| 6 | IT-6.2.d.ix | Standalone (SA) | P4P | No | PSQ-18 Technical Quality |
| 6 | IT-6.2.d.x | Standalone (SA) | P4P | No | PSQ-18 Interpersonal Aspects |
| 6 | IT-6.2.d.xi | Standalone (SA) | P4P | No | PSQ-18 Communication |
| 6 | IT-6.2.d.xii | Standalone (SA) | P4P | No | PSQ-18 Financial Aspects |
| 6 | IT-6.2.d.xiii | Standalone (SA) | P4P | No | PSQ-18 Time Spent w/ Doctors |
| 6 | IT-6.2.d.xiv | Standalone (SA) | P4P | No | PSQ-18 Access, Availability, & Convenience |
| 6 | IT-6.2.e | Standalone (SA) | P4R | Yes | Experience of Care and Health Outcomes (ECHO) 3.0 |
| 7 | IT-7.1 | Non-Standalone (NSA) | P4P | Yes | Dental Sealant: Children |
| 7 | IT-7.2 | Standalone (SA) | P4P | Yes | Cavities: Children |
| 7 | IT-7.3 | Non-Standalone (NSA) | P4P | Yes | Early Childhood Caries – Fluoride Applications |
| 7 | IT-7.4 | Non-Standalone (NSA) | P4P | Yes | Topical Fluoride application |
| 7 | IT-7.5 | Standalone (SA) | P4P | Yes | Proportion of older adults aged 65 to 74 years who have lost all their natural teeth |
| 7 | IT-7.6 | Standalone (SA) | P4P | Yes | Urgent Dental Care Needs in Children: Percentage of children with urgent dental care needs |
| 7 | IT-7.7 | Standalone (SA) | P4P | Yes | Urgent Dental Care Need in Older Adults |
| 7 | IT-7.8 | Standalone (SA) | P4P | Yes | Chronic Disease Patients Accessing Dental Services |
| 7 | IT-7.9 | Standalone (SA) | P4P | Yes | Dental Treatment Needs Among Chronic Disease Patients |
| 7 | IT-7.10 | Standalone (SA) | P4P | No | Cavities: Adults |
| 7 | IT-7.11 | Non-Standalone (NSA) | P4P | No | Utilization of Services: Children |
| 7 | IT-7.12 | Non-Standalone (NSA) | P4P | No | Oral Evaluation: Children |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 7 | IT-7.13 | Non-Standalone (NSA) | P4P | No | Prevention: Sealants for 6 – 9 year-old Children at Elevated Risk |
| 7 | IT-7.14 | Non-Standalone (NSA) | P4P | No | Prevention: Sealants for 10 – 14 year-old Children at Elevated Risk |
| 7 | IT-7.15 | Non-Standalone (NSA) | P4P | No | Prevention: Topical Fluoride Intensity for Children at Elevated Caries Risk |
| 7 | IT-7.16 | Non-Standalone (NSA) | P4P | No | Preventive Services for Children at Elevated Caries Risk |
| 7 | IT-7.17 | Non-Standalone (NSA) | P4P | No | Treatment Services: Children |
| 7 | IT-7.18 | Non-Standalone (NSA) | P4P | No | Usual Source of Services |
| 7 | IT-7.19 | Non-Standalone (NSA) | P4P | No | Care Continuity: Children |
| 7 | IT-7.20 | Non-Standalone (NSA) | P4P | No | Per Member Per Month Cost of Clinical Services (PMPM Cost): Children |
| 7 | IT-7.21 | Non-Standalone (NSA) | P4P | No | Annual Dental Visit |
| 7 | IT-7.22 | Non-Standalone (NSA) | P4R | Yes | Diabetes mellitus: percent of patients who obtained a dental exam in the last 12 months (NQMC:1600) |
| 8 | IT-8.1 | Non-Standalone (NSA) | P4P | No | Timeliness of Prenatal/Postnatal Care |
| 8 | IT-8.2 | Standalone (SA) | P4P | No | Percentage of Low Birth- weight births |
| 8 | IT-8.3 | Standalone (SA) | P4P | No | Early Elective Delivery |
| 8 | IT-8.4 | Non-Standalone (NSA) | P4P | No | Antenatal Steroids |
| 8 | IT-8.5 | Non-Standalone (NSA) | P4P | No | Frequency of ongoing prenatal care |
| 8 | IT-8.6 | Non-Standalone (NSA) | P4P | No | Cesarean Rate for Nulliparous Singleton Vertex |
| 8 | IT-8.7 | Non-Standalone (NSA) | P4P | No | Birth Trauma Rates |
| 8 | IT-8.8 | Standalone (SA) | P4P | Yes | Neonatal Mortality |
| 8 | IT-8.9 | Standalone (SA) | P4R | Yes | Youth Pregnancy Rate |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 8 | IT-8.10 | Standalone (SA) | P4R | Yes | Pregnancy Rate |
| 8 | IT-8.11 | Standalone (SA) | P4R | Yes | Healthy term newborn |
| 8 | IT-8.12 | Standalone (SA) | P4P | No | Pre-term birth rate |
| 8 | IT-8.13 | Standalone (SA) | P4R | Yes | NICU days/delivery |
| 8 | IT-8.14 | Non-Standalone (NSA) | P4R | Yes | Exclusive Breastfeeding at 3 Months |
| 8 | IT-8.15 | Non-Standalone (NSA) | P4R | Yes | Exclusive Breastfeeding at 6 Months |
| 8 | IT-8.16 | Non-Standalone (NSA) | P4R | Yes | Any Breastfeeding at 6 Months |
| 8 | IT-8.17 | Non-Standalone (NSA) | P4R | Yes | Any Breastfeeding at 12 Months |
| 8 | IT-8.18 | Non-Standalone (NSA) | P4P | No | Rate of Exclusive Breastfeeding |
| 8 | IT-8.19 | Standalone (SA) | P4P | No | Post-Partum Follow-Up and Care Coordination |
| 8 | IT-8.20 | Non-Standalone (NSA) | P4P | No | Developmental Screening in the First Three Years of Life |
| 8 | IT-8.21 | Non-Standalone (NSA) | P4P | No | Well-Child Visits in the First 15 Months of Life (6 or more visits) |
| 8 | IT-8.22 | Non-Standalone (NSA) | P4P | No | Well-Child Visits in the Third, Fourth, Fifth and Sixth Years of Life |
| 8 | IT-8.23 | Non-Standalone (NSA) | P4P | No | Children and Adolescents' Access to Primary Care Practitioners (CAP) |
| 8 | IT-8.24 | Non-Standalone (NSA) | P4P | No | Adolescent Well-Care Visits (AWC) |
| 8 | IT-8.25 | Non-Standalone (NSA) | P4R | Yes | Sudden Infant Death Syndrome Counseling |
| 8 | IT-8.26 | Non-Standalone (NSA) | P4R | Yes | Routine prenatal care: percentage of pregnant patients who receive counseling about aneuploidy screening in the first trimester (NQMC:8031) |
| 8 | IT-8.27 | Non-Standalone (NSA) | P4R | Yes | Behavioral health risk assessment (for pregnant women) |
| 9 | IT-9.1 | Standalone (SA) | P4P | Yes | Decrease in mental health admissions and readmissions to criminal justice settings such as jails or prisons |
| 9 | IT-9.2 | Standalone (SA) | P4P | No | Reduce Emergency Department (ED) visits for Ambulatory Care Sensitive Conditions (ACSC) per 100,000 |
| 9 | IT-9.3 | Standalone (SA) | P4P | No | Reduce Pediatric Emergency Department (ED) visits for Ambulatory Care Sensitive Conditions (ACSC) per 100,000 |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 9 | IT-9.2.a | Standalone (SA) | P4P | No | Emergency Department (ED) visits per 100,000 |
| 9 | IT-9.3.a | Standalone (SA) | P4P | No | Pediatric Emergency Department (ED) visits per 100,000 |
| 9 | IT-9.4.a | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Congestive Heart Failure |
| 9 | IT-9.4.b | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Diabetes |
| 9 | IT-9.4.c | Standalone (SA) | P4P | No | Reduce Emergency Department visits for End Stage Renal Disease |
| 9 | IT-9.4.d | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Angina and Hypertension |
| 9 | IT-9.4.e | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Behavioral Health/Substance Abuse |
| 9 | IT-9.4.f | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Chronic Obstructive Pulmonary Disease |
| 9 | IT-9.4.g | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Asthma |
| 9 | IT-9.4.i | Standalone (SA) | P4P | No | Reduce Emergency Department visits for Dental Conditions |
| 9 | IT-9.4.h | Standalone (SA) | P4P | No | Pediatric/Young Adult Asthma Emergency Department Visits |
| 9 | IT-9.5 | Non-Standalone (NSA) | P4R | Yes | Reduce low acuity ED visits |
| 9 | IT-9.6 | Non-Standalone (NSA) | P4P | No | Emergency department (ED) visits where patients left without being seen |
| 9 | IT-9.7 | Non-Standalone (NSA) | P4P | No | Emergency department (ED) visits where patients with a mental health complaint without being seen |
| 9 | IT-9.8 | Non-Standalone (NSA) | P4P | No | Care Transition: Transition Record with Specified Elements Received by Discharged Patients (Emergency Department Discharges to Ambulatory Care [Home/Self Care] or Home Health Care) |
| 9 | IT-9.9 | Non-Standalone (NSA) | P4P | No | Transition Record with Specified Elements Received by Discharged Patients (Inpatient Discharges to Home/Self Care or Any Other Site of Care) |
| 9 | IT-9.10 | Standalone (SA) | P4P | No | ED throughput Measure bundle |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 9 | IT-9.10.a | Non-Standalone (NSA) | P4P | No | Median Time from ED Arrival to ED Departure for Discharged ED Patients |
| 9 | IT-9.10.b | Non-Standalone (NSA) | P4P | No | Median time from admit decision time to time of departure from the ED for ED patients admitted to inpatient status |
| 9 | IT-9.10.c | Non-Standalone (NSA) | P4P | No | Median time from ED arrival to time of departure from the emergency room for patients admitted to the facility from the ED |
| 10 | IT-10.1.a.i | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-4D) |
| 10 | IT-10.1.a.ii | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-6D) |
| 10 | IT-10.1.a.iii | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-7D) |
| 10 | IT-10.1.a.iv | Standalone (SA) | P4P | No | Assessment of Quality of Life (AQoL-8D) |
| 10 | IT-10.1.a.v | Standalone (SA) | P4P | No | Pediatric Quality of Life Inventory (PedsQL) |
| 10 | IT-10.1.b.i | Standalone (SA) | P4P | No | RAND Medical Outcomes Study: Measures of Quality of Life Survey Core Survey (MOS) |
| 10 | IT-10.1.b.ii | Standalone (SA) | P4P | No | RAND Short Form 12 (SF-12v2) Health Survey |
| 10 | IT-10.1.b.iii | Standalone (SA) | P4P | No | RAND Short Form 36[1] (SF-36) Health Survey |
| 10 | IT-10.1.c | Standalone (SA) | P4R | Yes | Quality of Life Enjoyment and Satisfaction Questionnaire (Q-LES-Q) |
| 10 | IT-10.1.d | Standalone (SA) | P4P | No | McGill Quality of Life (MQOL) Index |
| 10 | IT-10.1.e.i | Standalone (SA) | P4P | No | Palliative Care Outcome Scale (POSv1) |
| 10 | IT-10.1.e.ii | Standalone (SA) | P4P | No | Palliative Care Outcome Scale (POSv2) |
| 10 | IT-10.1.f | Standalone (SA) | P4P | No | Functional Assessment of Cancer Therapy (FACT-G) |
| 10 | IT-10.1.g | Standalone (SA) | P4P | No | Missoula-VITAS Quality of Life Index (MVQOLI) |
| 10 | IT-10.1.h | Standalone (SA) | P4P | No | CDC Health-Related Quality of Life (HRQoL) Measures |
| 10 | IT-10.1.i.i | Standalone (SA) | P4R | Yes | Child Health Questionnaire Parent CHQ-PF50 |
| 10 | IT-10.1.i.ii | Standalone (SA) | P4R | Yes | Child Health Questionnaire Parent CHQ-PF28 |
| 10 | IT-10.1.i.iii | Standalone (SA) | P4R | Yes | Child Health Questionnaire Child Form (CHQ-CF87) |
| 10 | IT-10.1.j | Standalone (SA) | P4R | Yes | Family Experiences Interview Schedule (FEIS) |
| 10 | IT-10.2.a | Standalone (SA) | P4R | Yes | Supports Intensity Scale (SIS) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 10 | IT-10.2.b | Standalone (SA) | P4P | No | Lawton Instrumental Activities of Daily Living (IADLs) Scale |
| 10 | IT-10.3.a | Standalone (SA) | P4P | No | Activity Measure for Post-Acute Care (AMPAC) |
| 10 | IT-10.3.b | Standalone (SA) | P4R | Yes | The Duke Health Profile (Duke) |
| 10 | IT-10.3.d | Standalone (SA) | P4P | No | Battelle Development Inventory-2 (BDI-2) |
| 10 | IT-10.3.e | Standalone (SA) | P4P | No | Problem Areas in Diabetes (PAID) Scale |
| 10 | IT-10.4.a | Standalone (SA) | P4R | Yes | Developmental Profile 3 (DP-3) |
| 10 | IT-10.4.b | Standalone (SA) | P4R | Yes | Vineland Adaptive Behavior Scales, 2nd Edition (VABS II) |
| 10 | IT-10.5 | Standalone (SA) | P4R | Yes | Bayley Scales of Infant and Toddler Development-Third Edition (Bayley-III) |
| 11 | IT-11.1 | Non-Standalone (NSA) | P4R | Yes | Adult Mental Health Facility Admission Rate |
| 11 | IT-11.2 | Non-Standalone (NSA) | P4R | Yes | Youth Mental Health Facility Admission Rate |
| 11 | IT-11.3 | Non-Standalone (NSA) | P4R | Yes | IDD/ICF Admissions to a Care Facility |
| 11 | IT-11.4 | Non-Standalone (NSA) | P4R | Yes | IDD/SPMI Admissions and Readmissions to State Institutions |
| 11 | IT-11.5 | Standalone (SA) | P4P | No | Adherence to Antipsychotic Medications for Individuals with Schizophrenia |
| 11 | IT-11.6 | Standalone (SA) | P4P | No | Follow-up Care for Children Prescribed ADHD Medication (ADD) |
| 11 | IT-11.7 | Non-Standalone (NSA) | P4P | No | Initiation of Depression Treatment |
| 11 | IT-11.8 | Standalone (SA) | P4P | No | Initiation and Engagement of Alcohol and Other Drug Dependence Treatment |
| 11 | IT-11.9 | Non-Standalone (NSA) | P4P | No | Care Planning for Dual Diagnosis |
| 11 | IT-11.10 | Non-Standalone (NSA) | P4R | Yes | Diabetes Screening for People with Schizophrenia or Bipolar Disorder Prescribed Antipsychotic Medications (SSD) |
| 11 | IT-11.11 | Non-Standalone (NSA) | P4R | Yes | Diabetes Monitoring for People With Diabetes and Schizophrenia |
| 11 | IT-11.12 | Non-Standalone (NSA) | P4P | No | Cardiovascular monitoring for people with cardiovascular disease and schizophrenia (SMC) |
| 11 | IT-11.13 | Non-Standalone (NSA) | P4R | Yes | Assignment of Primary Care Physician to Individuals with Schizophrenia |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 11 | IT-11.14 | Non-Standalone (NSA) | P4R | Yes | Annual Physical Exam for Persons with Mental Illness |
| 11 | IT-11.15 | Non-Standalone (NSA) | P4R | Yes | Depression Screening by 18 years of age |
| 11 | IT-11.16 | Non-Standalone (NSA) | P4P | Yes | Assessment for Substance Abuse Problems of Psychiatric Patients |
| 11 | IT-11.17 | Non-Standalone (NSA) | P4P | Yes | Assessment of Risk to Self/Others |
| 11 | IT-11.18 | Non-Standalone (NSA) | P4R | Yes | Bipolar Disorder (BD) and Major Depression (MD): Appraisal for alcohol or substance use |
| 11 | IT-11.19 | Non-Standalone (NSA) | P4P | Yes | Assessment for Psychosocial Issues of Psychiatric Patients |
| 11 | IT-11.20 | Non-Standalone (NSA) | P4R | Yes | Bipolar Disorder and Major Depression: Assessment for Manic or hypomanic behaviors |
| 11 | IT-11.21 | Non-Standalone (NSA) | P4R | Yes | Assessment of Major Depressive Symptoms |
| 11 | IT-11.22 | Non-Standalone (NSA) | P4R | Yes | Child and Adolescent Major Depressive Disorder: Suicide Risk Assessment |
| 11 | IT-11.27 | Non-Standalone (NSA) | P4P | No | Vocational Rehabilitation for Schizophrenia |
| 11 | IT-11.28 | Non-Standalone (NSA) | P4R | Yes | Housing Assessment for Individuals with Schizophrenia |
| 11 | IT-11.29 | Non-Standalone (NSA) | P4R | Yes | Independent Living Skills Assessment for Individuals with Schizophrenia |
| 11 | IT-11.23.a | Standalone (SA) | P4R | Yes | Texas Adult Mental Health (AMH) Consumer Survey |
| 11 | IT-11.23.b | Standalone (SA) | P4R | Yes | Quick Inventory of Depressive Symptomatology (QIDS) |
| 11 | IT-11.24 | Standalone (SA) | P4R | Yes | Generalized Anxiety Disorder (GAD-7) |
| 11 | IT-11.25 | Standalone (SA) | P4R | Yes | Daily Living Activities (DLA-20) |
| 11 | IT-11.26.a | Standalone (SA) | P4R | Yes | Positive Symptom Rating Scale (PSRS) |
| 11 | IT-11.26.b | Standalone (SA) | P4R | Yes | Aberrant Behavior Checklist (ABC) |
| 11 | IT-11.26.c | Standalone (SA) | P4R | Yes | Adult Needs and Strength Assessment (ANSA) |
| 11 | IT-11.26.d | Standalone (SA) | P4R | Yes | Children and Adolescent Needs and Strengths Assessment (CANS-MH) |
| 11 | IT-11.26.e.i | Standalone (SA) | P4P | No | Patient Health Questionnaire 9 (PHQ-9) |
| 11 | IT-11.26.e.ii | Standalone (SA) | P4P | No | Patient Health Questionnaire 15 (PHQ-15) |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|----|------|------|------|------|------|
| 11 | IT-11.26.e.iii | Standalone (SA) | P4P | No | Patient Health Questionnaire: Somatic, Anxiety, and Depressive Symptoms (PHQ-SADS) |
| 11 | IT-11.26.e.iv | Standalone (SA) | P4P | No | Patient Health Questionnaire 4 (PHQ-4) |
| 11 | IT-11.26.e.v | Standalone (SA) | P4R | Yes | Edinburg Postpartum Depression Scale |
| 12 | IT-12.1 | Non-Standalone (NSA) | P4P | No | Breast Cancer Screening |
| 12 | IT-12.2 | Non-Standalone (NSA) | P4P | No | Cervical Cancer Screening |
| 12 | IT-12.3 | Non-Standalone (NSA) | P4P | No | Colorectal Cancer Screening |
| 12 | IT-12.4 | Non-Standalone (NSA) | P4P | No | Pneumonia vaccination status for older adults |
| 12 | IT-12.5 | Non-Standalone (NSA) | P4P | No | Pneumococcal Immunization- Inpatient |
| 12 | IT-12.6 | Non-Standalone (NSA) | P4P | No | Influenza Immunization -- Ambulatory |
| 12 | IT-12.7 | Non-Standalone (NSA) | P4P | No | Influenza Immunization- Inpatient |
| 12 | IT-12.8 | Non-Standalone (NSA) | P4P | No | Immunization for Adolescents- Tdap/TD and MCV |
| 12 | IT-12.9 | Non-Standalone (NSA) | P4P | No | Childhood immunization status |
| 12 | IT-12.10 | Non-Standalone (NSA) | P4P | No | Adults (18+ years) Immunization status |
| 12 | IT-12.11 | Non-Standalone (NSA) | P4P | No | HPV vaccine for adolescents |
| 12 | IT-12.12 | Non-Standalone (NSA) | P4R | Yes | Immunization and Recommended Immunization Schedule Education |
| 12 | IT-12.13 | Standalone (SA) | P4P | No | Mammography follow-up rate |
| 12 | IT-12.14 | Non-Standalone (NSA) | P4R | Yes | Prostate Cancer: Avoidance of Overuse Measure – Bone Scan for Staging Low-Risk Patients |
| 12 | IT-12.15 | Standalone (SA) | P4P | No | Abnormal Pap test follow-up rate |
| 12 | IT-12.16 | Standalone (SA) | P4P | No | High-risk Colorectal Cancer Follow-up rate within one year |
| 12 | IT-12.17 | Non-Standalone (NSA) | P4R | Yes | Intensive behavioral dietary counseling for adult patients with hyperlipidemia and other known risk factors for cardiovascular and diet-related chronic disease |
| 12 | IT-12.18 | Non-Standalone (NSA) | P4R | Yes | ABI Screening for Peripheral Arterial Disease |
| 12 | IT-12.19 | Non-Standalone (NSA) | P4P | No | Osteoporosis: Screening or Therapy for Women Aged 65 Years and Older |
| 13 | IT-13.1 | Non-Standalone (NSA) | P4P | Yes | Hospice and Palliative Care – Pain assessment |
| 13 | IT-13.2 | Non-Standalone (NSA) | P4P | No | Hospice and Palliative Care – Treatment Preferences |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 13 | IT-13.3 | Standalone (SA) | P4P | Yes | Hospice and Palliative Care – Proportion with more than one emergency room visit in the last days of life |
| 13 | IT-13.4 | Standalone (SA) | P4P | Yes | Hospice and Palliative Care – Proportion admitted to the ICU in the last 30 days of life |
| 13 | IT-13.5 | Non-Standalone (NSA) | P4P | No | Hospice and Palliative Care – Percentage of patients receiving hospice or palliative care services with documentation in the clinical record of a discussion of spiritual/religions concerns or documentation that the patient/caregiver did not want to discuss |
| 13 | IT-13.6 | Non-Standalone (NSA) | P4P | No | Palliative Care: Percent of patients who have documentation in the medical record that an interdisciplinary family meeting was conducted on or before day five of ICU admission |
| 13 | IT-13.7 | Standalone (SA) | P4R | Yes | Oncology: Pain Intensity Quantified – Medical Oncology and Radiation Oncology |
| 13 | IT-13.8 | Non-Standalone (NSA) | P4R | Yes | Oncology: Plan of Care for Pain – Medical Oncology and Radiation Oncology |
| 14 | IT-14.1 | Standalone (SA) | P4R | Yes | Number of practicing primary care practitioners per 1000 individual in HPSAs or MUAs |
| 14 | IT-14.2 | Standalone (SA) | P4R | Yes | Number of practicing nurse practitioners and physician assistants per 1000 individuals in HPSAs or MUAs |
| 14 | IT-14.3 | Standalone (SA) | P4R | Yes | Number of practicing psychiatrists per 1000 individuals in HPSAs or MUAs |
| 14 | IT-14.4 | Non-Standalone (NSA) | P4R | Yes | Percent of graduates who practice in a HPSA or MUA |
| 14 | IT-14.5 | Non-Standalone (NSA) | P4R | Yes | Percent of graduates who work in a practice that has a high Medicaid share that reflects the distribution of Medicaid in the population |
| 14 | IT-14.6 | Non-Standalone (NSA) | P4R | Yes | Percent of trainees who have spent at least 5 years living in a health- professional shortage area (HPSA) or medically underserved area |

| OD | IT reference number | Measure type | Performance Type | Prior Authorization Required | Title of measure |
|---|---|---|---|---|---|
| 14 | IT-14.7 | Non-Standalone (NSA) | P4R | Yes | Percent of trainees who report that they plan to practice in HPSAs or MUAs based on a systematic survey |
| 14 | IT-14.8 | Non-Standalone (NSA) | P4R | Yes | Percent of trainees who report that they plan to serve Medicaid populations based on a systematic survey |
| 14 | IT-14.9 | Standalone (SA) | P4R | Yes | Number of practicing specialty care practitioners per 1000 individuals in HPSA or MUA |
| 15 | IT-15.1 | Non-Standalone (NSA) | P4P | No | HIV medical visit frequency |
| 15 | IT-15.2 | Standalone (SA) | P4P | No | Prescription of Antiretroviral Medications |
| 15 | IT-15.3 | Non-Standalone (NSA) | P4P | No | HIV Screening: Patients at High Risk of HIV |
| 15 | IT-15.4 | Non-Standalone (NSA) | P4P | No | HIV/AIDS: Tuberculosis (TB) Screening |
| 15 | IT-15.5 | Non-Standalone (NSA) | P4P | No | HIV/AIDS: Sexually Transmitted Diseases - Screening for Chlamydia, Gonorrhea, and Syphilis |
| 15 | IT-15.6 | Non-Standalone (NSA) | P4P | No | Chlamydia screening in women |
| 15 | IT-15.7 | Non-Standalone (NSA) | P4P | No | Chlamydia Screening and Follow up in adolescents |
| 15 | IT-15.8 | Standalone (SA) | P4R | Yes | Follow-up testing for C. trachomatis among recently infected men and women |
| 15 | IT-15.9 | Non-Standalone (NSA) | P4R | Yes | Syphilis screening |
| 15 | IT-15.10 | Non-Standalone (NSA) | P4P | No | Syphilis positive screening rates |
| 15 | IT-15.11 | Standalone (SA) | P4P | No | Follow-up after Treatment for Primary or Secondary Syphilis |
| 15 | IT-15.12 | Non-Standalone (NSA) | P4R | Yes | Gonorrhea screening rates |
| 15 | IT-15.13 | Non-Standalone (NSA) | P4P | No | Gonorrhea Positive Screening Rates |
| 15 | IT-15.14 | Standalone (SA) | P4P | No | Follow-up testing for N. gonorrhoeae among recently infected men and women |
| 15 | IT-15.15 | Non-Standalone (NSA) | P4R | Yes | High Intensity Behavioral Counseling to prevent STIs for all sexually active adolescents and for adults at increased risk for STIs |
| 15 | IT-15.16 | Standalone (SA) | P4P | No | Curative Tuberculosis (TB) treatment rate |
| 15 | IT-15.17 | Standalone (SA) | P4P | No | Latent Tuberculosis Infection (LTBI) treatment rate |
| 15 | IT-15.18 | Standalone (SA) | P4P | No | Hepatitis C Cure Rate |

**Grouping Patients for Outcomes**

For the purpose of Category 3 outcomes, there are three main groups of patients to consider.

**Intervention population** - This is the group of individuals that receives the intervention outlined in the Category 1 or 2 project. In almost all cases (and based on measure specifications), a provider will not report on the intervention-level population for the purposes of Category 3 reporting.

**Target population** - This is the group of individuals that is eligible to receive the intervention (the broader group of individuals the intervention is designed to serve). While Category 3 must be reported to measure specifications, providers may narrow the measure denominator based on certain criteria to more closely represent the Category 1 or 2 project's target population.

**Outcome population** - This is the group of patients that meet the criteria for outcome measurement based on the specifications for each measure. This often is a broader population than the project target population.

**Allowable Denominator Subsets**

All Category 3 outcome measures are required to be reported to the specifications required for the measure as outlined in the menu and the compendium. However, as appropriate to the Category 1 or 2 project, the provider can propose a more narrow denominator (a subset of the outcome population) based on one or more of the following criteria:

- Payer source (Medicaid or Indigent or both),
- Target condition (including co-morbid condition/diagnosis)
- Demographic factors - age, race/ethnicity, and/or gender, or
- Clinic or other location where the Category 1 or 2 project is taking place.

Using allowable denominator subsets is a way to more closely reflect the target population for each project (which will still be broader than the intervention population in almost all cases).

**Establishing a Baseline for Each Category 3 Measure**

Each DSRIP provider will need to establish a baseline for all Category 3 outcome measures, both P4P and P4R. Baselines also must be established for any selected Population-Focused Priority measures used as an alternative performance activity. The baseline will be specific to the patients served by that provider. Baselines will be formally reported in October 2014 or later if needed.

The provider's baseline for each measure will determine both the achievement goals for the measure in DY4 and DY5. The baseline period should be as recent as possible, DY3 is preferred, and will generally be a 12-month or 6-month period. The DY4 measurement period will be set as the 12 months immediately following the end of baseline period and the DY5 measurement period will be the 12 months immediately following the end of DY4 measurement

period. Providers should review the measure specifications to help determine the appropriate baseline period.

If providers need to request an earlier baseline measurement period than DY2, provider will need to submit justification as to why DY2 or DY3 baseline is not appropriate or available. HHSC will review these on a case by case basis and make a determination on appropriate DY4 and DY5 measurement periods.

**Standard Achievement Target Methodology for Achievement Milestones**

For achievement milestones for P4P measures in DY4-5 and Population-Focused Priority Measures in DY5, providers will receive incentive payments for demonstrating improvements in rate performance towards an achievement target. Achievement targets are determined based on a provider's baseline performance in the measure and are calculated by one of the two methodologies described below. Achievement milestones are eligible for partial achievement in increments of 25% as outlined in the PFM Protocol.

***Quality Improvement System for Managed Care (QISMC)****: For those P4P measures where the improvement methodology is designated as QISMC, providers will receive incentive payments for closing the gap between their baseline performance and the benchmark rates listed. For DSRIP, Texas is using a hybrid of this system used for managed care, and the benchmarks are a proxy for performance based on national or state data and may not be an exact match to the population or delivery system for a DSRIP project. If a provider, at baseline, is performing above the high performance benchmark it is required to select another measure unless the provider can make a compelling justification for how improvement can be demonstrated beyond the high performance benchmark.

The achievement level goal for DY4 will be determined as follows:

- IF a provider's reported baseline rate falls below the low performance benchmark (also called minimum performance level or MPL) the DY4 Achievement Target is equal to the rate listed for the MPL.
- IF a provider's reported baseline rate falls above the MPL but below the high performance level (HPL) benchmark, the provider must close the gap between baseline performance and the HPL rate by 10%.

The achievement level goal for DY5 will be determined as follows.

- IF a provider's reported baseline rate falls below the low performance benchmark (also called minimum performance level or MPL) the DY5 Achievement Target is equal to a 10% gap reduction between the MPL and HPL.
- IF a provider's reported baseline rate falls above the MPL but below the high performance level (HPL) benchmark providers must close the gap between baseline performance and the HPL rate by 20%.

**Example:**

| IT-1.10 A1C poor control (>9%) | | | MPL = 50.7% | HPL = 28.95% |
|---|---|---|---|---|
| **Baseline** performance | **DY4** Achievement Target **(goal)** | **DY5** Achievement target **(goal)** | **DY4 performance/** payment | **DY5 performance/** payment |

| Scenario 1: **63.4%** | 50.7% (= MPL) | 48.53% = MPL – ([HPL-MPL] * 10%) | 53.4%: 78% achievement towards goal- earns 75% of allocation | 47.50%: 100% achievement towards goal- earns 100% of allocation |
|---|---|---|---|---|
| Scenario 2: **36.7%** | 35.93% ( = (baseline - HPL)* 10% improvement over baseline) | 35.15% ( = (baseline - HPL)* 20% improvement over baseline | 35.50%: 100% achievement towards goal- earns 100% of allocation | 35.40%: 84% achievement towards goal- earns 75% of allocation |

***Improvement over Self (IOS)***: There are some P4P measures where QSMIC appropriate benchmarks (HPL and MPL) are not available. For these P4P measures, the improvement methodology is designated as "IOS", or Improvement over self, providers earn incentive payments for demonstrating improvement over baseline performance.

The <u>achievement level goals</u> will be determined as follows:

- DY4 achievement level goal is equal to a 5% improvement over the provider's baseline and is calculated as a 5% gap reduction between baseline performance and highest possible performance in the measure (e.g., 0% or 100% depending on the directionality of a rate based measure).
- DY5 achievement level goal is equal to a 10% improvement over the provider's baseline and is calculated as a 10% gap reduction between baseline performance and highest possible performance in the measure.

The IOS methodology is further described and specified in Appendix B for measures that are categorized as rates, frequencies or counts and survey scores

Example of IOS achievement methodology for a rate based measure:

| IT-1.9 | Depression Management: Depression Remission at 12 months | | | No high and low performing benchmark information available, therefore assume highest possible performance (100%) as performance gap upper limit. |
|---|---|---|---|---|
| Baseline | DY4 Achievement target (goal) | DY4 performance/payment | DY5 Achievement target (goal) | DY5 performance/payment |
| **40.25%** | 5%* (100- 40.25) + baseline= **43.24%** | **42.5%**: ((performance – baseline)/(goal – baseline)) = 2.25/2.99 * 100 = 75.25% achievement towards | 10%* (100- 40.25) + baseline = **46.23%** | **47.5%**: ((performance – baseline)/(goal – baseline)) = 7.25/5.98 * 100 = 121% |

| | | | | |
|---|---|---|---|---|
| | | goal - earns 75% of allocation | | achievement towards goal - earns 100% of allocation. |

## Category 3 Reporting

i.     <u>DY2 Reporting</u>

For DY2, providers were able to select their Category 3 process milestones from the below options and also designate the valuation for each milestone as long as their total Category 3 valuation met the minimum percentage level required in the PFM Protocol.  Metrics, data sources, goals and rationale were specified by the performing provider for each of the selected process milestones listed below.

- P- 1 Project planning - engage stakeholders, identify current capacity and needed resources,
- determine timelines and document implementation plans
- P- 2 Establish baseline rates
- P- 3 Develop and test data systems
- P- 4 Conduct Plan Do Study Act (PDSA) cycles to improve data collection and intervention activities
- P- 5 Disseminate findings, including lessons learned and best practices, to stakeholders
- P- 7 Other activities not described above

HHSC and CMS also allowed performing providers in DY2 to provider a Category 3 status update in lieu of documentation specific to the milestones above since the revised Category 3 menu and framework was not final by the end of DY2.

ii.    <u>DY3 Reporting</u>

For all Category 3 measures, there will be two process milestones in DY3 - providers will be eligible to earn 50% of the funding for each Category 3 measure based on a status report and the other 50% during the based on establishing or validating the baseline for each measure.

iii.   <u>DY4 Reporting</u>

Reporting in DY4 will vary depending on the type of outcome selected (P4P or P4R).

| Measure and performance type | Milestone type and % fund allocation | Successful Achievement |
|---|---|---|
| P4P – QISMC | Process Milestone (PM) - 50% allocation Achievement Milestone (AM) - 50% allocation | PM - accurate reporting of DY4 rate per approved measure specifications. AM - achievement of DY4 goal (MPL achieved or 10% gap reduction between baseline rate and HPL benchmark) |
| P4P- IOS | Process Milestone (PM) - 50% allocation Achievement Milestone (AM) - 50% allocation | PM - accurate reporting of DY4 rate per approved measure specifications. AM - achievement of DY4 goal (5% improvement over baseline rate) |

| P4R | Process Milestone (PM) - 100% allocation | PM - accurate reporting of DY4 rate per approved measure specifications. |
|---|---|---|

iv.     <u>DY5 Reporting</u>

DY5 reporting will vary depending on the type of outcome selected (P4P or P4R) as well as the type of Alternate Improvement Activity selected.

| Measure and performance type | Milestone type and % fund allocation | Successful Achievement |
|---|---|---|
| P4P - QISMC | Achievement Milestone - 100% allocation | AM- achievement of DY5 goal (improvement over MPL goal by a 10% gap reduction between MPL and HPL or 20% gap reduction between baseline rate and HPL benchmark) |
| P4P – IOS | Achievement Milestone - 100% allocation | AM- achievement of DY5 goal (10% improvement over baseline rate) |
| P4R | Process Milestone - 50% allocation<br><br><u>Alternate Improvement Activity</u> – 50% allocation for Achievement Milestone for Population-Focused Priority Measure improvement OR Process Milestone for Stretch Activity | PM - accurate reporting of DY5 rate per approved measure specifications.<br><br>AM - for Population-Focused Priority measures- achievement of DY5 goal OR<br>PM- successful reporting of Stretch Activity |

# Category 4 Population-focused Improvements

*The Category 4 measures are:*
- Aligned with the low-income, Medicaid, and uninsured population;
- Identified as high priority given the health care needs and issues of the patient population served; and
- Viewed as valid health care indicators to inform and identify areas for improvement in population health within the health care system.

*Category 4 Structure:*
- <u>Required Reporting Domains:</u> Category 4 contains five domains on which hospital performing providers must report, as specified in the *Program Funding and Mechanics Protocol*. The required reporting domains include:
  - Potentially Preventable Admissions (PPAs)
  - Potentially Preventable Readmissions (PPRs) - 30-day
  - Potentially preventable Complications (PPCs)
  - Patient-centered healthcare, including patient satisfaction and medication management
  - Emergency department
- <u>Optional Reporting Domain:</u> At their option, hospital performing providers may report on Reporting Domain (RD) 6, which is the CMS Initial Core Set of Measures for Adults and Children in Medicaid/CHIP. While reporting on this domain is optional, participation in Domain 6 reporting is required to value Category 4 at the 15 percent maximum (see *Category 4 Valuation* below.)
- Hospital performing providers, with the exception of those that are exempt from Category 4 reporting in accordance with paragraph 11.f of the *Program Funding and Mechanics Protocol*, must report on Category 4 measures in the required reporting domains. Each hospital performing provider subject to required Category 4 reporting must report on all measures in the required reporting domains, unless for certain measures the provider does not have statistically valid data, as defined in paragraph 11.e of the *Program Funding and Mechanics Protocol*. Hospitals designated as Institutes of Mental Disease (IMDs) report on an alternate set of measures listed at the end of this section.
- HHSC will collect all Category 4 data for each hospital, but based on Texas statutory requirements pertaining to the confidentiality of individual hospital data for some of the Category 4 measures, HHSC will summarize certain data related to Category 4 for CMS at the RHP level rather than at the individual provider level.
- Each performing provider subject to Category 4 required reporting will include Category 4 measures for PPCs (RD-3) during DY 4-5 and for all other required reporting domains during DY 3-5.
- The Category 4 emphasis is on the reporting of population health measures to gain information on and understanding of the health status of key populations and to build the capacity for reporting on a comprehensive set of population health metrics; therefore, hospital performing providers will not be required to achieve improvement in Category 4.

*Category 4 Valuation:*

- **Maximum valuation:** In order to value Category 4 up to the 15 percent maximum for DY 3-5, hospital performing providers must report on the optional reporting domain (RD-6) in addition to the five required reporting domains.
- **10 percent valuation:** Hospital performing providers that do not report on the optional reporting domain (RD-6) only may value Category 4 at the minimum 10 percent for DY 3-5. Performing providers that only report on the required reporting domains may designate to Categories 1, 2, or 3 the 5 percent valuation they are unable to obtain in Category 4 by foregoing reporting on the optional domain.

**Category 4 Reporting Measures by Domain:**

**RD-1: Potentially Preventable Admissions**
Texas Medicaid's External Quality Review Organization (EQRO) supplies Potentially Preventable Admissions (PPA) reports for DSRIP participating hospital providers for the duration of the Waiver. These PPA reports are produced with the 3M methodology and describe admissions for the providers Medicaid and CHIP populations. For reporting in this domain, providers submit the PPA data on the following categories:

| Category |
| --- |
| Congestive Heart Failure |
| Diabetes |
| Behavioral Health or Substance Abuse |
| Chronic Obstructive Pulmonary Disease |
| Adult Asthma  (Age>18yrs) |
| Pediatric Asthma  (Age<=18yrs) |
| Angina and Coronary Artery Disease |
| Hypertension |
| Cellulitis |
| Bacterial PNA (Respiratory Infection) |
| Pulmonary Edema and Respiratory Failure |
| Others |

Additional technical specifications are available in the DSRIP Provider Reporting Potentially Preventable Events Technical Notes (Appendix E), including APR-DRGs associated with these categories.

**RD-2: Potentially Preventable Readmission - 30-day**

Texas Medicaid's External Quality Review Organization (EQRO) supplies Potentially Preventable 30-day Readmissions (PPR) reports for the duration of the waiver. These PPR reports are produced with the 3M methodology and describe readmissions for the providers Medicaid and CHIP populations. For reporting in this domain, providers submit PPR data on the following categories:

| Category |
|---|
| Congestive Heart Failure |
| Diabetes |
| Behavioral Health or Substance Abuse |
| Chronic Obstructive Pulmonary Disease |
| Cerebrovascular Accident |
| Adult Asthma  (Age>18yrs) |
| Pediatric Asthma  (Age<=18yrs) |
| Acute Myocardial Infarction |
| Angina and Coronary Artery Disease |
| Hypertension |
| Cellulitis |
| Renal Failure |
| Cesarean delivery |
| Sepsis |
| Others |

Additional technical specifications are available in the DSRIP Provider Reporting Potentially Preventable Events Technical Notes (Appendix E), including APR-DRGs associated with these categories.

### RD-3: Potentially Preventable Complications (PPCs)

Hospital performing providers subject to required Category 4 reporting must report on the 64 PPC measures listed below in DY 4-5. Texas Medicaid's External Quality Review Organization (EQRO) supplies PPC reports for the duration of the waiver.
  o **Metric:**  Risk-adjusted PPC rates for the 64 PPCs below.  (As calculated by the 3M software.[99])

| PPC | PPC Description |
|---|---|
| 1 | Stroke & Intracranial Hemorrhage |
| 2 | Extreme CNS Complications |

---

[99]For measure specifications see 3M's Users Manual.

| 3 | Acute Pulmonary Edema and Respiratory Failure without Ventilation |
|---|---|
| 4 | Acute Pulmonary Edema and Respiratory Failure with Ventilation |
| 5 | Pneumonia & Other Lung Infections |
| 6 | Aspiration Pneumonia |
| 7 | Pulmonary Embolism |
| 8 | Other Pulmonary Complications |
| 9 | Shock |
| 10 | Congestive Heart Failure |
| 11 | Acute Myocardial Infarction |
| 12 | Cardiac Arrhythmias & Conduction Disturbances |
| 13 | Other Cardiac Complications |
| 14 | Ventricular Fibrillation/Cardiac Arrest |
| 15 | Peripheral Vascular Complications except Venous Thrombosis |
| 16 | Venous Thrombosis |
| 17 | Major Gastrointestinal Complications without Transfusion or Significant Bleeding |
| 18 | Major Gastrointestinal Complications with Transfusion or Significant Bleeding |
| 19 | Major Liver Complications |
| 20 | Other Gastrointestinal Complications without Transfusion or Significant Bleeding |
| 21 | Clostridium Difficile Colitis |
| 23 | GU Complications except UTI |
| 24 | Renal Failure without Dialysis |
| 25 | Renal Failure with Dialysis |
| 26 | Diabetic Ketoacidosis & Coma |
| 27 | Post-Hemorrhagic & Other Acute Anemia with Transfusion |
| 28 | In-Hospital Trauma and Fractures |
| 29 | Poisonings except from Anesthesia |
| 30 | Poisonings due to Anesthesia |
| 31 | Decubitus Ulcer |
| 32 | Transfusion Incompatibility Reaction |
| 33 | Cellulitis |
| 34 | Moderate Infections |
| 35 | Septicemia & Severe Infections |
| 36 | Acute Mental Health Changes |
| 37 | Post-Operative Infection & Deep Wound Disruption without Procedure |
| 38 | Post-Operative Wound Infection & Deep Wound Disruption with Procedure |
| 39 | Reopening Surgical Site |
| 40 | Post-Operative Hemorrhage & Hematoma without Hemorrhage Control Procedure or I&D Procedure |
| 41 | Post-Operative Hemorrhage & Hematoma with Hemorrhage Control Procedure or I&D Procedure |

| 42 | Accidental Puncture/Laceration during Invasive Procedure |
|----|---|
| 43 | Accidental Cut or Hemorrhage during Other Medical Care |
| 44 | Other Surgical Complication - Moderate |
| 45 | Post-procedure Foreign Bodies |
| 46 | Post-Operative Substance Reaction & Non-O.R. Procedure for Foreign Body |
| 47 | Encephalopathy |
| 48 | Other Complications of Medical Care |
| 49 | Iatrogenic Pneumothorax |
| 50 | Mechanical Complication of Device, Implant & Graft |
| 51 | Gastrointestinal Ostomy Complications |
| 52 | Inflammation & Other Complications of Devices, Implants or Grafts except Vascular Infection |
| 53 | Infection, Inflammation and Clotting Complications of Peripheral Vascular Catheters and Infusions |
| 54 | Infections due to Central Venous Catheters |
| 55 | Obstetrical Hemorrhage without Transfusion |
| 56 | Obstetrical Hemorrhage with Transfusion |
| 57 | Obstetric Lacerations & Other Trauma Without Instrumentation |
| 58 | Obstetric Lacerations & Other Trauma With Instrumentation |
| 59 | Medical & Anesthesia Obstetric Complications |
| 60 | Major Puerperal Infection and Other Major Obstetric Complications |
| 61 | Other Complications of Obstetrical Surgical & Perineal Wounds |
| 62 | Delivery with Placental Complications |
| 63 | Post-Operative Respiratory Failure with Tracheostomy |
| 64 | Other In-Hospital Adverse Events |
| 65 | Urinary Tract Infection |
| 66 | Catheter-Related Urinary Tract Infection |

> o Additional technical specifications will be available in the DSRIP Provider Reporting Potentially Preventable Events Technical Notes (Appendix E).

### RD-4: Patient-centered Healthcare

1. **Patient Satisfaction**

The reporting of the measures is limited to the inpatient setting only utilizing Hospital Consumer Assessment of Healthcare Providers and Systems (HCAHPS) survey. IMDs and children's facilities not eligible to use HCAHPs report any other relevant survey results in the qualitative reporting section.

Additional guidance is available in the Category 4 compendium. (Appendix F)

2. **Medication management**

   *1.*

   *Reconciled Medication List Received by Discharged Patients (Discharges from an Inpatient Facility to Home/Self Care or Any Other Site of Care) (NQF 0646)*

   STEWARD: American Medical Association - Physician Consortium for Performance Improvement (AMA-PCPI), http://www.qualitymeasures.ahrq.gov/content.aspx?id=28139

   Detailed measure specifications are described in Category 4 compendium (Appendix F).

   *i.*
   **RD-5: Emergency Department**

   *Emergency department throughput time—admitted patients: admit decision time to ED departure time for admitted patients (NQF 0497)*

   Measure Steward Information: Center for Medicare and Medicaid Services;   http://www.qualitymeasures.ahrq.gov/hhs/content.aspx?id=44602#.U1-9VvldWCU

   Additional guidance is available in the Category 4 compendium (Appendix F).

   **RD-6.   (Optional  Domain)  Initial Core Set of Measures for Adults and Children in Medicaid/CHIP**

**Initial Core Set for Children in Medicaid/CHIP**: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/ChildCoreMeasures.pdf

   **Child Core Set Technical Specifications**: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/Medicaid-and-CHIP-Child-Core-Set-Manual.pdf

**Initial Core Set for Adults in Medicaid**: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/AdultCoreMeasures.pdf

   **Adult Core Set Technical Specifications:**  http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/Medicaid-Adult-Core-Set-Manual.pdf

Measures designed for health plans and will require minor modifications of specifications for reporting by hospital providers.

Hospital providers will report measures appropriate to settings of care. Hospitals that provide inpatient services only are not required to report measures that are specific to ambulatory settings. Hospitals that have outpatient clinics are required to report measures appropriate to ambulatory care settings. HHSC and CMS will jointly agree on a minimum data set for inpatient and outpatient providers (Appendix G)

**Alternate Measures for Institutes of Mental Disease (IMDs) :**

Public and private Institutes for Mental Disease (IMDs) report an alternative set of Category 4 measures:

**RD-1**
1. – Potentially Preventable Admissions for behavioral health/ substance abuse conditions (with a preference for distinguishing behavioral health and substance abuse)
2. All-cause Potentially Preventable Admissions

**RD-2**
1. Behavioral health/ substance abuse readmission rates (with a preference for distinguishing behavioral health and substance abuse)
2. All-cause Potentially Preventable Readmissions

**RD-4**
1. - Patient satisfaction
   o Psychiatric facilities for which using HCAHPS is not appropriate should report "0" in the HCAHPS reporting section. Facilities should include all relevant data from their satisfaction surveys in the qualitative reporting section.
2. - Medication reconciliation (NQF 0646 specifications)

**Additional Measures:**
   **Bacterial pneumonia immunization**
   o Pneumococcal Immunization (PPV23) – Overall Rate (CMS IQR/Joint Commission measure IMM-1a)
   Specifications Found Here: http://www.jointcommission.org/specifications_manual_for_national_hospital_inpatient_quality_measures.aspx
   **Influenza Immunization**
   o Influenza Immunization (CMS IQR/Joint Commission measure IMM-2)
   Specifications Found Here: http://www.jointcommission.org/specifications_manual_for_national_hospital_inpatient_quality_measures.aspx

The Texas state IMDs will be able to report on the Category 4 measures suggested by CMS above with the following caveats:

- State mental health hospitals will have admission rates for BH and not substance abuse as a separate reportable item.

- The "all cause PPAs" will only report on mental health PPA since that is the only diagnosis the state admits a patient to a state mental health facility.

- State mental health hospitals can report on mental health readmission rates but not substance abuse, since patients would have not been admitted for only substance abuse disorders.
- The "all cause PPRs" will only report on mental health PPR since that is the only diagnosis DSHS admits a patients into a state mental health facility.

**Addendum to RHP Planning Protocol - Demonstration Year 6A**

Attachment I -Regional Healthcare Partnership (RHP) planning protocol is amended for Demonstration Year (DY) 6A as follows:

# Category 1 and 2

➢ All Process and Improvement Milestones in all Category 1 and 2 project areas are replaced with the following milestones under each project area:

**DY6A Milestones:**

1. Milestone: Total Quantifiable Patient Impact (QPI)
   Q.1.1 Number of individuals served or encounters provided over pre-DSRIP baseline

2. Milestone:  Medicaid and Low-Income Uninsured (MLIU) QPI
   MQ. 1.1 Number of MLIU individuals served or MLIU encounters provided over MLIU pre-DSRIP baseline

3. Milestone:  Project Summary and Core Components
   3.1. Project Overview: Accomplishments
   3.2. Project Overview: Challenges
   3.3. Project Overview: Lessons Learned
   3.4. Progress on Core Components, including quality improvement activities
   3.5. Description of other federal funding sources available for the project
   3.6. Participation in learning collaboratives, stakeholder forum, or other stakeholder meeting during DY6A
   3.7. The progress and completion of the next step taken (if required for a particular project)

4. Milestone: Sustainability Planning

   Responses to questions related to sustainability planning efforts:
   4.1 Collaboration with Medicaid Managed Care
   4.2 Value Based Purchasing and/or Alternative Payment Models
   4.3 Availability of other funding sources
   4.4 Project Evaluation
   4.5 Health Information Exchange (HIE)

➢ Project areas and project options remain unchanged.

**Attachment I**
**Regional Healthcare Partnership (RHP) Planning Protocol**

➢ Reporting for the DY6A milestones should be done in the manner specified in the Program Funding and Mechanics (PFM) Protocol.

➢ This amendment does not apply to any of the DY5 carryforward milestones, which should be reported based on the milestones in the RHP Planning Protocol (initially approved or updated for 3-year projects).

# Category 3

➢ Category 3 updates include a DY6 milestone structure for Category 3 measures, DY6 goal calculation, measurement period, partial payment calculation, stretch activities, and the listing of Population Focused Priority Measure (PFPM) Menu.

**DSRIP Category 3 Milestones for DY6**
**(based on DYs 3 - 5 milestone structure)**

| Standard P4P Milestone Structure (baseline ending by 09/30/2014) | | | |
|---|---|---|---|
| Year | Milestone | Milestone Description | Payment |
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY4 Value* |
| | *AM-1.x\** | *Achievement of PY1 performance goal* | *50% of Cat 3 DY4 Value* |
| *DY5* | *AM-2.x\** | *Achievement of PY2 performance goal* | *100% of Cat 3 DY5 Value* |
| DY6 | AM-3.x* | Achievement of PY3 performance goal | 100% of Cat 3 DY6 Value |

| Standard P4R w/ PFPM Milestone Structure (baseline ending by 09/30/2014) | | | |
|---|---|---|---|
| Year | Milestone | Milestone Description | Payment |
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications* | *100% of Cat 3 DY4 Value* |
| *DY5* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY5 Value* |
| | *AM-3.x\** | *Achievement of DY5 PFPM Goal* | *50% of Cat 3 DY5 Value* |
| DY6 | AM-3.x* | Achievement of DY6 PFPM Goal | 100% of Cat 3 DY6 Value |

| Standard P4R w/ Stretch Activity Milestone Structure (baseline ending by 09/30/2014) | | | |
|---|---|---|---|

| Year | Milestone | Milestone Description | Payment |
|------|-----------|----------------------|---------|
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications* | *100% of Cat 3 DY4 Value* |
| *DY5* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY5 Value* |
| | *PM-11* | *Successful Achievement of Stretch Activity* | *50% of Cat 3 DY5 Value* |
| DY6 | PM-10 | Successful reporting to approved measure specifications | 50% of Cat 3 DY6 Value |
| | PM-11 | Successful Achievement of Stretch Activity | 50% of Cat 3 DY6 Value |
| | | *or* | |
| | AM-3.x* | Achievement of DY6 PFPM PY3 Goal | 100% of Cat 3 DY6 Value |

| Standard Maintenance w/ PFPM Milestone Structure (baseline ending by 09/30/2014) | | | |
|------|-----------|----------------------|---------|
| Year | Milestone | Milestone Description | Payment |
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY4 Value* |
| | *PM-12* | *Maintain Baseline High Performance Level* | *50% of Cat 3 DY4 Value* |
| *DY5* | *PM-12* | *Maintain Baseline High Performance Level* | *50% of Cat 3 DY5 Value* |
| | *AM-3.x** | *Achievement of DY5 PFPM Goal* | *50% of Cat 3 DY5 Value* |
| DY6 | AM-3.x* | Achievement of DY6 PFPM Goal | 100% of Cat 3 DY6 Value |

| Standard Maintenance w/ Stretch Activity Milestone Structure (baseline ending by 09/30/2014) | | | |
|------|-----------|----------------------|---------|
| Year | Milestone | Milestone Description | Payment |
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY4 Value* |
| | *PM-12* | *Maintain Baseline High Performance Level* | *50% of Cat 3 DY4 Value* |
| *DY5* | *PM-12* | *Maintain Baseline High Performance Level* | *50% of Cat 3 DY5 Value* |
| | *PM-11* | *Successful Achievement of Stretch Activity* | *50% of Cat 3 DY5 Value* |
| DY6 | PM-12 | Maintain Baseline High Performance Level | 100% of Cat 3 DY6 Value |
| **DY4 Baseline P4P Milestone Structure (baseline established with DY4 data)** | | | |
| Year | Milestone | Milestone Description | Payment |

| | | | |
|---|---|---|---|
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance (functions as a status update)* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications (functions as a final baseline)* | *100% of Cat 3 DY4 Value* |
| *DY5* | *AM-2.x\** | *Achievement of PY2 performance goal* | *100% of Cat 3 DY5 Value* |
| DY6 | AM-3.x\* | Achievement of PY3 performance goal | 100% of Cat 3 DY6 Value |

| **DY4 Baseline P4R w/ Stretch Activity Milestone Structure (baseline established with DY4 data)** | | | |
|---|---|---|---|
| Year | Milestone | Milestone Description | Payment |
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance (functions as a status update)* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications (functions as a final baseline)* | *100% of Cat 3 DY4 Value* |
| *DY5* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY5 Value* |
| | *PM-11* | *Successful Achievement of Stretch Activity* | *50% of Cat 3 DY5 Value* |
| DY6 | PM-10 | Successful reporting to approved measure specifications | 50% of Cat 3 DY6 Value |
| | PM-11 | Successful Achievement of Stretch Activity | 50% of Cat 3 DY6 Value |
| | | or | |
| | AM-3.x\* | Achievement of DY6 PFPM Goal | 100% of Cat 3 DY6 Value |

| **DY4 Baseline P4R w/ PFPM Milestone Structure (baseline established with DY4 data)** | | | |
|---|---|---|---|
| Year | Milestone | Milestone Description | Payment |
| *DY3* | *PM-8* | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
| | *PM-9* | *Validation and submission of baseline performance (functions as a status update)* | *50% of Cat 3 DY3 Value* |
| *DY4* | *PM-10* | *Successful reporting to approved measure specifications (functions as a final baseline)* | *100% of Cat 3 DY4 Value* |
| *DY5* | *PM-10* | *Successful reporting to approved measure specifications* | *50% of Cat 3 DY5 Value* |
| | *AM-3.x* | *Achievement of DY5 PFPM Goal* | *50% of Cat 3 DY5 Value* |
| DY6 | AM-3.x | Achievement of DY6 PFPM Goal | 100% of Cat 3 DY6 Value |

| **DY4 Baseline Maintenance w/ Stretch Activity Milestone Structure (baseline established with DY4 data)** | | | |
|---|---|---|---|
| Year | Milestone | Milestone Description | Payment |

| DY3 | PM-8 | *Submission of Category 3 DY3 Status Report* | *50% of Cat 3 DY3 Value* |
|-----|------|--------------------------------------------|--------------------------|
|     | PM-9 | *Validation and submission of baseline performance (functions as status update)* | *50% of Cat 3 DY3 Value* |
| DY4 | PM-10 | *Successful reporting to approved measure specifications (functions as final baseline)* | *100% of Cat 3 DY4 Value* |
| DY5 | PM-12 | *Maintain Baseline High Performance Level* | *50% of Cat 3 DY5 Value* |
|     | PM-11 | *Successful Achievement of Stretch Activity* | *50% of Cat 3 DY5 Value* |
| DY6 | PM-12 | Maintain Baseline High Performance Level | 100% of Cat 3 DY6 Value |

## DY6 goal calculations

The following goal calculations apply to Category 3 outcomes and PFPM outcomes in DY6. P4P outcomes approved to use a standard baseline, outcomes approved to use a DY4 baseline, and PFPM outcomes will all use the same goal calculations to determine goals for DY6 milestone AM-3.x.

| PY3 QISMC Goal Setting for Category 3 P4P Outcomes | | |
|---------------------------------------------------|---|---|
| Direction | Baseline | PY3 Goal |
| Positive | Below the MPL | MPL + .15*(HPL - MPL) |
|          | Between the MPL & HPL | the greater of:<br>baseline + .25*(HPL - baseline); or<br>baseline + .10*(HPL - MPL) † |
|          | Above the HPL | the lesser of:<br>baseline + .125*(1-baseline); or<br>baseline + .10*(HPL - MPL) † |
| Negative | Above the MPL | MPL -.15*(MPL - HPL) |
|          | Between the MPL & HPL | the lesser of:<br>baseline - .25*(baseline - HPL); or<br>baseline - .10*(MPL - HPL) † |
|          | Below the HPL | the greater of:<br>baseline - .125*(baseline); or<br>baseline - .10*(MPL - HPL) † |
| † Goal set using the improvement floor | | |

| PY3 IOS Goal Setting for Category 3 P4P Outcomes | |
|--------------------------------------------------|---|
| Direction | PY3 Goal |
| Positive | baseline + .125*(perfect - baseline) |

| Negative | baseline -.125*(baseline) |
|---|---|

| PY3 IOS - Survey Goal Setting for Category 3 P4P Outcomes | | |
|---|---|---|
| Direction | Reporting Scenario | PY3 Goal |
| Positive | Scenario 1 | Posttest baseline + .125*(posttest baseline - pretest baseline) |
| | Scenario 2 & Scenario 3 | Baseline + .125*(max score - baseline) |
| Negative | Scenario 1 | Posttest baseline - .125*(pretest baseline - posttest baseline) |
| | Scenario 2 & Scenario 3 | Baseline - .125*(baseline - min score) |

## Alternate Achievement Requests

If an outcome has an HHSC approved alternate achievement request in DY5, the performer must submit to HHSC, by a date determined by HHSC in a form determined by HHSC, a request to use a PY3 goal that is a continuation of the goals approved in DYs 4-5. Such requests will be approved by HHSC on a case-by-case basis.

If an outcome, including a PFPM outcome, is designated as QISMC in DY5, with a baseline that is below the MPL, and the performer is measuring a population substantially dissimilar from the population used to establish the MPL benchmark, the performer may submit, by a date determined by HHSC in a form determined by HHSC, an alternate achievement request to set the PY3 goal as a 12.5 percent gap closure towards perfect over the baseline.

## Measurement Periods

If a Category 3 outcome is designated as P4P or maintenance in DY5, performance year (PY) 3 is the 12-month period immediately following the PY2 approved for use in DYs 3-5, or a performer may request, by a date to be determined by HHSC, to use DY6A as PY3. PY4 is the 12-month period immediately following PY3. The selected PY3 is used to report achievement of DY6 milestones AM-3.x and PM-12, and PY4 is used to report any partial achievement carried forward from DY6 milestone AM-3.x.

If a Category 3 outcome is designated as P4R in DY5, PY3 is the 12-month period immediately following the PY2 approved for use in DYs 3-5, and is used for reporting achievement of DY6 milestone PM-10.

## Partial Payment Calculations

Partial payment for a Category 3 P4P outcome is available in quartiles as defined in the RHP Planning Protocol, measured between the outcome's PY1 goal and PY3 goal.

Each Category 3 P4P outcome has an associated achievement milestone that is assigned an achievement value based on the performer's achievement of the outcome's goal as follows:

- if 100 percent of the goal is achieved, the achievement milestone is assigned an achievement value of 1.0;
- if at least 75 percent of the goal is achieved, the achievement milestone is assigned an achievement value of 0.75;
- if at least 50 percent of the goal is achieved, the achievement milestone is assigned an achievement value of 0.5;
- if at least 25 percent of the goal is achieved, the achievement milestone is assigned an achievement value of 0.25; or
- if less than 25 percent of the goal is achieved, the achievement milestone is assigned an achievement value of 0.

The percent of the goal achieved for DY6 milestones AM-3.x is determined as follows:

| Percent of Goal Achieved for Category 3 P4P Outcomes | | | |
|---|---|---|---|
| PY | Milestone | Positive Direction (higher rates indicate improvement) | Negative Direction (lower rates indicate improvement) |
| PY3 | DY6A AM-3.x | (PY3 achieved - PY1 goal or equivalent)/(PY3 goal - PY1 goal or equivalent) | (PY1 goal or equivalent - PY3 achieved)/(PY1 goal or equivalent - PY3 goal) |
| PY4 | Carry forward of DY6A AM-3.x | (PY4 achieved - PY1 goal or equivalent)/(PY3 goal - PY1 goal or equivalent) | (PY1 goal or equivalent - PY4 achieved)/(PY1 goal or equivalent - PY3 goal) |

**PY1 Equivalent Goals**

For P4P outcomes where there is no PY1 goal or where the PY3 goal is set using a different methodology than used to determine the PY1 goal, partial payment will be measured as the percent of goal achieved between PY3 goal and a PY1 equivalent goal, as defined below.

If a category 3 outcome is approved to use a baseline established in DY4 and does not have a DY4 achievement milestone, partial payment will be measured over a PY1 equivalent goal. For PFPM outcomes, partial payment will be measured over a PY1 equivalent goal. The PY1 equivalent goal

for category 3 outcomes without and DY4 achievement milestone and for PFPM outcomes will follow the QISMC or IOS goal calculations for PY1 as approved in the RHP Planning Protocol.

If a QISMC outcome has a PY3 goal that was determined using the improvement floor, partial payment will be measured over the PY1 equivalent goal. If a higher rate indicates improvement for the outcome, the PY1 equivalent goal is the baseline plus 40 percent of the improvement floor. If a lower rate indicates improvement for the outcome, the PY1 equivalent goal is the baseline minus 40 percent of the improvement floor.

If an IOS - Survey outcome is using reporting scenario 2 or reporting scenario 3, partial payment will be over the PY1 equivalent goal. If a higher rate indicates improvement for the outcome, the PY1 equivalent goal is the baseline plus a five percent gap closure towards the maximum score. If a lower rate indicates improvement for the outcome, the PY1 equivalent goal is the baseline minus a five percent gap closure towards the minimum score.

**DY6 Stretch Activities**

If a Category 3 outcome is designated as P4R with an associated stretch activity in DY5, the Performing Provider must choose one of the following options by a date determined by HHSC in a form determined by HHSC:

    A. The Performing Provider may maintain the Category 3 outcome designated as P4R from DY5 and select a new stretch activity that does not duplicate the DY5 stretch activity; or

    B. The Performing Provider may select a PFPM to replace the Category 3 outcome designated as P4R. If a Performing Provider chooses this option, 100 percent of the Category 3 outcome's value is P4P of the newly selected PFPM.

If the Performing Provider chooses option A, the Performing Provider must select a stretch activity from the following:

    a) Program evaluation (SA-3: Alternate approaches to program and outcome linkages).

    b) New participation in Health Information Exchange (HIE), or improvement of existing HIE structure.

    c) Cost analysis and value-based purchasing planning

| DY6 Category 3 Stretch Activities | |
|---|---|
| **Activity** | **Description** |
| SA-3 Program Evaluation | Submission of a report evaluating one or more aspects of the project intervention and its outcomes. The program evaluation may include a quantitative and/or qualitative analysis of the project. Providers have discretion in determining the components and framework of the program evaluation. The end product/output should be beneficial and useful to the provider. Providers will submit the final program evaluation along with a one-page HHSC coversheet that includes fields for providers to input |

| | |
|---|---|
| | provider/project information and respond to qualitative questions related to the program evaluation. |
| SA-7 New Participation or Improvement in Health Information Exchange | Demonstration of new participation in a community-based HIE program (such as the Local HIE Program or the Texas White Space Program), or demonstration of improvements or enhancements in the use of health information exchanges (HIE). Providers will submit a report detailing one or more of the following: |
| | Participation activities |
| | Partnerships developed (i.e. treating physicians, hospitals, healthcare payers, and other health care providers involved in the care of the patient and exchange of health-related information) |
| | The impact to the provider's data infrastructure and the usefulness of data |
| | System improvements (specifically how involvement improved data infrastructure and reporting capabilities) |
| | The number of times a portion (such as medication history) or all of a patient's health record was either received or transmitted by a practice for the purpose of care (this could include pre and post HIE-participation or improvement) |
| | Detailed plans for further enhancement |
| | For additional details on HIE, please visit the following websites: http://www.hietexas.org http://linktexas.healthcare/ |
| SA-9 Cost-Benefit analysis of Project to move towards Value-based purchasing plan | Submission of cost-benefit analysis (CBA) or return-on-investment analysis of the project. Costs could include, but would not be limited to, costs associated with ongoing overhead needs, staff/labor, supplies and equipment costs. Savings/benefits could include, but would not be limited to, reduced utilization of healthcare services and improved health outcomes. The CBA or ROI would function as a way to demonstrate that a project is a worthwhile investment to payors (MCOs, community, health systems etc…) to include as a value-based service. |

**Population Focused Priority Measure Menu**

| Final Selection PFP ID | PFP Measure Description | Related Cat 3 Outcome | Related Cat 3 Outcome Title | Methodology |
|---|---|---|---|---|
| PPR.1 | Risk Adjusted CHF PPR | IT-3.3 | Risk Adjusted Congestive Heart Failure (CHF) 30-day Readmission Rate | IOS |
| PPR.2 | Risk Adjusted DM PPR | IT-3.5 | Risk Adjusted Diabetes 30-day Readmission Rate | IOS |
| PPR.3 | Risk Adjusted BH/SA PPR | IT-3.15 | Risk Adjusted Behavioral Health /Substance Abuse 30-day Readmission Rate | IOS |

| PPR.4 | Risk Adjusted Pediatric Asthma PPR | IT-3.21 | Risk Adjusted Pediatric Asthma 30-day Readmission Rate | IOS |
|---|---|---|---|---|
| PPR.5 | Risk Adjusted Chronic Obstructive Pulmonary Disease Related PPR | IT-3.17 | Risk Adjusted Chronic Obstructive Pulmonary Disease (COPD) 30-day Readmission Rate | IOS |
| PPR.6 | Risk Adjusted Cerebrovascular Accident (Stroke) Related PPR | IT-3.13 | Risk Adjusted Stroke (CVA) 30-day Readmission Rate | IOS |
| PPR.7 | Risk Adjusted Acute Myocardial Infarction (AMI) Related PPRs | IT-3.9 | Risk Adjusted Acute Myocardial Infarction (AMI) 30-day Readmission Rate | IOS |
| PPR.8 | Risk Adjusted Angina and Coronary Artery Disease related PPR | IT-3.11 | Risk Adjusted Coronary Artery Disease (CAD) 30-day Readmission Rate | IOS |
| PPR.10 | Risk Adjusted Renal Failure Related PPR | IT-3.7 | Risk Adjusted Renal Disease 30-day Readmission Rate | IOS |
| PPR.12 | Risk Adjusted All Cause PPR | IT-3.22 | Risk Adjusted All-Cause Readmission | IOS |
| CMHC.1 | Follow-up after hospitalization for mental illness | IT-1.18 | Follow-Up After Hospitalization for Mental Illness | QISMC |
| CMHC.2 | Follow-up care for children prescribed ADHD medication | IT-11.6 | Follow-up Care for Children Prescribed ADHD Medication (ADD) | QISMC |
| CMHC.3 | Antidepressant Medication Management - Effective Acute Phase Treatment | IT-1.19 | Antidepressant Medication Management | QISMC |
| CMHC.4 | Depression Remission at 12-months | IT-1.9 | Depression management: Depression Remission at Twelve Months | IOS |
| CMHC.5 | Adherence to Antipsychotic Medications | IT-11.5 | Adherence to Antipsychotic Medications for Individuals with Schizophrenia | IOS |
| CMHC.6 | Depression Management: Screening and Treatment Plan for Clinical Depression | IT-1.8 | Depression management: Screening and Treatment Plan for Clinical Depression | IOS |
| PP.1 | Medication Management for People with Asthma | IT-1.31 | Medication Management for People with Asthma (MMA) | IOS |
| PP.2 | Follow-up Care for Children Prescribed ADHD Medication | IT-11.6 | Follow-up Care for Children Prescribed ADHD Medication (ADD) | QISMC |
| PP.4 | Heart Failure Admission Rate | IT-2.2 | Risk Adjusted Congestive Heart Failure (CHF) Admission rate | IOS |
| PP.6 | Weight Assessment and Counseling for Nutrition and Physical Activity for Children/Adolescents | IT-1.29 | Weight Assessment and Counseling for Nutrition and Physical Activity for Children/Adolescents | QISMC |
| PP.7 | Adult Body Mass Index (BMI) Assessment | IT-1.21 | Adult Body Mass Index (BMI) Assessment | QISMC |
| PP.8 | Immunization Status for Adolescents | IT-12.8 | Immunization for Adolescents-Tdap/TD and MCV | QISMC |
| PP.9 | Prenatal and Postnatal Care | IT-8.1 | Timeliness of Prenatal/Postnatal Care | QISMC |
| PP.10 | Live Births Weighing Less than 2,500 grams | IT-8.2 | Percentage of Low Birth- weight births | IOS |
| PP.11 | Cesarean Rate for Nulliparous Singleton Vertex | IT-8.6 | Cesarean Rate for Nulliparous Singleton Vertex | IOS |

| PP.12 | Annual Percentage of Asthma Patients 2 Through 20 Years Old with One or More Asthma-related Emergency Room Visits | IT-9.4.h | Pediatric/Young Adult Asthma Emergency Department Visits | IOS |
|---|---|---|---|---|

Note: Providers can select to report on a Potentially Preventable Admission rate for all-causes or for a specific diagnosis with prior approval from HHSC.

## Selecting a new PFPM to replace a P4R outcome and Stretch Activity and Establishing a Baseline

Providers who are newly selecting a PFPM in DY6 must select one of the above PFPM outcomes and report a baseline by a date determined by HHSC in a form determined by HHSC.

## PFPM Measurement Periods

For providers with a newly selected PFPM in DY6, the baseline should be a 12-month measurement period aligned with either DY4 (ending by 9/30/2014) or DY5 (ending by 9/30/2016), with some exceptions to be confirmed with HHSC prior to reporting a PFPM baseline. For these providers, the first opportunity to report performance of the PFPM will be called performance year (PY) 3, to align with other Category 3 outcomes. PY3 will be DY6 (10/1/2016 to 9/30/2017), and PY4 will be the 12 months following PY3. PY3 is used to report achievement of DY6 milestone AM-3.x., and PY4 is used to report any partial achievement carried forward from DY6 milestone AM-3.x

Example: if a provider with a newly selected PFPM in DY6 reports a baseline with a measurement period of 10/1/2014 to 9/30/2015, their PY3 measurement period would be from 10/1/2016 to 9/30/2017.

| Example of PFPM Measurement Periods for newly selected PFPM | |
|---|---|
| Baseline (DY4) | 10/1/2014 to 9/30/2015 |
| PY2/DY5 milestones | Not applicable |
| PY3/ DY6 milestones | 10/1/2016 to 9/30/2017 |
| PY4/DY7 milestones | 10/1/2017 to 9/30/2018 |

The protocols related to goal calculations, partial payment calculations and alternate achievement requests that apply to Category 3 outcomes will also apply to PPFM outcomes in DY6.

# Category 4 Population-focused Improvements

➢ Reporting on Optional Domain RD-6 is eliminated for DY6A. The following language is removed from the RHP Planning Protocol.

> **RD-6. (Optional Domain) Initial Core Set of Measures for Adults and Children in Medicaid/CHIP**
>
> **Initial Core Set for Children in Medicaid/CHIP: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/ChildCoreMeasures.pdf**
>
> **Child Core Set Technical Specifications**: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/Medicaid-and-CHIP-Child-Core-Set-Manual.pdf
> **Initial Core Set for Adults in Medicaid: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/AdultCoreMeasures.pdf**
> **Adult Core Set Technical Specifications: http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Quality-of-Care/Downloads/Medicaid-Adult-Core-Set-Manual.pdf**
> **Measures designed for health plans and will require minor modifications of specifications for reporting by hospital providers.**
> Hospital providers will report measures appropriate to settings of care. Hospitals that provide inpatient services only are not required to report measures that are specific to ambulatory settings. Hospitals that have outpatient clinics are required to report measures appropriate to ambulatory care settings. HHSC and CMS will jointly agree on a minimum data set for inpatient and outpatient providers (Appendix G)

# Appendix

**CMS-Provided Key Elements for Learning Collaboratives and Continuous Quality Improvement**

**Learning Collaboratives** – The key elements in the design of any learning collaborative include:

1. *It should review data and respond to it - with tests of new solutions and ideas - every week.*

2. *It should bring all participating sites together by phone or webinar on a weekly or bi-weekly basis to learn from one another.* All sites should share results of their testing, a breakthrough idea, and a challenge each week at the start of each call and they should leave with a public commitment to test a new idea the following week.

3. *It should set one or two quantifiable, project-level goals, with a deadline, preferably defined in terms of outcomes, related to the project's area of work.* Participants should actively manage toward this goal over the course of the work.

4. *It should invest more in learning than in teaching.* Huge proportional investments in web sites and conferences do not typically result in performance improvement or transformation of care delivery. It is more effective to get out into the field and support learning and exchange at the front lines where care is delivered.

5. *It should support a small, lightweight web site to help site share ideas and simple data over time.* The website should not be developed from scratch for the program. Rather, it should be possible to "rent" space on a portal already designed to support this kind of improvement work.

6. *It should set up simple, interim measurement systems, based on self-reported data and sampling, that can be shared at the local level and are sufficient for the purposes of improvement.*

7. *It should employ individuals (regional "innovator agents") to travel from site to site in the network to (a) rapidly answer practical questions about implementation and (b) harvest good ideas and practices that they systematically spread to others. The regional "innovator agents" should all attend the same initial training in improvement tools and skills organized by the State or RHP and should receive periodic continuing education on improvement.*

8. *It should set up face-to-face learning (meetings or seminars) at least a couple of times a year.*

9. *It should celebrate success every week.*

10. *It should mandate some improvements (simple things that everyone can do to "raise the floor" on performance) and it should unleash vanguard sites to pursue previously unseen levels ("raise the bar" on performance).*

11. *It should use metrics to measure its success such as:*
    - Rate of testing
    - Rate of spread
    - Time from idea to full implementation
    - Commitment rate (rate at which 50% of organizations take action for any specific request)
    - Number of questions asked per day
    - Network affinity/reported affection for the network

**Continuous Quality Improvement:**
In order to incentivize engagement in meaningful quality improvement (QI) activities that can lead to successful projects, this protocol includes optional process milestones and metrics for quality improvement activities. The process milestones and metrics for quality improvement activities listed below (which are also included as process milestone in the relevant project areas) further reflect CMS thinking on the type of QI activities that should be part of the QI core component for projects and provide direct insight into how CMS will review projects for this core element.

# I. PREFACE

On December 12, 2011, the Centers for Medicare and Medicaid Services (CMS) approved the Texas request for a new Medicaid demonstration waiver entitled "Texas Healthcare Transformation and Quality Improvement Program" (Project # 11-W-00278/6) in accordance with section 1115 of the Social Security Act. The new waiver was approved through September 30, 2016.

## 1. Delivery System Reform Incentive Payment Program

Special Terms and Conditions (STC) 45 of the Demonstration authorizes Texas to establish a Delivery System Reform Incentive Payment (DSRIP) program. Initiatives under the DSRIP program are designed to provide incentive payments to hospitals and other providers for investments in delivery system reforms that increase access to health care, improve the quality of care, and enhance the health of patients and families they serve.

The program of activity funded by the DSRIP shall be based on Regional Healthcare Partnerships (RHPs). Each RHP shall have geographic boundaries and will be coordinated by a public hospital or local governmental entity with the authority to make intergovernmental transfers. The public hospital or local governmental entity shall collaborate with hospitals and other potential providers to develop an RHP Plan that will accelerate meaningful delivery system reforms that improve patient care for low-income populations. The RHP Plans must be consistent with regional shared mission and quality goals of the RHP and CMS's triple aims to improve care for individuals (including access to care, quality of care, and health outcomes); improve health for the population; and lower costs through improvements (without any harm whatsoever to individuals, families, or communities).

## 2. RHP Planning Protocol and Program Funding and Mechanics Protocol

In accordance with STC 45(a) and 45(d)(ii)(A) & (B), the RHP Planning Protocol (Attachment I) defines the specific initiatives that will align with the following four categories: (1) Infrastructure Development; (2) Program Innovation and Redesign; (3) Quality Improvements; and (4) Population-focused Improvements. The Program Funding and Mechanics Protocol (Attachment J) describes the State and CMS review process for RHP Plans, incentive payment methodologies, RHP and State reporting requirements, and penalties for missed milestones.

Following CMS approval of Attachment I and Attachment J, each RHP must submit an RHP Plan that identifies the projects, outcomes, population-focused objectives, and specific milestones and metrics in accordance with these attachments and STCs.

This version of the Program Funding and Mechanics Protocol is approved as of May 22, 2014.

## 3. Organization of "Attachment J: Program Funding and Mechanics Protocol"

## 4.

Attachment J has been organized into the following sections:

|      |                                                   |
| ---- | ------------------------------------------------- |
| I.   | Preface                                           |
| II.  | DSRIP Eligibility Criteria                        |
| III. | Key Elements of Proposed RHP Plans                |
| IV.  | State and Federal Review Process of RHP Plans     |
| V.   | RHP and State Reporting Requirements              |
| VI.  | Disbursement of DSRIP Funds                       |
| VII. | Plan Modifications                                |
| VIII.| Carry-forward and Penalties for Missed Milestones |

# II. DSRIP ELIGIBILITY CRITERIA

### 5. RHP Regions

Texas has approved 20 Regional Healthcare Partnerships whose members may participate in the DSRIP program.  The approved RHPs share the following characteristics:

- The RHPs are based on distinct geographic boundaries that generally reflect patient flow patterns for the region;
- The RHPs have identified local funding sources to help finance the non-federal share of DSRIP payments for Performing Providers; and
- The RHPs have identified an Anchoring Entity to help coordinate RHP activities.

The approved RHPs include the following counties:

1. RHP 1: Anderson, Bowie, Camp, Cass, Cherokee, Delta, Fannin, Franklin, Freestone, Gregg, Harrison, Henderson, Hopkins, Houston, Hunt, Lamar, Marion, Morris, Panola, Rains, Red River, Rusk, Smith, Titus, Trinity, Upshur, Van Zandt, Wood

2. RHP 2: Angelina, Brazoria, Galveston, Hardin, Jasper, Jefferson, Liberty, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Tyler

3. RHP 3: Austin, Calhoun, Chambers, Colorado, Fort Bend, Harris, Matagorda, Waller, Wharton

4. RHP 4: Aransas, Bee, Brooks, DeWitt, Duval, Goliad, Gonzales, Jackson, Jim Wells, Karnes, Kenedy, Kleberg, Lavaca, Live Oak, Nueces, Refugio, San Patricio, Victoria

5. RHP 5: Cameron, Hidalgo, Starr, Willacy

6. RHP 6: Atascosa, Bandera, Bexar, Comal, Dimmit, Edwards, Frio, Gillespie, Guadalupe, Kendall, Kerr, Kinney, La Salle, McMullen, Medina, Real, Uvalde, Val Verde, Wilson, Zavala

7. RHP 7: Bastrop, Caldwell, Fayette, Hays, Lee, Travis

8. RHP 8: Bell, Blanco, Burnet, Lampasas, Llano, Milam, Mills, San Saba, Williamson

9. RHP 9: Dallas, Denton, Kaufman

10. RHP 10: Ellis, Erath, Hood, Johnson, Navarro, Parker, Somervell, Tarrant, Wise

11. RHP 11: Brown, Callahan, Comanche, Eastland, Fisher, Haskell, Jones, Knox, Mitchell, Nolan, Palo Pinto, Shackelford, Stephens, Stonewall, Taylor

12. RHP 12: Armstrong, Bailey, Borden, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Dawson, Deaf Smith, Dickens, Donley, Floyd, Gaines, Garza, Gray, Hale, Hall, Hansford, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley  0, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Scurry, Sherman, Swisher, Terry, Wheeler, Yoakum

13. RHP 13: Coke, Coleman, Concho, Crockett, Irion, Kimble, Mason, McCulloch, Menard, Pecos, Reagan, Runnels, Schleicher, Sterling, Sutton, Terrell, Tom Green

14. RHP 14: Andrews, Brewster, Crane, Culberson, Ector, Glasscock, Howard, Jeff Davis, Loving, Martin, Midland, Presidio, Reeves, Upton, Ward, Winkler

15. RHP 15: El Paso, Hudspeth

16. RHP 16: Bosque, Coryell, Falls, Hamilton, Hill, Limestone, McLennan

17. RHP 17: Brazos, Burleson, Grimes, Leon, Madison, Montgomery, Robertson, Walker, Washington

18. RHP 18: Collin, Grayson, Rockwall

19. RHP 19: Archer, Baylor, Clay, Cooke, Foard, Hardeman, Jack, Montague, Throckmorton, Wichita, Wilbarger, Young

20. RHP 20: Jim Hogg, Maverick, Webb, Zapata

## 6. RHP Anchoring Entity

The Texas Health and Human Services Commission (HHSC) delegates to the Anchoring Entity the responsibility of coordination with the RHP participants in development of the RHP Plan for that region. Each RHP shall have one Anchoring Entity that coordinates the development of the RHP Plan for that region. In RHPs that have a public hospital, a public hospital shall serve as

the Anchoring Entity. In regions without a public hospital, the following entities may serve as anchors: (1) a hospital district; (2) a hospital authority; (3) a county; or (4) a State university with a health science center or medical school. RHP Anchoring Entities shall be responsible for coordinating RHP activities and assisting HHSC perform key oversight and reporting responsibilities.

Anchoring Entities activities shall include:

- Coordinating the development of a community needs assessment for the region;
- Engaging stakeholders in the region, including the public;
- Coordinating the development the 5-year RHP Plan that best meets community needs in collaboration with RHP participants;
- Ensuring that the RHP Plan is consistent with Attachment I, Attachment J, and all other State/waiver requirements;
- Facilitating RHP Plan compliance with the RHP Plan Checklist;
- Transmitting the RHP Plan and any associated plan amendments to HHSC on behalf of the RHP;
- Ongoing monitoring and annual reporting (as required in paragraphs 16 and 24) on status of projects and performance of Performing Providers in the region; and
- Ongoing communication with HHSC on behalf of the RHP.

## 7. IGT Entities

Intergovernmental transfer (IGT) Entities are entities that fund the non-federal share of DSRIP payments for an RHP. They include Anchoring Entities, government-owned Performing Providers, community mental health centers (CMHCs), local health departments, academic health science centers, and other government entities such as counties.

An IGT Entity may fund DSRIP, Uncompensated Care (UC), or both DSRIP and UC as long as regional requirements are met, as described in Section VI "Disbursement of DSRIP Funds" and the IGT funding source comports with federal requirements outlined in paragraph 55 of the waiver's special terms and conditions.

IGT Entities may fund DSRIP projects outside of their RHP Region. Such a DSRIP project must be documented in the RHP Plan where the Performing Provider implementing the DSRIP project is physically located, with a few exceptions described in 7 below.

## 8. Performing Providers

Providers that are responsible for performing a project in an RHP Plan are called "Performing Providers." All Performing Providers must have a current Medicaid provider identification number. Performing Providers that complete RHP project milestones and measures as specified

in Attachment I, "RHP Planning Protocol" are the only entities that are eligible to receive DSRIP incentive payments in DYs 2-5. Performing Providers will primarily be hospitals, but CMHCs, local health departments, physician practice plans affiliated with an academic health science center, and other types of providers approved by the State and CMS may also receive DSRIP payments. Physician practices plans not affiliated with an academic health science center may also be eligible as Performing Providers under the "Pass 2" methodology as described in paragraph 29.d.

A Performing Provider may only participate in the RHP Plan where it is physically located except that physician practice plans affiliated with an academic health science center, major cancer hospitals, or children's hospitals may perform projects outside of the region where the Performing Provider's institution is physically located if it receives an allocation from that region in accordance with the process described in paragraph 29. In these cases, the project must be included in the RHP Plan where the DSRIP project is implemented. All related DSRIP payments for the project(s) are counted against the allocation of that RHP Plan as specified in Section VI "Disbursement of DSRIP Funds".

**9. DSRIP and Uncompensated Care Pool**

a. UC Pool Description
STC 44 establishes an Uncompensated Care Pool to help defray uncompensated care costs provided to Medicaid eligibles or to individuals who have no source of third party coverage, for services provided by hospitals or other selected providers.

b. DSRIP Requirements for UC Pool Program Participants
Hospitals that receive payments from the Uncompensated Care Pool shall participate in the RHP and be required to report on a subset of Category 4 measures from Attachment I, "RHP Planning Protocol". The subset of Category 4 measures fall into 3 domains: (1) Potentially Preventable Admissions (PPAs); (2) Potentially Preventable Readmissions (PPRs) and (3) Potentially Preventable Complications (PPCs). Category 4 reporting shall begin in DY 3 for the PPA and PPR domains, and in DY 4 for the PPC domain and continue through DY 5. Hospitals that only participate in UC shall not be eligible to receive DSRIP funding for required Category 4 reporting. If a hospital fails to report on all required Category 4 measures by the last quarter of the applicable Demonstration Year, the hospital shall forfeit one fourth of its total UC payments for that DY. A hospital may request from HHSC a 6-month extension from the end of the DY to report any outstanding Category 4 measures. The fourth-quarter UC payment will be made upon completion of the outstanding required Category 4 measure reports within the 6-month period. A hospital may receive only one 6-month extension to complete Category 4 reporting for each demonstration year. This requirement shall apply to all UC participating hospitals, including hospital Performing Providers that are fully participating in DSRIP. Hospitals that meet the criteria described in paragraph 11.f below are exempt from this requirement.

UC hospital participants shall also participate in learning collaboratives conducted annually during DYs 3-5 to share learning, experiences, and best practices acquired from the DSRIP program across the State.

# III. KEY ELEMENTS OF PROPOSED RHP PLANS

## 10. RHP Plans

Each RHP must submit an RHP Plan using a State-approved template that identifies the projects, objectives, and specific milestones, metrics, measures, and associated DSRIP values adopted from Attachment I, "RHP Planning Protocol" and meet all requirements pursuant to STCs 45 and 46. The project and DSRIP payments are documented in the RHP Plan where the Performing Provider of the DSRIP project is physically located. An exception applies to projects performed by physician practice plans affiliated with an academic health science center, major cancer hospitals, or children's hospitals in locations outside of the RHP region where these Performing Providers are physically located (as discussed in paragraph 7 above). In these cases, the project must be documented in the RHP Plan where the DSRIP project is implemented.

## 11. Organization of RHP Plan

a. Executive Summary
   The Executive Summary shall provide a summary of the RHP Plan, a summary of the RHP's vision of delivery system transformation, a description of the RHP's patient population, a description of the health system, and a table of the projects being funded including project titles, brief descriptions of the projects, and the five-year goals. The Executive Summary shall also include a description of key challenges facing the RHP and how the five-year RHP Plan realizes the RHP's vision.

b. Description of RHP Organization
   The RHP Plan shall describe how the RHP is organized and include information on RHP participants including the Anchoring Entity, IGT Entities, Performing Providers, and other stakeholders.

c. Community Needs Assessment
   The RHP Plan shall include a community needs assessment for the five-year period that has the following elements for the region:

   i.   Demographic information (e.g., race/ethnicity, income, education, employment, etc.)
   ii.  Insurance coverage (e.g., commercial, Medicaid, Medicare, uncompensated care);
   iii. Description of the region's current health care infrastructure and environment (e.g., number/types of providers, services, systems, and costs; Health Professional Shortage Area [HPSA]);
   iv.  Description of any initiatives in which providers in the RHP are participating that are funded by the U.S. Department of Health and Human Services and any other relevant delivery system reform initiatives underway in the RHP region.
   v.   Description of changes in the above areas, i. – iv., expected to occur during the waiver period of federal fiscal years 2012-16.
   vi.  Key health challenges specific to the region supported by data (e.g., high diabetes rates, access issues, high emergency department [ED] utilization, etc.)

   The RHP's community needs assessment should guide, and be reflected in, the RHP Plan and selection of projects. The community needs assessment may be compiled from existing data sources.

d. Stakeholder Engagement
   The RHP Plan shall include a description of the processes used to engage and reach out to the following stakeholders regarding the DSRIP program:

   i.  Hospitals and other providers in the region.
   ii. Public stakeholders and consumers, including processes used to solicit public input into RHP Plan development and opportunities for public discussion and review prior to plan submission.

    iii.    A plan for ongoing engagement with public stakeholders.

    iv.    At a minimum, a description of public meetings that were held in different areas of the RHP Region, the public posting of the RHP Plan, and the process for submitting public comment on the RHP Plan.

e.   RHP Plan Development
The RHP Plan shall describe the regional approach for addressing the community needs and goals, process for evaluating and selecting projects, and identification of Pass 1 and Pass 2 projects. The RHP Plan shall also include as an appendix a list of projects that were considered but not selected.

## 12. Number of Projects and Measures

a.   General Requirements for Categories 1-4
Pursuant to Attachment I, RHP Planning Protocol, an RHP Plan must meet the following requirements:

    i.    RHPs must select a minimum number of projects from Categories 1 and 2. The number of minimum projects will differ for RHPs depending on their Tier classification (defined below). An RHP's Tier classification is displayed in Table 1 of Section VI "Disbursement of DSRIP Funds";

    ii.    Both hospital-based and non-hospital Performing Providers must establish outcomes in Category 3 that tie back to their Category 1 and 2 projects; and

    iii.    Hospital-based Performing Providers must report on the population-focused improvement measures across five domains identified in Category 4.

Certain hospital Performing Providers defined in 11.f below shall be exempt from selected requirements.

b.   RHP Tier Definition

    i.    Tier 1 RHP
An RHP that contains more than 15 percent share of the statewide population under 200 percent of the federal poverty level (FPL) as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS).

    ii.    Tier 2 RHP
An RHP that contains at least 7 percent and less than 15 percent share of the statewide population under 200 percent FPL as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS).

    iii.    Tier 3 RHP
An RHP that contains at least 3 percent and less than 7 percent share of the statewide population under 200 percent FPL as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS).

    iv.    Tier 4 RHP
An RHP is classified in Tier 4 if one of the following three criteria are met: (1) the RHP contains less than 3 percent share of the statewide population under 200 percent

FPL as defined by the U.S. Census Bureau: 2006-2010 American Community Survey for Texas (ACS); (2) the RHP does not have a public hospital; or (3) the RHP has public hospitals that provide less than 1 percent of the region's uncompensated care.

c. Categories 1 and 2 Projects

    i.    Tier 1 RHP
A Tier 1 RHP must select a minimum of 20 projects from Categories 1 and 2 combined, with at least 10 of the 20 projects selected from Category 2, in accordance with Attachment I, "RHP Planning Protocol", which lists the acceptable projects, milestones, metrics, and data sources.

    ii.    Tier 2 RHP
A Tier 2 RHP must select a minimum of 12 projects from Categories 1 and 2 combined, with at least 6 of the 12 projects selected from Category 2, in accordance with Attachment I, "RHP Planning Protocol", which lists the acceptable projects, milestones, metrics, and data sources.

    iii.    Tier 3 RHP
A Tier 3 RHP must select a minimum of 8 projects from Categories 1 and 2 combined, with at least 4 of the 8 projects selected from Category 2, in accordance with Attachment I, "RHP Planning Protocol, which lists the acceptable projects, milestones, metrics, and data sources.

    iv.    Tier 4 RHP
A Tier 4 RHP must select a minimum of 4 projects from Categories 1 and 2 combined, with at least 2 of the 4 projects selected from Category 2, in accordance with Attachment I, "RHP Planning Protocol", which lists the acceptable projects, milestones, metrics, and data sources.

    v.    Performing Provider Participation in Categories 1 and 2

        1.  A Performing Provider in an RHP Plan must, at a minimum, participate in a project(s) from either Category 1 or Category 2, and if it chooses to, may participate in projects from both Categories;

        2.  The RHP Plan must explain how incentive payments to Performing Providers that perform a similar DSRIP project are not duplicative. For example, if two Performing Providers offer diabetes disease management, they must describe how the projects are serving different patients; and

        3.  The RHP Plan must explain how incentive payments do not duplicate funding for activities of federal initiatives funded by the U.S. Department of Health and Human Services.

d. Category 3: Outcome Reporting and Improvements

    i.    For each of its Category 1 and 2 projects, every Performing Provider must have one or more related Category 3 outcomes. The outcomes shall assess the results of care experienced by patients, including patients' clinical events, patients' recovery and health status, patients' experiences in the health system, and efficiency/cost. A single Category 3 outcome may tie back to more than one project in Categories 1 or 2 implemented by the Performing Provider. All Category 3 outcomes must be reported

to specifications as outlined in the RHP Planning Protocol (and the compendium, which contains specifications for each outcome).

ii. Performing Providers shall report on outcome improvement over baseline in DY 4 and DY 5.  In DYs 2 and 3, Performing Providers may undertake actions/steps to establish baselines and prepare for outcome reporting in DYs 4 and 5. These preparatory activities will be reflected as process milestones in the RHP Plan.

    a. A hospital Performing Provider shall identify the outcome(s) it has selected for its Category 1 and 2 projects in the RHP Plan. Such baselines must be established for no later than DY 3.

    b. A non-hospital Performing Provider may defer identifying outcomes for its Category 1 and 2 projects until a date defined by HHSC, at which point new, approved outcomes shall be added to the RHP Planning Protocol and incorporated into the RHP Plan.  A non-hospital Performing Provider must complete establishment of baselines for its selected outcomes for no later than DY 3.

    c. Each Performing Provider shall have the opportunity during DY 3, based on the revised RHP Planning Protocol and Category 3 framework, to modify the outcome(s) previously selected for its Category 1 and 2 projects, in a manner specified by HHSC.

    d. If the provider's baseline (DY 3) performance on a Category 3 measure exceeds their DY 5 target, the provider must either increase the DY 5 target to exceed their baseline performance or add an alternate improvement activity, as described in the RHP Planning Protocol.

e. Category 4 "Pay for Reporting" Measures
Pursuant to STC 45(d)(ii)(A), all hospital-based Performing Providers in all RHPs must report on all common Category 4 measures.  A Performing Provider may also choose to report on additional optional measures.  In accordance with this requirement, beginning in DY 3 (FFY 14) and DY 4 (FFY 15) hospital-based Performing Providers in all RHPs must include reporting of all common domains, pursuant to Attachment I, "RHP Planning Protocol".  Hospitals defined under paragraph 11.f are exempt from reporting Category 4 measures. If an exempted hospital elects to report Category 4, then it shall report on all common Category 4 measures and be held to the same requirements as all other Performing Providers participating in Category 4.  If a hospital-based Performing Provider's population for a given measure is not sufficiently large to produce statistically valid data, the hospital shall not be required to report the data for that particular Category 4 measure.  HHSC will collect all Category 4 data for each hospital. Where limited by Texas statutory requirements pertaining to the confidentiality of individual hospital data for some of the Category 4 measures, HHSC will summarize certain data related to Category 4 for CMS at the RHP level rather than at the individual provider level.

f. Hospital Exemption

DSRIP hospitals that meet the criteria below and as approved by the State are exempt from implementing Category 4 reporting in paragraph 11.e of this section.

Definition:

A hospital is not a state-owned hospital or a hospital that is managed or directly or indirectly owned by an individual, association, partnership, corporation, or other legal entity that owns or manages one or more other hospitals and:

(1) is located in a county that has a population estimated by the United States Bureau of the Census to be not more than 35,000 as of July 1 of the most recent year for which county population estimates have been published; or

(2) is located in a county that has a population of more than 35,000, but that does not have more than 100 licensed hospital beds and is not located in an area that is delineated as an urbanized area by the United States Bureau of the Census.

## 13. Organization of DSRIP Projects

a. <u>Categories 1-4 Descriptions</u>
The RHP five-year plan will include sections on each of the 4 categories as specified in the RHP Planning Protocol. They include:

   i. <u>Category 1 Infrastructure Development</u> lays the foundation for delivery system transformation through investments in technology, tools, and human resources that will strengthen the ability of providers to serve populations and continuously improve services.
   ii. <u>Category 2 Program Innovation and Redesign</u> includes the piloting, testing, and replicating of innovative care models.
   iii. <u>Category 3 Quality Improvements</u> includes outcome reporting and improvements in care that can be achieved within four years.
   iv. <u>Category 4 Population Focused Improvements</u> is the reporting of measures that demonstrate the impact of delivery system reform investments under the waiver.

b. <u>Categories 1-2 Requirements</u>
For each project selected from Category 1 and 2, RHP Plans must include a narrative that includes the following subsections:

   i. <u>Identifying Information</u>
   Identification of the DSRIP Category, name of the project, project element, and RHP Performing Provider name and Texas Provider Identifier (TPI) involved with the project. Each project shall be implemented by one Performing Provider only.

   ii. <u>Project Goal</u>

The goal(s) for the project, which describes the challenges or issues of the Performing Provider and brief description of the major delivery system solution identified to address those challenges by implementing the particular project; the starting point of the Performing Provider related to the project and based on that, the 5-year expected outcome for the Performing Provider and the patients.

iii. Rationale
As part of this subsection, each Performing Provider will provide the reasons for selecting the project, milestones, and metrics based on relevancy to the RHP's population and circumstances, community need, and RHP priority and starting point with available baseline data, as well as a description of how the project represents a new initiative for the Performing Provider or significantly enhances an existing initiative, including any initiatives that may have related activities that are funded by the U.S. Department of Health and Human Services.

iii. Relationship to Other Projects and Measures
A description of how this project supports, reinforces, enables, and is related to other Category 1 and 2 projects, Category 3 outcomes, and Category 4 population-focused improvement measures within the RHP Plan

iv. Milestones and Metrics Table
For each project, RHP Plans shall include milestones and metrics adopted in accordance with Attachment I, "RHP Planning Protocol." In a table format, the RHP Plan will indicate by demonstration year when project milestones will be achieved and indicate the data source that will be used to document and verify achievement.

1. For each project from Category 1 and 2, the Performing Provider must include at least 1 milestone based on a Process Milestone and at least 1 milestone based on an Improvement Milestone over the 4-year period in accordance with Attachment I, "RHP Planning Protocol."
2. For each project from Category 1 and 2, the Performing Provider must include at least 1 milestone that reflects the quantifiable patient impact (number of additional individuals served or encounters provided) of the project in DY 5. The 3-year projects, which are referenced in paragraph 18, also must contain a quantifiable patient impact milestone in DY 4. For certain projects, as specified by CMS and HHSC, these milestones also must include the quantifiable patient impact specific to the Medicaid and low-income uninsured populations.
3. For each milestone, the estimated DSRIP funding must be identified as the maximum amount that can be received for achieving the milestone. For each year, the estimated available non-federal share must be included and the source (IGT Entity) of non-federal share identified.

c. Category 3 Requirements
This focus area involves outcomes associated with Categories 1 and 2 projects. All Performing Providers (both hospital and non-hospital providers) shall select outcomes that tie back to their projects in Categories 1 and 2. RHP Plans must include:

**Attachment J**
**Program Funding and Mechanics Protocol**

i. <u>Identifying Information</u>
Identification of the Category 3 outcome and RHP Performing Provider name and Texas Provider Identifier that is reporting the outcome.

ii. <u>Narrative Description</u>
In the associated Category 1 or 2 project, a brief narrative description of each Category 3 outcome selected for the project.

iii. <u>Category 3 Selection Information</u>
A summary of Category 3 outcome selection information for all DSRIP providers in an RHP shall be included as an attachment to the plan.

1. For each outcome, in DY 2 the RHP Plan may include process milestones described in 11.d.ii above that support the development of the outcome. For October 2013 DY 2 reporting, HHSC and CMS allowed a status update to meet the requirements for DY 2 Category 3 process milestones given that CMS and HHSC had not finalized the revised Category 3 framework and outcomes options as of the end of DY 2.

2. For each outcome, the RHP Plan will include two process milestones for each outcome in DY 3 – one for providing a status update on a template specified by HHSC once Category 3 outcomes are re-selected in DY 3, and one for establishing or verifying the provider's baseline for the outcome upon which improvement will be measured.

3. In DY 4 and DY 5 each outcome will have one or two milestones depending on whether the outcome is designated as a pay for performance (P4P) outcome or pay for reporting (P4R) outcome in the RHP Planning Protocol. These milestones may be process or achievement milestones depending on the specific outcome measure. See paragraph 32 and the RHP Planning Protocol for further details.

4. For each milestone, the estimated DSRIP funding must be identified as the maximum amount for achieving the milestone. For each year, the estimated non-federal share must be included and the source (IGT Entity) of non-federal share identified.

d. <u>Category 4 Requirements</u>
This focus area involves population-focused improvements associated with Categories 1 and 2 projects and Category 3 outcomes. Each hospital-based Performing Provider shall report on all common measures pursuant to Attachment I, "RHP Planning Protocol". RHP Plans must include:

i. <u>Identifying information</u>
Identification of the DSRIP Category 4 measures and RHP Performing Provider name and Texas Provider Identifier (TPI) that is reporting the measure.

ii. <u>Narrative description</u>
A narrative description of the Category 4 measures.

iii. <u>Table Presentation</u>
In a table format, the RHP Plan will include, starting in demonstration year 3:

1. List of Category 4 measures the Performing Provider will report on by domain;

2. For each measure, the estimated DSRIP funding must be identified as the maximum amount that can be received for reporting on the measure. For each year, the estimated available non-federal share must be included and the source of non-federal share identified.

e. Project Valuation
The RHP Plan shall contain a narrative that describes the overall regional and individual project approach for valuing each project and rationale, including an explanation why a similar project selected by two Performing Providers might have different valuations (e.g., due to project size, provider size, project scope, populations served, community benefit, cost avoidance, and addressing priority community needs). Project valuations must comply with requirements prescribed in Section VI "Disbursement of DSRIP Funds".

In addition, the value of a four-year Category 1 or Category 2 project may not exceed the greater of 10 percent of the Performing Provider's Pass 1 allocation (described in paragraph 29.c) or $20 million in total over DYs 2-5. For projects that represent collaboration across more than one Performing Provider as described in paragraph 29.c.iii and iv., the total maximum value may not exceed the greater of the sum of 10 percent of each Performing Provider's Pass 1 allocation for each Performing Provider that is collaborating in the project or $20 million in total over DYs 2-5. The value of a three-year project may not exceed $20 million in total for Categories 1-3 for DYs 3-5.

# IV. STATE AND FEDERAL REVIEW PROCESS OF RHP PLANS

## 14. Review Process

HHSC will review all 5-year RHP Plan proposals prior to submission to CMS for final approval according to the schedule below.

The HHSC and CMS review process for 5-year RHP Plan proposals shall include the following schedule:

## 15. HHSC Review and Approval Process

a. Pre-Submission Review of RHP Plans
To support HHSC's review process, the RHP Anchoring Entity shall perform an initial review of the RHP Plan to ensure compliance with elements described in b. below and with the RHP Plan Checklist, prior to submitting the plan to HHSC.

b. HHSC Review of Plans

i. Between September 1, 2012 and December 31, 2012, each RHP identified in paragraph 4 will submit a 5-year RHP Plan to HHSC for review. HHSC shall review and assess each plan according to the following criteria using the RHP Plan Checklist:

- The plan is in the format and contains all required elements described herein and is consistent with special terms and conditions, including STCs 45(a), 45(b), 45(c), and 45(d)(iii).
- The plan conforms to the requirements for Categories 1, 2, 3, and 4, as described in Section III "Key Elements of Proposed RHP Plans", Attachment I, "RHP Planning Protocol", and "RHP Plan Checklist."
- Category 1 and 2 projects clearly identify goals, milestones, metrics, and expected results, including quantifiable patient impact appropriate to the project option. Category 3 clearly identifies the outcomes to be reported. Category 4 clearly identifies the population-focused health improvement measures to be reported.
- The amount and distribution of funding is in accordance with the stipulations of STC 46 and Section VI "Disbursement of DSRIP Funds" of this protocol.
- The plan and all of the projects within are consistent with the overall goals of the DSRIP program and the objectives of the Medicaid program.

ii. Within 30 days of initial, complete RHP Plan submission, HHSC will complete its initial review of each timely submitted RHP Plan proposal using the RHP Plan Checklist and based on the Program Funding and Mechanics Protocol and RHP Planning Protocol and will notify the RHP Anchoring Entity in writing of any questions or concerns identified.

iii. The Anchoring Entity shall respond in writing to any notification by HHSC of questions or concerns. The RHP's responses must be received by the date specified in the aforementioned notification. The RHP Anchoring Entity's initial response may consist of a request for additional time to address HHSC's comments provided that the RHP's revised plan addresses HHSC's comments and is submitted to HHSC within 15 days of the notification.

c. <u>HHSC Approval of Plans</u>
HHSC will take action on each timely submitted RHP Plan, will approve each plan that it deems meets the criteria outlined in Attachment I, "RHP Planning Protocol", Attachment J, "Program and Funding Protocol", and "RHP Plan Checklist" and submit approved plans to CMS for final consideration. HHSC may approve a plan for submission to CMS that requires technical corrections when there is substantial compliance with the above criteria and HHSC notifies CMS of the priority technical corrections that need to be made.

**16. CMS Review Process for initial RHP plan submissions**

CMS will review an RHP's 5-year RHP Plan upon receipt of the plan as approved by HHSC. Plans reviewed and approved by HHSC will result in a decision by CMS within 45 days of receipt of an HHSC-approved plan. Plan(s) must meet all criteria outlined in paragraph 14.b.i above.

CMS will review RHP plans in a phased process that will allow providers to begin working on their DSRIP projects in DY 2 and 3 ("Initial Approval") while the issues in subparagraph c. of

this paragraph are resolved in order to allow providers to continue working on their DSRIP projects in DY 4 and 5 ("Full Approval").

a. <u>CMS Initial Approval</u>

Within 45 days of receipt of the State-approved RHP Plan and RHP Plan Checklist from HHSC, CMS will complete its overall review of the RHP Plan and will either:

- Approve the plan; or
- Notify HHSC and the Anchoring Entity if initial approval will not be granted for all of, or a component of, the RHP Plan. For example, CMS may approve a project in the plan but not approve the project valuation if it does not comport with Section VI "Disbursement of DSRIP Funds". Notice to the State will be in writing and will include any questions, concerns, or issues identified in the application.

Receipt of initial approval constitutes recognition that the requirements of paragraph 29.a-d were met at the time of the full RHP Plan submission as of December 31, 2012.

An RHP may revise a plan for any components of the plan identified by CMS as not approvable. After the revisions are determined to be acceptable by HHSC, HHSC shall submit the revisions to CMS and CMS shall initially approve or deny the revisions (in whole or in part) in writing to HHSC by May 1, 2013 or within 15 days of receipt of the revisions, whichever is later.

If a provider submits an alternative project for review during the plan revision process, HHSC and CMS shall review the project in accordance with the timeline for new RHP Plan submissions (e.g. CMS has 45 days for initial review and 15 days for review of revisions).

With initial approval, if a project does not require priority technical corrections, the project is eligible to earn DY 2 and DY 3 payments. If a project requires priority technical corrections, the project is eligible to earn DY 2 payments with initial approval but the necessary priority technical corrections must be approved in order to be eligible to earn DY 3 payments. Initially approved projects must also meet the requirements of paragraphs 30 and 31 in order to receive DSRIP payments.

b. <u>Priority Technical Corrections</u>

HHSC or CMS may require an RHP to submit priority technical corrections to an RHP Plan that receives initial approval. Possible priority technical corrections include:

- Hospital provider Category 3 outcome does not meet criteria for one standalone or three non-standalone measures.
- Provider did not include at least one process milestone and one improvement milestone.
- Category 3 outcome duplicates an improvement milestone.
- All project components, if required, were not included in the narrative or milestones.
- Project lacks clearly defined milestones and metrics, including the lack of a quantifiable patient impact milestone for DYs 4 and 5, as required by paragraph 14.b.i.
- Any other priority technical correction CMS specifies for a project in the RHP Plan initial approval letter.
- Any other priority technical correction identified by HHSC, including any identified by HHSC subsequent to the RHP Plan initial approval letter, that is needed to clarify a Category 1 or 2 project or Category 3 outcome in order to make payment, such as clearly defined milestones and metrics.

These changes must be submitted to HHSC for review by no later than October 1, 2013 or such later date as specified by HHSC or CMS. HHSC, in collaboration with CMS, will work with the provider to refine the submitted priority technical corrections as needed for approval no later than March 31, 2014. DSRIP payment for a project for DY 3 may be withheld until the necessary priority technical corrections are approved (and all other requirements for DSRIP payment described in paragraphs 30 and 31 are met).

c. <u>CMS Full Approval</u>
CMS may require an RHP to submit additional revisions to the plan to receive full approval, as specified in the RHP Plan initial approval letter. Full approval is necessary for a project to be eligible for DY 4 and 5 DSRIP funding, except that ii. of this subparagraph only applies to DY 4 and 5 DSRIP funding for Category 3. HHSC will review all revisions submitted prior to CMS review and final consideration, consistent with the process for review of plan modifications, described in paragraph 32.d. Fully approved projects must also meet the requirements of paragraph 30 and 31 in order to receive DSRIP payments.

In addition to any project-specific revisions requested in the RHP Plan initial approval letter, all RHPs will be required to submit the following revisions, as applicable, in order to receive full approval for the plan.

i. Valuation that is consistent with project impact

Using an objective methodology developed with HHSC, CMS will determine whether the information submitted on each project's impact sufficiently justifies each project's value for DYs

4 and 5.  Any outlier project values identified by HHSC or CMS will be reviewed by the state's independent assessor as part of the mid-point assessment.  The assessor will make recommendations to HHSC, and if HHSC's decision differs from the recommendations, HHSC will consult CMS to establish the DY4-5 project value.  Projects that receive valuation approval for DYs 4 and 5 through this process may still be subject to a DY 4 and 5 modification during the mid-point assessment, including adjustments to metrics or valuation, if the performance of the project substantially deviates from what was approved.

ii.     Category 3 framework for DY 4 and 5

Recognizing the complexity of setting Category 3 outcome targets, CMS and HHSC will jointly develop a standard target setting methodology for Category 3 outcomes no later than February 28, 2014 that will apply prospectively to Category 3 achievement milestones for DYs 4 and 5 for all projects.  This methodology will recognize the demonstration's focus on the Medicaid/uninsured populations and the differing baselines for different providers and will use appropriate benchmarks (where applicable) to set targets for meaningful improvement.  The methodology also will recognize the innovative nature of certain projects, as well as data limitations and data sharing issues for certain types of performing providers, including non-hospital providers.

Providers will be required to use this standard methodology to set their Category 3 achievement targets in DYs 4 and 5 unless they provide a compelling justification to use a different target that is approved by HHSC based on statistically justifiable inconsistencies with the target setting benchmark used, including differences in the relative size of the Category 1 or 2 project and reporting specifications of the measure.  If providers have already submitted Category 3 improvement targets for DYs 4 and 5 to CMS in the initial approval process, they should replace their previous targets with new targets based on the standard target setting methodology.  Providers will have the opportunity by October 2014 to request to use an achievement target other than the standard methodology.  The independent assessor will provide recommendations to HHSC in cases where providers request to use a different target.  HHSC will need to approve the use of a different target that is not based on the standard target setting methodology.

Category 3 process or achievement milestone information for DYs 4 and 5 must be submitted to be eligible for payment of Category 3 outcome measures for DYs 4 and 5 (in addition to all requirements for DSRIP payment described in paragraphs 30 and 31).  HHSC will work with RHPs to submit Category 3 outcomes once the standard target setting methodology is developed and to refine outcomes as needed in October 2014.

17.     **Post-approval Public Engagement and Ongoing Monitoring**

After receiving initial CMS approval of an RHP Plan, the RHP shall conduct a post-award implementation forum with stakeholders, including those described in paragraph 10.d, in order to promote shared learning and continued alignment with community goals. The feedback from these post-award forums shall be summarized in HHSC's annual demonstration report and should help inform the development of more robust quality improvement infrastructure for the region that can support the learning collaborative plan for each region, as described below and in the appendix to the RHP Planning Protocol.

On each RHP's website, the RHP Anchoring Entity will publicly post a copy of the most recently approved RHP plan as well as any pending plan modifications that have been submitted to HHSC for review. The RHP websites will also provide for an opportunity for public comment.

In order to monitor the implementation of DSRIP activities and support shared learning, RHPs shall submit semi-annual progress reports to HHSC and CMS in a standardized format jointly agreed upon by HHSC and CMS. If semi-annual reports are not submitted on time or do not meet the requirements of the reporting, future DSRIP payments may be withheld until the complete report is submitted (and all other requirements for DSRIP payment described in paragraphs 30 and 31 are met). HHSC shall provide overall programmatic reporting in the demonstration's quarterly and annual reports for all RHPs combined.

## 18. Learning Collaborative Plans

Recognizing the importance of learning collaboratives in supporting continuous quality improvement, RHPs will submit learning collaborative plans by October 1, 2013, to reflect opportunities and requirements for shared learning among the approved DSRIP projects in the region. Specifically, there should be a coherent discussion of providers' participation in a learning collaborative that is strongly associated with their projects and demonstrates a commitment to collaborative learning that is designed to accelerate progress and mid-course correction to achieve the goals of the projects and to make significant improvement in the Category 3 outcome measures and the Category 4 population health reporting measures.

Tier 4 RHPs may submit, for HHSC and CMS review, a request not to conduct their own regional learning collaborative if they have a compelling justification, such as if they do not have the administrative capacity to do so. They also must submit their plan to actively participate in the statewide learning collaborative referenced in paragraph 8.b and any plans to participate in other RHPs' learning collaboratives, which is strongly encouraged.

## 19. Review and Approval Process for Three-Year DSRIP Projects

By December 2013, using DY 3-5 DSRIP funds not yet allocated to DSRIP projects, each RHP may submit additional proposed three-year DSRIP projects for HHSC and CMS review and approval. Based on the criteria established in paragraph 14, HHSC will work with the RHPs and the Performing Provider of each proposed three-year project to get the projects ready for CMS submission. HHSC will take action on each project that it deems meets the criteria outlined in the "RHP Plan Checklist" and submit approved plans to CMS for initial consideration during a 45-day CMS review process.

If a three-year project submitted by HHSC is not initially approved by CMS prior to May 31, 2014 during CMS's 45-day review, then HHSC rather than CMS will notify RHPs of subsequent approvals as appropriate. Provider will have a one-time opportunity to revise projects that were not initially approved by CMS by a date specified by HHSC. HHSC, and the independent assessor will review these projects to ensure compliance with the "RHP Plan Checklist." HHSC will notify CMS of the HHSC approved projects, and provide CMS an opportunity for secondary review within 30 days, if requested by CMS.

## 20. Mid-Point Assessment

By the end of 2014, an independent assessor (also known as the compliance monitor) will work with HHSC to conduct a transparent mid-point assessment of all RHPs using CMS-approved criteria. This review will provide an opportunity to modify projects and/or metrics in consideration of learning and new evidence. The independent assessor will review certain projects identified by HHSC, CMS or the entity based on information provided for all projects in semi-annual reports for the following elements:

- Compliance with the approved RHP plan, including the elements described in the project narrative.

- Compliance with the required core components described in the RHP Planning Protocol, including continuous quality improvement activities.

- Non-duplication of Federal funds.

- The clarity of the improvement milestones for DYs 4 and 5 and their connection with actual project activities and meaningful, quantifiable patient impact. A clear improvement milestone should be supported by a coherent and comprehensive project description that clearly describes the relationship between the goals, the interventions and the measures of progress and outcome.

- The benefit of the project to the Medicaid and uninsured population and to the health outcomes of all patients served by the project (examples include number of readmissions, potentially preventable admissions, or adverse events that will be prevented by the project in DY 4 and DY 5).

- The opportunity to continue to improve the project by applying any lessons learned or best practices that can increase the likelihood of the project advancing the triple aim.

Based on the recommendations by the independent assessor, HHSC or CMS may require prospective plan modifications that would be effective for DYs 4 and 5, including adjustments to

project metrics or valuation, if the performance of the project has substantially deviated from what was approved   Based on additional DSRIP compliance monitoring conducted by the independent assessor after the mid-point assessment is completed, HHSC or CMS also may require prospective plan modifications to be effective for DY 5.

 HHSC will submit to CMS, on or before September 1, 2013, draft review criteria, a description of its approach to review, and a draft DSRIP Plan Checklist that will reflect the approved criteria and will be used in the assessment.  CMS will provide comments within 60 days of HHSC's submission.  CMS and HHSC will work collaboratively to refine the criteria, approach, and DSRIP Plan Checklist.  HHSC will apply these criteria to ensure that DSRIP projects are thoroughly and consistently reviewed.  Where possible, HHSC will notify providers in advance of the mid-point assessment if providers need to make changes in order to comply with the approved review criteria.

HHSC will review all modifications resulting from the mid-point, consistent with the process for review of plan modifications, described in paragraph 32.d. Future DSRIP payment for a provider may be withheld until the necessary changes as identified by the mid-point assessment are submitted (and all other requirements for DSRIP payment described in paragraphs 30 and 31 are met).

## 21. Revisions to the RHP Planning Protocol

If the CMS review process of RHP Plans results in the modification of any component of an RHP's plan, including but not limited to projects, milestones, measures, metrics, or data sources, that was not originally include in the RHP Planning Protocol, Texas may revise the RHP Planning Protocol accordingly.  CMS will review and approve these proposed revisions within 30 days of submission by HHSC, provided that the RHP Planning Protocol revisions are in accordance with the final approved RHP Plan(s) prompting the revision(s) and all applicable STC requirements. Such revisions to the RHP Planning Protocol do not require a waiver amendment.

# V.  RHP AND STATE REPORTING REQUIREMENTS

## 22. RHP Reporting for Payment in DY 1

a.  <u>RHP Plan Submission</u>
   Submission of a State-approved RHP Plan to CMS shall serve as the basis for the full DY 1 presumptive payment to that RHP's Performing Providers and Anchoring Entity as prescribed by Section VI "Disbursement of DSRIP Funds".

b.  <u>RHP Plans Not Approved by CMS on or after May 1, 2013</u>
   All Performing Providers and Anchoring Entities in an RHP whose RHP Plan is not approved in full by CMS shall be at risk for recoupment of their entire DY 1 incentive

payment related to plan submission. Within 10 business days of CMS written denial of an RHP Plan, the State shall recoup the DY 1 payment from all eligible entities in the affected RHP and promptly return the associated FFP to CMS. If an RHP deletes a project without a replacement to obtain CMS approval of the RHP Plan, the State shall recoup the DY 1 payment from the entities that received funding for that project and promptly return the associated FFP to CMS.

## 23. RHP Reporting for Payment in DYs 2-5

Two times per year, Performing Providers seeking payment under the DSRIP program shall submit reports to HHSC demonstrating progress on each of their projects as measured by category-specific milestones and metrics achieved during the reporting period. The reports shall be submitted using the standardized reporting form approved by HHSC. IGT Entities will review the submission of the reported performance. Based on the reports, HHSC will calculate the incentive payments for the progress achieved in accordance with Section VI "Disbursement of DSRIP Funds". The Performing Provider shall have available for review by Texas or CMS, upon request, all supporting data and back-up documentation. These reports will be due as indicated below after the end of each reporting period:

- Reporting period of October 1 through March 31: the reporting and request for payment is due April 30.
- Reporting period of April 1 through September 30: the reporting and request for payment is due October 31.

These reports will serve as the basis for authorizing incentive payments to Performing Providers in an RHP for achievement of DSRIP milestones. HHSC and CMS concurrently shall have 30 days to review and approve or request additional information regarding the data reported for each milestone/metric and measure. If additional information is requested, the Performing Provider shall respond to the request within 15 days and both HHSC and CMS shall have an additional 15 days to review, approve, or deny the request for payment, based on the data provided. HHSC shall schedule the payment transaction for each RHP Performing Provider within 30 days following CMS and HHSC approval of the Performing Provider's RHP report.

HHSC and CMS may determine that a subset of not less than half of the projects and metrics will be reviewed during the 30 days after the reporting period. In such instances, HHSC and CMS will designate those projects and metrics that are not reviewed within 30 days as "provisionally approved." Such "provisionally approved" projects and metrics will be reviewed in full by HHSC prior to the next reporting due date. HHSC will report back to CMS which projects were reviewed by the end of the initial 30 day review period and which projects will be reviewed prior to the next reporting cycle due date. When all reports have been reviewed, HHSC will submit to CMS a report with the results of completed reviews and assurance that all reviews have been completed. CMS will review projects and metrics judiciously as it deems necessary.

For metrics that are "provisionally approved" the Performing Provider will receive full DSRIP payment. After review of any "provisionally approved" item, additional information regarding the data reported for each milestone/metric will be requested if necessary. If the initial supporting documentation, and any additional information, does not form a sufficient basis for actual metric achievement, HHSC will recoup the associated overpayments from the Performing Provider. If the Performing Provider does not comply with the recoupment, the overpayment amount will be deducted from future Medicaid payments. HHSC will notify CMS of any cases where the initial supporting documentation and additional information does not form a sufficient basis for metric achievement and the outcome of recouping the payments or withholding future payments.

## 24. Intergovernmental Transfer Process

HHSC will calculate the nonfederal share amount to be transferred by an IGT Entity in order to draw the federal funding for the incentive payments related to the milestone achievement that is reported by the Performing Provider in accordance with paragraph 22 and approved by the IGT Entity and the State. Within 14 days after notification by HHSC of the identified nonfederal share amount, the IGT Entity will make an intergovernmental transfer of funds. The State will draw the federal funding and pay both the nonfederal and federal shares of the incentive payment to the Performing Provider. If the IGT is made within the appropriate 14-day timeframe, the incentive payment will be disbursed within 30 days. The total computable incentive payment must remain with the Performing Provider.

At the time that HHSC requests IGT funding for DSRIP incentive payments, the state may also require the IGT Entity to transfer additional funds to provide a portion of the non-federal share of the state's administrative costs related to waiver monitoring activities, as permitted under the state plan.

## 25. RHP Annual Year End Report

Each RHP Anchoring Entity shall submit an annual report by December 15 following the end of Demonstration Years 2-5. The annual report shall be prepared and submitted using the standardized reporting form approved by HHSC. The report will include information provided in the interim reports previously submitted for the Demonstration Year, including data on the progress made for all metrics. Additionally, the RHP will provide a narrative description of the progress made, lessons learned, challenges faced, and other pertinent findings.

## 26. Texas Reporting to CMS

a. Quarterly and Annual Reporting
   DSRIP will be a component of the State's quarterly operational reports and annual reports related to the Demonstration. These reports will include:

   i. All DSRIP payments made to Performing Providers that occurred in the quarter as required in the quarterly payment report pursuant to STC 43(b);

    ii.    Expenditure projections reflecting the expected pace of future disbursements for each RHP and Performing Providers;

    iii.    A summary assessment of each RHP's DSRIP activities during the given period including progress on milestones; and

    iv.    Evaluation activities and interim findings for the evaluation design pursuant to STC 68.

b.    <u>Claiming Federal Financial Participation</u>

Texas will claim federal financial participation (FFP) for DSRIP incentive payments on the CMS 64.9 waiver form. FFP will be available only for DSRIP payments made in accordance with all pertinent STCs and Attachment I, "RHP Planning Protocol" and Attachment J, "Program Funding and Mechanics Protocol". All RHP Plans are subject to potential audits, including review by the independent assessor during the mid-point assessment and ongoing compliance monitoring. The Performing Providers shall have available for review by HHSC and CMS, upon request, all supporting data and back-up documentation evidencing performance as described under an RHP Plan for DSRIP incentive payments. Failure of the Performing Provider to maintain adequate documentation or inaccurate reporting of data may result in recoupment of DSRIP payments, including based on findings of the independent assessor.

# VI.   DISBURSEMENT OF DSRIP FUNDS

## 27. DSRIP Allocation Methodology to RHPs in DYs 1-5

a.    <u>Initial DSRIP Allocation</u>

For Demonstration Years 1-5, DSRIP funding amounts identified in Table 6 of Waiver STC 46 shall be allocated to RHPs according to a formula that takes into account the RHP's role in the safety net system. RHPs that shoulder a larger burden of Medicaid care and serve a larger share of low-income populations shall be allocated a higher share of DSRIP funds. The goal of this approach is to ensure that delivery system reforms under DSRIP have the greatest impact on Medicaid and low-income populations. The following variables were selected as proxies for measuring an RHP's participation in Medicaid and serving low-income populations:

    i.    Percent of State population with income below 200% FPL residing in the RHP Region (Source: U.S. Census Bureau: 2006-2010 American Community Survey for Texas). An RHP's percentage was calculated by dividing the number of low-income individuals with income below 200% FPL in the RHP Region by the total number of low-income individuals in the State with income below 200% FPL.

    ii.    Percent of Texas Medicaid acute care payments in SFY 2011 made in the RHP Region (including fee for service, MCO, vendor drug, and PCCM payments). An RHP's percentage was calculated by dividing SFY 2011 Medicaid acute care payments in the RHP Region by total SFY 2011 State Medicaid acute care payments.

    iii.    Percent of total SFY 2011 Medicaid supplemental payments (former Upper Payment Limit [UPL] program) made to providers in the RHP. An RHP's percentage was

calculated by dividing SFY 2011 Medicaid supplemental payments by total SFY 2011 State Medicaid supplemental payments.

The RHP's percentages for the three variables are weighted equally, and then the individual RHP's percentages are averaged to come up with the RHP's DSRIP Funding Allocation Percentage for each demonstration years 1-5.

An RHP's DSRIP Funding Allocation Percentage shall be multiplied by the statewide DSRIP funding amounts in DYs 1-5 identified in Table 6 of STC 46.  The product result of this calculation yields the DSRIP funding allocation amount for an RHP, which is reflected in Table 1 below.  This table also displays the Tier Level of an RHP as defined in paragraph 11, Section III "Key Elements of Proposed RHP Plans".

## Table 1: DSRIP Allocation (All Funds)

| RHP | Tier | Funding Allocation % | DY 1 | DY 2 | DY 3 | DY 4 | DY 5 | Total |
|---|---|---|---|---|---|---|---|---|
| 1 | 3 | 4.00% | 19,978,502 | 91,901,110 | 106,525,374 | 113,957,376 | 123,866,713 | 456,229,075 |
| 2 | 3 | 3.78% | 18,880,393 | 86,849,806 | 100,670,253 | 107,693,759 | 117,058,434 | 431,152,643 |
| 3 | 1 | 20.22% | 101,101,113 | 465,065,121 | 539,071,136 | 576,680,750 | 626,826,902 | 2,308,745,022 |
| 4 | 3 | 4.23% | 21,162,653 | 97,348,206 | 112,839,268 | 120,711,775 | 131,208,451 | 483,270,354 |
| 5 | 4 | 7.02% | 35,114,687 | 161,527,561 | 187,231,512 | 200,294,176 | 217,711,061 | 801,878,997 |
| 6 | 2 | 10.15% | 50,733,669 | 233,374,879 | 270,511,925 | 289,384,850 | 314,548,750 | 1,158,554,074 |
| 7 | 3 | 6.04% | 30,176,126 | 138,810,179 | 160,899,104 | 172,124,622 | 187,091,981 | 689,102,012 |
| 8 | 4 | 1.66% | 8,275,517 | 38,067,378 | 44,125,056 | 47,203,548 | 51,308,205 | 188,979,704 |
| 9 | 2 | 14.29% | 71,434,099 | 328,596,853 | 380,886,614 | 407,460,098 | 442,891,411 | 1,631,269,075 |
| 10 | 2 | 9.74% | 48,707,230 | 224,053,259 | 259,706,952 | 277,826,042 | 301,984,828 | 1,112,278,311 |
| 11 | 4 | 1.16% | 5,822,871 | 26,785,208 | 31,047,550 | 33,213,658 | 36,101,803 | 132,971,091 |
| 12 | 3 | 3.56% | 17,777,700 | 81,777,422 | 94,790,698 | 101,404,003 | 110,221,742 | 405,971,566 |
| 13 | 4 | 0.67% | 3,353,261 | 15,425,003 | 17,879,590 | 19,127,003 | 20,790,221 | 76,575,078 |
| 14 | 4 | 2.29% | 11,426,916 | 52,563,813 | 60,928,316 | 65,179,128 | 70,846,879 | 260,945,051 |
| 15 | 3 | 4.41% | 22,037,042 | 101,370,394 | 117,501,509 | 125,699,288 | 136,629,661 | 503,237,895 |
| 16 | 4 | 1.30% | 6,511,903 | 29,954,753 | 34,721,466 | 37,143,894 | 40,373,798 | 148,705,813 |
| 17 | 4 | 1.89% | 9,474,480 | 43,582,608 | 50,517,928 | 54,042,434 | 58,741,777 | 216,359,227 |
| 18 | 4 | 1.22% | 6,095,208 | 28,037,958 | 32,499,651 | 34,767,068 | 37,790,292 | 139,190,178 |

| 19 | 4 | 0.95% | 4,727,871 | 21,748,205 | 25,209,007 | 26,967,774 | 29,312,798 | 107,965,655 |
| 20 | 4 | 1.44% | 7,208,757 | 33,160,283 | 38,437,093 | 41,118,751 | 44,694,294 | 164,619,177 |
| | | **100%** | **500,000,000** | **2,300,000,000** | **2,666,000,000** | **2,852,000,000** | **3,100,000,000** | **11,418,000,000** |

b. <u>One-time Re-Assessment of DSRIP Allocation to RHPs in DY 3</u>

During DY 3, HHSC shall re-assess DSRIP allocation amounts to RHPs.  In the event that the total amount of DSRIP funds included in an RHP Plan for DYs 3-5 is less than the total amount available to the RHP in Table 1, HHSC shall redistribute uncommitted amounts that an RHP does not propose to use for new three year projects for DYs 3-5.  The uncommitted amounts shall be redistributed to RHPs according to a DSRIP funding allocation methodology agreed to by HHSC and CMS.  The redistributed funds may be used by RHPs to fund new three year projects beginning in DY 3 that are approved according to the process described in paragraph18.

**28. Benchmark Payment Variation between UC and DSRIP**

UC payments will be based on each provider's reported UC costs on the UC application and reduced proportionately if the total statewide UC cap is exceeded for a given demonstration year. However, to ensure a robust and meaningful DSRIP program, RHPs are strongly encouraged to submit RHP Plans that in total fund DSRIP projects at no less than the percentages listed in Table 2 below.  Table 2 shows the statewide waiver funding allocation schedule for DSRIP and UC described in Table 6 of STC 46.

**Table 2:  Waiver Funding Allocation between UC Program and DSRIP Programs**

|          | DY 2 | DY 3 | DY 4 | DY 5 | Total |
|----------|------|------|------|------|-------|
| % UC     | 63%  | 57%  | 54%  | 50%  | 60%   |
| % DSRIP  | 37%  | 43%  | 46%  | 50%  | 40%   |

**29. DY 1 RHP DSRIP Allocation Formula**

a. <u>Eligible Entities</u>
Anchoring Entities and Performing Providers that begin participation in DSRIP in DY 2 and that have a current Medicaid provider identification number are eligible to receive a DY 1 DSRIP payment according to the requirements in this section.  An entity that serves both roles in an RHP is eligible to receive a DY 1 payment under each of the categories described below.

b. <u>Anchoring Entities</u>
The Anchoring Entity of an RHP shall be allocated 20 percent of the total DY 1 RHP DSRIP funding amount.

c. <u>Performing Providers</u>

Remaining DY 1 RHP DSRIP funding (less the Anchoring Entity DY 1 DSRIP) shall be allocated to Performing Providers based on an allocation formula. The allocation formula divides an RHP Plan's estimated dollar value of a Performing Provider's DSRIP projects in

Categories 1-4 over the DYs 2-5 period by the total value of the RHP's DSRIP projects over the DYs 2-5 period. The resulting percentage is then multiplied by the RHP's remaining DY 1 DSRIP amount to determine the DY 1 DSRIP payment for the Performing Provider.

*Example:*

- An RHP's DY1 DSRIP Allocation is $25 million.
- 20 percent or $5 million is allocated to the Anchoring Entity.
- The remaining amount, $20 million, shall be distributed to Performing Providers according to the following formula:
    1. An RHP Plan reports a total DSRIP valuation of projects in DYs 2-5 equal to $500 million across 10 Performing Providers.
    2. Performing Provider "A's" DSRIP valuation for projects over the 4-year period in the RHP is $100 million, or 20 percent of the total DSRIP valuation.
    3. Based on the formula, Performing Provider "A" would be eligible to receive $4 million or 20 percent of the remaining $20 million DY 1 DSRIP payment amount.

## 30. DYs 2-5 RHP DSRIP Allocation Formula

a. <u>Eligibility for DSRIP</u>
Performing Providers described in Section II "DSRIP Eligibility Criteria" are eligible to receive RHP DSRIP payments in Demonstration Years 2-5.  Each Performing Provider will be individually responsible for progress towards and achievement of its milestone bundles in all categories as defined in the RHP's approved RHP Plan. As outlined in Section V "RHP and State Reporting Requirements", Performing Providers will be eligible to receive DSRIP incentive payments related to achievement of their milestone bundles upon submission and approval of the required reports for payment.

b. <u>"Two-Pass" Process for Allocating DSRIP Funds</u>
DSRIP funding shall be allocated to Performing Providers using a two-stage process.  The first stage or "Pass 1" sets an initial allocation to each potential provider who would be eligible to participate in DSRIP as described in paragraph 26.c.i.-ii.  The purpose of this step is to encourage broad participation in DSRIP within an RHP.  Under Pass 1, the RHP must identify and fund its minimum required number of projects.  In addition, in order to access Pass 2 funds, RHPs in each Tier must meet DSRIP participation requirements for major safety net hospitals (described below in paragraph 29.c.v.2) and meet a threshold for DSRIP participation by non-profit and other private hospitals (described below in paragraph 29.c.v.3).


Recognizing that not all potentially eligible Performing Providers will participate in DSRIP, Pass 2 of the DSRIP allocation process permits RHPs to reallocate unused DSRIP funds for new projects in Categories 1, 2, and 3.  DSRIP projects funded in the plan must support the RHP's overall goals and be consistent with its community needs assessment. HHSC shall ensure in the RHP Plan submission requirements that the "two-pass" process has been followed.

c. Initial DSRIP Allocation ("Pass 1" Allocation)

    i. <u>Hospital Providers</u>
Potentially eligible hospital Performing Providers in an RHP that participated in either the Disproportionate Share Hospital (DSH) program during FFY 2012 or the former Upper Payment Limit (UPL) program during FFY 2011 shall be allocated 75 percent of the RHP's annual DSRIP funds. Of this amount, each hospital shall be assigned a potential DSRIP allocation based on a provider's size and role in serving Medicaid and uninsured patients, as measured by three variables:

1. The hospital's percent share of Medicaid acute care payments in SFY 2011 made to all potentially eligible hospitals in the RHP (including fee for service, MCO, and PCCM payments);
2. The hospital's percent share of total SFY 2011 Medicaid supplemental payments made to all potentially eligible hospital providers in the RHP (former UPL program); and
3. The hospital's percent share of uncompensated care in the RHP. A hospital's uncompensated care is measured by its FFY 2012 Hospital Specific Limit (HSL). For hospitals that do not have a FFY 2012 Hospital Specific Limit, uncompensated care shall be measured by that hospital's charity care costs reported in the 2010 Annual Hospital Survey trended to 2012 by an annual trend rate of approximately 2 percent (4 percent total trend over the two-year period).

        The individual hospital's percent share of Medicaid acute care payments shall be weighted 25 percent, percent share of Medicaid supplemental payments shall be weighted 25 percent, and percent share of uncompensated care shall be weighted 50 percent to determine the Hospital DSRIP Funding Allocation Percentage. The Hospital DSRIP Funding Allocation shall be multiplied by the annual RHP DSRIP amount allocated to hospitals in the RHP to come up with the Pass 1 allocation amount for each hospital.

    ii. <u>Non-Hospital Providers</u>
Potentially eligible non-hospital Performing Providers in an RHP are allocated a total of 25 percent of the RHP's annual DSRIP funds, to be distributed as follows:

1. Community Mental Health Centers (CMHCs) initially shall be allocated a total of 10 percent of the RHP's annual DSRIP funds;
2. Physician Practices affiliated with an Academic Health Science Center initially shall be allocated a total of 10 percent of the RHP's annual DSRIP funds. Such physician practices outside an RHP as referenced in paragraph 7 may access the 10 percent upon request of the RHP; and
3. Local Health Departments initially shall be allocated a total of 5 percent of the RHP's annual DSRIP funds.

If an RHP does not include one or more of the non-hospital providers listed above, the Pass 1 allocations will be redistributed in "Pass 2" as described in paragraph 29.d.

iii.  Option for Smaller Hospitals in Tiers 1 and 2 to Collaborate in Pass 1

1.  Hospitals in RHPs categorized in Tiers 1 or 2 whose DSRIP allocation in Pass 1 in DY 2 is less than $2 million are encouraged to work within their RHP to combine their individual DSRIP allocations to implement a robust DSRIP project(s) that will be valuable to the RHP as determined by the RHP Plan and community needs assessment. A single Performing Provider must implement each DSRIP project.
2.  Such hospitals can combine their individual DSRIP allocations if there is a signed agreement between the affected parties submitted with the RHP Plan stating that the transaction is entered into freely and that it benefits regional transformation. No hospital is required to combine its individual DSRIP allocation.

iv.  Option for Performing Providers in Tiers 3 and 4 to Collaborate in Pass 1

1.  Performing Providers in RHPs categorized in Tiers 3 or 4 may combine their individual DSRIP allocations within their RHP to implement a robust DSRIP project(s) considered valuable to the RHP as determined by the RHP Plan and community needs assessment. A single Performing Provider must implement each DSRIP project.
2.  Such Performing Providers can combine their individual DSRIP allocations if there is a signed agreement between the affected parties submitted with the RHP Plan stating that the transaction is entered into freely and that it benefits regional transformation. No Performing Provider is required to combine its individual DSRIP allocation.

v.  Requirements in Pass 1

1.  Minimum Projects
    RHP Plans must identify the minimum number of Category 1 and 2 projects the RHP is required to implement according to its Tier Level as outlined in Section III "Key Elements of Proposed RHP Plans" and must show that Performing Providers will meet the funding allocation requirements in each Category as described in paragraph 29.e. If an RHP Plan does not meet these criteria in Pass 1, the RHP Plan will not be approved.

2.  DSRIP Participation Target for Major Safety Net Hospitals

An RHP Plan must meet DSRIP participation requirements for major safety net hospitals in order to be eligible to participate in "Pass 2" and to receive any redistributed DSRIP funds in DY 3 (as described in paragraph 26.b). In order to ensure broad participation of safety net hospitals in DSRIP, each RHP will have a minimum number of safety net hospitals participate in DSRIP as Performing Providers. The participation target varies by RHP Tier Level and is presented in Table 3 below.

For the purposes of this requirement, a hospital is defined as a major safety net hospital if it meets either of these two criteria:

a. Criteria 1
   The hospital participated in the Disproportionate Share Hospital (DSH) program in FFY2012 <u>and</u>

   i. The hospital received at least 15 percent of the region's total Medicaid revenue (fee-for-service, managed care, primary care case management [PCCM]) in FFY2011 for Pass 1 hospitals <u>or;</u>
   ii. has a trended 2012 hospital specific limit (HSL) that represents at least 15 percent of the region's total HSL,
       <u>or</u>

b. Criteria 2
   The hospital has a Pass 1 DSRIP allocation for DY 2-5 of greater than $60 million as defined in paragraph 29.c.i above.

**Table 3: Major Safety Net Hospital DSRIP Participation Target by RHP Tier Level**

| RHP Tier | Number of Major Safety Net Hospitals in each RHP that must Participate in DSRIP* | Estimated Number of Safety Net Hospitals Participating in DSRIP |
|---|---|---|
| **Tier 1** | At least 5 | 5 |
| **Tier 2** | At least 4 | 11 |
| **Tier 3** | At least 2 | 12 |
| **Tier 4** | At least 1 | 10 |
| **Total** | | 38 |

*If there are fewer major safety net hospitals in an RHP than specified for its Tier level, then the RHP Plan must include all the major safety net hospitals as defined above in that RHP as Performing Providers for DSRIP.

3. Broad Hospital Participation Target
An RHP Plan must meet the broad hospital participation target in order to be eligible to participate in "Pass 2" and to receive any redistributed DSRIP funds in DY 3 (as described in paragraph 26.b). RHPs shall have minimum representation of non-profit and other private hospitals in their RHP plans. An RHP Plan must include projects with values equal to at least a minimum percentage of DSRIP Annual Allocation Amounts assigned to non-profit and other private hospitals as defined in paragraph 29.c.i above. The minimum percentage varies by RHP Tier Level and is presented in Table 4 below.

**Table 4:  Non-Profit and Other Private Hospital DSRIP Target by RHP Tier Level**

| RHP Tier | Percent of Total Pass 1 Assigned DSRIP Annual Amounts Aggregated Across all Non-Profit and Other Private Hospitals included in RHP Plan |
|---|---|
| Tier 1 | At least 30% |
| Tier 2 | At least 30% |
| Tier 3 | At least 15% |
| Tier 4 | At least 5% |

d. Re-allocation of Unused DSRIP Amounts for New Projects ("Pass 2")
After requirements of Pass 1 are met, as specified in paragraph 29.c.iv, if there are DSRIP allocation amounts that remain unused by potential Performing Providers, the RHP may redirect the unused amounts to fund additional projects by hospital providers and non-hospital providers that support the overall goals and community needs assessment of the RHP. HHSC also strongly encourages broad geographic representation across the region. In "Pass 2", the RHP shall identify the new projects and outcomes from Categories 1-3, the Performing Providers who shall implement the project, and the DSRIP funding amount assigned to the projects and measures.

In addition to the eligible providers identified in paragraph 29, physician practices that are not affiliated with academic science health centers may participate in Categories 1, 2, and 3 DSRIP projects in Pass 2. Hospitals that did not participate in the DSH program in FFY 2012 or the UPL program in FFY 2011 may also participate in DSRIP in Pass 2.

i. Pass 2 - Performing Providers that did not participate in Pass 1:
Potentially eligible Performing Providers in an RHP that did not participate in Pass 1 shall be allocated a total of 25 percent of the RHP's unused Pass 1 DSRIP funds. The

Anchor will calculate the following for Pass 2 using the total unused DSRIP from Pass 1 allocations:

1. Hospital Performing Providers that did not participate in the DSH program in FFY 2012 or the UPL program in FFY 2011 shall be allocated a total of 15 percent of the RHP's unused Pass 1 DSRIP funds. Each hospital shall be allocated a proportion of the 15 percent divided by the number of new hospital Performing Providers.
2. Physician practices not affiliated with academic health science centers shall be allocated 10 percent of the RHP's unused Pass 1 DSRIP funds. Each physician practice shall be allocated a proportion of the 10 percent divided by the number of interested physician practices.

ii. Pass 2 - Performing Providers that participated in Pass 1:
Performing Providers in an RHP that participated in Pass 1 shall be allocated a total of 75 percent of the RHP's unused Pass 1 DSRIP funds. The Anchor will calculate the following for Pass 2 using Pass 1 DSRIP project information:

1. Each individual Performing Provider's percent of the total Pass 1 funding for DSRIP projects in Pass 1 in DYs 2-5.
2. The Performing Provider's percent as calculated in 1. above is multiplied by the 75 percent of the RHP's unused Pass 1 DSRIP funds to determine the allocation of DSRIP to each Performing Provider in the RHP for Pass 2.
3. Performing Providers may implement new DSRIP projects that complement the projects from Pass 1 and address outstanding community needs.
4. One Performing Provider must implement each DSRIP project.

iii. Collaboration among Performing Providers in Pass 2
Within each RHP, Performing Providers may combine their individual Pass 2 DSRIP allocations to fund a DSRIP project that is a priority for the RHP if there is a signed agreement between the affected parties submitted with the RHP Plan stating that the transaction is entered into freely and that it benefits regional transformation. No Performing Provider is required to combine its individual DSRIP allocation.

iv. If there are unused funds after Pass 2, the Anchoring Entity may collaborate with RHP Performing Providers to determine which additional DSRIP projects to include in the RHP Plan.

e. Project Valuation

RHP Plans shall include a narrative that describes the approach used for valuing projects and rationale to support the approach. At a minimum, Performing Providers shall ensure that upon initial submission of the RHP Plan and individual three-year projects, project values comport with the following funding distribution across Categories 1-4 in DYs 2-5. Projects valued at the maximum levels described in paragraph 12.e are expected to support meaningful, large-scale delivery system transformation and must provide sufficient justification of the project value in the RHP Plan.

In addition, if an IGT entity does not elect to transfer additional IGT funds to provide a portion of the nonfederal share of the administrative costs related to waiver monitoring activities, as described in paragraph 23, the state may lower a provider's valuation. The state may lower the valuation by an amount necessary to equal the associated IGT entity's share of the expected funds for waiver monitoring activities described in paragraph 23.

**Hospital Performing Providers: DSRIP Category Funding Distribution**

|  | **DY 2** | **DY 3** | **DY 4** | **DY 5** |
|---|---|---|---|---|
| **Category 1 & 2** | No more than 85% | No more than 80% | No more than 75% | No more than 57% |
| **Category 3** | At least 10% | At least 10% | At least 15% | At least 33% |
| **Category 4\*** | 5% | 10 - 15% | 10 - 15% | 10 - 15% |

*Hospital providers defined in paragraph 11.f, Section III "Key Elements of Proposed RHP Plans" that elect not to report Category 4 measures shall allocate Category 4 funding to Categories 1 & 2 or 3.

**Non-Hospital Performing Providers: DSRIP Category Funding Distribution**

|  | **DY 2** | **DY 3** | **DY 4** | **DY 5** |
|---|---|---|---|---|
| **Category 1 & 2** | 95% to 100% | No more than 90% | No more than 90% | No more than 80% |
| **Category 3\*** | 0% to 5% | At least 10% | At least 10% | At least 20% |

*Non-hospital Performing Providers are expected to allocate funds for Category 3 in the RHP Plan submission and may submit plan modifications in DY 2 with specific Category 3 outcomes to be eligible for the funding in DYs 3-5.

f.   <u>Milestone Valuation</u>

With respect to Categories 1, 2, and 4, milestones for a project within a demonstration year shall be valued equally. For Category 3, milestones for a project within a demonstration year from DY 3-5 shall be valued equally (within the limits for pay for reporting and pay for performance and other parameters described in paragraph 32 below).

## 31. Payment Based on Achievement of Milestone Bundles in Categories 1, 2, and 4

a. <u>Definition</u>
With respect to Categories 1-2, a milestone bundle is the compilation of milestones and related metrics associated with a project in a given year. A milestone may have more than one annual metric associated with it. Two or more metrics associated with a milestone shall be assigned equal weighted value for the purpose of calculating incentive payments. With respect to Category 4, a milestone bundle is the compilation of reporting measures within a Category 4 domain. A Category 4 reporting measure within a domain shall be considered a milestone for the purpose of this section and all measures within a domain shall be weighted equally for the purpose of calculating incentive payments.

b. <u>Basis for Calculating Incentive Payment for Categories 1-2</u>
Incentive payments are calculated separately for each project in Categories 1 and 2.The amount of the incentive funding paid to a Performing Provider will be based on the amount of progress made within each specific milestone bundle. For each milestone within the bundle, the Performing Provider will include in the RHP semi-annual report the progress made in completing each metric associated with the milestone. A Performing Provider must fully achieve a Category 1 or 2 metric to include it in the incentive payment calculation.

Based on the progress reported, each milestone will be categorized as follows to determine the total achievement value for the milestone bundle:

- Full achievement (achievement value = 1)
- At least 75 percent achievement (achievement value = .75)
- At least 50 percent achievement (achievement value = .5)
- At least 25 percent achievement (achievement value = .25)
- Less than 25 percent achievement (achievement value = 0)

The achievement values for each milestone in the bundle will be summed together to determine the total achievement value for the milestone bundle. The Performing Provider is then eligible to receive an amount of incentive funding for that milestone bundle determined by multiplying the total amount of funding related to that bundle by the result of dividing the reported achievement value by the total possible achievement value. If a Performing Provider has previously reported progress in a bundle and received partial funding, only the additional amount it is eligible for will be disbursed. HHSC may determine milestones that qualify for partial achievement. (See example below of disbursement calculation).

*Example of disbursement calculation:*

A Category 1 Project in DY 2 is valued at $30 million and has 5 milestones, which make up the Milestone Bundle. Under the payment formula, the 5 milestones represent a maximum achievement value of 5.

The hospital Performing Provider reports the following progress at 6 months:

Milestone 1: 100 percent achievement (achievement value = 1)

- Metric 1: Fully achieved
- Metric 2: Fully achieved

Milestone 2: 66.7% percent achievement (Achievement value = .5)

- Metric 1: Fully achieved
- Metric 2: Fully achieved
- Metric 3: Not Achieved

Milestone 3: 0 percent achievement (Achievement value = 0)

Metric 1: Not Achieved

Milestone 4: 50 percent achievement (Achievement value = .5)

- Metric 1: Fully Achieved
- Metric 2: Not Achieved

Milestone 5: 40 percent achievement (Achievement value = .25)

- Metric 1: Fully achieved
- Metric 2: Fully Achieved
- Metric 3: Not Achieved
- Metric 4: Not Achieved
- Metric 5: Not Achieved

Total achievement value at 6 months = 2.25

Disbursement at 6 months = $30M x (2.25/5) = $13.5 million

By the end of the Demonstration Year, the hospital Performing Provider successfully completes all of the remaining metrics for the project. The hospital is eligible to receive the balance of incentive payments related to the project:

Disbursement at 12 months is $30 million - $13.5 million = $16.5 million.

c. <u>Basis for Calculating Incentive Payment for Category 4</u>

     i.    <u>DY 2 Incentive Payments</u>
In DY 2, a hospital Performing Provider participating in Category 4 reporting shall be eligible to receive an incentive payment equal to 5 percent of its total allocation amount in DY 2 upon submission to HHSC of a status report that describes the system changes the hospital is putting in place to prepare to successfully report Category 4 measures in DYs 3-5.

    ii.    <u>DYs 3-5 Incentive Payments</u>
The amount of the incentive funding paid to a hospital Performing Provider will be based on the amount of progress made in successfully reporting all measures included in a domain.  A hospital must complete reporting on **all** Category 4 measures included in a domain prior to requesting incentive payments.  Hospitals shall report progress on completing measure reporting in the semi-annual reports.

*Example of disbursement calculation:*

A Category 4 Domain includes 5 reporting measures.  The hospital Performing Provider completes reports on two measures by March 31 (or by the 6th month of the DY).  The hospital reports this achievement in the first semi-annual report; however, an incentive payment is not made because 3 other measures in the domain remaining outstanding.  By the 12th month of the DY, the hospital has successfully reported on the remaining 3 measures.  At that point, the hospital may request and receive a full incentive payment for the entire domain of measures.  If a hospital fails to report on a single measure in a domain, it will forfeit the entire payment for the domain in question.

## 32. Basis for Payment in Category 3

d.   <u>Valuation of Category 3 Outcomes</u>
In February 2014, CMS and HHSC agreed to a revised Category 3 framework, including a revised list of Category 3 outcome options and a standard target setting methodology to be used to measure outcome improvement in DY 4 and DY 5.

The revised RHP Planning Protocol classifies Category 3 outcomes either as pay for performance (P4P) or pay for reporting (P4R).  The number and type of milestones for each outcome in DY4 and DY 5 depends on whether the outcome is P4P or P4R, and in DY 5 Performing Providers with P4R measures also are required to report on a population-focused priority measure or stretch activity. See the RHP Planning Protocol for further details on the revisions to Category 3.

In the initial RHP Plan submission, a Performing Provider had flexibility to assign different values to its Category 3 outcomes and related milestones, as long as total payments met the

annual category allocation amounts defined in 29.e above and the valuations were sufficiently justified.

Based on the updated Category 3 outcomes and framework in the RHP Planning Protocol, in March 2014 providers will re-select or verify their Category 3 outcome(s) for each Category 1 or 2 project. Category 3 valuation for DY 3-5 will be determined as follows:

    i.    HHSC will total all the funds the provider allocated to Category 3 each DY for DY 3, 4, and 5.

   ii.    HHSC will total the provider's Category 1 and 2 DSRIP projects, including both approved four-year projects and proposed three-year projects.

  iii.    Each provider will decide what percentage of its Category 3 funds will go toward a given Category 1 or 2 project. This percentage must be the same for DY 3-5. When determining the percentage of Category 3 funds related to each Category 1 or 2 project, a Performing Provider must allocate a minimum percentage to each Category 1 or 2 project. The minimum percentage is calculated as follows:

       1. Divide the total number of Category 1 and 2 DSRIP projects into 100. This is the average percentage of total Category 3 funding that would relate to each Category 1 or 2 project.

       2. Multiply the average percentage from 1 above by 25%.

       3. The product in 2 above is the minimum percentage of Category 3 funds that can be allocated to a Category 3 outcome related to a Category 1 or 2 project.

       4. HHSC may grant exceptions to a provider's minimum required percentage allocation per Category 1 or 2 project if needed for a provider to retain Category 3 valuation proportional to its Category 1 and 2 valuation. This would occur in cases where the valuation of a provider's Category 1 and 2 projects varies widely (e.g. one $7 million project and one $200,000 project).

Example of Category 3 Valuation Allocation Methodology with 5 Category 1 and 2 Projects

|  | DY 3 | DY4 | DY5 |
|---|---|---|---|
| Project 1.1 | 30% | 30% | 30% |
| Project 1.2 | 25% | 25% | 25% |
| Project 1.3 | 35% | 35% | 35% |
| Project 2.1 | 5% | 5% | 5% |
| Project 2.2 | 5% | 5% | 5% |

  iv.    Once a provider decides the percentage of its funds to allocate to a given Category 1 or 2 project for DY 3-5, based on the number of outcome measures the provider selects for that Category 1 or 2 project, HHSC will allocate an equal amount of Category 3 funds to each outcome, and also to each milestone for that outcome in a given demonstration year.

v.   If one or more of a Performing Provider's proposed three-year DSRIP projects do not get approved, HHSC will adjust the Category 3 valuations of its projects based on the above methodology.

vi.   The Category 3 funding breakdown in DY 3-5 is as follows:

|  | **P4P Category 3 Outcomes** | **P4R Category 3 Outcomes (need prior authorization)** |
|---|---|---|
| **DY3** | 50 percent status report / 50 percent establish baseline (both process milestones) | 50 percent status report / 50 percent establish baseline (both process milestones) |
| **DY 4** | 50 percent P4R (process milestone) / 50 percent P4P (achievement milestone) | 100 percent P4R on outcome (process milestone) |
| **DY 5** | 100 percent P4P (achievement milestone) | 50 percent P4R on outcome (process milestone) 50 percent P4P on population-focused priority measure (achievement milestone) or stretch activity (process milestone) |

Example 1 - P4P Outcomes

A provider allocates to its 1.1 project 30% of its total Category 3 valuation, which equals $1 million in DY 3, $2 million in DY 4, and $4 million in DY5.  The provider selects two pay for performance outcomes associated with its 1.1 project.  Funding distribution:

|  | DY 3 | DY 4 | DY 5 |
|---|---|---|---|
| P4P Outcome 1 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (50% for reporting to specifications and 50% for improving on the outcome) | $2 million (100% for improving on the outcome) |
| P4P Outcome 2 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (50% for reporting to specifications and 50% for improving on the outcome) | $2 million (100% for improving on the outcome) |

Example 2 - P4R Outcomes

A provider allocates to its 1.1 project 30% of its total Category 3 valuation, which equals $1 million in DY 3, $2 million in DY 4, and $4 million in DY5. The provider selects two pay for reporting outcomes associated with its 1.1 project. Funding distribution:

|  | DY 3 | DY 4 | DY 5 |
|---|---|---|---|
| P4R Outcome 1 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (100% for reporting to specifications) | $2 million (50% for reporting to specifications and 50% for improvement on population health measure or stretch activity) |
| P4R Outcome 2 | $500,000 (50% for status update and 50% for establishing baseline) | $1 million (100% for reporting to specifications) | $2 million (50% for reporting to specifications and 50% for improvement on population health measure or stretch activity) |

e. Process Milestones/Metrics

   A Performing Provider must fully achieve metrics associated with the process milestones to qualify for a DSRIP payment related to these milestones.

f. Achievement Milestones

   Performing Providers may receive partial payment for making progress towards, but not fully achieving, an achievement milestone. The partial payment would equal 25 percent, 50 percent, or 75 percent of the achievement value of that milestone. Based on the progress reported, each achievement milestone will be categorized as follows to determine the total achievement value percentage:

   - Full achievement (achievement value = 1)
   - At least 75 percent achievement (achievement value = .75)
   - At least 50 percent achievement (achievement value = .5)
   - At least 25 percent achievement (achievement value = .25)
   - Less than 25 percent achievement (achievement value = 0)

   *Example of disbursement calculation*:

   A hospital Performing Provider has set an achievement target that would decrease potentially preventable readmissions for a target population with a chronic condition by 5 percent in DY 4 and by 10 percent in DY 5.

In DY 4, the Performing Provider achieved a 2.5 percent reduction in PPR, short of its goal. Under the partial payment policy, the provider would be reimbursed 50 percent of the incentive payment associated with this achievement milestone because it achieved 50 percent of the target. The Performing provider may earn the remaining DY 4 incentive payment for the achievement milestone in the following year (DY 5) under the carry-forward policy outlined in Section VIII: "Carry-forward and Penalties for Missed Milestones."

# VII.  PLAN MODIFICATIONS

Consistent with the recognized need to provide RHPs with flexibility to modify their plans over time and take into account evidence and learning from their own experience over time, as well as for unforeseen circumstances or other good cause, an RHP may request prospective changes to its RHP Plan through a plan modification process.

### 33. Plan Modification Process

An RHP may request modifications to an RHP Plan under the following circumstances:

a. <u>Adding New Projects for Demonstration Year 3</u>
An RHP may amend its plan to include new projects financed by either new or existing IGT Entities that are implemented by either existing and/or new Performing Providers. These projects shall be 3 years in duration, beginning in Demonstration Year 3. Projects added for DY 3 may be selected from Categories 1, 2, or 3 of Attachment I, "RHP Planning Protocol" and are subject to all requirements described herein and in the STCs. Newly added hospital Performing Providers shall be required to report Category 4 measures according to Section III "Key Elements of Proposed RHP Plans". HHSC and CMS will review three year projects according to the process described in paragraph 18.

b. <u>Deleting or Terminating an Existing Project</u>
An RHP may request to delete or terminate a project from its RHP plan and forgo replacing it if the RHP continues to meet the minimum project number requirements outlined in Section III "Key Elements of Proposed RHP Plans" and the loss of the project does not jeopardize or dilute the remaining delivery system reforms pursued in the plan. An RHP may not redistribute incentive funding from the deleted project to other existing projects; unless the project is replaced in accordance with subparagraph a. above, the affected Performing Provider and RHP shall forfeit DSRIP allocation associated with the deleted project. The forfeited DSRIP allocation may be available for redistribution to RHPs in accordance with Section VI "Disbursement of DSRIP Funds".

If a project is terminated prior to the mid-point assessment, HHSC will recoup prior DSRIP payments for that project and return the associated federal share of the payments to CMS.

A Performing Provider will receive some period of time after the mid-point assessment to determine if a DSRIP project will continue for the remainder of the demonstration. Specifically, if the Performing Provider withdraws after the mid-point assessment but before DY 4 payments are made, no prior DSRIP payments will be recouped.

If a DSRIP project is terminated after the post mid-point assessment consideration period, then HHSC will recoup all DSRIP payments made after the mid-point assessment and return the associated federal share of the payments to CMS.

c. <u>Modifying Existing Projects</u>
RHPs may submit requests to HHSC to modify elements of an existing project prospectively, including changes to milestones and metrics with good cause. Such requests must be submitted to HHSC 90 days prior to when the changes go into effect according to the standardized timeline agreed to by the state and CMS. Performing providers have opportunities to submit plan modification requests in December 2013 (for DY 3-5) and July 2014 (for DY 4-5). The final opportunity to submit plan modification requests for DY 4 will align with the timing of the mid-point assessment. There will be a final opportunity during DY 4 to submit plan modification requests for DY 5 only for Category 3 changes and for three-year projects.

d. <u>Plan Modification Review and Approval Process</u>
Plan modifications must be submitted in writing to HHSC; HHSC shall take action on the plan modification request using a CMS-approved approach, criteria, and checklist. HHSC will notify providers in writing of any questions or concerns identified. Once the projects are determined by HHSC to meet the CMS-approved criteria, the plan modifications will be approved and HHSC will notify CMS. Substantial reductions in project scope (such as reductions to quantifiable patient impact, as well as significant changes in the hiring of staff and completion of core components) will be subject to a secondary review and ongoing compliance monitoring by the independent assessor. If the independent assessor disagrees with HHSC's assessment to approve a plan modification, CMS will have an opportunity to review the plan modification and request a re-review by HHSC.

# VIII.  CARRY-FORWARD AND PENALTIES FOR MISSED MILESTONES

## 34. Carry-forward Policy

If a Performing Provider does not fully achieve a milestone bundle in Categories 1 or 2, or a Category 3 process milestone or achievement milestone that was specified in its RHP Plan for completion in a particular demonstration year, it will be able to carry forward the available incentive funding associated with the milestone until the end of the following demonstration year during which the Performing Provider may complete the milestone and receive full payment. Incentive funding that is carried forward still remains associated with the original demonstration year for all accounting purposes (including calculation of the annual DSRIP payment limits). Carried forward DSRIP funding is subject to all Medicaid claiming requirements and may be paid no later than two years after the end of a demonstration year in which it was to have been completed (e.g., for DY 2, which ends September 30, 2013, payments may be made no later than September 30, 2015). Although authority for DSRIP funding expires September 30, 2016, DSRIP payment may be claimed after this point, subject to the carry-forward provisions in this

section. To effectuate carry-forward policy, a Performing Provider shall provide narrative description on the status of the missed milestones and outline the provider's plan to achieve the missed milestones by the end of the of the following demonstration year.

### 35. Penalties for Missed Milestones

If a Performing Provider does not complete the missed milestone bundle or measure during the 12-month carry-forward period or the reporting year with respect to Category 4, funding for the incentive payment shall be forfeited and no longer available for use in the DSRIP program.

# IX. DATA QUALITY ASSURANCE

### 36. Data validation and alignment with managed care

Data and metrics that form the basis of incentive payments in DSRIP should have a high degree of accuracy and validity. The state must require that each Performing Provider certify that data received to demonstrate DSRIP achievement is accurate and complete. Data accuracy and validity also will be subject to review by the independent assessor.

Consistent with the requirements of STC 27, the state will update its comprehensive quality strategy and include in its annual report to CMS opportunities to better standardize quality measurement between DSRIP and the state's Medicaid managed care programs in order to reduce administrative burden and ensure greater validity and reliability for performance measures.

# X. TRANSITION YEAR (DY6)

### 37. Definitions

a. Demonstration Year (DY) 6 - The initial 15-month period of time, as approved by the Centers for Medicare & Medicaid Services (CMS), for which the waiver is extended beyond the initial demonstration period, or October 1, 2016 - December 31, 2017.

   i. Demonstration Year (DY) 6A - Federal fiscal year (FFY) 2017, or the first 12 months of DY6 (October 1, 2016 - September 30, 2017).
   ii. Demonstration Year (DY) 6B - The last three months of DY6 (October 1, 2017 - December 31, 2017).

b. Extension period - The entire period of time, as approved by the Centers for Medicare & Medicaid Services (CMS), for which the waiver is extended beyond the initial demonstration period.

c. Initial demonstration period - The first five demonstration years (DYs) of the waiver, or December 12, 2011 through September 30, 2016.

d. Medicaid and Low-income or Uninsured (MLIU) – MLIU is changed from Medicaid/ Low-income uninsured in the initial demonstration period to Medicaid and low-income or uninsured in the applicable DY.

    i. To qualify as a Medicaid individual for purposes of MLIU Quantifiable Patient Impact (QPI), the individual must be enrolled in Medicaid at the time of at least one DSRIP project encounter during the applicable DY.

    ii. To qualify as a low-income or uninsured individual for purposes of MLIU QPI, the individual must either be below 200 percent of the federal poverty level (FPL) or must not have health insurance at the time of at least one DSRIP project encounter during the applicable DY.

    iii. If an individual was enrolled in Medicaid at the time of one DSRIP project encounter during the applicable DY, and was low-income or uninsured at the time of a separate DSRIP project encounter during the applicable DY, that individual is classified as a Medicaid individual for purposes of MLIU QPI.

e. Medicaid and Low-income or Uninsured (MLIU) Quantifiable Patient Impact (QPI) – The number of MLIU individuals served, or encounters provided to MLIU individuals, in accordance with paragraph 41(a)(iii), during an applicable DY that are attributable to the DSRIP project.

f. Medicaid and Low-income or Uninsured (MLIU) Quantifiable Patient Impact (QPI) Goal – The number of MLIU individuals that a Performing Provider intends to serve, or the number of MLIU encounters that a Performing Provider intends to provide, in accordance with paragraph 41(a)(iii), during an applicable DY that are attributable to the DSRIP project.

g. Quantifiable Patient Impact (QPI) Grouping – The category of the QPI measurement. The category may be either individuals served or encounters provided.

h. Pre-DSRIP Baseline - The service volume prior to the implementation of a DSRIP project, as measured by the number of individuals served or encounters provided during the 12-month period preceding the implementation of the DSRIP project. There is a pre-DSRIP baseline for total QPI and a pre-DSRIP baseline for MLIU QPI. For a DSRIP project that is a new intervention, both the pre-DSRIP baseline for total QPI and the pre-DSRIP baseline for MLIU QPI are zero.

i. Total Quantifiable Patient Impact (QPI) – The total number of individuals served or encounters provided, in accordance with paragraph 41(a)(ii), during an applicable DY that are attributable to the DSRIP project.

j. Total Quantifiable Patient Impact (QPI) Goal – The total number of individuals that a Performing Provider intends to serve, or the total number of encounters that a Performing

Provider intends to provide, in accordance with paragraph 41(a)(ii), during an applicable DY that are attributable to the DSRIP project.

k.  Uncompensated Care (UC) Only Hospital – A hospital eligible to be a Performing Provider that is not a Performing Provider but receives UC payments.

## 38.  DY6 DSRIP Pool Allocation

a.  The DSRIP pool allocation for DY6 is $3.875 billion.

 i.    $3.1 billion of the DSRIP pool allocation for DY6 is allocated to DY6A.
 ii.   $775 million of the DSRIP pool allocation for DY6 is allocated to DY6B.

b.  The $775 million allocated to DY6B will be combined with any DSRIP pool funds agreed to for DY7.

c.  Performing Providers' values must comport with the following funding distributions across Categories 1-4 in DY6A.

**Hospital Performing Providers:  DSRIP Category Funding Distribution***

|  | DY 2 | DY 3 | DY 4 | DY 5 | DY 6A |
|---|---|---|---|---|---|
| **Category 1 & 2** | No more than 85% | No more than 80% | No more than 75% | No more than 57% | No more than 57% |
| **Category 3** | At least 10% | At least 10% | At least 15% | At least 33% | At least 33% |
| **Category 4** | 5% | 10 - 15% | 10 - 15% | 10 - 15% | No more than 10% |

*Hospital Performing Providers defined in paragraph 11.f, Section III "Key Elements of Proposed RHP Plans" that elected not to report Category 4 measures during the initial demonstration period allocated Category 4 funding to Categories 1 & 2 or 3.  Consequently, the percentage of these Performing Providers' funding that is allocated to Categories 1 & 2 may exceed the maximum threshold of 57 percent to up to 67 percent.  Also, if the Performing Provider met the 57 percent threshold at the time of initial RHP plan submission, but later exceeded it due to HHSC and CMS approval of a three-year project or withdrawal of Category 4 Reporting Domain 6, Categories 1 & 2 may be allocated no more than 62 percent of the DSRIP funds allocated to the Performing Provider.

## Non-Hospital Performing Providers:  DSRIP Category Funding Distribution

|  | DY 2 | DY 3 | DY 4 | DY 5 | DY 6A |
|---|---|---|---|---|---|

**Attachment J**
**Program Funding and Mechanics Protocol**

| Category 1 & 2 | 95% to 100% | No more than 90% | No more than 90% | No more than 80% | No more than 80% |
|---|---|---|---|---|---|
| **Category 3** | 0% to 5% | At least 10% | At least 10% | At least 20% | At least 20% |

**39. Current DSRIP Projects Eligible to Continue**

a.  A Performing Provider's total value for DY6A is equal to its total value for DY5 with the following exceptions:

    i.  HHSC notified a Performing Provider in January 2016 that a DSRIP project's value may be reduced if the DSRIP project fails to complete DSRIP project or metric goals by the end of DY5; or

    ii.  Performing Providers with a total value less than $250,000 for DY5 may increase their total value to up to $250,000 per each subsequent DY beginning in DY6. The increase in value is contingent on funds availability as described in paragraph 44. Categories 1-4 will each be increased proportionately. However, any funds in excess of the 10 percent maximum for Category 4 will be allocated to Category 3. A Performing Provider may need to increase a DSRIP project's MLIU QPI goal for DY6A and beyond in order to obtain the increased value. Performing Providers eligible for this option must make this choice by a date to be determined by HHSC.

b.  For each DSRIP project that HHSC determines is eligible to continue, the Performing Provider must indicate to HHSC, by a date to be determined by HHSC, whether it chooses to: 1) discontinue the DSRIP project in DY6; or 2) continue the DSRIP project in DY6.

    i.  If a Performing Provider indicates to HHSC, by a date to be determined by HHSC, that it chooses to discontinue the DSRIP project in DY6, the Performing Provider may not propose any new DSRIP projects for the entirety of the extension period with funds associated with the discontinued DSRIP project.

    ii.  If a Performing Provider indicates to HHSC, by a date to be determined by HHSC, that it chooses to continue the DSRIP project in DY6, the Performing Provider must indicate to HHSC, by a date to be determined by HHSC, whether it chooses to: 1) continue the DSRIP project for the remainder of the extension period; or 2) replace the DSRIP project with a new DSRIP project to commence no sooner than the beginning of DY6B.

c.  If a DSRIP project is withdrawn prior to the second payment period for DY7, HHSC will recoup all prior extension period DSRIP payments associated with the DSRIP project.

d.  If a DSRIP project is withdrawn after the second payment period for DY7, but before the first reporting period for DY8, no prior extension period DSRIP payments associated with the DSRIP project will be recouped due to withdrawal.

e.  If a DSRIP project is withdrawn after the first reporting period for DY8, any DSRIP payments made after that period will be recouped.

f.  The DY5 intergovernmental transfer (IGT) process, payment calculations, and monitoring IGT are maintained in the extension period. IGT entities from DY5 will continue to provide funding for the extension period unless a Performing Provider submits changes during a reporting period. No new certifications (RHP Plan Section VI) are required for continuing RHP participants.

g.  If a Performing Provider participated in Category 4 in DY5, the Performing Provider will continue to participate in Category 4 in DY6A. The Performing Provider's Category 4 value for DY6A will be equal to the Performing Provider's Category 4 value for DY5, unless the Performing Provider's DY5 Category 4 value is greater than 10 percent of the Performing Provider's total DY5 value. In this case, the Performing Provider's DY6A Category 4 value will be reduced to 10 percent of the Performing Provider's total DY5 value, and the funds above the 10 percent threshold will be allocated to Category 3 in DY6A.

## 40.  Current DSRIP Projects Ineligible to Continue

a.  If HHSC determines that a DSRIP project is ineligible to continue in its current form, that DSRIP project may not participate in the extension period. A Performing Provider affected by such a determination will have the opportunity to use the funds associated with the DSRIP project beginning in DY6B, subject to DY6B-DY10 requirements.

## 41.  Requirements for Continuing DSRIP Projects

a.  <u>Category 1 and 2 Requirements for DY6A</u>

  i.  Each DSRIP project must have the following four milestones in DY6A:
    A.  A total QPI milestone valued at 25% of each DSRIP project's Category 1 or 2 value;
    B.  A MLIU QPI milestone valued at 25% of each DSRIP project's Category 1 or 2 value;
    C.  A core component reporting milestone valued at 25% of each DSRIP project's Category 1 or 2 value; and
    D.  A sustainability planning milestone valued at 25% of each DSRIP project's Category 1 or 2 value.
  ii.  *Total QPI Milestone*
    A.  HHSC will convert each total QPI metric to a total QPI milestone with standardized language in DY6A. However, if a DSRIP project has multiple QPI metrics in DY5, that project may be exempted from this conversion, based on criteria determined by HHSC and CMS.
    B.  The DY6A total QPI goal is equal to the DY5 total QPI goal. However, certain DSRIP projects are eligible for an adjustment to the DSRIP project's DY6A total QPI goal as identified by HHSC.
    C.  DSRIP projects must retain the same QPI grouping from the initial demonstration period in DY6A for total QPI.

    D. DSRIP projects must retain the same pre-DSRIP baseline from the initial demonstration period in DY6A for total QPI. If multiple metrics are combined to form one total QPI milestone, the pre-DSRIP baselines will also be combined.

    E. DSRIP projects may carry forward total QPI milestones from DY6A to DY6B and DY7.

iii. *MLIU QPI Milestone*

    A. Beginning in DY6A, there is a standardized MLIU QPI milestone.

    B. For DSRIP projects that have an MLIU QPI requirement in DY5:

        1. The DY6A MLIU QPI goal is equal to the DY5 MLIU QPI goal. If, based on HHSC's determination pursuant to paragraph 41(a)(ii)(B), the DY6A total QPI goal is changed, the DY6A MLIU QPI goal will also be changed in proportion to the DY6A total QPI goal.

        2. If the DSRIP project has an MLIU QPI metric in DY5, it retains the same pre-DSRIP baseline for MLIU QPI in DY6A used in the initial demonstration period.

        3. If the DSRIP project does not have an MLIU QPI metric in DY5, the pre-DSRIP baseline for MLIU QPI in DY6A is equal to the pre-DSRIP baseline for total QPI multiplied by the earliest MLIU percentage goal on record with HHSC. For example, if a project's pre-DSRIP baseline for total QPI is 100 individuals, and the DY3 MLIU percentage target was 20%, the pre-DSRIP baseline for total QPI in DY6A would be 100, and the pre-DSRIP baseline for MLIU QPI in DY6A would be 20.

        4. The MLIU QPI milestone must be pay-for-performance (P4P).

**Example:**

| | Goal | Pre-DSRIP baseline | QPI Numeric Goal | MLIU Numeric Goal |
|---|---|---|---|---|
| **DY3 QPI milestone and MLIU % goal** (first year of QPI) | Serve 40 additional patients in the expanded clinic (individuals) in DY3. **80%** Medicaid/Low Income Uninsured | 220 | 40 | While there was no MLIU goal for payment purposes, 40*.80 = 32 |
| **DY5 QPI milestone and MLIU % goal** | Serve 50 additional patients in the expanded clinic (individuals) in DY5. 90% Medicaid/Low Income Uninsured | 220 | 50 | While there was no MLIU goal for payment purposes, 50*.90 = **45** |

| | | | | |
|---|---|---|---|---|
| **DY6A Total QPI milestone** | Serve 50 additional patients in the expanded clinic (individuals). | 220 | 50 | NA |
| **DY6A MLIU QPI milestone** | Serve 45 MLIU patients (individuals). | 220*.**80**=176 | NA | **45** ← |

C. For DSRIP projects that do not have an MLIU QPI requirement in DY5:

1. The DY6A MLIU QPI goal is equal to the DY5 MLIU percentage goal multiplied by the DY5 total QPI goal, or as indicated in the DY5 goal language. If, based on HHSC's determination pursuant to paragraph 41(a)(ii)(B), the DY6A total QPI goal is changed, the DY6A MLIU QPI goal will also be changed in proportion to the DY6A total QPI goal.

2. The pre-DSRIP baseline for MLIU QPI in DY6A is equal to the pre-DSRIP baseline for total QPI in DY6A multiplied by the earliest MLIU percentage goal on record with HHSC. For example, if a project's pre-DSRIP baseline for total QPI in DY6A is 100 individuals, and the DY3 MLIU percentage target was 20%, the pre-DSRIP baseline for total QPI in DY6A would be 100, and the pre-DSRIP baseline for MLIU QPI in DY6A would be 20.

3. Although all DSRIP projects must have a DY6A MLIU QPI goal, DSRIP projects under paragraph 41(a)(iii)(C), with the exception of projects subject to paragraph 41(a)(iii)(C)(4), has a DY6A MLIU QPI milestone that is pay-for-reporting (P4R). This means that the Performing Provider is eligible to receive payment for the project's DY6A MLIU QPI milestone by reporting their actual DY6A MLIU QPI achievement, regardless of whether they achieved the DY6A MLIU QPI goal.

4. HHSC may determine that some of these DSRIP projects must have an DY6A MLIU QPI milestone that is P4P, meaning that the Performing Provider must demonstrate achievement of the project's DY6A MLIU QPI goal in order to receive payment for the DY6A MLIU QPI milestone. These DSRIP projects include the following:

   a) All Project Area 1.9 DSRIP projects, as described by the RHP Planning Protocol;

   b) DSRIP projects that did not achieve the estimated MLIU percentage in DY3, DY4, or DY5, and that caused them to have a higher than expected value per MLIU individual/ encounter;

   c) DSRIP projects for which HHSC notified the Performing Provider that the project was eligible to continue with changes, but the project's MLIU QPI milestone must be P4P; and

        d) DSRIP projects that included an MLIU goal in their QPI metric Baseline/Goal statement of their own choosing or that were required to address MLIU to receive CMS initial DSRIP project approval.

D. Certain DSRIP projects are eligible for an adjustment to the DSRIP project's DY6 MLIU QPI goal. These DSRIP projects include:

    1. A DSRIP project that HHSC identifies as underperforming on MLIU estimates in the initial demonstration period;

    2. A DSRIP project that is reporting on individuals or encounters that meet the MLIU definition for the initial demonstration period, but will not meet the MLIU definition for the extension period; and

    3. Any other DSRIP project that HHSC determines has a strong justification for an adjustment.

E. Performing Providers of a DSRIP project described in paragraph 41(a)(iii)(D) may, by a date to be determined by HHSC, request an adjustment to the DSRIP project's DY6A MLIU QPI goal.

F. In DY6A, DSRIP projects must retain the same total QPI grouping from the initial demonstration period for MLIU QPI.

G. DSRIP projects may carry forward MLIU QPI milestones from DY6A to DY6B and DY7.

H. To be eligible for the MLIU QPI milestone payment, beginning in DY6A, Performing Providers must report for each DSRIP project the MLIU individuals served or MLIU encounters provided at the individual or encounter level as opposed to the percentage of total QPI.

    1. There are limited exceptions to this requirement. Performing Providers may request an exception to this requirement by a date to be determined by HHSC. DSRIP projects eligible for an exception include:

        a) A DSRIP project for which the Performing Provider did not assess the DSRIP project participants' health insurance coverage or financial status prior to September 30, 2015, and instead used a proxy to estimate the MLIU population served in their October DY4 QPI Reporting Template, and:

            1) Utilizes an intervention site that is a school, non-medical social service office (i.e., shelter), or community health fair;

            2) Is in Project Area 1.6 (Enhance Urgent Medical Advice), 2.6 (Implement Evidence-based Health Promotion), or 2.7 (Implement Evidence-based Disease Prevention Programs) as described by the RHP Planning Protocol; or

            3) The Performing Provider is a Local Health Department that does not bill Medicaid for the types of services provided through the DSRIP project; or

        b) Any other DSRIP project that HHSC determines has a strong justification for an exception.

    iv.   *Non-QPI Milestones*
        A.  DSRIP projects must include the following non-QPI milestones in DY6A:
             1.  Core component reporting, which may include continuous quality improvement (CQI); and
             2.  Sustainability planning, which may include:
                    a)  Activities toward furthering the exchange of health information, integration into managed care, or collaboration with other community partners; and/ or
                    b)  A project-level evaluation.
             Performing Providers must report on their activities for these milestones in order to be eligible for milestone payment.
        B.  DSRIP projects may report on DY6A non-QPI milestones only during the second reporting period of DY6A, and may not carry forward non-QPI milestones from DY6A to DY6B or DY7.

  b.  <u>Category 3 Requirements for DY6A</u>

    i.   The Category 3 outcome values for DY6A are equal to the Category 3 outcome values for DY5.
        A.  However, if a Performing Provider's Category 4 value is greater than 10 percent of the Performing Provider's total value, the funds in excess of the 10 percent will be redistributed to Category 3 outcomes proportionately.
    ii.  If a Category 3 outcome is designated as pay-for-performance (P4P) in DY5, 100 percent of the Category 3 outcome's value in DY6A is P4P.
    iii.  If a Category 3 outcome is designated as pay-for-reporting (P4R) or maintenance (outcomes designated as maintenance were high performing at baseline with no reasonable room for improvement and have been approved to use a milestone structure that includes an alternate improvement activity) with a population focused priority measure (PFPM) in DY5, 100 percent of the Category 3 outcome's value in DY6A is P4P of the PFPM.
    iv.  If a Category 3 outcome is designated as P4R with an associated stretch activity in DY5, the Performing Provider must choose one of the following options by a date determined by HHSC in a form determined by HHSC:
        A.  The Performing Provider may maintain the Category 3 outcome designated as P4R from DY5 and select a new stretch activity that does not duplicate the DY5 stretch activity.
             1.  If the Performing Provider chooses this option, the Performing Provider must select a stretch activity from the following:
                    a)  Program evaluation (Alternate approaches to program and outcome linkages).
                    b)  New participation in Health Information Exchange (HIE), or improvement of existing HIE structure.
                    c)  Cost analysis and value-based purchasing planning.
             2.  If the Performing Provider chooses this option, 50 percent of the Category 3 outcome's value is P4R of the Category 3 outcome, and 50 percent is for completion of the stretch activity.

     B. The Performing Provider may select a PFPM to replace the Category 3 outcome designated as P4R. If a Performing Provider chooses this option, 100 percent of the Category 3 outcome's value is P4P of the newly selected PFPM.

    v. If a Category 3 outcome is designated as maintenance with an associated stretch activity in DY5, 100 percent of the Category 3 outcome's value in DY6A is for statistically significant maintenance of the approved baseline rate.

    vi. For Category 3 P4P outcomes, DY6A goals will be set as an improvement over the baseline approved in DYs 3-5 to be achieved in performance year (PY) 3, or PY4 if not fully achieved in PY3. PY3 is the 12-month period immediately following the PY2 approved for use in DYs 3-5, or Performing Providers may request, by a date to be determined by HHSC, to use DY6A as PY3. PY4 is the 12-month period immediately following the selected PY3.

     A. For Category 3 outcomes designated as Quality Improvement System for Managed Care (QISMC) with a baseline between the High Performance Level (HPL) and Minimum Performance Level (MPL), PY3 goals will be set as a 25 percent gap closure towards the HPL used for goal setting in DYs 3-5, or with a minimum improvement floor for outcomes with a baseline close to the HPL. For outcomes with a baseline below the MPL, PY3 goals will be a 15% gap closure between the MPL and the HPL.

     B. For outcomes designated as improvement over self (IOS) in DY5, DY6A goals will be set as a 12.5 percent gap closure towards perfect over baseline.

     C. HHSC will develop an alternate DY6A goal-setting methodology for outcomes designated as IOS - Survey.

    vii. Partial payment for DY6A will be measured over the PY1 goal. For outcomes approved to use a baseline established in DY4, partial payment will be measured over the PY1 equivalent goal, which is a 5 percent IOS or 10 percent QISMC gap closure.

| Percent of Goal Achieved for Category 3 P4P Outcomes | | | |
|------|------|------|------|
| PY | Milestone | Positive Direction (higher rates indicate improvement) | Negative Direction (lower rates indicate improvement) |
| PY3 | DY6A AM-3.x | (PY3 achieved - PY1 goal or equivalent)/(PY3 goal - PY1 goal or equivalent) | (PY1 goal or equivalent - PY3 achieved)/(PY1 goal or equivalent - PY3 goal) |
| PY4 | Carryforward of DY6A AM-3.x | (PY4 achieved - PY1 goal or equivalent)/(PY3 goal - PY1 goal or equivalent) | (PY1 goal or equivalent - PY4)/(PY1 goal or equivalent - PY3 goal) |

    viii. Performing Providers may carry forward Category 3 milestones from DY6A to DY6B and DY7.

c. <u>Category 4 Requirements for DY6</u>

    i.   Requirements for Category 4 in DY6A are the same as the requirements for Category 4 Reporting Domains (RDs) 1-5 in DY5.

    ii.   If a Performing Provider's Category 4 value is greater than 10 percent of the Performing Provider's total value, the funds in excess of the 10 percent will be redistributed to Category 3.

    **iii.**   The optional RD6 will be removed in DY6A as it was required to value Category 4 at the 15 percent maximum in DYs 3-5.

## 42. Requirements for Combining Certain DSRIP Projects

a.  Certain DSRIP projects may be eligible to combine in DY6A based on Performing Provider requests to combine.  These DSRIP projects must:

    i.   Be eligible to continue into the extension period;

    ii.   Not exceed a DY6A value of $5 million when combined; and

    iii.   Be one of the following:
        A.  Cross-regional community mental health center DSRIP projects;
        B.  Similar DSRIP projects by the same Performing Provider; or
        C.  Similar DSRIP projects by different Performing Providers within the same health system.

b.  HHSC will combine these DSRIP projects' total QPI metrics, MLIU QPI metrics, and MLIU QPI goals, as well as their pre-DSRIP baselines, into:

    i.   One total QPI milestone and goal;

    ii.   One MLIU QPI milestone and goal; and

    iii.   One pre-DSRIP baseline for each.

## 43. DSRIP Requirements for Uncompensated Care (UC) Only Hospitals

**a.**  A UC only hospital must participate in an annual learning collaborative and report on mandatory Category 4 domains.

## 44. Remaining DSRIP Funds

a.  The funds in the DSRIP pool not allocated to DSRIP projects for DY6A will be reallocated.

    i.   Funds are reallocated to increase Performing Providers' total value to up to $250,000 per each subsequent DY beginning in DY6A, as described in paragraph 39(a)(ii).

    ii.   The Anchoring Entity of an RHP is allocated the greater of the regional DSRIP Funding Allocation Percentage as defined in paragraph 27(a) multiplied by $20 million or the following minimum allocations:

**Attachment J**
**Program Funding and Mechanics Protocol**

A. A Tier 1 RHP Anchoring Entity has no minimum DY6A allocation.
B. A Tier 2 RHP Anchoring Entity has no minimum DY6A allocation.
C. A Tier 3 RHP Anchoring Entity has a minimum DY6A allocation of $1,250,000.
D. A Tier 4 RHP Anchoring Entity has a minimum DY6A allocation of $625,000. A Tier 4 RHP's minimum DY6A allocation may be increased to $800,000 if the Anchoring Entity meets the requirements described in paragraph 45(a)(i).

**DY6A Anchoring Entity Allocation (All Funds)**

| RHP | Tier | Funding Allocation % | DY6A Anchoring Entity Allocation | DY6A Anchoring Entity Allocation with Regional Learning Collaboratives |
|-----|------|---------------------|----------------------------------|------------------------------------------------------------------------|
| 1 | 3 | 4.00% | $1,250,000 | $1,250,000 |
| 2 | 3 | 3.78% | $1,250,000 | $1,250,000 |
| 3 | 1 | 20.22% | $4,044,045 | $4,044,045 |
| 4 | 3 | 4.23% | $1,250,000 | $1,250,000 |
| 5 | 4 | 7.02% | $1,404,587 | $1,404,587 |
| 6 | 2 | 10.15% | $2,029,347 | $2,029,347 |
| 7 | 3 | 6.04% | $1,250,000 | $1,250,000 |
| 8 | 4 | 1.66% | $625,000 | $800,000 |
| 9 | 2 | 14.29% | $2,857,364 | $2,857,364 |
| 10 | 2 | 9.74% | $1,948,289 | $1,948,289 |
| 11 | 4 | 1.16% | $625,000 | $800,000 |
| 12 | 3 | 3.56% | $1,250,000 | $1,250,000 |
| 13 | 4 | 0.67% | $625,000 | $800,000 |
| 14 | 4 | 2.29% | $625,000 | $800,000 |
| 15 | 3 | 4.41% | $1,250,000 | $1,250,000 |
| 16 | 4 | 1.30% | $625,000 | $800,000 |
| 17 | 4 | 1.89% | $625,000 | $800,000 |
| 18 | 4 | 1.22% | $625,000 | $800,000 |
| 19 | 4 | 0.95% | $625,000 | $800,000 |
| 20 | 4 | 1.44% | $625,000 | $800,000 |
| | | **100.00%** | **$25,408,632** | **$26,983,632** |

iii.    The DY6A Anchoring Entity allocation is in lieu of the anchor administrative payment.

**45. Anchoring Entity Requirements**

a. To receive its DY6A Anchoring Entity allocation, an Anchoring Entity must:

  i. Submit a DY6A learning collaborative plan at the beginning of DY6 if it is the Anchoring Entity of a Tier 1, 2, or 3 region or it is the Anchoring Entity of a Tier 4 region that wishes to receive the enhanced allocation.

   A. The DY6A learning collaborative plan, at a minimum, must include an annual regional learning collaborative. The learning collaborative must include a focus on DSRIP integration into Medicaid managed care, value-based purchasing, alternative payment models, or sustainability strategies for low-income uninsured. The Anchoring Entity could meet also meet this requirement through a work groups that would be in addition to the annual learning collaborative.

   B. Two or more regions may work together to submit a cross-regional DY6A learning collaborative plan.

   C. HHSC will develop a template that includes the required activities specified in paragraph 45(a)(i)(A). Anchoring Entities will complete each element in the template and HHSC will follow up if the template questions are incomplete.

  ii. Extension Stakeholder Engagement Forum: Once CMS and HHSC agree on the longer term extension, the Anchoring Entity will conduct an extension stakeholder engagement forum to promote collaboration in the next phase of the waiver and community goals. The feedback from this forum should be used to inform the learning collaborative plan for DY6B and beyond. The Anchoring Entity will post a copy of the updated RHP Plan on the RHP's website prior to the forum.

  iii. Submit the following information in June 2017, or by another date specified by HHSC:

   A. The region's community needs assessment that was submitted with the original RHP plan in 2012 that has been updated as appropriate to reflect major changes, including changes to the priority needs;

   B. A description of the process used to update the region's community needs assessment, including the process used to obtain stakeholder feedback; and

   C. The RHP plan that was submitted in 2012 that has been updated for DY6B onward. This updated RHP plan will include next steps for DSRIP projects as agreed upon by HHSC and CMS that would occur beginning in DY6B.

  iv. Submit documentation during October 2017 that demonstrates that the Anchoring Entity implemented the DY6A learning collaborative plan and conducted an extension stakeholder engagement forum.

**46. Compliance Monitoring of DSRIP Projects**

a. All RHP plans are subject to potential audits, including review by the independent assessor. Upon request, Performing Providers must have available for review by the independent

assessor, HHSC, and CMS, all supporting data and back-up documentation demonstrating performance as described under an RHP plan for DSRIP payments.

Failure of a Performing Provider to provide supporting documentation of metric or milestone achievement may result in recoupment of DSRIP payments.

**Preface**

The following guidance and protocols have been developed to inform and assist the TX Health and Human Services Commission (HHSC) and their partner Anchor and/or contractors in their efforts to comply with Federal statute, regulations, protocols, and guidance regarding claiming for Federal Financial Participation (FFP) for Medicaid administrative expenditures necessary to implement and operate this waiver.

## I.  General Requirements/Assurances

**A.  The HHSC/Anchor hospital under this waiver must fully describe the administrative expenditures to be claimed to Medicaid, including the methodology used to identify allowable expenditures, and submit a detailed narrative description and a budget summary for all costs for claiming administrative expenditures in writing to CMS.**

**State Response:**

Texas has 20 Regional Healthcare Partnerships (RHPs), whose members may participate in the Delivery System Reform Incentive Payment (DSRIP) program.  A map of the Texas RHPs is provided (reference *Attachment C – RHP Map*).

The RHPs share the following characteristics:

- The RHPs are based on distinct geographic boundaries that generally reflect patient flow patterns for the region;
- The RHPs have identified local funding sources to help finance the non-federal share of DSRIP payment for Performing Providers;
- The RHPs have identified an Anchoring Entity to help coordinate RHP activities.

RHPs vary in geographic and population size. RHP 3 represents the largest region which includes Houston and surrounding areas.  This RHP contains more than 15% share of the statewide population under 200 percent of the federal poverty level (FPL) as defined by the U.S. Census Bureau: 2006 – 2010 American Community Survey for Texas (ACS).  Approximately one half of the RHPs contain less than 3 percent share of the statewide population under 200 percent of the population. Narrative descriptions from Anchors and the methodologies proposed will vary based on the size of the RHP they are serving, and the type of organization.

Each RHP has one of its members designated as an "Anchor" entity.  Anchors provide certain administrative services with respect to the Texas Transformation and Quality Improvement Program 1115 Waiver.  The Anchor is a member of an RHP, and is one of the following types of public organizations:
- public hospital,
- hospital district,
- other hospital authority,

- county government, or
- State university with a health science center or medical school.

<u>Description of Administrative Expenditures</u>

Costs for Anchor activities allowable under this protocol for administrative claiming include the following:

1. The provision of appropriate accounting, human resources, and data management resources for the RHP;

2. The coordination of RHP annual reporting, as specified in the Program Protocol, on the status of projects and the performance of Performing Providers (as defined in the Program Protocol) in the region;

3. The provision of RHP data management for purposes of evaluation;

4. The development and facilitation of one or more regional learning collaboratives;

5. Communication with stakeholders in the region, including the public;  and

6. Communication on behalf of the RHP with HHSC.


<u>Methodology used to identify allowable expenditures</u>

Parameters of allowable costs for the six activities listed above are addressed in the "Cost Principles for Expenses" specific to the 1115 Waiver document (reference *Attachment A – Cost Principles*). (Note that this document is also included as an attachment to the contract with each Anchor.) The Cost Principles describe in detail that not all types of costs that might be incurred by the Anchor in connection with the performance of its administrative functions under the Contract are allowable.  It is the function of these Cost Principles for Expenses to clarify this issue. While this Attachment was derived from similar cost principles used by HHSC with respect to managed care and other contracts, there are substantive differences.  The specific terms of this Attachment are the definitive cost principles with respect to the Anchor function.

The Cost Reporting Template (reference *Attachment B – Cost Template*) provides additional framework and controls for reporting of costs for each Anchor. The protected Excel spreadsheet has rows set up for each of the six activities listed above. Cost limits placed in the spreadsheet by HHSC that are specific to each Anchor prevent the Anchor from submitting costs per FFY to HHSC in excess of the limits established by CMS (i.e., the lesser of: $2,000,000  or  2.5%  of the RHP DSRIP allocation per FFY).  (Note that Anchors may submit a request for additional funding above the maximum to support additional transformation activities for the RHP for approval by HHSC and CMS.)

<u>Narrative description and a budget summary</u>

Each Anchor has submitted a narrative description (reference *Attachment D - RHP Narratives*) and a corresponding budget summary (reference *Attachment E - RHP Budget (Projected Costs)*). Within each of the twenty RHP Narratives, there are three sections, as follows:

- The first section, "Information about the Anchor Organization" includes a general description of the type of organization, any 1115 Waiver activities other than the role as an Anchor (including DSRIP activities), and, any other Administrative Costs or Claiming in which the organization participates.

- The next section, "Administrative Activities," outlines a detailed narrative description and budget (projected costs) summary for each of the six allowable activities for this Protocol. Each Anchor has also submitted an Excel budget (projected costs) spreadsheet (reference Attachment E, which contains RHP 1 through RHP 20 Budget (Projected Costs). The documents also include the indirect rate proposed. If the rate proposed is higher than 10 %, the Anchor provides a justification proposed for the higher amount that is specific to the Anchor functions for the 1115 Waiver.

- The last section, "Cost Allocation Methodology," describes the specific method that the particular Anchor uses to account for its relevant staff and/or contract time, and to allocate the staff/contractor time according to multiple activities or cost objectives. The methodology described is required to provide sufficient detail to demonstrate that costs are not duplicated in other programs. Anchors are using a similar methodology for cost allocation that results in a Percent Effort Spreadsheet (Attachment D.1) The approach is consistent with the "2003 CMS Medicaid School-Based Administrative Claiming Guide" incorporating the following requirements:
  a. Reflect an after the fact distribution of the actual activity of each employee;
  b. Are prepared monthly and coincide with one or more pay period;
  c. Are signed by the employee as being a true statement of activities and the employee/office will retain the documentation to support the report;
  d. Account for the total activity for which each employee is compensated.

  The Anchors will utilize a "Time and Effort" reporting process similar to the process utilized by the Texas A&M University System for federally sponsored projects. This process is required for all federally sponsored projects in order to validate that direct salaries and wages charged are reasonable and accurately reflect the work performed. The Anchors will use a spreadsheet and designate a percent effort for each activity by individual employee based on time spent on each activity on a monthly basis.

A narrative overview description of each Anchor is provided below; see the attachments for further details for each Anchor. Also see the *Attachment E -* which includes a *Consolidated Budget Summary* that adds all twenty Anchors into a single total cost projection.

Anchors are using the Percent Effort Spreadsheet as a consistent methodology beginning DY 3 (October 2013) and will also use DY 4 and 5. Anchors have also described a methodology used for DY 2 (October 2012 through August 2013) in their narratives attached.

RHP 1: University of Texas Health Science Center at Tyler (UTHSCT) participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP, and also in the Uncompensated Care (UC) Program. Expenses for Anchor activities are maintained separately from any other administrative functions of the institution. UTHSCT participates in Medicaid, Medicare, and federal funding for graduate medical education programs; none of these programs provide administrative match.

RHP 2: University of Texas Medical Branch (UTMB) participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP, and in UC. For the Anchor function, UTMB created the Office of Waiver Operations.

RHP 3: Harris Health System participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP, and in UC. The organization's DSRIP projects are all related to patient care, with no costs that could also be considered Anchor administration. There are no Anchor administrative costs that could be claimed under other state or federal programs. RHP 3 is Texas' largest region and has included significant detail in attached narrative for the staff involved in Anchor administrative activities.

RHP 4: Nueces County Hospital District (NCHD) participates in the 1115 Waiver as an Anchor. NCHD is not a provider for Medicaid, Medicare, or any other federal program, nor does it operate any healthcare facilities. The organization does not participate in any programs that have administrative cost claiming. It is an IGT entity for DSRIP and Uncompensated Care.

RHP 5: Hidalgo County is a local governmental entity and participates in the 1115 Waiver as an Anchor. It is also an IGT entity for funding for Uncompensated Care. Hidalgo County currently participates in the Medicaid Administrative Claiming (MAC) program. Hidalgo County is not planning to submit administrative costs at this time. Narrative information is not included.

RHP 6: The Bexar County Hospital District, doing business as University Health System (UHS), participates in the 1115 Waiver as an Anchor, as a Performing Provider for DSRIP projects, and in UC. University Health System prepares an annual Medicare/Medicaid cost report and submits administrative reports as required through grants and research programs. UHS has proposed an indirect cost rate of 34.8 %, which is the current federal negotiated cost rate with the Department of Health and Human Services (DHHS) used for grants and research.

RHP 7: The Travis County Healthcare District, doing business as Central Health, participates in the 1115 Waiver as an Anchor and IGT entity for DSRIP and UC. Central Health does not provide direct services but rather contracts with providers such as the Seton Healthcare Family. Central Health is the 51% owner of the Community Care Collaborative (Seton Healthcare Family is 49% owner). The Community Care Collaborative is a performing provider for DSRIP projects. Central Health is also the sole owner of Sendero Health Plan Medicaid Health Maintenance Organization (HMO). Sendero has a separate board, staff and facilities. Central Health does not participate in any other administrative costs or claiming.

RHP 8: Texas A&M Health Science Center (TAMHSC) is the anchoring entity for both RHP 8 and RHP 17. There is separate Anchor staff for the two regions. RHP 8's Anchor staff is at TAMHSC's Round Rock campus; RHP 17 is at the Bryan campus. TAMHSC is a health related institution operating as a component under Texas A&M University and, in addition to the anchor role, participates in the 1115 Waiver as an IGT entity, and as a performing provider for DSRIP projects in RHP 17. TAMHSC's School of Rural Public Health is currently under contract with HHSC to conduct the Statewide Evaluation of the 1115 Waiver.

RHP 9: Dallas County Hospital District, DBA Parkland Health and Hospital System, "Parkland" is the anchoring entity for RHP 9. Parkland is the largest public safety net hospital in the Dallas area and participates in the 1115 Waiver as an Anchor, IGT entity for DSRIP and UC, a performing provider for DSRIP projects, and participates in UC. Parkland does not receive any other administrative match for Medicaid or any other federal program in which they participate. No costs related to Parkland as a participating provider are included in the costs.

RHP 10: Tarrant County Hospital District, DBA JPS Health Network, is the anchoring entity for RHP 10 and also participates in the 1115 Waiver as an IGT entity for DSRIP and UC, DSRIP performing provider, and in UC.

RHP 11: Palo Pinto General Hospital, in Mineral Wells, TX (about 50 miles west of Ft. Worth), is the anchoring entity in RHP 11. It is a small rural hospital and reports that it does not have resources to document administrative activities, and thus is not planning to participate in administrative match claiming at this time.

RHP 12: Lubbock County Hospital District, *dba* University Medical Center (UMC), is the anchoring entity in RHP 12, and participates in the 1115 Waiver as Anchor, DSRIP performing provider, UC, and as an IGT entity. UMC does not participate in any other administrative costs or claiming.

RHP 13: McCulloch County Hospital District, in Brady, TX (about 75 miles east of San Angelo), the anchoring entity in RHP 13, and is not planning to submit administrative costs at this time. Narrative and cost information is not included.

RHP 14: Ector County Hospital District, DBA Medical Center Health System (MCHS), is the anchoring entity in RHP 14 and also participates as a performing provider in DSRIP, in UC and as an IGT entity. MCHS does not participate in other administrative match or claiming activities. For the purposes of Anchor functions, MCHS relies solely on one lead staff person.

RHP 15: El Paso County Hospital District, DBA University Medical Center of El Paso (UMC) is the anchoring entity in RHP 15 and also participates in the 1115 Waiver as a performing provider for DSRIP, UC, and an IGT entity for both DSRIP and UC. UMC also claims administrative types of costs on the Medicare and Medicaid cost reports. The anchor administrative costs will be excluded from these filings.

RHP 16: Coryell County Memorial Hospital Authority, the anchoring entity in RHP 16, is not planning to submit administrative costs at this time. Narrative and cost information is not included.

RHP 17: Texas A&M Health Science Center (TAMHSC) is the anchoring entity for RHP 8 and RHP 17. The RHP 17 Anchor team, as well as RHP 8 Anchor team, operates under the Rural and Community Health Institute which is a component of the College of Medicine. TAMHSC is a health related institution operating as a component under Texas A&M University and, in addition to the anchor role, participates in the 1115 Waiver as an IGT entity, and as a performing provider for DSRIP projects in RHP 17. RHP 17 Anchor team is housed at the Bryan TX campus.

RHP 18: Collin County is the anchoring entity for RHP 18. Collin County is not a Medicaid provider and does not participate as a Performing Provider in DSRIP or in UC.

RHP 19: Electra Hospital District (*dba* Electra Memorial Hospital) is the anchoring entity in RHP 19, and is not planning to submit administrative costs at this time. Narrative and cost information is not included.

RHP 20: Webb County is the anchoring entity in RHP 20. The Anchor did not submit a narrative, so cannot claim any costs unless this is rectified. Note that although narrative information was not submitted, preliminary costs information was submitted in an earlier request: $371,000 for DY2, and $395,000 for DY3.

**B. The state is at risk for loss of FFP should an audit of this waiver find non-compliance with Federal statute, regulations, protocols, and guidance.**

**State Response:**
Understood. Language is incorporated in Cost Principles that hold the Anchors to this same standard and risks.

**C. The state may be required to develop an administrative claiming plan (protocol) that is described in a later section of this agreement and to amend its cost allocation plan.**

**In order for the costs of administrative activities to be claimed as Medicaid administrative expenditures at the 50% FFP rate, the state assures that the following requirements are understood and met:**

✓ The state complies with all Federal statute, regulations and guidance for all claims for FFP.
✓ Costs are "necessary for the proper and efficient administration of the Medicaid State Plan" (Section 1903(a)(7) of the Social Security Act).
✓ If applicable, costs are allocated in accordance with the relative benefits received by all programs, not just Medicaid.

- ✓ Claims for costs are not duplicate costs that have been, or should have been, paid for through another federal funding source or paid as part of a rate for direct medical services.
- ✓ State or local governmental agency costs are supported by an allocation methodology under the applicable approved public assistance Cost Allocation Plan (42 Code of Federal Regulations (CFR) 433.34) submitted to the Division of Cost Allocation.
- ✓ Costs do not include funding for a portion of general public health initiatives that are made available to all persons, such as public health education campaigns.
- ✓ Costs do not include the overhead costs of operating a provider facility or otherwise include costs of a direct medical services to beneficiaries (these should be claimed as medical service costs, and not plan administration).
- ✓ Costs do not duplicate activities that are already being offered or should be provided by other entities, or through other programs.
- ✓ Costs are supported by adequate source documentation.
- ✓ Costs are not federally-funded or used for any other federal matching purposes.

**State Response:**
Understood. As a result of the specific guidance, the state has now added language to the Cost Principles that holds the Anchors to the above requirements. See new section I.E. entitled "Core CMS requirements for cost allowability" in the revised version of 1115 Waiver Cost Principles (reference Attachment A).


**D. Under the waiver, the state must:**

**1. Provide a detailed summary budget and a narrative description of all administrative expenditures for review and approval.**

**State Response:**
The total net impact to the Federal government of the administrative claiming hereunder, after incorporating offsetting IGT, shows the 50% Federal match at $4.0 Million for DY2, and $5.1M for DY3.

In terms of what they will be claiming (in total dollars, before the impact/offset of IGTs), the twenty RHPs report that they have spent $8.0M during DY2, and plan to spend $10.1M in DY3. Actual expenditures are higher, in that five RHPs plan to not claim administrative expenses hereunder.

Most RHPs are far under their individual maximum allowed amounts, and the aggregate amount of administrative claiming is about one-third of the maximum state-wide amount allowed.

A summary of each Anchor's narrative is provided in Section A above. The full Anchor narratives are provided in Attachment D. Further, an aggregate budget narrative is included within Attachment E. Attachment E also includes substantial budget details,

including an aggregate overview by Administrative Activity, a summary overview by RHP, and a detailed numerical page for each individual RHP.

2. **Submit a narrative budget of administrative expenditures for review purposes to be referenced in the administrative claiming section of the standard terms and conditions for the waiver.**

   **State Response:**
   A summary of each Anchor's narrative is provided in Section A above. The full Anchor narratives are provided in Attachment D. An aggregate budget narrative is included within Attachment E, along with additional budget details.

3. **Obtain prior approval from CMS for any changes to the methodology used to capture or claim FFP for administrative costs associated with the Waiver/Demonstration**

   **State Response:**
   Understood.

4. **Describe how the State and its partners will offset other revenue sources for administrative expenditures associated with the Waiver/Demonstration, if applicable.**

   **State Response:**
   N/A

5. **Detail the oversight and monitoring protocol to oversee all aspects of the Waiver/Demonstration including administrative claiming for the Waiver/Demonstration.**

   **State Response:**
   A monitoring function is planned for the Waiver that is under development with CMS that may include staff and/or contracted activities.

6. **Obtain prior approval for any new categories of administrative expenditures to be claimed under the Demonstration.**

   **State Response:**
   Understood.

7. **Agree to permit CMS to review any time study forms and/or allocation methodology related documents that are subsequently developed for use by this program, prior to modification or execution.**

   **State Response:**
   Understood.

8. **Submit a Medicaid administrative claiming plan to CMS for review and approval prior to implementation and/or claiming costs.**

   **State Response:**
   Initial Medicaid administrative claiming plan was submitted February 2012.

9. **Submit copies of all of the interagency agreements/MOUs/ and signed contracts for vendors that include administrative costs under this Waiver/Demonstration.**

   **State Response:**
   Understood.


## II. Interagency Agreements/Memorandum of Understanding (MOU)/Contracts

**A. Only the state Medicaid agency may submit a claim to CMS to receive FFP for allowable Medicaid costs. Therefore, every participating entity that is performing administrative activities on behalf of the Medicaid agency must be covered, either directly or indirectly, through an interagency agreement, memorandum of understanding (MOU) or contractual arrangement.**

These agreements must describe and define the relationships between the state Medicaid agency and the sister agency or sub-grantee claiming entity and document the scope of the activities to be performed by all parties. The interagency agreements must be in effect before the Medicaid agency may submit claims for federal matching funds for any administrative activities conducted by the entity as detailed in the agreement with the Medicaid agency. Although CMS does not have approval authority for interagency agreements, nor are we party to them, the agency reserves the right to review interagency agreements executed for purposes of administering the waiver.

**State Response:**
See anchor list in box below. Contracts will be executed with each Anchor utilizing the Anchor Contract Template (Attachment F). Anchor Administrative Costs reimbursement is contingent on signed MOU or Contract.

| Agency Name/Sub-grantee | Date of Signed MOU or Contract |
|---|---|
| University of Texas Health Science Center at Tyler | |
| University of Texas Medical Branch | |
| Harris Health System | |
| Nueces County Hospital District | |
| Hidalgo County | |
| University Health System | |

| | |
|---|---|
| Travis County Healthcare District (Central Health) | |
| Texas A&M Health Science Center | |
| Dallas Cty Hosp District (Parkland Health & Hosp) | |
| Tarrant Cty Hosp District (JPS Health Network) | |
| Palo Pinto General Hospital District | |
| Lubbock County Hospital District - University Medical Center | |
| McCulloch County Hospital District | |
| Ector County Hospital District (Medical Center Health System) | |
| University Med Ctr of El Paso (El Paso Hosp Dist) | |
| Coryell County Memorial Hospital Authority | |
| Texas A&M Health Science Center | |
| Collin County | |
| Electra Hosp District (Electra Memorial Hospital) | |
| Webb County | |

**B. The agreements above describe and define the relationships between the state Medicaid agency and the sister agency or sub-grantee claiming entity and document the scope of the activities being performed by all parties.**

    **State Response:**
        Understood.

**C. The interagency agreement or sub-grant contract must describe the Medicaid administrative claiming process, including an allocation methodology, (i.e., time study) to identify the services the state Medicaid agency will provide as well as those to be performed by the local entity, including any related reimbursement and funding mechanisms, and define oversight and monitoring activities and the responsibilities of all parties.**

    **State Response:**
        See cost reporting template (Attachment B).

**D. All requirements of participation the state Medicaid agency determines to be mandatory for ensuring a valid process should be detailed in the agreement. Maintenance of records, participation in audits, designation of local project coordinators, training**

**timetables and criteria, and submission of fiscal information are all important elements of the interagency agreement.**

The interagency agreement includes:

- ✓ Mutual objectives of the agreement;
- ✓ Responsibilities of all the parties to the agreement;
- ✓ A description of the activities or services each party to the agreement offers and under what circumstances;
- ✓ Cooperative and collaborative relationships at the state and local levels;
- ✓ Specific administrative claiming time study activity codes which have been approved by CMS, by reference or inclusion;
- ✓ Specific methodology which has been approved by CMS for computation of the claim, by reference or inclusion;
- ✓ Methods for reimbursement, exchange of reports and documentation, and liaison between the parties, including designation of state and local liaison staff.

**State Response:**
> See updated contract form (Attachment G), Cost Principles (Attachment A), and cost reporting template (Attachment B).

**E. Many interagency agreements require the governmental agency that performs the administrative activities to provide the required state match for Medicaid administrative claiming.**

**State Response:**
> Anchors will be required to provide the required state match.

## III. <u>Non-federal Share Funding Source</u>

**For each activity and/or agreement to provide an activity please specify the source of the non-federal share of funding below. The non-federal share of the Medicaid payments must be derived from permissible sources (e.g., appropriations, Intergovernmental transfers, certified public expenditures, provider taxes) and must comply with federal regulations and policy.**

| Activity/Agreement | Funding Source |
|---|---|
| RHP01 Anchor Administrative Costs | UT Health Science Center Tyler |
| RHP02 Anchor Administrative Costs | The University of Texas Medical Branch at Galveston (UTMB) |
| RHP03 Anchor Administrative Costs | Harris Health System |
| RHP04 Anchor Administrative Costs | Anchor Entity (Nueces County Hospital District) |
| RHP05 Anchor Administrative Costs Not planning to submit at this time | Anchor – Hidalgo County |
| RHP06 Anchor Administrative Costs | University Hospital |

| | |
|---|---|
| RHP07 Anchor Administrative Costs | Public funds as defined in Rule 355.8202 of the Texas Administrative Code |
| RHP08 Anchor Administrative Costs | Texas A&M Health Science Center |
| RHP 09 Anchor Administrative Costs | Parkland Health & Hospital System |
| RHP10 Anchor Administrative Costs | Anchor – JPS Health Network |
| RHP11<br>Not planning to submit costs as this time | |
| RHP12 Anchor Administrative Costs | Lubbock County Hospital District dba University Medical Center |
| RHP13<br>Not planning to submit costs as this time | |
| RHP 14 Anchor Administrative Costs | Ector County Hospital District |
| RHP 15 Anchor Administrative Costs | El Paso County Hospital District d/b/a UMC of El Paso |
| RHP16<br>Not planning to submit costs as this time | |
| RHP 17 Anchor Administrative Costs | Texas A&M Health Science Center |
| RHP18 Anchor Administrative Costs | Collin County Healthcare Foundation |
| RHP19<br>Not planning to submit costs as this time | |
| RHP20<br>Did not submit narrative | |

**State Response:**
    See anchor list above.


## IV. <u>Administrative Activities</u>

**The state and its partners must describe the proposed administrative activities to be performed in the section below.**

| Activity | Provider |
|---|---|
| The provision of appropriate accounting, human resources, and data management resources for the RHP; | Anchors |
| The coordination of RHP annual reporting, as specified in the Program Protocol, on the status of projects and the performance of Performing Providers (as defined in the Program Protocol) in the region; | Anchors |

| The provision of RHP data management for purposes of evaluation; | Anchors |
|---|---|
| The development and facilitation of one or more regional learning collaboratives; | Anchors |
| Communication with stakeholders in the region | Anchors |
| Communication on behalf of the RHP with HHSC. | Anchors |

**State Response:**
> See the list of proposed administrative activities in the box immediately above. For additional details, further see the cost reporting template (Attachment B), the contract form (Attachment F), and updated Cost Principles (Attachment A).

## V. Identification, Documentation and Allocation of Costs

**A. Public Assistance Cost Allocation Plan**

**1. The Public Assistance Cost Allocation Plan (CAP) is a narrative description of the procedures that the state agency will use to identify, measure, and allocate costs incurred under this Waiver/Demonstration. All administrative costs (direct and indirect) are normally charged to federal grant awards such as Medicaid through the state's public assistance Cost Allocation Plan (CAP).**

   **State Response:**
   > Submitted February 2012.

**2.** The single state agency has an approved public assistance cost allocation plan (CAP) on file with the Division of Cost Allocation in the U.S. Department of Health and Human Services that meets certain regulatory requirements, which are specified at Subpart E of 45 CFR part 95 and referenced in OMB Circular A-87, Attachment D.

   **State Response:**
   > Submitted February 2012.

**3.** Upon approval of this Waiver/Demonstration, it is the responsibility of the state Medicaid agency to amend their CAP plan and submit to the DCA for review and approval.

   **State Response:**
   > Understood.

**4.** In accordance with the statute, the regulations, and the Medicaid state plan, the state will maintain/retain adequate source documentation to support Medicaid payments.

   **State Response:**

Understood.

**5.** Upon approval, the CAP must reference the claiming mechanism, the interagency agreement, and the time study methodology and other relevant issues pertinent to the allocation of costs to submit claims. The time study requirements are described in the next section.

**State Response:**
Understood. Note: the State is not proposing time studies.

## B. Cost Allocation Methodology and/or Time Study Description

The state will describe the methodology used to account for 100% of staff time (i.e., time study and/or sampling system) to allocate the staff time accordingly to multiple activities or cost objectives. The time study allocates the share of costs to administrative activities (both Medicaid and non-Medicaid) and direct medical services as well as all other funding sources that are not reimbursable under this administrative claiming protocol. The time study must be described in sufficient detail to include a description of each Medicaid and non-Medicaid codes (to allocate to other federal and non-federal programs) to account for 100% of staff time.

The state and its partners are responsible to develop a time study methodology and instructions to capture costs and reflect all of the time and activities performed by staff. The time study must include careful documentation of all of the work performed by staff over a set period of time and is used to identify, measure and allocate staff time devoted to Medicaid reimbursable administrative activities.

A Medicaid allocation statistic is applied to the resulting recognized administrative cost pool to determine Medicaid's reimbursable administrative cost. Note: Overhead costs incurred that are an integral part of, or an extension of, the provision of services by medical providers, are to be included in the rate paid by the state or its fiscal agent for the medical service. These costs are not claimable as administrative expenditures and there is no additional FFP available under this section.

In accordance with the statute, regulations and the Medicaid state plan, the state is required to maintain and retain source documentation to support Medicaid payments for administrative activities. The basis of this requirement can be found in statute and regulations.

See section 1902 (a)(4) of the Act and 42 CFR 431.17. Documentation maintained in support of administrative claims must be sufficiently detailed to permit CMS to determine whether activities are necessary for the proper and efficient administration of the state plan.

---

Provide the cost identification and time study methodology descriptions here, if applicable.
**State Response:**
Anchors are using a similar methodology for cost allocation that results in a Percent Effort Spreadsheet (Attachment D.1)
a. Reflect an after the fact distribution of the actual activity of each employee;
b. Are prepared monthly and coincide with one or more pay period;
c. Are signed by the employee as being a true statement of activities and the employee/office will retain the documentation to support the report;
d. Account for the total activity for which each employee is compensated.

---

## VI. <u>Authorized Collaborations/Partnerships</u>

**A.** As part of the total amount payable under this Waiver/Demonstration authority granted under section 1115(a)(2) of the Social Security Act (the Act) by the Centers for Medicare & Medicaid Services (CMS) Federal Financial Participation (FFP) as authorized by 42 Code of Federal Regulations (CFR) 433.15 is available at the 50 percent matching rate for administrative costs required for "proper and efficient" administration of the Waiver/Demonstration and subject to the limitations outlined below.

**State Response:**
  Understood.

## VII. <u>Administrative Claiming Budget and Budget Narrative</u>

Provide a detailed budget and budget narrative.   The budget must crosswalk all of
the administrative activities and staff positions associated with administrative
services.
**State Response:**
Each anchor has provided based on draft cost reporting template, and contract
and updated cost principles.

**VII**
S
A
d
c                                                                                                      SC
a

Attachment B – Cost Template  –  This is the cost reporting template, in the form of a locked Excel spreadsheet, which provides additional framework and controls for reporting of administrative costs by each Anchor.  Among other data, the spreadsheet shows costs by activity by Demonstration Year for each Anchor.

Attachment C – RHP Map  –  This map of the state of Texas shows the locations of the twenty Regional Healthcare Partnerships, whose members may participate in the Delivery System Reform Incentive Payment (DSRIP) program.

Attachment D – RHP Narratives  –  Each Anchor has submitted a narrative description, per the CMS requirements herein, which has been reviewed by HHSC.  This attachment shows this narrative detail for each of the twenty Anchors.

Attachment D.1 -- Percent Effort Spreadsheet -- Each Anchor will utilize this spreadsheet for cost allocation methodology.

Attachment E – RHP Budget (Projected Costs) and Consolidated Budget Summary  –  Each Anchor has submitted a cost projection / budget by Demonstration Year, which is subject to the maximums as established by CMS. There is a separate spreadsheet for each of the twenty Anchors. HHSC has consolidated the individual submittals from the twenty Anchors into a combined state total by activity by Demonstration Year.

Attachment F – Anchor Contract template -- This is the proposed form for the contracts between HHSC and each of the separate Anchors.  Among other things, the contract outlines tasks and

responsibilities, payment terms, and various requirements, such as adherence to the Cost Principles for submission of allowable costs for reimbursement hereunder.

**Attachment L**
**Independent Consumer Support System Plan**


1.        Introduction

The Health and Human Services Commission (HHSC) is submitting this report as required by the Centers for Medicare and Medicaid Services (CMS) in its agreement with the State of Texas to operate Medicaid managed care under the authority of the Texas Healthcare Transformation and Quality Improvement Program, Section 1115(a) Demonstration (THTQIP 1115(a)).  The THTQIP 1115(a) demonstration requires an independent consumer supports system to support beneficiary experience receiving medical assistance and long term services and supports in a managed care environment.  Texas is required to maintain a consumer support system that is independent of the managed care organizations to assist enrollees in understanding the coverage model and in the resolution of problems regarding services, coverage, access and rights.  see THTQIP 1115(a), STC 20.e.ii.)

*2.*
Independent Consumer Support System (ICSS)

Texas' independent consumer supports system consists of the HHSC's Medicaid/CHIP Division, Office of the Ombudsman (Ombudsman), the State's managed care Enrollment Broker (EB, "MAXIMUS"), and community support from the Aging and Disability Resource Centers (ADRCs).  These entities operate independently of any Medicaid managed care organization (MCO) and work with beneficiaries and MCOs to ensure beneficiaries working to enroll with a MCO understand their managed program, MCO options, and the process for resolving issues.

HHSC's Medicaid/CHIP Division includes staff devoted to providing guidance to the MCOs on Medicaid policy and managed care program requirements, reviewing MCO materials, monitoring the MCO's contractual obligations, answering managed care inquiries, and resolving managed care complaints.  HHSC also implements MCO corrective action plans and assesses damages when necessary.

Data related to the ICSS is reported and monitored regularly, on at least a quarterly basis, by all entities discussed in this report. Within each system, the data is reported consistently and across all systems; the data reported is similar.

*Ombudsman*

The Ombudsman consists of three units dedicated to assisting beneficiaries with health and human services related concerns and a fourth unit specializing in operations and reporting. The units consist of the Hotline unit which receives and triages general health and human services inquiries and complaints, the Special Services unit which assists consumers with more in-depth, complex complaints, and the Medicaid Managed Care Helpline (MMCH) unit that was created to serve Medicaid managed care beneficiaries.  These units work under the same Ombudsman leadership.  The Ombudsman exists outside of agency program areas and

operates independently of the Medicaid/CHIP Division and any MCO. The Ombudsman's primary purpose is to facilitate the resolution of complaints and inquiries through a collaborative and transparent operation. The office serves as the central point of contact when any Medicaid beneficiary needs assistance obtaining health care services or has a complaint or issue regarding an agency, MCO, or program.

To fulfill its purpose, the Ombudsman offers several ways beneficiaries can access the Ombudsman's assistance: toll-free hotline, online submission, fax, and mail. Similarly, staff are able to work with beneficiaries over the phone, email, fax, and mail, in addition to offering notices by text message or email to provide beneficiaries with updates regarding the status of their concern. The toll-free line offers bilingual services (English and Spanish) and employs two language interpreter vendors for other languages as needed. The Ombudsman strives to make contact information widely available to consumers and maintains a dedicated legislative line for public officials.

The Ombudsman serves as a central access point for beneficiaries to voice complaints or raise issues of concern, specifically related to MCO enrollment and access to services. The office assists beneficiaries through the navigation of the Medicaid managed care system, and educates about the enrollment process and services available under this system. Staff is available to help resolve problems and is trained to educate beneficiaries about their rights related to grievance and appeal processes both through the MCO and through the State, including their right to request a fair hearing. Staff encourages individuals to seek to resolve issues first with the entity or program providing services, but staff will also work directly with MCOs, other State staff, and beneficiaries to assist with issue resolution where appropriate. The MMCH unit was created to teach beneficiaries to advocate for themselves. Staff also advocates on the beneficiary's behalf to resolve problems, including access to care issues, through direct coordination with the beneficiary's MCO. At times, the Ombudsman staff will assist beneficiaries to achieve self-advocacy skills by modeling these skills on a three-way call between the Ombudsman, the beneficiary, and the other entity (such as the MCO).

To ensure staff is adequately prepared to assist beneficiaries, the Ombudsman employs staff with a wide background of experience and knowledge of health and human services programs, services, and individual populations. Ombudsman staff are not typically entry-level employees. New staff receive training designed to expand their knowledge of the State's Medicaid programs and services, including beneficiary protections and rights, in order to best meet consumer needs. Formal training is provided to enhance customer service and the office ensures ongoing training to keep staff abreast of agency initiatives and policy changes, specifically those related to Medicaid, STAR, STAR+PLUS, waiver programs, and Medicare, as well as relevant Social Security Administration policy.

The Ombudsman regularly hosts representatives from various organizations and programs who train staff to better serve individuals with complex needs and/or diverse backgrounds in

an effort to better understand the needs of populations served through the system and resources available, including: National Alliance on Mental Illness, the Department of Aging and Disability Services (DADS), Area Agencies on Aging (AAAs), as well as the following HHSC offices: 2-1-1 Information and Referral, Office of Acquired Brain Injury, Medical Transportation Program, Center for Elimination of Disproportionality and Disparities (CEDD), and the Data Integrity Division, which assists with concerns related to Social Security Income (SSI-related) Medicaid and the Medicare Savings Program processes. Staff have opportunities to attend external training events such as the Central Texas African American Family Support Conference where they interact with consumers of agency services, CEDD annual conference, various health expositions, and professional development trainings. Additionally, Ombudsman staff and leadership attend stakeholder meetings at HHSC and DADS, as well as advisory committee meetings, and communicate to all Ombudsman staff the needs and concerns expressed at such meetings. The Ombudsman staff and Medicaid/CHIP Division staff meet regularly to share information and discuss trends and issues.

The HHSC Ombudsman utilizes a custom designed and secure web-based data tracking system to document each contact received. Staff use the tracking system to collect detailed information such as: specific beneficiary information, the nature of the contact, the type of Medicaid program, beneficiary demographic and residence information, the related MCO, whether a complaint is substantiated or unsubstantiated, and the resolution.

The fourth unit within the Ombudsman, Operations and Reporting, compiles and analyzes inquiry and complaint data from this system and prepares ad hoc and routine reports for internal and external use. Trend analysis is conducted to examine: the types of issues beneficiaries experience, the demographic service area, the responsible MCO, and to identify potential serious, systemic and emerging issues and trends. Reports and analysis are routinely shared, no less than quarterly, with the appropriate program areas including the Medicaid/CHIP Division and executive HHSC leadership, in an effort to address potential systemic issues and improve service to beneficiaries.

*Enrollment Broker (EB)*

The EB is an entity contracted with HHSC and operates independently of any MCO. The EB serves as an intermediary between the MCOs, beneficiaries, and the State regarding all aspects of enrolling a beneficiary into a MCO. The EB's purpose is to improve access to health and human service programs and reduce administrative burden on beneficiaries, providers, and the State of Texas.

The EB fulfills its contractual obligations by educating beneficiaries about their managed care options and the enrollment process, issuing enrollment packets, operating a call center for beneficiaries, conducting outreach and enrollment events for beneficiaries, conducting home visits, and working one-on-one with beneficiaries to assist with completion of

managed care enrollment. To complete enrollment into a MCO, beneficiaries may submit enrollment forms via fax, mail, and online, or call the EB's toll-free hotline to complete the MCO enrollment process. Spanish speaking hotline staff is available, as needed. The EB is also required to provide language translation for all languages as needed. The EB accepts complaints from beneficiaries about the Medicaid and CHIP programs and MCOs. Any complaint is escalated to HHSC if it cannot be resolved by the EB.

When additional types of beneficiaries become eligible for managed care, the EB implements a specific outreach plan to assist and educate the new beneficiaries locally. For example, for the 2014-15 enrollment period, the EB will conduct enrollment events, community education sessions, and home visits for individuals with intellectual and developmental disabilities and individuals residing in nursing facilities statewide, and to individuals residing in the Medicaid Rural Service Area to educate them about Medicaid managed care and enrolling in the STAR+PLUS program. These events will include collaboration with the AAAs and local intellectual and developmental disability authorities.

To ensure staff are adequately prepared to assist with managed care enrollment and handle complaints as required by their contract with HHSC, the EB employs staff that are properly trained and qualified to perform the functions required by their contract and requires staff complete required training on each of the managed care programs: STAR, STAR+PLUS, STAR Health, CHIP, and Dental. Specific training is provided when new populations are added to Medicaid or CHIP managed care, such as training about providing acute care for individuals with intellectual and developmental disabilities through the managed care system. The EB is required to ensure staff participates in trainings on population-specific sensitivity and effective communication training.

In order to provide adequate oversight, HHSC requires the EB to submit relevant reports, policies and procedures on a regular basis and expects the EB to maintain policies or procedures approved by HHSC. The EB provides HHSC a monthly report on the following: staff training provided , including the types of trainings, the number of participants that passed or failed the class and any remediation plans if a participant did not pass; quality assurance trend analysis related to evaluations; MCO provider network reports, including the number of primary care providers and specialists; enrollment reports summarizing the number of monthly and year-to-date enrollments for each managed care program; call center performance, including results and recommendations for improvement; complaint and dispute information that includes the reason or type of complaint, resolution by incidence, and issues or complaints escalated to HHSC. Separate enrollment reports are submitted for pregnant women and beneficiaries with special health care needs who have been enrolled.

The EB is required to annually submit and maintain a communication and coordination management plan that outlines its overall approach for communications with HHSC, other contractors, and stakeholders. The EB submits an annual progress and statistical report that includes trend analyses, performance data and metrics. The EB submits outreach and

informing policies, procedures, and business rules on a quarterly and annual basis. A complaint and dispute analysis report is sent to HHSC quarterly. Reports are also submitted regarding the EB's outreach and informing efforts.

*Aging and Disability Resource Centers*

The Aging and Disability Resource Centers (ADRCs) operate independently of any MCO and have historically been grantees of the Department of Aging and Disability Services (DADS). Coordinated through DADS and made up of key partners including the area agencies on aging, local intellectual and developmental disability authorities, and regional DADS staff, the ADRCs provide information about state and federal benefits, primarily to individuals who are aged or disabled seeking assistance.

The ADRCs are a point of contact in the state for people who are aged or have a disability; have physical or intellectual disabilities; or have mental health or substance abuse issues. The ADRCs work with individuals at an individual ADRC, over the phone, or in a person's home if needed. ADRCs offer language assistance through their staff, a statewide language line, or through external vendors under language assistance contracts. The ADRCs assist individuals to determine their needs, provide information about services, and provide person-centered planning to discuss options that most closely meet an individual's needs, which could include assisting an individual enrolling in managed care and accessing other state or federal programs.

According to their contracts, ADRCs must report performance metrics to DADS on a quarterly basis. Current measures relate to outreach and training events, information and referral data, and certain caller demographic data (age, need, conditions, caregiver information). In September 2015, ADRCs will also report data related to the provision of the Long Term Services and Supports (LTSS) pre-screening assessment tool. These metrics and the development of uniform intake, assessment, reporting and referral management processes will ensure a standardized and consistent consumer experience statewide.

The ADRCs play a key role in the statewide "No Wrong Door" system of information and access by promoting better coordination and integration among existing networks of aging and disability services. ADRC partners employ extensive cross-training to ensure consistent service delivery at all ADRC access points. This cross-training includes but is not limited to extensive training in cultural competence; the health and service options of individuals with complex, multiple needs, chronic conditions, disabilities and cognitive or behavioral needs; the state's Medicaid Programs; and beneficiary protections. Training also includes specific information about existing state-level consumer support access points including the Ombudsman, Medicaid Managed Care Helpline, Enrollment Broker services, DADS Consumer Rights and Services and the Long Term Care Ombudsman Program.

3.        Conclusion

**Attachment L**
**Independent Consumer Support System Plan**

HHSC primarily relies on Medicaid/CHIP Division staff, the Ombudsman and EB to support consumers receiving Medicaid managed care.  These entities assist beneficiaries navigating the managed care system by educating about options, rights, and processes for enrollment and issue resolution.  ADRCs are an integral community support in the consumer support system for the State of Texas, as they also assist, educate, counsel, and advocate on behalf of beneficiaries seeking services.  Together, these entities ensure beneficiaries are able to understand their options and the services available to them, successfully enroll in Medicaid managed care, and resolve any issues that may arise.

**Attachment L**
**Independent Consumer Support System Plan**

## Attachment M

## Historical Demonstration Information

The Texas Legislature, through the 2012-2013 General Appropriations Act and Senate Bill 7, instructed the Texas Health and Human Services Commission (HHSC) to expand its use of pre-paid Medicaid managed care to achieve program savings, while also preserving locally funded supplemental payments to hospitals. The State of Texas submitted a section 1115 Demonstration proposal to CMS in July 2011 to expand risk-based managed care statewide consistent with the existing STAR section 1915(b) and STAR+PLUS section 1915(b)/(c) waiver programs, and thereby replace existing Primary Care Case Management (PCCM) or fee-for-service (FFS) delivery systems. The state sought a section 1115 Demonstration as the vehicle to both expand the managed care delivery system, and to operate a funding pool, supported by managed care savings and diverted supplemental payments, to reimburse providers for uncompensated care costs and to provide incentive payments to participating hospitals that implement and operate delivery system reforms.

STAR and STAR+PLUS Programs

STAR is the primary managed care program providing acute care services to low-income families, children, and pregnant women. STAR+PLUS provides acute and long-term service and supports to older adults and adults with disabilities.

The STAR and STAR+PLUS managed care programs cover most beneficiaries statewide through three geographic expansions. The first expansion occurred on September 1, 2011, under existing section 1915(b) and section 1915(c) authorities; the second expansion occurred in March 2012, under section 1115 authority; and a third expansion of STAR+PLUS occurred on September 1, 2014 under section 1115 authority as a result of an amendment to the demonstration.

Effective March 1, 2012, the STAR program expanded statewide to include the three Medicaid rural service areas (MRSAs). Following this expansion, Medicaid eligible adults who were not enrolled in Medicare, met the level of care for Home and Community Based Services (HCBS), and resided in the MRSA, had to enroll in a STAR managed care organization (MCO); children meeting these criteria could voluntarily enroll in STAR. STAR MCOs in the MRSA provided acute care services, and will coordinate acute and long-term care services with section 1915(c) waivers, such as the Community Based Alternatives Program and the Community Living Assistance and Support Services Program, that exist outside of this section 1115 demonstration.

Effective September 1, 2014, STAR+PLUS expanded to the MRSA and Medicaid eligible adults over age 21 meeting STAR+PLUS eligibility criteria and residing in the MRSA were required to enroll in STAR+PLUS. Clients under 21 who meet the criteria may able to voluntarily enroll in STAR+PLUS effective September 1, 2014, and until the implementation of STAR Kids on November 1, 2016.

STAR and STAR+PLUS beneficiaries receive enhanced behavioral health services consistent with the requirements of the Mental Health Parity Act. As of March 2012, STAR+PLUS beneficiaries began receiving inpatient services through the contracted managed care organizations (MCOs). STAR+PLUS MCOs also provide Medicaid wrap services for outpatient drugs and biological products to dual eligible beneficiaries for whom the State has financial payment obligations. Additionally, Medicaid beneficiaries under the age of 21 received the full array of primary and preventive dental services required under the State plan, through contracting pre-paid dental plans.

Effective March 6, 2014, cognitive rehabilitation therapy services (CRT) will be provided through the STAR+PLUS HCBS program.

Effective September 1, 2014, the following additional benefits are provided:

- acute care services for beneficiaries receiving services through an intermediate care facility for individuals with intellectual disabilities or a related condition (ICF/IID), or an ICF/IID waiver are provided through STAR+PLUS; employment assistance and supported employment are provided through the STAR+PLUS home and community based services (HCBS) program;
- mental health rehabilitation services will be provided via managed care; and
- mental health targeted case management for members who have chronic mental illness are provided via managed care.
- Effective March 1, 2015, nursing facility services are a covered benefit under STAR+PLUS managed care for adults over the age of 21,

Note: The NorthSTAR waiver in the Dallas service delivery area did not change as a result of the September 1, 2014 and the March 1, 2015 STAR+PLUS expansions.

Beginning January 1, 2014, children ages 6 - 18 with family incomes between 100 – 133 percent of the federal poverty level were transferred from the state's separate Children's Health Insurance Program (CHIP) to Medicaid in accordance with section 1902(a)(10)(A)(i)(VII) of the Act. Under the demonstration these targeted low-income children (M-CHIP) are required to enroll in managed care. For the purposes of eligibility and benefits, these children are considered a mandatory Medicaid group for poverty-level related children and title XIX eligibility and benefit requirements apply. The state may claim enhanced match from the state's title XXI allotment for these M-CHIP children in accordance with title XXI funding requirements and regulations. All references to CHIP and title XXI in this document apply to these M-CHIP children only. Other requirements of title XXI (for separate CHIP programs) are not applicable to this demonstration.

STAR Kids Program

Effective November 1, 2016, the following four groups of Medicaid clients from birth through age 20 will become mandatory populations through a new program under the 1115 waiver -- the STAR Kids Medicaid managed care program.

1. Clients receiving SSI and disability-related (including SSI-related) Medicaid who do not participate in a 1915(c) waiver: these children will receive their state plan acute care services and their state plan long term services and supports (LTSS) through STAR Kids.
2. Clients receiving HCBS services through the MDCP 1915(c) waiver: these children and young adults will receive the full range of state plan acute care services and state plan LTSS as well as MDCP 1915(c) HCBS waiver services through STAR Kids. The MDCP waiver will continue, but will be operated by HHSC effective November 1, 2016. This is to ensure that options for MDCP services provided under the 1915(c) authority remain available to individuals in STAR Health, which services children and young adults in the conservatorship of the Department of Family and Protective Services.
3. Clients receiving HCBS through the following 1915(c) waivers -- CLASS, DBMD, HCS, TxHmL, and YES:
    a. Clients enrolled in CLASS, DBMD, HCS and TxHmL receive their 1915(c) LTSS and 1915(k) (Community First Choice) services through their current waiver provider, which are contracted with DADS. These clients receive all other state plan LTSS and acute care services through STAR Kids.
    b. Clients enrolled in the YES waiver receive their 1915(c) LTSS through their current HCBS delivery system, which is operated by DSHS. These clients receive all state plan LTSS, including 1915(k) services, as well as all acute care services through STAR Kids.
4. Clients receiving SSI and disability-related (including SSI-related) Medicaid who reside in a community-based intermediate care facility for individuals with intellectual disabilities or a nursing facility: clients will continue to receive all long term services and supports provided by the facility through the current delivery system. All non-facility related services will be paid through STAR Kids.

Individuals in all four categories will receive a continuum of services, including acute care, behavioral health, and state plan long-term services and supports. STAR Kids managed care organizations will provide service coordination for all members, including coordination with non-capitated HCBS services that exist outside of this section 1115 demonstration. Indian children and young adults who are members of federally-recognized tribes, and have SSI or disability-related (including SSI-related) Medicaid or who are served through one of the 1915(c) waivers, will be able to voluntarily enroll in STAR Kids or opt to remain in traditional fee-for-service Medicaid.

Effective January 1, 2017, the NorthSTAR program (currently operated in Dallas, Ellis, Collin, Hunt, Navarro, Rockwall and Kaufman counties) will discontinue. All Medicaid behavioral health services previously provided to Medicaid-eligible individuals by NorthSTAR will be provided through the 1115 Medicaid STAR, STAR+PLUS and STAR Kids MCOs.[1,2]

Savings generated by the expansion of managed care and diverted supplemental payments will enable the state to maintain budget neutrality, while establishing two funding pools supported by

---

[1] For members enrolled in STAR Kids, these services will be available through MCOs beginning November 1, 2016.
[2] As with all other service areas, Mental Health Targeted Case Management and Mental Health Rehabilitative services will be paid through FFS for individuals who receive Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) funded services or PASSAR services. All wrap-around services and crossover claims will be paid via FFS for dually eligible individuals not enrolled in the duals demonstration.

Federal matching funds, to provide payments for uncompensated care costs and delivery system reforms undertaken by participating hospitals and providers. These payments are intended to help providers prepare for new coverage demands in 2014 scheduled to take place under current Federal law. The state proposes that the percentage of funding for uncompensated care will decrease as the coverage reforms of the Patient Protection and Affordable Care Act are implemented, and the percentage of funding for delivery system improvement will correspondingly increase.

Texas plans to work with private and public hospitals to create Regional Healthcare Partnerships (RHPs) that are anchored financially by public hospitals and/or local government entities, that will collaborate with participating providers to identify performance areas for improvement that may align with the following four broad categories: (1) infrastructure development, (2) program innovation and redesign, (3) quality improvements, and (4) population focused improvements. The non-Federal share of funding pool expenditures will be largely financed by state and local intergovernmental transfers (IGTs). Texas will continue to work with CMS in engaging provider stakeholders and developing a sustainable framework for the RHPs. It is anticipated, if all deliverables identified in this demonstration's STCs are satisfied, incentive payments for planning will begin in the second half of the first Demonstration Year (DY).

Through this demonstration, the state aims to:
- Expand risk-based managed care statewide;
- Support the development and maintenance of a coordinated care delivery system;
- Improve outcomes while containing cost growth;
- Protect and leverage financing to improve and prepare the health care infrastructure to serve a newly insured population; and
- Transition to quality-based payment systems across managed care and hospitals.

In May of 2016, CMS granted the demonstration a 15 month temporary extension to allow additional time for DSRIP projects to demonstrate their results. The extension also allows Texas to study its Medicaid payment and financing policies and providers' uncompensated care burdens, and prepare for the next stage in delivery system reform.

Effective September 1, 2017, the following populations are mandatory for managed care. Those who meet the STAR Kids eligibility criteria are mandatory to enroll in STAR Kids, and the remainder are mandatory to enroll in STAR.
- Clients enrolled in the Department for Family and Protective Services (DFPS) Adoption Assistance program.
- Clients enrolled in the DFPS Permanency Care Assistance program.

Effective September 1, 2017, women participating in the Medicaid for Breast and Cervical Cancer will transition to STAR+PLUS Medicaid managed care.

# Attachment N

## Reserved

**Introduction**
For states that are testing new approaches and flexibilities in their Medicaid programs through section 1115 demonstrations, evaluations are crucial to understand and disseminate what is or is not working and why.  The evaluations of new initiatives seek to produce new knowledge and direction for programs and inform Medicaid policy for the future.  While a narrative about what happened during a demonstration provides important information, the principal focus of the evaluation of a section 1115 demonstration should be obtaining and analyzing data on the process (e.g., whether the demonstration is being implemented as intended), outcomes (e.g., whether the demonstration is having the intended effects on the target population), and impacts of the demonstration (e.g., whether the outcomes observed in the targeted population differ from outcomes in similar populations not affected by the demonstration).  Both state and federal governments need rigorous quantitative and qualitative evidence to inform policy decisions.

**Expectations for Evaluation Designs**
All states with Medicaid section 1115 demonstrations are required to conduct an evaluation, and the Evaluation Design is the roadmap for conducting the evaluation.  The roadmap begins with the stated goals for the demonstration followed by the measurable evaluation questions and quantifiable hypotheses, all to support a determination of the extent to which the demonstration has achieved its goals.  When conducting analyses and developing the evaluation reports, every effort should be made to follow the approved methodology.  However, the state may request, and CMS may agree to, changes in the methodology in appropriate circumstances.

The format for the Evaluation Design is as follows:
    A.  General Background Information;
    B.  Evaluation Questions and Hypotheses;
    C.  Methodology;
    D.  Methodological Limitations;
    E.  Attachments.

**Submission Timelines**
There is a specified timeline for the state's submission of Evaluation Design and Reports.  (The graphic below depicts an example of this timeline).  In addition, the state should be aware that section 1115 evaluation documents are public records.  The state is required to publish the Evaluation Design to the state's website within 30 days of CMS approval, as per 42 CFR 431.424(e).  CMS will also publish a copy to the Medicaid.gov website.



Demo Approved Jan. 1, 2017

Evaluation Design April 30, 2017

Interim Evaluation Dec. 31, 2020 (data from DY 1-2.5)

Renewal Jan. 1, 2022

Summative Evaluation for Jan. 1 2017 - Dec. 31, 2021 Due June 30, 2023

**Required Core Components of All Evaluation Designs**

The Evaluation Design sets the stage for the Interim and Summative Evaluation Reports. It is important that the Evaluation Design explain the goals and objectives of the demonstration, the hypotheses related to the demonstration, and the methodology (and limitations) for the evaluation. A copy of the state's Driver Diagram (described in more detail in paragraph B2 below) should be included with an explanation of the depicted information.

**A. General Background Information** – In this section, the state should include basic information about the demonstration, such as:

1) The issue/s that the state is trying to address with its section 1115 demonstration and/or expenditure authorities, the potential magnitude of the issue/s, and why the state selected this course of action to address the issue/s (e.g., a narrative on why the state submitted an 1115 demonstration proposal).

2) The name of the demonstration, approval date of the demonstration, and period of time covered by the evaluation;

3) A brief description of the demonstration and history of the implementation, and whether the draft Evaluation Design applies to an amendment, extension, renewal, or expansion of, the demonstration;

4) For renewals, amendments, and major operational changes: A description of any changes to the demonstration during the approval period; the primary reason or reasons for the change; and how the Evaluation Design was altered or augmented to address these changes.

5) Describe the population groups impacted by the demonstration.

**B. Evaluation Questions and Hypotheses** – In this section, the state should:

1) Describe how the state's demonstration goals are translated into quantifiable targets for improvement, so that the performance of the demonstration in achieving these targets could be measured.

2) Include a Driver Diagram to visually aid readers in understanding the rationale behind the cause and effect of the variants behind the demonstration features and intended outcomes. A driver diagram is a particularly effective modeling tool when working to improve health and health care through specific interventions. The diagram includes information about the goal of the demonstration, and the features of the demonstration. A driver diagram depicts the relationship between the aim, the primary drivers that contribute directly to achieving the aim, and the secondary drivers that are necessary to achieve the primary drivers for the demonstration. For an example and more information on driver diagrams: https://innovation.cms.gov/files/x/hciatwoaimsdrvrs.pdf

3) Identify the state's hypotheses about the outcomes of the demonstration:
   a. Discuss how the evaluation questions align with the hypotheses and the goals of the demonstration;
   b. Address how the research questions / hypotheses of this demonstration promote the objectives of Titles XIX and/or XXI.

C. **Methodology** – In this section, the state is to describe in detail the proposed research methodology. The focus is on showing that the evaluation meets the prevailing standards of scientific and academic rigor, and the results are statistically valid and reliable, and that where appropriate it builds upon other published research (use references).

This section provides the evidence that the demonstration evaluation will use the best available data; reports on, controls for, and makes appropriate adjustments for the limitations of the data and their effects on results; and discusses the generalizability of results. This section should provide enough transparency to explain what will be measured and how. Specifically, this section establishes:

1) Evaluation *Design* – Provide information on how the evaluation will be designed. For example, will the evaluation utilize a pre/post comparison? A post-only assessment? Will a comparison group be included?

2) *Target and Comparison Populations* – Describe the characteristics of the target and comparison populations, to include the inclusion and exclusion criteria. Include information about the level of analysis (beneficiary, provider, or program level), and if populations will be stratified into subgroups. Additionally discuss the sampling methodology for the populations, as well as support that a statistically reliable sample size is available.

3) *Evaluation Period* – Describe the time periods for which data will be included.

4) *Evaluation Measures* – List all measures that will be calculated to evaluate the demonstration. Include the measure stewards (i.e., the organization(s) responsible for the evaluation data elements/sets by "owning", defining, validating; securing; and submitting for endorsement, etc.) Include numerator and denominator information. Additional items to ensure:

    a. The measures contain assessments of both process and outcomes to evaluate the effects of the demonstration during the period of approval.
    b. Qualitative analysis methods may be used, and must be described in detail.
    c. Benchmarking and comparisons to national and state standards, should be used, where appropriate.
    d. Proposed health measures could include CMS's Core Set of Health Care Quality Measures for Children in Medicaid and CHIP, Consumer Assessment of Health Care Providers and Systems (CAHPS), the Initial Core Set of Health Care Quality Measures for Medicaid-Eligible Adults and/or measures endorsed by National Quality Forum (NQF).
    e. Proposed performance metrics can be selected from nationally recognized metrics, for example from sets developed by the Center for Medicare and Medicaid Innovation or for meaningful use under Health Information Technology (HIT).
    f. Among considerations in selecting the metrics shall be opportunities identified by the state for improving quality of care and health outcomes, and controlling cost of care.

5) *Data Sources* – Explain where the data will be obtained, and efforts to validate and clean the data. Discuss the quality and limitations of the data sources.

    If primary data (data collected specifically for the evaluation) – The methods by which the data will be collected, the source of the proposed question/responses, the frequency and timing of data collection, and the method of data collection. (Copies of any proposed surveys must be reviewed with CMS for approval before implementation).

6) *Analytic Methods* – This section includes the details of the selected quantitative and/or qualitative measures to adequately assess the effectiveness of the demonstration. This section should:
    a. Identify the specific statistical testing which will be undertaken for each measure (e.g., t-tests, chi-square, odds ratio, ANOVA, regression). Table A is an example of how the state might want to articulate the analytic methods for each research question and measure.
    b. Explain how the state will isolate the effects of the demonstration (from other initiatives occurring in the state at the same time) through the use of comparison groups.
    c. A discussion of how propensity score matching and difference in differences design may be used to adjust for differences in comparison populations over time (if applicable).
    d. The application of sensitivity analyses, as appropriate, should be considered.

7) *Other Additions* – The state may provide any other information pertinent to the Evaluation Design of the demonstration.

**Table A. Example Design Table for the Evaluation of the Demonstration**

| Research Question | Outcome measures used to address the research question | Sample or population subgroups to be compared | Data Sources | Analytic Methods |
|---|---|---|---|---|
| **Hypothesis 1** | | | | |
| Research question 1a | -Measure 1 <br> -Measure 2 <br> -Measure 3 | -Sample e.g. All attributed Medicaid beneficiaries <br> -Beneficiaries with diabetes diagnosis | -Medicaid fee-for-service and encounter claims records | -Interrupted time series |
| Research question 1b | -Measure 1 <br> -Measure 2 <br> -Measure 3 <br> -Measure 4 | -sample, e.g., PPS patients who meet survey selection requirements (used services within the last 6 months) | -Patient survey | Descriptive statistics |
| **Hypothesis 2** | | | | |
| Research question 2a | -Measure 1 <br> -Measure 2 | -Sample, e.g., PPS administrators | -Key informants | Qualitative analysis of interview material |

**D. Methodological Limitations** – This section provides detailed information on the limitations of the evaluation.  This could include the design, the data sources or collection process, or analytic methods.  The state should also identify any efforts to minimize the limitations.  Additionally, this section should include any information about features of the demonstration that effectively present methodological constraints that the state would like CMS to take into consideration in its review.

**E. Special Methodological Considerations-** CMS recognizes that there may be certain instances where a state cannot meet the rigor of an evaluation as expected by CMS.  In these instances, the state should document for CMS why it is not able to incorporate key components of a rigorous evaluation, including comparison groups and baseline data analyses.  Examples of considerations include:

1) When the state demonstration is:
   a. Long-standing, non-complex, unchanged, or
   b. Has previously been rigorously evaluated and found to be successful, or
   c. Could now be considered standard Medicaid policy (CMS published regulations or guidance)

2) When the demonstration is also considered successful without issues or concerns that would require more regular reporting, such as:
   a. Operating smoothly without administrative changes; and

      b. No or minimal appeals and grievances; and
      c. No state issues with CMS 64 reporting or budget neutrality; and
      d. No Corrective Action Plans (CAP) for the demonstration.

## F. Attachments

1) **Independent Evaluator.** This includes a discussion of the state's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications that the selected entity must possess, and how the state will assure no conflict of interest. Explain how the state will assure that the Independent Evaluator will conduct a fair and impartial evaluation, prepare an objective Evaluation Report, and that there would be no conflict of interest. The evaluation design should include "No Conflict of Interest" signed by the independent evaluator.

2) **Evaluation Budget.** A budget for implementing the evaluation shall be provided with the draft Evaluation Design. It will include the total estimated cost, as well as a breakdown of estimated staff, administrative, and other costs for all aspects of the evaluation. Examples include, but are not limited to: the development of all survey and measurement instruments; quantitative and qualitative data collection; data cleaning and analyses; and reports generation. A justification of the costs may be required by CMS if the estimates provided do not appear to sufficiently cover the costs of the draft Evaluation Design or if CMS finds that the draft Evaluation Design is not sufficiently developed.

3) **Timeline and Major Milestones.** Describe the timeline for conducting the various evaluation activities, including dates for evaluation-related milestones, including those related to procurement of an outside contractor, if applicable, and deliverables. The Final Evaluation Design shall incorporate an Interim and Summative Evaluation. Pursuant to 42 CFR 431.424(c)(v), this timeline should also include the date by which the Final Summative Evaluation report is due.

**Attachment P:**
**Preparing the Evaluation Report**

**Introduction**
For states that are testing new approaches and flexibilities in their Medicaid programs through section 1115 demonstrations, evaluations are crucial to understand and disseminate what is or is not working and why. The evaluations of new initiatives seek to produce new knowledge and direction for programs and inform Medicaid policy for the future. While a narrative about what happened during a demonstration provide important information, the principal focus of the evaluation of a section 1115 demonstration should be obtaining and analyzing data on the process (e.g., whether the demonstration is being implemented as intended), outcomes (e.g., whether the demonstration is having the intended effects on the target population), and impacts of the demonstration (e.g., whether the outcomes observed in the targeted population differ from outcomes in similar populations not affected by the demonstration). Both state and federal governments need improved quantitative and qualitative evidence to inform policy decisions.

**Expectations for Evaluation Reports**
Medicaid section 1115 demonstrations are required to conduct an evaluation that is valid (the extent to which the evaluation measures what it is intended to measure), and reliable (the extent to which the evaluation could produce the same results when used repeatedly). To this end, the already approved Evaluation Design is a map that begins with the demonstration goals, then transitions to the evaluation questions, and to the specific hypotheses, which will be used to investigate whether the demonstration has achieved its goals. States should have a well-structured analysis plan for their evaluation. With the following kind of information, states and CMS are best poised to inform and shape Medicaid policy in order to improve the health and welfare of Medicaid beneficiaries for decades to come. When conducting analyses and developing the evaluation reports, every effort should be made to follow the approved methodology. However, the state may request, and CMS may agree to, changes in the methodology in appropriate circumstances. When submitting an application for renewal, the interim evaluation report should be posted on the state's website with the application for public comment. Additionally, the interim evaluation report must be included in its entirety with the application submitted to CMS.

**Intent of this Attachment**
Title XIX of the Social Security Act (the Act) requires an evaluation of every section 1115 demonstration. In order to fulfill this requirement, the state's submission must provide a comprehensive written presentation of all key components of the demonstration, and include all required elements specified in the approved Evaluation Design. This Attachment is intended to assist states with organizing the required information in a standardized format and understanding the criteria that CMS will use in reviewing the submitted Interim and Summative Evaluation Reports.

The format for the Interim and Summative Evaluation reports are as follows:
    A. Executive Summary;
    B. General Background Information;

    C.  Evaluation Questions and Hypotheses;
    D.  Methodology;
    E.  Methodological Limitations;
    F.  Results;
    G.  Conclusions;
    H.  Interpretations, and Policy Implications and Interactions with Other State Initiatives;
    I.  Lessons Learned and Recommendations; and
    J.  Attachment(s).

**Submission Timelines**

There is a specified timeline for the state's submission of Evaluation Designs and Evaluation Reports. These dates are specified in the demonstration Special Terms and Conditions (STCs). (The graphic below depicts an example of this timeline). In addition, the state should be aware that section 1115 evaluation documents are public records. In order to assure the dissemination of the evaluation findings, lessons learned, and recommendations, the state is required to publish the evaluation design and reports to the state's website within 30 days of CMS approval, as per 42 CFR 431.424(d). CMS will also publish a copy to the Medicaid.gov website.



**Required Core Components of Interim and Summative Evaluation Reports**

The section 1115 Evaluation Report presents the research about the section 1115 Demonstration. It is important that the report incorporate a discussion about the structure of the Evaluation Design to explain the goals and objectives of the demonstration, the hypotheses related to the demonstration, and the methodology for the evaluation. A copy of the state's Driver Diagram (described in the Evaluation Design Attachment) must be included with an explanation of the depicted information. The Evaluation Report should present the relevant data and an interpretation of the findings; assess the outcomes (what worked and what did not work); explain the limitations of the design, data, and analyses; offer recommendations regarding what (in hindsight) the state would further advance, or do differently, and why; and discuss the implications on future Medicaid policy. Therefore, the state's submission must include:

    a.  **Executive Summary** – A summary of the demonstration, the principal results, interpretations, and recommendations of the evaluation.

**B. General Background Information about the Demonstration** – In this section, the state should include basic information about the demonstration, such as:

    i. The issues that the state is trying to address with its section 1115 demonstration and/or expenditure authorities, how the state became aware of the issue, the potential magnitude of the issue, and why the state selected this course of action to address the issues.

    ii. The name of the demonstration, approval date of the demonstration, and period of time covered by the evaluation;

    iii. A brief description of the demonstration and history of the implementation, and if the evaluation is for an amendment, extension, renewal, or expansion of, the demonstration;

    iv. For renewals, amendments, and major operational changes: A description of any changes to the demonstration during the approval period; whether the motivation for change was due to political, economic, and fiscal factors at the state and/or federal level; whether the programmatic changes were implemented to improve beneficiary health, provider/health plan performance, or administrative efficiency; and how the Evaluation Design was altered or augmented to address these changes.

    v. Describe the population groups impacted by the demonstration.

**C. Evaluation Questions and Hypotheses** – In this section, the state should:

    1) Describe how the state's demonstration goals were translated into quantifiable targets for improvement, so that the performance of the demonstration in achieving these targets could be measured. The inclusion of a Driver Diagram in the Evaluation Report is highly encouraged, as the visual can aid readers in understanding the rationale behind the demonstration features and intended outcomes.

    2) Identify the state's hypotheses about the outcomes of the demonstration;

        a. Discuss how the goals of the demonstration align with the evaluation questions and hypotheses;

        b. Explain how this Evaluation Report builds upon and expands earlier demonstration evaluation findings (if applicable); and

        c. Address how the research questions / hypotheses of this demonstration promote the objectives of Titles XIX and XXI.

**D. Methodology** – In this section, the state is to provide an overview of the research that was conducted to evaluate the section 1115 demonstration consistent with the approved Evaluation Design. The evaluation Design should also be included as an attachment to the report. The focus is on showing that the evaluation builds upon other published research (use references), and meets the prevailing standards of scientific and academic rigor, and the results are statistically valid and reliable.

An interim report should provide any available data to date, including both quantitative and qualitative assessments. The Evaluation Design should assure there is appropriate data development and collection in a timely manner to support developing an interim evaluation.

This section provides the evidence that the demonstration evaluation used the best available data and describes why potential alternative data sources were not used; reported on, controlled for, and made appropriate adjustments for the limitations of the data and their effects on results; and discusses the generalizability of results. This section should provide enough transparency to explain what was measured and how. Specifically, this section establishes that the approved Evaluation Design was followed by describing:

1) *Evaluation Design*—Will the evaluation be an assessment of: pre/post, post-only, with or without comparison groups, etc?
2) *Target and Comparison Populations*—Describe the target and comparison populations; include inclusion and exclusion criteria.
3) *Evaluation Period*—Describe the time periods for which data will be collected
4) *Evaluation Measures*—What measures are used to evaluate the demonstration, and who are the measure stewards?
5) *Data Sources*—Explain where the data will be obtained, and efforts to validate and clean the data.
6) *Analytic methods*—Identify specific statistical testing which will be undertaken for each measure (t-tests, chi-square, odds ratio, ANOVA, regression, etc.).
7) *Other Additions* – The state may provide any other information pertinent to the evaluation of the demonstration.

**E. Methodological Limitations**
This section provides sufficient information for discerning the strengths and weaknesses of the study design, data sources/collection, and analyses.

**F. Results** – In this section, the state presents and uses the quantitative and qualitative data to show to whether and to what degree the evaluation questions and hypotheses of the demonstration were achieved. The findings should visually depict the demonstration results (tables, charts, graphs). This section should include information on the statistical tests conducted.

**G. Conclusions** – In this section, the state will present the conclusions about the evaluation results.

1) In general, did the results show that the demonstration was/was not effective in achieving the goals and objectives established at the beginning of the demonstration?

2) Based on the findings, discuss the outcomes and impacts of the demonstration and identify the opportunities for improvements. Specifically:
   a. If the state did not fully achieve its intended goals, why not? What could be done in the future that would better enable such an effort to more fully achieve those purposes, aims, objectives, and goals?

**H. Interpretations, Policy Implications and Interactions with Other State Initiatives** –
In this section, the state will discuss the section 1115 demonstration within an overall Medicaid context and long range planning. This should include interrelations of the demonstration with other aspects of the state's Medicaid program, interactions with other

Medicaid demonstrations, and other federal awards affecting service delivery, health outcomes and the cost of care under Medicaid. This section provides the state with an opportunity to provide interpretation of the data using evaluative reasoning to make judgments about the demonstration. This section should also include a discussion of the implications of the findings at both the state and national levels.

I. **Lessons Learned and Recommendations** – This section of the Evaluation Report involves the transfer of knowledge. Specifically, the "opportunities" for future or revised demonstrations to inform Medicaid policymakers, advocates, and stakeholders is just as significant as identifying current successful strategies. Based on the evaluation results:
   1) What lessons were learned as a result of the demonstration?
   2) What would you recommend to other states which may be interested in implementing a similar approach?

J. **Attachment**
   1) Evaluation Design: Provide the CMS-approved Evaluation Design

# Attachment Q: DSRIP Sustainability Plan

## Reserved

# Attachment R: Measure Bundle Protocol

## Reserved

# Attachment S: Evaluation Design

## Reserved

# Exhibit N

# HEALTH PRACTICE COUNCIL PRACTICE NOTE

*August 2005*

## ACTUARIAL CERTIFICATION OF RATES FOR MEDICAID MANAGED CARE PROGRAMS

Developed by the
Medicaid Rate Certification Work Group of the
American Academy of Actuaries



AMERICAN ACADEMY *of* ACTUARIES



# AMERICAN ACADEMY *of* ACTUARIES

The American Academy of Actuaries is the public policy organization for actuaries practicing in all specialties within the United States. A major purpose of the Academy is to act as the public information organization for the actuarial profession. The Academy is non-partisan and assists the public policy process through the presentation of clear and objective actuarial analysis. The Academy regularly prepares testimony for Congress, provides information to federal elected officials, comments on proposed federal regulations, and works closely with state officials on issues related to insurance. The Academy also supports the development and enforcement of actuarial standards of conduct, qualification and practice and the Code of Professional Conduct for all actuaries practicing in the United States.

Members of the Medicaid Rate Certification Work Group include:

| | |
|---|---|
| P. Anthony Hammond, Chairperson | M. Scott Lockwood |
| F. Kevin Russell, Vice Chairperson | Gary J. McCollum |
| Ben S. Brandon | Mary J. Murley |
| Thomas P. Carlson | David F. Ogden |
| April S. Choi | Herbert B. Olson |
| Robert M. Damler | Richard D. Pattinson |
| Timothy F. Harris | Robert Ruderman |
| Joann M. Hess | Martin E. Staehlin |
| Grace C. Kiang | Jill A. Stockard |
| Julia S. Lambert | Gordon R. Trapnell |
| Arlene E. Livingston | Todd W. Whitney |

This group includes actuaries who have experience performing certifications to the Centers for Medicare and Medicaid Services (CMS) as either consultants to state Medicaid agencies or as state employees, and actuaries who have experience with Medicaid rates, as either employees of, or consultants to, HMOs that contract with states to provide managed health care to Medicaid populations. The work group acknowledges CMS actuary John D. Klemm for coordinating the efforts of the work group with CMS. The group would also like to thank staff at CMS who met with the work group including: Dianne Heffron, Ed Hutton, Brenda Jackson, Bruce Johnson, and Carrie Smith.

HEALTH PRACTICE NOTE 2005-1

August 2005

**Actuarial Certification of Rates for Medicaid Managed Care Programs**

Developed by the
**Medicaid Rate Certification Work Group of the
American Academy of Actuaries**

This practice note was prepared by a work group organized by the Health Practice Council of the American Academy of Actuaries. The work group was asked to:

Review the Centers for Medicare & Medicaid Services (CMS) regulations that require certification of the "actuarial soundness" of Medicaid managed care premium rates;[1]

Determine the extent to which the Academy has addressed the term "actuarial soundness" in any public statements (the Health Committee of the Actuarial Standards Board is reviewing the need for an Actuarial Standard of Practice on this topic); and

Make a recommendation to the Health Practice Council about the best way to proceed on this issue. The work group's recommendation was to publish a practice note. The Health Practice Council approved this recommendation and directed the work to proceed with the drafting of the practice note.

The purpose of this practice note is to provide nonbinding guidance to the actuary when certifying rates or rate ranges as meeting the requirements of 42 CFR 438.6(c) for capitated Medicaid managed care programs. Examples of responses to certain situations and issues are provided. However, no representation of completeness is made; other approaches may also be reasonable and may currently be in common use. Further, appropriate alternatives to these methods may develop over time and come into common use. Events occurring subsequent to the date of publication of this practice note may make the practices described herein irrelevant or inappropriate.

Since the purpose of this practice note is to provide nonbinding guidance, this practice note has not been promulgated by the Actuarial Standards Board nor by any other authoritative body of the American Academy of Actuaries. The information in this practice note is not binding on any actuary and is not a definitive statement as to what constitutes generally accepted practice in this area. Moreover, this practice note is based upon 42 CFR 438.6(c) and current CMS requirements. To the extent that the legal requirements of a particular state impose additional or conflicting requirements, practices described in this practice note may not be appropriate for actuarial practice in that state.[2]

Comments are welcome as to the appropriateness of the practice note, desirability of updates, substantive disagreements, etc. Comments should be sent to Holly Kwiatkowski, the Academy's senior health policy analyst (federal), at kwiatkowski@actuary.org or American Academy of Actuaries, 1100 17th St. NW, 7th floor, Washington, DC 20036.

1. In this setting, the term "premium rates" refers to all payments under risk contracts and all risk-sharing mechanisms (ref. 42 CFR 438.6(c)(2)). Lump sum payments in risk contracts (and all other payments) outside of premiums are also subject to actuarial soundness certification.
2. Since these situations may exist, it is important for the actuary to bring the specific situation(s) to the attention of the appropriate state officials so a dialogue can be established to find an equitable solution.

**Health Practice Council**

**Practice Note — August 2005**

**Actuarial Certification of Rates for Medicaid Managed Care Programs**

**Table of Contents**

I.      Introduction

II.     Overview of Generally Accepted Actuarial Principles and Practices, and the Term "Actuarial Soundness"

III.    The Medicaid Managed Care Regulation (including the "Comments and Responses" section)

IV.    CMS Rate-setting Checklist

V.      Documentation

VI.    Certification Language

## I. Introduction

Medicaid is a program that provides health care to indigent people in the United States under Title XIX of the Social Security Act of 1965. Created at the same time as Medicare (Title XVIII), both programs are regulated by the Centers for Medicare and Medicaid Services (CMS), an agency of the federal Department of Health and Human services. Medicaid is financed jointly by the states and the federal government from general tax revenue, with the federal share between 50 and 80 percent of costs. The Title XXI State Children's Health Insurance Program (SCHIP) has a federal share of up to 85 percent. Primary administrative responsibility for Medicaid belongs to the state, with federal oversight. Federal rules require certain populations to be covered and a core set of services to be covered. States are permitted to expand coverage to additional populations and additional services. Medicare, in contrast, is financed and administered federally, with funds from taxes on wages, premiums paid by (or on behalf of) beneficiaries, and general tax revenue. In Federal Fiscal Year 2002, Medicaid outlays ($259 billion federal and state combined) exceeded Medicare outlays ($257 billion) for the first time.[3]

Except for some small-scale voluntary HMO enrollment in a few areas, Medicaid operated almost exclusively on a fee-for-service (FFS) basis from its inception in the 1960s until 1982. Arizona, which until that time had remained outside the Medicaid program, requested a waiver from the requirement to operate Medicaid as an FFS program. The Health Care Financing Administration (HCFA), as CMS was then called, granted Arizona's request and permitted that state to operate its Medicaid program using managed care organizations (MCOs). Other states expressed interest in using MCOs to provide Medicaid benefits, and mandatory MCO enrollment was approved in certain metropolitan areas of Minnesota, Missouri, and Wisconsin. HCFA developed a waiver process by which states could do this, with the provision that the cost of the program under managed care could not exceed the cost, known as the Upper Payment Limit (UPL), of providing the same services on a FFS basis to an actuarially equivalent non-enrolled population group. (See 42 CFR 447.361, now repealed.)

Interest in waivers for Medicaid managed care plans increased throughout the 1990s. By the late 1990s, the UPL requirement was seen as problematic. For some states, Medicaid for certain populations had been delivered exclusively through MCOs for several years, rendering FFS claim experience data on those populations out-of-date. In addition, financial requirements based on a FFS delivery system that had low levels of medical screening, vaccination, and access to health care were seen as increasingly problematic for a managed care delivery system with increased access to necessary health care services and requirements for high levels of medical screening and vaccination.

In recognition of the problem with the UPL requirement, the new 42 CFR § 438.6(c) was enacted in June 2002 to be effective for rates covering periods of August 2003 and later (see Federal Register, Vol. 67, No. 115), and § 447.361 was repealed. In summary, the requirements as stated in § 438.6 (c) are as follows:

(2) *Basic requirements.*

(i) All payments under risk contracts and all risk sharing mechanisms in contracts must be actuarially sound.

(ii) The contract must specify the payment rates and any risk sharing mechanisms, and the actuarial basis for computation of those rates and mechanisms.

(3) *Requirements for actuarially sound rates.* In setting actuarially sound capitation rates, the state must apply the following elements, or explain why they are not applicable:

(i) Base utilization and cost data that are derived from the Medicaid population, or if not, are adjusted to make them comparable to the Medicaid population.

---

3. Testimony of Thomas Scully, Administrator, CMS on October 8, 2003, before the House Energy and Commerce Committee Subcommittee on Health.

(ii)     Adjustments are made to smooth data and adjustments to account for such factors as medical trend inflation, incomplete data, MCO, PIHP [prepaid inpatient health plan], or PAHP [prepaid ambulatory health plan] administration, and utilization;

(iii)     Rate cells are specific to the enrolled population, by—

(A) Eligibility category;

(B) Age;

(C) Gender;

(D) Locality/region; and

(E) Risk adjustments based on diagnosis or health status (if used).

(iv)     Other payment mechanisms and utilization and cost assumptions that are appropriate for individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims, using risk adjustment, risk sharing, or other appropriate cost-neutral methods.

(4) *Documentation.* The state must provide the following documentation:

(i)     The actuarial certification of the capitation rates.

(ii)     An assurance that all payment rates are—

(A) Based only upon services covered under the state plan (or costs directly related to providing these services, for example, MCO, PIHP, or PAHP administration).

(B) Provided under the contract to Medicaid-eligible individuals.

(iii)     The state's projection of expenditures under its previous year's contract (or under its FFS program if it did not have a contract in the previous year) compared to those projected under the proposed contract.

(iv)     An explanation of any incentive arrangements, or stop-loss limits or other risk-sharing methodologies under the contract.


Section 438.6(c) defines "actuarially sound capitation rates" as capitation rates that:
- have been developed in accordance with generally accepted actuarial principles and practices;
- are appropriate for the populations to be covered and the services to be furnished under the contract; and
- have been certified as meeting the requirements of the regulation by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board.

Section 438.6(c) also specifies what is **not** "actuarially sound" under special contract provisions. (The practitioner may wish to refer to Sections III and IV of this practice note for additional information.) For example, the following conditions would result in payments that would not be considered "actuarially sound:"
i.    If risk corridor arrangements result in payments that exceed the sum of:
     a.    the amount Medicaid would have paid, on a FFS basis, for the state plan services, plus
     b.    administrative costs directly related to the provisions of these services.
ii.    If contracts with incentive arrangements provide for payment in excess of 105 percent of the approved capitation payments.


Section 438.6(c) requirements for "actuarial soundness" are thus a combination of two types of requirements. The first is the general requirement of being developed in accordance with generally accepted actuarial

principles and practices. The second is the potentially more restrictive requirement that CMS may impose on fiscal arrangements. This practice note concentrates on issues concerning the former. For issues concerning the latter, it is acknowledged that CMS or the states may impose additional restrictions, and this practice note, therefore, addresses only the potential areas of conflict between these requirements and generally accepted actuarial principles and practices.

In a regulation as published in the Federal Register, the section on "Comments and Responses" often is a valuable resource. This preliminary section includes such topics as CMS views on rate adequacy, the establishment of standards for risk and profit levels, and data integrity. Interpretations of these views are further detailed in Section III of this practice note.[4]

The checklist is a step-by-step tool that is expected to be used by the CMS Regional Offices to assess whether the capitation rates submitted by states are "actuarially sound" per the regulatory guidelines. For purposes of this practice note, the July 22, 2003 version of the checklist has been used. It is usually prudent to obtain the most current available version of the checklist when certifying Medicaid rates. Issues concerning risk adjustment techniques (section AA. 5.3 of the checklist) are not addressed at this time, pending the release by CMS of guidance on risk adjustment.

---

4. The work group that developed this practice note is fully aware of the sensitive issues surrounding the interaction of "actuarial soundness" and rate adequacy. The reader may choose to refer to Section III for a discussion of the issues that are likely to arise as one performs the task of certifying to "actuarial soundness" of rates.

**II. Overview of Generally Accepted Actuarial Principles and Practices, and the Term "Actuarial Soundness"**

In determining what constitutes generally accepted actuarial principles and practices, the Code of Professional Conduct and, by reference, the Actuarial Standards of Practice (ASOP) have the highest standing. Other items — such as practice notes, textbooks, examination study notes, and articles in professional journals — do not have the same standing. Currently, no ASOP applies specifically to actuarial work performed to comply with CMS requirements for rate certification. Such an ASOP would be unique among health ASOPs, in that it would address actuarial work performed for a ***purchaser*** of health plan benefit coverage. Other health-related ASOPs have scopes that apply specifically to actuarial work performed on behalf of health plans (the entities that bear the risks).[5] Some health-related ASOPs are general, so that they apply both to health actuarial work performed for health plans or to health actuarial work performed for purchasers of health plan services.[6] Certain other ASOPs are general and not specific to health work, so they could be applicable.[7] Note that ASOP 32 on Social Insurance does not apply to Medicaid. ASOP 32 applies to social insurance programs (such as Medicare, listed in the scope paragraph), which have broad-based eligibility requirements. Medicaid, which is conspicuously not included in the scope paragraph, is a public assistance program with strict income and asset eligibility requirements. The reader may wish to refer to *Social Insurance and Economic Security* by George E. Rejda, chapter 2, for more on the distinction between social insurance and public assistance.

In the ASOPs, there is only one place in which "actuarial soundness" is defined – ASOP 26*, Compliance with Statutory and Regulatory Requirements for the Actuarial Certification of Small Employer Benefit Plans*. That standard states:

> Actuarial Soundness — Small employer health benefit plan premium rates are actuarially sound if, for business in the state for which the certification is being prepared and for the period covered by the certification, projected premiums in the aggregate, including expected reinsurance cash flows, governmental risk adjustment cash flows, and investment income, are adequate to provide for all expected costs, including health benefits, health benefit settlement expenses, marketing and administrative expenses, and the cost of capital.

The published comments on the exposure draft of ASOP 26 show that the issue of whether and how to describe "actuarial soundness" of small group premium rates was a significant portion of the work performed by the committee that drafted ASOP 26. That committee noted that "many applicable laws … require the actuary to address *actuarial soundness,"* so the committee found it appropriate to address the issue. Please note, however, that the definition of "actuarial soundness" in ASOP 26, like all of the definitions in all of the standards, is specific to that standard, and does not purport to provide a definition of "actuarial soundness" for all areas and types of actuarial practice.

The above discussion of "actuarial soundness" involves knowledge concerning the health benefit plan's expected costs. An actuary working on behalf of a state Medicaid agency to form an opinion concerning the "actuarial soundness" of rates offered to MCOs would not normally have MCO-specific knowledge like that of the actuary working on behalf of the MCO. A workable assessment of "actuarial soundness" for certifications performed on behalf of state Medicaid agencies would usually take into account the following:

1. The data available to develop rates for populations with current coverage:
   - FFS data for the overall program (before introduction of MCO coverage)

5. ASOPs 3, 6, 7, 8, 10, 11, 16, 18, 19, 22, 25, 26, 28, 31, 33, and 37, as well as Actuarial Compliance Guideline (ACG) 4.
6. E.g., ASOPs 5, 12, 23, and 42.
7. E.g., ASOPs 17 and 41.

- FFS data for all but those voluntarily enrolled in an MCO (choice of one or more MCOs and a Primary Care Case Management (PCCM) or other FFS program)
- FFS data for the months before all recipients are mandated to be enrolled in an MCO
- MCO financial data and/or encounter data (utilization and cost per unit service) from a voluntary MCO enrollment period
- MCO financial data and/or encounter data from a mandatory MCO enrollment period.

2. The types of rate negotiation methods that may be in use by states, such as:
   - The state develops a range for each rate category and negotiates with each potential MCO contractor to settle on a rate within the range. This may involve MCOs submitting bids to the state for each rate cell. This likely results in rates that vary among MCOs for the same rate cell. The state may offer inducements for an MCO to bid lower than the others, such as a larger market share of those recipients who decline to select a particular MCO and must therefore be assigned to one.
   - The state negotiates separately with each MCO contractor.
   - The state develops a set of rates and contracts with MCOs that accept these rates as long as these MCOs also satisfy other requirements. Rates do not vary among MCOs, except for risk-adjusted payment methods, such as the chronic illness and disability payment system (CDPS).

3. The financial condition and operations of participating MCOs:
   - Some MCOs may be Medicaid-only and one-state-only, with no other lines of business or states over which to allocate certain administrative costs. In contrast, some MCOs may have other lines of business (Medicare Advantage, commercial group, and commercial individual) or other states' Medicaid business.
   - Some MCOs may not have gained sufficient enrollment to realize efficiencies of administration, but participation of these MCOs may still be desirable for the appropriate functioning of the state's Medicaid managed care program.
   - Some MCOs may be completely independent financial entities, while others could be wholly owned by other corporations that could control a significant portion of the administrative and reinsurance expenses being allocated to their Medicaid-participating subsidiaries.
   - Some MCOs may be for-profit entities that seek to generate a return while others could be not-for-profit MCOs.
   - Some MCOs may have arms-length negotiations with providers, while other MCOs may be owned by facility and/or professional providers.
   - Some PIHPs are government owned and may not participate in competitive procurement.[8]

The work group developed, for purposes of this practice note, the following proposed definition of "actuarial soundness" to apply to Medicaid managed care rates developed on behalf of a state for submission to CMS (based on the description in ASOP 26 shown earlier):

> Actuarial Soundness—Medicaid benefit plan premium rates are "actuarially sound" if, for business in the state for which the certification is being prepared and for the period covered by the certification, projected premiums, including expected reinsurance and governmental stop-loss cash flows, governmental risk adjustment cash flows, and investment income, provide for all reasonable, appropriate and attainable costs, including health benefits, health benefit settlement

---

8. In these instances, while there would normally be an appropriate risk allowance, CMS also believes that it is usually appropriate to use an 'excess revenues — expenses' approach on prior-approved Medicaid waiver services to Medicaid eligibles or returned to the federal government rather than offsetting other taxpayer expenses that, by statute, should not be charged to the Medicaid program (e.g., roads, bridges, stadiums, care to non-Medicaid eligibles, non-Medicaid services under 1903(i)(17) of the SSA).

expenses, marketing and administrative expenses, any state-mandated assessments and taxes, and the cost of capital.[9]

This definition is only for purposes of this practice note. It is not applicable to any actuarial practice other than actuarial certification of rates for Medicaid managed care programs and does not have the binding authority of a definition in an ASOP.

Some differences between the proposed definition above and the language in ASOP 26 are addressed in the following paragraphs.

"Governmental stop-loss" is included in the practice note description of "actuarial soundness" in recognition of non-insured stop-loss programs funded by states to cover certain costs in excess of specified amounts, or for certain types of services, or for treatment of certain medical conditions.

The words "reasonable, appropriate, and attainable" clarify that the costs of the Medicaid benefit plan do not normally encompass the level of all possible costs that any MCO might incur, but only such costs as are reasonable, appropriate, and attainable for the Medicaid program. In addition, all expected costs directly related to the Medicaid benefit plan would normally be included.

An actuary may be asked to assist a MCO by providing an opinion as to whether the rates bid by the MCO or offered by a state are "actuarially sound" for that particular MCO.[10] The analysis forming the basis of such an opinion would usually include expected costs specific to that MCO. This is a separate and distinct analysis compared to the analysis performed by the actuary who, on behalf of a state, is forming an opinion concerning the "actuarial soundness" of rates to be offered to MCOs and for submission to CMS.

The paragraph above uses the words "'actuarially sound' for that particular MCO." There is no federal regulatory requirement that rates are to be "actuarially sound" for a particular MCO. However, some states may require MCOs that make rate bids or that accept offered rates to provide the state with an opinion as to the "actuarial soundness" (or an opinion addressing acceptability but not using the term "actuarial soundness") of the rates for that particular MCO. An MCO may reasonably decide to accept rates for a particular year while knowing that it expects an underwriting loss in that year. Such a decision may be a reasonable business decision, given that the MCO is entering a new market or expects underwriting gains to emerge in future periods.

Regardless of the method used to arrive at a contract between a state and an MCO, an actuary advising the MCO is usually prudent to make a reasonable effort to confirm that the MCO's management understands the risks inherent in such a contract. Some states require that MCOs produce an actuarial certification that the contracted rates are sufficient but not excessive. Some states have minimum loss ratio requirements that would apply to Medicaid MCO rates. Actuarial certifications for NAIC annual statements (and quarterly statements, in some states for some MCOs) would typically require the development of deficiency reserves if the Medicaid line of business is expected to operate at a loss until the next premium rate change. Numerous ASOPs apply to the actuarial work performed on behalf of MCOs that accept risk on Medicaid and other recipients.

The remainder of this practice note describes items an actuary may wish to consider when certifying that Medicaid rates meet CMS requirements. These include items from the regulation (including the section on "Comments and Responses") as published in the Federal Register and from the rate-setting checklist. Sample certification language is also included.

9. The work group is sensitive to the issue of, on the one hand, providing a road map to understand rate development, while on the other hand, preserving practitioners' freedom to use actuarial judgment in the setting of individual assumptions. For example, Section IV, Item AA.3.2 provides a more comprehensive list of the usual considerations for expense allowance and profit/risk levels.
10. There is no prohibition on a state relying upon an MCO actuary's opinion. In some competitive bidding instances, there may be times when the state chooses to accept and submit to CMS the plan's certification.

### III.  The Medicaid Managed Care Regulation (including the "Comments and Responses" section)

**Overview**
In developing rates for capitated Medicaid managed care programs, actuaries follow the regulatory requirements stated in 42 CFR § 438.6 (c) and are normally familiar with the guidelines stated in the CMS checklist.  In particular, CMS recommends that the "Comments and Responses" section preceding the main body of the regulation be reviewed, since it represents CMS's interpretation of the statutory requirements.

This section provides additional clarification of the regulatory requirements, and identifies areas where they appear to conflict with actuarial practices and principles.

**Regulatory Requirements and Issues:**

1.  **Section 438.6(c)(4)(ii) requires that all payment rates be based only upon services covered under the state plan (or costs directly related to providing these services).**

    **What are some of the issues related to this requirement?  What would CMS allow, and what would actuaries usually do?**

We can classify the non-state plan services into the following categories:
   a.  Substituted services that cannot be built into the rate calculations;
   b.  Substituted services that require demonstration that their equivalent value in state plan services can be included in the rate calculations;
   c.  Additional services that cannot be included in the rate calculations; and
   d.  Additional Medicaid waiver services that can be built into the rate for individuals specifically covered in the waiver (i.e., 1115 or 1915(c) waiver) or into a separate rate for individuals under a 1915(b)(3) waiver. [11]

In the "Comments and Responses" section, it is reported that there were concerns expressed regarding the rule that the state must exclude from the rate calculations any costs related to services that are not in the state plan. The "Comments and Responses" section includes a number of comments that favored the inclusion of these amounts.  In general, these comments can be summarized by the statement, "MCOs must maintain the flexibility to be able to arrange for and provide whatever services most efficiently meet the needs of their members, and these alternative services may not be in the state plan."  The position of CMS is that it will prevent states from obtaining federal financial participation (FFP) for things such as new b(3) services (a reference to the authorizing clause in Section 1915 of the Social Security Act) or other state-funded services, for which FFP would not ordinarily be available, by including them in an MCO, PIHP, or PAHP contract.

When discussing rates which are based on FFS data, the "Comments and Responses" section says that managed care contractors have the ability to provide services that are in the place of, or in addition to, services covered under the state plan and that these additional or alternative services do not affect the capitation rate paid to the MCO by the state.

In response to a comment about the use of encounter data for setting rates, CMS says, "actuaries must adjust the data to reflect FFS state plan services only. States cannot use … services not part of the state plan to calculate "actuarially sound" rates. We are open to suggestions from states and their actuaries, but we will not modify the basic principle that rates be based only on services covered under the state plan."

11. Actuaries are normally prudent to verify both that the data are according to waiver/contract services and that they are appropriately interpreting policy and reflecting the impact in calculated rates.

CMS indicates that it will accept a demonstration of cost efficiency for services that are delivered at the health plan's option. For example, in the substitution of sub-acute days for inpatient days, the rate development would usually convert the non-plan services to plan services on a substitution basis. This process is based on detailed encounter data permitting a comparison of the unit cost of the substituted service with the unit cost of the state plan service. This requirement to demonstrate savings may be more difficult (and perhaps impossible) to comply with if services are offered by a health plan to replace other services but are expected to decrease *future* costs, rather than current costs. Prenatal classes might be an example of this type of service. CMS acknowledges that it is important to allow health plans and states the opportunity to justify offering services that are cost efficient. However, there may be services that are offered to provide a better product to members that cannot be easily justified on a cost efficiency basis. These services may be treated as an administrative expense, classified as member services, or viewed as marketing.[12]

The reader may also wish to refer to:
> (a) Discussion in Federal Register, p. 41003.
> (b) Checklist section 2.4
> (c) Practice note, section IV— checklist discussion on AA. 2.4

2. **Section 438.6(c)(5)(iii) specifies that contracts with incentive arrangements may not provide for payment in excess of 105 percent of the approved capitation payments attributable to the enrollees or services covered by the incentive arrangement, since such total payments will not be considered "actuarially sound."**

**What are the issues and what will actuaries normally do to comply?**

The requirement that the incentive arrangements may not provide for payment in excess of 105 percent of the approved cap payments is a compliance issue and, if violated, would likely result in the payments being considered by CMS as non-compliant.

3. **In the "Comments and Responses" section, there were discussions that highlight actuaries' concerns regarding "actuarial soundness" — specifically, rate adequacy vs. methodology and process.**

**How is rate adequacy normally addressed?**

Rate adequacy is a component of "actuarial soundness."

State rate filings have frequently required an actuarial opinion stating that "the rates are not inadequate, excessive, or unfairly discriminatory." However, the actuary stating the opinion is normally hired by the company filing the rates, either as an employee or as a consultant, and usually has access to the data, assumptions, business plans, etc. that support those rates.

Rate adequacy for Medicaid would normally mean that rates calculated and paid by a state Medicaid agency are likely to cover the costs of the program. The actuary working for the state may only have access to publicly available financial information about the health plans that contract with the state.

---

12. These non-state plan services may also be covered under a b(3) waiver if the state had previously received one. These waivers were to provide FFP for non-state plan services that were paid for using savings realized in moving to managed Medicaid. However, CMS has taken the position that there will be no new b(3) waivers approved. Existing b(3) waivers have been grandfathered effective August 2003; however, CMS has stated that no new non-state plan services can be added, and that the average increase in costs for the b(3) services cannot exceed the average increases in costs for the state plan services.

It is generally difficult to set any specific administrative targets, either in percentage of capitation or amount per member per month (PMPM), without knowledge of the specific environment in each state – including such items as populations covered, services covered, medical costs, access to health care, and other factors.

The same concept applies to profit/risk levels. It is generally difficult to specify a precise value, and this practice note makes no attempt to do so. However, there would usually be appropriate profit/risk margins included in the capitation rates.

Provider reimbursement and medical management are also usually difficult for an outside observer to predict. Thus, the actuary may choose to make estimates based on what is publicly known about the level of Medicaid managed care in a specific state. The actuary may be able to reasonably estimate the level of management of health care from the encounter data.

The discussions on pp. 40998 and 41001 of the Federal Register contain information relevant to this issue.

4. **In the "Comments and Responses" section, the question is raised whether states will have the flexibility to take into account their FFS budgets, and managed care budget authority, when developing "actuarially sound" rates.**

   **How would the actuary usually address this?**

"Actuarially sound" rates or ranges of rates depend on the benefits provided and the population covered. These rates are normally independent of budget issues unless benefits or populations change.

In times of economic downturn, state budgets may exert pressure on rates that must be certified as "actuarially sound." This pressure can build as program expenditures are capped, yet "actuarially sound" rates are usually independently determined. In rate-setting, there is normally a range of reasonable assumptions. Budgetary constraints may influence the selection of certain assumptions toward the low end of the range. However, the actuary would usually be prudent to select assumptions that are individually reasonable and appropriate when deriving the final premium rates.

5. **Does the regulation require each rate cell to be "actuarially sound?"**

Section 438.6(c)(2) requires "all payments" to be "actuarially sound." Pages 40998–40999 of the "Comments and Response" section specifically state that "all payments" refers to individual rate cells. CMS appears to be looking for the certification of "actuarial soundness" to apply to each individual rate cell.

CMS also specifies requirements concerning the establishment of rate cells. Section 438.6(c)(3)(iii) requires states to establish rate cells by eligibility category, age, gender, region and risk adjustment (or explain why any of these factors is not applicable). Section AA.4.0 of the checklist indicates that the key principle is that rate cells should be developed *"whenever the average* [which we interpret as "expected"] *costs of a group of beneficiaries greatly differ from another group and that group can be easily identified."*

CMS expects that rates will usually be developed for appropriate rate cells, taking into account the credibility of the data for each rate cell. Where sufficient data are unavailable to establish a rate for a particular cell, the rate would normally be developed based on blended data from that cell and an adjacent cell. Further, separate rate cells would usually be established only where there is a meaningful difference in expected per capita costs.

6.  **Section 438.6(c)(5)(ii) specifies that, if risk corridor arrangements result in payments that exceed the approved capitation rates, these excess payments *will not be considered "actuarially sound"* if they result in total payments that exceed the amount Medicaid would have paid, on a fee-for-service basis, for the state plan services actually furnished to enrolled individuals.**

    **What are the issues related to this requirement, and what would actuaries normally do?**

This requirement is a compliance issue and, if violated, would likely result in the payments being unable to be determined as "actuarially sound."

State payments under risk corridor arrangements in excess of those permitted by CMS do not meet regulatory requirements.  Since the contracts involved put the MCO at risk, CMS has determined that a limit on total payments should be established.  Therefore, in developing both base rates and risk corridors, the actuary would usually consider the potential range of variation in experience that may emerge, so that in the aggregate the contractual arrangement meets the regulatory requirement under likely scenarios.[13]

---

13. In situations where there is little or no data on which to base rates, and risk corridors are being used, discussions with CMS may be appropriate to support compliance.

## IV. CMS Rate-setting Checklist

CMS provides materials for regional offices to utilize in reviewing and approving contracts and capitation rates associated with Medicaid managed care programs. One of these tools is a checklist to be used by the regional offices in reviewing and approving the rates under 42 CFR 438.6(c) for all Medicaid managed care programs, excluding the PACE capitated programs. An actuary preparing capitation rates for use in Medicaid managed care programs would usually review and become familiar with the most recent version of the checklist. This section of the practice note provides a general overview of the checklist, as well as an outline of areas of the checklist that may have a potential for misinterpretation or may be counter to generally accepted actuarial practice. The comments prepared in this section relate to the checklist entitled "Appendix A. PAHP, PIHP, and MCO Contracts, Financial Review Documentation for At-risk Capitated Contracts Ratesetting, Edit Date: 7/22/03."

### Overview

The checklist was developed by a CMS work group that had previously been involved in the development and/or review of capitation rates for managed care programs. Based on its own experience, as well as the regulatory requirements of 42 CFR 438.6(c), the work group prepared the checklist document to assist the regional offices in reviewing the materials prepared and submitted by the states and their consulting actuaries in support of their proposed Medicaid managed care capitation rates.

The checklist has been separated into seven primary sections. The rate-setting actuary would usually review the checklist document to become broadly familiar with each of these items. In reviewing the checklist, the rate-setting actuary may find it helpful to recognize that some of the items outlined may not be found in the rate-setting methodology that was used. Several of the items that are identified in the checklist relate to contractual or state regulation. The actuary may want to discuss these items with state Medicaid personnel to identify any likely impact on the rate-setting methodology. The following provides a brief description and overview of each section.

**AA.1.0** — *Overview of Rate-setting Methodology*. This section requires documentation regarding the general rate-setting methodology and contract procurement and the actuarial certification. Under the contract procurement section, two methodologies are outlined: open cooperative contracting and competitive procurement. Under the open cooperative contracting methodology, the actuary may establish a single rate for each rate cell the state would use in contracting with the MCOs. Under the competitive procurement methodology, the actuary may establish a range of rates for each rate cell.[14] The actuary's range of rates would normally be used as a guide for either contract negotiations by the state or for submission of bids by the MCOs. A sample of an actuarial certification has been provided in Section VI of this practice note.

**AA.2.0** — *Base Year Utilization and Cost Data*. This section outlines the types of data and information that may be used in the establishment of the capitation rate. The checklist indicates that the base year utilization and cost data should be consistent with the Medicaid services and population that will be covered by the contract. With respect to the Medicaid population selection, the actuary would normally become familiar with the different populations that are included or excluded from the MCO contract, including dual-eligibles and spend-down recipients. The checklist allows for the use of Medicaid FFS data, Medicaid managed care data, or non-Medicaid data. The checklist describes the types of services that may be used in the analysis. The checklist provides a description of the requirement for inclusion of state plan services only and possible allowances for additional services.

---

14. CMS has received some rate ranges based upon "Degree of Health Care Management" whereby the actuary assumed a higher or lower level of "care management" to develop the rates. CMS usually expects to see justification as to why the state or actuary expects a range of rates to be appropriate (e.g., inflation, trend, utilization variances).

**AA.3.0** — *Adjustments to the Base-Year Data*. The section outlines the types of adjustments that would be allowed on the base-year data to develop the capitation rates. The checklist provides a listing of many items concerning which the actuary would usually exercise professional judgment to determine the appropriateness of the adjustment based on the underlying base-year data chosen. This section of the checklist illustrates the desirability of a movement from the prior upper payment limit rate-setting calculation methodology to the development of a capitation rate that would be "actuarially sound." For example, the factors reflect adjustments to reimbursement per unit of service,[15] utilization rates, and contractual obligation or benefit differentials so that the rates are "actuarially sound" for the covered Medicaid population. The rate-setting actuary is challenged to develop a rate that would be "actuarially sound" for a third-party entity. Usually, each of the adjustments would be carefully reviewed for applicability. The outlined adjustments typically include one for the review of the financial experience of the health plans. The rate-setting actuary would normally be familiar with the process of reviewing financial statements and interpreting the results.

**AA.4.0** — *Establish Rate Category Groupings*. This section of the checklist outlines different rate-setting categories that would normally be considered in the establishment of the capitation rates. The rate-setting categories include age, gender, locality/region, and eligibility categories. The checklist indicates that each of these components would normally be used in establishing rate-setting categories, unless omitting a component or combining a rate category with an adjacent category can be justified.

**AA.5.0** – *Data Smoothing, Special Populations, and Catastrophic Claims*. This section of the checklist outlines methodologies that may be used in the examination and modification of the data to reflect any data distortions or special populations. The checklist indicates that it is usually preferable for the data smoothing techniques to be cost-neutral. The checklist provides a brief definition of cost-neutrality for the actuary to review. This section also briefly discusses the use of health status-based (or diagnosis-based) risk adjustment.

**AA.6.0.** — *Stop Loss, Reinsurance, or Risk sharing Arrangements*. This section of the checklist includes an outline of the use of reinsurance, either commercial or state-sponsored, in the determination of the capitation rate. The regulations call for inclusion of these provisions to be determined on an "actuarially sound" basis. The risk corridor limit compares total payments to MCO state plan services provided, priced at the Medicaid FFS fee schedule, plus an amount for MCO administrative costs. A risk corridor or risk sharing mechanism may involve the actuary comparing the cost of the managed care program to a FFS program before receiving approval from CMS for the inclusion of a risk corridor program. The checklist discusses the inclusion of a risk corridor program and provides an example.

**AA.7.0** — *Incentive Arrangements*. This section of the checklist outlines the use of incentive arrangements in the contract between the state and the MCO. An incentive arrangement provides additional funds in excess of the capitation rates for meeting specified targets. The checklist states that the incentive arrangement payment may not increase total payments above 105 percent of the approved capitation rates. Additionally, all incentives are expected to be determined through the use of an "actuarially sound" methodology.

## Considerations in Complying with the Checklist

This section of the practice note discusses items that may be considered by the rate-setting actuary when developing the capitation rates and complying with the checklist. The checklist is a general document and probably does not cover every circumstance the actuary may encounter. Should the actuary think it appropriate to deviate from the guidance provided in the checklist, he or she would usually be prudent to describe and explain the deviation.

15. One commenter noted that "adjustments to reimbursement per unit of service" for the impact of intergovernmental transfers have been particularly problematic in the development of rates.

**Section AA.2.0** — *Base-Year Utilization and Cost Data*. This section states, "States without recent FFS history and no validated encounter data will need to develop other data sources for this purpose. States and their actuaries will have to decide which source of data to use for this purpose, based on which source is determined to have the highest degree of reliability, subject to RO approval."

**Comment:** The actuary should consider ASOP #23 (Data Quality) in the development of the base-year data. Generally, the actuary would consider all available data, including the Medicaid FFS data, Medicaid managed care encounter data, Medicaid managed care financial reports and Medicaid MCO financial statements. The actuary typically would compare data sources for reasonableness and check for material differences when determining the preferred source(s) for the base-period data.

The checklist refers to several data sources CMS would consider appropriate. The actuary typically would consider these data sources as well as the most recent available data that, in the actuary's professional judgment, appear to be reliable and well-suited to the assignment. The checklist acknowledges that there are instances where the commonly used data sources are unavailable.

**Section AA.2.4** — *State Plan Services Only*. This section states, "The state must document that the actuarially sound capitation rates are appropriate for the services to be furnished under the contract and based only upon services covered under the state plan." Additionally, "Services provided by the managed care plan that exceed the services covered in the Medicaid state plan may not be used to set capitated Medicaid managed care rates."

**Comment:** The actuary may want to remove the value of non-state plan services and add in the value of any significant state-plan services that are not reflected in the data. Additionally, as FFS data erodes, data and information for developing the amount of the adjustment for substituted services may not be available.[16]

**AA.3.0.** — *Adjustments to Base-Year Data*. This section states, "The state made adjustments to the base period to construct rates to reflect populations and services covered during the contract period. These adjustments ensure that the rates are predictable for the covered Medicaid population."

This section includes adjustments that are more specific to the Medicaid rate-setting process than the rate-setting actuary will normally have encountered in the commercial or Medicare managed care environments. The rate-setting actuary is usually prudent to understand each of these adjustments and discuss these items with state Medicaid personnel as necessary. Additional comments related to the other adjustments are as follows.[17]

> Pharmacy rebates – State Medicaid programs, which participate in the federal drug rebate program, receive additional rebates for prescribed medications. The rebates are generally greater than rebates received by managed care organizations through their prescription drug contracts.

> Managed care adjustment – This adjustment may have a significant impact on the development of the capitation rate or rate ranges. The adjustment may be developed based on the reported experience of managed care organizations, be it publicly available or commercially available information. The managed care adjustments will usually affect both utilization rates and unit costs

---

16. Capitation rates may be based only on Medicaid state plan services to Medicaid covered eligibles, so an actuary would initially remove the value of non-state plan services. The actuary is usually careful to not reincorporate the value of these excluded services.
17. One commenter mentioned that managed care adjustment (initial or update) assumptions may also result from encounter data analysis benchmarking, or on-site operational reviews measuring the medical utilization and cost management effectiveness of the MCO(s). Assumptions could also be derived from state and/or MCO expectation of continuous improvement in the MCO's medical utilization and cost management.

<u>Financial experience adjustment</u> –This adjustment is most often used for a rate update approach, rather than a rate re-basing approach. These adjustments would usually arise only when calculating future rates based on prior rates.

**AA.3.2.** — *Administrative Cost Allowance Calculation*. This section says that the state must document that the rate was adjusted to account for MCO, PIHP, or PAHP administration.

In determining an appropriate level of an administrative cost allowance, the rate-setting actuary may want to consider the following items:

- Overall size across all lines of business
- Lines of business covered by the capitation
- Age of the health plan or years of participation in Medicaid
- Organizational structure
- Demographic mix of enrollees
- Marketing expenditures
- Claims processing expenditures
- Medical management expenditures
- Staff overhead expenses
- Member services
- Interpreter services

The section further notes, "CMS does not have established standards for risk and profit levels but does allow reasonable amounts for risk and profit to be included in capitated rates."

**Comment:** In the determination of an appropriate level of a profit and risk allowance, the rate-setting actuary may want to consider the following items:[18]

- Contingency margin
- Contribution to surplus
- Investment rate of return
- Profit margin

**AA 3.7** — *Copayments, Coinsurance, and Deductibles in Capitated Rates*. This section says, "If the state uses FFS data as the base data to set rates and the state Medicaid agency chooses to not impose the FFS cost-sharing in its pre-paid capitation contracts with entities, the state must calculate the capitated payments to the organization as if those cost-sharing charges were collected."

**Comment:** When determining the appropriate adjustment for copayment amounts, an actuary considers an appropriate adjustment for a collection percentage associated with the copayment amounts.

**AA.3.10** — *Medical Cost/Trend Inflation*. This section states, "Medical cost and utilization trend inflation factors are based on historical medical state-specific costs or a national/regional medical market basket applicable to the state and population. All trend factors and assumptions are explained and documented."

18. It may be appropriate for the actuary to consider the public nature of the venture (e.g., government owned PIHPs). Governmental entities without competitive procurement may not be permitted to have contribution to surplus, investment rate of return, or profit margin because this contributes to the federal Medicaid budget subsidiary programs not under Title XIX. Refer to OMB-A87 and 1903(i)(17) of the SSA. The actuary is usually prudent to have considered all relevant factors in selecting an appropriate level of profit and risk allowance.

**Comment:** The actuary may choose to consider a number of elements in establishing both utilization and unit cost trend rates. Utilization trend rates typically will be affected by changes in demographics, medical technology, benefit levels, and the degree and emphasis of medical management. Unit cost trends may be affected by changes in state-mandated fee schedules (if applicable), FFS cost levels, and provider contracting performed by the health plans. The contracted rates between the MCO and providers are potentially the most variable, by plan and by local market, and least likely to be known by the state's actuary. Therefore, a range of estimates may be more appropriate in accordance with the actuary's professional judgment. However, the rate-setting actuary may be requested to establish a single-point estimate for a cost trend.

Projection of future results through the projection of trend rates typically requires the most flexibility and judgment of any part of the rate analysis. Historical results from FFS or other data sources would normally be considered but not fully relied upon, because the mix of providers and services and the market landscape may have changed. In particular, FFS data may have deteriorated or may not apply in heavily managed care environments. Depending on the timing and impact of managed care implementation— and on market penetration and growth — increasing, flat, or decreasing trends may occur. Local market conditions are generally more important, but harder to determine, than statewide or nationwide trends.

**Section AA.3.12** – Utilization and Cost Assumptions – This section states, "The State must document that the utilization and cost data assumptions for voluntary programs were analyzed and adjusted to ensure they are appropriate for populations to be covered if a healthier or sicker population voluntarily chooses to enroll."

**Comment:** The rate-setting actuary would normally consider the data used to develop the adjustment. If encounter data from the MCOs were used, the population may have shifted from the time of the base period to the time of the rate period. If some other base was used, the rate-setting actuary would usually verify that the adjustment appears to be appropriate. Examples of such adjustments would be those for a program change or expansion in the covered population.[19]

**AA.5.2** – Cost-neutral data smoothing adjustment – This section states, "If the State determines that a small number of catastrophic claims are distorting the per capita costs then at least one of the following cost-neutral data smoothing techniques must be made."

**Comment:** The cost-neutral data smoothing techniques outlined call for the rate-setting actuary to balance the potential for adverse selection with the actual risk assumed by the managed care organizations. The checklist defines "cost neutral" as a process that results in no aggregate gain or loss across all payments categories. The rate-setting actuary may wish to select an appropriate methodology for pooling large claims or the inclusion of reinsurance.

**AA.5.3** – Risk Adjustment – This section discusses the optional use of risk adjustment based upon enrollees' health status or diagnosis and requires that the risk adjustment be cost neutral.

**Comment:** The rate-setting actuary is usually prudent to be broadly familiar with the theory and statistical success as well as the inherent strengths and weaknesses of the risk adjustment model the state employs. Background materials on such models are frequently available through the Society of Actuaries and the American Academy of Actuaries, including several reports that outline the statistical characteristics of the models.

---

19. It is normally appropriate to include an analysis of whether or not the population covered under the contract has a different acuity than the data being used to set the rates.

The diagnosis-based risk adjustment methodologies generally utilize statistical models based on historical FFS or managed care base data. The reliance on diagnosis-specific data may be hindered by the capitation contracts that are often encountered in managed care programs. The capitation contracts may result in underreporting of encounter data to the managed care organization, and subsequently to the state Medicaid encounter system. The underreporting will usually result in a lower morbidity score than what might result from a review of all claims.

The rate-setting actuary would typically consider the adjustment technique that will be utilized in the rate-setting process. The diagnosis-based risk adjustment methods may be implemented using either concurrent or prospective adjustments. The actuary would usually consider the criteria for evaluating a risk adjustment mechanism that are identified by the Society of Actuaries and the American Academy of Actuaries in the reports mentioned above.

**AA.7.0** – Incentive Arrangements – This section states, "CMS will not consider payment rates to be actuarially sound if incentive arrangements provide for payment in excess of 105 percent of the approved capitation rate payments attributable to the enrollees or services covered by the incentive arrangements…"

**Comment:** The requirement that the incentive arrangements may not provide for payment in excess of 105 percent of the approved capitation payments is a compliance issue, and if violated, would normally result in the payments being unable to be determined as "actuarially sound."

In determining an "actuarially sound" incentive, the actuary would normally consider the specific criteria associated with utilization targets established within the terms of the contract. The amount of the incentive would usually reflect the cost of providing the services specified in the incentive clause. For example, if there is an incentive payment associated with increasing the number of members receiving physical examinations, then the incentive payment typically would be based in part on the cost of providing the additional physicals.

The checklist is not clear if the 5 percent limitation is by rate cell or in total. As an illustration, in the example of providing physical examinations to adults, it is unclear if this particular incentive payment is limited to 5 percent of the adult capitation payments, or if it is only the sum of all incentive payments that is limited to 5 percent of the total capitation payment made to the health plan.

## V. Documentation

This section provides an overview of documentation for Medicaid managed care rate development.[20] The actuary usually develops documentation in support of the actuarial work product. The extent of the documentation is normally appropriate to the circumstances for which the rates are developed. These items are indicated on the checklist. The documentation typically describes the relevant data, sources of data, material assumptions, methods and process by which the rates were developed with sufficient clarity that another qualified actuary practicing in the same field could make an objective evaluation of the reasonableness of the work product. Note that, for an actuary working on behalf of a state Medicaid agency, the regulation does not require that the documentation be shared with any party – such as a participating MCO – other than the actuary's client (i.e., the state).

The actuary normally explains the reason(s) for and describes the effect of any material changes in sources of data, assumptions or methods from the last analysis.[21]

Generally speaking, there are four key areas to be documented:

A. Data integrity

B. Experience period data

    1. Items related to claims data

    2. Items related to administrative cost allowance

C. Trend factors

D. Risk

The extent of the documentation would usually be, at a minimum, the level required in the checklist. The required documentation identified in the checklist includes the source(s) of data, material assumptions, the methods used, and the process by which the rates were developed. The actuary would usually explain the reason(s) for and describe the effect of any material changes in the source(s) of data, assumptions, or methods from the last rate-setting.

---

20. The documentation would usually include, at a minimum, the following five elements: 1) The state submits the actuarial certification for the final rates to be paid to the contractors; 2) Rates may be based only on Medicaid services; 3) Rates may only pay for services to Medicaid beneficiaries; 4) The state submits an expenditure projection comparing previous and proposed rates; and 5) The State explains any incentives or risk-sharing. Additional guidance on documentation may also be obtained from ASOP No. 31. Actuaries can appropriately prepare by examining approved Medicaid State Plans, waivers and contracts in order to understand the Medicaid services and Medicaid beneficiaries that are to be covered in the rates.

21. The documentation would usually be available to the actuary. The sharing of documentation is generally under the control of the actuary's client.

A. <u>Documentation of Data Integrity</u>.[22]  The actuary normally documents how the following issues are addressed in the ratemaking process, to the extent that they are relevant and material:

- Choice of experience period

- Choice of experience data

- Credibility/validation of data

- Adjustments and use of external data

1. Experience Period:  For documentation purposes, an explanation of the basis by which the experience period was selected would usually be provided.  For Medicaid ratemaking projects, the fiscal calendar may dictate the basic parameters of the project.  The experience period will usually be selected to be the most recent, with sufficient time for reasonable runout to allow the rates to be determined in the fiscal process. If a different experience period than is normally used in the fiscal process is used, its use would typically be disclosed and explained.

2. Experience Data:  Documentation would usually be provided so that only State Plan approved services that are the responsibility of the managed care organization are included in the base data (AA.2.4). A data book accompanies many managed Medicaid ratemaking projects.  The data book typically provides a summary of the base data, often in sufficient detail to calculate experience period PMPM rates by rate cell.

3. Credibility/Validity: The methods and procedures used to validate the data would normally be documented.

4. Adjustments Made/Use of External Data: The source and relevance of any adjustments made or external data used in "completing" or enhancing the base data would usually be provided.

B. <u>Documentation of the Development of Experience Period Costs</u>.  The actuary would usually document how the following issues are addressed in the ratemaking process, to the extent that they are relevant and material:

- Calculation of exposure units

- Adjustments to experience data

- Policy and provider contract provisions

- Mix of Business [23]

1. Items related to claims data

The majority of the discussion in the previous section was on claims experience, its analysis, use, and modification (or adjustment).  The current section begins to make refinements to the claims data, to begin to put it in a framework of developing rates.  The claims experience will generally be divided by exposure units.  This step presumes an appropriate mechanism has been developed to establish rate category groupings.

22. CMS requires base utilization and cost data from a Medicaid population or similar population adjusted to reflect only Medicaid services and eligibles.  CMS further requires actuaries to use actual databases instead of samples to create the base data.
23. As the actuary examines splits of eligibles by demographic category, it might be determined that a mix of business adjustment would be beneficial between two rate cells due to shifts in exposure and cost.

- Exposure Units: This step is intended to encompass several items. The rate category groupings used would normally be documented, especially if there is a change from the prior structure. If specific population sub-groupings are expected to undergo special changes (due to program changes, redefinitions, or anticipated economic shifts), the actuary may choose to disclose how these factors adjusted the expected results. Documentation would usually include a description of the impact of retroactivity and plans' contractual responsibilities, when appropriate. Adjustments made to ensure that exposures are consistent with accepted base experience data (e.g., if a plan's encounter data were removed because they were considered invalid, also remove exposures) would also usually be documented (AA.3.4).

- Adjustments to Experience Data: To the extent adjustments differ between rate cells, documentation would normally reflect the differences.

- Operational/Benefit Changes: If an operational change is expected to impact the ratemaking, it would usually be described. Examples might include carving out a formerly covered service, or bringing a formerly carved out service back into the at-risk rates. A new type of service might be added or removed from covered services since the base year. An explanation of the change and its impact would usually be provided (AA.3.1).

- Investment Income: To the extent new benefits or new population groupings are added to the managed care program, or carved-out services are added back, there might be a lag in claims versus funding and an adjustment for investment income might be appropriate. An investment income adjustment can also be used when using FFS data. If used, disclosure and documentation are normally provided.

- Special populations adjustments: The checklist states that this adjustment can only be made if the population has changed since the base period experience data. If this occurs, an explanation of the adjustment would usually be provided (AA.3.3).

- The actuary usually discloses whether any DSH payments are included in the rates (AA.3.5); typically they are not.

- With respect to third-party liability, the actuary normally explains the TPL arrangement and documents any significant adjustments (AA.3.6).

- Policy and Provider Contract Provisions: To the extent that deductible, coinsurance, copays, coverage limitations and coordination of benefits impact the Medicaid managed care population or expanded populations, it may be appropriate to model policy and contract provisions against available data and their documented impact (AA.3.7). The Medicaid checklist discusses incentive arrangements, and requires the parameters of the program and its impact to be documented (AA.7.0).

- With respect to graduate medical education (GME), the actuary usually documents any material adjustments (AA.3.8).[24]

- With respect to FQHC/RHC, the actuary usually document any material adjustments (AA.3.9).[25]

- Smoothing/Large Claims (Shock Loss Claims): The effect of large claims, including the effect

---

24. States may pay GME outside of capitation rates only if these payments are excluded from the capitation rate and are not more than they would have been under FFS.

25. CMS has specific requirements that the actuary usually considers in the documentation of the appropriate treatment of services rendered by FQHC/RHCs.

of large claims on the experience period data and on the projection of historical data to the rating period, and how the cost of large claims is incorporated in the ratemaking process would normally be documented. The effect of reinsurance arrangements is often related to the discussion on large claims.

Smoothing can be used to reduce distortions in the data caused by a few large claims. The checklist requires smoothing to be cost-neutral. Documentation on the technique used would usually be provided.

- Any additional material adjustments would normally be explained.

2. Items related to expense allowance

- Administrative Expenses: Expenses are usually an important part of the development of rates. In general terms, expenses are sometimes referred to as retention. Retention includes expenses, as well as risk charges (possibly for pooling or other contingencies), the cost of capital and the ability to support reserves (and capital) needs with a contribution to surplus. Assumptions used to adjust for each of these factors would normally be documented. (AA.3.2)

- The documentation may address the treatment of other items of retention, including all provision for risk charges and the cost of capital and the ability to support reserves with a contribution to surplus.[26]

C. Documentation of Trending Factors. The actuary would typically document how the following issues are addressed in the ratemaking process, to the extent that they are relevant and material:

- Trend Measurement

- Claim Cost Trend Factors

- Other Trend Factors

The documentation of trend and its measurement and application can be a critical area to understand. The report would usually include a comparison of last year's trended rates to this year's estimates.

- Trend Measurement and Trend Selection: The method of developing cost and utilization trend factors would usually be documented in appropriate detail.

- Claim Cost Trend Factors: The factors affecting the change in claim costs over time would typically be discussed. Unless otherwise accounted for, these factors usually include, but are not limited to: general price inflation, leveraging, changes in provider contract, medical cost inflation, changes in medical practice, demographics, changes in policy provisions, and utilization.

- Other Trend Factors: The factors affecting the change of other ratemaking parameters over time would normally be disclosed.

D. Issues Related to Documentation of Risk. The actuary would normally document how the following issues are addressed in the ratemaking process, to the extent that they are relevant and material:

- Risk Provision: In an at-risk ratemaking process, there is typically an expectation that a participant should have a reasonable probability of achieving target-operating margins. The target-operating

26. Risk charges are also addressed in Section D, Issues Related to Documentation of Risk.

margin would usually be disclosed. If the target-operating margin is 0 percent for the entire system, one scenario is that 50 percent of the participants will exceed the target and 50 percent will not. In this simple example, for plans to achieve target-operating margins, the operation of the plans as a whole would usually be expected to achieve a more efficient delivery of care than the assumptions suggest. Many actuaries prefer the target-operating margin to be positive (i.e., rather than be 0 percent). They believe that this level of target margin would normally be achievable by a health plan operating in an efficient manner within the program guidelines.

- Stop Loss, Reinsurance, or other Risk Sharing: Rates would normally be adjusted to reflect the risk the State is willing to assume. Documentation on the effect to the rates would usually be provided. This risk factor is covered in Subsection 6.0 of the checklist.

- External Influences: This factor appears to describe the pressures that might be affecting state budgets. Refer to Section III, Item 4 of this draft, for guidance on this issue. Other external influences may come to the actuary's attention. Since these circumstances will most likely not have an existing body of knowledge or data available, discussion with CMS early in the process is recommended in most instances.

- Risk Classification Plan: The issue of risk classification is directly covered in the checklist at Subsection AA.5.3 The documentation would usually include:

  - An explanation of the risk assessment methodology chosen

  - Documentation on how payments will be adjusted

  - Demonstration of cost neutrality

  - Procedures for monitoring and re-basing

## Conclusion

Normally, the actuary's documentation would address the reasonableness or appropriateness of the assumptions and methodology used in the ratemaking process. The chosen data, assumptions used, and adjustments made would usually be provided. The size and effect of any significant adjustments would usually be included, as well as a statement to the effect that the adjustments are mutually exclusive and are not being applied more than once if such a statement is accurate.

# VI. Certification Language[27]

<div align="center">

**Sample Certification Language**
**State of XXXXX**
**Actuarial Certification**

</div>

I, {your name}, am an employee of the Division of Medical Services of the State of XXXXX. {If a consulting actuary, the actuary would usually indicate the company affiliation.} I am a Member of the American Academy of Actuaries {mandatory} and an Associate / Fellow of the Society of Actuaries {if applicable}. I meet the qualification standards established by the American Academy of Actuaries and have followed the practice standards established from time-to-time by the Actuarial Standards Board. I have been employed {either as an employee or as a consultant} by the State of XXXXX for the past YY years and am generally familiar with the state-specific Medicaid program, eligibility rules, and benefit provisions.

The capitation rates provided with this certification are considered "actuarially sound" for purposes of 42 CFR 438.6(c), according to the following criteria:

- the capitation rates have been developed in accordance with generally accepted actuarial principles and practices;
- the capitation rates are appropriate for the Medicaid populations to be covered, and Medicaid services to be furnished under the contract; and,
- the capitation rates meet the requirements of 42 CFR 438.6(c).

The assumptions used in the development of the "actuarially sound" capitation rates have been documented in my correspondence with {either the state or the MCO}. The "actuarially sound" capitation rates / rate ranges that are associated with this certification are effective for the YY month period beginning July 1, 200X.

The "actuarially sound" capitation rates are based on a projection of future events. It may be expected that actual experience will vary from the experience assumed in the rates.

In developing the "actuarially sound" capitation rates, I have relied upon data and information provided by the State. I have relied upon the State for audit of the data. However, I did review the data for reasonableness and consistency (if applicable).

The capitation rates developed may not be appropriate for any specific health plan. An individual health plan will need to review the rates in relation to the benefits that it will be obligated to provide. The health plan should evaluate the rates in the context of its own experience, expenses, capital and surplus, and profit requirements prior to agreeing to contract with the State. The health plan may require rates above, equal to, or below the "actuarially sound" capitation rates that are associated with this certification.


_____        _____

John Q. Smith                                  Date
Member, American Academy of Actuaries

---

27. This sample certification language is offered solely for educational purposes and is not intended to limit in any way the content of individual actuaries' certifications. The actuary is encouraged to develop appropriate language for each certification, and is under no obligation to make use of the sample language offered here.



AMERICAN ACADEMY *of* ACTUARIES

1100 Seventeenth Street NW
Seventh Floor
Washington, DC 20036
Telephone 202 223 8196
Facsimile 202 872 1948
www.actuary.org

# Exhibit O



**Fact sheet**

# Better Care. Smarter Spending. Healthier People: Why It Matters

Jan 26, 2015    Billing & payments, Initiatives, Quality

### Better Care. Smarter Spending. Healthier People: Why It Matters

We are taking action to build on progress made in improving health care so patients and their families can get the best care possible. Our goal is to spend our health care dollars more wisely, so—ultimately—people can live healthier lives. These shared goals are important:

- **For patients and families**: Giving doctors the opportunity to focus on patient-centered care and to be accountable for quality and cost means keeping people healthier for longer. It also creates opportunities for providers to spend more time with their patients.
- **For providers**: We have an opportunity to realign the practice of medicine with the ideals of the profession—keeping the focus on patient health and the best care possible.
- **For employers**: A healthier workforce means fewer sick days and costly medical expenses, and healthier employees are more productive. Cost savings also mean a higher bottom line and allow businesses to do more for their employees.
- **For taxpayers and the economy**: Businesses lose billions of dollars each year because of health problems of their employees.  Health care costs also account for a significant portion of household and business expenses. Progress on both these fronts makes our country more competitive in the global economy.
- **For states**: Health care costs consume a significant portion of state budgets. We can find ways to spend those dollars more wisely and improve care.
- **For insurance companies**: Lowering the costs of health care, while maintaining quality, means keeping premiums affordable.

### What is Better, Smarter, Healthier?

To achieve better care, smarter spending and healthier people, we are focused on three key areas: (1) improving the way providers are paid, (2) improving and innovating in care delivery, and (3) sharing information more broadly to providers, consumers, and others to

delivery, and (3) sharing information more broadly to providers, consumers, and others to support better decisions while maintaining privacy.

**Payment Incentives**: When it comes to improving the way providers are paid, we want to reward value and care coordination – rather than volume and care duplication. Many providers today receive a payment for each individual service, such as a physician visit, surgery, or blood test, and it does not matter whether these services help (or harm) the patient. Conversely, providers are generally not paid to keep their patients healthy before diseases like diabetes develop or worsen. In other words, providers are paid based on the volume of care provided rather than the value of care provided. We want to pay providers for what works – whether it is something as complex as preventing or treating disease or something as straightforward as making sure a patient has time to ask questions. Alternative payment models such as Bundled Payments or Accountable Care Organizations generally make doctors and hospitals attentive to the total costs of treating a patient at a high level of quality, giving clinicians the opportunity to focus on quality, patient-centered care. These and other models are being tested as important approaches for improving care and lowering costs, and already we are seeing positive results.

By setting ambitious, but achievable goals for the adoption of these new payment models we expect that health care providers can move with greater certainty towards these approaches, with proven benefits for patients and families.

**Care Delivery**: To improve care delivery, we are supporting providers to find new ways to coordinate and integrate care. And we are also focused on improving the health of our communities – with a priority on prevention and wellness. When a patient is admitted to the hospital or referred to a specialist without effective coordination between providers, it can lead to duplicative X-rays or lab tests that mean wasted time and money to the patient. With more emphasis on coordinated care, patients are more likely to get the right tests and medications rather than taking tests twice or getting procedures they do not need. Better care coordination can also mean giving patients more quality time with their doctor; expanding the ways patients are able communicate with the team of clinicians taking care of them; or engaging patients and families more deeply in decision-making. For example, if a patient is discharged from the hospital without clear instructions on how to take care of themselves at home, when they should take their medicines, or when to check back in with the doctor, it can lead to an unnecessary readmission back into the hospital for easily preventable harms. This is especially true of individuals who have complex illnesses or diseases that may be more difficult to manage. We are supporting care improvement through a variety of channels, including facilitating hospitals and community groups teaming up to share best practices.

**Information Sharing**: As we look to improve the way information is distributed, we are working to create more transparency on the cost and quality of care, to bring electronic health information to inform care, and to bring the most recent scientific evidence to the

point of care so we can bolster clinical decision-making. While we have made great strides

in encouraging and supporting the adoption of electronic health records, there are many areas where important information is missing. For example, many important providers in the health system such as nursing homes do not have electronic health records to be able to store and share health information electronically with their patients or other providers, and some providers find that their electronic health records do not share information (i.e. are not "interoperable") with other systems as easily as they would have hoped.

When information is available to the treating physician across all settings of care, patients can rest assured that all their relevant information is being tracked accurately and they are not asked to repeat information from recent hospitalizations or laboratory tests. Doctors can get electronic alerts from a hospital letting them know that their patient has been discharged and can proactively follow up with special care transition management tools. And doctors can use health care data to make improvements to their care delivery strategies. For example, if a doctor notices through data that only 40 percent of her patients over age 50 are being tested for colon cancer screenings, she can set up an electronic system to automatically notify her if a patient has not had a test. Early detection can mean early cures without radiation or chemotherapy and lives saved.  And automatic medication alerts can help patients take their medications properly and avoid medication errors.

We are also expanding access to cost and quality information to enable smarter decision-making about where and how to get the best care possible. In most cases, the patient knows neither the cost of their care nor the quality of the service they are about to receive. But with more data, for example, a patient could choose to get a hip replacement from the provider with the track record of superior outcomes. There is tremendous opportunity to improve value and choice for consumers and providers by empowering them with information.

###

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services.

7500 Security Boulevard, Baltimore, MD 21244