UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:21-cv-00191

———

**State of Texas et al.,**
*Plaintiffs,*

v.

**Chiquita Brooks-LaSure et al.,**
*Defendants.*

———

## OPINION AND ORDER

In January 2021, a federal agency approved Texas's request to extend and amend the State's long-running, managed-care system for the delivery of most Medicaid services. Texas and numerous medical-service providers relied on that approval, investing heavily in and counting on implementation of the extension and amendments. A few months later, in April 2021, the agency announced that it had revisited the matter and had wrongly excused a procedural step allegedly needed to issue the approval, so the agency was rescinding and withdrawing that approval.

Turmoil in the State's Medicaid program resulted, as did this lawsuit. Texas now moves for a preliminary injunction on its challenge under the Administrative Procedure Act to the agency's rescission. Defendants oppose an injunction and move to dismiss, arguing that the court lacks jurisdiction and that injunctive relief is supported by neither the merits nor equity. After briefing and oral argument, the court denies the motion to dismiss and grants the motion for a preliminary injunction.

### Background

The federal Medicaid program aims, through a series of state partnerships, to provide healthcare to individuals who fall below certain income thresholds. The federal agency administering the program is the Centers for Medicare and Medicaid Services, or CMS.

The Social Security Act sets forth a slew of mandatory requirements for participating States, who must submit a state plan that details how those requirements will be met. Once each plan is approved, the States "administer Medicaid with little to no oversight, but the federal government pays a large portion of state administrative expenses." Nicole Huberfeld, *Federalizing Medicaid*, 14 U. Pa. J. Const. L. 431, 447 (2011).

To allow flexibility from the default requirements of the Social Security Act, CMS may issue a waiver that exempts a State from those statutory requirements. One common waiver is authorized by § 1115 of the Act, codified at 42 U.S.C. § 1315. Such a waiver allows a State to implement an "experimental, pilot, or demonstration project" that diverges from federal requirements so long as the project "is likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a).

To obtain a § 1115 waiver, States must file an application with CMS and comply with various statutory and regulatory requirements. As relevant here, the State generally must engage in two notice-and-comment phases. First, before submitting a demonstration-project application to CMS, the State must conduct a 30-day notice-and-comment period at the state level, along with at least two public hearings to allow citizens and relevant stakeholders to provide their input. 42 C.F.R. § 431.408. Second, after CMS has received an application and marked it as complete, CMS will solicit public comment in a federal notice-and-comment period. *Id.* § 431.416.

In 2011, Texas applied for and received a § 1115 waiver for its demonstration project, the Texas Healthcare Transformation and Quality Improvement Program (called THTQIP, or simply the demonstration project). Doc. 1 at 3 ¶ 5. Typically, States use a fee-for-service model in which healthcare providers are reimbursed by the State for every service they provide, like a doctor's visit or a particular procedure. Doc. 11-2 at 261. By contrast, the demonstration project adopts a managed-care delivery model. Under that system, the State pays managed-care organizations (MCOs)

a fixed rate per Medicaid beneficiary. Doc. 1 at 13 ¶ 35. The MCOs in turn "are responsible for reimbursing providers, coordinating client care, and promoting improved health outcomes while limiting excessive costs and unnecessary services." Doc. 15-3 at 2 ¶ 4.

Texas is one of the twelve States that opted to not expand Medicaid after Congress enacted the Patient Protection and Affordable Care Act in 2010. Roughly 1.4 million Texans who would qualify for Medicaid coverage if Texas adopted the federal government's expanded criteria are thus not covered.

To provide healthcare services to this segment of the population, the State redirects the savings from its demonstration project to two pools of funding. The most significant of these is the Delivery System Reform Incentive Program (DSRIP), a roughly $2.5 billion program that dovetails with Texas's demonstration project. Doc. 1 at 17–18 ¶¶ 47–50. DSRIP is a pool of funding from which the State pays incentive bonuses to those healthcare providers that improve "along a variety of identifiable measures relating to specific health-related issues, such as primary care and prevention, pediatric primary care, and maternal care." *Id*. at 18 ¶ 48. DSRIP provides those payments to nearly 300 healthcare providers and institutions, and the State has disbursed over $20 billion to DSRIP participants over the years. *Id*. at 18 ¶¶ 49–50.

In 2020, Texas sought an extension of its demonstration project. *Id*. at 23 ¶ 63. At the time, the project was scheduled to expire in September 2022, with DSRIP set to expire in September 2021. *Id*. at 18 ¶¶ 46, 50. Concerns over disruptions to Texas healthcare providers during the COVID-19 pandemic provided an additional impetus for state authorities to seek an extension. *See id*. at 22–23 ¶¶ 62–63. Accordingly, on November 30, 2020, the State filed an application with CMS to extend the demonstration project for five years, with some amendments. *Id*. But the State's application did not seek an extension of DSRIP, meaning the program would expire in September 2021 even if the demonstration project was extended. *See* Doc. 23-3 at 7 ¶ 13.

Shortly after submitting its application, Texas complied with its state-level notice-and-comment obligations. Doc. 1-2, Ex. J. But, citing the exigencies of the COVID-19 pandemic, Texas applied for an exemption from the federal notice-and-comment requirement. Texas noted that its "health care system is experiencing significant pressure and uncertainty as Texas continues to respond to" the pandemic. Doc. 23-3 at 70. On December 15, 2020, CMS notified Texas that its application was complete and that it was exempt from the federal notice-and-comment requirement pursuant to 42 C.F.R. § 416(g). Doc. 1-2, Ex. K.

