UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | § § § § § | |
| Plaintiffs, | § | Case No. 6:21-cv-00191 |
| | § | |
| v. | § | |
| | § | |
| CHIQUITA BROOKS-LASURE, in her official capacity as Administrator for the Centers for Medicare & Medicaid Services, et al., | § § § § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' MOTION TO ENFORCE THE PRELIMINARY INJUNCTION**

### TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Glossary .............................................................................................................................. iv

Introduction ........................................................................................................................ 1

Factual Background ............................................................................................................ 3

Standard .............................................................................................................................. 5

Argument ............................................................................................................................ 6

    I.    CMS must work collaboratively with Texas toward approval of Texas's SDPs and PHP-CCP submissions to comply with the STCs of the demonstration project and this Court's injunction. ................................................. 6

        A.    STCs 29–36 require CMS to work collaboratively with Texas toward approval of the five SDPs. ......................................................................... 7

        B.    STC 39 requires CMS to work collaboratively with Texas to approve the payment protocol for the PHP-CCP within ninety days. ............................. 7

    II.    CMS's reasons for not approving Texas's SDPs are pretextual. ............................ 8

        A.    CMS is withholding approval of Texas's SDPs based on a pretextual claim that Texas's managed care organization capitation rates are not actuarially sound. ........................................................................................................... 8

        B.    CMS has not explained how the total amount of funding under Texas's SDPs violates a statute or regulation. ...................................................... 10

        C.    CMS's offer to approve some SDPs under Option 1 underscores the pretextual nature of CMS's grounds for refusing to approve all SDPs under Option 2. ...................................................................................... 13

        D.    CMS has also asserted that the Social Security Act and CMS regulations require attestations that Texas has not provided, but CMS's demand exceeds the scope of its authority. ........................................................... 15

    III.    The above examples are part of a larger pattern of CMS delay and obstruction. ..................................................................................................... 20

    IV.    CMS has violated the preliminary injunction by failing to work collaboratively with Texas on approval of the PHP-CCP's payment protocol and application tools. ............................................................... 22

        A.    The Initial Payment Protocol for October 1, 2021, to September 30, 2022 .................................................................................................. 23

        B.    The PHP-CCP Application Tool and Addendum to Attachment T ......... 26

Requested Relief ............................................................................................................... 28

Conclusion ....................................................................................................................... 29

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020).....................................................................................10

*Dept' of Com. v. New York*,
    139 S. Ct. 2551 (2019).......................................................................................8

*Martin v. Trinity Indus., Inc.*,
    959 F.2d 45 (5th Cir. 1992)..............................................................................6

*Michigan v. EPA*,
    576 U.S. 743 (2015).........................................................................................10

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
    826 F.2d 392 (5th Cir. 1987)............................................................................6

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)..........................................................................................10

*SEC v. First Fin. Grp. of Tex., Inc.*,
    659 F.2d 660 (5th Cir. 1981)............................................................................5

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005)............................................................................6

*Whitfield v. Pennington*,
    832 F.2d 909 (5th Cir. 1987)............................................................................5

**Constitutional Provisions, Statutes, and Rules**

84 Fed. Reg. 63736...............................................................................................18

42 U.S.C.
    § 433.68(a)......................................................................................................16
    § 433.68(b)......................................................................................................16
    § 433.68(f).......................................................................................................16
    § 433.68(f)(3).............................................................................................17, 18
    § 438.6(c).........................................................................................7, 10, 12
    § 1396b(m)(2)(A)(iii)......................................................................................9
    § 1396b(w)(1)(A)(iii)....................................................................................16
    § 1396b(w)(4)..........................................................................................16, 17
    § 1396d(ii)(1)..................................................................................................12

Fed. R. App. P. 4(a)(1)(B) ...................................................................27

Tex. Health & Safety Code
    § 121....................................................................................24
    § 533....................................................................................24
    § 534....................................................................................24

**Other Authorities**

American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9814 .................12

Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008(b)(3)
    (2020).................................................................................11

Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685, 9694 (Feb.
    22, 2008) (to be codified at 42 C.F.R. pt. 433).........................18

Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg.
    63722, 63734 (Nov. 18, 2019) (to be codified at 42 C.F.R. pts. 430, 433, 447,
    455, and 457) .....................................................................18

## GLOSSARY

| | |
|---|---|
| CHIRP | Comprehensive Hospital Increased Reimbursement Program |
| CMS | Centers for Medicare & Medicaid Services |
| DPP for BHS | Directed Payment Program for Behavioral Health Services |
| DSRIP | Delivery System Reform Incentive Program |
| DY | Demonstration Year |
| FFP | Federal Financial Participation |
| HHSC | Health and Human Services Commission |
| LPPF | Local Provider Participation Funds |
| MCO | Managed Care Organization |
| PHP-CCP | Public Health Providers Charity Care Pool |
| RAPPS | Rural Access to Primary and Preventive Services |
| SDP | State Directed-Payment Program |
| SFY | State Fiscal Year |
| STC | Special Terms and Conditions |
| TIPPS | Texas Incentives for Physician and Professional Services |
| UHRIP | Uniform Hospital Rate Increase Program |
| QIPP | Quality Incentive Payment Program |

## INTRODUCTION

If CMS had abided by the Court's preliminary injunction—and worked collaboratively and in good faith toward approval of Texas's state directed-payment programs ("SDPs") and its submissions required to implement the Public Health Providers Charity Care Pool ("PHP-CCP")— those programs would have been approved and active by now. Instead—over two months after the preliminary injunction, almost two months after the SDPs were scheduled to come online, and almost one month after the PHP-CCP should have been up and running—none of the programs are operational. As a direct result of CMS's failure to respect the preliminary injunction, as detailed in this Motion, Medicaid providers are unable to access over $7 billion in critical funding needed to provide health care to the most vulnerable Texans, and Texas is at risk of losing approximately $6.5 billion due to the impact on the State's budget-neutrality expenditures.

Despite the preliminary injunction in this case, CMS has persisted in dragging its feet in implementing the January extension of Texas's demonstration project. The terms of the January extension and the Court's orders require CMS to work collaboratively with Texas toward approval of Texas's SDPs and materials required to implement the PHP-CCP. But, instead of working collaboratively with Texas toward approval of Texas's submissions, CMS has repeatedly and needlessly delayed the process and avoided making final decisions.

Before CMS would engage in conversations regarding Texas's SDP requests as required by the terms of the January extension, Texas had to obtain a court order. And even then, CMS resisted complying with its obligations. The Court ordered CMS to notify Texas of "specific further modifications required for approval" of Texas's pending SDP requests, ECF 40 at 4, but instead CMS demanded that Texas abandon its new SDPs to obtain short-term relief or start the approval process anew, *see* ECF 42-1 at 4 (Appendix). Texas has been negotiating with CMS in good faith, doing all it can to obtain approval of the SDPs by promptly responding to CMS's

requests and modifying its submissions as required, but CMS has resisted working collaboratively with Texas toward approval of the five SDP proposals on their individual merits. Instead, CMS has raised pretextual arguments, made demands beyond the scope of its authority, and generally failed to provide Texas with the sort of actionable information necessary to arrive at SDPs that are consistent with the terms of the January extension that CMS will approve.

