IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS; TEXAS | § | |
| HEALTH AND HUMAN SERVICES | § | |
| COMMISSION | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:21-CV-191 |
| | § | |
| CHIQUITA BROOKS-LASURE, in | § | |
| her official capacity as | § | |
| Administrator of the Centers | § | |
| for Medicare & Medicaid Services, | § | |
| et al. | § | |
| Defendants. | § | |

**RESPONSE IN OPPOSITION TO
MOTION TO ENFORCE PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.      Introduction ............................................................................. 1

II.     Standard ................................................................................. 1

III.    Argument ................................................................................ 2

        a.      The parties have made consistent progress towards resolving flaws in
                Plaintiffs' SDP proposals ........................................................ 4

                i.       CMS directed payment approval methodology. .................................. 4

                ii.      The parties have resolved all concerns related to reconciliation,
                         evaluation, and quality improvement. ..................................... 6

                iii.     The parties have resolved all actuarial soundness concerns for
                         the five proposed SDPs .................................................. 8

                iv.      CMS has determined that two SDPs are approvable and has
                         approved those payments for use in Texas's Medicaid Program ...... 10

        b.      Plaintiffs are delaying resolution of the only issue with the remaining
                SDPs ................................................................................. 11

                i.       Statutory and Regulatory Background ...................................... 11

                ii.      Texas's Local Provider Participation Fund (LPPF)
                         Arrangement ............................................................. 13

                iii.     Texas's arguments do not relieve it of its obligation to ensure a
                         permissible non-federal share ........................................... 14

        c.      Plaintiffs' allegations of non-compliance and bad faith are
                unsupported .......................................................................... 17

                i.       CMS has acted in good faith. ............................................ 18

                ii.      The concerns CMS raised as to the approvability of Texas's
                         SDPs were and are bona fide ............................................. 20

        d.      CMS is working collaboratively to approve the PHP-CCP protocol............ 23

        e.      The relief requested by Plaintiffs is unwarranted, unnecessary, or
                ineffective .......................................................................... 29

IV.     Conclusion .............................................................................. 31

# TABLE OF AUTHORITIES

**CASES**

*In re Bradley*,

   588 F.3d 254, 264 (5th Cir. 2009) ........................................................................ 2

*FDIC v. LeGrand*,

   43 F.3d 163, 170 (5th Cir. 1995) .......................................................................... 2

*SEC v. Res. Dev. Int'l LLC*,

   217 F. App'x 296, 298 (5th Cir. 2007) ................................................................. 2

*SEC v. First Financial Group of Texas, Inc.*,

   659 F.2d 660, 669 (5th Cir. 1981) ........................................................................ 2

*United States v. Rizzo*,

   539 F.2d 458, 465 (5th Cir. 1976) ........................................................................ 2

**STATUTES**

42 U.S.C. § 1316 ....................................................................................................12

42 U.S.C. § 1396a(a) ..................................................................................... 5, 11, 12

42 U.S.C. § 1396b(d) .............................................................................................12

42 U.S.C. § 1396b(w) ...................................................................................... *passim*

**REGULATIONS**

42 C.F.R. § 433.38 .................................................................................................12

42 C.F.R. § 433.68 .................................................................................................16

42 C.F.R. § 438.6 ............................................................................................. 5, 6, 7

## I.       Introduction

The evidence regarding the parties' dealings between August and today demonstrates without question that they have worked collaboratively under the terms of the January 15, 2021, demonstration project extension approval as required by the preliminary injunction. Not only have the parties complied with the procedures laid out in that approval, but more importantly they have made significant substantive progress towards resolution of the issues preventing approval of Texas's requested State Directed Payment Programs (SDPs) and Texas's proposed PHP-CCP pool payment protocol. Indeed, two of Plaintiffs' five requested SDPs have been approved and may now be implemented. The majority of the approvability issues CMS identified in Texas's submissions have been resolved through the parties' collaboration. The parties discussed the issues raised by CMS and potential solutions both in their regular meetings and through written exchanges. Texas agreed to make modifications to its proposals to address CMS's concerns and as a result, many issues have been fully remedied.

However, CMS has also identified statutory and regulatory deficiencies in Texas's submissions that the state has to this point been unable or unwilling to fix. These deficiencies relate to core aspects of the Medicaid program, the state's share of jointly funded programs and the bounds of reimbursable health care costs. Both CMS and Texas have an obligation to ensure that approved programs do not violate these requirements, and they cannot be ignored in order to achieve a more expedient resolution. For the reasons explained herein, Plaintiffs have fallen far short of making the elevated showing necessary for a finding of civil contempt, and the relief they seek, in addition to being unnecessary or ineffective in many cases, is unwarranted.

## II.      Standard

Plaintiffs ask the Court to order Defendants to take (or refrain from taking) a number of actions in the form of civil contempt sanctions. To establish the elements of contempt, the

1

moving party must show by clear and convincing evidence that "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009) (emphasis omitted) (quoting *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)). A court's power to impose civil contempt sanctions should be used "sparingly." *Id*. at 265 (internal citation omitted). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *SEC v. Res. Dev. Int'l LLC*, 217 F. App'x 296, 298 (5th Cir. 2007) (quoting *SEC v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981). The moving party must demonstrate proof of the non-moving party's contempt by "clear and convincing evidence," a standard that "is higher than the 'preponderance of the evidence' standard, common in civil cases, but not as high as 'beyond a reasonable doubt.'" *Id*. (quoting *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976)).

### III.     Argument

This Court's preliminary injunction compels Defendants to "treat Texas's demonstration project . . . as currently remaining in effect as it existed on April 15, 2021." Order Granting Preliminary Injunction, ECF No. 47 at 26. That Order also states that

> If a future dispute arises as to whether defendants are complying with the terms of that demonstration project, the court will undertake to decide if such noncompliance has a nexus to the April 16, 2021 rescission that is enjoined by this order. Any contempt sanctions will require showing such a nexus through persuasive, though not necessarily direct, evidence. Agency foot-dragging in implementing the terms of the demonstration project may be inferred to stem from failure to respect the injunction based on the timing of any such noncompliance—whether it occurred or intensified after the rescission or this injunction—and any other relevant evidence.

*Id*. at 25. Plaintiffs allege that Defendants have failed to comply with the terms of the demonstration project because they have not "worked collaboratively" with Plaintiffs toward

approval of the SDPs and the PHP-CCP payment protocol as required by the STCs. The STCs do not define "working collaboratively," but this Court has previously suggested that the phrase implies a requirement to negotiate in good faith regarding the approval of items left unapproved by the STCs. Hr'g Tr., Aug. 17, 2021, ECF No. 49 at 64. In general, good faith "is an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice, and the absence of a design to defraud or to seek an unconscionable advantage." Black's Law Dictionary, 11th Ed. (2019).

