## Texas & CMS Meeting: Friday, August 20, 2021

## Discussion: State Directed Payment Preprint Modifications

CMS is committed to working with Texas to support safety net providers and to ensure that safety net financing and reimbursement approaches advance measurement and accountability for improving health equity and quality. We reiterate our offer, outlined in CMS' August 13, 2021 letter, to address the near-term stability for safety net providers while CMS and Texas continue to work toward a more sustainable, equitable, and high quality safety net, by approving an amendment to the state's demonstration, if timely submitted, that would extend the DSRIP program for one year (through September 30, 2022).

At the state's request, CMS is providing, in the chart below, more detailed information under Option 2, which was outlined in the Appendix to the August 13, 2021 letter. As described below, the state could modify all five (5) state directed payment preprints currently under CMS review for SFY 2022 to be consistent with statutory and regulatory requirements. Such modifications will need to satisfy all the terms below, with sufficient data to CMS as described. Most importantly, the state will need to ensure that the overall aggregate amount of payments is significantly less than previously proposed to satisfy actuarial concerns.

CMS will review the information submitted by the state, which may lead to additional communications back and forth between the state and CMS.

As an alternative, the state could resubmit the preprints as described in option 1, and CMS could timely approve those preprints before September 1, 2021.

In either case, CMS is willing to work with the state on the extension of DSRIP, subject to the state's submission of an amendment, consistent with the STCs in the THTQP demonstration by Monday, August 23.

CMS will work with the state over the course of the next year on a more sustainable approach to a high-quality, equitable heath safety net.

September 10, 2021 Update: CMS responses are provided below, highlighted in yellow.

September 24, 2021 Update: CMS responses are provided below, highlighted in green.

October 18, 2021 Update: CMS responses are provided below, highlighted in pink.

November 10, 2021 Update: CMS responses are provided below, highlighted in blue.

**Overarching comments from the CMCS Division of Quality and Health Outcomes:**

RAPPS, CHIRP, TIPPS, and BHS:

1. **Using state-level data in the evaluations.**

- Upon review, it appears that many of the measures the state will be using to evaluate the SDPs will be at the state-level, even after the EQRO develops an attribution methodology. Given the overlap in services being provided by the SDPs, we have concerns about whether Texas can clearly evaluate the economy and efficiency of their progress in elevating the health services provided to Medicaid beneficiaries through the SDPs.
- We see this currently evolving evaluation methodology as unable to capture the progress of SDPs with smaller provider categories such as rural health clinics. For example, how will the state determine that improvement is driven by a rural health clinic on the ED visit measure by analyzing at the state-level?

State Response: An evaluation could never wholly attribute, for example, an increase in access to services in a health clinic to a reduction in ED utilization, because there are more factors at play – it requires the whole system to reduce ED utilization – ambulance, payor, Medicaid member, clinics, etc. Additionally, the Potentially Preventable ED Visit (PPV) measure can never be directly attributed to a non-hospital provider. Potentially Preventable Events (PPEs) are structured as a ratio of predicted events at the hospital divided by observed events at the hospital, so any improvements made outside of the hospital setting can only be correlated with any reduction in observed events at the hospital. Another complicating factor is that Medicaid members have freedom of choice in provider. And multiple provider types participating in these SDPs would be contributing to the outcomes for Medicaid beneficiaries as a system.

The state will amend the evaluation to add more provider-reported measures to isolate the performance of the participating providers in the respective DPPs. The state is open to any suggestions and strategies CMS may have to include in the evaluation. HHSC will consider amending proposed measures in UHRIP and RAPPS to ensure more provider-reported outcome measures can be used for the evaluation. This will delay the first provider reporting period.

As the SDPs are advancing the state's quality strategy on the whole, HHSC will also include statewide measures in the combined evaluation of DPP BHS, CHIRP, RAPPS, and TIPPS (see response to comment 2 below).

2. **Providing one evaluation for SDPs.**
- Currently, the state is unable to isolate the effects of these SDPs due to the SDPs reinforcing one another. Though these SDPs target different providers, they target similar services and largely have the same goals. The state appears to consider them a unit of policies working together to improve quality in the state, and not as separate tools to be measured individually. However, we need to better understand how the state's efforts to improve healthcare delivery to Medicaid beneficiaries is affecting their health and well-being and without full attribution, we do not see how an evaluation report could discern this. One option discussed with the state is to provide one annual SDP evaluation for the four SDPs which will include measures attributed specifically to each SDP.

State Response: The state will provide one evaluation report to minimize administrative burden, and based on the reasons explained above, the state will primarily use provider-reported measures in the evaluation.

==ALL SDPs:==

**3. Recommendation to add clarity to the findings of all Texas SDPs.**
- To relieve the struggle of controlling for factors external to the Texas SDPs, CMS recommends conducting outreach with participating providers (e.g., surveys or key informant interviews) to understand their experience with each SDP. Qualitative analysis can be critical to contextualizing and validating quantitative findings.

State Response: The state has already proposed incorporating qualitative data via the structure measures questions that will be answered by providers.

| State Directed Payment Topic | Modifications/Information Required for State Fiscal Year (SFY) 2022 Under Option #2 |
|---|---|
| Quality Incentive Payment Program (QIPP) | 1. Remove the 18% reconciliation threshold on component 1 and base payments only on current utilization or performance measured during the contract rating period (rather than historical utilization or performance). <br><br> **State Response:** Texas has utilized this type of program structure since the inception of QIPP in 2017. CMS noted in the SFY 2021 program approval: "if the state continues to pay this component as a uniform increase, CMS expects the state to move away from a reconciliation requirement and instead require plans to pay based on the actual facility bed days during the contract rating period." Texas understood this guidance to indicate that efforts should be made to show progress prior to the SFY 2022 submission but did not understand CMS to be stating that the state must definitively eliminate this structure prior to SFY 2022. As CMS is aware, nursing facility providers have undergone tremendous strain since the beginning of the public health emergency as they have worked to respond to COVID-19. For that reason, Texas did not undertake major structural changes to QIPP for SFY 2022, except for continuing advancements in our quality goals. To that end, the state has enhanced Component 1 to require a PIP with documented progress on the PIP, which we believe is a considerable advance towards a more performance-based payment. With respect to the existing reconciliation threshold, our preliminary review of QIPP Year 4 data suggests a likelihood of a reconciliation required following the program period. The state considers claims to be adjudicated 180 days following the date of encounter and these numbers are subject to change, but the state would like to emphasize that the potential impact of COVID-19 on utilization is not yet known, and the state believes the threshold is appropriate for QIPP Year 5. <br><br> However, Texas also believes that the necessity of the continuation of this program for SFY 2022 is critical to the quality of services delivered to the Medicaid nursing facility beneficiaries. We understand from the call between Texas and CMS on August 20, 2021, CMS will not consider Texas's proposal of a reduced threshold for SFY 2022, with a complete elimination of the structure for SFY2023. In an effort to achieve a pathway forward for this important and long-standing program, Texas would like to utilize a payment structure where interim payments for SFY 2022 are based initially upon the historical utilization data, with final payments made based upon actual data at the end of the program year, with no contingency for a variation in utilization data. This approach will allow for consistent |

payments to be made through the program year, but final payments to be based exclusively on actual utilization. Would CMS agree that this approach resolves any outstanding concerns about the tie to utilization? If so, Texas will submit a revised pre-print to this effect immediately.

**CMS Response**: What the state has described for SFY 2022 for QIPP Component 1, where interim payments would initially be based upon historical information but reconciled to actual utilization during the rating period, would be permissible under the regulation. We do have a few follow-up questions to ensure our understanding of this arrangement:
State Response: Thank you for this feedback; we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

a.  Please describe in more detail how the payments will be made under the state's new proposal to replace the reconciliation threshold. Please provide a step-by step breakdown for how payment will work for both the MCOs and providers -- including whether the interim payments will be based on the same monthly payment amount currently proposed in the preprint, when interim payments will be made based on historical utilization, how long such interim payments will continue to be made based on historical utilization, when the payments will be made based on actual utilization, and how the initial payments made based on historical utilization will be reconciled to actual utilization during the rating period. Please also discuss if the reconciliation could potentially result in recoupments from MCOs or providers.
State Response: Please see Attachment A for a timeline and high-level description of the process. There will be three subprocesses required as part of this overall process. In the first subprocess, HHSC will pay MCOs a monthly actuarially sound capitated rate based upon actual caseloads each month. MCOs will adjudicate actual claims through normal processes and then submit to HHSC encounter data. Typically, due to claims processing timelines, encounter data for a rating period is usually considered substantially complete approximately 120 days after the end of the rating period, which for Texas means December 31, 2022 for the September 1, 2021 through August 31, 2022 rating period. In a separate subprocess, HHSC receives quality-related data from providers that is required as a condition of participation in the program. HHSC will direct MCOs to issue payments to providers based upon historical data and using funds received by the MCO in the monthly capitated rate that was paid. The MCO will issue the interim payment to the provider monthly. In the final subprocess, approximately 120 days after the end of the rating period, HHSC will reconcile the historical utilization that was used as the basis of the interim payments to the actual encounters reported by the MCOs. HHSC will then direct the MCOs to recoup from and redistribute funds to providers based upon the reconciled information. The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments. Providers may experience recoupments or receive additional funds based upon historical-to-actual utilization fluctuations.

**CMS Response (9/24/2021):** CMS appreciates the additional information provided on the process. CMS would like to confirm the following:

**State Response (9/29/2021)**: HHSC is happy to share additional information to confirm CMS' understanding of the reconciliation process. Per CMS' September 10, 2021 statement that the reconciliation process would be permissible under the regulation, we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

1. The 3 processes indicate that no changes will be made to the payments the MCO receives from the state; changes to the payments would occur for the providers within what the state has paid the plans, is that correct?
   State Response (9/29/2021): Yes, that is the intent. However, there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound.

2. Does the state anticipate any amendments to the rates or rate certifications to account for the reconciliation requirement?
   **State Response (9/29/2021)**: Not at this time.

3. How will the state inform the plans of any needed recoupments or redistributions of the funds to providers? Through updates to the contract?
   **State Response (9/29/2021)**: The state will inform the MCOs via an updated payment scorecard that will show any provider level payment adjustments (positive or negative) that are required.
   **CMS Response (10/18/2021):** We understand that the payment scorecard has historically been used for payments to QIPP providers, and that the state will now include direction in the MCO contracts for using this scorecard for when recoupments or redistributions are needed for providers participating in TIPPS, BHS, and RAPPS. Is this correct?
   **State Response (10/22/2021)**: The state will create a scorecard specific to each program that is similar to the scorecard used in QIPP, but there will not be a consolidated scorecard for all programs. The program-specific scorecards will be used to indicate when recoupments or redistributions are necessary.

4. CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.
   **State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

5. The response to Question 9a in the preprint indicates that the payment for Component 1 will be a uniform increase of 36.9% per claim. Can the state confirm this is correct? Are the payments made under Component 1 to providers on a PMPM basis or on a per service (or per claim) basis? Would the percentage amount change with the reconciliation?

**State Response (9/29/2021)**: Yes, the percentage increase is approximately 36.9%. To be clear, however, the impact of the payment increase is the percentage identified on a per claim basis; however, the state intends on making the payments as a lump sum monthly payment during the program year, prior to the reconciliation to actual NF claims at the end of the program period. The percentage could change as the state intends to maintain the size of component 1 as identified in the pre-print but would adjust the percentage per claim if the actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation.

**CMS Response (10/18/2021):** Our understanding from previous rounds of review is that the targeted amount for Component 1 is $448,305,000; however, our understanding is that this amount excludes provisions for administration, risk margin, and premium tax. Can the state please clarify the targeted amount of Component 1 funding that they intend to reconcile to? Will this targeted amount include any provisions for administration, risk margin, and premium tax?

**State Response (10/22/2021)**: The amount identified for Component 1 is an estimate based upon the proposed program size. However, if the actual program size fluctuates as a result of caseload, the size of Component 1 would fluctuate proportionately as Component 1 is designed to be equal to a percentage of the overall program value. The reconciliation performed at the end of the program year will be performed to reconcile to the actual value of Component 1 based upon the actual value of the overall program as paid through the program year. All managed care capitated payments will include administration, risk margin, and premium tax, as appropriate. Component 1 value listed above does not include any provisions associated with administration, risk margin, and premium tax.

6.  The state indicated on calls that the state intended to continue incorporating this payment arrangement as an adjustment to base rates rather than a separate payment term. Given the revised reconciliation process for Component 1, can the state affirm that it still plans to incorporate all components of this payment arrangement through an adjustment to base rates or would the state pay any part of this payment arrangement, such as Component 1, as a separate payment term?

**State Response (9/29/2021)**: Yes, all components will be through an adjustment to base rates.

**CMS Response (10/18/2021):** The state indicates in the response to question 5 above that the uniform percentage increase currently documented in the preprint would change at the time of the reconciliation as the state intends to maintain the size of Component 1 funding currently identified in the preprint. Is the state's goal under Component 1 or any other Component to ensure that exactly a certain amount (e.g., $448,305,000) is expended by the plans for payments to providers under any specific components (e.g., Component 1)? Or are the amounts listed for each component an estimate that is subject to change? If so, what would cause it to change?

**State Response (10/22/2021)**: To clarify, the state intends to maintain the size of Component 1 as a percentage of the overall program value; however, the gross value of Component 1 may change if the overall program value fluctuates from the estimated value. This fluctuation would be a result of changes in caseload from the forecasted caseload for the fiscal year. However, the payments will still be reconciled against actual utilization, so the actual percentage of program value compared to actual utilization may

result in a different percentage rate increase than the estimated rate increase, which is based upon historical utilization and estimated program values.

**CMS Response (10/18/2021)**: Does the state direct the plans to set aside any portion of the capitation rate paid to them for this payment arrangement?
**State Response (10/22/2021):** No. The portion of the capitation rate attributed to each DPP has been separately identified and reported to the MCOs but no direction has been provided on how the MCOs should "set aside" these funds.
**CMS Response (10/18/2021)**: Are the plans directed to use a specific portion of the capitation rate paid to them to pay out Component 1?
**State Response (10/22/2021):** No. The capitation rates have been calculated separately for each DPP; however, this add-on rate isn't delineated between the various components.

7.  Please also revise the preprint to include the information on the reconciliation process described in Attachment A.
    State Response (9/29/2021): Please see the changes in the attached pre-prints, per your request.

    b.  Can the state confirm that all payments (including the interim payments based on historical data) will be reconciled to actual utilization data during the rating period? Or will those initial interim payments remain based only on historical utilization?
        State Response: All payments will be reconciled to actual utilization data during the final reconciliation.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.
**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

    c.  We will note that states that make interim payments based on historical utilization and then reconcile to actual data have noted that reconciliations like this can be administratively burdensome.
        State Response: Noted. The importance of the program to our healthcare safety net is significant so HHSC will absorb the administrative burden.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021):** The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

   d.  CMS' understanding from previous responses is that the reconciliation threshold is a part of the state's administrative code. Can the state confirm that this change can be implemented without changes to the administrative code? If not, can the state describe the process and timing for making such changes? If changes to the administrative code are needed, will the state be able to implement those retroactively back to the start of the rating period?

State Response: Implementing this change will require the state to modify the Texas Administrative Code. HHSC will propose that rule changes will apply to the entire program period, though the effective date of the rule change will be subsequent to the start of the rating period.

**CMS Response (9/24/2021):** Can the state elaborate on the timeframes that would be needed to complete the state rulemaking process? Can the state also comment on if they anticipate challenges to the rulemaking and what impact those would have on implementation timelines?

**State Response (9/29/2021):** The Texas rulemaking process requires filing of a proposed rule with the Texas Register by Monday at noon to have the proposal published 11 days later (the second Friday after submission). Proposed rules are generally posted for a 30-day public comment period. Following the public comment period, the rule can be adopted with or without changes. Typically, a rule takes effect 20 days after the date the rule is filed with the Texas Register. This total process requires a minimum of 51 days; however, accounting for time necessary to prepare the rules for publication, to review public comments, and make any changes as a result thereof, HHSC typically assumes a minimum of 90 days will be necessary. HHSC anticipates receiving public comments but also anticipates that providers prefer changes be made if they are necessary for CMS approval for state fiscal year 2022.

For more information, CMS may wish to visit our webpage on rulemaking: https://www.hhs.texas.gov/laws-regulations/policies-rules/health-human-services-rulemaking.

**CMS Response (10/18/2021):** From the description above, it sounds like CMS would not expect rate amendments or contract amendments to implement the proposed changes until 90 days after the start of rulemaking at the state level. Is this correct?

**State Response (10/22/2021):** With respect to rule making changes described above, the state does not anticipate that rate changes or contract amendments would be required to implement the changes proposed for QIPP, so the rates and contracts already filed with CMS will stand.

    e.  Can the state please describe how this new approach will be accounted for in the capitation rates? Will the directed payment continue to be incorporated into the rates as an adjustment to the base data or will the directed payment now be incorporated into the rates as a separate payment term? It would be helpful for the state to clarify how this new approach would impact the amounts included in the initial certification, and if the state and actuary intend to amend the rates in the future once the final payments based on actual utilization are known.

**State Response:** We expect that the QIPP would continue to be incorporated as an adjustment to the base capitation rates and included in the monthly premium. Once final data is available at the end of the year, a retroactive adjustment to the QIPP capitation rates may be necessary, in which case HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Questions 1, 2 and 6. Appendix A, process 3 does not indicate that there will be any changes to the MCO payments and the state's response above states, "The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments." However, this response indicates that retroactive adjustments to the capitation rates may be necessary. Can the state please clarify if the state expects or anticipates an amendment to the rates and if amendments to the rate certifications may be needed? Please also identify under what circumstances amendments would be needed?

**State Response (9/29/2021):** The state does not anticipate making any prospective capitated rate changes based upon this modification. However, once final data is available at the end of the year, a retroactive adjustment to the capitation rates may be necessary if the degree of recoupments and redistributions is significant to the point that the capitated rates are no longer actuarially sound. If that occurs, HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (10/18/2021):** The state indicates that there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound. We would appreciate better understanding under what circumstances the MCO rates would be revised.

    1.  Can the state and its actuary please discuss how you are defining "significant" in this instance, and what threshold would trigger adjustments to the MCO capitation rates. Please address both the potential instances when MCOs are required to pay out more QIPP payments than the amount of funding included prospectively in capitation rates, and when MCOs are required to pay out less QIPP payments than the amount of funding included prospectively in the capitation rates.

**State Response (10/22/2021)**: The intent of any reconciliation would be to ensure that all MCO capitation rates continued to be considered actuarially sound and to ensure that no MCO was inadvertently harmed (or profited) due to shifts in utilization and provider payments that are beyond their control. The threshold for triggering a retroactive rate change is difficult to define in advance given that there are numerous variables that impact the capitation rates and would need to be taken into consideration. Without being overly prescriptive we believe that the risk margin would be the starting point for evaluating whether a modification would be necessary and that such consideration would be equivalent for the cases of both over and underpayment. There could be scenarios where the trigger could be higher or lower than the risk margin such as large scale utilization shifts that impact the overall profitability of the MCOs either positively or negatively resulting in variations in other assumptions that offset the need to adjust rates retroactively.

2. Since CMS evaluates actuarial soundness at a rate cell level, we would appreciate understanding if the state and actuary intend to review whether adjustments to the rates are necessary as a result of the reconciliation at a rate cell level. If not, we would appreciate understanding why not, and at what level the state intends to perform the analyses to determine if adjustments to the rates are necessary.

**State Response (10/22/2021)**: Our intent would be to evaluate the need for any rate adjustments at the same level of detail on which the capitation rates are set, i.e. at the MCO, SDA and risk group level.

3. To the extent the state and actuary determine that adjustments to the MCO capitation rates are necessary as a result of the reconciliation, we would appreciate understanding if the state intends to still include a risk margin provision in the revised QIPP amounts included in the rates based on the reconciliation. If the state intends to still include a risk margin when developing revised QIPP amounts based on the reconciliation, we would appreciate understanding why this is reasonable.

**State Response (10/22/2021)**: In general, risk margins are set by program and applied uniformly across all components of the premium rate, i.e. medical, pharmacy, QIPP, CHIRP, etc…The margins are not necessarily intended to reflect the risk associated with each individual claim type, risk group, SDA but an aggregate reflection of the risk across the entire program inclusive of all services and rate components. For this reason, we believe that a risk margin may still be necessary as this assumption is set in aggregate and not specific to the QIPP. This assumption may need to be reevaluated given the specific circumstances in the event a rate adjustment is necessary.

2. Require that any payments based on performance are made only for facilities that achieve year over year improvement in accordance with the regulatory requirement that the arrangement must advance managed care quality goals and objectives.

**State Response:** MDS-based quality measures in Component 3 include improvement-over-self-targets as well as program-wide targets. As indicated in the pre-print Q&A, program-wide targets are meant to incentivize the participation of smaller facilities, where natural population fluctuations lead to wider variance in quarterly performance tracking, and already high-performing facilities, where there is less room for sustained improvement-over-self.

a. Does CMS recommend HHSC remove quarterly measurement cycles and rely only on averaged or annual improvement for all participating facilities? **CMS Response**: Our primary concern for QIPP Component 3 is the OIG audit finding that nursing facilities that declined in performance continued to receive quality improvement incentive payments. With the state's new quarterly improvement schedule for Component 3 based on either 5% improvement over self or the national average, we still have concerns that there could be instances where a nursing facility has a *significant* decline in performance but the facility would still receive the quality improvement incentive payment by performing at or better than the national average. We understand that there may be natural fluctuations in provider performance; what we want to address with the state are these instances when there is a notable decline in performance and yet the provider still earns a quality incentive payment because they satisfy the national average benchmark.

For QIPP Components 2 and 4, the state is using benchmarks only for these measures and not factoring in improvement over self. While this is acceptable, we do caution the state that such an approach can lead to the same issues raised by the OIG report if the benchmarks are not set appropriately. We would strongly advise that the state consider adding some threshold for at least maintaining or improving performance.

CMS believes the only way to address this concern would be that for all components where payment is conditioned upon performance on a quality measure and the state wants to use a set benchmark that a provider must achieve to earn payment (e.g., a statewide or national benchmark), the state adopt a requirement that if the provider already was achieving the benchmark at the start of the performance period, they would have to demonstrate improvement or maintenance in period over period performance (e.g., year over year or quarter over quarter.) We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark.

State Response: The state acknowledges CMS' suggestion to use the absolute change in the national average to set an allowed fluctuation for each MDS-based quality measure. HHSC proposes to calculate the variance for each measure at the beginning of the program year, relying on the Care Compare data used to set the baselines and benchmarks. The methodology could include using the four preceding quarters published alongside the 12-month average to calculate allowed quarterly variance. The state publishes final targets for each NF and measure at the beginning of the program year, in accordance with program rule; calculating the ad hoc variance each quarter would prevent state NFs from knowing their performance targets ahead of time.

**CMS Response (9/24/2021):** The state's response is unclear. CMS was suggesting that the state revise the requirements of the payment arrangement such that if the provider began the performance period above the national average, they would be required to show improvement over self, which could be defined as the facility maintaining performance (which could include a margin defined by the trend for the national benchmark.) Such an approach would not seem to prevent providers from knowing their performance target ahead of time. Can the state clarify its concerns and if it is able to make such an update to the preprint?

**State Response (9/29/2021):** The state's previous response was attempting to confirm that CMS was referencing an annual calculation with the phrase "For example, if the national or statewide benchmark dipped […] from the previous period to the current period." The change from the previous period to the current period will be calculated annually as the change from the previous program year's initial benchmark to the current year's benchmark.

The state proposes to add the following to the preprint: To account for natural fluctuations in quarterly performance results while still holding NFs accountable for incremental improvement, the state will define an allowed margin for each quality metric in Component 3. Any metric will be considered "Not Met" for the quarter if a NF performs worse than its initial baseline by more than this margin. Each metric's margin will be defined as the relative +/- change in the national average for that metric from the previous program year to the current program year.

**CMS Response (10/18/2021):** CMS received a revised preprint for QIPP on 10/13/2021; we are reviewing the changes discussed on 10/15 and will follow-up if there are any additional questions.

