# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, TEXAS HEALTH AND HUMAN SERVICES COMMISSION, <br><br> Plaintiffs, <br><br> v. <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as Administrator for the Centers for Medicare & Medicaid Services, et al., <br><br> Defendants. | Case No. 6:21-cv-00191-JCB |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO ENFORCE THE PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I. Introduction ................................................................................................................. 1

II. Argument ..................................................................................................................... 2

    I. Because CMS has backed down from several pretextual grounds, a number of the issues raised in the motion are now moot. ................................................... 2

    II. Withholding approval based on nonexistent authority is pretext and violates the preliminary injunction. .................................................................................... 4

        A. Texas's Local Provider Participation Funds ............................................... 5

        B. CMS's Purported Concern with Private-Provider Agreements ................. 5

        C. Agreements between private providers (to the extent they exist) are not hold-harmless provisions. ............................................................................ 6

            1. The plain language of the Social Security Act does not prohibit private-provider agreements. .................................................................... 6

            2. CMS's rule also does not reach private-provider agreements. ............. 9

    III. CMS mischaracterizes STC 39 and the impact of its failure to comply with its terms. ................................................................................................................ 13

III. Conclusion ................................................................................................................ 14

IV. Certificate of Service ................................................................................................ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Entergy Servs., Inc. v. FERC*,
   375 F.3d 1204 (D.C. Cir. 2004) ................................................................................. 9

*In re Nowlin*,
   576 F.3d 258 (5th Cir. 2009) ..................................................................................... 6

*Peabody Twentymile Mining, LLC v. Sec'y of Lab.*,
   931 F.3d 992 (10th Cir. 2019) ................................................................................... 9

*Trout Point Lodge, Ltd. v. Handshoe*,
   729 F.3d 481 (5th Cir. 2013) ..................................................................................... 6

*United States v. Williams*,
   993 F.3d 976 (5th Cir. 2021) ..................................................................................... 6

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) ............................................................................................... 6

**Statutes:**

42 U.S.C.:
    § 1396b(a)(1) ................................................................................................................7
    § 1396b(w)(1)(A) .........................................................................................................7
    § 1396b(w)(1)(A)(iii) ..................................................................................................7
    § 1396b(w)(4) ..........................................................................................................4, 7
    § 1396b(w)(4)(c) ..........................................................................................................4
    § 1396b(w)(4)(C)(i) ..............................................................................................6, 7, 8

Tex. Health & Safety Code:
    ch. 288 ..........................................................................................................................5
    ch. 288–300A ..............................................................................................................5
    § 300.0053 ...................................................................................................................5
    § 300.0102 ...................................................................................................................5
    § 300.0103(b)(1) .........................................................................................................5
    § 300.151 .....................................................................................................................5
    § 300.0151(b) ..............................................................................................................5
    § 300.0154 ...................................................................................................................5
    § 300.0156 ...................................................................................................................5

42 C.F.R.:
    § 433.68(f) ...................................................................................................................9
    § 433.68(f)(1)–(3) .......................................................................................................9
    § 433.68(f)(3) ......................................................................................................4, 6, 9

**Other Authorities:**

Acts 2013, 83d Leg., R.S., ch. 1369 ..................................................................................5

BLACK'S LAW DICTIONARY 820 (Bryan A. Garner et al. eds., 10th ed. 2014) ...............9

Health Care-Related Taxes, 73 Fed. Reg. 9685 (Feb. 22, 2008) .........................9, 10, 11

Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63722 (Nov. 18, 2019) .......12

Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5105 (Jan. 19, 2021) ..........12

