UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

No. 6:21-cv-00191

**State of Texas et al.,**
*Plaintiffs*,
v.
**Chiquita Brooks-LaSure et al.,**
*Defendants.*

# OPINION AND ORDER ON ENFORCEMENT OF PRELIMINARY INJUNCTION

For the following reasons, plaintiffs' motion to enforce the preliminary injunction (Doc. 75) is granted in part and otherwise denied in part without prejudice.

## Background

In August 2021, the court enjoined defendants to treat Texas's Medicaid demonstration project, Waiver Number 11-W-00278/6, as remaining in effect as it existed on April 15, 2021 (the day before CMS rescinded it). *See* Doc. 47. That demonstration project includes special terms and conditions 30 through 34, which bind CMS to certain procedures in reviewing Texas's request for approval of state directed-payment programs (SDPs). *See* Doc. 29-1 at 47–49.

That same month, the court issued its Order to Clarify Sanctions Standards. Doc. 40. In it, the court interpreted aspects of special terms and conditions 30 through 34. Given their requirement of collaborative work to consider the programs slated to begin in short order, CMS could not justify an open-ended gap in communications after the state responded to a CMS request for information. *Id.* at 3.

Now, Texas again asks the court to order defendants to comply with their obligations under the special terms and conditions of the demonstration project. Doc. 75 at 33. Texas objects that

defendants have not issued a final decision on several SDPs and are delaying that decision based on an unreasonable, pretextual legal position. Originally, that dispute concerned five SDPs. Two have now been approved by CMS. *See* Doc. 84 at 7. So the current dispute concerns three remaining proposed SDPs: *Rural Access to Primary and Preventative Services*, *Texas Incentives for Physician and Professional Services*, and *Comprehensive Hospital Increased Reimbursement Program*. The court held a hearing on the motion two days ago and now issues its ruling.

**Analysis**

In response to Texas's motion to enforce the injunction, CMS makes two main points. First, CMS states that it has not issued a final decision on the last three SDPs because it believes that an arrangement among private hospitals creates a prohibited "hold-harmless" guarantee, which requires CMS to withhold federal funding. *See* 42 U.S.C. § 1396b(w)(1)(A)(iii), (4)(C); 42 C.F.R. § 433.68(f). Texas replies that, even if such a private arrangement exists, it does not trigger the statute's preclusion of federal funding as legal matter. Texas further argues that CMS's position is unreasonable and a pretext to excuse vexatious delay.

Second, CMS argues that it can delay a final decision while it considers the hold-harmless issue. The agency argues that the applicable special terms and conditions do not require it to issue a final approval or disapproval of an SDP by any specific date.

As explained below, CMS's stated reason for failing to issue a final decision on these SDPs rests on a legal interpretation on which the parties have a concrete dispute. *See infra* Part I. Although the relevant special terms and conditions do not give a specific calendar date by which a final decision must issue, they do require "collaborative work" in considering a proposed SDP, which must continue "until final consideration of the proposal." Doc. 29-1 at 48–49 ¶¶ 30, 34. Now that the parties are at a loggerhead on a dispositive point of law, CMS must promptly issue a final decision on the pending SDP proposals.

## I. The statutory and regulatory framework on hold-harmless guarantees presents a dispositive legal question on which the parties are at an impasse.

CMS currently has only one remaining reason for not approving the three relevant SDPs. The agency points to a statutory limitation on state guarantees that healthcare providers will be held harmless for certain taxes they pay to fund Medicaid. As explained below, the parties' legal dispute on interpretation of that statute would dispose of CMS's objection if resolved in Texas's favor.

### A. Medicaid funding generally

First, a review of the basics. Medicaid is a program of federal grants to states for medical assistance to people with limited resources. The Social Security Act sets forth requirements for participating states, which must submit a state plan that details how those requirements will be met.

Once a state plan is approved, the state administers Medicaid with little to no federal oversight. But the Medicaid program is jointly financed by the federal and state governments. The federal government pays its share of medical-assistance costs to a state, on a quarterly basis, according to a variable-matching formula set forth in sections 1903 and 1905(b) of the Social Security Act, codified at 42 U.S.C. §§ 1396b and 1396d(b), respectively.