While Texas's application was pending, it engaged in a series of negotiations with CMS over the terms of the demonstration project. Along with other significant changes, the parties agreed to a partial replacement of DSRIP called the Public Health Providers Charity Care Pool (PHP-CCP). *Id*. at 24 ¶ 68. Like DSRIP, PHP-CCP would provide incentive payments to healthcare providers, but it would draw from a smaller pool of up to $500 million. Doc. 23-3 at 7 ¶ 14. To recoup the remaining 80% of DSRIP funding, the State "also submitted a separate application to use state-directed payments (SDP), through amendments to the state's contracts with managed care organizations." *Id*. The demonstration project sets forth certain special terms and conditions that govern the procedure for working collaboratively to approve these SDPs. But the ultimate decision to approve them is independent of the demonstration project.

On January 15, 2021, CMS informed Texas that its extension application was approved for a ten-year period ending on September 30, 2030. *See generally* Doc. 23-1. Once Texas received that confirmation, it began reassigning staff, making plans, appropriating money, passing regulations, and engaging stakeholders to work towards implementing the necessary changes. Doc. 1-5; *see, e.g.*, Tex. S.B. 1, art. 2, § 16, 87th Leg., R.S. (2021); 46 Tex. Reg. 1715 (2021).

Three months later, on April 16, 2021, Acting CMS Administrator Richter issued a letter that rescinded and withdrew the

agency's previous approval of Texas's waiver extension. Doc. 23-2. Richter's letter found that CMS had acted unlawfully when it exempted Texas from the federal notice-and-comment requirement because "the state's exemption request did not articulate a sufficient basis for [CMS] to conclude that . . . an exemption from the normal public notice process was needed to address a public health emergency or other sudden emergency threat to human lives, as required under 42 C.F.R. § 416(g)." *Id*. at 2. The letter additionally noted that the decision to waive the federal notice-and-comment requirement "deprived beneficiaries and other interested stakeholders of the opportunity to comment on, and potentially influence, the state's request to extend a complex demonstration." *Id*.

One month later, the State filed this lawsuit, alleging that the April 16 letter was unlawful. Doc. 1. Later that day, the State filed a notice of appeal with the Departmental Grant Appeals Board of HHS, alleging more or less the same substantive problems. *See* Doc. 23-5. On July 14, 2021, the State sent another application to CMS for an extension of its demonstration project. Doc. 23-7.

## Analysis

The court first addresses defendants' assertion that the court lacks subject-matter jurisdiction, *infra* Part I, and then turns to plaintiffs' motion for preliminary injunctive relief, *infra* Part II.

### I.  Subject-matter jurisdiction

The court concludes that (a) Article III jurisdiction exists; (b) jurisdiction is not barred by the final-agency-action limitation on the APA's waiver of sovereign immunity; and (c) jurisdiction is not barred by the committed-to-agency-discretion-by-law limitation on the APA's waiver of sovereign immunity.

### A.  Article III jurisdiction exists.

**1.**  "The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Standing requires, among other things, an

injury-in-fact to plaintiff that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Ripeness often overlaps with standing, most notably in the shared requirement that the injury be imminent rather than conjectural or hypothetical. *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008). Because defendants' ripeness objection parrots their standing objection by simply asserting that the "case is similarly not ripe," Doc. 23 at 14, both objections are treated under the rubric of standing.

Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof. *Lujan*, 504 U.S. at 561. To overcome a motion to dismiss, adequate pleading of facts showing standing is required. *In re Deepwater Horizon*, 739 F.3d 790, 799–800 (5th Cir. 2014). To obtain a preliminary injunction, evidence making out a substantial likelihood of success on any such factual matters is required. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

**2.**  Defendants do not dispute that plaintiffs had sufficient injury-in-fact from the rescission during the time period from the rescission's issuance on April 16, 2021, until plaintiffs filed this lawsuit on May 14, 2021. *See* Doc. 23 at 14 (no such dispute). The complaint alleges, in specific and plausible detail, several injuries resulting from the rescission, *see* Doc. 1 at 31–34 ¶¶ 86–91, and plaintiffs' evidence on their motion for a preliminary injunction backs up those allegations, *see, e.g.*, Doc. 15-9 at 3–8 ¶¶ 4–10; Doc. 15-4 at 6–9 ¶¶ 12–13, 18; Doc. 15-2 at 4–5 ¶¶ 16–19.

Defendants argue, however, that any injury from the rescission became hypothetical and no longer imminent once plaintiffs filed their post-lawsuit appeal with the HHS Departmental Grant Appeals Board.[1] That appeal, defendants argue, triggered the Board's regulation staying implementation of the rescission

---

[1] Without explanation, the parties abbreviate the Board's name as *DAB* and thus omit *Grant* from the Board's name. *But see* 45 C.F.R. § 16.2. For simplicity, the court refers to the entity as *the Board*.

pending review, 45 C.F.R. § 16.22(a), and could ultimately result in the rescission being vacated.

But Texas has put forth evidence adequately showing at this stage that at least some CMS officials were dragging their feet and not acting as if the rescission had been paused. *See* Doc. 34 at 2; Doc. 29-1 at 3 ¶¶ 9–13. The court finds, on the record before it now, that CMS did not in fact fully act as if the pre-rescission version of Texas's program was in effect. *See also* Doc. 34 at 2 (finding that CMS's delay did not constitute the collaborative effort required by special terms and conditions of the pre-rescission program). Doc. 34-2 at 5 ¶ 14.