CMS's obstruction and delay has extended to its review of materials necessary to implement the PHP-CCP. The January extension approved the PHP-CCP to begin on October 1, 2021, but CMS has not worked collaboratively with Texas to approve the necessary payment protocol and application tool. CMS waited six months to provide any feedback on Texas's request for approval of the program's payment protocol. And that one-page response demonstrates that CMS gave Texas's submission little, if any, consideration, provides no specifics regarding what CMS requires for its approval, and indicates CMS's desire to renegotiate the terms of the January extension. So long as CMS continues to unnecessarily delay approval of Texas's PHP-CCP submissions, providers cannot be certain that they will be reimbursed for expenses incurred and, thus, they may not provide services under the program.

The tactics CMS has and continues to employ violate the Court's orders and the terms of the January extension and are causing further irreparable harm to Medicaid providers that desperately need the funds being withheld on account of CMS's behavior. Without further court intervention to ensure that CMS complies with the preliminary injunction and terms of the January extension, the harm that necessitated the preliminary injunction will continue to grow, and the ability for Texas to recover from that harm when it ultimately prevails will become even more difficult. Accordingly, Texas moves the Court to exercise its broad discretion to enforce the preliminary injunction and respectfully requests that the Court hold an oral hearing on this motion.

## FACTUAL BACKGROUND

Because the Court is familiar with this case, this section focuses on events having taken place since the Court's August 12, 2021 Order to Clarify Sanctions Standards (ECF 40) and August 20, 2021 Opinion and Order granting Plaintiffs' motion for preliminary injunction (ECF 47).

### State Directed-Payment Program Negotiations

The Court's August 12 order was necessitated by CMS's failure to conform its conduct with the special terms and conditions ("STCs") of the January extension despite representing to the Court that it was acting as if the extension was in force while Plaintiffs' administrative appeal was pending. *See generally* ECF 40. In that order, the Court held that:

> Paragraphs 30–34 operate as a cohesive whole to require a series of ongoing communications by CMS to ensure that the state receives a timely decision on its proposed directed-payment programs. Paragraph 30 requires CMS to work collaboratively with the state for programs proposed to begin on September 1, 2021, which describe the programs at issue. That same paragraph specifically requires CMS to adhere to the milestones outlined in the special terms and conditions that follow.

*Id.* at 2 (citations omitted). The Court ordered Defendants to withdraw their representation or conform their conduct to the STCs of the January extension. *Id.* at 3–4.

Defendants purported to exercise the second option by presenting Texas with the choice of two options—neither of which is consistent with the January extension. *See* ECF 42-1 at 4 (Appendix). Under CMS's Option 1, Texas could abandon the new SDPs under CMS review and thereby abandon the January extension, which calculated budget neutrality based on the availability of these funds. *Id.*; Grady Decl. ¶ 22. Under CMS's Option 2, Texas could modify its submissions to address CMS's general comments, "submit new proposals," and thereby abandon the January extension by restarting the approval process. ECF 42-1 at 4 (Appendix). Regular correspondence and telephone conversations between CMS and HHSC regarding Texas's SDPs began shortly after CMS presented these two options. Grady Decl. ¶¶ 19–21.

On August 20, 2021, the Court "enjoin[ed] defendants from implementing the rescission and withdrawal" attempted by CMS's April 16 rescission letter. ECF 47 at 25. Since the preliminary injunction, CMS and HHSC have spoken every two business days, CMS has sent Texas four rounds of written questions (on August 20, September 10, September 24, and October 18, 2021), and CMS and HHSC have exchanged approximately eighty pages of correspondence. Grady Decl. ¶ 44; Ex. B.[1] Despite these calls and Texas's comprehensive written responses to CMS's questions regarding Texas's SDP proposals, little progress has been made toward approval of the five SDPs contemplated by the January extension and its STCs. Grady Decl. ¶ 44.

The lack of meaningful progress is the direct result of CMS's failure to work collaboratively and in good faith toward approval of Texas's SDP proposals. CMS has raised pretextual arguments to justify its refusal to approve Texas's SDPs on the ground that they are not compliant with CMS regulations. CMS has also demanded that Texas provide attestations without the requisite legal authority. And more generally, during the ongoing negotiations between CMS and HHSC, CMS has repeatedly and unjustifiably delayed and obstructed meaningful progress toward approval of Texas's SDPs.

### REVIEW OF PHP-CCP SUBMISSIONS

STC 39 of the January extension sets forth a process for CMS approval of HHSC submissions defining how the PHP-CCP—which was approved as part of the January extension and set to begin on October 1, 2021—will be implemented. ECF 29-1, Ex. C at 37–40. In compliance with STC 39, HHSC submitted documents to CMS for review on March 8 and on June 30, 2021. ECF 29-1 ¶¶ 10–13. CMS provided feedback only after the preliminary injunction.

---

[1] Unless otherwise indicated, references to exhibits in this Motion are reference to exhibits attached to the Declaration of Victoria Grady submitted in conjunction with this Motion.

Grady Decl. ¶¶ 5–6; Ex. C. CMS's feedback arrived in a one-page email sent on September 1, 2021—almost six months after Texas submitted the protocol to CMS. Ex. C. In that email, CMS did not approve the PHP-CCP protocol; instead, CMS provided only general feedback. *Id.*; *see* Grady Decl. ¶¶ 6–10. Even though the PHP-CCP was approved to begin on October 1, 2021, in the January extension (ECF 1-2, Ex. B at 3–4 (January 15 Letter); ECF 29-1, Ex. C at 37 (STC 39)), because of CMS's excessive delay and failure to "work collaboratively" with Texas to achieve timely approval of the payment protocol as required by STC 39 (ECF 29-1, Ex. C at 38), Medicaid providers still do not know the requirements that they must satisfy in order to be reimbursed by CMS for providing services under the program. Grady Decl. ¶ 17. And even though CMS has finally provided some feedback, prompt approval of the payment protocol appears unlikely, as the feedback that CMS provided indicates that CMS wants to renegotiate the terms of the January extension. *See id.* ¶¶ 7–9.

It is now November. The PHP-CCP and SDPs were scheduled to begin on October 1 and September 1, 2021, respectively (ECF 1-2, Ex. B at 3–4 (January 15 Letter); ECF 29-1, Ex. C at 31–32, 37 (STCs)), but neither the PHP-CCP nor any of the five SDPs that were part of the January extension are fully up and running due to CMS's ongoing refusal to comply with the Court's orders and the terms of the January extension. The result is an urgent need for court intervention, because CMS's noncompliance has caused further uncertainty for safety-net providers that rely on the supplemental payments and SDPs authorized by the January extension of Texas's demonstration project. *See* Grady Decl. ¶¶ 15, 17, 53; *see also* White Decl., Exs. A–B.

STANDARD

"A party may be held in contempt if he violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *SEC v. First Fin. Grp. of Tex.,*

*Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)). "A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (citing *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987)). "Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005).