As explained below and demonstrated in the exhibits accompanying this brief, Defendants have complied with the terms of the January extension of THTQIP since the entry of the Court's preliminary injunction. Plaintiffs' motion to enforce the preliminary injunction lacks any evidence, direct or indirect, showing that Defendants are not complying with the injunction. To the extent Plaintiffs claim Defendants have delayed approving Texas's requested SDPs and PHP-CCP Protocol, their motion fails to link any alleged non-compliance with the April 16 rescission. Indeed the evidence of the parties' interactions since the entry of the preliminary injunction proves the opposite. The parties have engaged in meetings regarding Texas's proposed SDPs every other business day since August 18, 2021, as Plaintiffs admit, Motion to Enforce PI (Mot.), ECF No. 75 at 4, and those meetings have resulted in significant progress towards resolving the statutory and regulatory roadblocks preventing approval of Plaintiffs' requested SDPs. The parties have also worked collaboratively toward approval of Texas's PHP-CCP Protocol; and in any event, approval of that protocol is not necessary for Texas to implement the PHP-CCP pool for the demonstration year that runs October 1, 2021 through September 30, 2022. Moreover, to the extent that certain issues remain unresolved, it is because Plaintiffs have failed to act to ensure compliance with the Medicaid statute and regulations.

3

### a. The parties have made consistent progress towards resolving flaws in Plaintiffs' SDP proposals

In Defendants' August 13, 2021 letter to Plaintiffs, CMS identified five categories of statutory or regulatory flaws with the SDPs as proposed by Plaintiffs which prevented those proposals from being considered approvable. ECF No. 42-1 at 4. Beginning on August 18, 2021, the parties entered into every other business-day meetings as contemplated by STC 34. In these meetings, the parties discussed the flaws identified in Plaintiffs' SDP proposals and worked together to conform those proposals to the necessary standards. *See, e.g.*, Declaration of John Giles, Ex. B. In addition to these meetings, the parties regularly exchanged written requests for information and feedback that formally stated their positions concerning the issues discussed in the meetings. *See* Giles Decl. Ex. A, CMS Round 5 Feedback, November 15, 2021, at 1; *see generally*, *id.* (collecting the parties' substantive questions and responses between August 20, 2021 and November 15, 2021); *see* January Approval STCs ECF No. 67-1 at 49, STC 33 (additional requests for information will be made in writing within 20 days of receipt of Texas's responses). As a result of these discussions, each of the statutory or regulatory approvability flaws in Texas's proposed SDPs has been resolved at this time with the exception of the financing of the non-federal share payments as described in detail *infra* at 11.

### i. CMS directed payment approval methodology

Approval of a request to implement any state directed payment is a complex and time-consuming process that requires the participation of a team of experts from multiple components of CMS. Giles Decl. ¶¶ 7-8, 10. The "federal review team" assembled for each request may vary depending on the nature of the requested payment but will include representatives from CMS's Office of the Actuary (OACT) and the Financial Management Group and the Division of Quality and Health Outcomes components of CMCS. *Id.* ¶ 7. Based on the nature of the payments

4

requested by Texas and their interaction with Texas's demonstration project (THTQIP), in this case the review team also included representatives from the Division of Managed Care Policy and the State Demonstrations Group. *Id*. Each of these entities must work with states to assess proposals and collect necessary information, and with each other to ensure that proposed payments satisfy applicable regulatory requirements and serve to advance the states' Medicaid programs and the overall purposes of Medicaid. *Id*. ¶ 8.

In order to be considered for approval, the state must demonstrate to the federal review team that its proposed state directed payment satisfies the requirements of 42 C.F.R. § 438.6 and the Medicaid statute, *see* 42 U.S.C. §§ 1396a(a)(2); 1396b(w). More specifically, proposed directed-payment arrangements must conform to the requirements of § 438.6(c) and "be developed in accordance with § 438.4, the standards specified in § 438.5, and generally accepted actuarial principles and practices." 42 C.F.R. § 438.6(c)(2)(i). Section 438.4 establishes the standards for CMS's review and approval of actuarially sound capitation rates for Medicaid contracts and § 438.5 describes the process and requirements for setting such rates. As Defendants have explained in previous submissions in this case, *see, e.g.*, ECF No. 67 at 6-9. CMS lacks authority to knowingly approve any payments that do not satisfy these and all other applicable statutory and regulatory requirements. Consequently, approval is anything but a rubber stamp and requires extensive internal and external collaboration.

Additionally, the same teams at CMS are concurrently obligated to review directed-payment submissions from all states that make such requests. Giles Decl. ¶ 11. Directed payments must, with certain exceptions, be approved on an annual basis, *see* § 438.6(c)(3), so the submissions under review include a mixture of entirely new proposed payment programs, re-approval requests for existing programs, and modified or revised proposals for previously

approved programs. *See Id.* Typically, this means that there are approximately 100 individual program preprint submissions[1] under review by federal review teams composed of the relevant CMS offices at any one time. *Id.* As indicated by the procedures set forth in the STCs applicable to this matter, CMS generally exchanges written question sets with the states to determine the approvability of any proposals. *See* STCs ECF No. 67-1 at 48-49. Because of the complexity (and sometimes novelty) of these issues and the need for feedback from both the requesting state and various internal components, CMS's response to any particular question set typically takes several weeks. Giles Decl. ¶ 11. CMS has maintained a consistent exchange with Plaintiffs of written questions and feedback within a reasonable timeframe in addition to meeting every other business day. *See generally* Giles Decl. Ex. A; Giles Decl. ¶¶ 11-21.

Consequently, approval of any state directed payment proposal can be, and often is, an extensive process even when there are no significant statutory or regulatory concerns like those present in this case. The time required for CMS to review and approve a state's request depends on the complexity of the issues, the available resources of the agency, and the cooperative participation of the state making the proposal. Delay may arise for any of these reasons despite CMS's good faith efforts to determine the approvability of a given payment in a timely manner.

### ii.  The parties have resolved all concerns related to reconciliation, evaluation, and quality improvement

Among the issues raised by Defendants' August 13, 2021 letter were concerns related to reconciliation thresholds, evaluation plans, and quality improvement for some or all of the SDPs pursuant to several subsections of 42 C.F.R. § 438.6(c)(2). Through the parties' collaborative work, all of the concerns in these areas have been resolved and are no longer impediments to the

---

[1] Preprints are states' requests for prior written approval of directed payment programs to be included in Medicaid managed care contracts and rate certifications.

SDPs' approvability.  Plaintiffs have not pointed to evidence of any unreasonable delay in the resolution of these issues since the entry of the preliminary injunction nor to any indication whatsoever that CMS raised these issues for an improper purpose related to the enjoined April 16, 2021 letter.