**State Response (10/22/2021):** Thank you for this update.

b. Does CMS expect the state to select one year as the baseline for that program year and subsequent years (e.g. FY 2021 baseline would be used not only to evaluate FY 2022, but also FY 2023, 2024, etc.) or can the baseline be set at the start of each program year (the method used in QIPP since year 1)? **CMS Response:** For establishing baselines for pay for performance measures where payment is conditioned upon performance, the baseline can be set at the start of each program year (or each quarter if the state chooses to continue measuring performance quarterly when determining payment).

For evaluation purposes, CMS expects the state to select one year as the baseline and it should be consistent for subsequent years. The November 2017 CIB provided further guidance on the quality requirements for directed payment proposals to include baseline data and improvement targets for performance measures. This was reiterated in the January 2021 SMDL and the revised preprint form. To best demonstrate improvement over time, SDP quality evaluations should always have a baseline that is before Year 1. Having the baseline set before Year 1 allows the state and CMS to understand the SDP's impact over time, as well as the ability to identify trends and allow continual adjustments to improve the program. If that is not possible, states

should at the latest use baseline data for the most recent period available (e.g., Year 1). In such instances where states cannot use baseline data before Year 1, baseline data should be submitted six months after the end of the first-year rating period. Additionally, to better understand trends in performance, baseline data should be consistent across years for payment arrangements that are operated over multiple years (even if approved annually).

State Response: Thank you for clarifying. This is in line with our submitted Evaluation Plan and performance measurement methodology.

    c.    Would CMS consider SDPs with performance-based components that use structure or process measures, or are outcome measures the only acceptable type of measures? For example, QIPP Component 2 recognizes increased nurse hours. **CMS Response:** CMS strongly encourages states to use outcome measures for value-based payments. While the use of Component 2 measures is permissible under the regulations at this time, using a Network Adequacy "count" such as the impact of increasing nursing hours, does not necessarily lead to health improvements for Medicaid beneficiaries. Using structure or count measures along with outcome measures can, however, show the importance of ensuring adequate staffing on health outcomes of beneficiaries, especially when done over time. We encourage Texas, therefore, to use these measures along with outcome measures that are measuring the impact of the healthcare. Also process measures, such as vaccine administration, can be used with outcome measures.

State Response: The submitted Evaluation Plan includes claims-based outcome measures regarding hospitalizations, which augment the RN coverage measures used in Component 2 as a way of showing impact and importance.

**CMS Response (9/24/2021):** Thank you for the state's response. To clarify, CMS' guidance to pair structure or count measures with outcome measures was referencing the condition of payment rather than just evaluation. The QIPP payment arrangement includes both outcome measures (such as those in Component 3) with the measures in Component 2. While CMS does encourage the state to pursue more outcome measures for future years, the current sets of measures is permissible under the regulations at this time.

**State Response (9/29/2021):** The state thanks CMS for the clarification, and the state will continue in accordance with the arrangement submitted in the preprint.

3.    Refine the evaluation plan for QIPP to ensure that the effect of the QIPP state directed payment, absent other programmatic changes or other state directed payments, can be appropriately evaluated by the state, including a sound attribution methodology. The state must provide consistent baseline data to demonstrate year over year changes.

**State Response:** It is the state's goal to have improvement year over year and to evaluate annual performance for participating facilities. The QIPP Performance Review submitted with the SFY 2022 pre-print includes analyses of the first three program years and demonstrated year-over-year improvement. Likewise, the QIPP Evaluation Plan submitted with the SFY 2022 pre-print includes a methodology of analysis that measures participating facilities

| | |
|---|---|
| | individually and as a group against previous year performance. Some individual, MCO-designed value-based payment agreements with individual nursing facilities (NFs) may exist but QIPP is the only state-wide payment program focusing on NFs. For structure and process performance measures, the state planned to use SFY 2022 data as a baseline for future years.<br><br>    a. Does CMS have specific recommendations for how to isolate the impact of DPP from other state-wide initiatives?<br><br>**CMS Response:** The state may consider involving their EQRO contractor or 1115 external evaluator to support this assessment.<br><br>QIPP has the unique advantage to the other Texas SDPs of using the Medicare Minimum Data Set (MDS) 3.0 data collected by Texas Medicaid. MDS is standardized assessment data used for facilitating care management in all state nursing homes. We would recommend the use of the MDS raw data Texas is mandated to collect as the best source for their QIPP quality evaluation. We understand this has programming implications and will take time to implement. CMS will work with the state to find an agreed upon timeline for using MDS raw data for the evaluation.<br><br>The state may also consider including qualitative analyses in their evaluation. Please see the discussion at the beginning of this paper regarding qualitative analysis.<br>State Response: The state will explore possibilities for including the EQRO in the QIPP evaluation process and will obtain estimated timelines and costs for transitioning to using raw data.<br><br>**CMS Response (10/18/2021):** We understand that the QIPP evaluation plan will be standalone, whereas there will be a single evaluation plan for CHIRP, TIPPS, BHS, and RAPPS. Please confirm.<br>**State Response (10/22/2021):** Yes this is correct. |
| Comprehensive Hospital Increase Reimbursement Program (CHIRP) | 1. CMS does not consider the current aggregate payment amounts to be reasonable and appropriate, and CMS is concerned that the resulting capitation rates are not actuarially sound. Additionally, the state must provide a complete reimbursement analysis with a comparison to the average commercial rate for hospitals that only participate in the UHRIP component of the state directed payment. This reimbursement analysis must include hospital-specific reimbursement data as compared to the average commercial rate by hospital for the hospitals participating only in the UHRIP component.<br><br>**State Response:**<br><br>Aggregate Payment Amounts:<br><br>Texas understands that CMS has approved directed-payment programs in other states using a comparison to the estimate of what an average commercial payor would have paid for the same services. To develop an estimate of an ACR upper payment limit, in consultation with CMS, Texas designed CHIRP to utilize a payment-to-charge ratio that is identical to the method used to calculate the estimate of Medicare payments for the same services. Texas |

understands from its call with CMS on August 20, 2021 that the proposed CHIRP would be the largest payment by gross dollars approved by CMS and that the year-over-year increase from FY2021 UHRIP to the proposed FY2022 CHIRP is a significant percentage increase.

Texas notes that Medicaid generally requires reimbursement rates to be economic and efficient, but sufficient to attract enough providers for a Medicaid beneficiary to have equivalent access to a provider as an individual who is not in the Medicaid program. Because of this, reimbursement rates on a per service or per provider basis are generally understood to consider comparators to determine a reasonable and appropriate level of reimbursement. On Texas' call with CMS on August 24, 2021, CMS confirmed that typical comparators examined to evaluate reasonableness include Medicare, average commercial rates, and Medicaid Fee-for-service. We indicated that in Texas Medicaid FFS represents less than 4% of our population and for that reason, we feel that a more appropriate comparator is either Medicare or Average Commercial. CMS also noted that there may be variation in appropriateness of payment amongst payers for a variety of reasons; Texas agrees, specifically as it relates to Medicare. Texas' Medicaid population is primarily children and pregnant women who are not typical Medicare populations. For this reason, for hospitals in Texas, such as Children's hospitals, or urban hospitals that have high levels of maternity and neonatal care, Medicare may not be the most appropriate comparator and average commercial is likely the most appropriate comparator.

Additionally, as discussed on the August 24, 2021 call, reimbursement rates generally incorporate some contemplation of the aspects of the provider market. As CMS is aware, with the discontinuation of DSRIP in FY2022, hospital payments in Texas will decline by more than $1.6 billion. Inherently, this means that the provider market, including willingness to serve Medicaid clients at prior rates, will not be comparable between FY2021 and FY2022. For this reason, Texas does not believe a year-over-year comparison of aggregate Medicaid managed care costs is appropriate.

Actuarial Soundness of Capitation Rates:
It has been Texas's long-standing understanding that actuarial soundness practices and principles for setting capitation rates applies to providing reasonable and appropriate provision to Managed Care Organizations congruent with costs and risk under the contracts. HHSC submitted actuarial certification reports to CMS on July 16, 2021 that included the CHRIP add-on rates for FY 2022. The actuarial opinion outlines the actuarial practices and principles applied to arrive at actuarially sound rates for the inclusion of the CHIRP, should CMS approve the program as submitted. In recent discussions, CMS is also applying actuarial opinions to aggregate Medicaid managed care spending. HHSC is not aware of federal guidance or direction for the actuary to provide an opinion on provider rates nor aggregate spending.

In the August 24, 2021 call, CMS clarified that the review by OACT was made in the context of the pre-print review, and not the evaluation of the capitated rate submission. CMS further clarified that the questions and concerns at this time were more focused on the reasonableness of the underlying provider reimbursements and were not regarding the actuarial soundness of

the capitated rates. Texas appreciates this clarification and agrees that there are not currently actuarial soundness concerns with the calculated capitated rates.

Reimbursement Analysis:
Texas also understands that CMS typically analyzes the reasonableness of the impact of state-directed payments on a per class basis, rather than on an individual provider basis, as illustrated in the pre-print template question 23. CMS confirmed this understanding on the August 24, 2021 call. Texas is of course willing to provide to CMS an analysis of the individual hospitals that are UHRIP participants only, for those providers who furnished to Texas the data necessary to calculate an ACR UPL. Please find it attached in Attachment A. Texas did not receive ACR data in the application from 17 hospitals, as providing such data was optional for providers at the time of the application. Texas seeks CMS guidance on whether CMS would allow Texas to obtain the data from these providers within 4 months of the program effective date with the condition that if the data is not received in that time frame, these providers would be removed from CHIRP, or alternately whether these providers can merely be restricted from participation in ACIA, as was originally planned. Texas would be willing to seek the data from the providers and furnish it to CMS as part of the monthly ongoing oversight calls that are supposed to occur between CMS and Texas pursuant to STC 36.

Next Steps:
While Texas continues to believe that the initial proposal and the underlying provider reimbursements on a per class basis are reasonable and appropriate, Texas would like to work with CMS collaboratively to achieve an approval for SFY 2022. Texas would be willing to impose a cap of 90% on the aggregate percentage of ACR that a hospital class can receive. This would reduce the total estimated program size to approximately $4.7 billion and would ensure that on an aggregate class basis, payments are at least 10% lower than ACR. Would CMS agree that this approach resolves any outstanding concerns about reasonableness of the payments and actuarial soundness? While the ACR data from 17 providers would be absent for this methodology based upon the data we have, they would be represented in the aggregate calculation as having an ACR UPL of $0 and thus their inclusion would have the effect of creating a lower aggregate ACR UPL cap because there would be no amount included in the denominator, though these providers would be included in the numerator. If so, Texas will submit a revised pre-print to this effect immediately.

**CMS Response (11/10/2021)**: Related to the proposed sizing of CHIRP, payments under which the state has agreed to limit to no more than 90% of ACR, we have no additional concerns or questions about the size of the program. However, we remain concerned about the underlying financing of the CHIRP payments.

**State Response (11/15/2021):** Thank you for confirming that our submitted pre-print methodology is approvable; we are glad that this matter can be considered resolved for the purposes of consideration of the pending CHIRP approval.

**CMS Response:**

a. For the Reimbursement Analysis, CMS appreciates the state providing the additional data in Attachment A on the hospitals in UHRIP only.
   1. Can the state please confirm that we have accurately identified the 17 hospitals who have not provided ACR data to-date?

| # | NPI | PROVIDER NAME |
|---|-----|---------------|
| 1 | 1205900370 | HARRIS COUNTY HOSPITAL DISTRICT |
| 2 | 1871917971 | SAN ANTONIO BEHAVIORAL HEALTHCARE HOSPITAL, LLC- |
| 3 | 1215354899 | WESTPARK SPRINGS LLC- |
| 4 | 1821025990 | MEMORIAL HOSPITAL |
| 5 | 1275956807 | GEORGETOWN BEHAVIORAL HEALTH INSTITUTE, LLC-GEORGETOWN BEHAVIORAL HEALTH INSTITUTE LLC |
| 6 | 1750620456 | OCEANS BEHAVIORAL HOSPITAL OF ABILENE LLC- |
| 7 | 1740791748 | WOODLAND SPRINGS LLC-WOODLAND SPRINGS |
| 8 | 1114435260 | CROCKETT MEDICAL CENTER LLC-CROCKETT MEDICAL CENTER |
| 9 | 1174021695 | REHABILITATION HOSPITAL LLC-UT HEALTH EAST TEXAS REHABILITATION HOSPITAL |
| 10 | 1326349986 | SCOTT AND WHITE HOSPITAL - LLANO-BAYLOR SCOTT AND WHITE MEDICAL CENTER - LLANO |
| 11 | 1184056954 | ROCK SPRINGS, LLC- |
| 12 | 1538150370 | SHAMROCK GENERAL HOSPITAL |
| 13 | 1134401466 | CARROLLTON SPRINGS LLC |
| 14 | 1366880627 | MESA SPRINGS, LLC- |
| 15 | 1821612284 | Kindred BH Acquisition 1, LLC d/b/a WellBridge Hospital Greater Dallas |

| 16 | 1285258640 | Kindred BH Acquisition 2, LLC d/b/a WellBridge Healthcare Fort Worth |
|----|------------|---------------------------------------------------------------------|
| 17 | 1942795133 | Ascension Seton Bastrop |

State Response: Yes, Texas confirms these are the 17 hospitals that did not provide ACR data as part of the CHIRP application process.

2. If CMS were to grant the state the 4 months proposed to collect the outstanding ACR data for the 17 hospitals that would receive payments under UHRIP only, what would those hospitals be paid in the interim? If the ACR data from these 17 hospitals resulted in changes to the class percentage paid under UHRIP, how would the state implement such changes? Would such changes be retroactive to the start of the rating period? If the hospital(s) fail to provide the data, would the payments made during this 4-month period be recouped by the plan and the state?

State Response: HHSC anticipates that the 17 providers will comply with our request for the additional data, as we will work with them to help them understand that furnishing the data is an expectation from CMS for approval of the program. Those hospitals would continue to be eligible for payments under UHRIP as the payment calculation for all hospitals in a class is based upon the Medicare UPL demonstration, for which we are not lacking data. If upon receipt of the ACR data from the 17 hospitals there is a reduction to the available 90% aggregate ACR cap that HHSC has proposed, we anticipate the state would submit for CMS consideration a mid-year adjustment to decrease rates for the impacted class to ensure that the provider payments stay under the cap. If a hospital fails to furnish the data required by CMS, HHSC would remove those hospitals from the program, if that is what CMS would require under the terms of this agreement, but requests that if that is required that the modification be applied prospectively as a mid-year adjustment.

Texas notes that these hospitals represent approximately 1% of provider payments in CHIRP as originally proposed, so Texas does not anticipate that these hospitals' data will make a material difference in the program calculations.

CMS Response 9/24/21: If the state will need to make modifications to the uniform increases for these 17 hospitals, can the state clarify if the adjustments would be implemented consistently with the effective date of CHIRP (i.e. likely back to the beginning of the fiscal year 2022/September 1 2021), but compressed into a shorter prospective time period? Or would the state make modifications to the uniform increases from a point within the rating period going forward and not back to the effective date of CHIRP?

State Response (9/29/2021): HHSC reiterates that we anticipate the 17 providers will comply with our request for the additional data, as we will work with them to help them understand that furnishing the data is an expectation from CMS for approval of the program. We have already had outreach from

some of the providers asking what data they need to furnish to begin the process.  If a hospital fails to furnish the data required by CMS, HHSC would remove those hospitals from the program, if that is what CMS would require under the terms of this agreement. But HHSC requests that such modification be applied prospectively as a mid-year adjustment.  If the adjustment is implemented as a mid-year adjustment, the state proposes to make modifications from that point in the rating period going forward rather than back to the effective date of CHIRP.  However, HHSC seeks CMS guidance on what CMS would require for the program to be considered approvable.

**CMS Response (10/18/2021):** Can the state please provide an update on the 17 hospitals and if they have agreed to provide the requested data?

**State Response (10/22/2021)**: We have not yet solicited agreement from the 17 providers at this point, though some have contacted the state to ascertain specifications of what data will be required, if CMS requires Texas to implement this.  Prior to making a request for data, Texas would like to be able to clarify for providers the consequences of potentially failing to submit to the data, and waits for CMS to issue guidance, pursuant to our response from September 29.

**CMS Response (11/10/2021)**: CMS' position is that should a hospital fail to provide their respective ACR data, that hospital would no longer be eligible for CHIRP payments and any modificiations to the capitation rates would go back to the effective date of CHIRP. The state could make CHIRP payments to these providers in the interim until the hospital provides the ACR data and subsequently collect any recoupments as necessary, or alternatively withhold payment to the hospital until the ACR data is provided. To the extent the state determines that a mid-year adjustment to the capitation rates is necessary, the state should implement these adjustments back to the effective date of CHIRP (if this is consistent with the effective date of the changes to the uniform increases to providers), rather than making modifications to the rates from the point of the mid-year amendment going forward.

**State Response (11/15/2021):** Thank you for providing clarity on CMS' expectations for the consequences of failure to submit ACR data from the 17 hospitals. Texas will send formal requests to the hospitals to submit the data immediately following CMS approval of the pending pre-print.

b.  Please confirm in writing the following from the call on 8/30:
1.  The data provided in the third tab of Attachment A sent on 8/25 for the hospitals that receive both ACIA and UHRIP is the same as the data provided in Attachment C during the third round of responses?
State Response: The data is the same. There is, however, an inadvertently duplicated hospital on Attachment C, CHIRP Payment Calc tab, line 422. The average CHIRP rate in Attachment C does change slightly for Urban Lubbock. It changes from 72% to 80% for inpatient CHIRP and from 143% to 150% for outpatient CHIRP.

2. For hospitals participating in only UHRIP and not ACIA, there are 106 hospitals that would be receiving payments above the average commercial rate?

State Response: In the original CHIRP proposal, 106 hospitals would receive UHRIP inpatient rate increases that result in those hospitals receiving payments above their individual inpatient ACR.  However, 83 hospitals would receive UHRIP outpatient rate increases that result in those hospitals receiving payments above their individual outpatient ACR.  There are 32 hospitals that receive both inpatient and outpatient increases that result in those hospitals receiving payments above their individual outpatient ACR.  However, Texas understands and agrees with CMS' approach to analyze the reasonableness of the impact of state-directed payments on a per class basis, rather than on an individual provider basis, as illustrated in the pre-print template question 23. CMS confirmed this understanding on our August 24, 2021 call.

**CMS Response (9/24/2021):** CMS is still considering if the revised payment arrangement is reasonable and appropriate. CMS has not seen payment arrangements designed with the complexity of Texas', particularly in terms of the number of classes and the application of percentage increases differing from a class level in one component of the program (UHRIP) to an individual hospital level in another component (ACIA). CMS' understanding from calls has been that the same number of hospitals would receive UHRIP payments above the individual ACR levels for inpatient (106 hospitals) and outpatient (83 hospitals) as described above. Can the state confirm this?

**State Response (9/29/2021):** Texas agrees that the programmatic structure discussed is innovative and complex. Texas implemented the original UHRIP in December 2017 and has worked each year to improve the program; it is natural that the program being proposed for September 2021 is significantly more complex, sizeable, and mature.  With respect to the number of classes, Texas notes that in CMS' State Medicaid Director letter 21-001 (SMD #21-001), CMS said, "As stated in the May 2020 CIB, historically, **CMS has deferred to states** in defining the provider class for purposes of state directed payment arrangements, **as long as the provider class is reasonable and identifiable, such as the provider class being defined in the state's Medicaid State Plan.**" (emphasis added). Texas has adhered very closely to the Medicaid State Plan class definitions but has incorporated the additional geographic criteria of the Service Delivery Areas that are pre-defined for Medicaid managed care. Additionally, according to the American Hospital Association, in 2021, Texas has the highest number of community hospitals in the nation; California, which has 40% fewer hospitals, is a distant second. It is consistent with the size and diversity of the state that there are many hospital classes in the proposed program.

Additionally, in SMD #21-001, CMS stated that they have "required states to demonstrate that the state directed payments result in provider payment rates that are reasonable, appropriate, and attainable…To do this, CMS has required an analysis from states to understand the relative effect of the directed payment on reimbursement for **each service type and each provider class** receiving the state directed payment(s)." (emphasis added).  Texas understands that CMS is continuing their review of Texas' proposed modifications to the program design but anticipates that when review of each service type and each provider class is complete, the proposed payment amounts will be determined to be reasonable.

Regarding the number of hospitals that would receive UHRIP payments above the individual ACR levels, the totals are still 106 hospitals for inpatient and 83 hospitals for outpatient.

3.  There was one hospital that appeared to be included in the Round 3 responses (Attachment C) that was missing from Attachment A sent on 8/25 – TPI #1154893675 labeled "Health" in the Urban Lubbock class/SDA. Was this an omission or did the provider decide to no longer participate?
    State Response: The duplicated hospital in Attachment C was corrected for the Attachment A submission.

4.  During the call, CMS noted that it appeared there may be an increase in outpatient payments for CHIRP driven by the UHRIP only hospitals from $456M to $659M. Can the state confirm in writing if there was an increase and if so, what the cause of the increase was?
    State Response: In Attachment C to the third-round responses, Texas showed on Tab "CHIRP Payment Calc", cell W3, a UHRIP outpatient reimbursement amount of $659 million. There is no change to the amount in the original proposal for CHIRP. $456 million is the subportion of the $659 million UHRIP outpatient amount that is associated with hospitals that also receive ACIA payments. Texas reiterates the offer made in its proposal submitted on August 25, 2021 to cap payments at a 90% aggregate ACR for the class.

5.  In tab 1 of Attachment A sent on 8/25, CMS's understanding is that nearly all the classes for either inpatient or outpatient hospital services would receive payment above the ACR when the analysis is limited to hospitals within the class that are only receiving UHRIP and not ACIA, correct? For example, Urban hospitals in Harris SDA that are only participating in UHRIP would receive increases that are expected to bring total reimbursement up to 280% of the Average Commercial Rate.
    State Response: Yes, this is correct, but Texas thinks it is inappropriate to subdivide the class in this manner as the analysis is not a complete picture of the reasonableness of payments to the class. Texas understands and agrees with CMS' approach to analyze the reasonableness of the impact of state-directed payments on a per class basis, rather than on an individual provider basis, as illustrated in the pre-print template question 23. CMS described this approach on the August 24, 2021 call. Texas reiterates the offer made in its proposal submitted on August 25, 2021 to cap payments at a 90% aggregate ACR for the class.

c.  We noticed during the preprint review process that the impact of the NAIP pass-through payments appears to have changed for several classes between the analyses provided for Round 2 and Round 3. Can the state please clarify if the NAIP amounts provided in Attachment A, tab "All Hospitals by Class", include the most accurate NAIP amounts to-date?

State Response: The largest contributor to the change in NAIP payments is that the University of Texas Southwestern Medical Center (TPI #175287501) had their physician NAIP payment included in the CHIRP analysis initially. The hospital informed Texas HHSC of the error, and the approximately $19 million NAIP payment was removed from the analysis. There were also some smaller variances due to the usage of different data sources for the NAIP payment data. To be consistent, HHSC has used the NAIP payments included in the 2021 Medicare UPL tests as the basis for NAIP payments in this analysis.

**CMS Response (9/24/2021):** CMS appreciates the state's clarification. Was the $19 million physician NAIP payment accounted for in the payment level analysis provided as part of the TIPPS proposal? Or is the University of Texas Southwestern Medical Center not eligible for the TIPPS state directed payment?

**State Response (9/29/2021):** The $19 million physician NAIP payment to UT Southwestern was accounted for in the payment level analysis provided as part of the TIPPS proposal.

d.  The 90% cap the state has proposed would apply across CHIRP payments, correct? CMS' understanding from the 8/30 call is that the state would take the following steps in calculating the 90% cap:
    1.  Calculate the Medicare UPL gap for the class/SDA (Urban Hospitals in Bexar) for inpatient and outpatient services separately.
    2.  Determine a percentage increase for the class/SDA for UHRIP.
    3.  Calculate the ACR gap for the class/SDA.
    4.  Apply the 90% cap to the ACR gap for the class/SDA.
    State Response: Yes, this is correct, unless the Medicare UPL for a class exceeds 90% of the ACR, in which case a hospital class would be eligible to receive payments under UHRIP, but no hospital within the class would be eligible for increases under ACIA.

e.  Under the 90% cap, hospitals would receive up to the UHRIP % increase determined by the Medicare UPL gap first before additional funds would be divided up to pay the additional increase under ACIA, correct?
    State Response: Yes, this is correct, unless the Medicare UPL for a class exceeds 90% of the ACR, in which case a hospital class would be eligible to receive payments under UHRIP, but no hospital within the class would be eligible for increases under ACIA.

f.  If a hospital receives an increase under UHRIP that exceeds their ACR, they would continue to receive the full UHRIP increase under the 90% cap proposal, correct?
    State Response: Yes, this is correct. Texas understands and agrees with CMS' approach to analyze the reasonableness of the impact of state-directed payments on a per class basis, rather than on an individual provider basis, as illustrated in the pre-print template question 23. CMS described this approach on the August 24, 2021 call.

g.  To proceed with the state's proposal to impose a cap of 90% on the aggregate percentage of the ACR that a hospital can receive, CMS will need the state to provide the actual uniform percentage increases for each hospital class and SDA for UHRIP

==and for each hospital for ACIA being requested under the preprint. The state will also need to provide an updated reimbursement analysis based on these new UHRIP and ACIA uniform percentage increases. This reimbursement analysis should show the impacts of the uniform percentage increases for both UHRIP and ACIA and across all hospitals.==

State Response: HHSC has completed the analysis and it can be found in the Attachment labeled "CHIRP_9.10.21_90% ACR.