# GLOSSARY

| | |
|---|---|
| CHIRP | Comprehensive Hospital Increased Reimbursement Program |
| CMS | Centers for Medicare & Medicaid Services |
| DAB | Departmental Appeal Board |
| DPP for BHS | Directed Payment Program for Behavioral Health Services |
| FMAP | Federal Medical Assistance Percentage |
| FFP | Federal Financial Participation |
| HHSC | Health and Human Services Commission |
| LPPF | Local Provider Participation Funds |
| PHP-CCP | Public Health Providers Charity Care Pool |
| RAPPS | Rural Access to Primary and Preventive Services |
| SDP | State Directed-Payment Program |
| STC | Special Terms and Conditions |
| TIPPS | Texas Incentives for Physician and Professional Services |
| QIPP | Quality Incentive Payment Program |

## INTRODUCTION

Yet again, CMS has proven that it will only comply with its obligations under threat of sanction from this Court. Texas brought the current motion to enforce the preliminary injunction because CMS had been dragging its feet and relying on pretext to deny approval of Texas's state directed-payment programs ("SDPs"). For example, as the motion explained, CMS insisted that Texas's SDPs were not approvable because they were not actuarially sound as required by the Social Security Act—even though CMS admitted that it had not actually performed an actuarial analysis. ECF 75 at 8–10. Days before its attorneys had to explain that discrepancy to this Court, CMS dropped this and other pretextual grounds, agreeing that the SDPs are approvable with the exception of CMS's purported concern with the financing of the non-federal share payments. ECF 79 at 4. CMS had also been demanding that Texas provide attestations from all participating hospitals, ECF 75 at 15–20, which it now admits are not legally required, ECF 79 at 14.

CMS's constantly evolving positions demonstrate why this Court's prompt resolution of the only legal issue that remains as an impediment to approval of Texas's SDPs—whether CMS has the authority to regulate private agreements between healthcare providers—is more pressing than ever. As Texas previously explained, CMS has no authority to regulate (or require Texas to regulate) agreements between private providers that do not involve Texas or a unit of local government. ECF 75 at 15–20. By relying on this nonexistent authority as the sole basis for refusing to approve CHIRP, RAPPS, and TIPPS, ECF 79 at 4, CMS continues to violate the preliminary injunction.

What is worse, on November 15, CMS sent a letter suggesting it will use its "back-end" powers to investigate and recoup federal funds if Texas does not agree to provide the demanded

1

attestations by November 29. *See* Ex. A at 7.[1] While deliberately vague, this letter's implied threat of disallowance is disturbing because that process can only be applied to funds that have already been paid under programs that have already been approved. *See also* ECF 81-5 at 1 (expressly threatening to "enforce compliance by initiating deferrals and/or disallowances of federal financial participation" in the QIPP approval letter); ECF 81-6 at 1 (same for DPP for BHS). Far from demonstrating the good-faith negotiations that CMS's attorneys insist have continued to occur, CMS's letter appears to threaten an expansion of the current dispute if Texas does not capitulate to its demands in the next week.

If that threat were not enough, CMS continues to mischaracterize its obligations under the terms of the January extension regarding review and approval of Texas's PHP-CCP submissions and the ramifications of CMS's failure to abide by those terms.

With both parties having now set forth in detail their positions on the issues that remain, Texas respectfully requests that the Court promptly resolve these remaining disputes,[2] as time is of the essence and the stability of Texas's Medicaid program hangs in the balance.

## ARGUMENT

I. **Because CMS has backed down from several pretextual grounds, a number of the issues raised in the motion are now moot.**

The central theme of CMS's opposition is that Texas's motion is unfounded because "substantive progress" toward approval of Texas's SDPs and PHP-CCP submissions has been made in the three months since the Court enjoined Defendants. *See, e.g.*, ECF 79 at 1. To the extent

---

[1] Unless otherwise noted, references to exhibits are in reference to exhibits to the attached Declaration of Victoria Grady submitted with this reply.

[2] As the Court is aware, it "need not wait for the reply or sur-reply before ruling on the motion." Local Rule CV-7(f).

2

that is true, however, a calendar can confirm that this progress was achieved only after—and directly from—Texas filing the motion. More importantly, because CMS did not address *all* of the grounds for the motion to enforce, the Court's intercession remains necessary.