The rate at which the federal government matches a state's Medicaid expenditures for covered services is at least 50%. *See* 42 U.S.C. § 1396d(b) (setting floor); *see also* Congressional Budget Office, *Medicaid Baseline Projections July 2021*, https://www.cbo.gov/system/files/2021-07/51301-2021-07-medicaid.pdf ("On average, the federal government pays for about 65 percent of Medicaid services, depending on the year.").

### B. Earlier statutory provisions on federal matching

Using a system of matching funding creates an important threshold question: What funds count as state medical-assistance

expenditures that trigger matching federal dollars? Federal law reflects compromises over the years and across different topics.

One example: Can hospitals donate money to a state's Medicaid fund to be counted in the state share that receives matching federal dollars? The current answer looks at whether the donated money is a bona fide donation that the state spends freely. *See* 42 U.S.C. § 1396b(w)(2)(A), (B). A donation that the state spends by sending the money right back to the donating hospital cannot inflate the state expenditures that receive matching federal dollars. *Id.*

What about taxes paid by hospitals, as opposed to donations by hospitals? Section 1902(t) of the Social Security Act, codified at 42 U.S.C. § 1396a(t), says that nothing authorizes the agency to limit payments to a state for expenditures "attributable to taxes of general applicability" imposed on the provision of medical items or services. In other words, a state may count, as part of its Medicaid spending that gets federally matched, the proceeds of general taxes on healthcare providers.

But an exception exists. A useful examination of its history begins on New Year's Day in 1991. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4701(c), 104 Stat. 1388. On that date, a statutory amendment took effect that allowed the agency to limit payments to a state "as provided in section 1903(i)." *Id.* § 4701(b)(1) (adding 42 U.S.C. § 1396a(t)). Section 1903(i), codified at 42 U.S.C. § 1396b(i), was amended to allow the agency to limit federal payments to a state:

> (10) with respect to any amount expended for medical assistance for care or services furnished by a hospital, nursing facility, or intermediate care facility for the mentally retarded to reimburse the hospital or facility for the costs attributable to taxes imposed by the State solely with respect to hospitals or facilities.

Pub. L. No. 101-508, § 4701(b)(2). In other words, state revenues from a generally applicable tax on healthcare providers could get federal matching under section 1902(t). But, under the section

1903(i) exception, states would not get federal matching for their revenues from taxes solely on certain healthcare providers, where the state spent those revenues by simply reimbursing those providers for their taxes.

**C. The agency's initial rule on matching tax revenue**

Shortly after that legislation, the agency published its first rule addressing the issue. *See* Medicaid Program; State Share of Financial Participation, 56 Fed. Reg. 46,380, 46,381 (Sept. 12, 1991) (noting that, at the time, there were "no regulations limiting the State's use of any tax revenue for its share in the costs of the Medicaid program"). The rule sought to align the treatment of donations made by a hospital and taxes paid by a hospital. *Id.* at 46,382 (stating that provider-specific taxes "might be described as coerced donations").

An example shows the agency's thinking. Suppose a state wanted to pay a hospital bill to a Medicaid beneficiary of $100. The federal share of that payment, assuming a 75/25 federal/state match, would be $75. If the state received a $25 donation from the hospital, to be used as the state's share of the payment, the state could draw down the $75 federal share and pay the hospital the $100 bill without the state "making an expenditure of its own." *Id.* The $25 donation, which was sent right back to the hospital, would be only a "nominal" expenditure by the state. *Id.* The same agency rationale applied if a 25% tax were imposed on the hospital's $100 bill—and, generally, whenever a tax was imposed specifically on Medicaid receipts by healthcare providers. *Id.*

Under that rule, a healthcare provider was considered to be reimbursed for its costs "attributable" to a state tax on the provider whenever there was a "linkage" between a state payment to the provider and the state's tax program. *Id.* at 46,385. The rule was to take effect on New Year's Day in 1992. *Id.* at 46,381.

A congressional subcommittee promptly held two oversight hearings, at which the relevant administrator conceded that "our rulemaking is disruptive and controversial." H.R. Rep. No. 102-310, 1991 U.S.C.C.A.N. 1413, 1991 WL 245200 (Nov. 12, 1991).