Moreover, even if the Board's regulation had the full effect of staying implementation of the rescission, CMS cites no case holding that a defendant's compliance with another entity's stay pending review will negate otherwise-existing standing and ripeness. A stay pending review is, by definition, temporary. It can evaporate at a moment's notice. Such an external stay has a different character than a defendant's own choice to modify its action (which choice would itself affect standing only within the limits of the voluntary-cessation doctrine).

Thus, in the analogous context of one district court issuing a stay pending review of an action under review by another district court, the federal government itself has recognized that the stay in one case does "not moot" the other case. Suppl. Br. for the Fed. Appellants at 6, *California v. HHS*, 941 F.3d 410 (9th Cir. 2019) (No. 19-15072), 2019 WL 2271619; *accord* Suppl. Mem. in Opp. to Pls.' Mot. for a Preliminary Inj. at 2, *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008 (N.D. Ill. 2019) (No. 1:19-cv-06334) (expressing the federal government's position that stay orders in another case "do not moot" a lawsuit challenging the same agency action). Here, too, the court concludes that plaintiffs' injury continues to be concrete and imminent regardless of the extent of CMS's compliance with the Board's regulatory stay pending its review. And, of course, the mere possibility that a reviewing entity enters a final

decision vacating an agency action does not undo its consequences in the meantime.

Lastly, an independent basis shows standing. Plaintiffs assert not only financial and logistical injuries affecting their medical-assistance program but, also, a procedural injury from the absence of notice and an opportunity to comment regarding the rescission. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). That removal-of-some-possibility injury exists just as much after the Board appeal as before it.

### B. The April 16 letter is final agency action.

The Administrative Procedure Act waives federal sovereign immunity for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. If there is no "final" agency action, a federal court lacks subject-matter jurisdiction. *Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004).

Agency actions are final if (1) the action marks the consummation of the agency's decision-making process and (2) the action is one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Application of that finality requirement is "flexible" and "pragmatic." *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). CMS's April 16 rescission letter meets both finality requirements. The pending Board appeal does not change that conclusion.

**1.** First, the April 16 rescission letter is neither tentative nor interlocutory. It is not a mere proposal or draft put forth for consideration. Rather, it announces a final decision and binds both CMS and Texas. It specifically states that "we have determined" and "we find" that CMS's already-issued exemption from notice and comment was unjustified. Doc. 23-2 at 1, 2, 3 n.1, 6. The letter states that CMS is "rescinding" and "withdrawing" the approval

issued in January 2021 of Texas's demonstration program. *Id.* at 2, 7. The letter then specifically reimposes the prior timelines and reporting requirements and states that the prior version of the program will now "be in effect" and "is currently authorized through [the prior program's expiration date]." *Id.*

**2.**   Second, the rescission letter determines rights and has legal and practical consequences. Withdrawing CMS's approval of Texas's demonstration program determines Texas's legal right to receive federal Medicaid money if Texas proceeds with that particular program. That right has huge consequences given the size of Texas's Medicaid program. The rescission also applies to certain terms that CMS had approved that require CMS to work collaboratively with Texas to promptly collect information, review it, and communicate on needed changes as Texas applied for federal approval of certain directed-payment programs. *See* Doc. 40 (giving further detail). Rescinding those obligations is also of serious legal and practical consequence.

**3.**   All of this changed, defendants say, with the Board's regulatory stay pending its review. But defendants have not cited any authority for the proposition that a regulatory stay pending review de-finalizes an otherwise final agency action. That is certainly not the case with a judicial stay pending review. It does not de-finalize a final agency action and thus negate a court's jurisdiction. *See* 5 U.S.C. § 705 (allowing a judicial stay). The court does not see why the result would differ for a regulatory stay.

The Board appeal at issue is not the same as a motion to CMS itself for rehearing of the challenged action. In that context of a pending motion for rehearing by the agency that acted, "'there is no final action until the rehearing is denied.'" *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 541 (1970) (quoting *Outland v. CAB*, 284 F.2d 224, 227 (D.C. Cir. 1960)).[2]

---

[2] Of course, that rule is contrary to the plain meaning of the third sentence of 5 U.S.C. § 704. *See Am. Trucking Ass'ns v. ICC*, 697 F.2d 1146, 1148 (D.C. Cir. 1983) (Scalia, J.) ("The Administrative Procedure Act explicitly permits

Here, in contrast, Texas did not file an appeal with or motion for reconsideration by CMS. This is not a case where one employee of an agency presided at a hearing and issued an initial decision, which becomes the decision of the agency by default unless there is "an appeal to . . . the agency within time provided by rule." 5 U.S.C. § 557(b). In that scenario, a pending appeal to the agency from an employee's initial decision would keep that initial decision from attaining finality.

But no statute or regulation requires a State to pursue any level of administrative review before CMS's rescission of a demonstration program can become final. *Cf. Heckler v. Ringer*, 466 U.S. 602, 606 (1984). Defendants thus concede that Texas was not required to exhaust any administrative process before seeking judicial review of the April 16 letter. *See* Doc. 37 at 5 n.3.

Nor is an appeal requirement inherent in the concept of action by the "agency" here. The Administrative Procedure Act makes reviewable "final agency action," 5 U.S.C. § 704, and defines an "agency" for purposes of judicial review as "each authority of the Government of the United States, *whether or not it is within or subject to review by another agency*," *id*. § 701(b)(1) (emphasis added).

CMS is an "agency" under that definition. In accordance with 5 U.S.C. § 301, the head of the Department of Health and Human Services has prescribed regulations for the distribution of that department's business. Those regulations establish CMS: the "Centers for Medicare & Medicaid Services, formerly the Health Care Financing Administration." 42 C.F.R. § 400.200. The regulations assign CMS authority concerning approval of state medical-assistance plans. 42 C.F.R. §§ 430.10–430.25.