**ARGUMENT**

**I. CMS must work collaboratively with Texas toward approval of Texas's SDPs and PHP-CCP submissions to comply with the STCs of the demonstration project and this Court's injunction.**

Defendants are subject to the preliminary injunction effective as of August 20, 2021, which remains in effect while this case is pending. ECF 47 at 25–26. That injunction prohibits them from "implementing the rescission and withdrawal stated in [the April 16, 2021] letter." *Id.* at 25. "With that injunction . . . , Texas's demonstration project . . . currently remains in effect as it existed on April 15, 2021." *Id.* With the demonstration project in effect, CMS is obligated to comply with its STCs, which became effective on January 15, 2021. ECF 29-1, Ex. C.

The preliminary injunction states that Defendants may be subject to contempt sanctions upon a showing that their failure to comply with the demonstration project's STCs "has a nexus to the April 16, 2021 rescission." ECF 47 at 25. "Agency foot-dragging in implementing the terms of the demonstration project may be inferred to stem from failure to respect the injunction based on the timing of any such noncompliance—whether it occurred or intensified after the rescission or this injunction—and any other relevant evidence." *Id.*

**A.  STCs 29–36 require CMS to work collaboratively with Texas toward approval of the five SDPs.**

The STCs require CMS to work collaboratively with Texas toward approval of five SDPs that comply with 42 C.F.R. § 438.6(c). ECF 1-2, Ex. B at 5 (January 15 Letter); ECF 29-1, Ex. C at 31–34 (STCs 29–36). The demonstration project contemplates five SDPs—CHIRP, TIPPS, RAPPS, DPP for BHS, and QIPP. ECF 29-1, Ex. C at 31–32 (STC 29). STC 30 states that "the state and CMS will work collaboratively towards consideration of approval of state requests and will adhere to the milestones outlined in the subsequent STCs." *Id.* at 32. As the Court previously found, STCs 30–34 "operate as a cohesive whole to require a series of ongoing communications by CMS to ensure that the state receives a timely decision on its proposed directed-payment programs." ECF 40 at 2; *see* ECF 29-1, Ex. C at 32–33 (STCs 30–34).

**B.  STC 39 requires CMS to work collaboratively with Texas to approve the payment protocol for the PHP-CCP within ninety days.**

As part of the January extension, CMS approved "new authority for the state to receive [federal financial participation] for payments made through the Public Health Providers Charity Care Pool (PHP-CCP) starting October 1, 2021." ECF 1-2, Ex. B at 3–4 (January 15 Letter). "The methodology used by the state to determine PHP-CCP payments" is specified in Attachment T to the STCs. *Id.* at 4. STC 39 provides that "payments from the PHP-CCP may be used to defray the actual uncompensated cost of eligible or uninsured individuals incurred by qualified providers" starting on October 1, 2021. ECF 29-1, Ex. C at 37. STC 39 provides that Attachment T—the "PHP-CCP Payment Protocol, also known as the funding and reimbursement protocol"—which "establishes rules and guidelines for the State to claim [federal financial participation] for PHP-CCP Payments . . . will be approved subsequent to [the] extension reward [sic]." *Id.* at 38. STC 39 sets forth an approval process by which "CMS and Texas will work collaboratively with

the expectation of CMS approval of the protocol within 90 calendar days after it receives the Attachment T." *Id.*

## II.    CMS's reasons for not approving Texas's SDPs are pretextual.

CMS has not respected the Courts' orders and acted in good faith to satisfy its obligations under STCs 29–36 of the January extension. Instead, after the preliminary injunction, CMS has repeatedly obstructed and delayed the SDP review process and thereby unjustifiably impeded achievement of the ultimate goal of these STCs—approval of Texas's SDPs. As a result of CMS's actions, the harm to Texas, its Medicaid providers, and its Medicaid beneficiaries has increased. CMS's reliance on pretextual arguments as the basis for its refusal to approve Texas's SDPs unquestionably demonstrates CMS's failure to respect the preliminary injunction. CMS is required to "offer genuine justifications for important decisions . . . that can be scrutinized by the courts and the interested public," but its pretextual arguments threaten to "defeat the purpose of that enterprise." *See Dept' of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). Texas moves the Court to order CMS to take specific actions, as indicated below, to ensure CMS meets its obligation to work collaboratively with Texas toward approval of Texas's five SDPs under the January extension, which were supposed to begin on September 1, 2021.

### A.    CMS is withholding approval of Texas's SDPs based on a pretextual claim that Texas's managed care organization capitation rates are not actuarially sound.

A blatant example of CMS relying on pretextual arguments to justify its refusal to approve Texas's SDPs is its assertion that the SDPs cannot be approved because they "would result in managed care capitation rates not being actuarially sound in accordance with section 1903(m)(2)(A)(iii) of the Act." ECF 42-1 at 2; *see also* Ex. A at 2 (August 20 CMS Comments) ("CMS is concerned that the resulting capitation rates are not actuarially sound."). Texas directly questioned CMS about the basis for this claim, and CMS admitted that its Office of the Actuary

had not performed an actuarial analysis. Grady Decl. ¶ 29. An actuarial analysis is performed to determine if an SDP capitation rate—i.e., the fixed amount of money that is paid to Medicaid providers each month for the delivery of health care services under the program—was developed using actuarially sound practices and principles and results in reasonable and appropriate payments to managed care organizations under the requirements of the SDP. *Id.* ¶ 28. The analysis is performed by a qualified actuary, who applies sound actuarial practices and principles in reviewing the SDP capitation rate in order to render an opinion on its soundness. *Id.* CMS's admission that it did not perform this analysis is an admission that its refusal to approve Texas's SDPs on this basis was pretextual. Texas moves the Court to order CMS to cease relying on this pretextual argument as a basis for not approving Texas's SDP requests.

The reason for CMS's pretextual claim is obvious: the Social Security Act requires payments to managed care organizations to be "made on an actuarially sound basis." 42 U.S.C. § 1396b(m)(2)(A)(iii). By claiming (without evidence) that Texas's capitation rates are not actuarially sound, CMS can assert that it is prohibited by statute from approving them. ECF 42-1 at 1 ("At this time, CMS cannot approve Texas's proposed SDPs in their current form because we are unable to establish that the proposed payments meet all applicable federal statutory and regulatory requirements under the Social Security Act . . . and implementing regulations."); Ex. A at 1 (August 20 CMS Comments) ("As described below, the state could modify all five (5) state directed payment preprints currently under CMS review for SFY 2022 to be consistent with statutory and regulatory requirements."). This pretext, however, demonstrates that CMS is *not* following the Court's orders to "work collaboratively" with Texas toward approval of Texas's SDPs. *See* ECF 29-1, Ex. C at 32 (STC 30) ("[T]he state and CMS will work collaboratively towards consideration of approval of state requests . . . ."); ECF 47 at 4, 22, 25–26 (finding that

the STCs require CMS to work collaboratively with Texas and explaining that "foot-dragging in implementing the terms of the demonstration project" may result in contempt sanctions). Quite the opposite—this is but one example of CMS's repeated efforts to drag out the approval process, hoping that, if it just threatens Texas's Medicaid funding long enough, Texas will acquiesce to CMS's demand that Texas effectively abandon the January extension by accepting CMS's Option 1, which requires Texas to abandon further negotiations to achieve approval of its pending SDPs. Texas moves the Court to order CMS to refrain from refusing to approve Texas's SDP requests when the basis for doing so is not supported by a statute or regulation. Texas also moves the Court to order CMS to explain its basis for asserting that Texas's SDP requests violate the particular statute or regulation.