CMS determined that Texas's initial QIPP, TIPPS, BHS, and RAPPS proposals might not adequately link providers' payments to services they provide.  CMS policy requires that state directed payments be based on the "delivery and utilization of services" provided during the managed care contracting period. 42 C.F.R. § 438.6(c)(2)(ii)(A).  Texas's original submissions indicated that Medicaid managed care plans would make interim payments to providers based on historical claims data throughout the state fiscal year. Giles Decl. ¶¶ 30-32. After the year had concluded, the plans would reconcile the total amount of payment each provider received with the actual utilization data. *Id.*¶ 32. However, Texas indicated it would set an 18% threshold for reconciliations under QIPP and TIPPS and a 10% threshold for BHS and RAPPS, meaning the plan would not reconcile payments with actual utilization if the amount received was under the threshold. *Id*. In its August 20, 2021 question set, *see Id.*¶ 32, CMS instructed Texas that the state should transition to payments based on actual utilization data and that, if Texas chose instead to proceed with a reconciliation framework, it must eliminate the thresholds to ensure payments based on the actual utilization of services as required by regulation.[2] On August 25, 2021, Texas agreed to eliminate the reconciliation thresholds from its SDPs in response to CMS's direction. *Id.*¶¶ 13, 34. Following additional exchanges, Texas agreed to consider

---

[2] CMS first made Texas aware of the unsuitability of its use of reconciliation thresholds in the prior year approval of QIPP on August 3, 2020.  Giles Decl. Ex. D at 2. CMS instructed all states not to base SDP payments on historical utilization data in a January 8, 2021 letter to State Medicaid Directors. Giles Decl., Ex. C.

changing its payment framework to make payments based on actual utilization data. *Id.* ¶ 33. On September 29, 2021, Texas submitted revised preprints reflecting resolution of the reconciliation issue. *Id.*, Ex. A at 12.

Texas's initial proposals also included insufficient information about Texas's evaluation plans for the SDPs. In its initial written exchange with Texas on August 20, 2021, CMS explained that Texas had not provided sufficient explanations of how the state would evaluate the individual impact of each payment program as distinguished from other programmatic changes or state directed payments. CMS provided specific modifications Texas could make to resolve this problem, *see* Giles Decl. ¶¶ 38-39. Texas accepted CMS's modifications and provided the requested information, resolving the issue by October 22, 2021. *Id.* ¶ 39. Similarly, Plaintiffs agreed to make modifications responsive to CMS's concern that the SDPs did not comply with Quality Improvement standards requiring performance-based payments to ensure improvement over the previous year. *Id.* ¶¶ 35-37.

### iii. The parties have resolved all actuarial soundness concerns for the five proposed SDPs

Plaintiffs focus a significant amount of their briefing on CMS's concerns about the actuarial soundness and overall size of the proposed SDPs; however, these issues have already been resolved through the parties' collaborative process. Because of the unique structure and unprecedented size of Texas' proposed SDPs relative to the total size of the THTQIP program, officials from CMS's Office of the Actuary (OACT) expressed concern that the payments would not produce an overall sound capitation rate as required by regulation when combined and assessed with the rest of the program. *See* Giles Decl. ¶¶ 23-25; *id.*, Ex. B, 8/20/21 Notes.

Beginning with the parties' first meeting on August 18, 2021, CMS and Texas discussed these concerns on multiple occasions, *see, e.g., id.*, Ex. B, 8/18/21 Notes, 9/28/21 Notes,

8

10/27/21 Notes, as well as in extensive written exchanges, *see id.* Ex. A at 14-23.  CMS

expressed concerns related to the proposed increase in directed payments from the previous year

to the first year of the SDPs as well as the aggregate amount of proposed SDP payments.  In

response to CMS's concerns about the soundness of an approximately $3 billion proposed

increase in directed payments from demonstration year (DY) 10 to DY 11, Texas submitted

additional explanations supporting the changes based on a revised reimbursement analysis

showing the payments would not exceed the average commercial rate (ACR). *See* Giles Decl.

¶ 28. In response to the concerns identified by CMS relating to the aggregate amount of SDP

payments, Texas proposed to "impose a cap of 90% on the aggregate percentage of ACR that a

hospital class can receive," under CHIRP, the largest proposed SDP. *Id.*, Ex. A at 16.  On

September 15, 2021, Texas submitted a revised preprint for the CHIRP payment incorporating

the proposed payment cap. *Id.* ¶ 29. CMS sought additional information from Texas in support of

this proposed change to the CHIRP SDP through at least October 22, 2021. *Id.*, Ex. A at 19, 23.

On November 3, 2021, CMS concluded on the basis of the information it had elicited and its

discussions with Texas that the proposed cap to 90% of ACR relieved CMS's concerns with the

actuarial soundness of the CHIRP payment and communicated that conclusion at the parties'

regularly scheduled meeting. *Id.* ¶ 29; *Id.*, Ex. B, 11/03/21 Notes. On November 10, 2021, CMS

formally communicated to Texas in writing that it had "no additional concerns or questions about

the size of the program," *id.*, Ex. A at 16, and informed Texas in its regularly scheduled meeting

that the changes to CHIRP resolved the overall actuarial concern with the aggregate amount of

all five proposed SDPs. *Id.* ¶ 29; *Id.*, Ex. B, 11/10/21 Notes.

   Thus, the parties' collaborative process resulted in the resolution of all issues related to

actuarial soundness or the size of the proposed SDPs. The time taken by the parties to resolve

these issues was not unreasonable and was necessary for CMS to assess and approve substantive changes made by Texas in response to CMS's concerns and for Texas to provide the information requested by CMS. As with the other issues discussed *supra*, the evidence shows that CMS was collaborating in good faith with Texas and working towards approvability of the SDPs. The relief Plaintiffs request related to actuarial soundness and the size of the SDP payments is not warranted by any noncompliance. In any event, the parties have now resolved the issues related to actuarial soundness through their collaborative process, so Texas's request for relief in this regard is moot.

### iv.  CMS has determined that two SDPs are approvable and has approved those payments for use in Texas's Medicaid program

On the basis of the resolution of the issues described *supra*, which were addressed over the last two months through the collaborative process undertaken by the parties, CMS recently determined that two of Plaintiffs' proposed SDPs are now approvable. Giles Decl. ¶ 22. CMS verbally communicated this development to Texas in their meeting on November 10, 2021 and sent letters of approval for the QIPP and BHS payment programs on November 15, 2021. *Id.* Exs. E & F. The successful resolution of the statutory and regulatory issues necessary for these approvals demonstrate CMS's good faith and the parties' collaborative work. The QIPP and BHS payments will go into force for the current plan year, including with retroactive effect to September 1, 2021, *see id.* Ex. E & F, notwithstanding the ongoing issues with the remaining SDPs, and notwithstanding the eventual resolution of this lawsuit on the merits. To this point, the parties have not only participated meaningfully in the STC process as required by the preliminary injunction, but have successfully resolved some of CMS's concerns such that two SDPs became approvable. Furthermore, Plaintiffs' allegation that CMS has reviewed the SDPs in

the aggregate and not individually, which in any event is permissible, cannot be maintained in the face of these approvals.