==**CMS Response (9/24/2021):**==
1. ==CMS was unable to locate the file referenced here titled CHIRP_9.10.21_90% ACR. Is the information requested in this question available in 4.2 Attachment C – CHIRP Rate Estimates and Payment Levels? If not, can the state provide this attachment?==
   **State Response (9/29/2021)**: Yes, this information is included in the new Attachment C that was submitted on September 15, 2021.
   ==**CMS Response (10/18/2021):** We understand that the Attachment C that was submitted to CMS on 9/29/21 had no substantive changes compared to the 9/15/21 version. The only changes in the 9/29/21 version are how the tabs are labelled. Please confirm.==
   **State Response (10/22/2021)**: Yes this is correct.

2. ==Can the state also confirm if the analysis in the attachment labeled 4.2 Attachment C – CHIRP Rate Estimates and Payment Levels accounts for the final percentage increases for each component of CHIRP (UHRIP and ACIA) under the 90% proposal?==
   **State Response (9/29/2021)**: Yes, the state confirms that the analysis under tabs "IP CHIRP Payment Levels – All" and "OP CHIRP Payment Levels – All" includes all hospitals and all components.
   ==**CMS Response (10/18/2021):** We understand that Attachment C includes all hospitals and components, but can the state please confirm too that Attachment C reflects the final percentage increases under each component under the 90% proposal?==
   **State Response (10/22/2021)**: Yes this is correct.

3. ==The revised preprint for CHIRP, the state's response in Table 2 says to refer to the "Provider Payment Analysis" tab of Attachment C. However, the latest version of Attachment C does not have a tab entitled "Provider Payment Analysis". Please update the preprint and/or Attachment C appropriately.==
   **State Response (9/29/2021)**: The pre-print has been updated appropriately.

2. Refine the evaluation plan for CHIRP to ensure that the effect of the CHIRP state directed payment, absent other programmatic changes or other state directed payments, can be appropriately evaluated by the state, including a sound attribution methodology. The state must provide consistent baseline data to demonstrate year over year changes.

**State Response:**  The state is working with our EQRO contractor to refine an attribution methodology for each program. There are some measures included in the evaluation which cannot be limited to providers participating in the DPP. Some of the measures that cannot be attributed exclusively to one DPP provider are CMS core set measures recommended by CMS for DPP evaluations. In light of the call on 8/24 and CMS' acknowledgement, we will proceed

with maintaining the CMS core set measures selected for the respective evaluations, even though they cannot be attributed only to providers participating in the corresponding DPPs. HHSC is also open to providing one annual DPP evaluation which breaks out DPP-specific attribution measures, as suggested by CMS in the August 24, 2021 call with Texas.

a. Does CMS have any other recommendations for how to isolate the impact of the DPP other than the work HHSC is undertaking with its EQRO contractor to do so?

**CMS Response:** Please refer to the overarching comments at the top of this paper.
State Response: Please refer to our responses to CMS's overarching comments.

With respect to baseline year, in a phone call on January 27, 2021 with CMS, HHSC proposed using CY 2020 and CY2021 as baselines because of the timing of the beginning of the program (CY 2021 would include 4 months of the start of the program) and the impact of COVID. Using the two years was intended to capture that context for future measurement. CMS indicated the proposal made sense. If CMS prefers that we use only one year, HHSC could use CY 2021 for the new CHIRP evaluation measures. However, this would delay further any evaluation of the programs because of data lags (please see page 6 of the CHIRP updated evaluation plan for timeline of available data).

With respect to year-over-year improvement, it is the state's goal to have improvement year-over-year, but we are also cognizant of not being able to set goals at this point because of the unknown impact of the PHE.
a. Does CMS have a recommendation for how the state can address this issue in the evaluation plan?

**CMS Response:** CMS recognizes all healthcare systems have been impacted by COVID and that year-over-year improvement will be challenged by the PHE. We take that into consideration in our review of quality improvement efforts. We anticipate that the PHE will be part of the narrative and outcomes of the SDP evaluations including how COVID impacted the evaluation findings.
State Response: We will add this discussion to the evaluations. Does CMS have concerns with the goals and targets we have included in the plans?

**CMS Response 9/24/21**: Our concern is that the state has not identified any overall quality improvement targets for the SDPs. The state will need to provide those overall quality improvement targets (for each measure) for SFY 2023; that timeframe allows the state to see 2021 data and adjust for COVID.
**State Response (9/29/2021)**: As acknowledged by CMS, the SFY2022 preprints will not include improvement targets as baseline data is pending. The State will include initial improvement targets for achievement in CY2022 in the SFY2023/Year 2 preprint submissions. However, the State may submit an addendum to update these improvement targets during SFY2023 after CY2021 data are available (estimated in summer/fall 2022).
**CMS Response (10/18/2021):** We understand from the October 4, 2021 call that the targets included in the SFY 2023 preprint submission will take into account initial CY2022 provider-

| | |
|---|---|
| | submitted data and that the addendum would take into account state-level measurement data from the EQRO. Is this understanding correct? |
| | **State Response (10/22/2021)**: The SFY 2023 preprint submission would take into account initial baseline CY 2021 provider-submitted data in order to set preliminary goals for improvement in the 2nd year of the program. The addendum would update the DPP-specific improvement goals, if needed, based on complete baseline CY 2021 provider-submitted data (which would not be received until April 2022 on currently proposed timelines). Although CY 2021 state level data from the EQRO will not be available until October 2022, HHSC could use historical state level data (incuding CY 2020) to set preliminary goals in the SFY 2023 preprint submission  .  Another SFY 2023 preprint addendum would update improvement goals, if needed, based on complete baseline CY 2021 state level data from the EQRO (which would not be received until October 2022). |
| | b. Would maintenance of a high-performance rate within an allowable threshold (but still above national benchmarks, for example) be acceptable? |
| | **CMS Response:** CMS would agree to maintenance of a high-performance rate within a threshold above the national benchmark.  The threshold percentage would need to align with the national trend for each measure as noted in response to the questions on QIPP above. State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for agreeing to maintenance of a high-performance rate. HHSC will consider the recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement is something that will be evident in the evaluation and structure of the second year of these programs. |
| | **CMS Response (9/24/2021):** CMS' understanding is that each of the preprints listed here have moved to include only uniform increases where payment is conditioned upon utilization and not performance. If any of these proposals condition payment upon performance, then changes to account for this will need to be made in alignment to feedback previously provided. See comments above related to QIPP. **State Response (9/29/2021):** The state confirms that CMS' understanding is correct, and payment is not conditioned upon performance in Year 1 in the four new, proposed SDPs. |
| Texas Incentives for Physicians and Professional Services (TIPPS) | 1. Remove the 18% reconciliation threshold and base payments only on current utilization or performance measured during the rating period (rather than historical utilization or performance). |
| | **State Response**: We understand from the call between Texas and CMS on August 20, 2021, CMS will not consider Texas's proposal of a reduced threshold for SFY 2022, with a complete elimination of the structure for SFY2023. In an effort to achieve a pathway forward for this important program, Texas would like to utilize a payment structure where interim payments for SFY 2022 are based initially upon the historical utilization data, with final payments made based upon actual data at the end of the program year, with no contingency for a variation in utilization data. This approach will allow for consistent payments to be made through the program year, but final payments to be based exclusively on actual utilization. |

Would CMS agree that this approach resolves any outstanding concerns about the tie to utilization? If so, Texas will submit a revised pre-print to this effect immediately.

**CMS Response**: What the state has described for SFY 2022 for TIPPS Component 1, where interim payments would initially be based upon historical information but reconciled to actual utilization during the rating period, would be permissible. We do have a few follow-up questions to ensure our understanding of this arrangement:

State Response: Thank you for this feedback; we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

2. Please describe in more detail how the payments will be made under the state's new proposal to replace the reconciliation threshold. Please provide a step-by step breakdown for how payment will work for both the MCOs and providers -- including whether the interim payments will be based on the same monthly payment amount currently proposed in the preprint, when interim payments will be made based on historical utilization, how long such interim payments will continue to be made based on historical utilization, when the payments will be made based on actual utilization, and how the initial payments made based on historical utilization will be reconciled to actual utilization during the rating period. Please also discuss if the reconciliation could potentially result in recoupments from MCOs or providers.

State Response: Please see Attachment A for a timeline and high-level description of the process. There will be three subprocesses required as part of this overall process. In the first subprocess, HHSC will pay MCOs a monthly actuarially sound capitated rate based upon actual caseloads each month. MCOs will adjudicate actual claims through normal processes and then submit to HHSC encounter data. Typically, due to claims processing timelines, encounter data for a rating period is usually considered substantially complete approximately 120 days after the end of the rating period, which for Texas means December 31, 2022 for the September 1, 2021 through August 31, 2022 rating period. In a separate subprocess, HHSC receives quality-related data from providers that is required as a condition of participation in the program. HHSC will direct MCOs to issue payments to providers based upon historical data and using funds received by the MCO in the monthly capitated rate that was paid. The MCO will issue the interim payment to the provider monthly. In the final subprocess, approximately 120 days after the end of the rating period, HHSC will reconcile the historical utilization that was used as the basis of the interim payments to the actual encounters reported by the MCOs. HHSC will then direct the MCOs to recoup from and redistribute funds to providers based upon the reconciled information. The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments. Providers may experience recoupments or receive additional funds based upon historical-to-actual utilization fluctuations.

**CMS Response (9/24/2021):** CMS appreciates the additional information provided on the process. CMS would like to confirm the following:

**State Response (9/29/2021)**: HHSC is happy to share additional information to confirm CMS' understanding of the reconciliation process. Per CMS' September 10, 2021 statement that the reconciliation process would be permissible under the regulation, we are glad that this

matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

1. The 3 processes indicate that no changes will be made to the payments the MCO receives from the state; changes to the payments would occur for the providers within what the state has paid the plans, is that correct?
**State Response (9/29/2021)**: Yes, that is the intent. However, there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound.

2. Does the state anticipate any amendments to the rates or rate certifications to account for the reconciliation requirement?
**State Response (9/29/2021)**: Not at this time.

3. How will the state inform the plans of any needed recoupments or redistributions of the funds to providers? Through updates to the contract?
**State Response (9/29/2021)**: The state will inform the MCOs via an updated payment scorecard that will show any provider level payment adjustments (positive or negative) that are required.

**CMS Response (10/18/2021):** We understand that the payment scorecard has historically been used for payments to QIPP providers, and that the state will now include direction in the MCO contracts for using this scorecard for when recoupments or redistributions are needed for providers participating in TIPPS, BHS and RAPPS. Is this correct?
**State Response (10/22/2021)**: The state will create a scorecard specific to each program that is similar to the scorecard used in QIPP, but there will not be a consolidated scorecard for all programs.  The program-specific scorecards will be used to indicate when recoupments or redistributions are necessary.

4. CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.
**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state.  There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

5. The response to Question 9a in the preprint indicates that the payment for Component 1 will be a uniform increase of $47.99 for class 1 and $29.15 for class 2. Can the state

confirm this is correct? Are the payments made under Component 1 to providers on a PMPM basis or on a per service (or per claim) basis? Would the amount paid for each class change with the reconciliation?

**State Response (9/29/2021)**: Yes, those uniform increases are correct. The impact of the payment increase is the percentage identified on a per unique client or percentage of total claims basis; however, the state intends on making the payments as lump sum monthly payment during the program year, prior to the reconciliation to actual physician and professional claims at the end of the program period. The amounts could change as the state intends to maintain the size of components 1 and 2 as identified in the pre-print but would adjust the uniform increase per unique client served or the percentage of total claims if actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation.

**CMS Response (10/18/2021)**:

1. It is still unclear to us if the Component 1 uniform increases would be paid on a PMPM basis or on a per service/per claim basis. Our understanding is that $47.99 for class 1 and $29.15 for class 2 are the uniform increase estimates on a per claim/service basis. However, the response to preprint question 19.b and Attachment L in the revised preprint indicates: "The following per member per month rates will be paid: $47.99 for class 1, $29.15 for class 2." Please clarify if the state intends to pay these funds on a PMPM basis (rather than on a per claim/utilization basis), including as part of the final reconciliation (i.e. applying the PMPM increase in the preprint to actual member months during the reconciliation).

**State Response (10/22/2021)**: Component 1 in TIPPS is designed to be paid based upon the number of unique Medicaid managed care clients served by the provider in proportion to the total number of unique Medicaid managed care clients served by all program participants. The total value of Component 1 for all providers is equal to 65% of the program value, paid monthly to each provider. HHSC intends, at the time of reconciliation, to recalculate all provider payments using the actual number of unique clients served by the provider as compared to the total number of actual unique clients served by all program participants. If the total value of Component 1 fluctuates, as a result of the total program value fluctuating as a result of caseloads, the per unique client monthly payment to providers in the pre-print would be scaled proportionately as well.

2. The state says, "The amounts could change as the state intends to maintain the size of components 1 and 2 as identified in the pre-print but would adjust the uniform increase per unique client served or the percentage of total claims if actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation."

   a. We understand from this response that the uniform increase amounts may change to ensure that the state maintains the size of components 1 and 2. Is that correct?

   **State Response (10/22/2021)**: No, if the actual program size fluctuates as a result of caseload, the size of Component 1 would fluctuate proportionately as Component 1 is designed to be equal to a percentage of the overall program value. The reconciliation performed at the end of the program year will be performed to reconcile to the actual value of Component 1 based upon the actual value of the overall program as paid through the program year.

b. Our understanding from previous rounds of review is that the targeted amount for Component 1 is $366,600,000 and for Component 2 is $141,000,000. Can the state please confirm these are the amounts that the state intends to reconcile to? Will these targeted amounts include any provisions for administration, risk margin, and premium tax?

**State Response (10/22/2021)**: The amounts identified for Components 1 and 2 are an estimate based upon the proposed program size. However, if the actual program size fluctuates as a result of caseload, the size of Components 1 and 2 would fluctuate proportionately as Component 1 and 2 are designed to be equal to a percentage of the overall program value. The reconciliation performed at the end of the program year will be performed to reconcile to the actual value of Components 1 and 2 based upon the actual value of the overall program as paid through the program year. All managed care capitated payments will include administration, risk margin, and premium tax, as appropriate. The Component 1 and 2 values listed above do not include any provisions associated with administration, risk margin, and premium tax.

c. Can the state please further explain what is meant by adjusting the uniform increase "per unique client" and confirm the retroactively adjusted uniform increase would still be the same for all providers in the class for each component.

**State Response (10/22/2021)**: As described above, for Component 1, HHSC has calculated the provider payments to pay an equal amount for each unique client served by the provider historically compared to the total number of unique clients served by all providers. When the reconciliation occurs, the payments to each provider will be recalculated to ensure their payments reflect actual numbers of unique clients served. The per unique client value will remain uniform for all providers in the class.

d. Can the state please further explain what is meant by adjusting "the percentage of total claims", and confirm the retroactively adjusted uniform increase would still be applied to all eligible claims/services.

**State Response (10/22/2021)**: HHSC has calculated the provider payments to pay a uniform percentage increase for all adjudicated claims paid to program participants historically. When the reconciliation occurs, the payments to each provider will apply a uniform increase to all actual adjudicated claims to ensure that the total value of Component 2 is still in proportion to the overall program value at 25%. This means that the uniform percentage increase may fluctuate proportionately to the program, but will remain uniform for all providers based upon actual adjudicated claims.

6. The state indicated on calls that the state intended to continue incorporating this payment arrangement as an adjustment to base rates rather than a separate payment term. Given the revised reconciliation process for Component 1, can the state affirm that it still plans to incorporate all components of this payment arrangement through an adjustment to base rates or would the state pay any part of this payment arrangement, such as Component 1, as a separate payment term?

**State Response (9/29/2021)**: Yes, all components will be through an adjustment to base rates.

**CMS Response (10/18/2021)**: The state indicates in the response to question 5 above that the uniform increases currently documented in the preprint would change at the time of the reconciliation as the state intends to maintain the size of Component 1 and Component 2 funding currently identified in the preprint. Is the state's goal under Component 1, Component 2 or any other component to ensure that exactly a certain amount (e.g., $366,600,000 for Component 1 and $141,000,000 for Compnent 2) is expended by the plans for payments to providers under any specific components? Or are the amounts listed for each component an estimate that is subject to change? If so, what would cause it to change?

**State Response (10/22/2021)**: To clarify, the state intends to maintain the sizes of Components 1 and 2 as a percentage of the overall program value; however, the gross value of Component 1 may change if the overall program value fluctuates from the estimated value. This fluctuation would be a result of changes in caseload from the forecasted caseload for the fiscal year. However, the payments will still be reconciled against actual utilization, so the actual percentage of program value compared to actual utilization may result in a different percentage rate increase than the estimated rate increase, which is based upon historical utilization and estimated program values.

**CMS Response (10/18/2021)**: Does the state direct the plans to set aside any portion of the capitation rate paid to them for this payment arrangement?

**State Response (10/22/2021):** No. The portion of the capitation rate attributed to each DPP has been separately identified and reported to the MCOs but no direction has been provided on how the MCOs should "set aside" these funds.

**CMS Response (10/18/2021)**: Are the plans directed to use a specific portion of the capitation rates paid to them to pay out Component 1?

**State Response (10/22/2021):** No. The capitation rates have been calculated separately for each DPP; however, this add-on rate isn't delineated between the various components.

7. Please also revise the preprint to include the information on the reconciliation process described in Attachment A.

**State Response (9/29/2021)**: All payments will be reconciled to actual utilization data during the final reconciliation. Attachment B.1, Reconciliation Process, has been incorporated by reference.

3. Can the state confirm that all payments (including the interim payments based on historical data) will be reconciled to actual utilization data during the rating period? Or will those initial interim payments remain based only on historical utilization?

State Response: All payments will be reconciled to actual utilization data during the final reconciliation.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments

initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

4. We will note that states that make interim payments based on historical utilization and then reconcile to actual data have noted that reconciliations like this can be administratively burdensome.

    State Response: Noted. The importance of the program to our healthcare safety net is significant so HHSC will absorb the administrative burden.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.
.

5. CMS' understanding from previous responses is that the reconciliation threshold is a part of the state's administrative code. Can the state confirm that this change can be implemented without changes to the administrative code? If not, can the state describe the process and timing for making such changes? If changes to the administrative code are needed, will the state be able to implement those retroactively back to the start of the rating period?

    State Response: Implementing this change will require the state to modify the Texas Administrative Code. HHSC will propose that rule changes will apply to the entire program period, though the effective date of the rule change will be subsequent to the start of the rating period.

**CMS Response (9/24/2021):** Can the state elaborate the timeframes that would be needed to complete the state rulemaking process? Can the state also comment on if they anticipate challenges to the rulemaking and what impact those would have on implementation timelines?

**State Response (9/29/2021):** The Texas rulemaking process requires filing of a proposed rule with the Texas Register by Monday at noon to have the proposal published 11 days later (the second Friday after submission). Proposed rules are generally posted for a 30-day public comment period. Following the public comment period, the rule can be adopted with or without changes. Typically, a rule takes effect 20 days after the date the rule is filed with the Texas Register. This total process requires a minimum of 51 days; however, accounting for time necessary to prepare the rules for publication, to review public comments and make any changes as a result thereof, HHSC typically assumes a minimum of 90 days will be necessary. HHSC anticipates receiving public comments, but also anticipates that providers prefer changes be made if they are necessary for a CMS approval for state fiscal year 2022.

For more information, CMS may wish to visit our webpage on rulemaking: https://www.hhs.texas.gov/laws-regulations/policies-rules/health-human-services-rulemaking.

**CMS Response (10/18/2021):** From the description above, it sounds like CMS would not expect rate amendments or contract amendments to implement the proposed changes until 90 days after the start of rulemaking at the state level. Is this correct?

**State Response (10/22/2021):** With respect to rule making changes described above, the state does not anticipate that rate changes or contract amendments would be required to implement the changes proposed for TIPPS, so the rates and contracts already filed with CMS will stand.

6. Can the state please describe how this new approach will be accounted for in the capitation rates? Will the directed payment continue to be incorporated into the rates as an adjustment to the base data or will the directed payment now be incorporated into the rates as a separate payment term? It would be helpful for the state to clarify how this new approach would impact the amounts included in the initial certification, and if the state and actuary intend to amend the rates in the future once the final payments based on actual utilization are known.

   State Response: We expect that the TIPPS would continue to be incorporated as an adjustment to the base capitation rates and included in the monthly premium. Once final data is available at the end of the year, a retroactive adjustment to the TIPPS capitation rates may be necessary, in which case HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Questions 1, 2 and 6. Appendix A, process 3 does not indicate that there will be any changes to the MCO payments and the state's response above states, "The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments." However, this response indicates that retroactive adjustments to the capitation rates may be necessary. Can the state please clarify if the state expects or anticipates an amendment to the rates and rate certifications may be needed and under what circumstances?

**State Response (9/29/2021)**: The state does not anticipate making any prospective capitated rate changes based upon this modification. However, once final data is available at the end of the year, a retroactive adjustment to the capitation rates may be necessary if the degree of recoupments and redistributions is significant to the point that the capitated rates are no longer actuarially sound.  If that occurs, HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (10/18/2021):** The state indicates that there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound. We would appreciate better understanding under what circumstances the MCO rates would be revised.

1. Can the state and its actuary please discuss how you are defining "significant" in this instance, and what threshold would trigger adjustments to the MCO capitation rates. Please address both the potential instances when MCOs are required to pay out more TIPPS payments than the amount of funding included prospectively in capitation rates, and when MCOs are required to pay out less TIPPS payments than the amount of funding included prospectively in the capitation rates.

    **State Response (10/22/2021)**: The intent of any reconciliation would be to ensure that all MCO capitation rates continued to be considered actuarially sound and to ensure that no MCO was inadvertently harmed (or profited) due to shifts in utilization and provider payments that are beyond their control.  The threshold for triggering a retroactive rate change is difficult to define in advance given that there are numerous variables that impact the capitation rates and would need to be taken into consideration.  Without being overly risk prescriptive we believe that the risk margin would be the starting point for evaluating whether a modification would be necessary and that such consideration would be equivalent for the cases of both over and underpayment.  There could be scenarios where the trigger could be higher or lower than the risk margin such as large scale utilization shifts that impact the overall profitability of the MCOs either positively or negatively resulting in variations in other assumptions that offset the need to adjust rates retroactively.

2. Since CMS evaluates actuarial soundness at a rate cell level, we would appreciate understanding if the state and actuary intend to review whether adjustments to the rates are necessary as a result of the reconciliation at a rate cell level. If not, we would appreciate understanding why not, and at what level the state intends to perform the analyses to determine if adjustments to the rates are necessary.

    **State Response (10/22/2021)**: Our intent would be to evaluate the need for any rate adjustments at the same level of detail on which the capitation rates are set, i.e. at the MCO, SDA and risk group level.

3. To the extent the state and actuary determine that adjustments to the MCO capitation rates are necessary as a result of the reconciliation, we would appreciate understanding if the state intends to still include a risk margin provision in the revised TIPPS amounts included in the rates based on the reconciliation. If the state intends to still include a risk margin when developing revised TIPPS amounts based on the reconciliation, we would appreciate understanding why this is reasonable.