Texas filed its motion on November 2, explaining how CMS was not abiding by the preliminary injunction and acting in good faith. ECF 75. For example, Texas explained that CMS was withholding approval of Texas's SDPs based on a pretextual claim that the capitation rates were not actuarially sound and that the funding amounts were too large. *Id.* at 8–13. Texas also explained how CMS's position that it had the authority to approve its so-called Option 1 was irreconcilable with the reasons CMS had asserted for refusing to approve QIPP and other SDPs (including DPP for BHS). *Id.* at 13–15.

Only after Texas filed the motion did CMS even begin to move off its dogmatic refusal to negotiate. In its opposition, CMS notes that, on November 10, it provided written confirmation that it had "no additional concerns or questions about the size of the [CHIRP] program," ECF 81-1 at 16, and CMS states that it "informed Texas that there were no remaining concerns about actuarial soundness or the size . . . for any of the five proposed SDPs" on the same day, ECF 81 ¶ 29. Subsequently, on November 15, CMS approved QIPP and DPP for BHS. ECF 81-5; ECF 81-6.

CMS uses much of its opposition attempting to explain how it acted in good faith. Texas disagrees and reserves the right—if necessary—to show that CMS has consistently acted in bad faith and is currently mischaracterizing the parties negotiations. *See generally* Grady Decl.; Bilse Decl. But Texas did not come to the Court to get a declaration that CMS was acting in bad faith for its own sake; it did so to break the logjam preventing the flow of vitally needed Medicaid funding to its most vulnerable citizens. To the extent that CMS is now representing that certain

3

issues raised in Texas's motion have been resolved, Texas withdraws its request for the Court to assess those issues.

But CMS's belated abandonment of certain unsupportable grounds for refusing to approve Texas's SDPs does not negate the necessity of the Court's intervention. CMS is still refusing to approve CHIRP, RAPPS, and TIPPS—which dwarf the size of the approved SDPs—based on an erroneous assertion of authority to regulate agreements between private providers under 42 U.S.C. § 1396b(w)(4)(c) and 42 C.F.R. § 433.68(f)(3). *See* ECF 79 at 4, 11–17. Also, CMS maintains that it has fully complied with its obligations under the terms of the January extension that concern Texas's PHP-CCP submissions. *Id.* at 22–29. Because the former is legally improper and the latter is factually incorrect, the Court's intervention and guidance is still desperately needed.

## II. Withholding approval based on nonexistent authority is pretext and violates the preliminary injunction.

As Texas previously explained, neither 42 U.S.C. § 1396b(w)(4) nor 42 C.F.R. § 433.68(f)(3) provide a statutory or regulatory basis for CMS to deny approval of Texas's SDPs based on CMS's suspicion that private providers may have agreements amongst themselves that do not involve Texas or a unit of local government. *See, e.g.*, ECF 75 at 17–20; ECF 75-1, Ex. B at 69. CMS's reliance on this statute and regulation to deny approval of Texas's SDPs is therefore pretext and violates the preliminary injunction.

Defendants mischaracterize Texas's argument as limited to CMS's demand for attestations in order to suggest that the Court cannot provide meaningful relief, *see* ECF 79 at 11, but that is not Texas's argument. Texas objects to CMS's demand that HHSC obtain written attestations from all participating hospitals that they do not participate in arrangements involving the redistribution of Medicaid payments because the statute and rule in question *do not apply* to agreements solely between private providers. Texas moved the Court to "find that CMS's request . . . is beyond its

authority," ECF 75 at 15–16, and thus, that it was a pretext for denying Texas's SDPs in violation of the preliminary injunction, *id.* at 15–20. As long as CMS continues to refuse to approve CHIRP, RAPPS, and TIPPS based on its suspicion of the existence of lawful agreements between private providers, that is pretext, and CMS is violating the preliminary injunction.