Shortly afterwards, the agency withdrew its original rule and published a new final rule. *See* Medicaid Program; State Share of Financial Participation, 56 Fed. Reg. 56,132, 56,133 (Oct. 31, 1991). Like the prior rule, the new rule was to take effect on New Year's Day in 1992. *Id.* at 56,132.

The new rule was substantially similar to the original rule with respect to healthcare-provider-specific taxes. A disqualifying "linkage" between a provider-specific tax program and a state's payments to providers would exist if any of three things were true:

- an increase in state payments to a provider "is related integrally" to the state tax program;
- a provider is "held harmless" for its tax payments by "an effective guarantee" that its enhanced Medicaid payments from the state will cover the cost of taxes; or
- a provider's tax payment "is correlated significantly" to the state's payment to the provider.

*Id.* at 46,385. If such a "linkage" existed, federal matching would not be allowed for the lesser of (1) the total provider-specific tax received by the state or (2) the amount of reimbursement paid by the state to the provider and attributable to such tax. *Id.*

**D. Congress's response to the agency's initial rulemaking**

Due to concerns about the statutory basis for the agency's rule, as well as its imminent effective date, Congress nullified the rule. *See* Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102-234, § 2(c), 105 Stat. 1793 (Dec. 12, 1991) (declaring the rule nullified).

At the same time, Congress amended the law to rework the agency's authority to limit federal matching. *Id.* § 2(a). Congress replaced the disallowance authority previously enacted as section 1903(i) of the Social Security Act with a new disallowance authority added as section 1903(w) of the Act. *Id.* (adding subsection (w), codified at 42 U.S.C. § 1396b(w)). That amended authority, still in effect today, provides that:

> Notwithstanding the previous provisions of this section, for purposes of determining the amount to be paid to a State (as defined in paragraph (7)(D)) under subsection (a)(1) for quarters in any fiscal year, the total amount expended during such fiscal year as medical assistance under the State plan (as determined without regard to this subsection) shall be reduced by the sum of any revenues received by the State (or by a unit of local government in the State) during the fiscal year—
>
> . . .
>
> (iii) from a broad-based health care related tax, if there is in effect a *hold harmless provision* (described in paragraph (4)) with respect to the tax; . . . .

42 U.S.C. § 1396b(w)(1)(A) (emphasis added).

The amendments then provide, in language still in effect today as paragraph (w)(4), three ways to find a "hold harmless provision" with respect to a state tax on healthcare items or services:

> (A) "The State or other unit of government imposing the tax provides (directly or indirectly) for a payment (other than under this title) to taxpayers and the amount of such payment is positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan."
>
> (B) "All or any portion of the payment made under this title to the taxpayer varies based only upon the amount of the total tax paid."
>
> (C) "The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax."

Pub. L. No. 102-234, § 2(a), 105 Stat. 1793. If a hold-harmless provision exists as to a healthcare-related tax, the federal matching amount is reduced by the amount of the tax. *Id.*

**E. The agency's subsequent rulemaking and its limited adoption by statute**

Congress has not since changed the text of those three definitions of a disqualifying hold-harmless provision. But Congress has clarified the third definition by adopting part of agency rulemaking on the matter. *See* Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, § 403, 120 Stat. 2922 (Dec. 20, 2006) (keeping that definition as the first clause of subparagraph (C) and adding a second clause adopting a specific federal regulation).

**1. Implementing regulations**

After the statutory amendments that took effect in 1992, the agency issued implementing regulations. *See* Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 58 Fed. Reg. 43,156 (Aug. 13, 1993) (final rule); Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 57 Fed. Reg. 55,118 (Nov. 24, 1992) (interim final rule).

The regulations explain that any healthcare-related taxes must meet several requirements to avoid a reduction in matching federal dollars. Specifically, such taxes are permissible only if the taxes are broad-based (as defined by law), the taxes are uniformly imposed, and "the tax program" does not hold taxpayers harmless for their tax costs. 57 Fed. Reg. at 55,141.

The statute's hold-harmless definition was incorporated as subsection (f) of 42 C.F.R. § 433.68, which set out the three ways of finding a "hold harmless provision" for a state tax program. *Id.* at 55,142. The preamble to that regulation provided the agency's thinking on its application and on the regulation's addition of a further detail.