Because CMS is thus an authority of the federal government, it is an "agency." And CMS acts as such. The rescission letter here, for instance, expressly speaks on behalf of CMS and uses the plural "we," for the agency, in exercising government authority.

---

judicial appeal and requests for agency reconsideration to be pursued simultaneously."). But it is the accepted rule. *E.g., Ecee, Inc. v. FERC*, 611 F.2d 554, 557 (5th Cir. 1980).

Doc. 23-2. The Supreme Court has likewise observed: "The Centers for Medicare & Medicaid Services (CMS) is the agency administering the Medicaid program on behalf of the Secretary." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 n.3 (2003).

The Board is a separate entity within HHS, defined and governed by separate regulations. 45 C.F.R. §§ 16.1–16.23. Because the Board is not part of CMS, the pendency of a Board appeal does not negate the existence of final action by CMS—the agency. Indeed, for a Board appeal to proceed, a "final written decision" is first required. *Id.* § 16.3. The Board may *review* certain final CMS decisions. But the definition of the agency whose action must be final expressly disregards whether that entity is "subject to review by another agency." 5 U.S.C. § 701(b)(1); *see Lassiter v. Guy F. Atkinson Co.*, 176 F.2d 984, 991 n.6 (9th Cir. 1949) (noting this definition and collecting decisions holding several entities to be agencies); *In re Myers*, 147 B.R. 221, 233 (Bankr. D. Or. 1992) (holding that the Executive Office for United States Trustees is an agency for judicial-review purposes, even though it is subject to department-level review); *Dayley v. United States*, 169 Ct. Cl. 305, 309 (1965) ("[O]nce there is a final Board decision, a subsequent administrative hearing or determination does not deprive the earlier decision of finality[.]").

For those reasons, final agency action permitting judicial review exists here. CMS all but concedes as much by a position it takes in this case. CMS says that if, during the pendency of the Board appeal, Texas pays organizations pursuant to the program whose approval the April 16 letter rescinds, CMS reserves the right to claw back those payments if CMS ultimately wins the Board appeal. Doc. 23 at 12; Doc. 37 at 6 n.5. In other words, CMS is claiming the right to treat its rescission announcement as effective immediately as of April 16 (or even retroactively), not simply as of the later date of a final Board ruling. An agency decision that immediately triggers a right of financial clawbacks certainly has a "direct and immediate" effect "on the day-to-day business" of

the State. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980).

### C.  The rescission is not within 5 U.S.C. § 701(a)(2)'s narrow exception to the presumption of judicial review.

The text and structure of the Administrative Procedure Act creates a "basic presumption of judicial review" for a person or organization aggrieved by agency action. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702). A narrow exception to that rule is created in 5 U.S.C. § 701(a)(2) for agency action that "is committed to agency discretion by law." That exception applies "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Webster v. Doe*, 486 U.S. 592, 599 (1988), and "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). That exception, therefore, is very narrow. *Id.*

Defendants cite no law committing to the unfettered discretion of CMS the choice to rescind its approval of a State's demonstration project. Defendants analogize this case to *Calle-Vujiles v. Ashcroft*, 320 F.3d 472 (3d Cir. 2003), but the regulation there explicitly provided authority to reopen a final decision on a motion, without any limitation. Here, in contrast, no statute even speaks of CMS's authority to rescind an already-issued § 1115(a) approval. The APA provides applicable law in requiring an agency to act with statutory authority, 5 U.S.C. § 706(2)(C), and judicially administrable limitations on inherent authority to revisit past decisions exist, *see ConocoPhillips Co. v. EPA*, 612 F.3d 822, 832 (5th Cir. 2010). Arbitrary-and-capricious and notice principles under that test and the APA also provide judicially administrable limitations.

Defendants fail to cite any authority holding that the approval, disapproval, rescission, or withdrawal of a Medicaid demonstration project is unreviewable pursuant to § 701(a)(2). To the contrary, every court to have considered the issue has held that CMS decisions regarding the approval of § 1115 demonstration projects

and the concomitant waivers of statutory, default requirements are reviewable under the APA. *Beno v. Shalala*, 30 F.3d 1057, 1067 & n.24 (9th Cir. 1994) (collecting cases). The narrow exception to judicial review invoked by defendants does not apply here. The court has subject-matter jurisdiction.

## II. Plaintiffs are entitled to a preliminary injunction.

Plaintiffs have proved their entitlement to a preliminary injunction by showing a substantial likelihood of success on the merits, *infra* Part A; that an injunction would prevent a likelihood of future harm not reparable by damages, *infra* Part B; and that the balance of the equities and the public interest support an injunction, *infra* Part C.

### A. Likelihood of success on the merits

Plaintiffs have demonstrated a substantial likelihood of ultimate success on at least their claims that the April 16 rescission is unlawful and must be set aside as in excess of statutory authority and as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A), (C). Those claims suffice to justify the injunctive relief issued, so the court need not address plaintiffs' other claims at this time.

#### 1. Statutory authority

Like every agency, CMS has only the authority granted to it by statute. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). With its statutory authority for the April 16 rescission letter challenged, CMS offers two responses.