### B. CMS has not explained how the total amount of funding under Texas's SDPs violates a statute or regulation.

CMS has suggested that its real concern is the amount of funding provided under Texas's SDPs, but that concern cannot support its decision to reject the SDPs, because that was not what CMS said in its comments. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (citing *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). CMS has never explained how the amount of funding for Texas SDPs, whether for an individual program or in aggregate for all five SDPs, runs afoul of 42 C.F.R. § 438.6(c), which governs CMS's review of Texas's SDPs. *See* Grady Decl. ¶¶ 21, 28–29. For the reasons provided below, Texas moves the Court to order CMS not to reject Texas's SDP requests based on their size or, at a minimum, order CMS to promptly explain what statute or regulation will be violated, how CMS has made that determination, and what size would be approvable.

While CMS has complained about the amount of funding for Texas's SDPs, it has not clearly indicated whether it is concerned about the total amount of funding for all of Texas's SDPs,

as a whole, or if it is concerned with the amount of funding for a particular SDP proposal. *See id.* Regardless of whether CMS is purportedly concerned with the funding for one SDP, or the total funding for all five SDPs, any such concern is misplaced and not a valid basis for asserting that Texas's SDPs cannot be approved.

First, the size of Texas's SDPs is fully contemplated in the January extension. *Id.* ¶ 22. During negotiation of the STCs, HHSC provided CMS with details of the individual SDPs, including the program funding amounts and the estimated impact to Texas's budget-neutrality calculations for the duration of the extension. ECF 29-1 ¶ 15; *id.*, Exs. G–H. The funding amounts for each of the five SDPs are also reflected in the budget neutrality workbook that is part of the January extension. Grady Decl. ¶ 22; A.R. 6224. Attachment U to the January extension's STCs includes Texas's estimated without waiver per member per month expenditures, and these amounts are based on the calculations in the budget neutrality workbook, which include the funding amounts for the five SDPs. Grady Decl. ¶ 22; ECF 29-1, Ex. C at 59; Ex. D (Attachment U). And STC 62 provides that Texas and CMS agreed that "the budget neutrality will be adjusted so that budget neutrality accounts for annualized amounts of CMS-approved state directed payments . . . expenditures made in DY11," which would begin October 1, 2021. ECF 29-1, Ex. C at 58.

Second, although the amount of SDP funding may be significant, that should not surprise CMS. The amount of SDP funding depends on both the capitation rate and the Medicaid caseload in Texas. Grady Decl. ¶ 42. Texas, a large state with a large Medicaid population prior to the COVID-19 pandemic, has experienced almost thirty-percent growth in Medicaid enrollment as a result of the COVID-19 pandemic and federal requirements that prohibit Texas from disenrolling individuals from Medicaid during the on-going public health emergency. *Id.*; *see* Families First

Coronavirus Response Act, Pub. L. No. 116-127, § 6008(b)(3) (2020); American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9814 (2021) (adding 42 U.S.C. § 1396d(ii)(1)).

Third, there is nothing unique about the methodology that Texas is using to set its capitation rates. Using CHIRP as an example, because CMS has focused on that program as negotiations have proceeded, the proposed capitation rate is consistent with the rate proposed by another State that CMS has approved. Grady Decl. ¶ 37. The proposed capitation rate for CHIRP is based on average commercial rates, which CMS has confirmed is an acceptable comparator. *Id.* Texas has proposed to cap payments under CHIRP at 90% of the aggregate percentage of average commercial rates that a hospital class can receive as a compromise, in order to reduce by $300 million the amount of funding provided under CHIRP and, hopefully, alleviate CMS's purported concern. *Id.*; Ex. B at 16. Kentucky recently proposed a similar rate, and CMS approved Kentucky's SDP proposal. Grady Decl. ¶ 37; *see* Ex. E at 4 ("Final reimbursement is intended to result in spending of approximately 90% of the gap between existing MCO rates and average commercial rates . . . ."); Ex. F (CMS approval letter).

Even if the size of Texas's SDPs were not contemplated by the January extension and reasonable for the reasons provided above, it would be improper for CMS not to consider Texas's SDP proposals on their individual merits. Each of Texas's five SDPs was submitted as a separate proposal to be reviewed for compliance with 42 C.F.R. § 438.6(c). Grady Decl. ¶ 18. The STCs of the January extension set forth a process for review and approval of individual requests for SDPs, not the package of requests as a whole. *See* ECF 29-1, Ex. C at 32–33 (STCs 30–33). Texas's individual SDP proposals vary in size, yet CMS has not distinguished amongst them. Grady Decl. ¶ 29. Accordingly, to the extent the Court permits CMS to continue to rely on the size of Texas's SDP requests as a valid reason for not approving Texas's SDP requests, Texas moves the Court to

order CMS to review each of Texas's five SDP requests individually and explain why a request is not approvable based on statute or regulation accordingly.

### C.  CMS's offer to approve some SDPs under Option 1 underscores the pretextual nature of CMS's grounds for refusing to approve all SDPs under Option 2.

The general structure of CMS's offer of two options to Texas underscores the pretextual nature of its actions. Beyond its pretextual actuarial-soundness complaint, CMS has asserted that each of Texas's five SDPs requires a multitude of modifications "to be consistent with statutory and regulatory requirements." *See generally* Ex. A (Aug. 20 CMS Comments). However, at the same time, CMS has not raised those same issues as a barrier to approval of QIPP and a revised version of CHIRP if Texas otherwise abandons the five SDP proposals under the January extension. CMS's inconsistent positions reveal another pretextual argument causing unnecessary delay, because if a program can be approved by CMS without addressing these purported issues, then those issues cannot be a statutory or regulatory barrier to the approval of the SDPs that form part of the January extension. Texas moves the Court to order CMS to cease from relying on the grounds addressed in this section as a basis for refusing to approve Texas's SDP requests.

After the Court's August 12 order, in a letter sent to Texas the next day, CMS presented Texas with two "modification options" for how CMS would proceed with negotiations, ECF 42-1 at 2, even though the Court's order required Defendants "to either: (1) withdraw or modify their representation that CMS is treating the Demonstration Project as in effect . . . , or (2) conform their conduct with the Demonstration Project's special terms and conditions" as interpreted by the Court, ECF 40 at 3. CMS apparently believed that its proposal satisfied the option to conform its conduct by "notifying the state why CMS does not anticipate approving the [directed-payment] programs and notifying the state of specific further modifications required for approval" pursuant to the Court's order. *Id.* at 3–4.