### b.  Plaintiffs are delaying resolution of the only issue with the remaining SDPs.

The only concern preventing approval of the remaining SDPs (CHIRP, TIPPS, and RAPPS) is the apparent impermissibility of the intended source of the non-federal share for these payments, which likely violates the Social Security Act's prohibition on hold harmless arrangements. Plaintiffs object to CMS's requests for provider attestations that impermissible financing arrangements will not be used. However, this objection is simply misdirection and even if this Court were to grant Plaintiffs' request to prohibit such attestations, it would not provide any meaningful relief because CMS would still be unable to approve those SDPs. The requested attestations are merely one option being offered to Texas to meet its explicit statutory and regulatory obligation, *see* 42 U.S.C. §§ 1396a(a)(2), 1396b(w), to ensure a permissible source of the non-federal share for Medicaid payments. CMS is not withholding SDP approval on the basis of Texas' failure to provide these attestations. Rather the SDPs are not approvable because there is evidence that the underlying financing arrangements are impermissible and the requested attestations could serve to resolve that concern. Such financing arrangements cut to the heart of the jointly financed Medicaid program by shifting all or most of the burden onto federal funds. If the Court orders CMS not to ask Texas for these attestations, it will not result in approval of the SDPs, but may create a further delay by eliminating one option for resolving this issue.

### i.  Statutory and Regulatory Background

Pursuant to 42 U.S.C. § 1396b(w)(1)(iii), when determining the amount of federal Medicaid reimbursement available to a state, the Medicaid expenditures of the state for that fiscal year "shall be reduced by the sum of any revenues received by the State (or a unit of local

government in the State)…from a broad-based health care related tax, if there is in effect a hold harmless provision…with  respect to the tax." In other words, the state's share of its Medicaid funding cannot include any amount received from a health care tax for which there is in effect a hold harmless provision for the taxed entities. Section 1396b(w)(4)(C)  elaborates that there is in effect a hold harmless agreement "if the Secretary determines" that the taxing entity "provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." CMS's approvals of SDPs also require states to ensure a permissible  non-federal share. *See* Giles Decl. Exs. D, E, & F.

When an impermissible  non-federal share arrangement of any kind is identified by CMS, it may defer or disallow  the requested federal share of Medicaid  payments. *See* 42 U.S.C. § 1396b(d); 42 U.S.C. § 1316, 42 C.F.R. § 433.38. There is no restriction of this authority to before or after a payment is made, so CMS may deny proposed programs on the basis of an impermissible  financing scheme proposed for the non-federal share or may disallow  federal funding after the fact based on evidence that an improper scheme was used. CMS seeks whenever possible to prevent the use of any impermissible  funding  sources because relying on after the fact disallowances is time and resource intensive and can lead to destabilizing  outcomes for states that have improperly  relied on such funding.  In order to receive federal funding, therefore, the state must ensure a permissible  source of its non-federal share. *See* 42 U.S.C. § 1396a(a)(2).

### ii.  Texas's Local Provider Participation Fund (LPPF) Arrangement

Texas proposes to derive the non-federal share of the remaining  SDPs from LPPF arrangements that collect health care tax revenues imposed by local governments and provide them to the state's Medicaid  agency through an intergovernmental  transfer (IGT). Giles  Decl.

¶ 41. These funds are in turn used by Texas to finance certain Medicaid payments to tax-paying hospitals. *Id*. Through a routine review of the LPPF arrangements in two counties in Texas, CMS became aware in 2018 and 2019 that the providers participating in the LPPFs were likely engaged in a scheme of redistribution among the tax-paying entities resulting in a guarantee that all such entities would be held harmless from the burden of the tax. *Id*. ¶ 42. Texas did not make CMS aware of the existence of such arrangements before CMS approved previous payments that relied on LPPFs. CMS obtained third-party documentation of the LPPF arrangements, Giles Decl. Ex. G, Salsberry Presentation, explaining that certain taxed entities with low Medicaid volume experience a net loss because they pay more into the applicable LPPF than they receive in Medicaid payments. *Id*. Those net loss entities receive a redistribution of Medicaid funds from other taxed entities in the LPPF that experience a net gain from increased Medicaid payments; the redistribution provided to the net loss entities meet or potentially exceed the burden of the relevant taxes imposed on them. *Id*. ¶ 41. The third-party documentation further indicates that LPPFs are designed to ensure that each tax-paying entity ends up with a "benefit," or in other words is at least held harmless, from the arrangement. *Id*.

Based on this information regarding the nature of existing LPPF arrangements in Texas, CMS has reason to suspect that the proposed SDPs will rely on an impermissible source of the non-federal share generated by a taxing arrangement that holds all payers harmless for their tax burden. An impermissible non-federal share results in Medicaid being funded not jointly as required by statute, but mostly or entirely with federal funds. CMS has communicated its understanding of the LPPF arrangements to Texas previously, and Texas has not denied or corrected the third-party description or CMS's understanding of the LPPF's operation. *Id*. ¶ 43. CMS has repeatedly attempted, both before and during the current negotiations, to obtain

additional information from Texas to determine definitively whether LPPF arrangements create an impermissible financing source, but Texas has not provided the requested information. *Id.* ¶ 44; *see also, e.g.*, *Id.*, Ex. A at 68. CMS has also recommended to Texas pathways Texas could take to ensure that no impermissible hold harmless arrangements are used for the non-federal share, *see infra*, but Texas has refused to take any of those actions. *Id.*¶¶ 44-45.

### iii. Texas's arguments do not relieve it of its obligation to ensure a permissible non-federal share

Texas makes two types of arguments related to the problem with their non-federal share arrangement. First, they contend that CMS lacks authority to require Texas to provide attestations from providers to ensure that there are no impermissible private redistribution arrangements that result in a guarantee that participants in the LPPF will be held harmless. Plaintiffs are correct that CMS does not have specific statutory or regulatory authority to oblige the state to provide these types of attestations. *See* Giles Decl. ¶ 45. However, CMS is not attempting to impose such an obligation on Texas, and, more importantly, CMS does not consider the remaining SDPs to be unapprovable because of Texas's refusal to provide attestations. *See Id*. CMS is offering Texas the opportunity to provide these attestations as one option to resolve CMS's underlying concern that impermissible hold harmless arrangements exist within the LPPFs. *Id*. The investigations CMS would otherwise need to undertake to satisfy itself that the non-federal share used to fund a portion of the SDPs is permissible would take far longer and be more resource intensive for both CMS and Texas. *Id*. For this reason CMS's request for attestations also does not constitute an attempt to renegotiate the terms of the January 15 approval. The parties did not agree to require attestations in the STCs, but that does not prohibit CMS from offering voluntary attestations as a pathway to approval.

Texas's second argument is that it lacks regulatory authority to oversee the operation of any LPPF and CMS in turn lacks authority to regulate or require states to regulate interactions between private entities in which the state does not take part. It is unnecessary for the Court to consider these arguments to resolve the permissibility of the attestations for the reason explained above. However if the Court does consider these arguments, Texas's positions are unavailing. Texas's claim about its regulatory authority is irrelevant to its obligation under the applicable federal statute and regulations to ensure a permissible non-federal share of Medicaid funding. A state's decision not to give itself specific authority to ensure its compliance with a federal requirement does not excuse that state from compliance. Texas could act to give itself the necessary authority to prevent such arrangements, it could modify the funding of the non-federal share of the proposed SDPs, or it could condition receipt of Medicaid payments on providers' agreement not to participate in any hold harmless arrangements.