    **State Response (10/22/2021)**: In general, risk margins are set by program and applied uniformly across all components of the premium rate, i.e. medical, pharmacy, QIPP, CHIRP, etc…The margins are not necessarily intended to reflect the risk associated

<span style="color:red">with each individual claim type, risk group, SDA but an aggregate reflection of the risk across the entire program inclusive of all services and rate components. For this reason, we believe that a risk margin may still be necessary as this assumption is set in aggregate and not specific to the TIPPS. This assumption may need to be reevaluated given the specific circumstances in the event a rate adjustment is necessary.</span>

7. We understand from the preprint review that the final expected provider reimbursement under this preprint is 100% of ACR for Class 1 (HRIs) and 88% of ACR for Class 2 (IMEs). Since Component 1 of TIPPS applies to provider classes 1 and 2, can the state please clarify if the state's proposed approach is expected to result in changes to the final expected provider reimbursement levels indicated in the current preprint.

> <span style="color:red">State Response: The state does not anticipate a change in the reimbursement levels indicated in the pre-print as a result of this change.</span>

8. Require that any payments be based on performance linked to Medicaid managed care enrollees only (not Medicaid FFS), and performance-based payments must ensure that providers are achieving year over year improvement in accordance with the regulatory requirement that the arrangement must advance managed care quality goals and objectives.

**State Response:** The state believes the payments are based on performance linked to Medicaid managed care enrollees. HHSC has developed a hybrid model that requires providers to meet program quality requirements, but where payment is still triggered by Medicaid managed care utilization. In the TIPPS amended pre-print, both types of DPPs are selected in question 9. For example, in the TIPPS Component 3 and DPP BHS Component 2, once a provider has demonstrated achievement on their measures, they are eligible to earn payments. The payments are rate enhancements paid upon claims adjudication of certain codes identified in the program requirements. On the August 24, 2021 call with Texas, CMS indicated this was not clear in the preprint. Could we maintain the quality descriptions in our pre-print submissions, as we hope to transition toward more value-based DPPs in the future, but change the selection under question 10 to remove "Quality Payment/Pay for Performance" but leave "Medicaid-Specific Delivery System Reform" and "Performance Improvement Initiative"? Or does CMS have suggestions for other changes Texas could make to the pre-print to address this issue?

**CMS Response**: Based on our recent discussions with the state, CMS understands that Component 1 and 3 should be considered a fee schedule requirement (per preprint question 9b) and Component 2 should be considered a value-based payment arrangement (per preprint question 9a). If this is accurate, please update preprint question 8 (Att B) to make this distinction. Please also revise the responses to Questions 9-14 to only reflect the condition of payment for Component 2; Questions 15-18 should only reflect information for Components 1 and 3. Components 1 and 3, as they are paid per adjudicated claim, would be classified as uniform increases using an alternative fee schedule.
<span style="color:red">State Response: We will make this adjustment. However, the rate enhancement will not be using an alternative fee schedule, but rather an increase above the contracted rate. This</span>

information has been updated in the preprint. Please see revised preprint PDF, Attachment B, Attachment C, and Attachment D.

**CMS Response (9/24/2021):**

9. From the revisions in the preprint, the state has indicated that all components of this payment arrangement are uniform increases where payment is conditioned upon utilization and no components are VBP (where payment is conditioned upon performance.) Can the state confirm this understanding is correct?
   **State Response (9/29/2021):** Yes, the state confirms CMS' understanding.

10. The state's revised preprint includes the following in response to Question 8, "Texas will discuss with CMS specifics related to Component 3 on the call scheduled for September 16, 2021." Please strike this sentence from the preprint.
    **State Response (9/29/2021):** The pre-print has been updated accordingly.

11. In the state's revised preprint, Question 21 no longer has a response. Please revise the preprint to include an update to Question 21.
    **State Response (9/29/2021):** The pre-print has been updated accordingly.

Should CMS want to restrict measurement to only Medicaid managed care members, would it be possible to transition over the first year of the program so that providers are able to make necessary system changes to stratify by Medicaid managed care only? In that instance, HHSC would need to amend the selection of measures used for tracking provider quality improvement, such as the structure measures or hospital safety measures.

12. Does CMS's concern about restricting measurement to managed care members only apply to Pay-for-performance measures in a value-based DPP? Or would it also apply to provider-reported measures used for evaluations?

**CMS Response:** When payment is made based upon performance, the performance must be measured to be specific to Medicaid managed care and not Medicaid FFS or another payer. We understand that providers may need more time to report the data properly to do so. When such instances have come up in other states, states will often restructure the payment from a pay-for-performance requirement to a fee schedule (e.g., uniform increase). In such instances, the uniform increase is paid per claim rather than paid based upon performance. States will often pair this change with a provider eligibility requirement that in order to obtain the uniform increase, the provider must report certain data elements according to the state's specifications. Such a strategy allows the state and providers time to report the data appropriately, collect proper baseline data and then in later years, transition to payment based upon performance in such a way that performance is measured to be specific to Medicaid managed care. Other states have used such strategies to successfully transition to VBP arrangements.

State Response: The state is amending component 2 to a uniform rate enhancement and will require provider-reported measures to be stratified by Medicaid managed care only for the purposes of the evaluation.

**CMS Response (9/24/2021):** The state's revised preprint indicates that component 2 payments to providers will be conditioned upon utilization rather than performance. If that is incorrect, then changes to account for this will need to be made in alignment to feedback previously provided. See comments above related to QIPP.

**State Response (9/29/2021):** The State confirms that CMS' understanding is correct. In Year 1, Component 2 in TIPPS will be conditioned upon utilization and a reconciliation approach identical to the reconciliation described for Component 1 will be utilized for Component 2.

**CMS Response (10/18/2021):** Our understanding is that the state will do a reconciliation from historical to actual utilization for Components 1 and 2, but not Component 3. Please confirm.

**State Response (10/22/2021):** Correct. Component 3 is already paid on actual adjudicated claims at the time of adjudication so no reconciliation for Component 3 is necessary.

The evaluation needs to be of the SDP which operates in Medicaid managed care only. For this reason, evaluation data should only include Medicaid managed care members. This would apply to both pay for performance measures and provider reported measures for evaluations.

State Response: This change to require participating providers to stratify measure reporting by Medicaid managed care will necessitate changes in the program requirements. It may also require a new program participation application and eligibility determination period or withdrawal period, as some providers will not be able to comply with this requirement in the first year of the program. Finally, these required changes will delay the provider reporting periods.

**CMS Response 9/24/21:** Please clarify whether the data and evaluations will be delayed due to these challenges, or that these challenges make separation of health services provided to Medicaid MCO beneficiaries and their health outcomes insurmountable.

**State Response (9/29/2021):** The data and evaluations may be delayed in the first year, but these challenges are not insurmountable.

With regard to year-over-year improvement, we also have additional questions:
13. HHSC assumes this applies to provider-level pay-for-performance measures in addition to evaluation measurement at the Medicaid-member level. Is that correct? **CMS Response: Yes, the SDP should aim to have year-over-year improvement in the evaluation measures at the SDP-level (i.e., across all the providers participating the SDP).**

For determining payment under Component 2 or any other pay for performance components, measurement should be done at the facility or provider level.

As noted earlier, our primary concern for components of the payment arrangement where payment is conditioned upon performance, such as Component 2 in TIPPS, relates to the OIG finding on QIPP that nursing facilities that declined in performance continued to receive quality improvement incentive payments. The structure of Component 2 in TIPPS appears to raise the same sort of concerns raised about the structure of QIPP in determining payment – that there could be instances where a provider has a *significant* decline in performance but the provider would still receive a payment under Component 2 by performing at or better than the national average on at

least some of the measures. We understand that there may be natural fluctuations in provider performance; what we want to address with the state is to prevent instances when there is a notable decline in performance and yet the provider still earns payment under Component 2 because they satisfy the benchmark. We would strongly advise that the state consider adding some threshold for at least maintaining or improving performance.

As noted for QIPP, CMS believes the only way to address this concern would be that for all components where payment is conditioned upon performance on a quality measure (e.g. Component 2 of TIPPS) and the state wants to use a set benchmark that a provider must achieve to earn payment (e.g., a statewide or national benchmark), the state adopt a requirement that if the provider was already achieving the benchmark at the start of the performance measurement period, they would have to demonstrate period over period performance (e.g., year over year or quarter over quarter.) We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark.

State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for recognizing the option for maintenance of a high-performance rate. HHSC will consider the CMS recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement will be evident in the evaluation and structure of the second year of these programs.

CMS Response (9/24/2021): CMS' understanding is that each of the preprints listed here have moved to include only uniform increases where payment is conditioned upon utilization and not performance. If any of these proposals condition payment upon performance, then changes to account for this will need to be made in alignment to feedback previously provided. See comments above related to QIPP.

State Response (9/29/2021): The State confirms that CMS' understanding is correct. In Year 1, all components of CHIRP, TIPPS, RAPPS, and DPP for BHS will be uniform increases where payment is conditioned upon utilization and not performance. In QIPP, Components 2, 3, and 4 will remain value based payments conditioning payment upon performance.

14. How should this apply to structure measures currently included in the program? **CMS Response**: As noted earlier, CMS strongly encourages states to use outcome measures for

value-based payments. Using structural measures does not necessarily lead to health improvements for Medicaid beneficiaries. Using structure or count measures along with outcome measures can, however, show the importance of ensuring adequate staffing on health outcomes of beneficiaries, especially when done over time. We encourage Texas, therefore, to use these measures along with outcome measures that are measuring the impact of the healthcare. Also process measures, such as vaccine administration, can be used with outcome measures.

If the state chooses to pair outcome measures with structure measures and/or process measures, the same advice would apply as in response to part b above.
State Response: The state has included structure, process and outcome measures in TIPPS. We will continue to do so, as the structures are encouraging DSRIP-informed best practices that impact improvement in health outcomes. It is our understanding that CMS does not require year-over-year improvement in structure measures and prefers process and outcome measures for the pay-for-performance components of these programs.

CMS Response (9/24/2021): Thank you for the state's response. CMS' understanding is the state has revised this preprint so that the payments under this payment arrangement are no longer conditioned upon performance. CMS' understanding is the inclusion of structure, process and outcomes measures for TIPPS refers to the evaluation of the payment arrangement and/or provider eligibility for the class. If this is incorrect and any component of TIPPS requires payments conditioned upon performance, the guidance provided earlier for QIPP Components 2-4 would apply.
State Response (9/29/2021): Noted. The State confirms that CMS' understanding is correct and in Year 1 TIPPS will not include any payments conditioned upon performance.

Texas DPPs feature measures intended exclusively as improvement over self (IOS) measures or benchmark measures. If a measure is exclusively a benchmark measure, is it acceptable for a provider to maintain performance above the benchmark? CMS Response: As noted earlier, our primary concern for components of the payment arrangement where payment is conditioned upon performance, such as Component 2 in TIPPS, relates to the OIG finding on QIPP that nursing facilities that declined in performance continued to receive quality improvement incentive payments. The structure of Component 2 in TIPPS appears to raise the same sort of concerns raised about the structure of QIPP in determining payment – that there could be instances where a provider has a *significant* decline in performance but the provider would still receive a payment under Component 2 by performing at or better than the national average on at least some of the measures. We understand that there may be natural fluctuations in provider performance; what we want to address with the state is to prevent instances when there is a notable decline in performance and yet the provider still earns payment under Component 2 because they satisfy the benchmark. We would strongly advise that the state consider adding some threshold for at least maintaining or improving performance.

As noted for QIPP, CMS believes the only way to address this concern would be that for all components where payment is conditioned upon performance on a quality measure (e.g. Component 2 of TIPPS) and the state wants to use a set benchmark that a provider must achieve to earn payment (e.g. a statewide or national benchmark), the state adopt a requirement that if the provider was already achieving the benchmark at the start of the performance measurement period, they would have to demonstrate period over period performance (e.g. year over year or quarter over quarter.)

State Response: The state will assess using IOS goals for providers who are performing above the benchmark goal. For CHIRP, DPP BHS, RAPPS, and TIPPS, the requirement to demonstrate year-over-year improvement is something that will be evident in the evaluation and structure of the second year of these programs. As proposed, the first year of these programs will establish baselines.

**CMS Response (9/24/2021):** Thank you for the state's response. CMS' understanding is the state has revised this preprint so that the payments under this payment arrangement are no longer conditioned upon performance. CMS' understanding is the inclusion of structure, process and outcomes measures for TIPPS refers to the evaluation of the payment arrangement and/or provider eligibility for the class. If this is incorrect and any component of TIPPS requires payments conditioned upon performance, the guidance provided earlier for QIPP Components 2-4 would apply.

**State Response (9/29/2021):** Noted. The State confirms that CMS' understanding is correct, and in Year 1 TIPPS will not include any payments conditioned upon performance.

15. Would maintenance of a rate of performance for a high performer be acceptable? **CMS Response:** We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark.

State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for recognizing the option for maintenance of a high-performance rate. HHSC will consider the CMS recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement will be evident in the evaluation and structure of the second year of these programs.

**CMS Response (9/24/2021):** Thank you for the state's response. CMS' understanding is the state has revised this preprint so that the payments under this payment arrangement are no longer conditioned upon performance. CMS' understanding is the inclusion of structure, process and outcomes measures for TIPPS refers to the evaluation of the payment

arrangement and/or provider eligibility for the class. If this is incorrect and any component of TIPPS requires payments conditioned upon performance, the guidance provided earlier for QIPP Components 2-4 would apply.

**State Response (9/29/2021)**: Noted. The State confirms that CMS' understanding is correct, and in Year 1 TIPPS will not include any payments conditioned upon performance.

16. Refine the evaluation plan for TIPPS to ensure that the effect of the TIPPS state directed payment, absent other programmatic changes or other state directed payments, can be appropriately evaluated by the state, including a sound attribution methodology. The state must provide consistent baseline data to demonstrate year over year changes.

**State Response:** The state is working with our EQRO contractor to refine an attribution methodology for each program. There are some measures included in the evaluation which cannot be limited to providers participating in the DPP. Some of the measures that cannot be attributed exclusively to one DPP provider are CMS core set measures recommended by CMS for DPP evaluations. In light of the call with Texas on August 24 and CMS' acknowledgement, we will proceed with maintaining the CMS core set measures selected for the respective evaluations, even though they cannot be attributed only to providers participating in the corresponding DPPs. HHSC is also open to providing one annual DPP evaluation which breaks out DPP-specific attribution measures, as suggested by CMS in the August 24, 2021 call with Texas.

17. Does CMS have any other recommendations for how to isolate the impact of the DPP other than the work HHSC is undertaking with its contractor to do so? **CMS Response:** Please refer to the overarching comments at the top of this paper.
       State Response: Please refer to our responses to CMS's overarching comments.

With respect to baseline year, in a phone call on January 27, 2021 with CMS, HHSC proposed using CY 2020 and CY2021 as baselines because of the timing of the beginning of the program (CY 2021 would include 4 months of the start of the program) and the impact of COVID. Using the two years was intended to capture that context for future measurement. CMS indicated the proposal made sense. If CMS prefers that we use only one year, HHSC could use CY 2021 for the new TIPPS evaluation measures. However, this would delay further any evaluation of the programs because of data lags (please see page 5 of the TIPPS updated evaluation plan for timeline of available data).

With respect to year-over-year improvement, it is the state's goal to have improvement year-over-year, but we are also cognizant of not being able to set goals at this point because of the unknown impact of the PHE.

18. Does CMS have a recommendation for how the state can address this issue in the evaluation plan? **CMS Response**: CMS recognizes all healthcare systems have been impacted by COVID and that year-over-year improvement will be challenged by the PHE. We take that into consideration in our review of quality improvement efforts. We anticipate that the PHE will be part of the narrative and outcomes of the SDP evaluations including how COVID impacted the evaluation findings.

State Response: We will include this in the evaluation discussion. Does CMS have concerns with the goals and targets we have included in the plans?

**CMS Response 9/24/21**: Our concern is that the state has not identified any overall quality improvement targets for the SDPs. The state will need to provide those overall quality improvement targets (for each measure) for SFY 2023; that timeframe allows the state to see 2021 data and adjust for COVID.

**State Response (9/29/2021):** As acknowledged by CMS, the SFY2022 preprints will not include improvement targets as baseline data is pending. The State will include initial improvement targets for achievement in CY2022 in the SFY2023/Year 2 preprint submissions. However, the State may submit an addendum to update these improvement targets during SFY2023 after CY2021 data are available (estimated in summer/fall 2022).

19. Would maintenance of a high-performance rate within an allowable threshold (but still above national benchmarks, for example) be acceptable? **CMS Response:** We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark.

State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for recognizing the option for maintenance of a high-performance rate. HHSC will consider the CMS recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement will be evident in the evaluation and structure of the second year of these programs.

**CMS Response (9/24/2021):** CMS' understanding is that each of the preprints listed here have moved to include only uniform increases where payment is conditioned upon utilization and not performance. If any of these proposals condition payment upon performance, then changes to account for this will need to be made in alignment to feedback previously provided. See comments above related to QIPP.

**State Response (9/29/2021):** The State confirms that CMS' understanding is correct. In Year 1 all components of CHIRP, TIPPS, RAPPS, and DPP for BHS will be uniform increases where payment is conditioned upon utilization and not performance. In QIPP, Components 2, 3, and 4 will remain value based payments conditioning payment upon performance.

| | |
|---|---|
| Rural Access to Primary and Preventative Services (RAPPS) | 1. Remove the 10% reconciliation threshold and base payments only on current utilization or performance measured during the rating period (rather than historical utilization or performance).<br><br>**State Response:** We understand from the call between Texas and CMS on August 20, 2021, CMS will not consider Texas's proposal of a reduced threshold for SFY 2022, with a complete elimination of the structure for SFY2023. In an effort to achieve a pathway forward for this important program, Texas would like to utilize a payment structure where interim payments for SFY 2022 are based initially upon the historical utilization data, with final payments made based upon actual data at the end of the program year, with no contingency for a variation in utilization data. This approach will allow for consistent payments to be made through the program year, but final payments to be based exclusively on actual utilization. Would CMS agree that this approach resolves any outstanding concerns about the tie to utilization? If so, Texas will submit a revised pre-print to this effect immediately.<br><br>**CMS Response**: What the state has described for SFY 2022 for RAPPS Component 1, where interim payments would initially be based upon historical information but reconciled to actual utilization during the rating period, would be permissible. We do have a few follow-up questions to ensure our understanding of this arrangement:<br>State Response: Thank you for this feedback; we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.<br>**CMS Response (10/18/2021):** Our understanding is that only RAPPS Component 1, not Component 2, will have a reconciliation from historical to actual utilization. However, in Attachment B for preprint question 8, it indicates for Component 2 that "A separate reconciliation will be performed for rural health clinics based on actual utilization." Can the state please clarify?<br>**State Response (10/22/2021):** The statement that CMS refers to is not in the context of Component 2, but is a reiteration indiciating that the reconciliation will be performed for Component 1, which was described in more detail under the paragraph specific to Component 1 in Attachment B.<br><br>2. Please confirm our understanding that proposed approach of continuing interim payments based on past utilization with a final year-end payment based on actual utilization only applies to Component 1 of the directed payment.<br>    State Response: Texas confirms CMS' understanding.<br><br>3. Please describe in more detail how the payments will be made under the state's new proposal to replace the reconciliation threshold. Please provide a step-by step breakdown for how payment will work for both the MCOs and providers -- including whether the interim payments will be based on the same monthly payment amount proposed in the current preprint, when interim payments will be made based on historical utilization, how long such interim payments will continue to be made based on historical utilization, when the payments will be made based on actual utilization, and how the initial payments made based on historical utilization will be reconciled to actual utilization during the rating period. Please also discuss if the reconciliation could potentially result in recoupments from MCOs or providers. |

State Response: Please see Attachment A for a timeline and high-level description of the process. There will be three subprocesses required as part of this overall process. In the first subprocess, HHSC will pay MCOs a monthly actuarially sound capitated rate based upon actual caseloads each month. MCOs will adjudicate actual claims through normal processes and then submit to HHSC encounter data. Typically, due to claims processing timelines, encounter data for a rating period is usually considered substantially complete approximately 120 days after the end of the rating period, which for Texas means December 31, 2022 for the September 1, 2021 through August 31, 2022 rating period. In a separate subprocess, HHSC receives quality-related data from providers that is required as a condition of participation in the program. HHSC will direct MCOs to issue payments to providers based upon historical data and using funds received by the MCO in the monthly capitated rate that was paid. The MCO will issue the interim payment to the provider monthly. In the final subprocess, approximately 120 days after the end of the rating period, HHSC will reconcile the historical utilization that was used as the basis of the interim payments to the actual encounters reported by the MCOs. HHSC will then direct the MCOs to recoup from and redistribute funds to providers based upon the reconciled information. The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments. Providers may experience recoupments or receive additional funds based upon historical-to-actual utilization fluctuations.

**CMS Response (9/24/2021):** CMS appreciates the additional information provided on the process. CMS would like to confirm the following:

**State Response (9/29/2021):** HHSC is happy to share additional information to confirm CMS' understanding of the reconciliation process. Per CMS' September 10, 2021 statement that the reconciliation process would be permissible under the regulation, we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

1. The 3 processes indicate that no changes will be made to the payments the MCO receives from the state; changes to the payments would occur for the providers within what the state has paid the plans, is that correct?
   **State Response (9/29/2021):** Yes, that is the intent. However, there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound.

2. Does the state anticipate any amendments to the rates or rate certifications to account for the reconciliation requirement?
   **State Response (9/29/2021):** Not at this time.

3. How will the state inform the plans of any needed recoupments or redistributions of the funds to providers? Through updates to the contract?
   **State Response (9/29/2021):** The state will inform the MCOs via an updated payment scorecard that will show any provider level payment adjustments (positive or negative) that are required.
   **CMS Response (10/18/2021):** We understand that the payment scorecard has historically been used for payments to QIPP providers, and that the state will now include direction in

the MCO contracts for using this scorecard for when recoupments or redistributions are needed for providers participating in TIPPS, BHS and RAPPS. Is this correct?

**State Response (10/22/2021)**: The state will create a scorecard specific to each program that is similar to the scorecard used in QIPP, but there will not be a consolidated scorecard for all programs.  The program-specific scorecards will be used to indicate when recoupments or redistributions are necessary.

4.  CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state.  There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

5.  The response to Question 9a in the preprint indicates that the payment for Component 1 will be a uniform increase of $22.53 for free-standing RHCs and $20.74 for hospital-based RHCs. Can the state confirm this is correct? Are the payments made under Component 1 to provider on a PMPM basis or on a per service (or per claim) basis? Would the amount paid for each class change with the reconciliation?

**State Response (9/29/2021)**: Yes, we confirm these amounts are correct. The impact of the payment increase is a uniform increase based upon utilization; however, the state intends on making the payments as a lump sum monthly payment during the program year, prior to the reconciliation to actual RHC claims at the end of the program period. The amounts could change as the state intends to maintain the size of component 1 as identified in the pre-print but would adjust the amount if the actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation.

**CMS Response (10/18/2021)**: The state says, "The amounts could change as the state intends to maintain the size of component 1 as identified in the pre-print but would adjust the amount if the actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation."

e.  We understand from this response that the uniform increase amounts may change to ensure that the state maintains the size of components 1. Is that correct?

**State Response (10/22/2021)**: No, if the actual program size fluctuates as a result of caseload, the size of Component 1 would fluctuate proportionately as Component 1 is designed to be equal to a percentage of the overall program value.  The reconciliation performed at the end of the program year will be

performed to reconcile to the actual value of Component 1 based upon the actual value of the overall program as paid through the program year.

f.  Our understanding from previous rounds of review is that the targeted amount for Component 1 is $7,957,751. Can the state please confirm this is the amount that the state intends to reconcile to? Will this targeted amount include any provisions for administration, risk margin, and premium tax?

**State Response (10/22/2021)**: The amount identified for Component 1 is an estimate based upon the proposed program size. However, if the actual program size fluctuates as a result of caseload, the size of Component 1 would fluctuate proportionally as Component 1 is designed to be equal to a percentage of the overall program value.  The reconciliation performed at the end of the program year will be performed to reconcile to the actual value of Component 1 based upon the actual value of the overall program as paid through the program year. All managed care capitated payments will include administration, risk margin, and premium tax, as appropriate. The Component 1 value above does not include any provisions associated with administration, risk margin, and premium tax as these are removed from the total program funds before Component 1's value is calculated.