### A. Texas's Local Provider Participation Funds

Beginning in 2013, like a number of other States, the Texas Legislature authorized certain units of local government to operate Local Provider Participation Funds ("LPPFs"). *See* Act of May 24, 2013, 83d Leg., R.S., ch. 1369, 2013 Tex. Gen. Laws 3630 (codified at Tex. Health & Safety Code ch. 288); Tex. Health & Safety Code ch. 288–300A. Pursuant to that authority, the unit of government may levy a specific tax on hospitals located within its jurisdiction and hold the revenues received from this tax in a dedicated-purpose account. *E.g.*, Tex. Health & Safety Code §§ 300.0102, 300.0151. Those revenues may be transferred to HHSC via intergovernmental transfer as a source of Texas's non-federal share in support of certain Medicaid programs. *Id.* § 300.0103(b)(1). The taxes the unit of government levies must be uniform and broad-based. *See id.* § 300.0151(b). HHSC's role is to ensure that the funds it receives from these units of government comply with federal requirements. *See id.* §§ 300.0053, 300.0154, 300.0156; Grady Decl. ¶ 28. As part of this role, HHSC ensures that neither Texas nor any unit of government imposing the tax provides, directly or indirectly, for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax. Grady Decl. ¶¶ 28–30. Contrary to Defendants' insistence, ECF 79 at 16, HHSC has no direct or specific knowledge that any private providers have entered into agreements to redistribute Medicaid funds, Grady Decl. ¶ 31.

### B. CMS's Purported Concern with Private-Provider Agreements

CMS asserts that it cannot approve CHIRP, RAPPS, and TIPPS because of "the apparent impermissibility of the intended source of the non-federal share for these payments," which it

5

contends "likely violates the Social Security Act's prohibition on hold harmless arrangements." ECF 79 at 11. CMS's asserted concern is that "*providers* participating in the LPPFs [are] likely engaged in a scheme of redistribution among the tax-paying entities resulting in a guarantee that all such entities would be held harmless from the burden of the tax." *Id.* at 13 (citing ECF 81 ¶ 42) (emphasis added). CMS asserts that its suspicion arose when it obtained a PowerPoint presentation discussing an arrangement between hospitals whereby some hospitals agreed to make payments to other hospitals. *See* ECF 81-7 at 16–17. That presentation explicitly notes that no unit of government is party to any such agreement. *Id.* at 17. Defendants offer no evidence showing any involvement by Texas or any other unit of government in Texas, but nevertheless, CMS contends such agreements (if they exist) would violate the prohibition of hold-harmless provisions in 42 U.S.C. § 1396b(w)(4)(C)(i) and 42 C.F.R. § 433.68(f)(3). ECF 79 at 12, 15-16. CMS is wrong.

### C. Agreements between private providers (to the extent they exist) are not hold-harmless provisions.

#### 1. The plain language of the Social Security Act does not prohibit private-provider agreements.

The Social Security Act's definition of a hold-harmless provision does not include agreements solely between private providers. When interpreting the meaning of a statute, the place to start is the statute's text. *See, e.g.*, *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021) ("[W]e start where we always do: with the text of the statute."); *United States v. Williams*, 993 F.3d 976, 980 (5th Cir. 2021) ("We start as always with the text of the statute."); *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013) ("The task of statutory interpretation begins and, if possible, ends with the language of the statute." (citing *In re Nowlin*, 576 F.3d 258, 261–62 (5th Cir. 2009))).

Each quarter, the federal government pays each State with an approved Medicaid plan "an amount equal to the Federal medical assistance percentage . . . of the total amount expended during

6

such quarter as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1). When calculating that amount, the Social Security Act provides that "the total amount expended during such fiscal year as medical assistance under the State plan . . . shall be reduced by the sum of any revenues received by the State (or by a unit of local government in the State) during the fiscal year" that fall into four specified categories. *Id.* § 1396b(w)(1)(A). Defendants rely on the third category, which concerns "revenues received by the State (or by a unit of local government in the State) . . . from a broad-based health care related tax, if there is in effect a hold harmless provision [as described in 42 U.S.C. § 1396b(w)(4)] with respect to the tax." *Id.* § 1396b(w)(1)(A), (w)(1)(A)(iii).