**a.** As to the first hold-harmless definition, the preamble gave examples of several fact patterns that the agency believed met the definition. That definition covers a state payment to a taxpayer

that is "positively correlated" to the healthcare-related tax paid by the taxpayer. 42 U.S.C. § 1396b(w)(4)(A).

One example was of a state that taxed nursing homes based on their charges to their residents. 57 Fed. Reg. at 55,129. If the state separately gave some of that tax revenue to private-pay residents (i.e., non-Medicaid residents), as grants to compensate them for additional charges passed on to them by nursing homes because of the tax, "the State is using non-Medicaid funds [the grants] to compensate nursing homes, indirectly [through residents], for the cost of the tax imposed on private charges." *Id.* This, the agency argued, would satisfy the first hold-harmless definition.

**b.** The regulation also added detail on the third hold-harmless definition. The agency's concern in doing so was the situation in which states levy "excessive amounts of taxes" on providers that furnish services predominantly to Medicaid recipients. *Id.*

To take an extreme case, if 100% of a healthcare provider's clients received Medicaid reimbursement that covered all of their charges from that provider, then 100% of any increase in a tax imposed specifically on that provider's charges to its clients would flow back to that provider in the form of increased Medicaid reimbursement. *Id.* The increased Medicaid payments to the provider would be funded with federal-matching dollars, but the state's share of those payments would come from a tax that cost the state's businesses nothing, in the end, because the provider was made financially whole. A state would face no political resistance to raising such taxes from which its businesses felt no burden. The regulation referred to that as a hold-harmless "guarantee" to the provider, albeit a non-explicit or indirect guarantee. *Id.*

To address that concern, the regulation set out a test for when a "disproportionate" tax on certain healthcare providers would qualify as a hold-harmless "guarantee." *Id.* If the tax on the providers' revenue was at or below 6% (selected as the national average sales tax), the tax would be assumed permissible. *Id.* If the tax was above 6%, however, "a numerical test would deem a hold harmless situation to exist when Medicaid rates are used to repay

(within a 12-month period) at least 75 percent of providers for at least 75 percent of their total tax cost." *Id.* That two-prong test for the third hold-harmless definition was implemented as paragraphs (3)(i) and (3)(ii) of 42 C.F.R. § 433.68(f). *Id.* at 55,142–55,143.

In the Tax Relief and Health Care Act of 2006, Congress endorsed the 6% threshold test for most years, adopting by reference the test in paragraph (3)(i) of 42 C.F.R. § 433.68(f). Pub. L. No. 109-432, § 403, 120 Stat. 2922 (Dec. 20, 2006). For a period in the near-term future, however, Congress directed a lower 5.5% threshold for prong one of the indirect-guarantee test. *Id.* The purpose of that amendment was "[t]ax [r]elief," *id.* § 1, premised on the idea that states would likely lower taxes on certain healthcare providers as to fall within the lower threshold for the safe harbor. Congress did not speak to the issue of a direct guarantee, as opposed to an indirect guarantee, or otherwise modify the relevant statutory text.

**2. Departmental Grant Appeals Board ruling**

Starting in 1994, certain agency officials began questioning state programs providing for either grants to private-pay residents in nursing homes or tax credits for such patients. *In re: Hawaii Dep't of Human Servs.*, Docket No. A-01-40 (lead), Decision No. 1981 (Dep't Appeals Bd., Appellate Div. June 24, 2005), *available at* https://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2005/dab1981.htm. In 2001, the agency issued a formal "disallowance" decision as to past federal funding sent to five states that had such programs. *Id.* at *1.

The states filed an administrative appeal, and the reviewing board reversed the disallowances in their entirety. *Id.* at *47. The board ruled that the states' programs could not be found to meet either the first or third test for a "hold harmless provision." *Id.* at *2. As to the first test, the agency had not performed a statistical "positive correlation" analysis and had impermissibly relied on subjective as opposed to objective factors. *Id.*

As to the third test, the board rejected the agency's argument that the states' programs "contained indirect guarantees (or otherwise indirectly held taxpayers harmless)." *Id.* at *3. The board noted that the states' grant or credit programs "provided no explicit *or* direct assurance of any payment to a taxpayer provider." *Id.* (noting that the agency "does not point to any wording in the States' programs that could reasonably constitute an explicit or direct assurance of any payment to the provider taxpayer"). The board concluded that reading the regulations as allowing the agency "to examine the use of a payment without regard to the two-prong test where there is no explicit guarantee" is, not just incorrect, but "unreasonable." *Id.* at *23.