**a.** First, CMS renews its argument that the letter did nothing—it "serves merely as a notice to Texas" that CMS's January 15 approval is "void" "by operation of law." Doc. 37 at 8. That characterization is belied by the letter itself. The letter repeatedly states that CMS ("we") "are rescinding" and "are withdrawing" the January 15 approval. Doc. 23-2 at 7. Those are action verbs. CMS took those actions only after engaging in a prejudice analysis, determining that its putative earlier error in excusing federal notice and comment "was not harmless" and that Texas "has not incurred a reliance interest" on CMS's earlier approval. *Id.* That

substantive analysis underlies CMS's action. *Id.* ("Accordingly, we are rescinding . . . ."). CMS's characterization of the letter as a mere notice, needing no statutory authority, is meritless. *Accord supra* Part I.B.

**b.**  In the alternative, CMS relies on the principle that "in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002). "An agency's inherent authority to reconsider its decisions is not without limits, however." *ConocoPhillips Co.*, 612 F.3d at 832. Any such reconsideration must (1) be made within a reasonable time after the original decision; (2) be preceded by notice to the parties of the agency's intent to reconsider; and (3) not be arbitrary, capricious, or an abuse of discretion. *Id.* (citing *Macktal*, 286 F.3d at 825); *see Dun & Bradstreet Corp. Found. v. USPS*, 946 F.2d 189, 193 (2d Cir. 1991).

The first limitation on that authority likely applies here. The second limitation on inherent authority also applies here: plaintiffs received no notice of CMS's intent to reconsider. And the third, arbitrary-and-capricious limitation on inherent authority also applies. *Infra* Part II.A.2.

**i.**  In considering whether a time lapse before agency reconsideration is "short and reasonable," several factors may be considered: (1) whether it is within widely accepted reconsideration time periods; (2) any express time limit for administrative appeals from the agency's original final decision; (3) reliance by the plaintiff or third parties on the original final decision, including whether any cognizable property interests arose; (4) whether regular agency processes were followed; (5) the complexity of the reconsidered decision and whether it was factually or legally based; and (6) the probable impact of an erroneous agency decision absent reconsideration. *See Macktal*, 286 F.3d at 826; *Dun & Bradstreet*, 946 F.2d at 194; *Prieto v. United States*, 655 F. Supp. 1187, 1192–93 (D.D.C. 1987); *Dayley*, 169 Ct. Cl. at 309 n.2.

First, both *Macktal* and *Dun & Bradstreet* trace the "short and reasonable time" limitation to *Bookman v. United States*, 453 F.2d 1263, 1265 (Ct. Cl. 1972), which draws that limitation from *Dayley*, 169 Ct. Cl. 305. *Dayley*'s examples of such short and reasonable time periods for reconsideration are all a month or less: "The Supreme Court allows 25 days (Rule 58); this court allows 30 days (Rule 68); the Federal Rules of Civil Procedure allow 10 days (Rule 59); the Federal Rules of Criminal Procedure allow 5 days, generally (Rule 33)." 169 Ct. Cl. at 309 n.2. The time lapse here, of course, is months beyond any of those time periods.

Second, the time lapse here is beyond the time limit for an administrative appeal to the Board. If Board review of the January 15 approval were available to someone aggrieved by it, "a prospective appellant must submit a notice of appeal to the Board within 30 days after receiving the final decision." 45 C.F.R. § 16.7(a). Again, the time lapse here far exceeds that 30-day appeal period.

Third, the time lapse here is not short and reasonable from a functionalist perspective due to the intervening, reasonable reliance on the January final approval. The final approval of Texas's program resulted from a complex negotiation process between CMS and Texas and thus reasonably led Texas to immediately begin intense preparation efforts for implementing the program. *See* Doc. 15-3 at 12 ¶ 41. Texas immediately began developing new timelines, evaluation designs, and reports. Doc. 1-5 ¶ 6. Texas also reassigned staff, appropriated additional funds, adopted new rules, and worked with providers in reliance on CMS's approval of Texas's demonstration project. *Id.*; Doc. 15-3 at 12 ¶ 41. Texas furthermore decided not to pursue an extension of the DSRIP program. Doc. 15-3 at 12 ¶ 39. And healthcare providers in the State acted in reliance on the extension, making changes to staffing, billing, and training. Doc. 15-1 at 8–9 ¶¶ 15, 17; Doc. 15-5 at 8 ¶¶ 20–21; Doc. 15-9 at 12 ¶ 16; Doc. 15-8 at 4 ¶ 13; Doc. 15-6 at 4–5 ¶ 16. In short, given the complex nature of a Medicaid plan, the State's and third parties' reliance on the January final approval was immediate, extensive, and reasonably so.

Fourth, the only regular agency processes that the parties identify as concerning the withdrawal of § 1115(a) waivers are those in 42 C.F.R. § 431.420(d)—which were not followed here. Subsection (d)(1) of that regulation requires the agency to determine "that the State has materially failed to comply with the terms of the demonstration project" in order to terminate an approved project. CMS made no such determination here. Subsection (d)(2) of that regulation requires the agency to find "that the demonstration project is not likely to achieve the statutory purposes" of a medical-assistance plan in order to withdraw a § 1115(a) waiver. Again, CMS made no such finding here. The agency's rulemaking after notice-and-comment procedure to create those two processes for terminating or withdrawing a § 1115(a) waiver at least implies the absence of a freestanding, broader authority to withdraw such a waiver.

Fifth, the complexity of the reconsidered decision was not terribly great. CMS did not purport to reconsider whether Texas's program approved in January would in fact meet the objectives and limitations stated in § 1115(a). Rather, the April 16 letter reconsiders the narrower matter of whether a specific regulation exempted the State from federal notice and comment, in addition to the state notice and comment already undertaken. Doc. 23-2 at 1. That appears to be a much narrower matter.