CMS's Option 1 was not responsive to the Court's order. Instead of notifying Texas "of specific further modifications required for approval" of Texas's five SDPs submitted for CMS's review and approval, *id.* at 4, CMS asked Texas to abandon all of the new programs contemplated by the January extension. CMS asked Texas to withdraw its preprints for TIPPS, RAPPS, and DPP for BHS and revise its preprint for CHIRP "to reflect only the [UHRIP] payment amounts that were approved in UHRIP for SFY 2021." ECF 42-1 at 4 (Appendix). CMS offered to approve QIPP (which is not a new program) "for SFY 2022 as currently submitted and consistent with the payment amounts approved in QIPP for SFY 2021." *Id.* Only Option 2 purported to identify issues that needed to be resolved for CMS to approve Texas's five SDPs, but CMS failed to notify Texas of "specific further modifications required for approval." *Id.* In fact, under Option 2, CMS asked Texas to "submit new proposals," which would require the approval process to begin again at square one. *Id.*

While continuing to ask Texas to pursue Option 1, and abandon the new SDPs, on August 20, 2021, CMS finally provided "more detailed information under Option 2." Ex. A at 1 (Aug. 20 CMS Comments). For approval of QIPP under Option 2, CMS directed Texas to: (1) "[r]emove the 18% reconciliation threshold on component 1," (2) "base payments only on current utilization or performance measured during the contract rating period," (3) "[r]equire that any payments based on performance are made only for facilities that achieve year over year improvement," and (4) "[r]efine the evaluation plan." *Id.* Under Option 2, CMS demanded virtually identical modifications for TIPPS, RAPPS, and DPP for BHS. *Id.* at 2–3. Under Option 1, in its offer to approve QIPP, CMS did not ask Texas to address any of these issues. ECF 42-1 at 4 (Appendix).

For approval of CHIRP under Option 2, in addition to the pretextual actuarial-soundness issue addressed above, CMS directed Texas to: (1) "provide a complete reimbursement analysis

with a comparison to the average commercial rate for hospitals that only participate in the UHRIP component of the state directed payment" and (2) "[r]efine the evaluation plan . . . to ensure that the effect of CHIRP state directed payment, absent other programmatic changes or other state directed payments, can be appropriately evaluated by the state, including a sound attribution methodology." Ex. A at 2. Under Option 1, CMS did not ask Texas to address any of these issues. ECF 42-1 at 4 (Appendix).

In addition to the SDP-specific modifications that CMS demanded for approval under Option 2, CMS also asked Texas to address purported issues with statutory and regulatory compliance based on the source of Texas's non-federal share. Ex. A at 3–4 (Aug. 20 CMS Comments). But CMS did not identify these as issues preventing approval of CHIRP as revised under Option 1. ECF 42-1 at 4 (Appendix).

If statutory or regulatory obstacles prevented CMS from approving QIPP or CHIRP, then the issues would need to be resolved under Option 1 *or* Option 2. CMS's offer to approve QIPP in its current form and CHIRP as revised if Texas abandons its other SDPs, reveals that the cited issues are not actually statutory or regulatory obstacles to CMS approval of QIPP, CHIRP, or Texas's three other SDP proposals. Instead, they are additional pretextual issues raised for the purpose of delay, contrary to the terms of the January extension and the preliminary injunction. Accordingly, Texas moves the Court to order CMS to cease relying on these purported issues as a basis for refusing to approve Texas's SDP requests.

> ### D. CMS has also asserted that the Social Security Act and CMS regulations require attestations that Texas has not provided, but CMS's demand exceeds the scope of its authority.

CMS's refusal to approve Texas's SDPs because Texas has not provided CMS with attestations that CMS cannot legally require Texas to provide is another example of CMS's reliance on pretext. Texas moves the Court to find that CMS's request for these attestations is

beyond its authority, and order CMS to cease from refusing to approve Texas's SDP request because it has not provided these attestations.

CMS has demanded attestations relating to the sources of Texas's non-federal share of Medicaid funding. To receive federal funding, States must ensure that they can fund the remaining amount of Medicaid expenditures. Grady Decl. ¶ 23. States may fund this non-federal share using either state or local government funds. *Id.* Since 2013, Texas has authorized the use of Local Provider Participation Funds ("LPPFs"), which are accounts into which certain authorized local governments may deposit mandatory payments from hospitals to use as intergovernmental transfers to HHSC. *Id.* ¶ 31. HHSC can use the money transferred from the LPPF as the non-federal share of Medicaid funding. *Id.* CMS has authorized the use of LPPFs as Texas's non-federal share matching funds since they were first authorized in 2013. *Id.* For example, these LPPF-derived funds have been used previously for UHRIP and DSRIP.[2] *Id.*

When a State's non-federal share is funded by provider taxes, the Social Security Act and CMS regulations prohibit holding providers harmless from the burden of the tax. *See* 42 U.S.C. § 1396b(w)(1)(A)(iii), (w)(4); 42 C.F.R. § 433.68(a), (b), (f). In its August 13 letter, CMS stated that Texas needed to "affirm and document compliance" with these hold-harmless provisions to address CMS's concerns. ECF 42-1 at 4 (Appendix). On August 20, 2021, CMS asked Texas to attest that:

> a. No localities impose a tax where all hospitals paying the tax receive their total tax cost back in the form of Medicaid payments funded by the tax (including localities that impose a tax on a single hospital).

---

[2] As discussed above, under CMS's Option 1, CMS offered to approve CHIRP as modified "to reflect only the [UHRIP] payment amounts that were approved in SFY 2021" without demanding that Texas provide these attestations. ECF 42-1 at 4 (Appendix). CMS has also offered to extend DSRIP for one year without requiring these attestations. *Id.* at 2–3. As explained above, this shows that CMS's assertion that these attestations are required by statute or regulation is mere pretext.

> b. No localities impose a tax on hospitals that are not located within the boundaries of their jurisdiction.
> c. That the state will actively oversee how the locality taxes and LPPF arrangements meet federal requirements on an ongoing basis.

Ex. A at 3 (Aug. 20 CMS Comments). CMS also asked for "[w]ritten attestations from all participating hospitals that they do not participate in arrangements, through written agreements or otherwise, which involve participating hospitals transferring, redirecting, redistributing (including through pooling arrangements) Medicaid payments to other Medicaid providers, directly or indirectly." *Id.* at 4.

Texas provided its attestation, with the caveat that "HHSC does not have regulatory authority nor oversees the operation of any LPPF." Ex. B at 68 (Aug. 25 HHSC Responses). As for CMS's request for attestations from all participating hospitals, Texas explained that "the state has implemented an LPPF monitoring requirement to ensure that units of local government with authority to operate an LPPF do not have any statutes, regulations, or policies that could constitute such a guarantee." *Id.* at 68–69. But Texas also explained that "the law CMS purports to be enforcing refers to arrangements in which the State or other unit of government imposing the tax provides for any payment that guarantees to hold taxpayers harmless," but it does not "give CMS the authority to regulate (or require States to regulate) transactions between private providers in which the State is not involved." *Id.* at 69.

## 1. CMS lacks authority to demand attestations from Texas regarding transactions between private providers.

As Texas told CMS, the Social Security Act's definition of a hold-harmless provision does not encompass transactions between private providers not involving the State or local government. Instead, the definition is based solely on actions of "[t]he State or other unit of government imposing the tax" and the form of payment made by the State to the taxpayer. *See* 42 U.S.C. § 1396b(w)(4). The implementing regulation, 42 C.F.R. § 433.68(f)(3), is the same—referencing

"[t]he State (or other unit of government) imposing the tax" and the form of payment from the State to the taxpayer. As CMS itself explained in adopting the regulation:

> A direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments). A direct guarantee does not need to be an explicit promise or assurance of payment. Instead, *the element necessary to constitute a direct guarantee is the provision for payment by State statute, regulation, or policy*.

Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685, 9694 (Feb. 22, 2008) (to be codified at 42 C.F.R. pt. 433) (emphasis added).

In 2019, CMS published a proposed rule intended to reach agreements by taxpayers "to redistribute . . . Medicaid payments to ensure that taxpayers, when accounting for both the original Medicaid payment (from the state, unit of local government, or MCO) and any redistribution payment from another taxpayer or taxpayers, receive all or any portion of their tax amount back." Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63722, 63734 (Nov. 18, 2019) (to be codified at 42 C.F.R. pts. 430, 433, 447, 455, and 457). The proposed rule would have added "a net effect standard to § 433.68(f)(3)" to try to reach the agreements between taxpayers not involving the State. *See id.* at 63736. The proposed rule, however, never became final. CMS withdrew it in January 2021. Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5105, 5105 (Jan. 19, 2021).

Thus, the 2008 rule remains in effect, and CMS lacks authority to demand attestations from all participating hospitals. This is what Texas told CMS when it provided its own attestation. Ex. B at 69 (Aug. 25 HHSC Responses). Texas moves the Court to find that CMS lacks the authority to demand this attestation under the 2008 rule and, for this reason, order CMS to cease from refusing to approve Texas's SDP requests because it has not provided the attestation.

## 2. CMS's attempt to require this attestation is an attempt to renegotiate the terms of the January extension.

During negotiation of the terms of the January extension, Texas maintained the same position regarding CMS's lack of authority under the Social Security Act and CMS regulations to demand the attestations that CMS is now requiring before it will approve Texas's SDPs, and the end result of those negotiations were STCs that omitted any such requirement. Grady Dec. ¶ 36. CMS proposed STCs that would have required Texas to submit a report that would include: "Any agreement, written or otherwise, regarding any arrangement between or among the provider(s) subject to the tax, any group or entity related to the provider(s) subject to the tax, the county or other unit of government imposing the tax, and the state, for each locality tax," but Texas (a) explained to CMS that it is "unable to compel" the requested information from third parties, (b) explained that "CMS's authority extends only as far as an arrangement that involves 'the State or other unit of government imposing the tax,'" and (c) modified the STC accordingly. *E.g.*, A.R. 5543; A.R. 5549. CMS's insistence on applying this requirement after it was addressed during negotiations and omitted from the STCs of the January extension (*see generally* ECF 29-1, Ex. C), is an improper attempt to renegotiate the terms of the January extension and expand CMS's authority beyond what the law permits when the preliminary injunction requires CMS to treat Texas's demonstration project as "in effect as it existed on April 15, 2021." ECF 47 at 25–26. Texas moves the Court to find that the attestation requested by CMS is not within the terms of the January extension and, for that reason as well, order CMS to cease from refusing to approve Texas's SDP requests because it has not provided the attestation.

\*     \*     \*

CMS's attestation demand is unsupported by law, an improper attempt to renegotiate the terms of the January extension, and, as far as Texas is aware, an unprecedented request not required

of any other State for CMS approval of an SDP proposal. *See* Grady Decl. ¶¶ 50–51. This is yet another example of CMS's reliance on pretext to delay approval of Texas's SDPs following the preliminary injunction. Texas moves the Court to order CMS to stop citing Texas's failure to provide this attestation as a basis for not approving Texas's SDPs.

### III.   The above examples are part of a larger pattern of CMS delay and obstruction.

At no time following the April 16 rescission letter has CMS made a good faith effort to work collaboratively with HHSC toward approval of Texas's SDPs, whether required to do so because of the State's administrative appeal or this Court's orders. Instead, CMS has—and continues to—unnecessarily delay the process and avoid making a final decision on Texas's pending SDPs. The three examples discussed above are glaring examples of CMS flaunting its obligations under the preliminary injunction and the STCs of the January extension, but CMS has engaged in other tactics that merit discussion.

Before the Court entered its Order to Clarify Sanctions Standards, Defendants "represented to the court that they [were] 'acting as if the January approval [of Texas's Demonstration Project] is in force' while [the State's] administrative appeal [was] pending," ECF 40 at 1, but they were not, as the State explained in prior briefing. It required a court order to get CMS to begin conforming its conduct with the STCs by providing HHSC with the notification required by STC 33, and beginning the phone calls required by STC 34. *Id.* at 3–4. But when CMS provided that notice, it did not do as instructed—i.e., "notify[] the state of specific further modifications required for approval." *Id.* at 4. Instead, CMS gave HHSC two inconsistent options: abandon the new SDPs (Option 1) or submit new proposals (Option 2). ECF 42–1 at 4 (Appendix). Since then, although HHSC notified CMS that it intended to continue to pursue approval of the new SDPs while accepting Option 1, *see generally* Ex. G (Sept. 7 Letter), CMS has refused to budge off its binary choice, which is inconsistent with the terms of the STCs, and it has never responded to Texas's

proposal to accept the interim relief afforded under Option 1 while still pursuing approval of regulatory-compliant SDPs under Option 2. Grady Decl. ¶¶ 38, 46. Texas moves the Court to order CMS to formally respond to Texas's notification letter and remind CMS of its obligation under the preliminary injunction to work collaboratively with Texas toward approval of the SDPs, not to pressure Texas to abandon them.

After the Court's orders (ECF 40, ECF 47), CMS has nominally participated in the discussions every two business days required by STC 34 (ECF 29-1, Ex. C at 33), but CMS has not participated as a willing participant interested in working collaboratively with Texas toward approval of its SDPs. *See* Grady Decl. ¶ 45. Almost exclusively, CMS has deferred to Texas to set the agenda for the calls, and then during the calls, CMS has frequently been unable to discuss Texas's proposals because CMS is still evaluating information, or because the matter is "sitting" with CMS leadership. *Id.* ¶¶ 39, 45, 50. On these occasions, CMS has been unable or unwilling to indicate when it will be prepared to respond to information provided by Texas. *Id.* Often CMS has appeared unprepared for meaningful discussions, requiring Texas to provide an overview of information Texas presented in writing before the call. *Id.* ¶ 45. Because of CMS's inability or unwillingness to prepare for and actively participate in these calls, many have lasted for mere minutes. *Id.* In order to ensure that CMS meets its obligation under STC 34 (ECF 29-1, Ex. C at 33) to meet and discuss any modifications required to approve Texas's SDPs (*see* ECF 40 at 2), Texas moves the Court to order CMS to review Texas's submissions in advance and to be prepared to meaningfully discuss that information.