In any event, the Social Security Act and its implementing regulations clearly prohibit the payment or retention of federal matching funds drawn on an impermissible source of the non-federal share. The obligation on CMS and states to ensure that the source of the non-federal share is permissible is not extinguished when the impermissible arrangement is created by private entities. *See* 42 U.S.C. § 1396(d). Even if the state or CMS is not specifically authorized to take particular actions to cure the existence of an impermissible funding arrangement, they nevertheless cannot request or approve payment of federal funds on the basis of an impermissible source of the non-federal share.

Additionally, Plaintiffs' proposed reading of the statutory and regulatory definitions of hold harmless agreements is not supportable. Their argument that the prohibition only reaches the actions of governmental entities ignores the fact that § 1396b(w)(4)(C) identifies a hold

harmless whenever the entity imposing the tax "provides (directly or *indirectly*) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the cost of the tax." (emphasis added). Neither the statute nor the implementing regulation, 42 C.F.R. § 433.68(f)(3), indicate that the governmental entity's indirect payment, offset, or waiver cannot pass through a private party. Plaintiffs' reliance on the preamble to the final rule, Mot. at 18, conflates direct guarantee with direct provision of payment. A direct guarantee can be found when the taxpayer has "a *reasonable expectation* that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." Health Care-Related Taxes, Preamble to Final Rule 73 Fed. Reg. 9685, 9694 (Feb. 22, 2008) (emphasis added). Plaintiffs have not disputed that the participating providers in an LPPF have a reasonable expectation of being held harmless as explained above, and the LPPF arrangement is permitted by state regulation. Therefore a direct guarantee based on a reasonable expectation of being held harmless exists along with an indirect provision by the state of the funds holding LPPF participants harmless through the private redistribution arrangements.[3]

    If the LPPFs indeed operate as outlined above, and CMS has evidence to suggest that they do, then an impermissible hold harmless arrangement of which Texas is aware exists, and Texas has not taken steps to cure or prevent it. The state has approved these local tax arrangements to fund its non-federal share which provides the taxpayers with federal Medicaid funds. The taxpayers arrange—with the state's knowledge—to redistribute Medicaid funds such that participants in LPPFs will be held harmless for the tax burden.

---

[3] The evidence also suggests that certain providers in LPPFs may be held harmless by the direct Medicaid payments themselves due to the amount they receive.

16

The fact that CMS's 2019 proposed "net effect" rule was not promulgated, Mot. at 18, has no relevance to this conclusion. The proposed rule stated that "[t]his proposed change represents a clarification of existing policy and would not impose any new obligations or place any new restrictions on states that do not currently exist." Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63742 (Nov. 18, 2019). Thus, the proposed net effect standard would not have enlarged CMS's authority under the 2008 rule and only clarified CMS's current authority, delegated by Congress, to ensure that the sources of Medicaid funding are permissible as required by Section 1903(w).

The evidence demonstrates that CMS's concerns about the source of the non-federal share for the remaining SDPs are bona fide. Despite CMS's repeated requests to Texas for information or action, Giles Decl. ¶¶ 44, 45, Texas has not provided the necessary information or taken steps to address CMS's concerns. Thus, any alleged delay related to this issue is attributable to Texas and does not show that CMS is somehow violating the Court's preliminary injunction.

### c. Plaintiffs' allegations of non-compliance and bad faith are unsupported.

As detailed at length *supra*, the basic premise of Plaintiffs' motion, that CMS has unduly delayed approval of Texas's proposed SDPs in an attempt to compel Texas to give up or alter the terms of the January THTQIP approval, is belied by the evidence. First, approval of the SDPs is separate from the January THTQIP approval, *see, e.g.*, ECF No. 67 at 6-7, and as Plaintiffs seem to acknowledge, approval of the SDPs cannot be compelled under the terms of the preliminary injunction, Mot. at 28. More importantly, Plaintiffs' claims entirely ignore the substantial progress the parties have made through the ongoing negotiations to date. Not only have the parties completely resolved four of the five statutory or regulatory problems CMS identified with

the originally proposed SDPs, but because two of the proposed SDPs do not suffer from the remaining infirmity, those SDPs have been approved. Finally, as explained, Plaintiffs, and not Defendants are the source of any delay in resolving the financing issue with their remaining SDPs, despite CMS's ongoing efforts to work collaboratively to address this issue.

### i. CMS has operated in good faith

Plaintiffs contend that CMS's statutory and regulatory concerns must be pretextual because its August 13 letter proposed re-approving two SDPs on a temporary basis without making the same modifications required to approve the currently pending SDPs. This argument ignores the fact that, as elaborated above, Texas agreed to make various modifications to resolve the concerns identified by CMS with the pending SDPs. Aside from that, Plaintiffs argument ignores CMS's discretion to decide how and when to use its enforcement authority. Option 1 from CMS's August letter proposed to re-approve the QIPP and UHRIP payments from DY10 with certain modifications. There was no concern for actuarial soundness because the payments would be the same as previous years, so there would be no year-over-year increase or aggregate funding issues presented by Texas's pending requests. *See* Giles Decl. ¶¶ 9, 25. The QIPP payment also is not funded by an LPPF so there has never been a statutory financing issue. *Id.* ¶ 40. Both payments CMS offered to reapprove did have reconciliation and evaluation issues, as Texas had been made aware previously, but those issues were more minor and in order to preserve the safety net for Texas providers CMS was willing to allow Texas to resolve them in the future. *See Id.* ¶¶ 9, 38-39; *Id.* Ex. D. CMS did suspect at the time of the offer that UHRIP, which relied on an LPPF, might have an impermissible funding source. *Id.* ¶¶ 9, 43. However, because of the lack of information from Texas and the much smaller size of the UHRIP payment compared to the aggregate of the pending SDPs, CMS was willing to approve the payment

temporarily  and determined  after approval  whether  it would  be necessary  to disallow  the federal

share. *See Id.* Although  enforcement  through disallowances  after payment  is the more  typical

mechanism,  it is time-consuming  and resource intensive,  and a large  disallowance  can be

extremely destabilizing  for a state. *Id.* ¶ 40, 45. In the case of the smaller  UHRIP payment,  CMS

considered  it reasonable  to agree to approve the state directed  payment  and later seek

disallowances  once it fully  investigated  the LPPFs, whereas for the three pending  SDPs reliant

on LPPF payments,  totaling  nearly  25% of Texas's proposed  Medicaid  funding  for DY11,

approval  despite the likelihood  of later disallowance  was unjustifiable.  *See Id.* ¶¶ 9, 40, 45

Therefore,  CMS's offers in its August  13 letter were not inconsistent  with each other or with its

reasons  for not approving  Texas's pending  requests.