6.  The state indicated on calls that the state intended to continue incorporating this payment arrangement as an adjustment to base rates rather than a separate payment term. Given the revised reconciliation process for Component 1, can the state affirm that it still plans to incorporate all components of this payment arrangement through an adjustment to base rates or would the state pay any part of this payment arrangement, such as Component 1, as a separate payment term?

**State Response (9/29/2021)**: Yes, all components will be through an adjustment to base rates.

**CMS Response (10/18/2021)**: The state indicates in the response to question 5 above that the uniform percentage increase currently documented in the preprint would change at the time of the reconciliation as the state intends to maintain the size of Component 1 funding currently identified in the preprint. Is the state's goal under Component 1 or any other Component to ensure that exactly a certain amount (e.g., $7,957,751) is expended by the plans for payments to providers under any specific components (e.g., Component 1)? Or are the amounts listed for each component an estimate that is subject to change? If so, what would cause it to change?

**State Response (10/22/2021)**: To clarify, the state intends to maintain the size of Component 1 as a percentage of the overall program value; however, the gross value of Component 1 may change if the overall program value fluctuates from the estimated value.  This fluctuation would be a result of changes in caseload from the forecasted caseload for the fiscal year. However, the payments will still be reconciled against actual utilization, so the actual percentage of program value compared to actual utilization may result in a different percentage rate increase than the estimated rate increase, which is based upon historical utilization and estimated program values.

**CMS Response (10/18/2021)**: Does the state direct the plans to set aside any portion of the capitation rate paid to them for this payment arrangement?

**State Response (10/22/2021):** No. The portion of the capitation rate attributed to each DPP has been separately identified and reported to the MCOs but no direction has been provided on how the MCOs should "set aside" these funds.

**CMS Response (10/18/2021):** Are the plans directed to use a specific portion of the capitation rates paid to them to pay out Component 1?

**State Response (10/22/2021):** No. The capitation rates have been calculated separately for each DPP; however, this add-on rate isn't delineated between the various components.

7. Please also revise the preprint to include the information on the reconciliation process described in Attachment A.

**State Response (9/29/2021):** Please see the changes in the attached pre-prints, per your request.

4. Can the state confirm that all payments (including the interim payments based on historical data) will be reconciled to actual utilization data during the rating period? Or will those initial interim payments remain based only on historical utilization?

State Response: All payments will be reconciled to actual utilization data during the final reconciliation.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021):** The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

5. We will note that states that make interim payments based on historical utilization and then reconcile to actual data have noted that reconciliations like this can be administratively burdensome.

State Response: Noted. The importance of the program to our healthcare safety net is significant so HHSC will absorb the administrative burden.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its

preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state.  There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

6.  CMS' understanding from previous responses is that the reconciliation threshold is a part of the state's administrative code. Can the state confirm that this change can be implemented without changes to the administrative code? If not, can the state describe the process and timing for making such changes? If changes to the administrative code are needed, will the state be able to implement those retroactively back to the start of the rating period?

State Response: Implementing this change will require the state to modify the Texas Administrative Code.  HHSC will propose that rule changes will apply to the entire program period, though the effective date of the rule change will be subsequent to the start of the rating period.

**CMS Response (9/24/2021):** Can the state elaborate the timeframes that would be needed to complete the state rulemaking process? Can the state also comment on if they anticipate challenges to the rulemaking and what impact those would have on implementation timelines?

**State Response (9/29/2021)**: The Texas rulemaking process requires filing of a proposed rule with the Texas Register by Monday at noon to have the proposal published 11 days later (the second Friday after submission). Proposed rules are generally posted for a 30-day public comment period. Following the public comment period, the rule can be adopted with or without changes. Typically, a rule takes effect 20 days after the date the rule is filed with the Texas Register.  This total process requires a minimum of 51 days; however, accounting for time necessary to prepare the rules for publication, to review public comments, and make any changes as a result thereof, HHSC typically assumes a minimum of 90 days will be necessary. HHSC anticipates receiving public comments but also anticipates that providers prefer changes if they are necessary for CMS approval for state fiscal year 2022.

For more information, CMS may wish to visit our webpage on rulemaking: https://www.hhs.texas.gov/laws-regulations/policies-rules/health-human-services-rulemaking.

**CMS Response (10/18/2021):** From the description above, it sounds like CMS would not expect rate amendments or contract amendments to implement the proposed changes until 90 days after the start of rulemaking at the state level. Is this correct?

**State Response (10/22/2021):** With respect to rule making changes described above, the state does not anticipate that rate changes or contract amendments would be required to implement the changes proposed for RAPPS, so the rates and contracts already filed with CMS will stand.

7. Can the state please describe how this new approach will be accounted for in the capitation rates? Will the directed payment be incorporated into the rates as a separate payment term? It would be helpful for the state to clarify how this new approach would impact the amounts included in the initial certification, and if the state and actuary intend to amend the rates in the future once the final payments based on actual utilization are known.

State Response: We expect that the RAPPS would continue to be incorporated as an adjustment to the base capitation rates and included in the monthly premium. Once final data is available at the end of the year, a retroactive adjustment to the RAPPS capitation rates may be necessary, in which case HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Questions 1, 2 and 6. Appendix A, process 3 does not indicate that there will be any changes to the MCO payments and the state's response above states, "The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments." However, this response indicates that retroactive adjustments to the capitation rates may be necessary. Can the state please clarify if the state expects or anticipates an amendment to the rates and rate certifications may be needed and under what circumstances?

**State Response (9/29/2021):** The state does not anticipate making any prospective capitated rate changes based upon this modification. However, once final data is available at the end of the year, a retroactive adjustment to the capitation rates may be necessary if the degree of recoupments and redistributions is significant to the point that the capitated rates are no longer actuarially sound. If that occurs, HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (10/18/2021):** The state indicates that there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound. We would appreciate better understanding under what circumstances the MCO rates would be revised.

1. Can the state and its actuary please discuss how you are defining "significant" in this instance, and what threshold would trigger adjustments to the MCO capitation rates. Please address both the potential instances when MCOs are required to pay out more RAPPS payments than the amount of funding included prospectively in capitation rates, and when MCOs are required to pay out less RAPPS payments than the amount of funding included prospectively in the capitation rates.

**State Response (10/22/2021):** The intent of any reconciliation would be to ensure that all MCO capitation rates continued to be considered actuarially sound and to ensure that no MCO was inadvertently harmed (or profited) due to shifts in utilization and provider payments that are beyond their control. The threshold for triggering a retroactive rate change is difficult to define in advance given that there are numerous variables that impact the capitation rates and would need to be taken into consideration. Without being overly prescriptive we believe that the risk margin

would be the starting point for evaluating whether a modification would be necessary and that such consideration would be equivalent for the cases of both over and underpayment. There could be scenarios where the trigger could be higher or lower than the risk margin such as large scale utilization shifts that impact the overall profitability of the MCOs either positively or negatively resulting in variations in other assumptions that offset the need to adjust rates retroactively.

2. Since CMS evaluates actuarial soundness at a rate cell level, we would appreciate understanding if the state and actuary intend to review whether adjustments to the rates are necessary as a result of the reconciliation at a rate cell level. If not, we would appreciate understanding why not, and at what level the state intends to perform the analyses to determine if adjustments to the rates are necessary.

**State Response (10/22/2021)**: Our intent would be to evaluate the need for any rate adjustments at the same level of detail on which the capitation rates are set, i.e. at the MCO, SDA and risk group level.

3. To the extent the state and actuary determine that adjustments to the MCO capitation rates are necessary as a result of the reconciliation, we would appreciate understanding if the state intends to still include a risk margin provision in the revised RAPPS amounts included in the rates based on the reconciliation. If the state intends to still include a risk margin when developing revised RAPPS amounts based on the reconciliation, we would appreciate understanding why this is reasonable.

**State Response (10/22/2021)**: In general, risk margins are set by program and applied uniformly across all components of the premium rate, i.e. medical, pharmacy, QIPP, CHIRP, etc…The margins are not necessarily intended to reflect the risk associated with each individual claim type, risk group, SDA but an aggregate reflection of the risk across the entire program inclusive of all services and rate components. For this reason, we believe that a risk margin may still be necessary as this assumption is set in aggregate and not specific to the RAPPS. This assumption may need to be reevaluated given the specific circumstances in the event a rate adjustment is necessary.

8. We wanted to note that during Round 2 of preprint review, the state revised the uniform percent increase for Component 2, but did not provide a revised total dollar amount for the directed payment. Can the state please provide the final total dollar amount for this directed payment, inclusive of the new reconciliation approach? We note that the total amount of funding for RAPPS included in the current SFY 2022 certifications appears to be $11,128,433.

State Response: The final total dollar amount for RAPPS is $11,264,178. See the breakout below:

i. Component 1: $7,959,071
ii. Component 2: $2,653,024
iii. Administration, risk margin, or premium tax: $652,084

This is based on an updated rate increase for Component 2 of 3.77%, rounded to the nearest hundredth for MCO implementation. This information is also provided in an updated preprint.

**CMS Response (9/24/2021):** Can the state confirm that the provider payment level analysis provided in the preprint reflects these changes? If not, please provide an updated preprint with an updated provider payment level analysis that reflects these changes.

**State Response (9/29/2021)**: Yes, the state confirms that Question 23 (table 2) reflects these updates.

9. Refine the evaluation plan for RAPPS to ensure that the effect of the RAPPS state directed payment, absent other programmatic changes or other state directed payments, can be appropriately evaluated by the state, including a sound attribution methodology. The state must provide consistent baseline data to demonstrate year over year changes.

**State Response:** The state is working with our EQRO contractor to refine an attribution methodology for each program. There are some measures included in the evaluation which cannot be limited to providers participating in the DPP. Some of the measures that cannot be attributed exclusively to one DPP provider are CMS core set measures recommended by CMS for DPP evaluations. In light of the call with Texas on August 24 and CMS' acknowledgement, we will proceed with maintaining the CMS core set measures selected for the respective evaluations, even though they cannot be attributed only to providers participating in the corresponding DPPs.

HHSC is also open to providing one annual DPP evaluation which breaks out DPP-specific attribution measures, as suggested by CMS in the August 24, 2021 call with Texas.

10. Does CMS have any other recommendations for how to isolate the impact of the DPP other than the work HHSC is undertaking with its contractor to do so? **CMS Response: Please refer to the overarching comments at the top of this paper.**

State Response: Please refer to our responses to CMS's overarching comments.

With respect to baseline year, in a phone call on January 27, 2021 with CMS, HHSC proposed using CY 2020 and CY2021 as baselines because of the timing of the beginning of the program (CY 2021 would include 4 months of the start of the program) and the impact of COVID. Using the two years was intended to capture that context for future measurement. CMS indicated the proposal made sense. If CMS prefers that we use only one year, HHSC could use CY 2021 for the new RAPPS evaluation measures. However, this would delay further any evaluation of the programs because of data lags (please see page 5 of the RAPPS updated evaluation plan for timeline of available data).

With respect to year-over-year improvement, it is the state's goal to have improvement year-over-year, but we are also cognizant of not being able to set goals at this point because of the unknown impact of the PHE.

11. Does CMS have a recommendation for how the state can address this issue in the evaluation plan? **CMS Response**: CMS recognizes all healthcare systems have been impacted by COVID and that year-over-year improvement will be challenged by the PHE. We take that into consideration in our review of quality improvement efforts. We anticipate that the PHE will be part of the narrative and outcomes of the SDP evaluations including how COVID impacted the evaluation findings.

| | |
|---|---|
| | State Response: We will include this in the evaluation discussion. Does CMS have concerns with the goals and targets we have included in the plans? |
| | **CMS Response 9/24/21:** Our concern is that the state has not identified any overall quality improvement targets for the SDPs. The state will need to provide those overall quality improvement targets (for each measure) for SFY 2023; that timeframe allows the state to see 2021 data and adjust for COVID. |
| | **State Response (9/29/2021):** As acknowledged by CMS, the SFY2022 preprints will not include improvement targets as baseline data is pending. The State will include initial improvement targets for achievement in CY2022 in the SFY2023/Year 2 preprint submissions. However, the State may submit an addendum to update these improvement targets during SFY2023 after CY2021 data are available (estimated in summer/fall 2022). |
| | 12. Would maintenance of a high-performance rate within an allowable threshold (but still above national benchmarks, for example) be acceptable? **CMS Response:** We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark. |
| | State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for recognizing the option for maintenance of a high-performance rate. HHSC will consider the CMS recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement will be evident in the evaluation and structure of the second year of these programs. |
| Behavioral Health Services Directed Payment Program (BHS) | 1. Remove the 10% reconciliation threshold and base payments only on current utilization or performance measured during the rating period (rather than historical utilization or performance). |
| | **State Response:** We understand from the call between Texas and CMS on August 20, 2021, CMS will not consider Texas's proposal of a reduced threshold for SFY 2022, with a complete elimination of the structure for SFY2023. In an effort to achieve a pathway forward for this important program, Texas would like to utilize a payment structure where interim payments for SFY 2022 are based initially upon the historical utilization data, with final payments made based upon actual data at the end of the program year, with no contingency for a variation in utilization data. This approach will allow for consistent payments to be made through the program year, but final payments to be based exclusively on actual utilization. Would CMS agree that this approach resolves any outstanding concerns about the tie to utilization? If so, Texas will submit a revised pre-print to this effect immediately. |

**CMS Response**: What the state has described for SFY 2022 for BHS Component 1, where interim payments would initially be based upon historical information but reconciled to actual utilization during the rating period, would be permissible. We do have a few follow-up questions to ensure our understanding of this arrangement:

State Response: Thank you for this feedback; we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

1. Please confirm our understanding that proposed approach of continuing interim payments based on past utilization with a final year-end payment based on actual utilization only applies to Component 1 of the directed payment.

    State Response: Texas confirms CMS' understanding.

2. Please describe in more detail how the payments will be made under the state's new proposal to replace the reconciliation threshold. Please provide a step-by step breakdown for how payment will work for both the MCOs and providers -- including whether the interim payments will be based on the same monthly payment amount proposed in the current preprint, when interim payments will be made based on historical utilization, how long such interim payments will continue to be made based on historical utilization, when the payments will be made based on actual utilization, and how the initial payments made based on historical utilization will be reconciled to actual utilization during the rating period. Please also discuss if the reconciliation could potentially result in recoupments from MCOs or providers.

    State Response:  Please see Attachment A for a timeline and high-level description of the process.  There will be three subprocesses required as part of this overall process. In the first subprocess, HHSC will pay MCOs a monthly actuarially sound capitated rate based upon actual caseloads each month. MCOs will adjudicate actual claims through normal processes and then submit to HHSC encounter data.  Typically, due to claims processing timelines, encounter data for a rating period is usually considered substantially complete approximately 120 days after the end of the rating period, which for Texas means December 31, 2022 for the September 1, 2021 through August 31, 2022 rating period.  In a separate subprocess, HHSC receives quality-related data from providers that is required as a condition of participation in the program.  HHSC will direct MCOs to issue payments to providers based upon historical data and using funds received by the MCO in the monthly capitated rate that was paid. The MCO will issue the interim payment to the provider monthly. In the final subprocess, approximately 120 days after the end of the rating period, HHSC will reconcile the historical utilization that was used as the basis of the interim payments to the actual encounters reported by the MCOs. HHSC will then direct the MCOs to recoup from and redistribute funds to providers based upon the reconciled information.  The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments.  Providers may experience recoupments or receive additional funds based upon historical-to-actual utilization fluctuations.

**CMS Response (9/24/2021):** CMS appreciates the additional information provided on the process. CMS would like to confirm the following:

**State Response (9/29/2021)**: HHSC is happy to share additional information to confirm CMS' understanding of the reconciliation process. Per CMS' September 10, 2021 statement that the reconciliation process would be permissible under the regulation, we are glad that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

1. The 3 processes indicate that no changes will be made to the payments the MCO receives from the state; changes to the payments would occur for the providers within what the state has paid the plans, is that correct?
**State Response (9/29/2021)**: Yes, that is the intent. However, there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound.

2. Does the state anticipate any amendments to the rates or rate certifications to account for the reconciliation requirement?
**State Response (9/29/2021)**: Not at this time.

3. How will the state inform the plans of any needed recoupments or redistributions of the funds to providers? Through updates to the contract?
**State Response (9/29/2021)**: The state will inform the MCOs via an updated payment scorecard that will show any provider level payment adjustments (positive or negative) that are required.
**CMS Response (10/18/2021):** We understand that the payment scorecard has historically been used for payments to QIPP providers, and that the state will now include direction in the MCO contracts for using this scorecard for when recoupments or redistributions are needed for providers participating in TIPPS, BHS and RAPPS. Is this correct?
**State Response (10/22/2021)**: The state will create a scorecard specific to each program that is similar to the scorecard used in QIPP, but there will not be a consolidated scorecard for all programs. The program-specific scorecards will be used to indicate when recoupments or redistributions are necessary.

4. CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.
**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

5. The response to Question 9a in the preprint indicates that the payment for Component 1 will be a uniform increase of $23.77. Can the state confirm this is correct? Are the payments made under Component 1 to provider on a PMPM basis or on a per service (or per claim) basis? Would the amount paid under this component change with the reconciliation?

**State Response (9/29/2021)**: Yes, we confirm the amount is correct. The impact of the payment increase is uniform increase based upon historical utilization; however, the state intends on making the payments as a lump sum monthly payment during the program year, prior to the reconciliation to actual CMHC claims at the end of the program period. The amount could change as the state intends to maintain the size of component 1 as identified in the pre-print but would adjust the percentage per claim if the actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation.

**CMS Response (10/18/2021)**: The state says, "The amounts could change as the state intends to maintain the size of component 1 as identified in the pre-print but would adjust the amount if the actual utilization varies from the historical. The adjustment would take place at the time of the reconciliation."

a. We understand from this response that the uniform dollar increase amount may change (and state cites adjusting the percentage per claim in the response but we believe the state meant to stay adjusting the dollar increase per claim) to ensure that the state maintains the size of component 1. Is that correct?

**State Response (10/22/2021)**: No, if the actual program size fluctuates as a result of caseload, the size of Component 1 would fluctuate proportionately as Component 1 is designed to be equal to a percentage of the overall program value. The reconciliation performed at the end of the program year will be performed to reconcile to the actual value of Component 1 based upon the actual value of the overall program as paid through the program year.

b. The state informed us below that the total dollar estimate is $108,324,269 for Component 1. Can the state confirm that this is the targeted amount for Component 1 funding that they intend to reconcile to? Will this targeted amount include any provisions for administration, risk margin and premium tax?

**State Response (10/22/2021)**: The amount identified for Component 1 is an estimate based upon the proposed program size. However, if the actual program size fluctuates as a result of caseload, the size of Component 1 would fluctuate proportionately as Component 1 is designed to be equal to a percentage of the overall program value. The reconciliation performed at the end of the program year will be performed to reconcile to the actual value of Component 1 based upon the actual value of the overall program as paid through the program year. All managed care capitated payments will include administration, risk margin, and premium tax, as appropriate. The Component 1 value listed above does not include any provisions associated with administration, risk margin, and premium tax.

6. The state indicated on calls that the state intended to continue incorporating this payment arrangement as an adjustment to base rates rather than a separate payment term. Given the revised reconciliation process for Component 1, can the state affirm that it still plans to

incorporate all components of this payment arrangement through an adjustment to base rates or would the state pay any part of this payment arrangement, such as Component 1, as a separate payment term?

**State Response (9/29/2021)**: Yes, all components will be through an adjustment to base rates.

**CMS Response (10/18/2021)**: The state indicates in the response to question 5 above that the uniform percentage increase currently documented in the preprint would change at the time of the reconciliation as the state intends to maintain the size of Component 1 funding currently identified in the preprint. Is the state's goal under Component 1 or any other Component to ensure that exactly a certain amount (e.g., $108,324,269) is expended by the plans for payments to providers under any specific components (e.g., Component 1)? Or are the amounts listed for each component an estimate that is subject to change? If so, what would cause it to change?

**State Response (10/22/2021)**: To clarify, the state intends to maintain the size of Component 1 as a percentage of the overall program value; however, the gross value of Component 1 may change if the overall program value fluctuates from the estimated value. This fluctuation would be a result of changes in caseload from the forecasted caseload for the fiscal year. However, the payments will still be reconciled against actual utilization, so the actual percentage of program value compared to actual utilization may result in a different percentage rate increase than the estimated rate increase, which is based upon historical utilization and estimated program values.

**CMS Response (10/18/2021)**: Does the state direct the plans to set aside any portion of the capitation rate paid to them for this payment arrangement?

**State Response (10/22/2021):** No. The portion of the capitation rate attributed to each DPP has been separately identified and reported to the MCOs but no direction has been provided on how the MCOs should "set aside" these funds.

**CMS Response (10/18/2021)**: Are the plans directed to use a specific portion of the capitation rates paid to them to pay out Component 1?

**State Response (10/22/2021):** No. The capitation rates have been calculated separately for each DPP; however, this add-on rate isn't delineated between the various components.

7. Please also revise the preprint to include the information on the reconciliation process described in Attachment A.

**State Response (9/29/2021)**: Please see the changes in the attached pre-prints, per your request.

3. Can the state confirm that all payments (including the interim payments based on historical data) will be reconciled to actual utilization data during the rating period? Or will those initial interim payments remain based only on historical utilization?

State Response: All payments will be reconciled to actual utilization data during the final reconciliation.

**CMS Response (9/24/2021)**: See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while

removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

4. We will note that states that make interim payments based on historical utilization and then reconcile to actual data have noted that reconciliations like this can be administratively burdensome.

State Response: Noted. The importance of the program to our healthcare safety net is significant so HHSC will absorb the administrative burden.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Question 4 above - CMS notes the process described in Attachment A seems highly complex and disruptive to providers while removing risk from the plans. The source of the complexity seems to be basing payments initially on historical utilization instead of current utilization. Can the state explain its preference for this approach? Why not instead base payments under Component 1 on current utilization; doing so would then seem to eliminate the need for processes 2 and 3 in Attachment A.

**State Response (9/29/2021)**: The state may consider a change to payments based upon claims at the time of adjudication in the future. However, at this time, the administrative burden of making coding modifications to claiming systems for each of our MCOs, coupled with the shift in timing of payments to providers, outweighs the administrative burden that would be absorbed through the process described by the state. There will be risk experienced by the MCOs as their capitated payments will be based upon the historical utilization and if utilization varies, the MCO may have downward or upward risk.

5. CMS' understanding from previous responses is that the reconciliation threshold is a part of the state's administrative code. Can the state confirm that this change can be implemented without changes to the administrative code? If not, can the state describe the process and timing for making such changes? If changes to the administrative code are needed, will the state be able to implement those retroactively back to the start of the rating period?

State Response: Implementing this change will require the state to modify the Texas Administrative Code. HHSC will propose that rule changes will apply to the entire

program period, though the effective date of the rule change will be subsequent to the start of the rating period.

**CMS Response (9/24/2021):** Can the state elaborate the timeframes that would be needed to complete the state rulemaking process? Can the state also comment on if they anticipate challenges to the rulemaking and what impact those would have on implementation timelines?

**State Response (9/29/2021):** The Texas rulemaking process requires filing of a proposed rule with the Texas Register by Monday at noon to have the proposal published 11 days later (the second Friday after submission). Proposed rules are generally posted for a 30-day public comment period. Following the public comment period, the rule can be adopted with or without changes. Typically, a rule takes effect 20 days after the date the rule is filed with the Texas Register. This total process requires a minimum of 51 days; however, accounting for time necessary to prepare the rules for publication, to review public comments, and make any changes as a result thereof, HHSC typically assumes a minimum of 90 days will be necessary. HHSC anticipates receiving public comments but also anticipates that providers prefer changes be made if they are necessary for CMS approval for state fiscal year 2022.

For more information, CMS may wish to visit our webpage on rulemaking: https://www.hhs.texas.gov/laws-regulations/policies-rules/health-human-services-rulemaking.

**CMS Response (10/18/2021):** From the description above, it sounds like CMS would not expect rate amendments or contract amendments to implement the proposed changes until 90 days after the start of rulemaking at the state level. Is this correct?

**State Response (10/22/2021):** With respect to rule making changes described above, the state does not anticipate that rate changes or contract amendments would be required to implement the changes proposed for DPP for BHS, so the rates and contracts already filed with CMS will stand.

6. Can the state please describe how this new approach will be accounted for in the capitation rates? Will the directed payment be incorporated into the rates as a separate payment term? It would be helpful for the state to clarify how this new approach would impact the amounts included in the initial certification, and if the state and actuary intend to amend the rates in the future once the final payments based on actual utilization are known.