As indicated in § 1396b(w)(1)(A)(iii), § 1396b(w)(4) defines instances when "there is in effect a hold harmless provision." The instance on which CMS relies is when "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C)(i); *see* ECF 79 at 12. But the plain meaning of this language creates two key requirements: (1) the State or other unit of government imposing the tax must provide the payment, offset, or waiver; and (2) that payment, offset, or waiver must guarantee to hold taxpayers harmless. *See* 42 U.S.C. § 1396b(w)(4)(C)(i). The private-provider agreements that CMS believes may exist satisfy neither requirement.

As Defendants concede repeatedly in their opposition, CMS's purported concern relates to the potential that hospitals—not Texas or another unit of government in Texas—may be providing payments to each other. *See* ECF 79 at 13 ("CMS became aware . . . that *the providers* . . . were likely engaged in a scheme of redistribution *among the tax-paying entities* . . . ." (emphases added)); *id.* ("Those net loss entities receive a redistribution . . . *from other taxed entities* . . . ."

7

(emphasis added)); ECF 81 ¶ 41 ("[E]ach net loss hospital receives a redistribution payment *from hospitals* that benefit from increased Medicaid payments . . . ." (emphasis added)); ECF 81 ¶ 43 ("CMS later discovered . . . the existence of redistribution of Medicaid payments *among taxpaying providers* . . . ." (emphasis added)); ECF 81 ¶ 44 (complaining of "*taxpayer actions* that could include redirecting Medicaid payments to *other taxpayers*" (emphasis added)). To the extent any such arrangements exist, they are not hold-harmless provisions under 42 U.S.C. § 1396b(w)(4)(C)(i), which requires an act by "[t]he State or other unit of government imposing the tax."

Defendants imply—without evidence—that Texas is aware of arrangements between private providers and that such arrangements are somehow part of the design of LPPFs in Texas. *See* ECF 79 at 13–14 (asserting that Texas could have "ma[d]e CMS aware of the existence of such agreements," that such agreements are part of how "LPPFs are designed," that Texas could have denied their existence or corrected the description in the PowerPoint presentation, and that the arrangements have been made with Texas's knowledge). This is not true. Grady Decl. ¶ 31. Texas is not party to any such agreement, has not seen any such agreement, and has not endorsed any such agreement. *Id.* Indeed, to the extent any such agreements exist, as Defendants concede, they do not involve the State at all. ECF 79 at 13. And as the plain text of the statute reaches only payments, offsets, and waivers provided by the State or another unit of government, there is no reason for Texas to investigate their potential existence.

To the extent that Defendants imply that merely reimbursing private providers for qualified Medicaid expenditures satisfies the statute's requirement of State involvement in a hold-harmless provision, that is wrong. Texas lacks knowledge of any such private-provider agreements or their parties, terms, or enforceability. Grady Decl. ¶¶ 31–32. Without involvement by the State in those

8

agreements, the payment of Medicaid reimbursements alone cannot constitute a "*guarantee*[] to hold taxpayers harmless." *See* 42 U.S.C. § 1396b(w)(4)(C)(i) (emphasis added). A guarantee denotes an obligation by the guarantor. *See Guarantee*, Black's Law Dictionary (10th ed. 2014). As a non-party to any agreement that may or may not exist, Texas assumes no obligation regarding any reimbursements by private providers.