The board rejected the agency's argument that the third hold-harmless definition was a "broad catch-all provision," as that view is "contradicted by the history of the provision and the implementing regulation." *Id.* at *3. The agency argued that, even if state grants to nursing-home residents were not an indirect "guarantee," they were at least an "indirect payment" to the nursing homes. *Id.* at *24. The board conceded that, "at first blush," the third definition "seems to apply to any payment that guarantees to return to a provider even a small part of the tax." *Id.* But that view was untenable, the board explained:

> [T]he regulatory history as a whole, however, makes it clear that the regulatory choice to distinguish explicit and indirect guarantees and to adopt the two-prong test was made in order to reconcile this broad language with the statement in section 1903(w)(4) of the Act that the hold harmless provisions 'shall not prevent use of the tax to reimburse health care providers in a class for expenditures under this title' and in order to permit the states some flexibility in designing their tax and payment programs.

*Id.*

The board thus rejected something very close, if not identical, to the interpretation of the third hold-harmless definition that the agency advances here. Here, CMS argues that a direct

"guarantee" of being held harmless for paying the relevant tax exists because Texas's Medicaid payments to some hospitals have the effect, through private arrangements not compelled by the state, of holding other hospitals harmless for the tax. Similarly, in the prior case, the agency told the board "that all it needs to do to show a direct guarantee is to see if, on the face of the State statute, there was a direct or indirect payment made, and whether the effect of that payment was to make State money available to reimburse nursing homes for a portion of the tax costs." *Id.*

The board rejected that argument based on plain meaning and the history and context of the third hold-harmless definition. *Id.* As to plain meaning, the board noted the dictionary definition of "guarantee" as something that "ensures" a particular outcome. *Id.* So if a state government "provides" for a payment that "guarantees" indemnification, 42 U.S.C. § 1396b(w)(4)(C), the board expected to see indemnification that is "legally enforceable." Decision No. 1981, *supra*, at *25. The board also noted that the statute allows a reduction in federal funding based on a hold-harmless "provision." *Id.* at *5 (quoting 42 U.S.C. § 1396b(w)(1)(A)). So the board looked for the claimed hold-harmless guarantee "in these States' laws." *Id.* at *25.

The board noted, as examples of a direct guarantee, that an "assurance . . . under the State programs" at issue or "a State law" would suffice. *Id.* at *24–25. But even if a state payment to a private party was used to pay a healthcare provider and thus "could be considered an *indirect payment*" to the provider, the lack of an "assurance" of that indirect payment meant that the state had not provided for a payment that was a "*direct guarantee*" of indemnification. *Id.* at *25 (emphases added).

**3. Subsequent regulatory changes**

After that board decision, the agency again changed its hold-harmless regulations. *See* Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685 (Feb. 22, 2008). One change merely reflected the 2006 tax-relief bill and is not relevant here.

*See id.* at 9686. Other changes purported to "clarify" the first and third tests for a hold-harmless provision. *Id.*

As to the first definition—which focuses on a "positive correlation" between a healthcare provider's tax payment and a state's payment to that taxpayer—the agency moved away from a mathematical test for such a correlation. *Id.* at 9691. Finding imprecise its prior statements that the term has a statistical meaning, the agency amended the regulation to state that the term means any positive relationship, even if not consistent over time. *Id.* at 9699.

As to the third definition—upon which CMS relies here—the agency distanced itself from the logic of the 2006 board decision and also from the statutory text. The statutory definition covers the situation where a government provides for a certain financial measure "that guarantees" indemnification:

> The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver *that guarantees* to hold taxpayers harmless for any portion of the costs of the tax.

42 U.S.C. § 1396b(w)(4)(C)(i) (emphasis added). The amended regulation, however, covers the situation where a government provides for a certain financial measure "such that" the measure guarantees indemnification:

> The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver *such that* the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

42 C.F.R. § 433.68(f)(3) (emphasis added).

That change removes the statute's tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for. In contrast, the amended regulation merely requires that the government provide for a specified financial measure "such that" the measure has a result. *Id.*

The regulation thus loosens the statute's tight relationship between the result and what the government provides for.