Sixth, the probable impact of an erroneous agency decision absent reconsideration does not move the needle much either way. Federal-level notice and comment on the extension of Texas's program could, of course, lead to further comments that reshape the nature of the extension. But it is unclear if such procedural error, if there was one, is significant enough to substantially outweigh the heavy reliance interests outlined above. And that possibility is further diminished by the fact that, by the time of the reconsideration, state-level notice and comment on the extension had been completed.

Weighing all of those considerations, plaintiffs have shown their strong likelihood of success on the merits in invoking this

timing-based limitation on CMS's inherent authority to recon-
sider its final approval of Texas's program.

**ii.**   In any event, an agency's inherent reconsideration author-
ity is limited by the requirement that "notice of the agency's in-
tent to reconsider must be given to the parties." *Macktal*, 286 F.3d
at 826 (citing *Bookman*, 453 F.2d at 1265). The court finds that
CMS did not provide Texas notice of its intent to reconsider its
approval of Texas's demonstration program. No such notice has
been identified in the record. Accordingly, this independent limi-
tation on CMS's authority applies. For this reason alone, plain-
tiffs have a strong likelihood of success on the merits.

This limitation also appears to consider whether the agency
gave an opportunity for comment, in addition to mere notice.
*Bookman* explains that this limitation requires "procedural safe-
guards most commonly associated with courts of justice." 453
F.2d at 1265. Of the statutes given as examples in *Bookman*, some
expressly require a chance for party participation. 15 U.S.C.
§ 45(b) (FTC "may at any time, after notice and opportunity for
hearing," reopen and modify an order); 49 U.S.C. § 17(5) (1970)
(ICC reconsideration must proceed on the same record or after
"further hearing"). Others require "reasonable notice," together
with a timing requirement. *See* 15 U.S.C. § 717r(a) (rehearing by
Federal Power Commission requires either an application by a
party or "reasonable notice" before an appellate record is filed);
29 U.S.C. § 160(d) (NLRB may modify its order upon "reasona-
ble notice" before a record is filed in court). And, to decide
whether a reconsideration process is "reasonable," the Fifth Cir-
cuit expressly relies on the existence of an opportunity for com-
ment. *Macktal*, 286 F.3d at 826 (finding a reconsideration reason-
able because the agency "acted promptly and allowed additional
briefing by the parties").

Here, because Texas was not given notice of CMS's intent to
reconsider its final approval, Texas did not have an opportunity to
provide information or comment on the possibility of rescission.

- 17 -

To the extent that fact is significant under this limitation on inherent authority, it too favors Texas's likely success.

**iii.** Any inherent agency authority to reconsider a final decision does not allow reconsideration that is "arbitrary, capricious, or an abuse of discretion." *Id.* That limitation is not specific to reconsideration; it is a requirement of all agency action. *Id.* (citing 5 U.S.C. § 706(2)(A)). Accordingly, that requirement is addressed separately below. As shown, it also indicates Texas's likely success on the merits.

### 2. Arbitrary and capricious

The Administrative Procedure Act prohibits agency actions that are arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A). An agency must examine the relevant circumstances and articulate a satisfactory explanation for its action, including a rational connection with the choice made. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Arbitrary-and-capricious review of agency action is highly deferential. *Frey v. HHS*, 920 F.3d 319, 326 (5th Cir. 2019). An agency's decision is given a presumption of regularity, which is not to be disturbed by merely substituting a court's own judgment for the agency's. *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985). Because the focus is on the agency's own decision-making, it is well-settled that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery*, 318 U.S. 80, 87 (1943). If an agency opposing judicial relief wishes to rely on an administrative record with materials not reflected on the face of the agency action, the agency of course must file those materials in court. *See* E.D. Tex. Local R. CV-7(d). Here, however, CMS has not filed an administrative record for its April 16 rescission. Nor did CMS move to extend the time for filing those materials. *Cf.* E.D. Tex. Local R. CV-7(e). Defendants' opposition to a preliminary injunction is thus considered without reference to any unfiled administrative record.

Agency action is lawful under arbitrary-and-capricious review only if it rests on a meaningful consideration of the relevant factors. *Michigan v. EPA*, 576 U.S. 743, 750 (2015). That includes reliance interests: those affected by an agency's change in course are entitled to consideration of any reliance on the decision to be withdrawn. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). A court must make a "searching and careful" inquiry into whether an agency considered the relevant facts. *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

Here, no evidence shows that CMS meaningfully considered reliance interests around the final approval of the demonstration program that CMS rescinded. The agency's rescission letter addresses the State's past reliance only briefly, in one sentence:

> On the other hand, [Texas's demonstration project] is operating today without a material change from the demonstration's operations as it was approved before our January 15, 2021 approval; and because payments from the new uncompensated care pool are not authorized until October 1, 2021, no material programmatic changes have been implemented at this time and the state has not incurred a reliance interest based on the January 15, 2021 approval.

Doc. 23-2 at 7. That is like a contractor saying that a homeowner has not relied on a contract because the agreed-upon work has not yet started, so there is no injury from the contractor's decision not to perform. It ignores whether the homeowner gave up other opportunities no longer available and invested substantial money and time in preparing the home for the agreed-upon future work. That answer would not fly in contracts class. It does not fly here either. A party can incur substantial reliance interests in an agency's final approval of a program slated to start in the future, even if the program's implementation date has not yet arrived.