When CMS provides written requests for modifications or information, it usually does so on Friday at the end of the day. Grady Decl. ¶ 44. Texas has worked diligently to promptly respond to CMS's requests, but then CMS will take weeks to review Texas's responses and provide

additional feedback. *Id.* ¶¶ 43–44. When CMS does provide comments to Texas's submissions, it has often failed to specify whether its comments are driven by law or policy preferences, and CMS has ignored requests from Texas to provide this specificity. *Id.* ¶ 38. To ensure that progress toward approval of Texas's SDPs can be achieved in a timely fashion, Texas moves the Court to order CMS to reply to information provided by Texas in a timely manner and, when it does so, to specifically identify the statute or regulation that CMS believes prevents approval, if any, and the basis for that position.

CMS has also impeded progress toward approval of Texas's SDPs by insisting that none of the programs can be approved until all purported issues with all five programs have been resolved. *Id.* And CMS has requested modifications to Texas's submissions, waited for Texas to make those modifications, and then asked for additional information and indicated that Texas may need to make further modifications. *Id.* ¶ 47; Ex. B at 3–10, 25–33, 41–49, 51–59. Texas moves the Court to order CMS to review Texas's SDP proposals individually and to not reopen issues by asking for more information or further modifications after Texas has addressed CMS's concerns with a program's statutory or regulatory compliance.

Taken together, these actions and those discussed above demonstrate CMS's refusal to comply with the preliminary injunction and STCs of the January extension. Without further Court intervention, CMS will continue to obstruct progress and create further delays.

## IV. CMS has violated the preliminary injunction by failing to work collaboratively with Texas on approval of the PHP-CCP's payment protocol and application tools.

CMS's failure to abide by the terms of the January extension that govern implementation of the PHP-CCP also demonstrates CMS's disregard for its obligations under the preliminary injunction. The January extension "provide[s] new authority for [Texas] to receive [federal financial participation] for payments made through the [PHP-CCP] starting October 1, 2021." ECF

1-2, Ex. B at 3–4 (January 15 letter). STC 39 governs implementation of the PHP-CCP, and it specifies a process and timeline for CMS approval of the program's payment protocol and application tools. ECF 29-1, Ex. C at 38. The PHP-CCP payment protocol and application tools must be approved according to the specified timeline to effectively implement the program. *See* Grady Decl. ¶¶ 5, 9, 15, 17. Both before and after the preliminary injunction, CMS has unreasonably delayed approval of Texas's STC 39 submissions, and as a result, Medicaid providers have been unable to implement the program. *Id.* ¶¶ 9, 15, 17.

### A.  The Initial Payment Protocol for October 1, 2021, to September 30, 2022

STC 39 provides for CMS's approval of an initial version of the PHP-CCP payment protocol (Attachment T):

> The PHP-CCP Payment Protocol, also known as the funding and reimbursement protocol, establishes the rules and guidelines for the State to claim FFP for PHP-CCP Payments and will be appended to these STCs as Attachment T, which ***will be approved*** subsequent to this extension reward [sic].

ECF 29-1, Ex. C at 38 (emphasis added). This initial version of Attachment T would govern the first year of the program, from October 1, 2021, to September 30, 2022, and an addendum to the Attachment T that would be submitted and approved at a later date would govern the second year of the program. *See id.*

Texas submitted the initial version of Attachment T on March 8, 2021, prior to the filing of this case. ECF 29-1 ¶ 11; *id.*, Ex. D (receipt confirmation); Ex. H (Attachment T). STC 39 specifies that CMS will "work collaboratively" with Texas "with the expectation of CMS approval of the protocol within 90 calendar days after it receives the Attachment T." ECF 29-1, Ex. C at 38. These 90 days expired on June 6, 2021, but Texas did not receive any feedback from CMS until September 1, 2021, 177 days after its submission and only one month before the PHP-CCP was set to begin. Grady Decl. ¶¶ 5–6; Ex. C. CMS had nearly six months to review the payment

protocol, but it provided no useful comments in its belated response, which consisted solely of a one-page email containing no actionable feedback. *See* Grady Decl. ¶¶ 6–10; Ex. C. CMS's extensive delay and failure to provide useful feedback are inconsistent with its obligation to work collaboratively with Texas toward timely approval of the submissions. As evidenced by the feedback in its one-page email, CMS did not review HHSC's submission, did not review the STCs in the January extension, and now seeks to use the approval process to renegotiate the terms of the PHP-CCP. Grady Decl. ¶ 12.

The feedback in CMS's one-page email comprised three points, with the third having four subparts. Ex. C. CMS first asserted that it needed "additional information on the roles and relationships of the entities the state intends to make the pool available to, with respect to local governments." *Id.* If CMS had reviewed the Attachment T that Texas submitted in March, it would have found this information in the first sentence on the first page:

> Publicly-owned and operated Community Mental Health Clinics (CMHCs), Community Centers, Local Mental Health Authorities (LMHAs) and Local Behavioral Health Authorities (LBHAs) providing behavioral health services under Chapter 533 or Chapter 534 of the Texas Health & Safety Code and publicly-owned and -operated Local Health Departments (LHDs) and public health districts (PHDs) that are established under the Texas Health and Safety Code, Title 2, Subtitle F, Chapter 121 are eligible to participate in the PHP-CCP.

Ex. H at 1.

Next, CMS stated that "501(c)(3) are not Governmental entities and [are] ineligible to participate in a Certified Public Expenditure Per Social Security Act 1903(w)(6)." Ex. C. This too shows that CMS did not review the Attachment T that Texas submitted in March. The January extension approval, its STCs, and the March Attachment T each state that only publicly owned and operated health providers (not 501(c)(3) entities) are eligible to participate. ECF 1-2, Ex. B at 4 (January 15 letter); ECF 29-1, Ex. C at 37 (STC 39); Ex. H at 1 (Attachment T).

With its third and final comment, CMS once again demonstrated that it had not reviewed the Attachment T from March. CMS asserted that Texas's "intended cost report structure is inadequate" and would require four "modifications to be approvable." Ex. C. The first modification that CMS demanded was "[i]solation of costs and revenues associated with providing care to Medicaid and uninsured populations." *Id.* But Texas's March Attachment T already instructed providers to complete "Exhibit 1: General and Statistical Information," which requests this information. Ex. I at 2-3 (HHSC response); *see* Ex. H at 6–8 (March Attachment T); *see also* Ex. J at 11–13 (June addendum). This is also reflected in the application tool that HHSC submitted in June, which specifically requests the information in rows 17–22 and 27–29 of Exhibit 1. Ex. I at 2.

The next two modifications demanded by CMS in the third bullet would require Texas to modify the payment protocol based on a time study and step down time and effort to costs. Ex. C. Neither finds support in the terms of the January extension, and they would make implementation of the PHP-CCP in its first year effectively impossible. *See* Grady Decl. ¶ 9. CMS's demand for a time study is particularly problematic and revealing of CMS's disregard for its obligation to work collaboratively toward approval of Texas's submissions. It would take nine months to one year to complete such a study, and any costs incurred by providers prior to its completion would not be reimbursable. *Id.* But CMS made its demand only one month before PHP-CCP was to begin. *Id.* Withholding approval of the payment protocol based on this new condition would effectively cancel the first year of the PHP-CCP. *Id.*

The terms of the January extension authorize the PHP-CCP to begin on October 1, 2021. ECF 29-1, Ex. C at 37. But CMS's delay has resulted in a funded program that Medicaid providers cannot implement. Without an approved payment protocol (Attachment T), Medicaid providers

lack certainty about the requirements for reimbursement by CMS. *See* Grady Decl. ¶¶ 9, 15, 17. Without certainty that they will be reimbursed by CMS in the future, those providers may not incur the costs to provide services now. *Id.* ¶ 17.