Plaintiffs'  general  complaints  about CMS's lack of good faith participation  in the

ongoing  negotiations  also do not establish  any clear and convincing  violation  of the obligation  to

work collaboratively.  As explained  in detail,  the parties have made significant  progress  towards

resolution  of the approvability  issues identified  by CMS through  their exchanges  of technical  and

policy information.  This also belies Plaintiffs'  assertion  that CMS did not provide  actionable  or

specific  feedback  as to the flaws with their proposals.  Plaintiffs'  complaint  that CMS is not

prepared  or does not participate  up to Texas's desired standard  for every meeting  in no way

demonstrates  contempt  for the preliminary  injunction;  moreover Texas's expectations  are simply

unrealistic.  The meetings  take place every other business  day, it is neither  surprising  nor unusual

that a large federal agency with limited  resources  and competing  priorities  considering  complex

submissions  and proposals  would  occasionally  need additional  time to make decisions

implicating  billions  of dollars in federal funds. *See* Giles Decl. ¶ 11. Plaintiffs'  request that the

Court order CMS to review submissions  "in advance"  and be prepared  to "meaningfully  discuss"

their contents every other day, Mot. at 21, has no specific basis in the STCs and does not reflect the typical interactions between CMS and states. Plaintiffs' complaints about CMS's written submissions are also meritless. Under STC 34, Texas is under an obligation to provide feedback to any written request from CMS within five business days, ECF No. 67-1 at 49, while CMS has no such obligation. Nevertheless, CMS has provided written responses at least every 20 days in compliance with STC 33, *see id.*, and has communicated feedback verbally in the parties' regularly scheduled meetings, *see generally*, Giles Decl. Ex. B.

### ii. The concerns CMS raised as to the approvability of Texas's SDPs were and are bona fide

As explained in previous submissions, *e.g.* ECF No.67, CMS cannot approve SDPs that it reasonably believes fail to comply with all applicable statutory and regulatory requirements. Thus, CMS is bound to conduct a thorough review of any proposed SDPs and to satisfy itself that there are no such problems with a program before approving it. Although Plaintiffs have not taken issue with CMS's concerns related to reconciliation, evaluation, and quality improvement, Plaintiffs allege that CMS's concerns with the actuarial soundness and permissible financing of the SDPs are pretexts for delaying approval of the SDPs. They are not. As it is required to do by the Medicare statute, CMS has engaged in good faith efforts to ensure that Texas' proposed SDPs comply with applicable requirements. CMS cannot be barred from carrying out its statutory and regulatory duties merely because a state expresses self-serving disagreement with CMS's legal analysis.

It is clear as explained *supra* at 11 that CMS's non-federal share concerns are not pretextual and that its requests for attestations are neither mandatory nor a tactic for delay.

CMS's actuarial soundness concerns were also bona fide. In its August 13, 2021 letter, CMS indicated that it could not approve the SDPs *as submitted* because there was a concern that

those SDPs would result in managed care capitation rates that were not actuarially sound. ECF No. 42-1 at 4. In the meeting on August 20, 2021, CMS elaborated that OACT had assessed the payments and determined that a new $3 billion aggregate increase in money flowing through the managed care capitation compared to the prior year could not result in a reasonable and appropriate rate. Giles Decl. Ex. B, 8/20/21 Notes. Plaintiffs claim that this concern was pretextual because CMS had not yet completed a final actuarial analysis of the overall capitation rate. But Plaintiffs' argument ignores both the procedure for assessing actuarial soundness and CMS's statements. A final determination of actuarial soundness cannot be conducted on an individual component of a Medicaid project, but must instead incorporate all elements of a project for the rating year including any directed payment programs. Giles Decl. ¶ 27. An analysis of this type cannot be completed until all of the relevant information is collected. *Id.* Nevertheless, CMS identifies potential actuarial soundness problems in the development of programs to resolve them in advance of a point where they are likely to result in rejection of the capitation rate. *Id.* As CMS conveyed to Texas, it was apparent to CMS's actuaries on the face of the proposals, which were of an unprecedented size and organization, that it would be difficult to achieve actuarial soundness in the final rate assessment. *Id.* ¶¶ 23-25. As a result, CMS sought additional information and modifications from Texas to ensure that the SDPs could satisfy the actuarial soundness requirement. As Plaintiffs point out in their motion, CMS did not say that it would not approve Texas's SDPs on the basis of actuarial soundness, but rather that it could not approve them at that time because it was "unable to establish" that the SDPs met all statutory and regulatory requirements. ECF No. 42-1 at 1.

Plaintiffs also contend that CMS's concerns about the aggregate size of the payments were pretextual because CMS was aware of the amounts contemplated at the time of the January

approval and aware that Texas's Medicaid program is growing. These considerations are irrelevant to CMS's obligation to ensure full statutory and regulatory compliance in the SDPs, an obligation that was explicitly maintained and reinforced by the January approval. ECF No. 67 at 6-7. Plaintiffs also allege that CMS is improperly delaying by considering the SDPs in the aggregate as opposed to individually. However nothing in the STCs or any other authority prohibits such aggregate consideration, and as explained, final actuarial analysis of the capitation rates for the plan year must include all SDPs and other payments considered together. Because the aggregate concern was largely premised on the large payment increase created by CHIRP, once Texas made the agreed upon changes to CHIRP, CMS was able to determine that no actuarial soundness concerns remained for any of the five payments.

Plaintiffs have come nowhere close to showing by clear and convincing evidence that CMS's actuarial concerns were pretextual. Despite their present allegations, as explained *supra*, during the last two months of negotiations Texas has provided the information CMS requested and agreed to limit the size of its CHIRP payment. Once the parties worked collaboratively through their negotiations, these concerns were resolved. The process worked as intended with the cooperation of both parties.

### d.  CMS is working collaboratively to approve the PHP-CCP protocol

At bottom, Texas's argument as to the PHP-CCP pool is that CMS is not complying with STC 39. That is wrong. CMS's actions are consistent with the January 15, 2021 approval and with this Court's preliminary injunction. None of Texas's arguments demonstrate otherwise. They certainly fall short of clear and convincing evidence required to impose contempt liability.

Texas asserts that CMS has "unreasonably delayed" in approving or providing feedback on the payment protocol applicable to the PHP-CCP, Attachment T to the January 15 approval.

Texas's argument misconstrues the applicable timeframes and mischaracterizes the course of the parties' negotiations.  To begin, STC 39 does not impose a 90-day deadline for CMS to rubber stamp Texas's submission, as the State implies.  At most, STC 39 suggests that the parties attempt to conclude their discussions regarding a payment protocol for DY 11 within 90 days of submission.  *See* STC 39(b) (providing that the State and CMS would "work collaboratively with the *expectation* of CMS approval" within 90 days of receipt).  And consistent with that understanding, STC 39 contemplates a collaborative exchange regarding the State's anticipated submission.  For example, as to the provider reimbursement application tools, STC 39(b) requires the State to "revise, test, and obtain CMS approval" of those tools.  STC 39 further contains various requirements against which the State's payment protocol would be tested before approval, including that it "must ensure that payments . . . are distributed based on the provider's actual uncompensated care costs," "identify the allowable source documents to support costs," and "include detailed instructions regarding the calculation and documentation of eligible costs." STC 39, 39(b).  Because of the novel nature of the pool, CMS and Texas were obliged to create a new cost reporting methodology that complies with the Medicaid statute and relevant regulatory requirements related to the use of certified public expenditures to generate the non-federal share. Declaration of Teresa DeCaro, ¶¶ 7-8. Given these various requirements, CMS was obligated to collect information on and in some cases revise the State's proposal. CMS anticipated the likelihood that this process would be extensive, and imposed no required date for approval, no penalty for Texas failing to obtain approval during DY11, and no requirement that Texas obtain approval for the DY11 protocol in advance of implementing the pool whereas there are requirements and penalties associated with the DY12 protocol. *Id.* ¶ 9.