State Response: We expect that the DPP for BHS would continue to be incorporated as an adjustment to the base capitation rates and included in the monthly premium. Once final data is available at the end of the year, a retroactive adjustment to the DPP BHS capitation rates may be necessary, in which case HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (9/24/2021):** See CMS Round 3 responses, Questions 1, 2 and 6. Appendix A, process 3 does not indicate that there will be any changes to the MCO payments and the state's response above states, "The MCOs will not experience recoupments as the capitated rates paid to the MCOs will include all necessary payments." However, this response indicates that retroactive adjustments to the capitation rates may be necessary. Can the state please

clarify if the state expects or anticipates an amendment to the rates and rate certifications may be needed and under what circumstances?

**State Response (9/29/2021)**: The state does not anticipate making any prospective capitated rate changes based upon this modification. However, once final data is available at the end of the year, a retroactive adjustment to the capitation rates may be necessary if the degree of recoupments and redistributions is significant to the point that the capitated rates are no longer actuarially sound. If that occurs, HHSC would amend the MCO contracts and submit an actuarial rate amendment.

**CMS Response (10/18/2021):** The state indicates that there may be modifications to MCO payments if the redistributions are significant to a point that the resulting adjustments would no longer be considered actuarially sound. We would appreciate better understanding under what circumstances the MCO rates would be revised.

1. Can the state and its actuary please discuss how you are defining "significant" in this instance, and what threshold would trigger adjustments to the MCO capitation rates. Please address both the potential instances when MCOs are required to pay out more BHS payments than the amount of funding included prospectively in capitation rates, and when MCOs are required to pay out less BHS payments than the amount of funding included prospectively in the capitation rates.

**State Response (10/22/2021)**: The intent of any reconciliation would be to ensure that all MCO capitation rates continued to be considered actuarially sound and to ensure that no MCO was inadvertently harmed (or profited) due to shifts in utilization and provider payments that are beyond their control. The threshold for triggering a retroactive rate change is difficult to define in advance given that there are numerous variables that impact the capitation rates and would need to be taken into consideration. Without being overly prescriptive we believe that the risk margin would be the starting point for evaluating whether a modification would be necessary and that such consideration would be equivalent for the cases of both over and underpayment. There could be scenarios where the trigger could be higher or lower than the risk margin such as large scale utilization shifts that impact the overall profitability of the MCOs either positively or negatively resulting in variations in other assumptions that offset the need to adjust rates retroactively.

2. Since CMS evaluates actuarial soundness at a rate cell level, we would appreciate understanding if the state and actuary intend to review whether adjustments to the rates are necessary as a result of the reconciliation at a rate cell level. If not, we would appreciate understanding why not, and at what level the state intends to perform the analyses to determine if adjustments to the rates are necessary.

**State Response (10/22/2021)**: Our intent would be to evaluate the need for any rate adjustments at the same level of detail on which the capitation rates are set, i.e. at the MCO, SDA and risk group level.

3. To the extent the state and actuary determine that adjustments to the MCO capitation rates are necessary as a result of the reconciliation, we would appreciate understanding if the state intends to still include a risk margin provision in the revised BHS amounts included in the rates based on the reconciliation. If the state intends to still include a risk margin when developing revised BHS amounts based on the reconciliation, we would appreciate understanding why this is reasonable.

**State Response (10/22/2021)**: In general, risk margins are set by program and applied uniformly across all components of the premium rate, i.e. medical, pharmacy, QIPP, CHIRP, etc…The margins are not necessarily intended to reflect the risk associated with each individual claim type, risk group, SDA but an aggregate reflection of the risk across the entire program inclusive of all services and rate components. For this reason, we believe that a risk margin may still be necessary as this assumption is set in aggregate and not specific to the BHS. This assumption may need to be reevaluated given the specific circumstances in the event a rate adjustment is necessary.

7. As part of Round 2 during the preprint review, the state provided a revised total dollar amount of $176,400,019 for this directed payment; however we do not believe the state provided a revised preprint updating the amount of the payment, or the other parts of the pre-print such as the reimbursement rate analysis. Can the state please confirm that this total dollar amount is still accurate given the new reconciliation approach and submit a revised preprint accounting for this total dollar amount?

State Response: During the calculation for this program's capitation payments, the state found that some providers had not submitted all associated NPI numbers on their program applications therefore skewing those provider's payments (NPIs are used to pull claims for historical utilization). After the correct NPIs were collected, the model calculated new payments from updated historical utilization using the same methodology. The final program total is $176,400,019. See below for the updated breakout:

Component 1: $108,324,269
Component 2: $57,681,357
Administration, profit margin and premium tax: $10,394,393

This information is also provided in an updated preprint.

**CMS Response (10/18/2021):** The state's rate certification(s) appear to include $180,740,784 for this state directed payment. Is this an older estimate and does the state expect to revise this amount in the preprint?

**State Response (10/22/2021)**: The change in program value from $180,740,784 to $176,400,019 is due to the exclusion of 3 providers that were determined to not yet be eligible after the FY2022 capitation rates were calculated, actuarial reports drafted and submitted to CMS. Given the relatively small size of this reduction we do not believe an adjustment is needed to the capitation rates.

**CMS Response (9/24/2021):** Can the state confirm that the provider payment level analysis provided in the preprint reflects these changes? If not, please provide an updated preprint with an updated provider payment level analysis that reflects these changes.

**State Response (9/29/2021)**: The pre-print has been updated to reflect this information.

2. Require that any payments be based on performance linked to Medicaid managed care enrollees only (not Medicaid FFS), and performance-based payments must ensure that

providers are achieving year over year improvement in accordance with the regulatory requirement that the arrangement must advance managed care quality goals and objectives.

**State Response:** The state believes the payments are based on performance linked to Medicaid managed care enrollees. HHSC has developed a hybrid model that requires providers to meet program quality requirements, but where payment is still triggered by Medicaid managed care utilization. For example, in the TIPPS Component 3 and DPP BHS Component 2, once a provider has demonstrated achievement on their measures, they are eligible to earn payments. The payments are rate enhancements paid upon claims adjudication of certain codes identified in the program requirements. On the August 24, 2021 call with Texas, CMS indicated this was not clear in the preprint. Could we maintain the quality descriptions in our pre-print submissions, as we hope to transition toward more value-based DPPs in the future, but change the selection under question 10 to remove "Quality Payment/Pay for Performance" but leave "Medicaid-Specific Delivery System Reform" and "Performance Improvement Initiative"? Or does CMS have suggestions for other changes Texas could make to the pre-print to address this issue?

Should CMS want to restrict measurement to only Medicaid managed care members, HHSC would propose to transition over the first year of the program so that providers are able to make necessary system changes to stratify by Medicaid managed care only, and HHSC would need to amend the selection of measures used for tracking provider quality improvement, such as the structure measures or hospital safety measures.

8. Is this a requirement that only applies to Pay-for-performance measures in a value-based DPP? Or would it also apply to provider-reported measures used for evaluations?

**CMS Response:** From recent discussions with the state, we understand that Component 2 should be classified as a uniform increase and not a pay for performance arrangement as the condition of payment is the submission of a claim rather than performance on a quality measure. Can the state please confirm this is correct? Additionally, can the state confirm that payment will be made per claim during the rating period and not based on historical claims?

State Response: Yes, this is correct (though Texas wishes to note that we view this component of a hybrid approach wherein eligibility for the uniform rate increase is made with consideration of quality-based achievements); however, for purposes of CMS review of the pre-print and regulatory compliance, this component is most appropriately considered uniform rate increase. The payments will be made per claim during the rating period and not based on historical claims. The increased rate will be paid at the time of claim adjudication.

As previously noted, CMS does expect measurement to be restricted to only Medicaid managed care members for pay for performance arrangements and provider-reported measures for evaluation.

State Response: Yes, rate increases will be applied to adjudicated claims specified in the preprint. The providers will only be eligible for these rate increases if the providers have demonstrated achievement on the performance measures, but the payments will only be released on the submission of the specific claims. In component 2, the payment will be made as a rate increase per claim during the rating period and not based on historical claims.

With regard to year-over-year improvement

9. HHSC assumes this applies to provider-level pay-for-performance measures in addition to evaluation measurement at the Medicaid-member level. Is that correct? **CMS Response**: Yes, the SDP should aim to have year-over-year improvement in the evaluation measures at the SDP-level (i.e., across all the providers participating in the SDP) as noted earlier in response to QIPP.

> State Response: As proposed, the first year of these programs will establish baselines. The state will consider this in setting goals in the year 2 evaluation plan.

**CMS Response (9/24/2021):** CMS' understanding is that each of the preprints listed here have moved to include only uniform increases where payment is conditioned upon utilization and not performance. If any of these proposals condition payment upon performance, then changes to account for this will need to be made in alignment to feedback previously provided. See comments above related to QIPP.

**State Response (9/29/2021):** The State confirms that CMS' understanding is correct. In Year 1 all components of CHIRP, TIPPS, RAPPS, and DPP for BHS will be uniform increases where payment is conditioned upon utilization and not performance. In QIPP, Components 2, 3, and 4 will remain value based payments conditioning payment upon performance.

10. How should this apply to structure measures currently included in the program? **CMS Response:** As noted earlier, CMS strongly encourages states to use outcome measures for value-based payments. Using structural measures does not necessarily lead to health improvements for Medicaid beneficiaries. Using structure or count measures along with outcome measures can, however, show the importance of ensuring adequate staffing on health outcomes of beneficiaries, especially when done over time. We encourage Texas, therefore, to use these measures along with outcome measures that are measuring the impact of the healthcare. Also process measures, such as vaccine administration, can be used with outcome measures.

> State Response: The state has included structure, process, and outcome measures in DPP BHS. We will continue to do so, as the structures are encouraging DSRIP-informed best practices that impact improvement in health outcomes. It is our understanding that CMS does not require year-over-year improvement in structure measures and prefers process and outcome measures for the pay-for-performance components of these programs.

**CMS Response (9/24/2021):** Thank you for the state's response. CMS' understanding is the state has revised this preprint so that the payments under this payment arrangement are no longer conditioned upon performance. CMS' understanding is the inclusion of structure, process and outcomes measures for TIPPS refers to the evaluation of the payment arrangement and/or provider eligibility for the class. If this is incorrect and any component of TIPPS requires payments conditioned upon performance, the guidance provided earlier for QIPP Components 2-4 would apply.

**State Response (9/29/2021):** Noted. The State confirms that CMS' understanding is correct and in Year 1 DPP for BHS will not include any payments conditioned upon performance.

11. Texas DPPs feature measures intended exclusively as improvement over self (IOS) measures or benchmark measures. If a measure is exclusively a benchmark measure, is it not acceptable for a provider to maintain performance above the benchmark? **CMS Response**: As previously discussed under QIPP, where payment is conditioned upon performance on a quality measure and the state wants to use a set benchmark that a provider must achieve to earn payment (e.g., a statewide or national benchmark), the state must adopt a requirement that if the provider already was achieving the benchmark at the start of the performance period, they would have to demonstrate period over period performance (e.g., year over year or quarter over quarter). We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure.

State Response: The state will assess using IOS goals for providers who are performing above the benchmark goal. For CHIRP, DPP BHS, RAPPS, and TIPPS, the requirement to demonstrate year-over-year improvement is something that will be evident in the evaluation and structure of the second year of these programs. As proposed, the first year of these programs will establish baselines.

**CMS Response (9/24/2021):** Thank you for the state's response. CMS' understanding is the state has revised this preprint so that the payments under this payment arrangement are no longer conditioned upon performance. CMS' understanding is the inclusion of structure, process and outcomes measures for TIPPS refers to the evaluation of the payment arrangement and/or provider eligibility for the class. If this is incorrect and any component of TIPPS requires payments conditioned upon performance, the guidance provided earlier for QIPP Components 2-4 would apply.

**State Response (9/29/2021)**: Noted. The State confirms that CMS' understanding is correct, and in Year 1 DPP for BHS will not include any payments conditioned upon performance.

12. Would maintenance of a rate of performance for a high performer be acceptable? **CMS Response:** We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark.

State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for recognizing the option for maintenance of a high-performance rate. HHSC will

consider the CMS recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement will be evident in the evaluation and structure of the second year of these programs.

**CMS Response (9/24/2021):** Thank you for the state's response. CMS' understanding is the state has revised this preprint so that the payments under this payment arrangement are no longer conditioned upon performance. CMS' understanding is the inclusion of structure, process and outcomes measures for TIPPS refers to the evaluation of the payment arrangement and/or provider eligibility for the class. If this is incorrect and any component of TIPPS requires payments conditioned upon performance, the guidance provided earlier for QIPP Components 2-4 would apply.

**State Response (9/29/2021):** Noted. The State confirms that CMS' understanding is correct, and in Year 1 DPP for BHS will not include any payments conditioned upon performance.

13. Refine the evaluation plan for BHS to ensure that the effect of the BHS state directed payment, absent other programmatic changes or other state directed payments, can be appropriately evaluated by the state, including a sound attribution methodology. The state must provide consistent baseline data to demonstrate year over year changes.

**State Response:** The state is working with our EQRO contractor to refine an attribution methodology for each program. There are some measures included in the evaluation which cannot be limited to providers participating in the DPP. Some of the measures that cannot be attributed exclusively to one DPP provider are CMS core set measures recommended by CMS for DPP evaluations. In light of the call with Texas on August 24 and CMS' acknowledgement, we will proceed with maintaining the CMS core set measures selected for the respective evaluations, even though they cannot be attributed only to providers participating in the corresponding DPPs. HHSC is open to providing one annual DPP evaluation which breaks out DPP-specific attribution measures, as CMS suggested in the August 24, 2021call with Texas.

14. Does CMS have any other recommendations for how to isolate the impact of the DPP other than the work HHSC is undertaking with its contractor to do so? **CMS Response: Please refer to the overarching comments at the top of this paper.**

State Response: Please refer to our responses to CMS's overarching comments.

With respect to baseline year, in a phone call on January 27, 2021 with CMS, HHSC proposed using CY 2020 and CY2021 as baselines because of the timing of the beginning of the program (CY 2021 would include 4 months of the start of the program) and the impact of COVID. Using the two years was intended to capture that context for future measurement. CMS indicated the proposal made sense. If CMS prefers that we use only one year, HHSC could use CY 2021 for the new DPP BHS evaluation measures. However, this would delay further any evaluation of the programs because of data lags (please see page 4-5 of the DPP BHS updated evaluation plan for timeline of available data).

With respect to year-over-year improvement, it is the state's goal to have improvement year-over-year, but we are also cognizant of not being able to set goals at this point because of the unknown impact of the PHE.

15. Does CMS have a recommendation for how the state can address this issue in the evaluation plan? **CMS Response**: CMS recognizes all healthcare systems have been impacted by COVID and that year-over-year improvement will be challenged by the PHE. We take that into consideration in our review of quality improvement efforts. We anticipate that the PHE will be part of the narrative and outcomes of the SDP evaluations including how COVID impacted the evaluation findings.

State Response: We will include this in the submitted evaluation discussion. Does CMS have concerns with the goals and targets we have included in the plans?

**CMS Response 9/24/21**: Our concern is that the state has not identified any overall quality improvement targets for the SDPs. The state will need to provide those overall quality improvement targets (for each measure) for SFY 2023; that timeframe allows the state to see 2021 data and adjust for COVID.

**State Response (9/29/2021):** As acknowledged by CMS, the SFY2022 preprints will not include improvement targets as baseline data is pending. The State will include initial improvement targets for achievement in CY2022 in the SFY2023/Year 2 preprint submissions. However, the State may submit an addendum to update these improvement targets during SFY2023 after CY2021 data are available (estimated in summer/fall 2022).

16. Would maintenance of a high-performance rate within an allowable threshold (but still above national benchmarks, for example) be acceptable? **CMS Response:** We recognize that there may be high-achieving providers that already surpassed the benchmark and show moderate fluctuations in performance that are natural fluctuations in performance. To address this, we would recommend that when measuring performance over self, the state allow for maintaining performance within the trend for the national benchmark for each measure. For example, if the national or statewide benchmark dipped by 1% from the previous period to the current period, providers who are already over the benchmark and maintained their performance measured at the individual facility level within a margin of +/-1 percent or improved by more than that would earn payment; if the same facility declined in performance by more than 1%, they would not receive payment even if their performance is over the benchmark.

State Response: As proposed, the first year of these programs (CHIRP, DPP BHS, RAPPS, and TIPPS) will establish baselines. As such, the state will not make these adjustments in administrative rule or the preprints at this time. Thank you for recognizing the option for maintenance of a high-performance rate. HHSC will consider the CMS recommendation for its second-year program designs. The requirement to demonstrate year-over-year improvement will be evident in the evaluation and structure of the second year of these programs.

**CMS Response (9/24/2021):** CMS' understanding is that each of the preprints listed here have moved to include only uniform increases where payment is conditioned upon utilization and not performance. If any of these proposals condition payment upon performance, then

| | |
|---|---|
| | changes to account for this will need to be made in alignment to feedback previously provided. See comments above related to QIPP.<br><br>**State Response (9/97/2021):** The State confirms that CMS' understanding is correct. In Year 1 all components of CHIRP, TIPPS, RAPPS, and DPP for BHS will be uniform increases where payment is conditioned upon utilization and not performance. In QIPP, Components 2, 3, and 4 will remain value based payments conditioning payment upon performance.<br><br>**CMS Response (9/24/2021):** The revised preprint for BHS includes the following sentence in the response to Question 8, "Texas will discuss with CMS specifics related to Component 3 on the call scheduled for September 16, 2021." Please revise the preprint to remove this sentence.<br><br>**State Response (9/97/2021):** The State has removed the sentence in the updated Question 8. |
| Sources of Non-Federal Share (IGTs, Bonds, and Debt Instruments) | CMS and the state must ensure that sources of non-federal share (including bond revenues, and other debt instruments, that localities use to source inter-governmental transfers) comply with section 1903(w) of the Social Security Act and implementing regulations at 42 CFR Part 433.<br><br>1. Please confirm that Texas currently does not collect information related to the entities that purchase bonds (and other debt instruments) that are used to finance the non-federal share of Medicaid payments from localities that provide inter-governmental transfers.<br><br>**State Response:** Texas confirms this statement.<br>**CMS Response:** Thank you for confirming. CMS continues to have concerns over the use of bond and other debt instrument revenues as the source of IGTs used to finance the non-federal share of Medicaid payments to the extent private Medicaid providers (or provider-related entities) participate in such financing and receive Medicaid payments. We advise Texas to develop an oversight plan that examines the underlying sources of local non-federal share that rely on bonds or other debt instruments, including gathering the information described in question #2 below for bond or other debt instruments that involve financing Medicaid payments, to understand whether and how Medicaid providers (or provider-related entities) are participating in the arrangements through the purchase of bonds or other debt instruments and/or the receipt of payments supported by the revenue raised.<br>State Response: Thank you for this feedback; we are glad that this matter can be considered closed for the purposes of consideration of our pending SDP approvals. Texas will take this under advisement as the monitoring protocols are finalized.<br><br>2. Please provide an assurance that Texas will develop an oversight plan for local non-federal share financing, whereby the state will collect and maintain information from localities detailing (at a minimum):<br>    a. The names of entities that purchase bonds (or other debt instruments) used to finance the non-federal share of Medicaid payments.<br>    b. Identification of any providers or provider-related organizations that are bond (or other debt instruments) purchasers.<br>    c. Identification of any providers or provider-related organizations that are bond (or other debt instruments) purchasers and that either: receive Medicaid payments directly or are within a provider class that receives Medicaid payments. |

d.  For any entity identified under (c), the total dollar amount of the bonds (or other debt instruments) the entity purchases and the amount of Medicaid payments the entity (or provider class) receives.

**State Response:** Texas is developing a comprehensive monitoring and oversight plan for local funds used in the Medicaid program.  To the extent that a local or state governmental entity is in possession of information about bond purchasers (or other debt instruments), Texas would be willing to obtain and provide this information to CMS.  However, as discussed on the August 20, 2021 call between Texas and CMS, Texas is unsure that governmental entities that have bonds issued by an underwriter or financial institution who sells the bonds through a normal bond market would be in possession of this information.  As a result, Texas requests that CMS provide to Texas for use in the development of the oversight plan:

(1) a clear description of the circumstances in which the information sought above is required (I.e. for all bond offerings by a governmental entity or only for a bond issued for specific purposes);

**CMS Response:** CMS is not requesting Texas report this information to CMS at this time. We advise the state to conduct oversight on the sources of non-federal share that are used to finance Medicaid payments and to thoroughly understand the underlying sources of financing that localities rely upon to source IGTs.  Based on information previously provided by the state, there appear to be at least 9 entities (listed below) that may rely on bonds or other debt instruments as a source of revenue to fund IGTs that are used as the state's non-federal share of Medicaid expenditures.  We would urge the state to examine the sources of financing that these entities use to source IGTs as a starting point in your oversight efforts and to further work with localities to identify where bonds or other debt instruments are used to finance the non-federal share of Medicaid payments.

| SDA | Name of IGT Entity |
|---|---|
| Dallas | Dallas County Hospital District (Parkland) |
| MRSA West | Texas Tech University Health Science Center-Permian Basin |
| Lubbock | Texas Tech University Health Sciences Center AMA |
| CORYELL COUNTY MEMORIAL HOSPITAL AUTHORITY | |
| DECATUR HOSPITAL AUTHORITY | |
| FANNIN COUNTY HOSPITAL AUTHORITY | |
| SMITHVILLE HOSPITAL AUTHORITY | |

| UVALDE COUNTY HOSPITAL AUTHORITY | I |
|---|---|
| Metrocare | |

State Response: Thank you for this feedback; we are glad that this matter can be considered closed for the purposes of consideration of our pending SDP approvals. Texas will take this under advisement as the monitoring protocols are finalized. Texas does wish to clarify that the notation in TIPPS that Dallas County Hospital District (Parkland) does not have taxing authority was made in error; Parkland does have authority to levy ad valorem taxes. Additionally, while Tech Texas University's specific campuses noted in our submissions do not directly receive appropriations from General Revenue, The Texas Tech University System does receive appropriations and uses those appropriations to fund the operations of the campuses, including the two campuses referenced here, under their authority.

(2) a clear description of an exemption to the requirement of providing this language if a governmental entity can attest that they are not in possession of and have no knowledge of who has purchased the bonds, if the bonds are available for purchase to the general public through a routine bond issuing transaction; and

**CMS Response:** While there may be circumstances where bonds or other debt instruments are routine and generally available for the general public to purchase that would not involve a non-bona-fide provider related donation, we do not believe that an attestation by a government entity that it does not have knowledge of the purchasers of its bonds or other debt instruments would be sufficient to ensure state compliance with federal statutory and regulatory limitations on the permissible sources of non-federal share. We urge Texas to gather information from local entities that contribute to the non-federal share of Medicaid payments, so the state has a full accounting of the entities, including bond and other debt instrument purchasers whose purchase funds support IGTs, that contribute to the financing. To the extent that a locality has information to substantiate an attestation that providers or provider-related entities are not participating in bond or debt instrument issuances, such an attestation may be sufficient evidence of compliance with federal requirements concerning non-bona fide provider-related donations.

State Response: Thank you for this feedback; we are glad that this matter can be considered closed for the purposes of consideration of our pending SDP approvals. Texas understands that CMS, per CMS' statements above, is not requiring this information to be furnished at this time or for approval of the SDPs and is offering this feedback for Texas' consideration as the Local Funds Monitoring protocols are developed. We look forward to finalizing our protocol in cooperation with local governments in Texas and sharing the finalized protocols with CMS in due time.

(3) clarity on how frequent this reporting would be due.

**CMS Response:** We again clarify that CMS is not suggesting that the state furnish this information to CMS on any regular basis; rather, the state should gather and review the information to ensure compliance with federal requirements and support claims for federal financial participation. CMS is only seeking for Texas to conduct sufficient oversight to

ensure it can credibly assure that it is complying with federal statutory and regulatory requirements for federal financial participation. Given the questions that surround the use of bonds and debt instruments and concerns over non-bona-fide provider related donations, gathering such information is crucial for state oversight to ensure compliance with federal requirements. In addition, communicating expectations to localities on their responsibilities to ensure compliance with federal Medicaid requirements is important when localities are providing funds to the state to support the non-federal share of Medicaid payments. We suggest that Texas work with localities on the timeframe for gathering information necessary to support compliance with non-federal share financing requirements and that the state receive this information in alignment with the timing of transfers from localities to the state Medicaid agency through IGTs. To the extent that Texas holds IGT agreements with local entities that contribute to the non-federal share of Medicaid payments, the state might consider modifying the agreements to require the provision of information on the underlying source(s) of the transferred funds on a specified schedule.