### 2.     CMS's rule also does not reach private-provider agreements.

Assuming that CMS *could* extend a statutory bar on hold-harmless provisions that involve States to include agreements that do *not* involve States, CMS has not done so. Instead, the relevant CMS rule closely tracks the statutory language and leads to the same conclusion—if the agreements CMS suspects of existing between private providers in fact do exist, they do not constitute hold-harmless provisions. 42 C.F.R. § 433.68(f) provides: "A taxpayer will be considered to be held harmless under a tax program if any of the following conditions applies." Three subsections follow. 42 C.F.R. § 433.68(f)(1)–(3). CMS relies on the third: "*The State (or other unit of government) imposing the tax provides* for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly *guarantees* to hold taxpayers harmless for all or any portion of the tax amount." *Id.* § 433.68(f)(3) (emphases added); *see* ECF 79 at 16 (citing this subsection); ECF 81 ¶ 42 (same). The same two requirements discussed above are also found here, and neither is satisfied for the same reasons.

Thus, CMS is left to rely (mistakenly) on the rule's preamble. ECF 79 at 16 (quoting Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685, 9694 (Feb. 22, 2008)). But the language of a rule's preamble cannot impose obligations that are inconsistent with its operative text. *See Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 997–98 (10th Cir. 2019); *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004). Moreover, the preamble does not actually support CMS's new and expansive view that a "direct guarantee can

9

be found" so long as "the taxpayer has 'a *reasonable expectation* that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments).'" ECF 79 at 16 (quoting 73 Fed. Reg. at 9694). This portion of the preamble actually supports Texas's interpretation.

   a. Defendants read the language they quote out of context. The complete sentence cited by Defendants states: "A direct guarantee will be found *when a State payment is made* available to a taxpayer or a party related to the taxpayer *with the reasonable expectation* that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." 73 Fed. Reg. at 9694 (emphases added). The logical reading of this sentence is that the "reasonable expectation" is that of the party making the payment when it makes the payment—i.e., the State—not the party receiving the payment—i.e., the taxpayer. This is confirmed by the preceding sentence, which explains that "[t]he clarification of the guarantee test is meant to specify that *a State can provide* a direct or indirect guarantee through a direct or indirect payment." *Id.* (emphasis added). If the State is providing the guarantee, its expectation is what matters. This is also confirmed two sentences later: "[T]he element necessary to constitute a direct guarantee is the provision for payment *by State statute, regulation, or policy*." *Id.* (emphasis added).

  Indeed, State action is a consistent theme of the preamble—as well as the operative text. CMS explains: "This regulation is intended to carry out" Congress's statutory purpose "by prohibiting FFP for health care-related taxes *where the state has implemented a hold harmless provision*." *Id.* at 9690 (emphasis added). CMS expressed concern about its prior ability to "anticipate every hold harmless arrangement that may be *implemented by States*." *Id.* (emphasis added). CMS explained that it attempted to clarify the rule "to explain that the hold harmless

10

standard applies to situations where *the state payments are made to third parties.*" *Id.* at 9691 (emphasis added). CMS also explained that its concern was with States that "recycle[d] monies through third parties" *Id.* at 9694. In CMS's own words: "We believe *'controlled or directed by the state' is a more accurate description* of the types of payments that will be considered in evaluating whether an impermissible hold harmless arrangement exists." *Id.* (emphasis added). And CMS was clear that it "use[d] the term reasonable expectation because we recognized that *state laws* were rarely overt in requiring that *state payments* be used to hold taxpayers harmless." *Id.* (emphases added). Nowhere does the preamble explicitly or implicitly indicate that private-provider agreements not involving a State may constitute a hold-harmless provision under the rule.

      b.    This is confirmed by examining the history of the 2008 rule, which was issued in response to a DAB finding that prior regulations "did not clearly preclude certain types of arrangements" involving States. *Id.* at 9685–86. Specifically:

> the States had created programs that imposed a tax on nursing homes and simultaneously created programs that awarded grants or tax credits to private residents of those nursing homes. These grants and/or tax credits were *designed by the States* to compensate private pay residents of nursing homes for the costs of the tax passed on to them by their nursing homes through increased charges. The DAB, however[,] found that CMS regulations did not clearly identify that such grants and tax payments amounted to hold harmless arrangements that would preclude FFP.