That was deliberate. The agency noted the board's 2006 decision, which relied on Congress's phrasing of the third definition and rejected the agency's argument that it was a broad catch-all. 73 Fed. Reg. at 9685–9686. The agency changed the regulatory definition from the statutory definition, however, arguing that this allowed the third definition to focus on the "reasonable expectation" about the "result" of a state payment, as opposed to merely what *the state provided* when making a payment. *Id.* at 9694–9695.

Several commenters objected that the term "reasonable expectation" was too broad or subjective. *Id.* at 9694. But the agency rejected those concerns. As its reason for rejecting those comments, the agency noted a specific result that it thought should obtain on a certain fact pattern and justified the new approach because it would allow that result. *Id.*; *cf.* Logically Fallacious, *Circular Reasoning*, https://www.logicallyfallacious.com/logicalfallacies/Circular-Reasoning.

**F. The parties' interpretive dispute regarding 42 U.S.C. § 1396b(w)(4)(C) would dispose of the agency's sole remaining objection.**

CMS states that the three unapproved SDPs are to be funded by Texas through a state tax regime that likely disqualifies the state from federal matching funds because of a hold-harmless provision. Doc. 79 at 15–16.[1] CMS's sole remaining objection to approving those three SDPs is that funding them federally is likely prohibited by 42 U.S.C. § 1396b(w)(4)(C). *Id.* (relying on the third hold-harmless definition under the statute and regulation).

**1.** Texas proposes to collect the funds for those SDPs pursuant to chapter 300 of the Texas Health and Safety Code. That chapter allows counties, municipalities, and hospital districts in Texas to "administer a health care provider participation program

[1] Citations to the parties' filings are to the page numbers assigned by ECF, not those assigned by the party in the PDF. In the future, the parties can avoid complexity by beginning their documents with page number 1.

to provide additional compensation to certain hospitals located in the [jurisdiction] by collecting mandatory payments . . . to be used to provide the nonfederal share of a Medicaid supplemental payment program and for other purposes." Tex. Health & Safety Code § 300.0001.

If the governmental unit votes to authorize such a local provider participation fund (LPPF), that governmental unit assesses a mandatory payment against each hospital in the jurisdiction. *Id.* § 300.0151(a). Those assessments are uniformly proportionate with the amount of net patient revenue generated by each hospital and may not exceed 6% of net patient revenue. *Id.* § 300.0151(b), (c). So they are intended to fall within the federal statute's 6% safe harbor from a finding of an indirect guarantee of indemnification.

**2.** There is always a possibility that some hospitals in a jurisdiction treat more Medicaid recipients than do other hospitals. So hospitals in a given jurisdiction face at least a possibility that their increase in Medicaid earnings under an LPPF would not offset their costs of paying LPPF assessments.

CMS relays that hospitals in certain Texas jurisdictions have likely entered into private agreements amongst themselves to mitigate that financial risk of an LPPF. Doc. 79 at 16; Doc. 79-1 (Giles Decl.) at 20–21. Under those private agreements, a hospital whose increased Medicaid earnings under an LPPF do not exceed its increased taxes under the LPPF will be paid, from the other hospitals in the jurisdiction, an amount generally equal to 105% of its total tax cost. Doc. 79-1 at 21 (CMS's evidence). Essentially, rather than each hospital paying a third-party insurer to insure against the financial risk noted, the hospitals have self-insured.

CMS states that it has asked Texas for details about those private agreements for hospitals to self-insure against that risk of loss. *Id.* at 22. But Texas answers that it does not restrict how hospitals use their payments for serving Medicaid beneficiaries after the hospitals have received those payments. *Id.* at 23.

More fundamentally, Texas argues that federal law does not allow CMS to limit federal funds even if there are the private

arrangements described by CMS. Doc. 84 at 8. Texas argues that, without evidence that a unit of government is involved in the indemnity agreements found by CMS, they are not attributable to the state for purposes of disallowing federal funds. *Id.* at 10. Texas acknowledges, of course, that the hospitals are paid for serving Medicaid recipients. But it argues that any private indemnity arrangements by those hospitals do not involve *the state* "providing for" payments that "guarantee" indemnity merely because the hospitals earn money from Medicaid. *Id.* at 10–17.