With no administrative record filed by the agency, the court is left with only the April 16 letter as the agency's discussion of the State's reliance on the rescinded approval. The single sentence quoted above is wholly inadequate to show that CMS

- 19 -

meaningfully considered reliance. An agency merely "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty*, 805 F.2d at 1055. Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. DOD*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quotation marks omitted). No evidence in the record shows any meaningful consideration by CMS of Texas's past reliance. That shows plaintiffs' substantial likelihood of success on their arbitrary-and-capricious challenge to the rescission. *See, e.g.*, *Regents*, 140 S. Ct. at 1913.

That conclusion is reinforced by the agency's failure to consider alternatives that might have vindicated the notice-and-comment interests animating the rescission while retaining the existing policy. *See id.* ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy[.]") (quotation and alteration marks omitted). An agency is not required to consider all policy alternatives. *Id.* But an important aspect of the existing policy was establishing legal authority for the billions of dollars spent in Texas's Medicaid program. CMS could have considered retaining that authority by leaving the approval in place while pursuing less-restrictive alternatives to vindicate its concerns, such as initiating federal notice and comment after the fact. *See, e.g.*, *Advocs. for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994) ("Defects in an original notice may be cured by an adequate later notice.") (quotation marks omitted).

### 3. Prejudicial error

Judicial review under the APA must take due account of the rule of prejudicial error. 5 U.S.C. § 706. Defendants do not oppose relief on this ground, *see* Doc. 23 at 26–27, nor could they. The harmful-error standard does not "impose a . . . particularly onerous requirement." *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009); *see Jicarilla Apache Nation v. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further."). The prejudice to Texas from the likely APA violations

and from CMS rescinding approval for billions of dollars of Medicaid funding is manifest.

### B.  Irreparable harm absent an injunction

A preliminary injunction requires a plaintiff to show a significant threat, absent a preliminary injunction, of incurring future injury that is not reparable by an award of money damages at the end of the lawsuit. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Damages are unavailable in this suit because the Administrative Procedure Act does not waive the federal government's sovereign immunity from damages actions. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999) (noting that the Act "waives the Government's immunity from actions seeking relief 'other than money damages'") (quoting 5 U.S.C. § 702).

Accordingly, any future injury to plaintiffs from the agency action here is not reparable by an award of damages at the end of the case. The question is thus whether plaintiffs have shown a significant threat, absent a preliminary injunction, of future injury from the challenged rescission. Plaintiffs readily make that showing.

**1.**   In reliance on CMS's final approval of Texas's demonstration program in January, the State made substantial resource investments in planning for the implementation of that program. *See* Doc. 15-3 at 12–13 ¶ 41 (quantifying the effort expended at hundreds of thousands of dollars). Those resource investments created an expectation interest that the State would be able to capitalize on those investments by delivering future medical assistance under the extended program—and by receiving future federal funds in doing so. *See, e.g.*, Doc. 11 at 4–7, 12–13, 32–34, 4 n.4, 5 n.5, 6 n.7, 12 n.10, 13 n.11 (detailing how rescission of the approval would likely cause a contraction of healthcare providers and service). Allowing the rescission of that program's approval to proceed would stymie those benefits and thus injure plaintiffs.

Defendants dismiss this evidence as showing only a past injury, which cannot be prevented by prospective relief. Doc. 23 at 11. But plaintiffs' claimed injury is not in the nature of bodily injury from a car crash. Texas's expenditures in reliance on the

approval were investments that created a future expectation of benefits under the approved program. The rescission would deny those future benefits. The situation is akin to equitable relief directing a seller of land to convey title to the property that he has already been paid for, if he could not pay full damages because he is spending the purchase money. *See generally* Arthur Linton Corbin, 5A *Corbin on Contracts* § 1143 (1964). True, the buyer's expenditure of money happened before the lawsuit. But an injunction would prevent the future harm to the buyer of failing to realize the benefit of that expenditure—a harm prevented with an injunction.

**2.** Defendants next argue that Texas's evidence of a future contraction in its healthcare market from a threatened reduction in funding for certain programs (SDP and PHP-CCP) is not traceable to the rescission challenged here. Doc. 23 at 10–11. Those programs were intended to replace, in part, an existing program (DSRIP) that Texas was already ending, regardless of the extension of its demonstration project. Doc. 23-3 at 7 ¶ 13. CMS's suggestion is that effects of that independent termination of DSRIP funding are not due to the rescission of the demonstration project.

That argument falters for two reasons. First, the demonstration project approved in January 2021 contained provisions that would advance replacement programs for DSRIP. Some provisions in the demonstration project bound CMS to specific timelines for reviewing SDP programs, *see* Doc. 29-1 at 48–49 ¶¶ 30–34, and other provisions bound CMS to work collaboratively with the State with the expectation of approval of a PHP-CCP payment protocol within 90 days after certain action, *see id.* at 54 ¶ 39(b).

Delay in replacing funding scheduled to terminate soon is a future harm. Although the rescinded demonstration project did not require CMS to approve the SDPs or PHP-CCP, it did require CMS to work collaboratively to advance review of those replacements for DSRIP. Rescinding those CMS requirements for prompt action thus threatens a perpetuation of imminent harm.

Second, healthcare providers also faced a predicted fiscal cliff in 2022 from the expiration of Texas's demonstration project. *E.g.*, Doc. 15-1 at 5–7. The evidence shows that healthcare providers needed to rely on the extension of Texas's project for their financial stability and viability in Texas's healthcare safety net. *Id.* at 8. And the evidence shows that healthcare providers did so, taking steps such as setting mandatory payment rates rather than seeking delay and further information. *Id.* The evidence thus demonstrates that rescinding the approval of that demonstration program will threaten future harm to the expectation interests of healthcare providers who have acted in reliance on the program's extension.