In light of the requirement in STC 39 that CMS "work collaboratively" with Texas "with the expectation of CMS approval of the protocol within 90 calendar days after it receives the Attachment T"—and in light of the fact that Texas's initial Attachment T has been pending with CMS for nearly six months—Texas moves the Court to order CMS to immediately coordinate with Texas on an accelerated review process for Texas's initial Attachment T. Further, Texas moves the Court to order CMS to cease from seeking modifications beyond the agreed-upon terms for the PHP-CCP—such as its requests for Texas to perform a time study and step down time and effort to costs—as part of the review process.

**B.  The PHP-CCP Application Tool and Addendum to Attachment T**

STC 39 also requires that HHSC "obtain CMS approval of the application tools used to collect the information needed to determine the eligibility of providers to participate in the PHP-CCP pool and their eligible uncompensated costs, as described in the protocol for [demonstration year] 11,"[3] by June 30, 2021. ECF 29-1, Ex. C at 38. Developing this tool requires an approved protocol. Grady Decl. ¶ 5. CMS's failure to work collaboratively with Texas on approval of the protocol submitted in March had a cascading impact on compliance with this deadline. *Id.* On June 30, 2021, HHSC submitted the application tool to CMS even though CMS had not responded to its March protocol submission. *Id.*; ECF 29-1 ¶ 13; *id.*, Ex. E (June 30 email). CMS still has not approved the application tool, and without CMS's approval of the tool, Texas

---

[3] Demonstration year 11 (or DY 11) runs from October 1, 2021, to September 30, 2022. ECF 29-1, Ex. C at 37–38.

cannot make payments to providers. *See* ECF 29-1, Ex. C at 38 (requiring HHSC to "obtain CMS approval of the application tools used to collect the information needed to determine the eligibility of providers . . . and their eligible uncompensated costs); Grady Decl. ¶ 5.

HHSC also submitted the addendum to Attachment T, which would govern demonstration year 12 (October 1, 2022, to September 30, 2023), to CMS on June 30, 2021, even though the protocol for demonstration year 11 still remained pending before CMS. *Id.*; ECF 29-1 ¶ 12; *id.*, Ex. E (June 30 email); Ex. J (June Addendum).

Both of these submissions occurred while CMS was under an obligation to treat the January extension as in effect.[4] Though CMS previously argued that it need not act before 90 days have passed, ECF 37 at 6; ECF 37-1 ¶¶ 13–14, its actual obligation is to "work collaboratively" with Texas "with the expectation of CMS approval of the protocol within 90 calendar days" after receipt. ECF 29-1, Ex. C at 38. The 90 days for the materials submitted by HHSC on June 30, 2021, expired on September 28, 2021.

Again in light of the requirement in STC 39 that CMS "work collaboratively" with Texas "with the expectation of CMS approval of the protocol within 90 calendar days after it receives the Attachment T," Texas moves the Court to order CMS to promptly identify any statutory or regulatory issues preventing approval of Texas's application tool and addendum to Attachment T and coordinate with Texas on an accelerated review process for these two pending submissions.

---

[4] Defendants have represented to the Court that they were obligated to treat the January extension as effective, even without a preliminary injunction, while the DAB appeal was pending. ECF 40 at 1. The DAB appeal was dismissed after the Court granted the preliminary injunction. ECF 65-1. Thus, the January extension was effective from January 15, 2021, to April 16, 2021, and CMS has been required to treat it as in effect from May 14, 2021, until a final judgment is entered in this case. ECF 47 at 26. The time to appeal the Court's preliminary injunction expired on October 19, 2021. Fed. R. App. P. 4(a)(1)(B).

**REQUESTED RELIEF**

Texas respectfully requests that the Court exercise its broad discretion to address CMS's failure to comply with its obligations under the preliminary injunction and the terms of the January extension. Texas does not ask the Court to order CMS to approve its SDPs or PHP-CCP submissions, but Texas does request the Court to order CMS to cease certain practices that have impeded progress toward approval of regulatory-compliant SDPs and timely approval of the protocol and application tool required to implement the PHP-CCP.

To that end, Plaintiffs move the Court to order the relief requested above in the body of this Motion and, to the extent not already requested: (a) order CMS to cease imposing requirements for approval of Texas's submissions that are not based on the terms of the January extension, statute, or regulation; (b) order CMS to specifically identify the basis for its requests for modifications or information in an STC, statute, or regulation; (c) order CMS to cease from making requests for additional modifications or information regarding a matter after CMS has acknowledged that a submission complies with terms of the January extension and statutory and regulatory requirements; (d) order CMS to review Texas's SDP requests on a program-by-program basis; (e) order CMS to refrain from withholding approval of Texas's SDP requests on the basis that the program's capitation rate is not actuarially sound without having completed an actuarial analysis; (f) order CMS to specifically identify the statute or regulation that requires Texas to modify the amount of funds available under an SDP and the amount of funds that would be permitted by that statute or regulation; and (g) find that CMS lacks the authority to require Texas to provide information about agreements between private businesses that are subject to a mandatory payment to an LPPF when neither Texas nor a unit of local government is party to that agreement.

## CONCLUSION

Plaintiffs respectfully request that the Court find that CMS has violated the preliminary injunction and order CMS to modify how it conducts its review obligations under the STCs of the January extension to ensure that CMS works collaboratively with HHSC to achieve timely approval of HHSC's submissions. Plaintiffs also request that the Court set this motion for an oral hearing.

Date: November 2, 2021

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JUDD E. STONE II
Solicitor General
*Lead Counsel*
Texas Bar No. 24076720
Judd.Stone@oag.texas.gov

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant
  Attorney General

LANORA C. PETTIT
Deputy Solicitor General
Texas Bar No. 24115221

LESLEY FRENCH
Chief of Staff

WILLIAM T. THOMPSON
Principal Deputy Chief, Special Litigation
Unit
Texas Bar No. 24088531

PATRICK SWEETEN
Deputy Attorney General for
  Special Litigation

BENJAMIN D. WILSON
Assistant Solicitor General
Texas Bar No. 24084105

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*/s/ Jeffrey M. White*
JEFFREY M. WHITE
Special Counsel
Texas Bar No. 24064380

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2021, this document was filed with the Court through its CM/ECF service, which served a copy on all counsel of record.

*/s/ Jeffrey M. White*
JEFFREY M. WHITE

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that Plaintiffs have complied with the meet and confer requirement in Local Rule CV-7(h). Defendants oppose the present motion. Jeffrey M. White, counsel for Plaintiffs, and Keri Berman, counsel for Defendants conferred by telephone on November 1, 2021, and November 2, 2021. The parties could not reach an agreement because they disagree about whether the issues raised violate the preliminary injunction. The parties are presently at an impasse that requires resolution by the Court.

*/s/ Jeffrey M. White*
JEFFREY M. WHITE