The history of the parties' conduct does not indicate any unreasonable delay or actions by CMS. Texas submitted its draft payment protocol on March 8, 2021. PHP Decl. ¶10. Shortly thereafter, on April 16, 2021, CMS provided notice to Texas that its January approval of the THTQIP extension was void. Although CMS was preliminarily enjoined in August to treat the January approval as in effect, it was reasonable that CMS did not act upon the draft protocol in March, April, or May because the agency understood the January approval to be void at that time. On May 14, 2021, Plaintiffs filed their appeal of the April 16 letter before the Department of Health and Human Services Departmental Appeals Board (DAB) and in the subsequent weeks CMS determined that the DAB regulations required the January approval to be treated as in force during the pendency of the appeal. *See* Opp. to Mot. for Prelim. Inj. ECF No. 23 at 4-5. Texas filed a revised Attachment T for the current plan year beginning September 1, 2021 (DY 11) on June 30, 2021. DeCaro Decl. ¶¶ 10-11. Although STC 39 does not impose any firm time limits for CMS approval of Texas's proposed PHP-CCP payment protocol, to the extent there was any running 90-day clock, it reset on June 30th when Texas requested that CMS consider a modified protocol. CMS's initial feedback on September 1, 2021, fell well within the 90-day window suggested by STC 39(b), and CMS subsequently exchanged additional feedback with Texas related to the proposed protocol on several occasions in September and October. DeCaro Decl. ¶¶ 10-11, 15-20. To the extent outstanding issues with the protocol have not been resolved since September 1st, that delay is attributable to the Plaintiffs, *see infra*.

The negotiations have proceeded in good faith and with each party contributing at a similar pace, with CMS and Texas both responding to the others' questions or points within 10 to 15 days of receipt. DeCaro Decl. ¶¶ 15-20. Moreover, the urgency that Texas now presses before this Court is belied by the structure of the PHP-CCP arrangement. Texas has made clear that the

pool cannot disburse any funds to providers until the end of the applicable fiscal year after the provider cost reports are received, at the earliest September of 2022. *Id.* ¶ 23. More importantly, the STCs do not condition the eligibility of participants in the pool to receive federal financing participation (FFP) on advance approval of Texas's payment protocol. *Id.* ¶ 9. Although the lack of any such restriction is apparent in the text of STC 39, *see id.*, CMS also conveyed to Texas verbally and in writing on September 21, 2021, that the PHP-CCP pool could come into operation on October 1, 2021 without prior approval of the payment protocol. *Id.* ¶ 17; DeCaro Decl., Ex. C 9/21/21 Notes; *Id.*, Ex. D 9/21/21 Email to Texas. On September 23, 2021, CMS offered to work with Texas to develop an interim cost allocation methodology that could be used to mitigate any risk while the parties worked collaboratively to establish an approvable long-term allocation method, such as a time study, consistent with statutory and regulatory requirements. *Id.* ¶ 18. Texas declined to adopt this interim method and has refused to provide necessary information or make necessary adjustments to its cost reporting proposal to comply with statutory and regulatory requirements. *Id.* ¶¶ 18-21.

Texas also asserts that CMS's feedback on the State's proposed payment protocol demonstrates the agency did not review the State's submission or the STCs and, instead, has used this process as an opportunity to renegotiate the PHP-CCP's terms. Mot. at 24. As a factual matter, that is simply false. *See* DeCaro Decl. ¶ 17; *id.* Ex. C. But even if one takes the State to be arguing that CMS's feedback was unreasonable or inconsistent with the STCs, the evidence demonstrates otherwise.

The feedback in CMS's September 1st letter was both actionable and consistent with STC 39, identifying three discrete areas of necessary additional information or development to make the proposed protocol approvable. DeCaro Decl. ¶ 12. CMS noted that the protocol

provided insufficient information about the relationship of entities participating in the pool to local government and that some of the anticipated providers seemed to be registered as 501(c)(3) nonprofit entities. *Id.* The PHP-CCP pool is based on public expenditures and CMS must review such expenditures to ensure they meet the requirements of 42 U.S.C. § 1903(w)(6)(A). *Id.* The general reference in Texas's submission to the categories of entities that would participate, Mot. at 24, was not sufficient for this purpose. *Id.* ¶ 20. During the negotiations, when CMS solicited additional information, Texas agreed to provide it, including relevant Tax Identification Numbers . *Id.* However Texas still has not provided the numbers, but CMS has accepted Texas's other assurances for the time being to permit review of Texas's submissions. *Id.*

Finally, CMS's concerns with the State's cost reporting structure are also consistent with the STCs. CMS's overarching point, as further articulated in subsequent communications among the parties, is that Texas's cost reporting methodology must satisfy the applicable statutory and regulatory requirements. *Id.* ¶ 9. Each of the points made in CMS's September 1st response are consistent with that basic principle articulated in the STCs.

CMS first reminded the state that it must "isolate[e] [] costs and revenues associated with providing care to Medicaid and uninsured populations." Texas does not object to the accuracy of this principle but instead points to its request that providers submit this information. Mot. at 25. But as CMS has conveyed to the State, it is the *State's* responsibility to establish a protocol for accurately distinguishing the costs that are actually attributable to Medicaid services. *See* PHP Decl. ¶¶ 13-14, 19. CMS has thus explained that the State must further demonstrate that its proposed methodology will accurately differentiate between costs appropriately allocated to the Medicaid program and those that cannot. *See id.*

26

The State argues that CMS is unreasonably requiring it to initiate a time study and to step down time and effort costs, stating that this finds no support in the STCs. Texas is wrong on the facts and the law. First, as noted above, the pool is permitted to operate without approval of the protocol in its first year and in any event, payments are not made until the end of the fiscal year so it is not true that providers will be denied payments for the duration of the time study and that the pool would effectively be canceled for DY11, as Texas has claimed. *See id.* ¶¶ 17-18, 23. Moreover, the PHP-CCP Protocol and application tools must comply with Medicaid's statutory and regulatory requirements for determining reimbursable costs. *Id.* ¶¶ 13–14. Only certain costs of a provider or other entity are reimbursable under Medicaid, and cost reporting methodologies must capture and account for these distinctions. Both direct, provision of medical services, and indirect, facilities and administration, costs must be allocated to determine what percentages are attributable to Medicaid beneficiaries and uninsured individuals, and therefore reimbursable. *See id.* A time study is the preferred and most common method to determine those allocations *Id.* Moreover, CMS has subsequently clarified for the State that it need not necessarily engage in a time study and may use an alternative measure, such as a different statistical model, however a time study is recommended as the best method to satisfy the cost reporting requirements. *Id.* ¶¶ 13-14 19.