State Response: Thank you for this feedback; we are glad that this matter can be considered closed for the purposes of consideration of our pending SDP approvals. Texas understands that CMS, per CMS' statements above, is not requiring this information to be furnished at this time or for approval of the SDPs and is offering this feedback for Texas' consideration as the Local Funds Monitoring protocols are developed. We look forward to finalizing our protocol in cooperation with local governments in Texas and sharing the finalized protocols with CMS in due time. Texas does not have any agreements with local entities to contribute the non-federal share for SDPs, but if any are developed in the future, we would take this guidance under consideration.

3. CMS understands that the state is in the process of setting up an oversight group related to the financing mechanisms described in this state directed payment preprint. Please describe steps in the near-term that the state will use to effectively oversee how these program payments are funded by the state or local units of governments.

**State Response:** S.B. 1 (Article II, Health and Human Services Commission, Rider 15), 87th Texas Legislature, Regular Session, 2021, authorizes additional staff to HHSC for increased monitoring and oversight of the use of local funds and the administration of new directed-payment programs. Texas plans to utilize the resources to implement additional oversight and monitoring as described in Attachment B.

**CMS Response:** Thank you for this information, we will consider it with the other information you provide in reviewing your requested State Directed Payments.
State Response: Noted.

| Sources of Non-Federal Share (Locality Taxes and LPPFs) | To ensure compliance with section 1903(w)(4) of the Social Security Act and implementing regulations in 42 CFR 433.68(f)(3), please provide the following: <br> 1. A table using the most recent data available to the State, of every LPPF in the State, including the name of the unit of local government that operates the LPPF, the hospitals that are taxed in the LPPF, and the amount that each hospital is taxed, and the amount of payments funded by the tax. |
| --- | --- |

State Response: Since there was no additional feedback or questions from CMS on this item, Texas understands that this matter can be considered resolved for the purposes of consideration of our pending SDP approvals.

**State Report:** Please see Attachment C, which is the most recent final data we have at this time.

2. Written attestation from the state that:
   a. No localities impose a tax where all hospitals paying the tax receive their total tax cost back in the form of Medicaid payments funded by the tax (including localities that impose a tax on a single hospital).
   b. No localities impose a tax on hospitals that are not located within the boundaries of their jurisdiction.
   c. That the state will actively oversee how the locality taxes and LPPF arrangements meet federal requirements on an ongoing basis.

**State Response:** The state attests that the above is true and accurate. With respect to item (2)(c), HHSC clarifies that HHSC does not have regulatory authority over nor oversees the operation of any LPPF. As a result, HHSC is limited to actively overseeing the arrangements for the specific and exclusive determination that the revenues transferred to HHSC for use in the Medicaid program meet applicable state and federal requirements for using funds in the Medicaid program.

3. Written attestations from all participating hospitals that they do not participate in arrangements, through written agreements or otherwise, which involve participating hospitals transferring, redirecting, redistributing (including through pooling arrangements) Medicaid payments to other Medicaid providers, directly or indirectly.

**State Response:** The state takes seriously its responsibility to ensure compliance with all federal financing requirements. In compliance with the relevant statute and CMS's published rulemaking and state reporting requirements, the state has implemented an LPPF monitoring requirement to ensure that units of local government with authority to operate an LPPF do not have any statutes, regulations, or policies that could constitute such a guarantee. However, it must be noted that the law CMS purports to be enforcing refers to arrangements in which the State or other unit of government imposing the tax provides for any payment that guarantees to hold taxpayers harmless. As CMS explained in its February 2008 final rule, "the element necessary to constitute a direct guarantee is the provision for payment by State statute, regulation, or policy." 73 Fed. Reg. 9694. Neither § 1903(w)(4) nor § 433.68(f)(3) give CMS the authority to regulate (or to require States to regulate) transactions between private providers in which the State is not involved. Therefore, Texas requests that CMS clarify the following:
(1) Given that CMS withdrew the proposed rule that would have expanded the circumstances in which a direct guarantee will be found to exist, what is CMS's legal authority for finding a direct guarantee when a governmental entity is not a party to the arrangement?

(2) Can CMS provide the statute or regulation that specifically restricts or directs how a Medicaid provider may use reimbursements received for services delivered in the Medicaid program once received by the provider?

CMS Response:
1. CMS is concerned that a hold harmless arrangement as described in section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f) exists if a locality imposes a health care-related tax in which all taxpaying hospitals receive their total tax cost back in the form of Medicaid payments or other payments. The state recently affirmed that no localities impose a tax where hospitals receive some or all of their tax cost back in the form of Medicaid payments. However, the state did not provide complete data requested by CMS to support its affirmation (i.e., based on the most recent data available to the state, identifying every LPPF in the state, including the name of the unit of local government that operates the LPPF, the hospitals that are taxed, and the amount that each hospital is taxed, and the amount of Medicaid payments funded by the tax made to each hospital).

Please provide the requested data or explain why it is unavailable. In either case, please explain how the state is able to affirm that no localities impose a tax where taxpaying hospitals receive their total tax cost back in the form of Medicaid payments if it does not have and/or has not considered the requested information.

State Response: The state reaffirms our prior attestation that items 2(a), (b), and (c) of this subsection of correspondence is true and accurate. With respect to item (2)(c), HHSC again clarifies that HHSC does not have regulatory authority over nor oversees the operation of any LPPF. As a result, HHSC is limited to actively overseeing the arrangements for the specific and exclusive determination that the revenues transferred to HHSC for use in the Medicaid program meet applicable state and federal statutes and regulations for using funds in the Medicaid program.

As described on our call on September 1, 2021, Texas understood the attestation to the first portion of the items described above to speak to a guarantee in payment methodology for programs funded by intergovernmental transfer funds to consider the source of the IGT (who has paid into a provider tax) to ensure that the providers all receive sufficient Medicaid payments to offset the amount of their taxation. None of the program methodologies consider the source of the funds which is why Texas felt comfortable attesting. Additionally, for the proposed SDPs, like in the Uncompensated Care Program, IGTs received from local entities are pooled by service delivery area so it is not possible to directly tie IGT received by the state that is funded via an LPPF assessment to the Medicaid payments received by a provider as the dollars are not used in a one-to-one relationship (i.e. payments are not conditioned upon receipt of IGT).

However, due to CMS' clarification that CMS wished the state to examine whether entities that are subject to a mandatory payment to a local government through an LPPF happen to receive payments equivalent or exceeding the amount received by the hospitals in that area from Medicaid payments, Texas undertook the analysis, though the results have no bearing on the determination that a hold harmless exists or not. When completing the analysis using Fiscal Year 2020 (the most recent year for which there is a complete year of data for both Medicaid payments and LPPF-related reporting), there were 28 entities that had authority to operate an LPPF. Of the 28 entities that had authority to operate, 26 were active and assessed mandatory payments on providers in their respective jurisdictions. Of the 26 that assessed mandatory payments, there was at least one hospital in the jurisdiction that did not receive Medicaid payments in an amount greater than or equal to the amount paid by the entity to the LPPF.

In the case of the 2 jurisdictions (Ellis and McClennan Counties) where the providers all received Medicaid payments in an amount that exceeds the amount paid by those hospitals to the Governmental Entity operating the LPPF, the non-federal share required to support the Medicaid payments made to those providers far exceeds the total amount paid via assessment for the LPPF. In the case of Ellis County, more than 28 percent of the non-federal share necessary to support the payments to the providers exceeds the amount paid by the hospitals to the Governmental Entity operating the LPPF. In the case of McClennan County, more than 37 percent of the non-federal share necessary to support the payments to the providers exceeds the amount paid by the hospitals to the Governmental Entity operating the LPPF. Therefore, there is clear evidence that the receipt of Medicaid payments is unrelated to the amount of funds paid by the Provider to the Governmental Entity operating the LPPF, consistent with HHSC's prior representations that no direct guarantee between LPPF-related payments to a local government and the amount of Medicaid payments received by the hospital exists. The Medicaid payments to those hospitals were clearly supported by non-LPPF-related non-federal share funds transferred by an entity using public funds exceeding collected LPPF paid assessments and no direct or indirect guarantee exists. Mandatory LPPF receipts are wholly unrelated to the payment methodologies used by HHSC. HHSC believes strongly that this is clear evidence that no hold harmless arrangement exists between the local government or the state for those providers.

A copy of the analysis described above can be found in Attachment B.

**CMS Response (10/18/2021)**: CMS remains concerned that a hold harmless arrangement as described in section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f) exists if a locality imposes a health care-related tax in which

all taxpaying hospitals receive their total tax cost back in the form of Medicaid payments or other payments.

We recognize that HHSC maintains that it does not have regulatory authority over nor oversees the operation of any LPPF. Has the state or HHSC enacted, issued, or provided any statutory requirements, regulations, policy guidance, or training to localities regarding which localities are eligible to impose health care-related taxes in Texas? If so, please explain and provide documentation as applicable.

**State Response (10/22/2021)**: As CMS is aware, there are two jurisdictions where all hospitals subject to the tax receive Medicaid payments in excess of their LPPF tax burden. HHSC has demonstrated that the Medicaid payments hospitals receive in these jurisdictions are (1) not positively correlated to the tax amount or to the difference between the Medicaid payment and the tax amount, (2) do not vary based on the tax amount, and (3) neither the state nor local government imposing the tax provides any direct or indirect guarantee that the provider will be held harmless for the tax amount. As a result, HHSC understands the funds from these jurisdictions to be permissible provider taxes eligible to be used as the non-federal share.

Each governmental entity with individual authority to operate a LPPF is granted such authority through statute. See Texas Health and Safety Code, Chapter 288 *et seq*. During the 86th regular session, The Texas Legislature authorized any locality with taxing authority to move forward with an LPPF on a limited basis. To date, no additional entities have pursued establishing an LPPF outside those specifically authorized through individual legislation.

With regard to training and policy guidance, since as far back as spring of 2019, HHSC has reiterated its willingness to work with CMS on how the newly established Local Funds Monitoring team should conduct its oversight. CMS has not provided feedback to that end.

However, as CMS is aware from our prior responses, HHSC has begun to develop a monitoring plan, sought public comment, and continues to identify potential inquiries, training, data collection, on-site visits, and a robust annual survey for all local governmental entities that provide non-federal share funds through IGT or CPE. Like CMS, HHSC's goal is to ensure that local governments are providing permissible funding as the non-federal share. HHSC seeks to ensure that no local government is involved in any arrangement that would lead its funds to be impermissible for use in the Medicaid program. HHSC remains open to collaboration with CMS to thoroughly carry out this mission to the extent supported by federal and state statutes and regulations.

2. In accordance with 1903(w)(6) of the Social Security Act and the implementing regulations at 42 CFR 433 Subpart B, CMS has requested copies of "mitigation agreements" or similar agreements in place between or among

LPPF-participating providers and/or the LPPF, to ensure that health care-related taxes imposed by Texas localities that generate funds used as the source of the state's non-federal share of Medicaid payments, meet statutory and regulatory requirements. CMS is concerned that these agreements may be part of a hold harmless arrangement that would violate section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f)(3) because there appears to be a "reasonable expectation" that the taxpaying hospitals – whether directly through their Medicaid payments or due to the mitigation agreements or other agreements – are held harmless for at least part of their tax cost.

Absent copies of these agreements, CMS requests the state provide CMS an assurance, through an attestation, that no arrangement exists, through written agreements or otherwise, which involves participating hospitals transferring, redirecting, and/or redistributing (including through pooling arrangements) their payments supported by the tax to other Medicaid providers, directly or indirectly. CMS further requests the state obtain the necessary information from each LPPF-participating provider and/or the LPPFs, as the state may need, to support the state's attestation that no such arrangements exist.

State Response:
Texas attests that all units of government and the hospitals within their jurisdictions are in compliance with 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f). Texas attests the units of local government imposing a mandatory payment (a.k.a. Local Provider Participation Fund (LPPF)) do not provide for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly guarantees to hold taxpayers harmless for all or any portion of the tax amount. Texas attests that neither the state or any unit of local government within the state issue a payment directly or indirectly to any participating hospitals such that the hospital could compel an agreement from another hospital to transfer, redirect, and/or redistribute (including through pooling arrangements) payments supported by LPPF revenues.

CMS Response (9/24/2021): Thank you for the responses and additional information provided on the LPPFs for the round 2 responses. Based on the review of this information, we have a few additional questions:
1. On our call on 9/20/2021, the State of Texas explained that one reason why Attachment C, provided on 8/25/2021, may have listed LPPFs in some counties as not having any assessed hospitals is that these counties had newly instituted LPPFs and the data provided covered only one quarter (3rd quarter FY 2021). However, in Attachment B that the State of Texas provided on September 15, 2021, which covers an entire fiscal year, FY 2020 (Attachment B provided), 36 hospitals do not appear to be taxed. Please explain why the 36 hospitals in Attachment B are not listed as being taxed if the tax is broad-based and applies to all private providers?

**State Response (9/29/2021)**: In Attachment B, there are 36 instances where there is no entry under the "LPPF Paid Amount;" however, our review of the data sheet shows that 24 of those blanks do not indicate a facility paid no tax:

- 9 of those blanks represent Cherokee County and Nueces County Hospital District, both of which Texas disclosed had LPPF taxing authority, but did not implement an assessment for FFY 2020, so we would expect those to be blank.
- 3 of the rows were blank, where the entire row was unintentionally included, but blank all the way across (Lines 151, 280, and 309).
- 5 blanks seem to be sub-parts of hospitals that were assessed, and paid a mandatory assessment – we will confirm that with the impacted local governmental entities (Lines 83 and 84 are labeled as "part of Texoma Medical Center," Line 269 appears to be part of Mother Frances Hospital, and Lines 270 and 271 appear to be part of UT Health East Texas).
- 7 blanks list duplicative TINs or TPIs for entities which all paid the mandatory assessment, as shown in the line immediately preceding or following such blank, (Lines 29, 132, 160, 193, 194, 257, and 258), and none of which represent a separate entity.

There are 12 facilities listed that did not have an LPPF payment reported. As CMS knows, Texas has been working diligently to create and staff a local funds monitoring team, which will be responsible for researching and determining the cause of these types of data anomalies. While each local government is already bound by Texas statute to assess the LPPF uniformly to applicable facilities, the local funds monitoring team will communicate with each local government to (1) ensure the tax assessments were appropriately administered, and (2) confirm that each local government is following its statutorily required collection procedures for any delinquent taxpayers. Based on our understanding from the local governments participating in the program, tax assessments are levied in accordance with the applicable LPPF enabling statute; therefore, we should infer that any unpaid mandatory assessment shown in the data is a reporting or data error, or is being pursued in accordance with local rules.

| LPPF Governmental Entity | Facility | Explanation of Non-Payment of LPPF for FFY 2020 |
|---|---|---|
| Bexar County Hospital District | Clarity Guidance Center | The mandatory payment in this jurisdiction is imposed on providers that provide inpatient hospital services (Texas Health and Safety Code Chapter 298F). Pursuant to 42 C.F.R. Sec. 440.10, inpatient hospital services are limited to institutions meeting the requirements to participate in Medicare as a hospital. This provider does not meet the requirements to participate in Medicare, is not required to make mandatory payments, and was erroneously included as a paying facility. |

| | | |
|---|---|---|
| El Paso County Hospital District | Foundation Surgical Hospital of El Paso Foundation Hospitals | Taxpayer is Delinquent – HHSC has verified documentation showing collection attempts. |
| El Paso County Hospital District | Rio Vista Behavioral Health | New Facility – did not have sufficient data on which to base an assessment during FFY20. |
| Harris County Hospital District | Altus Baytown Hospital | Taxpayer is Delinquent – HHSC has verified documentation showing collection attempts. |
| Harris County Hospital District | UMMC Providence Hospital of North Houston LLC | Taxpayer is Delinquent – HHSC has verified documentation showing collection attempts. |
| Harris County Hospital District | Sacred Oak Medical Center | Taxpayer is Delinquent – HHSC has verified documentation showing collection attempts. |
| Lubbock County Hospital District | Lubbock Heart and Surgical Center | Taxpayer was Delinquent, but a payment was subsequently received in Q1 of FFY21. |
| Travis County (Central Health Hospital District) | Arise Austin Medical Center | Taxpayer is Delinquent – HHSC has requested documentation of ongoing collection attempts. |
| Travis County (Central Health Hospital District) | Baylor Scott & White Medical Center - Pflugerville | New Facility – did not have sufficient data on which to base an assessment during FFY20. |
| Travis County (Central Health Hospital District) | Lake Travis ER LLC | New Facility – did not have sufficient data on which to base an assessment during FFY20. |
| Travis County (Central Health Hospital District) | The Hospital at Westlake Medical Center | Taxpayer is Delinquent – HHSC has requested documentation of ongoing collection attempts. |
| Williamson County | PAM Behavioral Health of Round Rock | New Facility – did not have sufficient data on which to base an assessment during FFY20. |

2. In a response to round 2 of our questions concerning LPPFs, the State of Texas wrote that every LPPF that assessed mandatory payments on hospitals had at least one hospital that received less in Medicaid payments than it paid in tax. Can the State please explain why four of the LPPFs listed in Attachment B were assessed mandatory payments in which all the hospitals received Medicaid payments in an amount greater than or equal to their tax burdens (for Ellis, Nueces, Cherokee and McClennan Counties)?

**State Response (9/29/2021)**: Texas understands the purpose of the attestation requested (No localities impose a tax where all hospitals paying the tax receive their total tax cost back in the form of Medicaid payments funded by the tax (including

localities that impose a tax on a single hospital)) to be in relation to CMS' expressed concerns that a hold harmless arrangement may exist. The state is providing our attestation that no hold harmless arrangement exists as described in section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f).  Texas has analyzed the data, as requested by CMS, and identified the four jurisdictions noted in this question.  In Texas' Round 2 responses, Texas noted that Nueces and Cherokee counties had authority to operate an LPPF but were not actively operating one during the time period in question; therefore, the mandatory payments assessed to providers was $0. In Ellis and McClennan Counties, there was no correlation between the amount the hospitals paid in mandatory payments to the government entity and the amount the hospitals received in payments from the Medicaid program. Section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f) do not prohibit all providers in a jurisdiction from receiving Medicaid payments that meet or exceed the amount paid by those providers as a mandatory payment to the government jurisdiction.  HHSC reiterates its informed belief that there is clear evidence that no hold harmless arrangement exists.

3. Within Attachment B, in column J of the LPPF data tab, can the State of Texas please clarify the meaning of the column heading "Where LPPF Revenues are a Potential NFS Source"?

**State Response (9/29/2021)**: Column J is the sum of columns G, H, and I. In 2020, these three programs were the only ones that were supported via intergovernmental transfer funds that may have included funds derived from LPPFs.  Therefore, Column J is "Total Medicaid Program Payments Where LPPF Revenues are a Potential NFS Source".  Texas does not construct program payment methodologies where payments in programs have a 1:1 relationship between the source of the non-federal share and the payment amount received by the provider. Rather, most programs utilize a payment methodology that is entirely agnostic of the source of funds; therefore, it is impossible for Texas or any provider to say which specific non-federal share funds were used to support specific payments to providers, as all non-federal share funds are pooled and used to support the payment methodology designed by the state and approved by CMS.

4. The state provided a written assurance in response to a CMS request for an attestation relating to agreements that may be part of a hold harmless arrangement that would violate section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f)(3). However, the attestation does not align with the request because it does not attest that no arrangement exists, through written agreements or otherwise, which involves participating hospitals transferring, redirecting, and/or redistributing (including through pooling arrangements) their payments supported by the tax to other Medicaid providers, directly or indirectly.  Additionally, it does not provide an indication that the state obtained any necessary information from each LPPF-participating provider and/or the LPPFs, as needed, to support the state's attestation that no such arrangements exist.

CMS remains concerned that agreements in place may be part of a hold harmless arrangement that would violate section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f)(3).  Please provide the previously requested information on the agreements and/or the requested attestation.

**State Response (9/29/2021):** CMS and Texas are in agreement as to the importance of ongoing oversight and detailed analysis as to the permissibility of the non-federal share of Medicaid payments. The LPPF arrangements in Texas are designed within the parameters of permissible local health care-related taxes in that they are uniform, broad-based, and do not include a hold harmless arrangement whereby the local government administering the tax provides for any direct or indirect payment, offset, or waiver. CMS has required Texas to attest that there are no oral or written agreements between the local government entities and entities subject to the tax. Texas has done so based on discussions with the entities imposing the tax, as well as confidence in the local governments' compliance with the statutorily imposed requirements.

In addition to such attestation, Texas has provided a monitoring plan for ongoing, comprehensive, and detailed oversight of the LPPF programs to ensure continued compliance with federal statute and regulations governing the non-federal share. The Texas legislature has provided resources, and Texas is progressing on the goal milestones that were submitted to CMS, including hiring a Director for Local Funds Monitoring who is building a team to perform this critical function. The monitoring team will have a primary directive of performing deep-dive analyses of LPPF arrangements to verify the permissibility of the local funds being used to finance the non-federal share of Medicaid payments, as required of the State Medicaid Agency.

CMS has also requested that Texas require each local government to make a similar attestation. Texas is willing to incorporate a new certification for local governments that would be required during LPPF reporting. The potential certification would state:

> I hereby certify that there are no agreements, whether written or oral, between this unit of local government and any entity subject to the mandatory assessment whereby an entity subject to the tax is held harmless as described under Social Security Act §1903(w)(4) and 42 C.F.R. §433.68(f)(3).

We are hopeful that such certification will be part of the reporting process following the next reporting system update.

The federal provider tax law CMS cites only gives CMS (and, consequently HHSC) authority to reject local funds where a tax is not broad based, is not uniform, or where the unit of government holds a taxpayer harmless from the tax; the law does not authorize CMS to deny state share funds based upon the existence or non-existence of agreements exclusively between private entities. As Texas has made clear in its responses, HHSC does not have regulatory authority over private agreements amongst non-governmental actors. HHSC requested CMS' feedback on what legal basis CMS relies on to require Texas to make such an attestation. CMS has been unable to provide a persuasive explanation for its interpretation of the law, nor did CMS provide specific feedback on what statutory or regulatory provision restricts Medicaid providers use of funds once earned by the provider. Texas made and stands by its attestation:

Texas attests that all units of government and the hospitals within their jurisdictions are in compliance with 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f). Texas attests the units of local government imposing a mandatory payment (i.e., Local Provider Participation Fund (LPPF)) do not provide for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly guarantees to hold taxpayers harmless for all or any portion of the tax amount. Texas attests that neither the state or any unit of local government within the state issue a payment directly or indirectly to any participating hospitals such that the hospital could compel an agreement from another hospital to transfer, redirect, and/or redistribute (including through pooling arrangements) payments supported by LPPF revenues.

**CMS Response (10/18/2021)**: CMS remains concerned that agreements in place may be part of a hold harmless arrangement that would violate section 1903(w)(4) of the Social Security Act and 42 CFR 433.68(f)(3). CMS refers the state to the original question above for the requested statutory and regulatory basis for requesting such information/the attestation. CMS is reiterating its previous request for information the agreements and/or for the requested attestation.

Additionally, recognizing that HHSC maintains that it does not have regulatory authority over private agreements amongst non-governmental actors, HHSC has previously acknowledged to CMS that it is aware of the referenced agreements. Please explain how the state became aware of the agreements and provide a description of how the arrangements work based on the HHSC's current understanding.

**State Response (10/22/2021)**: In December of 2018, HHSC was made aware that private hospitals in at least one jurisdiction had orally agreed – exclusively amongst private entities and without the involvement of a taxing authority – to ensure that hospitals subject to the tax were "not unduly burdened" by the existence of an LPPF. HHSC received this information from a consultant for private hospital systems that did not specify either the jurisdiction in which these oral agreements or mutual understandings had taken place, nor did the private hospital consultant clearly describe what the parties had agreed to amongst themselves. HHSC called the then-Director of CMS' Financial Manamgent Group to notify CMS of this information and seek guidance. Shortly thereafter, HHSC received written approval of the LPPF structures in Dallas and Tarrant Counties from CMS, which Texas relied upon in accepting IGT from other jurisdictions' LPPFs subsequently.