*Id.* at 9686 (emphasis added). CMS modified the rule so that it would cover "a State imposing a tax on nursing facilities" that also "provided grants or tax credits to private pay residents of those facilities that could be used to compensate those residents for any portion of the tax amount that the State has allowed to be passed down to them by their nursing homes." *See id.* As the preamble explains, "[a] direct guarantee would be found when a State payment is made available to a taxpayer or a party related to the taxpayer . . . in the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax." *Id.* This explanation

11

demonstrates that a State must make the payment, and it is the "reasonable expectation" of the State payor, not the recipient that is relevant.

        c.      CMS's current contention that the 2008 rule classifies private-provider agreements as hold-harmless provisions is also contrary to CMS's own acknowledgement in March 2019 that it lacked statutory authority to address these types of agreements among providers. *See* ECF 75-1 ¶ 34; *id.*, Ex. K (Kristin Fan email). That is why CMS attempted to amend the rule in 2019, *see* ECF 75 at 18, regardless of whether CMS incorrectly asserted in that failed attempt at amendment that the "proposed change . . . would not impose any new obligations or place any new restrictions on states that do not currently exist." Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63722, 63742 (Nov. 18, 2019); *see* Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5105, 5105 (Jan. 19, 2021) (withdrawing the proposed rule after receiving "approximately 10,188 individual comments," many of which cited CMS's lack of statutory authority for its proposals); *see also* Grady Decl. ¶ 42 (discussing Ex. B – Jan. 27, 2020 letter from Dan Tsai to CMS). As Dan Tsai told CMS in 2020 when he represented Massachusetts, the proposed rule: (1) "introduce[d] new state obligations," (2) "[i]f implemented, . . . would represent an unprecedented federal overreach," (3) "exceeds CMS' statutory authority," (4) included "provisions [that] are highly susceptible to arbitrary and capricious application," (5) "is not supported by the underlying statute," and (6) "includ[ed] reporting on business dealings of private entities that are not available to the state," among other problems. Ex. B at 1–2, 4.

      It is also presumably why CMS sought—unsuccessfully—to require Texas to include the attestation it currently demands in the January extension's STCs. ECF 75 at 19–20. And even now, CMS acknowledges that it lacks authority to compel a State to furnish attestations about the existence or content of such agreements. ECF 79 at 14; Ex. A at 7.

\*     \*     \*

In sum, CMS has no authority to prohibit private-provider agreements of the sort that it now contends prevent approval of Texas's SDPs. Its continued insistence that it cannot approve CHIRP, RAPPS, and TIPPS is pretext and violates the preliminary injunction by trying to impose a requirement that the parties considered *and rejected* during negotiation of the January extension.

**III.   CMS mischaracterizes STC 39 and the impact of its failure to comply with its terms.**

Defendants' opposition regarding the PHP-CCP is also filled with mischaracterizations and fails for at least three reasons. *First*, Defendants assert that "to the extent there was any 90-day clock" governing the review of Texas's proposed PHP-CCP payment protocol (i.e., Attachment T) "it reset on June 30th when Texas requested that CMS consider a modified protocol." ECF 79 at 24. Defendants' post hoc explanation of CMS's delay is irreconcilable with CMS's September 1 email, which states that the feedback is based on CMS's review of "Attachment T, for Demonstration Year 11." ECF 75-1, Ex. C. The protocol that Texas submitted on March 8, 2021, governs Demonstration Year ("DY") 11, whereas the revised Attachment T submitted on June 30, 2021, governs DY12. *See* ECF 75 at 23, 26 n.3, 27. STC 39 states that Attachment T "will be approved" and that "CMS and Texas will work collaboratively with the expectation of CMS approval of the protocol within 90 calendar days after it receives the Attachment T." ECF 29-1, Ex. C at 38. Waiting 177 days to provide initial feedback, ECF 75 at 23, does not satisfy this obligation.[3]