CMS responds by relying on the "reasonable expectation" language in the preamble to its 2008 amendments of the relevant regulation. Doc. 87 at 12. It argues that the "reasonable expectation" discussed in the preamble need not be the state's expectation; apparently, any expectation suffices so long as the agency finds it "reasonable." *Id. But see Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019) (holding that a preamble to a regulation is "not binding and cannot be read to conflict with the language of the regulation itself"). Texas responds that the statute and even the amended regulation still require a "guarantee" of indemnity tied to the state, which is not present here since Texas has no involvement with any risk-spreading agreements among private providers. Doc. 84 at 9.

The court does not see a need to resolve that interpretive dispute at this time. It suffices to note that the dispute has solidified, is legal in nature, and is at the heart of CMS's final objection to approving the three proposed SDPs. If Texas's view is correct, the private arrangement that CMS describes would not disqualify the state from receiving federal funds. If CMS's view is correct, Texas has been given a chance to deny the existence of the private agreements and payments and has not done so. Texas thus agreed at the hearing that it would prefer a final decision on SDP approval as opposed to continued agency delay.

## II. In the context of the dispute here, the special terms and conditions require CMS to promptly issue a final decision on SDP approval.

It was over a year ago—in January 2021—that CMS entered into the special terms and conditions governing its review of the SDPs. Doc. 38 at 2. That January 2021 agreement concerns SDPs meant to go into effect that fall (in September 2021) and to last for one year. Doc. 29-1 at 47 ¶ 29. The agreement thus imposed tight timelines for CMS's initial review, requests for additional information, review of the state's response to those requests, and additional processing. *Id.* at 48–49 ¶¶ 30–34.

In August 2021, on expedited review, Texas obtained a preliminary injunction compelling CMS to abide by those special terms and conditions. Yet Texas now finds itself, more than six months into the contemplated one-year term of the proposed SDPs, without a final decision on their approval.

To be sure, the special terms and conditions require CMS to work collaboratively with the state to *consider* approval of an SDP and do not expressly require *approving* any particular SDP. But the special terms and conditions, in the context of this dispute, do compel CMS to at least *make* a decision forthwith now that the "collaborative" review process has lasted more than half of the lifespan of the proposed SDPs themselves. Any further delay in reaching a final decision, despite a dispositive legal issue now being intractably contested, would open the door to CMS simply delaying for the entire one-year duration of the proposed SDPs. That would not be the required collaborative process.

The court takes no position at this juncture on whether CMS's final decision should deny approval of the SDPs, approve the SDPs unconditionally, or approve the SDPs while reserving the prospect of future disallowment proceedings despite the large size of the SDPs. *See generally* 42 C.F.R. § 430.42 (disallowment procedure). But the time is ripe, under the special terms and conditions that CMS has been enjoined to follow, for CMS to issue a final decision on the SDPs.

**Conclusion**

Plaintiffs' motion to enforce is granted as to compelling CMS to promptly issue a final decision as to those SDPs. It has been months since CMS understood Texas's legal position and the absence of any state attestation about the existence of private indemnity agreements between healthcare providers in LPPF jurisdictions. *See* Doc. 84-1 at 14–15 ¶¶ 42–43. Given CMS's insistence during negotiations that Texas respond within 14 calendar days, *id.* at 15 ¶ 43, the court interprets the "collabortive[]" requirement of the special terms and conditions as requiring CMS, in the present posture, to issue a final decision on the three remaining proposed SDPs by March 25, 2022, which is 14 days from this order. Sanctions may issue for CMS's noncompliance with the special terms and conditions as interpreted herein.

The court has considered whether to impose sanctions for CMS's delay in issuing such a final decision. But the court does not act at this time on plaintiffs' argument, extensively documented, *e.g.*, Doc. 84-1, that CMS's negotiations to date have been some combination of internally contradictory, not in robust cooperation, or based on an exercise of putatively broad authority that is better explained as pretext than principled. That history and those arguments can be considered by any judicial or administrative tribunal reviewing any final CMS decision denying approval of the SDPs or any future CMS disallowance decision based on the agency's hold-harmless rationale. Plaintiffs' motion, however, is denied as to that further argument without prejudice to its reassertion in the future.

*So ordered by the court on March 11, 2022.*

J. CAMPBELL BARKER
United States District Judge