**3.** CMS argues that any threatened future harm that may have existed between the rescission and the Board appeal became purely hypothetical and speculative with the filing of that appeal. Doc. 23 at 8. The court has already concluded that the Board's regulatory stay is not, as a factual matter, ensuring Texas the full benefits of the rescinded provisions. *Supra* Part I.A. Even were the regulatory stay by the Board fully effective, the court also agrees with its sister court in another district that the existence of a stay by another reviewing tribunal does not prevent a finding of irreparable harm absent an injunction:

> Defendants argue that Plaintiffs have not shown that irreparable harm is imminent, or even likely, given the preliminary injunction recently issued in *Regents*. . . . Defendants cite no authority for the proposition that Plaintiffs cannot establish irreparable harm simply because another court has already enjoined the same challenged action.

*Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018) (quotation marks omitted). Likewise unpersuasive is defendants' suggestion that the possibility of permanent Board relief for plaintiffs negates their showing of irreparable harm.

Lastly, defendants argue that any enjoinable harm from CMS's rescission is speculative and hypothetical because CMS "could consider and approve a new extension" before the current

- 23 -

program expires in September 2022. Doc. 23 at 9. But it is that possibility that seems speculative. The current final agency action by CMS is its rescission. There is always the possibility that a defendant might voluntarily cease its harm-causing action in the future. But even the mootness doctrine requires the actual elimination of injury, not merely the future possibility of it.

### C. Balance of the equities and the public interest

Federal courts consider the balance of the equities and the public interest together, as they overlap considerably. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting overlap as to federal government). The court must consider any harm to the defendant from a preliminary injunction, balance that against the extent of irreparable injury to the plaintiff without a preliminary injunction, and consider whether the public interest disfavors an injunction even if it would protect the plaintiff without offsetting cost to the defendant. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008).

Defendants mount no real argument of harm to them from a preliminary injunction. *See* Doc. 23 at 27–28. Their only mention of the point comes in a footnote, *id.* at 28 n.7, which the court finds forfeited and disregards as insufficiently briefed. *See, e.g., Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016) ("Arguments subordinated in a footnote are 'insufficiently addressed in the body of the brief,' and thus are waived.") (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 356 n.7 (5th Cir. 2003)). In any event, the footnote cites no record evidence substantiating CMS's contention that an injunction would require it to expend any particular resources, so the point fails for lack of record support as well.

As for the public interest, the court finds that it favors the preliminary injunction. The threatened decrease in the number of healthcare providers and the quality of care appears substantiated and outweighs the procedural interests that the rescission letter purports to vindicate. *See* Doc. 15-2 at 3–4 ¶¶ 12–13; Doc. 15-3 at 11 ¶ 35. Moreover, there is generally "no public interest in the

perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### III. Scope of the preliminary injunction

A preliminary injunction must "state its terms specifically" and "describe in reasonable detail" the conduct restrained or required. Fed. R. Civ. P. 65(d). And the scope of a preliminary injunction must be tailored to the harm that occasions it. *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

The court has concluded that CMS's April 16, 2021 rescission letter is likely unlawful and causes prospective harm to plaintiffs that can be avoided by an injunction but not compensated later in damages. Accordingly, the court will enjoin defendants from implementing the rescission and withdrawal stated in that letter and from enforcing the new deadlines and requirements stated in the letter as a result of the rescission.

With that injunction of the April 16, 2021 rescission, Texas's demonstration project (Waiver Number 11-W-00278/6) currently remains in effect as it existed on April 15, 2021. If a future dispute arises as to whether defendants are complying with the terms of that demonstration project, the court will undertake to decide if such noncompliance has a nexus to the April 16, 2021 rescission that is enjoined by this order. Any contempt sanctions will require showing such a nexus through persuasive, though not necessarily direct, evidence. Agency foot-dragging in implementing the terms of the demonstration project may be inferred to stem from failure to respect the injunction based on the timing of any such noncompliance—whether it occurred or intensified after the rescission or this injunction—and any other relevant evidence.

A preliminary injunction also requires the movant to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Plaintiffs' proposed order filed with their motion proposes that defendants will not sustain costs and damages should a preliminary injunction be found to have issued wrongfully. Doc. 11-1 at 1–2.

Defendants' opposition to the motion does not mention or resist that conclusion. *See* Doc. 23. The opposition fails altogether to identify any evidence of damages that defendants would allegedly sustain if an injunction were ultimately found to have issued wrongly. *See id.* Defendants have thus forfeited any argument regarding a bond amount. *See* E.D. Tex. Local R. CV-7(d). Without any timely argument on point by defendants, the court dispenses with the requirement of a bond.

### Conclusion

For the reasons given above, defendants' motion to dismiss for lack of subject-matter jurisdiction (Doc. 23) is denied, and plaintiffs' motion for a preliminary injunction (Doc. 11) is granted.

As of the date of this order, and until final judgment is entered in this case or as otherwise ordered by the court, defendants are enjoined from implementing Acting Administrator Richter's April 16, 2021 letter that is filed as document 23-2 in this case. That injunction obligates defendants to treat Texas's demonstration project (Waiver Number 11-W-00278/6) as currently remaining in effect as it existed on April 15, 2021.

The court dispenses with the requirement of a bond for the reasons stated above. The court retains power to enforce this injunction. Given this injunction, the motion for a temporary restraining order (Doc. 34) is denied.

*So ordered by the court on August 20, 2021.*

J. CAMPBELL BARKER
United States District Judge