CMS has clearly communicated these requirements, which are consistent with the STCs and applicable law and regulation, to Texas and it is Texas's recalcitrance that has delayed approval of the protocol. Texas claims that no time study or alternative cost allocation methodology is necessary for the PHP-CCP pool because none of the participating providers have indirect costs. *Id.* ¶¶ 19, 21-22. The intended participants in the PHP-CCP pool are publicly-owned and operated community mental health clinics, local behavioral health

authorities,  and local mental health authorities,  local health departments, and public  health

districts.  *Id.* Contrary to Texas's assertion, it is readily apparent that such entities  likely  have

indirect  and non-medical  costs such as "veteran services; crisis supportive  housing;  substance

use disorder  treatment services; Special Supplemental  Nutrition  Program for Women, Infants,

and Children;  permit handling;  forensic services; homeless  assistance; sanitation  services; waste

management;  among others" and that they provide  services to patients  who do not receive

Medicaid  or uncompensated  care. *Id.* ¶ 21. Texas has so far resisted complying  with the clear

requirement of the STCs and applicable  law to provide  a permissible  methodology  on the basis

that CMS previously  approved ambulance  funding  pool protocols without time studies.  *Id.* This

reliance is illogical.  One hundred  percent  of an ambulance's  time and resources are dedicated  to

the direct  provision  of medical services and they are thus fundamentally  dissimilar  to the entities

participating  in the PHP-CCP pool. *Id.*

The only present  impediment  to approval of Texas's PHP-CCP protocol is the resolution

of the cost allocation  issue in the proposed cost reporting  method. *Id.* An approvable  cost

reporting  method is a statutory and regulatory  requirement  for any compensation  pool that

cannot be waived, nor do the STCs contemplate  any divergence  from such requirements.  *See*

ECF No. 67-1 at 20, STC 2. CMS has identified  this issue to Texas and offered several solutions.

Texas has declined  to come into  compliance  with these requirements  and has further declined

CMS's assistance in complying.  Texas's underlying  legal argument  for why it need not amend

its proposal is unsupportable  and the arguments it puts forward in its motion,  including  the lack

of explicit  time study obligation  in the STCs and the amount  of time such a study would take,

Mot. at 25, cannot relieve the state of its statutory and regulatory  obligations.  Plaintiffs'

remaining  submissions,  the application  tools and the Addendum  to Attachment T rely on the

payment protocol,  and thus cannot be approved until  the problems with the protocol are resolved.  *See* DeCaro Decl. ¶ 24; ECF No. 75-1, Grady Decl. ¶ 5. Moreover, CMS is not under any specific obligation  to approve them on any timeline  under the STCs.

Texas is delaying  the approval of its PHP-CCP protocol and any further items that rely on that approval by failing  to work collaboratively  to establish an acceptable cost reporting methodology  The relief requested by Plaintiffs  is unwarranted.

### e.  The relief requested by Plaintiffs  is unwarranted,  unnecessary, or ineffective

Plaintiffs  request various specific and general forms of relief, which are either unnecessary, unwarranted, ineffective or all three. First, as discussed  *supra*, the parties have resolved all issues related to actuarial soundness  and the size of proposed payments for all SDPs. Therefore, even if some relief would have been warranted on these claims (Mot. at 10, 12-13, 28 (e) and (f)), which Defendants dispute,  it is not necessary now and would  serve no purpose.

Second, CMS's approval of two of the five requested SDPs belies  Texas's claim that CMS has only considered the requested payments in the aggregate and not individually.  To the extent Plaintiffs' request is not tied specifically  to the size of the payments, Mot. at 13, which has now been resolved, it should be denied because CMS is already evaluating the payments on their individual  merits. Moreover, as explained  *supra*, the remaining three SDPs all share the same defect so there would be no practical purpose to an order requiring  them to be evaluated separately.

Third, Plaintiffs' claims for relief related to the attestations proposed by CMS, Mot. at 18, 20, 28 (g), are also unwarranted and unnecessary because CMS does not claim that such attestations in and of themselves are required for approval of the remaining  SDPs. As explained in detail  *supra*, Texas is required to ensure that the source of its state share of Medicaid

payments under each SDP is permissible  and CMS has offered attestations as a pathway to make the required showing. The requested relief would not change the position of the parties nor would it relieve Texas of its statutory and regulatory obligations  to ensure that the non-federal share of each SDP is permissible.

Fourth, to the extent Plaintiffs' requests (a) – (c), Mot. at 28, are intended  to apply to the SDPs, they are inapplicable  and would provide no relief. The requirement to ensure a permissible non-federal share for all Medicaid  payments is explicitly  set out in statute and regulation, *see supra*. Defendants have made clear in numerous communications,  and in this brief, that those requirements have not been satisfied and the three SDPs with that financing problem therefore are not approvable. CMS has not acknowledged that any submissions  related to these SDPs are compliant  with the applicable  requirements. Plaintiffs' request that the Court order CMS to formally  respond to Texas's September 7, 2021 counteroffer letter, Mot. at 20, is also moot. CMS responded to the contents of that letter and other issues by letter on November 15, 2021.[4]

Finally,  all of the requested relief should also be denied as it pertains to the PHP-CCP pool. Plaintiffs requests (a) – (c), Mot. at 28, are inapplicable.  CMS has not acknowledged  that the protocol is compliant  with all requirements and has not imposed any requirement on approval of the protocol that is not required by statute or regulation. CMS has explicitly  explained in discussions  with Texas and in this brief the statutory and regulatory bases of the approval requirements. Although Defendants maintain  that a time study and step down requirement would be permissible  under STC 39 based on the obligation  of Texas to comply with the statutory and regulatory requirements for determining  reimbursable costs, CMS has recommended and not

---

[4] November 15, 2021 Letter from CMS to Texas, available  at https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/tx-healthcare-transformation-cms-ltr-state-11152021.pdf.

required a time study to resolve the outstanding approval issue. The Court could order the parties to immediately coordinate on an accelerated review of the proposed protocol, Mot. at 26, but the effect of such an order would be to compel Texas, not CMS, to make the necessary changes to come into compliance with statutory and regulatory requirements. Plaintiffs also have not provided any basis to compel the relief requested for the application tool or the Addendum to Attachment T. The application tool, as Plaintiffs admit, "requires an approved protocol," so approval is not possible until Plaintiffs bring their proposed protocol into compliance. The addendum to Attachment T for DY 12, also relies on the DY 11 protocol, and in any event there is no obligation on CMS under STC 39 to act on any timeline. Therefore, the requested relief is entirely unwarranted.

## IV.    Conclusion

For the reasons explained above Plaintiffs' Motion to Enforce should be denied.

Dated: November 16, 2021                       Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

NICHOLAS J. GANJEI
Acting United States Attorney

MICHELLE BENNETT
Assistant Branch Director

*/s/ Keri L. Berman*
KERI L. BERMAN
Trial Attorney
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11206
Washington, DC 20005
Tel: (202) 305-7538
Email: Keri.L.Berman@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.

DATED: November 16, 2021

/s/ *Keri L. Berman*
KERI L. BERMAN
Trial Attorney
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11206
Washington, DC 20005
Tel: (202) 305-7538
Email: Keri.L.Berman@usdoj.gov