In 2019, CMS and Texas became aware that a private consultant had conducted a presentation describing something the consultant described as "Community Benefit Payments." HHSC has explained to CMS in writing that it became aware of the presentation at the same time CMS did. As HHSC has already informed CMS, following this discovery, HHSC had two conversations with stakeholders to discuss CMS's position on written mitigation agreements. HHSC also had a phone call with

CMS, which was made at the request of stakeholders to find out CMS's position about such written agreements. The purpose of all of these conversations was to ensure both CMS and the stakeholders that HHSC is operating transparently.

Texas has explained to CMS in writing that we had no involvement with the types of arrangements described by the consultant, but that we believed the purported agreements would comply with 42 C.F.R. 433.68. We further stated:

> HHS OIG reviewed similar actions regarding the Missouri DSH program in 2003 and determined that "because the agreements were voluntary between the hospital provider and the MHA/MSC, and because there are no regulations precluding the arrangement, we are not making any recommendations for recovery of the pooled payments in excess of DSH limits." HHSC has reasonably relied on this opinion and current regulations to inform its oversight responsibility.

CMS has provided federal matching funds for DSRIP, UHRIP, and UC, all of which utilize LPPF-derived IGTs as a source of non-federal share.

Now, CMS is asking the same questions and requesting an attestation from HHSC about information that neither CMS nor Texas have authority to seek or consider.

Since the 2019 discovery described above, HHSC has not received any information from anyone that further identifies any details about any written or oral agreements that may exist among some providers in some jurisdictions, including any explicit written confirmation that they do exist at all.

HHSC has not reviewed, approved, or sanctioned any such agreements or arrangements, and does not intend to. However, HHSC will fully investigate the conduct of each governmental entity administering a LPPF and confirm that no governmental entity is engaged in a mitigation arrangement, as such circumstance would create a hold harmless under Social Security Act §1903(w)(4) and 42 C.F.R. §433.68(f)(3).

CMS continues to assert that the attestation from HHSC does not go far enough. On our call Tuesday, October 19, 2021, Texas specifically asked if other states had been asked to make such an attestation. The Acting Director of CMS' Financial Management Group replied that at least one other state had been asked to make a similar attestation, but confirmed that no state has made an attestation that CMS deems satisfactory. CMS fully understands the operation of the LPPF program in Texas, which is consistent with provider taxes that exist in many other states. HHSC may differ from many states in that it has been completely transparent with regard to the operation of its programs, including in December 2018 when HHSC immediately passed along new information to CMS.

There is no legal basis for CMS or HHSC to regulate agreements between non-governmental entities. CMS proposed amending its regulations to create a broader

scope of oversight in this arena, but failed to accomplish such an expansion. HHSC is invested in ensuring the Texas Medicaid population continues to receive services, and to do so, must ensure that Texas providers are paid for services provided to Medicaid patients. HHSC is committed to ensuring that the non-federal share of Medicaid payments comes from a permissible source. Provider taxes in a local jurisdiction are a permissible source so long as they are uniform, broad based, and the taxing entity does not hold a taxpayer harmless from the tax. As stewards of the non-federal share, HHSC has repeatedly asked CMS for a compelling legal basis for regulating agreements between private parties. CMS has not been able to produce that cite.

Texas requests that CMS provide the responses to the questions that we sought answers to on the October 19, 2021 call that CMS was unable to answer at the time. Specifically, please provide the following:

(1) Please identify any state(s) that have been required to submit a similar attestation prior to receiving a state directed payment program approval;

**CMS Response (11/10/2021)**: Similar to Texas, CMS requested an attestation from one other state relating to a state directed payment financing arrangement involving possible redistribution of provider payments. Although the circumstances in Louisiana differ from Texas' LPPF arrangement, Louisiana submitted a state-direct payment proposal that generated questions surrounding the financing of the non-federal share of Medicaid payments, specifically relating to provider-related donations and the redistribution of Medicaid payments. CMS requested that Louisiana provide an attestation from their providers regarding these arrangements (see response to question two for more detail). While CMS was working with the state regarding its payment proposal, including the financing concerns, the state withdrew its proposal and it was not approved. Recently, CMS has engaged with Louisiana on a new payment proposal and CMS and the state are actively working with the state to ensure the non-federal share is permissible.

Missouri committed to CMS to end an apparent pooling arrangement relating to a hospital tax in which Medicaid payments appeared to be redistributed among private providers to hold provider harmless for the hospital tax. Subsequent to this commitment, Missouri submitted a proposed state-directed payment that appears to rely on similar financing arrangements. Recently, CMS has identified concerns with financing arrangement in conjunction with this payment proposal and CMS and the state are actively working to ensure the non-federal share financing meets all federal requirements.

**State Response (11/15/2021):** Thank you for this information. CMS' response indicates that the circumstances in Louisiana and Missouri are dissimilar to Texas' situation except that CMS is also refusing to approve their proposed programs. Based upon the statements above, we understand CMS to be indicating that Louisiana has not submitted completed attestations in writing that satisfy CMS' request, and Missouri has not been asked to submit an attestation at this time.

Can CMS provide any written commitments or documents from the exchanges between CMS and either state where the state explicitly agrees with CMS' position that CMS has legal authority to demand attestations related to private business arrangements where no governmental entity is a party in order to achieve a program approval? If CMS has no documentation to this effect, can CMS explain in what way the comparison to these other states are relevant to Texas' situation?

(2) If any state that has a provider tax was not asked to make such an attestation, please identify them and explain why they were not asked to make such an attestation;

**CMS Response (11/10/2021)**: CMS has required that all states requesting approval of a state-directed payment cease arrangements that are financed by a health care-related tax for which we have knowledge of, or information suggesting that there may be, an arrangement whereby private providers agree to pool and redistribute Medicaid payments for the purposes of holding all providers harmless for the cost of the tax. We are currently working with these states to ensure compliance with federal Medicaid financing requirements.

CMS does not request attestations from all states with a health care-related tax. However, CMS has not identified apparent hold harmless arrangements in all states with a health care-related tax. Despite numerous requests, Texas has not provided the information needed to ensure the LPPF arrangements used to fund the state directed payments meet federal requirements. With only very limited information from the state on the LPPF arrangements, CMS has relied on publicly available third-party materials[1] for more complete information about the arrangements. Texas has not denied that the information provided in those materials is an accurate description of how the LPPFs operate in Texas. As previously requested in our regular meetings and via email exchanges, we request the state respond to the five items below in writing. We are seeking a clearer understanding of the specifics of the redistribution aspect of the LPPF arrangements, and for copies of any agreements that might be in place. Although the state has explicitly acknowledged the agreements exist among providers, it has indicated to us that it "has not reviewed, approved, or sanctioned any such agreements or arrangements, and does not intend to." The statute and implementing regulations prohibit hold harmless arrangements without consideration of whether the state has "reviewed, approved or sanctioned" them. Based on the available information, it appears that LPPF-participating parties (and the state, due to its knowledge of the existence of the LPPF arrangements) reasonably expect that taxpaying hospitals are held harmless for all or a portion of the tax. Further, Texas has not disputed the mechanics of the arrangement described in the third-party materials. We have repeatedly provided the state an opportunity to demonstrate that the hold harmless arrangements described are not in place or have ended, including through attestations from the state or participating providers. These attestations

---

[1] https://lonestarhfma.org/wp-content/uploads/2015/06/170801-David-Salsberry.pdf

are not specifically required by law, but we have offered them as a way for CMS and the state to avoid the more resource-intensive, back-end investigations into exactly how the LPPF arrangements work in each locality, which otherwise could be necessary in connection with deferrals or disallowances of FFP.  So far, the state has only offered us a limited assurance that covers only units of government and does not cover any private providers that participate in LPPF arrangements, including those that receive Medicaid payments. If the hold harmless arrangements described above do not exist or if Texas has already taken measures to end those arrangements, please provide the following information to demonstrate that the state's non-federal share sources comply with section 1903(w)(4) of the Social Security Act and implementing regulations in 42 CFR 433.68(f)(3):

A.      A comprehensive description of how the LPPF arrangements work, including at the provider level.
B.      Copies of mitigation agreements or similar agreements in place between or among LPPF-participating providers and/or the LPPF and a complete description of how the LPPF mitigation arrangements work, including at the provider level.
C.      As an alternative to providing the agreements in #2, attestations from each participating provider or from the state (attesting on behalf of each provider) that the providers do not participate in arrangements, through written agreements or otherwise (including non-written agreements or understandings that result in reasonable expectations for participating parties), which involve participating providers transferring, redirecting, redistributing (irrespective of state or local government involvement) Medicaid or other payments to other providers, directly or indirectly (irrespective of whether the state or unit of local governments are compelling or sanctioning provider participation).
D.      If all participating providers or the state are able to provide the attestation(s) in #3, a comprehensive description of the process used by the state and providers to ensure the accuracy of the attestation(s) that the arrangements described in #3 have either stopped or were never in effect.
E.      Confirmation that no locality, including Ellis and McClennan Counties, imposes a health care-related tax in which all taxpaying hospitals receive at least their total tax cost back in the form of Medicaid payments or other payments.

**State Response (11/15/2021):** CMS and Texas have a fundamental disagreement on the authority that 1903(w) confers on CMS (and by extension Texas) to examine and consider private business arrangements that may or may not exist in determining the permissibility of the use of funds as non-federal share in the Medicaid program.  Despite the fact that LPPFs have been authorized and in use in the Texas Medicaid program since 2013, and that CMS has repeatedly approved programs that utilize LPPF-derived funds as a method of finance, CMS now seeks to coerce Texas into adopting CMS' position and serving as its agent in pursuing an unauthorized regulatory agenda by threatening deferrals or disallowances and withholding program approvals.  CMS overreaches its authority and is threatening the fabric and stability

of the Texas Medicaid program in an effort to renegotiate terms and conditions that CMS attempted to insert into the 1115 Waiver that was approved in January 2021 (and that Texas rejected due to the lack of legal authority for such Terms and Conditions). The discussion between CMS and Texas on CMS' unreasonable interpretation of 1903(w) has been ongoing for almost 3 years – and CMS has approved multiple programs in Texas during that time period. There is no reason for CMS to adopt a new position that the programs that utilize LPPF-derived funds in Texas are not approvable.

CMS agreed on April 10, 2019 (more than 20 months after the date of the cited presentation), that it is accurate "that CMS is aware that there may be arrangements out there among providers that you do not particularly like, but that you do not have statutory authority to address, which would include these types of mitigation agreements." (See Attachment A). Can CMS explain on what legal or regulatory basis the agency now believes that it does have this authority, even though the statutes and regulations have not changed?

As the state indicated to CMS in writing in August 2019, the state has been told that some sorts of arrangements between private entities exist, but the state seeks no involvement and has not been involved in any such arrangements…**because it does not have the authority to do so.** (See Attachment B). Texas has repeatedly explained to CMS why CMS (and Texas) do not have the authority to consider, regulate, or prohibit the use of funds in the Medicaid program as a result of private business relationships where no governmental entity is a party.

 Additionally, can CMS confirm that in response to pre-print question 35(c), CMS has only approved programs where a state has answered the question and affirmatively stated that no arrangements exist "amongst healthcare providers and/or related entities"? If not, can CMS provide a comprehensive list of the answers that were provided, by state, and any follow up questions that were sent to a state related to their response to that question, for all programs that have been approved since that question was added to the pre-print template?

With respect to Ellis and McClennan counties, there is no prohibition on all providers subject to a provider tax receiving Medicaid payments that meet or exceed the amount that the taxpayer paid. Rather, 42 CFR 433.68(f) describes three conditions in which a taxpayer will be considered to be held harmless. First, the state or unit of government imposing the tax must provide a **"direct or indirect non-Medicaid payment to those providers or others paying the tax and the payment amount is positively correlated to… the tax amount."** (emphasis added).

Second, the regulation speaks to a condition where the "**Medicaid payment to the taxpayer varies based on the tax amount, including where Medicaid payment is conditional on receipt of the tax amount**." (emphasis added). As previously described, no payment methodology used by the state for any program in which local governments have transferred funds derived from LPPF revenues considers the source of the revenues.

Third, the regulation speaks to a condition where "[t]**he State (or other unit of government imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless…"** (emphasis added). All LPPFs in Texas are operated by local governments who cannot provide for a direct guarantee with respect to Medicaid payments as

HHSC is the sole Medicaid agency for Texas, and local governments are not in a position to direct Medicaid payments or Medicaid payment methodologies used in SDPs. Further, no direct guarantee exists as the state's payment methodologies are not related to the source of funds. The regulation provides for a two-pronged test to determine if there's an indirect guarantee, which considers whether the amount taxed exceeds 6 percent. If the tax amount applied is 6 percent of net patient revenue or less, the tax is permissible. In Texas, all LPPFs by state law are prohibited from assessing mandatory payments that exceed 6 percent, therefore no indirect guarantee exists.

Can CMS please identify where in the statute or regulation all taxpayers are prohibited from receiving their full tax amount in the form of a Medicaid payment if the payments are not correlated to the paid tax amount? Has CMS required all states or jurisdictions where a provider tax is in place to conduct an analysis to examine whether the providers are all receiving their paid tax amounts in the form of Medicaid payments? If not, why not?

If the matter of whether the Social Security Act conveys to CMS (or Texas) the authority to consider fully-private business arrangements in restricting Medicaid funds derived from a provider tax is resolved in accordance with Texas' stated understanding of the law, does CMS agree that CMS would not have the authority to withhold approval of a program proposal due to the possibility that some such private business relationships might exist?

(3) Please provide a template or language that has been used by another state to resolve CMS' concerns related to a similar matter;

**CMS Response (11/10/2021)**: As we indicated in response to question one, no state with outstanding financing issues has included an attestation as a condition of approval for a state-directed payment because we have not reached the approval stage with these states. For example, we requested Louisiana provide such an attestation during the review of its state-directed payment, but Louisiana ended up withdrawing their proposal and it was not approved. Louisiana's situation was similar, but not identical, to Texas's. Instead of a hold harmless arrangement relating to health care-related taxes, the potential hold harmless arrangement in Louisiana related to provider-related donations. Therefore, we do not believe that the specific language requested from Lousiana would directly apply in Texas. For purposes of transparency, the language of Louisiana's proposed attestation, which was still in open discussion between the state and CMS, read as follows, "(Name of Entity/Facility) through the authorized signatory below, hereby certifies that it has no agreements (written or otherwise), or agreements under active consideration, with any hospital provider that would receive Medicaid reimbursement as a result of the directed payment program that would present the possibility of a transfer of value between a public and a private entity for the purposes of providing the state match for the direct payment program to LDH through IGTs." We intend to request similar language in conjunction with any state directed payment with similar provider payment redistribution/hold

harmless concerns during the payment review, adapting the language as necessary to fit the circumstances.

**State Response (11/15/2021):**  Texas appreciates the information.  Texas agrees that the specific language requested from Louisiana would not apply in Texas. Further, since there is no attestation template that has ever actually been used by CMS with another state, it appears that this is a new requirement that CMS is imposing on certain states for reasons that are arbitrary or entirely pretextual.

Given that CMS withdrew the proposed rule that would have expanded the circumstances in which a direct guarantee could have been found to exist, what is CMS's legal authority for finding a direct guarantee when a governmental entity is not a party to the arrangement?[2] Texas is trying but unable to reconcile the contradiction that CMS could approve "the comprehensive hospital increase reimbursement program (CHIRP) for SFY 2022 to reflect only the uniform hospital rate increase program (UHRIP) payment amounts that were approved in UHRIP for SFY 2021"  in August 2021 but now requires modifications to the method of finance when neither the facts nor the law have changed.

(1) Please provide the statutory basis for restricting providers from utilizing Medicaid payments that they have duly earned (either based upon performance or an adjudicated claim) after it has been received by the provider;

**CMS Response (11/10/2021)**: CMS is not imposing new restrictions on how providers utilize Medicaid payments. Providers are free to utilize their Medicaid payments in any manner consistent with federal requirements. However, as CMS has repeatedly explained to Texas, if there is in effect a hold harmless practice with regard to a health care-related tax, as specified by Section 1903(w)(1)(A)(iii) of the Social Security Act, CMS is statutorily obligated to reduce the state's medical assistance expenditures by the amount of such a tax prior to providing FFP to the state.

Medicaid regulations at 42 CFR 433.68(f)(3) state that a hold harmless arrangement exists where a state imposing a health care-related tax provides for any direct or indirect payment, offset, or waiver such that the provision of the payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount. We recognize that the statute clearly permits health care-related taxes and we support states' adoption of these financing strategies.  However, the taxes must be imposed in a manner consistent with applicable federal statute and regulations and cannot include a direct or indirect hold harmless arrangement.  In the preamble to the 2008 final rule amending this provision, CMS wrote that, "[a] direct guarantee will be

---

[2] Even if CMS had finalized MFAR and attempted to expand the circumstances in which a direct guarantee could have been found to exist, CMS's authority would have been limited by Social Security Act § 1903(w)(4), which does not permit CMS to regulate private business arrangements.

found when a State payment is made available to a taxpayer or a party related to the taxpayer in the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax." 73 FR 9685, 9695 (Feb. 22, 2008) (confirming proposed rule preamble statement in 72 FR 13726, 13730 (Mar. 23, 2007)).

As CMS further explained in the same preamble, we used the term "reasonable expectation" because "state laws were rarely overt in requiring that state payments be used to hold taxpayers harmless." 73 FR at 9694. Therefore, hold harmless arrangements are not always overtly established through state law, but can be based instead only on reasonable expectations of certain actions among participating entities.

The state has indicated it is aware of the existence of agreements among at least some LPPF-participating providers. The state has not provided any information to CMS that refutes the third-party description as representative of the LPPF arrangement. By its own statements, dating back to December 2018, the state has been aware that agreements among providers relating to the LPPF may exist. Further, the state acknowledged that it obtained this information through direct conversations with a consultant and through CMS providing the third-party information described above. In the LPPF arrangements, all parties appear to have a reasonable expectation that the taxpaying hospitals, whether directly through their Medicaid payments made by the state (including through proposed CHIRP, RAPPS and TIPPS state directed payments) or due to the availability of the redistributed payments from other taxpaying hospitals, are held harmless for all or a portion of their tax costs. This appears to be a hold harmless arrangement described in section 1903(w)(4)(C) of the Act and 42 CFR 433.68(f)(3).

**State Response (11/15/2021):** CMS has indicated that it is relying on the language in the 2008 rule preamble relating to a provider's "reasonable expectation." However, neither 1903(w) of the Social Security Act nor 42 CFR 433.68 contain the term "reasonable expectation" to define or refine the evaluation of whether a direct guarantee exists. Notably, CMS' guidance in the final rule's preamble provides, "A direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments). A direct guarantee does not need to be an explicit promise or assurance of payment. **Instead, the element necessary to constitute a direct guarantee is the provision for payment by State statute, regulation, or policy** (73 Fed. Reg. 9694 (emphasis added). CMS has been unable to produce a state statute, regulation, or policy that would implicate a guarantee in violation of 42 C.F.R. 433.68(f)(3) because none exist.

Can CMS please specify whether, as described in 73 Fed. Reg. 9694, it has determined there is a provision for payment by Texas statute, regulation, or policy? If CMS cannot identify whether there is a provision for payment by State statute, regulation, or policy, can CMS

please explain under what law Congress has authorized CMS to regulate private business relationships? If no such law exists, can CMS please explain how CMS has chosen to assume powers and duties that have not been conferred upon CMS by Congress?

(2) Please provide clarity on CMS' statements about another state in a "similar situation" to Texas, including a description of what CMS believes constitutes a "similar situation"; and

**CMS Response (11/10/2021):** Please see our response to question one.

**State Response (11/15/2021):** Texas understands from CMS' response to question one that there is no state in a similar situation despite CMS' representations as CMS clearly explained that the situations are factually disparate.

(3) Please provide an estimate on when Texas can expect a response to our September 7, 2021 letter accepting CMS' offer to extend DSRIP for one year, continue UHRIP and QIPP on a temporary basis, and continue to work with Texas to resolve any matters of concern on the 5 pending directed-payment programs.

**CMS Response (11/10/2021):** Texas's September 7, 2021 letter did not accept either option set forth in CMS's August 13, 2021 letter providing specific modifications Texas could make to its SDPs to make them approvable. As we have explained in several of our meetings with the state, there was no agreement on a path forward based on Texas's September 7 letter. Accordingly, we have continued our work with the state on information the state can provide and changes the state can make to its proposed SDPs to demonstrate they are approvable. We have also had discussions since September 7 with the state about an alternative mutually agreeable path forward. We also anticipate sending a letter to the state soon, which will further discuss a path forward.

**State Response (11/15/2021):** Texas looks forward to receiving the letter described above as Texas has not yet been given any meaningful details by CMS about the potential pathway that CMS references. In the conversations we have had to date, CMS has indicated orally, but never in writing, that there are "other vehicles" that CMS is willing to discuss for Texas, but CMS has not provided any details on what these "vehicles" would be, when they would start, what the amount would be, and how the budget neutrality terms would be altered to ensure the long-term stability Texas has sought for the Medicaid providers who have been impacted by COVID-19. Nor has CMS explained why these other vehicles, which presumably could not be implemented until Fiscal Year 2023 at the earliest, prohibit CMS from moving forward with resolving and approving the programs proposed by Texas.

Texas does understand from recent conversations that CMS has had with Texas and with interested Texas stakeholders that CMS has altered the position represented by CMS in the August 13, 2021 letter to Texas. Texas understands that CMS is now indicating that the offer

to extend DSRIP for one-year is only available to Texas if Texas exclusively selects Option 1 as presented in CMS' August 13, 2021 letter and withdraws its requests for approval of TIPPS, RAPPS, and DPP for BHS. Can CMS please confirm that this is correct?

Texas also understands that CMS has determined that it cannot approve any program that is financed using revenues derived from LPPFs – including DSRIP and UHRIP – even though CMS did not include any indication that modifications to the method of finance for DSRIP and UHRIP would be required in the August 13, 2021 letter. Texas further understands that CMS believes that immediate actions to prohibit any private business arrangement that may or may not exist would be required before CMS is willing to approve any program – SDP or otherwise. Can CMS please confirm that this is correct?

CMS has indicated that there is no objection to the existence or use of LPPF-derived funds, merely to the "LPPF arrangements." But the supposed "arrangements" to which CMS refers are not included or authorized by the state statutes that authorize LPPFs in Texas. CMS has made vague references to potential structural remedies that might be available, but Texas has indicated to CMS that LPPFs are authorized by state law and the Texas Legislature's next regularly-scheduled session is not until 2023. However, CMS has stated in spite of this timing, CMS will require actions by Texas immediately. Additionally, CMS has threatened to issue deferrals or disallowances of funds if Texas does not take the immediate actions described previously. Can CMS please confirm that this is correct?

Texas assumes the details about the potential future pathway, including any requirements related to the method of finance for these vehicles, will be included in the forthcoming CMS letter referenced above. If any of the items of understanding that have been identified in the paragraphs above are inaccurate, Texas requests that CMS provide clarity in the anticipated letter.

Texas requests that the letter be provided to Texas no later than November 20, 2021.

We hope that Texas can be treated equitably with all other states as we continue to resolve any outstanding matters that remain after this round of responses. Texas providers are continuing to provide services to Medicaid patients, despite a significant delay in payments as CMS attempts to rehash this issue, but we cannot expect them to continue to do so indefinitely.

Texas Budget Neutrality (BN) Implications Questions on State Directed Payments (SDPs)
- Texas has asked about the budget neutrality (BN) implications for the next year of the demonstration.
- CMS' offer to extend DSRIP is intended to help provide stability over the next year while we continue to work on the SDPs and other approaches to secure the safety net.
- Under current BN policy, the DSRIP expenditures would be authorized as a cost not otherwise matchable (CNOM) and would be reflected on the "with waiver (WW)" side of

budget neutrality for the coming year. In applying the rebasing policy, as articulated in STC 62, CNOM are not included in the without waiver (WOW) baseline.

- The state has adequate savings to absorb these additional DSRIP expenditures for the next demonstration year.
- CMS recognizes the importance of and shares Texas's commitment to maintaining a sustainable approach to safety net hospital reimbursement. The one-year DSRIP extension provides an opportunity for CMS and Texas to continue to work toward a more sustainable, equitable, and high quality safety net.