*Second*, Defendants suggest that CMS's excessive delay is not important because CMS "imposed no required date for approval" of Attachment T for DY11, "no penalty for Texas failing

---

[3] Defendants assert that "it was reasonable that CMS did not act upon the draft protocol in March . . . because the agency understood the January approval to be void at that time." ECF 79 at 24. But CMS did not send its rescission letter until April 16. ECF 1-2, Ex. D.

13

to obtain approval [of Attachment T] for DY11, and no requirement that Texas obtain approval for the DY11 protocol in advance of implementing the [PHP-CCP]." ECF 79 at 23; ECF 80 ¶ 9; *see also* ECF 79 at 25. However, this ignores a key point from Texas's motion—STC 39 requires approval of the application tools for DY11, and developing this tool requires an approved protocol. ECF 75 at 26. Moreover, "[w]ithout an approved payment protocol (Attachment T), Medicaid providers lack certainty about the requirements for reimbursement," and thus, they "may not incur the costs to provide services now." *Id.* at 25–26. Defendants ignore this economic reality.

*Third*, Defendants deny that CMS's demand that Texas conduct a time study and step down costs for the PHP-CCP would effectively cancel the first year of the PHP-CCP. ECF 79 at 27; *see* ECF 75 at 25. Again, Defendants are wrong. If a time study is imposed as a program requirement, data from the study would be required to claim reimbursement and, therefore, the requirement would effectively cancel the first year of PHP-CCP. Grady Decl. ¶ 11. CMS cites no statute, regulation, or STC that requires a time study. If a time study were required (it is not), by waiting until thirty days before the PHP-CCP start date, CMS effectively rendered implementation of the PHP-CCP impossible because of the time-study delays previously discussed. *Id.* ¶ 12. Again, that requirement is inconsistent with the January extension's STCs—and thus with the injunction that Texas seeks to enforce.

## CONCLUSION

For the reasons above and in Plaintiffs' motion, the Court should find that Defendants have violated the preliminary injunction and use its broad discretion to assess appropriate sanctions that will ensure that CMS conforms its conduct with the preliminary injunction. Prompt Court action is respectfully requested in light of the November 29 deadline imposed by CMS's November 15 letter.

| | |
|---|---|
| Date: November 22, 2021 | Respectfully submitted. |
| KEN PAXTON<br>Attorney General of Texas | JUDD E. STONE II<br>Solicitor General<br>*Lead Counsel*<br>Texas Bar No. 24076720<br>Judd.Stone@oag.texas.gov |
| BRENT WEBSTER<br>First Assistant Attorney General | |
| GRANT DORFMAN<br>Deputy First Assistant<br>  Attorney General | LANORA C. PETTIT<br>Principal Deputy Solicitor General<br>Texas Bar No. 24115221 |
| LESLEY FRENCH<br>Chief of Staff | WILLIAM T. THOMPSON<br>Principal Deputy Chief, Special Litigation Unit<br>Texas Bar No. 24088531 |
| PATRICK SWEETEN<br>Deputy Attorney General for<br>  Special Litigation | BENJAMIN D. WILSON<br>Deputy Solicitor General<br>Texas Bar No. 24084105 |
| | */s/ Jeffrey M. White* |
| OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548 (MC-059)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1700<br>Fax: (512) 474-2697 | JEFFREY M. WHITE<br>Special Counsel<br>Texas Bar No. 24064380 |
| | LEIF A. OLSON<br>Special Counsel<br>Texas Bar No. 24032801 |
| | *Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I certify that on November 22, 2021, this document was filed with the Court through its CM/ECF service, which served a copy on all counsel of record.

*/s/ Jeffrey M. White*
JEFFREY M. WHITE

15